**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| GALLERIA 2425 OWNER, LLC, | ) |  |
|  | ) | Case No. 23-34815 |
| Debtor. | ) |  |
|  | ) |  |

**TRUSTEE'S OMNIBUS REPLY TO RESPONSES TO OBJECTIONS TO CLAIM OF INSIDERS**

Christopher R. Murray, the chapter 11 trustee (the "Trustee") in the above-captioned chapter 11 case, hereby replies as follows to the (a) Response to Trustee's Claim No. 7 of 2425 WL, LLC [ECF No. 595] (the "Claim No. 7 Response"), (b) Response to Trustee's Omnibus Objection to Claims No. 21 and 22 of Ali Choudhri as to Claim No. 21 (Tax Liens) [ECF No. 591] (the "Claim No. 21 Response"); Response to Trustee's Omnibus Objection to Claim Nos. 21 and 22 of Ali Choudhri as to Claim No. 22 (Reimbursement) [ECF No. 592] (the "Claim No. 22 Response"); (c) Response to Trustee's Omnibus Objection to Claim Nos. 23 and 24 of Jetall Capital, LLC as to Claim No. 23 (Tenant Improvement Allowance) [ECF No. 593] (the "Claim No. 23 Response"); and (d) Response to Trustee's Omnibus Objection to Claim Nos. 23 and 24 of Jetall Capital, LLC as to Claim No. 24 (the "Claim No. 24 Response"):

**PRELIMINARY STATEMENT[1]**

1.      The Trustee objected to various proofs of claim filed by 2425 WL LLC, Ali Choudhri and Jetall Capital on June 3, 2024. These entities, represented by a single attorney, filed responses to the Trustee's objections to claim on July 3, 2024. Because of the overlap in certain

---

[1] Capitalized used but not defined in this section have the meanings ascribed to them in other sections of this reply.

issues, and for ease of reference for the Court and opposing counsel, the Trustee replies to the responses together.

2.  Each of the Trustee's objections should be sustained. As set out below, the presumption of validity has been rebutted with respect to each of the asserted claims. Claim No. 7 (2425 WL LLC) and Claim No. 21 (Choudhri—Tax Loan Claim) are facially unsupportable based on the pleadings. Claim No. 23 (Jetall Capital—Lease Claim) and Claim No. 24 (Jetall Capital—Management Leasing Agreement Claim) fail to meet the requirements of Bankruptcy Rule 3001(c)(1), are inconsistent with Debtor's schedules, and it is Jetall Companies that is the correct counterparty to the relevant agreements. Claim No. 22 (Choudhri—Reimbursement Claim) has been rebutted by the Trustee's allegations and inconsistency between the asserted amount of the claim and the attached documentation and should be disallowed even if advances by Choudhri are demonstrated because the payments constitute equity contributions and were made in exchange for personal benefits received by Choudhri. While the claimants could potentially present evidence to meet their burden of proof with respect to Claim Nos. 22, 23, and 24 the Trustee does not believe that any credible evidence will be adduced by the claimants.

<div align="center">

**OVERLAPPING/COMMON ISSUES**

</div>

**A.  Standard regarding rebutting the prima facie validity of proofs of claim.**

3.  Each of the responses contains a recitation regarding the prima facie validity of the proofs of claim and the burden shifting under Bankruptcy Rule 3001(f). However, this summary ignores that the evidence necessary to rebut the presumption depends on the evidentiary heft of the proof of claim. *In re High Standard Mfg. Co.*, 2016 Bankr. LEXIS 3701, at *6-7 (Bankr. S.D. Tex. Oct. 13, 2016) (citing *In re Wyly*, 552 B.R. 338, 375 (Bankr. N.D. Tex. 2016)).

4.  No evidence is necessary to rebut the presumption of validity where the proof of claim has no evidentiary weight. This is so where the proofs of claim do not contain supporting

<div align="center">

2

</div>

000486

documents required to be attached by Bankruptcy Rule 3001(c), *e.g.*, *Pearl Res. Operating Co., LLC v. Transcon Cap., LLC (In re Pearl Res. LLC)*, 2024 Bankr. LEXIS 405, at *21 (Bankr. S.D. Tex. Feb. 20, 2024) or where legal arguments based upon the contents of the claim and its supporting documents undercuts the validity of the claim, *e.g.*, *In re Tug Robert J. Bouchard Corp.*, 2023 U.S. Dist. LEXIS 102356, at *6 (S.D. Tex. June 13, 2023).

5.      Further, an objection to claim can rebut the prima facie validity of a proof of claim with specific and detailed allegations to put the validity of the claim issue. *E.g.*, *id.*; *In re High Standard Mfg. Co.*, 2016 Bankr. LEXIS 3701, at *7 (Bankr. S.D. Tex. Oct. 13, 2016); *In re Walker*, 2012 Bankr. LEXIS 2202, at *8 (Bankr. S.D. Tex. May 17, 2012) *In re Goldston*, 2012 Bankr. LEXIS 35, at *8 (Bankr. S.D. Tex. Jan. 3, 2012). Among other reasons, this is because a claim objection under Bankruptcy Local Rule 3007-1(a) requires an affidavit or declaration that has the effect of putting the objection on the same evidentiary basis as the proof of claim.[2] Ultimately, the question is whether there is a true dispute. *Collier on Bankruptcy* ¶ 3001.09[2].

6.      As more fully set out below, the Trustee's claim objections have rebutted the presumption of validity provided by Bankruptcy Rule 3001(f) for each of the respective claims. The ultimate burden to establish the validity of the claims by the preponderance of the evidence therefore rests with the claimants. *In re Tug Robert J. Bouchard Corp.*, 2023 U.S. Dist. LEXIS 102356, at *6. The Trustee does not believe that the claimants will be able to meet this burden because the claims are not valid.

**B.  Application of the adversary rules.**

7.      In the Claim No. 7 Response and Claim No. 21 Response, 2425 WL LLC and Choudhri respectively assert that the Trustee's objections amount to adversary proceedings under

---

[2] Bankruptcy Local Rule 3007-1 requires an affidavit but 28 U.S. Code § 1746 provides that a declaration suffices when a rule made pursuant to law requires an affidavit.

000487

Bankruptcy Rule 7001(1) & (9). Bankruptcy Rule 7001(1) provides that a proceeding to recover money or property, with some exceptions, is an adversary proceeding. Bankruptcy Rule 7001(9) provides that a proceeding to obtain declaratory judgment with respect to any other matter constituting an adversary proceeding is an adversary proceeding. Neither of those is applicable to any of the Trustee's objections to claim.

8.      Bankruptcy Rule 7001(2) would be a better fit for the claimants' arguments but also does not apply. According to Bankruptcy Rule 7001(2), a proceeding to determine the validity, priority, or extent of a lien or other interest in property, with certain exceptions, is an adversary proceeding. But the Trustee is *not* seeking any determinations of the validity, priority, or extent of a lien or other interest through the claim objections. Rather, the Trustee challenges the underlying right to payment (i.e., the claim) purportedly secured by the asserted liens.

9.      While Bankruptcy Rule 9014(c) authorizes courts to apply the adversary rules to contested matters, the claimants have not requested that relief and it is not necessary here. Several of the adversary rules already apply to contested matters under Bankruptcy Rule 9014(c) and Bankruptcy Local Rule 9013-1(g).[3] The procedure under the Bankruptcy Rules for contested matters is sufficient.

### C. Effect of this Court's prior orders and confirmation of the plan.

10.      Each of the responses contains a section regarding the effect of the confirmation of the Chapter 11 Plan of Liquidation of the Debtor by National Bank of Kuwait S.A.K.P., New York Branch (the "Plan"). According to the claimants, the Plan and the Court's order [ECF No. 566] confirming the Plan (the "Confirmation Order") do not have any res judicata or collateral estoppel

---

[3] Bankruptcy Rule 9014(c) provides that Bankruptcy Rules 7009, 7017, 7021, 7025, 7026, 7028–7037, 7041, 7042, 7052, 7054–7056, 7064, 7069, and 7071 apply in contested matters. Bankruptcy Local Rule 9013-1(g) provides that Bankruptcy Rule 7008 applies in contested matters.

000488

effect because the Confirmation Order is subject to an appeal and the effective date and substantial consummation of the Plan have not yet occurred.

11.     It is not clear how the Plan or Confirmation Order would bolster the Trustee's claim objections, and there are other reasons to disallow the relevant claims. To the extent it matters, however, the Court's orders *are* entitled to collateral estoppel notwithstanding any pending appeal. *Medliant Inc. v. Delgado*, 2024 U.S. Dist. LEXIS 79535, at *13 (E.D. Tex. May 1, 2024) ("[T]he fact that the appeal of the District of Nevada's order remains pending does not preclude application of the collateral estoppel doctrine."); *United States v. Safety Nat'l Cas. Corp.*, 782 F. Supp. 2d 420, 424 (S.D. Tex. 2011) ("The Court must follow clear Fifth Circuit precedent, and accordingly holds that, where the prior order was based on federal law, a pending appeal of that order has no effect on its effect as collateral estoppel."); *see also Stevens v. St. Tammany Par. Gov't*, 17 F.4th 563, 571 (5th Cir. 2021) ("Generally, 'a judgment is entitled to preclusive effect even though an appeal is pending.'") (deciding the issue based on Louisiana law).

12.     The law of the case is perhaps more relevant. The essence of the doctrine is that when a court decides a legal issue in a case, the decision should continue to govern the same issue in subsequent stages of the case. *In re Pilgrim's Pride Corp.*, 442 B.R. 522, 529 (Bankr. N.D. Tex. 2010) (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988)). In a bankruptcy proceeding, the "case" consists of all the various components of the case. *See id.* at 530. But the law of the case doctrine does not prevent the Court from revisiting its own decisions, especially where the evidence is substantially different or the decision was clearly erroneous and would work manifest injustice. *See id.* at 531 (quoting *Royal Ins. Co. v. Quinn-L Capital Corp.*, 3 F.3d 877, 880 (5th Cir. 1993)). It is appropriate for the Court's prior decisions to inform its decision here.

000489

13.     Further, the Court may consider testimony and exhibits admitted in prior hearings in this case in determining the Trustee's claim objections. *See In re Liao*, 553 B.R. 584, 587 n.1 (Bankr. S.D. Tex. 2016) (citing *In re Acequia, Inc.*, 787 F.2d 1352, 1358-59 (9th Cir. 1986); *Credit Alliance Corp. v. Idaho Asphalt Supply, Inc. (In re Blumer)*, 95 B.R. 143, 146 (B.A.P. 9th Cir. 1988)). The Court is not required to evaluate the Trustee's claim objections in a vacuum even if it does not apply collateral estoppel or rely on the law of the case in reaching its decisions.

### REPLY TO THE CLAIM NO. 7 RESPONSE

14.     2425 WL LLC filed proof of claim no. 7 on March 21, 2024, and an amended proof of claim on June 28, 2024 (as amended, "Claim No. 7"). In Claim No. 7, 2425 WL LLC asserts a claim on account of a purported note dated May 23, 20218, in the original amount of $14,780,332.38 that is secured by a deed of trust also dated May 23, 2018. A copy of the purported note, the deed of trust, and the settlement statement related to the May 23, 2018, sale and financing transaction are attached to the amended version of Claim No. 7.

15.     The Trustee filed an objection to Claim No. 7 [ECF No. 402] (the "Claim No. 7 Objection") on June 3, 2024. The basis of the Trustee's objection is that (a) the promissory note is unenforceable (i) due to a lack of consideration or (ii) because Ali Choudhri ("Choudhri") lacked authority to bind the Debtor at the time the note was executed and (b) the doctrine of quasi-estoppel should prevent 2425 WL LLC from asserting that the "Seller Credit to Buyer" was actually an undisclosed loan. The Claim No. 7 Objection contained detailed allegations supported by twelve (12) exhibits thereto and legal arguments supported by citations to relevant authority.

16.     2425 WL LLC filed the Claim No. 7 Response on July 3, 2024. 2425 WL LLC's response on the merits consisted of nothing more than general statements that (a) considering the note, deed of trust, and settlement statement, the note and lien are valid, (b) a delay in recording

6

the deed of trust does not render the transaction void or fraudulent, and (c) the evidence at trial will prove that the transaction was an arms-length, valid transaction. Additionally, 2425 WL LLC asserts that the Trustee's objection is an adversary proceeding and the Trustee lacks standing to object to Claim No. 7.

17.     For the reasons set out below and in the Claim No. 7 Objection, the Trustee's objection to Claim No. 7 should be sustained. The Trustee clearly has standing and authority to pursue objections to claim and the Trustee's objection to Claim No. 7 does not constitute an adversary proceeding. The Trustee has also rebutted the prima facie validity of Claim No. 7 through the detailed allegations in the Claim No. 7 Objection supported by the attached documents, and 2425 WL LLC should be prohibited from presenting any evidence that would have been responsive to the Trustee's discovery requests on 2425 WL LLC. There is no possible way for 2425 WL LLC to prove that Claim No. 7 reflects "an arms-length, valid transaction."

**A.  The Trustee has standing and may pursue an objection to Claim No. 7.**

18.     2425 WL LLC asserts that the estate has no liability on Claim No. 7 and therefore the Trustee has no standing to object. (Claim No. 7 Response ¶ 4). If so, the lack of liability of the Debtor or property of the Debtor would be *grounds* for the Claim No. 7 Objection to be sustained. *See* 11 U.S.C. § 502(b)(1) (providing that claims that are unenforceable against a debtor and property of the debtor should be disallowed).

19.     To the extent that Claim No. 7 represents a claim that would be enforceable against the Debtor or the property of the Debtor according to its terms, however, the Trustee has standing to pursue an objection to the claim. As 2425 WL LLC itself has successfully argued in this case [ECF Nos. 312, 321], any party in interest may object to a claim. *See* 11 U.S.C. § 502(a). The Trustee is a party in interest and can raise any issue in this chapter 11 case. *See* 11 U.S.C. § 1109(b) ("A party in interest, including . . . the trustee . . . may raise and may appear and be heard on any

000491

issue in a case under this chapter."). Moreover, among the Trustee's *duties* in this case is to examine proofs of claim and object to the allowance of any claim that is improper. 11 U.S.C. §§ 704(a)(5) & 1106(a)(1).

**B. The Trustee's objection to Claim No. 7 is not an adversary proceeding.**

20.     2425 WL LLC asserts that the Trustee's objection to Claim No. 7 involves determination of the validity and enforceability of 2425 WL LLC's deed of trust lien and therefore is an adversary proceeding. (Claim No. 7 Response ¶ 3). That mischaracterizes the Claim No. 7 Objection.

21.     While 2425 WL LLC's asserted lien could likely be challenged successfully, the Claim No. 7 Objection does not seek a determination of the validity, priority, or extent of the lien. Rather, the Trustee's objection to Claim No. 7 challenges the underlying claim—i.e., the right to payment, *see* 11 U.S.C. 101(5)—that the lien purportedly secures on three grounds: (1) The promissory note is unenforceable due to lack of consideration; (2) If the promissory note was executed in 2018, the note is additionally unenforceable because Choudhri lacked apparent or actual authority at that time to bind the Debtor in connection with the note; and (3) Equitable estoppel should prevent 2425 WL LLC from asserting the $14,730,332.38 reduction in the amount due to 2425 WL LLC in connection with the sale of the the property was for a loan instead of a "Seller Credit to Buyer," as reflected in the settlement statement executed by 2425 WL LLC. This does not constitute an adversary proceeding. *See, e.g.*, *In re Concepts Am., Inc.*, 621 B.R. 848, 854 (Bankr. N.D. Ill. 2020) (collecting cases); *In re Anderson*, 330 B.R. 180, 188 (Bankr. S.D. Tex. 2005) (holding that challenges that do not go to the existence or legitimacy of the lien itself do not require an adversary proceeding).

22.     The Trustee's Claim No. 7 Objection references the irregularities in the 2425 WL LLC deed of trust only to demonstrate that the promissory note was likely invented in 2021, rather

000492

than May 23, 2018. The note indicates that the deed of trust already exists and incorporates terms thereof. (Claim No. 7 at p. 5). The deed of trust purports that it is dated May 23, 2018, but that is contradicted by the jurat indicating that it was executed in 2021. (Claim No. 7 at pp. 9, 16). And it is undisputed that the deed of trust was *filed* in 2021 (Claim No. 7 at pp. 9, 22). While the note would still be unenforceable even if it was created in 2018, the lack of consideration is even more obvious if it was created in 2021.

### C. The Trustee has rebutted the prima facie validity of Claim No. 7.

23.    The Claim No. 7 Response describes the prima facie validity of proofs of claim and the burden shifting process. (Claim No. 7 Response ¶ 5). Here, the prima facie validity of the Claim No. 7 has been rebutted by the detailed allegations of the Claim No. 7 Objection, the supporting documents thereto, the arguments regarding the documents attached to Claim No. 7, and other evidence in this chapter 11 case. The validity of Claim No. 7 has been brought into question and 2425 WL LLC has the burden establish the validity of the claim by the preponderance of the evidence.

24.    The documents attached to Claim No. 7 (as amended) support the Trustee's objection. The settlement statement indicates that the reduced purchase price was a "Seller Credit to Buyer." (Claim No. 7 at p. 23). A seller credit has the effect of lowering the amount owed by the Buyer. *See Johnson v. Kacimi*, 2024 Del. C.P. LEXIS 13, *1-*4 (describing the mechanism of a seller credit in a real estate transaction). A *loan* from the seller would be indicated on lines 204-209 of the HUD-1 Settlement Statement. *See* https://www.consumerfinance.gov/rules-policy/regulations/1024/2017-10-19/a/.[4] Further, the discrepancy regarding the date of the deed of

---

[4] While the May 23, 2018, transaction was not required to use a HUD-1 Settlement Statement under the relevant regulations, the instructions are nevertheless relevant to understanding what the settlement statement attached to Claim No. 7 shows.

000493

trust—purportedly of even date with the promissory note—is apparent in the jurat.[5] (*See* Claim No. 7 at p. 16). At a minimum, the inconsistencies in the documents attached to Claim No. 7 rebut the presumption of validity in connection with the Trustee's allegations.

25.     Other evidence already in the record in this chapter 11 case also supports the Trustee's objection. Several documents related to the May 23, 2018, sale of the real property from 2425 WL LLC to the Debtor and the related financing are already in the record, including the loan agreement [ECF Nos. 87-2, 501-10] between the Debtor and the National Bank of Kuwait ("NBK"),[6] the note [ECF Nos. 143-7, 501-12] issued by the Debtor to NBK pursuant to the loan agreement,[7] the deed of trust delivered by the Debtor to NBK [ECF Nos. 143-8, 501-11],[8] and the assignment of leases and rents delivered by the Debtor to NBK [ECF No. 143-9].[9] Each of these documents was dated May 23, 2018, and related to the sale of the real property and attendant financing but ***was not*** executed by Choudhri on behalf of the Debtor. They were each executed by Azeemeh Zaheer as managing member of Naissance Capital Real Estate, LLC, in turn as managing member of Galleria 2425 JV, LLC, and in turn sole member of the Debtor. When coupled with the Trustee's allegations, they are sufficient to rebut the presumption of validity of Claim No. 7.

---

[5] While the jurat technically indicates the date that the deed of trust was acknowledged rather than executed, the rest of the document demonstrates that the jurat was authored contemporaneously. The year 2021 was typed in to the document and the document control number at the bottom is consistent throughout.

[6] The loan agreement between the Debtor and NBK at ECF No. 87-2 was admitted into evidence at the January 31, 2024, hearing. (Courtroom Minutes, ECF No. 97). The loan agreement was also reflected at ECF No. 501-10 and admitted into evidence at the June 19, 2024, hearing. (Courtroom Minutes, ECF No. 549).

[7] The note issued by the Debtor to NBK at ECF No. 143-7 was admitted into evidence at the March 22, 2024, hearing. (Courtroom Minutes, ECF. No. 153). The note was also reflected at ECF No. 501-12 and admitted into evidence at the June 19, 2024, hearing. (Courtroom Minutes, ECF No. 549).

[8] The deed of trust granted by the Debtor to NBK at ECF No. 143-8 was admitted into evidence at the March 22, 2024, hearing. (Courtroom Minutes, ECF No. 153). The deed of trust was also reflected at ECF No. 501-11 and admitted into evidence at the June 19, 2024, hearing. (Courtroom Minutes, ECF No. 549).

[9] The assignment of rents and leases granted by the Debtor to NBK at ECF No. 143-9 was admitted into evidence at the March 22, 2024, hearing. (Courtroom Minutes, ECF No. 153).

000494

**D. 2425 WL LLC should be estopped from presenting contrary evidence responsive to the Trustee's discovery requests.**

26.     The Trustee sought discovery from 2425 WL LLC regarding the issues surrounding the Claim No. 7 Objection but 2425 WL LLC has provided no documents and refused to make a corporate representative available. The Trustee served a Notice of Deposition and Subpoena Duces Tecum on 2425 WL LLC and other parties in interest in the case on May 21, 2024. The original date of the deposition was scheduled for June 11, 2024, with a deadline to provide documents of June 7, 2024. The deadline for 2425 WL LLC to provide responsive documents was extended by agreement to June 13, 2024. However, the documents were not produced. All of this is already demonstrated by evidence in the record [ECF Nos. 505-1, 505-7, 505-9, 505-10, and 505-11].[10] More than a month has passed and still no documents have been provided and 2425 WL LLC has still not agreed to produce a corporate representative. 2425 WL LLC should not be allowed to present evidence on the topics related to that refused discovery.

27.     The Trustee's requested discovery covered most of what might be relevant to Claim No. 7. The Trustee's deposition topics for 2425 WL LLC's corporate representative included:

- 2425 WL LLC's historic ownership, organizational, and management structure (Topic No. 1);

- The facts and circumstances surrounding 2425 WL LLC's sale of the Real Property to the Debtor, including any financing related thereto (Topic No. 3);

- Any distribution of funds in connection with 2425 WL LLC's sale of the Real Property to the Debtor (Topic 4);

- The Settlement Statement in connection with 2425 WL LLC's sale of the Real Property to the Debtor (Topic No. 5);

- The facts and circumstances surrounding the 2425 WL DOT, including its (a) creation, (b) execution, and (c) filing (Topic No. 6);

---

[10] These documents were admitted into evidence at the June 17, 2024, hearing. (Courtroom Minutes, ECF No. 536).

000495

- The facts and circumstances surrounding the 2425 WL Note, including its (a) creation, (b) execution, and (c) any consideration provided (Topic No. 7); and

- Any payments 2425 WL LLC received under the 2425 WL Note (Topic No. 8).

[ECF No. 505-7 at p. 10, 507-9 at p. 9]. The documents requested from 2425 WL LLC included:[11]

- All documents reflecting, describing, or evidencing 2425 WL LLC's corporate structure and management, including but not limited to any (a) company agreement, (b) the membership interests in 2425 WL LLC, (c) management of 2425 WL LLC, and (d) the basis for Ali Choudhri to act on behalf of 2425 WL LLC (Request No. 1);

- Communications or documents referencing, describing, or evidencing the preparation and drafting of the 2425 WL Note (Request No. 3);

- Communications and other documents referencing, describing, or evidencing any consideration 2425 WL LLC provided to the Debtor in exchange for the 2425 WL Note (Request No. 4);

- Communications or documents referencing, describing, or evidencing any indebtedness of the Debtor to 2425 WL LLC prior to May 11, 2021 (Request No. 5);

- Communications or documents exchanged with Azeemah Zaheer, Naissance Capital Real Estate, LLC, or Galleria 2425 JV, LLC regarding the 2425 WL Note (Request No. 8);

- Communications or documents referencing, describing, or evidencing the distribution of funds from 2425 WL LLC's sale of the Real Property to the Debtor (Request No. 9);

- The final version and any drafts of the Settlement Statement (Request No. 10);

- Communications or documents referencing, describing, or evidencing the preparation of the Settlement Statement (Request No. 11);

- Communications or documents referencing, describing, or evidencing the "Seller Credit" indicated on the Settlement Statement (Request No. 12); and

- All communications or documents exchanged with NBK in connection wit the sale of the Real Property on or before May 23, 2018 (Request No. 13); and

---

[11] The Trustee also requested copies of the 2425 WL LLC promissory note and the settlement statement for the May 23, 2018, transaction because they were not attached to the original version of Claim No. 7. While not provided in response to the Trustee's discovery requests, 2425 WL LLC had previously provided those documents informally and attached them to the amended Claim No. 7. While 2425 WL LLC can certainly introduce and present arguments about those documents, the fact is that the settlement statement does not indicate any financing from 2425 WL LLC.

000496

- All communications or documents exchanged with the Debtor in connection with the sale of the Real Property on or before May 23, 2018 (Request No. 14).

[ECF Nos. 505-7 at pp. 18-19, 505-10 at pp. 11-12].

28.     As has been 2425 WL LLC's typical practice in this chapter 11 case, the Trustee anticipates that 2425 WL LLC will request additional time to comply with discovery in an effort to delay and increase the cost of the proceedings. The Court should deny that request. Giving 2425 WL LLC additional time to meet the deadlines to which it agreed [ECF No. 505-1 at ¶ 11] would only reward its refusal to participate in discovery with what it hoped to obtain.

**E.  The Trustee's Objection to Claim No. 7 should be sustained.**

29.     2425 WL LLC's response to merits the Claim No. 7 Objection consisted of only the following three sentences:

> 7.     **Merits of Claim.** Considering the note, deed of trust, and especially the Settlement Statement, the note and the lien are valid. A delay in recording the deed of trust does not render the transaction voidable or fraudulent. The evidence at trial will prove that this was an arms-length, valid transaction.

The Claim No. 7 Response does not address the Trustee's allegations regarding the lack of consideration or Choudhri's lack of authority to execute the note, dispute the validity of any of the exhibits attached to the Claim No. 7 Objection, or address the Trustee's arguments with respect to equitable estoppel. Instead, 2425 WL LLC asserts that the evidence will show that Choudhri acted at arms-length with himself.

30.     2425 WL LLC's failure to deny or otherwise address substantively the allegations in the Claim No. 7 Objection, or the exhibits thereto, limits the issues for a hearing. 2425 WL LLC will not be able to establish that the promissory note from the Debtor to 2425 WL LLC executed by Choudhri was arms-length. Choudhri dealing with himself through entities under his control at

000497

arms-length is a contradiction. The Court should not allow 2425 WL LLC to perform a bait and switch and assert an alternative argument at the hearing on the Trustee's objection to Claim No. 7.

31.     The inability of 2425 WL LLC to establish its claim by a preponderance of the evidence is further compounded by its failure to provide documents or testimony in response to the Trustee's discovery requests. Even if the Claim No. 7 Response was sufficient to raise meaningful issues, the inability of 2425 WL LLC to present evidence on these topics because of its failure to respond to discovery leaves nothing material for a hearing. 2425 WL LLC cannot establish its claim by a preponderance of the evidence just based on the documents attached to Claim No. 7. The inconsistencies therein and the other evidence in the record overwhelm the evidentiary weight they provide.

32.     To the extent that 2425 WL LLC is allowed to present evidence beyond what was produced in discovery and referenced in the Claim No. 7 Response, the Court should evaluate that evidence critically. If 2425 WL LLC submits testimony that the settlement statement is incorrect or incomplete, the Court should require direct corroborating evidence that the 2425 WL LLC note was known and consented to by the other parties in that transaction. Sections 5.26 and 6.1(g) of the loan agreement between the Debtor and NBK (Claim No. 7 Objection, Ex. C, at pp. 38, 41 [ECF No. 402-5])[12] provided that the Debtor represented that it had not and would not incur any debt that was secured or evidenced by a note other than the loan from NBK. Similarly, if 2425 WL LLC submits testimony that Choudhri was authorized to execute the 2425 WL LLC note on behalf of the Debtor, the Court should require direct corroborating evidence that he was authorized by Naissance Capital Real Estate, LLC ("NCRE"). As reflected in the Galleria 2425 JV Company

---

[12] 2425 WL LLC did not dispute the authenticity of the loan agreement between the Debtor and NBK attached to the Claim No. 7 Objection and the loan agreement has been admitted into evidence previously.

000498

Agreement (Claim No. 7 Objection, Ex. I, at pp. 10, 29 [ECF No. 402-11]),[13] NCRE was the managing member of the Galleria 2425 JV, LLC and had the sole authority to act on behalf of the sole member of the Debtor. There was no reason for NBK or the mezzanine lender to accept inaccurate documents in connection with the May 23, 2018, transaction while there is every reason for 2425 WL LLC to misrepresent what happened in response to the Trustee's objection.

## REPLY TO THE CLAIM NO. 21 RESPONSE[14]

33.     Ali Choudhri filed proof of claim no. 21 ("Claim No. 21") on April 9, 2024. In Claim No. 21, Choudhri asserts a claim in the amount of $4,176,657.46 on account of tax loans assigned to him by Caz Creek TX II, LLC (the "Caz Creek Tax Loans"). Copies of a loan modification agreement between the Debtor and Caz Creek TX II, LLC, documents filed with the real property records of Harris County assigning the notes, liens, and all loan documents to Choudhri, and a breakdown of the asserted accrued interest are attached to Claim No. 21.

34.     The Trustee filed an objection to Claim No. 21 and another claim asserted by Choudhri [ECF No. 403] (the "Choudhri Claims Objection") on June 3, 2024. With respect to Claim No. 21, the Trustee asserts that Caz Creek Tax Loans have been assigned to NBK, as reflected in the certified copy of the assignment document executed by Choudhri, notarized, and filed in the Harris County real property records and attached to the Choudhri Claims Objection as Exhibit A thereto [ECF No. 403-3] (the "NBK Assignment"). The NBK Assignment expressly indicates that it is transferring "the Note, Liens, and any and all other related loan documents, including other agreements, instruments and other collateral which evidence, secure or otherwise

---

[13] 2425 WL LLC did not dispute the authenticity of 2425 JV Company Agreement attached to the Claim No. 7 Objection.

[14] Counsel for Choudhri has indicated an intent to withdrawal Claim No. 21. The Trustee does not oppose such a withdrawal provided that it is a withdrawal of the underlying claim, including any corresponding scheduled claim. An order has not yet been agreed upon at the time of the filing of this reply.

15

000499

relate to the Transferor's right, title or interest in the Note and Liens." The NBK Assignment also references the Confidential Settlement Agreement, about which the Court has heard testimony and was attached as Exhibit B to the Choudhri Claims Objection [ECF No. 403-4].

35.     Choudhri filed the Claim No. 21 Response on July 3, 2024. On the merits, Choudhri asserts that the Confidential Settlement Agreement required NBK to return the Caz Creek Tax Loans to him upon the termination of the Confidential Settlement Agreement irrespective of the reason for any breach. Choudhri does not dispute the Trustee's factual allegations or the authenticity of the exhibits attached to the Choudhri Claims Objection. Additionally, Choudhri argues that the Trustee's objection to Claim No. 21 constitutes adversary proceeding, the Trustee lacks standing to object to Claim No. 21, the objection to claim should be consolidated with Adversary Proceeding No. 24-03120.

36.     For the reasons set out below and in the Choudhri Claims Objection, the Trustee's objection to Claim No. 21 should be sustained. The Trustee clearly has standing and authority to pursue an objection to Claim No. 21 and the Trustee's objection does not constitute an adversary proceeding because it challenges the claim secured by the lien rather than the lien itself. The Trustee has rebutted the prima facie validity of Claim No. 21 by presenting detailed allegations and attaching a certified copy of the NBK Assignment and the Confidential Settlement Agreement. Further, Choudhri asserts in other proceedings before this Court that the relevant obligations and tax liens *have not* been assigned back by NBK, which is necessary for Choudhri to have an enforceable claim against the Debtor and thus an allowable claim. In light of the Claim No. 21 Response and Choudhri's allegations in Adversary Proceeding No. 24-03120, there is no possible way for Choudhri to establish Claim No. 21 by a preponderance of the evidence.

000500

## A. The Trustee has standing and may pursue an objection to Claim No. 21.

37. Choudhri asserts in the Claim No. 21 Response that the Trustee lacks standing to bring or pursue his objection to Claim No. 21 because (a) the Trustee is not a party to the Confidential Settlement Agreement, (b) Claim No. 21 involves in rem rights to two tax liens, and (c) the tax liens will be paid from the proceeds of the sale of the Debtor's real property. (Claim No. 21 Response ¶¶ 4 & 6). Choudhri's position lacks any merit.

38. The Trustee disagrees that only a party to the Confidential Settlement Agreement can object to Claim No. 21 based on matters related to the agreement and that doing so is necessary for the Trustee's objection to Claim No. 21.[15] But even if that was so, the Debtor was a party to the Confidential Settlement Agreement any legal or equitable rights of the Debtor became property of the estate subject to the Trustee's control. 11 U.S.C. § 541(a)(1). This argument in the Claim No. 21 Response is inapposite.

39. Choudhri's argument that the Trustee lacks standing because Claim No. 21 involves in rem rights related to tax liens is similarly off base. Claim No. 21 asserts a debt against the Debtor—which would be satisfied from the bankruptcy estate—that is secured by a lien. The Trustee's objection to Claim No. 21 turns on the assignment of the obligation reflected by the Caz Creek Tax Loans, not the lien securing that obligation. Further, even if Claim No. 21 did require determination the lien rights themselves, the Trustee would still have *standing* because the asserted lien attached to property of the estate.[16]

---

[15] The Confidential Settlement Agreement is relevant to the Trustee's Objection only because it provides context about why the NBK Assignment was executed.

[16] If there were actually competing claims of ownership regarding a lien against property of the estate—which is not the case with respect to Claim No. 21—the Trustee's interest would be in determining which entity owned the lien so that it could be addressed according to the Bankruptcy Code. Administering the estate would require that determination.

000501

40. Choudhri's assertion that the Trustee lacks standing because the winning bidder of for the real property must pay the tax liens rather than the Trustee is also incorrect. Paragraph 30 of the sale order [ECF No. 608] provides that the *Trustee* is making payments to the non-contested claims secured by tax liens. In the event that Choudhri has a claim secured by a tax lien, that would similarly be paid by the Trustee, absent the provisions of the Plan.[17]

41. As described above with respect to Claim No. 7, to the extent that Claim No. 21 represents a claim that would be enforceable against the Debtor or the property of the Debtor according to its terms, the Trustee has standing and can pursue an object to the claim. Any party in interest may object to a claim. *See* 11 U.S.C. § 502(a). The Trustee is clearly a party in interest. *See* 11 U.S.C. § 1109(b). Among the Trustee's *duties* in this case is to examine proofs of claim and object to the allowance of any claim that is improper. 11 U.S.C. §§ 704(a)(5) & 1106(a)(1).

**B. The Trustee's Objection to Claim No. 21 is not an adversary proceeding.**

42. Choudhri asserts that the Trustee's objection to Claim No. 21 involves determination of whether the rights to two (2) tax liens is owned by NBK or Choudhri pursuant to the terms of the Confidential Settlement Agreement. (Claim No. 21 Response ¶ 4). That mischaracterizes the Trustee's objection to Claim No. 21.

43. The Trustee's objection is based on the uncontested fact that Choudhri assigned the Caz Creek Tax Loans—and particularly the underlying obligation—to NBK and NBK has not assigned them back to Choudhri. The NBK Assignment and the documentation attached to Claim No. 21 indicate there is an underlying note that was assigned in connection with the Caz Creek

---

[17] Choudhri asserts that the Plan does not render Claim No. 21 moot. (Claim No. 21 Response ¶ 10). If so, the Plan similarly does not render the Trustee's objection to Claim No. 21 moot.

000502

Tax Loans. What is critical to the Trustee's objection is the assignment of the *obligation* secured by the tax lien.[18]

### C. The Trustee's objection to Claim No. 21 should not be consolidated with Adversary Proceeding No. 24-03120.

44.     Choudhri argues in the Claim No. 21 Response that the Trustee's objection to Claim No. 21 should be consolidated with Adversary Proceeding No. 24-03120. (Claim No. 21 Response ¶ 5). Choudhri's reasoning is that the adversary proceeding "includes all of the issues raised by the Trustee in the Objection to Claim No. 21). Again, this is off the mark.

45.     In the Plaintiff's Third Amended Complaint [Adv. Proc. No. 24-03120, Dkt. 8] (the "Choudhri Complaint"), Choudhri seeks *monetary damages* against NBK for not assigning back to Choudhri the Caz Creek Tax Loans. It is not a dispute over who owns the tax liens or the obligations secured by the tax liens but rather what the Confidential Settlement Agreement required between Choudhri and NBK. Indeed, the damages Choudhri seeks includes the proceeds from payments NBK receives on account of the Caz Creek Tax Loans. (Choudhri Complaint ¶¶ 3, 62).

46.     The only overlap between Adversary Proceeding No. 24-03120 and the Trustee's objection to Claim No. 21 is that they are both predicated on the undisputed fact that Caz Creek Loans that Choudhri assigned to NBK have not been assigned back to Choudhri. (Choudhri Complaint ¶¶ 21 & 50; Choudhri Claims Objection ¶ 9). Whether NBK has liability to Choudhri

---

[18] As defined by Bankruptcy Code § 101(37) and in ordinary usage, a "lien" is a "charge against or interest in property to secure payment of debt or performance of an obligation." Chapter 32 of the Texas Tax Code is unambiguous that there is a distinction between the tax lien and the obligation arising from the advance of funds to pay taxes. Tex. Tax Code § 32.07 provides that "property taxes are the personal obligation of the person who owns or acquires the property on January 1 of the year for which the tax is imposed . . . ." Tex. Tax Code § 32.01 provides that "a tax lien attaches to property to secure the payment of all taxes, penalties, and interest ultimately imposed for the year on the property, whether or not the taxes are imposed in the year the lien attaches." Further, Tex. Tax Code § 32.06 describes the contract and agreed upon interest on money advanced separate and apart from the underlying tax lien.

000503

under those facts is immaterial to whether Choudhri has an enforceable obligation against the Debtor giving rise to an allowable claim.

**D. The Trustee has rebutted the prima facie validity of Claim No. 21.**

47.     The Claim No. 21 Response describes the prima facie validity of proofs of claim and the burden shifting process. (Claim No. 21 Response ¶ 7). Here, the prima facie validity of Claim No. 21 has been rebutted by the detailed allegations of the Choudhri Claims Objection, the NBK Assignment attached thereto, and Choudhri's own assertions in the Choudhri Complaint. Choudhri has the burden of proof to establish the validity of Claim No. 21 by the preponderance of the evidence.

48.     In the Choudhri Claims Objection, the Trustee specifically alleges that the Caz Creek Tax Loans were assigned by Choudhri to NBK. Exhibit A to the Choudhri Claims Objection [ECF No. 403-3] contained a certified copy of the NBK Assignment effectuating this transfer. The NBK Assignment was signed by Choudhri, acknowledged before a notary, and filed in the real property records of Harris County. This is sufficient to rebut the presumption of Claim No. 21, which attached an assignment of the Caz Creek Tax Loans to Choudhri prior in time to the NBK Claim as its evidentiary support.

49.     Further, other evidence already in the record in this chapter 11 case also supports the Trustee's objection. The Court has heard testimony regarding the Confidential Settlement Statement, the transactions related thereto, and the Caz Creek Tax Loans. Even more relevant are Choudhri's statements in the Choudhri Complaint that he assigned the Caz Creek Tax Loans to NBK and NBK has not assigned them back. The record contains sufficient evidence to rebut the presumption of validity of Claim No. 21.

000504

**E. The Trustee's Objection to Claim No. 21 should be sustained.**

50.     Choudhri's response to merits of the Trustee's objection to Claim No. 21 is that the Confidential Settlement Agreement required NBK to assign back the Caz Creek Tax Loans to Choudhri. (Claim No. 21 Response ¶ 9). Choudhri does not dispute that he assigned the Caz Creek Tax Loans to NBK or the authenticity of the NBK Assignment attached as Exhibit A to the Choudhri Claims Objection [ECF No. 403-3], assert that the Caz Creek Tax Loans have been assigned back to him, or even claim that he has right to payment from the Debtor notwithstanding the assignment. Indeed, in the Choudhri Complaint, Choudhri asserts affirmatively that NBK has not assigned the Caz Creek Tax Loans back and seeks monetary damages against NBK under various theories as the result of this fact. What Choudhri does ***not*** seek in Adversary Proceeding No. 24-03120—at least as of July 3, 2024, when both the Choudhri Complaint and the Claim No. 21 Response were filed—is a declaration that he owns the Caz Creek Tax Loans.

51.     There is no dispute with respect to the enforceability of Claim No. 21 against the Debtor or property of the Debtor's estate. There are not even any legal arguments or operative documents that the Court must evaluate. The only actual dispute is whether NBK's refusal to assign the Caz Creek Tax Loans back to Choudhri gives rise to claims *against NBK*. But that has nothing to do with the Trustee's objection to Claim No. 21 or whether Choudhri has an enforceable claim *against the Debtor*. The Trustee's objection to Claim No. 21 should therefore be sustained.

## REPLY TO THE CLAIM NO. 22 RESPONSE

52.     Ali Choudhri filed proof of claim no. 22 ("Claim No. 22") on April 9, 2024. In Claim No. 22, Choudhri asserts a claim in the amount of $1,844,500.45 on account of a bond payment made on behalf of the Debtor and legal advances. An email from NBK's attorney Charles Conrad indicating that payments totaling $961,959.08 had been paid by the Debtor to NBK was attached to Claim No. 22.

000505

53.     The Trustee filed an objection to Claim No. 22 through the Choudhri Claims Objection on June 3, 2024. With respect to Claim No. 22, the Trustee asserted that the claim should be disallowed because (a) the documentation attached to the proof of claim did not match the $1,844,500.45 amount claimed, (b) the documentation attached to the proof of claim does not indicate that the $961,959.08 of payments to NBK constituted amounts owed by the Debtor to Choudhri, (c) to the extent that Choudhri advanced the funds, the documentation attached to the proof of claim does not indicate that advances were loans rather than equity contributions, (d) the payments to NBK reflected in the documentation were on account of the Confidential Settlement Agreement under which Choudhri received a release.

54.     Choudhri filed the Claim No. 22 Response on July 3, 2024. With respect to the merits, Choudhri asserts that Claim No. 22 reflects the reimbursement to which he is entitled for two separate expenses of the Debtor paid by Choudhri: (a) the payments totaling $961,959.08 under the Confidential Settlement Agreement reflected in the email attached to Claim No. 22 (the "CSA Payments")  and (b) payments totaling $882,541.37 of for the Debtor's prepetition operating expenses, including legal fees incurred by the Debtor for litigation against NBK and George Lee (the "Operating Expense Payments"). The Claim No. 22 Response indicates that Choudhri will demonstrate that he is entitled to claim for these amounts through evidence of wire transfers and receipts.

55.     For the reasons set out below and in the Choudhri Claims Objection, the asserted claim CSA Payments should be disallowed and the asserted claim for Operating Expense Payments should be disallowed absent evidence demonstrating that the amounts were advanced by Choudhri, the payments constituted loans rather than equity contributions, and the payments were for expenses of the Debtor rather than of Choudhri personally. The Trustee has rebutted the limited

22

000506

prima facie validity of Claim No. 22 by presenting allegations calling into question amount claimed and the Debtor's obligation to Choudhri on account of any such payments. While Claim No. 22 Response presents legitimate issues for a hearing, the burden is on Choudhri to establish the validity of his claims by the preponderance of the evidence.

**A. The Trustee has rebutted the prima facie validity of Claim No. 22.**

56. The Claim No. 22 Response describes the prima facie validity of proofs of claim and the burden shifting process. (Claim No. 22 Response ¶ 4). The Trustee's allegations and arguments in the Choudhri Claims Objection with respect to Claim No. 22 are sufficient to rebut the prima facie validity of Claim No. 22. As pointed out in the Trustee's objection, the documentation attached to Claim No. 22 did not match the $1,844,500.45 amount claimed. Further, as asserted by the Trustee, (a) the documentation does not indicate that the $961,959.08 of payments from the Debtor to NBK constituted amounts owed by the Debtor to Choudhri, (b) to the extent that Choudhri advanced the funds, the documentation attached to the proof of claim does not indicate that  advances were loans rather than equity contributions, and (c) the payments to NBK reflected in the documentation were on account of the Confidential Settlement Agreement, under which Choudhri received a release.

**B. The Trustee's objection to Claim No. 22 should be sustained with respect to the CSA Payments and sustained with respect to the Operating Expense Payments absent evidence from Choudhri demonstrating the enforceability of the asserted obligations.**

57. Choudhri's response to the merits of the Trustee's objection to Claim No. 22 is that he advanced the CSA Payments to the Debtor and the Operating Expense Payments on behalf of the Debtor and is entitled to reimbursement because such amounts constituted a loan. (Claim No. 22 Response ¶¶ 6-9). Choudhri does not dispute that the CSA Payments were made pursuant to the Confidential Settlement Agreement, that he received a release through the Confidential Settlement Agreement, or the authenticity of the copy of the Confidential Settlement Agreement

23

000507

attached as Exhibit B to the Choudhri Claims Objection [ECF No. 403-4]. Instead, Choudhri asserts that evidence of the wire transfers and receipts will be provided at trial.

58.     The CSA Payments should be disallowed even if Choudhri presents evidence of the three (3) wire transfers from Choudhri to the Debtor described in the Claim No. 22 Response. Choudhri received consideration on account of those payments through the Confidential Settlement Agreement in the form of the release from NBK. Further, the Trustee anticipates that the evidence will demonstrate that these payments, if made, reflect equity contributions rather than debt owed by the Debtor to Choudhri.[19]

59.     The Operating Expense Payments should also be disallowed even if Choudhri presents evidence that he made payments on behalf of the Debtor. The Trustee anticipates that the evidence will show any payments made by Choudhri on behalf of the Debtor reflect equity contributions rather than debt owed by the Debtor to Choudhri. Further, any legal expenses paid by Choudhri likely involved matters in which *Choudhri* was personally liable for the expenses or received a personal benefit. Choudhri asserts that the payments were related to litigation against NBK and George Lee. The Harris County District Court indicates that the only lawsuit by George Lee against the Debtor (Cause No. 2019-89764) was dismissed for want of prosecution while several other lawsuits were asserted by George Lee against Choudhri individually. And while the litigation against the National Bank of Kuwait was significant, the evidence will likely demonstrate that it was motivated by Choudhri's personal interests rather than the interests of the Debtor.

---

[19] Whether advances constitute debt or equity is a proper basis for an objection to claim. *Grossman v. Lothian Oil Inc. (In re Lothian Oil Inc.)*, 650 F.3d 539, 543 (5th Cir. 2011).

000508

## REPLY TO THE CLAIM NO. 23 RESPONSE

60.     Jetall Capital, LLC ("<u>Jetall Capital</u>") filed proof of claim no. 23 ("<u>Claim No. 23</u>") on April 9, 2024. In Claim No. 23, Jetall Capital asserts a claim in the amount of $1,699,750.00. The proof of claim contains no basis in line 8 of Official Form 410 and attaches no documents.

61.     The Trustee filed an objection to Claim No. 23 and another claim asserted by Jetall Capital [ECF No. 404] (the "<u>Jetall Claims Objection</u>") on June 3, 2024. The Trustee asserted that Claim No. 23 provided no basis for the claim or supporting documentation and that the claim was contrary to the Debtor's schedules [ECF No. 70]. Both Jetall Capital and the Debtor are controlled by Choudhri.

62.     Jetall Capital filed the Claim No. 23 Response on July 3, 2024. With respect to the merits, Jetall Capital asserts that Claim No. 23 reflects amounts owed to it for the tenant improvement allowance (the "<u>Tenant Improvement Allowance</u>") under the Third Amendment to Lease Agreement (the "<u>Third Amendment</u>"). Jetall Capital also argues that the Trustee's objection to Claim No. 23 should be consolidated with Adversary Proceeding No. 24-03120, in which the Trustee seeks, among other things, to avoid the Third Amendment and recover the value of the transfer from Jetall Companies, Inc. ("<u>Jetall Companies</u>").

63.     For the reasons set out below and in the Jetall Claims Objection, the Trustee's objection to Claim No. 23 should be sustained. Claim No. 23 has no prima facie validity because it fails to comply with Bankruptcy Rule 3001(c)(1). If Jetall Capital's claim was based on the Third Amendment, that document should have been attached to Claim No. 23. Further, to the extent that Claim No. 23 has any presumption of validity, the Trustee's reference to the Debtor's schedules— which were admitted into evidence as ECF No. 171-4 (Courtroom Minutes, ECF No. 183)—is sufficient to rebut that presumption. The Debtor's schedules do not list Jetall Capital as a creditor

000509

and indicate that *Jetall Companies* is the counterparty to the relevant lease. The Third Amendment and the underlying lease indicate that it is Jetall Companies that is the relevant counterparty.

**A. The Trustee's objection to Claim No. 23 should not be consolidated with Adversary Proceeding No. 24-03120.**

64.     Jetall Capital argues in the Claim No. 23 Response that the Trustee's objection to Claim No. 23 should be consolidated with Adversary Proceeding No. 24-03120, in which the Trustee seeks, among other things, to avoid the Third Amendment and recover against Jetall Companies. (Claim No. 23 Response ¶ 4). Jetall Capital's reasoning is that the adversary proceeding "includes all of the issues raised by the Trustee in the Objection to Claim No. 23." That is not accurate.

65.     Claim No. 23 should be disallowed because Jetall Capital is *not* the counterparty to the lease. The Third Amendment indicates that it and the underlying lease are between the Debtor and Jetall Companies, which is confirmed by the Debtor's schedules. Even if the Third Amendment is not avoided or otherwise invalidated, Claim No. 23 should nonetheless be disallowed.

66.     At the hearing on the Trustee's objection to Claim No. 23, Jetall Capital can present evidence that it is the proper counterparty to the Third Amendment and defeat that basis of the Trustee's objection. Absent such showing, however, there is no basis for consolidation. Rather than delay, the Court should go forward with the Trustee's objection and address the issue if it arises.

**B. Claim No. 23 is not entitled to any prima facie validity and the Trustee has rebutted any presumption.**

67.     The Claim No. 23 Response describes the prima facie validity of proofs of claim and the burden shifting process. (Claim No. 23 Response ¶ 5). According to Jetall Capital, Claim

000510

No. 23 includes all documents and information required by Bankruptcy Rule 3001(c) and Official Form 410. That is obviously contradicted by the contents of Claim No. 23.

68.    Claim No. 23 contains absolutely no information regarding the basis of Jetall Capital's asserted claim. Line 8 of Official Form 410 setting out the basis of the claim is blank. Further, despite Jetall Capital's assertion that Claim No. 23 is based on the Third Amendment, that document is not attached to Claim No. 23 as required by Bankruptcy Rule 3001(c)(1).

69.    Moreover, even if Claim No. 23 was entitled to a presumption of validity, that presumption has been rebutted by the Trustee's allegations. The Trustee pointed out that the Debtor—an insider to Jetall Capital that is also controlled by Choudhri—did not include any claim by Jetall Capital on its schedules. Further, the Debtor's schedules indicate that *Jetall Companies* is the counterparty to the relevant lease. While the Debtor's schedules are the barest of evidence, they are sufficient to rebut the presumption of an entirely unsupported proof of claim filed by an insider that was not scheduled. The Debtor's non-scheduling of the insider Jetall Capital raises a legitimate question about the validity of the claim.

**C.  The Trustee's objection to Claim No. 23 should be sustained.**

70.    Even taking everything in Jetall Capital's response to the merits of the Trustee's objection to Claim No. 23 at face value, Claim No. 23 should be disallowed. In essence, Jetall Capital asserts rejection damages under an unexpired lease prior to the rejection of the lease. While the lease *might* be rejected in the future, that has not yet occurred, and might never occur.[20] Claim No. 23 is premature according to Jetall Capital's own position.

71.    The Trustee anticipates that the evidence at the hearing, however, will show that Jetall Capital does *not* have a valid claim. The Third Amendment and lease indicate that the

---

[20] As Jetall Capital points out in paragraph 8 of the Claim No. 23 response, the effective date of the Plan has not yet occurred. Further, there is the possibility that the lease will be assumed and assigned to QB Loop Property LP.

000511

counterparty is Jetall Companies. The Debtor's schedules agree and do not list Jetall Capital as a creditor. If Jetall Capital presents evidence purporting to show something different at the hearing on the Trustee's objection to Claim No. 24, that evidence should be evaluated critically.

## REPLY TO THE CLAIM NO. 24 RESPONSE

72.     Jetall Capital filed proof of claim no. 24 ("Claim No. 24") on April 9, 2024. In Claim No. 24, Jetall Capital asserts a claim in the amount of $1,699,750.00. The proof of claim contains no basis in line 8 of Official Form 410 and attaches no documents.

73.     The Trustee filed an objection to Claim No. 24 in the Jetall Claims Objection on June 3, 2024. The Trustee asserted that Claim No. 24 provided no basis for the claim or supporting documentation and that the claim was contrary to the Debtor's schedules [ECF No. 70]. Both Jetall Capital and the Debtor are controlled by Choudhri.

74.     Jetall Capital filed the Claim No. 24 Response on July 3, 2024. With respect to the merits, Jetall Capital asserts that Claim No. 24 reflects amounts owed to it for advances made by wire and bank transfers to pay payroll and other expenses of the Debtor, and for unpaid lease commissions and management fees pursuant to a "Management Leasing Agreement."

75.     For the reasons set out below and in the Jetall Claims Objection, the Trustee's objection to Claim No. 24 should be sustained. Claim No. 24 has no prima facie validity because it fails to comply with Bankruptcy Rule 3001(c)(1). If Jetall Capital's claim was based on the wire and bank transfers and the Management Leasing Agreement, those documents should have been attached to Claim No. 24. Further, to the extent that Claim No. 24 has any presumption of validity, the Trustee's reference to the Debtor's schedules is sufficient to rebut that presumption. The Debtor's schedules do not list Jetall Capital as a creditor, do not indicate that Jetall Capital as the counterparty to a "Management Leasing Agreement," and indicate that Jetall Companies is the

000512

counterparty to the vaguely similar "Property Management Agreement." The Trustee anticipates any evidence presented by Jetall Capital will demonstrate that the correct creditor under the referenced agreement is Jetall Companies. Further, Claim No. 24 is an *exact* duplicate of Claim No. 23, despite Jetall Capital's post-hoc assertion that Claim No. 23 and Claim No. 24 represent distinct claims.

### A. Claim No. 24 is not entitled to prima facie validity and the Trustee has rebutted any presumption.

76. The Claim No. 24 Response describes the prima facie validity of proofs of claim and the burden shifting process. (Claim No. 24 Response ¶ 3). According to Jetall Capital, Claim No. 23 includes all documents and information required by Bankruptcy Rule 3001(c) and Official Form 410. This is obviously false, and Claim No. 24 is not entitled to any presumption of validity.

77. Claim No. 24 contains absolutely no information regarding the basis of Jetall Capital's asserted claim. Line 8 of Official Form 410 setting out the basis of the claim is blank. Further, despite Jetall Capital's assertion that Claim No. 24 is based on the Managing Leasing Agreement, wire transfers, and bank transfers, none of these documents are attached to Claim No. 24, as required by Bankruptcy Rule 3001(c)(1).

78. Even if Claim No. 24 was entitled to a presumption of validity, it would be rebutted by the Trustee's allegations. As described in the Trustee's Jetall Claims Objection, the Debtor—an entity also controlled by Choudhri—did not include a claim by Jetall Capital on its schedules. The schedules are also silent about any "Management Leasing Agreement" but indicate that *Jetall Companies* is the relevant counterparty to a "Property Management Agreement." While the Debtor's schedules are the barest of evidence, they overcome the nullity of Claim No. 24, especially as the Debtor is an insider of Jetall Capital. The Debtor's non-scheduling of Jetall Capital raises a legitimate question about the validity of the claim

29

000513

79.     Further, Claim No. 23 and Claim No. 24 are exact duplicates. It is not merely that their content is the same—the proofs of claim have a number of aberrations to Official Form 410 that are precisely repeated and Choudhri's signature is identical on both. This sufficiently calls into question Jetall Capital's assertions in its responses that Claim No. 23 and Claim No. 24 represent distinct claims to rebut any presumption of validity of the claims. The circumstances at least raise the question of whether the claim was inadvertently filed twice and Jetall Capital's arguments are merely post-hoc justifications.

**B. The Trustee's objection to Claim No. 24 should be sustained.**

80.     The Trustee anticipates that the evidence at the hearing will show that Jetall Capital does not have a valid claim. On information and belief, Claim No. 24 did not have any description or documentation because there is none. The Debtor's schedules indicate that Jetall Capital does not have a claim because there is none. Jetall Capital is not indicated in the Debtor's schedules as the counterparty to any agreement because it is Jetall Companies—which filed its own $3,180,223.25 Claim [Proof of Claim No. 20]—that is the correct counterparty. If Jetall Capital presents evidence purporting to show something different at the hearing that evidence should be evaluated critically.

81.     The apparent duplication of Claim No. 23 and Claim No. 24 is a separate problem. Whatever actually happened, it is consistent with the conduct of insiders to the Debtor in this case that the same proof of claim was inadvertently filed twice and a story was concocted afterwards. Again, the Court should evaluate critically any contrary explanation provided at the hearing.

<u>**CONCLUSION**</u>

For the reasons set out above, the Trustee respectfully submits that the Court should sustain the Trustee's objections to Claim No. 7 (2425 WL LLC), Claim No. 21 (Choudhri—Tax Loan Claim), Claim No. 22 (Choudhri—Reimbursement Claim), Claim No. 23 (Jetall Capital—Lease

000514

Claim), and Claim No. 24 (Jetall Capital—Management Leasing Agreement Claim). The conclusory responses to the Trustee's objections aside, the evidence and arguments at the hearing will show that these claims are not allowable.

Dated: July 20, 2024

Respectfully submitted,

SHANNON & LEE LLP

*/s/R. J. Shannon*
Kyung S. Lee (TBA No. 12128400)
R. J. Shannon (TBA No. 24108062)
2100 Travis Street, STE 1525
Houston, TX 77002
Telephone: (713) 714-5770
Email: klee@shannonleellp.com
　　　　rshannon@shannonleellp.com

*Counsel to the Chapter 11 Trustee*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served by the Court's CM/ECF system on all parties registered to receive such service at the time of filing, including the following persons:

H. Gray Burks, IV
BurksBaker, PLLC
950 Echo Lane, Suite 300
Houston, TX 77024
*Counsel to 2425 WL LLC, Ali Choudhri,*
*and Jetall Capital, LLC*

*/s/R. J. Shannon*

000515

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Case No. 23-34815 |
|  | ) |  |
| GALLERIA 2425 OWNER, LLC, | ) |  |
|  | ) | Chapter 11 |
| Debtor. | ) |  |
|  | ) |  |

## WITNESS AND EXHIBIT LIST

| | |
|---|---|
| Judge: | Hon. Jeffrey P. Norman |
| Hearing Date: | July 24, 2024 |
| Hearing Time: | 11:00 a.m. prevailing Central Time |
| Party's Name: | Christopher R. Murray, Chapter 11 Trustee |
| Attorney's Name: | R. J. Shannon |
| Attorney's Phone: | (713) 714-5770 |
| Nature of Proceeding: | Hearing on: <ul><li>Trustee's Objection to Claim No. 7 of 2425 WL LLC [ECF No. 402];</li><li>Trustee's Omnibus Objection to Claim Nos. 21 and 22 of Ali Choudhri [ECF No. 403]; and</li><li>Trustee's Omnibus Objection to Claim Nos. 23 and 24 of Jetall Capital, LLC [ECF No. 404]</li></ul> |

Christopher R. Murray, the chapter 11 trustee in the above-captioned case (the "Trustee"), hereby submits this witness and exhibit list in connection with the hearing to be held on July 8, 2024, at 9:00 a.m. (Central Time) (the "Hearing").

## WITNESSES

The Trustee may call any of the following witnesses at the Hearing, whether in person, by proffer, or by declaration pursuant to Fed. R. Civ. P. Rule 43(c) made applicable by Bankruptcy Local Rule 9017-1(c):

1. Christopher R. Murray;

2. Ali Choudhri;

3. Any witness called or designated by any other party; and

4. Any witness necessary to rebut the testimony of any witness called or designated by any other party.

## **EXHIBITS**

The Trustee may offer for admission into evidence any of the following exhibits, any exhibit designated by any other party, and any document filed on the docket in the above-captioned case at the Hearing:

| Ex. | Description | Offered | Objection | Admitted /Not Admitted | Disposition |
|---|---|---|---|---|---|
| 1 | Proof of Claim No. 7 (Amended) | | | | |
| 2 | Appendix A to Part 1024 – Instructions for Completing HUD-1 and HUD-1 a Settlement Statements; Sample HUD-1 and HUD-1 a Statements (10/19/2017 Version), available at https://www.consumerfinance.gov/rules-policy/regulations/1024/2017-10-19/a/ | | | | |
| 3 | Plaintiff's Original Petition and Exhibits in Cause No. 2021-63370 (281st District Court, Harris County, Texas) | | | | |
| 4 | Loan Agreement dated May 23, 2018, between the Debtor and NBK (Ex. C to Trustee's objection to Claim No. 7 [ECF No. 402-5] and previously admitted as ECF Nos. 87-2 and 501-10) | | | | |
| 5 | Note issued by the Debtor to NBK dated May 23, 2018 (Ex. D to Trustee's objection to Claim No. 7 [ECF No. 402-6] and previously admitted as ECF No. 143-7 and 501-12) | | | | |

000517

| Ex. | Description | Offered | Objection | Admitted /Not Admitted | Disposition |
|-----|-------------|---------|-----------|------------------------|-------------|
| 6 | Deed of trust granted by the Debtor to NBK dated May 23, 2018 (Ex. E to Trustee's objection to Claim No. 7 [ECF No. 402-7] and previously admitted as ECF No. 143-8 and 501-11) | | | | |
| 7 | Absolute assignment of leases granted by the Debtor to NBK dated May 23, 2018 (previously admitted as ECF No. 143-9) | | | | |
| 8 | Sworn Document Authorizing Transfer of Tax Lien (Ex. G to Trustee's objection to Claim No. 7 [ECF No. 402-9]) | | | | |
| 9 | Tax Lien Contract (Ex. H to Trustee's objection to Claim No. 7 [ECF No. 402-10]) | | | | |
| 10 | Debtor Corporate Organization Chart (Ex. B to NBK Disclosure Statement [ECF No. 195] | | | | |
| 11 | Galleria 2425 Owner, LLC Application for Registration of a Foreign Limited Liability Company filed April 5, 2018 | | | | |
| 12 | Amended and Restated Limited Liability Company Agreement of Galleria 2425 JV, LLC dated May 23, 2018 (Ex. I to Trustee's objection to Claim No. 7 [ECF No. 402-11] | | | | |
| 13 | Galleria 2425 JV, LLC Application for Registration of a Foreign Limited Liability Company filed April 5, 2018 (Ex. B to Trustee's objection to Claim No. 7 [ECF No. 402-4] | | | | |
| 14 | Galleria 2425 JV, LLC Unanimous Consent of Members in Lieu of Meeting (Ex. J to Trustee's Objection to Claim No. 7 [ECF No. 402-12] | | | | |

000518

| Ex. | Description | Offered | Objection | Admitted /Not Admitted | Disposition |
|---|---|---|---|---|---|
| 15 | Notice of Deposition and Subpoena Duces Tecum to 2425 WL LLC (previously admitted as ECF No. 505-7) | | | | |
| 16 | Subpoena to Testify at a Deposition in a Bankruptcy Case (or Adversary Proceeding) (previously admitted as ECF No. 505-9) | | | | |
| 17 | Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Bankruptcy Case (or Adversary Proceeding) (previously admitted as ECF No. 505-10) | | | | |
| 18 | June 7, 2024, emails between R. Shannon and M. Smith re Extension of Deadline for 2425 WL LLC Document Production to June 13, 2024 | | | | |
| 19 | Notice of Appearance of Mark E. Smith on behalf of 2425 WL LLC [ECF No. 439] | | | | |
| 20 | June 26, 2024, emails between R. Shannon and S. Sather re outstanding discovery | | | | |
| 21 | July 16, 2024, email from R. Shannon and S. Sather and G. Burks re outstanding discovery | | | | |
| 22 | Proof of Claim No. 21 | | | | |
| 23 | Assignment of Tax Liens (Ex. A to Trustee's objection to Claim Nos. 21 and 22 [ECF No. 403-3]) | | | | |
| 24 | Plaintiff's Third Amended Complaint in Adv. Proc. No. 24-03120 [Adv. Proc. Dkt. No. 8] | | | | |
| 25 | Proof of Claim No. 22 | | | | |

000519

| Ex. | Description | Offered | Objection | Admitted /Not Admitted | Disposition |
|---|---|---|---|---|---|
| 26 | Confidential Settlement Agreement (Ex. B to Trustee's objection to Claim Nos. 21 and 22 [ECF No. 403-4]) | | | | |
| 27 | Ali Choudhri Net Worth Affidavit filed in Cause No. 2012-27197A (333rd District Court, Harris County, Texas) | | | | |
| 28 | Proof of Claim No. 23 | | | | |
| 29 | Lease Agreement between the Debtor and Jetall Companies, Inc. and Amendments thereto | | | | |
| 30 | Debtor's Schedules and Statement of Financial Affairs [ECF No. 70] (previously admitted as ECF No. 171-4) | | | | |
| 31 | Proof of Claim No. 24 | | | | |
| 32 | Transcript of January 31, 2024, hearing | | | | |
| 33 | Internal Notes of NBK on Loan to Galleria 2425 Owner | | | | |

The Trustee reserves the right to supplement, amend, or delete any witness and exhibits prior to the Hearing. The Trustee also reserves the right to (a) ask the Court to take judicial notice of any document, (b) introduce exhibits previously admitted or attached as exhibits to the relevant pleadings, and (c) introduce any exhibit necessary or appropriate to necessary to rebut the testimony of any witnesses called or designated by any other party or an exhibit introduced or designated by any other party.

000520

Dated: July 22, 2024

Respectfully submitted,

SHANNON & LEE LLP

/s/R. J. Shannon
Kyung S. Lee (TBA No. 12128400)
R. J. Shannon (TBA No. 24108062)
2100 Travis Street, STE 1525
Houston, TX 77002
Telephone: (713) 714-5770
Email: klee@shannonleellp.com
        rshannon@shannonleellp.com

*Counsel to the Chapter 11 Trustee*

6

000521

**Fill in this information to identify the case:**

Debtor 1 ___Galleria 2425 Owner, LLC___

Debtor 2 _____
(Spouse, if filing)

United States Bankruptcy Court for the: ___Southern District of Texas___

Case number ___23-34815___

Official Form 410

# Proof of Claim

04/22

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. **Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

| Part 1: | Identify the Claim |
| --- | --- |

| | |
| --- | --- |
| 1. **Who is the current creditor?** | 2425 WL, LLC |
| | Name of the current creditor (the person or entity to be paid for this claim) |
| | Other names the creditor used with the debtor _____ |
| 2. **Has this claim been acquired from someone else?** | ☑ No<br>☐ Yes. From whom? _____ |
| 3. **Where should notices and payments to the creditor be sent?**<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?** | **Where should payments to the creditor be sent? (if different)** |

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
| --- | --- |
| Stephen W. Sather | |
| Name | Name |
| 7320 N. MoPac Expwy., Suite 400 | |
| Number          Street | Number          Street |
| Austin              TX          78731 | Austin              US          78731 |
| City                 State       ZIP Code | City                 State       ZIP Code |
| Contact phone 512-649-3243 | Contact phone 5126493243 |
| Contact email ssather@bn-lawyers.com | Contact email ssather@bn-lawyers.com |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

| | |
| --- | --- |
| 4. **Does this claim amend one already filed?** | ☐ No<br>☑ Yes. Claim number on court claims registry (if known) _7-1_   Filed on __03/21/2024__<br>                                                                                                  MM / DD  / YYYY |
| 5. **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No<br>☐ Yes. Who made the earlier filing? _____ |

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**    $_____22,968,231.58_. Does this amount include interest or other charges?

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Real Eseate Lien

**9. Is all or part of the claim secured?**

☐ No

☑ Yes.  The claim is secured by a lien on property.

**Nature of property:**

☑ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:**    Deed of Trust

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**    $_____

**Amount of the claim that is secured:**    $_____

**Amount of the claim that is unsecured:**  $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**    $_____

**Annual Interest Rate** (when case was filed) 10.00 %

☑ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☑ No | | |
|---|---|---|---|
| | ☐ Yes. *Check one:* | | **Amount entitled to priority** |

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).    $ _____

☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).    $ _____

☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).    $ _____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).    $ _____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).    $ _____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies.    $ _____

\* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

---

**Part 3:    Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    04/10/2024
                     MM / DD / YYYY

_____
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Ali Choudhri | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | Manager | | |
| Company | 2425 WL, LLC | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 2425 West Loop South, 11th Floor | | |
| | Number        Street | | |
| | Houston | TX | 77027 |
| | City | State | ZIP Code |
| Contact phone | _____ | Email | _____ |

| Principal | $ 14,780,332.38 |
|---|---|
| Interest Rate | 10% |
| Start Date | 5/23/2018 |
| Petition Date | 12/5/2023 |
| Intrest Accrued | $  8,187,899.20 |
| Total | $ 22,968,231.58 |

## PROMISSORY NOTE

**$14,730,332.38 (USD)**

**Houston, Texas**
**May 23, 2018**

      **FOR VALUE RECEIVED, Galleria 2425 Owner, LLC** ("Borrower"), a Delaware limited liability company with an address at 1001 W. Loop South, Suite 700 Houston Texas 77027, through its managing member **Galleria 2425 JV, LLC**, a Delaware limited liability company, hereby unconditionally promises to pay to the order of **2425 WL, LLC**, a New York limited liability company, having an address at 11509 S Lou Al Dr Houston Texas 77024 ("Lender"), or at such other place as the holder hereof may from time to time designate in writing, the maximum principal sum of **FOURTEEN MILLION SEVEN HUNDRED AN THIRTY THOUSAND THREE HUNDRED AND THIRTY TWO AND 38/100 DOLLARS ($14,730,332.38)** in lawful money of the United States of America with interest thereon to be computed from the date of this Note at the Applicable Interest Rate, and to be paid in accordance with the terms of this Note, and the Deed of Trust (the "Deed of Trust"), dated as of the date hereof, between Borrowers and Lender (the "Loan Agreement"). All capitalized terms not defined herein shall have the meanings set forth in the Deed of Trust. This Note and the Deeds of Trust are sometimes collectively referred to as the "Loan Documents" or singly as "Loan Document."

### ARTICLE 1 - Payment Terms

      Borrowers agree to pay the principal sum of this Note, together with all accrued and unpaid interest thereon, all at the stated regular rate of ten percent (10.00%) per annum (the "Applicable Rate") on or before May 22, 2021 (the "Maturity Date"). Commencing May 23, 2018 and continuing on the 23rd of each subsequent May until the Maturity Date, Borrower agrees to pay to Lender interest-only payments based on the principal sum of this Note and the Applicable Rate.

      If Borrowers fail to pay the amount stated in the preceding paragraph, together with all accrued and unpaid interest thereon on or before the Maturity Date, Borrower shall pay to Lender additional interest at the Default Rate of the lesser of eighteen percent (18.00%) per annum (the "Default Rate") or the maximum amount allowed by the laws for the State of New York.

### ARTICLE 2 - Default And Acceleration

      The Debt shall without notice become immediately due and payable at the option of Lender if any payment of principal or interest required in this Note is not paid on or prior to the date when due or if not paid on the Maturity Date or on the happening of any other Event of Default and in addition, Lender shall be entitled to receive interest on the entire unpaid principal sum at the Default Rate pursuant to the terms of the Loan Agreement. This Article 2, however, shall not be construed as an agreement or privilege to extend the date of the payment of the Debt, nor as a waiver of any other right or remedy accruing to Lender by reason of the occurrence of any Event of Default.

## ARTICLE 3 - Loan Documents

This Note is secured by the Deed of Trust. All of the terms, covenants and conditions contained in any other Loan Document are hereby made part of this Note to the same extent and with the same force as if they were fully set forth herein.

## ARTICLE 4 - Savings Clause

This Note and the other Loan Documents are subject to the express condition that at no time shall Borrowers be obligated or required to pay interest on the principal balance of the Loan at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate. If, by the terms of this Note or any other Loan Document, Borrowers are at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Legal Rate, the Applicable Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder. All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate of interest from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

## ARTICLE 5 - No Oral Change

This Note may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrowers or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

## ARTICLE 6 - Waivers

Borrowers and all others who may become liable for the payment of all or any part of the Debt do hereby severally waive presentment and demand for payment, notice of dishonor, notice of intent to accelerate, notice of acceleration, protest, notices of protest and/or of non-payment and any and all other notices of any kind except any such notice expressly required by this Note. No release of any security for the Debt or extension of time for payment of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of this Note or any other Loan Documents made by agreement between Lender or any other Person shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrowers, and any other Person who may become liable for the payment of all or any part of the Debt, under this Note, the Loan Agreement or the other Loan Documents.

No notice to or demand on Borrowers shall be deemed to be a waiver of the obligation of Borrowers or of the right of Lender to take further action without further notice or demand as provided for in this Note, the Loan Agreement or the other Loan Documents. In the case of

- 2 -

Grove, the agreements herein contained shall remain in force and be applicable, notwithstanding any changes in the members comprising Grove, and the term "Borrower" as used herein, shall include any alternate or successor limited liability company, but any predecessor limited liability company shall not thereby be released from any liability.  (Nothing in the foregoing sentence shall be construed as a consent to, or a waiver of, any prohibition or restriction on transfers of interests in such partnership, corporation or limited liability company which may be set forth in any Loan Document.)

## ARTICLE 7 - Transfer

Upon the transfer of this Note, Borrowers hereby waiving notice of any such transfer, Lender may deliver all the collateral mortgaged, granted, pledged or assigned pursuant to the Loan Documents, or any part thereof, to the transferee who shall thereupon become vested with all the rights herein or under applicable law given to Lender with respect thereto, and Lender shall thereafter forever be relieved and fully discharged from any liability or responsibility in the matter accruing from and after the date of the transfer; but Lender shall retain all rights hereby given to it with respect to any liabilities and the collateral not so transferred.

## ARTICLE 8 - Governing Law

This Note shall be governed in accordance with the laws of the State of New York.

## ARTICLE 9 - Notices

All notices or other written communications hereunder shall be delivered to the respective addresses for each such party shown hereinabove, unless the party to whom notice is directed has given notice that its address has changed and provided the party from whom notice is given its new address.

## ARTICLE 10 -

[Intentionally omitted.]

## ARTICLE 11 - Liability

The obligations and liabilities of each Borrower hereunder shall be joint and several.

### [NO FURTHER TEXT ON THIS PAGE]

- 3 -

000528

IN WITNESS WHEREOF, EFFECTIVE as of the day and year first above written.

**BORROWER:**

**GALLERIA 2425 OWNER, LLC,**
a Delaware limited partnership

    **By: GALLERIA 2425 JV, LLC**
    Its Managing Member

  By:_____
    Its Authorized Agent

RP-2021-258619
05/11/2021   ER   $66.00

# Deed of Trust

**Notice of confidentiality rights: If you are a natural person, you may remove or strike any or all of the following information from any instrument that transfers an interest in real property before it is filed for record in the public records: your Social Security number or your driver's license number.**

## Basic Information

**Date:**  May 23, 2018

**Grantor:**      Galleria 2425 Owner, LLC, a Delaware limited liability company

**Grantor's Mailing Address:** 1001 West Loop South Suite 700, Houston, TX 77027

**Trustee:**    Michael O'Connor

**Trustee's Mailing Address:**  11509 S Lou Al Dr., Houston, TX 77024

**Lender:**    2425 WL, LLC, a New York limited liability company

**Lender's Mailing Address:**  11509 S Lou Al Dr., Houston, TX 77024

**Obligation**

   **Note**

   **Date:**  May 23, 2018

   **Original principal amount:** $14,730,332.38

   **Borrower:**    Galleria 2425 Owner, LLC.

   **Lender:**    2425 WL, LLC

   **Maturity date:**    June 1, 2021

   **Other Debt:** N/A

**Property** (including any improvements): that certain real property described on <u>Exhibit A</u> attached hereto.

**Other Exceptions to Conveyance and Warranty:** N/A

**A.    Granting Clause**

   For value received and to secure payment of the Obligation, Grantor conveys the Property to Trustee in trust. Grantor warrants and agrees to defend the title to the Property,

1

521550.000001 24808189.2

000530

subject to the Other Exceptions to Conveyance and Warranty. On payment of the Obligation and all other amounts secured by this deed of trust, this deed of trust will have no further effect, and Lender will release it at Grantor's expense.

**B.     Grantor's Obligations**

*B.1.*     Grantor agrees to maintain all property and liability insurance coverages with respect to the Property, revenues generated by the Property, and operations on the Property that Lender reasonably requires ("Required Insurance Coverages"), issued by insurers and written on policy forms acceptable to Lender, and as to property loss, that are payable to Lender under policies containing standard mortgagee clauses, and deliver evidence of the Required Insurance Coverages in a form acceptable to Lender before execution of this deed of trust and again at least ten days before the expiration of the Required Insurance Coverages.

*B.2.*     Grantor agrees to—

    a.     keep the Property in good repair and condition;

    b.     pay all taxes and assessments on the Property before delinquency, not authorize a taxing entity to transfer its tax lien on the Property to anyone other than Lender, and not request a deferral of the collection of taxes pursuant to section 33.06 of the Texas Tax Code;

    c.     defend title to the Property subject to the Other Exceptions to Conveyance and Warranty and preserve the lien's priority as it is established in this deed of trust;

    d.     obey all laws, ordinances, and restrictive covenants applicable to the Property;

    e.     keep any buildings occupied as required by the Required Insurance Coverages; and

    f.     notify Lender of any change of address.

**C.     Lender's Rights**

*C.1.*     Lender or Lender's mortgage servicer may appoint in writing one or more substitute trustees, succeeding to all rights and responsibilities of Trustee.

*C.2.*     If the proceeds of the Obligation are used to pay any debt secured by prior liens, Lender is subrogated to all the rights and liens of the holders of any debt so paid.

*C.3.*     Lender may apply any proceeds received under the property insurance policies covering the Property either to reduce the Obligation or to repair or replace damaged or destroyed improvements covered by the policy. If the Property is Grantor's primary residence and Lender reasonably determines that repairs to the improvements are economically feasible, Lender will make the property insurance proceeds available to Grantor for repairs.

2

UNOFFICIAL COPY

*C.4.* Notwithstanding the terms of the Note to the contrary, and unless applicable law prohibits, all payments received by Lender from Grantor with respect to the Obligation or this deed of trust may, at Lender's discretion, be applied first to amounts payable under this deed of trust and then to amounts due and payable to Lender with respect to the Obligation, to be applied to late charges, principal, or interest in the order Lender in its discretion determines.

*C.5.* If Grantor fails to perform any of Grantor's obligations, Lender may perform those obligations and be reimbursed by Grantor on demand for any amounts so paid, including attorney's fees, plus interest on those amounts from the dates of payment at the rate stated in the Note for matured, unpaid amounts. The amount to be reimbursed will be secured by this deed of trust.

*C.6.* **COLLATERAL PROTECTION INSURANCE NOTICE**

**In accordance with the provisions of section 307.052(a) of the Texas Finance Code, the Beneficiary hereby notifies the Grantor as follows:**

**(A)** **the Grantor is required to:**

**(i)** **keep the collateral insured against damage in the amount the Lender specifies;**

**(ii)** **purchase the insurance from an insurer that is authorized to do business in the state of Texas or an eligible surplus lines insurer; and**

**(iii)** **name the Lender as the person to be paid under the policy in the event of a loss;**

**(B)** **the Grantor must, if required by the Lender, deliver to the Lender a copy of the policy and proof of the payment of premiums; and**

**(C)** **if the Grantor fails to meet any requirement listed in Paragraph (A) or (B), the Lender may obtain collateral protection insurance on behalf of the Grantor at the Grantor's expense.**

*C.7.* If a default exists in payment of the Obligation or performance of Grantor's obligations and the default continues after any required notice of the default and the time allowed to cure, Lender may—

a. declare the unpaid principal balance and earned interest on the Obligation immediately due;

b. exercise Lender's rights with respect to rent under the Texas Property Code as then in effect;

c. direct Trustee to foreclose this lien, in which case Lender or Lender's

3

521550.000001 24808189.2

000532

agent will cause notice of the foreclosure sale to be given as provided by the Texas Property Code as then in effect; and

    d.    purchase the Property at any foreclosure sale by offering the highest bid and then have the bid credited on the Obligation.

*C.8.*    Lender may remedy any default without waiving it and may waive any default without waiving any prior or subsequent default.

**D.**    **Trustee's Rights and Duties**

If directed by Lender to foreclose this lien, Trustee will—

*D.1.*    either personally or by agent give notice of the foreclosure sale as required by the Texas Property Code as then in effect;

*D.2.*    sell and convey all or part of the Property "AS IS" to the highest bidder for cash with a general warranty binding Grantor, to the Other Exceptions to Conveyance and Warranty and without representation or warranty, express or implied, by Trustee;

*D.3.*    from the proceeds of the sale, pay, in this order—

    a.    expenses of foreclosure, including a reasonable commission to Trustee;

    b.    to Lender, the full amount of principal, interest, attorney's fees, and other charges due and unpaid;

    c.    any amounts required by law to be paid before payment to Grantor; and

    d.    to Grantor, any balance; and

*D.4.*    be indemnified, held harmless, and defended by Lender against all costs, expenses, and liabilities incurred by Trustee for acting in the execution or enforcement of the trust created by this deed of trust, which includes all court and other costs, including attorney's fees, incurred by Trustee in defense of any action or proceeding taken against Trustee in that capacity.

**E.**    **General Provisions**

*E.1.*    If any of the Property is sold under this deed of trust, Grantor must immediately surrender possession to the purchaser. If Grantor does not, Grantor will be a tenant at sufferance of the purchaser, subject to an action for forcible detainer.

*E.2.*    Recitals in any trustee's deed conveying the Property will be presumed to be true.

*E.3.*    Proceeding under this deed of trust, filing suit for foreclosure, or pursuing any other remedy will not constitute an election of remedies.

521550.000001 24808189.2

000533

*E.4.*    This lien will remain superior to liens later created even if the time of payment of all or part of the Obligation is extended or part of the Property is released.

*E.5.*    If any portion of the Obligation cannot be lawfully secured by this deed of trust, payments will be applied first to discharge that portion.

*E.6.*    Grantor assigns to Lender all amounts payable to or received by Grantor from condemnation of all or part of the Property, from private sale in lieu of condemnation, and from damages caused by public works or construction on or near the Property. After deducting any expenses incurred, including attorney's fees and court and other costs, Lender will either release any remaining amounts to Grantor or apply such amounts to reduce the Obligation. Lender will not be liable for failure to collect or to exercise diligence in collecting any such amounts. Grantor will immediately give Lender notice of any actual or threatened proceedings for condemnation of all or part of the Property.

*E.7.*    Grantor collaterally assigns to Lender all present and future rent from the Property and its proceeds. Grantor warrants the validity and enforceability of the assignment. Grantor will apply all rent to payment of the Obligation and performance of this deed of trust, but if the rent exceeds the amount due with respect to the Obligation and the deed of trust, Grantor may retain the excess. If a default exists in payment of the Obligation or performance of this deed of trust, Lender may exercise Lender's rights with respect to rent under the Texas Property Code as then in effect. Lender neither has nor assumes any obligations as lessor or landlord with respect to any occupant of the Property. Lender may exercise Lender's rights and remedies under this paragraph without taking possession of the Property. Lender will apply all rent collected under this paragraph as required by the Texas Property Code as then in effect. Lender is not required to act under this paragraph, and acting under this paragraph does not waive any of Lender's other rights or remedies.

*E.8.*    Interest on the debt secured by this deed of trust will not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the principal of the debt or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess will be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded. This provision overrides any conflicting provisions in this and all other instruments concerning the debt.

*E.9.*    In no event may this deed of trust secure payment of any debt that may not lawfully be secured by a lien on real estate or create a lien otherwise prohibited by law.

*E.10.*    Grantor may not sell, transfer, or otherwise dispose of any Property, whether voluntarily or by operation of law, without the prior written consent of Lender. If granted, consent may be conditioned upon (a) the grantee's integrity, reputation, character, creditworthiness, and management ability being satisfactory to Lender; and (b) the grantee's executing, before such sale, transfer, or other disposition, a written assumption agreement containing any terms Lender may require, such as a principal pay down on the Obligation, an increase in the rate of interest payable with respect to the Obligation, a transfer fee, or any other

modification of the Note, this deed of trust, or any other instruments evidencing or securing the Obligation.

Grantor may not cause or permit any Property to be encumbered by any liens, security interests, or encumbrances other than the liens securing the Obligation and the liens securing ad valorem taxes not yet due and payable without the prior written consent of Lender. If granted, consent may be conditioned upon Grantor's executing, before granting such lien, a written modification agreement containing any terms Lender may require, such as a principal pay down on the Obligation, an increase in the rate of interest payable with respect to the Obligation, an approval fee, or any other modification of the Note, this deed of trust, or any other instruments evidencing or securing the Obligation.

Grantor may not grant any lien, security interest, or other encumbrance (a "Subordinate Instrument") covering the Property that is subordinate to the liens created by this deed of trust without the prior written consent of Lender. If granted, consent may be conditioned upon the Subordinate Instrument's containing express covenants to the effect that—

a.  the Subordinate Instrument is unconditionally subordinate to this deed of trust;

b.  if any action is instituted to foreclose or otherwise enforce the Subordinate Instrument, no action may be taken that would terminate any occupancy or tenancy without the prior written consent of Lender, and that consent, if granted, may be conditioned in any manner Lender determines;

c.  rents, if collected by or for the holder of the Subordinate Instrument, will be applied first to the payment of the Obligation then due and to expenses incurred in the ownership, operation, and maintenance of the Property in any order Lender may determine, before being applied to any indebtedness secured by the Subordinate Instrument;

d.  written notice of default under the Subordinate Instrument and written notice of the commencement of any action to foreclose or otherwise enforce the Subordinate Instrument must be given to Lender concurrently with or immediately after the occurrence of any such default or commencement; and

e.  in the event of the bankruptcy of Grantor, all amounts due on or with respect to the Obligation and this deed of trust will be payable in full before any payments on the indebtedness secured by the Subordinate Instrument.

Grantor may not cause or permit any of the following events to occur without the prior written consent of Lender: if Grantor is (a) a corporation, the termination of the corporation or the sale, pledge, encumbrance, or assignment of any shares of its stock; (b) a limited liability company, the termination of the company or the sale, pledge, encumbrance, or assignment of any of its membership interests; (c) a general partnership or joint venture, the termination of the

RP-2021-258619

UNOFFICIAL COPY

6

partnership or venture or the sale, pledge, encumbrance, or assignment of any of its partnership or joint venture interests, or the withdrawal from or admission into it of any general partner or joint    enture; or (d) a limited partnership, (i) the termination of the partnership, (ii) the sale, pledge, encumbrance, or assignment of any of its general partnership interests, or the withdrawal from or admission into it of any general partner, (iii) the sale, pledge, encumbrance, or assignment of a controlling portion of its limited partnership interests, or (iv) the withdrawal from or admission into it of any controlling limited partner or partners. If granted, consent may be conditioned upon (a) the integrity, reputation, character, creditworthiness, and management ability of the person succeeding to the ownership interest in Grantor (or security interest in such ownership) being satisfactory to Lender; and (b) the execution, before such event, by the person succeeding to the interest of Grantor in the Property or ownership interest in Grantor (or security interest in such ownership) of a written modification or assumption agreement containing such terms as Lender may require, such as a principal pay down on the Obligation, an increase in the rate of interest payable with respect to the Obligation, a transfer fee, or any other modification of the Note, this deed of trust, or any other instruments evidencing or securing the Obligation.

E.11.    When the context requires, singular nouns and pronouns include the plural.

E.12.    The term *Note* includes all extensions, modifications, and renewals of the Note and all amounts secured by this deed of trust.

E.13.    This deed of trust binds, benefits, and may be enforced by the successors in interest of all parties.

E.14.    If Grantor and Borrower are not the same person, the term *Grantor* includes Borrower.

E.15.    Grantor and each surety, endorser, and guarantor of the Obligation waive, to the extent permitted by law, all (a) demand for payment, (b) presentation for payment, (c) notice of intention to accelerate maturity, (d) notice of acceleration of maturity, € protest, (f) notice of protest, and (g) rights under sections 51.003, 51.004, and 51.005 of the Texas Property Code.

E.16.    Grantor agrees to pay reasonable attorney's fees, trustee's fees, and court and other costs of enforcing Lender's rights under this deed of trust if an attorney is retained for its enforcement.

E.17.    If any provision of this deed of trust is determined to be invalid or unenforceable, the validity or enforceability of any other provision will not be affected.

E.18.    The term *Lender* includes any mortgage servicer for Lender.

E.19.    Grantor hereby grants Lender a right of first refusal with respect to Grantor's power to authorize any third party (other than Lender pursuant to its rights as set forth in this instrument) to pay ad valorem taxes on the Property and authorize a taxing entity to transfer its tax lien on the Property to that third party. Grantor's authorization to any third party (other than Lender) to pay the ad valorem taxes and receive transfer of a taxing entity's lien for ad valorem taxes shall be null and void and of no force and effect unless Lender, within ten days after

7

receiving written notice from Grantor, fails to pay the ad valorem taxes pursuant to Lender's rights as set forth in this instrument.

    *E.20.*    Grantor represents that this deed of trust and the Note are given for the following purposes: evidence and secure the Obligation.

            **GRANTOR**:

            **GALLERIA 2425 OWNER, LLC,**
            a Delaware limited liability company

            By:    Galleria 2425 JV, LLC,
                    a Delaware limited liability company,
                    its Managing Member

            By:    Galleria West Loop Investments II LLC,
                    its Managing Member

            By: _____
            Name: Ali Choudhri
            Title: Manager

STATE OF TEXAS        §
                        §
COUNTY OF Harris    §

    This instrument was acknowledged before me on this _____ day of _____, 2021, by Ali Choudhri, the Manager of Galleria West Loop Investments II LLC, the Managing Member of Galleria 2425 JV, LLC, a Delaware limited liability company, the Managing Member of Galleria 2425 Owner, LLC, a Delaware limited liability company, on behalf of said limited liability companies.

[SEAL]                    Notary Public in and for the
                              STATE OF TEXAS

    STEPHANIE ALVAREZ
    Public State of Texas
    m. Expires 04-06-2021
    Notary ID 131078509

RP-2021-258619

UNOFFICIAL COPY

8

EXHIBIT A
PROPERTY DESCRIPTION

**TRACT 1: FEE TRACT**

BEING 2.4462 ACRES (106,557 SQUARE FEET) OF LAND OUT OF THE WILLIAM WHITE SURVEY, ABSTRACT NO. 836, HOUSTON, HARRIS COUNTY, TEXAS, BEING THE SAME PROPERTY CONVEYED TO 2425 WEST LOOP, LP BY SPECIAL WARRANTY DEED RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20070732472, SAID TRACT CONVEYED BY DEED TO ONE WEST LOOP PLAZA, LTD. UNDER HCCF NO. S547896 AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE WESTHEIMER ROAD (ROW VARIES) BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR. TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 204.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST, TO A 1/2 INCH IRON ROD FOUND AT THE NORTHEAST CORNER OF THE 2.3468 ACRE PARCEL BEING THE SOUTHEAST CORNER OF THE HEREIN DESCRIBED PARCEL AND THE POINT OF BEGINNING:

THENCE, WESTERLY ALONG THE COMMON LINE OF THE 2.3468 ACRE PARCEL TO THE SOUTH AND THE HEREIN DESCRIBED PARCEL TO THE NORTH, SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 464.50 FEET TO A POINT ON THE EASTERLY RIGHT OF WAY (ROW) LINE OF INTERSTATE 610 WEST LOOP AND THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED PARCEL FROM. WHICH A FOUND RAILROAD SPIKE BEARS SOUTH 21 DEGREES 43 MINUTES EAST 2.42 FEET;

THENCE, NORTHERLY ALONG THE EASTERLY RIGHT OF WAY LINE OF INTERSTATE 610 WEST LOOP (ROW 350 FEET) NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST 251.27 FEET TO AN "X" SET IN CONCRETE BEING THE SOUTHWEST CORNER OF A 7.8998 ACRE PARCEL AS SHOWN ON THE HOUSTON VENTURE PLAT UNRESTRICTED RESERVE "A" FILED IN THE HARRIS COUNTY MAP RECORDS AS FILM CODE NUMBER 356074, AND THE NORTHWEST CORNER OF THE HEREIN DESCRIBED PARCEL;

THENCE, EASTERLY ALONG THE COMMON LINE OF THE ABOVE INDICATED 7.8998 ACRE PARCEL TO THE NORTH AND THE HEREIN DESCRIBED PARCEL TO THE SOUTH NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 406.61 FEET TO AN "X"

521550.000001 24808189.2

RP-2021-258619

000538

FOUND IN THE WESTERLY LINE OF A 3.4385 ACRE PARCEL OF LAND CONVEYED TO RESTPROP, LTD AS RECORDED IN THE HCCF NO. R228886;

THENCE, SOUTHERLY ALONG A COMMON LINE OF THE ABOVE INDICATED 3.4385 ACRE PARCEL TO THE EAST AND THE HEREIN DESCRIBED PARCEL TO THE WEST, SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 244.64 FEET TO THE POINT OF BEGINNING CONTAINING 106,557 SQUARE FEET, 2.4462 ACRES MORE LESS.

**TRACT 2 EASEMENT TRACT**: 20 FOOT NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT OVER AND ACROSS A TRACT OF LAND NORTHERLY OF AND 20 FEET WIDE ALONG THE ENTIRE NORTHERLY BOUNDARY LINE OF TRACT I; SAID EASEMENT CREATED AND GRANTED BY VI IAN L. SMITH, INDIVIDUALLY AND AS INDEPENDENT EXECUTRIX OF THE ESTATE OF R. E. SMITH, DECEASED IN THAT CERTAIN GENERAL WARRANTY DEED DATED JULY 5, 1977 FILED IN HCCF NO. F216562 AND DESCRIBED IN HCCF NO. G743294, BEING THE SAME EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS INC. IN A DEED RECORDED IN HCCF NO. S056346 AND

THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 204.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST TO A 1/2 INCH IRON ROD FOUND FOR THE SOUTHEAST CORNER OF TRACT I;

THENCE CONTINUING NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 244.64 FEET ALONG A COMMON LINE OF A PREVIOUSLY NOTED 3.4385 ACRE PARCEL OF LAND TO THE EAST AND TRACT I TO THE WEST TO AN "X" FOUND FOR THE NORTHEAST CORNER OF TRACT I AND THE POINT OF BEGINNING;

THENCE, WESTERLY SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 406.61 FEET ALONG THE NORTHERLY LINE OF TRACT 1 TO AN "X" SET ON THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP (350 FEET WIDE);

RP-2021-258619

10

THENCE, NORTHERLY NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST 20.54 FEET ALONG THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP TO A POINT;

THENCE, EASTERLY 20.00 FEET NORTHERLY FROM AND PARALLEL TO THE NORTHERLY LINE OF TRACT 1, NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 401.88 FEET TO A POINT;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST 20.00 FEET TO THE POINT OF BEGINNING AND CONTAINING 0.1856 ACRES OR 8,085 SQUARE FEET OF LAND MORE OR LESS.

**TRACT 3 EASEMENT TRACT**: 20 FOOT NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT;

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT OVER AND ACROSS A TRACT OF LAND SOUTHERLY OF AND 20.00 FEET WIDE ALONG THE ENTIRE SOUTHERN BOUNDARY LINE OF TRACT 1, SAID EASEMENT CREATED AND GRANTED ON FEBRUARY 16, 1979, FROM WEST LOOP HOTEL, LIMITED TO FIN PROPERTIES, LIMITED FILED IN HCCF NO. G041310, BEING THE SAME PROPERTY EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 184.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST TO THE POINT OF BEGINNING, WHENCE THE SOUTHEAST CORNER OF TRACT I BEARS NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 20.02 FEET;

THENCE, WESTERLY 20.00 FEET SOUTHERLY FROM AND PARALLEL TO THE SOUTHERLY LINE OF TRACT 1, SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 469.23 FEET TO A POINT IN THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP;

THENCE, NORTHERLY NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST, 20.54 FEET ALONG THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP TO THE



11

000540

RP-2021-258619

SOUTHWEST CORNER FOR TRACT 1 FROM WHICH A FOUND RAILROAD SPIKE BEARS SOUTH 21 DEGREES 43 MINUTES EAST, 2.42 FEET;

THENCE, EASTERLY NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 464.50 FEET ALONG THE SOUTHERLY LINE OF TRACT 1 TO A 1/2 INCH IRON ROD FOUND AT THE SOUTHEAST CORNER OF TRACT 1;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 20.02 FEET ALONG THE A COMMON LINE BETWEEN A PREVIOUSLY DESCRIBED 2.3468 ACRES PARCEL TO THE WEST AND A 3.4385 ACRE PARCEL TO THE EAST TO THE POINT OF BEGINNING AND CONTAINING 0.2144 ACRES OR 9,337 SQUARE FEET OF LAND, MORE OR LESS.

**TRACT 4 EASEMENT TRACT**: 28 FOOT ROADWAY AND PEDESTRIAN EASEMENT;

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT ACROSS EASTERLY 28 FEET OF A 2.3468 ACRE TRACT ADJACENT TO AND SOUTHERLY OF TRACT I, CREATED AND GRANTED IN THAT CERTAIN ROAD AND PEDESTRIAN EASEMENT DATED FEBRUARY 16, 1979 FROM WEST LOOP HOTEL, LIMITED TO FIN PROPERTIES, LIMITED, FILED IN HCCF NO. G041313, BEING THE SAME PROPERTY EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS;

BEGINNING AT A FOUND 5/8 INCH IRON ROD IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, WESTERLY SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST, 28.00 FEET ALONG THE NORTHERLY LINE OF WESTHEIMER ROAD TO A POINT;

THENCE, NORTHERLY 28.00 FEET WESTERLY OF AND PARALLEL TO THE EASTERLY LINE OF SAID 2.3468 ARE TRACT NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 205.08 FEET TO A POINT ON THE SOUTHERLY LINE OF TRACT I;

THENCE, EASTERLY NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 28.00 FEET ALONG THE SOUTHERLY LINE OF TRACT I TO A 1/2 INCH IRON ROD FOUND IN THE WESTERLY LINE OF A 3.4385 ACRE PARCEL OF LAND PRESENTLY OWNED BY RESTPROP, LTD AS RECORDED IN THE HCCF NO. R228886;

RP-2021-258619

12

000541

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 204.61 FEET ALONG A COMMON LINE OF THE ABOVE INDICATED 3.4385 ACRE PARCEL TO THE EAST SAID THE PREVIOUSLY DESCRIBED 2.3468 ACRE PARCEL TO THE WEST, TO THE POINT OF BEGINNING, CONTAINING 0.1317 ACRES OR 5,735 SQUARE FEET (CALLED 5,740) OF LAND MORE OR LESS.

**TRACT 5 EASEMENT TRACT**: 5 FOOT STORM SEWER EASEMENT

A 1,025 SQUARE FOOT TRACT OF LAND, BEING THAT SAME TRACT UN PROPERTIES, LIMITED, RECORDED IN HCCF NUMBER G041311, LOCATED IN THE WILLIAM WHITE SURVEY, ABSTRACT NUMBER 836, CITY OF HOUSTON, HARRIS COUNTY, TEXAS, BEING THE SAME EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY (ROW) OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. 5056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR. TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE ALONG THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD, SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST, A DISTANCE OF 16.00 FEET TO THE SOUTHEAST CORNER OF SAID EASEMENT AND THE HEREIN DESCRIBED TRACT;

THENCE CONTINUING ALONG THE NORTHERLY LINE OF WESTHEIMER ROAD, SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST A DISTANCE OF 5.00 FEET, THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE DEPARTING SAID WESTHEIMER ROAD, NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, A DISTANCE OF 204.96 FEET, TO A POINT IN THE SOUTHERLY LINE OF A 2.4462 ACRE TRACT CONVEYED BY DEED TO HE 2425 WEST LOOP, LP RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20070732472;

THENCE ALONG THE SOUTHERLY LINE OF SAID 2.4462 ACRE TRACT, NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST A DISTANCE OF 5.00 FEET TO THE NORTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE DEPARTING THE SOUTHERLY LINE OF SAID 2.4462 ACRE TRACT, SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, A DISTANCE OF 204.88 FEET TO THE POINT OF BEGINNING AND CONTAINING 1,025 SQUARE FEET OF LAND, MORE OR LESS.

13

521550.000001 24808189.2

RP-2021-258619

RP-2021-258619
# Pages 14
05/11/2021 12:19 PM
e-Filed & e-Recorded in the
Official Public Records of
HARRIS COUNTY
TENESHIA HUDSPETH
COUNTY CLERK
Fees  $66.00

RECORDERS MEMORANDUM
This instrument was received and recorded electronically
and any blackouts, additions or changes were present
at the time the instrument was filed and recorded.

Any provision herein which restricts the sale, rental, or
use of the described real property because of color or
race is invalid and unenforceable under federal law.
THE STATE OF TEXAS
COUNTY OF HARRIS
I hereby certify that this instrument was FILED in
File Number Sequence on the date and at the time stamped
hereon by me; and was duly RECORDED in the Official
Public Records of Real Property of Harris County, Texas.



COUNTY CLERK
HARRIS COUNTY, TEXAS

000543

### A. Settlement Statement

**B. Type of Loan**

| 1. ☐ FHA  2. ☐ FmHA  3. ☐ Conv Unins | 6. File Number | 7. Loan Number | 8. Mortgage Ins Case Number |
|---|---|---|---|
| 4. ☐ VA  5. ☐ Conv Ins  6. ☐ Seller Finance | 12000990 | | |
| 7. ☐ Cash Sale | | | |

**C. Note:** This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing, they are shown here for informational purposes and are not included in the totals.

| D. Name & Address of Borrower | E. Name & Address of Seller | F. Name & Address of Lender |
|---|---|---|
| Galleria 2425 Owner, LLC, a Delaware limited liability company<br>60 W 2nd St<br>Freeport, NY 11520 | 2425 WL, LLC, a New York Limited Liability Company<br>2500 West Loop South, Suite 255<br>Houston, TX 77027 | National Bank of Kuwait, S.A.K.P., New York Branch, a banking corporation organized under the laws of Kuwait, acting through its New York branch<br>299 Park Avenue<br>New York, NY 10171 |

| G. Property Location | H. Settlement Agent Name |
|---|---|
| TR 31D ABST 836 W WHITE<br>2425 W Loop S<br>Houston , TX 77027 | TransAct Title - Galleria<br>6117 Richmond Ave, Suite 250<br>Houston, TX 77057  Tax ID: 45-3483105<br>Underwritten By: WFG National Title Insurance Company |

| | Place of Settlement | I. Settlement Date |
|---|---|---|
| | TransAct Title - Galleria<br>6117 Richmond Ave, Suite 250<br>Houston, TX 77057 | 5/23/2018<br>Fund. |

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| **100. Gross Amount Due from Borrower** | | **400. Gross Amount Due to Seller** | |
| 101. Contract Sales Price | | 401. Contract Sales Price | $79,500,000.00 |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement Charges to borrower | | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| **Adjustments for items paid by seller in advance** | | **Adjustments for items paid by seller in advance** | |
| 106. City property taxes | | 406. City property taxes | |
| 107. County property taxes | | 407. County property taxes | |
| 108. Assessment Taxes | | 408. Assessment Taxes | |
| 109. School property taxes | | 409. School property taxes | |
| 110. MUD taxes | | 410. MUD taxes | |
| 111. Other taxes | | 411. Other taxes | |
| 112. | | 412. | |
| 113. | | 413. | |
| 114. | | 414. | |
| 115. | | 415. | |
| 116. | | 416. | |
| **120. Gross Amount Due From Borrower** | | **420. Gross Amount Due to Seller** | $79,500,000.00 |
| **200. Amounts Paid By Or In Behalf Of Borrower** | | **500. Reductions In Amount Due to Seller** | |
| 201. Deposit or earnest money | | 501. Excess Deposit | |
| 202. Principal amount of new loan(s) | | 502. Settlement Charges to Seller (line 1400) | $206,079.65 |
| 203. Existing loan(s) taken subject to | | 503. Existing Loan(s) Taken Subject to | |
| 204. Mezzanine financing | | 504. Payoff of first mortgage loan | $46,174,360.27 |
| 205. | | 505. Payoff of second mortgage loan | $3,039,880.50 |
| 206. | | 506. Escrow Reserve (Lee et al) | $50,000.00 |
| 207. Earnest Money pd directly | | 507. Earnest Money pd directly | $100.00 |
| 208. | | 508. CPate Family Investment Payoff | $608,007.88 |
| 209. | | 509. CC Multifamily G.P. Payoff | $608,007.88 |
| **Adjustments for items unpaid by seller** | | **Adjustments for items unpaid by seller** | |
| 210. City property taxes | | 510. City property taxes | |
| 211. County property taxes  01/01/18 05/23/18 | | 511. County property taxes  01/01/18 05/23/18 | $363,777.29 |
| 212. Assessment Taxes | | 512. Assessment Taxes | |
| 213. School property taxes | | 513. School property taxes | |
| 214. MUD taxes | | 514. MUD taxes | |
| 215. Other taxes | | 515. Other taxes | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. SELLER CREDIT TO BUYER | | 518. SELLER CREDIT TO BUYER | $14,730,332.38 |
| 219. | | 519. | |
| **220. Total Paid By/For Borrower** | | **520. Total Reduction Amount Due Seller** | $65,779,745.85 |
| **300. Cash At Settlement From/To Borrower** | | **600. Cash At Settlement To/From Seller** | |
| 301. Gross Amount due from borrower (line 120) | | 601. Gross Amount due to seller (line 420) | $79,500,000.00 |
| 302. Less amounts paid by/for borrower (line 220) | | 602. Less reductions in amt. due seller (line 520) | $65,779,745.85 |
| **303. Cash Borrower** | | **603. Cash To Seller** | $13,720,254.15 |

Page 1

File No. 12000990

| L. Settlement Charges | | | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|---|
| 700. Total Sales/Broker's Commission based on price | | @ % = | | |
| Division of Commission (line 700) as follows: | | | | |
| 701. | to | | | |
| 702. | to | | | |
| 703. | | | | |
| 800. Items Payable in Connection with Loan | | | | |
| 801. Loan Origination Fee    % | to | | | |
| 802. Loan Discount    % | to | | | |
| 803 Appraisal Fee | to | | | |
| 804 Attorney Fees (Invoice needed) | to  Baker & McKenzie LLP | | | |
| 805. Senior Loan | to  Polsinelli | | | |
| 806. Mezzanine Loan | to  Polsinelli | | | |
| 807. Equity / Joint Venture | to  Polsinelli | | | |
| 808. Commitment fee (Mezzanine lender) | to  Naissance Galleria, LLC | | | |
| 809  Interest 5/24/18 end 5/29/18 | to  National Bank of Kuwait, S.A.K.P., New York Branch, a banking corporation organized under the laws of Kuwait, acting through its New York branch | | | |
| 810  Interest 5/29/18 end 6/1/18 | to  National Bank of Kuwait, S.A.K.P., New York Branch, a banking corporation organized under the laws of Kuwait, acting through its New York branch | | | |
| 811  Interest Reserve Deposit | to  National Bank of Kuwait, S.A.K.P., New York Branch, a banking corporation organized under the laws of Kuwait, acting through its New York branch | | | |
| 812  50 bps Upfront Fee | to  National Bank of Kuwait, S.A.K.P., New York Branch, a banking corporation organized under the laws of Kuwait, acting through its New York branch | | | |
| 900. Items Required by Lender To Be Paid in Advance | | | | |
| 901. Interest from    5/23/2018   to    6/1/2018  @ $0/day | | | | |
| 902. Mortgage Insurance Premium for months | to | | | |
| 903. Hazard Insurance Premium for years | to  HANDLED OUTSIDE OF | | | |
| 1000. Reserves Deposited With Lender | | | | |
| 1001. Hazard Insurance | months @ | per month | | |
| 1002. Mortgage insurance | months @ | per month | | |
| 1003. City property taxes | months @ | per month | | |
| 1004. County property taxes | months @ | per month | | |
| 1005. Assessment Taxes | months @ | per month | | |
| 1006. School property taxes | months @ | per month | | |
| 1007. MUD taxes | months @ | per month | | |
| 1008. Other taxes | months @ | per month | | |
| 1011. Aggregate Adjustment | | | | |
| 1100. Title Charges | | | | |
| 1101. Settlement or closing fee | to  TransAct Title, LLC-Settlement Fees | | | $2,500.00 |
| 1102. Abstract or title search | to | | | |
| 1103. Title examination | to | | | |
| 1104. Title insurance binder | to  TransAct Title, LLC | | | |
| 1105. Document preparation (Curative) | to  Umatiya Law Firm, LLC | | | $1,250.00 |
| 1106. Notary fees | to | | | |
| 1107. Attorney's fees | to | | | |
| (includes above items numbers: | | ) | | |
| 1108. Title insurance | to  TransAct Title, LLC | | | $175,601.00 |
| (includes above items numbers: | | ) | | |
| 1109. Lender's coverage | $51,675,000.00/$13,533.10 . | | | |
| 1110. Owner's coverage | $79,500,000.00/$237,161.35 | | | |
| 1111 Escrow fee | to  TransAct Title, LLC | | | |
| 1112  Guaranty Assessment Recoupment Fee | to  Texas Title Insurance Guaranty Association | | | $4.50 |
| 1113  Courier Service | to  TransAct Title-Courier | | | $75.00 |
| 1114  Erecording Fee | to  TransAct Title, LLC-Recording | | | $20.00 |
| 1115  Document Review | to  Umatiya Law Firm, PLLC | | | |
| 1116. Non-Imputation Endorsement | to  TransAct Title, LLC | | | |
| 1117  Adjustable Mortgage Loan | to  TransAct Title, LLC | | | |
| 1118. Survey Amendment (OTP only) | to  TransAct Title, LLC | | | $26,340.15 |
| 1119  Not yet due/payable (MTP & DIN | to  TransAct Title, LLC | | | |
| 1120  T19 Non-Res. Endorsemen | to  TransAct Title, LLC | | | |
| 1121. Access Endorsement | to  TransAct Title, LLC | | | |
| 1122. Contiguity Endorsement | to  TransAct Title, LLC | | | |
| 1123. MSD MTP T-19.2 End | to  TransAct Title, LLC | | | |
| 1124. MSD MTP T-19.3 End | to  TransAct Title, LLC | | | |
| 1125  REM OTP T-19 1 No Amendment | to  TransAct Title, LLC | | | |
| 1126. MSD OTP T-19.2 End | to  TransAct Title, LLC | | | |
| 1127. MSD OTP T-19.3 End | to  TransAct Title, LLC | | | |
| 1200. Government Recording and Transfer Charges | | | | |
| 1201. Recording Fees    Deed $44.00 ; Mortgage $184.00 ; Rel $200.00    to TransAct Title, LLC-Recording | | | | $200.00 |
| 1202. City/county tax/stamps    Deed ; Mortgage    to | | | | |
| 1203. State tax/stamps    Deed ; Mortgage    to | | | | |
| 1204. Tax certificates | to  Kirby TaxNet, Inc. | | | $89.00 |

000545

| 1205 | | to | | | |
|---|---|---|---|---|---|
| **1300. Additional Settlement Charges** | | | | | |
| 1301 | Survey | to | South Texas Surveying & Associates, Inc. | | |
| 1302 | Pest Inspection | to | | | |
| 1303 | HOA Transfer Fee | to | | | |
| 1304 | Home Warranty | to | | | |
| 1305 | Third Parties - Appraisal | to | Jack W. Bass II, MAI | | |
| 1306 | Promotion | to | NAZAR (INVOICE NEEDED) | | |
| 1307 | Promotion | to | Eastil Secured LLC | | |
| 1308 | BBG Third Parties -ESA | to | AWA, LLC dba BBG Assessment | | |
| 1309 | BBG Third Parties - PCA | to | AWA, LLC dba BBG Assessment | | |
| 1310 | Third Parties - Valuations | to | Hibco Services, LLC | | |
| 1311 | UCCPlus Policy Premium | to | UCCPlus Insurance | | |
| 1312 | | to | | | |
| 1313 | | to | | | |
| 1314 | | to | | | |
| 1315 | | to | | | |
| **1400. Total Settlement Charges (enter on lines 103, Section J and 502, Section K)** | | | | | $286,079.65 |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a completed copy of pages 1, 2 and 3 of this HUD-1 Settlement Statement

**GALLERIA 2425 OWNER, LLC**
a Delaware limited liability company

By: Galleria 2425 JV, LLC
    a Delaware limited liability company,
    its sole member

    By: Naissance Capital Real Estate, LLC
        a Delaware limited liability company
        its Managing Member

      By:_____
          Azeemeh Zaheer, Managing Member

**2425 WL LLC,**
**a New York Limited Liability Company**

By:_____
    **Adam Broder, Sole Member**

SETTLEMENT AGENT CERTIFICATION
The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused the funds to be disbursed in accordance with this statement

_____    5-24-18
Settlement Agent               Date

000546

**A. Settlement Statement**

| B. Type of Loan | | | | | |
|---|---|---|---|---|---|
| 1. ☐ FHA   2. ☐ FmHA   3. ☐ Conv Unins | | 6. File Number | | 7. Loan Number | 8. Mortgage Ins Case Number |
| 4. ☐ VA   5. ☐ Conv Ins.   6. ☐ Seller Finance | | 12000990 | | | |
| 7. ☐ Cash Sale | | | | | |

C. Note: This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

| D. Name & Address of Borrower: | E. Name & Address of Seller | F. Name & Address of Lender |
|---|---|---|
| Galleria 2425 Owner, LLC, a Delaware limited liability company | 2425 WL, LLC, a New York Limited Liability Company | National Bank of Kuwait, S.A.K.P., New York Branch, a banking corporation organized under the laws of Kuwait, acting through its New York branch |
| 60 W 2nd St | 2500 West Loop South, Suite 255 | 299 Park Avenue |
| Freeport, NY 11520 | Houston, TX 77027 | New York, NY 10171 |

| G. Property Location | H. Settlement Agent Name | |
|---|---|---|
| TR 31D ABST 836 W WHITE | TransAct Title – Galleria | |
| 2425 W Loop S | 6117 Richmond Ave, Suite 250 | |
| Houston, TX 77027 | Houston, TX 77057   Tax ID: 45-3483105 | |
| | Underwritten By: WFG National Title Insurance Company | |
| | Place of Settlement | I. Settlement Date |
| | TransAct Title – Galleria | 5/23/2018 |
| | 6117 Richmond Ave, Suite 250 | Fund: |
| | Houston, TX 77057 | |

| J. Summary of Borrower's Transaction | | | K. Summary of Seller's Transaction | | |
|---|---|---|---|---|---|
| 100. Gross Amount Due from Borrower | | | 400. Gross Amount Due to Seller | | |
| 101. Contract Sales Price | $79,588,000.00 | | 401. Contract Sales Price | | |
| 102. Personal Property | | | 402. Personal Property | | |
| 103. Settlement Charges to borrower | $3,369,209.67 | | 403. | | |
| 104. | | | 404. | | |
| 105. | | | 405. | | |
| Adjustments for items paid by seller in advance | | | Adjustments for items paid by seller in advance | | |
| 106. City property taxes | | | 406. City property taxes | | |
| 107. County property taxes | | | 407. County property taxes | | |
| 108. Assessment Taxes | | | 408. Assessment Taxes | | |
| 109. School property taxes | | | 409. School property taxes | | |
| 110. MUD taxes | | | 410. MUD taxes | | |
| 111. Other taxes | | | 411. Other taxes | | |
| 112. | | | 412. | | |
| 113. | | | 413. | | |
| 114. | | | 414. | | |
| 115. | | | 415. | | |
| 116. | | | 416. | | |
| 120. Gross Amount Due From Borrower | $82,969,209.67 | | 420. Gross Amount Due to Seller | | |
| 200. Amounts Paid By Or In Behalf Of Borrower | | | 500. Reductions In Amount Due To Seller | | |
| 201. Deposit or earnest money | | | 501. Excess Deposit | | |
| 202. Principal amount of new loan(s) | $51,875,000.00 | | 502. Settlement Charges to Seller (line 1400) | | |
| 203. Existing loan(s) taken subject to | | | 503. Existing Loan(s) Taken Subject to | | |
| 204. Mezzanine financing | $16,100,000.00 | | 504. Payoff of first mortgage loan | | |
| 205. | | | 505. Payoff of second mortgage loan | | |
| 206. | | | 506. | | |
| 207. Earnest Money pd directly | $100.00 | | 507. Earnest Money pd directly | | |
| 208. | | | 508. | | |
| 209. | | | 509. | | |
| Adjustments for items unpaid by seller | | | Adjustments for items unpaid by seller | | |
| 210. City property taxes | | | 510. City property taxes | | |
| 211. County property taxes   01/01/18 05/23/18 | $363,777.29 | | 511. County property taxes   01/01/18 05/23/18 | | |
| 212. Assessment Taxes | | | 512. Assessment Taxes | | |
| 213. School property taxes | | | 513. School property taxes | | |
| 214. MUD taxes | | | 514. MUD taxes | | |
| 215. Other taxes | | | 515. Other taxes | | |
| 216. | | | 516. | | |
| 217. | | | 517. | | |
| 218. | | | 518. | | |
| 219. | | | 519. | | |
| 220. Total Paid By/For Borrower | $68,138,877.29 | | 520. Total Reduction Amount Due Seller | | |
| 300. Cash At Settlement From/To Borrower | | | 600. Cash At Settlement To/From Seller | | |
| 301. Gross Amount due from borrower (line 120) | $82,869,209.67 | | 601. Gross Amount due to seller (line 420) | | |
| 302. Less amounts paid by/for borrower (line 220) | $68,138,877.29 | | 602. Less reductions in amt. due seller (line 520) | | |
| 303. Cash From Borrower | $14,730,332.38 | | 603. Cash To Seller | | |

Page 1



File No. 12000990

## L. Settlement Charges

| | | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|
| 700. Total Sales/Broker's Commission based on price         @ ½ = | | | |
| Division of Commission (line 700) as follows: | | | |
| 701. | to | | |
| 702. | to | | |
| 703. | | | |
| **800. Items Payable in Connection with Loan** | | | |
| 801. Loan Origination Fee   % | to | | |
| 802. Loan Discount   % | to | | |
| 803. Appraisal Fee | to | | |
| 804. Attorney Fees (invoice needed) | to   Baker & McKenzie LLP | $150,237.25 | |
| 805. Senior Loan | to   Polsinelli | $67,200.25 | |
| 806. Mezzanine Loan | to   Polsinelli | $64,340.00 | |
| 807. Equity / Joint Venture | to   Polsinelli | $35,417.00 | |
| 808. Commitment fee (Mezzanine lender) | to   Naissance Galleria, LLC | $161,000.00 | |
| 809. Interest 5/24/18 and 5/29/18 | to   National Bank of Kuwait, S.A.K.P., New York Branch, a banking corporation organized under the laws of Kuwait, acting through its New York branch | $31,308.29 | |
| 810. Interest 5/29/18 and 6/1/18 | to   National Bank of Kuwait, S.A.K.P., New York Branch, a banking corporation organized under the laws of Kuwait, acting through its New York branch | $24,287.25 | |
| 811. Interest Reserve Deposit | to   National Bank of Kuwait, S.A.K.P., New York Branch, a banking corporation organized under the laws of Kuwait, acting through its New York branch | $2,500,000.00 | |
| 812. 50 bps Upfront Fee | to   National Bank of Kuwait, S.A.K.P., New York Branch, a banking corporation organized under the laws of Kuwait, acting through its New York branch | $253,375.00 | |
| **900. Items Required by Lender To Be Paid in Advance** | | | |
| 901. Interest from   @ $0/day | | | |
| 902. Mortgage Insurance Premium for months | to | | |
| 903. Hazard Insurance Premium for years | to   HANDLED OUTSIDE OF SETTLEMENT | | |
| **1000. Reserves Deposited With Lender** | | | |
| 1001. Hazard insurance | months @   per month | | |
| 1002. Mortgage insurance | months @   per month | | |
| 1003. City property taxes | months @   per month | | |
| 1004. County property taxes | months @   per month | | |
| 1005. Assessment Taxes | months @   per month | | |
| 1006. School property taxes | months @   per month | | |
| 1007. MUD taxes | months @   per month | | |
| 1008. Other taxes | months @   per month | | |
| 1011. Aggregate Adjustment | | | |
| **1100. Title Charges** | | | |
| 1101. Settlement or closing fee | to   TransAct Title, LLC-Settlement Fees | $2,500.00 | |
| 1102. Abstract or title search | to | | |
| 1103. Title examination | to | | |
| 1104. Title insurance binder | to   TransAct Title, LLC | | |
| 1105. Document preparation (Curative) | to   Umatiya Law Firm, LLC | | |
| 1106. Notary fees | to | | |
| 1107. Attorney's fees | to | | |
| (includes above items numbers: | ) | | |
| 1108. Title Insurance | to   TransAct Title, LLC | $100.00 | |
| (includes above items numbers: | ) | | |
| 1109. Lender's coverage | $51,675,000.00/$13,533.10 | | |
| 1110. Owner's coverage | $79,500,000.00/$237,161.35 | | |
| 1111. Escrow fee | to   TransAct Title, LLC | | |
| 1112. Guaranty Assessment Recoupment Fee | to   Texas Title Insurance Guaranty Association | $4.50 | |
| 1113. Courier Service | to   TransAct Title-Courier | $150.00 | |
| 1114. Erecording Fee | to   TransAct Title, LLC-Recording | $20.00 | |
| 1115. Document Review | to   Umatiya Law Firm, PLLC | | |
| 1116. Non-Imputation Endorsement | to   TransAct Title, LLC | $5,780.05 | |
| 1117. Adjustable Mortgage Loan | to   TransAct Title, LLC | $20.00 | |
| 1118. Survey Amendment (OTP only) | to   TransAct Title, LLC | | |
| 1119. Not yet due/payable (MTP & BIN | to   TransAct Title, LLC | $5.00 | |
| 1120. T19 Non-Res. Endorsement | to   TransAct Title, LLC | $13,103.10 | |
| 1121. Access Endorsement | to   TransAct Title, LLC | $100.00 | |
| 1122. Contiguity Endorsement | to   TransAct Title, LLC | $100.00 | |
| 1123. MSD MTP T-19.2 End | to   TransAct Title, LLC | $50.00 | |
| 1124. MSD MTP T-19.3 End | to   TransAct Title, LLC | $50.00 | |
| 1125. REM OTP T-19.1 No Amendment | to   TransAct Title, LLC | $26,348.15 | |
| 1126. MSD OTP T-19.2 End | to   TransAct Title, LLC | $50.00 | |
| 1127. MSD OTP T-19.3 End | to   TransAct Title, LLC | $50.00 | |
| **1200. Government Recording and Transfer Charges** | | | |
| 1201. Recording Fees   Deed $44.00 ; Mortgage $184.00 ; Rel $200.00   to TransAct Title, LLC-Recording | | $228.00 | |
| 1202. City/county tax/stamps   Deed ; Mortgage | to | | |
| 1203. State tax/stamps   Deed ; Mortgage | to | | |



000548

| 1204. Tax certificates | to | Kirby TaxNet, Inc. | | |
|---|---|---|---|---|
| 1205. | to | | | |
| 1300. Additional Settlement Charges | | | | |
| 1301. Survey | to | South Texas Surveying & Associates, Inc. | $3,193.38 | |
| 1302. Pest Inspection | to | | | |
| 1303. HOA Transfer Fee | to | | | |
| 1304. Home Warranty | to | | | |
| 1305. Third Parties - Appraisal | to | Jack W. Bass II, MAI | $1,000.00 | |
| 1306. Promotion | to | NAZAR (INVOICE NEEDED) | $1,200.00 | |
| 1307. Promotion | to | Eastil Secured LLC | $5,979.00 | |
| 1308. BBG Third Parties -ESA | to | AWA, LLC dba BBG Assessment | $1,450.00 | |
| 1309. BBG Third Parties - PCA | to | AWA, LLC dba BBG Assessment | $1,650.00 | |
| 1310. Third Parties - Valuations | to | Hibco Services, LLC | $3,731.00 | |
| 1311. UCCPlus Policy Premium | to | UCCPlus Insurance | $11,185.45 | |
| 1312. | to | | | |
| 1313. | to | | | |
| 1314. | to | | | |
| 1315. | to | | | |
| 1400. Total Settlement Charges (enter on lines 103, Section J and 502, Section K) | | | $3,369,209.67 | |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction.  I further certify that I have received a completed copy of pages 1, 2 and 3 of this HUD-1 Settlement Statement.

GALLERIA 2425 OWNER, LLC
a Delaware limited liability company

By: Galleria 2425 JV, LLC
     a Delaware limited liability company,
     its sole member

     By: Naissance Capital Real Estate, LLC
          a Delaware limited liability company
          its Managing Member

     By: _____
          Azeemeh Zaheer, Managing Member

2425 WL LLC,
a New York Limited Liability Company

By: _____
     Adam Broder, Sole Member

SETTLEMENT AGENT CERTIFICATION
The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction.  I have caused the funds to be disbursed in accordance with this statement.

_____     _____
Settlement Agent          Date
Warning: It is a crime to knowingly make false statements to the United States on this or any other similar form.  Penalties upon conviction can include a fine and imprisonment.  For details see: Title 18 U.S. Code Section 1001 and Section 1010.

Previous Editions are Obsolete                Page 3                form HUD-1 (3/86)
                                                                    Handbook 4305.2

000549

# Interest Calculator

| | |
|---|---|
| Initial investment | 14,730,332.38 |
| Annual contribution | 0 |
| Monthly contribution | 0 |

Contribute at the ⚪ beginning ⚪ end of each compounding period

| | |
|---|---|
| Interest rate | 10 |
| Compound | annually ⌄ |
| Investment length | 5 years  8 months |
| Tax rate ⓘ | 0 |
| Inflation rate | 0 |

**Calculate**     Clear



| Results | |
|---|---|
| **Ending balance** | **$25,279,652.27** |
| Total principal | $14,730,332.38 |
| **Total interest** | **$10,549,319.89** |

Initial investment
Interest

42%   58%

# Accumulation Schedule

**Annual Schedule**   <u>Monthly Schedule</u>

| Year | Deposit | Interest | Ending balance |
|---|---|---|---|
| 1 | $14,730,332.38 | $1,473,033.24 | $16,203,365.62 |
| 2 | $0.00 | $1,620,336.56 | $17,823,702.18 |
| 3 | $0.00 | $1,782,370.22 | $19,606,072.40 |
| 4 | $0.00 | $1,960,607.24 | $21,566,679.64 |
| 5 | $0.00 | $2,156,667.96 | $23,723,347.60 |
| 6 | $0.00 | $1,556,304.67 | $25,279,652.27 |



by Calculator.net

 **(cfpb.gov/)**

TABLE OF CONTENTS 

# Appendix A to Part 1024 – Instructions for Completing HUD-1 and HUD-1a Settlement Statements; Sample HUD-1 and HUD-1a Statements

> ⚠ This version is not the current regulation.
>
> You are viewing a previous version of this regulation with amendments that went into effect on Oct. 19, 2017.
>
> View all versions of this regulation (cfpb.gov/rules-policy/regulations/1024/versions/a/)

The following are instructions for completing the HUD-1 settlement statement, required under section 4 of RESPA and 12 CFR part 1024 (Regulation X) of the Bureau of Consumer Financial Protection (Bureau) regulations. This form is to be used as a statement of actual charges and adjustments paid by the borrower and the seller, to be given to the parties in connection with the settlement. The instructions for completion of the HUD-1 are primarily for the benefit of the settlement agents who prepare the statements and need not be transmitted to the parties as an integral part of the HUD-1. There is no objection to the use of the HUD-1 in transactions in which its use is not legally required. Refer to the definitions section of the regulations (12 CFR 1024.2) for specific definitions of many of the terms that are used in these instructions.

# General Instructions

Information and amounts may be filled in by typewriter, hand printing, computer printing, or any other method producing clear and legible results. Refer to the Bureau's regulations (Regulation X) regarding rules applicable to reproduction of the HUD-1 for the purpose of

Previous version (effective Oct. 19, 2017 to July 1, 2020)

000551

payments, check disbursements, a statement indicating receipt of funds, applicable special stipulations between Borrower and Seller, and the date funds are transferred.

The settlement agent shall complete the HUD-1 to itemize all charges imposed upon the Borrower and the Seller by the loan originator and all sales commissions, whether to be paid at settlement or outside of settlement, and any other charges which either the Borrower or the Seller will pay at settlement. Charges for loan origination and title services should not be itemized except as provided in these instructions. For each separately identified settlement service in connection with the transaction, the name of the person ultimately receiving the payment must be shown together with the total amount paid to such person. Items paid to and retained by a loan originator are disclosed as required in the instructions for lines in the 800-series of the HUD-1 (and for per diem interest, in the 900-series of the HUD-1).

As a general rule, charges that are paid for by the seller must be shown in the seller's column on page 2 of the HUD-1 (unless paid outside closing), and charges that are paid for by the borrower must be shown in the borrower's column (unless paid outside closing). However, in order to promote comparability between the charges on the GFE and the charges on the HUD-1, if a seller pays for a charge that was included on the GFE, the charge should be listed in the borrower's column on page 2 of the HUD-1. That charge should also be offset by listing a credit in that amount to the borrower on lines 204-209 on page 1 of the HUD-1, and by a charge to the seller in lines 506-509 on page 1 of the HUD-1. If a loan originator (other than for no-cost loans), real estate agent, other settlement service provider, or other person pays for a charge that was included on the GFE, the charge should be listed in the borrower's column on page 2 of the HUD-1, with an offsetting credit reported on page 1 of the HUD-1, identifying the party paying the charge.

Charges paid outside of settlement by the borrower, seller, loan originator, real estate agent, or any other person, must be included on the HUD-1 but marked "P.O.C." for "Paid Outside of Closing" (settlement) and must not be included in computing totals. However, indirect payments from a lender to a mortgage broker may not be disclosed as P.O.C., and must be included as a credit on Line 802. P.O.C. items must not be placed in the Borrower or Seller columns, but rather on the appropriate line outside the columns. The settlement agent must indicate whether P.O.C. items are paid for by the Borrower, Seller, or some other party by marking the items paid for by whoever made the payment as "P.O.C." with the party making the payment identified in parentheses, such as "P.O.C. (borrower)" or "P.O.C. (seller)".

In the case of "no cost" loans where "no cost" encompasses third party fees as well as the upfront payment to the loan originator, the third party services covered by the "no cost" provisions must be itemized and listed in the borrower's column on the HUD-1/1A with the charge for the third party service. These itemized charges must be offset with a negative adjusted origination charge on Line 803 and recorded in the columns.

Previous version (effective Oct. 19, 2017 to July 1, 2020)

000552

the settlement charges in section L and the names of the recipients of adjustments described in section J or K should be included on the blank lines.

Lines and columns in section J which relate to the Borrower's transaction may be left blank on the copy of the HUD-1 which will be furnished to the Seller. Lines and columns in section K which relate to the Seller's transaction may be left blank on the copy of the HUD-1 which will be furnished to the Borrower.

# Line Item Instructions

Instructions for completing the individual items on the HUD-1 follow.

**Section A.** This section requires no entry of information.

**Section B.** Check appropriate loan type and complete the remaining items as applicable.

**Section C.** This section provides a notice regarding settlement costs and requires no additional entry of information.

**Sections D and E.** Fill in the names and current mailing addresses and zip codes of the Borrower and the Seller. Where there is more than one Borrower or Seller, the name and address of each one is required. Use a supplementary page if needed to list multiple Borrowers or Sellers.

**Section F.** Fill in the name, current mailing address and zip code of the Lender.

**Section G.** The street address of the property being sold should be listed. If there is no street address, a brief legal description or other location of the property should be inserted. In all cases give the zip code of the property.

**Section H.** Fill in name, address, zip code and telephone number of settlement agent, and address and zip code of "place of settlement."

**Section I.** Fill in date of settlement.

**Section J. Summary of Borrower's Transaction.** Line 101 is for the contract sales price of the property being sold, excluding the price of any items of tangible personal property if Borrower and Seller have agreed to a separate price for such items.

Line 102 is for the sales price of any items of tangible personal property excluded from Line 101. Personal property could include such items as carpets, drapes, stoves, refrigerators, *etc.* What constitutes personal property varies from State to State. Manufactured homes are not considered personal property for this purpose.

Previous version (effective Oct. 19, 2017 to July 1, 2020)

000553

Lines 104 and 105 are for additional amounts owed by the Borrower, such as charges that were not listed on the GFE or items paid by the Seller prior to settlement but reimbursed by the Borrower at settlement. For example, the balance in the Seller's reserve account held in connection with an existing loan, if assigned to the Borrower in a loan assumption case, will be entered here. These lines will also be used when a tenant in the property being sold has not yet paid the rent, which the Borrower will collect, for a period of time prior to the settlement. The lines will also be used to indicate the treatment for any tenant security deposit. The Seller will be credited on Lines 404-405.

Lines 106 through 112 are for items which the Seller had paid in advance, and for which the Borrower must therefore reimburse the Seller. Examples of items for which adjustments will be made may include taxes and assessments paid in advance for an entire year or other period, when settlement occurs prior to the expiration of the year or other period for which they were paid. Additional examples include flood and hazard insurance premiums, if the Borrower is being substituted as an insured under the same policy; mortgage insurance in loan assumption cases; planned unit development or condominium association assessments paid in advance; fuel or other supplies on hand, purchased by the Seller, which the Borrower will use when Borrower takes possession of the property; and ground rent paid in advance.

Line 120 is for the total of Lines 101 through 112.

Line 201 is for any amount paid against the sales price prior to settlement.

Line 202 is for the amount of the new loan made by the Lender when a loan to finance construction of a new structure constructed for sale is used as or converted to a loan to finance purchase. Line 202 should also be used for the amount of the first user loan, when a loan to purchase a manufactured home for resale is converted to a loan to finance purchase by the first user. For other loans covered by 12 CFR part 1024 (Regulation X) which finance construction of a new structure or purchase of a manufactured home, list the sales price of the land on Line 104, the construction cost or purchase price of manufactured home on Line 105 (Line 101 would be left blank in this instance) and amount of the loan on Line 202. The remainder of the form should be completed taking into account adjustments and charges related to the temporary financing and permanent financing and which are known at the date of settlement. For reverse mortgage transactions, the amount disclosed on Line 202 is the initial principal limit.

Line 203 is used for cases in which the Borrower is assuming or taking title subject to an existing loan or lien on the property.

Lines 204-209 are used for other items paid by or on behalf of the Borrower. Lines 204-209 should be used to indicate any financing arrangements or other new loan not listed in Line 202. For example, if the Borrower is using a second mortgage or note to finance part of the purchase price, whether from the same lender, another lender or the Seller, insert the

Previous version (effective Oct. 19, 2017 to July 1, 2020)

000554

including seller paid GFE charges. They may also be used in cases in which a Seller (typically a builder) is making an "allowance" to the Borrower for items that the Borrower is to purchase separately. For reverse mortgages, the amount of any initial draw at settlement is disclosed on Line 204.

Lines 210 through 219 are for items which have not yet been paid, and which the Borrower is expected to pay, but which are attributable in part to a period of time prior to the settlement. In jurisdictions in which taxes are paid late in the tax year, most cases will show the proration of taxes in these lines. Other examples include utilities used but not paid for by the Seller, rent collected in advance by the Seller from a tenant for a period extending beyond the settlement date, and interest on loan assumptions.

Line 220 is for the total of Lines 201 through 219.

Lines 301 and 302 are summary lines for the Borrower. Enter total in Line 120 on Line 301. Enter total in Line 220 on Line 302.

Line 303 must indicate either the cash required from the Borrower at settlement (the usual case in a purchase transaction), or cash payable to the Borrower at settlement (if, for example, the Borrower's earnest money exceeds the Borrower's cash obligations in the transaction or there is a cash-out refinance). Subtract Line 302 from Line 301 and enter the amount of cash due to or from the Borrower at settlement on Line 303. The appropriate box should be checked. If the Borrower's earnest money is applied toward the charge for a settlement service, the amount so applied should not be included on Line 303 but instead should be shown on the appropriate line for the settlement service, marked "P.O.C. (Borrower)", and must not be included in computing totals.

**Section K. Summary of Seller's Transaction.** Instructions for the use of Lines 101 and 102 and 104-112 above, apply also to Lines 401-412. Line 420 is for the total of Lines 401 through 412.

Line 501 is used if the Seller's real estate broker or other party who is not the settlement agent has received and holds a deposit against the sales price (earnest money) which exceeds the fee or commission owed to that party. If that party will render the excess deposit directly to the Seller, rather than through the settlement agent, the amount of excess deposit should be entered on Line 501 and the amount of the total deposit (including commissions) should be entered on Line 201.

Line 502 is used to record the total charges to the Seller detailed in section L and totaled on Line 1400.

Line 503 is used if the Borrower is assuming or taking title subject to existing liens which are to be deducted from sales price.

Lines 504 and 505 are used for the amounts (including any accrued interest) of any first

Previous version (effective Oct. 19, 2017 to July 1, 2020)

000555

Line 506 is used for deposits paid by the Borrower to the Seller or other party who is not the settlement agent. Enter the amount of the deposit in Line 201 on Line 506 unless Line 501 is used or the party who is not the settlement agent transfers all or part of the deposit to the settlement agent, in which case the settlement agent will note in parentheses on Line 507 the amount of the deposit that is being disbursed as proceeds and enter in the column for Line 506 the amount retained by the above-described party for settlement services. If the settlement agent holds the deposit, insert a note in Line 507 which indicates that the deposit is being disbursed as proceeds.

Lines 506 through 509 may be used to list additional liens which must be paid off through the settlement to clear title to the property. Other Seller obligations should be shown on Lines 506-509, including charges that were disclosed on the GFE but that are actually being paid for by the Seller. These Lines may also be used to indicate funds to be held by the settlement agent for the payment of either repairs, or water, fuel, or other utility bills that cannot be prorated between the parties at settlement because the amounts used by the Seller prior to settlement are not yet known. Subsequent disclosure of the actual amount of these post-settlement items to be paid from settlement funds is optional. Any amounts entered on Lines 204-209 including Seller financing arrangements should also be entered on Lines 506-509.

Instructions for the use of Lines 510 through 519 are the same as those for Lines 210 to 219 above.

Line 520 is for the total of Lines 501 through 519.

Lines 601 and 602 are summary lines for the Seller. Enter the total in Line 420 on Line 601. Enter the total in Line 520 on Line 602.

Line 603 must indicate either the cash required to be paid to the Seller at settlement (the usual case in a purchase transaction), or the cash payable by the Seller at settlement. Subtract Line 602 from Line 601 and enter the amount of cash due to or from the Seller at settlement on Line 603. The appropriate box should be checked.

## Section L. Settlement Charges.

Line 700 is used to enter the sales commission charged by the sales agent or real estate broker.

Lines 701-702 are to be used to state the split of the commission where the settlement agent disburses portions of the commission to two or more sales agents or real estate brokers.

Line 703 is used to enter the amount of sales commission disbursed at settlement. If the sales agent or real estate broker is retaining a part of the deposit against the sales price

Previous version (effective Oct. 19, 2017 to July 1, 2020)

insert a note on Line 704 indicating the amount the sales agent or real estate broker is retaining as a "P.O.C." item.

Line 704 may be used for additional charges made by the sales agent or real estate broker, or for a sales commission charged to the Borrower, which will be disbursed by the settlement agent.

Line 801 is used to record "Our origination charge," which includes all charges received by the loan originator, except any charge for the specific interest rate chosen (points). This number must not be listed in either the buyer's or seller's column. The amount shown in Line 801 must include any amounts received for origination services, including administrative and processing services, performed by or on behalf of the loan originator.

Line 802 is used to record "Your credit or charge (points) for the specific interest rate chosen," which states the charge or credit adjustment as applied to "Our origination charge," if applicable. This number must not be listed in either column or shown on page one of the HUD-1.

For a mortgage broker originating a loan in its own name, the amount shown on Line 802 will be the difference between the initial loan amount and the total payment to the mortgage broker from the lender. The total payment to the mortgage broker will be the sum of the price paid for the loan by the lender and any other payments to the mortgage broker from the lender, including any payments based on the loan amount or loan terms, and any flat rate payments. For a mortgage broker originating a loan in another entity's name, the amount shown on Line 802 will be the sum of all payments to the mortgage broker from the lender, including any payments based on the loan amount or loan terms, and any flat rate payments.

In either case, when the amount paid to the mortgage broker exceeds the initial loan amount, there is a credit to the borrower and it is entered as a negative amount. When the initial loan amount exceeds the amount paid to the mortgage broker, there is a charge to the borrower and it is entered as a positive amount. For a lender, the amount shown on Line 802 may include any credit or charge (points) to the Borrower.

Line 803 is used to record "Your adjusted origination charges," which states the net amount of the loan origination charges, the sum of the amounts shown in Lines 801 and 802. This amount must be listed in the columns as either a positive number (for example, where the origination charge shown in Line 801 exceeds any credit for the interest rate shown in Line 802 or where there is an origination charge in Line 801 and a charge for the interest rate (points) is shown on Line 802) or as a negative number (for example, where the credit for the interest rate shown in Line 802 exceeds the origination charges shown in Line 801).

In the case of "no cost" loans, where "no cost" refers only to the loan originator's fees, the amounts shown in Lines 801 and 802 should offset, so that the charge shown on Line 803 is

Previous version (effective Oct. 19, 2017 to July 1, 2020)

000557

negative number to offset the settlement charges paid indirectly through the loan originator.

Lines 804-808 may be used to record each of the "Required services that we select." Each settlement service provider must be identified by name and the amount paid recorded either inside the columns or as paid to the provider outside closing ("P.O.C."), as described in the General Instructions.

Line 804 is used to record the appraisal fee.

Line 805 is used to record the fee for all credit reports.

Line 806 is used to record the fee for any tax service.

Line 807 is used to record any flood certification fee.

Lines 808 and additional sequentially numbered lines, as needed, are used to record other third party services required by the loan originator. These Lines may also be used to record other required disclosures from the loan originator. Any such disclosures must be listed outside the columns.

Lines 901-904. This series is used to record the items which the Lender requires to be paid at the time of settlement, but which are not necessarily paid to the lender (**e.g.,** FHA mortgage insurance premium), other than reserves collected by the Lender and recorded in the 1000-series.

Line 901 is used if interest is collected at settlement for a part of a month or other period between settlement and the date from which interest will be collected with the first regular monthly payment. Enter that amount here and include the per diem charges. If such interest is not collected until the first regular monthly payment, no entry should be made on Line 901.

Line 902 is used for mortgage insurance premiums due and payable at settlement, including any monthly amounts due at settlement and any upfront mortgage insurance premium, but not including any reserves collected by the Lender and recorded in the 1000-series. If a lump sum mortgage insurance premium paid at settlement is included on Line 902, a note should indicate that the premium is for the life of the loan.

Line 903 is used for homeowner's insurance premiums that the Lender requires to be paid at the time of settlement, except reserves collected by the Lender and recorded in the 1000-series.

Lines 904 and additional sequentially numbered lines are used to list additional items required by the Lender (except for reserves collected by the Lender and recorded in the 1000-series), including premiums for flood or other insurance. These lines are also used to

Previous version (effective Oct. 19, 2017 to July 1, 2020)

Lines 1000-1007. This series is used for amounts collected by the Lender from the Borrower and held in an account for the future payment of the obligations listed as they fall due. Include the time period (number of months) and the monthly assessment. In many jurisdictions this is referred to as an "escrow", "impound", or "trust" account. In addition to the property taxes and insurance listed, some Lenders may require reserves for flood insurance, condominium owners' association assessments, **etc.** The amount in line 1001 must be listed in the columns, and the itemizations in lines 1002 through 1007 must be listed outside the columns.

After itemizing individual deposits in the 1000 series, the servicer shall make an adjustment based on aggregate accounting. This adjustment equals the difference between the deposit required under aggregate accounting and the sum of the itemized deposits. The computation steps for aggregate accounting are set out in 12 CFR 1024.17(d). The adjustment will always be a negative number or zero (-0-), except for amounts due to rounding. The settlement agent shall enter the aggregate adjustment amount outside the columns on a final line of the 1000 series of the HUD-1 or HUD-1A statement. Appendix E to this part sets out an example of aggregate analysis.

Lines 1100-1108. This series covers title charges and charges by attorneys and closing or settlement agents. The title charges include a variety of services performed by title companies or others, and include fees directly related to the transfer of title (title examination, title search, document preparation), fees for title insurance, and fees for conducting the closing. The legal charges include fees for attorneys representing the lender, seller, or borrower, and any attorney preparing title work. The series also includes any settlement, notary, and delivery fees related to the services covered in this series. Disbursements to third parties must be broken out in the appropriate lines or in blank lines in the series, and amounts paid to these third parties must be shown outside of the columns if included in Line 1101. Charges not included in Line 1101 must be listed in the columns.

Line 1101 is used to record the total for the category of "Title services and lender's title insurance." This amount must be listed in the columns.

Line 1102 is used to record the settlement or closing fee.

Line 1103 is used to record the charges for the owner's title insurance and related endorsements. This amount must be listed in the columns.

Line 1104 is used to record the lender's title insurance premium and related endorsements.

Line 1105 is used to record the amount of the lender's title policy limit. This amount is recorded outside of the columns.

Line 1106 is used to record the amount of the owner's title policy limit. This amount is recorded outside of the columns.

Previous version (effective Oct. 19, 2017 to July 1, 2020)

000559

columns.

Line 1108 used to record the amount of the total title insurance premium, including endorsements, that is retained by the title underwriter. This amount is recorded outside of the columns.

Additional sequentially numbered lines in the 1100-series may be used to itemize title charges paid to other third parties, as identified by name and type of service provided.

Lines 1200-1206. This series covers government recording and transfer charges. Charges paid by the borrower must be listed in the columns as described for lines 1201 and 1203, with itemizations shown outside the columns. Any amounts that are charged to the seller and that were not included on the Good Faith Estimate must be listed in the columns.

Line 1201 is used to record the total "Government recording charges," and the amount must be listed in the columns.

Line 1202 is used to record, outside of the columns, the itemized recording charges.

Line 1203 is used to record the transfer taxes, and the amount must be listed in the columns.

Line 1204 is used to record, outside of the columns, the amounts for local transfer taxes and stamps.

Line 1205 is used to record, outside of the columns, the amounts for state transfer taxes and stamps.

Line 1206 and additional sequentially numbered lines may be used to record specific itemized third party charges for government recording and transfer services, but the amounts must be listed outside the columns.

Line 1301 and additional sequentially numbered lines must be used to record required services that the borrower can shop for, such as fees for survey, pest inspection, or other similar inspections. These lines may also be used to record additional itemized settlement charges that are not included in a specific category, such as fees for structural and environmental inspections; pre-sale inspections of heating, plumbing or electrical equipment; or insurance or warranty coverage. The amounts must be listed in either the borrower's or seller's column.

Line 1400 must state the total settlement charges as calculated by adding the amounts within each column.

# Page 3

Previous version (effective Oct. 19, 2017 to July 1, 2020)

000560

## Comparison of Good Faith Estimate (GFE) and HUD-1/1A Charges

The HUD-1/1-A is a statement of actual charges and adjustments. The comparison chart on page 3 of the HUD-1 must be prepared using the exact information and amounts for the services that were purchased or provided as part of the transaction, as that information and those amounts are shown on the GFE and in the HUD-1. If a service that was listed on the GFE was not obtained in connection with the transaction, pages 1 and 2 of the HUD-1 should not include any amount for that service, and the estimate on the GFE of the charge for the service should not be included in any amounts shown on the comparison chart on Page 3 of the HUD-1. The comparison chart is comprised of three sections: "Charges That Cannot Increase," "Charges That Cannot Increase More Than 10%," and "Charges That Can Change".

"Charges That Cannot Increase." The amounts shown in Blocks 1 and 2, in Line A, and in Block 8 on the borrower's GFE must be entered in the appropriate line in the Good Faith Estimate column. The amounts shown on Lines 801, 802, 803 and 1203 of the HUD-1/1A must be entered in the corresponding line in the HUD-1/1A column. The HUD-1/1A column must include any amounts shown on page 2 of the HUD-1 in the column as paid for by the borrower, plus any amounts that are shown as P.O.C. by or on behalf of the borrower. If there is a credit in Block 2 of the GFE or Line 802 of the HUD-1/1A, the credit should be entered as a negative number.

"Charges That Cannot Increase More Than 10%." A description of each charge included in Blocks 3 and 7 on the borrower's GFE must be entered on separate lines in this section, with the amount shown on the borrower's GFE for each charge entered in the corresponding line in the Good Faith Estimate column. For each charge included in Blocks 4, 5 and 6 on the borrower's GFE for which the loan originator selected the provider or for which the borrower selected a provider identified by the loan originator, a description must be entered on a separate line in this section, with the amount shown on the borrower's GFE for each charge entered in the corresponding line in the Good Faith Estimate column. The loan originator must identify any third party settlement services for which the borrower selected a provider other than one identified by the loan originator so that the settlement agent can include those charges in the appropriate category. Additional lines may be added if necessary. The amounts shown on the HUD-1/1A for each line must be entered in the HUD-1/1A column next to the corresponding charge from the GFE, along with the appropriate HUD-1/1A line number. The HUD-1/1A column must include any amounts shown on page 2 of the HUD-1 in the column as paid for by the borrower, plus any amounts that are shown as P.O.C. by or on behalf of the borrower.

The amounts shown in the Good Faith Estimate and HUD-1/1A columns for this section must be separately totaled and entered in the designated line. If the total for the HUD-1/1A column is greater than the total for the Good Faith Estimate column, then the amount of the increase must be entered both as a dollar amount and as a percentage increase in the

Charges That Can Change. The amounts shown in Blocks 9, 10 and 11 on the borrower's GFE must be entered in the appropriate lines in the Good Faith Estimate column. Any third party settlement services for which the borrower selected a provider other than one identified by the loan originator must also be included in this section. The amounts shown on the HUD-1/1A for each charge in this section must be entered in the corresponding line in the HUD-1/1A column, along with the appropriate HUD-1/1A line number. The HUD-1/1A column must include any amounts shown on page 2 of the HUD-1 in the column as paid for by the borrower, plus any amounts that are shown as P.O.C. by or on behalf of the borrower. Additional lines may be added if necessary.

## Loan Terms

This section must be completed in accordance with the information and instructions provided by the lender. The lender must provide this information in a format that permits the settlement agent to simply enter the necessary information in the appropriate spaces, without the settlement agent having to refer to the loan documents themselves. For reverse mortgages, the initial monthly amount owed for principal, interest, and any mortgage insurance must read "N/A" and the loan term is disclosed as "N/A" when the loan term is conditioned upon the occurrence of a specified event, such as the death of the borrower or the borrower no longer occupying the property for a certain period of time. Additionally, for reverse mortgages the question "Even if you make payments on time, can your loan balance rise?" must be answered as "Yes" and the maximum amount disclosed as "Unknown."

For reverse mortgages that establish an arrangement for the payment of property taxes, homeowner's insurance, or other recurring charges through draws from the principal limit, the second box in the "Total monthly amount owed including escrow payments" section must be checked. The blank following the first $ must be completed with "0" and an asterisk, and all items that will be paid using draws from the principal limit, such as for property taxes, must also be indicated. An asterisk must also be placed in this section with the following statement: "Paid by or through draws from the principal limit." Reverse mortgage transactions are not considered to be balloon transactions for the purposes of the loan terms disclosed on page 3 of the HUD-1.

## Instructions for Completing HUD-1A

Note: The HUD-1A is an optional form that may be used for refinancing and subordinate-lien federally related mortgage loans, as well as for any other one-party transaction that does not involve the transfer of title to residential real property. The HUD-1 form may also be used for such transactions, by utilizing the borrower's side of the HUD-1 and following the relevant parts of the instructions as set forth above. The use of either the HUD-1 or HUD-

## Background

The HUD-1A settlement statement is to be used as a statement of actual charges and adjustments to be given to the borrower at settlement, as defined in this part. The instructions for completion of the HUD-1A are for the benefit of the settlement agent who prepares the statement; the instructions are not a part of the statement and need not be transmitted to the borrower. There is no objection to using the HUD-1A in transactions in which it is not required, and its use in open-end lines of credit transactions (home-equity plans) is encouraged. It may not be used as a substitute for a HUD-1 in any transaction that has a seller.

Refer to the "definitions" section (§ 1024.2) of 12 CFR part 1024 (Regulation X) for specific definitions of terms used in these instructions.

## General Instructions

Information and amounts may be filled in by typewriter, hand printing, computer printing, or any other method producing clear and legible results. Refer to 12 CFR 1024.9 regarding rules for reproduction of the HUD-1A. Additional pages may be attached to the HUD-1A for the inclusion of customary recitals and information used locally for settlements or if there are insufficient lines on the HUD-1A. The settlement agent shall complete the HUD-1A in accordance with the instructions for the HUD-1 to the extent possible, including the instructions for disclosing items paid outside closing and for no cost loans.

Blank lines are provided in section L for any additional settlement charges. Blank lines are also provided in section M for recipients of all or portions of the loan proceeds. The names of the recipients of the settlement charges in section L and the names of the recipients of the loan proceeds in section M should be set forth on the blank lines.

## Line-Item Instructions

### Page 1

The identification information at the top of the HUD-1A should be completed as follows: The borrower's name and address is entered in the space provided. If the property securing the loan is different from the borrower's address, the address or other location information on the property should be entered in the space provided. The loan number is the lender's identification number for the loan. The settlement date is the date of settlement in accordance with 12 CFR 1024.2, not the end of any applicable rescission period. The name

Previous version (effective Oct. 19, 2017 to July 1, 2020)

000563

**Section L. Settlement Charges.** This section of the HUD-1A is similar to section L of the HUD-1, with minor changes or omissions, including deletion of lines 700 through 704, relating to real estate broker commissions. The instructions for section L in the HUD-1 should be followed insofar as possible. Inapplicable charges should be ignored, as should any instructions regarding seller items.

Line 1400 in the HUD-1A is for the total settlement charges charged to the borrower. Enter this total on line 1601. This total should include section L amounts from additional pages, if any are attached to this HUD-1A.

**Section M. Disbursement to Others.** This section is used to list payees, other than the borrower, of all or portions of the loan proceeds (including the lender, if the loan is paying off a prior loan made by the same lender), when the payee will be paid directly out of the settlement proceeds. It is not used to list payees of settlement charges, nor to list funds disbursed directly to the borrower, even if the lender knows the borrower's intended use of the funds.

For example, in a refinancing transaction, the loan proceeds are used to pay off an existing loan. The name of the lender for the loan being paid off and the pay-off balance would be entered in section M. In a home improvement transaction when the proceeds are to be paid to the home improvement contractor, the name of the contractor and the amount paid to the contractor would be entered in section M. In a consolidation loan, or when part of the loan proceeds is used to pay off other creditors, the name of each creditor and the amount paid to that creditor would be entered in section M. If the proceeds are to be given directly to the borrower and the borrower will use the proceeds to pay off existing obligations, this would not be reflected in section M.

**Section N. Net Settlement.** Line 1600 normally sets forth the principal amount of the loan as it appears on the related note for this loan. In the event this form is used for an open-ended home equity line whose approved amount is greater than the initial amount advanced at settlement, the amount shown on Line 1600 will be the loan amount advanced at settlement. Line 1601 is used for all settlement charges that both are included in the totals for lines 1400 and 1602, and are not financed as part of the principal amount of the loan. This is the amount normally received by the lender from the borrower at settlement, which would occur when some or all of the settlement charges were paid in cash by the borrower at settlement, instead of being financed as part of the principal amount of the loan. Failure to include any such amount in line 1601 will result in an error in the amount calculated on line 1604. Items paid outside of closing (P.O.C.) should not be included in Line 1601.

Line 1602 is the total amount from line 1400.

Line 1603 is the total amount from line 1520.

Line 1604 is the amount disbursed to the borrower. This is determined by adding together

# Page 2

This section of the HUD-1A is similar to page 3 of the HUD-1. The instructions for page 3 of the HUD-1 should be followed insofar as possible. The HUD-1/1A Column should include any amounts shown on page 1 of the HUD-1A in the column as paid for by the borrower, plus any amounts that are shown as P.O.C. by the borrower. Inapplicable charges should be ignored.

| | | | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|---|
| **700. Total Real Estate Broker Fees** | | | | |
| Division of commission (line 700) as follows: | | | | |
| 701. $ | to | | | |
| 702. $ | to | | | |
| 703. Commission paid at settlement | | | | |
| 704. | | | | |
| **800. Items Payable in Connection with Loan** | | | | |
| 801. Our origination charge | $ | (from GFE #1) | | |
| 802. Your credit or charge (points) for the specific interest rate chosen | $ | (from GFE #2) | | |
| 803. Your adjusted origination charges | | (from GFE A) | | |
| 804. Appraisal fee to | | (from GFE #3) | | |
| 805. Credit report to | | (from GFE #3) | | |
| 806. Tax service to | | (from GFE #3) | | |
| 807. Flood certification | | (from GFE #3) | | |
| 808. | | | | |
| **900. Items Required by Lender to Be Paid in Advance** | | | | |
| 901. Daily interest charges from | to | @ $ | /day | (from GFE #10) | | |
| 902. Mortgage insurance premium | for | months to | (from GFE #3) | | |
| 903. Homeowner's insurance | for | years to | (from GFE #11) | | |
| 904. | | | | |
| **1000. Reserves Deposited with Lender** | | | | |
| 1001. Initial deposit for your escrow account | | (from GFE #9) | | |
| 1002. Homeowner's insurance | months @ $ | per month | $ | | |
| 1003. Mortgage insurance | months @ $ | per month | $ | | |
| 1004. Property taxes | months @ $ | per month | $ | | |
| 1005. | months @ $ | per month | $ | | |
| 1006. | months @ $ | per month | $ | | |
| 1007. Aggregate Adjustment | | −$ | | |
| **1100. Title Charges** | | | | |
| 1101. Title services and lender's title insurance | | (from GFE #4) | | |
| 1102. Settlement or closing fee | $ | | | |
| 1103. Owner's title insurance | | (from GFE #5) | | |
| 1104. Lender's title insurance | $ | | | |
| 1105. Lender's title policy limit $ | | | | |
| 1106. Owner's title policy limit $ | | | | |
| 1107. Agent's portion of the total title insurance premium | $ | | | |
| 1108. Underwriter's portion of the total title insurance premium | $ | | | |
| **1200. Government Recording and Transfer Charges** | | | | |
| 1201. Government recording charges | | (from GFE #7) | | |
| 1202. Deed $ | Mortgage $ | Releases $ | | |
| 1203. Transfer taxes | | (from GFE #8) | | |
| 1204. City/County tax/stamps | Deed $ | Mortgage $ | | |
| 1205. State tax/stamps | Deed $ | Mortgage $ | | |
| 1206. | | | | |
| **1300. Additional Settlement Charges** | | | | |
| 1301. Required services that you can shop for | | (from GFE #6) | | |
| 1302. | $ | | | |
| 1303. | $ | | | |
| 1304. | | | | |
| 1305. | | | | |
| **1400. Total Settlement Charges (enter on lines 103, Section J and 502, Section K)** | | | | |

Previous editions are obsolete          Page 2 of 3          HUD-1

Previous version (effective Oct. 19, 2017 to July 1, 2020)

000566

| Charges That Cannot Increase | HUD-1 Line Number | | |
|---|---|---|---|
| Our origination charge | # 801 | | |
| Your credit or charge (points) for the specific interest rate chosen | # 802 | | |
| Your adjusted origination charges | # 803 | | |
| Transfer taxes | #1203 | | |

| Charges That in Total Cannot Increase More Than 10% | | Good Faith Estimate | HUD-1 |
|---|---|---|---|
| Government recording charges | # 1201 | | |
| | # | | |
| | # | | |
| | # | | |
| | # | | |
| | # | | |
| | # | | |
| | # | | |
| Total | | | |
| Increase between GFE and HUD-1 Charges | | $ _____ or _____ % |

| Charges That Can Change | | Good Faith Estimate | HUD-1 |
|---|---|---|---|
| Initial deposit for your escrow account | #1001 | | |
| Daily interest charges | # 901 $ ____ /day | | |
| Homeowner's insurance | # 903 | | |
| | # | | |
| | # | | |
| | # | | |

**Loan Terms**

| | |
|---|---|
| Your initial loan amount is | $ _____ |
| Your loan term is | _____ years |
| Your initial interest rate is | _____ % |
| Your initial monthly amount owed for principal, interest, and any mortgage insurance is | $ _____ includes ☐ Principal ☐ Interest ☐ Mortgage Insurance |
| Can your interest rate rise? | ☐ No. ☐ Yes, it can rise to a maximum of _____ %. The first change will be on _____ and can change again every _____ after _____. Every change date, your interest rate can increase or decrease by _____ %. Over the life of the loan, your interest rate is guaranteed to never be lower than _____ % or higher than _____ %. |
| Even if you make payments on time, can your loan balance rise? | ☐ No. ☐ Yes, it can rise to a maximum of $ _____ |
| Even if you make payments on time, can your monthly amount owed for principal, interest, and mortgage insurance rise? | ☐ No. ☐ Yes, the first increase can be on _____ and the monthly amount owed can rise to $ _____ The maximum it can ever rise to is $ _____. |
| Does your loan have a prepayment penalty? | ☐ No. ☐ Yes, your maximum prepayment penalty is $ _____. |
| Does your loan have a balloon payment? | ☐ No. ☐ Yes, you have a balloon payment of $ _____ due in _____ years on _____. |
| Total monthly amount owed including escrow account payments | ☐ You do not have a monthly escrow payment for items, such as property taxes and homeowner's insurance. You must pay these items directly yourself. ☐ You have an additional monthly escrow payment of $ _____ that results in a total monthly amount owed of $ _____. This includes principal, interest, any mortgage insurance and any items checked below: ☐ Property taxes ☐ Homeowner's insurance ☐ Flood Insurance ☐ _____ ☐ _____ |

Note: If you have any questions about the Settlement Charges and Loan Terms listed on this form, please contact your lender.

Previous editions are obsolete        Page 3 of 3        HUD-1

Previous version (effective Oct. 19, 2017 to July 1, 2020)

000567

## Settlement Statement (HUD-1A)
**Optional Form for Transactions without Sellers**

| Name and Address of Borrower | Name and Address of Lender |
|---|---|
| Property Location (if different from above) | Settlement Agent |
| | Place of Settlement |
| Loan Number: | Settlement Date: |

**L. Settlement Charges**

| | | | | M. Disbursements to Others | |
|---|---|---|---|---|---|
| **800. Items Payable in Connection with Loan** | | | | 1501. | |
| 801. Our origination charge | | (from GFE #1) $ | | | |
| 802. Your credit or charge (points) for the specific interest rate chosen (from GFE #2) | | | | 1502. | |
| 803. Your adjusted origination charges | | (from GFE A) | | | |
| 804. Appraisal fee to | | (from GFE #3) | | 1503. | |
| 805. Credit report to | | (from GFE #3) | | | |
| 806. Tax service to | | (from GFE #3) | | 1504. | |
| 807. Flood certification | | (from GFE #3) | | | |
| 808. | | | | 1505. | |
| **900. Items Required by Lender to Be Paid in Advance** | | | | | |
| 901. Daily interest charges from | to @$ /day | (from GFE #10) | | 1506. | |
| 902. Mortgage insurance premium for months to | | (from GFE #3) | | | |
| 903. Homeowner's insurance for years to | | (from GFE #11) | | 1507. | |
| 904. | | | | | |
| **1000. Reserves Deposited with Lender** | | | | 1508. | |
| 1001. Initial deposit for your escrow account | | (from GFE #9) | | | |
| 1002. Homeowner's insurance months @$ per month $ | | | | 1509. | |
| 1003. Mortgage insurance months @$ per month $ | | | | | |
| 1004. Property taxes months @$ per month $ | | | | 1510. | |
| 1005. months @$ per month $ | | | | | |
| 1006. months @$ per month $ | | | | 1511. | |
| 1007. Aggregate Adjustment -$ | | | | | |
| **1100. Title Charges** | | | | 1512. | |
| 1101. Title services and lender's title insurance | | (from GFE #4) | | | |
| 1102. Settlement or closing fee $ | | | | 1513. | |
| 1103. Owner's title insurance | | (from GFE #5) | | | |
| 1104. Lender's title insurance $ | | | | 1514. | |
| 1105. Lender's title policy limit $ | | | | | |
| 1106. Owner's title policy limit $ | | | | 1515. | |
| 1107. Agent's portion of the total title insurance premium $ | | | | | |
| 1108. Underwriter's portion of the total title insurance premium $ | | | | **1520. Total Disbursed** (enter on line 1603) | |
| **1200. Government Recording and Transfer Charges** | | | | | |
| 1201. Government recording charges | | (from GFE #7) | | **N. Net Settlement** | |
| 1202. Deed $ Mortgage $ Release $ | | | | 1600. Loan Amount | $ |
| 1203. Transfer taxes | | (from GFE #8) | | 1601. Plus Cash/Check from Borrower | $ |
| 1204. City/County tax/stamps Deed $ Mortgage $ | | | | 1602. Minus Total Settlement Charges (line 1400) | $ |
| 1205. State tax/stamps Deed $ Mortgage $ | | | | 1603. Minus Total Disbursements to Others (line 1520) | $ |
| 1206. | | | | 1604. Equals Total Disbursements to Increase (after expiration of any applicable rescission period required by law) | $ |
| **1300. Additional Settlement Charges** | | | | | |
| 1301. Required services that you can shop for | | (from GFE #6) | | | |
| 1302. | | $ | | | |
| 1303. | | $ | | | |
| 1304. | | | | | |
| 1305. | | | | | |
| **1400. Total Settlement Charges (enter on line 1602, Section N)** | | | | | |

The Public Reporting Burden for this collection of information is estimated at 35 minutes per response for collecting, reviewing, and reporting the data. This agency may not collect this information, and you are not required to complete this form, unless it displays a currently valid OMB control number. No confidentiality is assured; this disclosure is mandatory. This is designed to provide the parties to a RESPA covered transaction with information during the settlement process.

Previous version (effective Oct. 19, 2017 to July 1, 2020)

000568

Editorial Note: At 78 FR 80105, Dec. 31, 2013, appendix A to part 1024 was amended; however, amendatory instructions E and F could not be incorporated due to inaccurate amendatory instructions.

‹ Previous section - § 1024.41 (cfpb.gov/rules-policy/regulations/1024/2017-10-19/41/)

**§ 1024.41 Loss mitigation procedures.**

Next section - B (cfpb.gov/rules-policy/regulations/1024/2017-10-19/b/) ›

**Appendix B to Part 1024 – Illustrations of Requirements of RESPA**

Previous version (effective Oct. 19, 2017 to July 1, 2020)

000569

An official website of the United States government

CAUSE NO. _____

| | | |
|---|---|---|
| GALLERIA 2425 OWNER, LLC, | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | _____ JUDICIAL DISTRICT |
| | § | |
| NATIONAL BANK OF KUWAIT, S.A.K.P., | § | |
| NEW YORK BRANCH, A BANKING | § | |
| CORPORATION ORGANIZED UNDER THE | § | |
| LAWS OF KUWAIT, ACTING THROUGH | § | |
| ITS NEW YORK BRANCH | § | |
| | § | |
| AND | § | |
| | § | |
| GEORGE M. LEE, | § | |
| | § | |
| Defendants. | § | HARRIS COUNTY, TEXAS |

## PLAINTIFF'S ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Plaintiff **GALLERIA 2425 OWNER, LLC** ("Galleria" or "Plaintiff") and files its Original Petition against Defendant **NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH, A BANKING CORPORATION ORGANIZED UNDER THE LAWS OF KUWAIT, ACTING THROUGH ITS NEW YORK BRANCH** ("Kuwait" or "Defendant") and **GEORGE M. LEE** ("Lee") and, in support thereof, respectfully show the Court as follows:

## I.
## DISCOVERY CONTROL PLAN

1.    Plaintiff intends to conduct discovery under Level 2 of the Texas Rules of Civil Procedure 190.

## II.
## PARTIES

1

Certified Document Number: 98154337 - Page 1 of 12

2.     Plaintiff Galleria, at all times relevant hereto, was and is a limited liability company doing business in Texas with an interest in real property located in Harris County, Texas that is the subject of this action.

3.     NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH, A BANKING CORPORATION ORGANIZED UNDER THE LAWS OF KUWAIT, ACTING THROUGH ITS NEW YORK BRANCH has no registered agent in the state of Texas.  Plaintiff, therefore, requests service through the Texas Secretary of State at P.O. Box 12079, Austin, Texas 78711-2079.  **This Defendant's forwarding address is Corporation Service Company, 299 Park Ave., New York, New York 10171.**  Plaintiff requests that the clerk issue Citation at this time.

4.     George M. Lee is an individual residing in Harris County who can be served at 5353 West Alabama, Suite 610, Houston, Texas 77056 or wherever he may be found.  Plaintiff requests service at this time.

### III.
### JURISDICTION AND VENUE

5.     Venue is proper in Harris County, Texas pursuant to Texas Civil Practice and Remedies Code §15.001 in that this action affects title to commercial real property and improvements situated entirely within Harris County, Texas located 2425 West Loop South, Houston, Texas 77027 (the "Property").  *See Exhibit "A," Cover Letter and Notice of Sale and Legal Descriptions attached thereto and incorporated herein by reference.*

### IV.
### FACTS

6.     Defendant's alleged interest in the Property derives from an alleged Note secured by a alleged Deed of Trust, Assignment of Leases and Rents and Profits, Security Agreement and

Certified Document Number: 98154337 - Page 2 of 12

000572

Fixture Filing (the "Deed of Trust") dated on or about May 23, 2018, in favor of NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH. *See Exhibit E, Affidavit.*

7.    Stage Stores ("Stage") with approximately 13,000 employees overall and approximately 1,000 employees at its corporate headquarters in the Property was Plaintiff's longtime, primary tenant at the Property leasing hundreds of thousands of square feet over multiple floors. In May, 2020, Stage entered Chapter 11 bankruptcy. Since that time, Stage and its affiliates (Palais Royal, Bealls, Gordman's, etc.) ceased operations, vacated the Property, closed all retail stores in the chain, and laid off all its employees. It goes without saying that the loss of Stage as a tenant impacted the Property, and on account of the ongoing global pandemic, remote work, and market constrictions, it has been difficult for ALL commercial landlords to fill lease space. The appetite for commercial lease space is on the rise. Plaintiff is actively marketing the Property for lease and showing the Property to prospective tenants. *See Exhibit E, Affidavit.*

8.    Stage Stores' demise and quick exit from the Property left Plaintiff with little options until Plaintiff could market and re-lease the Property. Kuwait failed to follow its obligations under Texas law and is, therefore, barred from foreclosing on the Property on October 5, 2021. *See Exhibit E, Affidavit.*

9.    Galleria disputes that Kuwait properly served it with Notice of Default and Intent to Accelerate, but to the extent that Kuwait served the June 29, 2021 **alleged** Notice of Default and Intent to Accelerate, it is fatally defective. Therein, Kuwait advised that "[i]f payment of all amounts that are then currently due and owing under the Note are not received by [Kuwait] by [July 12, 2021], [Kuwait] **intends to** (1) accelerate the maturity of the indebtedness…" *See Exhibit B, Notice of Default and Intent to Accelerate* (emphasis added).

10.    Galleria disputes that Kuwait properly served it with Notice of Acceleration, but to

Certified Document Number: 98154337 - Page 3 of 12

the extent Kuwait served the July 14, 2021 Notice of Acceleration, the Notice of Acceleration is ineffective. Any subsequent Notice of Sale is likewise ineffective.

11.     Despite Galleria's requests to Defendant Kuwait to postpone the foreclosure sale, Kuwait refuses to postpone the foreclosure, and Kuwait informed Galleria that foreclosure will proceed on October 5, 2021. *See Exhibit E, Affidavit.*

12.     Defendant George M. Lee also claims an interest in the Property adverse to Plaintiff and adverse to Kuwait. Lee loaned money to the former owner of the Property, and Lee had a lien on the Property to secure re-payment of loan. Lee received funds sufficient to pay off his loan to the former owner, and Lee released his lien on the Property. Lee, however, repudiated his Release of Lien and now unlawfully claims that his lien continues encumber the Property and that his security interest remains and superior to Kuwait's alleged lien on the Property. Lee's alleged lien and/or interest is an unlawful cloud on title.

## V.
## CAUSES OF ACTION & PRAYERS FOR RELIEF

**A.     COUNT I AGAINST KUWAIT – BREACH OF CONTRACT AND VIOLATION OF TEXAS FORECLOSURE LAW.**

13.     Plaintiff adopts and incorporates herein by reference the foregoing paragraphs as though fully set forth herein.

14.     The applicable contracts in this instance are the alleged Note, Deed of Trust, and Loan Agreement (collectively, the "Loan Documents"). Plaintiff violated one or more of these alleged contracts and Texas law as further specified herein because Kuwait's alleged Notice of Intent to Accelerate is fatally defective. This defect renders the subsequent alleged Notice of Acceleration and Notice of Sale ineffective. The foreclosure cannot proceed.

15.     *Ogden v. Gibraltar Sav. Assoc.*, 640 S.W.2d 232, 233-234 (Tex. 1982) and

Certified Document Number: 98154337 - Page 4 of 12

000574

*Sarasota, Inc. v. Ballew*, 2001 WL 194031, at * 3 (Tex. App.-Austin 2001, pet. denied) are directly on point and vitiate Defendant's ability to foreclose.

16.     In *Ogden*, the Texas Supreme Court considered whether a notice of intent to accelerate which stated that "failure to cure…*may* result in acceleration" was sufficient to put the plaintiff on notice of the defendant's intent to accelerate. 640 S.W.2d at 233 (emphasis added). The court held that, because it used the word 'may,' the notice was insufficiently clear as to whether acceleration *would* result. *Id.*

17.     The Texas court of appeals has since extended *Ogden* to hold that even language indicating that the defendant 'intends' to exercise its rights – though somewhat more positive than the notice in *Ogden* that the defendant 'may' exercise its rights – is too vague to constitute notice of intent to accelerate. *Sarasota, Inc. v. Ballew*, 2001 WL 194031, at * 3 (Tex. App.-Austin, pet. denied). In *Mastin v. Mastin*, 70 S.W.3d 148, 155 (Tex. App.-San Antonio 2001, no pet.) the San Antonio Court of Appeals found that where a party did not give unequivocal notice of intent to accelerate, any attempted acceleration thereafter is ineffective.

18.     Kuwait's alleged Notice of Intent to Accelerate is defective on its face because it states that "[i]f payment of all amounts that are then currently due and owing under the Note are not received by Beneficiary by the time and date stated above, Beneficiary **intends to** (1) accelerate the maturity of the indebtedness…" *See Exhibit B (emphasis added).* On account of Kuwait's fatally defective Notice of Intent to Accelerate, black letter Texas law vitiates Kuwait's ability to foreclose. Kuwait's foreclosure cannot proceed.

19.     The alleged Loan Documents and Texas law require Kuwait to serve unequivocal Notice of Intent to Foreclose on Plaintiff. Defendant Kuwait failed to do so which makes any attempt by Kuwait to foreclose unlawful. Defendant Kuwait, therefore, breached the terms of its

Certified Document Number: 98154337 - Page 5 of 12

000575

alleged contracts with Plaintiff and violated Texas foreclosure law.[1] Plaintiff suffered and will continue to suffer damages if the Court does not restrain and enjoin Kuwait.

20.    **WHEREFORE**, Plaintiff requests this Court (i) enjoin the foreclosure sale of Kuwait, its successors and/or assigns and any and all trustees and/or substitute trustees acting by, through, or under them including, without limitation, Josh D. Morton, Laura E. Hannusch, and Adam Weaver, and (ii) enter judgment in favor of Plaintiff and against Defendant for actual damages of $1,000,000, (iii) award Plaintiff's attorney's fees and costs incurred herein, and (iv) award Plaintiff such other and further relief as this Court deems just and proper.

### B.    COUNT II AGAINST KUWAIT AND LEE - DECLARATORY JUDGMENT

21.    Plaintiff adopts and incorporates herein by reference all prior paragraphs of this Petition as though fully set forth herein.

22.    Plaintiff seeks a declaratory judgment pursuant to Texas Civil Practice and Remedies Code §37.004 that: (i) Plaintiff's interest in the Property constitutes a legally-protectable interest; (ii) Defendant's alleged Notice of Intent to Foreclose is fatally defective; (iii) the alleged Notice of Acceleration is ineffective; (iv) the alleged Notice of Sale is ineffective; and (v) Lee has no legal or equitable interest in the Property superior to Plaintiff's interest.

23.    A real, subsisting, and justiciable controversy exists between the parties hereto

---

[1] A borrower's obligation to make monthly payments is independent of a lender's obligations in the event of a default. *Williams v. Wells Fargo, Bank, N.A.*, 884 F.3d 239, 245 (5th Cir. 2018) ("If performance of the terms of a deed of trust governing the parties' rights and obligations in the event of default can always be excused by pointing to the debtor's default under the terms of the note, the notice terms have no meaning.").

   Thus, because Plaintiffs' breach of contract claim is related to Defendants' alleged failures to uphold its *post-default* obligations under the Deed of Trust, Plaintiff's default does not preclude its breach of contract claim. *See Adams v. U.S. Bank, N.A.*, No. 3:17-cv-723-B-BN, 2018 WL 2164520, at * 4 (N.D. Tex. Apr. 18, 2018) (concluding a borrower who is in default is not precluded from asserting a breach of contract claim against a bank when the claim arises out of the bank's alleged failure to provide post-default notice); *Thomas v. Wells Fargo Bank, N.A.*, No. 4:17-CV-2070, 2018 WL 1898455, at *3 (S.D. Tex. Apr. 20, 2018) ("Plaintiffs' breach of contract claim is not foreclosed as a matter of law by their failure to satisfy their payment obligations under the Deed of Trust.").

Certified Document Number: 98154337 - Page 6 of 12

000576

concerning the Property and transfer of title.

24.    **WHEREFORE**, Plaintiff prays for judgment declaring, decreeing, and adjudging that (i) Kuwait, its successors and assigns and any and all trustees and/or substitute trustees acting by, through, or under them including, without limitation, Josh D. Morton, Laura E. Hannusch, and Adam Weaver, have no right, to foreclose on the Property based on the current posture of the requisite Notices, and (ii) they are barred, enjoined, and estopped from pursuing foreclosure without serving effective, requisite notices.

## B.    COUNT III AGAINST LEE – QUIET TITLE

25.    Plaintiff adopts and incorporate herein by reference all prior paragraphs of this Petition as though fully set forth herein.

26.    Quiet title is brought in equity to remove the existence of a cloud on the title. A suit to quiet title is equitable and allows any person claiming any title, estate, or interest in real property to institute an action against any person or persons having or claiming to have any title, estate, or interest in such property to have the court determine the estate, title, or interest of said parties, respectively, in such real estate, and to define and adjudge by its judgment or decree the title, estate and interest of the parties severally in and to such real estate. *See e.g., Vernon v. Perrien*, 390 S.W.3d 47, 61 (Tex. App.—El Paso 2012, pet. denied); *Essex Crane Rental Corp. v. Carter*, 371 S.W.3d 366, 388 (Houston [1st Dist.] 2012, pet. denied); *Longoria v. Lasater*, 292 S.W.3d 156, 165 n.7 (Tex. App.—San Antonio 2009, pet. denied).

27.    Lee received all sums due and owing to him, and he released his lien. Nevertheless, he repudiated the Release of Lien and claims the lien remains and that he has an equitable lien and/or interest.

28.    Lee possesses no right, title, or interest in and to the Property superior to that of

Certified Document Number: 98154337 - Page 7 of 12

000577

Plaintiff <u>because Lee received funds sufficient to pay off everything he was owed</u>.  Same is adverse to Plaintiff's interest in the Property.  A justiciable controversy exists concerning title to the Property and the nature and extent of Lee's interest.  Plaintiff has no adequate remedy at law.

29.    **WHEREFORE**, Plaintiff prays for judgment (i) quieting title to the Property free and clear of any lien alleged held by Lee, (ii) finding that Lee has no interest in or to the Property and (iii) awarding such other and further relief as this Court deems just and necessary.

<div align="center">

**VI.**
**<u>APPLICATION FOR TEMPORARY RESTRAINING ORDER AND APPLICATION</u>**
**<u>FOR TEMPORARY INJUNCTION</u>**

</div>

30.    Plaintiff adopts and incorporates herein by reference all prior paragraphs of this Petition as though fully set forth herein.

31.    By Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer immediate and irreparable harm that cannot be adequately compensated by an award of damages, namely the loss of extremely valuable, unique, Harris County Real Estate.  Plaintiff is entitled to injunctive relief to force Kuwait, its successor and/or assigns, and any and all trustees and/or substitute trustees acting by, through, or under them including, without limitation, Josh D. Morton, Laura E. Hannusch, and Adam Weaver, to refrain from continuing such unlawful conduct.

32.    Defendant already confirmed in writing that its unlawful conduct will continue and that Defendant will foreclose on the Property unless this Court immediately enjoins , its successor and/or assigns, and any and all trustees and/or substitute trustees acting by, through, or under them including, without limitation, Josh D. Morton, Laura E. Hannusch, and Adam Weaver, from foreclosing.  *See Exhibit D, Email from Kuwait's counsel confirming that foreclosure sale will proceed.*

Certified Document Number: 98154337 - Page 8 of 12

000578

Certified Document Number: 98154337 - Page 9 of 12

33. Plaintiff requests a Temporary Restraining Order to maintain the *status quo* pursuant to Texas Civil and Practice Remedies Code Section 65.011. Unless Kuwait, its successor and/or assigns, and any and all trustees and/or substitute trustees acting by, through, or under them including, without limitation, Josh D. Morton, Laura E. Hannusch, and Adam Weaver, are immediately restrained, they will cause substantial and irreparable harm to Plaintiff, namely the potential, irreversible loss of the Property by virtue of a sale to a third party for a sizeable profit. Plaintiff ask the Court to maintain *status quo* and restrain Defendant Kuwait, its successor and/or assigns, and any and all trustees and/or substitute trustees acting by, through, or under them, including, without limitation, Josh D. Morton, Laura E. Hannusch, and Adam Weaver, from foreclosing on the Property until such time as all claims and causes of action in this lawsuit are resolved.

34. Unless Defendant Kuwait, its successor and/or assigns, and any and all trustees and/or substitute trustees acting by, through, or under them including, without limitation, Josh D. Morton, Laura E. Hannusch, and Adam Weaver, are enjoined, they will continue to take advantage of Plaintiff and potentially complete a foreclosure sale of the Property without lawful and proper notices which will greatly prejudice Plaintiff. Any attempt to take action against Plaintiff or that would prejudice Plaintiff in connection with this unique piece of Harris County real estate will cause Plaintiff to suffer imminent, irreparable harm for which no adequate remedy at law exists if Defendant Kuwait, its successor and/or assigns, and any and all trustees and/or substitute trustees acting by, through, or under them are not enjoined from these actions. The irreparable harm includes, but is not limited to, injury and a complete loss of Plaintiff's business and/or business reputation and/or business goodwill if the valuable real estate Plaintiff owns is lost to foreclosure.

000579

35. Black letter Texas law confirms that Plaintiff's Notice of Intent to Accelerate is fatally defective which renders the subsequent Notice of Acceleration and Notice of Sale ineffective. Plaintiff is likely to succeed on the merits of this suit because Defendant has acted unilaterally, unlawfully, and without the proper authority to take any of these actions.

36. The injunctive relief Plaintiff seeks will do no more than maintain *status quo*. Plaintiff asks the Court to set this application for temporary injunction for a hearing and, after hearing, issue a temporary injunction against Defendant Kuwait, its successor and/or assigns, and any and all trustees and/or substitute trustees acting by, through, or under them including, without limitation, Josh D. Morton, Laura E. Hannusch, and Adam Weaver, restraining Kuwait, its successor and/or assigns, and any and all trustees and/or substitute trustees acting by, through, or under them until a final trial on the merits or arbitration can be heard.

37. Black letter Texas law is directly on point and destroys Plaintiff's attempt to foreclose. As such, there is a substantial likelihood that Plaintiff will prevail in this suit. Other than equitable relief, Plaintiff has no adequate remedy at law with respect to the actions Plaintiff seeks to enjoin. Without equitable relief, Plaintiffs would suffer irreparable injuries such as complete loss of its business and loss of reputation and/or business goodwill among tenants and prospective tenants, among others.

38. In support of Plaintiff's Application for Temporary Restraining Order, Plaintiff and Plaintiff's representatives executed Affidavits confirming all facts set forth herein.

## VII.
## ATTORNEY'S FEES AND COSTS

39. Plaintiff adopts and incorporates herein by reference all prior paragraphs of this Petition as though fully set forth herein.

Certified Document Number: 98154337 - Page 10 of 12

000580

40.     Plaintiff had to employ the services of an attorney to prosecute this lawsuit against Defendant. Texas law and the Loan Documents allow Plaintiff to recover attorneys' fees and costs. For these reasons, Plaintiff seeks reimbursement of any and all reasonable and necessary attorneys' fees and costs it incurred in prosecution of this matter.

## VIII.
## TEX. R. CIV. P. 193.7 NOTICE

41.     This paragraph serves as continuing notice, pursuant to Tex. R. Civ. P. 193.7, that any and all documents produced in response to written discovery served by Plaintiff will be used against the producing party in any pretrial proceedings and/or trial.

## IX.
## JURY DEMAND

42.     Plaintiff hereby requests a jury trial.

## X.
## CONCLUSION AND PRAYER

WHEREFORE, PREMISES CONSIDERED, as a direct and proximate cause of Defendant's actions and the actions of its successor and/or assigns, and any and all trustees and/or substitute trustees acting by, through, or under them including, without limitation, Josh D. Morton, Laura E. Hannusch, and Adam Weaver, as outlined above, Plaintiff suffered and continues to suffer significant monetary damages including, without limitation, complete loss of the Property. Damages are within the minimum jurisdictional limits of this Court. Plaintiff, therefore, prays that Defendant be cited to appear herein, that upon trial Defendant is held liable for (i) the causes of action Plaintiff pleads and (ii) Plaintiff's damages. Specifically, Plaintiff prays for the following:

1. Actual economic damages;

2. Declaratory relief as requested herein;

3. Quiet title requested herein;

11

Certified Document Number: 98154337 - Page 11 of 12

4.  Reasonable and necessary attorneys' fees in an amount to be determined by the Court;

5.  Costs of Court;

6.  Temporary and permanent injunctive relief;

7.  Pre-judgment and post-judgment interest; and

8.  Any other damages or relief to which Plaintiff is justly entitled.

Respectfully submitted,

**GALLOWAY, JOHNSON, TOMPKINS, BURR & SMITH, A PLC**

By:  //s//  Branch M. Sheppard
         Branch M. Sheppard
         State Bar No. 24033057
         bsheppard@gallowaylawfirm.com
         Annarose M. Harding
         State Bar No. 24071438
         aharding@gallowaylawfirm.com
         1301 McKinney, Suite 1400
         Houston, Texas   77010
         Telephone:  (713) 599-0700
         Facsimile:  (713) 599-0777
         **ATTORNEYS FOR PLAINTIFF**


**THE ZWERNEMANN LAW FIRM**

By:   //s// Allen H. Zwernemann
         Allen H. Zwernemann
         State Bar No. 24034755
         FID No. 2851120
         800 Sawyer Street
         Houston, Texas 77007
         Tel:  (281) 221-
         Fax: (281) 783-4247
         E-mail: az@azlf.com
         **ATTORNEYS FOR PLAINTIFF**

Certified Document Number: 98154337 - Page 12 of 12

000582



I, Marilyn Burgess, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   July 21, 2024

Certified Document Number:        98154337 Total Pages:  12

Marilyn Burgess, DISTRICT CLERK

HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 51.301 and 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**



# pillsbury

Pillsbury Winthrop Shaw Pittman LLP

Two Houston Center 909 Fannin, Suite 2000 | Houston, TX 77010-1018 | tel 713.276.7600 | fax 713.276.7673

Josh D. Morton
tel: +1.713.276.7624
josh.morton@pillsburylaw.com

September 14, 2021

<u>Certified Mail No. 7018 0360 0000 1721 8501</u>
<u>Return Receipt Requested</u>
<u>and Copy by First-Class Mail and Email</u>

Galleria 2425 Owner, LLC
1001 West Loop South, Suite 700
Houston, Texas 77027
Attention: Ali Choudhri

Re: Notice of foreclosure sale regarding the following instruments, among others (collectively, the "<u>Loan Documents</u>"):

Deed of Trust, Assignment of Leases and Rents and Profits, Security Agreement and Fixture Filing ("<u>Deed of Trust</u>"):

| | |
|---|---|
| Dated: | May 23, 2018 |
| Grantor: | Galleria 2425 Owner, LLC, a Delaware limited liability company |
| Trustee: | Salima Umatiya |
| Beneficiary: | National Bank of Kuwait, S.A.K.P., New York Branch, a banking corporation organized under the laws of Kuwait, acting through its New York branch |
| Recorded in: | File No. RP-2018-235600 of the real property records of Harris County, Texas |
| Secures: | Promissory Note ("<u>Note</u>") dated May 23, 2018, in the original principal amount of $51,675,000.00, executed by Galleria 2425 Owner, LLC, a Delaware limited liability |

4832-4181-9642.v1

## EXHIBIT A

000584

Certified Document Number: 98154339 - Page 1 of 15

|  | company ("Borrower"), and payable to the order of National Bank of Kuwait, S.A.K.P., New York Branch, a banking corporation organized under the laws of Kuwait, acting through its New York branch, as administrative and collateral agent for the Lenders (as defined in the Loan Agreement [as defined in the Deed of Trust]) ("Administrative Agent"), and all other indebtedness of Borrower to Lender |
|---|---|
| Assignment: | The Note and the liens and security interests of the Deed of Trust were transferred and assigned to Beneficiary by an instrument dated effective as of September 13, 2021, to be recorded in the real property records of Harris County, Texas |
| Guaranty: | The Note and all other indebtedness of Borrower to Administrative Agent is guaranteed by a Guaranty dated May 23, 2018, and executed by Bradley Parker in favor of Administrative Agent |
| Substitute Trustee: | Any of Josh D. Morton, Laura E. Hannusch, or Adam Weaver |

Dear Mr. Choudhri:

This letter is written at the request and on behalf of our client, Beneficiary. Written notice dated June 29, 2021, was served on Borrower by this firm on behalf of Beneficiary by certified mail, return receipt requested, informing Borrower of the existence of one or more defaults under the Note and the Deed of Trust ("Defaults"). The Note, among other things, constitutes part of the indebtedness secured by the Deed of Trust ("Indebtedness"). In that notice, demand was made on Borrower to pay the unpaid past-due amounts then owing under the Note and Borrower was advised of Beneficiary's intention to accelerate the maturity of the Note if the Defaults were not cured.

Additionally, written notice dated July 14, 2021, was served on Borrower by this firm on behalf of Beneficiary by certified mail, return receipt requested, informing Borrower that, according to the records of Beneficiary, Borrower had not cured the Defaults, and that therefore Beneficiary, by that letter, had accelerated the maturity of the Indebtedness (including all unpaid principal of, and all lawful accrued and unpaid

Certified Document Number: 98154339 - Page 2 of 15

EXHIBIT A

interest and other lawful amounts due under, the Note), declared the entire Indebtedness immediately due and payable, and made demand on Borrower and on all persons and entities obligated on the Note (except to the extent that obligation is expressly limited by written contract or applicable law) for payment in full of the entire Indebtedness.

Beneficiary has instructed Substitute Trustee to sell the Property (as defined in the notice below) at a nonjudicial foreclosure sale ("Foreclosure Sale"). A copy of the Notice of Foreclosure Sale ("Notice") specifying the date, time, place, and terms of the Foreclosure Sale is enclosed with this letter. If all amounts due and owing have not been paid by the Foreclosure Sale, Substitute Trustee will conduct the Foreclosure Sale on the date and at the time and place specified in the Notice, as authorized by and in accordance with the provisions of the Deed of Trust and applicable law.

If the proceeds of the Foreclosure Sale are insufficient to repay the Indebtedness, then, except to the extent the Indebtedness is expressly nonrecourse or any party's liability is expressly limited by written contract or applicable law, each person and entity obligated to repay the Indebtedness will be jointly and severally liable for the deficiency.

If any party who receives this letter is a debtor in a bankruptcy proceeding subject to the provisions of the United States Bankruptcy Code (title 11 of the United States Code), this letter is merely intended to be written notice of the defaults under the Note in compliance with the Loan Documents and applicable law. This letter is not an act to collect, assess, or recover a claim against that party, nor is this letter intended to violate any provisions of the Code. Any and all claims that Beneficiary asserts against that party will be properly asserted in compliance with the Code in the bankruptcy proceeding. In addition, all of Beneficiary's claims, demands, and accruals regarding the Loan Documents, whenever made, and whether for principal, interest, or otherwise, are intended to comply in all respects, both independently and collectively, with all applicable usury laws, and are accordingly limited so that all applicable usury laws are not violated.

Nothing contained in this letter is intended to waive any default or event of default; waive any rights, remedies, or recourses available to Beneficiary; or be an election of remedies resulting from any default that may exist with respect to the Loan Documents.

You may contact Michael Carter, Vice President of National Bank of Kuwait, S.A.K.P., New York Branch, at 299 Park Avenue, New York, New York 10171, (212) 303-9897, regarding any questions that you may have, including the outstanding balance of the past-due amounts on the Note as of any particular date. If you have any questions that

Certified Document Number: 98154339 - Page 3 of 15

EXHIBIT A

Galleria 2425 Owner LLC
September 14, 2021
Page 4

you believe I can answer, you or your attorney may contact me at the telephone number
or address listed above.

**Assert and protect your rights as a member of the armed forces of the United
States. If you are or your spouse is serving on active military duty, including active
military duty as a member of the Texas National Guard or the National Guard of
another state or as a member of a reserve component of the armed forces of the
United States, please send written notice of the active duty military service to the
sender of this notice immediately.**

Very truly yours,

Josh D. Morton
Special Counsel

cc:     Holland & Knight LP
        811 Main Street, Suite 2500
        Houston, Texas 77002
        Attention: Bruce Merwin, Esq.

        Polsinelli
        2950 Harwood Street, Suite 2100
        Dallas, Texas 75201
        Attention: Brian Bullard, Esq.

        Bradley Parker
        2127 Bolsover Street
        Houston, Texas 77005

        Naissance Galleria, LLC
        c/o Walkers Corporate Limited
        Cayman Corporate Centre, 27 Hospital Road
        George Town, Grand Cayman KYI-9008
        Cayman Islands

EXHIBIT A

Certified Document Number: 98154339 - Page 4 of 15

Galleria 2425 Owner LLC
September 14, 2021
Page 5

Crain, Caton & James
Five Houston Center
1401 McKinney Street, Suite 1700
Houston, Texas 77010
Attention: Adrienne Bond, Esq.

4832-4181-9642.v1

**EXHIBIT A**

Certified Document Number: 98154339 - Page 5 of 15

**AFTER RECORDING, RETURN TO:**
Pillsbury Winthrop Shaw Pittman LLP
909 Fannin, Suite 2000
Houston, Texas 77010
Attn: Josh D. Morton

## NOTICE OF FORECLOSURE SALE

September 14, 2021

Deed of Trust, Assignment of Leases and Rents and Profits, Security Agreement and Fixture Filing ("Deed of Trust"):

| | |
|---|---|
| Dated: | May 23, 2018 |
| Grantor: | Galleria 2425 Owner, LLC, a Delaware limited liability company |
| Trustee: | Salima Umatiya |
| Original Beneficiary: | National Bank of Kuwait, S.A.K.P., New York Branch, a banking corporation organized under the laws of Kuwait, acting through its New York branch |
| Beneficiary: | Houston 2425 Galleria LLC, a Delaware limited liability company |
| Recorded in: | File No. RP-2018-235600 of the real property records of Harris County, Texas |
| Secures: | Promissory Note ("Note") dated May 23, 2018, in the original principal amount of $51,675,000.00, executed by Galleria 2425 Owner, LLC, a Delaware limited liability company ("Borrower"), and payable to the order of National Bank of Kuwait, S.A.K.P., New York Branch, a banking corporation organized under the laws of Kuwait, acting through its New York branch, as administrative and collateral agent for the Lenders (as defined in the Loan Agreement [as defined in the Deed of Trust]) ("Administrative Agent"), and all other indebtedness of Borrower to Lender |
| Property: | The real property, improvements, and personal property described in and mortgaged in the Deed of Trust, including the real property described in the attached Exhibit A, and all rights and appurtenances thereto |
| Assignment: | The Note and the liens and security interests of the Deed of Trust were transferred and assigned to Beneficiary by an instrument |

4839-2922-6490.v1

EXHIBIT A

000589

Certified Document Number: 98154339 - Page 7 of 15

dated effective as of September 13, 2021, to be recorded in the real property records of Harris County, Texas

| | |
|---|---|
| Guaranty: | The Note and all other indebtedness of Borrower to Administrative Agent is guaranteed by a Guaranty dated May 23, 2018, and executed by Bradley Parker in favor of Administrative Agent |
| Substitute Trustee: | Any of Josh D. Morton, Laura E. Hannusch, or Adam Weaver |
| Substitute Trustee's Address: | c/o Pillsbury Winthrop Shaw Pittman LLP<br>909 Fannin, Suite 2000<br>Houston, Texas 77010<br>Attn: Josh D. Morton |
| Foreclosure Sale: | |
| Date: | October 5, 2021 |
| Time: | The sale of the Property will be held between the hours of 10:00 a.m. and 4:00 p.m. local time; **the earliest time at which the Foreclosure Sale will begin is 10:00 a.m. and not later than three hours thereafter** |
| Place: | The Bayou City Event Center located at 9401 Knight Road in the City of Houston, Texas, or such other place designated for real property foreclosures pursuant to Section 51.002 of the Texas Property Code by the Commissioners Court of Harris County, Texas, in instrument(s) recorded in the real property records of Harris County, Texas |
| Terms of Sale: | The Foreclosure Sale will be conducted as a public auction and the Property will be sold to the highest bidder for cash, except that Beneficiary's bid may be by credit against the indebtedness secured by the lien of the Deed of Trust |

Default has occurred in the payment of the Note and in the performance of the obligations of the Deed of Trust. Because of that default, Beneficiary, the owner and holder of the Note, has requested Substitute Trustee to sell the Property.

The Deed of Trust may encumber both real and personal property. Formal notice is hereby given of Beneficiary's election to proceed against and sell both the real property and any personal property described in the Deed of Trust in accordance with Beneficiary's rights and remedies under the Deed of Trust and section 9.604(a) of the Texas Business and Commerce Code.

- 2 -

4839-2922-6490.v1

# EXHIBIT A

000590

Therefore, notice is given that on and at the Date, Time, and Place for the Foreclosure Sale described above, Substitute Trustee will sell the Property in accordance with the Terms of Sale described above, the Deed of Trust, and applicable Texas law.

If Beneficiary passes the Foreclosure Sale, notice of the date of any rescheduled foreclosure sale will be reposted and refiled in accordance with the posting and filing requirements of the Deed of Trust and the Texas Property Code.

The Foreclosure Sale will be made expressly subject to any title matters set forth in the Deed of Trust, but prospective bidders are reminded that by law the Foreclosure Sale will necessarily be made subject to all prior matters of record affecting the Property, if any, to the extent that they remain in force and effect and have not been subordinated to the Deed of Trust. For the avoidance of doubt, the Foreclosure Sale will not cover any part of the Property that has been released of public record from the lien and/or security interest of the Deed of Trust by Beneficiary. Prospective bidders are strongly urged to examine the applicable property records to determine the nature and extent of such matters, if any.

Pursuant to section 51.009 of the Texas Property Code, the Property will be sold **"AS IS," without any expressed or implied warranties, except as to the warranties (if any) provided for under the Deed of Trust.** Prospective bidders are advised to conduct an independent investigation of the nature and physical condition of the Property.

Pursuant to section 51.0075(a) of the Texas Property Code, Substitute Trustee reserves the right to set further reasonable conditions for conducting the Foreclosure Sale. Any such further conditions shall be announced before bidding is opened for the first sale of the day held by Substitute Trustee.

**Assert and protect your rights as a member of the armed forces of the United States. If you are or your spouse is serving on active military duty, including active military duty as a member of the Texas National Guard or the National Guard of another state or as a member of a reserve component of the armed forces of the United States, please send written notice of the active duty military service to the sender of this notice immediately.**

**THIS INSTRUMENT APPOINTS THE SUBSTITUTE TRUSTEE(S) IDENTIFIED TO SELL THE PROPERTY DESCRIBED IN THE SECURITY INSTRUMENT IDENTIFIED IN THIS NOTICE OF SALE. THE PERSON SIGNING THIS NOTICE IS THE ATTORNEY OR AUTHORIZED AGENT OF THE MORTGAGEE OR MORTGAGE SERVICER.**

The name and address of the sender of this notice is Josh D. Morton, c/o Pillsbury Winthrop Shaw Pittman LLP, 909 Fannin, Suite 2000, Houston, Texas 77010.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

- 3 -

4839-2922-6490.v1

Certified Document Number: 98154339 - Page 8 of 15

EXHIBIT A

000591



Josh D. Morton, Substitute Trustee

STATE OF TEXAS

COUNTY OF _Fort Bend_

This instrument was acknowledged before me on _September 14_, 2021, by
Josh D. Morton.

[SEAL]

Notary Public for the State of Texas
My commission expires: _4/10/2024_

R MOECKEL
ID# 2108392
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
APRIL 10, 2024

- 4 -

4839-2922-6490.v1

EXHIBIT A

Certified Document Number: 98154339 - Page 9 of 15

000592

**EXHIBIT A**

**LEGAL DESCRIPTION OF THE PROPERTY**

(ATTACHED)

4839-2922-6490.v1

EXHIBIT A

000593

Certified Document Number: 98154339 - Page 11 of 15

RP-2018-235600

<u>EXHIBIT A</u>
<u>PROPERTY DESCRIPTION</u>

Real property in the City of Houston, County of Harris and State of Texas, described as follows:

Tract 1: Fee Tract

BEING 2.4462 ACRES (106,557 SQUARE FEET) OF LAND OUT OF THE WILLIAM WHITE SURVEY, ABSTRACT NO. 836, HOUSTON, HARRIS COUNTY, TEXAS, BEING THE SAME PROPERTY CONVEYED TO 2425 WEST LOOP, LP BY SPECIAL WARRANTY DEED RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20070732472, SAID TRACT CONVEYED BY DEED TO ONE WEST LOOP PLAZA, LTD. UNDER HCCF NO. S547896 AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE WESTHEIMER ROAD (ROW VARIES) BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 204.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST, TO A 1/2 INCH IRON ROD FOUND AT THE NORTHEAST CORNER OF THE 2.3468 ACRE PARCEL BEING THE SOUTHEAST CORNER OF THE HEREIN DESCRIBED PARCEL AND THE POINT OF BEGINNING;

THENCE, WESTERLY ALONG THE COMMON LINE OF THE 2.3468 ACRE PARCEL TO THE SOUTH AND THE HEREIN DESCRIBED PARCEL TO THE NORTH, SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 464.50 FEET TO A POINT ON THE EASTERLY RIGHT OF WAY (ROW) LINE OF INTERSTATE 610 WEST LOOP AND THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED PARCEL FROM. WHICH A FOUND RAILROAD SPIKE BEARS SOUTH 21 DEGREES 43 MINUTES EAST 2.42 FEET;

THENCE, NORTHERLY ALONG THE EASTERLY RIGHT OF WAY LINE OF INTERSTATE 610 WEST LOOP (ROW 350 FEET) NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST 251.27 FEET TO AN "X" SET IN CONCRETE BEING THE SOUTHWEST CORNER OF A 7.8998 ACRE PARCEL AS SHOWN ON THE HOUSTON VENTURE PLAT UNRESTRICTED RESERVE "A" FILED IN THE HARRIS COUNTY MAP RECORDS AS FILM CODE NUMBER 356074, AND THE NORTHWEST CORNER OF THE HEREIN DESCRIBED PARCEL;

THENCE, EASTERLY ALONG THE COMMON LINE OF THE ABOVE INDICATED 7.8998 ACRE PARCEL TO THE NORTH AND THE HEREIN DESCRIBED PARCEL TO THE SOUTH NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 406.61 FEET TO AN "X"

[Exhibit A - Property Description]

EXHIBIT A

000594

FOUND IN THE WESTERLY LINE OF A 3.4385 ACRE PARCEL OF LAND CONVEYED TO RESTPROP, LTD AS RECORDED IN THE HCCF NO. R228886;

THENCE, SOUTHERLY ALONG A COMMON LINE OF THE ABOVE INDICATED 3.4385 ACRE PARCEL TO THE EAST AND THE HEREIN DESCRIBED PARCEL TO THE WEST, SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 244.64 FEET TO THE POINT OF BEGINNING CONTAINING 106,557 SQUARE FEET, 2.4462 ACRES MORE LESS.

NOTE: WE ARE PROHIBITED FROM INSURING ANY INACCURACY IN STATEMENT AS TO THE QUANTITY OF LAND CONTAINED WITHIN THE BOUNDARIES OF THE LAND DESCRIBED IN SCHEDULE A.

TRACT 2 EASEMENT TRACT: 20 FOOT NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT OVER AND ACROSS A TRACT OF LAND NORTHERLY OF AND 20 FEET WIDE ALONG THE ENTIRE NORTHERLY BOUNDARY LINE OF TRACT I; SAID EASEMENT CREATED AND GRANTED BY VI IAN L. SMITH, INDIVIDUALLY AND AS INDEPENDENT EXECUTRIX OF THE ESTATE OF R. E. SMITH, DECEASED IN THAT CERTAIN GENERAL WARRANTY DEED DATED JULY 5, 1977 FILED IN HCCF NO. F216562 AND DESCRIBED IN HCCF NO. G743294, BEING THE SAME EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 204.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST TO A 1/2 INCH IRON ROD FOUND FOR THE SOUTHEAST CORNER OF TRACT I;

THENCE CONTINUING NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 244.64 FEET ALONG A COMMON LINE OF A PREVIOUSLY NOTED 3.4385 ACRE PARCEL OF LAND TO THE EAST AND TRACT I TO THE WEST TO AN "X" FOUND FOR THE NORTHEAST CORNER OF TRACT I AND THE POINT OF BEGINNING;

[Exhibit A - Property Description]

EXHIBIT A

RP-2018-235600

Certified Document Number: 98154339 - Page 12 of 15

000595

THENCE, WESTERLY SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 406.61 FEET ALONG THE NORTHERLY LINE OF TRACT 1 TO AN "X" SET ON THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP (350 FEET WIDE);

THENCE, NORTHERLY NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST 20.54 FEET ALONG THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP TO A POINT;

THENCE, EASTERLY 20.00 FEET NORTHERLY FROM AND PARALLEL TO THE NORTHERLY LINE OF TRACT 1, NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 401.88 FEET TO A POINT;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST 20.00 FEET TO THE POINT OF BEGINNING AND CONTAINING 0.1856 ACRES OR 8,085 SQUARE FEET OF LAND MORE OR LESS.

TRACT 3 EASEMENT TRACT: 20 FOOT NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT;

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT OVER AND ACROSS A TRACT OF LAND SOUTHERLY OF AND 20.00 FEET WIDE ALONG THE ENTIRE SOUTHERN BOUNDARY LINE OF TRACT 1, SAID EASEMENT CREATED AND GRANTED ON FEBRUARY 16, 1979, FROM WEST LOOP HOTEL, LIMITED TO FIN PROPERTIES, LIMITED FILED IN HCCF NO. G041310, BEING THE SAME PROPERTY EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 184.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST TO THE POINT OF BEGINNING, WHENCE THE SOUTHEAST CORNER OF TRACT 1 BEARS NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 20.02 FEET;

THENCE, WESTERLY 20.00 FEET SOUTHERLY FROM AND PARALLEL TO THE SOUTHERLY LINE OF TRACT 1, SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 469.23 FEET TO A POINT IN THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP;

[Exhibit A - Property Description]

EXHIBIT A

RP-2018-235600

Certified Document Number: 98154339 - Page 13 of 15

000596

THENCE, NORTHERLY NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST, 20.54 FEET ALONG THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP TO THE SOUTHWEST CORNER FOR TRACT 1 FROM WHICH A FOUND RAILROAD SPIKE BEARS SOUTH 21 DEGREES 43 MINUTES EAST, 2.42 FEET;

THENCE, EASTERLY NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 464.50 FEET ALONG THE SOUTHERLY LINE OF TRACT 1 TO A 1/2 INCH IRON ROD FOUND AT THE SOUTHEAST CORNER OF TRACT 1;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 20.02 FEET ALONG THE A COMMON LINE BETWEEN A PREVIOUSLY DESCRIBED 2.3468 ACRES PARCEL TO THE WEST AND A 3.4385 ACRE PARCEL TO THE EAST TO THE POINT OF BEGINNING AND CONTAINING 0.2144 ACRES OR 9,337 SQUARE FEET OF LAND, MORE OR LESS.

TRACT 4 EASEMENT TRACT: 28 FOOT ROADWAY AND PEDESTRIAN EASEMENT;

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT ACROSS EASTERLY 28 FEET OF A 2.3468 ACRE TRACT ADJACENT TO AND SOUTHERLY OF TRACT 1, CREATED AND GRANTED IN THAT CERTAIN ROAD AND PEDESTRIAN EASEMENT DATED FEBRUARY 16, 1979 FROM WEST LOOP HOTEL, LIMITED TO FIN PROPERTIES, LIMITED, FILED IN HCCF NO. G041313, BEING THE SAME PROPERTY EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT A FOUND 5/8 INCH IRON ROD IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, WESTERLY SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST, 28.00 FEET ALONG THE NORTHERLY LINE OF WESTHEIMER ROAD TO A POINT;

THENCE, NORTHERLY 28.00 FEET WESTERLY OF AND PARALLEL TO THE EASTERLY LINE OF SAID 2.3468 ARE TRACT NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 205.08 FEET TO A POINT ON THE SOUTHERLY LINE OF TRACT 1;

THENCE, EASTERLY NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 28.00 FEET ALONG THE SOUTHERLY LINE OF TRACT 1 TO A 1/2 INCH IRON ROD FOUND IN THE WESTERLY LINE OF A 3.4385 ACRE PARCEL OF LAND PRESENTLY OWNED BY RESTPROP, LTD AS RECORDED IN THE HCCF NO. R228886;

[Exhibit A - Property Description]

RP-2018-235600

# EXHIBIT A

000597

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 204.61 FEET ALONG A COMMON LINE OF THE ABOVE INDICATED 3.4385 ACRE PARCEL TO THE EAST SAID THE PREVIOUSLY DESCRIBED 2.3468 ACRE PARCEL TO THE WEST, TO THE POINT OF BEGINNING, CONTAINING 0.1317 ACRES OR 5,735 SQUARE FEET (CALLED 5,740) OF LAND MORE OR LESS.

TRACT 5 EASEMENT TRACT: 5 FOOT STORM SEWER EASEMENT

A 1,025 SQUARE FOOT TRACT OF LAND, BEING THAT SAME TRACT UN PROPERTIES, LIMITED, RECORDED IN HCCF NUMBER G041311, LOCATED IN THE WILLIAM WHITE SURVEY, ABSTRACT NUMBER 836, CITY OF HOUSTON, HARRIS COUNTY, TEXAS, BEING THE SAME EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY (ROW) OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. 5056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR. TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE ALONG THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD, SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST, A DISTANCE OF 16.00 FEET TO THE SOUTHEAST CORNER OF SAID EASEMENT AND THE HEREIN DESCRIBED TRACT;

THENCE CONTINUING ALONG THE NORTHERLY LINE OF WESTHEIMER ROAD, SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST A DISTANCE OF 5.00 FEET, THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE DEPARTING SAID WESTHEIMER ROAD, NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, A DISTANCE OF 204.96 FEET, TO A POINT IN THE SOUTHERLY LINE OF A 2.4462 ACRE TRACT CONVEYED BY DEED TO HE 2425 WEST LOOP, LP RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20070732472;

THENCE ALONG THE SOUTHERLY LINE OF SAID 2.4462 ACRE TRACT, NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST A DISTANCE OF 5.00 FEET TO THE NORTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE DEPARTING THE SOUTHERLY LINE OF SAID 2.4462 ACRE TRACT, SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, A DISTANCE OF 204.88 FEET TO THE POINT OF BEGINNING AND CONTAINING 1,025 SQUARE FEET OF LAND, MORE OR LESS

[Exhibit A - Property Description]

EXHIBIT A

RP-2018-235600

Certified Document Number: 98154339 - Page 15 of 15

000598



I, Marilyn Burgess, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   July 21, 2024

Certified Document Number:        98154339 Total Pages:  15

Marilyn Burgess, DISTRICT CLERK

HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 51.301 and 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

June 29, 2021

Certified Mail No. 70083230000074759966
Return Receipt Requested
and Copy by First-Class Mail and Email

Galleria 2425 Owner, LLC                    Galleria 2425 Owner, LLC
2425 West Loop South, Suite 350             3139 W Holcombe Blvd #845
Houston, Texas 77027                        Houston, Texas 77025
Attention: Azeemeh Zaheer                   Attention: Azeemeh Zaheer

Re:     Demand for payment and notice of intention to accelerate unpaid
        principal balance regarding the following instruments, among others
        (collectively, the "Loan Documents"):

Deed of Trust, Assignment of Leases and Rents and Profits, Security Agreement
and Fixture Filing ("Deed of Trust"):

| | |
|---|---|
| Dated: | May 23, 2018 |
| Grantor: | Galleria 2425 Owner, LLC, a Delaware limited liability company |
| Trustee: | Salima Umatiya |
| Beneficiary: | National Bank of Kuwait, S.A.K.P., New York Branch, a banking corporation organized under the laws of Kuwait, acting through its New York branch |
| Recorded in: | File No. RP-2018-235600 of the real property records of Harris County, Texas |
| Secures: | Promissory Note ("Note") dated May 23, 2018, in the original principal amount of $51,675,000.00, executed by Galleria 2425 Owner, LLC, a Delaware limited liability |

EXHIBIT B

Certified Document Number: 98154340 - Page 2 of 4

company ("<u>Borrower</u>"), and payable to the order of National Bank of Kuwait, S.A.K.P., New York Branch, a banking corporation organized under the laws of Kuwait, acting through its New York branch, as administrative and collateral agent for the Lenders (as defined in the Loan Agreement [as defined in the Deed of Trust]) ("<u>Administrative Agent</u>"), and all other indebtedness of Borrower to Lender

Guaranty:    The Note and all other indebtedness of Borrower to Administrative Agent is guaranteed by a Guaranty dated May 23, 2018, and executed by Bradley Parker in favor of Administrative Agent

Dear Ms. Zaheer:

This letter is written at the request and on behalf of our client, Beneficiary. Borrower has failed to make payment of amounts owing under the Note. Borrower and any other party obligated on the Note are given notice that Borrower's failure to pay the amounts due constitutes a monetary default under the terms of the Note and the Deed of Trust. Demand is hereby made for payment in full of the past-due amounts, together with all lawful accrued and unpaid interest due until the date of payment, on or before 5:00 p.m. (EDT) on July 12, 2021, by cashier's check at the offices of Beneficiary at 299 Park Avenue, New York, New York 10171, attention: Michael Carter, Vice President, or by wire transfer in accordance with instructions furnished by Michael Carter, Vice President, at Beneficiary.

If payment of all amounts that are then currently due and owing under the Note are not received by Beneficiary by the time and date stated above, Beneficiary intends to (1) accelerate the maturity of the indebtedness evidenced by the Note and secured by the Deed of Trust and declare the entire unpaid principal balance of the Note, plus all lawful accrued and unpaid interest thereon, to be immediately due and payable; (2) enforce payment of the Note against Borrower and each other person or entity obligated therefor (except to the extent that the Note is nonrecourse or any party's liability has been limited by contract); (3) commence nonjudicial proceedings to foreclose the liens and security interests existing under the Deed of Trust (foreclosure of such liens and security interests would be by a sale of the real property and personal property, if any, described in the Deed of Trust, pursuant to the power of sale existing under the Deed

EXHIBIT B

000601

of Trust); and (4) exercise some or all of the other rights and remedies available to Beneficiary under the Loan Documents, at law, or in equity.

If any party who receives this letter is a debtor in a bankruptcy proceeding subject to the provisions of the United States Bankruptcy Code (title 11 of the United States Code), this letter is merely intended to be written notice of the defaults under the Note in compliance with the Loan Documents and applicable law. This letter is not an act to collect, assess, or recover a claim against that party, nor is this letter intended to violate any provisions of the Code. All claims that Beneficiary asserts against that party will be properly asserted in compliance with the Code in the bankruptcy proceeding. In addition, all of Beneficiary's claims, demands, and accruals regarding the Loan Documents, whenever made, and whether for principal, interest, or otherwise, are intended to comply in all respects, both independently and collectively, with all applicable usury laws, and are accordingly limited so that all applicable usury laws are not violated.

Nothing contained in this letter is intended to waive any default or event of default; waive any rights, remedies, or recourses available to Beneficiary; or be an election of remedies resulting from any default that may exist with respect to the Loan Documents.

Please understand that no communication, written or oral, that Borrower or Grantor has had or may have with Beneficiary concerning any modification, renewal, extension, or restructure of the Loan Documents, including any deed in lieu of foreclosure, waiver of deficiency or agreed foreclosure, in any way modifies this letter or constitutes consent to the nonpayment of the Note or a waiver by Beneficiary of any of the remedies described herein. There are currently no modification, renewal, extension, or settlement agreements between Borrower, Grantor, and Beneficiary with regard to the Note and Deed of Trust, except as noted above, and all proposals made by Borrower or Grantor to Beneficiary relating to any of the foregoing are rejected.

You may contact Michael Carter, Vice President of National Bank of Kuwait, S.A.K.P., New York Branch, at 299 Park Avenue, New York, New York 10171, (212) 303-9897, regarding any questions that you may have, including the outstanding balance of the past-due amounts on the Note as of any particular date. If you have any questions that you believe I can answer, you or your attorney may contact me at the telephone number or address listed below.

**Assert and protect your rights as a member of the armed forces of the United States. If you are or your spouse is serving on active military duty, including active military duty as a member of the Texas National Guard or the National Guard of another state or as a member of a reserve component of the armed forces of the**

EXHIBIT B

**United States, please send written notice of the active duty military service to the sender of this notice immediately.**

Very truly yours,

Josh D. Morton
Special Counsel

cc:     Polsinelli
2950 Harwood Street, Suite 2100
Dallas, Texas 75201
Attention: Brian Bullard, Esq.

Bradley Parker
2127 Bolsover Street
Houston, Texas 77005

Naissance Galleria, LLC
c/o Walkers Corporate Limited
Cayman Corporate Centre, 27 Hospital Road
George Town, Grand Cayman KYI-9008
Cayman Islands

Crain, Caton & James
Five Houston Center
1401 McKinney Street, Suite 1700
Houston, Texas 77010
Attention: Adrienne Bond, Esq.

EXHIBIT B

000603



I, Marilyn Burgess, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   July 21, 2024

Certified Document Number:        98154340 Total Pages:  4

Marilyn Burgess, DISTRICT CLERK

HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 51.301 and 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**



Pillsbury Winthrop Shaw Pittman LLP
Two Houston Center 909 Fannin, Suite 2000 | Houston, TX 77010-1018 | tel 713.276.7600 | fax 713.276.7673

Josh D. Morton
tel: +1.713.276.7624
josh.morton@pillsburylaw.com

July 14, 2021

<u>Certified Mail No. 70083230000074760368</u>
<u>Return Receipt Requested</u>
<u>and Copy by First-Class Mail and Email</u>

Galleria 2425 Owner, LLC                Galleria 2425 Owner, LLC
2425 West Loop South, Suite 350         3139 W Holcombe Blvd #845
Houston, Texas 77027                    Houston, Texas 77025
Attention: Azeemeh Zaheer               Attention: Azeemeh Zaheer

Re:     Notice of acceleration regarding the following instruments, among others (collectively, the "<u>Loan Documents</u>"):

Deed of Trust, Assignment of Leases and Rents and Profits, Security Agreement and Fixture Filing ("<u>Deed of Trust</u>"):

| | |
|---|---|
| Dated: | May 23, 2018 |
| Grantor: | Galleria 2425 Owner, LLC, a Delaware limited liability company |
| Trustee: | Salima Umatiya |
| Beneficiary: | National Bank of Kuwait, S.A.K.P., New York Branch, a banking corporation organized under the laws of Kuwait, acting through its New York branch |
| Recorded in: | File No. RP-2018-235600 of the real property records of Harris County, Texas |
| Secures: | Promissory Note ("<u>Note</u>") dated May 23, 2018, in the original principal amount of $51,675,000.00, executed by Galleria 2425 Owner, LLC, a Delaware limited liability company ("<u>Borrower</u>"), and payable to the order |


EXHIBIT C

000605

of National Bank of Kuwait, S.A.K.P., New York Branch, a banking corporation organized under the laws of Kuwait, acting through its New York branch, as administrative and collateral agent for the Lenders (as defined in the Loan Agreement [as defined in the Deed of Trust]) ("Administrative Agent"), and all other indebtedness of Borrower to Lender

Guaranty:    The Note and all other indebtedness of Borrower to Administrative Agent is guaranteed by a Guaranty dated May 23, 2018, and executed by Bradley Parker in favor of Administrative Agent

Dear Ms. Zaheer:

This letter is written at the request and on behalf of our client, Beneficiary. Written notice dated June 29, 2021, was served on Borrower by this firm on behalf of Beneficiary by certified mail, return receipt requested, informing Borrower of the existence of one or more defaults under the Note and the Deed of Trust ("Defaults"). The Note, among other things, constitutes part of the indebtedness secured by the Deed of Trust ("Indebtedness"). In that notice, demand was made on Borrower to pay the unpaid past-due amounts then owing under the Note and Borrower was advised of Beneficiary's intention to accelerate the maturity of the Note if the Defaults were not cured.

According to the records of Beneficiary, Borrower has not cured the Defaults. Therefore, Beneficiary, by this letter, accelerates the maturity of the Indebtedness (including all unpaid principal of, and all lawful accrued and unpaid interest and other lawful amounts due under, the Note) and declares the entire Indebtedness immediately due and payable. Beneficiary makes demand on Borrower and on all persons and entities obligated on the Note (except to the extent that obligation is expressly limited by written contract or applicable law) for payment in full of the entire Indebtedness.

If any party who receives this letter is a debtor in a bankruptcy proceeding subject to the provisions of the United States Bankruptcy Code (title 11 of the United States Code), this letter is merely intended to be written notice of the defaults under the Note in compliance with the Loan Documents and applicable law. This letter is not an act to collect, assess, or recover a claim against that party, nor is this letter intended to violate any provisions of the Code. All claims that Beneficiary asserts against that party will be properly asserted in compliance with the Code in the bankruptcy proceeding. In

Certified Document Number: 98154341 - Page 2 of 4

EXHIBIT C

Galleria 2425 Owner LLC
July 14, 2021
Page 3

addition, all of Beneficiary's claims, demands, and accruals regarding the Loan Documents, whenever made, and whether for principal, interest, or otherwise, are intended to comply in all respects, both independently and collectively, with all applicable usury laws, and are accordingly limited so that all applicable usury laws are not violated.

Nothing contained in this letter is intended to waive any default or event of default; waive any rights, remedies, or recourses available to Beneficiary; or be an election of remedies resulting from any default that may exist with respect to the Loan Documents.

You may contact Michael Carter, Vice President of National Bank of Kuwait, S.A.K.P., New York Branch, at 299 Park Avenue, New York, New York 10171, (212) 303-9897, regarding any questions that you may have, including the outstanding balance of the past-due amounts on the Note as of any particular date. If you have any questions that you believe I can answer, you or your attorney may contact me at the telephone number or address listed below.

**Assert and protect your rights as a member of the armed forces of the United States. If you are or your spouse is serving on active military duty, including active military duty as a member of the Texas National Guard or the National Guard of another state or as a member of a reserve component of the armed forces of the United States, please send written notice of the active duty military service to the sender of this notice immediately.**

Very truly yours,

Josh D. Morton
Special Counsel

cc:     Polsinelli
        2950 Harwood Street, Suite 2100
        Dallas, Texas 75201
        Attention: Brian Bullard, Esq.

        Bradley Parker
        2127 Bolsover Street
        Houston, Texas 77005

EXHIBIT C

Certified Document Number: 98154341 - Page 3 of 4

000607

Galleria 2425 Owner LLC
July 14, 2021
Page 4

Naissance Galleria, LLC
c/o Walkers Corporate Limited
Cayman Corporate Centre, 27 Hospital Road
George Town, Grand Cayman KYI-9008
Cayman Islands

Crain, Caton & James
Five Houston Center
1401 McKinney Street, Suite 1700
Houston, Texas 77010
Attention: Adrienne Bond, Esq.

**EXHIBIT C**

Certified Document Number: 98154341 - Page 4 of 4

000608



I, Marilyn Burgess, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   July 21, 2024

Certified Document Number:        98154341 Total Pages:  4

Marilyn Burgess, DISTRICT CLERK

HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 51.301 and 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**



---------- Forwarded message ---------
From: **Morton, Josh D.** <josh.morton@pillsburylaw.com>
Date: Mon, Sep 27, 2021 at 8:33 PM
Subject: RE: National Bank of Kuwait, S.A.K.P., New York Branch / Galleria 2425 Owner, LLC: Notice of Foreclosure Sale (2425 West Loop S., Houston, TX 77027)
To: Gardberg, Manny (HOU2 - X58615) <manny.gardberg@hklaw.com>
CC: Dajani, Mona E. <mona.dajani@pillsburylaw.com>, Ali @ Jetall <ali@jetallcompanies.com>, Merwin, Bruce W (HOU - X52859) <Bruce.Merwin@hklaw.com>


Manny:




Certified Document Number: 98154342 - Page 1 of 2

1

**EXHIBIT D**

000610



NBK intends to proceed with its foreclosure sale as scheduled, and continues to reserve all of its rights, remedies and defenses under the loan documents and applicable law. As NBK has repeatedly asserted, if the borrower intends to propose an alternative resolution, it is welcome to do so at any time in writing via email.

Regards,

Josh

EXHIBIT D



I, Marilyn Burgess, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   July 21, 2024

Certified Document Number:        98154342 Total Pages:  2

Marilyn Burgess, DISTRICT CLERK

HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 51.301 and 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

CAUSE NO. _____

| | | |
|---|---|---|
| GALLERIA 2425 OWNER, LLC, | § | IN THE DISTRICT COURT |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | _____ JUDICIAL DISTRICT |
| | § | |
| NATIONAL BANK OF KUWAIT, S.A.K.P., | § | |
| NEW YORK BRANCH, A BANKING | § | |
| CORPORATION ORGANIZED UNDER THE | § | |
| LAWS OF KUWAIT, ACTING THROUGH | § | |
| ITS NEW YORK BRANCH, | § | |
| | § | |
| Defendant. | § | HARRIS COUNTY, TEXAS |

## AFFIDAVIT IN SUPPORT OF TEMPORARY RESTRAINING ORDER

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

BEFORE ME, the undersigned authority, on this day personally appeared Michael Chang, known to me to be the person whose name is subscribed to the following instrument, and who, having been by me duly sworn, upon his oath deposed and stated as follows:

1. "My name is Michael Chang. I am an authorized representative of GALLERIA 2425 OWNER, LLC ('Galleria'). I am over twenty-one years old and have personal knowledge of the facts stated herein which are true and correct.

2. I reviewed our file pertaining to this matter. Galleria maintains the documents attached to its Petition as Exhibits 'A,' 'B,' 'C,' and 'D' in the regular course of business.

3. It is in the regular course of our business for Galleria to make a record of these documents and save these documents. The records were made at or near the time of their creation or soon thereafter.

4. Exhibits 'A,' 'B,' 'C,' and 'D' are true and correct copies of, respectively, the alleged Cover Letter and Notice of Sale ('A'), alleged Notice of Default and Intent to Accelerate ('B'), alleged Notice of Acceleration ('C'), and Email confirmation that NBK will proceed with foreclosure ('D').

5. Defendant's alleged interest in the Property derives from an alleged Note secured by a alleged Deed of Trust, Assignment of Leases and Rents and Profits, Security Agreement and Fixture Filing (the 'Deed of Trust') dated on or about May 23, 2018, in favor of NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH.

1

**EXHIBIT E**

Certified Document Number: 98154343 - Page 1 of 2

6. Stage Stores ('Stage') with approximately 13,000 employees overall and approximately 1,000 employees at its corporate headquarters in the Property was Plaintiff's longtime, primary tenant at the Property leasing hundreds of thousands of square feet over multiple floors. In May, 2020, Stage entered Chapter 11 bankruptcy. Since that time, Stage and its affiliates (Palais Royal, Bealls, Gordmans, etc.) ceased operations, vacated the Property, closed all retail stores in the chain, and laid off all its employees. It goes without saying that the loss of Stage as a tenant impacted the Property, and on account of the ongoing global pandemic, remote work, and market constrictions, it has been difficult for ALL commercial landlords to fill lease space. The appetite for commercial lease space is on the rise. Plaintiff is actively marketing the Property for lease and showing the Property to prospective tenants.

7. Stage Stores' demise and quick exit from the Property left Plaintiff with little options until Plaintiff could market and re-lease the Property. Kuwait failed to follow its obligations under Texas law and is, therefore, barred from foreclosing on the Property on October 5, 2021.

8. Foreclosure of the Property will irreparably harm Plaintiff, and it will be a complete loss of and injury to Plaintiff's business, its business reputation, and business goodwill with tenants and prospective tenants, among others. Plaintiff is actively marketing the Property for lease after Stage unexpectedly filed Chapter 11 and vacated the Property, and Plaintiff is doing everything it can to lease the Property.

9. Galleria disputes that Kuwait properly served it with Notice of Default and Intent to Accelerate, but to the extent that Kuwait served the June 29, 2021 **alleged** Notice of Default and Intent to Accelerate, Kuwait advised that "[i]f payment of all amounts that are then currently due and owing under the Note are not received by [Kuwait] by [July 12, 2021], [Kuwait] **intends to** (1) accelerate the maturity of the indebtedness…"

10. Despite Galleria's requests to Kuwait to postpone the foreclosure sale, Kuwait refuses to postpone the foreclosure, and Kuwait informed Galleria that foreclosure will proceed on October 5, 2021."

Further Affiant sayeth not.

_____

Michael Chang

SWORN AND SUBSCRIBED TO before me on this 29th day of September, 2021.

ANNETTE HOLLINGSWORTH
Notary Public, State of Texas
Comm. Expires 06-16-2024
Notary ID 126658296

Notary Public, State of Texas

EXHIBIT E



I, Marilyn Burgess, District Clerk of Harris
County, Texas certify that this is a true and
correct copy of the original record filed and or
recorded in my office, electronically or hard
copy, as it appears on this date.
Witness my official hand and seal of office
this   July 21, 2024

Certified Document Number:        98154343 Total Pages:  2

Marilyn Burgess, DISTRICT CLERK

HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 51.301 and 406.013 electronically transmitted authenticated
documents are valid. If there is a question regarding the validity of this document and or seal
please e-mail support@hcdistrictclerk.com**

LOAN AGREEMENT

Dated as of May 23, 2018

among

GALLERIA 2425 OWNER, LLC,

as Borrower,

NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH,

as Administrative Agent,

and

NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH, and certain other lenders who may now or later be made party hereto,

collectively, as Lenders

1

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS; PRINCIPLES OF CONSTRUCTION ........................................................ 1

    Section 1.1. Definitions ........................................................................... 1
    Section 1.2. Interpretation......................................................................... 12

ARTICLE II GENERAL TERMS .................................................................................. 13

    Section 2.1. Loan Commitment; Extension ........................................................ 13
    Section 2.2. Interest Rate and Loan Payments .................................................... 13
    Section 2.3. Usury Savings .......................................................................... 14

ARTICLE III CONDITIONS PRECEDENT ........................................................................ 14

    Section 3.1. Representations and Warranties; Compliance with Conditions...................... 14
    Section 3.2. Delivery of Loan Documents; Title Policy; Due Diligence Items.................... 14
    Section 3.3. Related Documents ..................................................................... 16
    Section 3.4. Organizational Documents ............................................................ 16
    Section 3.5. Opinions of Counsel ................................................................... 16
    Section 3.6. Taxes and Other Charges .............................................................. 16
    Section 3.7. Completion of Proceedings............................................................ 16
    Section 3.8. Payments ............................................................................... 16
    Section 3.9. Transaction Costs...................................................................... 16
    Section 3.10. No Material Adverse Change.......................................................... 16
    Section 3.11. Leases ................................................................................ 17
    Section 3.12. Tenant Estoppel Certificate ......................................................... 17
    Section 3.13. SNDA .................................................................................. 17
    Section 3.14. Tax Lot............................................................................... 17
    Section 3.15. Borrower's and Guarantor's Financials ............................................. 17
    Section 3.16. Acquisition of Property.............................................................. 17
    Section 3.17. Further Documents ................................................................... 17
    Section 3.18. Interest Reserve Deposit............................................................. 17

ARTICLE IV REPRESENTATIONS AND WARRANTIES.......................................................... 17

    Section 4.1. Organization.......................................................................... 17
    Section 4.2. Status of Borrower .................................................................... 18
    Section 4.3. Validity of Documents ................................................................ 18
    Section 4.4. No Conflicts .......................................................................... 18
    Section 4.5. Litigation............................................................................. 18
    Section 4.6. Agreements............................................................................ 18
    Section 4.7. Solvency............................................................................... 19
    Section 4.8. Full and Accurate Disclosure ........................................................ 19
    Section 4.9. ERISA Compliance...................................................................... 19
    Section 4.10. Not a Foreign Person ................................................................ 20
    Section 4.11. Enforceability....................................................................... 20
    Section 4.12. Business Purposes.................................................................... 20
    Section 4.13. Compliance ........................................................................... 20
    Section 4.14. Financial Information ................................................................ 20
    Section 4.15. Illegal Activity ..................................................................... 20
    Section 4.16. Separate Tax and Zoning Lot......................................................... 20

i

000617

## TABLE OF CONTENTS
continued

Section 4.17. Federal Reserve Regulation ..................................................................................... 20
Section 4.18. Investment Company Act ....................................................................................... 21
Section 4.19. No Change in Facts or Circumstances; Disclosure ................................................ 21
Section 4.20. Special Purpose Entity .......................................................................................... 21
Section 4.21. Intellectual Property .............................................................................................. 21
Section 4.22. Embargoed Person ................................................................................................. 21
Section 4.23. Patriot Act .............................................................................................................. 22
Section 4.24. No Contractual Obligations ................................................................................... 22
Section 4.25. Shareholders of Borrower ..................................................................................... 22
Section 4.26. Survival .................................................................................................................. 23
Section 4.27. Leases ..................................................................................................................... 23
Section 4.28. Landmark Status .................................................................................................... 23
Section 4.29. Broker ..................................................................................................................... 23

ARTICLE V COVENANTS ....................................................................................................... 23

Section 5.1. Existence; Compliance With Legal Requirements .................................................. 23
Section 5.2. Maintenance and Use of Project ............................................................................. 24
Section 5.3. Waste ....................................................................................................................... 24
Section 5.4. Taxes and Other Charges ........................................................................................ 24
Section 5.5. Litigation ................................................................................................................. 26
Section 5.6. Access to the Project ............................................................................................... 27
Section 5.7. Notice of Default ..................................................................................................... 27
Section 5.8. Cooperate in Legal Proceedings ............................................................................. 27
Section 5.9. Performance of Obligations .................................................................................... 27
Section 5.10. Awards; Insurance Proceeds ................................................................................. 27
Section 5.11. Financial Reporting ............................................................................................... 27
Section 5.12. Estoppel Statement ................................................................................................ 28
Section 5.13. Management of Project .......................................................................................... 28
Section 5.14. Liens ....................................................................................................................... 29
Section 5.15. Debt Cancellation .................................................................................................. 29
Section 5.16. Zoning .................................................................................................................... 29
Section 5.17. ERISA ..................................................................................................................... 30
Section 5.18. No Joint Assessment .............................................................................................. 30
Section 5.19. Alterations .............................................................................................................. 30
Section 5.20. Reciprocal Easement Agreement .......................................................................... 30
Section 5.21. Notices ................................................................................................................... 30
Section 5.22. Curing ..................................................................................................................... 30
Section 5.23. Limitation on Securities Issuances ....................................................................... 31
Section 5.24. Limitations on Distributions ................................................................................. 31
Section 5.25. Contractual Obligations ........................................................................................ 31
Section 5.26. Additional Indebtedness ....................................................................................... 31
Section 5.27. Restrictions on Leasing ......................................................................................... 31
Section 5.28. Debt Service Coverage Ratio ................................................................................ 32
Section 5.29. Loan-to-Value Ratio ............................................................................................. 33
Section 5.30. UCC Searches ........................................................................................................ 33
Section 5.31. Updated/New Appraisal ......................................................................................... 33
Section 5.32. Interest Reserve Account ....................................................................................... 33
Section 5.33. Mezzanine Loan ..................................................................................................... 34

4161624-v7\CHIDMS1

000618

**TABLE OF CONTENTS**
continued

ARTICLE VI ENTITY COVENANTS ............................................................................................. 34

    Section 6.1. Single Purpose Entity/Separateness .......................................................... 34
    Section 6.2. Change of Name, Identity or Structure ..................................................... 35
    Section 6.3. Business and Operations ........................................................................... 36

ARTICLE VII NO SALE OR ENCUMBRANCE ........................................................................... 36

    Section 7.1. Transfer Definitions .................................................................................. 36
    Section 7.2. No Sale/Encumbrance ............................................................................... 36
    Section 7.3. Administrative Agent's Rights .................................................................. 37
    Section 7.4. Assumption ................................................................................................ 37

ARTICLE VIII INSURANCE; CASUALTY; CONDEMNATION; RESTORATION ........................... 37

    Section 8.1. Insurance ................................................................................................... 37
    Section 8.2. Insurance Escrow; Payment by Administrative Agent ............................... 41
    Section 8.3. Casualty .................................................................................................... 42
    Section 8.4. Condemnation ........................................................................................... 44

ARTICLE IX INTENTIONALLY OMITTED ................................................................................ 45

ARTICLE X EVENTS OF DEFAULT; REMEDIES ...................................................................... 45

    Section 10.1. Event of Default ....................................................................................... 45
    Section 10.2. Remedies ................................................................................................. 48

ARTICLE XI REPLACEMENT OF LENDERS .............................................................................. 48

ARTICLE XII SECONDARY MARKET; ASSIGNMENT; PARTICIPATION .................................. 49

    Section 12.1. Assignment; Participation ........................................................................ 49
    Section 12.2. Intralinks ................................................................................................. 51

ARTICLE XIII AGENT ............................................................................................................... 51

    Section 13.1. Appointment, Powers and Immunities ..................................................... 51
    Section 13.2. Reliance by Administrative Agent ............................................................ 53
    Section 13.3. Purchase of Disapproving Lender's Interest ............................................. 53
    Section 13.4. Rights of Administrative Agent as Lender ................................................ 54
    Section 13.5. Indemnification ....................................................................................... 54
    Section 13.6. Non-Reliance on Administrative Agent and Other Lenders ...................... 55
    Section 13.7. Failure to Act .......................................................................................... 55
    Section 13.8. Action by Administrative Agent .............................................................. 55
    Section 13.9. Successor Administrative Agent .............................................................. 56
    Section 13.10. Sharing .................................................................................................. 56
    Section 13.11. Pro Rata Treatment and Payments ......................................................... 56
    Section 13.12. Lenders Pro Rata Shares ........................................................................ 57
    Section 13.13. Disbursement of Proceeds by Administrative Agent ............................... 57
    Section 13.14. Amendments Concerning Agency Function ............................................ 58
    Section 13.15. Events of Default .................................................................................... 58
    Section 13.16. Defaulting Lender ................................................................................... 59
    Section 13.17. Servicing Fee ......................................................................................... 61

4161624-v7\CHIDMS1

000619

Case 8:23-bk-00855-CBB Doc 173-2 Filed 01/27/23 Doc 01/27/23 14:72 Page 6 of 37

**TABLE OF CONTENTS**
continued

ARTICLE XIV INDEMNIFICATIONS .................................................................................. 61

    Section 14.1. General Indemnification .......................................................................... 61
    Section 14.2. Intangible Tax Indemnification ............................................................... 61
    Section 14.3. ERISA Indemnification .......................................................................... 61
    Section 14.4. Survival ................................................................................................... 62

ARTICLE XV NOTICES ..................................................................................................... 62

    Section 15.1. Notices .................................................................................................... 62

ARTICLE XVI FURTHER ASSURANCES ......................................................................... 62

    Section 16.1. Replacement and Corrective Documents................................................. 62
    Section 16.2. Further Acts, Etc ..................................................................................... 63
    Section 16.3. Changes in Tax, Debt, Credit and Documentary Stamp Law ................... 63
    Section 16.4. Expenses ................................................................................................. 64

ARTICLE XVII WAIVERS .................................................................................................. 64

    Section 17.1. Remedies Cumulative; Waivers............................................................... 64
    Section 17.2. Modification, Waiver in Writing .............................................................. 64
    Section 17.3. Delay Not a Waiver ................................................................................. 65
    Section 17.4. Trial by Jury ............................................................................................ 65
    Section 17.5. Waiver of Notice ..................................................................................... 65
    Section 17.6. Remedies of Borrower ............................................................................ 65
    Section 17.7. Waiver of Marshalling of Assets ............................................................. 65
    Section 17.8. Waiver of Statute of Limitations ............................................................. 66
    Section 17.9. Waiver of Counterclaim.......................................................................... 66

ARTICLE XVIII GOVERNING LAW .................................................................................. 66

    Section 18.1. Choice of Law......................................................................................... 66
    Section 18.2. Severability ............................................................................................. 67
    Section 18.3. Preferences ............................................................................................. 68

ARTICLE XIX MISCELLANEOUS ..................................................................................... 68

    Section 19.1. Survival ................................................................................................... 68
    Section 19.2. Administrative Agent's Discretion ........................................................... 68
    Section 19.3. Headings ................................................................................................. 68
    Section 19.4. Cost of Enforcement ............................................................................... 68
    Section 19.5. Schedule Incorporated ............................................................................ 68
    Section 19.6. Offsets, Counterclaims and Defenses ...................................................... 68
    Section 19.7. No Joint Venture or Partnership; No Third Party Beneficiaries ................ 69
    Section 19.8. Publicity ................................................................................................. 70
    Section 19.9. Conflict; Construction of Documents; Reliance ...................................... 70
    Section 19.10. Actions, Approvals and Determinations ................................................. 70
    Section 19.11. Entire Agreement .................................................................................. 71
    Section 19.12. Certain Additional Rights of Lenders .................................................... 71
    Section 19.13. Counterparts.......................................................................................... 71

4161624-v7\CHIDMS1

000620

**TABLE OF CONTENTS**
continued

EXHIBIT A - Borrower's Organizational Structure

EXHIBIT B - Form of Assignment and Assumption Agreement

SCHEDULE 13.12 - Amount of Loan Attributable to Lender

SCHEDULE 15.1 - Lenders' Offices, Addresses for Notices

4161624-v7\CHIDMS1

000621

LOAN AGREEMENT

THIS LOAN AGREEMENT dated as of May 23, 2018 (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "Agreement"), among (1) GALLERIA 2425 OWNER, LLC, a Delaware limited liability company, having an address at 3139 W Holcombe Blvd #845, Houston, Texas 77025 ("Borrower"), (2) the Lenders (as hereinafter defined), and (3) NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH, a banking corporation organized under the laws of Kuwait, acting through its New York branch, having an address at 299 Park Avenue, New York, New York 10171, as administrative and collateral agent for the Lenders (in such capacity, and together with its successors and assigns, "Administrative Agent").

RECITALS:

WHEREAS, Lenders have agreed to make a certain $51,675,000.00 loan to Borrower (the "Loan"); and

WHEREAS, the Loan shall be (i) governed by this Agreement, (ii) evidenced by the Note (as hereinafter defined), and (iii) secured by the Deed of Trust (as hereinafter defined).

NOW THEREFORE, in consideration of the making of the Loan by the Lenders and the covenants, agreements, representations and warranties set forth in this Agreement, the parties hereto hereby covenant, agree, represent and warrant as follows:

ARTICLE I
DEFINITIONS; PRINCIPLES OF CONSTRUCTION

Section 1.1. Definitions. For all purposes of this Agreement, except as otherwise expressly required or unless the context clearly indicates a contrary intent:

"Access Laws" shall mean, collectively, the Americans with Disabilities Act of 1990, the Fair Housing Amendments Act of 1988, all other federal, state and local laws, regulations, rules, statutes, ordinances, orders and decrees related to handicapped access, including, without limitation, the American with Disabilities Act Accessibility Guidelines for Buildings and Facilities.

"Action Notice" shall have the meaning set forth in Section 13.15 hereof.

"Actual Proceeds" shall have the meaning set forth in Section 8.3 hereof.

"Administrative Agent Loan Documents" shall have the meaning set forth in Section 13.1 hereof.

"Affiliate" shall mean, as to any specified Person, (a) any Person that directly or indirectly through one or more intermediaries Controls, is Controlled by or is under common Control with such Person, (b) any Person owning or controlling 10% or more of the outstanding voting securities of or other ownership interests in such Person, (c) any officer, director, partner, employee or member (direct or indirect and no matter how remote) of such Person, (d) if such Person is an individual, any entity for which such Person directly or indirectly acts as an officer, director, partner, owner employee or member, (e) any entity in which such Person (together with the members of his family if the Person in question is an individual) owns, directly or indirectly through one or more intermediaries an interest in any class of stock (or other beneficial interest in such entity) of 10% or more, (f) any immediate family member of such Person, (g) with respect to any Borrower or Guarantor, any other Borrower or Guarantor, or (h) with respect to any Borrower or Guarantor, any direct or indirect owner of an interest in such Borrower or Guarantor.

"Affiliated Manager" shall have the meaning set forth in Section 7.1 hereof.

"Agent Discretion Standard" shall have the meaning set forth in Section 13.15 hereof.

"Annex" shall have the meaning set forth in Section 4.23 hereof.

"Applicable Percentage" shall have the meaning set forth in Section 8.3 hereof.

"Appraised Value" shall have the meaning set forth in Section 5.29 hereof.

"Approving Lenders" shall have the meaning set forth in Section 13.3 hereof.

"Assignee" shall have the meaning set forth in Section 12.1 hereof.

"Assignment of Agreements, Licenses, Permits and Contracts" shall mean the Assignment of Agreements, Licenses, Permits and Contracts dated as of the Closing Date, made by Borrower to Administrative Agent, on behalf of Lenders, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Assignment of Interest Rate Agreement" shall mean, with respect to any Interest Rate Protection Product entered into between Borrower and a third-party, an Assignment of Interest Rate Agreement made by Borrower to Administrative Agent, on behalf of Lenders, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Assignment of Leases and Rents" shall mean the absolute assignment by Borrower to Administrative Agent of the Property Income with respect to the Property and the Project pursuant to that certain Absolute Assignment of Leases and Rents dated as of the Closing Date made by Borrower to Administrative Agent, on behalf of Lenders, encumbering the Project, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Award" shall mean any compensation paid by any Governmental Authority in connection with a Condemnation in respect of all or any part of the Project.

"Balance" shall have the meaning set forth in Section 8.3 hereof.

"Benefit Plan" shall mean any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA, Section 412 of the Internal Revenue Code or Section 302 or 303 of ERISA, that is or, within any of the preceding six (6) plan years was, sponsored, maintained or contributed to by Borrower or any of its Subsidiaries or ERISA Affiliates (or by any Person that was an ERISA Affiliate within the last six (6) years), or with respect to which Borrower or any of its Subsidiaries or ERISA Affiliates has any liability, whether actual or contingent.

"Benefit Plan Investor" shall mean any of the following: (a) an "employee benefit plan" (within the meaning of Section 3(3) of ERISA), whether or not it is subject to ERISA and including governmental and foreign plans, (b) a "plan" as defined in Section 4975 of the Internal Revenue Code of 1986, as amended, or (c) a Person whose underlying assets include "plan assets" of the foregoing by reason of investment by an employee benefit plan or plan in such Person.

"Borrower Materials" shall have the meaning set forth in Section 12.2 hereof.

"Borrower Members" shall have the meaning set forth in Section 4.1 hereof.

000623

"Borrower Operating Agreement" shall mean Borrower's Amended and Restated Limited Liability Company Agreement dated as of May 23, 2018, as the same may hereafter be amended in accordance with the terms and provisions hereof.

"Business Day" shall have the meaning set forth in the Note.

"Casualty" shall have the meaning set forth in Section 8.3 hereof.

"Closing Date" shall mean the date hereof.

"Condemnation" shall mean a temporary or permanent taking by any Governmental Authority as the result, in lieu or in anticipation, of the exercise of the right of condemnation or eminent domain, of all or any part of the Project, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Project or any part thereof.

"Consented Assignee" shall have the meaning set forth in Section 12.1 hereof.

"Contractual Obligation" shall mean as to any Person, any provision of any security issued by such Person or of any agreement, instrument or undertaking, to which such Person is a party or by which it or any of its property is bound, or any provision of the foregoing.

"Control" shall have the meaning set forth in Section 7.1 hereof.

"Control Account Agreement" means that certain Control Account Agreement dated as of May 18, 2018 and effective as of the Closing Date, entered into by and among Borrower, Administrative Agent and Frost Bank, a Texas state bank, with respect to Borrower's deposit account, as more particularly described therein.

"Coverage Advance" shall have the meaning set forth in Section 13.11 hereof.

"Creditors' Rights Laws" shall mean with respect to any Person any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to its debts or debtors.

"DSCR" shall have the meaning set forth in Section 5.28 hereof.

"DSCR Threshold" shall have the meaning set forth in Section 5.28 hereof.

"Debt" shall mean the outstanding principal amount set forth in, and evidenced by, this Agreement and the Note, together with all interest accrued and unpaid thereon and all other sums due to Lenders in respect of the Loan under the Note, this Agreement, the Deed of Trust or any other Loan Document.

"Debt Service" shall mean, with respect to any particular period of time, scheduled interest and principal payments under the Note and/or this Agreement.

"Debt Service Payments" shall have the meaning set forth in Section 13.12 hereof.

"Deed of Trust" shall mean that certain Deed of Trust, Assignment of Leases and Rents and Profits, Security Agreement and Fixture Filing dated as of the Closing Date made by Borrower to Salima Umatiya, as trustee, for the benefit of Administrative Agent, on behalf of Lenders, in the principal amount of $51,675,000.00, encumbering the Project, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

3

000624

"Default" shall mean the occurrence of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would be an Event of Default.

"Defaulting Lender" shall have the meaning set forth in Section 13.16 hereof.

"Defaulting Lender's Interest" shall have the meaning set forth in Section 13.16 hereof.

"Disapproving Lenders" shall have the meaning set forth in Section 13.3 hereof.

"Dollars" or "$" shall mean lawful money of the United States of America.

"Eligible Assignee" shall have the meaning set forth in Section 12.1 hereof.

"Embargoed Person" shall have the meaning set forth in Section 4.22 hereof.

"Engineering Report" shall mean any written report resulting from the property condition assessments of the Project delivered to Administrative Agent in connection with the Loan.

"Environmental Indemnity Agreement" shall mean that certain Environmental Indemnity Agreement dated as of the Closing Date made by Borrower and Guarantor in favor of Administrative Agent, on behalf of Lenders, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Environmental Report" shall mean any written report resulting from the environmental site assessments of the Project delivered to Administrative Agent in connection with the Loan.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time and any successor statutes thereto and applicable regulations issued pursuant thereto in temporary or final form.

"ERISA Affiliate" shall mean any trade or business (whether or not incorporated) that, together with Borrower, is treated as a single employer under Section 414(b), (c), (m) or (o) of the Internal Revenue Code.

"ERISA Event" shall mean (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Benefit Plan (other than an event for which the 30 day notice period is waived); (b) a failure to satisfy the minimum funding standards of Section 412 of the Internal Revenue Code or Section 302 of ERISA, whether or not waived; (c) the filing pursuant to Section 412(c) of the Internal Revenue Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standards with respect to any Benefit Plan; (d) a failure to make any required installment under Section 430(j) of the Internal Revenue Code with respect to any Benefit Plan; (e) a failure to make any required contribution to a Multiemployer Plan when due; (f) the incurrence by Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Benefit Plan; (g) the receipt by Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Benefit Plan or Benefit Plans or to appoint a trustee to administer any Benefit Plan; (h) the incurrence by Borrower or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Benefit Plan or Multiemployer Plan; (i) the receipt by Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from Borrower or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability; (j) a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, or in endangered or critical status within the meaning of Section 432 of the Internal Revenue Code or Title IV of ERISA; (k) a determination that any Benefit Plan is in "at risk" status (as defined in Section 430 of the Internal Revenue Code or Section 303 of ERISA); or (l) the imposition of a

4

Lien under the Internal Revenue Code or ERISA on the assets of Borrower, any Subsidiary or any ERISA Affiliate, or Borrower or any Subsidiary or ERISA Affiliate has been notified in writing that such a Lien will be imposed on the assets of Borrower, Subsidiary or ERISA Affiliate.

"Event of Default" shall have the meaning set forth in Section 10.1 hereof.

"Excess Funds" shall have the meaning set forth in Section 8.3 hereof.

"Existing Leases" means (i) the Key Tenant Lease, (ii) the Jetall Lease, (iii) the Regus Lease, (iv) Official Lease Agreement, dated October 3, 2012, by and between G3 Visas & Passports, Inc., as tenant, and Borrower, as successor-in-interest to Seller, as landlord, as amended by First Amendment to Lease Agreement, (v) Lease Agreement, dated November 1, 2014, by and between PEM Offshore, Inc., a Texas corporation, as tenant, and Borrower, as successor-in-interest to Seller, as landlord, as amended by First Amendment to Lease Agreement, (vi) Lease Agreement, dated November 1, 2014, by and between PrimeLending, a PlainsCapital Company, a Texas Corporation, as tenant, and Borrower, as successor-in-interest to Seller, as landlord, as amended by First Amendment to Lease Agreement, (vii) Lease Agreement, dated December 2016, by and between SIBS International, Inc. a Texas corporation, as tenant, and Borrower, as successor-in-interest to Seller, as landlord, (viii) Lease Agreement, dated November 1, 2014, by and between Uptown Cosmetic and Implant Dentistry/Dr. Robert Velasco, DDS, as tenant, and Borrower, as successor-in-interest to Seller, as landlord, (ix) Lease Agreement, dated December 1, 2015, by and between Vasso's Bar and Grill, as tenant, and Borrower, as successor-in-interest to Seller, as landlord, and (x) Lease Agreement, dated January 1, 2015, by and between Wallis State Bank, as tenant, and Borrower, as successor-in-interest to Seller, as landlord; as each has been and may hereafter be amended, extended, restated and assigned in accordance with the terms and provisions of this Agreement.

"FATCA" shall mean (i) Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to the foregoing and (ii) any similar law adopted by any non-U.S. Governmental Authority pursuant to an intergovernmental agreement between such non-U.S. jurisdiction and the United States.

"Federal Funds Rate" shall mean, for any day, the rate per annum (rounded upwards, if necessary, to the nearest 1/100 of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate charged to NBK on such day on such transactions as determined by Administrative Agent.

"Fee Letter" shall mean that certain Fee Letter dated as of the Closing Date between Borrower and NBK.

"Financial Statements" shall have the meaning set forth in Section 5.11 hereof.

"Governmental Authority" shall mean any court, board, agency, department, commission, office or other authority of any nature whatsoever for any governmental unit (federal, state, county, municipal, city, town, special district or otherwise) whether now or hereafter in existence.

"Guarantor" shall mean Bradley Parker, an individual.

5

000626

"Guaranty" shall mean that certain Guaranty, dated as of the Closing Date, made by Guarantor for the benefit of Administrative Agent, on behalf of Lenders, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Indemnified Liabilities" shall have the meaning set forth in Section 14.1 hereof.

"Indemnified Parties" shall mean (a) Lenders, (b) Administrative Agent, (c) any prior owner or holder of the Loan or Participations in the Loan, (d) any servicer or prior servicer of the Loan, (e) any Participant or Assignee or any prior Participant or Assignee of the Loan, (f) any trustees, custodians or other fiduciaries who hold or who have held a full or partial interest in the Loan for the benefit of any Participant or Assignee or other third party, (g) any receiver or other fiduciary appointed in a foreclosure or other Creditors' Rights Laws proceeding, (h) any officers, directors, shareholders, partners, member, employees, agents, servants, representatives, contractors, subcontractors, affiliates or subsidiaries of any and all of the foregoing, and (i) the heirs, legal representatives, successors and assigns of any and all of the foregoing (including, without limitation, any successors by merger, consolidation or acquisition of all or a substantial portion of the Indemnified Parties' assets and business), in all cases whether during the term of the Loan or as part of or following a foreclosure of the Deed of Trust.

"Inspector" shall have the meaning set forth in Section 8.3 hereof.

"Insurance Certificates" shall have the meaning set forth in Section 8.1(b) hereof.

"Insurance Premiums" shall have the meaning set forth in Section 8.1(b) hereof.

"Insurance Proceeds" shall have the meaning set forth in Section 8.3 hereof.

"Intercreditor Agreement" shall mean that certain Intercreditor Agreement, dated as of the Closing Date, by and between Administrative Agent, Lenders and Mezzanine Lender.

"Interest Rate" shall have the meaning set forth in the Note.

"Interest Rate Protection Products" shall mean any interest rate hedging agreement(s) relating to the Loan entered into by Borrower, any Lender or any Affiliate of any Lender, including, without limitation, any Transaction (as defined in any ISDA Master Agreement), and any interest rate swap, basis swap, forward rate transaction, commodity swap, commodity option, equity or index swap or option bond, note or bill option, interest rate option, forward foreign exchange transaction, cap, collar, or floor transaction, currency swap, cross currency swap, swap option, currency option, or any similar transaction, including, without limitation, under any ISDA Master Agreement, entered into by Borrower, any Lender or any affiliate of Lenders.

"Interest Reserve Account" shall have the meaning set forth in Section 3.18 hereof.

"Internal Revenue Code" shall mean the Internal Revenue Code of 1986, as amended, as it may be further amended from time to time, and any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"Involuntary Rate" shall have the meaning set forth in the Note.

"ISDA Master Agreement" shall mean any Master Agreement published by the International SWAP Dealers Association, Inc. or commonly used by swap dealers, as the same may be amended by any Lender or any Affiliate of such Lender.

"Jetall Lease" shall mean that certain Lease Agreement dated April 1, 2016 by and between Jetall Companies, Inc., as tenant, and Borrower, as successor-in-interest to Seller, as landlord.

6

"Judgment Amount" shall have the meaning set forth in Section 13.15 hereof.

"Key Principal" shall mean, collectively, Azeemeh Zaheer, an individual, and NCRE.

"Key Tenant" shall mean Specialty Retailers, Inc., a Texas corporation.

"Key Tenant Lease" shall mean that certain Office Lease Agreement, dated as of May 27, 2015, by and between Key Tenant and Borrower, as successor-in-interest to Seller, as landlord.

"Lease" shall mean the Existing Leases and any lease entered into by Borrower, as landlord, for all or any portion of the Project.

"Legal Requirements" shall mean all statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting Borrower or the Project or any part thereof, or the construction, use, alteration or operation thereof, whether now or hereafter enacted and in force, and all permits, licenses, authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting Borrower or the Project or any part thereof, including, without limitation, any which may (a) require repairs, modifications or alterations in or to the Project or any part thereof, or (b) in any way limit the use and enjoyment thereof.

"Lender Interest Rate" shall have the meaning set forth in Section 13.11 hereof.

"Lender(s)" shall mean, individually and collectively, any financial institution that either (a) is listed on the signature pages hereof as a "Lender" or (b) from time to time becomes a party hereto pursuant to the terms and provisions of this Agreement, in each case together with its successors.

"Lien" shall mean any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer of, on or affecting Borrower, the Project, any portion thereof or any interest therein, including, without limitation, any conditional sale or the title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanics', materialmens' and other similar liens and encumbrances.

"Loan" shall have the meaning set forth in the Recitals.

"Loan Documents" shall mean, collectively, this Agreement, the Note, the Deed of Trust, the Assignment of Leases and Rents, the Guaranty, the Environmental Indemnity Agreement, the Assignment of Agreements, Licenses, Permits and Contracts, the Subordination of Management Agreement, the Fee Letter, the Intercreditor Agreement, the Control Account Agreement, any Assignment of Interest Rate Agreement entered into after the Closing Date and any and all other documents, agreements and certificates executed and/or delivered in connection with the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time. Loan Documents shall also include any Interest Rate Protection Product or ISDA Master Agreement.

"Losses" shall mean any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, fines, penalties, charges, fees, judgments, awards, amounts paid in settlement of whatever kind or nature (including, but not limited to, legal fees and other costs of defense).

"LTVR" shall have the meaning set forth in Section 5.29 hereof.

"LTVR Threshold" shall have the meaning set forth in Section 5.29 hereof.

000628

"<u>Management Agreement</u>" shall mean, with respect to the Project, that certain Property Management Agreement dated on or about the Closing Date by and between Borrower and Manager, pursuant to which such Manager is to provide management, leasing and other services with respect to the Project, as the same may be amended, restated, replaced, supplemented or otherwise modified in accordance with the terms of this Agreement.

"<u>Manager</u>" shall mean (a) Boxer Property Management Corporation, a Texas corporation, (b) a Qualified Manager, or (c) any other management organization prior to whose employment as manager of the Project, such employment shall have been approved by Administrative Agent, which approval shall not be unreasonably delayed, conditioned or denied.

"<u>Material Lease</u>" shall mean (i) the Key Tenant Lease, (ii) the Regus Lease, (iii) the Jetall Lease, and (iv) any Lease which (A) individually or in the aggregate (with respect to such Tenant and its Affiliates) cover more than 20,000 square feet of the Improvements, (B) provide the Tenant under such Lease with an option or other preferential right to purchase all or any portion of the Project, or (C) the Tenant under such Lease is an Affiliate of the Borrower.

"<u>Maturity Date</u>" shall have the meaning set forth in the Note.

"<u>Maximum Rate</u>" shall have the meaning set forth in the Note.

"<u>Mezzanine Borrower</u>" shall mean the Sole Member.

"<u>Mezzanine Lender</u>" shall mean Naissance Galleria, LLC, a Cayman Islands limited liability company.

"<u>Mezzanine Loan</u>" shall mean the $16,100,000 loan made by Mezzanine Lender to Mezzanine Borrower, secured by the Mezzanine Pledge Agreement.

"<u>Mezzanine Loan Agreement</u>" shall mean that certain Mezzanine Loan Agreement, dated as of the Closing Date, by and between Mezzanine Lender and Mezzanine Borrower.

"<u>Mezzanine Loan Documents</u>" shall have the meaning given to the term "Loan Documents" in the Mezzanine Loan Agreement.

"<u>Mezzanine Pledge Agreement</u>" shall mean that certain Pledge and Security Agreement, dated as of the Closing Date, by and between Mezzanine Borrower and Mezzanine Lender.

"<u>Multiemployer Plan</u>" shall mean a multiemployer plan as defined in Section 3(37) of ERISA as to which Borrower or any ERISA Affiliate contributes or, within the last six (6) years, contributed or had any obligation to contribute or otherwise has any obligation or liability, whether actual or contingent.

"<u>NCRE</u>" shall mean Naissance Capital Real Estate, LLC, a Delaware limited liability company.

"<u>NBK</u>" shall mean National Bank of Kuwait, S.A.K.P., New York Branch.

"<u>Net Operating Income</u>" shall mean the difference between:

(a) the sum of (i) actual rent collections for the period in question from Tenants and other Persons paying rent to Borrower *plus* (ii) any miscellaneous income actually received by Borrower from the Project. Net Operating Income shall not include any amounts paid by a Tenant under any Lease, including without limitation, the Existing Leases, for reimbursement of operating costs and expenses (including Taxes); <u>and</u>

(b) actual operating expenses for the period in question (not including non-recurring expenses such as leasing commissions, tenant improvement costs, bonuses paid to managers for turning over space at the Project, and other renovation expenses), other than: (i) Debt Service due under the Note and (ii) all operating costs and expenses (including Taxes) payable by a Tenant under any Lease, including, without limitation, the Existing Leases. Any refunds or rebates to operating expenses are to be applied and credited against the applicable operating expenses for the period that such operating expenses were incurred.

"Note" shall mean that certain Promissory Note dated as of the Closing Date in the original principal amount of the Loan made by Borrower to Administrative Agent, on behalf of Lenders, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"OECD" shall mean the Organization for Economic Cooperation and Development.

"OFAC" shall mean the Office of Foreign Assets Control, Department of the Treasury.

"Organizational Documents" shall mean, as to any Person, the certificate of incorporation and by-laws with respect to a corporation; the articles of organization (or the equivalent of such items under applicable state law) and operating agreement with respect to a limited liability company; the certificate of limited partnership and partnership agreement with respect to a limited partnership, or any other organizational or governing documents of such Person.

"Other Charges" shall mean all ground rents, maintenance charges, impositions other than Taxes, and any other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Project, now or hereafter levied or assessed or imposed against the Project or any part thereof.

"Participant" shall have the meaning set forth in Section 12.1 hereof.

"Participations" shall have the meaning set forth in Section 12.1 hereof.

"Patriot Act" shall have the meaning set forth in Section 4.23 hereof.

"Permitted Encumbrances" shall mean, with respect to the Project, collectively, (a) Liens, if any, for Taxes imposed by any Governmental Authority not yet due and payable or delinquent, (b) Liens for Taxes being contested in accordance with Section 5.4(d), (c) Liens, if any, for mechanics, materialmen or laborers which are fully bonded over in accordance with Section 5.4(c), (d) Liens set forth on Schedule B of the Title Policy, and (e) such other encumbrances as Administrative Agent has approved or may approve in writing in Administrative Agent's sole and absolute discretion.

"Permitted Transfers" shall mean the following:

(a) a Lease entered into in accordance with the terms and conditions of the Loan Documents;

(b) provided that no Event of Default shall then exist and be continuing, any transfer, Sale or Pledge of an interest in Borrower or any Restricted Party to any Person provided that:

(i) such transfer shall not (x) cause the transferee (other than Key Principal), together with its Affiliates, to acquire Control of Borrower or Sole Member or to acquire or increase its direct or indirect interest in Borrower or in Sole Member to an amount which equals or exceeds forty-nine percent (49%) of the equity interests in Borrower or Sole Member, or (y) result in Borrower or Sole Member no longer being Controlled by Key Principal;

4161624-v7\CHIDMS1

000630

(ii)     after giving effect to such Transfer, Key Principal(s) shall continue to Control the day to day operations of Borrower and continue to own at least 51% of all equity interests (direct or indirect) in Borrower; and

(iii)     Borrower shall continue to be a single purpose entity in accordance with Section 6.1 and Sole Member shall continue to be the sole managing member of Borrower;

(c)     provided that no Event of Default shall then exist and be continuing, a transfer for estate planning purposes of any Key Principal's direct or indirect interests in Borrower to the spouse, child, parent, grandparent, grandchild, niece, nephew, aunt or uncle of such Key Principal, or to a trust for the benefit of such Key Principal or for the benefit of the spouse, child, parent, grandparent, grandchild, niece, nephew, aunt or uncle of such Key Principal so long as immediately following such transfer, Key Principals continue to Control the day to day operations of Borrower.

"Person" shall mean any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any other entity, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"Pre-Approved Accounting Firm" shall mean Pannell Kerr Forster of Texas, P.C.

"Plans" shall have the meaning set forth in Section 8.3 hereof.

"Platform" shall have the meaning set forth in Section 12.2 hereof.

"Policies" shall have the meaning set forth in Section 8.1(b) hereof.

"Policy" shall have the meaning set forth in Section 8.1(b) hereof.

"Prepayment Premium" shall have the meaning set forth in the Note.

"Prohibited Transfer" shall have the meaning set forth in Section 7.2(a) hereof.

"Project" shall mean the Property and that certain 281,590 rentable square foot office building located at the Property, and all other buildings and structures thereon, and all easements, rights, privileges and appurtenances (including, without limitation, any air or development rights, if any) thereunto belonging or in any way appurtenant, and all of the estate, right, title, interest, claim or demand whatsoever of Borrower therein, and all estates, rights, titles, interests, privileges, tenements, hereditaments, and appurtenances of any nature whatsoever, in any way belonging, relating or pertaining to the Property, either in law or in equity, in possession or expectancy, now or hereafter acquired.

"Property" shall mean that certain parcel of land located at 2425 West Loop South, City of Houston, County of Harris, State of Texas.

"Property Income" shall mean all rents, income, issues, profits, security deposits and other benefits to which Borrower may now or hereafter be entitled from the Project.

"Provided Information" shall have the meaning set forth in Section 12.1 hereof.

"Pro Rata Share" shall have the meaning set forth in Section 13.12 hereof.

4161624-v7\CHIDMS1

"PSA" shall mean the Contract of Sale dated as of April 16, 2018 by and between Sole Member and Seller, as assigned by Sole Member to Borrower pursuant to that certain Assignment and Assumption of Contract dated as of the Closing Date.

"Purchase Price" shall have the meaning set forth in Section 13.3 hereof.

"Qualified Manager" shall mean a property manager which (i) is a reputable and experienced professional management company having at least five (5) years' experience in the management of commercial properties with similar uses as the Project and in the jurisdiction in which the Project is located, (ii) has, for at least three (3) years prior to its proposed engagement as "Manager", managed at least five (5) properties of the same property type, quality and size as the Project, and (iii) is not the subject of a bankruptcy or similar insolvency proceeding. For the avoidance of doubt, an Affiliate of the Manager initially named in this Agreement shall be deemed to be a "Qualified Manager" for purposes of this Agreement.

"Regus Lease" shall mean the Lease Agreement dated February 29, 1995, as amended by Amendment No. 1 to Lease Agreement dated July 28, 1997, Amendment No. 2 to Lease Agreement dated February 26, 2001, Amendment No. 3 to Lease Agreement effective as of January 1, 2005, Amendment No. 4 to Lease Agreement effective as of October 3, 2011, Amendment No. 5 to Lease Agreement effective as of October 3, 2011, Amendment No. 6 to Lease Agreement effective as of September 11, 2012 and Amendment No. 7 to Lease Agreement effective as of November 15, 2012, by and between RGN-Houston XXXIX, as successor-in-interest to Abby Executive Suites, West Loop, Inc. and Abby Office Centers, Uptown, Ltd., as tenant, and Borrower, as successor-in-interest to Seller, as landlord.

"Required Lenders" shall have the meaning set forth in Section 13.2 hereof.

"Restoration Account" shall have the meaning set forth in Section 8.3 hereof.

"Restoration Work" shall have the meaning set forth in Section 8.3 hereof.

"Restricted Party" shall have the meaning set forth in Section 7.1 hereof.

"Sale or Pledge" shall have the meaning set forth in Section 7.1 hereof.

"Seller" shall mean 2425 West Loop, LP, a Texas limited partnership.

"Servicer" shall have the meaning set forth in Section 12.1 hereof.

"Servicing Fee" shall have the meaning set forth in Section 13.17 hereof.

"SNDA" shall mean a Subordination, Non-Disturbance and Attornment Agreement.

"Sole Member" shall mean Galleria 2425 JV, LLC, a Delaware limited liability company, the sole member of Borrower.

"State" shall mean, with respect to the Project, the state in which the Project or any part thereof is located, and with respect to Borrower, the state of Borrower's organization.

"Subordination of Management Agreement" shall mean, during such time as a Management Agreement may be in place, that certain Assignment and Subordination of Management Agreement among Administrative Agent, Borrower and Manager, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

4161624-v7\CHIDMS1

000632

"<u>Subsidiary</u>" shall mean any corporation, partnership, limited liability company or other entity in which a Person holds an equity interest which is more than twenty percent (20%) of the equity classes issued by such entity.

"<u>Syndication</u>" shall have the meaning set forth in <u>Section 12.1</u> hereof.

"<u>Taxes</u>" shall mean all real estate and personal property taxes, assessments, water rates or sewer rents, now or hereafter levied, assessed, or imposed against the Project (or any part thereof).

"<u>Telecom Leases</u>" shall mean leases with telecommunications providers or their affiliates or agents for the installation and maintenance of communication equipment, including, without limitation, antennas, at the Property.

"<u>Tenant</u>" shall mean any Person leasing, subleasing or otherwise occupying any portion of the Project under a Lease or other occupancy agreement with Borrower or any predecessor-in-interest to Borrower.

"<u>Term</u>" shall have the meaning set forth in the Note.

"<u>Title Company</u>" shall have the meaning set forth in <u>Section 3.2</u> hereof.

"<u>Title Policy</u>" shall have the meaning set forth in <u>Section 3.2</u> hereof.

"<u>UCC</u>" or "<u>Uniform Commercial Code</u>" shall mean the Uniform Commercial Code as in effect in the State.

"<u>West Loop</u>" shall mean Galleria West Loop Investments II, LLC, a Texas limited liability company.

"<u>Withdrawal Liability</u>" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

Section 1.2. <u>Interpretation</u>. Unless the context of this Agreement otherwise clearly requires, the following rules of construction shall apply to this Agreement and each of the Loan Documents:

(a)    <u>Number; Inclusion</u>. To the extent the context so requires, references to the plural include the singular, references to the singular include the plural, and references to the part include the whole; "or" has the inclusive meaning represented by the phrase "and/or"; and "including" has the meaning represented by the phrase "including, without limitation,";

(b)    <u>Determination</u>. References to "determination" of or by Administrative Agent or Lenders shall be deemed to include good-faith estimates by Administrative Agent or Lenders (in the case of quantitative determinations), and good-faith beliefs by Administrative Agent or Lenders (in the case of qualitative determinations), and such determination shall be conclusive absent manifest error;

(c)    <u>Construction</u>. This Agreement and all other Loan Documents shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement and all such other Loan Documents to be drafted. If any words or phrases in this Agreement or any other Loan Document shall have been stricken out or otherwise eliminated, whether or not any other words or phrases have been added, this Agreement and all other Loan Documents shall be construed as if the words or phrase so stricken out or otherwise eliminated were never included herein or therein and no implication or inference shall be drawn from the fact that said words or phrases were so stricken out or otherwise eliminated;

12

(d)  Agent's or Lenders Discretion and Consent. Whenever Administrative Agent or Lenders are granted the right herein or in any Loan Document to make any decision or determination, to exercise any right, remedy or power or otherwise to act in its or their sole discretion or to grant or withhold consent, such right shall be exercised in good faith utilizing generally accepted commercial practices for transactions similar to the transaction that is the subject matter of this Agreement or such Loan Document (as the case may be);

(e)  Documents Taken as a Whole. The words "hereof," "herein," "hereunder," "hereto" and similar terms in this Agreement or in any Loan Document refer to this Agreement or such Loan Document as a whole and not to any particular provision of this Agreement or such Loan Document;

(f)  Headings. The section and other headings contained in this Agreement or any Loan Document and the table of contents (if any) preceding this Agreement or any Loan Document are for reference purposes only and shall not control or affect the construction of this Agreement or such Loan Document or the interpretation thereof in any respect;

(g)  Implied References to this Agreement. Article, section, subsection, clause, schedule and exhibit references are to this Agreement unless otherwise specified;

(h)  Persons. Reference to any Person includes such Person's successors and assigns but, if applicable, only if such successors and assigns are permitted by this Agreement or by such Loan Document, as the case may be, and reference to a Person in a particular capacity excludes such Person in any other capacity;

(i)  Modifications to Documents. Reference to any agreement (including this Agreement and any Loan Document, together with the schedules and exhibits hereto or thereto), document or instrument means such agreement, document or instrument as amended, modified, replaced, substituted for, superseded or restated at the relevant time;

(j)  From, To and Through. Relative to the determination of any period of time, "from" means "from and including," "to" means "to but excluding," and "through" means "through and including"; and

(k)  Shall; Will. References to "shall" and "will" are intended to have the same meaning.

<div align="center">

ARTICLE II
GENERAL TERMS

</div>

Section 2.1. Loan Commitment; Extension.

(a)  Subject to the terms, provisions, covenants and conditions of this Agreement, Lenders shall make the Loan to Borrower in an amount equal to FIFTY ONE MILLION SIX HUNDRED SEVENTY FIVE THOUSAND AND NO/100THS DOLLARS ($51,675,000.00).

(b)  The Loan shall be secured by the Deed of Trust, the Assignment of Leases and Rents, and the other Loan Documents.

(c)  Borrower shall use the proceeds of the Loan to (i) partially finance Borrower's acquisition of the Project, (ii) make a deposit into the Interest Reserve Account, and (iii) pay costs and expenses incurred in connection with the closing of the Loan, as approved by Administrative Agent.

Section 2.2. Interest Rate and Loan Payments.

<div align="center">13</div>

4161624-v7\CHIDMS1

(a)     The Loan shall bear interest at the per annum rates set forth in the Note.

(b)     Borrower hereby agrees to make principal and interest payments as set forth in the Note.

(c)     All payments to be made by Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by Borrower hereunder and under the other Loan Documents shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's office in Dollars and in immediately available funds not later than 2:00 p.m. EST on the date specified herein. All payments received by the Administrative Agent after 2:00 p.m. EST shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue. If any payment to be made by Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

Section 2.3. <u>Usury Savings</u>. This Agreement and the Note are subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the principal balance of the Loan at a rate which could subject Lenders to either civil or criminal liability as a result of being in excess of the Maximum Rate. If, by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Rate, the Interest Rate or the Involuntary Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Rate and all previous payments in excess of the Maximum Rate shall be deemed to have been payments in reduction of principal, without premium, and not on account of the interest due hereunder. All sums paid or agreed to be paid to Lenders for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Rate of interest from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

ARTICLE III
CONDITIONS PRECEDENT

The obligation of Lenders to enter into this Agreement and make the Loan hereunder is subject to the fulfillment by Borrower and Guarantor or waiver by Administrative Agent of the following conditions precedent no later than the Closing Date.

Section 3.1. <u>Representations and Warranties; Compliance with Conditions</u>. The representations and warranties of Borrower and Guarantor contained in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the Closing Date with the same effect as if made on and as of such date, and Administrative Agent shall have determined that no Default or an Event of Default shall have occurred and be continuing nor shall any Default or Event of Default occur immediately following the Closing Date and Borrower and Guarantor shall be in compliance in all material respects with all terms and conditions set forth in this Agreement and in each other Loan Document on its part to be observed or performed.

Section 3.2. <u>Delivery of Loan Documents; Title Policy; Due Diligence Items</u>.

(a)     <u>Deed of Trust, Loan Agreement, Note and Guaranty</u>. Administrative Agent shall have received (i) from Borrower fully executed and acknowledged counterparts of the Deed of Trust and Assignment of Leases and Rents, and evidence that the Uniform Commercial Code financing statement has been delivered to the Title Company for recording and/or filing, in the judgment of Administrative

14

000635

Agent, so as to effectively create upon such recording and/or filing valid and enforceable Liens upon the Project, of first priority, in favor of Lenders, and (ii) from Borrower and Guarantor, as applicable, fully executed counterparts of this Agreement, the Note, the Guaranty and all of the other Loan Documents.

(b)      Policy; Title Policy. Administrative Agent shall have received a paid title insurance policy (the "Title Policy"), in the amount of the Deed of Trust, issued by a title company(ies) (the "Title Company") acceptable to Administrative Agent and dated as of the Closing Date. Such Title Policy shall (A) provide coverage for the full amount of the Loan, (B) insure Lenders that the Deed of Trust insured by such Title Policy creates a valid, perfected lien on the Project of first priority and that Borrower is the sole owner of a valid fee estate in and to the Project, free and clear of all exceptions from coverage other than the standard exceptions and exclusions from coverage, (C) provide full coverage against mechanics' liens (filed and inchoate), (D) contain such endorsements and affirmative coverages as Administrative Agent may reasonably request, and (E) name Administrative Agent as the insured. The Title Policy shall be assignable. Administrative Agent also shall have received evidence that all premiums in respect of such Title Policy have been paid.

(c)      Survey. Administrative Agent shall have received a current title survey for the Property, certified to the Title Company and Lenders and their successors and assigns, in form and content satisfactory to Administrative Agent and prepared by a professional and properly licensed land surveyor satisfactory to Administrative Agent. Such survey shall reflect the same legal description contained in the Title Policy referred to in Section 3.2(b) hereof and shall include, among other things, a metes and bounds description of the real property comprising part of the Project satisfactory to Administrative Agent. The surveyor's seal shall be affixed to the survey and the surveyor shall provide a certification for the survey in form and substance acceptable to Administrative Agent.

(d)      Insurance. Administrative Agent shall have received copies of the certificates of insurance for the Policies required hereunder, together with such Acord forms as Administrative Agent shall require, satisfactory to Administrative Agent in Administrative Agent's sole and absolute discretion, and, evidence of the payment of all Insurance Premiums payable for the existing policy period.

(e)      Encumbrances. Borrower shall have taken or caused to be taken such actions in such a manner so that Lenders have a valid and perfected first Lien as of the Closing Date on the Project and Administrative Agent shall have received satisfactory evidence thereof, subject to Permitted Encumbrances.

(f)      Lien Searches. Borrower shall have delivered to Administrative Agent certified search results pertaining to Borrower, Guarantor and such other Persons as reasonably required by Administrative Agent for state and federal tax liens, bankruptcy, judgment, litigation and state and local UCC filings.

(g)      Environmental Report. Administrative Agent shall have received an Environmental Report in respect of the Project, which report shall be satisfactory to Administrative Agent in all respects.

(h)      Engineering Report. Administrative Agent shall have received an Engineering Report in respect of the Project, which report shall be satisfactory to Administrative Agent in all respects (including, without limitation, indicating that there exists no material deferred maintenance at the Project).

(i)      Appraisal. Administrative Agent shall have received an appraisal for the Project, which appraisal shall be prepared by an MAI appraiser and satisfactory in form and substance to Administrative Agent (including, without limitation, providing for a loan-to-value ratio of not greater than

fifty-three and seven-tenths percent (53.7%), based on (i) the "as-is" value of the Project and (ii) the original principal balance of the Loan).

    (j)    [Intentionally Omitted]

    Section 3.3. <u>Related Documents</u>. Each additional document not specifically referenced herein, but relating to the transactions contemplated herein, shall have been duly authorized, executed and delivered by all parties thereto and at Administrative Agent's written request, Administrative Agent shall have received and approved certified copies thereof.

    Section 3.4. <u>Organizational Documents</u>. Administrative Agent shall have received (a) certified copies of all Organizational Documents related to Borrower and Guarantor, as applicable, which must be acceptable to Administrative Agent, in Administrative Agent's sole and absolute discretion, and (b) such other evidence of the formation, structure, existence and/or good standing of Borrower and Guarantor and such other Persons as Administrative Agent may request, in Administrative Agent's sole and absolute discretion, including, without limitation, good standing or existence certificates, resolutions authorizing the entering into of the Loan and the granting of the Deed of Trust and incumbency certificates as may be requested by Administrative Agent.

    Section 3.5. <u>Opinions of Counsel</u>. Administrative Agent shall have received opinions of counsel with respect to (i) formation, existence and good standing of Borrower and Guarantor, as applicable, (ii) due execution, authority, enforceability of the Loan Documents, and (iii) such other matters as Administrative Agent may reasonably require. All such opinions shall be in form, scope and substance reasonably satisfactory to Administrative Agent and Lenders' counsel in their sole and absolute discretion.

    Section 3.6. <u>Taxes and Other Charges</u>. Borrower shall have paid all Taxes and Other Charges (including any in arrears) relating to the Project.

    Section 3.7. <u>Completion of Proceedings</u>. All corporate and other proceedings taken or to be taken in connection with the transactions contemplated by this Agreement and other Loan Documents and all documents incidental thereto shall be satisfactory in form and substance to Administrative Agent, and Administrative Agent shall have received all such counterpart original or certified copies of such documents as Administrative Agent may reasonably request.

    Section 3.8. <u>Payments</u>. All payments, deposits or escrows required to be made or established by Borrower under this Agreement, the Note and the other Loan Documents on or before the Closing Date shall have been paid.

    Section 3.9. <u>Transaction Costs</u>. Except as otherwise expressly provided herein, Borrower shall have paid or reimbursed Administrative Agent and Lenders for all reasonable third party out of pocket expenses actually incurred in connection with the underwriting, negotiation, and closing of the Loan, including, without limitation, title insurance premiums and other title company charges; registration, filing and similar fees, taxes and charges; transfer, deed, stamp, mortgage recording or documentary taxes or similar fees or charges; actual costs of third-party reports, including, without limitation, environmental studies, credit reports, appraisals, surveys, underwriting and origination expenses; and all reasonable legal fees and expenses charged by counsel to Lenders and Administrative Agent.

    Section 3.10. <u>No Material Adverse Change</u>. There shall have been no material adverse change in the financial condition or business condition of the Project, Borrower or any other Person contributing to the operating income and operations of the Project since the date of the most recent financial statements and/or other information delivered to Administrative Agent. The income and expenses of the Project, the occupancy and leases thereof, and all other features of the transaction shall be as represented to Lenders

and Administrative Agent without material adverse change. Neither Borrower nor Guarantor shall be the subject of any bankruptcy, reorganization, or insolvency proceeding.

Section 3.11. <u>Leases</u>. Administrative Agent shall have received copies of all Leases affecting the Project, which shall be satisfactory in form and substance to Administrative Agent.

Section 3.12. <u>Tenant Estoppel Certificate</u>. Administrative Agent shall have received, or shall receive within fifteen (15) Business Days of the Closing Date, a tenant estoppel certificate from each Tenant under a Material Lease, addressed to Administrative Agent, in form and substance satisfactory to Administrative Agent in all respects. Failure by Borrower to deliver such tenant estoppel certificates within such time period shall constitute an Event of Default.

Section 3.13. <u>SNDA</u>. Administrative Agent shall have received, or shall receive within fifteen (15) days of the Closing Date, an SNDA executed by Key Tenant with respect to the Key Tenant Lease, in form and substance satisfactory to Administrative Agent in all respects. Failure by Borrower to deliver such SNDA within such time period shall constitute an Event of Default.

Section 3.14. <u>Tax Lot</u>. Administrative Agent shall have received evidence that the Property constitutes one or more separate tax lots, which evidence shall be satisfactory to Administrative Agent in all respects.

Section 3.15. <u>Borrower's and Guarantor's Financials</u>. Administrative Agent shall have received copies of Borrower's and Guarantor's most recent financial statements.

Section 3.16. <u>Acquisition of Property</u>. Administrative Agent shall have received evidence of the purchase price for the Project to be paid by Borrower and evidence that Borrower invested, upon acquisition of the Project, the required equity.

Section 3.17. <u>Further Documents</u>. Administrative Agent or Administrative Agent's counsel shall have received such other and further approvals, opinions, documents and information as Administrative Agent or Administrative Agent's counsel may have requested in form and substance satisfactory to Administrative Agent and Administrative Agent's counsel.

Section 3.18. <u>Interest Reserve Deposit</u>. Borrower shall have established a deposit account in the name of Borrower with Administrative Agent (the "<u>Interest Reserve Account</u>"), into which Borrower shall have deposited an amount equal to $2,500,000.

ARTICLE IV
REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to Lenders and Administrative Agent as of the Closing Date that:

Section 4.1. <u>Organization</u>. Borrower (a) has been duly organized and is validly existing and in good standing with requisite power and authority to own its properties and to transact the businesses in which it is now engaged, (b) is duly qualified to do business and is in good standing in each jurisdiction where it is required to be so qualified in connection with its properties, businesses and operations, (c) possesses all rights, licenses, permits and authorizations, governmental or otherwise, necessary to entitle it to own its properties and to transact the businesses in which it is now engaged, and the sole business of Borrower is the ownership and management of the Project, and (d) has full power, authority and legal right to mortgage the Project pursuant to the terms of the Loan Documents and has full power, authority and legal right to keep and observe all of the terms of the Loan Documents to which it is a party. Borrower represents and warrants that the chart attached hereto as <u>Exhibit A</u> sets forth an accurate listing

17

000638

of the direct and indirect owners of all of the equity interests in Borrower (the "Borrower Members"). For the avoidance of doubt, "Borrower Members" shall include Sole Member, NCRE and West Loop.

Section 4.2. Status of Borrower. Borrower's exact legal name is correctly set forth on the first page of this Agreement, on the Deed of Trust, and on any UCC-1 Financing Statements filed in connection with the Loan. Borrower is an organization of the type specified on the first page of this Agreement. Borrower is organized under the laws of the State of Delaware and authorized to do business under the laws of the State of Texas. Borrower's principal place of business and chief executive office, and the place where Borrower keeps its books and records, including recorded data of any kind or nature, regardless of the medium of recording, including software, writings, plans, specifications and schematics, has been for the preceding four (4) months (or, if less, the entire period of the existence of Borrower) the address of Borrower set forth on the first page of this Agreement. Borrower may designate a change of principal place of business and chief executive office by written notice to Administrative Agent by certified mail, return receipt requested, postage prepaid, at least thirty (30) days before such change of principal place of business and chief executive office is to become effective.

Section 4.3. Validity of Documents. Borrower has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents. This Agreement and the other Loan Documents have been duly executed and delivered by or on behalf of Borrower and Guarantor, as applicable, and constitute the legal, valid and binding obligations of Borrower and Guarantor, as applicable, enforceable against Borrower and Guarantor, as applicable, in accordance with their respective terms, subject only to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

Section 4.4. No Conflicts. The execution, delivery and performance of this Agreement and the other Loan Documents by Borrower and Guarantor, as applicable, will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any lien, charge or encumbrance (other than pursuant to the Loan Documents) upon any of the property or assets of Borrower and Guarantor, as applicable, pursuant to the terms of any agreement or instrument to which Borrower and Guarantor is a party or by which any of Borrower's or Guarantor's property or assets is subject, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any Governmental Authority having jurisdiction over Borrower or Guarantor or any of Borrower's or Guarantor's properties or assets, and any consent, approval, authorization, order, registration or qualification of or with any Governmental Authority required for the execution, delivery and performance by Borrower and Guarantor, as applicable, of this Agreement or any of the other Loan Documents has been obtained and is in full force and effect.

Section 4.5. Litigation. To the best of Borrower's knowledge, there are no actions, suits or proceedings at law or in equity by or before any Governmental Authority or other agency now pending or, to Borrower's knowledge, threatened against or affecting Borrower, Guarantor or the Project, which actions, suits or proceedings, if determined against Borrower, Guarantor or the Project, could materially adversely affect the condition (financial or otherwise) or business of Borrower or Guarantor or the condition or ownership of the Project.

Section 4.6. Agreements. Neither Borrower nor Guarantor is a party to any agreement or instrument or subject to any restriction which would materially and adversely affect Borrower, such Guarantor or the Project, or Borrower's or such Guarantor's business, properties or assets, operations or condition, financial or otherwise. To Borrower's and Guarantor's actual knowledge, neither Borrower nor Guarantor are in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which Borrower or

18

000639

Guarantor is a party or by which Borrower, Guarantor or the Project is bound. Borrower has no material financial obligations under any agreement or instrument to which Borrower is a party or by which Borrower or the Project is otherwise bound, other than (a) obligations incurred in the ordinary course of the ownership, leasing and operation of the Project and (b) obligations under the Loan Documents.

Section 4.7. <u>Solvency</u>. Neither Borrower nor Guarantor has entered into the transaction or executed the Note, this Agreement, the Guaranty or any other Loan Documents with the actual intent to hinder, delay or defraud any creditor, and Borrower and Guarantor have each received reasonably equivalent value in exchange for their respective obligations under such Loan Documents. No petition in bankruptcy has been filed against Borrower or Guarantor in the last ten years, and neither Borrower nor Guarantor in the last ten years has made an assignment for the benefit of creditors or taken advantage of any Creditors' Rights Laws. Neither Borrower nor Guarantor is contemplating either the filing of a petition by it under any Creditors' Rights Laws or the liquidation of all or a major portion of Borrower's or such Guarantor's assets or property, and Borrower has no knowledge of any Person contemplating the filing of any such petition against Borrower or Guarantor.

Section 4.8. <u>Full and Accurate Disclosure</u>. No material statement of fact made by or on behalf of Borrower or Guarantor in this Agreement or in any of the other Loan Documents or in any other document or certificate delivered by or on behalf of Borrower or Guarantor contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained herein or therein not misleading. There is no material fact presently known to Borrower or Guarantor which has not been disclosed to Administrative Agent and Lenders which adversely affects, nor as far as Borrower or the applicable Guarantor can reasonably foresee, might adversely affect, the Project or the business, operations or condition (financial or otherwise) of Borrower or Guarantor.

Section 4.9. <u>ERISA Compliance</u>.

(a)     Borrower covenants, represents and warrants that (i) Borrower is not and will not be a Benefit Plan Investor, (ii) neither Borrower nor any of its Subsidiaries or ERISA Affiliates maintains or contributes to, or has at any time maintained or contributed to, or has any liability, whether actual or contingent, under, a plan subject to Section 302 or Title IV of ERISA or to Section 412 of the Internal Revenue Code, (iii) neither Borrower nor any of its Subsidiaries or ERISA Affiliates has ever contributed to or had an obligation to contribute to any Multiemployer Plan. None of the Benefit Plans are part of, or have at any time been part of, a multiple employer welfare arrangement, as that term is defined in Section 3(40) of ERISA, (iv) no Benefit Plan is or was at any time a multiple employer plan, as described in Section 413(c) of the Internal Revenue Code or Sections 4063 or 4064 of ERISA, and (v) neither Borrower nor any of its Subsidiaries or ERISA Affiliates has ever contributed to or had an obligation to contribute to any such plan.

(b)     No ERISA Event has occurred or is reasonably expected to occur. No employee welfare benefit plan within the meaning of §3(1) or §3(2)(B) of ERISA of Borrower or any Subsidiary, provides benefit coverage subsequent to termination of employment except as required by Title I, Part 6 of ERISA or applicable state insurance laws. Each Benefit Plan is in material compliance with ERISA, the Internal Revenue Code and any applicable law. Each Benefit Plan that is intended to qualify under Section 401(a) of the Internal Revenue Code has received a favorable determination letter from the Internal Revenue Service for all required amendments regarding its qualification thereunder that considers the law changes incorporated in the plan sponsor's most recently expired remedial amendment cycle determined under the provisions of Rev. Proc. 2007-44, and nothing has occurred subsequent to the issuance of such termination letter which would prevent, or cause the loss of, such qualification.

000640

Section 4.10. <u>Not a Foreign Person</u>. Borrower is not a "foreign person" within the meaning of § 1445(f)(3) of the Internal Revenue Code.

Section 4.11. <u>Enforceability</u>. The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by Borrower or Guarantor including, without limitation, the defense of usury, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable, and neither Borrower nor Guarantor has asserted any right of rescission, set-off, counterclaim or defense with respect thereto. No Default or Event of Default exists under or with respect to any Loan Document.

Section 4.12. <u>Business Purposes</u>. The Loan is solely for the business purpose of Borrower, and is not for personal, family, household, or agricultural purposes.

Section 4.13. <u>Compliance</u>. To the best of Borrower's knowledge, and other than as contained in any searches requested by or on behalf of Administrative Agent in connection with the Loan, Borrower and the Project, and the use and operation of the Project, comply in all material respects with all Legal Requirements, including, without limitation, building ordinances and codes and the Americans with Disabilities Act. To the best of Borrower's knowledge, neither Borrower nor Guarantor is in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority and neither Borrower nor Guarantor has received any written notice of any such default or violation. There has not been committed by Borrower or Guarantor or, to Borrower's knowledge, any other Person in occupancy of or involved with the operation or use of the Project any act or omission affording any Governmental Authority the right of forfeiture as against the Project or any part thereof or any monies paid in performance of Borrower's or Guarantor's obligations under any of the Loan Documents.

Section 4.14. <u>Financial Information</u>. All financial data, including, without limitation, the balance sheets, statements of cash flow, and statements of income and operating expense, that have been delivered to Administrative Agent in respect of Borrower, Guarantor and/or to Borrower's knowledge the Project (a) are true, complete and correct in all material respects as of the date of such information, (b) accurately represent the financial condition of Borrower, Guarantor and/or the Project, as applicable, as of the date of such reports, and (c) to the extent prepared or audited by an independent certified public accounting firm, have been prepared in accordance with a modified accrual accounting method or such other method satisfactory to Administrative Agent throughout the periods covered, except as disclosed therein. Borrower has no contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments that are known to Borrower and reasonably likely to have a material adverse effect on the Project or the current and/or intended operation thereof, except as referred to or reflected in said financial statements. Since the date of such financial statements, there has been no materially adverse change in the financial condition, operations or business of the Borrower, Guarantor or, to Borrower's knowledge, the Project from that set forth in said financial statements.

Section 4.15. <u>Illegal Activity</u>. No portion of the Project has been or shall be purchased by Borrower with proceeds of any illegal activity and no part of the proceeds of the Loan will be used in connection with any illegal activity.

Section 4.16. <u>Separate Tax and Zoning Lot</u>. The Property constitutes a distinct parcel or parcels for purposes of zoning and of taxes, assessments and impositions (public or private) and are not otherwise considered as part of a larger single lot which includes property other than the Property for purposes of zoning or of taxes, assessments or impositions (public or private).

Section 4.17. <u>Federal Reserve Regulation</u>. Borrower shall use the proceeds of the Loan for the purposes set forth in <u>Section 2.1(c)</u> hereof and not for any illegal activity. No part of the proceeds of the

000641

Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by Legal Requirements or prohibited by the terms and conditions of this Agreement or the other Loan Documents.

Section 4.18. <u>Investment Company Act</u>. Borrower is not (a) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (b) [Reserved]; or (c) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

Section 4.19. <u>No Change in Facts or Circumstances; Disclosure</u>. All information submitted by Borrower, Guarantor or Borrower's or Guarantor's agents to Administrative Agent and in all financial statements, reports, certificates and other documents submitted in connection with the Loan or in satisfaction of the terms thereof and all statements of fact made by Borrower in this Agreement or in any other Loan Document, are accurate, complete and correct in all material respects as of the date of such item. There has been no material adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise misleading in any material respect or that otherwise materially and adversely affects or might materially and adversely affect the Project or the business operations or the financial condition of Borrower or Guarantor. Borrower and Guarantor have disclosed to Administrative Agent all material facts and have not failed to disclose any material fact that could cause any representation or warranty made herein to be materially misleading. With respect to any representations, warranties, or statements of fact which are specifically qualified in this Agreement as being true and correct to the best of Borrower's knowledge, the representation and warranty set forth in this <u>Section 4.19</u> shall be, to the best of Borrower's knowledge, true and correct as of the Closing Date.

Section 4.20. <u>Special Purpose Entity</u>. Borrower meets all of the requirements of <u>Article VI</u> hereof as of the Closing Date.

Section 4.21. <u>Intellectual Property</u>. All trademarks, trade names and service marks necessary to the business of Borrower as presently conducted or as Borrower contemplates conducting Borrower's business are in good standing and, to the extent of Borrower's actual knowledge, uncontested. To the best of Borrower's knowledge, Borrower has not infringed, is not infringing, and has not received notice of infringement with respect to asserted trademarks, trade names and service marks of others. To Borrower's knowledge, there is no infringement by others of trademarks, trade names and service marks of Borrower.

Section 4.22. <u>Embargoed Person</u>. To the best of Borrower's knowledge, as of the Closing Date and at all times throughout the term of the Loan, including after giving effect to any transfers of interests permitted pursuant to the Loan Documents or the Mezzanine Loan Documents, (a) none of the funds or other assets of Borrower or Guarantor constitute property of, or are beneficially owned, directly or indirectly, by any Person or government subject to trade restrictions under U.S. law, including, but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder with the result that the investment in Borrower (whether directly or indirectly), is prohibited by law or the Loan made by Lenders is in violation of law ("<u>Embargoed Person</u>"); (b) no Embargoed Person has any interest of any nature whatsoever in Borrower with the result that the investment in Borrower (whether directly or indirectly), is prohibited by law or the Loan is in violation of law; and (c) none of the funds of Borrower have been derived from any unlawful activity with the result that the investment in Borrower (whether directly or indirectly) is prohibited by law or the Loan is in violation of law.

4161624-v7\CHIDMS1

000642

Section 4.23. <u>Patriot Act</u>. All capitalized words and phrases and all defined terms used in the USA PATRIOT Act of 2001, 107 Public Law 56 (October 26, 2001) and in other statutes and all orders, rules and regulations of the United States government and its various executive departments, agencies and offices related to the subject matter of the Patriot Act, including Executive Order 13224 effective September 24, 2001 (collectively referred to in this Section only as the "<u>Patriot Act</u>") are incorporated into this Section. Each of Borrower and Borrower Members hereby represent and warrant that (a) Borrower, Guarantor and Borrower Members and each and every Person affiliated with Borrower, or that to Borrower's or Borrower Members' knowledge has an economic interest in Borrower or Borrower Members, or, to Borrower's or Borrower Members' knowledge, that has or shall have an interest in the transaction contemplated by this Agreement or in the Project or shall participate, in any manner whatsoever, in the Loan, is, to the extent required so that the Loan in not in violation of applicable Legal Requirements, <u>and</u> (b) Borrower, Guarantor and each Person actively involved in the management of Borrower or the Project is: (i) not a "blocked" Person listed in the Annex to Executive Order Nos. 12947, 13099 and 13224 and all modifications thereto or thereof (the "<u>Annex</u>"); (ii) in full compliance with the requirements of the Patriot Act and all other requirements contained in the rules and regulations of the OFAC; (iii) to the extent applicable, operated under policies, procedures and practices, if any, that are in compliance with the Patriot Act and available to Administrative Agent for Administrative Agent's review and inspection during normal business hours and upon reasonable prior notice; (iv) not in receipt of any notice from the Secretary of State or the Attorney General of the United States or any other department, agency, or office of the United States claiming a violation or possible violation of the Patriot Act; (v) not listed as a Specially Designated Terrorist or as a "blocked" Person on any lists maintained by the OFAC pursuant to the Patriot Act or any other list of terrorists or terrorist organizations maintained pursuant to any of the rules and regulations of the OFAC issued pursuant to the Patriot Act or on any other list of terrorists or terrorist organizations maintained pursuant to the Patriot Act; (vi) not a Person who has been determined by competent authority to be in violation of any of the prohibitions contained in the Patriot Act; and (vii) not controlled by or now acting or will in the future act for or on behalf of any Person named in the Annex or any other list promulgated under the Patriot Act or any other Person who has been determined to be in violation of the prohibitions contained in the Patriot Act. Borrower covenants and agrees that in the event Borrower or Guarantor receives any notice that Borrower (or any of Borrower's beneficial owners), Guarantor or any other Person related to or affiliated with Borrower, Guarantor or the Project become listed on the Annex or any other list promulgated under the Patriot Act or is indicted, arraigned, or custodially detained on charges involving money laundering or predicate crimes to money laundering, Borrower shall immediately notify Administrative Agent. It shall be an Event of Default hereunder if Borrower or any other party to any Loan Document becomes listed on any list promulgated under the Patriot Act or is indicted, arraigned or custodially detained on charges involving money laundering or predicate crimes to money laundering.

Section 4.24. <u>No Contractual Obligations</u>. Other than the Loan Documents, the Mezzanine Loan Documents, the Borrower Operating Agreement, the Management Agreement, the Existing Leases, the PSA pursuant to which Borrower is acquiring the Property, and certain Contractual Obligations to operate and manage the Project that are necessary and customary for properties similar to the Project, as of the date of this Agreement, Borrower is not subject to any Contractual Obligations and has not entered into any agreement, instrument or undertaking by which Borrower or Borrower's assets are bound, or has incurred any indebtedness (other than the Loan), and prior to the date of this Agreement, Borrower has not entered into any Contractual Obligation, or any agreement, instrument or undertaking by which it or its assets are bound or incurred any indebtedness (other than the Loan).

Section 4.25. <u>Shareholders of Borrower</u>. One hundred percent (100%) of the membership interests of Borrower are owned by the Sole Member.

22

000643

Section 4.26. <u>Survival</u>. Borrower acknowledges and agrees that, unless expressly provided otherwise, all of the representations and warranties of Borrower and Guarantor set forth in this Agreement and in the other Loan Documents shall survive for so long as any portion of the Debt remains owing to Lenders. All representations, warranties, covenants and agreements made in this Agreement or in the other Loan Documents by Borrower and Guarantor shall be deemed to have been relied upon by Lenders notwithstanding any investigation heretofore or hereafter made by Lenders or on its behalf.

Section 4.27. <u>Leases</u>. As of the Closing Date, there are no Leases pursuant to which any Person other than Borrower has any right, title or interest in the Project other than under the Existing Leases.

Section 4.28. <u>Landmark Status</u>. No portion of the Project is designated by or registered with any governmental authority as historic or landmark buildings or any other similar designation or registration and Borrower shall not attempt or cooperate to obtain or effect any such designation or registration.

Section 4.29. <u>Broker</u>. Borrower represents and warrants to Administrative Agent and Lenders that Borrower has not dealt with any broker with respect to the transaction contemplated hereby and, by accepting the Loan, Borrower agrees forever to indemnify and hold Administrative Agent and Lenders harmless from and against any and all claims or suits for compensation, commissions, fees or otherwise (and all Losses related thereto) that may be asserted or made by any broker or Person claiming to have dealt with or to have been employed by Borrower or Borrower's representatives in connection with the brokering of the Loan.

<div align="center">

ARTICLE V
COVENANTS

</div>

From the Closing Date and until repayment of the Debt in full and performance in full of all obligations of Borrower and Guarantor under the Loan Documents or the earlier release of the Lien of the Deed of Trust (and all related obligations) in accordance with the terms of this Agreement and the other Loan Documents, Borrower hereby covenants and agrees with Lenders that:

Section 5.1. <u>Existence; Compliance With Legal Requirements</u>.

(a) Borrower shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, licenses, permits and franchises and comply in all material respects with all Legal Requirements applicable to Borrower and the Project. Borrower hereby covenants and agrees not to commit, permit or suffer to exist any act or omission affording any Governmental Authority the right of forfeiture as against the Project or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents.

(b) Borrower agrees that the Project shall at all times comply, to the extent applicable, with the Access Laws in all material respects. Notwithstanding any provisions set forth herein or in any other documents regarding Administrative Agent's approval or alterations of the Project, Borrower shall not alter the Project in any manner which would increase Borrower's responsibilities for compliance with the applicable Access Laws in any material respect without the prior written approval of Administrative Agent. The foregoing shall apply to tenant improvements constructed by Borrower or by any of Borrower's Tenants. Administrative Agent may condition any such approval upon receipt of a certificate of Access Law compliance from an architect, engineer or other Person acceptable to Administrative Agent. Borrower agrees to give prompt notice to Administrative Agent of the receipt by Borrower of any complaints related to violations of any Access Laws and of the commencement of any proceedings or investigations which relate to compliance with applicable Access Laws.

<div align="center">23</div>

(c)      Notwithstanding any other provision of this Section, Borrower shall not be deemed to be in default solely by reason of Borrower's failure to comply with any applicable Legal Requirement so long as, in Administrative Agent's judgment, each of the following conditions is satisfied: (i) Borrower is engaged in and diligently pursuing in good faith administrative or judicial proceedings appropriate to contest the validity or amount of such law, rule regulation or order; (ii) Borrower's compliance with such law, rule, regulation or order would necessarily and materially prejudice Borrower's prospects for success in such proceedings; (iii) noncompliance with any such law, rule, regulation or order will not result in the loss or forfeiture of the Project or any other collateral for the Loan or any interest of Administrative Agent therein or result in any fines or other punitive actions or any insurance coverage; and (iv) Borrower deposits with Administrative Agent, as security for any payment or performance which may ultimately be required, a sum equal to the amount of any fine, assessment or charge plus the interest, penalties, and other costs which Administrative Agent reasonably estimates are likely to become payable if Borrower's contest is unsuccessful. If Administrative Agent determines that any one or more of such conditions is not satisfied or is no longer satisfied, Borrower shall comply with the law, rule regulation or order in question, within thirty (30) days after Administrative Agent gives notice of such determination.

Section 5.2. <u>Maintenance and Use of Project</u>. Borrower shall maintain the Project in a good and safe condition and repair. The improvements and the Borrower's personal property required for the use of the Project shall not be removed, demolished or materially altered without the written consent of Administrative Agent; *provided*, *however*, that Administrative Agent's consent shall not be required (a) in connection with any removal, demolition or alteration permitted to be made by a Tenant under an Existing Lease without Borrower's consent under the applicable Existing Lease, or required to be made by Borrower under an Existing Lease, and (b) as otherwise set forth in <u>Section 5.19</u>. If under applicable zoning provisions the use of all or any portion of the Project is or shall become a nonconforming use, Borrower shall not cause or permit the nonconforming use to be discontinued or the nonconforming improvement to be abandoned without the express written consent of Administrative Agent. Borrower shall not establish any condominium or cooperative regime with respect to the Project without the prior written consent of Administrative Agent, nor shall Borrower initiate, join in or consent to any change in any private restrictive covenant, zoning ordinance or other public or private restrictions, limiting or defining the uses which may be made of the Project or any portion thereof.

Section 5.3. <u>Waste</u>. Borrower shall not commit or suffer any intentional material waste of the Project or make any change in the use of the Project which shall in any way invalidate or give cause for cancellation of any Policy, or do or permit to be done thereon anything that may in any way materially impair the value of the Project or the security for the Loan. Borrower shall not, without the prior written consent of Administrative Agent, which consent shall not be unreasonably withheld, permit any drilling or exploration for or extraction, removal, or production of any minerals from the surface or the subsurface of the Project, regardless of the depth thereof or the method of mining or extraction thereof, except as may be required by law or in accordance with the orders of any Governmental Authorities having jurisdiction thereof.

Section 5.4. <u>Taxes and Other Charges</u>.

(a)      Borrower shall pay, or cause to be paid, all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Project or any part thereof as the same become due and payable. Borrower shall furnish to Administrative Agent receipts for the payment of the Taxes and the Other Charges prior to the date the same shall become delinquent. Borrower shall not suffer and shall promptly pay and discharge or bond any Lien or charge whatsoever which may be or become a Lien or charge against the Project, and shall pay for all utility services provided to the Project prior to delinquency.

24

000645

(b)     Borrower shall not be obligated to make any deposit for Taxes as hereinafter provided until (i) Administrative Agent makes demand therefor following a Default and (A) any Tenant under a Material Leases is not paying such Taxes in accordance with the terms and provisions of its respective Material Lease, or (B) any Tenant under a Material Lease is in default under such Material Lease, or (ii) the continuance of an Event of Default hereunder of under any of the other Loan Documents. Upon the occurrence of the events described in clauses (i) and (ii) of the immediately preceding sentence, Borrower shall pay to Administrative Agent, upon the request of Administrative Agent, at the time of each payment of an installment of interest and/or principal under the Note, an additional amount which, together with all other such monthly payments, is sufficient to discharge the obligations for payment of Taxes and Other Charges one (1) month prior to the date the same shall become due. The determination of the amount so payable and of the fractional part thereof to be deposited with Administrative Agent, so that the aggregate of such deposits shall be sufficient for this purpose, shall be made by Administrative Agent in Administrative Agent's sole but reasonable discretion. Such amounts shall be held by Administrative Agent not as a trust fund and without interest (except as may be required by law) and shall be applied to the payment of the obligations in respect of which such amounts were deposited, in such order or priority as Administrative Agent shall determine, on or before the respective dates on which the same or any of them would become delinquent. During the continuance of an Event of Default, the balance of any such amounts held by Administrative Agent may be used and applied for any purpose authorized pursuant to this Agreement or any other Loan Document, including, without limitation, payment of the Debt in any order Administrative Agent may deem appropriate. If, one (1) month prior to the date any of the aforementioned Taxes or Other Charges may be paid without interest or penalty, the amounts then on deposit shall be insufficient for the payment of such obligation in full, Borrower shall, within ten (10) days after demand, deposit the amount of the deficiency with Administrative Agent. Nothing herein contained shall be deemed to affect any right or remedy of Administrative Agent or Lenders under any provisions of this Agreement or the Deed of Trust or of any statute or rule of law to pay any such amount and to add the amount so paid, together with interest at the Involuntary Rate, to the Debt. So long as Administrative Agent requires Borrower to pay Administrative Agent the deposits provided for in this paragraph and for so long as Borrower complies therewith, the obligation for direct payment of Taxes and Other Charges set forth in Subsection 5.4(a) hereof shall be suspended. Notwithstanding anything to the contrary contained herein, Administrative Agent shall not require Borrower to make such deposits for water and sewer charges if such charges are calculated on a metered basis.

(c)     Borrower shall pay or bond so as to remove as a lien of record, from time to time when the same shall become due, all lawful claims and demands of mechanics, materialmen, laborers, and others which, if unpaid, might result in, or permit the creation of, a lien on the Project or any part thereof, or on the revenues, rents, issues, income and profits arising therefrom and in general will do or cause to be done everything necessary so that the Liens of the Deed of Trust shall be fully preserved, at the sole cost and expense of Borrower and without expense to Administrative Agent or Lenders.

(d)     Notwithstanding any other provision of this Section, Borrower shall not be deemed to be in default solely by reason of Borrower's failure to pay any Taxes so long as, in Administrative Agent's sole judgment, reasonably exercised, each of the following conditions is satisfied:

(i)     Borrower or a Tenant is engaged in and diligently pursuing in good faith administrative or judicial proceedings appropriate to contest the validity or amount of such Tax;

(ii)     [Intentionally Omitted];

(iii)     Nonpayment of such Tax will not result in the loss or forfeiture of any property encumbered by the Deed of Trust or any of the other Loan Documents or any interest of Administrative Agent therein; and

(iv)     Borrower deposits with Administrative Agent, as security for such payment which may ultimately be required, a sum equal to the amount of the disputed Taxes plus the interest, penalties, and other costs which Administrative Agent reasonably estimates are likely to become payable if Borrower's contest is unsuccessful.

If Administrative Agent determines, in Administrative Agent's sole judgment, reasonably exercised, that any one or more of such conditions is not satisfied or is no longer satisfied, Borrower shall pay the Tax in question, together with any interest and penalties thereon, within ten (10) days after Administrative Agent gives notice of such determination.  After Administrative Agent has received evidence of such payment, Administrative Agent shall release any security held for such payment of Taxes pursuant to Section 5.4(d)(iv).

(e)     Borrower shall pay any taxes, except income, gross receipts and other taxes determined by reference to the amount of interest and other sums payable under the Loan Documents, imposed on Administrative Agent or Lenders by reason of Administrative Agent's or Lenders' ownership of this Agreement, the Note or the Deed of Trust as a result of any change in Legal Requirements (or any change in the application, interpretation or enforcement of existing Legal Requirements) effected after the date of this Agreement, provided that the Administrative Agent or applicable Lender shall at the time of assessing such taxes upon all of its similarly situated borrowers; provided further that Borrower shall not be required to pay any U.S. federal withholding taxes imposed under FATCA as a result of the failure by a Lender to comply with the applicable provisions of FATCA.

(f)     Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Accordingly, prior to the date that any Lender becomes a party hereto, such Lender shall deliver to the Borrower such certificates, documents or other evidence, as required by the IRS Code or Treasury Regulations issued pursuant thereto (including Internal Revenue Service Forms W-9, W-8ECI, W-8BEN, W-8BEN-E, W-8EXP and W-8IMY as applicable, or appropriate successor forms), properly completed, currently effective and duly executed by such Lender establishing that payments to it hereunder and under the Note are (i) not subject to United States Federal backup withholding tax and (ii) not subject to United States Federal withholding tax under the Internal Revenue Code.  Each such Lender shall (x) deliver further copies of such forms or other appropriate certifications on or before the date that any such forms expire or become obsolete and after the occurrence of any event requiring a change in the most recent form delivered to the Borrower and (y) obtain such extensions of the time for filing, and renew such forms and certifications thereof, as may be reasonably requested by the Borrower.

Section 5.5. Litigation. Borrower shall give prompt written notice to Administrative Agent of any litigation or governmental proceedings pending or threatened in writing against Borrower or Guarantor which might materially adversely affect Borrower's condition (financial or otherwise) or business or the Project of which Borrower has knowledge.

26

000647

Section 5.6. <u>Access to the Project</u>. Borrower shall permit agents, representatives and employees of Administrative Agent and Lenders to inspect the Project or any part thereof at reasonable hours upon reasonable advance written notice, except in the event of an emergency, in which case no advance notice is necessary.

Section 5.7. <u>Notice of Default</u>. Borrower shall promptly advise Administrative Agent of (a) any material adverse change in the condition (financial or otherwise) of Borrower or the Project, (b) the occurrence of an Event of Default under any Loan Document or (c) an "Event of Default" under any Mezzanine Loan Document (as defined therein).

Section 5.8. <u>Cooperate in Legal Proceedings</u>. Borrower shall, at Borrower's sole cost and expense, cooperate fully with Administrative Agent and Lenders with respect to any proceedings before any court, board or other Governmental Authority which may in any way affect the rights of Lenders hereunder or any rights obtained by Lenders under any of the other Loan Documents and, in connection therewith, permit Administrative Agent and Lenders, at Administrative Agent's or Lenders' sole election, to participate in any such proceedings.

Section 5.9. <u>Performance of Obligations</u>. Borrower shall in a timely manner observe, perform and fulfill each and every covenant, term and provision to be observed and performed by Borrower under this Agreement and the other Loan Documents and any other agreement or instrument affecting or pertaining to the Project and any amendments, modifications or changes thereto.

Section 5.10. <u>Awards; Insurance Proceeds</u>. Borrower shall cooperate with Lenders in obtaining for Lenders the benefits of any Awards or Insurance Proceeds lawfully or equitably payable in connection with the Project in accordance with the terms and provisions of the Loan Documents, and Administrative Agent and Lenders shall be reimbursed for any reasonable, third party expenses incurred in connection therewith (including attorneys' fees and disbursements) out of such Awards or Insurance Proceeds.

Section 5.11. <u>Financial Reporting</u>.

(a)　　　Borrower shall keep proper books of record and account with respect to the Project and its leases and subleases, in accordance with a modified accrual accounting method or such other method satisfactory to Administrative Agent and in a manner acceptable to Administrative Agent, in Administrative Agent's sole and reasonable discretion.

(b)　　　Borrower shall furnish to Administrative Agent the following:

(i)　　　within ninety (90) days after the close of each fiscal or calendar year of Borrower, as applicable, annual financial statements audited by a "Big Four" accounting firm, the Pre-Approved Accounting Firm, or other independent certified public accountant acceptable to Administrative Agent, which financial statements shall include, without limitation, a balance sheet, a statement of income and expenses, and a projected profit and loss statement for the next fiscal or calendar year, as applicable, disclosing all earnings and expenses with respect to Borrower and the Project (collectively, the "<u>Financial Statements</u>"), together with a certificate from an officer of Borrower certifying that such annual Financial Statements fairly present the financial condition of Borrower and the Project;

(ii)　　　within forty-five (45) days after the close of each quarter of its fiscal year, a quarterly statement including a balance sheet and statement of profits and losses with respect to the Project;

(iii)　　　copies of any operating statements or the like when Borrower is required to submit such information to any Governmental Authority;

27

(iv)     promptly following any request therefor, copies of any notices described in Section 101(j) of ERISA that Borrower or any of its Subsidiaries or ERISA Affiliates may provide with respect to any Benefit Plan, copies of any documents described in Section 101(k) of ERISA that Borrower or any of its Subsidiaries or ERISA Affiliates may request with respect to any Multiemployer Plan, copies of any notices described in Section 101(1) of ERISA that Borrower or any of its Subsidiaries or ERISA Affiliates may request with respect to any Multiemployer Plan and any information that Borrower or any of its Subsidiaries or ERISA Affiliates may request with respect to any Multiemployer Plan in connection with Section 4221(e) of ERISA; provided, that if Borrower or any of its Subsidiaries or ERISA Affiliates has not requested such documents or notices from the administrator or sponsor of the applicable Benefit Plan or Multiemployer Plan, Borrower, the Subsidiary or the ERISA Affiliate, as applicable, shall promptly, upon the request of Administrative Agent, make a request for such documents or notices from such administrator or sponsor and shall provide copies of such documents and notices promptly after receipt thereof; and

(v)     such other information respecting the business, properties or the condition or operations, financial or otherwise, of Borrower and/or the Project as Administrative Agent may from time to time reasonably request.

(c)     All Financial Statements and other deliverables of Borrower required under this Section 5.11 shall be (i) prepared in accordance with generally accepted accounting principles or such other method satisfactory to Administrative Agent, (ii) delivered in duplicate, and (iii) certified by Borrower as being true, complete and correct.

Section 5.12. Estoppel Statement. After request by Administrative Agent, Borrower shall within fifteen (15) Business Days furnish Administrative Agent with a statement, duly acknowledged and certified, setting forth (i) the amount of the original principal amount of the Note, (ii) the rate of interest on the Note, (iii) the unpaid principal amount of the Note, (iv) the date installments of interest were last paid, (v) any offsets or defenses to the payment of the Debt, if any, and (vi) that the Note, this Agreement, the Deed of Trust and the other Loan Documents are valid, legal and binding obligations and have not been modified or if modified, giving particulars of such modification. In the event any Governmental Authority requires the same, Lenders shall deliver a similar statement to Borrower.

Section 5.13. Management of Project. In the event a Management Agreement shall be in effect at any time, Borrower hereby covenants and agrees as follows:

(a)     Borrower shall (i) promptly perform and observe all of the covenants required to be performed and observed by Borrower under the Management Agreement and do all things necessary to preserve and to keep unimpaired Borrower's material rights thereunder; (ii) promptly notify Administrative Agent of any material default under the Management Agreement of which Borrower is aware; (iii) promptly deliver to Administrative Agent a copy of any notice of default or other material notice received by Borrower under the Management Agreement; and (iv) promptly enforce the performance and observance of all of the covenants required to be performed and observed by Manager under the Management Agreement.

(b)     If at any time, (i) a Manager shall become insolvent or a debtor in a bankruptcy proceeding, (ii) an Event of Default has occurred and is continuing or (iii) a default has occurred and is continuing under the Management Agreement and Borrower has the right thereunder to terminate the Management Agreement on account thereof, Borrower shall, at the request of Administrative Agent, terminate the applicable Management Agreement upon thirty (30) days prior notice to such Manager and replace such Manager with a Qualified Manager (without the need for the approval of Administrative

000649

Agent) or a manager selected by Borrower and approved in writing by Administrative Agent, in Administrative Agent's reasonable discretion.

(c)     Borrower shall not, without the prior written consent of Administrative Agent, which consent shall not be unreasonably withheld, (i) surrender, terminate or cancel the Management Agreement or otherwise replace any Manager or enter into any other management agreement with respect to the Project; (ii) reduce or consent to the reduction of the term of the Management Agreement; (iii) increase or consent to the increase of the amount of any charges under the Management Agreement; or (iv) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under, the Management Agreement in any material respect. In the event that Borrower replaces a Manager at any time during the term of Loan pursuant to this subsection, such Manager shall be approved by Administrative Agent in writing.

(d)     Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Manager initially named in this Agreement may (i) transfer its interest in any Management Agreement for the management of the Project to any Affiliate of such Manager, (ii) transfer shares or equity interests in Manager or Manager's equity owners (including, without limitation, the issuance of treasury stock, or the creation or issuance of a new class of stock or membership interests, in either case in the context of an initial public offering or in the context of a subsequent offering of equity securities), (iii) sell all or substantially all of such Manager's assets, and (iv) merge or consolidate with another entity without, in each case, the approval of Administrative Agent or the same constituting an Event of Default under this Agreement; *provided*, *however*, if any of the actions described in clauses (ii), (iii) or (iv) shall cause such Manager to be unable to perform the functions required to be performed and observed by Manager under the Management Agreement, Borrower shall, at the request of Administrative Agent, terminate the applicable Management Agreement upon thirty (30) days prior notice to such Manager and replace such Manager with a Qualified Manager (without the need for the approval of Administrative Agent) or a manager selected by Borrower and approved in writing by Administrative Agent, in Administrative Agent's reasonable discretion.

(e)     Notwithstanding anything to the contrary contained herein or in any other Loan Document, the resignation, removal or replacement of Manager shall not be an Event of Default under this Agreement or require the approval of Administrative Agent so long as Borrower shall appoint or retain a substitute Manager that is a Qualified Manager.

Section 5.14. Liens. Borrower shall not, without the prior written consent of Administrative Agent, create, incur, assume or suffer to exist any Lien on any portion of the Project or permit any such action to be taken, other than the Permitted Encumbrances, the Deed of Trust, the Assignment of Leases and Rents and any other liens created by the Loan Documents. Neither Borrower nor any other Person shall take any action that would impair the Lien created under this Agreement, the Deed of Trust or any other Loan Document.

Section 5.15. Debt Cancellation. Borrower shall not cancel or otherwise forgive or release any claim or debt owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business, other than rent abatements or concessions in the ordinary course of business.

Section 5.16. Zoning. Borrower shall not initiate or affirmatively consent to any zoning classification or reclassification of any portion of the Project or seek any variance under any existing or future zoning ordinance or use or permit the use of any portion of the Project in any manner that could result in such use becoming a non-conforming use under any zoning ordinance or any other applicable land use law, rule or regulation, without the prior consent of Administrative Agent.

Section 5.17. ERISA. Borrower covenants and agrees to deliver to Administrative Agent such certifications or other evidence from time to time throughout the term of the Loan, as reasonably requested by Administrative Agent that Borrower is not and will not be a Benefit Plan Investor.

Section 5.18. No Joint Assessment. Borrower shall not suffer, permit or initiate the joint assessment of the Property with (a) any other real property constituting a tax lot separate from the Property, or (b) any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the Lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to the Property.

Section 5.19. Alterations. Administrative Agent's prior written approval shall be required in connection with any material alterations to any improvements at or on the Project, except for (a) alterations to Tenant spaces required to be undertaken by Borrower under a Lease, or permitted to be undertaken by such Tenant without Borrower's consent under its Lease, (b) alterations required by Legal Requirements, and (c) ordinary non-structural improvements, alterations and maintenance and structural repairs, the cost of which is $750,000 or less (in the aggregate in any twelve (12) month period). With respect to an Existing Lease, to the extent that Administrative Agent's prior approval is required under this Section 5.19, Administrative Agent shall grant or withhold its consent to any alterations proposed thereunder subject to the standard of consent applicable to the landlord under the applicable Existing Lease.

Section 5.20. Reciprocal Easement Agreement. Borrower shall not enter into any reciprocal easement agreement without Administrative Agent's prior written consent.

Section 5.21. Notices. Borrower shall give notice, or cause notice to be given, to Administrative Agent promptly upon the occurrence, or the receipt of notice, of:

(a) any Event of Default or, to Borrower's knowledge, any event that would with the giving of notice or passage of time would constitute an Event of Default;

(b) any default or event of default under any Contractual Obligation of Borrower that, to the knowledge of Borrower, could reasonably be expected to have a material adverse effect on Borrower, the ability of Borrower to perform Borrower's obligations under the Loan Documents or the rights and remedies of Lenders under the Loan Documents;

(c) any material litigation or proceeding affecting Borrower, Guarantor or the Project but only to the extent such litigation could be reasonably expected to have a material adverse effect on Borrower, Guarantor or the Project, the ability of Borrower or Guarantor to perform their obligations under the Loan Documents or the rights and remedies of Lenders under the Loan Documents;

(d) a change in the business, operations or financial or other condition or prospects of Borrower or Guarantor which could reasonably be expected to have a material adverse effect on Borrower the ability of Borrower or such Guarantor to perform Borrower's or such Guarantor's obligations under the Loan Documents or the rights and remedies of Administrative Agent and Lenders under the Loan Documents; or

(e) any ERISA Event.

Section 5.22. Curing. Administrative Agent and Lenders shall have the right, but shall not have the obligation, following ten (10) days' notice to Borrower and an opportunity to cure, to exercise Borrower's rights to satisfy or fully bond over any Liens, claims or judgments against the Project. Borrower shall reimburse Lenders and Administrative Agent on demand for any and all actual costs

incurred by Lenders or Administrative Agent in connection with satisfying any Liens, claims or judgments against the Project.

Section 5.23. <u>Limitation on Securities Issuances</u>. None of Borrower or any of Borrower Members shall issue any additional membership interests or other securities, other than those that have been issued as of the Closing Date to the extent that such issuance would violate the provisions of <u>Section 7.2</u>, without the prior written consent of Administrative Agent, which consent may be withheld by Administrative Agent in Administrative Agent's sole and absolute discretion. For the avoidance of doubt, this <u>Section 5.23</u> shall not apply to the issuance, reissuance or replacement of certificates evidencing membership interests existing as of the Closing Date in accordance with the Mezzanine Loan Documents.

Section 5.24. <u>Limitations on Distributions</u>. Following the occurrence and during the continuance of (i) an Event of Default or (ii) a default by Borrower or the Key Tenant under the Key Tenant Lease, Borrower shall not make any distributions to Sole Member or any Borrower Members or any other Person. Except as aforesaid, there shall be no limitation on the making of any distributions to Borrower Members so long as no Event of Default or default under the Key Tenant Lease shall have occurred and be continuing.

Section 5.25. <u>Contractual Obligations</u>. Other than the Loan Documents, the Mezzanine Loan Documents, the Borrower Operating Agreement (and the membership interests in Borrower issued pursuant thereto) and the other documents described in <u>Section 4.24</u>, neither Borrower nor any of Borrower's assets shall be subject to any Contractual Obligations, and Borrower shall not enter into any agreement, instrument or undertaking by which Borrower or Borrower's assets are bound, other than those Contractual Obligations to operate, manage and Lease the Project that are necessary and customary for properties similar to the Project.

Section 5.26. <u>Additional Indebtedness</u>. Except as provided in <u>Section 6.1(g)</u> hereof, Borrower shall not suffer or incur any additional debt, obligations as lessee under a capitalized lease or contingent liabilities without the prior written consent of Administrative Agent, which consent may be withheld by Administrative Agent in Administrative Agent's sole and absolute discretion.

Section 5.27. <u>Restrictions on Leasing</u>. Borrower shall (i) not execute a Material Lease which shall not have been submitted to and approved by Administrative Agent except for Telecom Leases, (ii) not alter, modify or change the terms of any Material Lease except in the ordinary course of business and provided such alteration, modification or change does not have a material adverse financial effect on Borrower, (iii) not give any consent or exercise any option unless required by the terms of any Lease approved by Administrative Agent, (iv) not cancel or terminate any Material Lease or accept a surrender or tenant buyout thereof except in the event of default by the Tenant thereunder, (v) not consent to any assignment of or subletting under any Material Lease, unless the same shall be in accordance with its terms and such terms have been approved by Administrative Agent, (vi) not collect any of the rents, income and profits arising or accruing under any Leases or from Project for more than one (1) month in advance of the time when the same shall become due, (vii) not execute any other assignment of Borrower's interest in the Leases or any assignment of rents arising or accruing from the Leases or from the Project; (viii) observe and promptly and faithfully perform or cause to be performed all of the covenants, conditions and agreements contained in all Leases in all material respects, (ix) at all times do all things reasonably necessary in the exercise of sound business judgment to compel performance by the lessee under each Lease of all obligations, covenants and agreements by such lessee to be performed thereunder, (x) not do or permit to be done anything to materially impair the security of any Lease, (xi) at Administrative Agent's request, assign and transfer to Administrative Agent any and all subsequent Leases upon all or any part of the Project, and (xii) execute and deliver at the reasonable request of Administrative Agent all such further assurances and assignments in the Project as Administrative Agent

shall from time to time require. None of the foregoing restrictions set forth in clauses (i) through (vii) of this Section shall be done or suffered to be done without in each instance obtaining the prior written consent of Administrative Agent, and any of such acts done without the prior written consent of Administrative Agent shall be null and void. For purposes of clarity, the Existing Leases and the terms therein have been approved by Administrative Agent.

(a)   Tenant Estoppel Certificates. Borrower shall deliver to Administrative Agent upon the written request of Administrative Agent (made not more often than once in any calendar year), an updated tenant estoppel certificate from any Tenant at the Project addressed to Administrative Agent, in form and substance satisfactory to Administrative Agent in all respects.

(b)   Copies of Leases. Within ten (10) Business Days of any such request, Borrower shall submit to Administrative Agent or Administrative Agent's counsel true and complete copies of all Leases for the Project including all amendments thereto or extensions thereof, and any guarantees thereof.

(c)   Subordination and Attornment. Each Lease hereafter entered into shall be subordinate to the lien of the Deed of Trust, to all advances under the Deed of Trust and to any renewals, extensions, modifications or consolidations thereof, and shall provide that, in the event of the enforcement by Lenders of the remedies provided for by law, by this Agreement or by the Deed of Trust, the lessee thereunder shall, upon request of any Person succeeding to the interest of Borrower as a result of such enforcement, automatically become the lessee of and shall attorn to said successor in interest, without change in the terms or other provisions of such Lease; provided, however, that said successor in interest shall not be bound by (i) any payment of rent or additional rent for more than one (1) month in advance, except prepayments in the nature of security for the performance by said lessee of its obligations under said Lease, or (ii) any amendment or modification of the Lease made without the consent of Administrative Agent or such successor in interest, unless such consent is not required pursuant to this Section 5.27. Each Lease shall also provide that, upon request by said successor in interest, such lessee shall execute and deliver an instrument or instruments confirming such attornment. Administrative Agent, on behalf of Lenders, shall enter into a commercially reasonable SNDA with Tenants under future Leases upon request, from time to time.

Section 5.28. Debt Service Coverage Ratio.

(a)   At all times during the term of the Loan, the Project must maintain a minimum debt service coverage ratio ("DSCR") of 1.20:1.00 ("DSCR Threshold"). The DSCR shall be tested on an annual basis commencing on December 31, 2018 and on each December 31 thereafter during the term of the Loan. The DSCR shall be calculated as the ratio of (i) Net Operating Income for the prior twelve-month period immediately preceding the measurement date, to (ii) actual scheduled principal and interest payments under the Loan for the prior trailing twelve-month period immediately preceding the measurement date. With respect to the calculation of DSCR as aforesaid, until the first (1st) anniversary of the Closing Date, Debt Service and Net Operating Income shall be calculated on the basis of actual Debt Service and Net Operating Income for such partial year period and such amounts shall be annualized by Administrative Agent for purposes of calculating the DSCR.

(b)   The certificate of Administrative Agent as to any DSCR calculation shall, absent manifest error, be final, conclusive and binding on Borrower.

(c)   If, on any annual measurement date, the DSCR is below the DSCR Threshold, Borrower may, at Borrower's option, pay down the Loan (without payment of any Prepayment Premium) by an amount necessary for Borrower to effectively achieve the DSCR Threshold immediately following delivery of such pay down (any amount so paid down may not be reborrowed). Borrower shall deliver the pay down to Administrative Agent within fifteen (15) days following notice from Administrative Agent

32

000653

that such DSCR Threshold has not been met. Borrower's failure to deliver the pay down within such time period such that DSCR Threshold is achieved shall be an Event of Default.

Section 5.29. <u>Loan-to-Value Ratio</u>.

(a)    The Project must maintain a maximum loan-to-value ratio ("<u>LTVR</u>") of 60.0% ("<u>LTVR Threshold</u>") at all times. The LTVR shall be tested by Administrative Agent on an annual basis, commencing on December 31, 2018 and on each December 31 thereafter during the term of the Loan, and shall be calculated as the ratio of (i) the outstanding principal balance under the Loan *to* (ii) the Appraised Value of the Project. For the purpose of this covenant, "<u>Appraised Value</u>" shall mean the market value of the Project according to the latest FIRREA appraisal performed by an appraiser appointed by Borrower and reasonably acceptable to Administrative Agent, which appraisals shall be performed annually by December 31st of each calendar year.

(b)    The certificate of Administrative Agent as to any LTVR calculation shall, absent manifest error, be final, conclusive and binding on Borrower.

(c)    If, on any measurement date, the LTVR exceeds the LTVR Threshold, Borrower may, at Borrower's option, pay down the Loan (without payment of any Prepayment Premium) by an amount necessary for Borrower to effectively achieve the LTVR Threshold immediately following delivery of such pay down (any amount so paid down may not be reborrowed). Borrower shall deliver the pay down to Administrative Agent within fifteen (15) days following notice from Administrative Agent that the LTVR Threshold has not been achieved. Borrower's failure to deliver the pay down within such time period such that LTVR Threshold is achieved shall be an Event of Default.

Section 5.30. <u>UCC Searches</u>. Borrower and Guarantor hereby agree that Administrative Agent shall have the right to order UCC, judgment and lien searches against Borrower and Guarantor at any time at Borrower's sole cost and expense. Borrower shall also be responsible for all actual out-of-pocket costs incurred by Administrative Agent to continue the UCC-1 Financing Statements delivered by Borrower in favor of Administrative Agent from time to time.

Section 5.31. <u>Updated/New Appraisal</u>. Borrower hereby acknowledges and agrees that Borrower shall order (or, at Administrative Agent's election, Administrative Agent may order) an updated or new appraisal of the Project (a) annually, in connection with Administrative Agent's test of the LTVR Threshold, at Borrower's sole cost and expense, (b) upon the occurrence of an Event of Default, at Borrower's sole cost and expense, and (c) at any other time, at Administrative Agent's sole cost and expense. Any such appraisal shall be performed by an appraiser appointed by Borrower and reasonably acceptable to Administrative Agent, and Administrative Agent may from time to time require that the appraiser who performs a particular appraisal be different than the appraiser who performed the prior appraisal.

Section 5.32. <u>Interest Reserve Account</u>. Borrower shall maintain the Interest Reserve Account for the term of the Loan, which Interest Reserve Account shall be under the sole dominion and control of Administrative Agent. The Interest Reserve Account shall have a title evidencing the foregoing in a manner reasoning acceptable to Administrative Agent. Borrower hereby grants to Administrative Agent, for the benefit of Lenders, a first-priority security interest in the Interest Reserve Account and all deposits at any time contained therein and the proceeds thereof and will take all actions necessary to maintain in favor of Administrative Agent, for the benefit of Lenders, a perfected first priority security interest in the Interest Reserve Account. All costs and expenses for establishing and maintaining the Interest Reserve Account (or any successor thereto) shall be paid by Borrower. All monies now or hereafter deposited into the Interest Reserve Account shall be deemed additional security for the Debt. Borrower shall not alter or modify the Interest Reserve Account without the prior written consent of Administrative Agent.

33

Borrower shall not draw upon the Interest Reserve Account during the term of the Loan (for the purpose of making interest payments or otherwise). Upon the occurrence of an Event of Default due to Borrower's failure to timely make any interest payment, Administrative Agent shall apply funds on deposit in the interest reserve against amounts owing to Lenders under this Agreement, and shall notify Borrower whether sufficient funds were available in the Interest Reserve Account to cure such Event of Default. For the avoidance of doubt, Borrower shall be required to make separate interest payments pursuant to the terms of the Note, regardless of whether there are funds in the Interest Reserve Account on deposit with Administrative Agent.

Section 5.33. <u>Mezzanine Loan</u>. Borrower shall not cause, suffer or permit Mezzanine Borrower to enter into any cancellation, termination, modification, change, supplement, restatement, alteration or amendment of any Mezzanine Loan Document. Without limitation of any other covenant set forth in this Agreement, Borrower shall deliver to Administrative Agent, within two (2) Business Days, any notice of default or other material notice, statement or report given or received by any party under the Mezzanine Loan Documents.

<div align="center">

ARTICLE VI
ENTITY COVENANTS
</div>

Section 6.1. <u>Single Purpose Entity/Separateness</u>. Until the Debt has been paid in full, Borrower represents, warrants and covenants that Borrower has not and shall not:

(a)     engage in any business or activity other than the ownership of the Project and any activities incidental thereto;

(b)     acquire or own any assets other than (i) the Project, and (ii) such incidental personal property as may be necessary for the ownership of the Project;

(c)     merge into or consolidate with any Person, or dissolve, terminate, liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure;

(d)     fail to observe all organizational formalities or fail to preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the applicable Legal Requirements of the jurisdiction of its organization or formation, or amend, modify, terminate or fail to comply with the provisions of its Organizational Documents;

(e)     form or own any Subsidiary or make any investment in any Person;

(f)     commingle its assets with the assets of any other Person;

(g)     incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation) other than (i) the Loan and/or (ii) trade and operational indebtedness incurred in the ordinary course of business with trade creditors, provided such indebtedness is (A) unsecured, (B) not evidenced by a note, (C) on commercially reasonable terms and conditions, and (D) due not more than ninety (90) days past the date incurred and paid on or prior to such date;

(h)     fail to maintain its records, books of account, bank accounts, financial statements, accounting records and other entity documents separate and apart from those of any other Person;

(i)     enter into any contract or agreement with any general partner, member, shareholder, principal, guarantor of the obligations of Borrower or any Affiliate of the foregoing, except

<div align="center">34</div>

upon terms and conditions that are intrinsically fair, commercially reasonable and substantially similar to those that would be available on an arm's length basis with unaffiliated third parties;

(j)  maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(k)  assume or guaranty the debts of any other Person, hold itself out to be responsible for the debts of any other Person, or otherwise pledge its assets for the benefit of any other Person or hold out its credit as being available to satisfy the obligations of any other Person, provided however, that this subsection (k) shall not be deemed to prohibit Borrower from pledging assets to secure its own obligations as required or permitted by the Loan Documents;

(l)  make (i) any loans or (ii) any advances (except with respect to distributions to its shareholders, partners or members, as applicable, which are not otherwise prohibited under this Agreement) to any Person;

(m)  fail to file its own tax returns or file a consolidated federal income tax return with any Person (unless prohibited or required, as the case may be, by applicable Legal Requirements);

(n)  fail either to hold itself out to the public as a legal entity separate and distinct from any other Person or to conduct its business solely in its own name or fail to correct any known misunderstanding regarding its separate identity;

(o)  fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations; *provided*, *however*, in no event shall this subsection (o) require any equity owner to make additional capital contributions to Borrower (it being acknowledged, however, that a failure of Borrower to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations shall be a Default hereunder irrespective of such equity owner's lack of an obligation to make additional capital contributions to Borrower);

(p)  (i) file or consent to the filing of any petition, either voluntary or involuntary, to take advantage of any Creditors' Rights Laws (unless filed by Administrative Agent), (ii) seek or consent to the appointment of a receiver, liquidator or any similar official, (iii) take any action that might cause such entity to become insolvent, or (iv) make an assignment for the benefit of creditors;

(q)  fail to allocate shared expenses (including, without limitation, shared office space and services performed by an employee of an Affiliate) among the Persons sharing such expenses and to use separate invoices and checks;

(r)  fail to remain solvent or pay its own liabilities (including, without limitation, salaries of its own employees) only from its own funds; *provided*, *however*, in no event shall this subsection (r) require any equity owner to make additional capital contributions to Borrower (it being acknowledged, however, that a failure of Borrower to remain solvent or pay its own liabilities (including, without limitation, salaries of its own employees) only from its own funds shall be a Default hereunder irrespective of such equity owner's lack of an obligation to make additional capital contributions to Borrower); and

(s)  acquire obligations or securities of its partners, members, shareholders or other affiliates, as applicable.

Section 6.2. <u>Change of Name, Identity or Structure</u>. Borrower shall not change or permit to be changed (a) Borrower's name, (b) Borrower's identity (including Borrower's trade name or names), (c)

4161624-v7\CHIDMS1

Borrower's principal place of business set forth on the first page of this Agreement, the Deed of Trust or any UCC-1 Financing Statements, (d) the corporate, partnership, limited liability company or other organizational structure of Borrower, (e) Borrower's state of organization, or (f) Borrower's organizational identification number, without in each case notifying Administrative Agent of such change in writing at least thirty (30) days prior to the effective date of such change and, in the case of a change in Borrower's structure, without first obtaining the prior written consent of Administrative Agent. In addition, Borrower shall not change or permit to be changed any Organizational Documents of such person if such change would adversely impact the covenants set forth in <u>Section 6.1</u> hereof. Borrower shall execute and deliver to Administrative Agent, prior to or contemporaneously with the effective date of any such change, any financing statement or financing statement amendment reasonably required by Administrative Agent to establish or maintain the validity, perfection and priority of the security interest granted herein. At the request of Administrative Agent, Borrower shall execute a certificate in form satisfactory to Administrative Agent listing the trade names under which Borrower intends to operate under, and representing and warranting that Borrower does business under no other trade name. If Borrower does not now have an organizational identification number and later obtains one, or if the organizational identification number assigned to Borrower subsequently changes, Borrower shall promptly notify Administrative Agent of such organizational identification number or change.

Section 6.3. <u>Business and Operations</u>. Borrower shall remain in good standing under the laws of each State as, and to the extent, the same are required for the ownership, maintenance, management and operation of the Project. Borrower shall not enter into any line of business other than the ownership of the Project and ancillary purposes in connection therewith, or make any material change in the scope or nature of its business objectives, purposes or operations, or undertake or participate in activities other than the continuance of its present business.

<div align="center">

ARTICLE VII
NO SALE OR ENCUMBRANCE

</div>

Section 7.1. <u>Transfer Definitions</u>. For purposes of this <u>Article VII</u>, an "<u>Affiliated Manager</u>" shall mean any managing agent in which Borrower, Guarantor or any Affiliate of such Persons has directly or indirectly, any legal, beneficial or economic interest; "<u>Control</u>" shall mean, for any Person, the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities or other beneficial interests, by contract or otherwise; "<u>Restricted Party</u>" shall mean Borrower, any Affiliated Manager, or any shareholder, partner, member or non-member manager, or any direct or indirect legal or beneficial owner of Borrower, any Affiliated Manager, or any non-member manager; and a "<u>Sale or Pledge</u>" shall mean a voluntary or involuntary sale, conveyance, mortgage, grant, bargain, encumbrance, lien, pledge, assignment, grant of any options with respect to, or any other transfer or disposition of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) a legal or beneficial interest.

Section 7.2. <u>No Sale/Encumbrance</u>.

(a) Other than Permitted Transfers, until the Debt is paid in full, Borrower shall not cause or permit a Sale or Pledge of the Project or any part thereof or any legal or beneficial interest therein nor permit a Sale or Pledge of an interest in any Restricted Party (in each case, a "<u>Prohibited Transfer</u>") without the prior written consent of Administrative Agent, which shall not be unreasonably withheld, conditioned or delayed.

(b) A Prohibited Transfer shall include, but not be limited to, (i) an installment sales agreement wherein Borrower agrees to sell the Project or any part thereof for a price to be paid in installments; (ii) an agreement by Borrower leasing all or a substantial part of the Project for other than

<div align="center">36</div>

actual occupancy by a space tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in Borrower's right, title and interest in and to any leases or any rents; (iii) if a Restricted Party is a corporation, any merger, consolidation or Sale or Pledge of such corporation's stock or the creation or issuance of new stock in one or a series of transactions; (iv) if a Restricted Party is a limited or general partnership or joint venture, any merger or consolidation or the change, removal, resignation or addition of a general partner or the Sale or Pledge of the partnership interest of any general or limited partner or any profits or proceeds relating to such partnership interests or the creation or issuance of new partnership interests; (v) if a Restricted Party is a limited liability company, any merger or consolidation or the change, removal, resignation or addition of a managing member or non-member manager (or if no managing member, any member) or the Sale or Pledge of the membership interest of any member or any profits or proceeds relating to such membership interest; (vi) if a Restricted Party is a trust, any merger, consolidation or the Sale or Pledge of the legal or beneficial interest in a Restricted Party or the creation or issuance of new legal or beneficial interests; (vii) the removal or the resignation of a Manager (including, without limitation, an Affiliated Manager) other than in accordance with <u>Section 5.13</u> hereof.

Section 7.3. <u>Administrative Agent's Rights</u>. Administrative Agent reserves the right to condition the consent to a Prohibited Transfer requested hereunder upon (a) a modification of the terms hereof and an assumption of the Note and the other Loan Documents as so modified by the proposed transferee, (b) receipt of payment of a transfer fee equal to $5,000 and all of Lenders' and Administrative Agent's out-of-pocket expenses actually incurred in connection with such Prohibited Transfer, (c) to the extent applicable to such proposed transferee, the proposed transferee's continued compliance with the covenants set forth in this Agreement (including, without limitation, the covenants in <u>Article VI</u> and the other Loan Documents), (d) a new manager for the Project and a new management agreement satisfactory to Administrative Agent (if applicable), and (e) the satisfaction of such other conditions and/or legal opinions as Administrative Agent shall determine in Administrative Agent's reasonable discretion to be in the interest of Lenders. All reasonable expenses incurred by Lenders and Administrative Agent shall be payable by Borrower whether or not Administrative Agent consents to the Prohibited Transfer. Lenders shall not be required to demonstrate any actual impairment of Lenders' security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon a Prohibited Transfer made without Administrative Agent's prior written consent. This provision shall apply to each and every Prohibited Transfer, whether or not Administrative Agent has consented to any previous Prohibited Transfer.

Section 7.4. <u>Assumption</u>. Other than as expressly permitted in this Agreement, Borrower hereby acknowledges and agrees that no transfer of all or any portion of the Project to, and the related assumption of the Loan by, any Person shall be permitted under this Agreement.

<div align="center">ARTICLE VIII<br>INSURANCE; CASUALTY; CONDEMNATION; RESTORATION</div>

Section 8.1. <u>Insurance</u>.

(a)        Borrower shall obtain and maintain at all times policies of insurance as follows:

(i)        comprehensive "all risk" or "special causes of loss" insurance, including, without limitation, fire, flood, earthquake, terrorism, vandalism, malicious mischief and such other hazards as may be reasonably specified by Administrative Agent for the mutual benefit of Borrower and Administrative Agent and which is customarily maintained for like properties, including the improvements and the fixtures (other than trade fixtures) at the Project, in each case (A) in an amount equal to one hundred percent (100%) of the "Full Replacement Cost," which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of excavations, foundations,

<div align="center">37</div>

000658

underground utilities and footings) and provided that earthquake and flood may have a sub limit reasonably acceptable to Administrative Agent; (B) containing a replacement cost endorsement and an agreed amount endorsement with respect to such improvements and fixtures (other than trade fixtures) and/or an endorsement waiving all coinsurance provisions; (C) providing for no deductible in excess of $100,000 or such other amount reasonably acceptable to Administrative Agent, for all such insurance coverage; and (D) if any of the improvements or the use of the Project shall at any time constitute legal nonconforming structures or uses, providing coverage for contingent liability from Operation of Building Laws, Demolition Costs and Increased Cost of Construction Endorsements and containing an "Ordinance or Law Coverage" or "Enforcement" endorsement. In addition, Borrower shall obtain, or cause to be obtained: (x) if any portion of the improvements is currently or at any time in the future located in a "special flood hazard area" designated by the Federal Emergency Management Agency, flood hazard insurance in an amount equal to $10,000,000 in excess of the maximum amount of such insurance available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended; and (y) earthquake insurance in amounts and in form and substance reasonably satisfactory to Administrative Agent as determined by a probable maximum loss study or other acceptable assessment of expected maximum loss, not to exceed the amount of indebtedness, in the event the Project is located in an area with a high degree of seismic risk provided that the insurance pursuant to clauses (x) and (y) hereof shall be on terms consistent with the comprehensive all risk insurance policy required under this subsection (i) and further provided that regardless of the flood or seismic zone, Administrative Agent may require reasonable limits of insurance covering such risks;

(ii)     Commercial General Liability insurance against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Project, with such insurance (A) to be on the so-called "occurrence" form with a general aggregate limit of not less than $2,000,000 per location and a per occurrence limit of not less than $1,000,000; (B) to continue at not less than the aforesaid limit until required to be changed by Administrative Agent in writing by reason of changed economic conditions making such protection inadequate; and (C) to cover at least the following hazards: (1) premises and operations; (2) products and completed operations; (3) independent contractors; and (4) contractual liability;

(iii)     loss of rents insurance or business income insurance, as applicable, (A) covering all risks required to be covered by the insurance provided for in subsection (i) above; (B) which provides that after the physical loss to the improvements and fixtures (other than trade fixtures) occurs, the loss of rents or income, as applicable, will be insured until such completion of Restoration and notwithstanding that the policy may expire prior to the end of such period; and (C) which contains an extended period of indemnity endorsement which provides that after the physical loss to the improvements and personal property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of at least six (6) months from the date that the Project is repaired or replaced and operations are resumed, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period. The amount of such loss of rents or business income insurance, as applicable, shall be determined prior to the date hereof and at least once each year thereafter based on Borrower's reasonable estimate of the gross income from the Project for the succeeding period of coverage required above. All proceeds payable to Lenders pursuant to this subsection shall be held by Lenders and shall be applied to the obligations secured by the Loan Documents with any remaining balance promptly payable to Borrower; *provided*, *however*, that nothing herein contained shall be deemed to relieve Borrower of Borrower's obligations to pay the obligations secured by the Loan Documents on the respective dates of payment provided for in the Note, this Agreement and the other Loan Documents except to the extent such amounts are actually paid out of the proceeds of such loss of rents or business income insurance, as applicable;

38

000659

(iv)     at all times during which structural construction, demolition, structural repairs or structural alterations are being made with respect to the improvements, and only if the property coverage form does not otherwise apply,

(A)     owner's contingent or protective liability insurance covering claims not covered by or under the terms or provisions of the above mentioned commercial general liability insurance policy;

(B)     the insurance provided for in subsection (i) above written in a so-called Builder's Risk Completed Value form (1) on a non-reporting basis, (2) against "all risks" insured against pursuant to subsection (i) above, (3) including permission to occupy the Project, (4) with an agreed amount endorsement waiving co-insurance provisions, and (5) including coverage for so-called "soft costs" and delayed completion loss of income; and

(C)     Borrower shall ensure, or cause to be insured, that the general contractor maintains (1) commercial general liability coverage, including products and completed operations coverage that shall be continuously renewed for the statutory period during which claims can be made following completion of the project, (2) automobile liability insurance (including owned, hired and non-owned liability) and (3) umbrella/excess liability insurance with no less than $25,000,000, or such other amount reasonably acceptable to Administrative Agent, in limits per occurrence and in the annual aggregate per project, and in addition Borrower shall ensure, or cause to be insured, that all trade contractors provide similar liability insurance coverage with umbrella liability limits that are commensurate with the risks presented by their operations at the site as determined by the general contractor. All parties engaged in work on the improvements or on any restoration shall maintain any workers' compensation and employer's liability insurance required by law in force for all workers on the job. A certificate of insurance shall be issued to Borrower and Administrative Agent, naming each as Additional Insured (except with respect to workers' compensation and employer's liability), and evidencing all insurance required in this subsection. Borrower and Administrative Agent shall be named as Additional Insured with respect to the general contractor's ongoing operations and completed operations by endorsements satisfactory to Administrative Agent. Such insurance shall be primary and any other insurance maintained by the additional insured shall be excess only and not contributing with this insurance;

(v)     workers' compensation, subject to the statutory limits of the State, and employer's liability insurance in respect of any work or operations on or about the Project, or in connection with the Project or its operation (if applicable);

(vi)     comprehensive boiler and machinery insurance, if applicable, in amounts as shall be reasonably required by Administrative Agent on terms consistent with the commercial property insurance policy required under subsection (i) above;

(vii)     excess liability insurance in an amount not less than $25,000,000 per occurrence and in the aggregate per location, or such other amount reasonably acceptable to Administrative Agent, per occurrence and per location, on terms consistent with the commercial general liability insurance required under subsection (ii) above; and

(viii)     upon sixty (60) days' written notice, such other reasonable insurance and in such reasonable amounts as Administrative Agent from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for property similar to the Project located in or around the region in which the Project is located.

4161624-v7\CHIDMS1

000660

(b)     All insurance provided for in <u>Section 8.1(a)</u> hereof shall be obtained under valid and enforceable policies (collectively, the "<u>Policies</u>" or in the singular, the "<u>Policy</u>"), and shall be in such forms and in such amounts as required above, and shall be subject to the reasonable approval of Administrative Agent as to insurance companies, amounts, deductibles, loss payees and insureds. The Policies shall be issued by financially sound and responsible insurance companies authorized to do business in the State and having a claims paying ability rating of "A" or better by at least two rating agencies (one of which shall be S&P) and/or a general policy rating of "A" or better and a financial class of VIII or better by A.M. Best Company, Inc.; *provided*, *however*, any insurance company with a rating below A:X must have a positive or stable outlook according to A.M. Best Company, Inc. The Policies described in <u>Section 8.1(a)</u> hereof shall designate Administrative Agent and Lenders and their successors and assigns as mortgagee, additional insured and/or loss payee as deemed appropriate by Administrative Agent. Borrower shall deliver to Administrative Agent certificates evidencing renewal of the Policies (such certificates, the "<u>Insurance Certificates</u>") and renewal policies accompanied by evidence satisfactory to Administrative Agent of payment of the premiums due with respect to the policies (the "<u>Insurance Premiums</u>"), within thirty (30) days after the expiration dates of such Policies.

(c)     Any blanket property insurance Policy shall specifically allocate to the Project the amount of coverage from time to time required hereunder and shall otherwise provide the same protection as would a separate Policy insuring only the Project in compliance with the provisions of <u>Section 8.1(a)</u> hereof.

(d)     All Policies provided for or contemplated by <u>Section 8.1(a)</u> hereof shall, in the case of Policies providing for (i) property damage, boiler and machinery, terrorism, flood and earthquake insurance, provide that the loss thereunder shall be payable to Administrative Agent, as mortgagee and loss payee, and (ii) commercial general liability insurance, name Administrative Agent as additional insured.

(e)     All Policies provided for in <u>Section 8.1(a)</u> hereof shall contain clauses or endorsements to the effect that:

(i)     no act or negligence of Borrower or anyone acting for or on behalf of Borrower or of any Tenant or other occupant, or failure to comply with the provisions of any Policy, which might otherwise result in a forfeiture of the insurance or any part thereof, shall in any way affect the validity or enforceability of the insurance with respect to Administrative Agent and Lenders;

(ii)     the property damage insurance Policies, including boiler and machinery, earthquake, flood and terrorism, if separately provided, shall not be materially changed (other than to increase the coverage provided thereby) or canceled without at least thirty (30) days' prior written notice to Administrative Agent and any party named therein as an additional insured;

(iii)     the issuers thereof shall give written notice to Administrative Agent if the Policies have not been renewed ten (10) Business Days prior to their expiration;

(iv)     Administrative Agent and Lenders shall not be liable for any Insurance Premiums thereon or subject to any assessments thereunder, provided that the insurer need not waive the requirement that the premium be paid in order for a claim to be paid and further shall provide that Administrative Agent (for the benefit of Lender) is permitted to make payments to effect the continuation of such policy upon notice of cancellation due to non-payment of premiums;

(v)     the Policies do not contain an exclusion for acts of terrorism; and

000661

(vi)     any claim or defense any property damage insurance company may have against Borrower to deny payment of any claim by Borrower thereunder shall not be effective against Administrative Agent and Lenders (and affirmatively providing that the insurance company will pay the proceeds of such Policy to Administrative Agent notwithstanding any claim or defense of the insurance company against Borrower) and such Policies shall also contain a standard "Waiver of Subrogation" endorsement.

(f)     If at any time Administrative Agent is not in receipt of written evidence that all insurance required hereunder is in full force and effect, Administrative Agent shall have the right, upon not less than five (5) Business Days' notice to Borrower (except in the event of an emergency or an imminent lapse or loss of insurance coverage), to take such action as Administrative Agent deems necessary to protect Lenders' interest in the Project, including, without limitation, obtaining such insurance coverage as Administrative Agent in Administrative Agent's reasonable discretion deems appropriate. All premiums incurred by Administrative Agent or Lenders in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Administrative Agent upon demand and shall bear interest at the Involuntary Rate.

(g)     Borrower shall not take out separate insurance concurrent in form or contributing (in the event of a loss) to the insurance required to be maintained under this Section 8.1. Borrower may, however, carry, or permit Tenants to carry, insurance for the Project in addition to required insurance, but only if such additional insurance: (i) does not violate or entitle the carrier to assert any defense or disclaim any primary coverage under any required insurance; (ii) mutually benefits Borrower or Tenants, as the case may be, and Administrative Agent, as their interests may appear; and (iii) otherwise complies with this Agreement; *provided*, *however*, Administrative Agent reserves the right to approve any insurance provided by any other Tenant.   Notwithstanding the foregoing, Administrative Agent hereby acknowledges that the insurance coverages held by the Tenants as of the Closing Date are acceptable to Administrative Agent.

Section 8.2. Insurance Escrow; Payment by Administrative Agent. Borrower shall not be obligated to make any deposit or payment for insurance premium payment obligations, as hereinafter provided, until Administrative Agent makes demand therefor following an Event of Default and (i) any Tenant under a Material Lease is not paying such premiums in accordance with the terms and provisions of its respective Lease, or (ii) any Tenant under a Material Lease is in default under such Lease. Subject to the foregoing, upon notice from Administrative Agent, Administrative Agent shall have the right to require that Borrower pay to Administrative Agent at the time of each payment of an installment of interest and/or principal under the Note, an additional amount sufficient to discharge the premium payment obligations under this Article VIII when they become due. The determination of the amount so payable and of the fractional part thereof to be deposited with Administrative Agent, so that the aggregate of such deposits shall be sufficient for this purpose, shall be made by Administrative Agent in Administrative Agent's reasonable discretion. Such amounts shall be held by Administrative Agent not as a trust fund and without interest (except as required by applicable law) and shall be applied to the payment of the obligations in respect of which such amounts were deposited, in such order or priority as Administrative Agent shall reasonably determine, on or before the respective dates on which the same or any of them would become due. After acceleration of the Debt, the balance of any such amounts held by Administrative Agent may be used and applied for any purpose authorized pursuant to Article II of the Deed of Trust and Section 10.2 hereof including, without limitation, payment of the Debt in any order Administrative Agent may deem appropriate. If, one (1) month prior to the date any of the aforementioned obligations are due, the amounts then on deposit shall be insufficient for the payment of such obligation in full, Borrower shall, within ten (10) days after written demand, deposit the amount of the deficiency with Administrative Agent. Nothing herein contained shall be deemed to affect any right or

remedy of Administrative Agent or Lenders under any provisions of this Agreement or of any statute or rule of law to pay any such amount and to add the amount so paid, together with interest at the Involuntary Rate, to the Debt.

Section 8.3. <u>Casualty</u>. If the Project shall be damaged or destroyed, in whole or in part, by fire or other casualty (a "<u>Casualty</u>"), Borrower shall give prompt notice of such damage to Administrative Agent and Administrative Agent shall have the right to join Borrower in adjusting any loss. In addition, after the entry of any decree of foreclosure of the Deed of Trust, any purchaser at foreclosure sale or the decree creditor, as the case may be, shall also have the right to join in the adjustment of any such losses. Any moneys received as payment for any loss under any such insurance (the "<u>Insurance Proceeds</u>") shall be paid, subject to the terms of the Existing Leases, over to Administrative Agent to be applied, at Administrative Agent's option, either to (i) prepayment of the Note and other sums due under the Loan Documents or (ii) to the extent reasonably practicable, the reimbursement of Borrower from time to time of expenses incurred by Borrower in connection with the restoration of the Project ("<u>Restoration Work</u>") upon terms otherwise satisfactory to Administrative Agent. Administrative Agent and Lenders shall have the right to participate in the adjustment of all claims for Insurance Proceeds. Borrower shall promptly commence and diligently prosecute the restoration of the Project whether or not the Insurance Proceeds are made available to Borrower. Borrower shall pay all costs of such restoration whether or not such costs are covered by insurance. Provided and on condition that no Event of Default has occurred and is continuing, any prepayment of the Debt by application of Insurance Proceeds shall not be subject to any Prepayment Premium, however, Borrower shall be obligated to pay any breakage costs or other similar losses incurred or suffered by Administrative Agent and Lenders as a result of such prepayment.

Notwithstanding the foregoing, and subject to the terms of subsection (f) hereof, if Administrative Agent agrees to make the Insurance Proceeds, less the reasonable and actual out-of-pocket cost, if any, to Administrative Agent of obtaining and disbursing such Insurance Proceeds (including, without limitation, reasonable attorneys' fees and disbursements and costs allocable to inspecting the Restoration Work and the Plans) for the repair and restoration of the Project ("<u>Actual Proceeds</u>") available to the Borrower (not by way of application against and readvancement of loan funds under the Deed of Trust but solely as a security fund from which to reimburse Borrower for or permit Borrower to pay directly the costs of such repair and restoration), then Administrative Agent shall make the Actual Proceeds available to Borrower and Borrower shall complete the Restoration work in accordance with the following terms, provisions and conditions:

(a) If the Project should be damaged or destroyed by fire or other casualty, Borrower shall promptly upon insurance settlement, which settlement shall be diligently pursued by Borrower, commence the Restoration Work. Administrative Agent shall, subject to the terms of Subsection (b) below, deposit the proceeds of settlement in an interest-bearing account (the "<u>Restoration Account</u>") in a branch of any federally-insured bank as Administrative Agent may determine, in Administrative Agent's sole and absolute discretion. Borrower shall, as provided below, pay or cause to be paid all expenses in connection with such repair and restoration of the Project so that the Project, at all times, shall be and remain free and clear from any and all Liens.

(b) If the Insurance Proceeds are less than or equal to $750,000, Administrative Agent shall deliver such Insurance Proceeds to Borrower to perform the Restoration Work. If the Insurance Proceeds are greater than $750,000, Administrative Agent shall make 90% of the Actual Proceeds available to Borrower as provided in subsection (c) below and the final 10% of the Actual Proceeds (the "<u>Balance</u>") available to Borrower as provided in subsection (d) below. Borrower shall utilize such Actual Proceeds only for the purposes of performing the Restoration Work and for no other purpose whatsoever, except as hereinafter set forth. If the estimated costs of the Restoration Work shall exceed the Actual Proceeds, the difference (the "<u>Excess Funds</u>") shall be deposited in the Restoration

4161624-v7\CHIDMS1

Account. Such Excess Funds shall be applied toward the Restoration Work prior to the application of the Actual Proceeds, all in accordance with the disbursement procedures hereinafter provided. Any unexpended Actual Proceeds remaining after completion of the Restoration Work shall be paid over to Borrower, provided no Event of Default exists or is continuing.

(c)     Any Actual Proceeds held by Administrative Agent shall be paid by Administrative Agent to Borrower from time to time as the Restoration Work progresses, subject to the following terms, provisions and conditions:

(i)     If the Restoration Work is structural or if the cost of the Restoration Work is reasonably estimated to exceed $750,000, the Restoration Work shall be supervised by a registered architect or engineer and inspected by a consultant engaged by Administrative Agent at the sole cost and expense of Borrower (the "Inspector"). Before Borrower commences any Restoration Work, other than temporary Restoration Work to protect property or prevent interference with business, Administrative Agent shall have been furnished with and shall have approved (which approval shall not be unreasonably withheld or delayed) (i) an estimate of the cost of the Restoration Work accompanied by an architect's certification as to such costs and (ii) appropriate plans and specifications ("Plans") for the Restoration Work, it being nevertheless understood that said Plans shall provide for Restoration Work so that, upon completion thereof, the Project shall be comparable in character and equal in value and general utility to the Project prior to the damage or destruction. Borrower shall furnish Administrative Agent with evidence satisfactory to Administrative Agent that all portions of the Project so restored and/or repaired and their contemplated use fully comply with all Legal Requirements;

(ii)     Each request for payment shall be made upon seven (7) days' prior notice to Administrative Agent and shall be accompanied by certificates to be made by the Inspector or, if none shall be required, by an officer of Borrower, stating (aa) that all of the Restoration Work completed has been done in compliance with the approved Plans, if any be required under subsection (c)(i) above, and all Legal Requirements, (bb) that the sum requested is justly required to reimburse Borrower for payments by Borrower, or is justly due to the contractor, subcontractors, materialmen, laborers, engineers, architects or other Persons rendering services or materials for the Restoration Work (giving a brief description of such services and materials), and that (prior to the final completion of the Restoration Work) the requested payment does not exceed the greater of (x) the amount of the requested payment less the retainage required pursuant to the applicable general contract or subcontract or (y) 90% of the value of the Restoration Work performed which is the subject of the requested payment (hereinafter called the "Applicable Percentage") and that all sums previously paid out by Administrative Agent do not exceed the Applicable Percentage of the aggregate value of the Restoration Work done to the date of such certificate, (cc) that if the sum requested is to cover payment relating to repair and restoration of personal property required or relating to the Project, that title to the personal property items covered by the request for payment is vested in Borrower and (dd) that the amount of Actual Proceeds remaining in the hands of Administrative Agent shall be sufficient upon completion of the Restoration Work to pay for the same in full free and clear of Liens. Additionally, each request for payment shall contain a statement signed by an officer or authorized signatory of Borrower approving both the Restoration Work done to date and the Restoration Work covered by the request for payment in question; and

(iii)     Each request shall be accompanied by (aa) invoices or receipts, (bb) waivers of lien reasonably satisfactory to Administrative Agent covering that part of the Restoration Work for which payment or reimbursement is being requested and (cc) if required by Administrative Agent, a search prepared by the Title Company or other evidence satisfactory to Administrative Agent that there has not been filed with respect to the Project any mechanic's or other lien or instrument for the retention of title in respect of any part of the Restoration Work not discharged of record, or that will not be discharged in connection with the requested payment, by payment, bonding or otherwise. If available,

43

000664

Administrative Agent may, at Administrative Agent's option, require an endorsement to the Title Policy insuring the continued priority of the lien of the Deed of Trust as to all sums advanced hereunder, such endorsement to be paid for by Borrower.

(d)      The Balance shall be paid to Borrower only after the Restoration Work has been fully completed and within seven (7) days following the furnishing by Borrower to Administrative Agent of (i) a copy of any certificate or certificates required by law to render occupancy and full operation of the Project legal and (ii) a certification by the Inspector, if applicable, as to completion in accordance with the approved Plans and Legal Requirements and an architect's certificate of completion in the form of AIA-G703.

(e)      At all times during the conduct of the Restoration Work, Borrower shall, at Borrower's sole cost and expense, obtain and cause to be maintained workmen's compensation and public liability insurance in amounts necessary to protect Borrower, Administrative Agent and Lenders from all liabilities, damages, claims or demands arising out of any accident or occurrence causing injury or death to any Person or property whatsoever. All insurance shall be with responsible insurance companies, licensed and authorized to transact business in the State of Texas and shall be written in forms, amounts and by companies reasonably satisfactory to Administrative Agent. The originals or certified copies of all Policies, together with original certificates or evidence thereof, shall be delivered to Administrative Agent. Renewals of such Policies shall be delivered to Administrative Agent at least ten (10) days before any such Policies shall expire. Nothing contained herein shall relieve Borrower from any requirement of this Agreement regarding the insuring of the Project.

(f)      Notwithstanding the terms and provisions of subsections (b), (c) and (d) hereof, in the event that (i) Borrower fails to commence the Restoration Work or to proceed diligently and continuously to completion of the Restoration Work, subject to force majeure delays, within twelve (12) months from the date the Project was damaged or destroyed, (ii) the damage or destruction occurs during the last six (6) months of the term of the Note, unless, in Administrative Agent's reasonable judgment, the required Restoration Work is capable of being completed by not later than ninety (90) days prior to the Maturity Date, (iii) the required Restoration Work is not capable of being completed within eighteen (18) months from the date the Project was damaged or destroyed, in Administrative Agent's reasonable judgment (provided rent or business interruption insurance is in effect for the entire period of reconstruction), or (iv) an Event of Default is continuing, the terms, provisions and condition of subsections (b), (c) and (d) hereof shall not apply and Administrative Agent's option as to the application of Insurance Proceeds shall continue to apply. During the continuance of an Event of Default, Insurance Proceeds may be applied by Administrative Agent in any manner determined by Administrative Agent in its sole and absolute discretion.

Section 8.4. <u>Condemnation</u>. Borrower shall promptly give Administrative Agent notice of the actual or threatened commencement of any proceeding for the Condemnation of the Project of which Borrower has knowledge and shall deliver to Administrative Agent copies of any and all papers served in connection with such proceedings. Administrative Agent and Lenders may participate in any such proceedings, and Borrower shall from time to time deliver to Administrative Agent all instruments requested by Administrative Agent to permit such participation. Borrower shall, at Borrower's sole cost and expense, diligently prosecute any such proceedings, and shall consult with Administrative Agent, Administrative Agent's attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings. In the event of such condemnation proceedings, the Award payable is hereby assigned to and shall be paid to Administrative Agent. Administrative Agent shall be under no obligation to question the amount of any such Award and may accept the same in the amount in which the same shall be paid. The proceeds of any Award so received shall (except for a temporary taking the Award for which shall be paid over to Borrower), at the option of Administrative Agent, and in the absence of an

44

000665

Event of Default, either be (i) applied to the prepayment of the Note and other sums due under the Loan Documents, or (ii) to the extent reasonably practicable, paid over to Borrower from time to time for expenses incurred by Borrower in the restoration of the Project and upon terms otherwise satisfactory to Administrative Agent, in Administrative Agent's sole and absolute discretion. Notwithstanding any taking by any public or quasi-public authority through Condemnation or otherwise (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Agreement and the Debt shall not be reduced until any Award shall have been actually received and applied by Lenders, after the deduction of expenses of collection, to the reduction or discharge of the Debt. Lenders shall not be limited to the interest paid on the Award by the condemning authority but shall be entitled to receive out of the Award interest at the rate or rates provided herein or in the Note. To the extent the Project can be restored or repaired following any condemnation, and to the extent Borrower shall be entitled or permitted to do the same, if the Project or any portion thereof is taken by a condemning authority, Borrower shall promptly commence and diligently prosecute the restoration of the Project whether or not such Award is made available to Borrower. If the Project is sold, through foreclosure or otherwise, prior to the receipt by Lenders of the Award, Lenders shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award, or a portion thereof sufficient to pay the Debt. Notwithstanding anything to the contrary contained herein, to the extent that the Project can be restored or repaired following any condemnation, as determined by Required Lenders in their sole and absolute good faith discretion, the awards or proceeds from any such condemnation shall be disbursed and paid over to Borrower in the same manner as set forth in Section 8.3 hereof with respect to Insurance Proceeds.

<div style="text-align:center">

ARTICLE IX
INTENTIONALLY OMITTED

ARTICLE X
EVENTS OF DEFAULT; REMEDIES

</div>

Section 10.1. Event of Default. The occurrence of any one or more of the following events shall constitute an "Event of Default":

(a)     if any portion of the Debt is not paid within five (5) days after the date the same is due, or if the entire Debt is not paid on or before the Maturity Date;

(b)     if Borrower shall fail to pay any other sum hereunder or under any of the other Loan Documents when and as the same shall become due and payable and such failure shall not be cured within fifteen (15) days after notice from Administrative Agent;

(c)     if the Policies are not kept in full force and effect, or if the Insurance Certificates or certified copies of the Policies are not delivered to Administrative Agent as provided in Section 8.1 hereof;

(d)     if Borrower breaches any covenant with respect to itself contained in Article VI hereof or if Borrower breaches any covenant contained in Article VII hereof, and same is not cured, if capable of being cured, within thirty (30) days after notice;

(e)     if any representation or warranty of any Person comprising Borrower or Guarantor, or with respect to, Borrower, Guarantor or any member, general partner, principal or beneficial owner of Borrower, made herein, in any other Loan Document, or in any certificate, report, financial statement or other instrument or document furnished to Administrative Agent at the time of the

<div style="text-align:center">45</div>

000666

closing of the Loan or during the term of the Loan shall have been false or misleading in any material respect when made;

(f)      if (i) Borrower or Guarantor shall commence any case, proceeding or other action (A) under any Creditors' Rights Laws, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or Borrower or Guarantor shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against Borrower or Guarantor any case, proceeding or other action of a nature referred to in clause (i) above which (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of sixty (60) days; or (iii) other than an involuntary proceeding commenced by Administrative Agent or any Lender, there shall be commenced against Borrower or Guarantor any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets which results in the entry of any order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within sixty (60) days from the entry thereof; or (iv) Borrower or Guarantor shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; or (v) Borrower or Guarantor shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due;

(g)      if there should occur a default which is not cured within the applicable grace or cure period, if any, under any other deed of trust encumbering all or part of the Project regardless of whether any such other deed of trust is prior or subordinate to the Deed of Trust or upon default in the performance of any term, provision, covenant or condition, which is not cured within the applicable grace or cure period, if any, under the notes evidencing such deeds of trust or any other documents executed in connection therewith; it being further agreed by Borrower that an Event of Default hereunder shall constitute an event of default under any such other deed of trust in respect of the Project held by Administrative Agent;

(h)      if Borrower shall be in default beyond applicable notice and grace periods under any other loan or financing arrangement between Borrower and any Lender, whether now or hereafter existing;

(i)      if any federal tax lien is filed against Borrower, Guarantor, Borrower Members or the Project and same is not discharged of record or bonded within thirty (30) days after the same is filed;

(j)      if a judgment is filed against Borrower, Guarantor, Borrower Members or the Project which (x) is in excess of $500,000 or (y) in the reasonable judgment of Administrative Agent would materially interfere with such Person's ability to perform its obligations under the Loan Documents to which it is a party, and which is not stayed, vacated, bonded or discharged within thirty (30) days after the same is filed;

(k)      if any Lien is filed or recorded against the Project or any interest therein *with the consent of Borrower* (but without the consent of Administrative Agent), and such Lien is not released within a period of five (5) days of the filing or recording thereof;

(l)      with the exception of Permitted Encumbrances, if any Lien is filed or recorded against the Project or any interest therein without the consent of Borrower or Administrative Agent and such Lien is not removed, discharged or bonded to the satisfaction of Administrative Agent within thirty (30) days of such filing or recording;

000667

(m)     if Borrower, Guarantor or any Borrower Member shall breach any of the terms of:

         (i)     Section 5.14 (Liens);

         (ii)     Section 5.19 (Alterations);

         (iii)     Section 5.21 (Notices);

         (iv)     Section 5.23 (Limitations on Securities Issuances);

         (v)     Section 5.24 (Limitations on Distributions);

         (vi)     Section 5.25 (Contractual Obligations);

         (vii)     Section 5.26 (Additional Indebtedness);

         (viii)     Section 5.27 (Restrictions on Leasing);

         (ix)     Section 5.28 (Debt Service Coverage Ratio);

         (x)     Section 5.29 (Loan-to-Value Ratio);

         (xi)     Section 7.2 (No Sale/Encumbrance).

(n)     [Reserved.];

(o)     if Borrower or Guarantor shall continue to be in default under any other term, covenant or condition of this Agreement or any of the Loan Documents for more than ten (10) days after notice from Administrative Agent in the case of any default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Administrative Agent in the case of any other default, provided that if such default cannot reasonably be cured within such thirty (30)-day period and Borrower or the applicable Guarantor shall have commenced to cure such default within such thirty (30)-day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30)-day period shall be extended for so long as it shall require Borrower or the applicable Guarantor in the exercise of due diligence to cure such default, it being agreed that no such extension shall (i) apply in the event of a default under Section 5.4 or Section 8.1 of this Agreement or (ii) be for a period in excess of one hundred (100) days in the aggregate;

(p)     if a default should occur under any Interest Rate Protection Product entered into by Borrower;

(q)     if there shall occur a default or event of default under the Guaranty which is not cured within any applicable grace or cure period, if any, or the Guaranty shall fail for any reason to be in full force of effect;

(r)     if there shall occur a default or event of default under the Environmental Indemnity Agreement which is not cured within any applicable grace or cure period, if any, or the Environmental Indemnity Agreement shall fail for any reason to be in full force of effect;

(s)     if an ERISA Event shall have occurred that, in the opinion of the Administrative Agent, when taken together with all other ERISA Events that have occurred, results in or could reasonably be expected to result in liability to Borrower in excess of $500,000;

000668

        (t)     if Borrower shall file a notice limiting the maximum principal amount that may be secured by the Deed of Trust to a sum less than the maximum principal amount set forth in <u>Section 3.12</u> thereof; or

        (u)     if there shall be an Event of Default under the Mezzanine Loan Agreement or any other Mezzanine Loan Document by Mezzanine Borrower or any other Person obligated thereunder.

        Section 10.2. <u>Remedies</u>.

        (a)     Upon the occurrence of an Event of Default (other than an Event of Default described in <u>Section 10.1(f)</u> hereof) and at any time thereafter that such Event of Default is continuing Administrative Agent and/or Lenders may, in addition to any other rights or remedies available to Administrative Agent or Lenders pursuant to this Agreement and the other Loan Documents or at law or in equity, take such action, without notice or demand, that Administrative Agent or Lenders deem advisable to protect and enforce Lenders' rights against Borrower, Guarantor and in the Project, including, without limitation, declaring the Debt to be immediately due and payable, and Administrative Agent and/or Lenders may enforce or avail themselves of any or all rights or remedies provided in the Loan Documents and may exercise all the rights and remedies of a secured party under the UCC, as adopted and enacted by the State where the Project is located, against Borrower, Guarantor and the Project, including, without limitation, all rights or remedies available at law or in equity; and upon any Event of Default described in <u>Section 10.1(f)</u> hereof, the Debt and all other obligations of Borrower and Guarantor hereunder and under the other Loan Documents shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained herein or in any other Loan Document to the contrary notwithstanding.

        (b)     Upon the occurrence and during the continuance of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Administrative Agent or Lenders against Borrower or Guarantor under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to, Borrower or Guarantor or at law or in equity may be exercised by Lenders at any time and from time to time, whether or not all or any of the Debt shall be declared due and payable, and whether or not Administrative Agent or Lenders shall have commenced any foreclosure proceeding or other action for the enforcement of Lenders' rights and remedies under any of the Loan Documents with respect to the Project. Any such actions taken by Administrative Agent or Lenders shall be cumulative and concurrent and may be pursued independently, singularly, successively, together or otherwise, at such time and in such order as Administrative Agent or Lenders may determine in Administrative Agent's or Lenders' sole discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Administrative Agent or Lenders permitted by law, equity or contract or as set forth herein or in the other Loan Documents.

<div align="center">

ARTICLE XI

REPLACEMENT OF LENDERS

</div>

        If Borrower is entitled to replace a Lender pursuant to the Note (i.e., pursuant to (i) subsection (e) of the section titled "Increased Costs", or (ii) the section titled "Illegality"), Borrower may, upon notice to such Lender and Administrative Agent, replace such Lender by causing such Lender to assign its rights and obligations under this Agreement and the Note to one or more Eligible Assignees reasonably acceptable to Borrower and Administrative Agent. Borrower shall or shall cause the replacement lender to pay in full all principal, interest, fees and other amounts owing to such Lender through the date of replacement. The Lender being replaced and the replacement lender shall execute and deliver an Assignment and Assumption Agreement in the form attached hereto as <u>Exhibit B</u>. A Lender shall not be required to make any such assignment if, prior thereto, as a result of a waiver by such Lender or otherwise,

<div align="center">48</div>

the circumstances entitling the Borrower to require such assignment cease to apply. If a Lender being replaced refuses to execute and deliver such Assignment and Assumption Agreement or otherwise comply with this <u>Article XI</u>, such Lender hereby appoints Administrative Agent as its attorney-in-fact to do so on such Lender's behalf. Administrative Agent shall distribute an amended Schedule 13.12, which shall thereafter be incorporated into this Agreement, to reflect adjustments to Lenders and their respective amount of the Loan.

<div align="center">

ARTICLE XII
SECONDARY MARKET; ASSIGNMENT; PARTICIPATION

</div>

Section 12.1. <u>Assignment; Participation</u>.

(a) Any non-Defaulting Lender (as defined in <u>Section 13.16</u> hereof) may at any time grant to one or more parties (each a "<u>Participant</u>") participating interests in its Pro Rata Share (as hereinafter defined) of the Loan (the "<u>Participations</u>") and Lenders may syndicate the Loan ("<u>Syndication</u>"). In the event of any such grant by a Lender of a Participation to a Participant, such Lender shall remain responsible for the performance of such Lender's obligations hereunder, and Borrower and Administrative Agent shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations hereunder. Any agreement pursuant to which any Lender may grant a Participation shall provide that such Lender shall retain the sole right and responsibility to enforce the obligations of Borrower, as the case may be, hereunder and under any other Loan Document, including, without limitation, the right to approve any amendment, modification or waiver of any provision of this Agreement or any other Loan Document.

(b) A Lender may at any time assign (x) to any Eligible Assignee with the consent of Administrative Agent, which consent shall not be unreasonably delayed, conditioned or denied, (y) to any other party with the consent of Administrative Agent, which consent may be withheld by Administrative Agent in Administrative Agent's sole and absolute discretion; *provided*, *however*, that as long as no Event of Default has occurred and is continuing, Borrower's consent shall also be required for an assignment pursuant to clauses (x) and (y) (each such assignee set forth in (x) and (y) above, a "<u>Consented Assignee</u>"), or (z) without such consent, to one or more Eligible Assignees which are affiliates, subsidiaries or a parent of a Lender (each Consented Assignee or subsidiary, affiliate or parent bank or institution, an "<u>Assignee</u>") all or a proportionate part of all of such Lender's rights and obligations under this Agreement and the Note, and such Assignee shall assume rights and obligations, pursuant to an Assignment and Assumption Agreement substantially in the form annexed hereto as <u>Exhibit B</u> and made a part hereof executed by such Assignee and the assigning Lender (duplicate executed originals of which shall be delivered to Borrower to the extent available). Upon (i) execution and delivery of such instrument, (ii) payment by such Assignee to the assigning Lender of an amount equal to the purchase price agreed between such Lender and such Assignee and (iii) with respect to a Consented Assignee, payment by such Assignee to Administrative Agent of a fee, for Administrative Agent's own account, in the amount of $5,000, such Assignee shall be a party to this Agreement and shall have all the rights and obligations of a Lender as set forth in such Assignment and Assumption Agreement, and the assigning Lender shall be released from such Lender's obligations hereunder to a corresponding extent, and no further consent or action by any party shall be required. If the Assignee is not incorporated under the laws of the United States or a state thereof, it shall, prior to the first date on which interest or fees are payable hereunder for its account, deliver to Borrower and Administrative Agent certification reasonably acceptable to Borrower as to exemption from deduction or withholding of any United States federal income taxes. Borrower shall not be required to reimburse any Lender for taxes or reimburse any Lender for any withholding due to such Lender's failure to deliver such certification, or due to the validity of such certification. Notwithstanding anything contained herein to the contrary, no Lender shall have the right to assign less than $5,000,000 of such Lender's interest under this Agreement and the other Loan

<div align="center">49</div>

000670

Documents. For the purposes hereof, an "Eligible Assignee" shall mean any of (a) a commercial bank organized under the laws of the United States, or any state thereof or the District of Columbia, and having total assets in excess of $1,000,000,000; (b) a savings and loan association or savings bank organized under the laws of the United States, or any State thereof or the District of Columbia, and having a net worth of at least $100,000,000, calculated in accordance with generally accepted accounting principles; (c) a commercial bank organized under the laws of any other country which is a member of the OECD, or a political subdivision of any such country and having total assets in excess of $1,000,000,000, provided that such bank is acting through a branch or agency located in the country in which it is organized or another country which is also a member of the OECD; (d) the central bank of any country which is a member of the OECD; (e) any other assignee that, in the reasonable judgment of Administrative Agent, is a reputable institutional investor with substantial experience in lending and originating loans similar to the Loan, or in purchasing, investing in or otherwise holding such loans, having a financial net worth of at least $100,000,000 and (f) any non-Defaulting Lender or any affiliate, subsidiary or parent of any non-Defaulting Lender. Neither Borrower, Guarantor nor any Affiliate or Subsidiary of Borrower or Guarantor shall be Eligible Assignee or Participant. Notwithstanding anything to the contrary contained herein, any Lender may at any time pledge or assign a security interest in all or any portion of its rights under the Loan, the Note and the other Loan Documents to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations under the Loan, the Note or any other Loan Document or substitute any such pledgee or assignee for such Lender as a party to the Loan, the Note or any Loan Document.

(c)     Borrower, Guarantor, Administrative Agent and Lenders shall execute such modifications to the Loan Documents as shall, in the reasonable judgment of Administrative Agent, be necessary or desirable in connection with assignments in accordance with the foregoing provisions of this Section 12.1 and which do not adversely affect Borrower or Guarantor or Borrower's or Guarantor's obligations or rights under the Loan Documents (other than to a *de minimis* extent).

(d)     Any Lender may at any time assign all or any portion of such Lender's rights under this Agreement and the Note to a Federal Reserve Bank. No such assignment shall release the transferor Lender from its obligations hereunder.

(e)     Borrower recognizes that in connection with a Lender's selling of Participations or making of assignments, any or all documentation, financial statements, appraisals and other data, or copies thereof, relevant to Borrower, Guarantor or the Loan may be exhibited to and retained by any such Participant or Assignee or prospective Participant or Assignee. Borrower hereby consents to the release of any and all Borrower information to such parties, and holds Administrative Agent and Lenders harmless from any and all liability due to the release of Borrower's financial information by Administrative Agent or any Lender to any such party. Administrative Agent and Lenders shall instruct such Participant or Assignee to keep such information confidential but Administrative Agent and Lenders shall have no liability if such Participant or Assignee fails to do so.

(f)     Borrower and Guarantor agree to cooperate with Lenders in connection with any sale or transfer of the Loan, Syndication or any Participation created pursuant to this Article XII. At the request of the holder of the Note and, to the extent not already required to be provided by Borrower or Guarantor under this Agreement, Borrower and Guarantor shall take such reasonable actions for the benefit of, and use reasonable efforts to provide information not in the possession of, the holder of the Note in order to satisfy the market standards (which may include such holder's delivery of information with respect to Borrower, Guarantor and the Project to any Participant or Assignee or prospective Participant or Assignee) to which the holder of the Note customarily adheres or which may be reasonably required in the marketplace in connection with such sales or transfers, including, without limitation, to:

(i)      provide (x) updated financial, budget and other information with respect to the Project, Borrower, Guarantor and Manager and (y) modifications and/or updates to the appraisals, market studies, Environmental Reports (including Phase I reports and, if appropriate, Phase II reports) of the Project obtained in connection with the making of the Loan (all of the foregoing being referred to as the "<u>Provided Information</u>"), together, if customary, with appropriate verification and/or consents of the Provided Information;

(ii)      make non-material changes to the Organizational Documents of Borrower, Guarantor or its principals;

(iii)      upon reasonable prior notice, permit site inspections, appraisals, market studies and other due diligence investigations of the Project, as may be reasonably requested by the holder of the Note or as may be necessary in connection with the Participations or Syndications;

(iv)      make the representations and warranties with respect to the Project, Borrower, Guarantor, Manager and the Loan Documents as such Persons have made in the Loan Documents and such other representations and warranties with respect to the Project, Borrower, Guarantor and Manager, as may be reasonably requested by the holder of the Note;

(v)      execute such amendments to the Loan Documents as may be requested by the holder of the Note including, without limitation, bifurcation of the Loan into two or more components and/or separate notes and/or creating a senior/subordinate note structure; *provided*, *however*, that Borrower and Guarantor shall not be required to modify or amend any Loan Document if such modification or amendment would (x) change the interest rate or the stated maturity set forth in the Note, except in connection with a bifurcation of the Loan which may result in varying fixed interest rates and amortization schedules, but which shall have the same initial weighted average coupon of the original Note, (y) in the reasonable judgment of Borrower modify or amend any other economic term of the Loan, or (z) in the reasonable judgment of Borrower or Guarantor increase Borrower's or Guarantor's obligations and liabilities under the Loan Documents, other than to a *de minimis* extent; and

(vi)      have reasonably appropriate personnel participate in a bank meeting and/or presentation for the potential Participants or Lenders.

(g)      At the option of Lenders, the Loan may be serviced by a servicer/trustee selected by Lenders ("<u>Servicer</u>") and Lenders may delegate all or any portion of Lenders' responsibilities under this Agreement and the other Loan Documents to such servicer/trustee pursuant to a servicing agreement between Lenders and such servicer/trustee. Lenders shall provide Borrower with notice of same. At no time shall there be more than one (1) Servicer.

(h)      All third party costs and expenses incurred by Borrower, Guarantor or Lenders in connection with Borrower's or Guarantor's complying with the requests and requirements made under this <u>Article XII</u> shall be paid by Lenders (and not by Borrower).

Section 12.2. <u>Intralinks</u>. Borrower hereby acknowledges that Administrative Agent will make available to Lenders all information provided by or on behalf of Borrower or Guarantor hereunder or under the other Loan Documents (collectively, "<u>Borrower Materials</u>") by posting the Borrower Materials on IntraLinks® or another similar electronic system (the "<u>Platform</u>").

<div align="center">

ARTICLE XIII
AGENT

</div>

Section 13.1. <u>Appointment, Powers and Immunities</u>.

<div align="center">51</div>

(a)     Each Lender hereby designates, appoints and authorizes Administrative Agent to act as agent hereunder and under the other Loan Documents to which Administrative Agent is a party in its capacity as Administrative Agent (this Agreement and such other Loan Documents, the "Administrative Agent Loan Documents") with such powers as are specifically delegated to Administrative Agent by the terms of this Agreement and such Loan Documents, together with such other powers as are reasonably incidental thereto. Administrative Agent (a) shall have no duties or responsibilities except those expressly set forth in this Agreement and in the other Administrative Agent Loan Documents, and shall not by reason of this Agreement or any other Administrative Agent Loan Document be a trustee or fiduciary for any of Lenders; (b) shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), provided that Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose Administrative Agent to liability or that is contrary to any Loan Document or applicable law; (c) shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as Administrative Agent or any of its Affiliates in any capacity; (d) shall not be responsible to Lenders for or have any duty to ascertain or inquire into (i) any recitals, statements, representations or warranties contained in this Agreement, any other Administrative Agent Loan Document, or in any certificate or other document referred to or provided for in, or received by any Lenders under, this Agreement or any other Administrative Agent Loan Document, (ii) the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Administrative Agent Loan Document or any other document referred to or provided for herein or therein, (iii) any failure by Borrower to perform any of such party's obligations hereunder or thereunder, or (iv) the satisfaction of any condition set forth herein, other than to confirm receipt of items expressly required to be delivered to Administrative Agent; and (e) shall not be responsible to Lenders for any action taken or omitted to be taken by Administrative Agent hereunder or under any other Administrative Agent Loan Document or under any other document or instrument referred to or provided for herein or therein or in connection herewith or therewith, except for Administrative Agent's own gross negligence or willful misconduct or the failure of Administrative Agent to follow the directions of the Required Lenders or all of the Lenders, as the case may be, as provided for herein.

(b)     To the extent that any action is to be taken, any information is to be delivered to or by any Lender, any determination is to be made, or any consent is to be given or withheld by any Lender, any such action, delivery, determination or consent shall be taken, made or given or withheld, as the case may be, by Administrative Agent or any successor agent thereto at the direction of the Required Lenders or all of the Lenders, as the case may be, as provided for herein.

(c)     Administrative Agent may employ agents and attorneys-in-fact and shall not be responsible for the negligence or misconduct of any such agents or attorneys-in-fact selected by Administrative Agent in good faith. Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by Administrative Agent. Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates. The exculpatory provisions of this Section 13.1 shall apply to any such sub-agent and to the Affiliates of Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

52

(d)     Administrative Agent may deem and treat the payee of any note as the holder thereof for all purposes hereof unless and until Administrative Agent shall have been notified of the assignment thereof.

Section 13.2. <u>Reliance by Administrative Agent</u>. Administrative Agent shall be entitled to rely upon, and shall incur no liability under or in respect of any of the Loan Documents by acting upon, any certification, consent, warranty, notice or other paper, instrument or communication (including any thereof by telephone, telecopy, e-mail, telex, telegram or cable) believed by Administrative Agent in good faith to be genuine and authentic and to have been signed or sent by or on behalf of the proper Persons, and upon advice and statements of legal counsel, independent accountants or other experts selected by Administrative Agent in good faith. As to any matters not expressly provided for by this Agreement or any other Administrative Agent Loan Document, Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, hereunder or thereunder in accordance with instructions given by Lenders holding sixty-six and two-thirds percent (66 2/3%) or more of the outstanding principal balance of the Loan (the "<u>Required Lenders</u>"), and such instructions of Administrative Agent and any action taken or not taken pursuant thereto shall be binding on all Lenders. Notwithstanding anything contained herein to the contrary, the consent of all of the Lenders (other than a Defaulting Lender) shall be required before Administrative Agent may take or not take any action with respect to the following:

(a)     any increase or decrease in the total principal amount of the Loan;

(b)     reductions in any interest rate (other than default rate interest) applicable to the Loan or any fees (other than late fees) required under this Agreement or any other Loan Document;

(c)     the extension of the Maturity Date of the Note or the due date of any payment due under the Note (other than default interest or late fees);

(d)     the release of all or substantially all of the Project (except as provided for herein and in the other Loan Documents);

(e)     the release of Borrower or Guarantor from Borrower's or such Guarantor's obligations under this Agreement or any other Loan Document; and

(f)     any amendment or modification of any of the provisions of <u>Article XII</u> or this <u>Article XIII</u>.

In the event Administrative Agent sends a notice to any Lender recommending any action (or inaction) to be taken under this Agreement or any other Loan Document and such Lender does not respond to Administrative Agent within ten (10) Business Days of the date of Administrative Agent's notice to such Lender, such Lender shall be deemed to have consented to the action (or inaction) being recommended by Administrative Agent.

Section 13.3. <u>Purchase of Disapproving Lender's Interest</u>.

(a)     In the event Administrative Agent makes a recommendation to Lenders to take any action requiring unanimous consent pursuant to <u>Section 13.2</u> hereof (which recommendation may be made at any time and for any number of times), and one or more Lenders approve such recommendation (the "<u>Approving Lenders</u>") and one or more Lenders disapprove such recommendation (the "<u>Disapproving Lenders</u>"), one or more of the Approving Lenders shall have the right (but not the obligation), in such Approving Lender's sole and absolute discretion, to purchase the interest of the Disapproving Lender in full within thirty (30) days of such disapproval, upon the payment to Administrative Agent of all principal, accrued interest, default interest (but not the payment of any

53

000674

applicable prepayment premium) due to such Disapproving Lender hereunder, and all amounts advanced by such Disapproving Lender as protective advances under the Deed of Trust as of the date of sale (collectively, the "<u>Purchase Price</u>"), whereupon such Disapproving Lender shall accept payment. In such event, and concurrently with the payment of the Purchase Price, such Disapproving Lender shall assign all of such Disapproving Lender's right, title and interest in and to the Loan and the Loan Documents to the Approving Lender purchasing such Disapproving Lender's interest, without recourse, representation, warranty or covenant, express or implied, of any kind or nature whatsoever, except that such Disapproving Lender has not assigned or encumbered such Lender's rights in the Loan and the Loan Documents.

(b)     Any sale pursuant to <u>Section 13.3(a)</u> hereof shall be made pursuant to documents reasonably satisfactory to Administrative Agent and the purchasing Approving Lender which shall provide, among other things, that the purchasing Approving Lender shall assume all of the obligations of such Disapproving Lender thereafter accruing under the Loan Documents and indemnify such Disapproving Lender from any claims or causes of actions that may arise after the closing date of such sale in connection with the Loan Documents (other than any claims or causes of action that may arise or be brought by Borrower or any third party as the result of the gross negligence or willful misconduct of such Disapproving Lender). The purchasing Approving Lender's right to purchase such Disapproving Lender's interest may be exercised by notice to Administrative Agent of the purchasing Approving Lender's intention to do so and payment by wire transfer of the Purchase Price.

(c)     If there is more than one Approving Lender that elects to purchase a Disapproving Lender's interest in the Loan, Administrative Agent shall apportion such Disapproving Lender's interest among such Approving Lenders in proportion to their Pro Rata Share.

Section 13.4.   <u>Rights of Administrative Agent as Lender</u>. With respect to its interest in the Loan, Administrative Agent in its capacity as a Lender hereunder shall have the same rights and powers hereunder as any other Lender and may exercise the same as though it were not acting as Administrative Agent, and the terms "<u>Lender</u>" and "<u>Lenders</u>" shall include Administrative Agent in its capacity as a Lender. Administrative Agent and Administrative Agent's affiliates may (without having to account therefor to any Lender) accept deposits from, lend money to (on a secured or unsecured basis), and generally engage in any kind of banking, trust or other business with Borrower (and any of Borrower Affiliates) as if it were not acting as Administrative Agent. Lenders and Lenders' Affiliates may (without having to account therefor to any other Lender or Administrative Agent) accept deposits from, lend money to (on a secured or unsecured basis), and generally engage in any kind of banking, trust or other business with Borrower (and any affiliates of them) as if it were not acting as Lender hereunder.

Section 13.5.   <u>Indemnification</u>.

(a)     Lenders agree to indemnify Administrative Agent (to the extent not reimbursed by Borrower and Guarantor hereunder and without limiting any obligations of Borrower hereunder) ratably, in accordance with their Pro Rata Shares, for any and all reasonable costs, fees, expenses, advances, interest, payments and claims of any kind and nature whatsoever that may be imposed on or incurred by Administrative Agent arising out of or by reason of any investigation in or in any way relating to or arising out of this Agreement or the transactions contemplated hereby (including, without limitation, the actual out-of-pocket costs and expenses that Administrative Agent is obligated to pay hereunder) or the servicing, administration and/or enforcement of the Loan, this Agreement and/or the Loan Documents (collectively, "<u>Costs</u>") provided that no Lender shall be liable for any of the foregoing Costs to the extent such Costs arise from the gross negligence or willful misconduct of Administrative Agent (as determined by a court of competent jurisdiction from which all appeal has been exhausted) or the failure of Administrative Agent to follow the directions of the Required Lenders or all of the Lenders, as the case

may be. The foregoing indemnity shall survive the payment of the obligations owing hereunder and the termination or non-renewal of this Agreement.

(b)     Any request by Administrative Agent for reimbursement of Costs shall be in the form of a certificate from Administrative Agent to each Lender as to the nature and amount for which Administrative Agent claims reimbursement from Lenders pursuant to this <u>Section 13.5</u>. Any such request shall include reasonable evidence that such Costs meet the criteria set forth in <u>Subsection 13.5(a)</u> hereof and have been incurred by Administrative Agent.

(c)     Any Costs which are required to be reimbursed by Lenders to Administrative Agent in accordance with this <u>Section 13.5</u> and which are not reimbursed to Administrative Agent within three (3) Business Days after demand therefor in accordance with <u>Subsection 13.5(b)</u> hereof shall accrue interest at the Federal Funds Rate from and after the fourth (4th) Business Day after the date that such reimbursement request was made through and including the date of reimbursement by such Lender.

(d)     Any Costs which are subsequently recovered from Borrower or any other Person shall be returned to each Lender in proportion to the Pro Rata Share of said Costs previously remitted by each Lender to Administrative Agent.

Section 13.6. <u>Non-Reliance on Administrative Agent and Other Lenders</u>. Each Lender agrees that such Lender has, independently and without reliance on Administrative Agent or any of the other Lenders, and based on such documents and information as such Lender has deemed appropriate, made such Lender's own credit analysis of Borrower and has made such Lender's own decision to enter into this Agreement and the other Loan Documents and that such Lender shall, independently and without reliance upon Administrative Agent or any of the other Lenders, and based on such documents and information as such Lender shall deem appropriate at the time, continue to make such Lender's own analysis and decisions in taking or not taking action under this Agreement and the other Loan Documents. Other than determining whether payments due to Administrative Agent under the Loan Documents have in fact been made, Administrative Agent shall not be required to keep itself informed as to the performance or observance by Borrower of any term or provision of this Agreement or any of the other Loan Documents or any other document referred to as provided for herein or therein or to inspect the properties or books of Borrower. Administrative Agent shall provide each Lender with any information received by Administrative Agent from Borrower which is required to be provided to Lenders hereunder and with a copy of any notice of default received by Administrative Agent from Borrower or any Lender. Except for notices, reports and other documents expressly required to be furnished to Lenders by Administrative Agent hereunder or under any other Administrative Agent Loan Document, Administrative Agent shall not have any duty or responsibility to provide any Lender with any other credit or other information concerning the affairs, financial condition or business of Borrower that may come into the possession of Administrative Agent.

Section 13.7. <u>Failure to Act</u>. Except for action expressly required of Administrative Agent hereunder or under any of the other Administrative Agent Loan Documents, Administrative Agent shall in all cases be fully justified in failing or refusing to act hereunder and thereunder unless Administrative Agent shall receive further assurances to Administrative Agent's complete satisfaction from Lenders of their indemnification obligations under <u>Section 13.5</u> hereof against any and all liability and expense that may be incurred by Administrative Agent by reason of Administrative Agent taking or continuing to take or failing to take any such action.

Section 13.8. <u>Action by Administrative Agent</u>. Each of the entities comprising Lenders hereby appoints Administrative Agent and each of the other Lenders as agent and bailee for the purpose of perfecting the security interests in and liens upon the Project, in accordance with Article 9 of the Uniform

4161624-v7\CHIDMS1

Commercial Code in effect in the State where the Project is located or the State where Borrower is organized, can be perfected only by possession (or where the security interest of a secured party with possession has priority over the security interest of another secured party). Each Lender hereby appoints Administrative Agent as such Lender's attorney-in-fact for the purpose of executing the Loan Documents (other than this Agreement) on such Lender's behalf.

Section 13.9. <u>Successor Administrative Agent</u>. Administrative Agent may resign as Administrative Agent upon thirty (30) days' written notice to Lenders. If Administrative Agent resigns under this Agreement, Lenders (other than the Lender which is the Administrative Agent resigning) shall appoint from among the other Lenders a successor agent for Lenders. If no successor agent is appointed prior to the effective date of the resignation of Administrative Agent, Administrative Agent may appoint, after consulting with Lenders (other than the Lender which is the Administrative Agent resigning), a successor agent from among such other Lenders. Upon the acceptance by the Lender so selected of such Lender's appointment as successor agent hereunder, such successor agent shall succeed to all of the rights, powers and duties of the retiring Administrative Agent and the term "Administrative Agent" as used herein and in the other Loan Documents shall mean such successor agent and the retiring Administrative Agent's appointment, powers and duties as Administrative Agent shall be terminated. After any retiring Administrative Agent's resignation hereunder as Administrative Agent, the provisions of this <u>Article XIII</u> shall inure to such retiring Administrative Agent's benefit as to any actions taken or omitted by such retiring Administrative Agent while such retiring Administrative Agent was Administrative Agent under this Agreement. If no successor agent has accepted appointment as Administrative Agent by the date which is thirty (30) days after the date of a retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nonetheless thereupon become effective and Lenders shall perform all of the duties of Administrative Agent hereunder until such time, if any, as the Lenders (other than the Lender which has resigned as Administrative Agent) appoint a successor agent as provided for above. The resigning Administrative Agent shall have continuing liability for any act of gross negligence or willful misconduct committed by Administrative Agent during the period such Administrative Agent was the Administrative Agent under this Agreement.

Section 13.10. <u>Sharing</u>. If at any time or times any Lender shall receive (i) by payment, foreclosure, setoff or otherwise, any proceeds of the Project or other collateral or any payments with respect to the obligations of Borrower to such Lender arising under, or relating to, this Agreement or any of the Loan Documents except for any such proceeds or payments received by such Lender from Administrative Agent or otherwise pursuant to the terms of this Agreement, or (ii) payments from Administrative Agent hereunder in excess of such Lender's ratable portion of the relevant distributions by Administrative Agent hereunder, such Lender shall promptly turn the same over to Administrative Agent, in kind, and with such endorsements as may be required to negotiate the same to Administrative Agent, or in same day funds, as applicable, for the account of all of the Lenders and for application to the obligations hereunder in accordance with the applicable provisions of this Agreement.

Section 13.11. <u>Pro Rata Treatment and Payments</u>.

(a) <u>Funding by Lenders; Presumption by Administrative Agent</u>. With respect to any advance required or deemed necessary by Administrative Agent under this Agreement or any other Loan Document (each, a "<u>Coverage Advance</u>"), Administrative Agent shall give each Lender not less than three (3) Business Days' notice by telephone and facsimile specifying the amount of the Coverage Advance, the date of the Coverage Advance and each Lender's Pro Rata Share of such Coverage Advance. Each Lender shall wire transfer to Administrative Agent immediately available federal funds equal to such Lender's Pro Rata Share of each Coverage Advance by 11:00 a.m. (New York City time) on the day of the Coverage Advance as set forth in the notice. Unless Administrative Agent shall have received notice from a Lender prior to the proposed date of any Coverage Advance that such Lender will not make

4161624-v7\CHIDMS1

available to Administrative Agent such Lender's Pro Rata Share of such Coverage Advance, Administrative Agent may assume that such Lender has made such Pro Rata Share available on such date in accordance with this Section and may, in reliance upon such assumption, make available to Borrower a corresponding amount. In such event, if a Lender has not in fact made its Pro Rata Share of the applicable Coverage Advance available to Administrative Agent, then the applicable Lender and Borrower severally agree to pay to Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to Borrower to but excluding the date of payment to Administrative Agent, at (i) in the case of a payment to be made by such Lender, a rate (the "Lender Interest Rate") equal to the greater of (x) the sum of (1) the Federal Funds Rate in effect from time to time and (2) one percent (1%) per annum and (y) a rate determined by Administrative Agent in accordance with banking industry rules on interbank compensation, and (ii) in the case of a payment to be made by Borrower, the Interest Rate. If Borrower and such Lender shall pay such interest to Administrative Agent for the same or an overlapping period, Administrative Agent shall promptly remit to Borrower the amount of such interest paid by Borrower for such period. If such Lender pays its Pro Rata Share of the applicable Coverage Advance to Administrative Agent, then the amount so paid shall constitute such Lender's Pro Rata Share of the applicable Coverage Advance. Any payment by Borrower shall be without prejudice to any claim Borrower may have against a Lender that shall have failed to make such payment to Administrative Agent.

(b)     Notices. Notices to each Lender shall be delivered in accordance with the terms and provisions of Section 15.1 hereof.

Section 13.12. Lenders Pro Rata Shares. Each Lender shall be entitled to receive, and Administrative Agent shall transfer to each Lender, each Lender's Pro Rata Share of all payments received and collected by Administrative Agent pursuant to the Loan Documents on account of principal and interest (collectively, "Debt Service Payments") and other sums, whether received from Borrower or any third party, excluding, however, any sums payable to Administrative Agent on account of expenses incurred by Administrative Agent for which Borrower is obligated to reimburse Administrative Agent pursuant to the Loan Documents to the extent that any Lender has not made a payment on account thereof pursuant to Section 13.5 hereof. For the purposes hereof, "Pro Rata Share" means, with respect to any Lender, the percentage obtained by dividing (a) the principal amount of the Loan attributable to such Lender as set forth on Schedule 13.12 annexed hereto and made a part hereof, as adjusted for any repayments of principal received by such Lender pursuant to this Agreement, by (b) the then outstanding aggregate principal amount of the Loan.

Section 13.13. Disbursement of Proceeds by Administrative Agent.

(a)     Administrative Agent shall hold each Lender's Pro Rata Share of any proceeds payable under the Loan, however received, as agent of and in trust for each of such Lenders subject to each of such Lenders' rights with respect thereto as herein set forth.

(b)     All sums received and collected by Administrative Agent pursuant to the Loan Documents on account of Debt Service Payments and other sums which are collected by 11:00 a.m. (New York City time) shall be paid to each Lender on the date of collection; all such sums collected by Administrative Agent after 11:00 a.m. (New York City time) shall be paid to each Lender on or before the next succeeding Business Day. Administrative Agent shall allocate and disburse to each Lender all payments received in proportion to each Lender's Pro Rata Share. All payments made by Administrative Agent to Lenders shall be made by deposit of immediately available funds pursuant to the wiring instructions set forth on the signature page hereof or as otherwise set forth in a written notice delivered from any Lender to Administrative Agent.

000678

(c) Unless Administrative Agent shall have received notice from Borrower prior to the date on which any payment is due to Administrative Agent for the account of the Lenders hereunder that Borrower will not make such payment, Administrative Agent may assume that Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption and pursuant to the foregoing paragraphs, distribute to the Lenders the amount due. In such event, if Borrower has not in fact made such payment or for any reason such payment is required to be returned to Borrower or paid to any other Person pursuant to any bankruptcy or insolvency law, any sharing clause in the Loan Documents or otherwise, then each of the Lenders severally agrees to repay to Administrative Agent forthwith on demand the amount so distributed to such Lender, without interest thereon, unless Administrative Agent is required to return such amount with interest thereon, in which case, with interest thereon at the Lender Interest Rate for each day from and including the date such amount is distributed to such Lender to but excluding the date of payment to Administrative Agent, unless such payment was made as a result of the gross negligence or willful misconduct of Administrative Agent, in which case Lenders shall not pay any interest on such payment.

(d) The transfer of funds to any Lender by Administrative Agent is made on a nonrecourse basis. Administrative Agent shall have no duty or obligation whatsoever to make any payments to any Lender except from corresponding payments received by Administrative Agent from Borrower or any other Person pursuant to the Loan Documents.

Section 13.14. <u>Amendments Concerning Agency Function</u>. Notwithstanding anything to the contrary contained in this Agreement, Administrative Agent shall not be bound by any waiver, amendment, supplement or modification of this Agreement or any other Loan Document which affects Administrative Agent's duties, rights, and/or functions hereunder or thereunder unless Administrative Agent shall have given Administrative Agent's prior written consent thereto.

Section 13.15. <u>Events of Default</u>.

(a) Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Event of Default unless and until Administrative Agent has received written notice from a Lender or Borrower specifying such Event of Default.

(b) In the event of the occurrence of an Event of Default and if Administrative Agent, in Administrative Agent's sole and absolute discretion, determines that any action is to be taken by Administrative Agent on behalf of Lenders in connection therewith, Administrative Agent shall send a notice (the "<u>Action Notice</u>") to each Lender recommending a course of action (which may include a recommendation to refrain from taking any action) and Lenders shall promptly consult in good faith to either confirm Administrative Agent's suggested course of action (or inaction) or to arrive at a course of action which shall be mutually acceptable to all Lenders in their reasonable discretion. Such course of action shall address, amongst other issues, (i) the exercise of remedies and the manner in which a foreclosure or additional remedies shall be conducted, (ii) the interests of all of the Lenders at a foreclosure sale or auction and whether Lenders or their nominees shall succeed to title to the Project or any other collateral and (iii) issues pertaining to the operation, management, maintenance, leasing and/or the sale of the Project or any other collateral. Administrative Agent shall promptly and diligently implement any such agreed upon course of action (or inaction) on behalf of Lenders. Notwithstanding anything to the contrary contained herein, if Lenders are unable to agree on a course of action (or inaction) within ten (10) Business Days of the date of the Action Notice, Administrative Agent shall have the right (but not the obligation), upon notice to Lenders, to take such course of action (or refrain from taking such action) as Administrative Agent deems appropriate and Administrative Agent may continue to proceed on such course of action, or refrain from taking such action, until Administrative Agent receives notice to the contrary from the Required Lenders ("<u>Agent Discretion Standard</u>"). Provided and on condition that

Administrative Agent has acted in accordance with this Subsection 13.15(b) and the Agent Discretion Standard, Lenders hereby acknowledge and agree that Administrative Agent shall have no obligation to take any action unless failure to do so would be grossly negligent or rise to the level of willful misconduct.

(c)     Provided that Lenders have agreed to a foreclosure or auction in accordance with Subsection 13.15(b) hereof (or Administrative Agent has exercised the Agent Discretion Standard), upon a foreclosure sale or auction and subject to the terms and provisions of this Agreement, Administrative Agent shall have the right to bid at the foreclosure sale or auction on behalf of Lenders. Any bid entered by Administrative Agent in an amount not in excess of the total indebtedness due under the Note plus expenses and all other amounts which are recoverable from the proceeds of the sale (collectively, the "Judgment Amount") shall be deemed to have been entered on behalf and for the benefit of Lenders, and, if such bid is the successful bid, Administrative Agent shall cause a referee's deed (as to the Project) or the applicable title instrument (as to all other collateral) to be issued to Administrative Agent (or Administrative Agent's nominee) in trust for Lenders, and Administrative Agent (or Administrative Agent's nominee) shall hold title subject to the terms and provisions of Subsection 13.15(d) and Subsection 13.15(e) hereof on behalf of, and as trustee for, Lenders.

(d)     Administrative Agent and Lender hereby acknowledge and agree that if title to (i) the Project or (ii) any other collateral is obtained by Administrative Agent (or Administrative Agent's nominee) for the benefit of Administrative Agent and Lenders, such asset(s) shall not be held as a permanent investment, but shall be marketed and sold as soon as possible, taking into account then current economic and market conditions. Subject to Subsection 13.15(b) hereof, each Lender shall, upon demand therefor from time to time, contribute such Lender's Pro Rata Share of all costs, fees and expenses (including, without limitation, attorney's fees and disbursements) suffered or incurred by Administrative Agent (or Administrative Agent's nominee) in connection with the operation, management, maintenance, leasing and/or sale of all or any part of the Project or any other collateral. Funds received from the ownership, operation or sale of the Project or any other collateral (net of operating expenses or transaction costs in connection with such ownership, operation or sale) shall constitute Debt Service Payments and shall be applied first, to reimburse Administrative Agent for any Costs, and thereafter, in accordance with Section 13.13 hereof. Lenders shall consult with Administrative Agent and attempt to determine a mutually acceptable course of action relating to, but not limited to, the management, operation and leasing of the Project and any other collateral as well as the sale of the Project and any other collateral; provided, however, if Lenders cannot agree on a mutually acceptable course of action, Administrative Agent shall have the right (but not the obligation) to apply the Agent Discretion Standard upon notice to Lenders.

(e)     Notwithstanding anything to the contrary contained herein, each Lender shall have the right to enter a bid in an amount in excess of the Judgment Amount and, if such bid is the successful bid, such Lender shall acquire the Project or other collateral, as the case may be, for such Lender's own account and, provided and on the condition that the non-bidding party is, by not later than the date of delivery to the bidding party (or such bidding party's nominee) of the referee's deed or other title instrument, paid in full all amounts owed to the non-bidding party under the Loan and this Agreement, the non-bidding party shall have no further interest in the Project or other collateral, as the case may be, and the terms and provisions of Subsection 13.15(b) hereof shall be null and void and of no further force or effect.

Section 13.16. Defaulting Lender.

(a)     In addition to the rights and remedies that may be available to Administrative Agent or Borrower under this Agreement or applicable law, if at any time any Lender has not performed such Lender's obligations under this Agreement or any of the other Loan Documents (a "Defaulting

4161624-v7\CHIDMS1

Lender") and such default continues for twenty (20) days after notice, such Defaulting Lender's right to participate in the administration of the Loan, this Agreement and the other Loan Documents, including, without limitation, any right to vote in respect of, to consent to or to direct any action or inaction of Administrative Agent or to be taken into account in the calculation of the Required Lenders, shall be suspended while such Lender remains a Defaulting Lender. If any Lender is a Defaulting Lender because such Lender has failed to make timely payment to Administrative Agent of any amount required to be paid to Administrative Agent hereunder, in addition to other rights and remedies which Administrative Agent or Borrower may have under the immediately preceding provisions or otherwise, Administrative Agent shall be entitled (i) to collect interest from such Defaulting Lender on such delinquent payment for the period from the date on which the payment was due until the date on which the payment is made at the Lender Interest Rate, (ii) to withhold or setoff and to apply in satisfaction of the defaulted payment and any related interest, any amounts otherwise payable to such Defaulting Lender under this Agreement or any other Loan Document until such defaulted payment and related interest has been paid in full and such default no longer exists and (iii) to bring an action or suit against such Defaulting Lender in a court of competent jurisdiction to recover the defaulted amount and any related interest. Any amounts received by Administrative Agent in respect of a Defaulting Lender shall not be paid to such Defaulting Lender and shall be held uninvested by Administrative Agent and either applied against the purchase price of such Defaulting Lender's interest in the Loan under Subsection 13.16(b) hereof or paid to such Defaulting Lender upon the default of such Defaulting Lender being cured.

(b)        Any Lender that is not a Defaulting Lender shall have the right, but not the obligation, in such Lender's sole and absolute discretion, to acquire all of a Defaulting Lender's interest in the Loan (the "Defaulting Lender's Interest") during the continuance of the applicable default. Upon any such purchase, the Defaulting Lender's Interest and the Defaulting Lender's rights hereunder (but not the Defaulting Lender's liability in respect thereof or under the Loan Documents or this Agreement to the extent the same relate to the period prior to the effective date of the purchase) shall terminate on the date of purchase, and the Defaulting Lender shall promptly execute all documents reasonably requested to surrender and transfer such interest to the purchaser thereof, including an assignment substantially in form and substance as set forth in Exhibit B annexed hereto and made a part hereof. The purchase price for the Defaulting Lender's Interest shall be equal to the amount of the principal balance of the Loan outstanding and owed by Borrower to the Defaulting Lender. The purchaser shall pay to the Defaulting Lender in immediately available funds on the date of such purchase the principal of and accrued and unpaid interest and fees with respect to the Defaulting Lender's Interest (it being understood that such accrued and unpaid interest and fees may be paid pro rata to the purchasing Lender and the Defaulting Lender by the Administrative Agent at a subsequent date upon receipt of payment of such amounts from Borrower). Prior to payment of such purchase price to a Defaulting Lender, Administrative Agent shall apply against such purchase price any amounts retained by Administrative Agent pursuant to the last sentence of Subsection 13.16(a) hereof. The Defaulting Lender shall be entitled to receive amounts owed to such Defaulting Lender by Borrower under the Loan Documents which accrued prior to the date of the default by the Defaulting Lender, to the extent the same are received by Administrative Agent from or on behalf of Borrower. There shall be no recourse against any Lender or Administrative Agent for the payment of such sums except to the extent of the receipt of payments from any other party or in respect of the Loan.

(c)        Nothing contained in this Section 13.16 or elsewhere in this Agreement shall release or in any way limit a Defaulting Lender's obligations as a Lender hereunder and/or under any other of the Loan Documents. Further, a Defaulting Lender shall indemnify and hold harmless Borrower, Administrative Agent and each of the non-Defaulting Lenders from any claim, loss, or costs incurred by Borrower, Administrative Agent and/or the non-Defaulting Lenders as a result of a Defaulting Lender's failure to comply with the requirements of this Agreement, including, without limitation, any and all additional losses, damages, costs and expenses (including, without limitation, attorneys' fees and

60

000681

disbursements) incurred by Borrower, Administrative Agent and/or any Lender as a result of and/or in connection with (i) any enforcement action brought by Borrower and/or Administrative Agent against a Defaulting Lender and (ii) any action brought against Borrower, Administrative Agent and/or Lenders by a Defaulting Lender. The indemnification provided above shall survive any termination of this Agreement.

Section 13.17. <u>Servicing Fee</u>. Administrative Agent shall be entitled, on a monthly basis, to a servicing fee in an amount to be determined by Administrative Agent based on a percentage of the outstanding principal balance of the Loan (the "<u>Servicing Fee</u>"). Lenders hereby irrevocably authorize Administrative Agent to deduct the Servicing Fee monthly from the Debt Service Payments to be made to Administrative Agent.

<div align="center">

ARTICLE XIV
INDEMNIFICATIONS
</div>

Section 14.1. <u>General Indemnification</u>. Borrower shall indemnify, defend and hold harmless the Indemnified Parties, or Borrower shall cause the Indemnified Parties to be indemnified, defended and held harmless, from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any one or more of the following: (a) any accident, injury to or death of Persons or loss of or damage to property occurring in, on or about the Project or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (b) any use, nonuse or condition in, on or about the Project or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (c) performance of any labor or services or the furnishing of any materials or other property in respect of the Project or any part thereof; (d) any failure of the Project to be in compliance with any applicable Legal Requirements or (e) the payment of any commission, charge or brokerage fee to anyone which may be payable in connection with the funding of the Loan (collectively, the "<u>Indemnified Liabilities</u>"); <i>provided</i>, <i>however</i>, that Borrower shall not have any obligation to Lenders hereunder to the extent that such Indemnified Liabilities arise from the gross negligence, illegal acts, fraud or willful misconduct of Administrative Agent or Lenders. To the extent that the undertaking to indemnify, defend and hold harmless set forth in the preceding sentence may be unenforceable because it violates any law or public policy, Borrower shall pay the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Lenders. Administrative Agent agrees that, so long as the Existing Leases shall continue to be in full force and effect, Borrower's indemnification, defense and holding harmless obligations to the Indemnified Parties under this <u>Section 14.1</u> may be satisfied by the applicable Tenants under the corresponding obligations of the Existing Leases; <i>provided</i>, <i>however</i>, the foregoing shall not act to, or be deemed to, release, relinquish or relieve Borrower from Borrower's obligations to indemnify the Indemnified Parties in accordance with the terms of this <u>Section 14.1</u> to the extent that the Tenant(s) fail, refuse, delay or are otherwise unable or unwilling to do so.

Section 14.2. <u>Intangible Tax Indemnification</u>. Borrower shall, at Borrower's sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any stamp or similar intangible tax on the making of the Deed of Trust, the Note or any of the other Loan Documents, excluding, for purposes of clarity, any income, franchise or other similar taxes, or U.S. federal withholding taxes imposed under FATCA as a result of the failure by a Lender to comply with the applicable provisions of FATCA.

Section 14.3. <u>ERISA Indemnification</u>. Borrower shall, at Borrower's sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses (including, without limitation, reasonable attorneys' fees and costs incurred in the investigation,

<div align="center">61</div>

defense, and settlement of Losses incurred in correcting any prohibited transaction or in the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA that may be required, in Administrative Agent's sole and absolute discretion) that Administrative Agent or Lenders may incur, directly or indirectly, as a result of a default under <u>Section 4.9</u> or <u>Section 5.17</u> hereof.

Section 14.4. <u>Survival</u>. The obligations and liabilities of Borrower under this <u>Article XIV</u> shall fully survive indefinitely notwithstanding any termination, satisfaction, or assignment of the Deed of Trust.

<div align="center">

ARTICLE XV
NOTICES

</div>

Section 15.1. <u>Notices</u>. All notices, consents, approvals and requests required or permitted hereunder or under any other Loan Document shall be given in writing and shall be effective for all purposes if hand delivered or sent by (a) certified or registered United States mail, postage prepaid, return receipt requested, or (b) expedited prepaid overnight delivery service, either commercial or United States Postal Service, with proof of attempted delivery, addressed as follows (or at such other address and Person as shall be designated from time to time by any party hereto, as the case may be, in a written notice to the other parties hereto in the manner provided for in this Section):

| | |
|---|---|
| If to Lenders: | See address and telephone number specified for such Lender on <u>Schedule 15.1</u> |
| If to Administrative Agent: | National Bank of Kuwait, S.A.K.P., New York Branch<br>299 Park Avenue<br>New York, New York 10171<br>Attention: Corporate Finance |
| With a copy to: | Baker & McKenzie LLP<br>300 E. Randolph St., Suite 5000<br>Chicago, Illinois 60601<br>Attention: Mona Dajani, Esq. |
| If to Borrower: | Galleria 2425 Owner, LLC<br>3139 W Holcombe Blvd #845<br>Houston, Texas  77025<br>Attention: Azeemeh Zaheer |
| With copies to: | Polsinelli<br>2950 Harwood Street, Suite 2100<br>Dallas, Texas 75201<br>Attention: Brian Bullard, Esq. |

A notice shall be deemed to have been given: (i) in the case of hand delivery, at the time of delivery; (ii) in the case of registered or certified mail, when delivered or the first attempted delivery on a Business Day; or (iii) in the case of expedited prepaid delivery, upon the first attempted delivery on a Business Day.

<div align="center">

ARTICLE XVI
FURTHER ASSURANCES

</div>

Section 16.1. <u>Replacement and Corrective Documents</u>. Upon receipt of an affidavit of an officer of Administrative Agent as to the loss, theft, destruction or mutilation of the Note or any other Loan

<div align="center">62</div>

Document which is not of public record, and, in the case of any such mutilation, upon surrender and cancellation of such Note or other Loan Document, Borrower and Guarantor shall issue, in lieu thereof, a replacement Note or other Loan Document, dated the date of such lost, stolen, destroyed or mutilated Note or other Loan Document in the same principal amount thereof and otherwise of like tenor. Borrower and Guarantor hereby consent and agree that in the event that any of the Loan Documents misstate or inaccurately reflect the true and correct terms and provisions of the Loan and said misstatement or inaccuracy is due to the unilateral mistake on the part of Lenders or Administrative Agent, mutual mistake on the part of any of Administrative Agent, Lenders, Borrower and Guarantor or clerical error, then in such event Borrower and Guarantor shall, within thirty (30) days after written request of Administrative Agent and in order to correct such misstatement or inaccuracy, execute such new documents as Administrative Agent may deem necessary to remedy said inaccuracy or mistake.

Section 16.2. <u>Further Acts, Etc</u>. Subject to <u>Article XII</u> hereof, Borrower and Guarantor shall, at the cost and expense of Borrower and Guarantor, and without expense to Lenders or Administrative Agent, do, execute, acknowledge and deliver all and every further acts, deeds, conveyances, assignments, security agreements, control agreements, notices of assignments, transfers and assurances as Administrative Agent shall, from time to time, reasonably require, for the better assuring, conveying, assigning, transferring, and confirming unto Lenders the rights hereby granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which Borrower or Guarantor may be or may hereafter become bound to convey or assign to Lenders, or for carrying out the intention or facilitating the performance of the terms of this Agreement or for filing or registering of the Deed of Trust, or for complying with all Legal Requirements. Borrower and Guarantor, on demand, shall deliver, and in the event Borrower or Guarantor shall fail to so deliver, hereby authorizes Administrative Agent to file, in the name of Borrower and Guarantor, one or more financing statements and financing statement amendments to evidence more effectively, perfect and maintain the priority of the security interest of Lenders in the Project. Borrower and Guarantor grant to Lenders and Administrative Agent an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Lenders or Administrative Agent at law and in equity, including, without limitation, such rights and remedies available to Lenders or Administrative Agent pursuant to this <u>Section 16.2</u>.

Section 16.3. <u>Changes in Tax, Debt, Credit and Documentary Stamp Law</u>.

(a)     If any law is enacted or adopted or amended after the date of this Agreement which deducts the Debt from the value of the Project for the purpose of taxation with the result that taxes are imposed on the Lenders, Borrower shall pay the tax, with interest and penalties thereon, if any, other than U.S. federal withholding taxes imposed under FATCA as a result of the failure by a Lender to comply with the applicable provisions of FATCA. If Lenders are advised by counsel chosen by Lenders that the payment of such tax by Borrower would be unlawful or taxable to Lenders (unless any such tax is reimbursed by Borrower) or unenforceable or provides the basis for a defense of usury then Lenders shall have the option by written notice of not less than one hundred twenty (120) days to declare the Debt immediately due and payable. Borrower shall not claim or demand or be entitled to any credit or credits on account of the Debt for any part of the Taxes or Other Charges assessed against the Project, or any part thereof, and no deduction shall otherwise be made or claimed from the assessed value of the Project, or any part thereof, for real estate or personal property tax purposes by reason of the Deed of Trust or the Debt if such claim, credit or deduction has the effect of imposing a tax on Lenders. If such claim, credit or deduction shall be required by law, Lenders shall have the option, by written notice of not less than one hundred twenty (120) days, to declare the Debt immediately due and payable.

(b)     If at any time the United States of America, any State thereof or any subdivision of any such State shall require revenue or other stamps to be affixed to the Note, the Deed of Trust, or any

63

000684

of the other Loan Documents or impose any other tax or charge on the same, Borrower shall pay for the same, with interest and penalties thereon, if any.

Section 16.4. <u>Expenses</u>. Borrower covenants and agrees to pay or reimburse, as applicable, Lenders and Administrative Agent upon receipt of written notice from Administrative Agent for all actual costs and expenses (including reasonable third party attorneys' fees and disbursements) incurred by Administrative Agent and Lenders in accordance with this Agreement in connection with (a) the preparation, negotiation, execution and delivery of this Agreement, the Deed of Trust and the other Loan Documents and the consummation of the transactions contemplated hereby and thereby and all the costs of furnishing all opinions by counsel for Borrower and Guarantor (including, without limitation, any opinions reasonably requested by Administrative Agent as to any legal matters arising under this Agreement or the other Loan Documents with respect to the Project); (b) Borrower's and Guarantor's ongoing performance of and compliance with Borrower's and Guarantor's agreements and covenants contained in this Agreement, the Deed of Trust and the other Loan Documents on its part to be performed or complied with after the Closing Date, including, without limitation, confirming compliance with environmental and insurance requirements; (c) [Reserved.] (d) subject to <u>Article XII</u> hereof, the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to this Agreement and the other Loan Documents; (e) securing Borrower's and Guarantor's compliance with any requests reasonably made pursuant to the provisions of this Agreement; (f) the filing and recording fees and expenses, title insurance and reasonable fees and expenses of counsel for providing to Administrative Agent all required legal opinions, and other similar expenses reasonably incurred in creating and perfecting the Lien in favor of Lenders pursuant to this Agreement, the Deed of Trust and the other Loan Documents; (g) enforcing or preserving any rights, in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Borrower or Guarantor, this Agreement, the other Loan Documents, the Project, or any security given for the Loan; and (h) enforcing any obligations of or collecting any payments due from Borrower under this Agreement, the other Loan Documents or with respect to the Project or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or of any insolvency or bankruptcy proceedings.

ARTICLE XVII
WAIVERS

Section 17.1. <u>Remedies Cumulative; Waivers</u>. The rights, powers and remedies of Administrative Agent and Lenders under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Administrative Agent or Lenders may have against Borrower or Guarantor pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise. Lenders' rights, powers and remedies may be pursued singularly, concurrently or otherwise, at such time and in such order as Lenders may determine in Lenders' sole discretion. No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient. A waiver of one Default or Event of Default with respect to Borrower or Guarantor shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon.

Section 17.2. <u>Modification, Waiver in Writing</u>. No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, or of the Note, or of any other Loan Document, nor consent to any departure by Borrower or Guarantor therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to, or demand on Borrower or

4161624-v7\CHIDMS1

Guarantor shall entitle Borrower or such Guarantor to any other or future notice or demand in the same, similar or other circumstances.

Section 17.3. <u>Delay Not a Waiver</u>. Neither any failure nor any delay on the part of Administrative Agent or Lenders in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under the Note or under any other Loan Document, or any other instrument given as security therefor, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege. In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement, the Note or any other Loan Document, Administrative Agent and Lenders shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement, the Note or the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.

Section 17.4. <u>Trial by Jury</u>. BORROWER, ADMINISTRATIVE AGENT AND LENDERS EACH HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER, ADMINISTRATIVE AGENT AND LENDERS, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH OF LENDERS, ADMINISTRATIVE AGENT AND BORROWER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER, ADMINISTRATIVE AGENT AND LENDERS.

Section 17.5. <u>Waiver of Notice</u>. Borrower and Guarantor shall not be entitled to any notices of any nature whatsoever from Administrative Agent or Lenders except with respect to matters for which this Agreement or the other Loan Documents specifically and expressly provide for the giving of notice by Administrative Agent or Lenders to Borrower and Guarantor and except with respect to matters for which Borrower or Guarantor is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice. Borrower hereby expressly waives the right to receive any notice from Administrative Agent or Lenders with respect to any matter for which this Agreement or the other Loan Documents do not specifically and expressly provide for the giving of notice by Administrative Agent or Lenders to Borrower.

Section 17.6. <u>Remedies of Borrower</u>. In the event that a claim or adjudication is made that Administrative Agent or Lenders or Administrative Agent's or Lenders' agents have acted unreasonably or unreasonably delayed acting in any case where by law or under this Agreement or the other Loan Documents, Administrative Agent, Lenders or such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that Administrative Agent, Lenders and Administrative Agent's and Lenders' agents shall not be liable for any monetary damages, and Borrower's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment. The parties hereto agree that any action or proceeding to determine whether Administrative Agent or Lenders have acted reasonably shall be determined by an action seeking declaratory judgment. Administrative Agent and Lenders agrees that, in such event, it shall cooperate in expediting any action seeking injunctive relief or declaratory judgment.

Section 17.7. <u>Waiver of Marshalling of Assets</u>. To the fullest extent permitted by law, Borrower for itself and its successors and assigns, waives all rights to a marshalling of the assets of Borrower and

<div align="center">65</div>

000686

other Persons with interests in Borrower, and of the Project, and agrees not to assert any right under any laws pertaining to the marshalling of assets, the sale in inverse order of alienation, homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Lenders under the Loan Documents to a foreclosure of the Deed of Trust for the collection of the Debt without any prior or different resort for collection or of the right of Lenders to the payment of the Debt out of the net proceeds of the Project in preference to every other claimant whatsoever.

Section 17.8. <u>Waiver of Statute of Limitations</u>. Borrower hereby expressly waives and releases, to the fullest extent permitted by law, the pleading of any statute of limitations as a defense to payment of the Debt or performance of its other obligations set forth in the Loan Documents.

Section 17.9. <u>Waiver of Counterclaim</u>. Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lenders or Administrative Agent or Lenders' or Administrative Agent's agents.

<div align="center">

ARTICLE XVIII
GOVERNING LAW

</div>

Section 18.1. <u>Choice of Law</u>.

(i)    THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, THE LOAN WAS MADE BY LENDERS AND ACCEPTED BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE LOAN WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, AND ENFORCEMENT OF THE LIEN AND SECURITY INTEREST CREATED PURSUANT THE DEED OF TRUST, THE ASSIGNMENT OF LEASES AND RENTS AND THE OTHER LOAN DOCUMENTS (OTHER THAN WITH RESPECT TO LIENS AND SECURITY INTERESTS IN PROPERTY WHOSE PERFECTION AND PRIORITY IS COVERED BY ARTICLE 9 OF THE UCC (INCLUDING, WITHOUT LIMITATION, THE ACCOUNTS) WHICH SHALL BE GOVERNED BY THE LAW OF THE JURISDICTION APPLICABLE THERETO IN ACCORDANCE WITH SECTIONS 9-301 THROUGH 9-307 OF THE UCC AS IN EFFECT IN THE STATE OF NEW YORK) SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE PROJECT IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS AND ALL OF THE OBLIGATIONS ARISING HEREUNDER OR THEREUNDER. TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE

<div align="center">66</div>

000687

LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW EXCEPT AS SPECIFICALLY SET FORTH ABOVE.

(ii) ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST ADMINISTRATIVE AGENT, ANY LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT MAY AT ADMINISTRATIVE AGENT'S OR LENDERS' OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. BORROWER DOES HEREBY DESIGNATE AND APPOINT:

> Capitol Services, Inc.
> 1218 Central Avenue, Suite 100
> Albany, NY 12205

AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS TOGETHER WITH WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER, IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK. BORROWER (I) SHALL GIVE PROMPT NOTICE TO ADMINISTRATIVE AGENT OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

(iii) Borrower, Administrative Agent and Lenders hereby knowingly, voluntarily, intentionally, unconditionally and irrevocably submit to the exclusive jurisdiction of any New York State or Federal court sitting in New York County over any suit, action or proceeding arising out of or relating to this Agreement, and each such party hereby agrees and consents that, in addition to any methods of service of process provided for under applicable law, all service of process in any such suit, action or proceeding in any New York State or Federal court sitting in New York County may be made by certified or registered mail, return receipt requested, directed to such party at the address indicated on the first page of this Agreement or in Section 15.1 hereof, as applicable, and service so made shall be complete three (3) days after the same shall have been so mailed.

Section 18.2. Severability. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

67

4161624-v7\CHIDMS1

Section 18.3. <u>Preferences</u>. Lenders shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the obligations of Borrower or Guarantor hereunder in connection with any payment deemed to be fraudulent or an impermissible preference payment under applicable Legal Requirements. To the extent Borrower or Guarantor makes a payment or payments to Lenders, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any Creditors' Rights Laws, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the obligations hereunder or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lenders.

<div align="center">

ARTICLE XIX
MISCELLANEOUS

</div>

Section 19.1. <u>Survival</u>. This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the entering into by Lenders of this Agreement and the execution and delivery to Lenders of the Note, and shall continue in full force and effect so long as all or any of the Debt is outstanding and unpaid unless a longer period is expressly set forth herein or in the other Loan Documents. Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the successors and assigns of such party. All covenants, promises and agreements in this Agreement, by or on behalf of Borrower shall inure to the benefit of the successors and assigns of Lenders.

Section 19.2. <u>Administrative Agent's Discretion</u>. Whenever pursuant to this Agreement, Administrative Agent exercises any right given to Administrative Agent to approve or disapprove, or any arrangement or term is to be satisfactory to Administrative Agent, the decision of Administrative Agent to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory shall (except as is otherwise specifically herein provided) be in the reasonable discretion of Administrative Agent.

Section 19.3. <u>Headings</u>. The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

Section 19.4. <u>Cost of Enforcement</u>. In the event (a) that the Deed of Trust is foreclosed in whole or in part, (b) of the bankruptcy, insolvency, rehabilitation or other similar proceeding in respect of Borrower or Guarantor or any of Borrower Members, Borrower's constituent Persons or Subsidiaries or an assignment by Borrower or Guarantor or any of Borrower Members, Borrower's constituent Persons or Subsidiaries for the benefit of its creditors, or (c) Lenders exercise any of its other remedies under this Agreement or any of the other Loan Documents, Borrower shall be chargeable with and agrees to pay all costs of collection and defense, including attorneys' fees and costs, incurred by Lenders, Administrative Agent or Borrower in connection therewith and in connection with any appellate proceeding or post-judgment action involved therein, together with all required service or use taxes.

Section 19.5. <u>Schedule Incorporated</u>. The Schedules annexed hereto are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

Section 19.6. <u>Offsets, Counterclaims and Defenses</u>. Any assignee of Lenders' interest in and to this Agreement, the Note and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which Borrower or Guarantor may otherwise have against any assignor of such documents, and no such unrelated counterclaim or defense shall be interposed or asserted by Borrower or such Guarantor in any action or proceeding brought by any

<div align="center">68</div>

such assignee upon such documents and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

Section 19.7. No Joint Venture or Partnership; No Third Party Beneficiaries.

(a)  Borrower, Administrative Agent and Lenders intend that the relationships created hereunder and under the other Loan Documents be solely that of borrower and lender. Nothing herein or therein is intended to create a joint venture, partnership, tenancy-in-common, or joint tenancy relationship between Borrower, Guarantor, Administrative Agent and Lenders nor to grant Administrative Agent or Lenders any interest in the Project other than that of secured party, Lenders or lender. Borrower hereby knowingly, voluntarily, intentionally, unconditionally and irrevocably waives and relinquishes all claims, demands, counterclaims and/or defenses alleging the existence of any partnership, joint venture or other fiduciary relationship between Administrative Agent or Lenders and Borrower and Borrower shall hold Lenders, Administrative Agent, Lenders' and Administrative Agent's successors and assigns, harmless from and against any and all losses, damages, penalties, fines, forfeitures, legal fees and related costs, judgments and any other fees, costs and expenses that Administrative Agent or Lenders may sustain as a result of any such allegation by any Person whatsoever.

(b)  This Agreement and the other Loan Documents are solely for the benefit of Lenders, Administrative Agent and Borrower and Guarantor and nothing contained in this Agreement or the other Loan Documents shall be deemed to confer upon anyone other than Lenders, Administrative Agent and Borrower and Guarantor any right to insist upon or to enforce the performance or observance of any of the obligations contained herein or therein. All conditions to the obligations of Lenders to enter into this Agreement and make the financial accommodations provided for hereunder are imposed solely and exclusively for the benefit of Lenders and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lenders will refuse to enter into this Agreement or make the financial accommodations provided for hereunder in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Administrative Agent or Lenders if, in Administrative Agent's or Lenders' sole discretion, Administrative Agent or Lenders deem it advisable or desirable to do so.

(c)  The shareholders, general partners, members, principals and (if Borrower is a trust) beneficial owners of Borrower are experienced in the ownership and operation of properties similar to the Project, and Lenders are relying solely upon such expertise and business plan in connection with the ownership and operation of the Project.

(d)  Notwithstanding anything to the contrary contained herein, Lenders are not undertaking the performance of any obligations with respect to any agreements, contracts, certificates, instruments, franchises, permits, trademarks, licenses and other documents of Borrower.

(e)  By accepting or approving anything required to be observed, performed or fulfilled or to be given to Lenders or Administrative Agent pursuant to this Agreement, the Deed of Trust, the Note or the other Loan Documents, including, without limitation, any officer's certificate, balance sheet, statement of profit and loss or other financial statement, survey, appraisal, or insurance policy, Lenders and Administrative Agent shall not be deemed to have warranted, consented to, or affirmed the sufficiency, the legality or effectiveness of same, and such acceptance or approval thereof shall not constitute any warranty or affirmation with respect thereto by Lenders or Administrative Agent.

(f)  Borrower and Guarantor recognize and acknowledge that in accepting this Agreement, the Note, the Deed of Trust and the other Loan Documents, Lenders are expressly and primarily relying on the truth and accuracy of the representations and warranties set forth in Article IV of

69

this Agreement without any obligation to investigate the Project and notwithstanding any investigation of the Project by Administrative Agent; that such reliance existed on the part of Lenders prior to the date hereof, that the warranties and representations are a material inducement to Lenders in entering into this Agreement and making the financial accommodations provided for hereunder; and that Lenders would not be willing to enter into this Agreement and make the financial accommodations provided for hereunder and accept this Agreement, the Note, the Deed of Trust and the other Loan Documents in the absence of the warranties and representations as set forth in Article IV of this Agreement.

Section 19.8. <u>Publicity</u>. All news releases, publicity or advertising by Borrower, Guarantor or Borrower's Affiliates through any media intended to reach the general public which refers to the Loan, Lenders, or any of Lenders' Affiliates shall be subject to the prior written approval of Administrative Agent, not to be unreasonably withheld. Administrative Agent and Lenders shall be permitted to make any news, releases, publicity or advertising by Lenders or Lenders' Affiliates through any media intended to reach the general public which refers to the Loan, the Project, Borrower, Guarantor and Borrower's Affiliates without the approval of Borrower or any such Persons in a "tombstone", advertisement or other written description or loan summary in an industry periodical, journal or newspaper or at industry events or conferences, provided that such references are limited to the following matters: (i) the principal amount of the Loan, (ii) the term of the Loan, (iii) the location of the Project, (iv) whether the interest rate of the Loan is fixed or variable and (v) the identity of Borrower. All other news-releases, publicity or advertising by Lenders shall be subject to Borrower's prior written approval, which approval shall not be unreasonably withheld or delayed. Borrower also agrees that Lenders and Administrative Agent may share any information pertaining to the Loan with third-parties in connection with the sale or transfer of the Loan or any Participations thereof.

Section 19.9. <u>Conflict; Construction of Documents; Reliance</u>. In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control. The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of the Loan Documents and that such Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same. Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Administrative Agent or Lenders or any parent, subsidiary or Affiliate of Administrative Agent or Lenders. Lenders shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or Affiliate of Lenders of any equity interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lenders' or Administrative Agent's exercise of any such rights or remedies. Borrower acknowledges that Lenders engage in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse to or competitive with the business of Borrower or its Affiliates.

Section 19.10. <u>Actions, Approvals and Determinations</u>. Wherever in this Agreement it is provided that (a) as a condition precedent to Borrower's undertaking certain action, Borrower shall be required to obtain Administrative Agent's consent or approval or (b) Administrative Agent shall have the right to make a determination (including, without limitation, a determination as to whether a matter is satisfactory to Administrative Agent), or if Borrower shall request that Administrative Agent or Lenders take any action, then, unless expressly provided to the contrary in the applicable provision of this Agreement, the decision whether to grant such consent or approval or to take the requested action, or the determination in question, shall be in the sole and exclusive discretion of Administrative Agent and Lenders and shall be

70

000691

final and conclusive. Wherever in this Agreement it is stated that any consent or approval shall not be unreasonably withheld or that a determination to be made by Administrative Agent or Lenders shall be subject to a specified standard, then, if a court of competent jurisdiction determines, without right to further appeal, that the consent or approval shall be deemed granted or the standard shall be deemed met, as the case may be, then Administrative Agent or Lenders, at the request of Borrower, shall deliver to Borrower written confirmation thereof. The obtaining of such consent or approval or determination that such standard has been met shall be Borrower's sole and exclusive remedy with respect to the subject matter of this section, and under no circumstance shall Administrative Agent or Lenders, or Administrative Agent's or Lenders' counsel or anyone else acting or purporting to act on Administrative Agent's or Lenders' behalf have any liability (whether in damages or otherwise) with respect thereto. In any instance in which Borrower requests, or any Loan Document provides, that Administrative Agent or Lenders shall consider granting Administrative Agent's or Lenders' consent or approval or making a determination or taking some other action, Borrower shall, upon demand, pay all actual out-of-pocket costs, expenses and reasonable attorneys' fees and disbursements incurred by Administrative Agent and Lenders in connection therewith.

Section 19.11. <u>Entire Agreement</u>. This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written between Borrower, Administrative Agent and Lenders are superseded by the terms of this Agreement and the other Loan Documents.

Section 19.12. <u>Certain Additional Rights of Lenders</u>. Notwithstanding anything which may be contained in this Agreement to the contrary, Lenders shall have:

(a)     the right to designate any party to receive payment of all fees, costs and expenses otherwise payable to Lenders under this Agreement or the other Loan Documents;

(b)     the right to routinely consult with and advise Borrower's, management regarding the significant business activities and business and financial developments of Borrower. Consultation meetings should occur on a regular basis with Administrative Agent or Lenders having the right to call special meetings at any reasonable times;

(c)     the right, without restricting any other right of Administrative Agent or Lenders under this Agreement (including any similar right), to restrict, upon the occurrence and continuance of an Event of Default, Borrower's payments of management consulting director or similar fees to affiliates of Borrower (or their personnel); and

(d)     the right, without restricting any other rights of Administrative Agent or Lenders under this Agreement (including any similar right), to restrict the transfer to voting interests in Borrower held by its shareholders, members or partners (as the case may be), and the right to restrict the transfer of interests in such shareholder, member or partner (as the case may be), except for any transfer that is expressly permitted hereunder.

Section 19.13. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, and each such counterpart shall for all purposes be deemed to be an original, and all such counterparts together constitute but one and the same agreement. In addition, the parties may execute separate signature pages, and such signature pages (and/or signature pages which have been detached from one or more duplicate original copies of this Agreement) may be combined and attached to one or more copies of this Agreement so that such copies shall contain the signatures of all of the parties hereto.

[balance of page intentionally left blank]

71

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

BORROWER:

**GALLERIA 2425 OWNER, LLC**,
a Delaware limited liability company

By: Galleria 2425 JV, LLC,
a Delaware limited liability company,
its sole member

By: Naissance Capital Real Estate, LLC,
a Delaware limited liability company,
its Managing Member

By: _____
Name: Azeemeh Zaheer
Title: Managing Member

[SIGNATURES CONTINUE ON NEXT PAGE]

[Signature Page to Loan Agreement]

000693

ADMINISTRATIVE AGENT AND LENDER:

**NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH,** a banking corporation organized under the laws of Kuwait, acting through its New York branch

By: _____

Name: _____

Title: _____

Arlette Kittaneh
Executive Manager

By: _____

Name: Michael G. McHugh

Title: Executive Manager

[Signature Page to Loan Agreement]

EXHIBIT A

BORROWER'S ORGANIZATIONAL STRUCTURE

[see attached]

000695

# The Galleria – Houston, Texas (Master Chart)





000696

EXHIBIT B

FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement"), dated as of the ____ day of _____, 20__, made by and between [NAME OF ASSIGNING BANK] ("Assignor") and [NAME OF ASSIGNEE] ("Assignee").

Preliminary Statement

1.      This Agreement relates to that certain Loan Agreement (as the same may be amended from time to time, the "Loan Agreement") dated as of May 23, 2018 made by and among (1) Galleria 2425 Owner, LLC, a Delaware limited liability company ("Borrower"), (2) the lender(s) party thereto (each, a "Lender" and collectively, "Lenders"), and (3) National Bank of Kuwait, S.A.K.P., New York Branch ("Administrative Agent"). All capitalized terms not otherwise defined herein shall have the respective meanings set forth in the Loan Agreement.

2.      Subject to the terms and conditions set forth in the Loan Agreement, Assignor has a pro-rata share of the Loan equal to _____ percent (_____%) in an aggregate principal amount of $_____ ("Assignor's Loan Commitment").

3.      The aggregate outstanding principal amount under Assignor's Loan Commitment at the commencement of business on the date hereof is $_____,

4.      Assignor desires to assign to Assignee all of the rights of Assignor under the Loan Agreement and the other Loan Documents (as defined in the Loan Agreement) in respect of a portion of Assignor's Loan Commitment, such portion being in an amount equal to $_____, which relates to a Pro-Rata Share of the Loan of _____ percent (_____%) (the "Assigned Loan Commitment"); and Assignee desires to accept assignment of such rights and assume the corresponding obligations from Assignor on such terms.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained herein, the parties hereto agree as follows:

SECTION 1.  Assignment. Assignor hereby assigns and sells to Assignee all of the rights of Assignor under the Loan Agreement and the other Loan Documents in and to the Assigned Loan Commitment, and Assignee hereby accepts such assignment from Assignor and assumes all of the obligations of Assignor under the Loan Agreement and the other Loan Documents with respect to the Assigned Loan Commitment. Upon the execution and delivery hereof by Assignor, Assignee, Administrative Agent and the payment of the amount specified in Section 2 hereof required to be paid on the date hereof, (1) Assignee shall, as of the commencement of business on the date hereof, succeed to the rights and obligations of a Lender under the Loan Agreement and the other Loan Documents with a Pro-Rata Share of the Loan equal to the percentage applicable to the Assigned Loan Commitment and (2) the Pro-Rata Share of Assignor shall, as of the commencement of business on the date hereof, be reduced correspondingly and Assignor released from its obligations under the Loan Agreement and the other Loan Documents to the extent such obligations have been assumed by Assignee. Assignor represents and warrants that it (x) owns the Assigned Loan Commitment free and clear of all liens and other encumbrances and (y) is legally authorized to enter into and perform this Agreement. Except as provided in the immediately preceding sentence, the assignment provided for herein shall be without representation or warranty by, or recourse to, Assignor.

Exh. B-1

SECTION 2. <u>Payments</u>. As consideration for the assignment and sale contemplated in Section 1 hereof, Assignee shall pay to Assignor on the date hereof, in immediately available funds, an amount equal to $_____. Each of Assignor and Assignee hereby agrees that if it receives any amount under the Loan Agreement or any of the other Loan Documents which is for the account of the other party hereto, it shall receive the same for the account of such other party to the extent of such other party's interest therein and shall promptly pay the same to such other party.

SECTION 3. <u>Consents; Notices</u>. If required pursuant to <u>Article XII</u> or <u>Article XIII</u> of the Loan Agreement, this Agreement is conditioned upon the consent of Administrative Agent. The execution of this Agreement by Administrative Agent is evidence of this consent. Assignee has designated its address for notices below.

SECTION 4. <u>Non-Reliance on Assignor</u>. Assignor makes no representation or warranty in connection with, and shall have no responsibility with respect to, the solvency, financial condition, or statements of Borrower or any other party to any Loan Document, or the validity and enforceability of the obligations of Borrower or any other party to a Loan Document in respect of the Loan Agreement or any other Loan Document. Assignee acknowledges that it has, independently and without reliance on Assignor, and based on such documents and information as it has deemed appropriate, made its own analysis of the collateral for the Loan, credit analysis of Borrower and decision to enter into this Agreement and will continue to be responsible for making its own independent appraisal of the collateral for the Loan and of the business, affairs and financial condition of Borrower and the other parties to the Loan Documents.

SECTION 5. <u>Governing Law</u>. This Agreement shall be governed by, and construed and enforced in accordance with the Laws of the State of New York without reference to principles of conflicts of law.

SECTION 6. <u>Counterparts</u>. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

SECTION 7. <u>Certain Representations and Agreements by Assignee</u>. Assignee represents that it is legally authorized to enter into and perform this Agreement. In addition, Assignee hereby represents that it is entitled to receive any payments to be made to it under the Loan Agreement or hereunder without the withholding of any tax and agrees to furnish the evidence of such exemption as specified therein and otherwise to comply with the provisions of the Loan Agreement and the other Loan Documents.

SECTION 8. <u>Reliance By Borrower</u>. This Agreement shall be binding upon, enforceable by and inure to the benefit of Borrower, its successors and assigns.

[balance of page intentionally left blank]

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered by their duly authorized officers as of the date first above written.

ASSIGNOR:

By: _____
    Name:
    Title:

ASSIGNEE:

By: _____
    Name:
    Title:

Assignee's Address for Notices:

[Assignee]
[Address]
Attention: _____
Telephone: (___) _____

ADMINISTRATIVE AGENT:

NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH, a banking corporation organized under the laws of Kuwait, acting through its New York branch

By: _____
    Name:
    Title:

Exh. B-3

SCHEDULE 13.12

Amount of Loan Attributable to Lender

| Lender | Amount of Loan Attributable to Lender |
|--------|---------------------------------------|
| NBK | $51,675,000.00 |

Sched. 13.12-1

000700

<div align="center">PROMISSORY NOTE</div>

$51,675,000.00                                                  Date: May 23, 2018

THIS PROMISSORY NOTE (this "Note") made as of May 23, 2018, by GALLERIA 2425 OWNER, LLC, a Delaware limited liability company, having an address at 3139 W Holcombe Blvd #845, Houston, Texas 77025 ("Borrower"), to NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH, a banking corporation organized under the laws of Kuwait, acting through its New York branch, having an office at 299 Park Avenue, New York, New York 10171, as administrative and collateral agent (in such capacity, together with its successors and assigns, "Administrative Agent") for the Lenders (as defined in the Loan Agreement referred to below). *Capitalized terms used but not defined in this Note shall have the meanings assigned to them in the Loan Agreement*.

1.  Covenant to Pay

FOR VALUE RECEIVED, without grace, except as expressly provided for herein and in the Loan Agreement, Borrower does hereby covenant and promise to pay to the order of Administrative Agent, on behalf of Lenders, at Administrative Agent's office at 299 Park Avenue, New York, New York 10171 or at such other place as Administrative Agent may designate to Borrower in writing from time to time, in legal tender of the United States, the principal amount of FIFTY ONE MILLION SIX HUNDRED AND SEVENTY-FIVE THOUSAND AND 00/100 DOLLARS ($51,675,000.00) (the "Principal Balance"), together with interest on the unpaid portion of said Principal Balance at the applicable Interest Rate (as hereinafter defined) calculated in accordance with the terms hereof, from the date the Principal Balance is advanced to Borrower until the Principal Balance and all interest accrued thereon shall be fully paid. The period from the date hereof through and including the Maturity Date is hereinafter referred to as the "Term." "Maturity Date" means May 23, 2023.

2.  Interest Rate

(a)     During the Term, the rate at which interest shall be calculated under this Note (the "Interest Rate") shall be:

i. Commencing on May 24, 2018 and including May 28, 2018, the Interest Rate shall be a rate equal to the sum of (i) 2.75% (the "Interest Rate Markup") plus (ii) the Weekly LIBOR Rate (as hereinafter defined) as of two (2) London Business Days (as hereinafter defined) prior to the date hereof;

ii. Commencing on May 29, 2018 through and including May 31, 2021, the Interest Rate shall be a fixed rate equal to five and sixty-four hundredths percent (5.64%) per annum (the "Fixed Rate");

iii. Commencing on June 1, 2021 and continuing on the first (1st) day of each LIBOR Period (as hereinafter defined) thereafter, as applicable (each, a "Rate Adjustment Date"), the Interest Rate shall be recalculated to an adjustable rate equal to the sum of (i) the Interest Rate Markup plus (ii) the LIBOR Rate (as hereinafter defined) for the applicable LIBOR Period (as hereinafter defined) as of two (2) London Business Days (as hereinafter defined) prior to each applicable Rate Adjustment Date.

(b)      Borrower hereby acknowledges and agrees that Borrower shall not have more than three (3) LIBOR contracts outstanding at any one time during the Term.

(c)      During the Term, the LIBOR Period shall be a period of 30 days, except as adjusted pursuant to the definition of "LIBOR Period."

(d)      The certificate of Administrative Agent as to any Interest Rate and the interest amounts payable by Borrower pursuant thereto shall, absent manifest error, be final, conclusive and binding on Borrower.

(e)      As used herein, the following terms shall have the indicated meanings:

Alternate Rate - a per annum rate equal to (i) the Interest Rate Markup plus (ii) the Prime Rate (as hereinafter defined) less (iii) one percent (1%).

Business Day - a day other than (i) a Saturday, Sunday or (ii) other day on which commercial banks in New York, New York are authorized or required by law to close.

LIBOR Period - the period commencing on June 1, 2021 or any Rate Adjustment Date (as the case may be) and ending on, as applicable, the day immediately prior to the next succeeding payment date or the day immediately prior to the payment date of the calendar month that is one (1) month thereafter; provided, however, that if a payment date would occur on a day that is not a Business Day, the LIBOR Period to which such payment date relates shall be extended to the day immediately prior to the next succeeding Business Day. To the extent that the preceding clause results in the extension of a LIBOR Period, Administrative Agent shall have the right (but not the obligation) to shorten or extend, respectively, the succeeding LIBOR Period so that it shall end on a day that numerically corresponds to the intended payment date indicated in this Note and minimize breakage and/or avoid early termination of

000702

any LIBOR contract; provided, however, that no LIBOR Period shall extend beyond the earlier to occur of (i) the Maturity Date or (ii) the date the Loan is otherwise due and payable pursuant to the terms and provisions hereof. For the avoidance of doubt, the intended payment date is the first calendar day of each calendar month.

LIBOR Rate - the rate per annum (rounded upward, if necessary, to the nearest 1/1000 of 1%) at which United States Dollar deposits are offered in the London interbank market as displayed on the Bloomberg L.P., page "BBAM" or any page that replaces BBAM, two (2) London Business Days prior to the first day of the applicable LIBOR Period, for deposits in immediately available funds, in lawful money of the United States, of amounts substantially comparable to the outstanding Principal Balance for the LIBOR Period, divided by a percentage equal to 100% minus the stated maximum rate of all reserves required to be maintained against "Eurocurrency Liabilities" as specified in Regulation D (or against any other category of liabilities which includes deposits by reference to which the interest rate on LIBOR-based loans is determined) on such date to any member bank of the Federal Reserve System. Notwithstanding any provision above, the practice of rounding to determine the LIBOR Rate may be discontinued at any time in Administrative Agent's sole discretion. Notwithstanding the foregoing, in no event shall the LIBOR Rate be less than 0%.

London Business Day - any day on which dealings in United States dollar deposits are carried on by banking institutions in the London interbank market.

Prime Rate - a fluctuating interest rate per annum which shall at all times be equal to the rate of interest announced publicly by NBK in New York from time to time, as NBK's prime rate. In the event NBK does not announce its prime rate, the Prime Rate shall be the prime rate as set forth in *The Wall Street Journal* from time to time.

Regulation D - Regulation D of the Board of Governors of the Federal Reserve System as in effect from time to time, including, without limitation, any successor or other regulation or official interpretation of said Board of Governors relating to reserve requirements applicable to member banks of the Federal Reserve System.

Weekly LIBOR Rate - the rate per annum (rounded upward, if necessary, to the nearest 1/1000 of 1%) at which United States Dollar deposits are offered in the London interbank market as displayed on the Bloomberg L.P., page "BBAM" or any page that replaces BBAM, two (2) London Business Days prior to the date hereof, for deposits in immediately available funds, in lawful money of the United States, of amounts substantially comparable to the outstanding Principal Balance for a one week period, divided by a percentage equal to 100% minus the stated maximum rate of all reserves

3

000703

required to be maintained against "Eurocurrency Liabilities" as specified in Regulation D (or against any other category of liabilities which includes deposits by reference to which the interest rate on LIBOR-based loans is determined) on such date to any member bank of the Federal Reserve System. Notwithstanding any provision above, the practice of rounding to determine the LIBOR Rate may be discontinued at any time in Administrative Agent's sole discretion. Notwithstanding the foregoing, in no event shall the LIBOR Rate be less than 0%.

3.  Increased Costs

(a)     If, after the date of this Note, any change in applicable law or regulation or in the interpretation or administration thereof by any Governmental Authority charged with the interpretation or administration thereof (whether or not having the force of law), and which change is applicable generally to other financial institutions (each, a "Change in Law"), shall (i) change the basis of taxation of payments to any Lender of the Principal Balance or interest due and owing under this Note or any fees or other amounts payable hereunder (other than changes in respect of taxes imposed on the overall net income of such Lender), (ii) subject any Lender to any tax of any kind whatsoever with respect to this Note or the Loan, or (iii) impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of or credit extended by any Lender or shall impose on any Lender any other condition affecting this Note, and the result of any of the foregoing shall or would be to increase the cost to any Lender of making or maintaining the Loan or to reduce the amount of any sum received or receivable by any Lender hereunder (whether of principal, interest or otherwise), Administrative Agent may, at any time, notify Borrower of the additional amount required to compensate such Lender for such increased cost or reduced amount and Borrower shall pay to Administrative Agent on behalf of such Lender such additional amount or amounts as shall compensate such Lender for such additional costs incurred or reduction suffered.

(b)     If any Lender determines that any Change in Law affecting such Lender or any lending office of such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such capital or on the capital of such Lender's holding company, if any, as a consequence of such Lender's participation in the Loan to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

4153909-v7\CHIDMS1

000704

(c)     A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section and delivered to Borrower shall be conclusive absent manifest error. Borrower shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)     Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation, provided that Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs incurred or reductions suffered more than six (6) months prior to the date that such Lender notifies Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the six-month period referred to above shall be extended to include the period of retroactive effect thereof).

(e)     Any Lender affected by increased costs as set forth above shall use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any portion of the Loan affected by such event, provided that such designation is made on such terms that such Lender and its lending office suffer no economic, legal or regulatory disadvantage, with the object of avoiding such increased costs.  If the affected Lender is not able to avoid such increased costs by designating another lending office, then Borrower shall have the right to replace the affected Lender with a new Lender in accordance with the terms and provisions of the Loan Documents.

(f)     The Increased Cost provisions of this Note shall be without duplication of the provisions of Section 5.4 or Section 16.3 of the Loan Agreement.

4.     <u>Illegality</u>

If Administrative Agent shall notify Borrower that the introduction of, or any change in, or in the interpretation of, any law or regulation makes it unlawful, or any central bank or other Governmental Authority asserts that it is unlawful, for any Lender to perform such Lender's obligations hereunder, then Borrower shall either (i) prepay in full the entire unpaid Debt within ninety days (such date to be adjusted to minimize or avoid breakage) after notice from Administrative Agent, without Prepayment Premium or yield maintenance of any kind or (ii) replace the affected Lender with a new Lender in accordance with the terms and provisions of the Loan Documents. In addition, if Administrative Agent notifies Borrower that by reason of circumstances affecting the London interbank market for United States dollar deposits there does not exist adequate and reasonable means for ascertaining the LIBOR Rate for any LIBOR Period, then, commencing on the last day of the then existing LIBOR Period therefor, the Interest Rate

000705

shall automatically be and remain at the per annum rate at all times equal to the Alternate Rate, which Interest Rate shall be adjusted concurrently with each adjustment in the Alternate Rate until Administrative Agent shall notify Borrower that the circumstances causing the suspension of the use of the LIBOR Rate no longer exist.

5.    Calculation of Interest

        Interest shall be computed on the basis of actual days over a three hundred sixty (360) day calendar year (except that interest computed by reference to the Alternate Rate shall be computed on the basis of a three hundred sixty five (365) day calendar year, or a three hundred sixty six (366) day calendar year in a leap year) and shall continue to accrue and be payable on the outstanding Principal Balance to but excluding the date of repayment thereof in full.

6.    Payment of Indebtedness

        Borrower shall make payments of interest under this Note as follows and said payments shall be applied upon receipt thereof:

        (a)    Interest shall be paid monthly, in arrears, on the first Business Day (i) of each calendar month, if the applicable Interest Rate for such payment is the Fixed Rate in accordance with Section 2(a)(i) above; or (ii) following the applicable one (1)-month LIBOR Period (which payment date, for the avoidance of doubt, is intended to be the first calendar day of each calendar month, subject to adjustment in accordance with the definition of LIBOR Period), for the period of such LIBOR Period, if the applicable Interest Rate for such payment is being calculated with reference to the LIBOR Rate in accordance with Section 2(a)(ii) above; notwithstanding the foregoing, interest for the period commencing on the date hereof and ending on May 31, 2018 shall be paid in advance on the date hereof; and

        (b)    On the Maturity Date the entire unpaid Principal Balance, together with all interest accrued thereon and all other Debt, shall be due and payable and repaid in full.

7.    Security

        This Note is governed and/or secured by, inter alia, the following documents, each dated as of the date hereof: (i) that certain Loan Agreement made by and among Borrower, Administrative Agent and Lenders (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "Loan Agreement"), (ii) that certain Deed of Trust, Assignment of Leases and Rents and Profits, Security Agreement and Fixture Filing made by Borrower to Salima Umatiya, as trustee, for the

4153909-v7\CHIDMS1

000706

benefit of Administrative Agent (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "<u>Deed of Trust</u>"), encumbering the premises known as and located at 2425 West Loop South, City of Houston, State of Texas (the "<u>Property</u>"), (iii) that certain Absolute Assignment of Leases and Rents made by Borrower for the benefit of Administrative Agent encumbering the Property (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "<u>Assignment of Leases</u>"), and (iv) those certain other documents defined as "Loan Documents" in the Loan Agreement, which documents specify various defaults upon the happening of which all sums due and owing under this Note may be declared immediately due and payable.

8. <u>Prepayment</u>

(a)     Provided no Event of Default exists, Borrower shall have the right to prepay the Principal Balance, in whole, or in part (but if in part, then in minimum increments of $100,000 (or $1,000,000 if an Interest Rate Protection Product in the form of an interest rate swap is then in effect)), upon not less than thirty (30) days' prior written notice (the "<u>Prepayment Notice</u>") to Administrative Agent specifying the date on which prepayment is to be made (the "<u>Prepayment Date</u>") and the amount of any such prepayment (the "<u>Prepayment Amount</u>"). On the Prepayment Date, Borrower shall pay (i) the Prepayment Amount, (ii) interest accrued and unpaid on the Prepayment Amount to and including the last day of the month in which the Prepayment Date occurs, (iii) in the event the Prepayment Amount equals the entire outstanding Principal Balance, all other unpaid Debt, (iv) the cost of unwinding, modifying or terminating any Interest Rate Protection Product then in effect ("<u>Unwinding Costs</u>"), and (v) the then applicable Prepayment Premium (as hereinafter defined). As used herein, "<u>Prepayment Premium</u>" shall mean: (A) if all or any portion of the Debt is prepaid within the first twelve (12) months following the date hereof, an amount equal to 1.50% of the amount so prepaid, and (B) if all or any portion of the Debt is prepaid within the period from and after the date which is twelve (12) months following the date hereof but before the date which is twenty-four (24) months following the date hereof, an amount equal to 1.00% of the amount so prepaid. If all or any portion of the Debt is prepaid after the date which is twenty-four (24) months following the date hereof, no Prepayment Premium shall be due.

(b)     If any Prepayment Notice is given, the entire Prepayment Amount specified therein (together with the applicable Prepayment Premium, Unwinding Costs and all other sums referred to above) shall be due and payable on the Prepayment Date set forth therein.

(c)     Any partial prepayment made hereunder shall be applied against the Principal Balance in inverse order of maturity (i.e., so as to reduce the final payments of principal due and owing hereunder

4153909-v7\CHIDMS1

and not result in any reduction in or deferment of the monthly payments of principal due and owing hereunder).

(d)      Payment of the entire outstanding Principal Balance following an acceleration of the same shall be deemed to be a voluntary prepayment to which the Prepayment Premium and Unwinding Costs shall be applicable.

(e)      Notwithstanding any other provision of this Section, no Prepayment Premium shall be payable with respect to any prepayment occurring as a result of the application of any Insurance Proceeds or Awards under the Loan Agreement.

9.      <u>Waivers</u>

Borrower hereby knowingly, voluntarily, intentionally, unconditionally and irrevocably (i) waives presentment and demand for payment, notice of dishonor, protest and notice of protest of this Note, (ii) agrees to pay all costs of collection when incurred by Administrative Agent and Lenders, including, but not limited to, reasonable attorneys' fees and disbursements (which costs may be added to the amount due under this Note and be receivable therewith) and (iii) agrees to perform and comply with each of the terms, provisions, covenants and conditions contained in this Note, the Loan Agreement, the Deed of Trust and any of the other Loan Documents on the part of Borrower to be observed or performed.

10.     <u>No Release</u>

No (a) release by Administrative Agent of any portion of the Mortgaged Property (as defined in the Deed of Trust) or any other collateral being held as security for the payment by Borrower of the Debt, (b) granting by Administrative Agent of an extension of time for payment of this Note, or any installment thereof, or (c) alteration, amendment or waiver of any term, provision, covenant or condition of this Note or any Loan Document shall release, discharge, modify, change or affect the liability of Borrower under this Note or any of the other Loan Documents. The right to plead any and all statutes of limitations as a defense to any demand on this Note, or any guaranty hereof, or any agreement to pay the same, or any demand secured by the Deed of Trust, or any and all obligations and liabilities arising out of or in connection with this Note, the Loan Agreement or any of the other Loan Documents, is expressly waived by Borrower, and any endorsers and/or guarantors of this Note, to the fullest extent permitted by law.

11.     <u>Writings</u>

4153909-v7\CHIDMS1

000708

This Note may not be waived, changed, modified or discharged orally, but only by an agreement in writing, signed by the party against whom enforcement of any waiver, change, modification or discharge is sought.

12.    Event of Default

It is hereby expressly agreed that the entire Debt shall, then or at any time thereafter, without notice (except as may be provided herein, in the Loan Agreement or in the Deed of Trust), become immediately due and payable at the option of Administrative Agent on the happening of any Event of Default and, in such event, the Deed of Trust may be foreclosed. All of the terms, provisions, covenants and conditions contained in the Loan Agreement, the Deed of Trust, the Assignment of Leases and the other Loan Documents which are to be kept and performed by Borrower are hereby made part of this Note to the same extent and with the same force and effect as if they were fully set forth in this Note. Failure to exercise such option or any other rights Administrative Agent may, in the event of any such Event of Default, be entitled to, shall not constitute a waiver of the right to exercise such option or any other rights in the event of any subsequent Event of Default, whether of the same or different nature.

13.    Late Charge

If any sum payable under this Note (but excluding, however, the final installment of the Principal Balance) is not paid within five (5) days of its due date, Borrower shall pay upon demand a late payment charge ("Late Charge") of two cents ($.02) for each dollar ($1) of such unpaid sum to defray the expenses incurred by Administrative Agent or Lenders in handling and processing such delinquent payment, and such amount shall be secured by the Deed of Trust and the Loan Documents. Nothing contained herein shall be deemed to constitute a waiver or modification of the due date on which such sums are due and payable.

14.    Involuntary Rate

In addition to any Late Charge which may be due under this Note, if the Debt is declared immediately due and payable by Administrative Agent pursuant to the provisions of this Note or any of the Loan Documents, or if any installment of principal or interest is not paid when due, or if the Debt is not paid in full on the Maturity Date, or if any other Event of Default shall have occurred, Borrower shall thereafter pay interest on the Principal Balance from the date of any of such events, as the case may be, until the date the installment of interest or principal is paid, the Debt is paid in full, or until such Event of Default is cured, at a rate (the "Involuntary Rate") equal to the lesser of (i) the Prime Rate plus two percent (2%) per annum or (ii) the Maximum Rate (as hereinafter defined), provided that there shall be no

000709

automatic reduction to the Maximum Rate if Borrower is barred by law from availing itself in any action or proceeding of the defense of usury or if Borrower is barred or exempted from the operation of any law limiting the amount of interest that may be paid for the Loan or use of money or in the event this transaction, because of its amount or purpose or for any other reason, is exempt from the operation of any statute limiting the amount of interest that may be paid for the Loan or use of money.

15. <u>Maximum Rate</u>

In the event the interest provisions or any exactions provided for herein or in the Loan Agreement, the Deed of Trust or in any of the other Loan Documents shall result, because of the monthly reduction of principal or for any other reason, at any time during the Term in an effective rate of interest which, for any month, transcends the limit of the usury or any other law applicable to the Loan (the "<u>Maximum Rate</u>"), all sums in excess of those lawfully collectible as interest for the period in question shall, without further agreement or notice between or by any party hereto, be applied in reduction of the Principal Balance immediately upon receipt of such moneys by Administrative Agent with the same force and effect as though Borrower had specifically designated such extra sums to be so applied to reduction of the Principal Balance and Administrative Agent had agreed to accept such extra payment(s) as a premium-free prepayment, provided that no Prepayment Premium shall be payable in connection with any such reduction of the Principal Balance. In no event shall any agreed to or actual exaction as consideration for the Loan transcend the limits imposed or provided by the law applicable to this transaction or Borrower in the jurisdiction in which the land is located for the use or detention of money or for forbearance in seeking its collection.

16. <u>Application of Payments</u>

If at any time Administrative Agent receives from Borrower a payment or prepayment in an amount that is less than all amounts then due, Administrative Agent may apply that payment or prepayment to amounts then due in any manner and in any order determined by Administrative Agent, in Administrative Agent's sole and absolute discretion. Borrower agrees that neither Administrative Agent's acceptance of a payment or prepayment from Borrower in an amount that is less than all amounts then due, nor Administrative Agent's application of such payment or prepayment in the manner authorized in the immediately preceding sentence, shall be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction.

17. <u>Notices</u>

4153909-v7\CHIDMS1

All notices, demands, requests, consents and other communications which are required or permitted to be given under this Note shall be sufficiently given when given as set forth in the Loan Agreement.

18.    <u>Applicable Law</u>

This Note shall be construed in accordance with and be governed by the laws of the State of New York without reference to principles of conflicts of law. Borrower hereby agrees to submit to personal jurisdiction in all state and federal courts located in the State and County of New York in any action or proceeding relating to this Note, the Loan Agreement, the Deed of Trust or any of the other Loan Documents. In furtherance of such agreement, Borrower hereby knowingly, voluntarily, intentionally, unconditionally and irrevocably appoints Capitol Services, Inc., having an address at 1218 Central Avenue, Suite 100, Albany, NY 12205, as general agent ("<u>Agent</u>") for Borrower for receipt of service of process in any such action or proceeding (and Administrative Agent may make service upon Borrower and/or such Agent). Service of any summons and complaint or other process in any such action or proceeding and any notice of sale or other notices may be made upon Borrower and/or Agent by registered or certified mail, return receipt requested, Borrower and Agent hereby waiving personal service thereof, or as may otherwise be permitted by law.

19.    <u>Waiver of Trial By Jury</u>

Borrower hereby knowingly, voluntarily, intentionally, unconditionally and irrevocably waives all right to trial by jury in any action, proceeding or counterclaim arising out of or relating to this Note, the Loan Agreement, the Deed of Trust or any of the other Loan Documents.

20.    <u>Right to Transfer Note</u>

Administrative Agent and Lenders may transfer this Note and their rights hereunder in accordance with Article XII of the Loan Agreement.

21.    <u>Purchase of Note</u>.

In lieu of prepaying the Note in whole, Borrower shall have the right to purchase this Note, and the liens securing same ("<u>Lender's Liens</u>") upon not less than thirty (30) days' prior written notice to Lender, specifying the date on which such purchase is to occur (the "<u>Note Purchase Date</u>"). The purchase price for the Note shall be an amount equal to the Prepayment Amount that Borrower would be required to pay pursuant to Section [__] if prepaying the Note in whole on the Note Purchase Date. For the avoidance of doubt, the purchase price shall include then-current Principal Balance, accrued but unpaid

4153909-v7\CHIDMS1

000711

interest, any applicable Prepayment Premium, Unwinding Costs, Late Charges or other charges owing on the Note, plus any other Debt or amounts owed to Administrative Agent or Lenders pursuant to the terms of the Loan Documents as of such Note Purchase Date, as reasonably determined by Administrative Agent. Upon receipt of such amounts, Administrative Agent and Lender shall execute and deliver to Borrower a recordable assignment of note and lien instrument ("Note Assignment") with respect to the Note and Lender's Liens being acquired.  The purchase of the Note by Borrower shall be on an as-is basis, other than as expressly set forth in the Note Assignment, which representations and warranties shall be limited to the principal balance of the Note, and that Lender is the owner and holder of the Note and Lender's Liens, subject to no liens or security interests in favor of any third party, and has the full legal right and authority to sell the Note and Lender's Liens.  It is expressly acknowledged and agreed by Borrower that the right granted in this Note is a right to purchase the Note and Loan in full and not in part, and, if the Loan is evidenced by more than one promissory note, Borrower shall not acquire one note without acquiring all notes evidencing the Loan, and Lender shall not sell or assign its interest in one note without selling or assigning its interest in all notes evidencing the Loan.  Prior to assigning, granting a participation in or syndication all or any part of the Note, Lender agrees to provide Borrower thirty (30) Business Days' prior notice thereof.

22.     Joint and Several

If Borrower consists of more than one person or party, the obligations and liabilities of each such person or party hereunder shall be joint and several.

23.     Power

Borrower (and the undersigned representatives of Borrower, if any) represents that Borrower has full power, authority and legal right to execute and deliver this Note and that the payment of the Debt constitutes a valid and binding obligation of Borrower.

24.     Form

Whenever used in this Note, the singular number shall include the plural, the plural the singular, and the words "Lender(s)", "Borrower" and "Administrative Agent" shall include their respective successors and assigns.

25.     Right of Set Off

If an Event of Default shall have occurred and be continuing, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted

4153909-v7\CHIDMS1

by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of Borrower against any and all of the obligations of Borrower now or hereafter existing under this Note, the Loan Agreement or any other Loan Document to such Lender, irrespective of whether or not such Lender shall have made any demand under this Note, the Loan Agreement or any other Loan Document and although such obligations of Borrower are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness. The rights of each Lender and its respective Affiliates under this paragraph are in addition to other rights and remedies (including other rights of setoff) that such Lender or its respective Affiliates may have. Each Lender agrees to notify Borrower and Administrative Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

26.   Construction

This Note shall be construed without regard to any presumption or other rule requiring construction against the party causing this Note to be drafted. To the extent any term herein conflicts with any term of the Loan Agreement, the Loan Agreement shall control.

27.   Administrative Agent

To the extent that any action is to be taken, any information is to be delivered to or by Lenders, any determination is to be made, or any consent is to be given or withheld by Lenders, any such action, delivery, determination or consent shall be taken, made or given or withheld, as the case may be, by Administrative Agent or any successor agent thereto.

28.   Heirs, Successors and Assigns

All of the terms, provisions, covenants and conditions of this Note shall apply to, bind and inure to the benefit of, the heirs, executors, administrators, successors and assigns of Borrower, Lenders and Administrative Agent, respectively.

[balance of page intentionally left blank]

4153909-v7\CHIDMS1

000713

IN WITNESS WHEREOF, Borrower has duly executed this Note as of the day and year first above written.

BORROWER:

**GALLERIA 2425 OWNER, LLC,**
a Delaware limited liability company

By:    Galleria 2425 JV, LLC,
       a Delaware limited liability company,
       its sole member

       By:    Naissance Capital Real Estate, LLC,
             a Delaware limited liability company,
             its Managing Member

             By: _____
             Name: Azeemeh Zaheer
             Title:  Managing Member

[Signature Page to Promissory Note]

000714

THIS INSTRUMENT WAS PREPARED BY
AND UPON RECORDING RETURN TO:

Baker & McKenzie LLP
300 E. Randolph St., Suite 5000
Chicago, IL 60601
Attention: Mona Dajani, Esq.

AFTER RECORDING RETURN TO:
**TransAct** TITLE

GF #: 12000490

## DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS AND PROFITS, SECURITY AGREEMENT AND FIXTURE FILING

by

GALLERIA 2425 OWNER LLC, a Delaware limited liability company,
whose address is 3139 W Holcombe Blvd #845, Houston, Texas 77025.
Grantor,

to

Salima Umatiya,
with an address of 245 Commerce Green Blvd., Suite 151, Sugar Land, TX 77478,
Trustee,

for the benefit of

NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH, a banking corporation
organized under the laws of Kuwait, acting through its New York branch, as administrative and
collateral agent,

whose address is having an office at 299 Park Avenue, New York, New York 10171,
Beneficiary

THIS DEED OF TRUST IS ALSO A FIXTURE FILING UNDER SECTION 9.502(b) OF THE
TEXAS BUSINESS AND COMMERCE CODE.

RP-2018-235600

000715



**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

<u>DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS AND PROFITS, SECURITY AGREEMENT AND FIXTURE FILING</u>

THIS DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS AND PROFITS, SECURITY AGREEMENT AND FIXTURE FILING made as of May 23, 2018 made by GALLERIA 2425 OWNER LLC, a Delaware limited liability company, having an address at 3139 W Holcombe Blvd #845, Houston, Texas 77025 ("<u>Grantor</u>"), in favor of Salima Umatiya, an individual, having an address at 245 Commerce Green Blvd., Suite 151, Sugar Land, TX 77478 (together with its successors and assigns, "<u>Trustee</u>"), as Trustee for the benefit of NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH, a banking corporation organized under the laws of Kuwait, acting through its New York branch, having an office at 299 Park Avenue, New York, New York 10171, as administrative and collateral agent (in such capacity, together with its successors and permitted assigns, "<u>Beneficiary</u>") for the Lenders (as defined in the Loan Agreement referred to below).

<div align="center">WITNESSETH:</div>

A.    Lenders are this day making a term loan to Grantor in the principal amount of $51,675,000.00 (the "<u>Loan</u>"), which loan shall be governed by that certain Loan Agreement dated of even date herewith made by and among Grantor, Beneficiary and Lenders (as the same may be amended, restated or otherwise modified from time to time, the "<u>Loan Agreement</u>");

B.    Beneficiary is the holder of a Promissory Note (as the same may be amended, restated, consolidated, split, severed or otherwise modified from time to time, the "<u>Note</u>"), dated as of even date herewith, given by Grantor, as maker, to Beneficiary, as payee, in the original principal amount of $51,675,000.00; and

C.    Beneficiary has requested, and Grantor has agreed, to secure Grantor's obligations under the Note by giving Beneficiary a first priority lien encumbering the Mortgaged Property (as hereinafter defined).

<div align="center">CERTAIN DEFINITIONS</div>

Unless the context otherwise specifies or requires, the following terms shall have the meanings herein specified, such definitions to be applicable equally to the singular and the plural forms of such terms.

"<u>Chattels</u>" means all fixtures, fittings, appliances, apparatus, equipment, machinery and articles of personal property and additions thereto and replacements thereof (other than those owned by lessees, contractors or licensees), now or at any time hereafter affixed to, attached to, placed upon, or used in any way in connection with the complete and comfortable present or future use, enjoyment, occupancy or operation of the Improvements on the Premises.

"<u>Debt</u>" shall mean the outstanding principal amount set forth in, and evidenced by, the Loan Agreement and the Note, together with all interest accrued and unpaid thereon and all other sums due to Administrative Agent or Lenders in respect of the Loan under the Note, the Loan Agreement, this Deed of Trust or any other Loan Document.

4162651-v5\CHIDMS1

000716



RP-2018-235600

"Deed of Trust" means this Deed of Trust, Assignment of Leases and Rents and Profits, Security Agreement and Fixture Filing, as the same may be amended, restated, consolidated, split, severed or otherwise modified from time to time.

"Deed of Trust Amount" means the maximum principal amount secured by this Deed of Trust as of the date hereof, i.e., $51,675,000.00.

"Events of Default" means the events and circumstances described as such in Section 2.01 hereof.

"Improvements" means all structures or buildings, and replacements thereof, to be erected or now or hereafter located upon the Premises, including all equipment, apparatus, machinery and fixtures of every kind and nature whatsoever forming part of said structures or buildings.

"Loan" means the $51,675,000.00 loan governed by the Loan Agreement, evidenced by the Note and secured by this Deed of Trust.

"Premises" means all that certain plot, piece or parcel of land situated, lying and being in the City of Houston, County of Harris and State of Texas, described on **Exhibit A** annexed hereto and made a part hereof, including all of the Improvements, easements, rights, privileges and appurtenances (including, without limitation, any air or development rights) thereunto belonging or in anywise appertaining, and all of the estate, right, title, interest, claim or demand whatsoever of Grantor therein and in the rights-of-way, gores of land, streets, ways, alleys, passages, sewer rights, waters, water courses, water rights and powers, and all estates, rights, titles, interests, privileges, tenements, hereditaments, and appurtenances of any nature whatsoever, in any way belonging, relating or pertaining thereto, either in law or in equity, in possession or expectancy, now or hereafter acquired.

All terms of this Deed of Trust which are not defined above shall have the meaning set forth elsewhere in this Deed of Trust or, if not set forth in the Deed of Trust, in the Loan Agreement.

NOW, THEREFORE, Grantor, in consideration of the premises and in order to secure the payment of the Debt and any sums due under any Interest Rate Protection Product and the performance and observance of all of the provisions of this Deed of Trust, the Loan Agreement, the Note and the other Loan Documents, hereby irrevocably GRANTS, TRANSFERS, CONVEYS, CONFIRMS, PLEDGES and ASSIGNS, all of its present and future estate, rights, title, interest and claim, either in law or in equity, of, in and to the following property (collectively, the "Mortgaged Property"), whether now owned or held or hereafter acquired, to Trustee for the benefit of Beneficiary, TO HAVE AND TO HOLD, IN TRUST FOR THE BENEFIT OF BENEFICIARY UPON THE STATUTORY CONDITION AND WITH THE STATUTORY POWER OF SALE:

    (i)     the Premises;

    (ii)    the Improvements;

    (iii)   the Chattels;

    (iv)   all proceeds of the conversion, voluntary or involuntary, of any of the foregoing into cash or liquidated claims, including, without limitation, proceeds of insurance and condemnation awards, and all rights of Grantor to refunds of real estate taxes and assessments and the reasonable attorney's fees, costs and disbursements incurred by Beneficiary or Lenders in connection with the collection of such award or payment;

    (v)    all Leases now or hereafter entered into and all right, title and interest of Grantor thereunder, including, without limitation, cash or securities deposited thereunder to secure performance

2

000717

by the Tenants of their obligations thereunder, whether such cash or securities are to be held until the expiration of the terms of such Leases or applied to one or more of the installments of rent coming due immediately prior to the expiration of such terms, including, further, the right during the continuance of an Event of Default, to receive and collect the rents thereunder;

      (vi)    all proceeds of (or return of any unearned premiums on) any insurance policies covering all or any part of the Premises, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments or settlements made in lieu thereof, for damage to the Premises;

      (vii)    all monies, funds, bank accounts, deposit accounts, accounts receivable, contract rights, other rights and any other intangible assets derived from or related to the rental, operation or ownership of the Premises or any part thereof, and all the agreements, instruments or documents evidencing or relating to any of the same, whether or not identified to or known by Beneficiary or Lenders;

      (viii)    all trade names, trademarks, logos, copyrights, good will and books and records relating to or used in connection with the operation of the Mortgaged Property or any part thereof;

      (ix)    to the extent assignable, all contracts from time to time executed by Grantor or any manager or agent on Grantor's behalf relating to the ownership, management, leasing, sale, marketing, construction, maintenance, repair, operation, occupancy or financing of the Mortgaged Property or any part thereof and all agreements relating to the purchase or Lease of any portion of same; all consents, licenses, building permits, certificates of occupancy and other governmental approvals relating to construction, completion, occupancy, use or operation of the Mortgaged Property or any part thereof; and all drawings, plans, specifications and similar or related items relating to the Mortgaged Property;

      (x)    all so-called "air rights," bulk development rights, floor area, floor area ratio, zoning rooms and other rights and privileges now or hereafter appurtenant to the Premises and Improvements or any part thereof, as defined in, under or with respect to the zoning and building codes or ordinances of all applicable jurisdictions and the regulations and interpretations thereunder or thereof, whether or not transferable, and any or all of the same that may now or hereafter be acquired for use with the Premises or Improvements; and

      (xi)    all proceeds and replacements of and substitutions for all or any of the foregoing.

As to any of the Mortgaged Property aforesaid which does not form a part and parcel of the real estate, this Deed of Trust is and is hereby deemed to be, as well, a Security Agreement under the Uniform Commercial Code for the purpose of creating hereby a security interest in such property, which is hereby granted to Beneficiary as "Secured Party" (as said quoted term is defined in the Uniform Commercial Code), securing the Debt and all other obligations set forth herein.

TO HAVE AND TO HOLD unto Beneficiary, its successors and assigns forever and Grantor does hereby bind itself, its successors and assigns to WARRANT AND FOREVER DEFEND the title to the Mortgaged Property unto Trustee.

<div align="center">

ARTICLE I.
REPRESENTATIONS, WARRANTIES AND COVENANTS OF GRANTOR

</div>

Grantor represents, warrants and covenants as follows:

SECTION 1.01. Title; No Encumbrances. Grantor warrants title to the Mortgaged Property subject to no lien, charge or encumbrance except such encumbrances as are listed as exceptions to title in the Title Policy; that Grantor owns the Chattels free and clear of liens and claims; and that this Deed of Trust is and shall remain a valid first priority lien on the Mortgaged Property subject only to the exceptions

<div align="center">3</div>

4162651-v5\CHIDMS1

000718


RP-2018-235600

referred to above. Grantor has full power and lawful authority to mortgage the Mortgaged Property in the manner and form herein done or intended hereafter to be done. Grantor shall preserve such title, and shall forever warrant and defend the same to Beneficiary and Grantor shall forever warrant and defend the validity and priority of the lien hereof against the claims of all persons and parties whomsoever.

SECTION 1.02. Related Mortgage Documents; Further Assurances. Grantor shall, at Grantor's sole cost and expense, and without expense to Beneficiary, do, execute, acknowledge and deliver all and every such further agreements, documents, acts, deeds, conveyances, mortgages, estoppel certificates, financing statements, continuation statements, assignments, notices of assignment, subordinations, transfers and assurances as Beneficiary shall from time to time reasonably require, for the better clarifying, assuring, conveying, assigning, transferring and confirming unto Beneficiary the property and rights hereby conveyed or assigned or intended now or hereafter so to be, or which Grantor may be or may hereafter become bound to convey or assign to Beneficiary, or for carrying out the intention or facilitating the performance of the terms, provisions, covenants and conditions of this Deed of Trust, or for filing, registering or recording this Deed of Trust or any of the other Loan Documents and, on demand, shall execute and deliver, and hereby authorizes Beneficiary to execute and file in Grantor's name, to the extent Beneficiary may lawfully do so, one or more financing statements, continuation statements, chattel mortgages or comparable Deed of Trusts, to evidence more effectively the lien of this Deed of Trust upon the Chattels.

SECTION 1.03. Filing and Recording of Mortgage Documents.

(a)    Recording. Grantor forthwith upon the execution and delivery of this Deed of Trust, and thereafter from time to time, shall cause this Deed of Trust and any Deed of Trust creating a lien or evidencing the lien of this Deed of Trust upon the Chattels and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect the lien of this Deed of Trust upon, and the interest of Beneficiary in, the Mortgaged Property, provided that no such instrument of further assurance shall materially increase the obligations of Grantor under this Deed of Trust.

(b)    Recording Fees. Grantor shall pay all filing, registration or recording fees, and all expenses incident to the execution and acknowledgment of this Deed of Trust, any mortgage supplemental hereto, any Deed of Trust or financing statement with respect to the Chattels, and any instrument of further assurance or continuation, and all federal, state, county, and municipal stamp taxes and other taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of the Loan Agreement, the Note, this Deed of Trust, any mortgage supplemental hereto, any Deed of Trust or financing statement with respect to the Chattels or any instrument of further assurance or continuation.

SECTION 1.04. Manner of Payment. Grantor shall punctually pay the principal and interest and all other sums to become due in respect of the Note at the time and place and in the manner specified in the Note, according to the true intent and meaning thereof, all in any coin or currency of the United States of America which at the time of such payment shall be legal tender for the payment of public and private debts.

SECTION 1.05. Compliance With Law.

(a)    Grantor shall comply with all laws, regulations, rules, statutes, ordinances, orders and decrees of any federal, state and local governmental authority or court applicable to the Mortgaged Property or any part thereof (including, without limitation, all applicable zoning, environmental, and energy-related laws and Access Laws (as hereinafter defined)) (collectively, "Legal Requirements").

4162651-v5\CHIDMS1

000719



RP-2018-235600

(b)     (i) Grantor agrees that the Premises shall at all times comply to the extent applicable with the requirements of the Americans with Disabilities Act of 1990, the Fair Housing Amendments Act of 1988, all other federal, state and local laws, regulations, rules, statutes, ordinances, orders and decrees related to handicapped access including, without limitation, the American with Disabilities Act Accessibility Guidelines for Buildings and Facilities (collectively, "Access Laws").

(ii)     Notwithstanding any provisions set forth herein or in any other documents regarding Beneficiary's approval or alterations of the Premises, Grantor shall not alter the Premises in any manner which would increase Grantor's responsibilities for compliance with the applicable Access Laws without the prior written approval of Beneficiary. The foregoing shall apply to tenant improvements constructed by Grantor or by any of Grantor's Tenants. Beneficiary may condition any such approval upon receipt of a certificate of Access Law compliance from an architect, engineer, or other person acceptable to Beneficiary.

(iii)     Grantor agrees to give prompt notice to Beneficiary of the receipt by Grantor of any complaints related to violations of any Access Laws and of the commencement of any proceedings or investigations which relate to compliance with applicable Access Laws.

(c)     Notwithstanding any other provision of this Section 1.05, Grantor shall not be deemed to be in default solely by reason of Grantor's failure to comply with any Legal Requirements as aforesaid so long as, in Beneficiary's sole judgment, reasonably exercised, each of the following conditions is satisfied:

(i)     Grantor is engaged in and diligently pursuing in good faith administrative or judicial proceedings appropriate to contest the validity or amount of such Legal Requirements;

(ii)     [Intentionally Omitted];

(iii)     Noncompliance with any such Legal Requirements will not result in the loss or forfeiture of any property encumbered hereby or any interest of Beneficiary therein or result in any fines or other punitive actions or the loss of any insurance coverage; and

(iv)     Grantor deposits with Beneficiary, as security for any payment or performance which may ultimately be required, a sum equal to the amount of any fine, assessment or charge plus the interest, penalties, and other costs which Beneficiary estimates are likely to become payable if Grantor's contest is unsuccessful.

If Beneficiary determines, in Beneficiary's sole judgment, reasonably exercised, that any one or more of such conditions is not satisfied or is no longer satisfied, Grantor shall comply with the Legal Requirements in question, within fifteen (15) days after Beneficiary gives notice of such determination.

SECTION 1.06. Future Acquisitions. All right, title and interest of Grantor in and to all extensions, improvements, betterments, renewals, substitutions and replacements of, and all additions and appurtenances to, the Mortgaged Property, hereafter acquired by or released to Grantor, or constructed, assembled or placed by Grantor on the Mortgaged Property, and all conversions of the security constituted thereby, immediately upon such acquisition, release, construction, assembling, placement or conversion, as the case may be, and in each such case, without any further mortgage, conveyance, assignment or other act by Grantor, shall become subject to the lien of this Deed of Trust as fully and completely, and with the same effect, as though now owned by Grantor and specifically described in the granting clause hereof, but at any and all times Grantor shall execute and deliver to Beneficiary any and all such further assurances, mortgages, conveyances or assignments thereof as Beneficiary may

5

4162651-v5\CHIDMS1


000720

RP-2018-235600

reasonably require for the purpose of expressly and specifically subjecting the same to the lien of this Deed of Trust.

SECTION 1.07.Beneficiary's Right To Cure Defaults: If Grantor shall fail to perform or comply with any of the representations, warranties and covenants contained in Sections 1.01, 1.03 or elsewhere herein, then upon five (5) days' notice to Grantor (which notice shall not be required to be delivered in the event of an emergency), Beneficiary may make advances to perform the same on its behalf, and all sums so advanced, with interest at the Involuntary Rate, shall immediately be due from Grantor to Beneficiary, and shall be added to the Debt and shall be secured by this Deed of Trust. The provisions of this Section 1.07 shall not prevent any default in the observance of any of the representations, warranties and covenants contained in said Sections 1.01, 1.03 or elsewhere herein from constituting an Event of Default.

SECTION 1.08.Legal Proceedings. Whether or not an Event of Default has occurred and exists, Beneficiary shall have the right, but not the duty or obligation, to intervene or otherwise participate in, prosecute or defend at any legal or equitable proceedings (including, without limitation, any eminent domain proceedings) which, in Beneficiary's reasonable discretion, affect the Mortgaged Property, the Leases or any of the rights created hereunder the reasonable out-of-pocket cost of which shall be reimbursed by Grantor to Beneficiary and shall be secured by this Deed of Trust.

SECTION 1.09.Assignment of Leases. Grantor hereby absolutely and unconditionally assigns and transfers to Beneficiary the Leases and the Property Income. Grantor shall not otherwise assign, transfer or encumber in any manner the Leases or the Property Income or any portion thereof. Grantor shall have a license to collect and use the Property Income as the same becomes due and payable and to amend, supplement or modify the Leases in accordance with and as permitted under the Loan Agreement and to exercise Grantor's rights thereunder, so long as no Event of Default is continuing, but may not collect any Property Income more than thirty (30) days in advance of the date the same becomes due. The assignment in this Section 1.09 shall constitute an absolute and present assignment of the Leases and the Property Income, and not an assignment for security, and the existence or exercise of the Grantor's conditional license to collect Property Income shall not operate to subordinate this assignment to any subsequent assignment. The exercise by Beneficiary or Trustee of any of its rights or remedies under this Section 1.09 shall not be deemed or construed to make Beneficiary or Trustee a mortgagee-in-possession.

SECTION 1.10.Insurance. Grantor agrees, at Grantor's sole cost and expense, to keep the Mortgaged Property insured, at all times throughout the term of this Deed of Trust, in accordance with Article VIII of the Loan Agreement.

<div align="center">

ARTICLE II.
EVENTS OF DEFAULT AND REMEDIES

</div>

SECTION 2.01.Events of Default. If an Event of Default shall occur and is continuing under the Loan Agreement, then, and in every such case Beneficiary, Lenders and/or Trustee may exercise any remedy available at law or in equity, including, but not limited to, those listed below and those listed in the Loan Agreement and the other Loan Documents, in such sequence and in such combination as Beneficiary may determine in Beneficiary's sole and absolute discretion:

(a)    Acceleration. Upon the occurrence of any Event of Default, the entire principal amount of the indebtedness evidenced by the Note and all other Debt together with accrued interest thereon at the Involuntary Rate shall, subject to the terms of the Loan Agreement and the Note, at the option of Beneficiary exercised while such Event of Default is continuing, without demand or notice of any kind to Grantor or any other person, become immediately due and payable. All the provisions of the Loan Agreement are incorporated herein for all purposes as if set forth in full herein.

<div align="center">6</div>

4162651-v5\CHIDMS1



RP-2018-235600

(b)   Remedies Cumulative. No remedy or right of Beneficiary hereunder or under the Loan Agreement, the Note or any of the other Loan Documents, or otherwise, or available under applicable law or in equity, shall be exclusive of any other right or remedy, but each such remedy or right shall be in addition to every other remedy or right now or hereafter existing under any such document or under applicable law or in equity. No delay in the exercise of, or omission to exercise, any remedy or right accruing on any Event of Default shall impair any such remedy or right or be construed to be a waiver of any such Event of Default or an acquiescence therein, nor shall it affect any subsequent Event of Default of the same or a different nature. Every such remedy or right may be exercised concurrently or independently, and when and as often as may be deemed expedient by Beneficiary. All obligations of Grantor, and all rights, powers and remedies of Beneficiary, expressed herein shall be in addition to, and not in limitation of, those provided by law or in equity or in the Loan Agreement, the Note or any other Loan Documents or any other written agreement or instrument relating to any of the Debt or any security therefor.

(c)   Foreclosure; Appointment of Receiver.

(i)   Non-Judicial Foreclosure. If the unpaid principal amount of or interest on the Debt or any part thereof shall have become due and payable (whether at maturity or as an installment of combined principal and/or interest or by reason of any prepayment requirement or by declaration or acceleration or otherwise) and shall not have been paid, Beneficiary or other holder of the Note may proceed with foreclosure by directing Trustee or his successor or substitute in trust to proceed as hereafter authorized to sell, assign, transfer and deliver the whole or, from time to time, any part of the Mortgaged Property, or any interest in any part thereof, by advertisement and sale in accordance with applicable law. Trustee shall execute and deliver to the purchaser at any such sale a trustee's deed conveying the property so sold, but without any covenant or warranty, expressed or implied. The recitals in such trustee's deed of any matters or facts shall be prima facie proof of the truthfulness thereof. Any Person, including Beneficiary, may bid at the sale. Trustee shall apply the proceeds of the sale in the following order:

First: To the payment of the costs and expenses of such sale (including the charges of advertising, sale and conveyance, including a commission to Trustee then acting, any amounts necessary to pay impositions or prior liens, the cost of evidence of title and the costs and expenses, if any, of taking possession of, retaining custody over, repairing, managing, operating, maintaining and preserving the Mortgaged Property or any part thereof prior to such sale), all reasonable costs and expenses incurred by Trustee, Beneficiary or any other Person in obtaining or collecting any insurance proceeds, condemnation awards or other amounts received by Beneficiary, all reasonable costs and expenses of any receiver of the Mortgaged Property or any part thereof, and any taxes, assessments, impositions or other charges or expenses prior to the security interest or lien of this Deed of Trust, which Trustee or Beneficiary may consider it necessary or desirable to pay;

Second: To the payment of all amounts of principal and interest (including post-petition interest to the extent such interest is a liability) at the time due and payable on the Debt outstanding at the time (whether due by reason of maturity or by prepayment or by declaration or acceleration or otherwise), including interest at the Involuntary Rate on any overdue principal and (to the extent permitted under applicable law) on any overdue interest;

Third: The balance, if any, held by Trustee after payment in full of all amount referred to in subdivisions First and Second, above, shall be paid to the Person or Persons entitled to receive such proceeds.

(ii)   Judicial Foreclosure. If an Event of Default is continuing, Beneficiary at any time may, at its election, proceed at law or in equity or otherwise to enforce the payment of the Debt

4162651-v5\CHIDMS1

000722



in accordance with the terms hereof and thereof and to foreclose the lien of this Deed of Trust as against all or any part of the Mortgaged Property and to have the same sold under the judgment or decree of a court of competent jurisdiction. Beneficiary shall be entitled to recover in such proceedings all reasonable costs incident thereto, including reasonable trustee's fees and reasonable attorneys' fees and expenses in such amounts as may be fixed by the court.

(iii)  Appointment of Receiver. If an Event of Default is continuing, Beneficiary shall, as a matter of right and without regard to the adequacy of any security for the indebtedness secured hereby or the solvency of Grantor, be entitled to the appointment of a receiver for all or any part of the Mortgaged Property, whether such receivership be incidental to a proposed sale of the Mortgaged Property or otherwise, and Grantor hereby consents to the appointment of such a receiver and will not oppose any such appointment.

(d)  Possession of the Premises; Remedies for Leases and Rents: Grantor hereby waives all right to the possession, income, and rents of the Premises during the continuance of any Event of Default, and Beneficiary is hereby expressly authorized and empowered, at and following any such occurrence, to enter into and upon and take possession of the Premises or any part thereof. If any Event of Default is continuing, then, whether before or after institution of legal proceedings to foreclose the lien of this Deed of Trust or before or after the sale thereunder, Beneficiary shall be entitled, in its sole and absolute discretion, to do all or any of the following: (i) enter and take actual possession of the Premises, the Property Income, the Leases and other Mortgaged Property relating thereto or any part thereof personally, or by its agents or attorneys, and exclude Grantor therefrom; (ii) with or without process of law, enter upon and take and maintain possession of all of the documents, books, records, papers and accounts of Grantor relating thereto; (iii) as attorney-in-fact or agent of Grantor, or in its own name as mortgagee and under the powers herein granted, hold, operate, manage and control the Premises, the Property Income, the Leases and other Mortgaged Property relating thereto and conduct the business, if any, thereof either personally or by its agents, contractors or nominees, with full power to use such measures, legal or equitable, as in its sole and absolute discretion or in the discretion of its successors or assigns may be deemed proper or necessary to enforce the payment of the Property Income, the Leases and other Mortgaged Property relating thereto (including actions for the recovery of rent, actions in forcible detainer and actions in distress of rent); (iv) cancel or terminate any Lease or sublease for any cause or on any ground which would entitle Grantor to cancel the same; (v) elect to disaffirm any Lease or sublease made subsequent hereto or subordinated to the lien hereof; (vi) make all necessary or proper repairs, decorations, renewals, replacements, alterations, additions, betterments and improvements to the Premises that, in its discretion, may seem appropriate; (vii) insure and reinsure the Mortgaged Property for all risks incidental to Beneficiary's possession, operation and management thereof; and (viii) receive all such Property Income and proceeds, and perform such other acts in connection with the management and operation of the Mortgaged Property, as Beneficiary in its discretion may deem proper, Grantor hereby granting Beneficiary full power and authority to exercise each and every one of the rights, privileges and powers contained herein at any and all times while any Event of Default is continuing without notice to Grantor or any other Person. Beneficiary, in the exercise of the rights and powers conferred upon it hereby, shall have full power to use and apply the Property Income to the payment, in such order as Beneficiary may determine, of or on account of any one or more of the following: (a) to the payment of the operating expenses of the Premises, including the actual out-of-pocket cost of management and leasing thereof (which shall include reasonable compensation to Beneficiary and its agents or contractors, if management be delegated to agents or contractors, and it shall also include lease commissions and other compensation and expenses of seeking and procuring tenants and entering into leases), established claims for damages, if any, and premiums on insurance hereinabove authorized; (b) to the payment of taxes, charges and special assessments, the out-of-pocket costs of all repairs, decorating, renewals, replacements, alterations, additions, betterments and improvements of the Mortgaged Property,

8

RP-2018-235600



including the out-of-pocket cost from time to time of installing, replacing or repairing the Mortgaged Property, and of placing the Mortgaged Property in such condition as will, in the judgment of Beneficiary, make it readily rentable; and (c) to the payment of any Debt. The entering upon and taking possession of the Premises, or any part thereof, and the collection of any Property Income and the application thereof as aforesaid shall not cure or waive any Event of Default theretofore or thereafter occurring or affect any notice of Default hereunder or invalidate any act done pursuant to any such Event of Default or notice, and, notwithstanding continuance in possession of the Premises or any part thereof by Beneficiary or a receiver and the collection, receipt and application of the Property Income, Beneficiary shall be entitled to exercise every right provided for in this Deed of Trust or by law or in equity during the continuance of an Event of Default. Any of the actions referred to in this Section 2.01(d) may be taken by Beneficiary irrespective of whether any notice of Default has been given hereunder and without regard to the adequacy of the security for the indebtedness hereby secured.

      (e)    Personal Property. If any Event of Default is continuing, Beneficiary may exercise from time to time any rights and remedies available to it under the Loan Documents or applicable law upon default in payment of indebtedness, including, without limitation, those available to a secured party under the Uniform Commercial Code of the state where the goods are located. Grantor shall, promptly upon request by Beneficiary, assemble the Mortgaged Property and make it available to Beneficiary at such place or places, reasonably convenient for both Beneficiary and Grantor, as Beneficiary shall designate. Grantor hereby expressly waives, to the fullest extent permitted by applicable law, any and all notices, advertisements, hearings, or process of law in connection with the exercise by Beneficiary of any of its rights and remedies while an Event of Default is continuing. If any notification of intended disposition of the Mortgaged Property is required by law, such notification, if mailed, shall be deemed reasonably and properly given if mailed by registered or certified mail, return receipt requested, at least ten (10) business days before such disposition, postage prepaid, addressed to Grantor either at the address shown below or at any other address of Grantor appearing on the records of Beneficiary. Without limiting the generality of the foregoing, whenever there exists an Event of Default hereunder, Beneficiary may, with respect to so much of the Mortgaged Property as is personal property under applicable law, to the fullest extent permitted by applicable law, without further notice, advertisement, hearing or process of law of any kind, (i) notify any Person obligated on the Mortgaged Property to perform directly for Beneficiary its obligations thereunder, (ii) enforce collection of any portion of the Mortgaged Property by suit or otherwise, and surrender, release or exchange all or any part thereof or compromise or extend or renew for any period (whether or not longer than the original period) any obligations of any nature of any party with respect thereto, (iii) endorse any checks, drafts or other writings in the name of Grantor to allow collection of the Mortgaged Property, (iv) take control of any proceeds of the Mortgaged Property, (v) enter upon any premises where any of the Mortgaged Property may be located and take possession of and remove such Mortgaged Property and render all or any part of the Mortgaged Property unusable, all without being responsible for loss or damage, (vi) sell any or all of the Mortgaged Property, free of all rights and claims of Grantor therein and thereto, at any lawful public or private sale and on such terms as Beneficiary deems advisable and (vii) bid for and purchase any or all of the Mortgaged Property at any such public or private sale. Any proceeds of any disposition by Beneficiary of any of the Mortgaged Property may be applied by Beneficiary to the payment of expenses in connection with the Mortgaged Property, including attorneys' fees and legal expenses, and any balance of such proceeds shall be applied by Beneficiary toward the payment of such portion of the Debt and in such order of application as Beneficiary may from time to time elect. Without limiting the foregoing, Beneficiary may exercise from time to time any rights and remedies available to it under the Uniform Commercial Code or other applicable law as in effect from time to time or otherwise available to it under applicable law. Grantor hereby expressly waives presentment, demand, notice of dishonor, protest and notice of protest in connection with the Note and, to the fullest extent permitted by applicable law, any and all other notices, demands, advertisements, hearings or process of law in connection with the exercise by Beneficiary of

9

RP-2018-235600

RP-2018-235600

any of its rights and remedies hereunder. Grantor hereby constitutes Beneficiary its attorney-in-fact with full power of substitution to take possession of the Mortgaged Property while any Event of Default is continuing and, as Beneficiary in its sole and absolute discretion deems necessary or proper, to execute and deliver all instruments required by Beneficiary to accomplish the disposition of the Mortgaged Property; this power of attorney is a power coupled with an interest and is irrevocable while any portion of the Debt is outstanding. Grantor shall remain liable for any deficiency resulting from the sale of the Mortgaged Property and shall pay such deficiency forthwith upon demand, and Beneficiary's right to recover such deficiency shall not be impaired by the sale or other disposition of the Mortgaged Property without required notice. Expenses of retaking, holding, preparing for sale, selling or the like will first be paid from the proceeds before the balance will be applied toward any portion of the Debt.

(f)     No Liability on Beneficiary or Lenders. Either Beneficiary or Trustee may cure any breach or default of Grantor, and if it chooses to do so in connection with any such cure, Beneficiary or Trustee may also enter the Premises and/or do any and all other things which it may in its sole and absolute discretion consider necessary and appropriate to protect the security of this Deed of Trust. Such other things may include, without limitation: appearing in and/or defending any action or proceeding which purports to affect the security of, or the rights or powers of Beneficiary or Trustee under, this Deed of Trust; paying, purchasing, contesting or compromising any encumbrance, charge, lien or claim of lien which in Beneficiary's or Trustee's sole judgment is or may be senior in priority to this Deed of Trust, such judgment of Beneficiary or Trustee to be conclusive as among the parties to this Deed of Trust; obtaining insurance and/or paying any premiums or charges for insurance required to be carried under the Loan Agreement; otherwise caring for and protecting any and all of the Premises; and/or employing counsel, accountants, contractors and other appropriate persons to assist Beneficiary or Trustee. Beneficiary and Trustee may take any of the actions permitted hereunder either with or without giving notice to any person. Notwithstanding anything contained herein, Beneficiary shall not be obligated to perform or discharge, and does not hereby undertake to perform or discharge, any obligation, duty or liability of Grantor, whether hereunder, under any third party agreements or otherwise. Neither Beneficiary nor Lenders shall have responsibility for the control, care, management or repair of the Premises (including, but not limited to, use, storage, manufacture, discharge or transportation of hazardous waste or substances including, without limitation, Hazardous Materials (as defined in the Environmental Indemnity Agreement), by Grantor) or be responsible or liable for any negligence in the management, operation, upkeep, repair or control of the Premises resulting in loss, injury or death to any tenant, licensee, employee, stranger or other Person. No liability shall be enforced or asserted against Beneficiary or Lenders in its exercise of the powers granted to it under this Deed of Trust, and Grantor expressly waives and releases any such liability. Should Beneficiary or Lenders incur any such liability, loss or damage under any third party agreements or under or by reason hereof, or in the defense of any claims or demands, Grantor agrees to reimburse Beneficiary or Lenders within five (5) Business Days upon demand for the full amount thereof, including costs, expenses and attorneys' fees. Such sums shall bear interest at the Involuntary Rate from the date of each such amount is due by Beneficiary or Lenders and shall be paid by Grantor to Beneficiary forthwith upon demand by Beneficiary, and shall be secured by this Deed of Trust, and Beneficiary shall have, in addition to any other right or remedy of Beneficiary, the same rights and remedies in the event of non-payment of any such sums by Grantor as in the case of a default by Grantor in the payment of any installment of principal or interest due and payable under the Loan Agreement.

<div align="center">

**ARTICLE III.**
**MISCELLANEOUS**

</div>

SECTION 3.01. Severability. In the event any one or more of the provisions contained in this Deed of Trust, the Loan Agreement or the Note shall for any reason be held to be invalid, illegal or

<div align="center">10</div>



County Clerk Harris County, Texas

RP-2018-235600

unenforceable in any respect, such invalidity, illegality, or unenforceability shall, at the option of Beneficiary, not affect any other provision of this Deed of Trust, but this Deed of Trust shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein or therein.

SECTION 3.02. Notices. All notices hereunder and under any applicable law pertaining hereto shall be in writing and shall be deemed sufficiently given or served for all purposes when delivered as provided for in the Loan Agreement.

SECTION 3.03. Heirs, Successors and Assigns. All of the grants, covenants, terms, provisions and conditions of this Deed of Trust shall run with the land and shall apply to, bind and inure to the benefit of, the heirs, executors, administrators, successors and assigns of Grantor, the heirs, executors, administrators, successors and assigns of Trustee, and the heirs, executors, administrators, successors and assigns of Beneficiary.

SECTION 3.04. Counterparts. This Deed of Trust may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same deed of trust.

SECTION 3.05. Future Mortgage Taxes. In the event of the passage after the date of this Deed of Trust of any law of the State of Texas deducting from the value of real property for the purpose of taxation any lien or encumbrance thereon or changing in any way the laws for the taxation of mortgages or debts secured by mortgages for state or local purposes or the manner of the collection of any such taxes, and imposing a tax, either directly or indirectly, on this Deed of Trust, the Loan Agreement, the Note or the Debt, Grantor shall, if permitted by law, pay any tax imposed as a result of any such law within the statutory period or within fifteen (15) days after demand by Beneficiary, whichever is less; *provided*, *however*, that if, in the opinion of the attorneys for Beneficiary, Grantor is not permitted by law to pay such taxes, Beneficiary shall have the right, at Beneficiary's option, to declare the Debt due and payable, without prepayment premium, on a date specified in a prior notice to Grantor of not less than thirty (30) days.

SECTION 3.06. Stamp Tax. If at any time the United States of America, any state thereof or any governmental subdivision of any such state, shall require revenue or other stamps to be affixed to the Loan Agreement, the Note or this Deed of Trust, Grantor shall pay for the same, with interest and penalties thereon, if any.

SECTION 3.07. Cover Sheet. The information set forth on the cover of this Deed of Trust is hereby incorporated herein.

SECTION 3.08. Governing Law.

(a)    THIS DEED OF TRUST WAS NEGOTIATED IN THE STATE OF NEW YORK, AND MADE BY GRANTOR TO BENEFICIARY IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE NOTE SECURED HEREBY WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS DEED OF TRUST AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES (I) THE PROVISIONS FOR THE CREATION,

4162651-v5\CHIDMS1



000726

RP-2018-235600

PERFECTION, AND ENFORCEMENT OF THE LIEN AND SECURITY INTEREST CREATED PURSUANT HERETO AND PURSUANT TO THE OTHER LOAN DOCUMENTS (OTHER THAN WITH RESPECT TO LIENS AND SECURITY INTERESTS IN PROPERTY WHOSE PERFECTION AND PRIORITY IS COVERED BY ARTICLE 9 OF THE UCC (INCLUDING, WITHOUT LIMITATION, THE ACCOUNTS) WHICH SHALL BE GOVERNED BY THE LAW OF THE JURISDICTION APPLICABLE THERETO IN ACCORDANCE WITH SECTIONS 9-301 THROUGH 9-307 OF THE UCC AS IN EFFECT IN THE STATE OF NEW YORK) AND (II) THE ENFORCEMENT OF THE RIGHTS CREATED BY THE ABSOLUTE ASSIGNMENT OF LEASES AND RENTS OF EVEN DATE HEREWITH SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE MORTGAGED PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS AND ALL OF THE OBLIGATIONS ARISING HEREUNDER OR THEREUNDER. TO THE FULLEST EXTENT PERMITTED BY LAW AND EXCEPT AS SET FORTH IN THE IMMEDIATELY PRECEDING SENTENCE, GRANTOR HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS DEED OF TRUST AND THE NOTE, AND THIS DEED OF TRUST AND THE NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(b)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST GRANTOR OR BENEFICIARY ARISING OUT OF OR RELATING TO THE DEBT OR THIS DEED OF TRUST MAY AT BENEFICIARY'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND GRANTOR WAIVES ANY OBJECTIONS WHICH GRANTOR MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND GRANTOR HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, UNCONDITIONALLY AND IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. GRANTOR DOES HEREBY DESIGNATE AND APPOINT:

> Capitol Services, Inc.
> 1218 Central Avenue, Suite 100
> Albany, NY 12205

AS GRANTOR'S AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON GRANTOR'S BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO GRANTOR IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON GRANTOR, IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK. GRANTOR (I) SHALL GIVE PROMPT NOTICE TO BENEFICIARY OF ANY CHANGED ADDRESS OF GRANTORS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF GRANTOR'S AUTHORIZED

4162651-v5\CHIDMS1

000727


RP-2018-235600

AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

SECTION 3.09.Joint and Several Liability. If Grantor consists of more than one person or party, the obligations and liabilities of each such person or party hereunder shall be joint and several.

SECTION 3.10.Variable Rate. The Note contains provisions for a variable rate of interest, and reference to such provisions is made hereby.

SECTION 3.11.Purchase Money Deed of Trust. Grantor hereby agrees and acknowledges that Grantor borrowed the Deed of Trust Amount to finance Grantor's purchase of the Mortgaged Property.

SECTION 3.12.Maximum Secured Amount/Future Advances. This Deed of Trust shall secure the payment of any amounts advanced from time to time under the Loan Documents, or under other documents stating that such advances are secured hereby, whether such advances are obligatory or to be made at the option of the Lenders, or otherwise, to the same extent as if such future advances were made on the date of the execution of this Deed of Trust, although there may be no advance made at the time of execution of this Deed of Trust and although there may be no indebtedness outstanding at the time any advance is made. The lien of this Deed of Trust shall be valid as to any and all future obligations and Debt arising under or in connection with this Deed of Trust from the time of its filing for record in the recorder's or registrar's office of the county in which the Premises is located, which future obligations and Debt shall have the same priority as if all such future obligations and Debt were made on the date of execution hereof. Nothing in this Section or in any other provision of this Deed of Trust shall be deemed an obligation on the part of Beneficiary to make any future advances of any sort. At all times, regardless of whether any loan proceeds have been disbursed, this Deed of Trust shall secure (in addition to any loan proceeds disbursed from time to time) the payment of any and all expenses and advances due to or incurred by Beneficiary in connection with the Debt to be secured hereby and which are to be reimbursed by Grantor under the terms of this Deed of Trust. The total amount of indebtedness may increase or decrease from time to time, as provided in the Loan Agreement. This Deed of Trust is intended to and shall be valid and have priority over all subsequent liens and encumbrances, including statutory liens, excepting solely taxes and assessments levied on the Premises.

SECTION 3.13.Interest Rate Protection Product. Grantor acknowledges and agrees that any amounts now or hereafter due and owing from Grantor to Beneficiary arising from or in connection with any Interest Rate Protection Product, now existing or hereafter entered into between Grantor and Beneficiary, and any out-of-pocket costs incurred by Beneficiary in connection therewith, including, without limitation, any interest, expenses, fees, penalties or other charges associated with any obligations undertaken by Beneficiary to hedge or offset Beneficiary's obligations pursuant to such Interest Rate Protection Product, or the termination of any such obligations, shall be (i) deemed additional interest and/or a related expense (to be determined in the sole discretion of Beneficiary) due in connection with the principal amount of the Debt secured by this Deed of Trust, (ii) included (in the manner described above) as part of the Debt secured by this Deed of Trust, and secured by this Deed of Trust to the full extent thereof, and (iii) included in any judgment in any proceeding instituted by Beneficiary or its agents against Grantor for foreclosure of this Deed of Trust or otherwise.

SECTION 3.14.Administrative Agent. To the extent that any action is to be taken, any information is to be delivered to or by Lenders, any determination is to be made, or any consent is to be given or withheld by Lenders, any such action, delivery, determination or consent shall be taken, made or given or withheld, as the case may be, by Beneficiary, as administrative agent under the Loan Agreement or any successor agent thereto.

4162651-v5\CHIDMS1



SECTION 3.15. Acts by Trustee. At any time upon written request of Beneficiary, payment of its fees and (in case of full reconveyance, for cancellation and retention) presentation of this Deed of Trust and the appropriate instruments evidencing the Debt for endorsement and without affecting the liability of any person for the payment of the Debt, Trustee may: (a) consent to the making of any map or plat of the Premises; (b) join in granting any easement or creating any restriction thereon; (c) join in any subordination or other agreement affecting this Deed of Trust or the lien or charge thereof; or (d) reconvey, without warranty, all or any part of the Premises, as provided in Section 3.20 hereof. The recitals in any reconveyance of any matters or facts shall be conclusive proof of the truthfulness thereof. Grantor agrees to pay a reasonable trustee's fee for full or partial reconveyance, together with a recording fee if Trustee, at its option, elects to record said reconveyance. Trustee may resign by instrument in writing filed in the office of county clerk or applicable recorder or registrar of deeds in which this Deed of Trust shall have been recorded or filed.

SECTION 3.16. Successor Trustee. In the event of the resignation, refusal or inability of Trustee to act or at the option of Beneficiary, with or without any reason, Beneficiary is authorized either in its own name or through an attorney or attorney-in-fact appointed for the purpose by written instrument duly recorded and without any formality other than a designation in writing of a successor or substitute trustee, to appoint a successor or substitute trustee who shall thereupon become vested with and succeed to all the rights, title and powers given to Trustee herein named, the same as if the successor or substitute trustee had been named original Trustee herein; and such right to appoint a successor or substitute trustee shall exist as often as and whenever Beneficiary desires.

SECTION 3.17. Covenants of Trustee. Trustee covenants faithfully to perform the trust herein created, being liable, however, only for its own gross negligence or misconduct and that of the employees and agents of Trustee.

SECTION 3.18. Employment of Agents. Trustee, or anyone acting in its stead, shall have, in its discretion, authority to employ all proper agents and attorneys in the execution of this trust and in the conducting of any sale made pursuant to the terms hereof, and to pay for such services rendered out of the proceeds of the sale of the Premises, should any be realized; and if no sale be made or if the proceeds of sale be insufficient to pay the same, then Grantor hereby undertakes and agrees to pay the costs of such services rendered to Trustee. Trustee may rely on any document believed by it in good faith to be genuine. All money received by Trustee shall, until used or applied as herein provided, be held in trust, but need not be segregated (except to the extent required by law), and Trustee shall not be liable for interest thereon.

SECTION 3.19. Indemnification of Trustee or Beneficiary. If Trustee or Beneficiary shall be made a party to or shall intervene in any action or proceeding affecting the Premises or the title thereto, or the interest of Trustee or Beneficiary under this Deed of Trust, except for any action or proceeding arising out of the willful misconduct or, to the extent prohibited by law, the gross negligence of Trustee or Beneficiary, Trustee and Beneficiary shall be reimbursed by Grantor, immediately and without demand, for all reasonable costs, charges and attorneys' fees incurred by them or any of them in any case, and the same shall become so much additional indebtedness secured hereby.

SECTION 3.20. Defeasance. Upon full payment of all indebtedness secured hereby and satisfaction of the entire Debt in accordance with their respective terms and at the time and in the manner provided, and when Beneficiary and Lenders have no further obligation to make any advance, or extend any credit hereunder, under the Note or any of the other Loan Documents, Beneficiary shall request Trustee in writing to reconvey the Premises, and shall surrender this Deed of Trust and all notes and instruments evidencing the Debt to Trustee. When Trustee receives Beneficiary's written request for reconveyance and all fees and other sums owing to Trustee by Grantor, Trustee shall reconvey the

4162651-v5\CHIDMS1

RP-2018-235600

Premises, or so much of it as is then held under this Deed of Trust, without warranty to the person or persons legally entitled to it. Such person or persons shall pay any costs of recordation. In the reconveyance, the grantee may be described as "the person or persons legally entitled thereto," and the recitals of any matters or facts shall be conclusive proof of their truthfulness absent manifest error. Neither Beneficiary nor Trustee shall have any duty to determine the rights of persons claiming to be rightful grantees of any reconveyance.

SECTION 3.21. Maximum Interest. It is expressly stipulated and agreed to be the intent of Grantor and Beneficiary at all times to comply strictly with the applicable Texas law governing the maximum rate or amount of interest payable on the Debt (or applicable United States federal law to the extent that it permits Beneficiary to contract for, charge, take, reserve or receive a greater amount of interest than under Texas law). If the applicable law is ever judicially interpreted so as to render usurious any amount (i) contracted for, charged, taken, reserved or received pursuant to the Note, any of the Loan Documents or any other communication or writing by or between Grantor and Beneficiary related to the Debt or to the transaction or transactions that are the subject matter of the Loan Documents, (ii) contracted for, charged, taken, reserved or received by reason of Beneficiary's exercise of the option to accelerate the maturity of the Note and/or any other portion of the Debt, or (iii) Grantor will have paid or Beneficiary will have received by reason of any voluntary prepayment by Grantor of the Note and/or any other portion of the Debt, then it is Grantor's and Beneficiary's express intent that all amounts charged in excess of the maximum amount of interest permissible by applicable law (the "Maximum Lawful Rate") shall be automatically cancelled, ab initio, and all amounts in excess of the Maximum Lawful Rate theretofore collected by Beneficiary shall be credited on the principal balance of the Note and/or any other portion of the Debt (or, if the Note and all other Debt have been or would thereby be paid in full, refunded to Grantor), and the provisions of the Note and the other Loan Documents immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder and thereunder; provided, however, if the Note has been paid in full before the end of the stated term of the Note, then Grantor and Beneficiary agree that Beneficiary shall, with reasonable promptness after Beneficiary discovers or is advised by Grantor that interest was received in an amount in excess of the Maximum Lawful Rate, either refund such excess interest to Grantor and/or credit such excess interest against any other portion of the Debt then owing by Grantor to Beneficiary. Grantor hereby agrees that as a condition precedent to any claim seeking usury penalties against Beneficiary, Grantor will provide written notice to Beneficiary, advising Beneficiary in reasonable detail of the nature and amount of the violation, and Beneficiary shall have sixty (60) days after receipt of such notice in which to correct such usury violation, if any, by either refunding such excess interest to Grantor or crediting such excess interest against the Note and/or any other portion of the Debt then owing by Grantor to Beneficiary. All sums contracted for, charged, taken, reserved or received by Beneficiary for the use, forbearance or detention of any of the Debt, including any portion of the Debt evidenced by the Note shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the stated term of the Note and/or any other portion of the Debt (including any and all renewal and extension periods) until payment in full so that the rate or amount of interest on account of the Note and/or any other portion of the Debt does not exceed the Maximum Lawful Rate from time to time in effect and applicable to the Note and/or any other portion of the Debt for so long as any portion of the Debt is outstanding. Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, it is not the intention of Beneficiary to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

SECTION 3.22. STATE SPECIFIC PROVISIONS

15

RP-2018-235600



RP-2018-235600

(a)    <u>Inconsistencies</u>. In the event of any inconsistencies between the terms and conditions of this Article and the other provisions of this instrument, the terms and conditions of this Article shall control and be binding.

(b)    <u>Section 1.09</u> is amended by adding the following:

Without in any way limiting or restricting any of Beneficiary's rights, benefits or privileges hereunder, Beneficiary and Grantor hereby expressly agree that Beneficiary shall be entitled to all of the rights, benefits and privileges provided for in the Texas Assignment of Rents Act, Chapter 64 of the Texas Property Code, as amended from time to time.

(c)    During the continuance of an Event of Default, it shall thereupon be the duty of the above named Trustee, or its successor or substitute, as hereinafter provided, to enforce this trust at the request of Beneficiary (which request shall be presumed) and to sell the Mortgaged Property with or without first having taken possession of the same and in whole or in part, as the Trustee, or its successor or substitute, may elect (all rights to a marshalling of assets of Grantor being expressly waived hereby) to the highest bidder for cash at public auction at the county courthouse of any County in which the Mortgaged Property is situated, in the area of such courthouse designated for real property foreclosure sales in accordance with applicable law (or in the absence of any such designation, in the area set forth in the notice of sale hereinafter described) on the first Tuesday of any month between the hours of 10:00 A.M. and 4:00 P.M. (commencing at the time stated in the hereinafter described notice of sale or not later than three hours after that time), after giving notice of the time, place and terms of sale and the Mortgaged Property to be sold by (i) the Trustee, or its successor or substitute, or any authorized agent of the foregoing filing a copy of the notice thereof in the office of the County Clerk of each County where the Mortgaged Property is situated and by posting written or printed notice thereof at least twenty-one (21) days preceding the date of said sale at the County Courthouse door of each County where the Mortgaged Property is located, and (ii) the holder of the Debt secured by this Deed of Trust or any authorized agent of such holder, at least twenty-one (21) days preceding the date of said sale, serving written notice of such proposed sale by certified mail on each debtor obligated to pay the Debt secured by this Deed of Trust evidenced by the Notes according to the records of Beneficiary. Service of such notice to each debtor shall be completed upon deposit of the notice enclosed in a postpaid wrapper, properly addressed to each debtor at the most recent address as shown by the records of Beneficiary, in a post office or official depository under the care and custody of the United States Postal Service. The affidavit of any person having knowledge of the facts to the effect that such service was completed shall be prima facie evidence of the fact of service. After such sale, the Trustee, or its successor or substitute, shall make due conveyance with general warranty to the purchaser or purchasers and the Grantor binds itself, its heirs, assigns, executors, administrators, successors and legal representatives to warrant and forever defend the title of such purchaser or purchasers. Any abstract of title to the Mortgaged Property furnished in connection with the Loan shall be delivered and become the property of the purchaser at said sale. In the event a foreclosure hereunder shall be commenced by the Trustee or its substitute or successor, Beneficiary may at any time before the sale of the Mortgaged Property, direct the said Trustee, or its successor or substitute, to abandon the sale, and may then institute suit for the collection of the Notes and the other secured indebtedness, and for the foreclosure of this Deed of Trust. It is agreed that if Lender should institute a suit for the collection of the Note or any other secured indebtedness and for the foreclosure of this Deed of Trust, Beneficiary may at any time before the entry of a final judgment in said suit dismiss the same, and require the Trustee, its substitute or successor to sell the Mortgaged Property in accordance with the provisions of this Deed of Trust.

(d)    With respect to the Personal Property, Beneficiary is hereby irrevocably appointed the true and lawful attorney of the Grantor (coupled with an interest), in its name and stead, to

16



RP-2018-235600

make all necessary conveyances, assignments, transfers and deliveries of the Personal Property, and for that purpose Beneficiary may execute all necessary instruments of conveyance, assignment, transfer and delivery, and may substitute one or more persons with such power, Grantor hereby ratifying and confirming all that its said attorney or such substitute or substitutes shall lawfully do by virtue hereof. Notwithstanding the foregoing, Grantor, if so requested by Beneficiary, shall ratify and confirm any such sale or sales by executing and delivering to Lender or to such purchaser or purchasers all such instruments as may be advisable, in the judgment of Beneficiary, for such purpose, and as may be designated in such request.  To the extent permitted by law, any such sale or sales made under or by virtue of this Section 3.22(d) shall operate to divest all the estate, right, title, interest, claim and demand whatsoever, whether at law, or in equity, of Grantor in and to the properties and rights so sold, and shall be a perpetual bar both at law and in equity against Grantor and against any and all persons claiming or who may claim the same, or any part thereof, from, through or under Grantor.  Upon any sale made under or by virtue of this Section 3.22(d), Trustee, or its successor or substitute, or Beneficiary may, to the extent permitted by law, bid for and acquire the Mortgaged Property or any part thereof and in lieu of paying cash therefor may make settlement for the purchase price by crediting upon the debt secured by this Deed of Trust the net sales price after deducting therefrom the expenses of the sale and the cost of the auction and any other sums which Beneficiary is authorized to deduct by law or under this Deed of Trust.  At any sale pursuant to this Section 3.22(d), whether made under power herein granted, the Texas Property Code, the Texas Business and Commerce Code, or any other legal enactment, or by virtue of any judicial proceeding or any other legal right, remedy or recourse, it shall not be necessary for Beneficiary or Trustee, or its successor or substitute, to be physically present, or to have constructive possession of, the Mortgaged Property, and the title to and right of possession of any such property shall pass to the purchaser thereof as completely as if the same had been actually presented and delivered to the purchaser at such sale.

(e)     During the continuance of an Event of Default, Beneficiary shall have the right and option to proceed with foreclosure in satisfaction of such item or items by directing the Trustee, or its successor or substitute as hereinafter provided, to proceed as if under a full foreclosure, conducting the sale as herein provided, and without declaring the whole debt secured by this Deed of Trust due, and provided that if sale is made because of default as hereinabove mentioned, such sale may be made subject to the unmatured part of the Note and the Debt secured by this Deed of Trust, and it is agreed that such sale, if so made, shall not in any manner affect any other obligations secured by this Deed of Trust, but as to such other obligations this Deed of Trust and the liens created hereby shall remain in full force and effect just as though no sale had been made under the provisions of this Section 3.22(e).  It is further agreed that several sales may be made hereunder without exhausting the right of sale for any other breach of any of the obligations secured hereby, it being the purpose to provide for a foreclosure and sale of the Mortgaged Property for any matured portion of any of the Debt secured hereby or other items provided for herein without exhausting the power to foreclose and to sell the Mortgaged Property for any other part of the debt secured hereby whether matured at the time or subsequently maturing.

(f)     The Trustee, or its successor or substitute, hereunder shall have the right to sell the Mortgaged Property in whole or in part and in such parcels and order as he may determine, and the right of sale hereunder shall not be exhausted by one or more sales, but successive sales may be had until all of the Mortgaged Property has been legally sold.  In the event any sale hereunder is not completed or is defective in the opinion of Beneficiary or the holder of any part of the Debt secured hereby, such sale shall not exhaust the power of sale hereunder, and Beneficiary or such holder shall have the right to cause a subsequent sale or sales to be made by the Trustee or any successor or substitute Trustee.  Likewise, Beneficiary on behalf of Lender may become the purchaser at any such sale if it is the highest bidder, and shall have the right, after paying or accounting for all costs of said sale or sales, to credit the amount of the bid upon the amount of the debt secured hereby, in lieu of cash payment.

17

4162651-v5\CHIDMS1

RP-2018-235600

(g)     It shall not be necessary for the Trustee, or its successor or substitute, to have constructively in its possession any part of the real or personal property covered by this Deed of Trust, and the title and right of possession of said property shall pass to the purchaser or purchasers at any sale hereunder as fully as if the same had been actually present and delivered. Likewise, on foreclosure of this Deed of Trust whether by power of sale herein contained or otherwise, Grantor or any person claiming any part of the Mortgaged Property by, through or under Grantor, shall not be entitled to a marshalling of assets or a sale in inverse order of alienation.

(h)     The recitals and statements of fact contained in any notice or in any conveyance to the purchaser or purchasers at any sale hereunder shall be prima facie evidence of the truth of such facts, and all prerequisites and requirements necessary to the validity of any such sale shall be presumed to have been performed.

(i)     Any sale under the powers granted by this Deed of Trust shall be a perpetual bar against Grantor, its heirs, successors, assigns and legal representatives.

(j)     In the event of a foreclosure under the powers granted by this Deed of Trust, Grantor, and all other persons in possession of any part of the Mortgaged Property shall be deemed tenants at will of the purchaser at such foreclosure sale and shall be liable for a reasonable rental for the use of the Mortgaged Property; and if any such tenants refuse to surrender possession of the Mortgaged Property upon demand, the purchaser shall be entitled to institute and maintain the statutory action of forcible entry and detainer and procure a writ of possession thereunder, and Grantor expressly waives all damages sustained by reason thereof.

(k)     To the extent permitted under applicable law, Grantor shall not, and will not, apply for, avail itself of, insist upon or plead or in any manner claim or take advantage of any appraisement, homestead, valuation, stay, extension or exemption laws, or any so called "*Moratorium Laws*", now existing or hereafter enacted, in order to prevent or hinder the enforcement or foreclosure of this Deed of Trust, but hereby waives the benefit of such laws. Grantor, for itself and all who may claim through or under Grantor, waives any and all right to have the property and estates comprising the Mortgaged Property marshaled upon any foreclosure of the lien hereof and agrees that any court having jurisdiction to foreclose such lien may order the Mortgaged Property sold as an entirety. Grantor hereby expressly waives any and all rights of reinstatement and redemption, if any, from sale pursuant to a foreclosure of this Deed of Trust on behalf of Grantor, and each and every person claiming by, through or under Grantor. The waiver of statutory rights contained set forth above specifically includes a waiver of all provisions of Sections 51.003, 51.004, and 51.005 of the Texas Property Code (as the same may be amended from time to time). In the event an interest in any of the Mortgaged Property is foreclosed upon pursuant to a judicial or nonjudicial foreclosure sale, notwithstanding the provisions of Sections 51.003, 51.004, and 51.005 of the Texas Property Code, and to the extent permitted by law, Beneficiary shall be entitled to seek a deficiency judgment from Grantor, any guarantor of the debt secured by this Deed of Trust and any other party obligated on obligations secured hereby (each an "Obligor") equal to the difference between the amount owing on the obligations secured hereby and the amount for which the Mortgaged Property was sold pursuant to judicial or nonjudicial foreclosure sale. Grantor expressly recognizes that this section constitutes a waiver of the above cited provisions of the Texas Property Code which would otherwise permit Grantor and other persons against whom recovery of deficiencies is sought independently (even absent the initiation of deficiency proceedings against them) to present competent evidence of the fair market value of the Mortgaged Property as of the date of the foreclosure sale and offset against any deficiency the amount by which the foreclosure sale price is determined to be less than such fair market value. Grantor further recognizes and agrees that this waiver creates an irrebuttable presumption that the foreclosure sale price is equal to the fair market value of the Mortgaged Property for

18

000733

RP-2018-235600

purposes of calculating deficiencies owed by Grantor or any other Obligor against whom recovery of a deficiency is sought.

(l)    To the extent, notwithstanding the provisions of Section 3.22(k) above, Section 51.003 of the Texas Property Code, or any amendment thereto or judicial interpretation thereof, requires that the "fair market value" of the Mortgaged Property shall be determined as of the foreclosure date in order to enforce a deficiency against Grantor or any other party liable for the repayment of the obligations secured by this Deed of Trust, the term "fair market value" shall include those matters required by law and shall also include the additional factors as follows:

(i)    The Mortgaged Property is to be valued "AS IS, WHERE IS" and "WITH ALL FAULTS" and there shall be no assumption of restoration of or refurbishment of the Mortgaged Property after the date of foreclosure;

(ii)    There shall be an assumption of a prompt resale of the Mortgaged Property for an all cash sales price by the purchaser at the foreclosure so that no extensive holding period should be factored into the determination of "fair market value" of the Mortgaged Property;

(iii)    An offset to the fair market value of the Mortgaged Property, as determined hereunder, shall be made by deducting from such value the reasonable estimated closing costs relating to the sale of the Mortgaged Property including but not limited to brokerage commissions, title policy expenses, tax prorations, escrow fees, and other common charges which are incurred by a seller of real property similar to the Mortgaged Property; and

(iv)    After consideration of the factors required by law and those required above (including the addition of any income to be generated by the Mortgaged Property), an additional discount factor shall be calculated based upon the estimated time it will take to effectuate a sale of the Mortgaged Property so that the "fair market value" as so determined is discounted to be as of the date of the foreclosure of the Mortgaged Property.

(m)    The Mortgaged Property forms no part of any property owned, used or claimed by Grantor as a residence or business homestead and is not exempt from forced sale under the laws of the State of Texas. Grantor hereby disclaims and renounces each and every claim to the Mortgaged Property as a homestead.

(n)    Pursuant to the Uniform Commercial Code, this Deed of Trust shall be effective as a Financing Statement filed as a fixture filing from the date of its filing for record covering and including any and all fixtures of every kind and type affixed to all or any portion of the Property or forming part of all or any portion of the Improvements. The name and address of Borrower, as debtor, and Lender (where information concerning the security interest granted hereby may be obtained), as secured party, are as set forth on the first page of this Deed of Trust. The above described goods are or are to become fixtures related to the Property and the Improvements of which Borrower is record title owner. This Deed of Trust shall also be effective as a financing statement covering minerals or the like (including oil and gas) and accounts subject to Section 9.103(e) of the Uniform Commercial Code, as amended.

(o)    **EACH OF THE PARTIES HERETO SPECIFICALLY ACKNOWLEDGES AND AGREES (i) THAT IT HAS A DUTY TO READ THIS DEED OF TRUST AND THAT IT IS CHARGED WITH NOTICE AND KNOWLEDGE OF THE TERMS HEREOF, (ii) THAT IT HAS IN FACT READ THIS DEED OF TRUST AND IS FULLY INFORMED AND HAS FULL NOTICE AND KNOWLEDGE OF THE TERMS, CONDITIONS AND EFFECTS OF THIS DEED OF TRUST, (iii) THAT IT HAS BEEN REPRESENTED BY LEGAL COUNSEL OF ITS**

19

000734

CHOICE THROUGHOUT THE NEGOTIATIONS PRECEDING ITS EXECUTION OF THIS DEED OF TRUST AND HAS RECEIVED THE ADVICE OF SUCH COUNSEL IN CONNECTION WITH ENTERING INTO THIS DEED OF TRUST, AND (iv) THAT IT RECOGNIZES THAT CERTAIN OF THE TERMS OF THIS DEED OF TRUST PROVIDE FOR (A) CERTAIN WAIVERS AND FOR (B) THE ASSUMPTION BY ONE PARTY OF, AND/OR RELEASE OF THE OTHER PARTY FROM, CERTAIN LIABILITIES THAT SUCH PARTY MIGHT OTHERWISE BE RESPONSIBLE FOR UNDER THE LAW. EACH PARTY HERETO FURTHER AGREES AND COVENANTS THAT IT WILL NOT CONTEST THE VALIDITY OR ENFORCEABILITY OF ANY SUCH PROVISIONS OF THIS DEED OF TRUST ON THE BASIS THAT THE PARTY HAD NO NOTICE OR KNOWLEDGE OF SUCH PROVISION OR THAT SUCH PROVISIONS ARE NOT "CONSPICUOUS."

NOTICE PURSUANT TO SECTION 26.02(e) OF THE TEXAS BUSINESS AND COMMERCE CODE: THE NOTE, THIS DEED OF TRUST AND THE OTHER SECURITY DOCUMENTS CONSTITUTE A WRITTEN LOAN AGREEMENT (AS DEFINED IN SECTION 26(a)(2) OF THE TEXAS BUSINESS AND COMMERCE CODE, AS AMENDED) AND REPRESENT THE FINAL AGREEMENT AND UNDERSTANDING BETWEEN THE BENEFICIARY, THE LENDERS AND THE OTHER RESPECTIVE PARTIES HERETO AND THERETO AND SUPERSEDE ALL PRIOR AGREEMENTS AND UNDERSTANDINGS BETWEEN SUCH PARTIES RELATING TO THE SUBJECT MATTER HEREOF AND THEREOF AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR CONTEMPORANEOUS OR SUBSEQUENT AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

<div align="center">NOTICE OF INDEMNIFICATION</div>

(p)    GRANTOR AND BENEFICIARY EACH HEREBY ACKNOWLEDGE AND AGREE THAT THIS DEED OF TRUST CONTAINS CERTAIN INDEMNIFICATION OBLIGATIONS AND COVENANTS.

<div align="center">[remainder of page intentionally left blank]</div>

4162651-v5\CHIDMS1

000735



IN WITNESS WHEREOF, this Deed of Trust has been duly executed by Grantor as of the day first above written.

GRANTOR:

**GALLERIA 2425 OWNER, LLC,**
a Delaware limited liability company

By:    Galleria 2425 JV, LLC,
a Delaware limited liability company,
its sole member

       By:    Naissance Capital Real Estate, LLC,
a Delaware limited liability company,
its Managing Member

       By: _____
Name: Azeemeh Zaheer
Title:  Managing Member

[Signature Page to Deed of Trust]

RP-2018-235600

000736

## ACKNOWLEDGMENT

STATE OF _Texas_ )
)ss.
COUNTY OF _Harris_ )

On _May 20,_ 2018 before me _Shelina Jamani_ personally appeared _Azeemeh Zaheer_ , personally known to me (or proved to me on the basis of satisfactory evidence) to be the person, whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Signature _[signature]_          (Seal)



SHELINA JAMANI
Notary Public, State of Texas
Comm. Expires 05-09-2019
Notary ID 128607783

[Signature Page to Deed of Trust]

RP-2018-235600

<u>EXHIBIT A</u>
<u>PROPERTY DESCRIPTION</u>

Real property in the City of Houston, County of Harris and State of Texas, described as follows:

Tract 1: Fee Tract

BEING 2.4462 ACRES (106,557 SQUARE FEET) OF LAND OUT OF THE WILLIAM WHITE SURVEY, ABSTRACT NO. 836, HOUSTON, HARRIS COUNTY, TEXAS, BEING THE SAME PROPERTY CONVEYED TO 2425 WEST LOOP, LP BY SPECIAL WARRANTY DEED RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20070732472, SAID TRACT CONVEYED BY DEED TO ONE WEST LOOP PLAZA, LTD. UNDER HCCF NO. S547896 AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE WESTHEIMER ROAD (ROW VARIES) BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 204.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST, TO A 1/2 INCH IRON ROD FOUND AT THE NORTHEAST CORNER OF THE 2.3468 ACRE PARCEL BEING THE SOUTHEAST CORNER OF THE HEREIN DESCRIBED PARCEL AND THE POINT OF BEGINNING:

THENCE, WESTERLY ALONG THE COMMON LINE OF THE 2.3468 ACRE PARCEL TO THE SOUTH AND THE HEREIN DESCRIBED PARCEL TO THE NORTH, SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 464.50 FEET TO A POINT ON THE EASTERLY RIGHT OF WAY (ROW) LINE OF INTERSTATE 610 WEST LOOP AND THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED PARCEL FROM. WHICH A FOUND RAILROAD SPIKE BEARS SOUTH 21 DEGREES 43 MINUTES EAST 2.42 FEET;

THENCE, NORTHERLY ALONG THE EASTERLY RIGHT OF WAY LINE OF INTERSTATE 610 WEST LOOP (ROW 350 FEET) NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST 251.27 FEET TO AN "X" SET IN CONCRETE BEING THE SOUTHWEST CORNER OF A 7.8998 ACRE PARCEL AS SHOWN ON THE HOUSTON VENTURE PLAT UNRESTRICTED RESERVE "A" FILED IN THE HARRIS COUNTY MAP RECORDS AS FILM CODE NUMBER 356074, AND THE NORTHWEST CORNER OF THE HEREIN DESCRIBED PARCEL;

THENCE, EASTERLY ALONG THE COMMON LINE OF THE ABOVE INDICATED 7.8998 ACRE PARCEL TO THE NORTH AND THE HEREIN DESCRIBED PARCEL TO THE SOUTH NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 406.61 FEET TO AN "X"

[Exhibit A - Property Description]



RP-2018-235600

FOUND IN THE WESTERLY LINE OF A 3.4385 ACRE PARCEL OF LAND CONVEYED TO RESTPROP, LTD AS RECORDED IN THE HCCF NO. R228886;

THENCE, SOUTHERLY ALONG A COMMON LINE OF THE ABOVE INDICATED 3.4385 ACRE PARCEL TO THE EAST AND THE HEREIN DESCRIBED PARCEL TO THE WEST, SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 244.64 FEET TO THE POINT OF BEGINNING CONTAINING 106,557 SQUARE FEET, 2.4462 ACRES MORE LESS.

NOTE: WE ARE PROHIBITED FROM INSURING ANY INACCURACY IN STATEMENT AS TO THE QUANTITY OF LAND CONTAINED WITHIN THE BOUNDARIES OF THE LAND DESCRIBED IN SCHEDULE A.

TRACT 2 EASEMENT TRACT: 20 FOOT NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT OVER AND ACROSS A TRACT OF LAND NORTHERLY OF AND 20 FEET WIDE ALONG THE ENTIRE NORTHERLY BOUNDARY LINE OF TRACT I; SAID EASEMENT CREATED AND GRANTED BY VI IAN L. SMITH, INDIVIDUALLY AND AS INDEPENDENT EXECUTRIX OF THE ESTATE OF R. E. SMITH, DECEASED IN THAT CERTAIN GENERAL WARRANTY DEED DATED JULY 5, 1977 FILED IN HCCF NO. F216562 AND DESCRIBED IN HCCF NO. G743294, BEING THE SAME EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 204.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST TO A 1/2 INCH IRON ROD FOUND FOR THE SOUTHEAST CORNER OF TRACT I;

THENCE CONTINUING NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 244.64 FEET ALONG A COMMON LINE OF A PREVIOUSLY NOTED 3.4385 ACRE PARCEL OF LAND TO THE EAST AND TRACT I TO THE WEST TO AN "X" FOUND FOR THE NORTHEAST CORNER OF TRACT I AND THE POINT OF BEGINNING;

[Exhibit A - Property Description]



THENCE, WESTERLY SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 406.61 FEET ALONG THE NORTHERLY LINE OF TRACT 1 TO AN "X" SET ON THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP (350 FEET WIDE);

THENCE, NORTHERLY NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST 20.54 FEET ALONG THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP TO A POINT;

THENCE, EASTERLY 20.00 FEET NORTHERLY FROM AND PARALLEL TO THE NORTHERLY LINE OF TRACT 1, NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 401.88 FEET TO A POINT;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST 20.00 FEET TO THE POINT OF BEGINNING AND CONTAINING 0.1856 ACRES OR 8,085 SQUARE FEET OF LAND MORE OR LESS.

TRACT 3 EASEMENT TRACT: 20 FOOT NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT;

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT OVER AND ACROSS A TRACT OF LAND SOUTHERLY OF AND 20.00 FEET WIDE ALONG THE ENTIRE SOUTHERN BOUNDARY LINE OF TRACT 1, SAID EASEMENT CREATED AND GRANTED ON FEBRUARY 16, 1979, FROM WEST LOOP HOTEL, LIMITED TO FIN PROPERTIES, LIMITED FILED IN HCCF NO. G041310, BEING THE SAME PROPERTY EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 184.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST TO THE POINT OF BEGINNING, WHENCE THE SOUTHEAST CORNER OF TRACT 1 BEARS NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 20.02 FEET;

THENCE, WESTERLY 20.00 FEET SOUTHERLY FROM AND PARALLEL TO THE SOUTHERLY LINE OF TRACT 1, SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 469.23 FEET TO A POINT IN THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP;

[Exhibit A - Property Description]

RP-2018-235600



RP-2018-235600

THENCE, NORTHERLY NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST, 20.54 FEET ALONG THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP TO THE SOUTHWEST CORNER FOR TRACT 1 FROM WHICH A FOUND RAILROAD SPIKE BEARS SOUTH 21 DEGREES 43 MINUTES EAST, 2.42 FEET;

THENCE, EASTERLY NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 464.50 FEET ALONG THE SOUTHERLY LINE OF TRACT 1 TO A 1/2 INCH IRON ROD FOUND AT THE SOUTHEAST CORNER OF TRACT 1;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 20.02 FEET ALONG THE A COMMON LINE BETWEEN A PREVIOUSLY DESCRIBED 2.3468 ACRES PARCEL TO THE WEST AND A 3.4385 ACRE PARCEL TO THE EAST TO THE POINT OF BEGINNING AND CONTAINING 0.2144 ACRES OR 9,337 SQUARE FEET OF LAND, MORE OR LESS.

TRACT 4 EASEMENT TRACT: 28 FOOT ROADWAY AND PEDESTRIAN EASEMENT;

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT ACROSS EASTERLY 28 FEET OF A 2.3468 ACRE TRACT ADJACENT TO AND SOUTHERLY OF TRACT 1, CREATED AND GRANTED IN THAT CERTAIN ROAD AND PEDESTRIAN EASEMENT DATED FEBRUARY 16, 1979 FROM WEST LOOP HOTEL, LIMITED TO FIN PROPERTIES, LIMITED, FILED IN HCCF NO. G041313, BEING THE SAME PROPERTY EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT A FOUND 5/8 INCH IRON ROD IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, WESTERLY SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST, 28.00 FEET ALONG THE NORTHERLY LINE OF WESTHEIMER ROAD TO A POINT;

THENCE, NORTHERLY 28.00 FEET WESTERLY OF AND PARALLEL TO THE EASTERLY LINE OF SAID 2.3468 ARE TRACT NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 205.08 FEET TO A POINT ON THE SOUTHERLY LINE OF TRACT 1;

THENCE, EASTERLY NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 28.00 FEET ALONG THE SOUTHERLY LINE OF TRACT 1 TO A 1/2 INCH IRON ROD FOUND IN THE WESTERLY LINE OF A 3.4385 ACRE PARCEL OF LAND PRESENTLY OWNED BY RESTPROP, LTD AS RECORDED IN THE HCCF NO. R228886;

[Exhibit A - Property Description]



THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 204.61 FEET ALONG A COMMON LINE OF THE ABOVE INDICATED 3.4385 ACRE PARCEL TO THE EAST SAID THE PREVIOUSLY DESCRIBED 2.3468 ACRE PARCEL TO THE WEST, TO THE POINT OF BEGINNING, CONTAINING 0.1317 ACRES OR 5,735 SQUARE FEET (CALLED 5,740) OF LAND MORE OR LESS.

TRACT 5 EASEMENT TRACT: 5 FOOT STORM SEWER EASEMENT

A 1,025 SQUARE FOOT TRACT OF LAND, BEING THAT SAME TRACT UN PROPERTIES, LIMITED, RECORDED IN HCCF NUMBER G041311, LOCATED IN THE WILLIAM WHITE SURVEY, ABSTRACT NUMBER 836, CITY OF HOUSTON, HARRIS COUNTY, TEXAS, BEING THE SAME EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY (ROW) OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. 5056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR. TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE ALONG THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD, SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST, A DISTANCE OF 16.00 FEET TO THE SOUTHEAST CORNER OF SAID EASEMENT AND THE HEREIN DESCRIBED TRACT;

THENCE CONTINUING ALONG THE NORTHERLY LINE OF WESTHEIMER ROAD, SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST A DISTANCE OF 5.00 FEET, THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE DEPARTING SAID WESTHEIMER ROAD, NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, A DISTANCE OF 204.96 FEET, TO A POINT IN THE SOUTHERLY LINE OF A 2.4462 ACRE TRACT CONVEYED BY DEED TO HE 2425 WEST LOOP. LP RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20070732472;

THENCE ALONG THE SOUTHERLY LINE OF SAID 2.4462 ACRE TRACT, NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST A DISTANCE OF 5.00 FEET TO THE NORTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE DEPARTING THE SOUTHERLY LINE OF SAID 2.4462 ACRE TRACT, SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, A DISTANCE OF 204.88 FEET TO THE POINT OF BEGINNING AND CONTAINING 1,025 SQUARE FEET OF LAND, MORE OR LESS

[Exhibit A - Property Description]



RP-2018-235600

# Pages 29

05/30/2018 08:41 AM

e-Filed & e-Recorded in the

Official Public Records of

HARRIS COUNTY

STAN STANART

COUNTY CLERK

Fees  $124.00

RECORDERS MEMORANDUM
This instrument was received and recorded electronically
and any blackouts, additions or changes were present
at the time the instrument was filed and recorded.

Any provision herein which restricts the sale, rental, or
use of the described real property because of color or
race is invalid and unenforceable under federal law.
THE STATE OF TEXAS
COUNTY OF HARRIS
I hereby certify that this instrument was FILED in
File Number Sequence on the date and at the time stamped
hereon by me; and was duly RECORDED in the Official
Public Records of Real Property of Harris County, Texas.



COUNTY CLERK
HARRIS COUNTY, TEXAS

000743





I, Teneshia Hudspeth, County Clerk of Harris County, Texas certify that these pages
are a true and correct copy of the original record filed and recorded in my office,
electronically or hard copy, as it appears on this date.

Witness my official hand and seal of office
This March 20, 2024

Teneshia Hudspeth, County Clerk
Harris County, Texas

Any provision herein which restrict the sale, rental or use of the described Real Property because of color or race is invalid and
unenforceable under the Federal Law. Confidential information may have been redacted from the document in compliance with the
Public Information Act.



THIS INSTRUMENT WAS
PREPARED BY AND UPON
RECORDING RETURN TO:

Baker & McKenzie LLP
300 E. Randolph St., Suite 5000
Chicago, IL 60601
Attention: Mona Dajani, Esq.

SPACE ABOVE LINE RESERVED FOR OFFICIAL RECORDER'S USE

GALLERIA 2425 OWNER, LLC,
Assignor,

to

NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH,
as Administrative Agent,
Assignee

ABSOLUTE ASSIGNMENT OF LEASES AND RENTS

Dated as of May 23, 2018

This instrument affects certain real and personal property
located in Harris County,
State of Texas

AFTER RECORDING RETURN TO:
TransAct
TITLE

GF #: 12000990



000745

**RP-2018-235601**

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

<u>ABSOLUTE ASSIGNMENT OF LEASES AND RENTS</u>

THIS ABSOLUTE ASSIGNMENT OF LEASES AND RENTS (this "<u>Assignment</u>") made as of May 23, 2018 by GALLERIA 2425 OWNER, LLC, a Delaware limited liability company, having an address at 3139 W Holcombe Blvd #845, Houston, Texas 77025 ("<u>Assignor</u>"), to NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH, a banking corporation organized under the laws of Kuwait, acting through its New York branch, having an office at 299 Park Avenue, New York, New York 10171, as administrative and collateral agent (in such capacity, together with its successors and assigns, "<u>Administrative Agent</u>" or "<u>Assignee</u>") for the Lenders (as defined in the Loan Agreement referred to below).

In consideration of TEN DOLLARS ($10.00) and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Assignor does hereby assign, transfer and set over unto Assignee, all of the right, title and interest of Assignor (and any affiliate, subsidiary or other entity related to or controlled by Assignor) in and to (i) all leases, subleases, licenses, occupancy or rental agreements, concession agreements and other agreements for occupancy now or hereafter in existence affecting all or any portion of the real property more particularly described on <u>Exhibit A</u> annexed hereto and made a part hereof (hereinafter called the "<u>Premises</u>"), heretofore or hereafter entered into, whether before or after the filing by or against Assignor of any petition for relief under 11 U.S.C. §101 et seq., as the same may be amended from time to time (the "<u>Bankruptcy Code</u>"), together with all modifications, renewals and extensions thereof and any guaranties, if any, of the lessee's obligations under said existing and future leases, subleases, licenses, occupancy or rental agreements, concession agreements and other agreements (each of said leases, subleases, licenses, occupancy or rental agreements, concession agreements and other agreements and all such guaranties, modifications, renewals and extensions relating thereto being hereinafter individually called a "<u>Lease</u>", and collectively called the "<u>Leases</u>"), and (ii) all cash or securities deposited under the Leases to secure the performance by the lessees of their obligations thereunder and all rents, additional rents, revenues, issues and profits (including all oil and gas or other mineral royalties and bonuses) from the Premises, all receivables, installment payment obligations and other obligations now existing or hereafter arising or created out of the lease, sublease, license, concession or other grant of the right of the use and occupancy of property (including, without limitation, from the rental of any office space, retail space or other space), license, lease and sublease fees and proceeds, if any, from business interruption or other loss of income insurance) whether paid or accruing before or after the filing by or against Assignor of any petition for relief under the Bankruptcy Code (collectively, the "<u>Rents</u>") and all proceeds thereof and the right to receive and apply the Rents to the payment of the Debt. It is the intention of Assignor and Assignee that this conveyance creates (1) a presently and immediately effective security interest in all Rents, whether accrued or unaccrued, by means of assignment of the Rents pursuant to this Assignment as contemplated in Chapter 64 of the Texas Property Code, the Texas Assignment of Rents Act (as modified from time to time, "TARA"), and (ii) a present and absolute assignment of the Leases, and in both cases, Lender's rights to same are not contingent or conditioned upon, and may be exercised without, Possession of the Property.

THIS ASSIGNMENT is a present, absolute and irrevocable assignment and is made for the purpose of securing:

A.    The payment of all principal, interest, indebtedness and other sums now or hereafter due under that certain Promissory Note in the original principal sum of $51,675,000.00, made by Assignor to Administrative Agent, on behalf of Lenders, dated as of the date hereof, and any amendments, extensions

2



RP-2018-235601

or renewals thereof (together with all amendments, extensions or renewals thereof, the "Note"), which Note is also secured by that certain Deed of Trust, Assignment of Leases and Rents and Profits, Security Agreement and Fixture Filing, made by Assignor to Salima Umatiya, as trustee, for the benefit of Administrative Agent, on behalf of Lenders, dated as of the date hereof, encumbering the Assignor's fee interest in and to the Premises and being recorded simultaneously herewith (together with all amendments, extensions or renewals thereof, the "Deed of Trust");

B.      Payment of all sums with interest thereon becoming due and payable to Assignee under this Assignment, the Deed of Trust, the Note, that certain Loan Agreement made by and among Assignor, Administrative Agent and Lenders dated as of even date herewith (together with all amendments, extensions or renewals thereof, the "Loan Agreement"; all capitalized terms used but not separately defined herein shall have the meanings ascribed to them in the Loan Agreement) and any other Loan Documents; and

C.      The performance and discharge of each and every obligation, covenant, representation, warranty and agreement of Assignor under this Assignment, the Loan Agreement, the Note, the Deed of Trust and any other Loan Document.

Assignor hereby covenants and warrants to Lender and Administrative Agent that Assignor has not executed any prior assignment of the Leases or Rents which shall be effective after the date hereof, other than to Assignee, nor has Assignor performed any act or executed any other instrument which might prevent Assignee from operating under any of the terms, provisions, covenants and conditions of this Assignment or which would limit Assignee in such operation; and Assignor further covenants and warrants to Assignee that Assignor has not executed or granted any modification whatsoever of the Leases, except as herein indicated, and that the Leases are in full force and effect, and that there are no material defaults now existing under the Leases.

THIS ASSIGNMENT is made on the following terms, provisions, covenants and conditions:

1.      So long as there shall exist no Event of Default, Assignor shall have a license, REVOCABLE AT ANY TIME DURING THE CONTINUANCE OF AN EVENT OF DEFAULT, (i) to collect at the time of, but not for more than one (1) month prior to, the date provided for the payment thereof, all Rents, and to retain, use and enjoy the same, (ii) amend, supplement, enforce and otherwise exercise the rights of landlord under the Leases in accordance with and as permitted under the Loan Documents. Assignor, without the prior consent of Assignee, shall not cause or permit the leasehold estate under the Leases to merge with Assignor's reversionary interest.

2.      (a)      During the continuance of an Event of Default, Assignee, without in any way waiving such default, at Assignee's option, without notice and without regard to the adequacy of the security for the Debt, either in person or by agent, with or without bringing any action or proceeding, or by a receiver appointed by a court, may take possession of the Premises (or any portion thereof) and have, hold, manage, lease and operate the same on such terms and for such period of time as Assignee may deem proper. Additionally, upon such occurrence, Assignee, either with or without taking possession of the Premises (or any portion thereof) in Assignee's own name, may demand, sue for or otherwise collect and receive all Rents, including those past due and unpaid, with full power to make from time to time all alterations, renovations, repairs or replacements thereto or thereof as may seem proper to Assignee and to apply such Rents to the payment of: (i) all reasonable and actual expenses of managing the Premises, including, without being limited thereto, the salaries, fees and wages of a managing or leasing agent and such other employees as Assignee may deem necessary or desirable and all expenses of operating and maintaining the Premises, including, without being limited thereto, all taxes, charges, claims, assessments, water rents, sewer rents and any other liens, and premiums for all insurance which Assignee may deem necessary or desirable, and the cost of all alterations, renovations, repairs or replacements, and all expenses incident to taking and retaining possession of the Premises; and (ii) the Debt, together with

·3



RP-2018-235601

all reasonable out-of-pocket costs and attorneys' fees and disbursements, in such order of priority as to any of the items mentioned in this paragraph as Assignee, in Assignee's sole and absolute discretion, may determine, any statute, law, custom or use to the contrary notwithstanding.

(b)     The exercise by Assignee of the options granted to Assignee under this <u>Section 2</u> and the collection of the Rents and the application thereof as herein provided shall not be considered a waiver of any default by Assignor under this Assignment, the Leases, the Loan Agreement, the Note, the Deed of Trust or any other Loan Document, and shall not constitute an action, render any of Assignor's obligations to Assignee unenforceable or otherwise limit any rights available to Assignee. Furthermore, Assignor agrees that the exercise by Assignee of one or more of Assignee's rights and remedies hereunder shall in no way be deemed or construed to make Assignee a mortgagee-in-possession.

3.     Assignee shall not be liable for any loss sustained by Assignor resulting from Assignee's failure to let the Premises (or any portion thereof) after an Event of Default or from any other act or omission of Assignee either in collecting the Rents or, if Assignee shall have taken possession of the Premises (or any portion thereof), in managing the Premises (or any portion thereof) after default, other than losses arising from the gross negligence or willful misconduct of Assignee. Further, Assignee shall not be obligated to perform or discharge, nor does Assignee hereby undertake to perform or discharge, any obligation, duty or liability under the Leases or under or by reason of this Assignment, and Assignor shall, and does hereby agree, to indemnify Assignee for, and to hold Assignee harmless from and against, any and all liability, loss or damage which may or might be incurred under the Leases or under or by reason of this Assignment and from any and all claims and demands whatsoever which may be asserted against Assignee by reason of any alleged obligations or undertakings on Assignee's part to perform or discharge any of the terms, covenants or agreements contained in the Leases. Should Assignee incur any such liability under the Leases or under or by reason of this Assignment or in defense of any such claims or demands, the amount thereof, including, without limitation, reasonable and actual costs, expenses and attorneys' fees and disbursements, shall be secured hereby and Assignor shall reimburse Assignee therefor immediately upon demand and upon the failure of Assignor so to do, Assignee may, at Assignee's option, declare the Debt immediately due and payable. It is further understood that this Assignment shall not operate to place responsibility for the control, care, management or repair of the Premises (or any portion thereof) upon Assignee, nor for the carrying out of any of the terms, provisions, covenants and conditions of the Leases; nor shall this Assignment operate to make Assignee responsible or liable for any waste committed at the Premises by the tenants or any other parties, or for any dangerous or defective condition of the Premises (or any portion thereof), or for any negligence in the management, upkeep, repair or control of the Premises (or any portion thereof) resulting in loss or injury or death to any tenant, licensee, occupant, employee or stranger. Furthermore, Assignor agrees that the exercise by Assignee of one or more of Assignee's rights and remedies hereunder shall in no way be deemed or construed to make Assignee a mortgagee in possession.

4.     Upon payment in full of the Debt, this Assignment shall become and be void and of no effect but the affidavit, certificate, letter or statement of any officer, agent or attorney of Assignee showing any part of the Debt to remain unpaid shall be and constitute evidence of the validity, effectiveness and continuing force of this Assignment and any person may, and is hereby authorized to, rely thereon. Assignor hereby authorizes and directs the lessees named in the Leases or any other or future lessee, licensee or occupants of the Premises (or any portion thereof), upon receipt from Assignee of written notice to the effect that Assignee is then the holder of said Loan Agreement, Note and Deed of Trust and that an Event of Default exists thereunder or under this Assignment, to pay over to Assignee all Rents arising or accruing under its Lease and to continue so to do until otherwise notified by Assignee.

5.     Assignee may take or release other security for the payment of the Debt (or any portion thereof), may release any party primarily or secondarily liable therefor and may apply any other security



4



held by Assignee to the satisfaction of the Debt (or any portion thereof) without prejudice to any of Assignee's rights under this Assignment.

6.    Assignor agrees that Assignor shall, from time to time, upon demand therefor by Assignee, deliver to Assignee a certified true copy of each and every Lease then affecting all or any part of the Premises. Further, Assignor agrees that Assignor shall execute and record such additional assignments as Assignee may reasonably request covering any and all of the Leases. Such assignments shall be on forms approved by Assignee, and Assignor agrees to pay all costs and expenses incurred by Assignee in connection with the examination of said Leases and the preparation, execution and recording of such assignments or any other related documents, including, without limitation, the fees and disbursements of Assignee's counsel and any recording charges.

7.    Wherever used in this Assignment, the singular (including, without limitation, the term "Lease") shall include the plural, and the use of either gender shall apply to both genders.

8.    This Assignment is expressly intended for the benefit and protection of Assignee, and all subsequent holders of the Loan Agreement, Note and Deed of Trust now held by Assignee and all persons holding a participating interest therein, and Assignor understands that this Assignment is a PRESENT ABSOLUTE ASSIGNMENT OF LEASES AND RENTS, subject only to the revocable license granted to Assignor under <u>Section 1</u> hereof.

9.    The recording of any valid full satisfaction of the Deed of Trust shall operate as a release of this Assignment in favor of the then owner of the Premises; *provided, however,* that the recording of any valid partial release of the Deed of Trust shall operate as a release of this Assignment only with respect to that portion of the Premises thereby released from the Deed of Trust, the term Premises as used in this Assignment being deemed thereafter to refer only to that portion of the Premises remaining encumbered by the Deed of Trust and the term Assignor as used in this Assignment being deemed thereafter to refer only to the owner or owners of such remaining portion of the Premises.

10.    Nothing contained in this Assignment and no act done or omitted by Assignee pursuant to the powers and rights granted to Assignee hereunder shall be deemed to be a waiver by Assignee of any of Assignee's rights and remedies hereunder or under the Loan Agreement, the Note, the Deed of Trust or any other Loan Document. This Assignment is made and accepted without prejudice to any of such rights and remedies possessed by Assignee to collect the Debt and to enforce any other security therefor held by Assignee, and said rights and remedies may be exercised by Assignee either prior to, simultaneously with, or subsequent to any other action taken by Assignee hereunder or thereunder.

11.    All notices, demands or documents which are required or permitted to be given or served under this Assignment shall be given in the manner and to the parties as provided in the Loan Agreement.

12.    This Assignment shall be construed without regard to any presumption or other rule requiring construction against the party causing this Assignment to be drafted.

13.    To the extent that any action is to be taken, any information is to be delivered to or by Assignee, any determination is to be made, or any consent is to be given or withheld by Assignee, any such action, delivery, determination or consent shall be taken, made or given or withheld, as the case may be, by Administrative Agent or any successor agent thereto.

14.    This Assignment shall be construed in accordance with and be governed by the laws of the State of New York without reference to principles of conflicts of law, except to the extent that matters of title, or creation, perfection or priority of the security interests created hereby or by Loan Documents or procedural issues of foreclosure or enforcement of remedies are required to be governed by the laws of the jurisdiction where the Premises is located or the jurisdiction where Assignor is formed, as applicable.

5

RP-2018-235601




000749

RP-2018-235601

15.    Without in any way limiting or restricting any of Assignee's rights, benefits or privileges hereunder, Assignee and Assignor hereby expressly agree that Assignee shall be entitled to all of the rights, benefits and privileges provided for in the Texas Assignment of Rents Act, Chapter 64 of the Texas Property Code, as amended from time to time.

[remainder of page intentionally left blank]

IN WITNESS WHEREOF, Assignor has duly executed this Assignment as of the date first written above.

ASSIGNOR:

**GALLERIA 2425 OWNER, LLC,**
a Delaware limited liability company

By:    Galleria 2425 JV, LLC,
      a Delaware limited liability company,
      its sole member

     By:    Naissance Capital Real Estate, LLC,
          a Delaware limited liability company,
          its Managing Member

     By: _____
     Name: Azeemeh Zaheer
     Title:  Managing Member

RP-2018-235601

[Signature Page to Absolute Assignment of Leases and Rents]

RP-2018-235601

## ACKNOWLEDGMENT

STATE OF _Texas_ )
                         )ss.
COUNTY OF _Harris_ )

On _May 20_ , 2018 before me _Shelina Jamani_ personally appeared _____ Azeemeh Zaheer_ , personally known to me (or proved to me on the basis of satisfactory evidence) to be the person, whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____ (Seal)



SHELINA JAMANI
Notary Public, State of Texas
Comm. Expires 05-09-2019
Notary ID 128607783

[Signature Page to Absolute Assignment of Leases and Rents]

000752

RP-2018-235601

## EXHIBIT A

### Premises

Real property in the City of Houston, County of Harris, State of Texas, described as follows:

Tract 1: Fee Tract

BEING 2.4462 ACRES (106,557 SQUARE FEET) OF LAND OUT OF THE WILLIAM WHITE SURVEY, ABSTRACT NO. 836, HOUSTON, HARRIS COUNTY, TEXAS, BEING THE SAME PROPERTY CONVEYED TO 2425 WEST LOOP, LP BY SPECIAL WARRANTY DEED RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20070732472, SAID TRACT CONVEYED BY DEED TO ONE WEST LOOP PLAZA, LTD. UNDER HCCF NO. S547896 AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE WESTHEIMER ROAD (ROW VARIES) BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 204.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST, TO A 1/2 INCH IRON ROD FOUND AT THE NORTHEAST CORNER OF THE 2.3468 ACRE PARCEL BEING THE SOUTHEAST CORNER OF THE HEREIN DESCRIBED PARCEL AND THE POINT OF BEGINNING;

THENCE, WESTERLY ALONG THE COMMON LINE OF THE 2.3468 ACRE PARCEL TO THE SOUTH AND THE HEREIN DESCRIBED PARCEL TO THE NORTH, SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 464.50 FEET TO A POINT ON THE EASTERLY RIGHT OF WAY (ROW) LINE OF INTERSTATE 610 WEST LOOP AND THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED PARCEL FROM. WHICH A FOUND RAILROAD SPIKE BEARS SOUTH 21 DEGREES 43 MINUTES EAST 2.42 FEET;

THENCE, NORTHERLY ALONG THE EASTERLY RIGHT OF WAY LINE OF INTERSTATE 610 WEST LOOP (ROW 350 FEET) NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST 251.27 FEET TO AN "X" SET IN CONCRETE BEING THE SOUTHWEST CORNER OF A 7.8998 ACRE PARCEL AS SHOWN ON THE HOUSTON VENTURE PLAT UNRESTRICTED RESERVE "A" FILED IN THE HARRIS COUNTY MAP RECORDS AS FILM CODE NUMBER 356074, AND THE NORTHWEST CORNER OF THE HEREIN DESCRIBED PARCEL;

THENCE, EASTERLY ALONG THE COMMON LINE OF THE ABOVE INDICATED 7.8998 ACRE PARCEL TO THE NORTH AND THE HEREIN DESCRIBED PARCEL TO THE SOUTH NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 406.61 FEET TO AN "X" FOUND IN THE WESTERLY LINE OF A 3.4385 ACRE PARCEL OF LAND CONVEYED TO RESTPROP, LTD AS RECORDED IN THE HCCF NO. R228886;

THENCE, SOUTHERLY ALONG A COMMON LINE OF THE ABOVE INDICATED 3.4385 ACRE PARCEL TO THE EAST AND THE HEREIN DESCRIBED PARCEL TO THE WEST, SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 244.64 FEET TO THE POINT OF BEGINNING CONTAINING 106,557 SQUARE FEET, 2.4462 ACRES MORE LESS.

4162672-v5\CHIDMS1

000753



RP-2018-235601

NOTE: WE ARE PROHIBITED FROM INSURING ANY INACCURACY IN STATEMENT AS TO THE QUANTITY OF LAND CONTAINED WITHIN THE BOUNDARIES OF THE LAND DESCRIBED IN SCHEDULE A.

TRACT 2 EASEMENT TRACT: 20 FOOT NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT OVER AND ACROSS A TRACT OF LAND NORTHERLY OF AND 20 FEET WIDE ALONG THE ENTIRE NORTHERLY BOUNDARY LINE OF TRACT I; SAID EASEMENT CREATED AND GRANTED BY VIVIAN L. SMITH, INDIVIDUALLY AND AS INDEPENDENT EXECUTRIX OF THE ESTATE OF R. E. SMITH, DECEASED IN THAT CERTAIN GENERAL WARRANTY DEED DATED JULY 5, 1977 FILED IN HCCF NO. F216562 AND DESCRIBED IN HCCF NO. G743294, BEING THE SAME EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 204.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST TO A 1/2 INCH IRON ROD FOUND FOR THE SOUTHEAST CORNER OF TRACT I;

THENCE CONTINUING NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 244.64 FEET ALONG A COMMON LINE OF A PREVIOUSLY NOTED 3.4385 ACRE PARCEL OF LAND TO THE EAST AND TRACT I TO THE WEST TO AN "X" FOUND FOR THE NORTHEAST CORNER OF TRACT I AND THE POINT OF BEGINNING;

THENCE, WESTERLY SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 406.61 FEET ALONG THE NORTHERLY LINE OF TRACT I TO AN "X" SET ON THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP (350 FEET WIDE);

THENCE, NORTHERLY NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST 20.54 FEET ALONG THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP TO A POINT;

THENCE, EASTERLY 20.00 FEET NORTHERLY FROM AND PARALLEL TO THE NORTHERLY LINE OF TRACT I, NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 401.88 FEET TO A POINT;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST 20.00 FEET TO THE POINT OF BEGINNING AND CONTAINING 0.1856 ACRES OR 8,085 SQUARE FEET OF LAND MORE OR LESS.

TRACT 3 EASEMENT TRACT: 20 FOOT NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT;

4162672-v5\CHIDMS1

000754



RP-2018-235601

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT OVER AND ACROSS A TRACT OF LAND SOUTHERLY OF AND 20.00 FEET WIDE ALONG THE ENTIRE SOUTHERN BOUNDARY LINE OF TRACT 1, SAID EASEMENT CREATED AND GRANTED ON FEBRUARY 16, 1979, FROM WEST LOOP HOTEL, LIMITED TO FIN PROPERTIES, LIMITED FILED IN HCCF NO. G041310, BEING THE SAME PROPERTY EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 184.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST TO THE POINT OF BEGINNING, WHENCE THE SOUTHEAST CORNER OF TRACT 1 BEARS NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 20.02 FEET;

THENCE, WESTERLY 20.00 FEET SOUTHERLY FROM AND PARALLEL TO THE SOUTHERLY LINE OF TRACT 1, SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 469.23 FEET TO A POINT IN THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP;

THENCE, NORTHERLY NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST, 20.54 FEET ALONG THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP TO THE SOUTHWEST CORNER FOR TRACT 1 FROM WHICH A FOUND RAILROAD SPIKE BEARS SOUTH 21 DEGREES 43 MINUTES EAST, 2.42 FEET;

THENCE, EASTERLY NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 464.50 FEET ALONG THE SOUTHERLY LINE OF TRACT 1 TO A 1/2 INCH IRON ROD FOUND AT THE SOUTHEAST CORNER OF TRACT 1;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 20.02 FEET ALONG THE A COMMON LINE BETWEEN A PREVIOUSLY DESCRIBED 2.3468 ACRES PARCEL TO THE WEST AND A 3.4385 ACRE PARCEL TO THE EAST TO THE POINT OF BEGINNING AND CONTAINING 0.2144 ACRES OR 9,337 SQUARE FEET OF LAND, MORE OR LESS.

TRACT 4 EASEMENT TRACT: 28 FOOT ROADWAY AND PEDESTRIAN EASEMENT;

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT ACROSS EASTERLY 28 FEET OF A 2.3468 ACRE TRACT ADJACENT TO AND SOUTHERLY OF TRACT 1, CREATED AND GRANTED IN THAT CERTAIN ROAD AND PEDESTRIAN EASEMENT DATED FEBRUARY 16, 1979 FROM WEST LOOP HOTEL, LIMITED TO FIN PROPERTIES, LIMITED, FILED IN HCCF NO. G041313, BEING THE SAME PROPERTY EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT A FOUND 5/8 INCH IRON ROD IN THE NORTHERLY RIGHT OF WAY LINE OF

4162672-v5\CHIDMS1



RP-2018-235601

WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, WESTERLY SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST, 28.00 FEET ALONG THE NORTHERLY LINE OF WESTHEIMER ROAD TO A POINT;

THENCE, NORTHERLY 28.00 FEET WESTERLY OF AND PARALLEL TO THE EASTERLY LINE OF SAID 2.3468 ARE TRACT NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 205.08 FEET TO A POINT ON THE SOUTHERLY LINE OF TRACT I;

THENCE, EASTERLY NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 28.00 FEET ALONG THE SOUTHERLY LINE OF TRACT I TO A 1/2 INCH IRON ROD FOUND IN THE WESTERLY LINE OF A 3.4385 ACRE PARCEL OF LAND PRESENTLY OWNED BY RESTPROP, LTD AS RECORDED IN THE HCCF NO. R228886;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 204.61 FEET ALONG A COMMON LINE OF THE ABOVE INDICATED 3.4385 ACRE PARCEL TO THE EAST SAID THE PREVIOUSLY DESCRIBED 2.3468 ACRE PARCEL TO THE WEST, TO THE POINT OF BEGINNING, CONTAINING 0.1317 ACRES OR 5,735 SQUARE FEET (CALLED 5,740) OF LAND MORE OR LESS.

TRACT 5 EASEMENT TRACT: 5 FOOT STORM SEWER EASEMENT

A 1,025 SQUARE FOOT TRACT OF LAND, BEING THAT SAME TRACT UN PROPERTIES, LIMITED, RECORDED IN HCCF NUMBER G041311, LOCATED IN THE WILLIAM WHITE SURVEY, ABSTRACT NUMBER 836, CITY OF HOUSTON, HARRIS COUNTY, TEXAS, BEING THE SAME EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY (ROW) OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. 5056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR. TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE ALONG THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD, SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST, A DISTANCE OF 16.00 FEET TO THE SOUTHEAST CORNER OF SAID EASEMENT AND THE HEREIN DESCRIBED TRACT;

THENCE CONTINUING ALONG THE NORTHERLY LINE OF WESTHEIMER ROAD, SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST A DISTANCE OF 5.00 FEET, THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE DEPARTING SAID WESTHEIMER ROAD, NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, A DISTANCE OF 204.96 FEET, TO A POINT IN THE SOUTHERLY LINE OF A 2.4462 ACRE TRACT CONVEYED BY DEED TO HE 2425 WEST LOOP, LP RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20070732472;

4162672-v5\CHIIDMS1



THENCE ALONG THE SOUTHERLY LINE OF SAID 2.4462 ACRE TRACT, NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST A DISTANCE OF 5.00 FEET TO THE NORTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE DEPARTING THE SOUTHERLY LINE OF SAID 2.4462 ACRE TRACT, SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, A DISTANCE OF 204.88 FEET TO THE POINT OF BEGINNING AND CONTAINING 1,025 SQUARE FEET OF LAND, MORE OR LESS

RP-2018-235601

4162672-v5\CHIDMS1

000757



RP-2018-235601

RP-2018-235601
# Pages 14
05/30/2018 08:41 AM
e-Filed & e-Recorded in the
Official Public Records of
HARRIS COUNTY
STAN STANART
COUNTY CLERK
Fees  $64.00

RECORDERS MEMORANDUM
This instrument was received and recorded electronically
and any blackouts, additions or changes were present
at the time the instrument was filed and recorded.

Any provision herein which restricts the sale, rental, or
use of the described real property because of color or
race is invalid and unenforceable under federal law.
THE STATE OF TEXAS
COUNTY OF HARRIS
I hereby certify that this instrument was FILED in
File Number Sequence on the date and at the time stamped
hereon by me; and was duly RECORDED in the Official
Public Records of Real Property of Harris County, Texas.



COUNTY CLERK
HARRIS COUNTY, TEXAS





I, Teneshia Hudspeth, County Clerk of Harris County, Texas certify that these pages
are a true and correct copy of the original record filed and recorded in my office,
electronically or hard copy, as it appears on this date.

Witness my official hand and seal of office
This March 20, 2024

*Teneshia Hudspeth*

Teneshia Hudspeth, County Clerk
Harris County, Texas

Any provision herein which restrict the sale, rental or use of the described Real Property because of color or race is invalid and
unenforceable under the Federal Law. Confidential information may have been redacted from the document in compliance with the
Public Information Act.





# ANN HARRIS BENNETT

Tax Assessor-Collector

RP-2020-112204

**STATE OF TEXAS** §

**COUNTY OF HARRIS** § Date: February 11, 2020

## CERTIFIED STATEMENT OF TRANSFER OF TAX LIEN

| | |
|---|---|
| Account Number: | 045-140-006-0400 |
| Legal Description: | TR 31D ABST 836 W WHITE |
| Street Address (if applicable): | 2425 W LOOP S |
| Taxing Unit(s): | City Of Houston, Harris County, Harris County Dept. Of Education, Harris County Flood Control Dist, Harris County Hospital District, Houston Community College System, Houston I.S.D., Port Of Houston Authority |
| Tax Year(s) Paid: | 2019 |
| Amount Paid for Transfer (including taxes, penalties, interest and collection costs): | $844,387.97 |
| Property Owner(s)' Name(s): | GALLERIA 2425 OWNER LLC 3139 W HOLCOMBE BLVD APT 845 |
| Transferee's Name: | CAZ CREEK TX II, LLC |
| Transferee's Street Address: | 14800 LANDMARK BLVD STE 400 DALLAS TX 75254 |

I, Ann Harris Bennett, Tax Assessor-Collector for Harris County, and for all taxing units for which the Office of the Harris County Tax Assessor-Collector collects ad valorem taxes, certify that the above named transferee or transferee's agent ("Transferee") has made payment of the amount listed above to the above named taxing units on the property described above as consideration for a transfer of the tax lien(s), and that the tax lien(s) held by taxing units on the property for the tax years listed above are hereby transferred to Transferee in accordance with Texas Tax Code §32.06. I have issued a receipt to Transferee in conjunction with this certification reflecting the payment for the transfer in the amount of taxes, penalties, interest, and collection costs.



Ann Harris Bennett
Harris County Tax Assessor-Collector

BY: _____
Deputy

AFTER RECORDING, RETURN TO:
CAZ CREEK TX II, LLC
14800 LANDMARK BLVD STE 400
DALLAS TX 75254

1.25



## SWORN DOCUMENT AUTHORIZING TRANSFER OF TAX LIEN

| STATE OF TEXAS | § | After recording, return to: |
| --- | --- | --- |
| COUNTY OF HARRIS | § | Caz Creek TX II, LLC<br>14800 Landmark Blvd, Suite 400<br>Dallas, TX 75254 |

Before me, the undersigned notary, on this day personally appeared Musa Hussain, authorized signer for Naissance Capital Real Estate, LLC, as Member of Galleria JV, LLC, as Member of Galleria Owner, LLC, known to me to be the person(s) whose name(s) is/are subscribed below, and being duly sworn, upon oath deposed and stated as follows:

"My name is Musa Hussain, authorized signer for Naissance Capital Real Estate, LLC, as Member of Galleria JV, LLC, as Member of Galleria Owner, LLC. I am over 18 years of age and am capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct. I or the entity I represent owns the real property described as follows:

| | |
| --- | --- |
| Account No. or Property ID No.: | '0451400060400 |
| Legal Description: | TR 31D ABST 836 W WHITE |
| Street Address, if applicable: | 2425 W LOOP S  HOUSTON TX 77027 |
| Amount Paid for Transfer: | $ 844,387.97  (including taxes, penalties, interest, & collection costs) |
| Tax Year(s): | 2019 |
| Transferee's Name: | Caz Creek TX II, LLC |
| OCCC Property Tax License Lender No.: | 1800062523-161548 |
| Transferee's Street Address: | 14800 Landmark Blvd, Suite 400, Dallas, TX 75254 |

"Pursuant to Texas Tax Code §32.06, I hereby authorize the above-named transferee or transferee's agent (the "Transferee"), to pay all taxes, penalties, interest, and collection costs imposed by any and all local taxing units or their agents on the real property, described above, for the tax years listed above. I further authorize and direct the tax assessor-collector(s) for said taxing units to issue a tax receipt with the collector's seal of office or notarized signature to the Transferee and to certify that the taxes and any penalties and interest on the subject property and collection costs have been paid by the transferee on behalf of the owner, and the tax lien on the owner's property has been transferred to the Transferee.

"I have been given notice that if this property is my homestead and I am  disabled, I may be eligible for a tax deferral under Texas Tax Code §33.06."

*Property Owner*
*OR Authorized*
*Representative*

Name:   Musa Hussain, authorized signer for Naissance Capital Real Estate,
LLC, as Member of Galleria JV, LLC, as Member of Galleria
Owner, LLC

1/31/2020
Date Signed

STATE OF TEXAS
COUNTY OF HARRIS

Subscribed and sworn to before me on 1/31/2020 by Musa Hussain, authorized signer for Naissance Capital Real Estate, LLC, as Member of Galleria JV, LLC, as Member of Galleria Owner, LLC.

NOTARY PUBLIC, STATE OF TEXAS

STEPHANIE A. GALLEGOS
Notary Public, State of Texas
Comm. Expires 12-29-2023
Notary ID 125186127

Account # 20018213 (County)
Current: 01/31/2020 / Original: //

RP-2020-112204

000761



RP-2020-112204

# Pages 3

03/11/2020 02:45 PM

e-Filed & e-Recorded in the

Official Public Records of

HARRIS COUNTY

DIANE TRAUTMAN

COUNTY CLERK

Fees  $20.00

RECORDERS MEMORANDUM
This instrument was received and recorded electronically
and any blackouts, additions or changes were present
at the time the instrument was filed and recorded.

Any provision herein which restricts the sale, rental, or
use of the described real property because of color or
race is invalid and unenforceable under federal law.
THE STATE OF TEXAS
COUNTY OF HARRIS
I hereby certify that this instrument was FILED in
File Number Sequence on the date and at the time stamped
hereon by me; and was duly RECORDED in the Official
Public Records of Real Property of Harris County, Texas.



COUNTY CLERK
HARRIS COUNTY, TEXAS





I, Teneshia Hudspeth, County Clerk of Harris County, Texas certify that these pages
are a true and correct copy of the original record filed and recorded in my office,
electronically or hard copy, as it appears on this date.

Witness my official hand and seal of office
This April 30, 2024

Teneshia Hudspeth, County Clerk
Harris County, Texas

Any provision herein which restrict the sale, rental or use of the described Real Property because of color or race is invalid and
unenforceable under the Federal Law. Confidential information may have been redacted from the document in compliance with the
Public Information Act.



RP-2020-237529

# TAX LIEN CONTRACT ("Contract")

**Date:** 01/31/2020

**Loan Number:** 20018213

**Property Owner:** Galleria 2425 Owner LLC
(whether one or more)   2425 West Loop South, Suite 350
Houston, TX 77027

**Tax Lien Transferee:** Caz Creek TX II, LLC
14800 Landmark Blvd, Suite 400
Dallas, TX 75254

**Tax Payment Agreement:** Date:   01/31/2020

Tax Obligation:  $845,366.97 (original amount)

**Property** (including any improvements) located in **Harris County**, Texas and described as follows:

SEE EXHIBIT "A" WHICH IS ATTACHED HERETO.

Located at: 2425 W. Loop S, Houston, TX 77027

1.   Pursuant to § 32.06, Texas Tax Code, Property Owner by execution of a sworn document did authorize Tax Lien Transferee to pay ad valorem taxes, penalties, interest and costs due on the Property to certain taxing units. Such sworn authorization permits the taxing units to transfer the tax liens on the Property to Tax Lien Transferee to secure payment of the Tax Obligation. Property Owner also executed the Tax Payment Agreement, and under its terms Property Owner shall pay to Tax Lien Transferee the Tax Obligation. The terms of the Tax Payment Agreement are incorporated herein.

2.   In compliance with § 32.06 and § 32.065, Texas Tax Code, this Contract further secures the special tax lien against the Property transferred to Tax Lien Transferee for the Tax Obligation and secures the payment of all amounts previously or hereafter advanced, charged, or incurred in connection with transferred lien(s), this Contract, the Tax Payment Agreement, or modifications thereof, as agreed to by Property Owner, including taxes, penalties, interest, costs, fees, post-closing costs and fees, or other charges as permitted by law. Tax Lien Transferee is subrogated to rights, liens, remedies, and equities of the taxing units paid, and the same are renewed and extended by this Contract until all obligations under the Tax Payment Agreement are satisfied and paid in full.

3.   An "Event of Default" is any failure by Property Owner to perform under this Contract or the Tax Payment Agreement. Upon an Event of Default, Tax Lien Transferee may proceed to foreclose its tax lien under any method provided in § 32.06(c), Texas Tax Code. In accordance with section 32.06, Texas Tax Code, Property Owner hereby waives the requirement that Tax Lien Transferee wait one year from the date the tax lien transfer is recorded before instituting foreclosure following a default and acceleration. This Contract shall not restrict Tax Lien Transferee from pursuing any remedy to which it is otherwise entitled by law.

4.   This Contract shall be recorded in each county in which the Property is located. When the context requires, singular nouns and pronouns include the plural.



Contract  Page 1





Musa Hussain, authorized signer for Naissance Capital Real Estate, LLC, as Member of Galleria JV, LLC, as Member of Galleria Owner, LLC

STATE OF TEXAS
COUNTY OF HARRIS

This instrument was acknowledged before me on _May 31  2020_ by Musa Hussain, authorized signer for Naissance Capital Real Estate, LLC, as Member of Galleria JV, LLC, as Member of Galleria Owner, LLC.

STEPHANIE A. GALLEGOS
Notary Public, State of Texas
Comm. Expires 12-29-2023
Notary ID 125186127

_____
Notary Public, State of Texas

AFTER RECORDING, RETURN DOCUMENT TO: Caz Creek TX II, LLC, 14800 Landmark Blvd Suite 400, DALLAS, TX 75254

RP-2020-237529

Contract   Page 2

000765

GALLERIA 2425 OWNER LLC

PARCEL I.D. #0451400060400

# EXHIBIT "A"

**Tract 1:**

BEING 2.4462 ACRES (106,557 SQUARE FEET) OF LAND OUT OF THE WILLIAM WHITE SURVEY, ABSTRACT NO. 836, HOUSTON, HARRIS COUNTY, TEXAS, BEING THE SAME PROPERTY CONVEYED TO 2425 WEST LOOP, LP BY SPECIAL WARRANTY DEED RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20070732472, SAID TRACT CONVEYED BY DEED TO ONE WEST LOOP PLAZA, LTD. UNDER HCCF NO. S547896 AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE WESTHEIMER ROAD (ROW VARIES) BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 204.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST, TO A 1/2 INCH IRON ROD FOUND AT THE NORTHEAST CORNER OF THE 2.3468 ACRE PARCEL BEING THE SOUTHEAST CORNER OF THE HEREIN DESCRIBED PARCEL AND THE POINT OF BEGINNING:

THENCE, WESTERLY ALONG THE COMMON LINE OF THE 2.3468 ACRE PARCEL TO THE SOUTH AND THE HEREIN DESCRIBED PARCEL TO THE NORTH, SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 464.50 FEET TO A POINT ON THE EASTERLY RIGHT OF WAY (ROW) LINE OF INTERSTATE 610 WEST LOOP AND THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED PARCEL FROM WHICH A FOUND RAILROAD SPIKE BEARS SOUTH 21 DEGREES 43 MINUTES EAST 2.42 FEET;

THENCE, NORTHERLY ALONG THE EASTERLY RIGHT OF WAY LINE OF INTERSTATE 610 WEST LOOP (ROW 350 FEET) NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST 251.27 FEET TO AN "X" SET IN CONCRETE BEING THE SOUTHWEST CORNER OF A 7.8998 ACRE PARCEL AS SHOWN ON THE HOUSTON VENTURE PLAT UNRESTRICTED RESERVE "A" FILED IN THE HARRIS COUNTY MAP RECORDS AS FILM CODE NUMBER 356074, AND THE NORTHWEST CORNER OF THE HEREIN DESCRIBED PARCEL;

THENCE, EASTERLY ALONG THE COMMON LINE OF THE ABOVE INDICATED 7.8998 ACRE PARCEL TO THE NORTH AND THE HEREIN DESCRIBED PARCEL TO THE SOUTH NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 406.61 FEET TO AN "X" FOUND IN THE WESTERLY LINE OF A 3.4385 ACRE PARCEL OF LAND CONVEYED

RP-2020-237529



TO RESTPROP, LTD AS RECORDED IN THE HCCF NO. R228886;
THENCE, SOUTHERLY ALONG A COMMON LINE OF THE ABOVE INDICATED 3.4385
ACRE PARCEL TO THE EAST AND THE HEREIN DESCRIBED PARCEL TO THE WEST,
SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 244.64 FEET TO THE POINT OF
BEGINNING CONTAINING 106,557 SQUARE FEET, 2.4462 ACRES MORE LESS.

**TRACT 2:** **20 FOOT NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT**

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT OVER AND ACROSS
A TRACT OF LAND NORTHERLY OF AND 20 FEET WIDE ALONG THE ENTIRE
NORTHERLY BOUNDARY LINE OF TRACT I; SAID EASEMENT CREATED AND
GRANTED BY VIVIAN L. SMITH, INDIVIDUALLY AND AS INDEPENDENT
EXECUTRIX OF THE ESTATE OF R. E. SMITH, DECEASED IN THAT CERTAIN
GENERAL WARRANTY DEED DATED JULY 5, 1977 FILED IN HCCF NO. F216562 AND
DESCRIBED IN HCCF NO. G743294, BEING THE SAME EASEMENT CONVEYED TO
PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH
VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO.
20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND
BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF
WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468
ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY
TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND
THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R.
HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 204.61
FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO
THE WEST AND 3.4385 ACRE PARCEL TO THE EAST TO A 1/2 INCH IRON ROD
FOUND FOR THE SOUTHEAST CORNER OF TRACT I;

THENCE CONTINUING NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS
WEST, 244.64 FEET ALONG A COMMON LINE OF A PREVIOUSLY NOTED 3.4385
ACRE PARCEL OF LAND TO THE EAST AND TRACT I TO THE WEST TO AN "X"
FOUND FOR THE NORTHEAST CORNER OF TRACT I AND THE POINT OF
BEGINNING;

THENCE, WESTERLY SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 406.61
FEET ALONG THE NORTHERLY LINE OF TRACT I TO AN "X" SET ON THE
EASTERLY LINE OF INTERSTATE 610 WEST LOOP (350 FEET WIDE);

THENCE, NORTHERLY NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST 20.54
FEET ALONG THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP TO A POINT;

RP-2020-237529



THENCE, EASTERLY 20.00 FEET NORTHERLY FROM AND PARALLEL TO THE NORTHERLY LINE OF TRACT I, NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 401.88 FEET TO A POINT;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST 20.00 FEET TO THE POINT OF BEGINNING AND CONTAINING 0.1856 ACRES OR 8,085 SQUARE FEET OF LAND MORE OR LESS.

**<u>TRACT 3</u>: 20 FOOT NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT**

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT OVER AND ACROSS A TRACT OF LAND SOUTHERLY OF AND 20.00 FEET WIDE ALONG THE ENTIRE SOUTHERN BOUNDARY LINE OF TRACT I, SAID EASEMENT CREATED AND GRANTED ON FEBRUARY 16, 1979, FROM WEST LOOP HOTEL, LIMITED TO HN PROPERTIES, LIMITED FILED IN HCCF NO. G041310, BEING THE SAME PROPERTY EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 184.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST TO THE POINT OF BEGINNING, WHENCE THE SOUTHEAST CORNER OF TRACT I BEARS NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 20.02 FEET;

THENCE, WESTERLY 20.00 FEET SOUTHERLY FROM AND PARALLEL TO THE SOUTHERLY LINE OF TRACT 1, SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 469.23 FEET TO A POINT IN THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP;

THENCE, NORTHERLY NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST, 20.54 FEET ALONG THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP TO THE SOUTHWEST CORNER FOR TRACT I FROM WHICH A FOUND RAILROAD SPIKE BEARS SOUTH 21 DEGREES 43 MINUTES EAST, 2.42 FEET;

THENCE, EASTERLY NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 464.50 FEET ALONG THE SOUTHERLY LINE OF TRACT I TO A 1/2 INCH IRON ROD FOUND

RP-2020-237529



AT THE SOUTHEAST CORNER OF TRACT I;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 20.02 FEET ALONG A COMMON LINE BETWEEN A PREVIOUSLY DESCRIBED 2.3468 ACRES PARCEL TO THE WEST AND A 3.4385 ACRE PARCEL TO THE EAST TO THE POINT OF BEGINNING AND CONTAINING 0.2144 ACRES OR 9,337 SQUARE FEET OF LAND, MORE OR LESS.

### TRACT 4:  28 FOOT ROADWAY AND PEDESTRIAN EASEMENT

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT ACROSS EASTERLY 28 FEET OF A 2.3468 ACRE TRACT ADJACENT TO AND SOUTHERLY OF TRACT I, CREATED AND GRANTED IN THAT CERTAIN ROAD AND PEDESTRIAN EASEMENT DATED FEBRUARY 16, 1979 FROM WEST LOOP HOTEL, LIMITED TO HN PROPERTIES, LIMITED, FILED IN HCCF NO. G041313, BEING THE SAME PROPERTY EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT A FOUND 5/8 INCH IRON ROD IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, WESTERLY SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST, 28.00 FEET ALONG THE NORTHERLY LINE OF WESTHEIMER ROAD TO A POINT;

THENCE, NORTHERLY 28.00 FEET WESTERLY OF AND PARALLEL TO THE EASTERLY LINE OF SAID 2.3468 ARE TRACT NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 205.08 FEET TO A POINT ON THE SOUTHERLY LINE OF TRACT I;

THENCE, EASTERLY NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 28.00 FEET ALONG THE SOUTHERLY LINE OF TRACT I TO A 1/2 INCH IRON ROD FOUND IN THE WESTERLY LINE OF A 3.4385 ACRE PARCEL OF LAND PRESENTLY OWNED BY RESTPROP, LTD AS RECORDED IN THE HCCF NO. R228886;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 204.61 FEET ALONG A COMMON LINE OF THE ABOVE INDICATED 3.4385 ACRE PARCEL TO THE EAST SAID THE PREVIOUSLY DESCRIBED 2.3468 ACRE PARCEL TO THE WEST, TO THE POINT OF BEGINNING, CONTAINING 0.1317 ACRES OR 5,735 SQUARE FEET (CALLED 5,740) OF LAND MORE OR LESS.

RP-2020-237529



**TRACT 5: 5 FOOT STORM SEWER EASEMENT**

A 1,025 SQUARE FOOT TRACT OF LAND, BEING THAT SAME TRACT HN PROPERTIES, LIMITED, RECORDED IN HCCF NUMBER G041311, LOCATED IN THE WILLIAM WHITE SURVEY, ABSTRACT NUMBER 836, CITY OF HOUSTON, HARRIS COUNTY, TEXAS, BEING THE SAME EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY (ROW) OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. 5056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR. TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE ALONG THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD, SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST, A DISTANCE OF 16.00 FEET TO THE SOUTHEAST CORNER OF SAID EASEMENT AND THE HEREIN DESCRIBED TRACT;

THENCE CONTINUING ALONG THE NORTHERLY LINE OF WESTHEIMER ROAD, SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST A DISTANCE OF 5.00 FEET, THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE DEPARTING SAID WESTHEIMER ROAD, NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, A DISTANCE OF 204.96 FEET, TO A POINT IN THE SOUTHERLY LINE OF A 2.4462 ACRE TRACT CONVEYED BY DEED TO HE 2425 WEST LOOP, LP RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20070732472;

THENCE ALONG THE SOUTHERLY LINE OF SAID 2.4462 ACRE TRACT, NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST A DISTANCE OF 5.00 FEET TO THE NORTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE DEPARTING THE SOUTHERLY LINE OF SAID 2.4462 ACRE TRACT, SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, A DISTANCE OF 204.88 FEET TO THE POINT OF BEGINNING AND CONTAINING 1,025 SQUARE FEET OF LAND, MORE OR LESS.

RP-2020-237529



RP-2020-237529

RP-2020-237529

\# Pages 8

06/04/2020 01:56 PM

e-Filed & e-Recorded in the

Official Public Records of

HARRIS COUNTY

CHRIS HOLLINS

COUNTY CLERK

Fees  $42.00

RECORDERS MEMORANDUM
This instrument was received and recorded electronically
and any blackouts, additions or changes were present
at the time the instrument was filed and recorded.

Any provision herein which restricts the sale, rental, or
use of the described real property because of color or
race is invalid and unenforceable under federal law.
THE STATE OF TEXAS
COUNTY OF HARRIS
I hereby certify that this instrument was FILED in
File Number Sequence on the date and at the time stamped
hereon by me; and was duly RECORDED in the Official
Public Records of Real Property of Harris County, Texas.



COUNTY CLERK
HARRIS COUNTY, TEXAS





I, Teneshia Hudspeth, County Clerk of Harris County, Texas certify that these pages
are a true and correct copy of the original record filed and recorded in my office,
electronically or hard copy, as it appears on this date.

Witness my official hand and seal of office
This April 30, 2024

Teneshia Hudspeth, County Clerk
Harris County, Texas

Any provision herein which restrict the sale, rental or use of the described Real Property because of color or race is invalid and
unenforceable under the Federal Law. Confidential information may have been redacted from the document in compliance with the
Public Information Act.







# Office of the Secretary of State

The undersigned, as Secretary of State of Texas, does hereby certify that the attached is a true and correct copy of each document on file in this office as described below:

Galleria 2425 Owner, LLC
Filing Number: 802982358

Application for Registration                                        April 05, 2018

In testimony whereof, I have hereunto signed my name officially and caused to be impressed hereon the Seal of State at my office in Austin, Texas on July 21, 2024.



Jane Nelson
Secretary of State

*Come visit us on the internet at https://www.sos.texas.gov/*

Phone: (512) 463-5555          Fax: (512) 463-5709          Dial: 7-1-1 for Relay Services
Prepared by: SOS-WEB           TID: 10266                    Document: 1383867450003

| | | |
|---|---|---|
| **Form 304**<br>**(Revised 05/11)**<br><br>Submit in duplicate to:<br>Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>512 463-5555<br>FAX: 512/463-5709<br>**Filing Fee: $750** | **Application for**<br>**Registration**<br>**of a Foreign Limited**<br>**Liability Company** | This space reserved for office use.<br><br>F I L E D<br>In the Office of the<br>Secretary of State of Texas<br><br>APR 0 5 2018<br><br>Corporations Section |

1. The entity is a foreign limited liability company. The name of the entity is:

Galleria 2425 Owner, LLC

*Provide the full legal name of the entity as stated in the entity's formation document in its jurisdiction of formation.*

2A. The name of the entity in its jurisdiction of formation does not contain the word "limited liability company" or "limited company" (or an abbreviation thereof). The name of the entity with the word or abbreviation that it elects to add for use in Texas is:

2B. The entity name is not available in Texas. The assumed name under which the entity will qualify and transact business in Texas is:

*The assumed name must include an acceptable organizational identifier or an accepted abbreviation of one of these terms.*

3. Its federal employer identification number is: _____

☑ Federal employer identification number information is not available at this time.

4. It is organized under the laws of: (set forth state or foreign country)  Delaware

and the date of its formation in that jurisdiction is:  04/04/2018
<div align="center"><i>mm/dd/yyyy</i></div>

5. As of the date of filing, the undersigned certifies that the foreign limited liability company currently exists as a valid limited liability company under the laws of the jurisdiction of its formation.

6. The purpose or purposes of the limited liability company that it proposes to pursue in the transaction of business in Texas are set forth below.

Any lawful business or activity under the law of this state.

The entity also certifies that it is authorized to pursue such stated purpose or purposes in the state or country under which it is organized.

7. The date on which the foreign entity intends to transact business in Texas, or the date on which the: foreign entity first transacted business in Texas is:  upon filing
<div align="center"><i>mm/dd/yyyy</i>     Late fees may apply (see instructions).</div>

8. The principal office address of the limited liability company is:

| 6501 Westchester Avenue | Houston | TX | U.S | 77005-3761 |
|---|---|---|---|---|
| *Address* | *City* | *State* | *Country* | *Zip/Postal Code* |

Form 304

**RECEIVED**

APR 0 5 2018

Secretary of State

6

000775

[✓] 9A. The registered agent is an organization (cannot be entity named above) by the name of:

Capitol Corporate Services, Inc.

**OR**

[ ] 9B. The registered agent is an individual resident of the state whose name is:

| | | | |
|---|---|---|---|
| *First Name* | *M.I.* | *Last Name* | *Suffix* |

9C. The business address of the registered agent and the registered office address is:

| | | | |
|---|---|---|---|
| 206 E. 9th Street, Suite 1300 | Austin | TX | 78701-4411 |
| *Street Address* | *City* | *State* | *Zip Code* |

10. The entity hereby appoints the Secretary of State of Texas as its agent for service of process under the circumstances set forth in section 5.251 of the Texas Business Organizations Code.

11. The name and address of each governing person is:

**NAME AND ADDRESS OF GOVERNING PERSON** (Enter the name of either an individual or an organization, but not both.)

IF INDIVIDUAL

| | | | |
|---|---|---|---|
| *First Name* | *M.I.* | *Last Name* | *Suffix* |

OR

IF ORGANIZATION

Galleria 2425 JV, LLC

*Organization Name*

| | | | | |
|---|---|---|---|---|
| 6501 Westchester Avenue | Houston | TX | U.S | 77005-3761 |
| *Street or Mailing Address* | *City* | *State* | *Country* | *Zip Code* |

**NAME AND ADDRESS OF GOVERNING PERSON** (Enter the name of either an individual or an organization, but not both.)

IF INDIVIDUAL

| | | | |
|---|---|---|---|
| *First Name* | *M.I.* | *Last Name* | *Suffix* |

OR

IF ORGANIZATION

*Organization Name*

| | | | | |
|---|---|---|---|---|
| *Street or Mailing Address* | *City* | *State* | *Country* | *Zip Code* |

**NAME AND ADDRESS OF GOVERNING PERSON** (Enter the name of either an individual or an organization, but not both.)

IF INDIVIDUAL

| | | | |
|---|---|---|---|
| *First Name* | *M.I.* | *Last Name* | *Suffix* |

OR

IF ORGANIZATION

*Organization Name*

| | | | | |
|---|---|---|---|---|
| *Street or Mailing Address* | *City* | *State* | *Country* | *Zip Code* |

000776

## Supplemental Provisions/Information

Text Area: [The attached addendum, if any, is incorporated herein by reference.]

## Effectiveness of Filing (Select either A, B, or C.)

A. ☑ This document becomes effective when the document is filed by the secretary of state.

B. ☐ This document becomes effective at a later date, which is not more than ninety (90) days from the date of signing. The delayed effective date is: _____

C. ☐ This document takes effect upon the occurrence of a future event or fact, other than the passage of time. The 90th day after the date of signing is: _____

The following event or fact will cause the document to take effect in the manner described below:

## Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

Date: _____4/4/2018_____

_Azeemeh Zaheer_

Signature of authorized person (see instructions)

Azeemeh Zaheer

Printed or typed name of authorized person.

000777

Form **401-A**
(Revised 12/09)



**Acceptance of Appointment
and
Consent to Serve as Registered Agent
§5.201(b) Business Organizations Code**

The following form may be used when the person designated as registered agent in a registered agent filing is an individual.

---

<u>Acceptance of Appointment and Consent to Serve as Registered Agent</u>

I acknowledge, accept and consent to my designation or appointment as registered agent in Texas for

*Name of represented entity*
I am a resident of the state and understand that it will be my responsibility to receive any process, notice, or demand that is served on me as the registered agent of the represented entity; to forward such to the represented entity; and to immediately notify the represented entity and submit a statement of resignation to the Secretary of State if I resign.

X:
_____       _____      _____
  *Signature of registered agent*            *Printed name of registered agent*      *Date (mm/dd/yyyy)*

---

The following form may be used when the person designated as registered agent in a registered agent filing is an organization.

---

<u>Acceptance of Appointment and Consent to Serve as Registered Agent</u>

I am authorized to act on behalf of   <u>Capitol Corporate Services, Inc.</u>
                                     *Name of organization designated as registered agent*
The organization is registered or otherwise authorized to do business in Texas. The organization acknowledges, accepts and consents to its appointment or designation as registered agent in Texas for:

Galleria 2425 Owner, LLC
*Name of represented entity*
The organization takes responsibility to receive any process, notice, or demand that is served on the organization as the registered agent of the represented entity; to forward such to the represented entity; and to immediately notify the represented entity and submit a statement of resignation to the Secretary of State if the organization resigns.

                               Krista Abair, Assistant Secretary on behalf 04/05/2018
X: _____       ·of Capitol Corporate Services, Inc.
  *Signature of person authorized to act on behalf of organization*    *Printed name of authorized person*     *Date (mm/dd/yyyy)*

---

000778

# AMENDED AND RESTATED
# LIMITED LIABILITY COMPANY AGREEMENT

## OF

# GALLERIA 2425 JV, LLC
*(a Delaware limited liability company)*

May 23, 2018

# TABLE OF CONTENTS

**ARTICLE I DEFINITIONS** ................................................................................ 1
    **Section 1.1.**    Definitions ............................................................. 1
    **Section 1.2.**    Interpretation ........................................................ 8

**ARTICLE II ORGANIZATION** ........................................................................ 9
    **Section 2.1.**    Formation. .............................................................. 9
    **Section 2.2.**    Name. ...................................................................... 9
    **Section 2.3.**    Principal Office. ..................................................... 9
    **Section 2.4.**    Registered Office; Registered Agent. ................ 10
    **Section 2.5.**    Purpose; Powers. ................................................. 10
    **Section 2.6.**    Term ...................................................................... 10
    **Section 2.7.**    Entity Covenants ................................................. 10

**ARTICLE III MEMBERSHIP INTERESTS** .................................................. 13
    **Section 3.1.**    Membership Schedule ......................................... 13
    **Section 3.2.**    Certification of Membership Interests ............... 13

**ARTICLE IV CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS** ......... 14
    **Section 4.1.**    Initial Capital Contributions ............................. 14
    **Section 4.2.**    Additional Capital Contributions ..................... 14
    **Section 4.3.**    Maintenance of Capital Accounts ..................... 16
    **Section 4.4.**    Succession Upon Transfer ................................. 16
    **Section 4.5.**    Negative Capital Accounts ................................. 17
    **Section 4.6.**    No Withdrawals From Capital Accounts ........... 17
    **Section 4.7.**    Treatment of Loans From Members ................... 17
    **Section 4.8.**    Modifications ...................................................... 17
    **Section 4.9.**    Company Expenses ............................................. 17

**ARTICLE V MEMBERS** .................................................................................. 18
    **Section 5.1.**    Members Schedule ............................................. 18
    **Section 5.2.**    Admission of New Members .............................. 18
    **Section 5.3.**    Representations and Warranties of Members ... 18
    **Section 5.4.**    No Personal Liability .......................................... 19
    **Section 5.5.**    No Withdrawal .................................................... 20
    **Section 5.6.**    No Interest in Company Property ...................... 20

**ARTICLE VI ALLOCATIONS** ........................................................................ 20
    **Section 6.1.**    Allocation of Net Income and Net Loss ............ 20
    **Section 6.2.**    Regulatory and Special Allocations ................. 20
    **Section 6.3.**    Tax Allocations ................................................... 21
    **Section 6.4.**    Allocations in Respect of Transferred Membership Interests ...................... 22

**ARTICLE VII DISTRIBUTIONS** ................................................................... 22
    **Section 7.1.**    Distributions of Cash Flow and Capital Proceeds. ......................................... 22
    **Section 7.2.**    Tax Withholding; Withholding Advances ........ 22
    **Section 7.3.**    Distributions in Kind. ........................................ 24

**ARTICLE VIII MANAGEMENT** .................................................................... 24
    **Section 8.1.**    Management of the Company ............................ 24
    **Section 8.2.**    Actions Requiring Approval of Members ......... 24
    **Section 8.3.**    Irrevocable Proxy ............................................... 26

| Section 8.4. | Officers | 26 |
| Section 8.5. | Action Without Meeting | 26 |
| Section 8.6. | Informational Rights | 26 |
| Section 8.7. | Budget | 26 |
| Section 8.8. | Deadlock | 27 |
| Section 8.9. | Other Activities; Business Opportunities | 28 |

**ARTICLE IX COMPANY OPERATIONS** ............................................................. **28**
| Section 9.1. | Acquisition of Underlying Investment | 28 |
| Section 9.2. | Asset Management Fee | 28 |
| Section 9.3. | Debt and Equity Placement Fee | 28 |
| Section 9.4. | Sale of the Underlying Investment | 28 |
| Section 9.5. | Management of Underlying Investment | 29 |

**ARTICLE X EXCULPATION AND INDEMNIFICATION** ................................ **30**
| Section 10.1. | Exculpation of Covered Persons | 30 |
| Section 10.2. | Liabilities and Duties of Covered Persons | 30 |
| Section 10.3. | Indemnification | 31 |
| Section 10.4. | Survival | 33 |

**ARTICLE XI TRANSFER** ................................................................................... **33**
| Section 11.1. | Restrictions on Transfer | 33 |
| Section 11.2. | Permitted Transfers | 34 |

**ARTICLE XII ACCOUNTING; TAX MATTERS** ............................................. **34**
| Section 12.1. | Financial Statements | 34 |
| Section 12.2. | Inspection Rights | 34 |
| Section 12.3. | Income Tax Status | 34 |
| Section 12.4. | Partnership Representative | 35 |
| Section 12.5. | Tax Returns | 35 |
| Section 12.6. | Company Funds | 36 |

**ARTICLE XIII DISSOLUTION AND LIQUIDATION** ..................................... **36**
| Section 13.1. | Events of Dissolution | 36 |
| Section 13.2. | Effectiveness of Dissolution | 36 |
| Section 13.3. | Liquidation | 36 |
| Section 13.4. | Cancellation of Certificate | 37 |
| Section 13.5. | Survival of Rights, Duties, and Obligations | 37 |
| Section 13.6. | Recourse for Claims | 37 |

**ARTICLE XIV MISCELLANEOUS** .................................................................. **38**
| Section 14.1. | Expenses | 38 |
| Section 14.2. | Further Assurances | 38 |
| Section 14.3. | Confidentiality | 38 |
| Section 14.4. | Notices | 39 |
| Section 14.5. | Headings | 39 |
| Section 14.6. | Severability | 39 |
| Section 14.7. | Entire Agreement | 40 |
| Section 14.8. | Successors and Assigns | 40 |
| Section 14.9. | No Third-party Beneficiaries | 40 |
| Section 14.10. | Amendment | 40 |
| Section 14.11. | Waiver | 40 |
| Section 14.12. | Governing Law | 40 |
| Section 14.13. | Submission to Jurisdiction | 40 |

**Section 14.14.**    WAIVER OF JURY TRIAL ........................................................................ 41
**Section 14.15.**    Equitable Remedies .................................................................................... 41
**Section 14.16.**    Attorneys' Fees ......................................................................................... 41
**Section 14.17.**    Remedies Cumulative ................................................................................ 41
**Section 14.18.**    Counterparts .............................................................................................. 41

# AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

This Amended and Restated Limited Liability Company Agreement of Galleria 2425 JV, LLC, a Delaware limited liability company (the "**Company**"), is entered into as of May 23, 2018 (the "**Effective Date**") by and between Galleria West Loop Investments II LLC, a Texas limited liability company (the "**GWLI II Member**"), and Naissance Capital Real Estate, LLC a Delaware limited liability company (the "**Naissance Member**").

<center>PRELIMINARY STATEMENTS</center>

A. The Company was formed under the laws of the State of Delaware by the filing of a Certificate of Formation (the "**Certificate**") with the Secretary of State of the State of Delaware on April 4, 2018.

B. This Agreement amends and restates, in its entirety, that certain Limited Liability Company Agreement of the Company dated as of April 4, 2018.

C. The Members desire to enter into this Agreement to reflect, among other things, the terms, and conditions governing the operation and management of the Company.

<center>AGREEMENT</center>

In consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

<center>

## ARTICLE I
## DEFINITIONS

</center>

**Section 1.1.** **Definitions**. Capitalized terms used herein and not otherwise defined will have the meanings set forth in this <u>Section 1.1</u>:

"**Additional Capital Contribution**" has the meaning set forth in <u>Section 4.2(a)</u>.

"**Adjusted Capital Account Deficit**" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(a) crediting to such Capital Account any amount that such Member is obligated to restore or is deemed to be obligated to restore pursuant to Treasury Regulations Sections 1.704-1(b)(2)(ii)(c), 1.704-2(g)(1), and 1.704-2(i); and

(b) debiting to such Capital Account the items described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5), and (6).

"**Affiliate**" means, with respect to any Person, any other Person who, directly or indirectly (including through one or more intermediaries), controls, is controlled by, or is under common control with, such Person. For purposes of this definition, "control," when used with respect to any specified Person, will mean the power, direct or indirect, to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or partnership or other ownership

interests, by contract or otherwise; and the terms "controlling" and "controlled" will have correlative meanings.

"**Agreement**" means this Amended and Restated Limited Liability Company Agreement, as executed and as it may be amended, modified, supplemented, or restated from time to time, as provided herein.

"**Applicable Law**" means all applicable provisions of: (a) constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations, or orders of any Governmental Authority; (b) any consents or approvals of any Governmental Authority; and (c) any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any Governmental Authority.

"**Article 8 Matter**" means any action, decision, determination or election by Mortgage Borrower or its member(s) that its membership interests or other equity interests, or any of them, be, or cease to be, a "security" as defined in and governed by Article 8 of the Uniform Commercial Code, and all other matters related to any such action, decision, determination or election.

"**Available Cash**" means, for any period of computation, the excess, if any, of (a) the sum of (i) all cash receipts of the Company during that period from whatever source and (ii) any cash reserves of the Company existing at the start of that period less (b) the sum of (i) all cash amounts paid or payable (without duplication) in that period on account of any expenses of any type whatsoever incurred in connection with the Company's business (including capital expenditures, operating expenses, all fees and other amounts payable under the Agreement, taxes, amortization and interest on any indebtedness of the Company or any Subsidiary of the Company, expenses incurred in connection with the satisfaction of any such indebtedness or the incurrence of additional indebtedness or any refinancing of indebtedness, and (ii) any cash reserves as contemplated in the Budget, including revisions to the Budget pursuant to Section 8.7(b), as determined by the Managing Member in its sole discretion.

"**Bankruptcy**" means, with respect to a Member, the occurrence of any of the following: (a) the filing of an application by such Member for, or a consent to, the appointment of a trustee of such Member's assets; (b) the filing by such Member of a voluntary petition in bankruptcy or the filing of a pleading in any court of record admitting in writing such Member's inability to pay its debts as they come due; (c) the making by such Member of a general assignment for the benefit of such Member's creditors; (d) the filing by such Member of an answer admitting the material allegations of, or such Member's consenting to, or defaulting in answering a bankruptcy petition filed against such Member in any bankruptcy proceeding; or (e) the expiration of sixty (60) days following the entry of an order, judgment or decree by any court of competent jurisdiction adjudicating such Member a bankrupt or appointing a trustee of such Member's assets.

"**BBA**" has the meaning set forth in Section 12.4(a).

"**BBA Procedures**" has the meaning set forth in Section 12.4(c).

"**Book Depreciation**" means, with respect to any Company asset for each Fiscal Year, the Company's depreciation, amortization, or other cost recovery deductions determined for federal income tax purposes, except that if the Book Value of an asset differs from its adjusted tax basis at the beginning of such Fiscal Year, Book Depreciation will be an amount which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided that, if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero and the Book Value of the

asset is positive, Book Depreciation will be determined with reference to such beginning Book Value using any permitted method selected by the Managing Member in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g)(3).

"**Book Value**" means, with respect to any Company asset, the adjusted basis of such asset for federal income tax purposes, except as follows:

(a)      the initial Book Value of any Company asset contributed by a Member to the Company will be the gross Fair Market Value of such Company asset as of the date of such contribution;

(b)      immediately prior to the distribution by the Company of any Company asset to a Member, the Book Value of such asset will be adjusted to its gross Fair Market Value as of the date of such distribution;

(c)      the Book Value of all Company assets will be adjusted to equal their respective gross Fair Market Values, as reasonably determined by the Members, as of the following times:

(i)      the acquisition of an additional Membership Interest by a new or existing Member in consideration for more than a *de minimis* Capital Contribution;

(ii)      the distribution by the Company to a Member of more than a *de minimis* amount of property (other than cash) as consideration for all or a part of such Member's Membership Interest; and

(iii)      the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g);

provided that, adjustments pursuant to clauses (i) and (ii) above need not be made if the Managing Member reasonably determines that such adjustment is not necessary or appropriate to reflect the relative economic interests of the Members and that the absence of such adjustment does not adversely and disproportionately affect any Member;

(d)      the Book Value of each Company asset will be increased or decreased, as the case may be, to reflect any adjustments to the adjusted tax basis of such Company asset pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Account balances pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m); provided that, Book Values will not be adjusted pursuant to this paragraph (d) to the extent that an adjustment pursuant to paragraph (c) above is made in conjunction with a transaction that would otherwise result in an adjustment pursuant to this paragraph (d); and

(e)      if the Book Value of a Company asset has been determined pursuant to paragraph (a) or adjusted pursuant to paragraphs (c) or (d) above, such Book Value will thereafter be adjusted to reflect the Book Depreciation taken into account with respect to such Company asset for purposes of computing Net Income and Net Losses.

"**Budget**" has the meaning set forth in Section 8.7(a).

"**Business Day**" means a day other than a Saturday, Sunday or other day on which commercial banks in the City of New York are authorized or required to close.

"**Buy-out Price**" has the meaning set forth in Section 8.8(b).

"**Buy-Sell Election Date**" has the meaning set forth in Section 8.8(b).

"**Buy-Sell Offer Notice**" has the meaning set forth in Section 8.8(b).

"**Capital Account**" has the meaning set forth in Section 4.3.

"**Capital Contribution**" means, for any Member, the total amount of cash and cash equivalents and the Book Value of any property actually contributed to the Company by such Member, including, for purposes of clarity, any Additional Capital Contributions.

"**Capital Transaction**" means (i) the sale, exchange, condemnation, casualty loss, or other disposition (whether voluntary or involuntary) of the Underlying Investment or the SPV, but specifically excluding any dispositions of personal property and equipment in the ordinary course of business, (ii) recovery of damage awards and insurance proceeds (other than business or rental interruption insurance proceeds), and/or (iii) net proceeds (if any) from the placement of mortgage debt or other financing upon the Company's property (including the Underlying Investment), or other indebtedness secured by the Underlying Investment or any ownership interest therein, or any refinancing thereof, in each case as expressly permitted pursuant to the terms and provisions of this Agreement.

"**Certificate**" has the meaning set forth in the Preliminary Statements.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Company**" has the meaning set forth in the preamble of this Agreement.

"**Company Interest Rate**" has the meaning set forth in Section 7.2(c).

"**Company Lender**" means any Person providing credit or cash to the Company where the indebtedness obligation(s) of the Company is secured by assets of, or equity interests in, the Company.

"**Company Minimum Gain**" means "partnership minimum gain" as defined in Treasury Regulations Section 1.704-2(b)(2), substituting the term "Company" for the term "partnership" as the context requires.

"**Confidential Information**" has the meaning set forth in Section 14.3(a).

"**Contributing Member**" has the meaning set forth in Section 4.2(b).

"**Covered Person**" has the meaning set forth in Section 10.1(a).

"**Cram-Down Contribution**" has the meaning set forth in Section 4.2(c).

"**Default Amount**" has the meaning set forth in Section 4.2(b).

"**Default Loan**" has the meaning set forth in Section 4.2(b).

"**Default Rate**" has the meaning set forth in Section 4.2(b).

"**Delaware Act**" means the Delaware Limited Liability Company Act, Title 6, Chapter 18, §§18-101, et seq, and any successor statute, as it may be amended from time to time.

"**Effective Date**" has the meaning set forth in the preamble of this Agreement.

"**Election Notice**" has the meaning set forth in Section 9.4(c).

"**Electronic Transmission**" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

"**Equity Interest**" has the meaning set forth in Section 8.3.

"**Evoking Member**" has the meaning set forth in Section 9.4(b).

"**Fair Market Value**" of any asset as of any date means the purchase price that a willing buyer having all relevant knowledge would pay a willing seller for such asset in an arm's length transaction, as determined jointly by the Members.

"**Fiscal Year**" means the calendar year, unless the Company is required to have a taxable year other than the calendar year, in which case Fiscal Year will be the period that conforms to its taxable year.

"**GAAP**" means United States generally accepted accounting principles in effect from time to time.

"**Governmental Authority**" means any federal, state, local, or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations, or orders of such organization or authority have the force of law), or any arbitrator, court, or tribunal of competent jurisdiction.

"**GWLI II Member**" has the meaning set forth in the preamble of this Agreement.

"**Initiating Member**" has the meaning set forth in Section 8.8(b).

"**Lender**" has the meaning set forth in Section 2.7(a).

"**Liquidator**" has the meaning set forth in Section 13.3(a).

"**Loan**" has the meaning set forth in Section 2.7(a).

"**Loan Agreement**" has the meaning set forth in Section 2.7(a).

"**Losses**" has the meaning set forth in Section 10.3(a).

"**Managing Member**" means, initially, the Naissance Member, or such other Member as may be designated or become the Managing Member pursuant to the terms of this Agreement.

"**Member**" means (a) the GWLI II Member and the Naissance Member, and (b) each Person who is hereafter admitted as a member of the Company in accordance with the terms of this Agreement and the Delaware Act. The Members will constitute the "members" (as that term is defined in the Delaware Act) of the Company.

"**Member Nonrecourse Debt**" means "partner nonrecourse debt" as defined in Treasury Regulations Section 1.704-2(b)(4), substituting the term "Company" for the term "partnership" and the term "Member" for the term "partner" as the context requires.

"**Member Nonrecourse Debt Minimum Gain**" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if the Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulations Section 1.704-2(i)(3).

"**Member Nonrecourse Deduction**" means "partner nonrecourse deduction" as defined in Treasury Regulations Section 1.704-2(i), substituting the term "Member" for the term "partner" as the context requires.

"**Membership Interest**" means an equity interest in the Company owned by a Member, which ownership is evidence of a Member's right to: (a) a distributive share of Net Income, Net Loss, and other items of income, gain, loss, and deduction of the Company; (b) a distributive share of the assets of the Company; (c) vote on, consent to, or otherwise participate in any decision of the Members; and (d) any and all other benefits that a Member may be entitled; each as further provided in this Agreement and the Delaware Act; provided that, the Membership Interest Percentage of a Member (relative to other Members) may not be determinative with respect to the amount of such Member's distributive share of any assets of the Company.

"**Membership Interest Percentage**" means, with respect to any Member, the fractional portion (expressed as a percentage) of the Membership Interest held by such Member relative to all other Members and, unless otherwise set forth in this Agreement, determined by dividing (i) the Capital Contributions of such Member by (ii) the Capital Contributions of all Members.

"**Members Schedule**" has the meaning set forth in Section 5.1.

"**Naissance Member**" has the meaning set forth in the preamble of this Agreement.

"**Net Income**" and "**Net Loss**" mean, for each Fiscal Year or other period specified in this Agreement, an amount equal to the Company's taxable income or taxable loss, or particular items thereof, determined in accordance with Code Section 703(a) (where, for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) will be included in taxable income or taxable loss), but with the following adjustments:

(a)     any income realized by the Company that is exempt from federal income taxation, as described in Code Section 705(a)(1)(B), will be added to such taxable income or taxable loss, notwithstanding that such income is not includable in gross income;

(b)     any expenditures of the Company described in Code Section 705(a)(2)(B), including any items treated under Treasury Regulations Section 1.704-1(b)(2)(iv)(I) as items described in Code Section 705(a)(2)(B), will be subtracted from such taxable income or taxable loss, notwithstanding that such expenditures are not deductible for federal income tax purposes;

(c)     any gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes will be computed by reference to the Book Value of the property so disposed, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

(d)     any items of depreciation, amortization and other cost recovery deductions with respect to Company property having a Book Value that differs from its adjusted tax basis will be computed by reference to the property's Book Value (as adjusted for Book Depreciation) in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g);

(e)     if the Book Value of any Company property is adjusted as provided in the definition of Book Value, then the amount of such adjustment will be treated as an item of gain or loss and included in the computation of such taxable income or taxable loss; and

(f)     to the extent an adjustment to the adjusted tax basis of any Company property pursuant to Code Sections 732(d), 734(b), or 743(b) is required, pursuant to Treasury Regulations Section 1.704 1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts will be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis).

"**Non-Contributing Member**" has the meaning set forth in Section 4.2(b).

"**Non-Managing Members**" means at any time a Member that is not the Managing Member.

"**Nonrecourse Deductions**" has the meaning set forth in Treasury Regulations Section 1.704-2(b).

"**Nonrecourse Liability**" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"**Officers**" has the meaning set forth in Section 8.4.

"**Owner SPV**" has the meaning set forth in Section 2.5(a)(i).

"**Partnership Representative**" has the meaning set forth in Section 12.4(a).

"**Permitted Transfer**" means a Transfer of Membership Interests carried out pursuant to Section 11.2. "**Permitted Transferee**" means a recipient of a Permitted Transfer.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, or other entity.

"**Pledge Agreement**" has the meaning set forth in Section 2.7(a).

"**Property Offer Notice**" has the meaning set forth in Section 9.4(a).

"**Property Sale Election**" has the meaning set forth in Section 9.4(b).

"**Property Sale Notice**" has the meaning set forth in Section 9.4(c).

"**Property Sale Offer**" has the meaning set forth in Section 9.4(b).

"**Purchasing Member**" has the meaning set forth in Section 8.8(d).

"**Regulatory Allocations**" has the meaning set forth in Section 6.2(e).

"**Related Party Agreement**" means any agreement, arrangement, or understanding between the Company and any Member or any Affiliate of a Member or any officer or employee of the Company, as such agreement may be amended, modified, supplemented, or restated in accordance with the terms of this Agreement.

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants, and other agents of such Person.

"**Responding Member**" has the meaning set forth in Section 8.8(b).

"**Response Notice**" has the meaning set forth in Section 8.8(c).

"**Securities Act**" means the Securities Act of 1933, as amended, or any successor federal statute, and the rules and regulations thereunder, which will be in effect at the time.

"**Sell-out Price**" has the meaning set forth in Section 8.8(b).

"**Selling Member**" has the meaning set forth in Section 8.8(d).

"**Subsidiary**" means, with respect to any Person, any other Person of which a majority of the outstanding shares or other equity interests having the power to vote for directors or comparable managers are owned, directly or indirectly, by the first Person.

"**Taxing Authority**" has the meaning set forth in Section 7.2(b).

"**Transfer**" means to, directly or indirectly, sell, transfer, assign, pledge, encumber, hypothecate, or similarly dispose of, either voluntarily or involuntarily, by operation of law or otherwise, or to enter into any contract, option, or other arrangement or understanding with respect to the sale, transfer, assignment, pledge, encumbrance, hypothecation, or similar disposition. "**Transfer**" when used as a noun will have a correlative meaning. "**Transferor**" and "**Transferee**" mean a Person who makes or receives a Transfer, respectively.

"**Treasury Regulations**" means the final or temporary regulations issued by the United States Department of Treasury pursuant to its authority under the Code, and any successor regulations.

"**Underlying Investment**" has the meaning set forth in Section 2.5(a)(ii).

"**Withholding Advances**" has the meaning set forth in Section 7.2(b).

**Section 1.2.      Interpretation**.

(a)      For purposes of this Agreement:

(i)      the words "include," "includes," and "including" will be deemed to be followed by the words "without limitation";

(ii)      the word "or" is not exclusive; and

(iii)      the words "herein," "hereof," "hereby," "hereto," and "hereunder" refer to this Agreement as a whole.

(b)     The definitions given for any defined terms in this Agreement will apply equally to both the singular and plural forms of the terms defined.

(c)     Whenever the context may require, any pronoun will include the corresponding masculine, feminine, and neuter forms.

(d)     Unless the context otherwise requires, references in this Agreement:

   (i)     to articles, sections, and exhibits mean the articles and sections of, and exhibits attached to, this Agreement;

   (ii)    to an agreement, instrument, or other document means such agreement, instrument, or other document as amended, supplemented, and modified from time to time to the extent permitted by the provisions thereof; and

   (iii)   to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder.

(e)     This Agreement will be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

(f)     The exhibits referred to herein will be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

## ARTICLE II
## ORGANIZATION

**Section 2.1.     Formation.**

(a)     The Company was formed pursuant to the provisions of the Delaware Act upon the filing of the Certificate with the Secretary of State of the State of Delaware, and the Members desire to continue such limited liability company pursuant to the Delaware Act and this Agreement.

(b)     This Agreement will constitute the "limited liability company agreement" (as that term is used in the Delaware Act) of the Company.  The rights, powers, duties, obligations, and liabilities of the Members will be determined pursuant to the Delaware Act and this Agreement.  To the extent that the rights, powers, duties, obligations, and liabilities of any Member are different by reason of any provision of this Agreement than they would be under the Delaware Act in the absence of such provision, this Agreement will, to the extent permitted by the Delaware Act, control.

**Section 2.2.     Name**.  The name of the Company is "Galleria 2425 JV, LLC" or such other name or names as may be designated by the Managing Member; provided that, the name will always contain the words "Limited Liability Company" or the abbreviation "L.L.C." or the designation "LLC."  The Managing Member will give prompt notice to the Members of any change to the name of the Company.

**Section 2.3.     Principal Office**.  The principal office of the Company is located at 6501 Westchester Ave., Houston Texas 77005, or such other place as may from time to time be determined by the Managing Member.  The Managing Member will give prompt notice of any such change to each of the Members.

**Section 2.4.      Registered Office; Registered Agent.**

(a)      *Registered Office*.  The registered office of the Company will be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Managing Member may designate from time to time in the manner provided by the Delaware Act and Applicable Law.

(b)      *Registered Agent*.  The registered agent for service of process on the Company in the State of Delaware will be the initial registered agent named in the Certificate or such other Person or Persons as the Managing Member may designate from time to time in the manner provided by the Delaware Act and Applicable Law.

**Section 2.5.      Purpose; Powers.**

(a)      The purposes of the Company are to:

    (i)      own (as the sole member) one hundred percent (100%) of the equity ownership interest in Galleria 2425 Owner, LLC, a Delaware limited liability company (including any successors and assigns, the "**Owner SPV**");

    (ii)      cause the Owner SPV to acquire real property and improvements located at 2425 West Loop South, Houston, Texas, 77027 (such real property and, the "**Underlying Investment**");

    (iii)      directly or indirectly facilitating (A) the renovation, rehabilitation, and installation of improvements to the Underlying Investment, and (B) the operation of the Underlying Investment for the production of a profit;

    (iv)      refinancing, selling, or otherwise disposing of, in whole or in part, the Underlying Investment or the SPV;

    (v)      causing the Company and the SPV to incur indebtedness to enable the activities set forth in Section 2.5(a)(ii)-(iv); and

    (vi)      engage in any and all activities necessary or incidental to the foregoing clauses, as determined by the Managing Member in its sole discretion.

(b)      The Company will have all the powers necessary or convenient to carry out the purposes for which it is formed, including the powers granted by the Delaware Act.

(c)      The Company may execute, deliver, and perform all contracts, agreements and other undertakings and engage in all activities and transactions as may in the opinion of the Managing Member be necessary or advisable to achieve the purposes of the Company.

**Section 2.6.      Term**.  The term of the Company commenced on the date the Certificate was filed with the Secretary of State of the State of Delaware and will continue in existence perpetually until the Company is dissolved in accordance with the provisions of this Agreement.

**Section 2.7.      Entity Covenants**.  Capitalized terms used but not defined in this Section shall have the meanings defined in that certain Mezzanine Loan Agreement (the "**Loan Agreement**") between the Company and Naissance Galleria, LLC, a Cayman Islands limited liability company (the "**Lender**"),

pursuant to which the Company will become indebted to the Lender in the amount of approximately $16,100,000 (the "**Loan**"). Borrower hereby represents and warrants to, and covenants with, Lender that since the date of its formation and at all times on and after the date hereof and until such time as the Obligations shall be paid and performed in full:

(a)  *Single Purpose of Borrower.* The sole purpose of Borrower is to (1) acquire, own, hold, and maintain equity interests in Mortgage Borrower (the "**Equity Interests**"); (2) serve as the borrower and perform its obligations under the Loan Documents in connection with the Loan; (3) serve as the sole member of Mortgage Borrower and deal with Mortgage Borrower to the extent permitted under the Loan Documents and the documents evidencing or securing the Mortgage Loan to Mortgage Borrower, and (4) subject to Section 2.7(b), to engage in any other business or activity that may be incidental, proper, advisable or convenient to accomplish the foregoing purposes (including, without limitation, obtaining financing therefor) and that is not forbidden by the law of any jurisdiction in which Borrower engages in that business.

(b)  *Single Purpose Entity/Separateness.* Until the Loan is paid in full, Borrower shall remain a Single Purpose Entity. A "Single Purpose Entity" means a limited liability company which contains provisions in its organizational documents similar to the provisions set forth in this Section 2.7(b). At all times since its formation and thereafter, Borrower:

  (i)   was, and will be, organized solely for the purpose of owning 100% of the direct or indirect Equity Interests;

  (ii)  has not, and will not, engage in any business unrelated to the ownership of 100% of the direct or indirect Equity Interests;

  (iii) has not and will not own any asset or property other than 100% of the direct or indirect Equity Interests;

  (iv)  to the fullest extent permitted by law, has not and will not engage in, seek or consent to any dissolution, winding up, liquidation, consolidation or merger, in whole or in part, and, except as otherwise expressly permitted by the Loan Agreement or consented to by Lender in writing, has not and will not engage in, seek or consent to any asset sale, transfer of limited liability company interests, or amendment of its certificate of formation or the Loan Agreement;

  (v)   has not failed, and will not fail, to correct any known misunderstanding regarding its separate identity;

  (vi)  has maintained, and will maintain, its books, records, financial statements, accounting records, bank accounts and other entity documents in its own name and separate from any other Person;

  (vii) has maintained, and will maintain, its books, records, resolutions and agreements as official records;

  (viii) has not commingled, and will not commingle, its funds or other assets with those of any other Person;

(ix)     has held, and will hold, its assets in its own name, and has maintained, and will maintain, its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its assets from those of any other Person;

(x)      has conducted, and will conduct, its business in its name;

(xi)     has filed, and will file, its own tax returns (to the extent required to file any tax returns) and has not and will not file a consolidated federal income tax return with any other Person;

(xii)    is and intends to remain solvent, and has paid and will pay its own debts and liabilities out of its own funds and assets (to the extent of such funds and assets) as the same shall become due, and will give prompt written notice to Lender of the insolvency or bankruptcy filing of Borrower or the death, insolvency, or bankruptcy filing of Guarantor;

(xiii)   has done or caused to be done, and will do or cause to be done, all things necessary to observe all limited liability company formalities and preserve its existence and good standing, and, has not, and without the prior written consent of Lender, will not, amend, modify or otherwise change any of the single purpose, separateness or bankruptcy remote provisions or requirements of the Loan Agreement or other organizational documents (except as required by law);

(xiv)    has maintained and will maintain an arms-length relationship with its Affiliates,

(xv)     has and will have no indebtedness other than the Loan and unsecured trade payables in the ordinary course of business relating to the ownership of 100% of the direct or indirect interests in Mortgage Borrower which (i) do not exceed, at any time, $25,000.00 and (ii) are paid within sixty (60) days of the date incurred;

(xvi)    has not and will not assume, guarantee, become obligated for or hold out its credit as being available to satisfy the debts or obligations of any other Person, or the decisions or actions respecting the daily business or affairs of any other Person, except Mortgage Borrower;

(xvii)   has not acquired and will not acquire obligations or securities of any other Person, except Mortgage Borrower;

(xviii)  has allocated and will allocate fairly and reasonably shared expenses, including, without limitation, shared office space, and has maintained and utilized and will maintain and utilize separate stationery, invoices and checks bearing its own name;

(xix)    has not and will not pledge its assets for the benefit of any other Person;

(xx)     has held and identified itself and will hold itself out to the public as a legal entity separate and distinct from any other Person and under its own name;

(xxi)    has not made and will not make loans or advances to any Person;

(xxii)   has not and will not identify itself or any of its Affiliates as a division or part of the other;

(xxiii) has not entered and will not enter into any transaction, contract or agreement with its members or its Affiliates except in the ordinary course of its business and on terms which are intrinsically fair and are no less favorable to it than would be obtained in a comparable arms-length transaction with an unrelated third party and which are fully disclosed to Lender in writing in advance;

(xxiv) has paid and will pay the salaries of its own employees from its own funds (to the extent of such funds) and has maintained and intends to maintain a sufficient number of employees in light of its contemplated business operations; provided, however, the foregoing shall not require Member to make additional capital contributions to Borrower;

(xxv) has maintained and intends to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations; provided, however, the foregoing shall not require Member to make additional capital contributions to Borrower;

(xxvi) other than in connection with the day to day operations of the Property, has not permitted and will not permit any Affiliate independent access to its bank accounts;

(xxvii) to the fullest extent permitted by law has considered and will consider the interests of Borrower, including its creditors, in connection with all of its limited liability company actions; and

(xxviii) has caused and will cause its agents and other representatives to act at all times with respect to such entity consistently and in furtherance of the foregoing and in the best interests of such entity.

## ARTICLE III
## MEMBERSHIP INTERESTS

**Section 3.1.     Membership Schedule**.  The aggregate equity ownership interests in the Company will be represented by issued and outstanding Membership Interests, which will initially be in a single type and class.

**Section 3.2.     Certification of Membership Interests**

(a)     The Managing Member may, but will not be required to, issue certificates to the Members representing the Membership Interest and Membership Interest Percentage held by such Member.

(b)     In the event the Managing Member issues certificates representing Membership Interests in accordance with Section 3.2(a), then in addition to any other legend required by Applicable Law, all certificates representing issued and outstanding Membership Interests will bear a legend substantially in the following form:

> THE MEMBERSHIP INTEREST REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO A LIMITED LIABILITY COMPANY AGREEMENT AMONG THE COMPANY AND ITS MEMBERS, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICE OF THE COMPANY.  NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION, OR OTHER DISPOSITION OF THE MEMBERSHIP INTEREST REPRESENTED

BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH LIMITED LIABILITY COMPANY AGREEMENT.

THE MEMBERSHIP INTEREST REPRESENTED BY THIS CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS AND MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED EXCEPT PURSUANT TO (A) A REGISTRATION STATEMENT EFFECTIVE UNDER SUCH ACT AND LAWS, OR (B) AN EXEMPTION FROM REGISTRATION THEREUNDER.

## ARTICLE IV
## CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

**Section 4.1.    Initial Capital Contributions**.    Contemporaneously with the execution of this Agreement, each Member has made an initial contribution of capital to the Company and is deemed to own the Membership Interest Percentage set forth opposite such Member's name on the Members Schedule.  The Managing Member will update the Members Schedule upon the issuance or Transfer of any Membership Interest to any new or existing Member in accordance with this Agreement.  Capital Contributions will be used by the Company (i) to pay expenses of the Company (in accordance with the Budget), (ii) to establish Reserves (as provided herein), and (iii) as otherwise determined by the Managing Member to be related to the object and purpose of the Company (as set forth in Section 2.5(a))

**Section 4.2.    Additional Capital Contributions**

(a)    The Members will make additional in-cash contributions of capital to the Company in proportion to their respective Membership Interest Percentages, as determined by the Managing Member from time to time to be reasonably necessary to pay any operating, capital, or other expenses relating to the business of the Company (such additional contributions of capital, the "**Additional Capital Contributions**"), provided that, such Additional Capital Contributions will not exceed corresponding amounts expressly provided for in the Budget, as it may be amended from time to time.  Upon the Managing Member making such determination for Additional Capital Contributions, the Managing Member will deliver to the Non-Managing Member(s) a written notice of the Company's need for Additional Capital Contributions, which notice will specify in reasonable detail (i) the purpose for such Additional Capital Contributions, (ii) the aggregate amount of such Additional Capital Contributions, (iii) each Member's share of such aggregate amount of Additional Capital Contributions based upon each such Member's Membership Interest Percentage, and (iv) the date (which date will not be less than three (3) Business Days from the date that such notice is given) on which such Additional Capital Contributions will be required to be made by the Members.

(b)    If any Member will fail to timely make, or notifies the other Member(s) that it will not make, all or any portion of any Additional Capital Contribution that such Member is obligated to make under Section 4.2(a), then such Member will be deemed to be a "**Non-Contributing Member**." Any Member who timely makes 100% of the Additional Capital Contribution that such Member is obligated to make under Section 4.2(a) (each, a "**Contributing Member**") will be entitled, but not obligated, to loan to a Non-Contributing Member, by contributing to the Company on its behalf, all or any part of the amount (the "**Default Amount**") that such Non-Contributing Member failed to contribute to the Company (each such loan, a "**Default Loan**").  Such Default

Loan will be treated as an Additional Capital Contribution by the Non-Contributing Member. Each Default Loan will bear interest (compounded monthly on the first day of each calendar month) on the unpaid principal amount thereof from time to time remaining from the date advanced until repaid, at the lesser of (i) 15% per annum, or (ii) the maximum rate permitted at law (the "**Default Rate**"). Each Default Loan will be recourse solely to the Non-Contributing Member's Membership Interest. Default Loans will be repaid out of the distributions that would otherwise be made to the Non-Contributing Member under ARTICLE VII or ARTICLE XIV, as more fully provided for in Section 4.2(d). So long as a Default Loan is outstanding, the Non-Contributing Member will have the right to repay the Default Loan (and interest then due and owing) in whole or in part. Upon the repayment in full of all Default Loans (but not upon their conversion as provided in Section 4.2(c)) made in respect of a Non-Contributing Member (and so long as the Non-Contributing Member is not otherwise a Non-Contributing Member), such Non-Contributing Member will cease to be a Non-Contributing Member.

(c)     At any time after the date six (6) months after a Default Loan is made, at the option of the Contributing Member, (i) such Default Loan will be converted into an Additional Capital Contribution of the Contributing Member in an amount equal to the principal and unpaid interest on such Default Loan pursuant to this Section 4.2(c), (ii) the Non-Contributing Member will be deemed to have received a distribution, pursuant to ARTICLE VII, of an amount equal to the principal and unpaid interest on such Default Loan, (iii) such distribution will be deemed paid to the Contributing Member in repayment of the Default Loan, (iv) such amount will be deemed contributed by the Contributing Member as an Additional Capital Contribution (a "**Cram-Down Contribution**"), and (v) the Contributing Member's Capital Account will be increased by, and the Non-Contributing Member's Capital Account will be decreased by, an amount equal to the principal and unpaid interest on such Default Loan. A Cram-Down Contribution will be deemed an Additional Capital Contribution by the Contributing Member making (or deemed making) such Cram-Down Contribution as of the date such Cram-Down Contribution is made or the date on which such Default Loan is converted to a Cram-Down Contribution. At the time of a Cram-Down Contribution, the Membership Interest Percentage of the Contributing Member will be increased proportionally by the amount of such contribution, thereby diluting the Membership Interest Percentage of the Non-Contributing Member. Once a Cram-Down Contribution has been made (or deemed made), no subsequent payment or tender in respect of the Cram-Down Contribution will affect the Membership Interest Percentages of the Members, as adjusted in accordance with this Section 4.2(c).

(d)     Notwithstanding any other provisions of this Agreement, any amount that otherwise would be paid or distributed to a Non-Contributing Member pursuant to ARTICLE VII will not be paid to the Non-Contributing Member but will be deemed paid and applied on behalf of such Non-Contributing Member (i) first, to accrued and unpaid interest on all Default Loans (in the order of their original maturity date), (ii) second, to the principal amount of such Default Loans (in the order of their original maturity date), and (iii) third, to any Additional Capital Contribution of such Non-Contributing Member that has not been paid and is not deemed to have been paid.

(e)     Notwithstanding the foregoing, if a Non-Contributing Member fails to make its Additional Capital Contribution in accordance with Section 4.2(a), the Contributing Member may:

(i)     institute proceedings against the Non-Contributing Member to obtain payment of its portion of the Additional Capital Contributions, together with interest thereon at the Default Rate from the date that such Additional Capital Contribution was due until the date that such Additional Capital Contribution is made, at the cost and expense of the Non-Contributing Member;

(ii)     purchase the Membership Interest of the Non-Contributing Member at a price equal to 85% of the lesser of (i) the price paid by the Non-Contributing Member for its Membership Interest, and (ii) the Fair Market Value of its Membership Interest; or

(iii)    force a sale of the Company to a third party other than an Affiliate of any of the Members on commercially reasonable market terms as reasonably determined by the Contributing Member; provided that, if the Non-Contributing Member pays the unfunded portion of its required Additional Capital Contribution prior to the Contributing Member's election of a forced sale, the Contributing Member will no longer have the right to force a sale of the Company under this Section 4.2(e)(iii).

(f)    If a Member is characterized as a Non-Contributing Member, then, so long as the Member remains a Non-Contributing Member, it will forfeit and no longer be entitled to any consent or voting rights granted in this Agreement.

(g)    Except as set forth in this Section 4.2, neither Member will be required to make additional Capital Contributions or make loans to the Company.

**Section 4.3.    Maintenance of Capital Accounts**.  The Company will establish and maintain for each Member a separate capital account (a "**Capital Account**") on its books and records in accordance with this Section 4.3.  Each Capital Account will be established and maintained in accordance with the following provisions:

(a)    Each Member's Capital Account will be increased by the amount of:

(i)    such Member's Capital Contributions;

(ii)    any Net Income or other item of income or gain allocated to such Member pursuant to ARTICLE VI; and

(iii)    any liabilities of the Company that are assumed by such Member or secured by any property distributed to such Member.

(b)    Each Member's Capital Account will be decreased by:

(i)    the cash amount or Book Value of any property distributed to such Member pursuant to ARTICLE VII and Section 13.3(c);

(ii)    the amount of any Net Loss or other item of loss or deduction allocated to such Member pursuant to ARTICLE VI; and

(iii)    the amount of any liabilities of such Member assumed by the Company or that are secured by any property contributed by such Member to the Company.

**Section 4.4.    Succession Upon Transfer**.  In the event that a Membership Interest is Transferred in accordance with the terms of this Agreement, the Transferee will succeed to the Capital Account of the Transferor to the extent it relates to the Transferred Membership Interest and, subject to Section 6.4, will receive allocations and distributions pursuant to ARTICLE VI, ARTICLE VII, and ARTICLE XIII in respect of such Membership Interest.

**Section 4.5.    Negative Capital Accounts**.  In the event that any Member will have a deficit balance in its Capital Account, such Member will have no obligation, during the term of the Company or upon dissolution or liquidation thereof, to restore such negative balance or make any contributions of capital to the Company by reason thereof, except as may be required by Applicable Law or in respect of any negative balance resulting from a withdrawal of capital or dissolution in contravention of this Agreement.

**Section 4.6.    No Withdrawals From Capital Accounts**.  No Member will be entitled to withdraw any part of its Capital Account or to receive any distribution from the Company, except as otherwise provided in this Agreement.  No Member, including the Managing Member, will receive any interest, salary, or drawing with respect to its Capital Contributions or its Capital Account, except as otherwise provided in this Agreement.  The Capital Accounts are maintained for the sole purpose of allocating items of income, gain, loss, and deduction among the Members and will have no effect on the amount of any distributions to any Members, in liquidation or otherwise.

**Section 4.7.    Treatment of Loans From Members**.  Loans by any Member to the Company will not be considered Capital Contributions and will not affect the maintenance of such Member's Capital Account, other than to the extent provided in Section 4.2(c) and Section 4.3(a)(iii), if applicable.

**Section 4.8.    Modifications**.  The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b) and will be interpreted and applied in a manner consistent with such Treasury Regulations.  If the Managing Member determines that it is prudent to modify the manner in which the Capital Accounts, or any increases or decreases to the Capital Accounts, are computed in order to comply with such Treasury Regulations, the Managing Member may authorize such modifications.

**Section 4.9.    Company Expenses**.

(a)     *Expenses Not Borne by the Company*.  The Managing Member will pay, without reimbursement by the Company, all of its own ordinary administrative and overhead expenses in connection with the activities of the Company, including all costs and expenses on account of salaries, wages, bonuses, and other employee benefits.

(b)     *Ongoing Company Expenses*.  On an ongoing basis, except for the expenses provided for in Section 4.9(a), the Company will pay, or reimburse the Managing Member or its Affiliates, as applicable, for the following out-of-pocket expenses:

     (i)     any expenses relating to the SPV or the Underlying Investment, including, without limitation, travel expenses, valuation expenses (e.g., costs of independent appraisers), carrying costs and custodial, trustee, record-keeping, and other administrative fees;

     (ii)     any and all expenses incurred in connection with the preparation, review, and audit of the Company's reports, tax returns, and related disclosure schedules;

     (iii)     any and all fees for attorneys and accountants (including in-house and outside legal and accounting fees and expenses) relating to Company matters;

     (iv)     any and all taxes and other governmental charges that may be incurred or payable by the Company;

     (v)     any and all reasonable costs and expenses incurred in connection with distributions to Members;

(vi)  any and all reasonable expenses (including in-house and outside legal fees and expenses) of the Company or the Managing Member incurred (A) to comply with any law or regulation related to the activities of the Company, or (B) in connection with any litigation or governmental inquiry, investigation, or proceeding involving the Company, including the amount of any judgments, settlements, or fines paid in connection therewith;

(vii)  any and all costs and expenses incurred in connection with the accounting and reporting requirements of the Company, including back-office overhead (e.g., rent, computer software, and equipment); and

(viii)  any and all reasonable expenses incurred in connection with any amendments, modifications, revisions, or restatements to the constituent documents of the Company.

(c)  *Loan Origination Fees*.  The Company will be permitted to pay an origination fee of up to $160,000 to a Company Lender.

## ARTICLE V
## MEMBERS

**Section 5.1.  Members Schedule**.  The name, address, and Membership Interest Percentage of each member of the Company are set forth on Schedule A, attached hereto (as amended, the "**Members Schedule**").  The Members Schedule will be revised from time to time by the Managing Member to reflect any of the following accomplished in compliance with the terms of this Agreement: (i) the withdrawal or admission of a member of the Company; (ii) any change in the name or address of a Member; and (iii) any change in Membership Interest Percentage of a Member.  A Member can modify their address at any time by providing the Managing Member at least five (5) days advance written notice of the same.

**Section 5.2.  Admission of New Members**

(a)  *Additional Members*.  No Persons will be admitted to the Company as additional members of the Company except as approved by the Managing Member, and the Managing Member may cause the Company to admit any Person as an additional member of the Company upon (i) the issuance of an additional Membership Interest to such Person, or (ii) any Transfer of a Membership Interest made in accordance with ARTICLE XI.

(b)  *Joinder*.  In order for any Person (not already a Member) to be admitted as a member of the Company, whether pursuant to an issuance or Transfer of a Membership Interest, such Person will be required to execute and deliver to the Company a written joinder agreement, the form and substance of which will be determined by the Managing Member in its sole discretion.  Upon the amendment of the Members Schedule by the Managing Member and the satisfaction of any other applicable conditions, including, if a condition, the receipt by the Company of payment for the issuance of the applicable Membership Interest, such Person will simultaneously be (i) admitted as a member of the Company, (ii) deemed listed as such on the books and records of the Company, and (iii) issued his, her, or its Membership Interest.  The Managing Member will adjust the Capital Accounts of the Members, as necessary, upon the admission of any additional Person as a member of the Company.

**Section 5.3.  Representations and Warranties of Members.**  All Members, whether admitted as of the Effective Date or pursuant to Section 5.2, represents and warrants to the Company and the other Members, and acknowledges that:

(a)     the Membership Interests have not been registered under the Securities Act or the securities laws of any other jurisdiction, are issued in reliance upon federal and state exemptions for transactions not involving a public offering, and cannot be disposed of unless (i) they are subsequently registered or exempted from registration under the Securities Act, and (ii) the provisions of this Agreement have been complied with;

(b)     such Member is an "accredited investor" within the meaning of Rule 501 promulgated under the Securities Act, as amended by Section 413(a) of the Dodd-Frank Wall Street Reform and Consumer Protection Act, and agrees that it will not take any action that could have an adverse effect on the availability of the exemption from registration provided by Rule 501 promulgated under the Securities Act with respect to the offer and sale of the Membership Interests;

(c)     such Member's Membership Interest is being acquired for its own account solely for investment purposes and not with a view to resale or distribution thereof;

(d)     such Member has such knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in the Company and making an informed decision with respect thereto;

(e)     with respect to the tax and other legal aspects of investment in the Company and the acquisition and ownership of a Membership Interest, such Member is relying solely upon the advice of such Member's own tax and legal advisors and not upon any representation by any other Member or representative thereof;

(f)     such Member is able to bear the economic and financial risk of an investment in the Company for an indefinite period of time;

(g)     the execution, delivery, and performance of this Agreement by such Member (i) have been duly authorized and do not require such Member to obtain any consent that has not been obtained, and (ii) will not contravene or result in a default under (A) any provision of any law or regulation applicable to such Member, (B) the Organizational Documents of such Member, or (C) any other agreements or instruments to which such Member is a party or by which such Member is bound;

(h)     this Agreement is valid, binding, and enforceable against such Member in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium, and other similar laws of general applicability relating to or affecting creditors' rights or general equity principles (regardless of whether considered at law or in equity);

(i)     such Member has been duly organized and is validly existing and in good standing under the laws of the state of its organization; and

(j)     there is no suit, action, or proceeding, pending or threatened, against or affecting such Member before or by any court, administrative agency, or other Governmental Authority that (i) brings into question the validity of the transactions contemplated by this Agreement, (ii) would interfere with or impede in any way the ability of such Member to comply with the terms of this Agreement, (iii) could materially and adversely affect such Member or any of its respective properties, assets or Affiliates, or (iv) could materially and adversely affect the legality, validity, or enforceability of this Agreement.

**Section 5.4.     No Personal Liability**.     Except as otherwise provided in the Delaware Act, by Applicable Law, or expressly in this Agreement, no Member will be obligated personally for any debt,

obligation or liability of the Company or other Members, whether arising in contract, tort or otherwise, solely by reason of being a Member.

**Section 5.5.    No Withdrawal**.  So long as a Member continues to hold a Membership Interest, such Member will not have the ability to withdraw or resign as a Member prior to the dissolution and winding up of the Company and any such withdrawal or resignation or attempted withdrawal or resignation by a Member prior to the dissolution or winding up of the Company will be null and void.  As soon as any Person who is a Member ceases to hold a Membership Interest, such Person will no longer be a Member.  A Member will not cease to be a Member as a result of the Bankruptcy of such Member or as a result of any other events specified in §18-304 of the Delaware Act.

**Section 5.6.    No Interest in Company Property**.  No real or personal property of the Company will be deemed to be owned by any Member individually, but will be owned by, and title will be vested solely in, the Company.  Without limiting the foregoing, each Member hereby irrevocably waives during the term of the Company any right that such Member may have to maintain any action for partition with respect to the property of the Company.

<div align="center">

**ARTICLE VI**
**ALLOCATIONS**

</div>

**Section 6.1.    Allocation of Net Income and Net Loss**.  For each Fiscal Year (or portion thereof), except as otherwise provided in this Agreement, Net Income and Net Loss (and, to the extent necessary, individual items of income, gain, loss, or deduction) of the Company will be allocated among the Members in a manner such that, after giving effect to the special allocations set forth in <u>Section 6.2</u>, the Capital Account balance of each Member, immediately after making such allocations, is, as nearly as possible, equal to (a) the distributions that would be made to such Member pursuant to <u>Section 13.3(c)</u> if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their Book Value, all Company liabilities were satisfied (limited with respect to each Nonrecourse Liability to the Book Value of the assets securing such liability), and the net assets of the Company were distributed, in accordance with <u>Section 13.3(c)</u>, to the Members immediately after making such allocations, minus (b) such Member's share of Company Minimum Gain and Member Nonrecourse Debt Minimum Gain, computed immediately prior to the hypothetical sale of assets.

**Section 6.2.    Regulatory and Special Allocations**.  Notwithstanding the provisions of <u>Section 6.1</u>:

(a)    If there is a net decrease in Company Minimum Gain (determined according to Treasury Regulations Section 1.704-2(d)(1)) during any Fiscal Year, each Member will be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g).  The items to be so allocated will be determined in accordance with Treasury Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2).  This <u>Section 6.2</u> is intended to comply with the "minimum gain chargeback" requirement in Treasury Regulations Section 1.704-2(f) and will be interpreted consistently therewith.

(b)    Member Nonrecourse Deductions will be allocated in the manner required by Treasury Regulations Section 1.704-2(i).  Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), if there is a net decrease in Member Nonrecourse Debt Minimum Gain during any Fiscal Year, each Member that has a share of such Member Nonrecourse Debt Minimum Gain will be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to that Member's share of the net decrease in Member Nonrecourse

Debt Minimum Gain. Items to be allocated pursuant to this paragraph will be determined in accordance with Treasury Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2). This <u>Section 6.2(b)</u> is intended to comply with the "minimum gain chargeback" requirements in Treasury Regulations Section 1.704-2(i)(4) and will be interpreted consistently therewith.

(c)     Nonrecourse Deductions will be allocated to the Members in accordance with their Membership Interest Percentages.

(d)     In the event any Member unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), Net Income will be specially allocated to such Member in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit created by such adjustments, allocations or distributions as quickly as possible. This <u>Section 6.2(d)</u> is intended to comply with the qualified income offset requirement in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and will be interpreted consistently therewith.

(e)     The allocations set forth in paragraphs (a), (b), (c) and (d) above (the "**Regulatory Allocations**") are intended to comply with certain requirements of the Treasury Regulations under Code Section 704. Notwithstanding any other provisions of this <u>ARTICLE VI</u> (other than the Regulatory Allocations), the Regulatory Allocations will be taken into account in allocating Net Income and Net Losses among Members so that, to the extent possible, the net amount of such allocations of Net Income and Net Losses and other items and the Regulatory Allocations to each Member will be equal to the net amount that would have been allocated to such Member if the Regulatory Allocations had not occurred.

## Section 6.3.     Tax Allocations.

(a)     Subject to <u>Section 6.3(b)</u>, <u>Section 6.3(c)</u>, and <u>Section 6.3(d)</u>, all income, gains, losses and deductions of the Company will be allocated, for federal, state and local income tax purposes, among the Members in accordance with the allocation of such income, gains, losses and deductions pursuant to <u>Section 6.1</u> and <u>Section 6.2</u>, except that if any such allocation for tax purposes is not permitted by the Code or other Applicable Law, the Company's subsequent income, gains, losses and deductions will be allocated among the Members for tax purposes, to the extent permitted by the Code and other Applicable Law, so as to reflect as nearly as possible the allocation set forth in <u>Section 6.1</u> and <u>Section 6.2</u>.

(b)     Items of Company taxable income, gain, loss and deduction with respect to any property contributed to the capital of the Company will be allocated among the Members in accordance with Code Section 704(c) and the traditional method with curative allocations of Treasury Regulations Section 1.704-3(c), so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Book Value.

(c)     If the Book Value of any Company asset is adjusted pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(f) as provided in <u>clause (c)</u> of the definition of Book Value, subsequent allocations of items of taxable income, gain, loss and deduction with respect to such asset will take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c).

(d)     Allocations of tax credit, tax credit recapture and any items related thereto will be allocated to the Members according to their interests in such items as determined by the Managing Member taking into account the principles of Treasury Regulations Section 1.704-1(b)(4)(ii).

(e)     Allocations pursuant to this <u>Section 6.3</u> are solely for purposes of federal, state and local taxes and will not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Income, Net Losses, distributions, or other items pursuant to any provisions of this Agreement.

**Section 6.4.    Allocations in Respect of Transferred Membership Interests**.   In the event of a Transfer of Membership Interests during any Fiscal Year made in compliance with the provisions of <u>ARTICLE XI</u>, Net Income, Net Losses, and other items of income, gain, loss, and deduction of the Company attributable to such Membership Interests for such Fiscal Year will be determined using the interim closing of the books method.

<div align="center">

**ARTICLE VII**
**DISTRIBUTIONS**

</div>

**Section 7.1.    Distributions of Cash Flow and Capital Proceeds.**

(a)     Subject to <u>Section 7.1(b)</u>, any Available Cash of the Company, after allowance for all reasonable costs and expenses incurred by the Company and for such reasonable reserves as contemplated in the Budget, will be distributed to the Members, on at least a quarterly basis, in accordance with their respective Membership Interest Percentages.

(b)     Proceeds from a Capital Transaction will be distributed to the Members in the following order and priority:

(i)     *first*, to the Members on a *pari passu* basis in proportion to their Membership Interest Percentages until the GWLI II Member receives cumulative distributions in an amount necessary to produce an IRR of seven percent (7%) on its Capital Contributions;

(ii)     *thereafter*, (i) twenty percent (20%) to the Managing Member, and (ii) eighty percent (80%) to the Members on a *pari passu* basis in proportion to their respective Membership Interest Percentages.

(c)     If a Member has (i) an unpaid Additional Capital Contribution that is overdue, or (ii) an outstanding Default Loan due to another Member, any amount that otherwise would be distributed to such Member pursuant to <u>Section 7.1(a)</u> or <u>ARTICLE XIV</u> (up to the amount of such Additional Capital Contribution or outstanding Default Loan, together with interest accrued thereon) will not be paid to such Member but will be deemed distributed to such Member and applied on behalf of such Member pursuant to <u>Section 4.2(d)</u>.

(d)     Notwithstanding any provision to the contrary contained in this Agreement, the Company will not make any distribution to Members if such distribution would violate §18-607 of the Delaware Act or other Applicable Law.

**Section 7.2.    Tax Withholding; Withholding Advances.**

(a)     *Tax Withholding*.  If requested by the Managing Member, each Member will, if able to do so, deliver to the Managing Member:

(i)     an affidavit in form satisfactory to the Managing Member that the applicable Member (or its members, as the case may be) is not subject to withholding under the provisions of any federal, state, local, foreign, or other Applicable Law;

(ii) any certificate that the Managing Member may reasonably request with respect to any such laws; and

(iii) any other form or instrument reasonably requested by the Managing Member relating to any Member's status under such law.

If a Member fails or is unable to deliver to the Managing Member the affidavit described in Section 7.2(a)(i), the Managing Member may withhold amounts from such Member in accordance with Section 7.2(b).

(b) *Withholding Advances*. The Company is hereby authorized at all times to make payments ("**Withholding Advances**") with respect to each Member in amounts required to discharge any obligation of the Company (as determined by the Partnership Representative based on the advice of legal or tax counsel to the Company) to withhold or make payments to any federal, state, local, or foreign taxing authority (a "**Taxing Authority**") with respect to any distribution or allocation by the Company of income or gain to such Member and to withhold the same from distributions to such Member. Any funds withheld from a distribution by reason of this Section 7.2(b) will nonetheless be deemed distributed to the Member in question for all purposes under this Agreement.

(c) *Repayment of Withholding Advances*. Any Withholding Advance made by the Company to a Taxing Authority on behalf of a Member and not simultaneously withheld from a distribution to that Member will, with interest thereon accruing from the date of payment at a rate equal to the prime rate published in the Wall Street Journal on the date of payment plus two percent (2.0%) per annum (the "**Company Interest Rate**"):

(i) be promptly repaid to the Company by the Member on whose behalf the Withholding Advance was made (which repayment by the Member will not constitute a Capital Contribution, but will credit the Member's Capital Account if the Managing Member will have initially charged the amount of the Withholding Advance to the Capital Account); or

(ii) with the consent of the Managing Member, be repaid by reducing the amount of the next succeeding distribution or distributions to be made to such Member (which reduction amount will be deemed to have been distributed to the Member, but which will not further reduce the Member's Capital Account if the Managing Member will have initially charged the amount of the Withholding Advance to the Capital Account).

Interest will cease to accrue from the time the Member on whose behalf the Withholding Advance was made repays such Withholding Advance (and all accrued interest) by either method of repayment described above.

(d) *Indemnification*. Each Member hereby agrees to indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest, or penalties that may be asserted by reason of the Company's failure to deduct and withhold tax on amounts distributable or allocable to such Member. The provisions of this Section 7.2(d) and the obligations of a Member pursuant to Section 7.2(c) will survive the termination, dissolution, liquidation, and winding up of the Company and the withdrawal of such Member from the Company or Transfer of its Membership Interest. The Company may pursue and enforce all rights and remedies it may have against each Member under this Section 7.2, including bringing a lawsuit to collect repayment with interest of any Withholding Advances.

(e)     *Overwithholding*.  Neither the Company nor the Managing Member will be liable for any excess taxes withheld in respect of any distribution or allocation of income or gain to a Member.  In the event of an overwithholding, a Member's sole recourse will be to apply for a refund from the appropriate Taxing Authority.

**Section 7.3.     Distributions in Kind.**

(a)     The Managing Member is hereby authorized, as it may reasonably determine, to make distributions to the Members in the form of securities or other property held by the Company.  In any non-cash distribution, the securities or property so distributed will be distributed among the Members in the same proportion and priority as cash equal to the Fair Market Value of such securities or property would be distributed among the Members pursuant to Section 7.1.

(b)     Any distribution of securities will be subject to such conditions and restrictions as the Managing Member determines are required or advisable to ensure compliance with Applicable Law.  In furtherance of the foregoing, the Managing Member may require that the Members execute and deliver such documents as the Managing Member may deem necessary or appropriate to ensure compliance with all federal and state securities laws that apply to such distribution and any further Transfer of the distributed securities, and may appropriately legend the certificates that represent such securities to reflect any restriction on Transfer with respect to such laws.

# ARTICLE VIII
# MANAGEMENT

**Section 8.1.     Management of the Company**.  The business and affairs of the Company will be managed by the Managing Member.  Subject to the provisions of Section 8.2, the Managing Member will have full and complete discretion to manage and control the business and affairs of the Company, to make all decisions affecting the business and affairs of the Company, and to take all such actions as it deems necessary or appropriate to accomplish the purposes of the Company set forth in Section 2.5; provided that, the Managing Member will manage the Company in accordance with the Budget.  The actions of the Managing Member taken in accordance with the provisions of this Agreement will bind the Company.  No other Member will have any authority or right to act on behalf of or bind the Company, unless otherwise provided herein or unless specifically authorized by the Managing Member pursuant to a resolution expressly authorizing such action which resolution is duly adopted by the Managing Member.

**Section 8.2.     Actions Requiring Approval of Members**.  Notwithstanding anything herein to the contrary, without the unanimous written approval of all Members, the Company will not, and will not enter into any commitment to:

(a)     admit any Person as an additional member, partner, or other economic owner of the Company, the Owner SPV, or any other Subsidiary of the forgoing;

(b)     make any material change to the nature of the business conducted by, or the purpose of, the Company, the Owner SPV, or any other subsidiary of the forgoing;

(c)     form any Subsidiary (other than the Owner SPV);

(d)     wind up, dissolve, or liquidate of the Company, the Owner SPV, or any other Subsidiary of the forgoing, except as otherwise permitted by the organizational documents of any such Person;

(e)      sell, lease, or convey of all or substantially all of the assets of the Company, the Owner SPV, or any other Subsidiary of the forgoing, including, without limitation, the Underlying Investment, except as otherwise permitted by the organizational documents of any such Person;

(f)      create or entire into any Related Party Agreement, except as otherwise permitted /contemplated by the organizational documents of the creating Person;

(g)      consummate a transaction that is not in the ordinary course of the business of the Company, the Owner SPV, or any other Subsidiary of the forgoing, or that is not directly related to the indirect acquisition and ownership of the Underlying Investment;

(h)      make any payment (or incurrence of liability) that deviates by more than three percent (3%) from the amount of such payment(s) provided for or contemplated in an applicable annual operating budget of the Company;

(i)      extend, modify, renew, amend, or terminate any material contract or agreement pertaining to the day-to-day management of the Underlying Investment;

(j)      extend, modify, renew, or amend any loan agreement, or any documents executed in connection with any refinancing transaction involving the Company or the Underlying Investment;

(k)      pay, settle, or compromise any legal action (whether actual or threatened in connection with the Underlying Investment, the Company, the Owner SPV, or any other Subsidiary of the Company or the Owner SPV;

(l)      commence any federal, state, or foreign bankruptcy, insolvency, reorganization, arrangement, or liquidation proceeding for, or consent to the appointment of a receiver, liquidator, assignee, trustee, conservator, or sequester (or other similar official) of, the Company, the Owner SPV, or any other Subsidiary of the forgoing, or of all or a substantial part of the assets of the Company, the Owner SPV, or any other Subsidiary of the forgoing;

(m)      permit the incurrence of indebtedness by the Company, the Owner SPV, or any other Subsidiary of the Company, except as set forth in any applicable and approved budget;

(n)      waive or compromise any claim or right the Company, the Owner SPV, or any other Subsidiary of the forgoing may have against an affiliate of a Member;

(o)      commence any action or proceeding to appeal ad valorem taxes or special assessments relating to the Underlying Investment, the Company, the Owner SPV, or any other Subsidiary of the Company, the Owner SPV;

(p)      condemn the Underlying Investment (or any portion thereof or any interest therein), or the conveyance or an agreement to convey the Property (or any portion thereof or any interest therein) in lieu of condemnation;

(q)      make a loan or other extension of credit to any Person;

(r)      spend proceeds or other funds received the Company, the Owner SPV, or any other Subsidiary of the forgoing as a result of insurance or condemnation awards except to the extent required by any loan agreement executed by the Company, the Owner SPV, or any other Subsidiary of the forgoing; or

(s)     issue additional Membership Interests.

**Section 8.3.     Irrevocable Proxy**. Solely with respect to Article 8 Matters (as hereinafter defined), the Company hereby irrevocably grants and appoints the Lender, as the Company's true and lawful proxy, for and in Company's name, place and stead to vote the Equity Interests, whether directly or indirectly, beneficially or of record, now owned or hereafter acquired, with respect to all Article 8 Matters.  The proxy granted and appointed in this Section 8.3 shall include the right to sign Company's name (as a member of Mortgage Borrower) to any consent, certificate or other document relating to an Article 8 Matter and the Pledged Securities that applicable law may permit or require, to cause the Pledged Securities to be voted in accordance with the preceding sentence.  Company hereby represents and warrants that there are no other proxies and powers of attorney with respect to an Article 8 Matter that Company may have granted or appointed.  Company will not give a subsequent proxy or power of attorney or enter into any other voting agreement with respect to the Pledged Securities with respect to any Article 8 Matter and any attempt to do so with respect to an Article 8 Matter shall be void and of no effect.  The proxies and powers granted by Company pursuant to this Agreement are coupled with an interest and are given to secure the performance of Company's obligations.

**Section 8.4.     Officers**.  The Managing Member may appoint individuals as officers of the Company (the "**Officers**") as it deems necessary or desirable to carry on the business of the Company and the Managing Member may delegate to such Officers such power and authority as the Managing Member deems advisable.  No Officer is required to also be a Member.  Any individual may hold two or more offices of the Company.  Each Officer will hold office until his successor is designated by the Managing Member or until his earlier death, resignation, or removal.  Any Officer may resign at any time upon written notice to the Managing Member.  Any Officer may be removed by the Managing Member with or without cause at any time.  A vacancy in any office occurring because of death, resignation, removal or otherwise, may, but need not, be filled by the Managing Member.

**Section 8.5.     Action Without Meeting**.  Any matter that is to be voted on, consented to, or approved by Members may be taken without a meeting, without prior notice and without a vote if consented to, in writing or by Electronic Transmission, by a Member or Members having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all members entitled to vote thereon were present and voted.  A record will be maintained by the Managing Member of each such action taken by written consent of a Member or Members.

**Section 8.6.     Informational Rights**.  In addition to the information required to be provided pursuant to ARTICLE XII, the Managing Member will keep the other Members reasonably informed on a timely basis of any material fact, information, litigation, employee relations, or other matter that could reasonably be expected to have a material impact on the operations or financial position of the Company, including, but not limited to, any modification of any loan or other financing to the Company. The Managing Member will provide all material information relating to the Company or the management or operation of the Company as any Member may reasonable request from time to time.

**Section 8.7.     Budget.**

(a)     The initial business plan and annual budgets for the Company through the Fiscal Year ending December 31, 2018 (the "**Budget**"), which have previously been approved by the Members, are attached hereto as Schedule B.  The Budget will include detailed capital and operating expense budgets, cash flow projections (which will include amounts and due dates of all projected calls for Additional Capital Contributions), and profit and loss projections.  The Managing Member will operate the Company in accordance with the Budget.

(b)     At least thirty (30) days before the beginning of each Fiscal Year, the Managing Member will prepare and submit to the Non-Managing Member proposed revisions (including any extensions thereof) to the Budget for such upcoming Fiscal Year. Not later than seven (7) days following its receipt of the proposed revisions, the Non-Managing Member must, by written notice to the Managing Member, either approve or disapprove the revised Budget. If the Non-Managing Member will not have responded in writing to the proposed revisions prior to the end of such seven (7)-day period, the Non-Managing Member will be deemed to have approved the revised Budget. If the Non-Managing Member disapproves of the proposed revisions, then the Members will use good faith efforts to agree on a revised Budget. The Managing Member will continue to operate the Company in accordance with the existing Budget until a revised Budget is approved by both Members.

**Section 8.8.     Deadlock.**

(a)     If the Members are unable to agree on any of the matters described in Section 8.2 and such disagreement continues for sixty (60) days despite good faith deliberations by the Members, then either Member will be entitled to exercise the buy-sell rights set forth in this Section 8.8 by delivering a Buy-Sell Offer Notice (as defined herein).

(b)     If a Member wishes to exercise the buy-sell right provided in this Section 8.8, such Member (the "**Initiating Member**") will deliver to the other Member (the "**Responding Member**") written notice (the "**Buy-Sell Offer Notice**") of such election, which notice will include (i) a description of the circumstances that triggered the buy-sell right, and (ii) the purchase price (which will be payable exclusively in cash (unless otherwise agreed)) at which the Initiating Member will (A) purchase all of the Membership Interest owned by the Responding Member (the "**Buy-out Price**") or (B) sell all of its Membership Interest to the Responding Member (the "**Sell-out Price**"), with any difference between the Buy-out Price and the Sell-out Price based solely on each Member's Membership Interest Percentage, without regard to any market discount or premium from differences in such proportionate interests.

(c)     Within thirty (30) days after the Buy-Sell Offer Notice is received (the "**Buy-Sell Election Date**"), the Responding Member will deliver to the Initiating Member a written notice (the "**Response Notice**") stating whether it elects to (i) sell all of its Membership Interest to the Initiating Member for the Buy-out Price, or (ii) buy all of the Membership Interest owned by the Initiating Member for the Sell-out Price. The failure of the Responding Member to deliver the Response Notice by the Buy-Sell Election Date will be deemed to be an election to sell all of its Membership Interest to the Initiating Member at the Buy-out Price.

(d)     The closing of any purchase and sale of a Membership Interest pursuant to this Section 8.8 will take place within thirty (30) days after the Response Notice is delivered or deemed to have been delivered or some other date mutually agreed upon by the parties. The Buy-out Price or the Sell-out Price, as the case may be, will be paid at closing by wire transfer of immediately available funds to an account designated in writing by the selling Member (the "**Selling Member**"). At the closing, the Selling Member will deliver to the purchasing Member (the "**Purchasing Member**") good and marketable title to its Membership Interest, free and clear of all liens and encumbrances. Each Member agrees to cooperate and take all actions and execute all documents reasonably necessary or appropriate to reflect the purchase of the Selling Member's Membership Interest by the Purchasing Member.

(e)     If the Purchasing Member defaults in any of its material closing obligations, then the Selling Member will have the option to purchase the Purchasing Member's entire Membership Interest at a price that is equal to 85% of the purchase price payable at the initial closing.

**Section 8.9.     Other Activities; Business Opportunities**.  Nothing contained in this Agreement will prevent any Member, including the Managing Member, or any of its Affiliates from engaging in any other activities or businesses, regardless of whether those activities or businesses are similar to or competitive with the business of the Company.  None of the Members nor any of their Affiliates will be obligated to account to the Company or to the other Member for any profits or income earned or derived from other such activities or businesses.  None of the Members nor any of their Affiliates will be obligated to inform the Company or the other Member of any business opportunity of any type or description.

<div align="center">

**ARTICLE IX**
**COMPANY OPERATIONS**

</div>

**Section 9.1.     Acquisition of Underlying Investment.**  On the Effective Date, the Company will cause the SPV to acquire the Underlying Investment free and clear of all liens and encumbrances (excluding any encumbrances previously agreed to in writing by the Members).

**Section 9.2.     Asset Management Fee.**  From and after the Effective Date, the Company will pay the Managing Member an annual asset management fee equal to $175,000, provided the annual asset management fee will be payable to the Managing Member during each Fiscal Year on the first day of each calendar quarter (i.e., January 1st, April 1st, July 1st, and October 1st) and prorated for partial quarters.

**Section 9.3.     Debt and Equity Placement Fee.**  On the Effective Date, the Managing Member will receive a debt and equity placement fee from the Company in an amount equal to $600,000; provided $200,000 will be immediately recontributed to the Company is equity shares.

**Section 9.4.     Sale of the Underlying Investment.**

(a)     *Property Offer Notice*.  If, during the term of this Agreement, the Company, the SPV, or a Member receives a written offer for the purchase of all or any portion of the Underlying Investment from a non-Affiliate of any Member, it will promptly give the other Members written notice of such offer (the "**Property Offer Notice**").  The Property Offer Notice will identify the prospective purchaser, the proposed purchase price, the proposed closing date, the proposed brokerage commission, and any of the other relevant terms of the transaction.  No Member will be authorized to cause the Company or the SPV to accept any such offer to purchase all or any portion of the Underlying Investment unless such offer has been approved by the other Members.

(b)     *Property Sale Election*.  At any time after thirty-six (36) months after the Effective Date, the Managing Member (the "**Evoking Member**") will have the right to unilaterally elect to cause the Company (on behalf of the SPV) to solicit offers (each, a "**Property Sale Offer**") from prospective third party purchasers to buy the Underlying Investment.  Upon determining to solicit Property Sale Offers, the Evoking Member (A) will notify the Members, in writing, of any such election (a "**Property Sale Election**"), and (B) prepare an information package on the Underlying Investment that includes (y) a form sale contract reasonably approved by the Members (to be executed by any such prospective third party purchaser), and (z) the other material terms and conditions on which the Evoking Member is prepared to have the Company (on behalf of the SPV) sell and otherwise dispose of the Underlying Investment.

(c)     *Property Sale Notice*.  If the Company obtains a Property Sale Offer within six (6) months after delivery of a Property Sale Election, and an Evoking Member determines, in its sole discretion, that the Company (on behalf of the SPV) should accept such Property Sale Offer, such Evoking Member will provide written notice ("**Property Sale Notice**") to the Members of its desire to accept such Property Sale Offer.  The non-Evoking Member(s) will have fifteen (15) Business Days from the delivery of any Property Sale Notice to notify the Evoking Member, in writing, of the election (the "**Election Notice**") of the non-Evoking Member(s) to either:

(i)     approve the Property Sale Offer, in which case the Evoking Member will be authorized to effect a Sale of the Underlying Investment, in the name and on behalf of the SPV, on the terms and subject to the conditions set forth in the applicable Property Sale Offer; or

(ii)    purchase the Underlying Investment on substantially the same terms and conditions as set forth in the applicable Property Sale Offer (net of any commission that would customarily be payable by the Company or the SPV in the event of a sale of the Underlying Investment to a third party), provided (A) the non-Evoking Member(s) must close such purchase within one hundred twenty (120) days following the Evoking Member's delivery of any Property Sale Notice, and (B) with respect to any obligations under agreement with Company Lenders for which the Evoking Member or any of its Affiliates are liable, the non-Evoking Members must secure the complete and unequivocal release of the Evoking Member and its Affiliates from and against any post-transfer claim(s) by each Company Lender;

provided that (x) failure to deliver an Election Notice on or before fifteen (15) Business Days from the delivery of any Property Sale Notice will be deemed to be an election of Section 9.4(c)(i), (y) the release set forth in the previous sentence will be a closing condition of any election permitted by this Section 9.4(c)(i), and (z) in order for a Property Sale Offer to be valid, it must be a bona fide, arm's-length, all-cash offer from a third party for the Underlying Investment, and must be accompanied by a signed contract of sale and a good-faith deposit.

(d)     *Default Sale*.   Any failure by non-Evoking Member(s) to effectuate the purchase of the Underlying Investment in accordance with Section 9.4(c)(i) (after such option is elected) will (i) be a material breach of this Agreement, and (ii) result in such Member forever forfeiting its right to act as a managing member of the Company, consent to material actions in accordance with Section 8.2, or initiate any action pursuant to Section 8.8.

**Section 9.5.     Management of Underlying Investment.**

(a)     Subject to the terms and conditions of this Agreement, the property manager will be engaged to oversee the management of the Underlying Investment.

(a)     The Managing Member may terminate, extend, or modify the property management agreement with the property manager of the Underlying Investment without the prior written consent of any other Member.

(b)     The Company or the SPV will pay a fixed fee to the manager of the Underlying Investment in accordance with a property management agreement.

# ARTICLE X
# EXCULPATION AND INDEMNIFICATION

**Section 10.1.    Exculpation of Covered Persons.**

(a)    *Covered Persons*.  As used herein, the term "**Covered Person**" will mean (i) each Member, including the Managing Member; (ii) each officer, director, stockholder, partner, member, Affiliate, employee, agent or representative of each Member, and each of their Affiliates; and (iii) each employee, agent, or representative of the Company (including all Officers).

(b)    *Standard of Care*.  No Covered Person will be liable to the Company or any other Covered Person for any loss, damage or claim incurred by reason of any action taken or omitted to be taken by such Covered Person in good faith reliance on the provisions of this Agreement, so long as such action or omission does not constitute fraud, gross negligence, willful misconduct or a material breach of this Agreement by such Covered Person or is not made in knowing violation of the provisions of this Agreement.

(c)    *Good Faith Reliance*.  A Covered Person will be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements (including financial statements and information, opinions, reports or statements as to the value or amount of the assets, liabilities, Net Income or Net Losses of the Company or any facts pertinent to the existence and amount of assets from which distributions might properly be paid) of the following Persons or groups: (i) another Member; (ii) one or more Officers or employees of the Company; (iii) any attorney, independent accountant, appraiser or other expert or professional employed or engaged by or on behalf of the Company; or (iv) any other Person selected in good faith by or on behalf of the Company, in each case as to matters that such relying Person reasonably believes to be within such other Person's professional or expert competence.  The preceding sentence will in no way limit any Person's right to rely on information to the extent provided in §18-406 of the Delaware Act.

**Section 10.2.    Liabilities and Duties of Covered Persons.**

(a)    *Limitation of Liability*.  This Agreement is not intended to, and does not, create, or impose any fiduciary duty on any Covered Person.  Furthermore, each of the Members and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied by Applicable Law, and in doing so, acknowledges and agrees that the duties and obligation of each Covered Person to each other and to the Company are only as expressly set forth in this Agreement.  The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person.

(b)    *Duties*.  Whenever in this Agreement a Covered Person is permitted or required to make a decision (including a decision that is in such Covered Person's "discretion" or under a grant of similar authority or latitude), the Covered Person will be entitled to consider only such interests and factors as such Covered Person desires, including its own interests, and will have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person.  Whenever in this Agreement a Covered Person is permitted or required to make a decision in such Covered Person's "good faith," the Covered Person will act under such express standard and will not be subject to any other or different standard imposed by this Agreement or any other Applicable Law.

**Section 10.3.     Indemnification.**

(a)     *Indemnification*.  To the fullest extent permitted by the Delaware Act, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution or replacement, only to the extent that such amendment, substitution or replacement permits the Company to provide broader indemnification rights than the Delaware Act permitted the Company to provide prior to such amendment, substitution or replacement), the Company will indemnify, hold harmless, defend, pay and reimburse any Covered Person against any and all losses, claims, damages, judgments, fines or liabilities, including reasonable legal fees or other expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines, or liabilities, and any amounts expended in settlement of any claims (collectively, "**Losses**") to which such Covered Person may become subject by reason of:

    (i)     any act or omission or alleged act or omission performed or omitted to be performed on behalf of the Company, any Member or any direct or indirect Subsidiary of the foregoing in connection with the business of the Company; or

    (ii)     such Covered Person being or acting in connection with the business of the Company as a member, stockholder, Affiliate, manager, director, officer, employee or agent of the Company, any Member, or any of their respective Affiliates, or that such Covered Person is or was serving at the request of the Company as a member, manager, director, officer, employee, or agent of any Person including the Company;

provided that, (x) such Covered Person acted in good faith and in a manner believed by such Covered Person to be in, or not opposed to, the best interests of the Company and, with respect to any criminal proceeding, had no reasonable cause to believe his conduct was unlawful, and (y) such Covered Person's conduct did not constitute fraud, gross negligence, willful misconduct or a material breach of this Agreement by such Covered Person or a knowing violation of the provisions of this Agreement, in either case as determined by a final, nonappealable order of a court of competent jurisdiction. In connection with the foregoing, the termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, will not, of itself, create a presumption that the Covered Person did not act in good faith or, with respect to any criminal proceeding, had reasonable cause to believe that such Covered Person's conduct was unlawful, or that the Covered Person's conduct constituted fraud, gross negligence, willful misconduct or a knowing violation or material breach of this Agreement.

(b)     *Control of Defense*.  Upon a Covered Person's discovery of any claim, lawsuit or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to this Section 10.3, the Covered Person will give prompt written notice to the Company of such claim, lawsuit or proceeding, provided that, the failure of the Covered Person to provide such notice will not relieve the Company of any indemnification obligation under this Section 10.3, unless the Company will have been materially prejudiced thereby. Subject to the approval of the disinterested Members, the Company will be entitled to participate in or assume the defense of any such claim, lawsuit, or proceeding at its own expense.  After notice from the Company to the Covered Person of its election to assume the defense of any such claim, lawsuit or proceeding, the Company will not be liable to the Covered Person under this Agreement or otherwise for any legal or other expenses subsequently incurred by the Covered Person in connection with investigating, preparing to defend or defending any such claim, lawsuit or other proceeding.  If the Company does not elect (or fails to elect) to assume the defense of any such claim, lawsuit or proceeding, the Covered Person will have the right to assume the defense of such claim, lawsuit

or proceeding as it deems appropriate, but it will not settle any such claim, lawsuit or proceeding without the consent of the Company (which consent will not be unreasonably withheld, conditioned or delayed).

(c) *Reimbursement*.  The Company will promptly reimburse (and/or advance to the extent reasonably required) each Covered Person for reasonable legal or other expenses (as incurred) of such Covered Person in connection with investigating, preparing to defend or defending any claim, lawsuit or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to this <u>Section 10.3</u>; provided that, if it is finally judicially determined that such Covered Person is not entitled to the indemnification provided by this <u>Section 10.3</u>, then such Covered Person will promptly reimburse the Company for any reimbursed or advanced expenses.

(d) *Entitlement to Indemnity*.  The indemnification provided by this <u>Section 10.3</u> will not be deemed exclusive of any other rights to indemnification to which those seeking indemnification may be entitled under any agreement or otherwise.  The provisions of this <u>Section 10.3</u> will continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this <u>Section 10.3</u> and will inure to the benefit of the executors, administrators, legatees, and distributees of such Covered Person.

(e) *Insurance*.  To the extent available on commercially reasonable terms, the Company may purchase, at its expense, insurance to cover Losses covered by the foregoing indemnification provisions and to otherwise cover Losses for any breach or alleged breach by any Covered Person of such Covered Person's duties in such amount and with such deductibles as the Managing Member may reasonably determine; provided that, the failure to obtain such insurance will not affect the right to indemnification of any Covered Person under the indemnification provisions contained herein, including the right to be reimbursed or advanced expenses or otherwise indemnified for Losses hereunder. If any Covered Person recovers any amounts in respect of any Losses from any insurance coverage, then such Covered Person will, to the extent that such recovery is duplicative, reimburse the Company for any amounts previously paid to such Covered Person by the Company in respect of such Losses.

(f) *Funding of Indemnification Obligation*.  Notwithstanding anything contained herein to the contrary, any indemnity by the Company relating to the matters covered in this <u>Section 10.3</u> will be provided out of and to the extent of Company assets only, and no Member (unless such Member otherwise agrees in writing) will have personal liability on account thereof or will be required to make additional contributions of capital to the Company to help satisfy such indemnity by the Company.

(g) *Savings Clause*.  If this <u>Section 10.3</u> or any portion hereof will be invalidated on any ground by any court of competent jurisdiction, then the Company will nevertheless indemnify and hold harmless each Covered Person pursuant to this <u>Section 10.3</u> to the fullest extent permitted by any applicable portion of this <u>Section 10.3</u> that will not have been invalidated and to the fullest extent permitted by Applicable Law.

(h) *Amendment*.  The provisions of this <u>Section 10.3</u> will be a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this <u>Section 10.3</u> is in effect, on the other hand, pursuant to which the Company and each such Covered Person intend to be legally bound.  No amendment, modification, or repeal of this <u>Section 10.3</u> that adversely affects the rights of a Covered Person to indemnification for Losses incurred or

relating to a state of facts existing prior to such amendment, modification, or repeal will apply in such a way as to eliminate or reduce such Covered Person's entitlement to indemnification for such Losses without the Covered Person's prior written consent.

**Section 10.4.    Survival**.  The provisions of this <u>ARTICLE X</u> will survive the dissolution, liquidation, winding up, and termination of the Company.

<div align="center">

**ARTICLE XI**
**TRANSFER**

</div>

**Section 11.1.    Restrictions on Transfer.**

(a)    Except as otherwise provided in this <u>ARTICLE XI</u> or in <u>Section 8.8</u>, no Member will Transfer all or any portion of its Membership Interest without the written consent of the other Member (which consent may be granted or withheld in the sole discretion of the other Member).  No Transfer of a Membership Interest to a Person not already a Member will be deemed completed until the prospective Transferee is admitted as a member of the Company in accordance with <u>Section 5.2(b)</u>.

(b)    Notwithstanding any other provision of this Agreement (including <u>Section 11.2</u>), each Member agrees that it will not Transfer all or any portion of its Membership Interest, and the Company agrees that it will not issue any Membership Interest:

(i)    except as permitted under the Securities Act and other applicable federal or state securities or blue sky laws, and then, with respect to a Transfer of a Membership Interest, only upon delivery to the Company of an opinion of counsel in form and substance satisfactory to the Company to the effect that such Transfer may be effected without registration under the Securities Act;

(ii)    if such Transfer or issuance would cause the Company to be considered a "publicly traded partnership" under Section 7704(b) of the Code within the meaning of Treasury Regulations Section 1.7704-1(h)(1)(ii), including the look-through rule in Treasury Regulations Section 1.7704-1(h)(3);

(iii)    if such Transfer or issuance would affect the Company's existence or qualification as a limited liability company under the Delaware Act;

(iv)    if such Transfer or issuance would cause the Company to lose its status as a partnership for federal income tax purposes;

(v)    if such Transfer or issuance would cause a termination of the Company for federal income tax purposes;

(vi)    if such Transfer or issuance would cause the Company to be required to register as an investment company under the Investment Company Act of 1940, as amended; or

(vii)    if such Transfer or issuance would cause the assets of the Company to be deemed "Plan Assets" as defined under the Employee Retirement Income Security Act of 1974 or its accompanying regulations or result in any "prohibited transaction" thereunder involving the Company.

(c)     Any Transfer or attempted Transfer of a Membership Interest in violation of this Agreement will be null and void, no such Transfer will be recorded on the Company's books and the purported Transferee in any such Transfer will not be treated (and the purported Transferor will continue be treated) as the owner of such Membership Interest for all purposes of this Agreement.

(d)     For the avoidance of doubt, any Transfer of a Membership Interest permitted by this Agreement will be deemed a sale, transfer, assignment, or other disposal of such Membership Interest in its entirety as intended by the parties to such Transfer, and will not be deemed a sale, transfer, assignment, or other disposal of any less than all of the rights and benefits described in the definition of the term "Membership Interest," unless otherwise explicitly agreed to by the parties to such Transfer.

**Section 11.2.    Permitted Transfers**.  The provisions of <u>Section 11.1(a)</u> will not apply to any Transfer by any Member of all or any portion of its Membership Interest to its Affiliate.

<center>

**ARTICLE XII**
**ACCOUNTING; TAX MATTERS**

</center>

**Section 12.1.    Financial Statements**.  The Managing Member will cause the Company will furnish to each Member the following reports:

(a)     *Annual Financial Statements*.  As soon as available, and in any event within one hundred twenty (120) days after the end of each Fiscal Year, consolidated balance sheets of the Company as at the end of each such Fiscal Year and consolidated statements of income, cash flows and Members' equity for such Fiscal Year, in each case setting forth in comparative form the figures for the previous Fiscal Year.

(b)     *Quarterly Financial Statements*.  As soon as available, and in any event within sixty (60) days after the end of each quarterly accounting period in each Fiscal Year (other than the last fiscal quarter of the Fiscal Year), consolidated balance sheets of the Company as at the end of each such fiscal quarter and for the current Fiscal Year to date and unaudited consolidated statements of income, cash flows and Members' equity for such fiscal quarter and for the current Fiscal Year to date, in each case setting forth in comparative form the figures for the corresponding periods of the previous fiscal quarter.

**Section 12.2.    Inspection Rights**.  Upon reasonable notice from a Member, the Company will afford each Member and its Representatives access during normal business hours to: (a) the Company's properties, offices, plants, and other facilities; (b) the corporate, financial, and similar records, reports, and documents of the Company, including, without limitation, all books and records, minutes of proceedings, internal management documents, reports of operations, reports of adverse developments, copies of any management letters, and communications with Members (including the Managing Member), and to permit each Member and its Representatives to examine such documents and make copies thereof; and (c) any officers, senior employees and public accountants of the Company, and to afford each Member and its Representatives the opportunity to discuss and advise on the affairs, finances and accounts of the Company with such officers, senior employees, and public accountants (and the Company hereby authorizes said accountants to discuss with such Member and its Representatives such affairs, finances, and accounts).

**Section 12.3.    Income Tax Status**.  It is the intent of this Company and the Members that this Company will be treated as a partnership for U.S., federal, state, and local income tax purposes.  Neither the

Company nor any Member will make an election for the Company to be classified as other than a partnership pursuant to Treasury Regulations Section 301.7701-3.

**Section 12.4.    Partnership Representative**.

(a)    *Appointment*.  The Members hereby appoint the Managing Member as the "partnership representative" (the "**Partnership Representative**") as provided in Code Section 6223(a) (as amended by the Bipartisan Budget Act of 2015 ("**BBA**")).  The Partnership Representative may resign at any time if there is another Managing Member to act as the Partnership Representative.

(b)    *Tax Examinations and Audits*.  The Partnership Representative is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by Taxing Authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith.  Each Member agrees that such Member will not independently act with respect to tax audits or tax litigation of the Company, unless previously authorized to do so in writing by the Partnership Representative, which authorization may be withheld by the Partnership Representative in its sole and absolute discretion.  The Partnership Representative shall have sole discretion to determine whether the Company (either on its own behalf or on behalf of the Members) will contest or continue to contest any tax deficiencies assessed or proposed to be assessed by any Taxing Authority.

(c)    *BBA Elections*.  To the extent permitted by applicable law and regulations, the Company will annually elect out of the partnership audit procedures enacted under Section 1101 of the BBA (the "**BBA Procedures**") for tax years beginning on or after January 1, 2018 pursuant to Code Section 6221(b) (as amended by the BBA).  For any year in which applicable law and regulations do not permit the Company to elect out of the BBA Procedures, then within forty-five (45) days of any notice of final partnership adjustment, the Company will elect the alternative procedure under Code Section 6226, as amended by Section 1101 of the BBA, and furnish to the Internal Revenue Service and each Member during the year or years to which the notice of final partnership adjustment relates a statement of the Member's share of any adjustment set forth in the notice of final partnership adjustment.

(d)    *Tax Returns and Tax Deficiencies*.  Each Member agrees that such Member shall not treat any Company item inconsistently on such Member's federal, state, foreign or other income tax return with the treatment of the item on the Company's return.  Any deficiency for taxes imposed on any Member or former Member (including penalties, additions to tax or interest imposed with respect to such taxes and any taxes imposed pursuant to Code Section 6226 as amended by the BBA) will be paid by such Member or former Member, and if required to be paid (and actually paid) by the Company, will be recoverable from such Member as provided in Section 7.2(d).

(e)    *Income Tax Elections*.  Except as otherwise provided herein, the Partnership Representative shall have sole discretion to make any determination regarding income tax elections it deems advisable on behalf of the Company; provided, that the Partnership Representative will make an election under Code Section 754, if requested in writing by another Member.

**Section 12.5.    Tax Returns**.  At the expense of the Company, the Managing Member (or any Officer that it may designate pursuant to Section 8.4) will endeavor to cause the preparation and timely filing (including extensions) of all tax returns required to be filed by the Company pursuant to the Code as well as all other required tax returns in each jurisdiction in which the Company own property or do business.  The Managing Member will provide the Non-Managing Member, for its review and comment, copies of

all tax returns prior to the filing thereof. As soon as reasonably possible after the end of each Fiscal Year, the Managing Member or designated Officer will cause to be delivered to each Person who was a Member at any time during such Fiscal Year, IRS Schedule K-1 to Form 1065 and such other information with respect to the Company as may be necessary for the preparation of such Person's federal, state and local income tax returns for such Fiscal Year.

**Section 12.6.    Company Funds**.  All funds of the Company will be deposited in its name, or in such name as may be designated by the Managing Member, in such checking, savings or other accounts, or held in its name in the form of such other investments as will be designated by the Managing Member. The funds of the Company will not be commingled with the funds of any other Person. All withdrawals of such deposits or liquidations of such investments by the Company will be made exclusively upon the signature or signatures of such Officer or Officers as the Managing Member may designate.

<div align="center">

**ARTICLE XIII**
**DISSOLUTION AND LIQUIDATION**

</div>

**Section 13.1.    Events of Dissolution**.  The Company will be dissolved and its affairs wound up only upon the occurrence of any of the following events:

(a)      The determination of the Members to dissolve the Company;

(b)      The Bankruptcy of a Member, unless within ninety (90) days after the occurrence of such Bankruptcy, the other Member agrees in writing to continue the business of the Company;

(c)      At the election of a non-defaulting Member, in its sole discretion, if the other Member breaches any material covenant, duty or obligation under this Agreement (including a Member's obligation to make Additional Capital Contributions pursuant to Section 4.2), which breach remains uncured for ten (10) days after written notice of such breach was received by the defaulting Member;

(d)      The sale, exchange, involuntary conversion, or other disposition or Transfer of all or substantially all the assets of the Company; or

(e)      The entry of a decree of judicial dissolution under §18-802 of the Delaware Act.

**Section 13.2.    Effectiveness of Dissolution**.  Dissolution of the Company will be effective on the day on which the event described in Section 13.1 occurs, but the Company will not terminate until the winding up of the Company has been completed, the assets of the Company have been distributed as provided in Section 13.3 and the Certificate will have been cancelled as provided in Section 13.4.

**Section 13.3.    Liquidation**.  If the Company is dissolved pursuant to Section 13.1, the Company will be liquidated and its business and affairs wound up in accordance with the Delaware Act and the following provisions:

(a)      *Liquidator*.  The Managing Member will act as liquidator to wind up the Company (the "**Liquidator**"), unless the Company is being dissolved pursuant to Section 13.1(b) or Section 13.1(c) based on the Bankruptcy or a breach by the Managing Member, in which case the Liquidator will be the Non-Managing Member. The Liquidator will have full power and authority to sell, assign, and encumber any or all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and business-like manner.

(b)　　*Accounting*.  As promptly as possible after dissolution and again after final liquidation, the Liquidator will cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable.

(c)　　*Distribution of Proceeds*.  The Liquidator will liquidate the assets of the Company and distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of Applicable Law:

    (i)　　First, to the payment of all of the Company's debts and liabilities to its creditors (including Members, if applicable) and the expenses of liquidation (including sales commissions incident to any sales of assets of the Company);

    (ii)　　Second, to the establishment of and additions to reserves that are determined by the Managing Member to be reasonably necessary for any contingent unforeseen liabilities or obligations of the Company; and

    (iii)　　Third, to the Members in accordance with Section 7.1.

(d)　　*Discretion of Liquidator*.  Notwithstanding the provisions of Section 13.3(c) that require the liquidation of the assets of the Company, but subject to the order of priorities set forth in Section 13.3(c), if upon dissolution of the Company the Liquidator reasonably determines that an immediate sale of part or all of the Company's assets would be impractical or could cause undue loss to the Members, the Liquidator may defer the liquidation of any assets except those necessary to satisfy Company liabilities and reserves, and may distribute to the Members, in lieu of cash, as tenants in common and in accordance with the provisions of Section 13.3(c), undivided interests in such Company assets as the Liquidator deems not suitable for liquidation. Any such distribution in kind will be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any agreements governing the operating of such properties at such time.  For purposes of any such distribution, any property to be distributed will be valued at its Fair Market Value.

**Section 13.4.　　Cancellation of Certificate**.  Upon completion of the distribution of the assets of the Company as provided in Section 13.3(c) hereof, the Company will be terminated and the Liquidator will cause the cancellation of the Certificate in the State of Delaware and of all qualifications and registrations of the Company as a foreign limited liability company in jurisdictions other than the State of Delaware and will take such other actions as may be necessary to terminate the Company.

**Section 13.5.　　Survival of Rights, Duties, and Obligations**.  Dissolution, liquidation, winding up, or termination of the Company for any reason will not release any party from any Loss that at the time of such dissolution, liquidation, winding up or termination already had accrued to any other party or thereafter may accrue in respect of any act or omission prior to such dissolution, liquidation, winding up or termination.  For the avoidance of doubt, none of the foregoing will replace, diminish, or otherwise adversely affect any Member's right to indemnification pursuant to Section 10.3.

**Section 13.6.　　Recourse for Claims**.  Each Member will look solely to the assets of the Company for all distributions with respect to the Company, such Member's Capital Account, and such Member's share of Net Income, Net Loss and other items of income, gain, loss and deduction, and will have no recourse therefor (upon dissolution or otherwise) against the Liquidator or any other Member.

# ARTICLE XIV
# MISCELLANEOUS

**Section 14.1.    Expenses**.  Except as otherwise expressly provided herein, all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with the preparation and execution of this Agreement, or any amendment or waiver hereof, and the transactions contemplated hereby will be paid by the Company.

**Section 14.2.    Further Assurances**.  In connection with this Agreement and the transactions contemplated hereby, the Company and each Member hereby agrees, at the request of the Company or any other Member, to execute and deliver such additional documents, instruments, conveyances and assurances and to take such further actions as may be required to carry out the provisions hereof and give effect to the transactions contemplated hereby.

**Section 14.3.    Confidentiality.**

(a)    Each Member acknowledges that during the term of this Agreement, it will have access to and become acquainted with trade secrets, proprietary information and confidential information belonging to the Company and its Affiliates that are not generally known to the public, including, but not limited to, information concerning business plans, financial statements and other information provided pursuant to this Agreement, operating practices and methods, expansion plans, strategic plans, marketing plans, contracts, customer lists or other business documents that the Company treats as confidential, in any format whatsoever (including oral, written, electronic or any other form or medium) (collectively, "**Confidential Information**").  In addition, each Member acknowledges that: (i) the Company has invested, and continues to invest, substantial time, expense and specialized knowledge in developing its Confidential Information; (ii) the Confidential Information provides the Company with a competitive advantage over others in the marketplace; and (iii) the Company would be irreparably harmed if the Confidential Information were disclosed to competitors or made available to the public.  Without limiting the applicability of any other agreement to which any Member is subject, no Member will, directly or indirectly, disclose or use (other than solely for the purposes of such Member monitoring and analyzing its investment in the Company) at any time, including, without limitation, use for personal, commercial or proprietary advantage or profit, either during its association with the Company or thereafter, any Confidential Information of which such Member is or becomes aware.  Each Member in possession of Confidential Information will take all appropriate steps to safeguard such information and to protect it against disclosure, misuse, espionage, loss, and theft.

(b)    Nothing contained in Section 14.3(a) will prevent any Member from disclosing Confidential Information: (i) upon the order of any court or administrative agency; (ii) upon the request or demand of any regulatory agency or authority having jurisdiction over such Member; (iii) to the extent compelled by legal process or required or requested pursuant to subpoena, interrogatories or other discovery requests; (iv) to the extent necessary in connection with the exercise of any remedy hereunder; (v) to the other Member; (vi) to such Member's Representatives who, in the reasonable judgment of such Member, need to know such Confidential Information and agree to be bound by the provisions of this Section 14.3 as if a Member; or (vii) to any potential Permitted Transferee in connection with a proposed Transfer of Membership Interests from such Member, as long as such Transferee agrees to be bound by the provisions of this Section 14.3 as if a Member; provided that, in the case of clause (i), (ii), or (iii), such Member will notify the Company and other Member of the proposed disclosure as far in advance of such disclosure as practicable (but in no event make any such disclosure before notifying the Company and other

Member) and use reasonable efforts to ensure that any Confidential Information so disclosed is accorded confidential treatment satisfactory to the Company, when and if available.

(c)     The restrictions of Section 14.3(a) will not apply to Confidential Information that: (i) is or becomes generally available to the public other than as a result of a disclosure by a Member in violation of this Agreement; (ii) is or has been independently developed or conceived by such Member without use of Confidential Information; or (iii) becomes available to such Member or any of its Representatives on a non-confidential basis from a source other than the Company, the other Member or any of their respective Representatives, provided that, such source is not known by the receiving Member to be bound by a confidentiality agreement regarding the Company.

(d)     The obligations of each Member under this Section 14.3 will survive (i) the termination, dissolution, liquidation and winding up of the Company, (ii) the withdrawal of such Member from the Company, and (iii) such Member's Transfer of its Membership Interests.

**Section 14.4.   Notices**.   All notices, requests, consents, claims, demands, waivers and other communications hereunder will be in writing and will be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as will be specified in a notice given in accordance with this Section 14.4):

| | |
|---|---|
| If to the GWLI II Member : | To the applicable address set forth on the Members Schedule |
| If to the Naissance Member: | To the applicable address set forth on the Members Schedule |
| *with a copy to:* | Polsinelli PC<br>2950 N. Harwood Street, Ste. 2100<br>Dallas, TX 75201<br>Attention: Brian A. Bullard<br>E-mail: bbullard@polsinelli.com |

**Section 14.5.   Headings**.  The headings in this Agreement are inserted for convenience or reference only and are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision of this Agreement.

**Section 14.6.   Severability**.  If any term or provision of this Agreement is held to be invalid, illegal or unenforceable under Applicable Law in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Except as provided in Section 10.3(g), upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto will negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 14.7.    Entire Agreement**.  This Agreement, together with the Certificate and all related Exhibits and Schedules, constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.

**Section 14.8.    Successors and Assigns**.  Subject to the restrictions on Transfers set forth herein, this Agreement will be binding upon and will inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

**Section 14.9.    No Third-party Beneficiaries**.  Except as provided in ARTICLE X, which will be for the benefit of and enforceable by Covered Persons as described therein, this Agreement is for the sole benefit of the parties hereto (and their respective heirs, executors, administrators, successors, and assigns) and nothing herein, express or implied, is intended to or will confer upon any other Person, including any creditor of the Company, any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 14.10.    Amendment**.  No provision of this Agreement may be amended or modified except by an instrument in writing executed by both of the Members.  Any such written amendment or modification will be binding upon the Company and each Member.  Notwithstanding the foregoing, amendments to the Members Schedule following any new issuance, redemption, repurchase, or Transfer of Membership Interests in accordance with this Agreement may be made by the Managing Member without the consent of or execution by the Members.

**Section 14.11.    Waiver**.  No waiver by any party of any of the provisions hereof will be effective unless explicitly set forth in writing and signed by the party so waiving.  No waiver by any party will operate or be construed as a waiver in respect of any failure, breach, or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.  No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement will operate or be construed as a waiver thereof, nor will any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.  For the avoidance of doubt, nothing contained in this Section 14.1 will diminish any of the explicit and implicit waivers described in this Agreement, including in Section 14.14.

**Section 14.12.    Governing Law**.  All issues and questions concerning the application, construction, validity, interpretation, and enforcement of this Agreement will be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Delaware.

**Section 14.13.    Submission to Jurisdiction**.  The parties hereby agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort, or otherwise, will be brought in the United States District Court for the District of Delaware or in the Court of Chancery of the State of Delaware (or, if such court lacks subject matter jurisdiction, in the Superior Court of the State of Delaware), so long as one of such courts will have subject-matter jurisdiction over such suit, action, or proceeding, and that any case of action arising out of this Agreement will be deemed to have arisen from a transaction of business in the State of Delaware. Each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action, or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now

or hereafter have to the laying of the venue of any such suit, action, or proceeding in any such court or that any such suit, action, or proceeding that is brought in any such court has been brought in an inconvenient form. Service of process, summons, notice, or other document by registered mail to the address set forth in <u>Section 14.4</u> will be effective service of process for any suit, action, or other proceeding brought in any such court.

**Section 14.14. WAIVER OF JURY TRIAL.** EACH PARTY HERETO HEREBY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**Section 14.15. Equitable Remedies**. Each party hereto acknowledges that a breach or threatened breach by such party of any of its obligations under this Agreement would give rise to irreparable harm to the other parties, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, each of the other parties hereto will, in addition to any and all other rights and remedies that may be available to them in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

**Section 14.16. Attorneys' Fees**. In the event that any party hereto institutes any legal suit, action or proceeding, including arbitration, against another party in respect of a matter arising out of or relating to this Agreement, the prevailing party in the suit, action, or proceeding will be entitled to receive, in addition to all other damages to which it may be entitled, the costs incurred by such party in conducting the suit, action, or proceeding, including reasonable attorneys' fees and expenses and court costs.

**Section 14.17. Remedies Cumulative**. The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise, except to the extent expressly provided in <u>Section 10.2</u> to the contrary.

**Section 14.18. Counterparts**. This Agreement may be executed in counterparts, each of which will be deemed an original, but all of which together will be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of Electronic Transmission will be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Remainder of page intentionally left blank – signature page follows]*

The parties hereto have caused this Agreement to be executed as of the Effective Date by their respective officers thereunto duly authorized.

**MEMBERS:**

NAISSANCE CAPITAL REAL ESTATE, LLC, a Delaware limited liability company

By: _____
Name: Azeemeh Zaheer
Title: Managing Member


GALLERIA WEST LOOP INVESTMENTS II LLC, a Texas limited liability company

By: GALLERIA WEST LOOP INVESTMENTS, LLC, a
Texas limited liability company, its manager

By: _____
Name: Bradley S. Parker
Title: President

# SCHEDULE A

### Members Schedule

| Member<br>*(Name and Address)* | Initial Capital<br>Contributions | Membership<br>Interest<br>Percentage |
|---|---|---|
| **GWLI II Member :** | | |
| 1614 Sidney Baker Street<br>Kerville, Texas 78028 | $16,000,000 | 98.77% |
| **Naissance Member:** | | |
| 6501 Westchester Ave.<br>Houston Texas 77005 | $200,000 | 1.23% |
| **Totals:** | **$16,200,000** | **100%** |

**SCHEDULE B**

BUDGET

[attached]

# Boxer Property Management
## *Property*
### *Pro Forma Summary*

|  | *Year 1* | |
| :--- | ---: | ---: |
|  | *May-18* | *Apr-19* |
|  | **Annual Total** | **PSF** |
| *Rate* | *$21.73* | *$22.18* |
| *Occupied Square Feet* | *259,016* | *259,016* |
| *Occupied Percentage* | *91.41%* | *91.41%* |
| **Gross Potential Revenue** | **6,241,332** $ | **22.03** |
| Vacancy Loss | (584,177) $ | (2.06) |
| Net Rental Revenue | 5,657,155 $ | 19.96 |
| Expense Reimbursements | 1,992,273 $ | 7.03 |
| Building Services / Other Income | 23,634 $ | 0.08 |
| **Total Revenue** | **7,673,063** $ | **27.08** |
| **Operating Expenses** | | |
| Salaries and Benefits | 264,844 $ | 0.93 |
| General and Administrative | 215,552 $ | 0.76 |
| Repair and Maintenance | 243,569 $ | 0.86 |
| Utilities (Electric) | 368,364 $ | 1.30 |
| Utilities (Non-electric) | 82,174 $ | 0.29 |
| Contract Services | 258,224 $ | 0.91 |
| Controllable Expenses | 1,432,727 $ | 5.06 |
| Mgmt Fee | 141,679 $ | 0.50 |
| Property Taxes | 753,500 $ | 2.66 |
| Insurance | 35,420 $ | 0.13 |
| **Total Operating Expenses** | **2,363,325** $ | **8.34** |
| **Net Operating Income** | **5,309,738** $ | **18.74** |
| **Other Expenses/(Income)** | | |
| In-house Leasing Salaries | 36,993 $ | 0.13 |
| In-house Marketing/Advertising | 87,677 $ | 0.31 |
| In-house Leasing/Design & Construction | 69,009 $ | 0.24 |
| In-house Legal | 24,302 $ | 0.09 |
| 3rd Party Professional Fees | 18,809 $ | 0.07 |
| Texas Margin Tax | 74,812 $ | 0.26 |
| **Total Other Expenses/(Income)** | **311,603** $ | **1.10** |
| **Net Income Before Interest** | **4,998,135** $ | **17.64** |

000827

| | May-18 | Jun-18 | Jul-18 | Aug-18 | Sep-18 | Oct-18 | Nov-18 | Dec-18 | Jan-19 | Feb-19 | Mar-19 | Apr-19 | Annual Total | PSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | | |
| *Rate* | $21.73 | $21.73 | $21.74 | $21.74 | $21.74 | $21.74 | $21.74 | $21.74 | $21.76 | $22.12 | $22.13 | $22.18 | | |
| *Occupied Square Feet* | 259,016 | 259,016 | 259,016 | 259,016 | 259,016 | 259,016 | 259,016 | 259,016 | 259,016 | 259,016 | 259,016 | 259,016 | | |
| *Occupied Percentage* | 91.41% | 91.41% | 91.41% | 91.41% | 91.41% | 91.41% | 91.41% | 91.41% | 91.41% | 91.41% | 91.41% | 91.41% | | |
| Total Current Rents | 469,129 | 469,129 | 469,248 | 469,248 | 469,248 | 469,248 | 469,248 | 469,248 | 469,641 | 477,524 | 477,575 | 478,669 | 5,657,155 | $ 19.96 |
| Total New Rents | - | - | - | - | - | - | - | - | - | - | - | - | | $ - |
| Vac Loss | 48,681 | 48,681 | 48,681 | 48,681 | 48,681 | 48,681 | 48,681 | 48,681 | 48,681 | 48,681 | 48,681 | 48,681 | 584,177 | $ 2.06 |
| **Gross Potential Revenue** | 517,810 | 517,810 | 517,929 | 517,929 | 517,929 | 517,929 | 517,929 | 517,929 | 518,322 | 526,205 | 526,256 | 527,351 | 6,241,332 | $ 22.03 |
| Rental Allowances | - | - | - | - | - | - | - | - | - | - | - | - | | $ - |
| Vacancy Loss | (48,681) | (48,681) | (48,681) | (48,681) | (48,681) | (48,681) | (48,681) | (48,681) | (48,681) | (48,681) | (48,681) | (48,681) | (584,177) | $ (2.06) |
| Bad Debt Expense | | | | | | | | | | | | | | |
| Net Rental Revenue | 469,129 | 469,129 | 469,248 | 469,248 | 469,248 | 469,248 | 469,248 | 469,248 | 469,641 | 477,524 | 477,575 | 478,669 | 5,657,155 | $ 19.96 |
| Expense Reimbursements | 166,023 | 166,023 | 166,023 | 166,023 | 166,023 | 166,023 | 166,023 | 166,023 | 166,023 | 166,023 | 166,023 | 166,023 | 1,992,273 | $ 7.03 |
| Building Services / Other Income | 1,970 | 1,970 | 1,970 | 1,970 | 1,970 | 1,970 | 1,970 | 1,970 | 1,970 | 1,970 | 1,970 | 1,970 | 23,634 | $ 0.08 |
| **Total Revenue** | 637,121 | 637,121 | 637,240 | 637,240 | 637,240 | 637,240 | 637,240 | 637,240 | 637,633 | 645,516 | 645,567 | 646,661 | 7,673,063 | $ 27.08 |
| **Operating Expenses** | | | | | | | | | | | | | | |
| Salaries and Benefits | 20,427 | 20,427 | 20,427 | 30,286 | 20,427 | 20,427 | 20,427 | 20,427 | 20,427 | 20,427 | 30,286 | 20,427 | 264,844 | $ 0.93 |
| General and Administrative | 17,859 | 17,859 | 17,859 | 18,482 | 17,859 | 17,859 | 17,859 | 17,859 | 17,859 | 17,859 | 18,482 | 17,859 | 215,552 | $ 0.76 |
| Repair and Maintenance | 20,297 | 20,297 | 20,297 | 20,297 | 20,297 | 20,297 | 20,297 | 20,297 | 20,297 | 20,297 | 20,297 | 20,297 | 243,569 | $ 0.86 |
| Utilities (Electric) | 30,697 | 30,697 | 30,697 | 30,697 | 30,697 | 30,697 | 30,697 | 30,697 | 30,697 | 30,697 | 30,697 | 30,697 | 368,364 | $ 1.30 |
| Utilities (Non-electric) | 6,848 | 6,848 | 6,848 | 6,848 | 6,848 | 6,848 | 6,848 | 6,848 | 6,848 | 6,848 | 6,848 | 6,848 | 82,174 | $ 0.29 |
| Contract Services | 21,519 | 21,519 | 21,519 | 21,519 | 21,519 | 21,519 | 21,519 | 21,519 | 21,519 | 21,519 | 21,519 | 21,519 | 258,224 | $ 0.91 |
| Mgmt Fee | 11,807 | 11,807 | 11,807 | 11,807 | 11,807 | 11,807 | 11,807 | 11,807 | 11,807 | 11,807 | 11,807 | 11,807 | 141,679 | $ 0.50 |
| Controllable Expenses | 129,453 | 129,453 | 129,453 | 139,936 | 129,453 | 129,453 | 129,453 | 129,453 | 129,453 | 129,453 | 139,936 | 129,453 | 1,574,405 | $ 5.56 |
| Property Taxes | 62,792 | 62,792 | 62,792 | 62,792 | 62,792 | 62,792 | 62,792 | 62,792 | 62,792 | 62,792 | 62,792 | 62,792 | 753,500 | $ 2.66 |
| Insurance | 2,952 | 2,952 | 2,952 | 2,952 | 2,952 | 2,952 | 2,952 | 2,952 | 2,952 | 2,952 | 2,952 | 2,952 | 35,420 | $ 0.13 |
| **Total Operating Expenses** | 195,197 | 195,197 | 195,197 | 205,679 | 195,197 | 195,197 | 195,197 | 195,197 | 195,197 | 195,197 | 205,679 | 195,197 | 2,363,325 | $ 8.34 |
| **Net Operating Income** | 441,925 | 441,925 | 442,044 | 431,561 | 442,044 | 442,044 | 442,044 | 442,044 | 442,437 | 450,320 | 439,888 | 451,465 | 5,309,738 | $ 18.74 |
| **Other Expenses/(Income)** | | | | | | | | | | | | | | |
| In-house Leasing Salaries | 2,846 | 2,846 | 2,846 | 4,268 | 2,846 | 2,846 | 2,846 | 2,846 | 2,846 | 2,846 | 4,268 | 2,846 | 36,993 | $ 0.13 |
| In-house Marketing/Advertising | 6,871 | 6,871 | 6,871 | 9,481 | 6,871 | 6,871 | 6,871 | 6,871 | 6,871 | 6,871 | 9,481 | 6,871 | 87,677 | $ 0.31 |
| In-house Leasing/Design & Construction | 5,308 | 5,308 | 5,308 | 7,963 | 5,308 | 5,308 | 5,308 | 5,308 | 5,308 | 5,308 | 7,963 | 5,308 | 69,009 | $ 0.24 |
| In-house Legal | 1,869 | 1,869 | 1,869 | 2,804 | 1,869 | 1,869 | 1,869 | 1,869 | 1,869 | 1,869 | 2,804 | 1,869 | 24,302 | $ 0.09 |
| 3rd Party Professional Fees | 1,567 | 1,567 | 1,567 | 1,567 | 1,567 | 1,567 | 1,567 | 1,567 | 1,567 | 1,567 | 1,567 | 1,567 | 18,809 | $ 0.07 |
| Texas Margin Tax | 6,234 | 6,234 | 6,234 | 6,234 | 6,234 | 6,234 | 6,234 | 6,234 | 6,234 | 6,234 | 6,234 | 6,234 | 74,812 | $ 0.26 |
| **Total Other Expenses/(Income)** | 24,697 | 24,697 | 24,697 | 32,318 | 24,697 | 24,697 | 24,697 | 24,697 | 24,697 | 24,697 | 32,318 | 24,697 | 311,603 | $ 1.10 |
| **Net Income Before Interest** | 417,228 | 417,228 | 417,347 | 399,244 | 417,347 | 417,347 | 417,347 | 417,347 | 417,740 | 425,623 | 407,570 | 426,768 | 4,998,135 | $ 17.64 |



# Office of the Secretary of State

The undersigned, as Secretary of State of Texas, does hereby certify that the attached is a true and correct copy of each document on file in this office as described below:

Galleria 2425 JV, LLC
Filing Number: 802982348

Application for Registration                                           April 05, 2018

In testimony whereof, I have hereunto signed my name officially and caused to be impressed hereon the Seal of State at my office in Austin, Texas on June 03, 2024.



Jane Nelson
Secretary of State

*Come visit us on the internet at https://www.sos.texas.gov/*

Phone: (512) 463-5555                  Fax: (512) 463-5709              Dial: 7-1-1 for Relay Services
Prepared by: SOS-WEB                   TID: 10266                      Document: 1368638960003

| | | |
|---|---|---|
| **Form 304**<br>**(Revised 05/11)**<br><br>Submit in duplicate to:<br>Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>512 463-5555<br>FAX: 512/463-5709<br>**Filing Fee: $750** | <br>**Application for<br>Registration<br>of a Foreign Limited<br>Liability Company** | This space reserved for office use.<br><br>F I L E D<br>In the Office of the<br>Secretary of State of Texas<br><br>APR 0 5 2018<br><br>Corporations Section |

1. The entity is a foreign limited liability company. The name of the entity is:

Galleria 2425 JV, LLC
_____
*Provide the full legal name of the entity as stated in the entity's formation document in its jurisdiction of formation.*

2A. The name of the entity in its jurisdiction of formation does not contain the word "limited liability company" or "limited company" (or an abbreviation thereof). The name of the entity with the word or abbreviation that it elects to add for use in Texas is:

_____

2B. The entity name is not available in Texas. The assumed name under which the entity will qualify and transact business in Texas is:

_____
*The assumed name must include an acceptable organizational identifier or an accepted abbreviation of one of these terms.*

3. Its federal employer identification number is: _____

☑ Federal employer identification number information is not available at this time.

4. It is organized under the laws of: (set forth state or foreign country)  Delaware
and the date of its formation in that jurisdiction is:  04/04/2018
_____
                                                        *mm/dd/yyyy*

5. As of the date of filing, the undersigned certifies that the foreign limited liability company currently exists as a valid limited liability company under the laws of the jurisdiction of its formation.

6. The purpose or purposes of the limited liability company that it proposes to pursue in the transaction of business in Texas are set forth below.

Any lawful business or activity under the law of this state.
_____
The entity also certifies that it is authorized to pursue such stated purpose or purposes in the state or country under which it is organized.

7. The date on which the foreign entity intends to transact business in Texas, or the date on which the: foreign entity first transacted business in Texas is:  upon filing
_____
                              *mm/dd/yyyy*      *Late fees may apply (see instructions).*

8. The principal office address of the limited liability company is:

| 6501 Westchester Avenue | Houston | TX | U.S | 77005-3761 |
|---|---|---|---|---|
| *Address* | *City* | *State* | *Country* | *Zip/Postal Code* |

**RECEIVED**

Form 304

APR 0 5 2018       6

**Secretary of State**

000830

☑ 9A. The registered agent is an organization (cannot be entity named above) by the name of:

Capitol Corporate Services, Inc.

OR

☐ 9B. The registered agent is an individual resident of the state whose name is:

| | | | |
|---|---|---|---|
| *First Name* | *M.I.* | *Last Name* | *Suffix* |

9C. The business address of the registered agent and the registered office address is:

| | | | |
|---|---|---|---|
| 206 E. 9th Street, Suite 1300 | Austin | TX | 78701-4411 |
| *Street Address* | *City* | *State* | *Zip Code* |

10. The entity hereby appoints the Secretary of State of Texas as its agent for service of process under the circumstances set forth in section 5.251 of the Texas Business Organizations Code.

11. The name and address of each governing person is:

**NAME AND ADDRESS OF GOVERNING PERSON** (Enter the name of either an individual or an organization, but not both.)

IF INDIVIDUAL

| | | | |
|---|---|---|---|
| *First Name* | *M.I.* | *Last Name* | *Suffix* |

OR

IF ORGANIZATION

Naissance Capital Real Estate, LLC

*Organization Name*

| | | | | | |
|---|---|---|---|---|---|
| 6501 Westchester Avenue | Houston | TX | U.S | 77005-3761 |
| *Street or Mailing Address* | *City* | *State* | *Country* | *Zip Code* |

**NAME AND ADDRESS OF GOVERNING PERSON** (Enter the name of either an individual or an organization, but not both.)

IF INDIVIDUAL

| | | | |
|---|---|---|---|
| *First Name* | *M.I.* | *Last Name* | *Suffix* |

OR

IF ORGANIZATION

*Organization Name*

| | | | | |
|---|---|---|---|---|
| *Street or Mailing Address* | *City* | *State* | *Country* | *Zip Code* |

**NAME AND ADDRESS OF GOVERNING PERSON** (Enter the name of either an individual or an organization, but not both.)

IF INDIVIDUAL

| | | | |
|---|---|---|---|
| *First Name* | *M.I.* | *Last Name* | *Suffix* |

OR

IF ORGANIZATION

*Organization Name*

| | | | | |
|---|---|---|---|---|
| *Street or Mailing Address* | *City* | *State* | *Country* | *Zip Code* |

000831

## Supplemental Provisions/Information

Text Area: [The attached addendum, if any, is incorporated herein by reference.]

## Effectiveness of Filing (Select either A, B, or C.)

A. ☑ This document becomes effective when the document is filed by the secretary of state.

B. ☐ This document becomes effective at a later date, which is not more than ninety (90) days from the date of signing. The delayed effective date is: _____

C. ☐ This document takes effect upon the occurrence of a future event or fact, other than the passage of time. The 90th day after the date of signing is: _____

The following event or fact will cause the document to take effect in the manner described below:

## Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

Date: 4/4/2018 _____

_Azeemeh Zaheer_
_____
Signature of authorized person (see instructions)

Azeemeh Zaheer
_____
Printed or typed name of authorized person.

8

000832

Form 401-A
(Revised 12/09)



### Acceptance of Appointment
### and
### Consent to Serve as Registered Agent
### §5.201(b) Business Organizations Code

The following form may be used when the person designated as registered agent in a registered agent filing is an individual.

---

#### Acceptance of Appointment and Consent to Serve as Registered Agent

I acknowledge, accept and consent to my designation or appointment as registered agent in Texas for

*Name of represented entity*

I am a resident of the state and understand that it will be my responsibility to receive any process, notice, or demand that is served on me as the registered agent of the represented entity; to forward such to the represented entity; and to immediately notify the represented entity and submit a statement of resignation to the Secretary of State if I resign.

x:

| *Signature of registered agent* | *Printed name of registered agent* | *Date (mm/dd/yyyy)* |

---

The following form may be used when the person designated as registered agent in a registered agent filing is an organization.

---

#### Acceptance of Appointment and Consent to Serve as Registered Agent

I am authorized to act on behalf of  __Capitol Corporate Services, Inc.__
*Name of organization designated as registered agent*

The organization is registered or otherwise authorized to do business in Texas. The organization acknowledges, accepts and consents to its appointment or designation as registered agent in Texas for:

Galleria 2425 JV, LLC

*Name of represented entity*

The organization takes responsibility to receive any process, notice, or demand that is served on the organization as the registered agent of the represented entity; to forward such to the represented entity; and to immediately notify the represented entity and submit a statement of resignation to the Secretary of State if the organization resigns.

x:

Krista Abair, Assistant Secretary on behalf of Capitol Corporate Services, Inc.   04/05/2018

| *Signature of person authorized to act on behalf of organization* | *Printed name of authorized person* | *Date (mm/dd/yyyy)* |

---

Form 401-A

3

000833

## GALLERIA 2425 JV, LLC

### UNANIMOUS WRITTEN CONSENT OF THE MEMBERS
### IN LIEU OF MEETING

Jun 18 , 20 21

THE UNDERSIGNED, being all of members (each, a "Member" and collectively, the "**Members**") of Galleria 2425 JV, LLC, a Delaware limited liability company ("**Company**"), do hereby waive any and all requirements for calling, giving notice of and holding a meeting and, in lieu of such meeting, consents to the adoption of the following resolutions:

RESOLVED, that Galleria West Loop Investment II LLC, a Texas limited liability company is hereby appointed as the Managing Member the Company pursuant to the terms of that certain Amended and Restated Limited Liability Company Agreement of Galleria 2425 JV, LLC.

*[Signature page follows]*

EXECUTED to be effective as of the date first written above.

**MEMBERS:**

NAISSANCE CAPITAL REAL ESTATE, LLC,
a Delaware limited liability company

By: _____
Name:    Azeemeh Zaheer
Title:    Managing Member


GALLERIA WEST LOOP INVESTMENTS II LLC,
a Delaware limited liability company

By:    Galleria West Loop Investments, LLC,
        a Texas limited liability company,
        its manager


By: _____
Name: _____
Title: _____

EXECUTED to be effective as of the date first written above.

<div style="margin-left: 40%;">

**MEMBERS:**

NAISSANCE CAPITAL REAL ESTATE, LLC,
a Delaware limited liability company

By: _____
Name:   Azeemeh Zaheer
Title:   Managing Member

GALLERIA WEST LOOP INVESTMENTS II LLC,
a Delaware limited liability company

By:   Galleria West Loop Investments, LLC,
      a Texas limited liability company,
      its manager

By: _____
Name: _____
Title: _____

</div>

**EXHIBIT F**

000837

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re: | ) Chapter 11 |
| GALLERIA 2425 OWNER, LLC, | ) |
| Debtor. | ) Case No. 23-34815 |
| | ) |

**NOTICE OF DEPOSITION OF AND SUBPOENA DUCES TECUM TO 2425 WL LLC**

PLEASE TAKE NOTICE that Christopher R. Murray, the chapter 11 trustee in the above-captioned case (the "Trustee") intends to take the deposition (the "Deposition") upon oral examination of 2425 WL LLC (the "Deponent") pursuant to Fed. R. Civ. P. 30(b)(6) in connection with the confirmation of the Chapter 11 Plan of Liquidation of the Debtor by National Bank of Kuwait S.A.K.P., New York Branch [Dkt No. 194] and any other contested matter pending in the above-captioned case on **June 11, 2024, at 10:00 a.m.**, or other such time and location agreed upon by the parties, and shall continue day to day, excluding weekends and holidays unless otherwise agreed to by the parties, until completed. The Deposition will be conducted at the offices of Jones & Murray LLP, 602 Sawyer Street, Suite 400, Houston, Texas 77007. The Deponent is requested to designate the person or persons most knowledgeable and prepared to testify on behalf of the Deponent concerning the subject matter described in Attachment A hereto.

PLEASE TAKE FURTHER NOTICE that the Deposition will be recorded by stenographic means. The stenographic recording will be taken before Veritext, 4295 San Felipe Street, Suite 125, Houston, TX 77027, or another court reporting service through a person authorized to administer oaths pursuant to Rule 28(a) of the Federal Rules of Civil Procedure.

PLEASE TAKE FURTHER NOTICE that, in connection with the Deposition, the Trustee will serve a subpoena duces tecum designating the documents indicated in Attachment B hereto for production prior to the Deposition.

PLEASE TAKE FURTHER NOTICE that the witness should have a government-issued identification to provide to the court reporter/notary to confirm his identity at the commencement of the deposition and before being sworn.

1

Dated: May 21, 2024

Respectfully submitted,

SHANNON & LEE LLP

*/s/R. J. Shannon*
Kyung S. Lee (TBA No. 12128400)
R. J. Shannon (TBA No. 24108062)
2100 Travis Street, STE 1525
Houston, TX 77002
Telephone: (713) 714-5770
Email: klee@shannonleellp.com
      rshannon@shannonleellp.com

*Counsel to the Chapter 11 Trustee*

## CERTIFICATE OF SERVICE

The undersigned certifies that on May 21, 2024, a true and correct copy of the foregoing document was served via (a) U.S.P.S. first class mail on the parties indicated in the attached service list and (b) U.S.P.S. first class mail and email on the following parties:

Stephen W Sather
BARRON & NEWBURGER, P.C.
7320 N. MoPac Expwy., Suite 400
Austin, TX 78731
ssather@bn-lawyers.com

Andrew M. Troop
PILLSBURY WINTHROP SHALL PITTMAN LLP
31 West 52nd Street
New York, NY 10019-6131
andrew.troop@pillsburylaw.com

Reese W. Baker
BAKER & ASSOCIATES
950 Echo Lane, Suite 300
Houston, Texas 77024
reese.baker@bakerassociates.net

Ali Choudhri
2425 West Loop South 11th Floor
Houston, TX 77027
ali@jetallcapital.com

*R. J. Shannon*
R. J. Shannon

2

Label Matrix for local noticing
0541-4
Case 23-34815
Southern District of Texas
Houston
Tue May 21 12:20:59 CDT 2024

2425 WL, LLC
2425 West Loop South 11th floor
Houston, TX 77027-4304

CC2 TX, LLC
c/o Howard Marc Spector
Spector & Cox, PLLC
12770 Coit Road Suite 850
Dallas, TX 75251-1364

City of Houston
Linebarger Goggan Blair & Sampson LLP
c/o Tara L. Grundemeier
PO Box 3064
Houston, TX 77253-3064

Galleria 2425 Owner, LLC
1001 West Loop South 700
Houston, TX 77027-9084

(p)HARRIS COUNTY ATTORNEY'S OFFICE
P O BOX 2928
HOUSTON TX 77252-2928

Hayward PLLC
c/o Melissa Hayward
10501 N. Central Expy., Ste. 106
Dallas, TX 75231-2203

Houston Community College System
Linebarger Goggan Blair & Sampson LLP
c/o Tara L. Grundemeier
PO Box 3064
Houston, TX 77253-3064

Houston ISD
Linebarger Goggan Blair & Sampson LLP
c/o Tara L. Grundemeier
PO Box 3064
Houston, TX 77253-3064

National Bank of Kuwait, S.A.K.P., New York

4
United States Bankruptcy Court
PO Box 61010
Houston, TX 77208-1010

2425 WL, LLC
13498 Pond Springs Rd.
Austin, TX 78729-4422

2425 West Loop, LLC
2000 Hughes Landing Blvd., Suite 815
The Woodlands, Texas 77380-4142

ADT
PO Box 382109
Pittsburgh, PA 15251-8109

Ali Choudhry
1001 West Loop South 700
Houston, TX 77027-9084

Arin-Air, Inc.
5710 Brittmoore Rd. #13
Houston, TX 77041-5627

Ash Automated Control Systems, LLC
PO Box 1113
Fulshear, TX 77441-2013

CC2 TX, LLC
14800 Landmark Blvd., Suite 400
Dallas, TX 75254-7598

CFI Mechanical, Inc
6109 Brittmoore Rd
Houston, TX 77041-5610

CNA Insurance Co
PO Box 74007619
Chicago, IL 60674-7619

Caz Creek Lending
118 Vintage Park Blvd No. W
Houston, TX 77070-4095

Cirro Electric
PO Box 60004
Dallas, TX 75266

City of Houston
PO Box 1560
Houston, TX 77251-1560

City of Houston
c/o Tara L. Grundemeier
Linebarger Goggan Blair & Sampson LLP
PO Box 3064
Houston, TX 77253-3064

Comcast
PO Box 60533
City of Industry, CA 91716-0533

Datawatch Systems
4520 East West Highway 200
Bethesda, MD 20814-3382

Environmental Coalition Inc
PO Box 1568
Stafford, TX 77497-1568

Ferguson Facilities Supplies
PO Box 200184
San Antonio, TX 78220-0184

Firetron
PO Box 1604
Stafford, TX 77497-1604

(p)FIRST INSURANCE FUNDING
450 SKOKIE BLVD SUITE 1000
NORTHBROOK IL 60062-7917

Gulfstream Legal Group
1300 Texas St
Houston, TX 77002-3509

H.N.B. Construction, LLC
c/o Malcolm D. Dishongh
PO Box 2347
Humble, TX 77347-2347

HNB Construction, LLC
521 Woodhaven
Ingleside, TX 78362-4678

Hayward PLLC
c/o Melissa S. Hayward
10501 N. Central Expy., Ste. 106
Dallas, TX 75231-2203

Houston Community College System
c/o Tara L. Grundemeier
Linebarger Goggan Blair & Sampson LLP
PO Box 3064
Houston, TX 77253-3064

Houston ISD
c/o Tara L. Grundemeier
Linebarger Goggan Blair & Sampson LLP
PO Box 3064
Houston, TX 77253-3064

Jetall Companies, Inc
1001 West Loop South Ste 700
Houston, TX 77027-9033

Kings 111 Emergency Communications
751 Canyon Drive, Suite 100
Coppell, TX 75019-3857

Lexitas
PO Box Box 734298 Dept 2012
Dallas, TX 75373-4298

Lloyd E. Kelley
2726 Bissonnet Suite 240
Houston, TX 77005-1352

Logix Fiber Networks
PO Box 734120
Dallas, TX 75373-4120

MacGeorge Law Firm
2921 E 17th St Blgd D Suite 6
Austin, TX 78702-1572

Mueller Water Treatment
1500 Sherwood Forest Dr.
Houston, TX 77043-3899

Naissance Galleria, LLC
c/o Law Office of Nima Taherian
701 N. Post Oak Rd. Ste 216
Houston, TX 77024-3868

National Bank of Kuwait
299 Park Ave. 17th Floor
New York, NY 10171-0023

Nationwide Security
2425 W Loop S 300
Houston, TX 77027-4205

Nichamoff Law Firm
2444 Times Blvd 270
Houston, TX 77005-3253

Rodney L. Drinnon
2000 West Loop S, Ste. 1850,
Houston, Texas 77027-3744

TKE
3100 Interstate North Cir SE  500
Atlanta, GA 30339-2296

U.S. Trustee's Office
515 Rusk, Suite 3516
Houston, Texas 77002-2604

US Retailers LLC d/b/a Cirro Energy
Attention: Bankruptcy Department
PO Box 3606
Houston, TX 77253-3606

US Trustee
Office of the US Trustee
515 Rusk Ave
Ste 3516
Houston, TX 77002-2604

Waste Management
PO Box 660345
Dallas, TX 75266-0345

Zindler Cleaning Service Co
2450 Fondren 113
Houston, TX 77063-2314

Ali Choudhri
24256 West Loop South
11th Floor
Houston, TX 77027

Christopher R Murray
Jones Murray LLP
602 Sawyer St
Ste 400
Houston, TX 77007-7510

James Q. Pope
The Pope Law Firm
6161 Savoy Drive
Ste 1125
Houston, TX 77036-3343

Reese W Baker
Baker & Associates
950 Echo Lane
Suite 300
Houston, TX 77024-2824

Rodney Drinnon
McCathern Houston
2000 W Loop S
Ste. 1850
Houston, TX 77027-3744

The preferred mailing address (p) above has been substituted for the following entity/entities as so specified by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).

Harris County, ATTN: Property Tax Division
Harris County Attorney's Office
P.O. Box 2928
Houston, TX 77252-2928 United States

First Insurance Funding
450 Skokie Blvd
Northbrook, IL 60062

(d)Harris County Tax Assessor
PO Box 4622
Houston, TX 77210

(d)Harris County, et al
PO Box 2928
Houston, TX 77252

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u)2425 West Loop, LLC

(u)Sonder USA Inc.

(d)Arin-Air, LLC
5710 Brittmoore Rd. #13
Houston, TX 77041-5627

(du)Sonder USA Inc.

(u)Jack Rose

End of Label Matrix
Mailable recipients    58
Bypassed recipients     5
Total                  63

**ATTACHMENT A**

**DEPOSITION TOPICS**

Pursuant to Fed. R. Civ. P. 30(b)(6), Christopher R. Murray (the "Trustee"), the chapter 11

Trustee in the above-captioned case, will conduct a deposition of 2425 WL LLC on the following

topics (the "Topics") indicated below.

**Definitions**

The following definitions of terms apply to the Topics. Unless otherwise defined herein,

all words and phrases used herein shall be accorded their usual meanings and shall be interpreted

in their common, ordinary sense.

1.      "2425 WL", "You," "Your", or "Yours" means 2425 WL, LLC, along with its

agents, employees, attorneys, representatives, affiliates, consultations, and all other persons acting

or purporting to act on its behalf.

2.      "2425 WL DOT" means the 'Deed of Trust' between the Debtor and 2425 WL filed

in the real property records of Harris County on May 11, 2021.

3.      "2425 WL Note" means the notice indicated in the 2425 WL DOT.

4.      "Affiliate" has the meaning set forth in 11 U.S.C. § 101(2).

5.      The terms "Communication" or "Communications" means the statement or

transmission of facts, information, advice, counsel, and/or inquiry from one person to another,

whether orally, in writing, by acts or actions, by signs, by appearances, electronically,

telephonically, or otherwise.

6.      "Choudhri" means the individual commonly referred to as Ali Choudhri who

asserts to be in control of the Debtor and has appeared in his individual capacity in the Current

1

Chapter 11 Case and his agents, employees, attorneys, representatives, consultants, and all other persons acting or purporting to act on his behalf.

7.      "Current Chapter 11 Case" means Case No. 23-24815 before the United States Bankruptcy Court for the Southern District of Texas.

8.      "Confidential Settlement Agreement" the Document titled 'Confidential Settlement Agreement' dated August 22, 2022, and signed by (a) Marwan Isbaih on behalf of NBK, (b) Choudhri on behalf of the Debtor, (c) Choudhri on behalf of Naissance Galleria, LLC., and (d) Choudhri in his individual capacity.

9.      "Debtor" means Galleria 2425 Owner, LLC, along with its agents, employees, attorneys, representatives, affiliates, consultants, and all other persons acting or purporting to act on its behalf.

10.      "Document" shall be given the broadest possible interpretation consistent with the applicable rules of procedure, including but not limited to, the original or a copy of any graphic material of any kind or nature whatsoever, including electronically stored information, however produced or reproduced, any writing, drawing, graph, chart, photograph, telephone record, tape recording, video tape, or other data compilation in which information can be reproduced or obtained, including computer tapes, disks, storage devices, or print-outs, which are in your possession, custody, control, or known by you to exist, including, without limiting the generality of the foregoing, all drafts, contracts, diaries, calendars, desk pads, correspondence, communications, emails, memoranda, notes, studies, reports, lists, minutes, and entries in books of any account relating or referring in any way to the subject matter of these requests. The term "Document" shall also mean all copies of a documents by whatever means made, except where a

2

document is identified or produced, identical copies which do not contain any markings, additions, or deletions, different from the original document, need not be separately identified or produced.

11.    "Jetall" means Jetall Companies, Inc. along with its agents, employees, attorneys, representatives, affiliates, consultants, and all other persons acting or purporting to act on its behalf.

12.    "Jetall Lease" means the 'Lease Agreement' dated May 13, 2015, between 2425 West Loop, LP and Jetall and subsequent amendments thereto.

13.    "Jetall Lease 2016 Amendment" means the 'First Amendment to Lease Agreement' dated April 6, 2018, between 2425 WL and Jetall.

14.    "Naissance Galleria" means Naissance Galleria, LLC along with its agents, employees, attorneys, representatives, affiliates, consultants, and all other persons acting or purporting to act on its behalf.

15.    "NBK" means the National Bank of Kuwait, S.A.K.P., New York Branch, along with its agents, employees, attorneys, representatives, affiliates, consultants, and all other persons acting or purporting to act on its behalf.

16.    "NBK Loan" means the Loan Agreement dated May 23, 2018, among the Debtor and NBK and any Documents effectuating the transaction pursuant thereto, including (a) the 'Promissory Note' dated May 23. 2018, issued by the Debtor to NBK; (b) the 'Deed of Trust, Assignment of Rents and Profits, Security Agreement, and Fixture Filing' dated May 23, 2018, among the Debtor and NBK; and (c) the 'Absolute Assignment of Leases and Rents' dated May 23, 2018, between the Debtor and NBK.

17.    "Person" has the meaning set forth in 11 U.S.C. § 101(41).

3

18.     "Real Property" means the real property located at 2425 West Loop South, Houston, TX, 77027, including the building and all other improvements thereon.

19.     "Settlement Statement" means the document titled Settlement Statement reflecting the transaction in which the Debtor acquired the Real Property.

20.     "Trustee" means Christopher R. Murray

21.     The terms "and" and "or" shall be interpreted in every instance as meaning "and/or" and shall not, in either instance, be interpreted disjunctively to exclude any document or information otherwise within the scope of any description or request herein.

### Topics

1.     Your current and historic ownership, organizational, and management structure.

2.     The facts and circumstances surrounding Your acquisition of the Real Property.

3.     The facts and circumstances surrounding Your sale of the Real Property to the Debtor, including any financing related thereto.

4.     Any distribution of funds in connection with Your sale of the Real Property to the Debtor.

5.     The Settlement Statement in connection with Your sale of the Real Property to the Debtor.

6.     The facts and circumstances surrounding the 2425 WL DOT, including its (a) creation, (b) execution, and (c) filing.

7.     The facts and circumstances surrounding the 2425 WL Note, including its (a) creation, (b) execution, and (c) any consideration provided.

8.     Any payments You received under the 2425 WL Note.

4

9.      The facts and circumstances surrounding the execution of the Jetall Lease 2016 Amendment, including any disclosure thereof.

10.      Any Document produced by or requested from You in advance of the Deposition.

5

**<u>EXHIBIT B</u>**

**DOCUMENT PRODUCTION**

Christopher R. Murray (the "<u>Trustee</u>") requests the production of documents (the "<u>Document Requests</u>") as set forth herein.

**<u>Definitions</u>**

The following definitions of terms apply to these Document Requests. Unless otherwise defined herein, all words and phrases used herein shall be accorded their usual meanings and shall be interpreted in their common, ordinary sense.

1.      "2425 WL", "You," "Your", or "Yours" means 2425 WL LLC, along with its agents, employees, attorneys, representatives, affiliates, consultations, and all other persons acting or purporting to act on its behalf.

2.      "2425 WL DOT" means the 'Deed of Trust' between the Debtor and 2425 WL filed in the real property records of Harris County on May 11, 2021.

3.      "2425 WL Note" means the notice indicated in the 2425 WL DOT.

4.      "Affiliate" has the meaning set forth in 11 U.S.C. § 101(2).

5.      The terms "Communication" or "Communications" means the statement or transmission of facts, information, advice, counsel, and/or inquiry from one person to another, whether orally, in writing, by acts or actions, by signs, by appearances, electronically, telephonically, or otherwise.

6.      "Choudhri" means the individual commonly referred to as Ali Choudhri who asserts to be in control of the Debtor and has appeared in his individual capacity in the Current Chapter 11 Case and his agents, employees, attorneys, representatives, consultants, and all other persons acting or purporting to act on his behalf.

1

000848

7.     "Current Chapter 11 Case" means Case No. 23-24815 before the United States Bankruptcy Court for the Southern District of Texas.

8.     "Confidential Settlement Agreement" the Document titled 'Confidential Settlement Agreement' dated August 22, 2022, and signed by (a) Marwan Isbaih on behalf of NBK, (b) Choudhri on behalf of the Debtor, (c) Choudhri on behalf of Naissance Galleria, LLC., and (d) Choudhri in his individual capacity.

9.     "Debtor" means Galleria 2425 Owner, LLC, along with its agents, employees, attorneys, representatives, affiliates, consultants, and all other persons acting or purporting to act on its behalf.

10.     "Document" shall be given the broadest possible interpretation consistent with the applicable rules of procedure, including but not limited to, the original or a copy of any graphic material of any kind or nature whatsoever, including electronically stored information, however produced or reproduced, any writing, drawing, graph, chart, photograph, telephone record, tape recording, video tape, or other data compilation in which information can be reproduced or obtained, including computer tapes, disks, storage devices, or print-outs, which are in your possession, custody, control, or known by you to exist, including, without limiting the generality of the foregoing, all drafts, contracts, diaries, calendars, desk pads, correspondence, communications, emails, memoranda, notes, studies, reports, lists, minutes, and entries in books of any account relating or referring in any way to the subject matter of these requests. The term "Document" shall also mean all copies of a document by whatever means made, except where a document is identified or produced, identical copies which do not contain any markings, additions, or deletions, different from the original document, need not be separately identified or produced.

2

000849

11.     "Jetall" means Jetall Companies, Inc. along with its agents, employees, attorneys, representatives, affiliates, consultants, and all other persons acting or purporting to act on its behalf.

12.     "Jetall Lease" means the 'Lease Agreement' dated May 13, 2015, between 2425 West Loop, LP and Jetall and subsequent amendments thereto.

13.     "Jetall Lease 2016 Amendment" means the 'First Amendment to Lease Agreement' dated April 6, 2018, between 2425 WL and Jetall.

14.     "Naissance Galleria" means Naissance Galleria, LLC along with its agents, employees, attorneys, representatives, affiliates, consultants, and all other persons acting or purporting to act on its behalf.

15.     "NBK" means the National Bank of Kuwait, S.A.K.P., New York Branch, along with its agents, employees, attorneys, representatives, affiliates, consultants, and all other persons acting or purporting to act on its behalf

16.     "NBK Loan" means the Loan Agreement dated May 23, 2018, among the Debtor and NBK and any Documents effectuating the transaction pursuant thereto, including (a) the 'Promissory Note' dated May 23. 2018, issued by the Debtor to NBK; (b) the 'Deed of Trust, Assignment of Rents and Profits, Security Agreement, and Fixture Filing' dated May 23, 2018, among the Debtor and NBK; and (c) the 'Absolute Assignment of Leases and Rents' dated May 23, 2018, between the Debtor and NBK.

17.     "Person" has the meaning set forth in 11 U.S.C. § 101(41).

18.     "Real Property" means the real property located at 2425 West Loop South, Houston, TX, 77027, including the building and all other improvements thereon.

3

19.     "Settlement Statement" means the document titled Settlement Statement reflecting the transaction in which the Debtor acquired the Real Property.

20.     "Trustee" means Christopher R. Murray

21.     The terms "and" and "or" shall be interpreted in every instance as meaning "and/or" and shall not, in either instance, be interpreted disjunctively to exclude any document or information otherwise within the scope of any description or request herein.

### Instructions

1.     The preceding Definitions apply to these Instructions and each of the succeeding Document Requests.

2.     Documents covered by the Document Requests include all responsive Documents in Your possession, custody, or control.

3.     Each Document Request shall be deemed to be continuing in nature. If at any time additional Documents responsive to the Document Requests come into Your possession, custody, or control or are brought to Your attention, prompt supplementation of Your response to these Document Requests is required.

4.     If, in responding to the Document Requests, You believe there are ambiguities in a request or definition, the response shall set forth the matter deemed ambiguous and the construction used in responding.

5.     You shall produce all Documents in the manner in which they are maintained in the ordinary course of you business, and/or You shall organize and label the Documents to correspond with the categories in this request. A request for a Document shall be deemed to include a request for any and all file folders within which the Document was contained, transmittal sheets, cover letters, exhibits, enclosures, or attachments to the Document in addition to the Document itself.

4

000851

6.      Documents attached to each other should not be separated.

7.      Except as provided in the following paragraph, the responsive material and documents should be produced in Native Format and converted into searchable Tagged Image File Format (FIFF), unless otherwise specified. All metadata associated with the responsive material and documents shall be maintained. For material documents that cannot be converted into TIFF, notify the requesting party of the intended form of production that is either reasonably usable or as it is ordinarily kept. All data responsive to the requests shall be provided in user-readable format (.txt or similar file types), or as otherwise agreed in supplemental writing by the parties. For any electronically stored information produced:

   a.   *Searchable Database Files*: Provide document images and database load files that are in a standard format with the following minimum characteristics:

      i.   *Images*: Images will be delivered in multi-page TIFF images, scanned at 300 dpi or more. Each imaged page will be branded with a unique sequential number consisting of an alpha prefix and numeric digits ("Bates Number");

      ii.  *Document Breaks*: Physical document boundaries will be capted during scanning and the load file will reflect those document boundaries. A document break will indicate where folders, redwells, binders, clips, ruber bands, staples, etc. originally appeared; and

   b.   *OCR Data*: Document OCR will be performed. OCR will be provided on a document level.

   c.   *Document Index*: For each document production, you shall provide an index containing the following values for each document:

      i.   Beginning Bates Number;

5

000852

ii. Ending Bates Number; and

iii. The Document's custodian.

8.      To the extent that You believe production according to the preceding paragraph is unduly burdensome, You shall (a) produce responsive material in a manner that provides substantially the same information as above and (b) advise the Trustee and his counsel of the manner of production and the particular requirements of the preceding paragraph You believe were unduly burdensome and with which You are not complying.

9.      If any document within the scope of this request has been destroyed, that Document shall be identified including identification of (i) its author(s); (ii) intended or unintended recipient(s); (iii) addressee(s); (iv) intended or unintended recipients of bling copies; (v) date; and (vi) subject matter. The circumstances of such destruction shall be set forth, and any Documents relating to such destruction shall be produced.

10.     In producing Documents and other materials, You are requested to furnish all Documents or things in Your possession, custody, or control, regardless of whether such Documents or materials are possessed by You directly.

11.     If You object to any part of any request, You shall state fully the nature of the objection. Notwithstanding any objections, You shall nonetheless comply fully with the other parts of the request not objected to.

12.     The Trustee reserves the right to request additional documents as needed and to submit additional or supplemental document requests, provided, further, that the Trustee expressly reserves his rights to supplement or amend the Document Requests.

6

**Document Requests**

1. All documents reflecting, describing, or evidencing Your corporate structure and management, including but not limited to any (a) company agreement, (b) the membership interests in 2425 WL (c) management of 2425 WL, and (d) basis for Choudhri to act on behalf of 2425 WL.

2. The 2425 WL Note.

3. Communications or Documents referencing, describing, or evidencing the preparation and drafting of the 2425 WL Note.

4. Communications and other Documents referencing, describing, or evidencing any consideration 2425 WL provided to the Debtor in exchange for the Note.

5. Communications and other Documents referencing, describing, or evidencing any indebtedness of the Debtor to You prior to May 11, 2021.

6. Communications or Documents referencing, describing, or evidencing any indebtedness of the Debtor to You on or after May 11, 2021.

7. Communications or Documents referencing, describing, or related to the 2425 WL DOT, including its execution.

8. Communications or Documents exchanged with Azeemah Zaheer, Naissance Capital Real Estate, LLC, or Galleria 2425 JV, LLC regarding the 2425 WL Note.

9. Communications or Documents referencing, describing, or evidencing the distribution of funds from Your sale of the Real Property to the Debtor.

10. The final version and any drafts of the Settlement Statement.

11. Communications or Documents referencing, describing, or evidencing the preparation of the Settlement Statement.

7

12.     Communications or Documents referencing, describing, or evidencing the "Seller Credit" indicated on the Settlement Statement.

13.     All Communications or Documents exchanged with NBK in connection with the sale of the Real Property on or before May 23, 2018.

14.     All Communications or Documents exchanged with the Debtor in connection with the Sale of the Real Property on or before May 23, 2018.

15.     All communications or Documents exchanged with Jetall, the Debtor, or NBK regarding the Jetall Lease 2016 Amendment.

16.     All Communications or Documents exchanged with TransAct Title – Galleria or any other title company in connection with the Sale of the Real Property at any time.

000855

**EXHIBIT I**

000856

B2570 (Form 2570 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (12/15)

# UNITED STATES BANKRUPTCY COURT

Southern  District of  Texas

In re  Galleria 2425 Owner, LLC

_____
Debtor

*(Complete if issued in an adversary proceeding)*

Case No.  23-34815

Chapter  11

_____
Plaintiff

v.

_____
Defendant

Adv. Proc. No.  _____

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To:  2425 WL LLC

*(Name of person to whom the subpoena is directed)*

☒ *Production*: **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:  **See Attachment**

| PLACE  Shannon & Lee LLP, 2100 Travis Street, Houston, TX 77002, rshannon@shannonleellp.com, klee@shannonleellp.com | DATE AND TIME  On or before June 7, 2024, at 5:00 p.m. (CT) |
|---|---|

☐ *Inspection of Premises*: **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| PLACE | DATE AND TIME |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  _____

CLERK OF COURT

OR

_____        _____
*Signature of Clerk or Deputy Clerk*                    *Attorney's signature*

The name, address, email address, and telephone number of the attorney representing *(name of party)*
 Christopher R. Murray _____ , who issues or requests this subpoena, are:  R. J. Shannon, Shannon & Lee LLP
 2100 Travis Street STE 1525, Houston, TX 77002, rshannon@shannonleellp.com; 713-715-5770

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed.  Fed. R. Civ. P. 45(a)(4).

B2570 (Form 2570 – Subpoena to Produce Documents, Information, or Objects or To Permit Inspection in a Bankruptcy Case or Adversary Proceeding) (Page 2)

## PROOF OF SERVICE
**(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)**

I received this subpoena for *(name of individual and title, if any)*: _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of  $ _____ .

My fees are $ _____ for travel and $_____ for services, for a total of $_____ .

I declare under penalty of perjury that this information is true and correct.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information concerning attempted service, etc.:

000858

# Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
## (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
　(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
　(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
　　(i) is a party or a party's officer; or
　　(ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:
　(A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
　(B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

　*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

　*(2) Command to Produce Materials or Permit Inspection.*
　(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
　(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
　　(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
　　(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

　*(3) Quashing or Modifying a Subpoena.*
　(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
　　(i) fails to allow a reasonable time to comply;
　　(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
　　(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
　　(iv) subjects a person to undue burden.
　(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
　　(i) disclosing a trade secret or other confidential research, development, or commercial information; or

　　(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
　(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
　　(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
　　(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

　*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
　(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
　(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
　(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
　(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

　*(2) Claiming Privilege or Protection.*
　(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
　　(i) expressly make the claim; and
　　(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
　(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.
…
**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

**EXHIBIT**

**DOCUMENT PRODUCTION**

Christopher R. Murray (the "Trustee") requests the production of documents (the "Document Requests") as set forth herein.

**Definitions**

The following definitions of terms apply to these Document Requests. Unless otherwise defined herein, all words and phrases used herein shall be accorded their usual meanings and shall be interpreted in their common, ordinary sense.

1.      "2425 WL", "You," "Your", or "Yours" means 2425 WL LLC, along with its agents, employees, attorneys, representatives, affiliates, consultations, and all other persons acting or purporting to act on its behalf.

2.      "2425 WL DOT" means the 'Deed of Trust' between the Debtor and 2425 WL filed in the real property records of Harris County on May 11, 2021.

3.      "2425 WL Note" means the notice indicated in the 2425 WL DOT.

4.      "Affiliate" has the meaning set forth in 11 U.S.C. § 101(2).

5.      The terms "Communication" or "Communications" means the statement or transmission of facts, information, advice, counsel, and/or inquiry from one person to another, whether orally, in writing, by acts or actions, by signs, by appearances, electronically, telephonically, or otherwise.

6.      "Choudhri" means the individual commonly referred to as Ali Choudhri who asserts to be in control of the Debtor and has appeared in his individual capacity in the Current Chapter 11 Case and his agents, employees, attorneys, representatives, consultants, and all other persons acting or purporting to act on his behalf.

1

7.     "Current Chapter 11 Case" means Case No. 23-24815 before the United States Bankruptcy Court for the Southern District of Texas.

8.     "Confidential Settlement Agreement" the Document titled 'Confidential Settlement Agreement' dated August 22, 2022, and signed by (a) Marwan Isbaih on behalf of NBK, (b) Choudhri on behalf of the Debtor, (c) Choudhri on behalf of Naissance Galleria, LLC., and (d) Choudhri in his individual capacity.

9.     "Debtor" means Galleria 2425 Owner, LLC, along with its agents, employees, attorneys, representatives, affiliates, consultants, and all other persons acting or purporting to act on its behalf.

10.    "Document" shall be given the broadest possible interpretation consistent with the applicable rules of procedure, including but not limited to, the original or a copy of any graphic material of any kind or nature whatsoever, including electronically stored information, however produced or reproduced, any writing, drawing, graph, chart, photograph, telephone record, tape recording, video tape, or other data compilation in which information can be reproduced or obtained, including computer tapes, disks, storage devices, or print-outs, which are in your possession, custody, control, or known by you to exist, including, without limiting the generality of the foregoing, all drafts, contracts, diaries, calendars, desk pads, correspondence, communications, emails, memoranda, notes, studies, reports, lists, minutes, and entries in books of any account relating or referring in any way to the subject matter of these requests. The term "Document" shall also mean all copies of a document by whatever means made, except where a document is identified or produced, identical copies which do not contain any markings, additions, or deletions, different from the original document, need not be separately identified or produced.

2

11.     "Jetall" means Jetall Companies, Inc. along with its agents, employees, attorneys, representatives, affiliates, consultants, and all other persons acting or purporting to act on its behalf.

12.     "Jetall Lease" means the 'Lease Agreement' dated May 13, 2015, between 2425 West Loop, LP and Jetall and subsequent amendments thereto.

13.     "Jetall Lease 2016 Amendment" means the 'First Amendment to Lease Agreement' dated April 6, 2018, between 2425 WL and Jetall.

14.     "Naissance Galleria" means Naissance Galleria, LLC along with its agents, employees, attorneys, representatives, affiliates, consultants, and all other persons acting or purporting to act on its behalf.

15.     "NBK" means the National Bank of Kuwait, S.A.K.P., New York Branch, along with its agents, employees, attorneys, representatives, affiliates, consultants, and all other persons acting or purporting to act on its behalf

16.     "NBK Loan" means the Loan Agreement dated May 23, 2018, among the Debtor and NBK and any Documents effectuating the transaction pursuant thereto, including (a) the 'Promissory Note' dated May 23. 2018, issued by the Debtor to NBK; (b) the 'Deed of Trust, Assignment of Rents and Profits, Security Agreement, and Fixture Filing' dated May 23, 2018, among the Debtor and NBK; and (c) the 'Absolute Assignment of Leases and Rents' dated May 23, 2018, between the Debtor and NBK.

17.     "Person" has the meaning set forth in 11 U.S.C. § 101(41).

18.     "Real Property" means the real property located at 2425 West Loop South, Houston, TX, 77027, including the building and all other improvements thereon.

3

19.     "Settlement Statement" means the document titled Settlement Statement reflecting the transaction in which the Debtor acquired the Real Property.

20.     "Trustee" means Christopher R. Murray

21.     The terms "and" and "or" shall be interpreted in every instance as meaning "and/or" and shall not, in either instance, be interpreted disjunctively to exclude any document or information otherwise within the scope of any description or request herein.

### Instructions

1.     The preceding Definitions apply to these Instructions and each of the succeeding Document Requests.

2.     Documents covered by the Document Requests include all responsive Documents in Your possession, custody, or control.

3.     Each Document Request shall be deemed to be continuing in nature. If at any time additional Documents responsive to the Document Requests come into Your possession, custody, or control or are brought to Your attention, prompt supplementation of Your response to these Document Requests is required.

4.     If, in responding to the Document Requests, You believe there are ambiguities in a request or definition, the response shall set forth the matter deemed ambiguous and the construction used in responding.

5.     You shall produce all Documents in the manner in which they are maintained in the ordinary course of you business, and/or You shall organize and label the Documents to correspond with the categories in this request. A request for a Document shall be deemed to include a request for any and all file folders within which the Document was contained, transmittal sheets, cover letters, exhibits, enclosures, or attachments to the Document in addition to the Document itself.

4

6.      Documents attached to each other should not be separated.

7.      Except as provided in the following paragraph, the responsive material and documents should be produced in Native Format and converted into searchable Tagged Image File Format (FIFF), unless otherwise specified. All metadata associated with the responsive material and documents shall be maintained. For material documents that cannot be converted into TIFF, notify the requesting party of the intended form of production that is either reasonably usable or as it is ordinarily kept. All data responsive to the requests shall be provided in user-readable format (.txt or similar file types), or as otherwise agreed in supplemental writing by the parties. For any electronically stored information produced:

a.   *Searchable Database Files*: Provide document images and database load files that are in a standard format with the following minimum characteristics:

i.   *Images*: Images will be delivered in multi-page TIFF images, scanned at 300 dpi or more. Each imaged page will be branded with a unique sequential number consisting of an alpha prefix and numeric digits ("Bates Number");

ii.   *Document Breaks*: Physical document boundaries will be capted during scanning and the load file will reflect those document boundaries. A document break will indicate where folders, redwells, binders, clips, ruber bands, staples, etc. originally appeared; and

b.   *OCR Data*: Document OCR will be performed. OCR will be provided on a document level.

c.   *Document Index*: For each document production, you shall provide an index containing the following values for each document:

i.   Beginning Bates Number;

000864

    ii.   Ending Bates Number; and

    iii.   The Document's custodian.

8.     To the extent that You believe production according to the preceding paragraph is unduly burdensome, You shall (a) produce responsive material in a manner that provides substantially the same information as above and (b) advise the Trustee and his counsel of the manner of production and the particular requirements of the preceding paragraph You believe were unduly burdensome and with which You are not complying.

9.     If any document within the scope of this request has been destroyed, that Document shall be identified including identification of (i) its author(s); (ii) intended or unintended recipient(s); (iii) addressee(s); (iv) intended or unintended recipients of bling copies; (v) date; and (vi) subject matter. The circumstances of such destruction shall be set forth, and any Documents relating to such destruction shall be produced.

10.    In producing Documents and other materials, You are requested to furnish all Documents or things in Your possession, custody, or control, regardless of whether such Documents or materials are possessed by You directly.

11.    If You object to any part of any request, You shall state fully the nature of the objection. Notwithstanding any objections, You shall nonetheless comply fully with the other parts of the request not objected to.

12.    The Trustee reserves the right to request additional documents as needed and to submit additional or supplemental document requests, provided, further, that the Trustee expressly reserves his rights to supplement or amend the Document Requests.

000865

**Document Requests**

1.      All documents reflecting, describing, or evidencing Your corporate structure and management, including but not limited to any (a) company agreement, (b) the membership interests in 2425 WL (c) management of 2425 WL, and (d) basis for Choudhri to act on behalf of 2425 WL.

2.      The 2425 WL Note.

3.      Communications or Documents referencing, describing, or evidencing the preparation and drafting of the 2425 WL Note.

4.      Communications and other Documents referencing, describing, or evidencing any consideration 2425 WL provided to the Debtor in exchange for the Note.

5.      Communications and other Documents referencing, describing, or evidencing any indebtedness of the Debtor to You prior to May 11, 2021.

6.      Communications or Documents referencing, describing, or evidencing any indebtedness of the Debtor to You on or after May 11, 2021.

7.      Communications or Documents referencing, describing, or related to the 2425 WL DOT, including its execution.

8.      Communications or Documents exchanged with Azeemah Zaheer, Naissance Capital Real Estate, LLC, or Galleria 2425 JV, LLC regarding the 2425 WL Note.

9.      Communications or Documents referencing, describing, or evidencing the distribution of funds from Your sale of the Real Property to the Debtor.

10.     The final version and any drafts of the Settlement Statement.

11.     Communications or Documents referencing, describing, or evidencing the preparation of the Settlement Statement.

7

12.     Communications or Documents referencing, describing, or evidencing the "Seller Credit" indicated on the Settlement Statement.

13.     All Communications or Documents exchanged with NBK in connection with the sale of the Real Property on or before May 23, 2018.

14.     All Communications or Documents exchanged with the Debtor in connection with the Sale of the Real Property on or before May 23, 2018.

15.     All communications or Documents exchanged with Jetall, the Debtor, or NBK regarding the Jetall Lease 2016 Amendment.

16.     All Communications or Documents exchanged with TransAct Title – Galleria or any other title company in connection with the Sale of the Real Property at any time.

000867

# **EXHIBIT H**

000868

B2560 (Form 2560 – Subpoena to Testify at a Deposition in a Bankruptcy Case or Adversary Proceeding) (12/15)

# UNITED STATES BANKRUPTCY COURT

Southern _____ District of __Texas__

In re __Galleria 2425 Owner, LLC__
_____
Debtor

*(Complete if issued in an adversary proceeding)*

Case No. __23-34815__

Chapter __11__

_____
Plaintiff

v.

_____
Defendant

Adv. Proc. No. _____

## SUBPOENA TO TESTIFY AT A DEPOSITION
## IN A BANKRUPTCY CASE (OR ADVERSARY PROCEEDING)

To:  __2425 WL LLC__
_____
*(Name of person to whom the subpoena is directed)*

☒ *Testimony*: **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this bankruptcy case (or adversary proceeding).  If you are an organization, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:  **See Attachment**

| PLACE | DATE AND TIME |
|---|---|
| Jones & Murray LLP, 602 Sawyer Street, Suite 400, Houston, TX, 77007 | June 11, 2024, at 10:00 a.m. (CT) |

The deposition will be recorded by this method:
  Stenographic recording before recording service through person authorized to administer oaths.

☐ *Production*:  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:

The following provisions of Fed. R. Civ. P. 45, made applicable in bankruptcy cases by Fed. R. Bankr. P. 9016, are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and 45(g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

               CLERK OF COURT

                                                          OR

_____                    _____
Signature of Clerk or Deputy Clerk                    *Attorney's signature*

The name, address, email address, and telephone number of the attorney representing *(name of party)*
 __Christopher R. Murray__          , who issues or requests this subpoena, are:  R. J. Shannon, Shannon & Lee LLP
 Shannon & Lee LLP, 2100 Travis St STE 1525, Houston, TX; 713-714-5770; rshannon@shannonleellp.com

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things, or the inspection of premises before trial, a notice and a copy of this subpoena must be served on each party before it is served on the person to whom it is directed.  Fed. R. Civ. P. 45(a)(4).

000869

B2560 (Form 2560 – Subpoena to Testify at a Deposition in a Bankruptcy Case or Adversary Proceeding) (Page 2)

## PROOF OF SERVICE
**(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)**

I received this subpoena for *(name of individual and title, if any)*: _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of  $ _____ .

My fees are $ _____ for travel and $_____ for services, for a total of $_____ .


I declare under penalty of perjury that this information is true and correct.

Date:  _____


_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*


Additional information concerning attempted service, etc.:

000870

B2560 (Form 2560 – Subpoena to Testify at a Deposition in a Bankruptcy Case or Adversary Proceeding) (Page 3)

# Federal Rule of Civil Procedure 45(c), (d), (e), and (g) (Effective 12/1/13)
## (made applicable in bankruptcy cases by Rule 9016, Federal Rules of Bankruptcy Procedure)

**(c) Place of compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:
(A) production of documents, or electronically stored information, or things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises, at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*
(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*
(A) *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*
(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.
…
**(g) Contempt.** The court for the district where compliance is required – and also, after a motion is transferred, the issuing court – may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013)

**ATTACHMENT**

**DEPOSITION TOPICS**

Pursuant to Fed. R. Civ. P. 30(b)(6), Christopher R. Murray (the "Trustee"), the chapter 11

Trustee in the above-captioned case, will conduct a deposition of 2425 WL LLC on the following

topics (the "Topics") indicated below.

**Definitions**

The following definitions of terms apply to the Topics. Unless otherwise defined herein,

all words and phrases used herein shall be accorded their usual meanings and shall be interpreted

in their common, ordinary sense.

1.      "2425 WL", "You," "Your", or "Yours" means 2425 WL, LLC, along with its

agents, employees, attorneys, representatives, affiliates, consultations, and all other persons acting

or purporting to act on its behalf.

2.      "2425 WL DOT" means the 'Deed of Trust' between the Debtor and 2425 WL filed

in the real property records of Harris County on May 11, 2021.

3.      "2425 WL Note" means the notice indicated in the 2425 WL DOT.

4.      "Affiliate" has the meaning set forth in 11 U.S.C. § 101(2).

5.      The terms "Communication" or "Communications" means the statement or

transmission of facts, information, advice, counsel, and/or inquiry from one person to another,

whether orally, in writing, by acts or actions, by signs, by appearances, electronically,

telephonically, or otherwise.

6.      "Choudhri" means the individual commonly referred to as Ali Choudhri who

asserts to be in control of the Debtor and has appeared in his individual capacity in the Current

1

Chapter 11 Case and his agents, employees, attorneys, representatives, consultants, and all other persons acting or purporting to act on his behalf.

7.      "Current Chapter 11 Case" means Case No. 23-24815 before the United States Bankruptcy Court for the Southern District of Texas.

8.      "Confidential Settlement Agreement" the Document titled 'Confidential Settlement Agreement' dated August 22, 2022, and signed by (a) Marwan Isbaih on behalf of NBK, (b) Choudhri on behalf of the Debtor, (c) Choudhri on behalf of Naissance Galleria, LLC., and (d) Choudhri in his individual capacity.

9.      "Debtor" means Galleria 2425 Owner, LLC, along with its agents, employees, attorneys, representatives, affiliates, consultants, and all other persons acting or purporting to act on its behalf.

10.     "Document" shall be given the broadest possible interpretation consistent with the applicable rules of procedure, including but not limited to, the original or a copy of any graphic material of any kind or nature whatsoever, including electronically stored information, however produced or reproduced, any writing, drawing, graph, chart, photograph, telephone record, tape recording, video tape, or other data compilation in which information can be reproduced or obtained, including computer tapes, disks, storage devices, or print-outs, which are in your possession, custody, control, or known by you to exist, including, without limiting the generality of the foregoing, all drafts, contracts, diaries, calendars, desk pads, correspondence, communications, emails, memoranda, notes, studies, reports, lists, minutes, and entries in books of any account relating or referring in any way to the subject matter of these requests. The term "Document" shall also mean all copies of a documents by whatever means made, except where a

2

document is identified or produced, identical copies which do not contain any markings, additions, or deletions, different from the original document, need not be separately identified or produced.

11.    "Jetall" means Jetall Companies, Inc. along with its agents, employees, attorneys, representatives, affiliates, consultants, and all other persons acting or purporting to act on its behalf.

12.    "Jetall Lease" means the 'Lease Agreement' dated May 13, 2015, between 2425 West Loop, LP and Jetall and subsequent amendments thereto.

13.    "Jetall Lease 2016 Amendment" means the 'First Amendment to Lease Agreement' dated April 6, 2018, between 2425 WL and Jetall.

14.    "Naissance Galleria" means Naissance Galleria, LLC along with its agents, employees, attorneys, representatives, affiliates, consultants, and all other persons acting or purporting to act on its behalf.

15.    "NBK" means the National Bank of Kuwait, S.A.K.P., New York Branch, along with its agents, employees, attorneys, representatives, affiliates, consultants, and all other persons acting or purporting to act on its behalf.

16.    "NBK Loan" means the Loan Agreement dated May 23, 2018, among the Debtor and NBK and any Documents effectuating the transaction pursuant thereto, including (a) the 'Promissory Note' dated May 23. 2018, issued by the Debtor to NBK; (b) the 'Deed of Trust, Assignment of Rents and Profits, Security Agreement, and Fixture Filing' dated May 23, 2018, among the Debtor and NBK; and (c) the 'Absolute Assignment of Leases and Rents' dated May 23, 2018, between the Debtor and NBK.

17.    "Person" has the meaning set forth in 11 U.S.C. § 101(41).

3

18.     "Real Property" means the real property located at 2425 West Loop South, Houston, TX, 77027, including the building and all other improvements thereon.

19.     "Settlement Statement" means the document titled Settlement Statement reflecting the transaction in which the Debtor acquired the Real Property.

20.     "Trustee" means Christopher R. Murray

21.     The terms "and" and "or" shall be interpreted in every instance as meaning "and/or" and shall not, in either instance, be interpreted disjunctively to exclude any document or information otherwise within the scope of any description or request herein.

## Topics

1.     Your current and historic ownership, organizational, and management structure.

2.     The facts and circumstances surrounding Your acquisition of the Real Property.

3.     The facts and circumstances surrounding Your sale of the Real Property to the Debtor, including any financing related thereto.

4.     Any distribution of funds in connection with Your sale of the Real Property to the Debtor.

5.     The Settlement Statement in connection with Your sale of the Real Property to the Debtor.

6.     The facts and circumstances surrounding the 2425 WL DOT, including its (a) creation, (b) execution, and (c) filing.

7.     The facts and circumstances surrounding the 2425 WL Note, including its (a) creation, (b) execution, and (c) any consideration provided.

8.     Any payments You received under the 2425 WL Note.

000875

9.      The facts and circumstances surrounding the execution of the Jetall Lease 2016 Amendment, including any disclosure thereof.

10.      Any Document produced by or requested from You in advance of the Deposition.

5

# RE: Subpoeans

Thank you, R.J. Your cooperation is much appreciated.

Mark

**From:** R. J. Shannon <rshannon@shannonleellp.com>
**Sent:** Friday, June 7, 2024 2:10 PM
**To:** Mark Smith <msmith@bn-lawyers.com>
**Cc:** Reese Baker <reese.baker@bakerassociates.net>
**Subject:** RE: Subpoeans

Thank you, Mark.

Confirmed with the caveat that the Trustee reserves his rights as to further postponement. Understood that 2425 WL and the Debtor also reserve their rights with respect to further postponement if advised by Mr. Choudhri's doctors. Just FYI, I think we would need some letter/other document from a doctor before agreeing to further postponement.

--
**R. J. Shannon**
Partner
**Shannon & Lee LLP**
Cell: (512) 693-9294
rshannon@shannonleellp.com

**From:** Mark Smith <msmith@bn-lawyers.com>
**Sent:** Friday, June 7, 2024 2:01 PM
**To:** R. J. Shannon <rshannon@shannonleellp.com>
**Cc:** Reese Baker <reese.baker@bakerassociates.net>
**Subject:** RE: Subpoeans

R.J.,

I completely understand the position the trustee is in, but this matter is complicated by Mr. Choudhri's health concerns. Mr. Choudhri had a follow-up visit today with his cardiologist and has been advised that he needs to be off from work for one month – until July 7th (see attached). Everyone is aware that Mr. Choudhri ignored his doctor's advice and participated in the deposition on Wednesday, but that does not mean he intends to do so on a going forward basis. He hopefully learned his lesson from Wednesday, as it had a significant negative impact on him. As to your bullet points:

1. In the time since Mr. Choudhri's medical issue, it has not been practicable to educate another potential witness to the point where they are the person with the most knowledge of the topics. To do so would require the active participation of Mr. Choudhri. Based on his most recent doctor's orders – to avoid work until July 7th - neither Reese nor I will take any action that ignores that order or further risks Mr. Choudhri's health. That includes asking him to participate in a crash course on this case to try and prepare another corporate representative. This is especially true given Mr. Choudhri's emotional involvement with these issues. To put it mildly, discussing this case or reviewing documents associated

with NBK's misdeeds raises Mr. Choudhri's blood pressure and that is something that his doctor has advised him to avoid. Moreover, even if he were to assist in preparing another witness, there is no way another witness would have the same level of knowledge on the noticed topics.

2. I am working on gathering documents, but that is complicated by Mr. Choudhri's absence. To the extent we have documents reviewed and ready for production today, I will send them. At this moment, I am unable to tell you whether that will happen or not.

3. If the confirmation hearing goes forward on June 17, neither 2425 WL or the debtor will object to amendments to the witness or exhibit list based on documents produced by 2425 WL or debtor after today's date. I cannot make that commitment for Mr. Choudhri, as I do not represent him individually and have not asked him his position since he just had a medical procedure with his cardiologist and considering the doctor's orders.

Please confirm that the trustee is extending the compliance date for the document subpoenas to June 13 as stated below and that the depositions are being rescheduled for the week before any rescheduled confirmation hearing, assuming that conforms with Mr. Choudhri's doctor's order. Thank you.

Regards,

Mark

---

**From:** R. J. Shannon <rshannon@shannonleellp.com>
**Sent:** Friday, June 7, 2024 8:53 AM
**To:** Mark Smith <msmith@bn-lawyers.com>
**Cc:** Reese Baker <reese.baker@bakerassociates.net>
**Subject:** RE: Subpoeans

Mark,

If Mr. Choudhri is going to ignore your advice and the advice of his doctors, then he needs to spend his energy providing discovery. I don't see how reviewing the Trustee's production would be significantly more taxing than going through his own documents so you could make production. But that is largely not the point.

Please confirm the following:

1. In the 8 days (for 2425 WL LLC) and 9 days (for the Debtor) between when everyone became aware of Mr. Choudhri's medical issue, it was not practicable to get someone up to speed with enough knowledge to have a meaningful deposition as scheduled.

2. You have no ability to provide any responsive documents today.

3. If the confirmation hearings go forward on June 17, you and your clients will not object to a supplemental witness and exhibit list adding any produced documents filed by the Trustee.

If you can confirm number 1, the Trustee will agree to reschedule the depositions to the week before any reset confirmation hearing based on that representation. If you confirm number 2 and 3, the Trustee will agree to not seek an order to compel/sanctions/take other action with respect to the documents until the morning of June 13 (so they would need to be produced on June 12) but is _not_ agreeing that you are not required to produce the documents that are able to today.

Please let me know if that works to resolve the issue.

Thanks,

R. J.

--
**R. J. Shannon**
Partner
**Shannon & Lee LLP**
Cell: (512) 693-9294
rshannon@shannonleellp.com

---

**From:** Mark Smith <msmith@bn-lawyers.com>
**Sent:** Friday, June 7, 2024 8:27 AM
**To:** R. J. Shannon <rshannon@shannonleellp.com>
**Cc:** Reese Baker <reese.baker@bakerassociates.net>
**Subject:** Re: Subpoeans

R.J.,
We fully understand that Mr. Choudhri appeared yesterday. But he did so against our advice and the advice of his doctors. He also paid the price for doing so. It impacted him very negatively. Mr. Choudhri's staff downloaded the production, as should be expected. I am not sure how difficult downloaded shared files would be even for an ill Mr. Choudhri. Mr. Choudhri was not at the building today.  I understand he is getting a heart device installed tomorrow and his condition is serious.
Regardless, as Reese and I have both expressed, we have serious concerns about the impact of continued stress and activity on Mr. Choudhri's health. Importantly, that concern is shared by Mr. Choudhri's doctor.
As for the identity of the 30(b)(6) witness for either 2425 WL or the debtor, it is Reese and my job to designate the person with the most knowledge of the noticed topics. That person is Mr. Choudhri. He knows far more than any other potential representative and getting anyone else up to his level of knowledge before the deposition dates would be extremely difficult, if not impossible. We are not asking for an open-ended agreement, just dates beyond the current dates that allow Mr. Choudhri additional time to convalesce.
If you would like to propose new dates, we are happy to try and reach an agreement. As for the documents, Mr. Choudhri is also the person who is best able to identify responsive documents. Because he was not working today and will be in the cardiologist office for a significant portion of the day, that process has been delayed. Would you be open to a brief extension of the compliance date to next week, preferably later in the week.
As I stated last evening, I am generally very easy to work with and am new to this case. I understand there are very strong feelings on all sides, but my goal is to try and work through these issues as efficiently as possible.
Regards,
Mark

Sent from my iPhone

On Jun 6, 2024, at 5:40 PM, R. J. Shannon <rshannon@shannonleellp.com> wrote:

Reese and Mark,

We're not agreeing to anything that open-ended.

First, Mr. Choudhri (a) attended and presented arguments at the June 4, 2024, hearing in Case No. 24-32143 (see Attachment 1); (b) asked questions for several hours at the NBK deposition yesterday; (c) downloaded the Trustee's production (see Attachment 2) after spending hours asking questions at the NBK deposition; and (d) was apparently at the building today. So, I'm skeptical of the burden.

Second, neither of your clients needs to produce Mr. Choudhri to testify:

* Debtor—
    * Mr. Choudhri did not sign the Debtor's schedules or statements. Obviously, other people are knowledgeable about the Debtor and have access to the documents.
    * Darjean testified for the Debtor and could testify at the deposition on 6/12/24. That is enough time for him to get prepared.


* 2425 WL—
    * Adam Broder is apparently the sole member of 2425 WL LLC.
    * Broder is also the person who signed the Settlement Statement and deed of the property from 2425 WL LLC. He did so in his capacity as sole member. Why can't he testify? Have you even reached out to him?

Third, if there are some topics that you think Mr. Choudhri is the only person who can competently testify, tell me and we can bifurcate things. If no one else knows anything, then I'm going to need you to put that in writing in the likely event that Mr. Choudhri claims not to know about those topics when we do depose him. I would also be interested in what you did to determine whether anyone else has knowledge or could have become familiar with the topics in the time before the scheduled depositions .

Fourth, Choudhri's condition doesn't really matter with respect to producing the documents. Was your production going to be entirely based on what Mr. Choudhri provided you at the last minute? Even if it was, I simply don't believe that you have nothing responsive. I'm going to need an objection or motion to quash on those as to your clients, even if we can agree to reschedule the depositions.

Fifth, when do you want to reschedule the depositions? What about the document production? Give me dates that I can agree to. Just saying "one day" isn't going to cut it.

Thanks,
R. J.

--
R. J. Shannon
Partner
Shannon & Lee LLP
Cell: (512) 693-9294
rshannon@shannonleellp.com<mailto:rshannon@shannonleellp.com>

From: Mark Smith <msmith@bn-lawyers.com>
Sent: Thursday, June 6, 2024 4:39 PM
To: Reese Baker <Reese.Baker@bakerassociates.net>
Cc: R. J. Shannon <rshannon@shannonleellp.com>
Subject: RE: Subpoeans

I agree with Reese. As discussed last night, I cannot sanction anything that goes against the doctor's orders and risks further damage to Mr. Choudhri.

Mark

From: Reese Baker <Reese.Baker@bakerassociates.net<mailto:Reese.Baker@bakerassociates.net>>
Sent: Thursday, June 6, 2024 4:35 PM
To: R. J. Shannon <rshannon@shannonleellp.com<mailto:rshannon@shannonleellp.com>>
Subject: Subpoeans

I am hopeful we can agree to continue the deposition dates past the 2 week period that Ali Choudhri is not to work per doctors orders.  He will agree to later dates but I am not going to do anything that is

contrary to doctors orders for his health.

Reese W. Baker
Baker & Associates
950 Echo Lane, Suite 300
Houston, Texas 77024
713-979-2251
Cell 713-385-3196
www.bakerassociates.net<http://www.bakerassociates.net>

For service of any documents or discovery, the email address of
courtdocs@bakerassociates.net<mailto:courtdocs@bakerassociates.net> must be used.
<1 - Hearing Audio from Case No. 24-32143.pdf>
<2 - Galleria 2425 - Choudhri Download Dropbox Transfer.pdf>

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | |
| **GALLERIA 2425 OWNER LLC,** | **Case No. 23-34815**<br>**Chapter 11** |
| Debtor. | |

## NOTICE OF APPEARANCE

PLEASE TAKE NOTICE that the undersigned hereby appears as counsel for Creditor 2425 WL, LLC, and requests that all notices given or required to be given in this case, and all papers served or required to be served in this case, be given to and served upon:

MARK E. SMITH
BARRON & NEWBURGER, P.C.
7320 N. MoPac Expwy., Suite 400
Austin, Texas 78731
Tel: (512) 476-9103 ext. 455
Fax: (512) 476-9253
msmith@bn-lawyers.com

Dated:  June 7, 2024

Respectfully submitted,

**BARRON & NEWBURGER, P.C.**

7320 N. MoPac Expy., Suite 400
Austin, Texas 78731
Tel: (512) 476-9103
Fax: (512) 476-9253

By:     */s/ Mark E. Smith*
        Mark E. Smith
        State Bar No. 24070639
        msmith@bn-lawyers.com
        David N. Stern
        State Bar No. 24103634
        dstern@bn-lawyers.com
        Stephen Sather
        State Bar No 17657520
        ssather@bn-lawyers.com

*Counsel for Creditor 2425 WL, LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on June 7, 2024, the foregoing Notice of Appearance was served via the Court's CM/ECF Noticing System to all parties registered for service in this matter.


*/s/ Mark E. Smith*
Mark E. Smith

# RE: NBK/Galleria: Demand for Withdrawal of Various Pleadings

**From:** R. J. Shannon <rshannon@shannonleellp.com>    Wed, Jun 26, 2024 at 6:38 PM CDT (GMT-05:00)
To: Steve Sather <ssather@bn-lawyers.com>
Cc: Kyung S. Lee <klee@shannonleellp.com>; Christopher Murray <christopher.murray@jonesmurray.com>

Right, but if you are going forward with the other matters for which we wanted discovery, then we should get that discovery. You can't have it both ways.

--
**R. J. Shannon**
Partner
**Shannon & Lee LLP**
Cell: (512) 693-9294
rshannon@shannonleellp.com

---

**From:** Steve Sather <ssather@bn-lawyers.com>
**Sent:** Wednesday, June 26, 2024 5:23 PM
**To:** R. J. Shannon <rshannon@shannonleellp.com>
**Cc:** Kyung S. Lee <klee@shannonleellp.com>; Christopher Murray <christopher.murray@jonesmurray.com>
**Subject:** RE: NBK/Galleria: Demand for Withdrawal of Various Pleadings

I didn't say they were still pending. I said that the plan's effective date hasn't occurred yet.

---

**From:** R. J. Shannon <rshannon@shannonleellp.com>
**Sent:** Wednesday, June 26, 2024 5:21 PM
**To:** Steve Sather <ssather@bn-lawyers.com>
**Cc:** Kyung S. Lee <klee@shannonleellp.com>; Christopher Murray <christopher.murray@jonesmurray.com>
**Subject:** RE: NBK/Galleria: Demand for Withdrawal of Various Pleadings

Steve,

That is an interesting point.

Since your view is that these matters are still pending, when am I going to get the documents that your client agreed to produce? We're coming on 14 days from the extended deadline. See attached.

When is there going to be a corporate representative deposition of 2425 WL LLC? It doesn't need to be Choudhri, just someone with knowledge. It has been *more* than 21 days since you knew of Choudhri's health issues.

My suggestion would be to focus on complying with your obligations to produce discovery instead of things that are defeated by the law of the case.

Thanks,
R. J.

--
**R. J. Shannon**
Partner
**Shannon & Lee LLP**
Cell: (512) 693-9294

rshannon@shannonleellp.com

---

**From:** Steve Sather <ssather@bn-lawyers.com>
**Sent:** Wednesday, June 26, 2024 5:01 PM
**To:** Troop, Andrew M. <andrew.troop@pillsburylaw.com>
**Cc:** R. J. Shannon <rshannon@shannonleellp.com>; Kyung S. Lee <klee@shannonleellp.com>; Conrad, Charles C. <charles.conrad@pillsburylaw.com>; Fitzmaurice, Patrick E. <patrick.fitzmaurice@pillsburylaw.com>
**Subject:** RE: NBK/Galleria: Demand for Withdrawal of Various Pleadings

I have not received authority to withdraw any pleadings. However, I think your demand is premature since the plan is not even effective yet.

---

**From:** Troop, Andrew M. <andrew.troop@pillsburylaw.com>
**Sent:** Tuesday, June 25, 2024 2:46 PM
**To:** Steve Sather <ssather@bn-lawyers.com>
**Cc:** R. J. Shannon <rshannon@shannonleellp.com>; Kyung S. Lee <klee@shannonleellp.com>; Conrad, Charles C. <charles.conrad@pillsburylaw.com>; Fitzmaurice, Patrick E. <patrick.fitzmaurice@pillsburylaw.com>
**Subject:** NBK/Galleria: Demand for Withdrawal of Various Pleadings

Steve,

Attached is a self-explanatory letter regarding several open matters in the Galleria Owner chapter 11 case.

Regards,

Andrew

**Andrew M. Troop** | Partner
Pillsbury Winthrop Shaw Pittman LLP
31 West 52nd Street | New York, NY 10019-6131
t +1.212.858.1660 | f +1.212.973.7435 | m +1.617.710.0902
andrew.troop@pillsburylaw.com | website bio

AUSTIN   BEIJING   HONG KONG   HOUSTON   LONDON   LOS ANGELES
MIAMI   NASHVILLE   NEW YORK   NORTHERN VIRGINIA   PALM BEACH
SACRAMENTO   SAN DIEGO   SAN FRANCISCO   SHANGHAI
SILICON VALLEY   TAIPEI   TOKYO   WASHINGTON, DC



The contents of this message, together with any attachments, are intended only for the use of the individual or entity to which they are addressed and may contain information that is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please notify the original sender or the Pillsbury Winthrop Shaw Pittman Service Desk at Tel: 800-477-0770, Option 1, immediately by telephone and delete this message, along with any attachments, from your computer. Nothing in this message may be construed as a digital or electronic signature of any employee of Pillsbury Winthrop Shaw Pittman. Thank you.

# Galleria 2425 - Document Production & Deposition of 2425 WL LLC

**From: R. J. Shannon <rshannon@shannonleellp.com>**   Tue, Jul 16, 2024 at 5:17 PM CDT (GMT-05:00)
To: Steve Sather <ssather@bn-lawyers.com>; <gray.burks@bakerassociates.net>
Cc: Kyung S. Lee <klee@shannonleellp.com>; Christopher Murray <christopher.murray@jonesmurray.com>

Steve and Gray,

We are now more than a month from the date that 2425 WL LLC agreed that it would provide documents responsive to the attached requests. You have also had a month and a half to get someone else prepared as a corporate representative. When will the documents be produced? When will a corporate representative be produced? And while we are at it, when will 2425 WL LLC be paying the amount ordered by the Court for its past discovery violations?

If we have to take action, we are going to have to request for sanction again. You guys need to sit your client down and make him understand that these things are not optional.

Thanks,
R. J.

--

**R. J. Shannon**
Partner
**Shannon & Lee LLP**
Cell: (512) 693-9294
rshannon@shannonleellp.com

---

**From:** R. J. Shannon
**Sent:** Wednesday, June 26, 2024 5:21 PM
**To:** 'Steve Sather' <ssather@bn-lawyers.com>
**Cc:** Kyung S. Lee <klee@shannonleellp.com>; Christopher Murray <christopher.murray@jonesmurray.com>
**Subject:** RE: NBK/Galleria: Demand for Withdrawal of Various Pleadings

Steve,

That is an interesting point.

Since your view is that these matters are still pending, when am I going to get the documents that your client agreed to produce? We're coming on 14 days from the extended deadline. See attached.

When is there going to be a corporate representative deposition of 2425 WL LLC? It doesn't need to be Choudhri, just someone with knowledge. It has been *more* than 21 days since you knew of Choudhri's health issues.

My suggestion would be to focus on complying with your obligations to produce discovery instead of things that are defeated by the law of the case.

Thanks,
R. J.

--

**R. J. Shannon**
Partner

**Shannon & Lee LLP**
Cell: (512) 693-9294
rshannon@shannonleellp.com

**From:** Steve Sather <ssather@bn-lawyers.com>
**Sent:** Wednesday, June 26, 2024 5:01 PM
**To:** Troop, Andrew M. <andrew.troop@pillsburylaw.com>
**Cc:** R. J. Shannon <rshannon@shannonleellp.com>; Kyung S. Lee <klee@shannonleellp.com>; Conrad, Charles
C. <charles.conrad@pillsburylaw.com>; Fitzmaurice, Patrick E. <patrick.fitzmaurice@pillsburylaw.com>
**Subject:** RE: NBK/Galleria: Demand for Withdrawal of Various Pleadings

I have not received authority to withdraw any pleadings. However, I think your demand is premature since the plan is not even effective yet.

---

**From:** Troop, Andrew M. <andrew.troop@pillsburylaw.com>
**Sent:** Tuesday, June 25, 2024 2:46 PM
**To:** Steve Sather <ssather@bn-lawyers.com>
**Cc:** R. J. Shannon <rshannon@shannonleellp.com>; Kyung S. Lee <klee@shannonleellp.com>; Conrad, Charles
C. <charles.conrad@pillsburylaw.com>; Fitzmaurice, Patrick E. <patrick.fitzmaurice@pillsburylaw.com>
**Subject:** NBK/Galleria: Demand for Withdrawal of Various Pleadings

Steve,

Attached is a self-explanatory letter regarding several open matters in the Galleria Owner chapter 11 case.

Regards,

Andrew

**Andrew M. Troop** | Partner
Pillsbury Winthrop Shaw Pittman LLP
31 West 52nd Street | New York, NY 10019-6131
t +1.212.858.1660 | f +1.212.973.7435 | m +1.617.710.0902
andrew.troop@pillsburylaw.com | website bio

AUSTIN   BEIJING   HONG KONG   HOUSTON   LONDON   LOS ANGELES
MIAMI   NASHVILLE   NEW YORK   NORTHERN VIRGINIA   PALM BEACH
SACRAMENTO   SAN DIEGO   SAN FRANCISCO   SHANGHAI
SILICON VALLEY   TAIPEI   TOKYO   WASHINGTON, DC



The contents of this message, together with any attachments, are intended only for the use of the individual or entity to which they are addressed and may contain information that is legally privileged, confidential and exempt from disclosure. If you are not the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this message, or any attachment, is strictly prohibited. If you have received this message in error, please notify the original sender or the Pillsbury Winthrop Shaw Pittman Service Desk at Tel: 800-477-0770, Option 1, immediately by telephone and delete this message, along with any

000888

attachments, from your computer. Nothing in this message may be construed as a digital or electronic signature of any employee of Pillsbury Winthrop Shaw Pittman. Thank you.

## Attachments

- 1 - Galleria 2425 - 2425 WL Notice of Deposition.pdf
- 1.a - 2425 WL Deposition Subpoena.pdf
- 1.b - 2425 WL Subpoena DT.pdf
- RE: Subpoeans.msg
- txsb-4_2023-bk-34815-00554.pdf

**Fill in this information to identify the case:**

Debtor 1    Galleria 2425 Owner

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the: _____ District of _____

Case number   23-34815; Galleria 2425 Owner

Official Form 410

# Proof of Claim

12/15

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

## Part 1: Identify the Claim

| | |
|---|---|
| **1. Who is the current creditor?** | **ALI CHOUDHRI**<br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the debtor |
| **2. Has this claim been acquired from someone else?** | ☑ No<br>☐ Yes. From whom? |
| **3. Where should notices and payments to the creditor be sent?**<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?**<br><br>**ALI CHOUDHRI**<br>Name<br>**1001 West Loop South, Suite 700**<br>Number   Street<br>**HOUSTON**    **TX**    **77027**<br>City     State     ZIP Code<br><br>Contact phone 281.630.6627<br>Contact email ALI@JETALLCOMPANIES.COM<br><br>Uniform claim identifier for electronic payments in chapter 13 (if you use one): <br><br>__ __ __ __ — __ __ __ __ — __ __ __ __ — __ __ __ __ | **Where should payments to the creditor be sent? (if different)**<br><br>Name<br><br>Number   Street<br><br>City     State     ZIP Code<br><br>Contact phone<br>Contact email |
| **4. Does this claim amend one already filed?** | ☑ No<br>☐ Yes. Claim number on court claims registry (if known) _____     Filed on ____ / ____ / ____<br>                 MM / DD / YYYY |
| **5. Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No<br>☐ Yes. Who made the earlier filing? _____ |

Official Form 410

Proof of Claim

page 1

000890

**Part 2:**  **Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| **6.** **Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____ |

**7.** **How much is the claim?**   $ ~~6,700,000.00~~  **Does this amount include interest or other charges?**

4,176,657.46

☑ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8.** **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

_____

**9.** **Is all or part of the claim secured?**

☐ No
☑ Yes. The claim is secured by a lien on property.

**Nature of property:**

☑ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.
☐ Motor vehicle
☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**   $ _____
**Amount of the claim that is secured:**   $ 4,176,657.46

**Amount of the claim that is unsecured:** $ _____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**   $ _____

**Annual Interest Rate (when case was filed)** _____ %
☐ Fixed
☐ Variable

**10.** **Is this claim based on a lease?**

☑ No
☐ Yes. Amount necessary to cure any default as of the date of the petition.   $ _____

**11.** **Is this claim subject to a right of setoff?**

☑ No
☐ Yes. Identify the property: _____

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?  A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☑ No |  |
|---|---|---|
|  | ☐ Yes. *Check one:* | **Amount entitled to priority** |
|  | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
|  | ☐ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
|  | ☐ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
|  | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
|  | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
|  | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies. | $_____ |
|  | * Amounts are subject to adjustment on 4/01/16 and every 3 years after that for cases begun on or after the date of adjustment. | |

---

## Part 3:   Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   03/14/2024
                    MM / DD / YYYY

Signature

Print the name of the person who is completing and signing this claim:

| Name | ALI CHOUDHRI | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | | | |
| Company | | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 1001 WEST LOOP SOUTH, SUITE 700 | | |
| | Number       Street | | |
| | HOUSTON, TEXAS 77027 | | |
| | City | State | ZIP Code |
| Contact phone | 281.630.6627 | Email | ALI@JETALLCOMPANIES.COM |

**Payoff Calculation of 2019 & 2020 Property Tax Loan Modification for Galleria 2025 Owner, LLC**

| NO. | DUE DATE | Payment PMT $30,566.34 | INT (18.00% p.a. / 1.50%) | PRINCIPAL | Initial Balance $1,696,384.85 — BALANCE | Exit Fee (3.00%) | Yield Maint. Fee (weekly) 9/1/21 0.50% / # of Weeks from Execution to Month-End | Yield Maint. Fee at each Month-End | Payoff at each month-end |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 9/1/21 | 30,566.34 | 25,445.77 | 5,120.57 | 1,691,264.28 | 50,737.93 | 512.86 | 4,336,884.83 | 6,078,887.04 |
| 2 | 10/1/21 | 30,566.34 | 25,368.96 | 5,197.38 | 1,686,066.90 | 50,582.01 | 508.43 | 4,322,222.92 | 6,072,071.83 |
| 3 | 11/1/21 | 30,566.34 | 25,291.00 | 5,275.34 | 1,680,791.56 | 50,423.75 | 504.14 | 4,236,795.39 | 5,968,010.60 |
| 4 | 12/1/21 | 30,566.34 | 25,211.87 | 5,354.47 | 1,675,437.09 | 50,263.11 | 499.71 | 4,186,199.24 | 5,911,899.44 |
| 5 | 1/1/22 | 30,566.34 | 25,131.56 | 5,434.79 | 1,670,002.30 | 50,100.07 | 495.29 | 4,135,641.41 | 5,855,743.78 |
| 6 | 2/1/22 | 30,566.34 | 25,050.03 | 5,516.31 | 1,664,485.99 | 49,934.58 | 491.29 | 4,088,690.94 | 5,803,111.51 |
| 7 | 3/1/22 | 30,566.34 | 24,967.29 | 5,599.05 | 1,658,886.94 | 49,766.61 | 486.86 | 4,038,204.77 | 5,746,858.31 |
| 8 | 4/1/22 | 30,566.34 | 24,883.30 | 5,683.04 | 1,653,203.89 | 49,596.12 | 482.57 | 3,988,944.83 | 5,691,744.84 |
| 9 | 5/1/22 | 30,566.34 | 24,798.06 | 5,768.29 | 1,647,435.61 | 49,423.07 | 478.14 | 3,938,547.85 | 5,635,406.52 |
| 10 | 6/1/22 | 30,566.34 | 24,711.53 | 5,854.81 | 1,641,580.80 | 49,247.42 | 473.86 | 3,889,373.94 | 5,580,202.16 |
| 11 | 7/1/22 | 30,566.34 | 24,623.71 | 5,942.63 | 1,635,638.17 | 49,069.15 | 469.43 | 3,839,076.44 | 5,523,783.75 |
| 12 | 8/1/22 | 30,566.34 | 24,534.57 | 6,031.77 | 1,629,606.40 | 48,888.19 | 465.00 | 3,788,834.87 | 5,467,329.46 |
| 13 | 9/1/22 | 30,566.34 | 24,444.10 | 6,122.25 | 1,623,484.15 | 48,704.52 | 460.71 | 3,739,811.70 | 5,412,000.37 |
| 14 | 10/1/22 | 30,566.34 | 24,352.26 | 6,214.08 | 1,617,270.07 | 48,518.10 | 456.29 | 3,689,686.13 | 5,355,474.30 |
| 15 | 11/1/22 | 30,566.34 | 24,259.05 | 6,307.29 | 1,610,962.77 | 48,328.88 | 452.00 | 3,640,775.86 | 5,300,067.52 |
| 16 | 12/1/22 | 30,566.34 | 24,164.44 | 6,401.90 | 1,604,560.87 | 48,136.83 | 447.57 | 3,590,778.00 | 5,243,475.70 |
| 17 | 1/1/23 | 30,566.34 | 24,068.41 | 6,497.93 | 1,598,062.94 | 47,941.89 | 443.14 | 3,540,850.88 | 5,186,855.71 |
| 18 | 2/1/23 | 30,566.34 | 23,970.94 | 6,595.40 | 1,591,467.54 | 47,744.03 | 439.14 | 3,494,408.01 | 5,133,619.57 |
| 19 | 3/1/23 | 30,566.34 | 23,872.01 | 6,694.33 | 1,584,773.21 | 47,543.20 | 434.71 | 3,444,617.76 | 5,076,934.17 |
| 20 | 4/1/23 | 30,566.34 | 23,771.60 | 6,794.75 | 1,577,978.46 | 47,339.35 | 430.43 | 3,396,035.07 | 5,021,295.89 |
| 21 | 5/1/23 | 30,566.34 | 23,669.68 | 6,896.67 | 1,571,081.79 | 47,132.45 | 426.00 | 3,346,404.22 | 4,964,618.47 |
| 22 | 6/1/23 | 30,566.34 | 23,566.23 | 7,000.12 | 1,564,081.68 | 46,922.45 | 421.71 | 3,307,977.93 | 4,908,982.06 |
| 23 | 7/1/23 | 30,566.34 | 23,461.23 | 7,105.12 | 1,556,976.56 | 46,709.30 | 417.29 | 3,248,520.37 | 4,852,206.23 |
| 24 | 8/1/23 | 30,566.34 | 23,354.65 | 7,211.70 | 1,549,764.86 | 46,492.95 | 412.86 | 3,199,157.46 | 4,795,415.27 |
| 25 | 9/1/23 | 30,566.34 | 23,246.47 | 7,319.87 | 1,542,444.99 | 46,273.35 | 408.57 | 3,130,994.77 | 4,739,713.11 |
| 26 | 10/1/23 | 30,566.34 | 23,136.67 | 7,429.67 | 1,535,015.32 | 46,050.46 | 404.14 | 3,101,827.39 | 4,682,893.17 |
| 27 | 11/1/23 | 30,566.34 | 23,025.23 | 7,541.11 | 1,527,474.21 | 45,824.23 | 399.86 | 3,053,857.36 | 4,627,155.79 |
| 28 | 12/1/23 | 30,566.34 | 22,912.11 | 7,654.23 | 1,519,819.98 | 45,594.60 | 395.43 | 3,004,901.21 | 4,570,315.78 |
| 29 | 1/1/24 | 30,566.34 | 22,797.30 | 7,769.04 | 1,512,050.93 | 45,361.53 | 391.00 | 2,956,059.57 | 4,513,472.03 |
| 30 | 2/1/24 | 30,566.34 | 22,680.76 | 7,885.58 | 1,504,165.35 | 45,124.96 | 386.86 | 2,909,485.55 | 4,458,775.86 |
| 31 | 3/1/24 | 30,566.34 | 22,562.48 | 8,003.86 | 1,496,161.49 | 44,884.84 | 382.43 | 2,860,874.50 | 4,401,920.83 |
| 32 | 4/1/24 | 30,566.34 | 22,442.42 | 8,123.92 | 1,488,037.56 | 44,641.13 | 378.14 | 2,813,453.88 | 4,346,132.57 |
| 33 | 5/1/24 | 30,566.34 | 22,320.56 | 8,245.78 | 1,479,791.78 | 44,393.75 | 373.71 | 2,765,096.65 | 4,289,282.19 |
| 34 | 6/1/24 | 30,566.34 | 22,196.88 | 8,369.47 | 1,471,422.32 | 44,142.67 | 369.43 | 2,717,937.22 | 4,233,692.21 |
| 35 | 7/1/24 | 30,566.34 | 22,071.33 | 8,495.01 | 1,462,927.31 | 43,887.82 | 365.00 | 2,669,842.34 | 4,176,657.46 |
| 36 | 8/1/24 | 30,566.34 | 21,943.91 | 8,622.43 | 1,454,304.87 | 43,629.15 | 360.57 | 2,621,903.93 | 4,119,837.95 |
| 37 | 9/1/24 | 30,566.34 | 21,814.57 | 8,751.77 | 1,445,553.10 | 43,366.59 | 356.29 | 2,575,149.60 | 4,064,069.29 |
| 38 | 10/1/24 | 30,566.34 | 21,683.30 | 8,883.05 | 1,436,670.05 | 43,100.10 | 351.86 | 2,527,513.10 | 4,007,248.26 |
| 39 | 11/1/24 | 30,566.34 | 21,550.05 | 9,016.29 | 1,427,653.76 | 42,829.61 | 347.57 | 2,481,558.29 | 3,951,541.66 |
| 40 | 12/1/24 | 30,566.34 | 21,414.81 | 9,151.54 | 1,418,502.22 | 42,555.07 | 343.14 | 2,433,744.53 | 3,894,801.82 |
| 41 | 1/1/25 | 30,566.34 | 21,277.53 | 9,288.81 | 1,409,213.41 | 42,276.40 | 338.71 | 2,386,603.57 | 3,838,093.39 |
| 42 | 2/1/25 | 30,566.34 | 21,138.20 | 9,428.14 | 1,399,785.27 | 41,993.56 | 334.71 | 2,342,640.63 | 3,784,419.46 |
| 43 | 3/1/25 | 30,566.34 | 20,996.78 | 9,569.57 | 1,390,215.70 | 41,706.47 | 330.29 | 2,295,841.93 | 3,727,764.11 |
| 44 | 4/1/25 | 30,566.34 | 20,853.24 | 9,713.11 | 1,380,502.59 | 41,415.08 | 326.00 | 2,250,219.23 | 3,672,136.90 |
| 45 | 5/1/25 | 30,566.34 | 20,707.54 | 9,858.81 | 1,370,643.79 | 41,119.31 | 321.57 | 2,203,799.41 | 3,615,562.51 |

| NO. | DUE DATE | PMT | INT | PRINCIPAL | BALANCE | Exit Fee | # of Weeks from Execution to Month-End | Yield Maint. Fee at each Month-End | Payoff at each month-end |
|---|---|---|---|---|---|---|---|---|---|
| 46 | 6/1/25 | 30,566.34 | 20,559.66 | 10,006.69 | 1,360,637.10 | 40,819.11 | 317.29 | 2,158,553.57 | 3,560,009.79 |
| 47 | 7/1/25 | 30,566.34 | 20,405.56 | 10,156.79 | 1,350,480.31 | 40,514.41 | 312.86 | 2,112,537.06 | 3,503,531.79 |
| 48 | 8/1/25 | 30,566.34 | 20,257.20 | 10,309.14 | 1,340,171.18 | 40,205.14 | 308.43 | 2,065,735.41 | 3,447,111.72 |
| 49 | 9/1/25 | 30,566.34 | 20,102.57 | 10,463.78 | 1,329,707.40 | 39,891.22 | 304.14 | 2,022,105.04 | 3,391,703.66 |
| 50 | 10/1/25 | 30,566.34 | 19,945.61 | 10,620.73 | 1,319,086.67 | 39,574.60 | 299.71 | 1,976,745.59 | 3,335,404.85 |
| 51 | 11/1/25 | 30,566.34 | 19,786.30 | 10,780.04 | 1,308,306.63 | 39,253.20 | 295.43 | 1,932,555.78 | 3,280,111.60 |
| 52 | 12/1/25 | 30,566.34 | 19,624.60 | 10,941.74 | 1,297,364.88 | 38,920.85 | 291.00 | 1,887,665.90 | 3,223,951.72 |
| 53 | 1/1/26 | 30,566.34 | 19,460.47 | 11,105.87 | 1,286,259.01 | 38,587.77 | 286.57 | 1,843,025.40 | 3,167,872.18 |
| 54 | 2/1/26 | 30,566.34 | 19,293.89 | 11,272.46 | 1,274,986.55 | 38,249.60 | 282.57 | 1,801,373.85 | 3,114,609.99 |
| 55 | 3/1/26 | 30,566.34 | 19,124.80 | 11,441.55 | 1,263,545.00 | 37,906.35 | 278.14 | 1,757,230.08 | 3,058,681.43 |
| 56 | 4/1/26 | 30,566.34 | 18,953.18 | 11,613.17 | 1,251,931.83 | 37,557.95 | 273.86 | 1,714,252.37 | 3,003,742.16 |
| 57 | 5/1/26 | 30,566.34 | 18,778.98 | 11,787.37 | 1,240,144.46 | 37,204.33 | 269.43 | 1,670,651.76 | 2,948,000.56 |
| 58 | 6/1/26 | 30,566.34 | 18,602.17 | 11,964.18 | 1,228,180.29 | 36,845.41 | 265.14 | 1,628,261.15 | 2,893,241.85 |
| 59 | 7/1/26 | 30,566.34 | 18,422.70 | 12,143.64 | 1,216,036.65 | 36,481.10 | 260.71 | 1,585,190.63 | 2,837,708.38 |
| 60 | 8/1/26 | 30,566.34 | 18,240.55 | 12,325.79 | 1,203,710.85 | 36,111.33 | 256.29 | 1,542,469.48 | 2,782,291.66 |
| 61 | 9/1/26 | 30,566.34 | 18,055.66 | 12,510.68 | 1,191,200.17 | 35,736.01 | 252.00 | 1,500,912.22 | 2,727,848.39 |
| 62 | 10/1/26 | 30,566.34 | 17,868.00 | 12,698.34 | 1,178,501.83 | 35,355.05 | 247.57 | 1,458,816.91 | 2,672,673.79 |
| 63 | 11/1/26 | 30,566.34 | 17,677.53 | 12,888.82 | 1,165,613.01 | 34,968.39 | 243.29 | 1,417,884.97 | 2,618,466.38 |
| 64 | 12/1/26 | 30,566.34 | 17,484.20 | 13,082.15 | 1,152,530.86 | 34,575.93 | 238.86 | 1,376,451.15 | 2,563,557.94 |
| 65 | 1/1/27 | 30,566.34 | 17,287.96 | 13,278.38 | 1,139,252.48 | 34,177.57 | 234.43 | 1,335,366.66 | 2,508,796.72 |
| 66 | 2/1/27 | 30,566.34 | 17,088.79 | 13,477.56 | 1,125,774.93 | 33,773.25 | 230.43 | 1,297,053.54 | 2,456,601.71 |
| 67 | 3/1/27 | 30,566.34 | 16,886.62 | 13,679.72 | 1,112,095.21 | 33,362.86 | 226.00 | 1,256,667.58 | 2,402,125.64 |
| 68 | 4/1/27 | 30,566.34 | 16,681.43 | 13,884.92 | 1,098,210.29 | 32,946.31 | 221.71 | 1,217,444.55 | 2,348,601.15 |
| 69 | 5/1/27 | 30,566.34 | 16,473.15 | 14,093.19 | 1,084,117.10 | 32,523.37 | 217.29 | 1,177,815.79 | 2,294,456.40 |
| 70 | 6/1/27 | 30,566.34 | 16,261.76 | 14,304.59 | 1,069,812.51 | 32,094.38 | 213.00 | 1,139,360.13 | 2,241,072.17 |
| 71 | 7/1/27 | 30,566.34 | 16,047.19 | 14,519.16 | 1,055,293.36 | 31,658.80 | 208.57 | 1,100,520.23 | 2,187,232.37 |
| 72 | 8/1/27 | 30,566.34 | 15,829.40 | 14,736.94 | 1,040,556.41 | 31,216.69 | 204.14 | 1,062,110.79 | 2,138,883.90 |
| 73 | 9/1/27 | 30,566.34 | 15,608.35 | 14,958.00 | 1,025,598.41 | 30,767.95 | 199.86 | 1,024,865.84 | 2,081,232.21 |
| 74 | 10/1/27 | 30,566.34 | 15,383.98 | 15,182.37 | 1,010,416.05 | 30,312.48 | 195.43 | 987,320.82 | 2,028,049.35 |
| 75 | 11/1/27 | 30,566.34 | 15,156.24 | 15,410.10 | 995,005.94 | 29,850.18 | 191.14 | 950,941.39 | 1,975,797.51 |
| 76 | 12/1/27 | 30,566.34 | 14,925.09 | 15,641.26 | 979,364.69 | 29,380.94 | 186.71 | 914,306.89 | 1,923,052.52 |
| 77 | 1/1/28 | 30,566.34 | 14,690.47 | 15,875.87 | 963,488.81 | 28,904.66 | 182.29 | 878,151.23 | 1,870,544.71 |
| 78 | 2/1/28 | 30,566.34 | 14,452.33 | 16,114.01 | 947,374.80 | 28,421.24 | 178.14 | 843,840.27 | 1,819,636.31 |
| 79 | 3/1/28 | 30,566.34 | 14,210.62 | 16,355.72 | 931,019.08 | 27,930.57 | 173.71 | 808,656.57 | 1,767,606.22 |
| 80 | 4/1/28 | 30,566.34 | 13,965.29 | 16,601.06 | 914,418.02 | 27,432.54 | 169.43 | 774,642.70 | 1,716,493.26 |
| 81 | 5/1/28 | 30,566.34 | 13,715.27 | 16,850.07 | 897,567.95 | 26,927.04 | 165.00 | 740,493.56 | 1,664,988.54 |
| 82 | 6/1/28 | 30,566.34 | 13,463.52 | 17,102.82 | 880,465.12 | 26,413.95 | 160.71 | 707,516.62 | 1,614,395.69 |
| 83 | 7/1/28 | 30,566.34 | 13,206.58 | 17,359.37 | 863,105.75 | 25,893.17 | 156.29 | 674,455.50 | 1,563,454.42 |
| 84 | 8/1/28 | 30,566.34 | 12,946.59 | 17,619.76 | 845,486.00 | 25,364.58 | 151.86 | 641,965.44 | 1,512,816.02 |
| 85 | 9/1/28 | 30,566.34 | 12,682.69 | 17,884.05 | 827,601.94 | 24,828.06 | 147.57 | 610,652.00 | 1,463,082.01 |
| 86 | 10/1/28 | 30,566.34 | 12,414.03 | 18,152.32 | 809,449.63 | 24,283.49 | 143.14 | 579,384.66 | 1,413,067.78 |
| 87 | 11/1/28 | 30,566.34 | 12,141.74 | 18,424.60 | 791,025.03 | 23,730.75 | 138.86 | 549,197.38 | 1,363,953.16 |
| 88 | 12/1/28 | 30,566.34 | 11,865.38 | 18,700.97 | 772,324.06 | 23,169.72 | 134.43 | 519,172.10 | 1,314,605.88 |
| 89 | 1/1/29 | 30,566.34 | 11,584.86 | 18,981.48 | 753,342.58 | 22,600.28 | 130.00 | 489,872.67 | 1,265,633.53 |
| 90 | 2/1/29 | 30,566.34 | 11,300.14 | 19,266.21 | 734,076.37 | 22,022.29 | 126.00 | 462,468.11 | 1,218,566.77 |
| 91 | 3/1/29 | 30,566.34 | 11,011.15 | 19,555.20 | 714,521.17 | 21,435.64 | 121.57 | 434,326.80 | 1,170,283.60 |
| 92 | 4/1/29 | 30,566.34 | 10,717.82 | 19,848.53 | 694,672.65 | 20,840.18 | 117.29 | 407,375.89 | 1,122,888.71 |
| 93 | 5/1/29 | 30,566.34 | 10,420.09 | 20,146.25 | 674,526.39 | 20,235.79 | 112.86 | 380,625.61 | 1,075,387.79 |
| 94 | 6/1/29 | 30,566.34 | 10,117.90 | 20,448.45 | 654,077.94 | 19,622.34 | 108.57 | 355,070.88 | 1,028,771.16 |

| NO. | DUE DATE | PMT | INT | PRINCIPAL | BALANCE | Exit Fee | # of Weeks from Execution to Month-End | Yield Maint. Fee at each Month-End | Payoff at each month-end |
|---|---|---|---|---|---|---|---|---|---|
| 95 | 7/1/29 | 30,566.34 | 9,811.17 | 20,755.18 | 633,322.77 | 18,959.63 | 104.14 | $ 329,780.21 | $ 982,102.66 |
| 96 | 8/1/29 | 30,566.34 | 9,499.84 | 21,066.50 | 612,256.26 | 18,367.69 | 99.71 | $ 305,253.48 | $ 935,877.43 |
| 97 | 9/1/29 | 30,566.34 | 9,183.84 | 21,382.50 | 590,873.76 | 17,726.21 | 95.43 | $ 281,991.20 | $ 890,531.17 |
| 98 | 10/1/29 | 30,566.34 | 8,863.11 | 21,703.24 | 569,170.53 | 17,075.12 | 91.00 | $ 258,972.59 | $ 845,218.23 |
| 99 | 11/1/29 | 30,566.34 | 8,537.56 | 22,028.79 | 547,141.74 | 16,414.25 | 86.71 | $ 237,225.03 | $ 800,781.02 |
| 100 | 12/1/29 | 30,566.34 | 8,207.13 | 22,359.22 | 524,782.52 | 15,743.48 | 82.29 | $ 215,910.52 | $ 756,436.57 |
| 101 | 1/1/30 | 30,566.34 | 7,871.74 | 22,694.61 | 502,087.92 | 15,062.64 | 77.86 | $ 195,455.65 | $ 712,606.21 |
| 102 | 2/1/30 | 30,566.34 | 7,531.32 | 23,035.03 | 479,052.89 | 14,371.59 | 73.86 | $ 176,907.39 | $ 670,331.87 |
| 103 | 3/1/30 | 30,566.34 | 7,185.79 | 23,380.55 | 455,672.34 | 13,670.17 | 69.43 | $ 158,183.40 | $ 627,525.91 |
| 104 | 4/1/30 | 30,566.34 | 6,835.09 | 23,731.26 | 431,941.08 | 12,958.23 | 65.14 | $ 140,688.38 | $ 585,588.69 |
| 105 | 5/1/30 | 30,566.34 | 6,479.12 | 24,087.23 | 407,853.85 | 12,235.62 | 60.71 | $ 123,812.78 | $ 549,902.24 |
| 106 | 6/1/30 | 30,566.34 | 6,117.81 | 24,448.54 | 383,405.32 | 11,502.16 | 56.43 | $ 108,175.07 | $ 503,082.55 |
| 107 | 7/1/30 | 30,566.34 | 5,751.08 | 24,815.26 | 358,590.05 | 10,757.70 | 52.00 | $ 93,283.41 | $ 462,581.17 |
| 108 | 8/1/30 | 30,566.34 | 5,378.85 | 25,187.49 | 333,402.56 | 10,002.08 | 47.57 | $ 79,302.18 | $ 422,706.82 |
| 109 | 9/1/30 | 30,566.34 | 5,001.04 | 25,565.31 | 307,837.25 | 9,235.12 | 43.29 | $ 66,624.78 | $ 383,697.15 |
| 110 | 10/1/30 | 30,566.34 | 4,617.56 | 25,948.79 | 281,888.47 | 8,456.65 | 38.86 | $ 54,766.90 | $ 345,112.02 |
| 111 | 11/1/30 | 30,566.34 | 4,228.33 | 26,338.02 | 255,550.45 | 7,666.51 | 34.57 | $ 44,173.72 | $ 307,390.68 |
| 112 | 12/1/30 | 30,566.34 | 3,833.26 | 26,733.09 | 228,817.36 | 6,864.57 | 30.14 | $ 34,486.05 | $ 270,157.93 |
| 113 | 1/1/31 | 30,566.34 | 3,432.26 | 27,134.08 | 201,683.28 | 6,050.50 | 25.71 | $ 25,930.71 | $ 233,664.48 |
| 114 | 2/1/31 | 30,566.34 | 3,025.25 | 27,541.10 | 174,142.18 | 5,224.27 | 21.71 | $ 18,906.87 | $ 198,273.31 |
| 115 | 3/1/31 | 30,566.34 | 2,612.13 | 27,954.21 | 146,187.97 | 4,385.64 | 17.29 | $ 12,634.82 | $ 163,208.43 |
| 116 | 4/1/31 | 30,566.34 | 2,192.82 | 28,373.52 | 117,814.45 | 3,534.43 | 13.00 | $ 7,657.94 | $ 129,006.82 |
| 117 | 5/1/31 | 30,566.34 | 1,767.23 | 28,799.13 | 89,015.32 | 2,670.46 | 8.57 | $ 3,814.94 | $ 95,500.72 |
| 118 | 6/1/31 | 30,566.34 | 1,335.23 | 29,231.11 | 59,784.21 | 1,793.53 | 4.29 | $ 1,281.09 | $ 62,858.82 |
| 119 | 7/1/31 | 30,566.34 | 896.76 | 29,669.58 | 30,114.62 | 903.44 | (0.14) | $ (21.51) | $ 30,996.55 |
| 120 | 8/1/31 | 30,566.34 | 451.72 | 30,114.62 | 0.00 | 0.00 | (4.57) | $ (0.00) | $ 0.00 |
| 120 months | Maturity on 8/1/2031 | | | | | | | | |

## LOAN MODIFICATION AGREEMENT

THIS LOAN MODIFICATION AGREEMENT, executed this __26_ day of August, 2021 (the "Effective Date"), by and between **GALLERIA 2425 OWNER, LLC**, a Delaware limited liability company ("Borrower"), and **CAZ CREEK TX II, LLC** ("Lender");

### W I T N E S S E T H:

**WHEREAS**, on June __17_, 2021, Lender acquired that certain Tax Payment Agreement executed by Borrower in the original principal amount of $1,704,813.08 dated April 30, 2021 (the "Note"), secured by the lien and provisions of that certain Tax Lien Contract recorded as Instrument No. RP-2021-252144 in the Official Public Records of Harris County, Texas (the "Tax Lien"); and

**WHEREAS**, Borrower has defaulted on the Note for failure to pay its monetary obligations thereunder; and

**WHEREAS**, Borrower and Lender have agreed to this modification of the terms and provisions of the loan evidenced by the Note, to be effective as of the date hereof;

**NOW, THEREFORE**, for good and valuable consideration, Borrower and Lender agree as follows:

1.      Borrower acknowledges that as of Lender's acquisition of the Note, the outstanding principal balance of the Note is $1,696,384.85.

2.      Interest shall accrue on the aforesaid principal sum from Lender's acquisition of the Note until June 1, 2031 (the "Maturity Date"), at the rate of eighteen percent (18.0%) (the "Interest Rate") per annum, with interest payable monthly commencing on September 1, 2021, and with all principal and accrued interest due and payable on the Maturity Date.

3.      Borrower may prepay the Note in its entirety, but not in part, in the amount of the outstanding principal balance plus interest thereon as provided herein, and upon prepayment prior to the Maturity Date hereof, Borrower shall pay to Lender a "yield maintenance fee" in an amount computed as follows: for each week subsequent to the execution of this Loan Modification Agreement until the Maturity Date, an amount equal to 0.5% per week calculated on the principal balance then owing Lender.

4.      An "Exit Fee" of Three Percent (3%) of then remaining unpaid principal balance of the Note together with all accrued but unpaid interest, shall be due upon any payment of the Note at maturity or upon acceleration, whether the acceleration is by Lender or by Borrower.

5.      Except as provided herein, the terms of the Note, Tax Lien and Guaranty shall continue in effect.

6.      Usury Savings. This Agreement and the Note are subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the principal balance of the Loan at a rate which could subject Lenders to either civil or criminal liability as result of being

521550.000001 25612926.2

1

in excess of the Maximum Rate. If, by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Rate, the Interest Rate or the Involuntary Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Rate and all previous payments in excess of the Maximum Rate shall be deemed to have been payments in reduction of principal, without premium, and not on account of the interest due hereunder. All sums paid or agreed to be paid to Lenders for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Rate of interest from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

7.      This Agreement shall be governed by and construed in accordance with the internal substantive laws of the Commonwealth of Virginia, without regard to the choice or conflict of law principles of such state.

8.      In the event of a conflict between the terms of this modification and the other documents evidencing the Note, this modification shall control.

[Signatures on Next Page]

WITNESS THE EXECUTION HEREOF as of the Effective Date.

**BORROWER:**

**GALLERIA 2425 OWNER, LLC,**
**a Delaware limited liability company**

By: _____
    Ali Choudhri, Manager


**LENDER:**

_____
**CAZ CREEK TX II, LLC**

521550.000001 25612926.2

000898

RP-2021-508701
09/03/2021  ER  $42.00

**ASSIGNMENT OF TAX LIEN**
Secured by Section 32.06 Tax Lien Transfer

Date: May 24, 2021

| Holder of Note(s) and Lien(s) ('Transferor'):<br>**CAZ CREEK TX II, LLC**<br>14800 Landmark Blvd, Suite 400<br>Dallas, TX 75254 | Transferee:<br>**ALI CHOUDHRI**<br>1001 West Loop South, Suite 700<br>Houston, TX 77027 | Note:<br>Tax Payment Agreement dated as of the Loan Date made by Borrower in favor of Transferor in the amount of the Original Balance |
| --- | --- | --- |
| Borrower:<br>Galleria 2425 Owner, LLC | Original Balance:<br>$845,366.97 | Loan Date:<br>January 31, 2020 |
| Maturity Date:<br>February 1, 2030 | First Payment Date:<br>March 1, 2020 | Tax Account Number(s):<br>0451400060400 |
| Lien: | | |
| Tax Lien Contract Recorded as Instrument No(s).: RP-2020-237529, Real Property Records of Harris County, TX | Tax Lien Transfer Recorded as Instrument No(s).:<br>**RP-2020-112204**, Real Property Records of Harris County, TX | County: Harris County, TX |
| Property: | | |
| Property Address: 2425 West Loop South, Houston, TX 77027 | | |
| The Property is more particularly described as follows: See attached EXHIBIT "A". | | |

For a good and valuable consideration paid, the receipt and sufficiency of which is hereby acknowledged, Transferor hereby transfers, assigns, grants, and conveys unto Transferee, effective the date first written, the Note, Liens, and any and all other related loan documents, including other agreements, instruments and other collateral which evidence, secure or otherwise relate to Transferor's right, title or interest in the Note and Lien.

THIS ASSIGNMENT IS DELIVERED WITHOUT RECOURSE, REPRESENTATION, OR EXPRESS OR IMPLIED WARRANTY OF ANY KIND OR ANY RESPONSIBILITY OR LIABILITY WHATSOEVER.

TRANSFEROR:
**CAZ CREEK TX II, LLC**

By: _____
    Ken Frisbie, Senior Vice President

STATE OF TEXAS          §
COUNTY OF DALLAS        §

This instrument was acknowledged before me on May 24, 2021 by Ken Frisbie, as authorized representative of Caz Creek TX II, LLC, a Texas limited liability company, on behalf of said company.

_____
Notary Public State of Texas

After recording, return to:
Ali Choudhri
1001 West Loop South, Suite 700



RUTH AURORA CARCAMO
My Notary ID # 132985060
Expires March 4, 2025

RP-2021-508701

Houston, TX 77027

RP-2021-508701

EXHIBIT "A"
Legal Description

**Tract 1:**

BEING 2.4462 ACRES (106,557 SQUARE FEET) OF LAND OUT OF THE WILLIAM WHITE SURVEY, ABSTRACT NO. 836, HOUSTON, HARRIS COUNTY, TEXAS, BEING THE SAME PROPERTY CONVEYED TO 2425 WEST LOOP, LP BY SPECIAL WARRANTY DEED RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20070732472, SAID TRACT CONVEYED BY DEED TO ONE WEST LOOP PLAZA, LTD. UNDER HCCF NO. S547896 AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE WESTHEIMER ROAD (ROW VARIES) BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 204.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST, TO A 1/2 INCH IRON ROD FOUND AT THE NORTHEAST CORNER OF THE 2.3468 ACRE PARCEL BEING THE SOUTHEAST CORNER OF THE HEREIN DESCRIBED PARCEL AND THE POINT OF BEGINNING;

THENCE, WESTERLY ALONG THE COMMON LINE OF THE 2.3468 ACRE PARCEL TO THE SOUTH AND THE HEREIN DESCRIBED PARCEL TO THE NORTH, SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 464.50 FEET TO A POINT ON THE EASTERLY RIGHT OF WAY (ROW) LINE OF INTERSTATE 610 WEST LOOP AND THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED PARCEL FROM WHICH A FOUND RAILROAD SPIKE BEARS SOUTH 21 DEGREES 43 MINUTES EAST 2.42 FEET;

THENCE, NORTHERLY ALONG THE EASTERLY RIGHT OF WAY LINE OF INTERSTATE 610 WEST LOOP (ROW 350 FEET) NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST 251.27 FEET TO AN "X" SET IN CONCRETE BEING THE SOUTHWEST CORNER OF A 7.8998 ACRE PARCEL AS SHOWN ON THE HOUSTON VENTURE PLAT UNRESTRICTED RESERVE "A" FILED IN THE HARRIS COUNTY MAP RECORDS AS FILM CODE NUMBER 356074, AND THE NORTHWEST CORNER OF THE HEREIN DESCRIBED PARCEL;

THENCE, EASTERLY ALONG THE COMMON LINE OF THE ABOVE INDICATED 7.8998 ACRE PARCEL TO THE NORTH AND THE HEREIN DESCRIBED PARCEL TO THE SOUTH NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 406.61 FEET TO AN "X" FOUND IN THE WESTERLY LINE OF A 3.4385 ACRE PARCEL OF LAND CONVEYED

(continued on next page)

RP-2021-508701

TO RESTPROP, LTD AS RECORDED IN THE HCCF NO. R228886;
THENCE, SOUTHERLY ALONG A COMMON LINE OF THE ABOVE INDICATED 3.4385
ACRE PARCEL TO THE EAST AND THE HEREIN DESCRIBED PARCEL TO THE WEST
SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 244.64 FEET TO THE POINT OF
BEGINNING CONTAINING 106,557 SQUARE FEET, 2.4462 ACRES MORE LESS.

### TRACT 2: 20 FOOT NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT OVER AND ACROSS
A TRACT OF LAND NORTHERLY OF AND 20 FEET WIDE ALONG THE ENTIRE
NORTHERLY BOUNDARY LINE OF TRACT I; SAID EASEMENT CREATED AND
GRANTED BY VIVIAN L. SMITH, INDIVIDUALLY AND AS INDEPENDENT
EXECUTRIX OF THE ESTATE OF R. E. SMITH, DECEASED IN THAT CERTAIN
GENERAL WARRANTY DEED DATED JULY 5, 1977 FILED IN HCCF NO. F216562 AND
DESCRIBED IN HCCF NO. G743294, BEING THE SAME EASEMENT CONVEYED TO
PCCF FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH
VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO.
20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND
BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF
WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468
ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY
TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND
THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R.
HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 204.61
FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO
THE WEST AND 3.4385 ACRE PARCEL TO THE EAST TO A 1/2 INCH IRON ROD
FOUND FOR THE SOUTHEAST CORNER OF TRACT I;

THENCE CONTINUING NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS
WEST, 244.64 FEET ALONG A COMMON LINE OF A PREVIOUSLY NOTED 3.4385
ACRE PARCEL OF LAND TO THE EAST AND TRACT I TO THE WEST TO AN "X"
FOUND FOR THE NORTHEAST CORNER OF TRACT I AND THE POINT OF
BEGINNING;

THENCE, WESTERLY SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 406.61
FEET ALONG THE NORTHERLY LINE OF TRACT I TO AN "X" SET ON THE
EASTERLY LINE OF INTERSTATE 610 WEST LOOP (350 FEET WIDE);

THENCE, NORTHERLY NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST 20.54
FEET ALONG THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP TO A POINT;

(continued on next page)

RP-2021-508701

THENCE, EASTERLY 20.00 FEET NORTHERLY FROM AND PARALLEL TO THE NORTHERLY LINE OF TRACT I, NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 401.88 FEET TO A POINT;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST 20.00 FEET TO THE POINT OF BEGINNING AND CONTAINING 0.1856 ACRES OR 8,085 SQUARE FEET OF LAND MORE OR LESS.

**TRACT 3: 20 FOOT NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT**

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT OVER AND ACROSS A TRACT OF LAND SOUTHERLY OF AND 20.00 FEET WIDE ALONG THE ENTIRE SOUTHERN BOUNDARY LINE OF TRACT I, SAID EASEMENT CREATED AND GRANTED ON FEBRUARY 16, 1979, FROM WEST LOOP HOTEL, LIMITED TO HN PROPERTIES, LIMITED FILED IN HCCF NO. G041310, BEING THE SAME PROPERTY EASEMENT CONVEYED TO PCCF FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 184.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST TO THE POINT OF BEGINNING, WHENCE THE SOUTHEAST CORNER OF TRACT I BEARS NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 20.02 FEET;

THENCE, WESTERLY 20.00 FEET SOUTHERLY FROM AND PARALLEL TO THE SOUTHERLY LINE OF TRACT I, SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 469.23 FEET TO A POINT IN THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP;

THENCE, NORTHERLY NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST, 20.54 FEET ALONG THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP TO THE SOUTHWEST CORNER FOR TRACT I FROM WHICH A FOUND RAILROAD SPIKE BEARS SOUTH 21 DEGREES 43 MINUTES EAST, 2.42 FEET;

THENCE, EASTERLY NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 464.50 FEET ALONG THE SOUTHERLY LINE OF TRACT I TO A 1/2 INCH IRON ROD FOUND

(continued on next page)

RP-2021-508701

000903

AT THE SOUTHEAST CORNER OF TRACT I;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 20.02 FEET ALONG A COMMON LINE BETWEEN A PREVIOUSLY DESCRIBED 2.3468 ACRES PARCEL TO THE WEST AND A 3.4385 ACRE PARCEL TO THE EAST TO THE POINT OF BEGINNING AND CONTAINING 0.2144 ACRES OR 9,337 SQUARE FEET OF LAND, MORE OR LESS.

## TRACT 4: 28 FOOT ROADWAY AND PEDESTRIAN EASEMENT

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT ACROSS EASTERLY 28 FEET OF A 2.3468 ACRE TRACT ADJACENT TO AND SOUTHERLY OF TRACT I, CREATED AND GRANTED IN THAT CERTAIN ROAD AND PEDESTRIAN EASEMENT DATED FEBRUARY 16, 1979 FROM WEST LOOP HOTEL, LIMITED TO HN PROPERTIES, LIMITED, FILED IN HCCF NO. G041313, BEING THE SAME PROPERTY EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT A FOUND 5/8 INCH IRON ROD IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, WESTERLY SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST, 28.00 FEET ALONG THE NORTHERLY LINE OF WESTHEIMER ROAD TO A POINT;

THENCE, NORTHERLY 28.00 FEET WESTERLY OF AND PARALLEL TO THE EASTERLY LINE OF SAID 2.3468 ARE TRACT NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 205.08 FEET TO A POINT ON THE SOUTHERLY LINE OF TRACT I;

THENCE, EASTERLY NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 28.00 FEET ALONG THE SOUTHERLY LINE OF TRACT I TO A 1/2 INCH IRON ROD FOUND IN THE WESTERLY LINE OF A 3.4385 ACRE PARCEL OF LAND PRESENTLY OWNED BY RESTPROP, LTD AS RECORDED IN THE HCCF NO. R228886;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 204.61 FEET ALONG A COMMON LINE OF THE ABOVE INDICATED 3.4385 ACRE PARCEL TO THE EAST SAID THE PREVIOUSLY DESCRIBED 2.3468 ACRE PARCEL TO THE WEST, TO THE POINT OF BEGINNING, CONTAINING 0.1317 ACRES OR 5,735 SQUARE FEET (CALLED 5,740) OF LAND MORE OR LESS.

(continued on next page)

RP-2021-508701

<u>TRACT 5</u>: 5 FOOT STORM SEWER EASEMENT

A 1,025 SQUARE FOOT TRACT OF LAND, BEING THAT SAME TRACT HN PROPERTIES, LIMITED, RECORDED IN HCCF NUMBER G041311, LOCATED IN THE WILLIAM WHITE SURVEY, ABSTRACT NUMBER 836, CITY OF HOUSTON, HARRIS COUNTY, TEXAS, BEING THE SAME EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY (ROW) OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. 5056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR. TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE ALONG THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD, SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST, A DISTANCE OF 16.00 FEET TO THE SOUTHEAST CORNER OF SAID EASEMENT AND THE HEREIN DESCRIBED TRACT;

THENCE CONTINUING ALONG THE NORTHERLY LINE OF WESTHEIMER ROAD, SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST A DISTANCE OF 5.00 FEET, THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE DEPARTING SAID WESTHEIMER ROAD, NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, A DISTANCE OF 204.96 FEET, TO A POINT IN THE SOUTHERLY LINE OF A 2.4462 ACRE TRACT CONVEYED BY DEED TO HE 2425 WEST LOOP, LP RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20070732472;

THENCE ALONG THE SOUTHERLY LINE OF SAID 2.4462 ACRE TRACT, NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST A DISTANCE OF 5.00 FEET TO THE NORTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE DEPARTING THE SOUTHERLY LINE OF SAID 2.4462 ACRE TRACT, SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, A DISTANCE OF 204.88 FEET TO THE POINT OF BEGINNING AND CONTAINING 1,025 SQUARE FEET OF LAND, MORE OR LESS.

RP-2021-508701

RP-2021-508701
# Pages 8
09/03/2021 03:07 PM
e-Filed & e-Recorded in the
Official Public Records of
HARRIS COUNTY
TENESHIA HUDSPETH
COUNTY CLERK
Fees   $42.00

RP-2021-508701

RECORDERS MEMORANDUM
This instrument was received and recorded electronically
and any blackouts, additions or changes were present
at the time the instrument was filed and recorded.

Any provision herein which restricts the sale, rental, or
use of the described real property because of color or
race is invalid and unenforceable under federal law.
THE STATE OF TEXAS
COUNTY OF HARRIS
I hereby certify that this instrument was FILED in
File Number Sequence on the date and at the time stamped
hereon by me; and was duly RECORDED in the Official
Public Records of Real Property of Harris County, Texas.



COUNTY CLERK
HARRIS COUNTY, TEXAS

000906

RP-2021-508702
09/03/2021  ER  $38.00

**ASSIGNMENT OF TAX LIEN**
Secured by Section 32.06 Tax Lien Transfer

Date: August 26, 2021

| Holder of Note(s) and Lien(s) ('Transferor'):<br>**CAZ CREEK TX II, LLC**<br>14800 Landmark Blvd, Suite 400<br>Dallas, TX 75254 | Transferee:<br>**ALI CHOUDHRI**<br>1001 West Loop South, Suite 700<br>Houston, TX 77027 | Note:<br>Tax Payment Agreement dated as of the Loan Date made by Borrower in favor of Transferor in the amount of the Original Balance |
|---|---|---|
| Borrower:<br>Galleria 2425 Owner, LLC | Revised Balance:<br>$868,704.35 | Loan Date:<br>April 30, 2021 and **modified** on June 1, 2021 |
| Maturity Date:<br>May 31, 2031 | First Payment Date:<br>June 1, 2021 | Tax Account Number(s):<br>0451400060400 |
| Lien: | | |
| Tax Lien Contract Recorded as Instrument No(s).: **RP-2021-252144**, Real Property Records of Harris County, TX | Tax Lien Transfer Recorded as Instrument No(s).:<br>**RP-2021-280403**, Real Property Records of Harris County, TX | County: Harris County, TX |
| Property: | | |
| Property Address: 2425 West Loop South, Houston, TX 77027 | | |
| The Property is more particularly described as follows: See attached <u>EXHIBIT "A"</u>. | | |

For a good and valuable consideration paid, the receipt and sufficiency of which is hereby acknowledged, Transferor hereby transfers, assigns, grants, and conveys unto Transferee, effective the date first written, the Note, Liens, and any and all other related loan documents, including other agreements, instruments and other collateral which evidence, secure or otherwise relate to Transferor's right, title or interest in the Note and Lien. Transferor warrants that the Lien(s) is valid against Property in the priority indicated and the above loan information is true and correct.

TRANSFEROR:
**CAZ CREEK TX II, LLC**

By: _____
    Ken Frisbie, Senior Vice President

STATE OF TEXAS           §
COUNTY OF HARRIS         §

This instrument was acknowledged before me on August 2021 by August , as authorized representative of Caz Creek TX II, LLC, a Texas limited liability company, on behalf of said company.

_____
Notary Public State of Texas

After recording, return to:
Ali Choudhri
1001 West Loop South, Suite 700
Houston, TX 77027



STEPHANIE ALVAREZ<br>ID #131078509<br>My Commission Expires<br>April 06, 2025

000907

**EXHIBIT "A"**
**Legal Description**

<u>Tract 1:</u>

BEING 2.4462 ACRES (106,557 SQUARE FEET) OF LAND OUT OF THE WILLIAM WHITE SURVEY, ABSTRACT NO. 836, HOUSTON, HARRIS COUNTY, TEXAS, BEING THE SAME PROPERTY CONVEYED TO 2425 WEST LOOP, LP BY SPECIAL WARRANTY DEED RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20070733472, SAID TRACT CONVEYED BY DEED TO ONE WEST LOOP PLAZA, LTD. UNDER HCCF NO. S547896 AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE WESTHEIMER ROAD (ROW VARIES) BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. 8056946 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 204.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST, TO A 1/2 INCH IRON ROD FOUND AT THE NORTHEAST CORNER OF THE 2.3468 ACRE PARCEL BEING THE SOUTHEAST CORNER OF THE HEREIN DESCRIBED PARCEL AND THE POINT OF BEGINNING:

THENCE, WESTERLY ALONG THE COMMON LINE OF THE 2.3468 ACRE PARCEL TO THE SOUTH AND THE HEREIN DESCRIBED PARCEL TO THE NORTH, SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 464.50 FEET TO A POINT ON THE EASTERLY RIGHT OF WAY (ROW) LINE OF INTERSTATE 610 WEST LOOP AND THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED PARCEL FROM WHICH A FOUND RAILROAD SPIKE BEARS SOUTH 21 DEGREES 43 MINUTES EAST 2.42 FEET;

THENCE, NORTHERLY ALONG THE EASTERLY RIGHT OF WAY LINE OF INTERSTATE 610 WEST LOOP (ROW 350 FEET) NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST 251.27 FEET TO AN "X" SET IN CONCRETE BEING THE SOUTHWEST CORNER OF A 7.8998 ACRE PARCEL AS SHOWN ON THE HOUSTON VENTURE PLAT UNRESTRICTED RESERVE "A" FILED IN THE HARRIS COUNTY MAP RECORDS AS FILM CODE NUMBER 356074, AND THE NORTHWEST CORNER OF THE HEREIN DESCRIBED PARCEL;

THENCE, EASTERLY ALONG THE COMMON LINE OF THE ABOVE INDICATED 7.8998 ACRE PARCEL TO THE NORTH AND THE HEREIN DESCRIBED PARCEL TO THE SOUTH NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 406.61 FEET TO AN "X" FOUND IN THE WESTERLY LINE OF A 3.4385 ACRE PARCEL OF LAND CONVEYED

(continued on next page)

RP-2021-508702

000908

TO RESTPROP, LTD AS RECORDED IN THE HCCF NO. R228886;
THENCE, SOUTHERLY ALONG A COMMON LINE OF THE ABOVE INDICATED 3.4385
ACRE PARCEL TO THE EAST AND THE HEREIN DESCRIBED PARCEL TO THE WEST
SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 244.64 FEET TO THE POINT OF
BEGINNING CONTAINING 106,557 SQUARE FEET, 2.4462 ACRES MORE LESS.

## TRACT 2:  20 FOOT NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT OVER AND ACROSS
A TRACT OF LAND NORTHERLY OF AND 20 FEET WIDE ALONG THE ENTIRE
NORTHERLY BOUNDARY LINE OF TRACT I; SAID EASEMENT CREATED AND
GRANTED BY VIVIAN L. SMITH, INDIVIDUALLY AND AS INDEPENDENT
EXECUTRIX OF THE ESTATE OF R. E. SMITH, DECEASED IN THAT CERTAIN
GENERAL WARRANTY DEED DATED JULY 5, 1977 FILED IN HCCF NO. F216562 AND
DESCRIBED IN HCCF NO. G743294, BEING THE SAME EASEMENT CONVEYED TO
PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH
VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO.
20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND
BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF
WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468
ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY
TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND
THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R.
HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 204.61
FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO
THE WEST AND 3.4385 ACRE PARCEL TO THE EAST TO A 1/2 INCH IRON ROD
FOUND FOR THE SOUTHEAST CORNER OF TRACT I;

THENCE CONTINUING NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS
WEST, 244.64 FEET ALONG A COMMON LINE OF A PREVIOUSLY NOTED 3.4385
ACRE PARCEL OF LAND TO THE EAST AND TRACT I TO THE WEST TO AN "X"
FOUND FOR THE NORTHEAST CORNER OF TRACT I AND THE POINT OF
BEGINNING;

THENCE, WESTERLY SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 406.61
FEET ALONG THE NORTHERLY LINE OF TRACT I TO AN "X" SET ON THE
EASTERLY LINE OF INTERSTATE 610 WEST LOOP (350 FEET WIDE);

THENCE, NORTHERLY NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST 20.54
FEET ALONG THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP TO A POINT;

(continued on next page)

RP-2021-508702

THENCE, EASTERLY 20.00 FEET NORTHERLY FROM AND PARALLEL TO THE NORTHERLY LINE OF TRACT I, NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 401.88 FEET TO A POINT;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST 20.00 FEET TO THE POINT OF BEGINNING AND CONTAINING 0.1856 ACRES OR 8,085 SQUARE FEET OF LAND MORE OR LESS.

TRACT 3:  20 FOOT NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT OVER AND ACROSS A TRACT OF LAND SOUTHERLY OF AND 20.00 FEET WIDE ALONG THE ENTIRE SOUTHERN BOUNDARY LINE OF TRACT I, SAID EASEMENT CREATED AND GRANTED ON FEBRUARY 16, 1979, FROM WEST LOOP HOTEL, LIMITED TO HN PROPERTIES, LIMITED FILED IN HCCF NO. G041310, BEING THE SAME PROPERTY EASEMENT CONVEYED TO PCCF FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 184.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST TO THE POINT OF BEGINNING, WHENCE THE SOUTHEAST CORNER OF TRACT I BEARS NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 20.02 FEET;

THENCE, WESTERLY 20.00 FEET SOUTHERLY FROM AND PARALLEL TO THE SOUTHERLY LINE OF TRACT I, SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 469.23 FEET TO A POINT IN THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP;

THENCE, NORTHERLY NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST, 20.54 FEET ALONG THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP TO THE SOUTHWEST CORNER FOR TRACT I FROM WHICH A FOUND RAILROAD SPIKE BEARS SOUTH 21 DEGREES 43 MINUTES EAST, 2.42 FEET;

THENCE, EASTERLY NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 464.50 FEET ALONG THE SOUTHERLY LINE OF TRACT I TO A 1/2 INCH IRON ROD FOUND

(continued on next page)

RP-2021-508702

000910

AT THE SOUTHEAST CORNER OF TRACT I;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 20.02 FEET ALONG A COMMON LINE BETWEEN A PREVIOUSLY DESCRIBED 2.3468 ACRES PARCEL TO THE WEST AND A 3.4385 ACRE PARCEL TO THE EAST TO THE POINT OF BEGINNING AND CONTAINING 0.2144 ACRES OR 9,337 SQUARE FEET OF LAND, MORE OR LESS.

TRACT 4: 28 FOOT ROADWAY AND PEDESTRIAN EASEMENT

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT ACROSS EASTERLY 28 FEET OF A 2.3468 ACRE TRACT ADJACENT TO AND SOUTHERLY OF TRACT I, CREATED AND GRANTED IN THAT CERTAIN ROAD AND PEDESTRIAN EASEMENT DATED FEBRUARY 16, 1979 FROM WEST LOOP HOTEL, LIMITED TO HN PROPERTIES, LIMITED, FILED IN HCCF NO. G041313, BEING THE SAME PROPERTY EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT A FOUND 5/8 INCH IRON ROD IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, WESTERLY SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST, 28.00 FEET ALONG THE NORTHERLY LINE OF WESTHEIMER ROAD TO A POINT;

THENCE, NORTHERLY 28.00 FEET WESTERLY OF AND PARALLEL TO THE EASTERLY LINE OF SAID 2.3468 ARE TRACT NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 205.08 FEET TO A POINT ON THE SOUTHERLY LINE OF TRACT I;

THENCE, EASTERLY NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 28.00 FEET ALONG THE SOUTHERLY LINE OF TRACT I TO A 1/2 INCH IRON ROD FOUND IN THE WESTERLY LINE OF A 3.4385 ACRE PARCEL OF LAND PRESENTLY OWNED BY RESTPROP, LTD AS RECORDED IN THE HCCF NO. R228886;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 204.61 FEET ALONG A COMMON LINE OF THE ABOVE INDICATED 3.4385 ACRE PARCEL TO THE EAST SAID THE PREVIOUSLY DESCRIBED 2.3468 ACRE PARCEL TO THE WEST, TO THE POINT OF BEGINNING, CONTAINING 0.1317 ACRES OR 5,735 SQUARE FEET (CALLED 5,740) OF LAND MORE OR LESS.

(continued on next page)

RP-2021-508702

000911

TRACT 5: 5 FOOT STORM SEWER EASEMENT

A 1,025 SQUARE FOOT TRACT OF LAND, BEING THAT SAME TRACT HN PROPERTIES, LIMITED, RECORDED IN HCCF NUMBER G041311, LOCATED IN THE WILLIAM WHITE SURVEY, ABSTRACT NUMBER 836, CITY OF HOUSTON, HARRIS COUNTY, TEXAS, BEING THE SAME EASEMENT CONVEYED TO PCCF FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY (ROW) OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED/LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. 5056346 AND THE SOUTHWEST CORNER OF A 9.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR. TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE ALONG THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD, SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST, A DISTANCE OF 15.00 FEET TO THE SOUTHEAST CORNER OF SAID EASEMENT AND THE HEREIN DESCRIBED TRACT;

THENCE CONTINUING ALONG THE NORTHERLY LINE OF WESTHEIMER ROAD, SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST A DISTANCE OF 5.00 FEET, THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE DEPARTING SAID WESTHEIMER ROAD, NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, A DISTANCE OF 204.96 FEET, TO A POINT IN THE SOUTHERLY LINE OF A 2.4462 ACRE TRACT CONVEYED BY DEED TO HE 2425 WEST LOOP, LP RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20070732472;

THENCE ALONG THE SOUTHERLY LINE OF SAID 2.4462 ACRE TRACT, NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST A DISTANCE OF 5.00 FEET TO THE NORTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE DEPARTING THE SOUTHERLY LINE OF SAID 2.4462 ACRE TRACT, SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, A DISTANCE OF 204.88 FEET TO THE POINT OF BEGINNING AND CONTAINING 1,025 SQUARE FEET OF LAND, MORE OR LESS.

RP-2021-508702

RP-2021-508702

RP-2021-508702
# Pages 7
09/03/2021 03:07 PM
e-Filed & e-Recorded in the
Official Public Records of
HARRIS COUNTY
TENESHIA HUDSPETH
COUNTY CLERK
Fees   $38.00

RECORDERS MEMORANDUM
This instrument was received and recorded electronically
and any blackouts, additions or changes were present
at the time the instrument was filed and recorded.

Any provision herein which restricts the sale, rental, or
use of the described real property because of color or
race is invalid and unenforceable under federal law.
THE STATE OF TEXAS
COUNTY OF HARRIS
I hereby certify that this instrument was FILED in
File Number Sequence on the date and at the time stamped
hereon by me; and was duly RECORDED in the Official
Public Records of Real Property of Harris County, Texas.



**COUNTY CLERK**
**HARRIS COUNTY, TEXAS**

RP-2023-248173

## ASSIGNMENT OF TAX LIENS
Secured by Section 32.06 Tax Lien Transfer

Date: August 26, 2022

| Holder of Note and Lien ("Transferor"):<br>Ali Choudhri<br>1001 West Loop South, Suite 700<br>Houston, TX 77027 | Transferee ("Transferee"):<br>National Bank of Kuwait, S.A.K.P., New York Branch<br>299 Park Avenue<br>New York, NY 10171 | Note (the "Note"):<br>Tax Payment Agreement dated as of the Loan Date made by Borrower in favor of Caz Creek TX II, LLC (the "Original Transferor") in the amount of the Original Balance |
|---|---|---|
| Borrower:<br>Galleria 2425 Owner, LLC | Original Balance:<br>$1,696,384.85 | Maturity Date:<br>February 1, 2030 |
| | | Tax Account Number(s):<br>0451400060400 |
| Liens (the "Liens"): | | |
| Tax Lien Contract Recorded as Instrument No(s).: RP-2020-237529, Real Property Records of Harris County, TX | Tax Lien Transfer Recorded as Instrument No(s).: RP-2020-112204, Real Property Records of Harris County, TX | First Assignment of Tax Lien Recorded as Instrument No(s): RP-2021-508701, Real Property Records of Harris County, TX |
| Tax Lien Contract Recorded as Instrument No(s).: RP-2021-252144, Real Property Records of Harris County, TX | Tax Lien Transfer Recorded as Instrument No(s).: RP-2021-280403, Real Property Records of Harris County, TX | First Assignment of Tax Lien Recorded as Instrument No(s): RP-2021-508702, Real Property Records of Harris County, TX |
| County: Harris County, TX | | |
| Property Address and Description: 2425 West Loop South, Houston, TX 77027 and more particularly described in Exhibit A attached hereto and incorporated by reference herein (the "Property"). | | |

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Transferor hereby transfers, assigns, grants, and conveys unto Transferee, effective the date first written above and subject to the terms set forth in that certain Confidential Settlement Agreement involving Transferor and Transferee dated August 22, 2022 (the "Settlement Agreement"), the Note, Liens, and any and all other related loan documents, including other agreements, instruments and other collateral which evidence, secure or otherwise relate to Transferor's right, title or interest in the Note and Liens. Transferor warrants that the Liens are valid against the Property in the priority indicated and the above loan information is true and correct. Transferee warrants that, pursuant to the Settlement Agreement, it will not take any actions during the "Foreclosure Forbearance Period" (as such term is defined in the Settlement Agreement) to: (a) foreclose upon, extinguish, or otherwise invalidate the Liens, or (b) merge the Note or Liens into the outstanding amount owed pursuant to that certain Loan Agreement between Transferee and Galleria 2425 Owner, LLC dated May 23, 2018.



**Transferor:**

Ali Choudhri



By: _____
Ali Choudhri

STATE OF TEXAS           §
COUNTY OF HARRIS         §

This instrument was acknowledged before me on August 31, 2022 by Ali Choudhri on behalf of himself individually.



Notary Public State of Texas

**After recording, return to:**
National Bank of Kuwait, S.A.K.P., New York Branch
c/o Charles C. Conrad
Pillsbury Winthrop Shaw Pittman, LP
909 Fannin St., Suite 2000
Houston, TX 77010

SCARLET MACGEORGE
My Notary ID # 124519627
Expires April 9, 2023

RP-2023-248173

2



000915

RP-2023-248173

EXHIBIT A
PROPERTY DESCRIPTION

Real property in the City of Houston, County of Harris and State of Texas, described as follows:

Tract 1: Fee Tract

BEING 2.4462 ACRES (106,557 SQUARE FEET) OF LAND OUT OF THE WILLIAM WHITE SURVEY, ABSTRACT NO. 836, HOUSTON, HARRIS COUNTY, TEXAS, BEING THE SAME PROPERTY CONVEYED TO 2425 WEST LOOP, LP BY SPECIAL WARRANTY DEED RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20070732472, SAID TRACT CONVEYED BY DEED TO ONE WEST LOOP PLAZA, LTD. UNDER HCCF NO. S547896 AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE WESTHEIMER ROAD (ROW VARIES) BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 204.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST, TO A 1/2 INCH IRON ROD FOUND AT THE NORTHEAST CORNER OF THE 2.3468 ACRE PARCEL BEING THE SOUTHEAST CORNER OF THE HEREIN DESCRIBED PARCEL AND THE POINT OF BEGINNING;

THENCE, WESTERLY ALONG THE COMMON LINE OF THE 2.3468 ACRE PARCEL TO THE SOUTH AND THE HEREIN DESCRIBED PARCEL TO THE NORTH, SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 464.50 FEET TO A POINT ON THE EASTERLY RIGHT OF WAY (ROW) LINE OF INTERSTATE 610 WEST LOOP AND THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED PARCEL FROM. WHICH A FOUND RAILROAD SPIKE BEARS SOUTH 21 DEGREES 43 MINUTES EAST 2.42 FEET;

THENCE, NORTHERLY ALONG THE EASTERLY RIGHT OF WAY LINE OF INTERSTATE 610 WEST LOOP (ROW 350 FEET) NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST 251.27 FEET TO AN "X" SET IN CONCRETE BEING THE SOUTHWEST CORNER OF A 7.8998 ACRE PARCEL AS SHOWN ON THE HOUSTON VENTURE PLAT UNRESTRICTED RESERVE "A" FILED IN THE HARRIS COUNTY MAP RECORDS AS FILM CODE NUMBER 356074, AND THE NORTHWEST CORNER OF THE HEREIN DESCRIBED PARCEL;

THENCE, EASTERLY ALONG THE COMMON LINE OF THE ABOVE INDICATED 7.8998 ACRE PARCEL TO THE NORTH AND THE HEREIN DESCRIBED PARCEL TO THE SOUTH NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 406.61 FEET TO AN "X"

[Exhibit A - Property Description]



RP-2023-248173

FOUND IN THE WESTERLY LINE OF A 3.4385 ACRE PARCEL OF LAND CONVEYED TO RESTPROP, LTD AS RECORDED IN THE HCCF NO. R228886;

THENCE, SOUTHERLY ALONG A COMMON LINE OF THE ABOVE INDICATED 3.4385 ACRE PARCEL TO THE EAST AND THE HEREIN DESCRIBED PARCEL TO THE WEST, SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 244.64 FEET TO THE POINT OF BEGINNING CONTAINING 106,557 SQUARE FEET, 2.4462 ACRES MORE LESS.

NOTE:  WE ARE PROHIBITED FROM INSURING ANY INACCURACY IN STATEMENT AS TO THE QUANTITY OF LAND CONTAINED WITHIN THE BOUNDARIES OF THE LAND DESCRIBED IN SCHEDULE A.

TRACT 2 EASEMENT TRACT: 20 FOOT NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT OVER AND ACROSS A TRACT OF LAND NORTHERLY OF AND 20 FEET WIDE ALONG THE ENTIRE NORTHERLY BOUNDARY LINE OF TRACT I; SAID EASEMENT CREATED AND GRANTED BY VI IAN L. SMITH, INDIVIDUALLY AND AS INDEPENDENT EXECUTRIX OF THE ESTATE OF R. E. SMITH, DECEASED IN THAT CERTAIN GENERAL WARRANTY DEED DATED JULY 5, 1977 FILED IN HCCF NO. F216562 AND DESCRIBED IN HCCF NO. G743294, BEING THE SAME EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 204.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST TO A 1/2 INCH IRON ROD FOUND FOR THE SOUTHEAST CORNER OF TRACT I;

THENCE CONTINUING NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 244.64 FEET ALONG A COMMON LINE OF A PREVIOUSLY NOTED 3.4385 ACRE PARCEL OF LAND TO THE EAST AND TRACT I TO THE WEST TO AN "X" FOUND FOR THE NORTHEAST CORNER OF TRACT I AND THE POINT OF BEGINNING;

[Exhibit A - Property Description]



RP-2023-248173

THENCE, WESTERLY SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 406.61 FEET ALONG THE NORTHERLY LINE OF TRACT 1 TO AN "X" SET ON THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP (350 FEET WIDE);

THENCE, NORTHERLY NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST 20.54 FEET ALONG THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP TO A POINT;

THENCE, EASTERLY 20.00 FEET NORTHERLY FROM AND PARALLEL TO THE NORTHERLY LINE OF TRACT 1, NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 401.88 FEET TO A POINT;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST 20.00 FEET TO THE POINT OF BEGINNING AND CONTAINING 0.1856 ACRES OR 8,085 SQUARE FEET OF LAND MORE OR LESS.

TRACT 3 EASEMENT TRACT: 20 FOOT NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT;

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT OVER AND ACROSS A TRACT OF LAND SOUTHERLY OF AND 20.00 FEET WIDE ALONG THE ENTIRE SOUTHERN BOUNDARY LINE OF TRACT 1, SAID EASEMENT CREATED AND GRANTED ON FEBRUARY 16, 1979, FROM WEST LOOP HOTEL, LIMITED TO FIN PROPERTIES, LIMITED FILED IN HCCF NO. G041310, BEING THE SAME PROPERTY EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 184.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST TO THE POINT OF BEGINNING, WHENCE THE SOUTHEAST CORNER OF TRACT 1 BEARS NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 20.02 FEET;

THENCE, WESTERLY 20.00 FEET SOUTHERLY FROM AND PARALLEL TO THE SOUTHERLY LINE OF TRACT 1, SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 469.23 FEET TO A POINT IN THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP;

[Exhibit A - Property Description]



RP-2023-248173

THENCE, NORTHERLY NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST, 20.54 FEET ALONG THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP TO THE SOUTHWEST CORNER FOR TRACT 1 FROM WHICH A FOUND RAILROAD SPIKE BEARS SOUTH 21 DEGREES 43 MINUTES EAST, 2.42 FEET;

THENCE, EASTERLY NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 464.50 FEET ALONG THE SOUTHERLY LINE OF TRACT 1 TO A 1/2 INCH IRON ROD FOUND AT THE SOUTHEAST CORNER OF TRACT 1;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 20.02 FEET ALONG THE A COMMON LINE BETWEEN A PREVIOUSLY DESCRIBED 2.3468 ACRES PARCEL TO THE WEST AND A 3.4385 ACRE PARCEL TO THE EAST TO THE POINT OF BEGINNING AND CONTAINING 0.2144 ACRES OR 9,337 SQUARE FEET OF LAND, MORE OR LESS.

TRACT 4 EASEMENT TRACT: 28 FOOT ROADWAY AND PEDESTRIAN EASEMENT;

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT ACROSS EASTERLY 28 FEET OF A 2.3468 ACRE TRACT ADJACENT TO AND SOUTHERLY OF TRACT 1, CREATED AND GRANTED IN THAT CERTAIN ROAD AND PEDESTRIAN EASEMENT DATED FEBRUARY 16, 1979 FROM WEST LOOP HOTEL, LIMITED TO FIN PROPERTIES, LIMITED, FILED IN HCCF NO. G041313, BEING THE SAME PROPERTY EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT A FOUND 5/8 INCH IRON ROD IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, WESTERLY SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST, 28.00 FEET ALONG THE NORTHERLY LINE OF WESTHEIMER ROAD TO A POINT;

THENCE, NORTHERLY 28.00 FEET WESTERLY OF AND PARALLEL TO THE EASTERLY LINE OF SAID 2.3468 ARE TRACT NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 205.08 FEET TO A POINT ON THE SOUTHERLY LINE OF TRACT 1;

THENCE, EASTERLY NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 28.00 FEET ALONG THE SOUTHERLY LINE OF TRACT 1 TO A 1/2 INCH IRON ROD FOUND IN THE WESTERLY LINE OF A 3.4385 ACRE PARCEL OF LAND PRESENTLY OWNED BY RESTPROP, LTD AS RECORDED IN THE HCCF NO. R228886;



RP-2023-248173

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 204.61 FEET ALONG A COMMON LINE OF THE ABOVE INDICATED 3.4385 ACRE PARCEL TO THE EAST SAID THE PREVIOUSLY DESCRIBED 2.3468 ACRE PARCEL TO THE WEST, TO THE POINT OF BEGINNING, CONTAINING 0.1317 ACRES OR 5,735 SQUARE FEET (CALLED 5,740) OF LAND MORE OR LESS.

TRACT 5 EASEMENT TRACT: 5 FOOT STORM SEWER EASEMENT

A 1,025 SQUARE FOOT TRACT OF LAND, BEING THAT SAME TRACT UN PROPERTIES, LIMITED, RECORDED IN HCCF NUMBER G041311, LOCATED IN THE WILLIAM WHITE SURVEY, ABSTRACT NUMBER 836, CITY OF HOUSTON, HARRIS COUNTY, TEXAS, BEING THE SAME EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY (ROW) OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. 5056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR. TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE ALONG THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD, SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST, A DISTANCE OF 16.00 FEET TO THE SOUTHEAST CORNER OF SAID EASEMENT AND THE HEREIN DESCRIBED TRACT;

THENCE CONTINUING ALONG THE NORTHERLY LINE OF WESTHEIMER ROAD, SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST A DISTANCE OF 5.00 FEET, THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE DEPARTING SAID WESTHEIMER ROAD, NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, A DISTANCE OF 204.96 FEET, TO A POINT IN THE SOUTHERLY LINE OF A 2.4462 ACRE TRACT CONVEYED BY DEED TO HE 2425 WEST LOOP, LP RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20070732472;

THENCE ALONG THE SOUTHERLY LINE OF SAID 2.4462 ACRE TRACT, NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST A DISTANCE OF 5.00 FEET TO THE NORTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE DEPARTING THE SOUTHERLY LINE OF SAID 2.4462 ACRE TRACT, SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, A DISTANCE OF 204.88 FEET TO THE POINT OF BEGINNING AND CONTAINING 1,025 SQUARE FEET OF LAND, MORE OR LESS

[Exhibit A - Property Description]



RP-2023-248173

# Pages 8

07/03/2023 01:37 PM

e-Filed & e-Recorded in the

Official Public Records of

HARRIS COUNTY

TENESHIA HUDSPETH

COUNTY CLERK

Fees  $42.00

RECORDERS MEMORANDUM
This instrument was received and recorded electronically
and any blackouts, additions or changes were present
at the time the instrument was filed and recorded.

Any provision herein which restricts the sale, rental, or
use of the described real property because of color or
race is invalid and unenforceable under federal law.
THE STATE OF TEXAS
COUNTY OF HARRIS
I hereby certify that this instrument was FILED in
File Number Sequence on the date and at the time stamped
hereon by me; and was duly RECORDED in the Official
Public Records of Real Property of Harris County, Texas.



COUNTY CLERK
HARRIS COUNTY, TEXAS





I, Teneshia Hudspeth, County Clerk of Harris County, Texas certify that these pages
are a true and correct copy of the original record filed and recorded in my office,
electronically or hard copy, as it appears on this date.

Witness my official hand and seal of office
This April 3, 2024

Teneshia Hudspeth, County Clerk
Harris County, Texas

Any provision herein which restrict the sale, rental or use of the described Real Property because of color or race is invalid and
unenforceable under the Federal Law. Confidential information may have been redacted from the document in compliance with the
Public Information Act.



**UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| **GALLERIA 2425 OWNER, LLC** | § | **Case No. 23-34815 (JPN)** |
| | § | |
| Debtor | § | |
| | § | |
| **ALI CHOUDHRI** | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | **ADV. PROC. 24-03120** |
| | § | |
| **NATIONAL BANK OF KUWAIT,** | § | **JURY TRIAL DEMANDED** |
| **S.A.K.P., NEW YORK BRANCH,** | § | |
| *Defendants.* | § | |

**PLAINTIFF'S THIRD[1] AMENDED COMPLAINT**

Plaintiff, ALI CHOUDHRI, INDIVDIUALLY, makes and files this his Third Amended

Complaint against NATIONAL BANK OF KUWAIT S. A. K.P., New York Branch (hereinafter

"NBK"), and respectfully shows:

**PARTIES**

1.  Plaintiff is an individual residing in Harris County, Texas.

2.  Defendant National Bank of Kuwait, S.A.K.P., New York Branch (hereinafter "NBK"), is

a banking corporation organized under the laws of Kuwait, acting through its New York Branch

and has made an appearance herein.

**JURISDICTION and VENUE**

3.  This Court does not have bankruptcy jurisdiction over this cause of action as the removal

was improper[2] and the parties agreed by contract that any dispute between them would be resolved

---

[1] This is the third iteration of the Plaintiff's pleading, although it is the first filed originally in this Court.  This action was removed from the 129th Judicial District Court of Harris County, Texas and is subject to a Motion to Remand.  It is being filed under Rule 15 without a request for leave, since no responsive pleading has been filed by the Defendant.
[2] Please see Motion to Remand, Doc.3, and any supplements.

in the state district courts of Harris County[3] and these types of contractual agreements are honored by the courts.[4] Neither the viability of the tax liens or the amount of them is in dispute.  The only issue is the identity of the rightful owner of the proceeds of the tax liens, and the determination of that issue is of no moment to the bankruptcy estate.   Venue is proper in Harris County, Texas for a number of reasons, most importantly the contractual agreement of the parties.

## FACTUAL BACKGROUND

4.   NBK, Galleria Owner, LLC ("Galleria"), Naissance Galleria, LLC ("Naissance", and Ali Choudhri, individually ("Choudhri") entered into an agreement titled "Confidential Settlement Agreement" (hereinafter "CSA") with a defined Effective Date of August 22, 2022.

5.   The CSA was recently presented in proceedings before this Court as an exhibit by NBK, the Trustee, and perhaps other parties.  Plaintiff requests that the Court take judicial notice of this contract that is in the Court's file.

6.    Portions of the CSA appear in this Court's memorandum opinion regarding confirmation.

7.   Under the terms of the CSA Galleria agreed "to pay or cause to be paid to NBK the total sum of $27,000,000."

8.    Under the CSA no party other than Galleria agreed "to pay or cause to be paid to NBK the total sum of $27,000,000."

9.   Under the terms of the CSA a Down Payment was to be made directly to NBK, described as "EIGHT HUNDRED AND ONE THOUSAND FIVE HUNDRED AND NINE AND 42/100 US DOLLARS ($801,509.42)."[5]

---

[3] The CSA expressly states that the parties "agree that exclusive jurisdiction for any dispute based on or arising from this agreement will be in the Harris County District Court, Houston, Texas."
[4] *E.g., Grand View PV Solar Two, LLC v. Helix Elec., Inc.*, 847 F.3d 255 (5th Cir. 2017); *City of New Orleans v. Mun. Admin. Servs., Inc.* , 376 F.3d 501, 504 (5th Cir. 2004).
[5] The Down Payment included "such amount [the $801,509.42] including any increases thereto or income thereon".

2

10.   NBK received the Down Payment.

11.   The time frame for payment of the Settlement Amount by Galleria under the CSA was identified in the CSA as the "Payment Date" and that date was 210 days from the Effective Date.

12.   The CSA also provided for a "Purchase Option" that included a "Purchase Option Payment" that could be made by the "Purchase Option Parties."  Under the Purchase Option, the Purchase Option Parties had the right, but not the obligation to "purchase the Loan Documents" (as defined in the CSA).

13.   The "Purchase Option Payment" includes the Down Payment referenced in paragraph 3.1(d) of the CSA, and referenced in this pleading in paragraph 9. The remainder of the "Purchase Option Payment" is the balance of funds, which added to the Down Payment equals the total purchase price of $27,000,000.

14.   The Purchase Option was never exercised by any party prior to the Payment Date.

15.   The CSA expired by its terms on the Payment Date.

16.   The CSA also provided that "[t]o the extent that a Settlement Default (as defined below) occurs, then NBK shall be entitled to retain the Down Payment as liquidated damages…".

17.   The CSA provided that Texas law would apply.

18.   Under Texas law the term "liquidated damages" as used in the CSA refers to an acceptable measure of damages that parties stipulate in advance will be assessed in the event of a contract breach.

19.   The CSA provided that in the event of a Settlement Default "then NBK shall be entitled to retain the Down Payment as liquidated damages..."

20.   The CSA also provides that "Choudhri shall cause the transfer and assignment of the tax liens with respect to the Property for years 2019 and 2020 (the 'Tax Liens') to NBK.

000925

21.   Choudhri did in fact cause the transfer and assignment of the Tax Liens to NBK.

22.   The CSA further provides that "Upon NBK's receipt of either the Settlement Payment or the Purchase Option Payment, NBK shall contemporaneously transfer and assign the Tax Liens to Choudhri."

23.   The Tax Liens are nowhere defined in the CSA as part of the consideration of the Settlement Payment or the Purchase Option Payment.

24.   The Tax Liens are not part of the Settlement Payment or the Purchase Option Payment.

25.   The Tax Liens are nowhere defined in the CSA as part of the "Down Payment".

26.   The Tax Liens were not part of the "Down Payment".

27.   The Tax liens are nowhere defined in the CSA as "liquidated damages."

28.   The Tax Liens are not liquidated damages.

29.   The Tax Liens are not defined anywhere in the CSA as damages for breach of the CSA by any party.

30.   Texas law provides that claimed liquidated damage provisions that violate the rule of just compensation, either in design or in operation are not enforceable.

31.   The value of the Tax Liens at the time they were temporarily transferred to NBK exceeded $3,000,000.

32.   The Purchase Option is not susceptible to being "breached" since it offers an option but does not create an obligation.

33.   Any exercise of the Purchase Option was required by the CSA to be "in the form and manner provided in Section 12 of the Intercreditor Agreement."

34.   Plaintiff did not exercise the Purchase Option "in the form and manner provided in Section 12 of the Intercreditor Agreement" prior to the Payment Date.

4

35.   On or about April 11, 2023 a civil action was commenced by Galleria Owner 2425, LLC in the 281st District Court of Harris County, Texas, being Cause No. 2021-63370 regarding disputes concerning the CSA.

36.   In the matter pending in the 281st Judicial District Court, Galleria asserted that NBK breached the CSA.[6]

37.   The trial court in the case in the 281st entered an Order finding that it was likely that Galleria would prevail on its claim of breach of contract.

38.   The finding by the 281st District Court in paragraph 37 was never appealed or set aside.

39.   On June 28, 2023 a letter in email form was forwarded by the lawyers for NBK to counsel for Galleria and Choudhri.

40.   The June 28, 2023 letter listed as "Amounts Paid to Date" the Down Payment, an April $80,000 payment per order of the Court, and a May $80,000 payment, also per order of the Court.

41.   The June 28, 2023 letter was sent after the Payment Date.

42.   The June 28, 2023 letter reflected an "Outstanding Settlement Balance" of $26,038,490.58.

43.   At no time prior to April 28, 2024 did NBK or its representatives send a writing to Plaintiff or his representatives that payment of $26,038,490.58 would be unacceptable.

44.   At no time ever did NBK assert that the consideration for the purchase of assets included in the CSA would be greater than $27,000,000.

45.   By correspondence dated April 28, 2024, from Ali Choudhri to Charles Conrad, counsel for NBK, Mr. Choudhri wrote that he accepted and tendered the Settlement/Purchase Option in the amount of $26,038,490.58.

---

[6] The pleadings in this state court case are now in 2023-22748 before this Court, and Plaintiff requests that the Court take judicial notice, not of the factual accuracy of the pleadings, but of the allegations contained therein.

000927

46.   NBK did not respond to Mr. Choudhri's April 28, 2024 communication favorably.

47.   In oral testimony on June 5, 2024 NBK's designated representative indicated that NBK considered the tender of the Settlement/Purchase Option untimely.

48. The offer to pay the $26,038,490.58 contained in Mr. Choudhri's April 28, 2024 letter was rejected by NBK.

49.   NBK considered the CSA in breach when the Settlement Amount was not received by NBK on or before the Payment Date.

50.   Plaintiff had requested return of the Tax Liens or compensation in the amount of the Tax Liens but NBK has declined to either return the Tax Liens or remit their value to Plaintiff.

## CLAIMS FOR RELIEF

51.   <u>Conversion</u> – Pleading in the alternative, NBK's retention of the Tax Liens to which Plaintiff had entitlement to possession constitutes the unlawful and unauthorized assumption and exercise of control over the property to the exclusion of and inconsistent with, the plaintiff's rights as an owner.  Nothing in the CSA or in the common law of the State of Texas allows NBK to keep the Tax Liens under the circumstances present in this case.  To the extent that NBK breached the CSA with respect to the only obligor in the contract, NBK had no right to maintain possession of the Plaintiff's Tax Liens.  To the extent that performance by Galleria was prevented or did not occur, NBK had no legal right to maintain possession of the Tax Liens.  The remedy for breach of contract is a suit for damages against the party who breached, which in this case could not be Plaintiff, since Galleria was the only party with the obligation to "pay or cause to be paid to NBK the total sum of $27,000,000" and no option was ever exercised by Plaintiff or consented to by NBK.  The Tax Liens are not "liquidated damages" because they are not identified as such, and because the CSA does identify liquidated damages in a specific amount in the event of a breach

6

that does not include the Tax Liens, and because the Tax Liens are the property of Plaintiff, who

as a matter of law could not have breached the CSA.  NBK agreed to an amount as "liquidated

damages" and was paid the amount agreed as "liquidated damages." To the extent that NBK now

claims that the Tax Liens are liquidated damages, this is contrary to the terms of the CSA, and in

any case the terms regarding the Tax Liens would be unenforceable under Texas law as liquidated

damages because they are clearly a penalty against a party who could not have breached the

contract.[7]

52.  <u>Money Had and Received – Unjust Enrichment.</u>  Pleading further in the alternative,

Plaintiff would show that the Tax Liens have been wrongfully held by NBK and the funds derived

from them should be restored to Plaintiff to prevent the unjust enrichment of NBK.  Equity and

good conscience require restitution of the value of the Tax Liens to Plaintiff.   Under the

circumstances presented here, NBK holds money which in equity and good conscience belongs to

the Plaintiff.  The CSA unequivocally identifies the purchase price in the transaction, and it does

not include the Tax Liens.  At no time from August 22, 2022 through the date of the letter from

NBK's counsel in June 2023 did NBK take the position that the Tax Liens were somehow part of

the purchase price.  As of this time, NBK has never taken such a position. Similarly, the CSA

identifies a specific cash penalty, identified directly as liquidated damages, that NBK is to receive

in the event of breach of the CSA. The only breach identified is the failure to remit the Settlement

Payment, which  is an obligation of Galleria, not the Plaintiff.  No breach of any kind has been

asserted against the Plaintiff.   Liquidated damages are defined under Texas law as "a contractual

device that parties use to determine their rights and liabilities in the event of a dispute."[8]  NBK

---

[7] *Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex. 1991) (Whether a contractual provision is an enforceable liquidated
damages provision or an unenforceable penalty is a question of law for the court to decide.').
[8] *See Atrium Med. Ctr., LP v. Hous. Red C LLC* , 595 S.W.3d 188, 192 (Tex. 2020)

000929

received those liquidated damages. NBK received the liquidated damages that it contracted to receive. The CSA, absent a finding of breach that caused other damages, is concluded.  No justification exists for the continuing exercise of dominion and control over the any funds derived from the Tax Liens by NBK.  Assuming the CSA was breached by Galleria and there is no legal excuse for the failure of Galleria to "pay or cause to be paid" funds, NBK has received its full measure of its agreed damages by its retention of the Down Payment as liquidated damages. Alternatively, any further grievance it might have would only be against Galleria, the only party obligated under the CSA to make payment.

53.  <u>Breach of Contract by NBK</u> – Pleading further in the alternative, Plaintiff would show that the failure to return the Tax Liens to Plaintiff is a breach of contract.  The operative provision requires the Tax Liens to be conveyed to Plaintiff once the contract between Galleria and NBK is concluded by payment.  NBK asserts that the CSA was breached by Galleria, and the damages for that alleged breach have been received by NBK.  The acceptance of the liquidated damages concludes Galleria's obligations under the CSA and is the agreed upon substitute for performance – i.e. the payment of the Settlement Payment.  To the extent that the condition for the return of the Tax Liens is in any way enforceable, it has effectively been met.  Whether Galleria or NBK breached the CSA, or neither of them did, the rules of contract law required the return of the Tax Liens to Plaintiff, and gives to Plaintiff the right to monetary damages equal to the value of the Tax Liens.

54.  Pleading further in the alternative, Plaintiff pleads for rescission of the contract terms related to the Tax Liens in the event the Court does not find as a matter of law that the funds obtained by NBK should be paid on the face of the CSA and the undisputed conduct of NBK. Rescission of a contract term is a remedy that operates to extinguish a contract term whether it is

000930

valid or not when it must be set aside because of fraud, mistake, or some other reason to avoid unjust enrichment.  The contract provisions concerning the Tax Liens should be rescinded because it was never within the contemplation of both parties that the Tax Liens would be held by NBK on anything other than a temporary basis, and the contract nowhere allows the retention of the Tax Liens due to a breach by NBK or Galleria, or the failure of the payments to be made irrespective of legal fault.  NBK has no breach of contract case against the Plaintiff, and in these circumstances could not.  NBK has no viable legal action against the Plaintiff that would allow it to keep the Tax Liens, and the funds derived from them, under any damage theory at all. The obligor on the CSA was Galleria.  This provision should be avoided due to unilateral or mutual mistake or the doctrine of "mistake-plus-knowledge."

55.     Pleading further in the alternative, if in this case if NBK was always had the intention that once it had secured Plaintiff's Tax liens it would retain them even if the contract was breached by NBK or Galleria, or for some unknown and justified reason the contract was not performed it was aware that this was not the intent of the Plaintiff and was aware of the mistake, and intentionally made no mention of this windfall to itself, leaving Plaintiff in the mistaken view that the Tax Lien transfer was temporary only.  No other construction of these facts makes any sense. The "mistake" was "remediable" since this provision could have indicated what result followed if Galleria failed to perform, or for any reason the contract was not performed. If this result is not clear from the wording of the CSA itself, then a jury must determine the fact question concerning whether the mistake is such that this provision should be rescinded.

56.     Pleading further and in the alternative Plaintiff would show that Plaintiff received no consideration for a provision that allegedly allows NBK's permanent taking of the Tax Liens. First of all, the provision adds nothing of any substance to the obligation of Galleria to pay or cause to

000931

be paiD the $27,000,000.  The Down Payment is the same.  The balance is the same.   The timing of the Settlement Payment is the same. The agreement on the amount of liquidated damages in the event of a default remains the same. The provisions regarding the Tax Liens, if interpreted as being permanently the property of NBK are without consideration of any kind.  They are not part of the Down Payment.  They are not part of the Settlement Payment.  They are not liquidated damages.  These provisions should be rescinded and the Tax Liens, or the funds derived therefrom, returned to Plaintiff.[9]

57.  Pleading further and in the alternative, Plaintiff would show that the factual circumstances surrounding the performance of the parties to the CSA are complicated and unresolved.  These claims have not been fully and fairly litigated as is applicable here, with the possible exception of the proceedings in state court reference above. In the event that NBK breached the CSA[10], then the retention of the Tax Liens obviously has no support in law, since NBK would be profiting from its own breach, but this result would follow from NBK's construction of the CSA. This result is even worse than NBK punishing Plaintiff for the alleged breach of the other party to the CSA which is the only party to the CSA with an obligation to "pay or cause to be paid" the Settlement Amount.  This construction is untenable and e above paragraphs concerning causes of action that support the return of the Tax Liens or the funds derived from them, compel the return of the Tax Liens or the payment of the value of the Tax Liens to the Plaintiff.

58.  Pleading further an in the alternative, should the Court find that the language concerning the Tax liens did not compel the return of the Tax Liens to Plaintiff and as a matter of law compel

---

[9] Plaintiff anticipates that the recent auction and sale will be approved by the court and the buyer will have the responsibility for paying the Tax Liens.  Any references to the "return" of the Tax Liens is not operative absent unforeseen circumstances, but would otherwise be an alternative legal remedy.
[10] These allegations have been incorporated by reference and are not the basis for a cause of action in this pleading for contract damages for breach per se.  Their inclusion in this pleading is addressed to the effect of a party other than Plaintiff causing a breach, and the effect that should have in law regarding the return of the Tax Liens or payment of their value to the Plaintiff.

000932

damages to be awarded to Plaintiff of their value, then Plaintiff would show that the language is ambiguous since there is no language in the CSA that expressly deals with the handling of the Tax Liens in the event of a breach of the agreement by NBK or by Galleria. There is no language concerning the treatment of the Tax Liens in the event of justifiable impossibility or other no-fault events that might prevent performance in a timely fashion. It seems abundantly clear that the parties intended the transfer to be only temporary but should there be any doubt about this then the operative clause must be considered ambiguous.  Under Texas law when a contract does not specifically address the treatment of the retention of assets the provision is deemed to be ambiguous, and then the fact question of intent must be resolved by a jury.

59.   State Court Matters -- Docket Control Order –If the matter is remanded, Plaintiff requests a docket control order specific to this particular case.  Pursuant Texas Rule of Civil Procedure 47(c)(4) Plaintiff seeks damages for over a million dollars. All conditions precedent to Plaintiff's claims for relief have occurred or been performed. RULE 193.7 NOTICE Plaintiff hereby gives actual notice to Defendant that any and all documents produced may be used against Defendant at any pre-trial proceeding and/or at trial of this matter without the necessity of authenticating the documents.

## DAMAGES

60.   Plaintiff requests monetary damages in the amount of the value of the Tax Liens, as well as reasonable attorneys' fees, prejudgment and postjudgment interest and costs, to the extent allowed by law.

## JURY DEMAND

61.   Plaintiff demands a jury trial.

000933

## PRAYER

62.   Plaintiff prays that upon hearing this matter be remanded back to the state court from which it was removed, the controversy here being between two non-debtor parties over the ownership of the proceeds from payment of the Tax Liens, and that after a jury trial the Plaintiff have judgment against NBK for actual damages in the amount of the value of the Tax Liens, for reasonable attorneys' fees, for costs, for prejudgment and post-judgment interest as set forth in law, and for such other and further relief concerning which the Court deems fair and just.

Respectfully Submitted,

**THE STEIDLEY LAW FIRM**

By: /s/ Jeffrey W. Steidley
JEFFREY W. STEIDLEY
State Bar No. 19126300
Federal Bar No. 5609
jeff@texlaw.us
3701 Kirby Drive, Suite 1196
Houston, Texas 77098
(713) 523-9595 (telephone)
(713) 523-0578 (facsimile)

**ATTORNEY FOR PLAINTIFF**

000934

## CERTIFICATE OF SERVICE

I hereby certify that I have served all counsel of record electronically or by other manner authorized by Fed. R. Civ. P. 5(b)(2) on this the 3rd day of July, 2024, as indicated below:

Charles C. Conrad                    ***VIA ECF***
State Bar No. 24040721
Elizabeth Klingensmith
State Bar No. 24046496
Ryan Steinbrunner
State Bar No. 24093201
PILLSBURY WINTHROP SHAW PITTMAN LLP
609 Main Street Suite 2000
Houston, TX 77002
Telephone: (713) 276-7600
Facsimile: (713) 276-7634
charles.conrad@pillsburylaw.com
liz.klingensmith@pillsburylaw.com
ryan.steinbrunner@pillsburylaw.com

**Attorneys for National Bank of Kuwait,
S.A.K.P., New York Branch**

By: */s/ Jeffrey W. Steidley*
        Jeffrey W. Steidley

13

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor 1 | Galleria 2425 Owner, LLC |
| Debtor 2 (Spouse, if filing) | |
| United States Bankruptcy Court for the: | Southern District of Texas |
| Case number | 23-60036  34815  Galleria Owner, LLC |

## Official Form 410

# Proof of Claim

04/22

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. **Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

### Part 1:   Identify the Claim

| | |
|---|---|
| 1. **Who is the current creditor?** | Ali Choudhri<br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the debtor _____ |
| 2. **Has this claim been acquired from someone else?** | ☑ No<br>☐ Yes.  From whom? _____ |

3. **Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

Ali Choudhri
Name
1001 West Loop South, Ste 700
Number     Street
Houston          TX          77027
City          State          ZIP Code

Contact phone  713-789-7654

Contact email  legal@jetallcompanies.com

**Where should payments to the creditor be sent? (if different)**

Name
Number     Street
City          State          ZIP Code

Contact phone _____

Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

| | |
|---|---|
| 4. **Does this claim amend one already filed?** | ☑ No<br>☐ Yes.  Claim number on court claims registry (if known) _____   Filed on ___/___/___<br>MM  /  DD  / YYYY |
| 5. **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No<br>☐ Yes.  Who made the earlier filing? _____ |

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$ 1,844,500. ~~960,000.00~~ 45 **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

bond payment on behalf of the Debtor *and Legal Advances*

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed) _____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☑ No | |
|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Yes. *Check one:* | **Amount entitled to priority** |

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).  $_____

☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).  $_____

☐ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).  $_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).  $_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).  $_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies.  $_____

\* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

---

### Part 3:   Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.
☐ I am the creditor's attorney or authorized agent.
☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.
☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date ~~10/31/2023~~ 4/9/24
                  MM / DD / YYYY

/s/ Ali Choudhri
Signature

**Print the name of the person who is completing and signing this claim:**

| Name | Ali | | Choudhri |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | | | |
| Company | | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 1001 West Loop South Ste 700 | | |
| | Number     Street | | |
| | Houston | TX | 77027 |
| | City | State | ZIP Code |
| Contact phone | 713-789-7654 | Email legal@jetallcompanies.com | |

**Jones, Nancy J.**

| | |
|---|---|
| **From:** | Conrad, Charles C. |
| **Sent:** | Thursday, June 29, 2023 5:42 PM |
| **To:** | jwetwiska@akingump.com; Petree, Nicholas |
| **Cc:** | Steinbrunner, Ryan; Fitzmaurice, Patrick E.; Weaver, Adam J.; Jones, Nancy J. |
| **Subject:** | RE: Galleria 2425 v National Bank of Kuwait - settlement |
| **Attachments:** | DRAFT NBK loan sale agreement 4853-6820-3629 v.2.docx; DRAFT Assignment of Deed of Trust 4872-5551-2941 v.1.doc; DRAFT assignment of '19 and '20 Tax Liens to purchaser 4888-1245-0925 v.1.docx |

Confidential:

Jim and Nick,

Attached are drafts of the following documents: 1) Loan Purchase and Sale Agreement (which includes the Allonge); 2) Assignment of Deed of Trust; and 3) Assignment of Tax Liens.  These drafts remain subject to NBK's review and comment.

**From:** Conrad, Charles C.
**Sent:** Wednesday, June 28, 2023 2:47 PM
**To:** Jones, Nancy J. <nancy.jones@pillsburylaw.com>; jwetwiska@akingump.com
**Cc:** Steinbrunner, Ryan <ryan.steinbrunner@pillsburylaw.com>; Petree, Nicholas <npetree@akingump.com>
**Subject:** RE: Galleria 2425 v National Bank of Kuwait - settlement

Confidential:

Jim, we went back to verify the amounts we received from the registry of the Court and determined the Court actually disbursed **$801,959.08** (slightly more than the $801,509.42 contemplated in the Settlement Agreement) to NBK. The additional $449.66 appears to account for the interest accrued over time. To that end, the revised amount of the Settlement Payment/Purchase Option Payment should be as follows:

**Settlement Payment Amount:** $27 million
**Amounts Paid to Date:**
- $801,959.08 paid to NBK from registry of the Court
- $80,000 paid to NBK on 4/18 per order of the Court
- $80,000 paid to NBK on 5/10 per order of the Court

**Current Outstanding Settlement Balance: $26,038,040.92**

**From:** Jones, Nancy J. <nancy.jones@pillsburylaw.com>
**Sent:** Wednesday, June 28, 2023 1:04 PM
**To:** jwetwiska@akingump.com
**Cc:** Conrad, Charles C. <charles.conrad@pillsburylaw.com>; Steinbrunner, Ryan <ryan.steinbrunner@pillsburylaw.com>
**Subject:** Galleria 2425 v National Bank of Kuwait - settlement

Jim, good afternoon.  Charles asked that I send you the attached.

1

000939

## CONFIDENTIAL SETTLEMENT AGREEMENT

This Confidential Settlement Agreement is made and entered into by and between the undersigned as of August 22, 2022 (the "Effective Date"), and is a binding contract pursuant to which the below named parties have fully and finally settled all claims and controversies existing between and among them, according to the terms of this Confidential Settlement Agreement. The parties to this agreement are National Bank of Kuwait, S.A.K.P., New York Branch, Galleria 2425 Owner, LLC, Naissance Galleria, LLC, and Ali Choudhri.

## I.    D E F I N I T I O N S

In addition to other definitions provided in this document as needed, the Parties hereto have agreed to the following definitions:

1.1    "Agreement" means this Confidential Settlement Agreement.

1.2    "Claims" means the Lawsuit (as defined below) and all other claims, counter-claims, causes of action, controversies, losses, demands, costs, damages, liabilities (joint or several), expenses of any nature (including attorneys' fees, costs and/or expenses), judgments, fines, and other amounts, both known and unknown, asserted or not asserted, accrued or not accrued, from the beginning of time up until the date of this Agreement, under any theory or any cause of action whatsoever recognized by law or equity between NBK, Galleria, and Ali Choudhri (and Naissance to the extent Naissance exercises the Purchase Option pursuant to Section 3.1(h)), as such terms are defined below.

1.3    "NBK" means National Bank of Kuwait, S.A.K.P., New York Branch, the Defendant and Counter-Plaintiff in the Lawsuit.

1.4    "NBK Released Parties" means NBK and all of its present or past parents, present or past subsidiaries, divisions, partners, successors-in-interest, predecessors, present and future affiliates, shareholders, unit holders, employees, officers, directors, representatives, agents, investigators, attorneys, assigns, executors, administrators, lenders, lien holders, creditors, financing institutions, banks, and insurers, and those in privity therewith.

1.5    "Galleria" means Galleria 2425 Owner, LLC, the Plaintiff and Counter-Defendant in the Lawsuit.

1.6    "Galleria Released Parties" means Galleria and all of its present or past parents, present or past subsidiaries, divisions, partners, successors-in-interest, members, managers, guarantors (including the Guarantor under the Loan Agreement), predecessors, present and future affiliates, shareholders, unit holders, employees, officers, directors, representatives, agents, investigators, attorneys, assigns, executors, administrators, lenders, lien holders, creditors, financing institutions, banks, and insurers, and those in privity therewith.

1.7    "Choudhri" means Ali Choudhri in his sole and individual capacity and as Intervenor in the Lawsuit.

1.8    "Choudhri Released Parties" means Choudhri, both in his individual capacity and including his heirs, assigns, agents, executors, attorneys, lenders, administrators, lien holders, creditors, and those in privity therewith, along with any entity in which Choudhri may have an ownership interest in and/or right to control now or in the future.

1.9    "Naissance" means Naissance Galleria, LLC.

1.10    "Parties" means NBK, Galleria, Naissance, and Choudhri, as defined herein, who are the parties to this Agreement.

1.11    "Lawsuit" means: Cause No. 2021-63370; *Galleria 2425 Owner, LLC v. National Bank of Kuwait, S.A.K.P., A New York Branch, et al.*; in the 281st District Court of Harris County, Texas.

1.12    "Loan Agreement" means that certain Loan Agreement between NBK and Galleria, dated May 23, 2018.  Capitalized terms not defined herein shall have the meaning ascribed in the Loan Agreement.

1.13    "Loan Documents" collectively means the following documents as defined in the Loan Agreement: the Loan Agreement, the Promissory Note, the Deed of Trust, the Assignment of Leases and Rents, the Guaranty, the Environmental Indemnity Agreement, the Assignment of Agreements, Licenses, Permits and Contracts, the Subordination of Management Agreement, the Fee Letter, the Intercreditor Agreement, the Control Account Agreement, any Assignment of Interest Rate Agreement entered into after the Closing Date and any and all other documents, agreements and certificates executed and/or delivered in connection with the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.  Loan Documents shall also include any Interest Rate Protection Product or ISDA Master Agreement.

1.14    "Property" means that certain real property and improvements located at 2425 West Loop South, Houston, TX 77027.

1.15    "Purchase Option Parties" means Naissance, Galleria, Choudhri and an entity wholly owned and controlled by Choudhri.

## II.    R E C I T A L S

2.1    WHEREAS, the Parties understand and agree that the claims and defenses asserted between them are in dispute, the Parties desire to confidentially compromise and settle the Claims and the Lawsuit, and including all claims, counter-claims, claims in intervention, third-party

2

claims and causes of action that were asserted or which could have been asserted, currently known or unknown, from the beginning of time up until the date of this Agreement, whether or not alleged or set forth in prior correspondence, claims, pleadings, or orally, which arise out of the Claims or the Lawsuit, the related occurrences, or legal proceedings, and which pertain thereto, to prevent any current or future litigation by or between the Parties arising out of or related to the Claims or the Lawsuit.

2.2     WHEREAS, the Parties deny all allegations, claims, counterclaims, claims in intervention and third-party claims arising out of the Claims or the Lawsuit, and by executing this Agreement, the Parties make no admissions, but rather have settled those claims and defenses which were raised or could have been raised by compromise as set forth below in order to avoid further litigation and to buy peace of mind.

## III.   A G R E E M E N T

NOW, THEREFORE, for and in consideration of the mutual promises, covenants and agreements contained herein, for the resolution and settlement of the Claims and the Lawsuit as set forth below, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree and covenant as follows:

### A.   SETTLEMENT TERMS

3.1     (a) **Acknowledgement of the Indebtedness.**     As of the Effective Date, Choudhri, Galleria and Naissance acknowledge and agree that NBK is owed $60,212,816.90 under the Loan Documents, **without defenses, setoffs, claims, counterclaims or deductions of any nature whatsoever, all of which are hereby expressly waived**;

(b) **Acknowledgment of Existing Defaults**. Galleria, Choudhri and Naissance further acknowledges and agrees that: (i) an Event of Default exists under the Loan Documents, (ii) any cure period with respect thereto has expired, (iii) all principal, interest, fees, costs and other charges due under the Loan Documents are fully accelerated and immediately due and owing to NBK **without defenses, setoffs, claims or counterclaims or deductions of any nature whatsoever all of which are hereby expressly waived**, and (iv) that each of Galleria, Choudhri and Naissance waives the right to all notices (including but not limited to notice of default, notice of intent to accelerate, notice of acceleration, and notice of foreclosure) each may otherwise be entitled to under the Loan Documents or otherwise. Galleria, Choudhri and Naissance further acknowledge and agree that all conditions precedent for NBK to post the Property for foreclosure have been fully satisfied;

(c) **Acknowledgment of Right to Foreclose.** Except as otherwise provided in this Agreement, Galleria, Choudhri and Naissance expressly recognize and acknowledge that NBK can exercise all of its rights and remedies under the Loan Documents, which are fully matured and

3

available for exercise by NBK, including, without limitation, the right to foreclose and the right to recover on any part or all of the indebtedness **without defenses, setoffs, claims or counterclaims or deductions of any nature whatsoever all of which are hereby expressly waived**;

(d) **Settlement Payment**. On or before the Payment Date (as defined below), Galleria will pay or cause to be paid to NBK the total sum of $27,000,000 as a settlement for all amounts owed under the Loan Documents, as follows: (i) within five (5) days of the Effective Date, Galleria agrees to request the Court to transfer the amount deposited into the registry of the Court by Choudhri, currently EIGHT HUNDRED AND ONE THOUSAND FIVE HUNDRED AND NINE AND 42/100 US DOLLARS ($801,509.42) (such amount, including any increases thereto or income thereon, the "<u>Down Payment</u>") directly to NBK. To the extent that a Settlement Default (as defined below) occurs, then NBK shall be entitled to retain the Down Payment as liquidated damages and, in addition, shall be entitled to pursue all of its rights and remedies under this Agreement, the Loan Documents or otherwise at law or in equity. If necessary, NBK agrees to join in Galleria's request to the Court where the Lawsuit is pending seeking disbursement of the funds constituting the Down Payment that is currently on file with the registry of the court in the Lawsuit; (ii) within two hundred ten (210) days of the Effective Date (such date, the "<u>Payment Date</u>") Galleria agrees to pay, or cause to be paid to NBK the balance by wire transfer in immediately available funds (the "<u>Settlement Payment</u>")**,** except to the extent that the Purchase Option is exercised pursuant to Section 3.1(h); and (iii) contemporaneously with NBK's receipt of the Settlement Payment set forth in Section 3.1(d)(ii), NBK will file a release of its lien and deliver proof of such release to Galleria's attorneys establishing that no NBK liens exist or have not been otherwise released by NBK;

(e) The Settlement Payment shall be made in good and immediately available funds by wire transfer to an account designated by NBK in writing; provided, however, that to the extent the Settlement Payment is made in connection with a sale or refinancing of the Property, the Settlement Payment may be first transferred to a title company handling the closing of such sale or refinancing for onward remittance to NBK;

(f) Galleria acknowledges and agrees that to the extent the Settlement Payment is remitted to NBK, or to an agreed upon title company as escrow agent or other acceptable escrow agent for further delivery to NBK, by anyone other than Galleria (including, without limitation, any lender to Galleria), then Galleria has no right, title or interest of any kind whatsoever in such Settlement Payment or the proceeds thereof;

(g) **Dismissal of the Lawsuit**. Within five (5) days of the Effective Date, Galleria will execute, enter, and file in conjunction with NBK a joint motion for dismissal with prejudice of all of its claims against NBK in the Lawsuit and a motion to permanently dissolve with prejudice the Court's Temporary Injunction Order issued in the Lawsuit;

4

(h) **Purchase Option**. NBK grants the Purchase Option Parties, as directed by Choudhri, the sole and exclusive right to purchase the Loan Documents as follows: (i) the Purchase Option Parties each acknowledge that a Purchase Option Event (as defined in the Intercreditor Agreement) has occurred, that Naissance has received a Purchase Option Notice (as defined in the Intercreditor Agreement), and that the Monetary Cure Period (as defined in the Intercreditor Agreement) has expired; (ii) the Parties agree that the Loan Purchase Price (within the meaning of Section 12(a) of the Intercreditor Agreement) is $27,000,000 payable as follows: (x) $801,509.42 in the form of the Down Payment payable pursuant to section 3.1(d) hereof; and (y) the balance payable by wire transfer in good and immediately available funds on or before the Payment Date (such payment, the "Purchase Option Payment"); (iii) other than the amount of the Loan Purchase Price set forth in this section 3.1(h), a Purchase Option Party's exercise of the Purchase Option shall be in the form and manner provided in Section 12 of the Intercreditor Agreement; (iv) all Parties consent to the transfer of the Loan Documents to a Purchase Option Party in connection with the exercise of the purchase option; (v) to the extent that a party other than a Purchase Option Party seeks to exercise this purchase option, NBK has the right to consent to such exercise, such consent not to be unreasonably withheld; and (vi) NBK shall transfer and assign the Loan Documents to the party exercising this purchase option upon NBK's receipt of the Purchase Option Payment. Upon written request of a Purchase Option Party, NBK shall provide such Purchase Option Party with a payoff statement for the satisfaction or purchase of its loan and the Loan Documents;

(i) within five (5) days of the Payment Date, NBK will prepare, execute and file a request to the Court in which the Lawsuit is pending for an abatement of NBK's claims in the Lawsuit. To the extent the Court declines to grant such abatement request, then NBK shall file a nonsuit, without prejudice, of its claims and Galleria specifically agrees (i) that such claims may be refiled following a the occurrence of a Settlement Default; (ii) that they will accept service of any such refiled claims by email on their counsel; and (iii) they agree not to assert any statute of limitations, laches or similar defense in response to such refiled claims;

(j) Except upon the occurrence of a Settlement Default, NBK will not take measures to foreclose on the Property or sell or assign the loan, other than as provided for in this Agreement, for two hundred ten (210) days after the Effective Date (such period, the "Foreclosure Forbearance Period"), and during such Foreclosure Forbearance Period, Galleria will maintain the Property itself and maintain all insurance policies covering the Property. If during the Foreclosure Forbearance Period, Galleria presents a request on behalf of any potential tenant that presents a Material Lease: 1) that does not include subordination and non-disturbance agreement from NBK, Galleria shall be permitted to enter into such lease without obtaining NBK's prior consent; or 2) that does include subordination and non-disturbance agreement from NBK, then NBK shall have the right to accept or reject pursuant to the Loan Documents;

**B.    RELEASES**

5

4.1    Release of NBK Released Parties.

(a) by Galleria. As of the Effective Date, Galleria **RELEASES, ACQUITS AND FOREVER DISCHARGES** the NBK Released Parties from all claims, both known and unknown, accrued or not accrued, from the beginning of time until the date of this Agreement, including, but not limited to, any and all claims relating to the Claims or the Lawsuit.  Upon NBK's receipt of either the Settlement Payment or the Purchase Option Payment, Galleria further **RELEASES, ACQUITS AND FOREVER DISCHARGES** the NBK Released Parties from all known and unknown claims, accrued or not accrued, from the beginning of time until the date of such payment, including, but not limited to, any and all claims relating to the Claims or the Lawsuit;

(b) By Choudhri. As of the Effective Date, Choudhri **RELEASES, ACQUITS AND FOREVER DISCHARGES** the NBK Released Parties from all known and unknown claims, accrued or not accrued, from the beginning of time until the date of this Agreement, including, but not limited to, any and all claims relating to the Claims or the Lawsuit.  Upon NBK's receipt of either the Settlement Payment or the Purchase Option Payment, Choudhri further **RELEASES, ACQUITS AND FOREVER DISCHARGES** the NBK Released Parties from all known and unknown claims, accrued or not accrued, from the beginning of time until the date of such payment, including, but not limited to, any and all claims relating to the Claims or the Lawsuit.

(c) by Naissance. As of the Effective Date, Naissance **RELEASES, ACQUITS AND FOREVER DISCHARGES** the NBK Released Parties from all known and unknown claims, accrued or not accrued, from the beginning of time until the date of this Agreement, including, but not limited to, any and all claims relating to the Claims, the Lawsuit or the Intercreditor Agreement.  Upon NBK's receipt of either the Settlement Payment or the Purchase Option Payment, Choudhri further **RELEASES, ACQUITS AND FOREVER DISCHARGES** the NBK Released Parties from all known and unknown claims, accrued or not accrued, from the beginning of time until the date of such payment, including, but not limited to, any and all claims relating to the Claims, the Lawsuit or the Intercreditor Agreement.

4.2    Release of Choudhri Released Parties.

(a) By NBK. As of the Effective Date, NBK **RELEASES, ACQUITS AND FOREVER DISCHARGES** the Choudhri Released Parties from all known and unknown claims, accrued or not accrued, from the beginning of time until the date of this Agreement, including, but not limited to, any and all claims relating to the Claims or the Lawsuit. Effective upon NBK's receipt of the Settlement Payment or the Purchase Option Payment, NBK **RELEASES, ACQUITS AND FOREVER DISCHARGES** the Choudhri Released Parties from all known and unknown claims, accrued or not accrued, from the beginning of time until the date of such payment, including, but not limited to, any and all claims relating to the Claims or the Lawsuit.

6

4.3     Release of Galleria Released Parties.

(a) By NBK. Effective upon NBK's receipt of the Settlement Payment or the Purchase Option Payment, NBK **RELEASES, ACQUITS AND FOREVER DISCHARGES** the Galleria Released Parties from all known and unknown claims, accrued or not accrued, from the beginning of time until the date of this Agreement, including, but not limited to, any and all claims relating to the Claims or the Lawsuit. Galleria acknowledges and agrees that such release, NBK's dismissal of its claims in the Lawsuit and the other obligations NBK has or will occur in connection with this Agreement constitute new value given to Galleria by NBK and that such new value is given by NBK and received by Galleria contemporaneously with the releases and any other value given or obligation incurred by Galleria under this Agreement.

## C.     REPRESENTATIONS AND WARRANTIES

5.1 **Capacity to Execute Agreement**. The Parties represent and warrant that they have the sole right and exclusive authority to enter into and execute this Agreement and that they have not sold, assigned, transferred or otherwise disposed of any of the Claims.

5.2 **Due Authority**. Each Party hereto that is not a natural person has duly authorized the person signing this Agreement on such Party's behalf to do so and each such signatory has the requisite power and authority to bind such Party to the terms of this Agreement.

5.3 **Concerning any Foreclosure**. Following any Settlement Default, each of Galleria, Choudhri and Naissance covenant and agree that they shall not seek to restrain or otherwise hinder, delay, frustrate or impair NBK's efforts to (i) foreclose upon any collateral granted under the Loan Documents, or (ii) enforce its rights and remedies pursuant to the Loan Documents. The provisions of this Paragraph shall be specifically enforceable by NBK and Galleria, Choudhri and Naissance acknowledge and agree that any breach thereof will expose NBK to irreparable harm and therefore injunctive relief is necessary without having to prove damages or post a bond or other collateral. Galleria, Choudhri and Naissance will cooperate, assist and execute all necessary documents, upon NBK's request, in furtherance of NBK's rights, powers and remedies under the Loan Documents.

5.4 **Assignment of Tax Liens**. Within five (5) days of the Effective Date, Choudhri shall cause the transfer and assignment of the tax liens with respect to the Property for years 2019 and 2020 (the "Tax Liens") to NBK. NBK represents and warrants that it will not take any measures to foreclose on the Property pursuant to the Tax Liens during the Foreclosure Forbearance Period. Upon NBK's receipt of either the Settlement Payment or Purchase Option Payment, NBK shall contemporaneously transfer and assign the Tax Liens to Choudhri.

## D.     DEFAULT

6.1 **Settlement Default**. Each of the following shall constitute a Settlement Default: (i) failure of any of Galleria, Choudhri or Naissance to comply with its representations, warranties,

7

covenants or other undertakings under this Agreement; (ii) breach of any representation made by Galleria, Choudhri or Naissance in this Agreement; (iii) if NBK does not receive the Settlement Payment or the Purchase Option Payment on or before the Payment Date; (iv) if Galleria (a) admits in writing of its inability to pay its debts generally as they become due, (b) file a petition in bankruptcy or a petition to take advantage of any insolvency act; (c) make an assignment for the benefit of creditors; (d) consent to, or acquiesce in, the appointment of a receiver, liquidator or trustee of itself or of the whole or any substantial part of its properties or assets; (e) file a petition or answer seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the Federal Bankruptcy laws or any other applicable law; (f) have a court of competent jurisdiction enter an order, judgment or decree appointing a receiver, liquidator or trustee of Borrower, or of the whole or any substantial part of the property or assets of Borrower, and such order, judgment or decree shall remain unabated or not set aside or unstated for sixty (60) days; (g) have a petition filed against it seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the Federal Bankruptcy laws or any other applicable law and such petition shall remain undismissed for sixty (60) days; (h) have, under the provisions of any other law for the relief or aid of debtors, any court of competent jurisdiction assume custody or control of Borrower or of the whole or any substantial part of its property or assets and such custody or control shall remain unterminated or unstayed for sixty (60) days; or (i) have an attachment or execution levied against the Property which is not discharged or dissolved by a bond within sixty (60) days;

6.2 **Remedies**. Upon the occurrence of a Settlement Default, NBK shall have the right to pursue any and all rights and remedies it has under the Loan Documents, applicable law and in equity, including, without limitation, the right to pursue foreclosure of the Property.

## E.    GUARANTY

7.1 Choudhri agrees that to the extent that any portion of the Settlement Payment or the Purchase Option Payment is avoided and recovered as a result of the operation of any bankruptcy or other proceeding, then Choudhri shall be liable for, and absolutely and unconditionally guarantees to NBK, the prompt payment to NBK of such avoided and recovered sums. This guaranty is a guaranty of payment and not of collection and Choudhri waives any right to require NBK to sue Galleria or any other party or to foreclose on the Property or any other collateral.

## F.    <u>DEFENSE, INDEMNITY AND HOLD HARMLESS.</u>

8.1    In consideration of the mutual promises, covenants, and agreements contained herein, for the resolution and settlement of the Claims and the Lawsuit, Galleria agrees to fully defend, indemnify, and hold NBK Released Parties harmless from any and all claims asserted against the NBK Released Parties by any party that are related to the Property, the Loan, the Loan Documents, this Agreement and any payments made under it.

8

### G. MISCELLANEOUS

9.1     The Parties further agree that this Agreement shall not be interpreted as an admission of liability on the part of any of the Parties hereto.  The consideration described above has been given by way of compromise to avoid expenses and terminate all controversies between the Parties, regardless to the extent of the Claims and the Lawsuit.

9.2     It is further agreed that the considerations stated above are the sole considerations for this Agreement, and that the considerations are contractual and not mere recitals, and that all agreements and understandings of the Parties are expressed herein.

**9.3     CONFIDENTIALITY AGREEMENT.  The Parties hereby further expressly represent, warrant, and agree that in making this Agreement, NBK, Galleria, Naissance, and Choudhri will keep the negotiations, contents and terms of this Agreement completely confidential and will not make known such information to anyone at any time under any circumstances (meaning that such information may not be published, displayed, discussed, disclosed, revealed or characterized, directly or indirectly, in any way to any one) save and except the Parties themselves, and as to their tax advisor or attorney, in which case NBK, Galleria, Naissance, and Choudhri warrant that such individuals shall also comply with this confidentiality provision, except as compelled to do so by law.  The Parties further agree, however, that any action brought on any kind herein released, this Agreement may be pled by the party against whom the claim is filed as a defense and this Agreement may be used by any party in any suit for breach of this Agreement.  Notwithstanding the foregoing and anything herein to the contrary, the Parties further agree that (i) following the Effective Date of this Agreement, Galleria or Choudhri may inform governmental agencies or departments that the Parties have reached a settlement agreement, and NBK will confirm same if contacted by any governmental agencies or departments, and (ii)  upon NBK's receipt of either the Settlement Payment or Purchase Option Payment, Galleria or Choudhri may inform governmental agencies or departments that the Parties have reached a settlement agreement to the satisfaction of all Parties, and NBK will confirm same if contacted by any governmental agencies or departments.**

9.4     No person or entity not a party to this Agreement shall be deemed to be a third-party beneficiary of this Agreement.

9.5     This Agreement may be amended only by an instrument in writing executed by the Parties.

9.6     If any term or other provision of this Agreement is found to be invalid, illegal, or incapable of being enforced by any rule of law or public policy, such provision shall be severed or reformed to the maximum extent allowed by law.  In any event, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect.

000948

9.7     The Parties hereto agree that this Agreement may be executed in counterpart originals, each of which shall constitute an original, and all of which together shall constitute one and the same agreement.

9.8     The Parties acknowledge that they have had the opportunity to read this Agreement and to consult with legal counsel of their choosing as to the meaning and effect of the Agreement and the rights and liabilities of the Parties. The Parties acknowledge that they understand and appreciate the foregoing words and terms and their effect.

9.9     The Parties acknowledge that they understand the meaning and effect of this Agreement and that they execute it of their own free will and accord for the purposes and considerations set forth.  Further, the Parties solemnly state that this Agreement is not being made because of any persuasive statement or representation or promise by anyone whomsoever or for anything other than what is recited herein.   In entering into this Agreement, each Party acknowledges that it is not relying upon any statement, representation, or promise that is not specified expressly herein.

9.10     The Parties represent one to the other that their respective signatory to this Agreement is empowered and legally competent to execute this Agreement on behalf of the Party for which it signed.  The Parties further represent that they, their respective signatories, and their respective representatives are of sound mind at the time they executed this Agreement.

9.11     The Parties represent and warrant to each other that they are the sole owner of all claims and causes of action they have released in this Agreement, that such claims are free and clear of all claims or liens of any other person or entity, that they have not assigned, pledged, subrogated or in any other manner transferred any of the claims or causes of action released herein, the Loan or any debt related to the Loan, and that there are no other persons or legal entities who could or should have asserted such claims or joined in any settlement or compromise of such claims.

9.12     Notwithstanding any provision contained herein to the contrary, each Party agrees to pay all of his or its own legal fees, costs and expenses that have been incurred in connection with the Claims and the Lawsuit, and the release of claims and related activities, including those associated with the negotiating, drafting and signing of this Agreement.

9.13     Within thirty (30) days after NBK's receipt of the Settlement Payment or the Purchase Option Payment, each party shall return all documents and discovery in their possession or control, including all copies, to the party who furnished it in the Lawsuit, or certify in writing that all such documents have been destroyed.

10

000949

9.14    The undersigned acknowledges that this Agreement is to be performed in Texas, and that the provisions hereof, and the respective rights and duties of the Parties hereto shall be construed in accordance with and governed by the laws of the State of Texas.  The undersigned agree that exclusive jurisdiction for any dispute based on or arising from this Agreement will be in the Harris County District Court, Houston, Texas; and that the prevailing party in any suit based on or arising from this Agreement will be further entitled to recover from the non-prevailing party the prevailing party's reasonable and necessary attorneys' fees, costs, and expenses.

9.15    THIS AGREEMENT CONSTITUTES THE ENTIRE AGREEMENT BETWEEN THE PARTIES HERETO WITH RESPECT TO THE SUBJECT MATTER HEREOF AND THERE ARE NO OTHER AGREEMENTS, WRITTEN OR ORAL, EXPRESS OR IMPLIED, RELATED TO THE MATTERS SET FORTH HEREIN.  THIS AGREEMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

*<remainder of this page left intentionally blank>*

000950

**NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH**

**Agreed:** National Bank of Kuwait, S.A.K.P., New York Branch

By:

Its:

~~Marwan Isbaih~~

~~General Manager~~

8/22/2020

**Date**

12

000951

## GALLERIA 2425 OWNER, LLC

Agreed:  Galleria 2425 Owner, LLC

By: _Ali Choudhri_ _Upermission_
Its: _Auth Agent_

Date _8/21/22_

13

## NAISSANCE GALLERIA, LLC

Agreed: Naissance Galleria, LLC

By: _____

Its: _____ Ali Choudhri w/permission MQ

Date ___8/21/22___

000953

**ALI CHOUDHRI**

Agreed: Ali Choudhri

_____

_____
**Date** 1-21-22

15

Super P6

| | |
|---|---|
| TEXAS REIT, LLC ALI CHOUDHRI DALIO HOLDINGS I, LLC AND DALIO HOLDINGS II, LLC APPELLANT(S) | IN THE DISTRICT COURT OF |
| VS. | HARRIS COUNTY, T E X A S |
| MOKARAM-LATIF WEST LOOP, LTD AND ALI MOKARAM APPELLEE(S) | 333RD JUDICIAL DISTRICT |

## CLERK'S CERTIFICATE OF
## DEPOSIT IN LIEU OF SUPERSEDEAS BOND

THE STATE OF TEXAS:

COUNTY OF HARRIS:

This document is to certify that I, the undersigned clerk of the District Courts of Harris County, Texas have received a cash deposit in the amount of TEN-DOLLARS and no cents (**$10.00**) deposited with the Registry of the Court (CASH), from **JAMES POPE** on behalf of **ALI CHOUDHRI** on **JANUARY 4TH 2024**

This cash deposit was deposited in accordance with Rule 24.1(c) (1) of the Texas Rules of Appellate Procedure, and is conditioned that the appellant shall prosecute his appeal or writ of error with effect and in case the judgment of the Supreme Court or Court of Appeals shall be against the appellant, he shall perform its judgment, sentence or decree and pay all such damages and costs as said court may award against him and, upon approval by the clerk, execution of the judgment or so much thereof as has been superseded shall be suspended.

WITNESS my hand and seal of office this **4TH day JANUARY of, A.D., 2024**

MARILYN BURGESS, District Clerk
Harris County, Texas

BY _Sophia Newton_ , Deputy
SOPHIA NEWTON

**F I L E D**
Marilyn Burgess
District Clerk

JAN 04 2024

Time:_____
Harris County, Texas
By_____
Deputy

Court of Civil Appeals:
JAMES Q POPE
THE POPE LAW FIRM
6161 SAVOY DRIVE, SUITE 1125
HOUSTON, TEXAS 77036
TBN: 24048738

**RECORDER'S MEMORANDUM**
This instrument is of poor quality
at the time of imaging.

PJ–27

000955

**FILED**
Marilyn Burgess
District Clerk

JAN 04 2024

Time:_____
Harris County
By_____
Deputy

Cause No. <u>2012-27197A</u>

| | | |
|---|---|---|
| MOKARAM-LATIF WEST LOOP, LTD. | § | IN THE DISTRICT COURT |
| and OSAMA ABDULLATIF | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| vs. | § | HARRIS COUNTY, TEXAS |
| | § | |
| ALI CHOUDHRI | § | |
| | § | |
| *Defendant,* | § | 333RD JUDICIAL DISTRICT |

## ALI CHOUDHRI
## NET WORTH AFFIDAVIT

STATE OF TEXAS §
                  §
HARRIS COUNTY §

      BEFORE ME, the undersigned authority, on this day personally appeared Ali Choudhri, known to me to be the person whose name is subscribed to this affidavit, who, after being by me first duly sworn, upon his oath deposes and states:

      1.   "My name is Ali Choudhri and I am over 18 years of age, have never been convicted of a felony or a crime involving moral turpitude, I am fully competent to make this affidavit, and I am of sound mind and capable of making this affidavit."

      2.   "I have personal knowledge of the facts states herein and they are all true and correct."

      3.   "I am currently a judgment debtor in the above entitled and numbered cause and I have appealed or intend to appeal the judgment.

      4.   "Attached hereto as Exhibit 1, and incorporated herein by reference as if set forth in full, is a true and correct copy of my personal statement of net worth which includes a detailed personal financial statement showing my assets and liabilities."

Page **1** of **2**

Certified Document Number: 112092997 - Page 2 of 6

5. As is reflected in my personal statement of net worth, attached as Exhibit 1, my net worth computed by subtracting my liabilities from my assets is in the negative amount of -$105,729,010.00."

6. "All of the facts stated herein are true and correct."

Ali Choudhri

BEFORE ME, the undersigned authority, on this day personally appeared Ali Choudhri, known to me to be the person whose name is subscribed to the foregoing affidavit, who, after being by me first duly sworn, upon his oath deposes and states that she is cognizant of the foregoing facts and statements contained in the above affidavit and that the facts and statements· contained therein are true and correct and within his personal knowledge.

SWORN TO AND SUBSCRJBED BEFORE ME, the undersigned authority, on this the _4th_ day of _January_ 2024, to certify·which witness my hand and seal.

Notary Public in and for the State of Texas

Christine Beck
My Commission Expires
05/29/2024
ID No 132498876

**FILED**
**Marilyn Burgess**
District Clerk

JAN 04 2024

By_____
Deputy

| | | |
|---|---|---|
| MOKARAM-LATIF WEST LOOP, LTD. | § | IN THE DISTRICT COURT |
| and OSAMA ABDULLATIF | § | Harris County, Texas |
| | § | |
| *Plaintiff,* | § | |
| vs. | § | HARRIS COUNTY, TEXAS |
| | § | |
| ALI CHOUDHRI | § | |
| | § | |
| *Defendant,* | § | 333RD JUDICIAL DISTRICT |

### ALI CHOUDHRI
### NOTICE OF CASH DEPOSIT IN LIEU OF SUPERSEDEAS BOND

On January 4, 2024, Judgment Debtor Ali Choudhri (the "Appellant") deposited with the County Clerk the sum of $10.00, in the form of cash, as authorized by Tex. R. App. P. 24.1(c). *See* Exhibit A, Clerk Receipts.

Pursuant to Tex. R. App. P. 24.1(d), this deposit is subject to liability for all damages and costs that may be awarded against the Appellants up to the amount of the deposit if :

(1)    the Appellants do not perfect an appeal or their appeal is dismissed, and the Appellants do not perform the trial court's judgment; or

(2)    the Appellants do not perform an adverse judgment on final appeal.

If the Court should determine any other bond amount is necessary, Appellant seeks alternative relief under Rule 24.2(b), and pray for the Court, after notice and hearing, to determine the amount of the bond that will not cause the judgment debtor substantial harm.

Certified Document Number: 112092997 - Page 4 of 6

000958

Respectfully submitted,

/s/ James Q. Pope
James Q. Pope
TBN: 24048738
The Pope Law Firm
6161 Savoy Drive, Suite 1125
Houston, Texas 77036
Ph: 713-449-4481
jamesp@thepopelawfirm.com

## Certificate of Service

I hereby certify that on January 4, 2024, this document was served on all counsel of record by electronic service through the court's electronic filing and noticing system.

/s/ James Q. Pope
James Q. Pope

Certified Document Number: 112092997 - Page 5 of 6

## Ali Choudhri Consolidated Personal and Business Financial Statement
## As of 11/30/2023

**Assets**

**Current Assets**

| | | |
|---|---|---:|
| | *Personal Cash and Cash equivalents* | *$87,262* |
| | *Business Bank Statements/Cash* | *$62,441* |
| **Total Current Assts** | | **$149,703** |

**Long Term Assets**

| | | |
|---|---|---:|
| 1/ | *Interests in Real Estate LLCs* | *$94,231,487* |
| 2/ | Less Associated LLC Liabilities | -$169,398,355 |
| | **Net Value of Real Estate Investments** | **-$75,166,868** |

| | |
|---|---:|
| **Total Long Term Assets** | **-$75,166,868** |

| | |
|---|---:|
| **Personal Assets** | |
| **Total Personal Assets** | **$92,000** |

| | |
|---|---:|
| **Total Assets** | **-$74,925,165** |

**Liabilities and Net Worth***

**Current Liabilities**

| | |
|---|---:|
| *Personal Credit Cards* | *$46,474* |
| **Total Current Liabilities** | **$46,474** |

| | |
|---|---:|
| **Long Term Liabilities** | |
| **Total Long Term Liabilities** | **$30,757,371** |

| | |
|---|---:|
| **Total Liabilities** | **$30,803,845** |

| | |
|---|---:|
| **Total Net Worth** | **-$105,729,010** * |

\* Subject to adjustment

000960



I, Marilyn Burgess, District Clerk of Harris County, Texas certify that this is a true and correct copy of the original record filed and or recorded in my office, electronically or hard copy, as it appears on this date.
Witness my official hand and seal of office this   February 15, 2024

Certified Document Number:        112092997 Total Pages:  6

Marilyn Burgess, DISTRICT CLERK

HARRIS COUNTY, TEXAS

**In accordance with Texas Government Code 51.301 and 406.013 electronically transmitted authenticated documents are valid. If there is a question regarding the validity of this document and or seal please e-mail support@hcdistrictclerk.com**

000961

Fill in this information to identify the case:

Debtor 1    Galleria 2425 Owner

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the: _____ District of _____   _

Case number 2 3 -- 3 4 8 1 5 -----------

## Official Form 410

# Proof of Claim

12/15

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

## Part 1: Identify the Claim

| | |
|---|---|
| 1. Who is the current creditor? | **JETALL CAPITAL, LLC**<br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the debtor _____ |
| 2. Has this claim been acquired from someone else? | ☑ No<br>☐ Yes.  From whom? _____ |
| 3. Where should notices and payments to the creditor be sent?<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(9) | Where should notices to the creditor be sent?     Where should payments to the creditor be sent? {if different)<br><br>**JETALL**<br>Name<br>**1001  West Loop South, Suite 700**<br>Number      Street<br>**HOUSTON**       **TX**       **77027**<br>City                State           ZIP Code<br><br>Contact phone 281.630.6627<br><br>contact email ALI@JETALLCOMPANIES.COM<br><br>Uniform claim identifier for electronic payments in chapter 13 (if you use one):<br><br>Name<br>Number      Street<br>City                State           ZIP Code<br>Contact phone _____<br>Contact email _____ |
| 4. Does this claim amend one already filed? | No<br>☐ Yes.  Claim number on court claims registry (if known) ---     Filed on _____<br>                                                         MM / DD  / YYYY |
| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☑ No<br>☐ Yes.  Who made the earlier filing? _____ |

Give Information About the Claim as of the Date the Case Was Filed

| | |
|---|---|
| 6. Do you have any number you use to identify the debtor? | ** li1** No<br>**0** Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: __ __   __ __ __ __ |
| 7. How much is the claim? | $1,699,750.00 _____ . Does this amount Include Interest or other charges?<br>No<br>**D** Yes. Attach statement Itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2XA). |
| 8. What Is the basis of the claim? | Examples: Goods sold, money loaned, lease, services performed, personal Injury or wrongful death, or credit card.<br>Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br>Limit disclosing Information that is entitled to privacy, such as health care Information. |
| 9. Is all or part of the claim secured? | **0** No<br>**D** Yes. The claim is secured by a lien on property.<br><br>Nature of property:<br>**D** Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410 A) with this *Proof of Claim*.<br>Motor vehicle<br>Other. Describe:<br><br>Basis for perfection:<br>Attach redacted copies of documents, If any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>Value of property:   $<br>Amount of the claim that is secured:   $<br>Amount of the claim that is unsecured: $ _____ (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>Amount necessary to cure any default as of the date of the petition:   $<br><br>Annual Interest Rate (when case was filed)_____  %<br>**0** Fixed<br>**D** Variable |
| 10. Is this claim based on a lease? | **li1** No<br>**D** Yes. Amount necessary to cure any default as of the data of the petition.   $ |
| 11. Is this claim subject to a right of setoff? | **li1** No<br>**0** Yes. Identify the property: |

| 12. Is all or part of the claim entitled to priority under **11 U.S.C. § 507(a)?** | IBNo |  |
|---|---|---|
| | D Yes. *Check one:* | Amount entitled to priority |
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | D Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | D Up to $2,775'" of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | D Wages, salaries, or commissions (up to $12,475'") earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | D Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | 0 Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | 0 Other. Specify subsection of 11 U.S.C. § 507(a)LJ that applies. | $_____ |

'" Amounts are subject to adjustment on 4/01/16 and every 3 years after that for cases begun on or after the date of adjustment.

---

**Part 3:  Sign Below**

The person completing this proof of claim must sign and date it. **FRBP 9011(b),**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be **fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152,157, and 3571.**

*Check the appropriate box:*

II' I am the creditor.

D I am the creditor's attorney or authorized agent.

D I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

D I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  03/14/2024
                   MM / DD / YYYY

Signature

Print the name of the person who is completing and signing this claim:

| Name | ALI CHOUDHRI | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | | | |
| Company | | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 1001 WEST LOOP SOUTH, SUITE 700 | | |
| | Number        Street | | |
| | HOUSTON, TEXAS 77027 | | |
| | City | State | ZIP Code |
| Contact phone | 281.630.6627 | Email | ALI@JETALLCOMPANIES.COM |

# LEASE AGREEMENT

## TABLE OF CONTENTS

| | | |
|---|---|---|
| 1. | Definitions and Basic Provisions | 1 |
| 2. | Lease of Premises; Parking Privileges | 2 |
| 3. | Services by Landlord | 2 |
| 4. | Additional Rents | 3 |
| 5.. | Payments and Performance | 7 |
| 6.. | Installation of Improvements; ADA Compliance | 8 |
| 7. | Completion of Improvements and Commencement of Rent | 8 |
| 8. | Limited Right to Calculate Rentable Space; Subsequent Liquidation. | 8 |
| 9. | Repairs and Reentry | 9 |
| 10. | Alterations and Additions by Tenant | 9 |
| 11. | Entry for Repairs and Inspection | 9 |
| 12. | Mechanic's Liens | 10 |
| 13. | Tenant's Use | 10 |
| 14. | Laws and Regulations; Rules of the Building | 10 |
| 15. | Indemnity, Liability and Loss or Damage | 11 |
| 16. | No Subrogation; Insurance | 11 |
| 17. | Fire and Casualty | 11 |
| 18. | Condemnation | 12 |
| 19. | Termination Right | 12 |
| 20. | Assignment and Subletting | 12 |
| 21. | Holding Over | 13 |
| 22. | Abandoned Property | 14 |
| 23. | Taxes | 14 |
| 24. | Transfer of Landlord's Rights | 14 |
| 25. | Default | 14 |
| 26. | Security Deposit | 17 |
| 27. | Landlord's Lien and Security Interest | 17 |
| 28. | Remedies | 17 |
| 29. | Joint and Several Liability | 17 |
| 30. | Constructive Eviction | 18 |
| 31. | Building Name | 18 |
| 32. | Subordination and Attornment; Notice to Mortgagee | 18 |
| 33. | Lease Certificates; Financial Statements | 18 |
| 34. | Limitation of Landlord Liability | 19 |
| 35. | Consents | 19 |
| 36. | Notices | 19 |
| 37. | Brokerage | 19 |
| 38. | Force Majeure | 19 |
| 39. | No Third Party Beneficiary | 20 |
| 40. | Severability | 20 |
| 41. | Binding Effect | 20 |
| 42 | Applicable Law; Consent to Jurisdiction | 20 |
| 43. | Entire Agreement; No Warranties | 20 |
| 44. | NO IMPLIED REPRESENTATIONS | 20 |
| 45. | Effective Date | 21 |



Exhibits

Exhibit A:     Legal Description of the Total Tract
Exhibit B:     Floor Plan(s) of the Premises
Exhibit C:     Parking Privileges
Exhibit D:     Leasehold Improvements Agreement
Exhibit E:     Building Rules and Regulations
Exhibit F:     Janitorial Specifications

## LEASE AGREEMENT

THIS LEASE AGREEMENT (this "Lease") is entered into by the Landlord and Tenant hereinafter named.

1. **Definitions and Basic Provisions.** The terms defined below shall have the respective meanings stated when used elsewhere in this Lease, and such terms and the following basic provisions constitute an integral part of this Lease:

(a) **"Landlord":** 2425 West Loop, LP

(b) **"Tenant":** Jetall Companies, Inc.

(c) **"Premises":** certain space in a building owned by Landlord (the "Building") located at <u>2425 W Loop</u>, Houston, Texas, on a tract of land (the "Land") situated in the City of Houston, Harris County, Texas, described on <u>Exhibit A</u> attached hereto and made a part hereof for all purposes. The Premises are to be located on the 8th floor(s) of the Building, Suite 805, as shown on the floor plan(s) attached hereto as <u>Exhibit B</u> and made a part hereof for all purposes. Subject to Paragraph 9 below, the parties hereby agree that for purposes of this Lease the Premises contains approximately 10,153 square feet of Rentable Space (as defined below), and that there are approximately 283,680 square feet of Rentable Space in the Building.

(d) **"Lease Term":** a period one hundred and twenty (120) months, commencing on August 1, 2015 (the **"Commencement Date"**), subject to the possibility of extension as explained in Paragraph 8 below.

(e) **"Base Rental":** Base Rentals will be payable as follows:

| From | To | Annual Rate per SF | # Months | Monthly Rental Income | Total Periodic Revue |
|------|------|------|------|------|------|
| 08/01/15 | 11/30/15 | $0.00 | 4 | $0.00 | $0.00 |
| 12/01/15 | 07/31/16 | $24.00 | 8 | $20,306.00 | $162,448.00 |
| 08/01/16 | 07/31/17 | $24.50 | 12 | $20,729.04 | $248,748.50 |
| 08/01/17 | 07/31/18 | $25.00 | 12 | $21,152.08 | $253,825.00 |
| 08/01/18 | 07/31/19 | $25.50 | 12 | $21,575.13 | $258,901.50 |
| 08/01/19 | 07/31/20 | $26.00 | 12 | $21,998.17 | $263,978.00 |
| 08/01/20 | 07/31/21 | $26.50 | 12 | $22,421.21 | $269,054.50 |
| 08/01/21 | 07/31/22 | $27.00 | 12 | $22,844.25 | $274,131.00 |
| 08/01/22 | 07/31/23 | $27.50 | 12 | $23,267.29 | $279,207.50 |
| 08/01/23 | 07/31/24 | $28.00 | 12 | $23,690.33 | $284,284.00 |
| 08/01/24 | 07/31/25 | $28.50 | 12 | $24,113.38 | $289,360.50 |

Tenant agrees to pay all Rent to Landlord at the following address: <u>2500 W Loop South Suite 255 Houston, TX 77027</u> (or at such other place as Landlord may designate from time to time in writing) in monthly installments, in advance and without demand on the first day of each calendar month during and throughout the Lease Term.

(f) **"Prepaid Rental":** $0.00 representing payment of Base Rental for the first month to be paid on the date of execution of this Lease.

(g) **"Security Deposit":** $0.00, to be paid on the date of the execution of this Lease, and held by Landlord pursuant to the provisions of Paragraph 27 of this Lease.

(h) **"Sole Permitted Use":** General office use, consistent with a reputable office building and subject to Paragraph 14 and other relevant provisions of this Lease.

(i) **"Additional Rents":** Defined in Section 4, shall be due with base rent on the 1st of every month. Additional rent is estimated at $9.25 annually per square foot.

1

000967

(j)     "Leasing Agent(s)": Jetall Companies (representing Landlord and Tenant)

(k)     "Property Manager": Jetall Companies, Inc., Houston, Texas, subject to change by Landlord upon written notice to Tenant.

(l)     "Rentable Space": The total area attributable to a leased premises within the Building, i.e., being deemed by the parties to be appropriate for purposes of determining the Base Rental, the Allowance, rental adjustments, etc. under this Lease, with such total attributed area being determined by (a) using the American National Standard method for measuring Rentable Area in office buildings, as described in the pamphlet entitled ☐Standard Method for Measuring Floor Area in Office Buildings☐, published by the Building Owners and Managers Association International (ANSI/BOMA Z65.1-1996), and then (b) adjusting the floor-by-floor results thus achieved by the factor being used by Landlord to more uniformly allocate to the tenants in the Building the first floor lobby, the elevator lobbies and the other common areas of the Building.

(m)     "Normal Business Hours": 7:00 a.m. until 6:00 p.m. on weekdays (except holidays, as defined below), and from 8:00 a.m. until 1:00 p.m. on Saturdays (except holidays).  For purposes of this Lease, holidays are deemed to mean the following:

| | |
|---|---|
| January 1st | New Years Day |
| Last Monday in May | Memorial Day |
| July 4th | Independence Day |
| First Monday in September | Labor Day |
| Fourth Thursday in November | |
| plus Friday following | Thanksgiving Holidays |
| December 25th | Christmas Day |

2.     **Lease of Premises; Parking Privileges.**

(a)     In consideration of the obligation of Tenant to pay rent as provided in this Lease, and in further consideration of the other terms, covenants and conditions of this Lease, Landlord hereby leases to Tenant, and Tenant hereby takes from Landlord, the Premises for the Lease Term specified herein, all upon and subject to the terms and conditions set forth in this Lease.  Landlord hereby covenants that Tenant, upon paying rent as herein reserved, and performing all covenants and agreements contained in this Lease on the part of Tenant, shall have quiet and peaceful possession of the Premises.

(b)     In addition, at all times during the Lease Term, and conditioned upon the Lease being in full force and effect and there being no uncured default under this Lease by Tenant, Landlord hereby agrees to make parking privileges available to Tenant, as explained on, and governed by, Exhibit C attached to this Lease.  In this regard, Tenant acknowledges that in order for Landlord to be able to comply with parking allotments for all tenants in the Building, Tenant must assure that the aggregate of all parking utilized by Tenant, its owners, officers, employees, agents and invitees, does not exceed the parking allotment for Tenant as specified in Exhibit C.

3.     **Services by Landlord.**  At all times during the Lease Term, and conditioned upon the Lease being in full force and effect and there being no uncured default under this Lease by Tenant, Landlord shall furnish the following services to the Premises, all of such services to be at Landlord's cost and expense except as specifically provided to the contrary elsewhere in this Lease:

(a)     Cold and warm water at those points of supply provided for general use of tenants in the Building.

(b)     Heated and refrigerated air conditioning in season during Normal Business Hours and at such temperatures and in such amounts as are reasonably considered by Landlord to be standard and as is consistent in quality and quantity as furnished in other comparable quality office buildings in the vicinity of the Building.  Such services at all other times and on Sundays and holidays shall be furnished only at the request of Tenant, who shall bear the entire cost thereof.  Whenever machines or equipment that generate abnormal heat and affect the temperature otherwise maintained by the air conditioning system are used in the Premises, Landlord shall have the right

2

000968

to install supplemental air conditioning units in the Premises; and the cost thereof, including the cost of installation, operation, use and maintenance, shall be paid by Tenant to Landlord promptly on demand.

(c) Elevator service in common with other tenants for ingress and egress from the Premises, provided that Landlord may reasonably limit the number of elevators to be in operation at times other than Normal Business Hours.

(d) Janitorial cleaning services as may, in the reasonable judgment of Landlord, be required in the normal operation of the Building (but no less frequently than five times per week).

(e) Electric current in the manner and to the extent reasonably deemed by Landlord to be standard for office use.

The failure to any extent to furnish or any stoppage of these defined utilities and services resulting from any cause whatsoever shall not render Landlord liable in any respect for damages to either person, property or business, nor be construed as an eviction of Tenant, nor entitle Tenant to any abatement of rent, nor relieve Tenant from fulfillment of any covenant or agreement contained herein. Should any malfunction of the Building improvements or facilities occur for any reason, Landlord shall use reasonable diligence to repair same promptly. Tenant shall have no claim for rebate or abatement of rent or damages on account of such malfunction or of any interruptions in service occasioned thereby or resulting therefrom; provided, however, that if any interruption or cessation of service continues for thirty (30) consecutive days after written notice from Tenant to Landlord (and to any mortgagee of Landlord of whom Tenant has received written notice, designating a specific address for notice to such mortgagee), identifying the problem with reasonable specificity and being labeled "URGENT/IMMEDIATE ACTION REQUIRED" in all capital letters, and if such interruption or cessation after the 30-day cure period causes the Premises to be untenantable in the reasonable judgment of Tenant, then notwithstanding any provision of this Lease to the contrary, Tenant's Base Rental and Tenant's share of Operating Expenses under this Lease will abate as of the thirty-first (31st) day and continue abated until the service is resumed.

4. **Additional Rent**. All Operating Costs (As defined below) of every kind and nature paid or incurred by Landlord (including without limitation, Reasonable reserves) in operating, managing, accounting in connection with equipping, controlling, decorating, lighting, repairing, replacing, enhancing and maintaining the Property (including, without limitation, all costs and expenses incident to maintaining and repairing as reasonably required to maintain the property in the same condition as existed when originally completed) shall be prorated and Tenant shall share therein in the manner provided in this Section A. Operating costs shall likewise include( but shall not be limited to) Taxes (as defined Below) and Insurance Premiums (as defined below) for liability, property, workers Compensation, employers liability and other casualty and/or risk insurance maintained by landlord in connection with the property (including all such insurance with respect to parking facilities and for the entire property): The term "Additional Rent" means Tenants share of Operating Costs and all other sums, fees or charges (other than Base Rent) due payable by Tenant to Landlord pursuant to this Lease.

A. Tenants Share of Operating Costs shall be computed by multiplying the Landlords estimate of Operating Costs for the then-existing Operating Year (as defined below) by the Tenant's Share, as provided in Section 1 above, and shall be paid by Tenant in advance in monthly installments on the first (1st) day of each calendar month, based upon Landlord's reasonable estimates of the Operating Costs as set forth in periodic statements during the Term 9Such periodic intervals to be determined by Landlord). On or before April 1st of each Operating Year, Landlord shall provide to tenant a detailed report of the Actual Operating Costs, (including but not limited to insurance premiums and Taxes paid by Landlord during the preceding Operating Year (the "Operating Statement"), together with reasonable documentation supporting such Operating Costs. In the event the aggregate of Tenant's installments during the Operating Year shall be less than or more than the amount of actual charges due from the Tenant, such deficiencies or overpayments shall be paid to Landlord or credited to the next installments of Base Rent due from the Tenant, as applicable, within thirty (30) days after demand therefore.

B. Definitions

3

Tenant's    Landlord's
Initials    Initials

000969

1. The term "Taxes" means all taxes, impositions, assessments and all other governmental charges, if any, which are levied, assessed or imposed upon or become due and payable in connection with, or lien upon, the Property, or the operation thereof, (excepting federal and State taxes on income) including taxes levied by present or future taxing authorities and all taxes of whatsoever nature that are imposed in substitution for, or in lieu of, any of the taxes, impositions, assessments, or other charges included in this definition of Taxes and including without limitation, any tax on rents, franchise tax or other tax levied against Landlord or the Premises, in lieu of the whole or any part of any taxes or assessments levied, assessed or imposed on real estate and the improvements thereon, there shall be levied, assessed or impose on Landlord or the Premises a capital levy or other tax directly on the rents received there from and/or a franchise tax, assessment, levy or charge measured by or based, in whole or in part, upon such rents, then all such taxes, assessments, levies or charges, or the part thereof so measured or based, shall be included within the term "Taxes" for the purpose hereof. The foregoing sentence shall be construed to specifically include in the definition of "Taxes" for all purposes under this lease franchise taxes, margin taxes and any other taxes assessed against Landlord pursuant to Chapter 171 of the Texas Code, as same may be hereafter modified or amended, or any new legislation enacted hereafter. However, Taxes exclude the portion, if any, of ad valorem taxes against the Premises that is paid by tenants as a separate charge.

2. The term "Insurance Premiums" as used in this Lease means the total annual insurance premiums which accrue on all property insurance, boiler insurance, commercial general and excess liability insurance, rental interruption insurance and other insurance which, from time to time, may at Landlords election be carried by Landlord with respect to the Property during any applicable Operating Year (or portion thereof) occurring during the term of this Lease: provided however, in the event that during any such Operating Year all or any part of such coverage is written under a "blanket policy" or otherwise in such manner that Landlord was not charged a specific insurance premium applicable solely to the Property, then in such event, the amount considered to be the insurance premiums with respect to such coverage for such Operating Year shall be determined in good faith by Landlords Insurance Agent. If the insurance policies maintained by the Landlord with respect to the Property contain any nature of deductible feature (and Landlord agrees that (I) the aggregate amount of the deductibles shall not exceed $100,000, and (II) the amount of the deductibles shall be disclosed to Tenant upon Tenant's written request therefore), the Tenant, in the event of a loss, shall pay to Landlord within ten(10) days following receipt from landlord's obligations to repair or restore the Property. Alternately, Landlord may include such deductibles in Operating Costs, in which event Landlord shall assess tenant for Tenant's Share thereof in connection with Landlord's delivery of the Operating Statement as provided above. Insurance Premiums shall also include costs to settle insurance claims or otherwise recover insurance proceeds.

3. The term "Operating Costs" means the aggregate of all expenses paid or incurred by or on behalf of Landlord, whether structural, non-structural, foreseen or unforeseen, relating to the ownership, maintenance, repair, management and operation of the Property and any sidewalks or any other areas related to the Property which Landlord has a repair or maintenance obligation, determined on an accrual basis in accordance with generally accepted industry accounting standards, including, but not limited to the following:

   (a) Wages and salaries of all employees engaged in the operation and maintenance of the Property, including taxes, insurance and benefits relating thereto.

   (b) Costs of all supplies and materials used in the operation, maintenance, repair and management of the Property:

   (c) Costs of water, sewage. Power, heating, lighting, air-conditioning, ventilating, and other utilities furnished with the cooperation of the Property (excluding any costs billed to specific tenants)

   (d) Costs of all maintenance and service agreements for the Property, including but not limited to, security service, alarm service, window cleaning service, janitorial servise, landscape service, pest control and elevator service:

4

Tenant's        Landlord's
Initials         Initials

(e) Costs of all insurance carried by the Landlord relating to the Property, including but not limited to, property insurance, rental interruption insurance and commercial general and excess liability insurance applicable to the Property and the Landlord's insurance deductibles, at Landlord's option as provided above:

(f) Costs of repairs and maintenance of the parking facilities and landscaping of the Property

(g) Management Fees

(h) All net expenses properly allocable to an Operating Year (hereinafter defined) for any capital improvement or structural repair incurred to reduce or limit increases in Operating Costs, or required by Landlord's insurance carrier or by any change in the laws, rules, regulations or orders of any governmental or quasi-governmental authority having jurisdiction or expanses resulting from normal repair and maintenance, which expenses shall be repaid in equal monthly installments together with interest at applicable rates or the operational savings payback period: and

(i) Legal expenses incurred with respect to the Property which relate directly to the operation of the Property and which benefit all of the tenants of the building generally, such as legal proceedings to abate offensive activities or uses or reduce property taxes, but excluding legal expenses related to the collection of rent or the sale, leasing or financing of the Property.

4. Expressly excluded from the definition of the term Operating Costs are:

(a) Cost for which Landlord actually receives reimbursement by insurance, condemnation awards, warranties or otherwise.

(b) Expenses incurred in leasing or procuring new tenants, including advertising and marketing expenses or leasing commissions paid to the agent of Landlord or other brokers;

(c) Cost of renovating, decorating or constructing space for Tenant or other tenants or, except for those cost set forth in Section 6B (3) (h) above, renovating vacant space.

(d) Income, capital stock, estate, inheritance, franchise or other taxes payable by Landlord unless the same shall have been levied as a substitute for or supplement of real estate taxes pursuant to the definition of Taxes;

(e) Depreciation of Landlord's personal property of the Building;

(f) Interest on debt or amortization payments on any mortgage or deed of trust, rental under any ground or underlying lease or similar rental under any other superior lease or sublease;

(g) Dividends paid by Landlord;

(h) The cost incurred to remove or otherwise abate asbestos or asbestos-containing materials from the Building;

(i) Attorney's fees, costs and disbursements and other expenses incurred in connection with negotiations for leases with tenants, other occupants, or prospective tenants or other occupants of the Building and similar costs incurred in connection with leasing disputes between Landlord and tenants, other occupants, or prospective tenants or other occupants of the Building;

(j) Except as provided in Section 6B (3)(h) depreciation and amortization, or cost of a capital nature (including, without limitation, additions, improvements, alterations,

5

Tenant's   Landlord's
Initials   Initials

000971

replacements and repairs to the extent such are of capital nature);

(k) Landlord's cost of services or utilities which are not standard for the Building and which are not available to Tenant without specific charge therefore, but which are provided to another tenant or occupant is specifically charged by Landlord (irrespective of whether Landlord actually receives payment therefor)[or Landlord would have the right to charge such other tenants or occupants], or for which Tenant or any other tenant or occupants pays third parties;

(l) Subject to the other provisions of the Lease, Cost [limited to penalties (including late payment), fines and associated legal expenses] incurred by Landlord due to the violation by Landlord of the terms and conditions of this Lease or of the leases of other tenants in the Building, or applicable federal, state and local governmental laws, codes and regulations as same shall pertain to the Building and the parking garage. Notwithstanding the foregoing, interest or penalties incurred in connection with assessments or taxes which are reasonably contested by Landlord shall be included in Operating Costs;

(m) Except for the management fee and other fees to Landlord specifically provided in this lease, overhead and profit increments paid to affiliates of Landlord for services on or to the Property in excess of competitive costs for such services if they were rendered by non-affiliated persons or entities of similar skill, competence and experience:

(n) Costs of Landlord's general overhead, and general administrative and accounting expenses not directly related to or allocable to the Building (individual, partnership or corporate, as the case may be):

(o) Any compensation paid to clerks, attendants or other persons in commercial concessions (such as snack bar) if any, operated by Landlord for Landlords economic benefit:

(p) All terms and services for which Tenant specifically reimburses Landlord (other than the actual Operating Costs) or which Tenant pays third persons:

(q) Penalties for late payments of Taxes:

(r) Costs directly resulting from the gross negligence or willful misconduct od Landlord and/or contractors

(s) Ad valorem taxes allocable to the leasehold improvements of other tenants or occupants in the building, provided that such tax statements or other documentation specify the name(s) and addresses of said other tenants or occupants:

(t) Rentals and other related expenses, if any incurred in leasing air-conditioning systems, elevators or other equipment ordinarily considered to be a capital nature, except equipment that is used in providing janitorial services and that is not affixed to the building or is used in an emergency or temporary basis:

(u) Costs or expenses for sculpture, paintings or other works of art totaling in excess of $15000 during the initial Term, including, but not limited to, costs incurred with respect to the purchase, ownership, leasing, showing, promotion, securing, insuring, repairing and/or maintenance of the same:

(v) Contributions to Operating Costs

(w) Contributions to charitable organizations:

(x) Costs incurred in removing the property of former tenants and/or occupants of the Building

(y) Consulting costs and expenses incurred by Landlord except to the extent that same are

6

000972

incurred in an effort by Landlord to reduce or minimize Operating Costs or to the extent that they relate to the improvement of the management or operation of the Building:

(z) Costs or fees relating to the defense of Landlord's title to or interest in the Building or the Property, or any part thereof; and

(aa) Any other expense which according to industry standards would not be considered to be a maintenance or operating expense of the Building, unless expressly provided otherwise herein:

5. The term "Operating Year" means any calendar year ending December 31st after the Commencement Date occurs.

6. Tenant, at Tenant's expense may audit the Operating Statement under the following conditions:

(a) Tenant provides notice of its intent to audit within ninety (90) days after Tenant's receipt of the Operating Statement:

(b) The audit is performed by a Certified Public Accounting Firm acceptable to both Landlord and Tenant that has not been retained on a contingency basis or other basis where its compensation relates to the cost savings to tenant. Prior to the audit, such auditor and Tenant shall sign and deliver to Landlord a confidentiality agreement in form acceptable to each Landlord, Tenant and such Auditor (each being reasonable in connection therewith):

(c) The audit is commenced not sooner than thirty (30) days and not later than sixty (60) days after the receipt by Landlord of Tenants notice of intent to audit:

(d) The audit must be conducted during normal business hours, at the location where Landlord maintains its books and records, and must conclude within thirty (30) days after it commences:

(e) The audit is limited to the Operating Year in question and records of prior years shall not be produced for review by the auditor:

(f) No event of default shall exist which remains uncured:

(g) Tenant shall have paid prior to or contemporaneous with the notice of intent to audit, Tenant's Share of the Operating Costs as calculated by Landlord for the Operating Year in question and the estimated Operating Costs payments for the Operating Year during which the audit occurs: and

(h) Tenant's auditor shall produce a detailed report addresses to both Landlord and Tenant with its calculated conclusions.

5. **Payments and Performance.** Tenant agrees to pay all rents, additional rents and sums provided to be paid by Tenant pursuant to this Lease at the times and in the manner herein provided, without any setoff, deduction or counterclaim whatsoever. Should this Lease commence on a day other than the first day of a calendar month or terminate on a day other than the last day of a calendar month, the rent for such partial month shall be proportionately reduced. The Base Rental for the first partial month, if any, shall be payable at the beginning of said period or as Prepaid Rental. The obligation of Tenant to pay rentals is an independent covenant, and no act or circumstance whatsoever, whether such act or circumstance constitutes a breach of covenant by Landlord or not, shall release Tenant from the obligation to pay rentals. Time is of the essence in the performance of all of Tenant's obligations hereunder. In the event any rental is not received within ten (10) days after Tenant receives notice of such late payment, provided that Landlord shall not be obligated to provide Tenant with a notice and cure period with respect to the Tenant's failure to timely pay Base Rental more than two (2) times during any calendar year, but Tenant shall still be entitled to receive the benefit of the five (5) day grace period for the remainder of such calendar year, but there will be no requirement of written from Landlord to Tenant of such default, or if any rental payment is by check which is returned for insufficient funds, then in addition to the past due amount Tenant shall pay to

7

Tenant's Initials     Landlord's Initials

000973

Landlord a late charge in an amount equal to five percent (5%) of the rental then due, in order to compensate Landlord for its administrative and other overhead expenses. Any such late charge shall be payable on demand as additional rental. In addition, if rental is paid by a check which is returned for insufficient funds, Tenant shall immediately make the required payment to Landlord in good funds; moreover, in such event Tenant shall also pay to Landlord not only the late charge specified above in this Paragraph 6 (i.e., if and to the extent that such dishonored check causes the rental to become past due by more than ten days), but also an additional fee of $250.00 to compensate Landlord for its expense and effort in connection with the dishonored check. After the first check is returned for insufficient funds, Tenant shall be required to provide all future payments via cashier's check, money order, or Electronic Fund Transfer at Landlord's discretion.

6. **Installation of Improvements; ADA Compliance.** All improvements to be installed in the Premises at the commencement of this Lease shall be installed as specified in the Leasehold Improvements Agreement attached hereto as __Exhibit D__ and made a part hereof. Landlord will assure that the "Required Improvements" (hereafter defined) comply with the Americans With Disabilities Act of 1990, as amended, and all related state and local laws (collectively, the "ADA"); and Landlord agrees that the remainder of the Building, other than the Premises, and including any common areas or other improvements made to the Premises by Landlord, without regard to the special needs of the Tenant's employees, shall be in compliance with the ADA (also taking into account the fact that the Building was constructed before the effective date of the ADA). Tenant shall be responsible for causing its business operations within the Premises to comply with the ADA.

7. **Completion of Improvements and Commencement of Rent.** If the Premises are not ready for occupancy by Tenant on the Commencement Date of this Lease, the obligations of Landlord and Tenant shall nevertheless continue in full force and effect, including the obligation of Tenant to commence paying rent on the Commencement Date stated in Paragraph 1(d); provided, however, that if the Premises are not ready for occupancy for any reason other than Tenant's Delay (as defined in __Exhibit D__), then the rent shall abate and not commence until the date the leasehold improvements to the Premises are substantially complete. Any abatement of rent shall constitute full settlement of all claims that Tenant might otherwise have against Landlord by reason of the Premises not being ready for occupancy by Tenant on the Commencement Date. Notwithstanding the foregoing, if Tenant, with Landlord's consent, occupies the Premises after substantial completion of Tenant's leasehold improvements but prior to the beginning of the Lease Term set forth herein, all of the terms and provisions of this Lease shall be in full force and effect from the commencement of such occupancy and the Lease Term shall commence on the date on which Tenant first occupies the Premises and shall expire the same period of months thereafter as shown in Paragraph 1(d); no change shall occur in the length of the Lease Term.

8. **Limited Right to Calculate Rentable Space; Subsequent Liquidation.** (a) Landlord and Tenant agree that at any time within sixty (60) days after the Commencement Date of this Lease, either party may, at its sole expense, employ a licensed architect to calculate the Rentable Space of the Premises and/or of the Building. If the architect performing any such services should issue a written statement within ninety (90) days after the date of this Lease, which indicates that the Rentable Space specified for either the Premises or the Building should be modified (a "Modification Statement"), and if the other party to this Lease agrees with such Modification Statement, then Landlord and Tenant shall execute a written Amendment to Lease confirming the mutually agreed information and the appropriate rental adjustment which results from the corrected information (e.g., increasing or decreasing the Base Rental proportionate with the increase or decrease in the Rentable Space). If the architect performing any such services should issue a Modification Statement within ninety (90) days after the Commencement Date of this Lease, and if the other party to this Lease does not agree with such Modification Statement, then the other party may, at its sole expense, within sixty (60) days after the date of the Modification Statement, employ a licensed architect to review and respond to the Modification Statement (the "Response").

If the two architects fail to reach agreement within thirty (30) days after the date of the Response, then they shall select a third licensed architect (either by agreement between the two architects or, if they fail to agree on the third architect, by requesting that the Dallas chapter of the American Institute of Architects provide the third architect), with the fees of the third architect to be shared

8

Tenant's   Landlord's
Initials   Initials

equally by Landlord and Tenant. Upon agreement between the two architects selected by the parties, or upon the final decision of the third architect, Landlord and Tenant shall execute a written Amendment to Lease confirming the final determination and, if necessary, the appropriate rental adjustment.

(b) Notwithstanding anything contained in this Lease to the contrary, both Landlord and Tenant acknowledge and confirm their mutual desire to have all financial obligations under this Lease fixed and liquidated as soon as possible so that they can account for and plan such obligations with greater certainty. Accordingly, the parties agree that if neither party employs a licensed architect to perform any of the above-listed services within sixty (60) days after the Commencement Date of this Lease, or if no Modification Statement is delivered within ninety (90) days after the Commencement Date of this Lease, then the provisions of Paragraph 9(a) shall be null and void and of no further force or effect; and in such event (i) so that both parties to this Lease can be assured that they will not have to expend monies for professional fees regarding Rentable Space determinations after the deadlines established in Paragraph 9(a), they hereby agree that the Rentable Space for the Premises and for the Building, as specified in Paragraph 1(c) above, shall conclusively be deemed to be applicable to this Lease; and (ii) so that both parties to this Lease can be assured as to their financial obligations after the deadlines established in Paragraph 9(a), they further agree that Base Rental, the Allowance, rental adjustments and all other aspects of this Lease which are based in whole or in part upon Rentable Space shall be deemed to be final and no longer subject to adjustment based upon inaccuracies and/or errors, if any, in the Rentable Space determinations specified in Paragraph 1(c).

9.. **Repairs and Reentry.** Tenant will, at Tenant's own cost and expense, maintain and keep the Premises and any alterations and additions thereto in sound condition and good repair, ordinary wear and tear excepted, and shall pay for the repair of any damage or injury done to the Building or any part thereof by Tenant or Tenant's agents, employees and invitees; provided, however, that Tenant shall make no repairs to the Premises without the prior written consent of Landlord. The performance by Tenant of its obligation to maintain and make repairs shall be conducted only by contractors approved by Landlord after plans and specifications have been approved by Landlord. Tenant will not commit or allow any waste or damage to be committed on any portion of the Premises, and upon the termination of this Lease by lapse of time or otherwise, Tenant shall deliver up the Premises to Landlord in as good condition as at date of possession, ordinary wear and tear excepted. Upon such termination of this Lease, Landlord shall have the right to reenter and resume possession of the Premises. Notwithstanding the foregoing provisions of this Paragraph 10, any repairs to the Premises or the Building that are necessitated because of any damage caused by fire or other casualty shall be governed by the provisions of Paragraph 18 below. Landlord shall be responsible for maintenance to the exterior, structural and common areas of the Building.

10. **Alterations and Additions by Tenant.** Tenant shall make no alterations in or additions to the Premises without the prior written consent of Landlord which shall not be unreasonably withheld; and all alterations, additions, and improvements made to or fixtures or improvements placed in or upon the Premises by either party (except only moveable trade fixtures of Tenant) shall be deemed a part of the Building and the property of the Landlord at the time they are placed in or upon the Premises, and they shall remain upon and be surrendered with the Premises as a part thereof at the termination of this Lease, unless Landlord shall elect otherwise, whether such termination shall occur by the lapse of time or otherwise. In the event Landlord shall elect that certain alterations, additions and improvements made by Tenant in the Premises shall be removed by Tenant, Tenant shall remove them and Tenant shall restore the Premises to its original condition, at Tenant's own cost and expense, prior to the termination of the Lease Term. Alterations and additions to the Premises will be performed by Landlord at Tenant's cost and expense.

11. **Entry for Repairs and Inspection.** Landlord and its agents and representatives shall have the right to enter into and upon any and all parts of the Premises at all reasonable hours and with reasonable prior notice when possible (or, in any emergency, at any hour) to inspect same or clean or make repairs or alterations or additions as Landlord may deem necessary, and Tenant shall not be entitled to any abatement or reduction of rent by reason thereof. During the period of

9

000975

180 days prior to the expiration date of this Lease, Landlord and Landlord's agents may exhibit the Premises to prospective tenants at reasonable hours and upon prior notice to Tenant.

12. **Mechanic's Liens.** Nothing contained in this Lease shall authorize Tenant to do any act which shall in any way encumber the title of Landlord in and to the Premises or the Building or any part thereof; and if any mechanic's or materialman's lien is filed or claimed against the Premises or Building or any part thereof in connection with any work performed, materials furnished or obligation incurred by or at the request of Tenant, Tenant will indemnify, defend and hold Landlord harmless from any claims, losses or liabilities arising out of any liens filed or claimed against the Premises or building or any part thereof, by, through or under Tenant, except to the extent that Tenant bonds around such liens in accordance with the provisions of the Texas Property Code or causes such liens to be released . If the lien is not released of record or bonded around as provide above and default in payment thereof shall continue for twenty (20) days after written notice thereof from Landlord to Tenant, Landlord shall have the right and privilege at Landlord's option of paying the same or any portion thereof without inquiry as to the validity thereof, and any amounts so paid, including expenses and interest, shall be repaid to Landlord immediately on demand therefor as additional rent.

13. **Tenant's Use.** Tenant will be solely responsible for obtaining all necessary certificates (e.g., Certificate of Occupancy) and licenses necessary for Tenant's occupancy of the Premises and conducting its business therein. Tenant will not occupy or use any portion of the Premises for any purpose other than the Sole Permitted Use or for any purpose which is unlawful or which, in the good faith judgment of Landlord, is disreputable or which is hazardous due to risk of fire, explosion or other casualty. Tenant will not permit occupancy or use of the Premises by more than four (4) persons per 1,000 square feet of Rentable Space of the Premises; nor will Tenant permit anything to be done which will in any way (i) increase the rate of fire and casualty insurance on the Building or its contents, (ii) tend to lower the first-class character of the Building, (iii) create unreasonable elevator loads or otherwise interfere with standard building operations, or (iv) affect the structural integrity or design capabilities of the Building or any portion thereof (e.g., a floor being occupied by Tenant). In the event that, by reason of any act or conduct or business of Tenant, there shall be any increase in the rate of insurance on the Building or its contents created by Tenant's acts or conduct or business, then Tenant hereby agrees to pay Landlord the amount of such increase on demand. Tenant will conduct its business, and control its agents, employees, and invitees in such a manner as not to create any nuisance or interfere with, annoy or disturb other tenants or Landlord in the management of the Building.

14. **Laws and Regulations; Rules of the Building.** (a) Tenant at its sole expense will maintain the Premises in a clean and healthful condition and will comply with all laws, ordinances, orders, rules and regulations of any governmental authority having jurisdiction over the use, conditions or occupancy of the Premises. Without limiting the generality of the foregoing, Tenant shall comply strictly and in all respects with the requirements of all Hazardous Waste Laws and shall indemnify, defend and hold Landlord harmless from and against any liability, costs or expenses that may arise on account of the release, discharge, storage, disposal, treatment, processing or other handling or discovery of any Hazardous Substance within the Premises, or the discharge, release, disposal, storage, treatment, processing or other handling of any Hazardous Substance by Tenant, its employees, agents, contractors, or invitees anywhere on the Land or within the Building, or off site. As used herein, **"Hazardous Substance"** means any substance, material or matter that may give rise to liability under any Hazardous Waste Laws, including (but not limited to) medical waste and petroleum products or petroleum wastes. **"Hazardous Waste Laws"** shall mean any local, state or federal laws, rules, ordinances, regulations, and policy and guidance statements by the Environmental Agencies, either in existence as of the date hereof, or enacted, promulgated or issued after the date of this Lease, that concern the management, control, discharge, treatment, containment or removal of substances or materials that are or may become a threat to public health or the environment. To the best of Landlord's knowledge, Landlord represents and warrants that the Premises are free from Hazardous Substances as of the commencement of this Lease, to the extent that any Hazardous Substance is in violation of Hazardous Waste laws.

(b) Tenant and Tenant's agents, employees, and invitees will comply fully with all Rules and Regulations of the Building which are attached hereto as Exhibit E and made a part hereof as

10

Tenant's   Landlord's
Initials   Initials

000976

though fully set out herein. As more particularly provided therein, Landlord shall at all times have the right to change such rules and regulations or to amend them in such reasonable manner as may be deemed advisable for the safety, protection, care and cleanliness of the Building and appurtenances and for preservation of good order therein, all of which rules and regulations, changes and amendments will be forwarded to Tenant in writing and shall be complied with and observed by Tenant; provided, however, that no new rules or regulations shall deprive Tenant of any rights expressly granted to Tenant pursuant to this Lease.

15.. **Indemnity, Liability and Loss or Damage.** By moving into the Premises or taking possession thereof, Tenant accepts the Premises as suitable for the purposes for which they are leased and accepts the Building and each and every appurtenance thereof, and waives any and all defects therein (with the exception of latent defects of which Tenant gives Landlord written notice within one year after the Commencement Date). Landlord shall not be liable to Tenant or Tenant's agents, employees, guests, invitees or any person claiming by, through or under Tenant for any injury to person, loss of or damage to property, or for loss of or damage to Tenant's business, occasioned by or through the acts or omissions of Landlord, or by any cause whatsoever except Landlord's negligence or willful wrongdoing. Unless arising solely from or out of Landlord's negligence or willful wrongdoing, Landlord shall not be liable for, and Tenant shall indemnify, defend and hold Landlord harmless from, all suits, actions, damages, liability and expense in connection with loss of life, bodily or personal injury or property damage arising from or out of any occurrence in, upon, at or from the Premises or the occupancy or use by Tenant of the Premises or any part thereof, or occasioned wholly or in part by any action or omission of Tenant, its agents, contractors, employees, invitees, or licensees. If Landlord shall, without fault on its part, be made a party to any action commenced by or against Tenant, Tenant shall indemnify, defend and hold Landlord harmless therefrom and shall pay all costs, expenses, and reasonable attorney's fees to Landlord incurred in connection therewith. Unless arising solely from Landlord's negligence or willful wrongdoing, Tenant shall not be liable for, and Landlord shall indemnify, defend and hold Tenant harmless from, all suits, actions, damages, liability and expense in connection with loss of life, bodily or personal injury or property damage arising from or out of the sole negligence or willful wrongdoing any action or omission of Landlord, its agents, contractors, employees, invitees, or licensees.

16. **No Subrogation: Insurance.** (a) Tenant hereby waives any cause of action it might have against Landlord on account of any loss or damage that is insured against under any insurance policy that covers the Premises, Tenant's fixtures, personal property, leasehold improvements or business and which names Tenant as a party insured. Landlord hereby waives any cause of action it might have against Tenant because of any loss or damage that is insured against under any insurance policy that covers the Building or any property of Landlord used in connection with the Building and which names Landlord as a party insured; provided, however, that Tenant shall remain liable to Landlord for the amount of the "deductible" applicable to Landlord's insurance coverage, not to exceed $10,000. This provision is cumulative of Paragraph 16.

(b) Tenant shall procure and maintain throughout the term of this Lease a policy or policies of insurance, at its sole cost and expense, insuring Tenant and Landlord against liability for injury to or death of a person or persons, occasioned by or arising out of or in connection with the use or occupancy of the Premises, the limits of such policy or policies to be in an amount not less than $1,000,000.00 with respect to injuries to or death of any one person and in an amount of not less than $1,000,000.00 with respect to any one accident or disaster, and shall furnish evidence satisfactory to Landlord of the maintenance of such insurance. Tenant shall obtain a written obligation on the part of each insurance company to endeavor to notify Landlord at least 10 days notice to prior to cancellation of such insurance. It is recommended that Tenant carry fire and extended coverage insurance on its personal property, as Landlord shall in no event be required to rebuild, repair or replace any part of the furniture, equipment, fixtures and other improvements which may have been placed by Tenant on or within the Premises.

17. **Fire and Casualty.** (a) If the Premises are damaged by fire or other casualty and if such damage is not susceptible of repair within 180 days (as estimated, as soon as reasonably practicable after the occurrence of such damage, by an architect of recognized good reputation selected by Landlord), then in such event this Lease, at the option of Landlord exercised by giving written notice thereof to Tenant within 30 days after receipt of a certificate of the architect so selected,

11

<table>
<tr><td>Tenant's<br>Initials</td><td>Landlord's<br>Initials</td></tr>
</table>

000977

shall terminate as of the date of such loss, and Tenant shall pay the rent hereunder apportioned to the time of such loss and shall pay all other obligations of Tenant owing on the date of termination, and Tenant shall immediately surrender the Premises to Landlord.

(b) If the damage described above is susceptible of repair within 180 days, or if the damage is not susceptible of repair within 180 days but Landlord fails to exercise its option to terminate this Lease, Landlord shall enter and make the necessary repairs without affecting this Lease, but the rent hereunder shall be reduced or abated as shall be equitable, in the good faith judgment of Landlord, until such repairs are made, unless such damage has been so slight that Tenant's occupancy of the Premises is not materially interfered with, in which case the rent hereunder shall not be abated or reduced. Notwithstanding the foregoing, Landlord shall have the option to terminate this Lease and shall not be obligated to repair the Premises or the Building if the damage is not covered by insurance or if Landlord's mortgagee applies any portion of the insurance proceeds to the unpaid balance of its loan.

(c) In the event the Building is so badly damaged or injured by fire or other casualty, even though the Premises may not be affected, that Landlord decides, within 90 days after such destruction, not to rebuild or repair the Building (such decision being vested exclusively in the discretion of Landlord), then in such event Landlord shall so notify Tenant in writing and this Lease shall terminate as of the date of Landlord's written notice to Tenant effecting its decision not to rebuild, and the Tenant shall pay rent hereunder apportioned to the date of such notice (subject to subparagraph (b) immediately above) and shall pay all other obligations of Tenant owing on the date of termination, and Tenant shall immediately surrender the Premises to Landlord.

(d) Notwithstanding the foregoing provisions of this Paragraph 18, Tenant agrees that if the Premises or any other portion of the Building is damaged by fire or other casualty resulting from the fault or negligence of Tenant or any of its agents, employees, or invitees, then there shall be no abatement of rent before or during the repair of such damage.

18. **Condemnation.** If all of the Premises, or so much thereof as would materially interfere with Tenant's use of the remainder, shall be taken or condemned for any public use or purpose by right of eminent domain, with or without litigation, or be transferred by agreement in connection with or in lieu of or under threat of condemnation, then the term of this Lease and the leasehold estate created hereby shall terminate as of the date title shall vest in the condemnor or transferee. If only a portion of the Building, but not the Premises, is taken or condemned or transferred as aforesaid, Landlord shall have the option to terminate this Lease effective as of the date title shall vest in the condemnor or transferee. Landlord shall receive the entire award from any taking or condemnation (or the entire compensation paid because of any transfer by agreement), and Tenant shall have no claim thereto.

19. **Termination Right.** Tenant shall have the right to terminate this Lease with 60-days prior written notice to Landlord starting in month sixty-one (61) of the Lease Term. If exercised, Tenant shall pay a termination penalty equal to Landlord's unamortized Tenant Improvement and Leasing Commissions at an annual percentage rate of seven percent (7%) straight amortization.

20. **Assignment and Subletting.** (a) In the event that Tenant desires to assign or mortgage this Lease or sublet all or any part of the Premises (with the term "sublet" being deemed, for purposes of this Paragraph 21, to include Tenant's grant of a license, concession or other right of occupancy of any portion of the Premises), Tenant shall notify Landlord in writing (a "Proposal Notice") and shall state in the Proposal Notice the name of the proposed assignee, mortgagee or sublessee and the terms of the proposed assignment, mortgage or sublease. In the Proposal Notice Tenant shall also provide financial information and state the nature and character of the business of the proposed assignee, mortgage or sublessee. Notwithstanding such Proposal Notice to Landlord, Tenant shall not assign or mortgage this Lease or any right hereunder or interest herein, and Tenant shall not sublet the Premises in whole or in part or grant any license, concession or other right of occupancy of any portion of the Premises, without the prior written consent of Landlord (which, subject to subsections (b) and (c) below, shall not be unreasonably withheld). Any such assignment, mortgage or subletting without Landlord's consent shall be void and shall, at the sole option of the Landlord, be deemed a breach of this Lease. Notwithstanding

12

Tenant's   Landlord's
Initials   Initials

000978

any assignment, mortgage or subletting consented to by Landlord, Tenant and each assignee shall at all times remain fully responsible and liable for the payment of the rent herein specified and for compliance with all of Tenant's other covenants and obligations under this Lease. No consent to any assignment or mortgage of this Lease or any subletting of the Premises shall constitute a waiver of the provisions of this paragraph except as to the specific instance covered thereby. If Tenant is a corporation or partnership, an assignment prohibited by this Paragraph 21 shall be deemed to include one or more sales or transfers, by operation of law or otherwise, or creation of new stock or partnership interests, by which a majority of the voting shares of the corporation or interests in the partnership shall be vested in a party or parties who are not owners of a majority of the voting shares or partnership interests of Tenant as of the date hereof; provided, however, that the foregoing provisions of this sentence shall not be applicable if Tenant's stock is listed on a recognized security exchange. Any transfer by operation of law shall also constitute an assignment prohibited by this Paragraph 21. Unless Landlord's withholding of consent is attributable primarily to a malicious intent to injure Tenant (i.e., as opposed to a difference of opinion between Landlord and Tenant), Landlord shall not be liable to Tenant for wrongfully withholding its consent to an assignment or subletting under this Lease and Tenant's sole remedy on account thereof shall be to enforce specific performance of Landlord's obligation to consent.

(b)    Landlord and Tenant hereby agree that the granting of consent by Landlord (i.e., if such consent is granted) shall, at a minimum, be preconditioned upon the fulfillment of the following requirements of Landlord, as well as any other reasonable requirements of Landlord:

(1)    Landlord shall be entitled to review Tenant's Proposal Notice for at least ten (10) days after receiving same from Tenant;

(2)    Tenant shall remain primarily liable under this Lease and shall guaranty the Lease if Landlord so requests;

(3)    Any proposed assignee or sublessee shall assume, in a written instrument acceptable to Landlord, all of the obligations of Tenant hereunder;

(4)    No use shall be employed in connection with the Premises other than the Sole Permitted Use set forth in this Lease;

(5)    The Premises shall remain intact and shall not be altered in any manner whatsoever unless Tenant and the prospective assignee or sublessee shall pay the entire cost thereof, and Landlord's prior written approval is obtained pursuant to Paragraph 10 above;

(6)    The tangible net worth of the proposed subtenant/assignee must be reasonably sufficient for the obligations under this Lease;

(7)    Any use of the Premises permitted hereunder by the proposed sublessee/assignee must not (i) violate or create any potential violation of any laws, nor (ii) violate any other agreements affecting the Premises, the Building or Landlord, nor (iii) increase by more than 5% the density of employees and/or other persons using the Premises from the density maintained by Tenant;

(8)    The proposed subtenant/assignee will not create traffic congestion or an unreasonable burden on existing parking or elevators;

(9)    Tenant shall pay any and all reasonable attorney's fees or other costs associated with Landlord's review and approval of a prospective assignee or sublessee, not to exceed $1,000.00;

(10)    No assignment or sublease shall be to a person or entity with whom Landlord is then negotiating, has negotiated with within the previous six months or currently is a tenant within the Building.

13

Tenant's    Landlord's
Initials    Initials

000979

(c) In the event of a sublease approved by Landlord where the monthly rental per square foot of space subleased which is payable by any sublessee to Tenant (including any bonuses or any other consideration paid directly or indirectly by the sublessee to Tenant) exceeds the monthly rental per square foot for the same space payable for the same month by Tenant to Landlord, Tenant shall be obligated to pay the amount of such excess to Landlord as additional rent hereunder within twenty (20) days after it is received by Tenant from the sublessee. In the event of an assignment approved by Landlord where Tenant receives any consideration from an assignee other than the assumption by the assignee of Tenant's obligations hereunder, Tenant shall be obligated to pay the amount of such consideration to Landlord as additional rent hereunder within twenty (20) days after the date it is received by Tenant. Landlord, at Landlord's option, may elect to require that rental payable by any sublessee be paid directly to Landlord and offset Tenant's rent obligations accordingly.

(d) Notwithstanding the foregoing, the provisions of Sections 21(a)-(c) will not apply to an assignment or sublease to a parent, subsidiary, affiliate, entity under common ownership or successor in interest arising out of or resulting from a merger or the sale of substantially all of the stock or assets of Tenant. Under such circumstances, Tenant will only be obligated to notify Landlord of such assignment or sublease and deliver a copy of the assignment or sublease, if applicable, to Landlord.

21.. **Holding Over.** Should Tenant continue to hold the Premises after this Lease terminates, whether by lapse of time or otherwise, such holding over shall, unless otherwise agreed to by Landlord in writing, constitute and be construed as a tenancy at will at a daily rental equal to one-thirtieth (1/30) of an amount equal to 125% of the amount of the monthly rental payable during the last month prior to the termination of this Lease, and upon and subject to all of the other terms and provisions set forth herein except any right to renew this Lease. This provision shall not be construed, however, as permission by Landlord for Tenant to hold over.

22. **Abandoned Property.** All personal property of Tenant remaining in the Premises after the expiration of the Lease Term or after the abandonment of the Premises by Tenant may be treated by Landlord as having been abandoned by Tenant, and Landlord shall have the right to remove such personal property from the Premises without any obligation to deliver such personal property to Tenant and without any liability to Tenant whatsoever, it being agreed that Tenant shall have no right to reclaim such property. Landlord shall have no duty to notify Tenant that Landlord may dispose of Tenant's property. Tenant shall be presumed conclusively to have abandoned the Premises if the amount of Tenant's property removed or being removed by Tenant from the Premises is substantial enough to indicate a probable intent to abandon the Premises, and such removal is not within the normal course of Tenant's business, or if Tenant removes or is removing any material amount of Tenant's personal property from the Premises at a time when Tenant is in default in the payment of rental due hereunder and such removal is not within the normal course of Tenant's business. Nothing contained in this paragraph shall prejudice or impair Landlord's rights as a lienholder and secured party under Paragraph 28 hereof, and the rights granted to Landlord under this paragraph shall be cumulative of its rights as a lienholder and secured party.

23. **Taxes.** (a) Tenant shall be liable for all taxes levied or assessed against all personal property, furniture and fixtures placed by Tenant, or on Tenant's behalf, in the Premises. If any such taxes for which Tenant is liable are levied or assessed against Landlord or Landlord's property and if Landlord elects to pay the same or if the assessed value of Landlord's property is increased by inclusion of personal property, furniture or fixtures placed by Tenant in the Premises, and Landlord elects to pay the taxes based on such increase, Tenant shall pay Landlord upon demand that part of such taxes for which Tenant is primarily liable hereunder.

(b) Tenant agrees that, as between Tenant and Landlord, Landlord has the sole and absolute right to contest taxes levied against the Premises and the Building (other than taxes levied directly against Tenant's personal property within the Premises). Accordingly, Tenant, to the maximum extent permitted by law, irrevocably waives any and all rights that Tenant may have to receive from Landlord a copy of notices received by Landlord regarding the appraisal or reappraisal, for tax purposes, of all or any portion of the Premises or the Building (including, without limitation, any rights set forth in 41.413 of the Texas Property Tax Code, as such section may be amended and/or supplemented from time to time). Additionally, Tenant, to the maximum extent permitted

14

| Tenant's | Landlord's |
| Initials | Initials |

by law, hereby assigns to Landlord any and all rights of Tenant to protest or appeal any governmental appraisal or reappraisal of the value of all or any portion of the Premises or the Building (including, without limitation, any rights set forth in 41.413 and 42.015 of the Texas Property Tax Code, as such sections may be amended and/or supplemented from time to time). To the maximum extent permitted by law, Tenant agrees that it will not protest or appeal any such appraisal or reappraisal before a governmental taxing authority without the express written authorization of Landlord.

24.  **Transfer of Landlord's Rights.** In the event Landlord transfers its interest in the Building, Landlord shall thereby be released from any further obligations hereunder, and Tenant agrees to look solely to the successor in interest of the Landlord for the performance of such obligations.

25.  **Default.** (a) The following events shall be deemed to be events of default by Tenant under this Lease: (i) Tenant shall fail to pay any rental or other sums payable by Tenant hereunder as and when such rental or other sums become due and payable and any such failure shall continue for a period of ten (10) days after written notice from Landlord to Tenant (provided, however, that if in any calendar year Landlord has given at least two written notices of rental defaults to Tenant, then for the remainder of that particular calendar year the grace period shall be reduced to five days and there shall be no requirement of written notice from Landlord to Tenant); (ii) Tenant shall fail to comply with any other provision, condition or covenant of this Lease and any such failure shall continue for a period of twenty (20) days after Landlord gives written notice thereof to Tenant; (iii) Tenant shall abandon, vacate or fail to physically occupy any substantial portion of the Premises; (iv) any petition shall be filed by or against Tenant or any guarantor of Tenant's obligations under this Lease pursuant to any section or chapter of the present federal Bankruptcy Act or under any future federal Bankruptcy Act or under any similar law or statute of the United States or any state thereof, or Tenant or any guarantor of Tenant's obligations under this Lease shall be adjudged bankrupt or insolvent in proceedings filed under any section or chapter of the present federal bankruptcy act or under any future federal bankruptcy act or under any similar law or statute of the United States or any state thereof; (v) Tenant or any guarantor of Tenant's obligations under this Lease shall become insolvent or make a transfer in fraud of creditors; (vi) Tenant or any guarantor of this Lease shall make an assignment for the benefit of creditors; or (vii) a receiver or trustee shall be appointed for Tenant or any of the assets of Tenant.

(b)  Upon the occurrence of any event of default, Landlord shall have the option to do any one or more of the following **without any further notice or demand**, in addition to and not in limitation of any other remedy permitted by law or by this Lease:

(1)  If (but only if) Tenant is in arrears in its rentals by more than two months, Landlord may enforce, by all legal suits and other means, its rights hereunder, including the collection of Base Rental and any other sums payable by Tenant hereunder, without reentering or resuming possession of Premises and without terminating this Lease.

(2)  If (but only if) Tenant is in arrears in its rentals by more than two months, Landlord may do whatever Tenant is obligated to do by the provisions of this Lease; and to the extent that Landlord deems it necessary or otherwise appropriate for Landlord to enter the Premises, Landlord may enter the Premises, by force if necessary (but only if and to the extent permitted by law), in order to accomplish this purpose. Tenant hereby waives any and all claims for damages caused by Landlord's actions pursuant to this subparagraph (b)(2), and Tenant also agrees to reimburse Landlord immediately upon demand for any expenses which Landlord may incur in thus effecting compliance with this Lease on behalf of Tenant.

(3)  If (but only if) Tenant is in arrears in its rentals by more than two months, Landlord may enter upon and take possession of the Premises without terminating this Lease and expel or remove Tenant and its effects therefrom without being liable to prosecution of any claims for damages therefor, and Landlord may relet the Premises for the account of Tenant. Tenant shall pay to Landlord all arrearages of Base Rental and other sums due and owing by Tenant to Landlord, and Tenant shall also pay to Landlord during each month of the unexpired Lease Term the installments of Base Rental and other sums due hereunder, less such part, if any, that Landlord shall have been able to collect from a new tenant upon reletting. In this regard the parties further agree that although Landlord shall use its reasonable efforts to relet the Premises after Tenant

15

000981

has vacated the Premises, Landlord shall have no obligation to agree to any lease terms which it deems to be unacceptable, nor shall Landlord be obligated (i) to travel outside a radius of thirty (30) miles from its principal office in order to meet with a prospective tenant, (ii) to accept a prospective tenant for the Premises (or any portion thereof) which is an existing or prospective tenant elsewhere in the Building, or (iii) to expend monies for finish-out requested by a prospective tenant unless Landlord, in its sole and absolute discretion, approves both the lease terms and the credit of such prospective tenant. Tenant further agrees that in the event of any reletting, Tenant shall pay to Landlord on demand all Reimbursable Costs prescribed in the final portion of this Paragraph 26. In the event Landlord exercises the rights and remedies afforded to it under this Paragraph 26(b)(3) and then subsequently elects to terminate this Lease, Tenant shall be liable to Landlord for damages as set forth in the final two sentences of Paragraph 26(b)(5) below and Landlord shall have the right at any time to demand final settlement as provided therein.

(4)    If (but only if) Tenant is in arrears in its rentals by more than two months, Landlord may enter upon the Premises by use of a duplicate key, a master key, an electronic pass card, a locksmith's entry procedures or any other means not involving personal confrontation, and change, alter or modify the door locks on all entry doors of the Premises, thereby excluding Tenant and its agents, employees, representatives and invitees, from the Premises. In such event Landlord shall not be obligated to place any written notice on the Premises explaining Landlord's action; moreover, Landlord shall not be required to provide the new key (if any) to Tenant until and unless all rental defaults of Tenant have been fully cured.

(5)    If (but only if) Tenant is in arrears in its rentals by more than two months, Landlord may terminate this Lease, in which event Tenant shall immediately surrender the Premises to Landlord, but if Tenant shall fail to do so, Landlord may without notice and without prejudice to any other remedy Landlord may have, enter upon and take possession of the Premises and expel or remove Tenant and its effects without being liable to prosecution or any claim for damages therefor; and upon any such termination, Tenant agrees that in addition to its liability for the payment of arrearages of Base Rental and other sums due and owing by Tenant to Landlord under this Lease upon such termination, Tenant shall be liable to Landlord for damages. Tenant shall pay to Landlord as damages on the same days as Base Rental and other payments are expressed to be due under the provisions of this Lease, the total amount of such Base Rental and other payments, less such part, if any, of such payments that Landlord shall have been able to collect from a new tenant upon reletting. In this regard the parties further agree that although Landlord shall use its reasonable effort to relet the Premises after Tenant has vacated the Premises, Landlord shall have no obligation to agree to any lease terms which it deems to be unacceptable, nor shall Landlord be obligated (i) to travel outside a radius of thirty (30) miles from its principal office in order to meet with a prospective tenant, (ii) to accept a prospective tenant for the Premises (or any portion thereof) which is an existing or prospective tenant elsewhere in the Building, or (iii) to expend monies for finish-out requested by a prospective tenant unless Landlord, in its sole and absolute discretion, approves both the lease terms and the credit of such prospective tenant. Tenant further agrees that in the event of any reletting, Tenant shall pay to Landlord on demand all Reimbursable Costs prescribed in the final portion of this Paragraph 26. Landlord shall have the right at any time to demand final settlement. Upon demand for a final settlement, Landlord shall have the right to receive, and Tenant hereby agrees to pay, as damages for Tenant's breach and in addition to the Reimbursable Costs prescribed in the final section of this Paragraph 26, the difference between the total rental provided for in this Lease for the remainder of the Lease Term and the reasonable rental value of the Premises for such period, such difference to be discounted to present value at a rate equal to the rate of interest allowed by law (at the time the demand for final settlement is made) when the parties to a contract have not agreed on any particular rate of interest (or, in the absence of such law, at the rate of 6% per annum).

Pursuit of any of the foregoing remedies shall not preclude pursuit of any of the other remedies herein provided or any other remedies provided by law or equity. Any entry by Landlord upon the Premises may be by use of a master or duplicate key or electronic pass card or any locksmith's entry procedure or other peaceable means. Any reletting by Landlord shall be without notice to Tenant, and if Landlord has not terminated this Lease, the reletting may be in the name of Tenant or Landlord, as Landlord shall elect. Any reletting shall be for such term or terms (which may be greater or less than the period which constitutes the balance of the Lease Term) and on such

16

Tenant's      Landlord's
Initials      Initials

terms and conditions (which may include free rent, rental concessions or tenant inducements of any nature) as Landlord in its absolute discretion may determine, and Landlord may collect and receive any rents payable by reason of such reletting. In the event of any reletting, Tenant shall pay to Landlord on demand the cost of renovating, repairing and altering the Premises for a new tenant or tenants, and the cost of advertisements, brokerage fees, reasonable attorney's fees and other costs and expenses incurred by Landlord in connection with such reletting (the "Reimbursable Costs"). In the event any rentals actually collected by Landlord upon any such reletting for any calendar month are in excess of the amount of rental payable by Tenant under this Lease for the same calendar month, the amount of such excess shall belong solely to Landlord; and Tenant shall have no right with respect thereto (except, however, same shall be applied to Tenant's deficiency, if any). In the event it is necessary for Landlord to institute suit against Tenant in order to collect the rental or any other sum due hereunder or any deficiency between the rental and any other sum provided for by this Lease for a calendar month and the rental and any other sum actually collected by Landlord for such calendar month, Landlord shall have the right to allow such deficiency to accumulate and to bring an action upon several or all of such rental deficiencies at one time. Any suit shall not prejudice in any way the right of Landlord to bring a similar action for any subsequent rental deficiency or deficiencies.

26.     **Security Deposit.** The Security Deposit shall be held by Landlord without liability for interest and as security for the performance by Tenant of Tenant's covenants and obligations under this Lease, it being expressly understood that the Security Deposit shall not be considered an advance payment of rental or a measure of Landlord's damages in case of default by Tenant upon the occurrence of any event of default by Tenant or upon termination of this Lease. Landlord may commingle the Security Deposit with Landlord's other funds. Landlord may, from time to time, without prejudice to any other remedy, use the Security Deposit to the extent necessary to make good any arrearages of rent or to satisfy any other covenant or obligation of Tenant hereunder. Following any such application of the Security Deposit, Tenant shall pay to Landlord on demand the amount so applied in order to restore the Security Deposit to its original amount. If Tenant is not in default at the termination of this Lease, the balance of the Security Deposit remaining after any such application shall be returned by Landlord to Tenant within thirty (30) days of the termination of this Lease. If Landlord transfers its interest in the Premises during the term of this Lease, Landlord may assign the Security Deposit to the transferee and thereafter shall have no further liability for the return of such Security Deposit.

27..    **Landlord's Lien and Security Interest.** Landlord shall have a Landlord's statutory lien, and in addition thereto Landlord shall have, and Tenant hereby grants unto Landlord, a security interest in all of the goods, wares, furniture, fixtures, office equipment, supplies and other property of Tenant now or hereafter placed in, upon, or about the Premises and all proceeds thereof, as security for all of the obligations of Tenant under this Lease, provided that Tenant shall have the right to make sales of its goods, wares and merchandise to its customers in the normal and regular course of its business conducted in the Premises free and clear of the aforesaid lien and security interest. Tenant shall not remove any of said personal property from the Premises until all of Tenant's obligations under this Lease have been satisfied in full. Upon the occurrence of an event of default by Tenant, Landlord may, in addition to any other remedies provided herein, enter upon the Premises and take possession by peaceable means of any and all goods, wares, equipment, fixtures, furniture, improvements and other personal property of Tenant situated on the Premises, without liability for trespass or conversion, and sell the same at public or private sale, with or without having such property at the sale, after giving Tenant reasonable notice of the time and place of any public sale or of the time after which any private sale is to be made; and at any such sale the Landlord or its assigns may purchase unless otherwise prohibited by law. The proceeds from any such disposition, less any and all expenses connected with the taking of possession, holding and selling of the property (including reasonable attorney's fees and other expenses); shall be applied as a credit against the indebtedness secured by the security interest granted in this Paragraph 28. Any surplus shall be paid to Tenant or as otherwise required by law; and Tenant shall pay any deficiencies forthwith. Upon request by Landlord, Tenant agrees to execute and deliver to Landlord a financing statement in form sufficient to perfect the security interest of Landlord in the aforementioned property and proceeds thereof under the provisions of the Texas Uniform Commercial Code. Upon request by Landlord, Tenant shall provide the name and address of any entity that has, or claims to have, an interest in any property located on the Premises and a description of such property. Failure to provide such list shall result in a

17

Tenant's        Landlord's
Initials        Initials

presumption that all property located in the Premises belongs to Tenant free from all claims. Without intending to exclude any other manner of giving Tenant any required notice, any requirement of reasonable notice to Tenant of Landlord's intention to dispose of any collateral pursuant to the enforcement of said security interest shall be met if such notice is given in the manner prescribed in Paragraph 37 of this Lease at least five days before the time of any such disposition. Landlord shall have all of the rights and remedies of a secured party under law.

28. **Remedies.** No act or thing done by Landlord or its agents during the term hereof shall be deemed an acceptance of an attempted surrender of the Premises, and no agreement to accept a surrender of the Premises shall be valid unless made in writing and signed by Landlord. No reentry or taking possession of the Premises by Landlord shall be construed as an election on its part to terminate this Lease, unless a written notice of such intention is given to Tenant. Notwithstanding any such reletting or reentry or taking possession, Landlord may at any time thereafter elect to terminate this Lease for a previous default. Landlord's acceptance of rent following an event of default hereunder shall not be construed as Landlord's waiver of such event of default. No waiver by Landlord of any violation or breach of any of the terms, provisions and covenants herein contained shall be deemed or construed to constitute a waiver of any other violation or breach of any of the terms, provisions and covenants herein contained. Forbearance by Landlord to enforce one or more of the remedies herein provided upon an event of default shall not be deemed or construed to constitute a waiver of any other violation or default. The failure of Landlord to enforce the rules described in Paragraph 15 against Tenant or any other tenant in the Building shall not be deemed a waiver of any such rules. No provisions of this Lease shall be deemed to have been waived by Landlord unless such waiver is in writing and is signed by Landlord. The rights granted to Landlord in this Lease shall be cumulative of every other right or remedy which Landlord may otherwise have at law or in equity, and the exercise of one or more rights or remedies shall not prejudice or impair the concurrent or subsequent exercise of other rights or remedies. If Landlord brings any action under this Lease, or consults or places this Lease or any amount payable by Tenant hereunder with an attorney for the enforcement of any of Landlord's rights hereunder, then Tenant agrees to pay to Landlord the reasonable attorney's fees and other costs and expenses incurred by Landlord in connection therewith.

29.. **Joint and Several Liability.** If there are two or more parties comprising Tenant, the obligations imposed upon Tenant pursuant to this Lease shall be joint and several. If there is a guarantor of Tenant's obligations under this Lease, the obligations of Tenant shall be joint and several obligations of Tenant and such guarantor, and Landlord need not first proceed against Tenant hereunder before proceeding against such guarantor; nor shall any such guarantor be released from its guarantee for any reason whatsoever, including, without limitation, any amendment of this Lease, any forbearance by Landlord or waiver of any of Landlord's rights, the failure to give Tenant or such guarantor any notices, or the release of any party liable for the payment of Tenant's obligations hereunder.

30.. **Constructive Eviction.** Tenant shall not be entitled to claim a constructive eviction from the Premises unless Tenant shall have first notified Landlord in writing of the condition or conditions giving rise thereto, and, if the complaints be justified, unless Landlord shall have failed to remedy such conditions within a reasonable time after receipt of said notice.

31. **Building Name.** Landlord reserves the right at any time to change the name by which the Building is designated, and Landlord shall have no obligation or liability whatsoever for costs or expenses incurred by Tenant as a result of such name change of the Building.

32. **Subordination and Attornment; Notice to Mortgagee.** (a) This Lease and all rights of Tenant hereunder are subject and subordinate to any deeds of trust, mortgages or other instruments of security which do now or may hereafter cover the Building and the Land or any interest of Landlord therein, and to any and all advances made on the security thereof, and to any and all increases, renewals, modifications, consolidations, replacements and extensions of any of such deeds of trust, mortgages or instruments of security. This provision is hereby declared by Landlord and Tenant to be self-operative and no further instrument shall be required to effect such subordination of this Lease. Tenant shall, however, upon demand at any time or times execute, acknowledge and deliver to Landlord any and all instruments and certificates that, in the judgment of Landlord, may be necessary or proper to confirm or evidence such subordination, and Tenant

18

hereby irrevocably appoints Landlord as Tenant's agent and attorney-in-fact for the purpose of executing, acknowledging and delivering any such instruments and certificates. However, notwithstanding the generality of the foregoing provisions of this Paragraph 33, Tenant agrees that any such mortgagee shall have the right at any time to subordinate any such deeds of trust, mortgages or other instruments of security to this Lease on such terms and subject to such conditions as such mortgagee may deem appropriate in its discretion. Tenant further covenants and agrees upon demand by Landlord's mortgagee at any time, before or after the institution of any proceedings for the foreclosure of any such deeds of trust, mortgages or other instruments of security, or sale of the Building pursuant to any such deeds of trust, mortgages or other instruments of security or voluntary sale, to attorn to such purchaser upon any such sale and to recognize and attorn to such purchaser as Landlord under this Lease. The agreement of Tenant to attorn upon demand of Landlord's mortgagee contained in the immediately preceding sentence shall survive any such foreclosure sale or trustee's sale.

(b)    Tenant further agrees that whenever Tenant receives written notice of a deed of trust, mortgage or other instrument of security affecting the Land and/or Building, then Tenant shall give to the mortgagee written notice of each and every default under this Lease by Landlord; moreover, Tenant shall not exercise any remedies under this Lease unless the mortgagee fails to cure such default within twenty (20) days, or within such longer period as may be reasonably necessary if such default cannot be cured within twenty (20) days, after the mortgagee has received such notice. Notwithstanding anything to the contrary which may be contained in this subsection (b), Tenant further agrees that this subsection (b) is solely for the benefit of an applicable mortgagee, i.e., granting to a mortgagee the option to cure a default by Landlord; and no mortgagee shall ever have any obligation to cure a default by Landlord.

(c)    Tenant hereby agrees to execute, acknowledge and deliver to Landlord's mortgagee any and all instruments and certificates that in the judgment of Landlord's mortgagee may be necessary or proper to confirm or evidence the agreements set out above in this Paragraph 33, and Tenant hereby irrevocably appoints Landlord's mortgagee as Tenant's agent and attorney-in-fact for the purpose of executing, acknowledging and delivering any such instruments and certificates.

33.    **Lease Certificates; Financial Statements.** Tenant agrees to furnish from time to time, within ten (10) days after requested by Landlord, a certificate signed by Tenant and addressed to Landlord -- or at Landlord's direction to any potential successor to Landlord or any existing or potential holder of a deed of trust or mortgage covering the Land and Building or any interest of Landlord therein -- to the effect that this Lease is then presently in full force and effect and specifying any modifications; that the term of this Lease has commenced and the full rental is then accruing hereunder; that Tenant has accepted possession of the Premises and that any improvements required by the terms of this Lease to be made by Landlord have been completed to the satisfaction of Tenant; that no rent under this Lease has been paid more than thirty (30) days in advance of its due date; that the address for notices to be sent to Tenant is as set forth in this Lease; that Tenant, as of the date of such certificate, has no charge, lien or claim of offset under this Lease or otherwise against rents or other charges due or to become due hereunder; and that to the knowledge of Tenant, Landlord is not then in default under this Lease. The certificate shall also contain an acknowledgement by Tenant of receipt of notice of the assignment of this Lease to such holder and the agreement by Tenant with such holder that from and after the date of such certificate, Tenant will not pay any rent under this Lease more than 30 days in advance of its due date, will not surrender or consent to the modification of any of the terms of this Lease nor to the termination of this Lease by Landlord, and will not seek to terminate this Lease by reason of any act or omission of Landlord until Tenant shall have given written notice of such act or omission to the holder of such deed of trust or mortgage (at such holder's last address furnished to Tenant) and until a reasonable period of time shall have elapsed following the giving of such notice, during which period such holder shall have the right, but shall not be obligated, to remedy such act or omission; provided, however, that if Tenant's certificate is executed before the assignment of Landlord's interest in the Lease to such holder, then the agreement of Tenant described in this sentence will be of no effect under such certificate unless Tenant is furnished with a copy of the assignment to such holder within ninety (90) days after the date of such certificate. Tenant shall also furnish to Landlord when requested by Landlord, but no more often than one time per calendar year, a statement of the financial condition of Tenant prepared by an independent Certified Public Accountant and in form reasonably satisfactory to Landlord.

19

34. **Limitation of Landlord Liability.** The liability of Landlord to Tenant for any default by Landlord under the terms of this Lease shall be limited to the interest of Landlord in the Building and the Land, and Landlord shall not be personally liable for any deficiency. This clause shall not be deemed to limit or deny any remedies which Tenant may have in the event of default by Landlord hereunder which do not involve the personal liability of Landlord. Notwithstanding anything to the contrary contained in this Lease, in the event Landlord sells, assigns, transfers or conveys its interest in the Land, Landlord shall have no liability for any acts or omissions that occur after the date of said sale, assignment, transfer or conveyance.

35. **Consents.** In all circumstances under this Lease where the prior consent of one party (the "consenting party"), whether it be Landlord or Tenant, is required before the other party (the "requesting party") is authorized to take any particular type of action, such consent shall not be withheld in a wholly unreasonable and arbitrary manner; however, the requesting party agrees that its exclusive remedy if it believes that consent has been withheld improperly (including, but not limited to, consent required from Landlord pursuant to Paragraph 11 or Paragraph 21 of this Lease) shall be to institute litigation either for a declaratory judgment or for a mandatory injunction requiring that such consent be given (with the requesting party hereby waiving any claim for damages, attorneys fees or any other remedy unless the consenting party refuses to comply with a court order or judgment requiring it to grant its consent).

36. **Notices.** Any notice required or permitted to be given hereunder by one party to the other shall be deemed to be given when deposited in the United States mail, certified or registered mail, return receipt requested, with sufficient postage prepaid, or hand delivered, addressed to the respective party to whom notice is intended to be given at the address of such party set forth below its name where it has executed this Lease. Either party hereto may at any time by giving written notice to the other party in the aforesaid manner designate any other address in substitution of the foregoing address to which any such notice shall be given.

37. **Brokerage.** Landlord and Tenant warrant to each other that they have not had any dealings with any broker or agent in connection with the negotiation or execution of this Lease except for the Leasing Agent, or Agents, if any, listed in Paragraph 1(j) of this Lease; and each party agrees to indemnify the other party and hold the other party harmless from and against any and all costs, expenses or liability for commissions or other compensation or charges claimed by any other broker or agent, through commitments of the indemnifying party with respect to this Lease.

38. **Force Majeure.** Whenever a period of time is herein prescribed for action to be taken by Landlord or Tenant, the party taking the action shall not be liable or responsible for, and there shall be excluded from the computation for any such period of time, any reasonable delays due to strikes, riots, acts of God, shortages of labor or materials, war, governmental laws, regulations or restrictions or any other causes of any kind whatsoever which are beyond the reasonable control of such party; provided, however, in no event shall the foregoing apply to the financial obligations of either Landlord or Tenant to the other under this Lease, including Tenant's obligation to pay Base Rentals and all other amounts payable to Landlord hereunder.

39. **No Third Party Beneficiary.** This Lease is for the sole benefit of Landlord, its successors and assigns, and Tenant, its permitted successors and assigns, and it is not for the benefit of any third party.

40.. **Severability.** If any clause or provision of this Lease is illegal, invalid or unenforceable under present or future laws effective during the term of this Lease, then and in that event, it is the intention of the parties hereto that the remainder of this Lease shall not be affected thereby, and it is also the intention of the parties to this Lease that in lieu of each clause or provision that is illegal, invalid or unenforceable, there be added as a part of this Lease a clause or provision as similar in terms to such illegal, invalid or unenforceable clause or provision as may be possible and be legal, valid and enforceable.

41. **Binding Effect.** The provisions of this Lease shall be binding upon and inure to the benefit of Landlord and Tenant, respectively, and to their respective heirs, personal representatives,

20

| Tenant's | Landlord's |
|----------|-----------|
| Initials | Initials |

000986

successors and assigns, subject to the provisions of Paragraph 21, Paragraph 25, Paragraph 35 and Paragraph 46 hereof.

42. **Applicable Law; Consent to Jurisdiction.** This Lease shall be governed by and construed in accordance with the laws of the State of Texas and the laws of the United States applicable to transactions in the State of Texas. Tenant hereby irrevocably agrees that any legal action or proceeding against it with respect to this Lease may be maintained in the courts of county where rent is payable under this Lease, or at Landlord's option in the U.S. District Court for the Northern District of Texas; and Tenant hereby consents to the jurisdiction and venue of such courts.

43. **Entire Agreement; No Warranties.** This Lease contains the entire agreement between the parties hereto with respect to the subject matter hereof and supersedes any and all prior and contemporaneous agreements, understandings, promises, and representations made by either party to the other concerning the subject matter hereof and the terms applicable hereto. It is expressly agreed by Tenant, as a material consideration for the execution of this Lease, that there have been no agreements pertaining to the Premises, the Building or this Lease not incorporated in writing herein and that this Lease shall not be altered, waived, amended or extended, except by a written agreement signed by the parties hereto, unless otherwise expressly provided herein. Landlord's duties and warranties are limited to those set forth in this Lease, and shall not include any implied duties or warranties, all of which are hereby disclaimed by Landlord and waived by Tenant. In particular, Landlord disclaims, and Tenant waives, any warranty that the Premises are suitable or fit for any particular purpose or use.

44. **NO IMPLIED REPRESENTATIONS.** LANDLORD AND TENANT HEREBY ACKNOWLEDGE THAT THEY ARE NOT RELYING UPON ANY BROCHURE, RENDERING, INFORMATION, REPRESENTATION, PROMISE OR UNDERSTANDING OF THE OTHER, OR OF ANY LEASING AGENT, EXCEPT AS MAY BE EXPRESSLY SET FORTH BELOW:

_____

_____

_____

21

Tenant's        Landlord's
Initials        Initials

000987

☒ IN THIS LEASE.

☐ IN _____ AS WELL AS IN THIS LEASE.

NOTE: IF NO "X" (OR OTHER MARK DESIGNATING A CHOICE) IS PLACED IN EITHER BOX IN THIS PARAGRAPH 45, THEN THE FIRST BOX WILL BE DEEMED TO HAVE BEEN MARKED.

45. **Effective Date.** The submission by Landlord of this instrument to Tenant for examination, negotiation or signature does not constitute an option for, or a representation by Landlord regarding, a prospective lease. This Lease shall be effective if and when (and only if and when) it has been executed by both Landlord and Tenant. When such condition has been satisfied, the effective date of this Lease shall be the latest date accompanying a signature by Landlord and Tenant below; and if either or both signatures fail to be accompanied by a date, then the date of such signature(s) shall be established by the best alternative evidence. If for any reason whatsoever this Lease has not been fully executed within fifteen (15) business days after the signature of the first party to sign, then this Lease shall be null and void and of no force or effect; provided, however, that if more than 15 business days elapse between the dates upon which Landlord and Tenant sign this Lease, but this Lease nevertheless is in fact fully executed by both parties and following the execution of this Lease by both parties either (i) Landlord and Tenant mutually agree to Approved Working Drawings for leasehold improvements to the Premises (as contemplated in Paragraph 3 of Exhibit D), or (ii) Tenant occupies the Premises, or both, then the immediately preceding provision of this sentence shall be inoperative and the remainder of this Lease shall be in full force and effect.

**LANDLORD:**

Sole Manager of 2425 West Loop, LP,

By: _____

Name: BRADLEY S. PARKER

Title: AUTHORIZED AGENT

**TENANT:**

Jetall companies, inc,

By: _____

Name: BRADLEY S. PARKER

Title: AUTHORIZED AGENT

Date of Signature: 5/13/15

22

000988

## EXHIBIT "A" TO LEASE AGREEMENT

## LEGAL DESCRIPTION

Being 2.4462 Acres (called 2.4455) of land out of the William White survey, Abstract No. 836 and out of a 7.913 acre tract of land described as two in a deed from Anna Skinner Green to R.E. Smith Dated August 15, 1950 as recorded at Volume 2145, Page 350 in the deed records of Harris County, Texas; and being more particularly described by metes and bounds as follows:

COMMENCING: at a found 5/8 –inch iron rod in the Northerly right-of-way line of Westheimer Road (R.O.W. varies), being the Southeast corner of a 2.4385 acre parcel conveyed by Lincoln National Life Insurance Company to Red Lion Hotels, Inc. in a deed recorded in Harris County Clerk's File No. S056346 and the southwest corner of the 3.4385 acre parcel conveyed by Harvey R. Houck, Jr. to Restprop, Ltd. in a deed recorded in Harris County Clerk's File No. R2288886;

THENCE: Northerly N 2 deg 23 min 52 sec West 204.61 feel along the common line of the aforesaid 2.3468 acre parcel to the west and 3.4385 acre parcel to the east, to the Northeast corner of the 2.3468 acre parcel being the southeast corner of the herein described parcel and the POINT OF BEGINNING, from which a found ½-inch iron rod in a 12-inch Hackberry Tree bears North 58 deg 29 min West 0.72 feet;

THENCE: Westerly along the common line of the 2.3468 acre parcel to the south and the herein described parcel the north South 87 deg 44 min 46 sec West 464.50 feet (called 464.47 feet) to a point on the Easterly right-of-way (R.O.W.) line in Interstate 610 West Loop and the southwest corner of the herein described parcel, whence a found X in concrete bears South 39 deg 35 min West 0.71 feet from whence a found railroad spike with X bears South 19 deg 50 min East 0.34 feet;

THENCE: Northerly along the easterly R.O.W. line of Interstate 610 West Loop (R.O.W. 350 feet) North 10 deg 55 min 17 sec East 251.27 feet to a point whence a found X in concrete bears North 33 deg 17 min East 0.53 feet and whence a found P.K. nail bears South 11 deg 55 min East 0.39 feet said point also being the southwest corners of a 7.8998 acre parcel as shown on the Houston Venture Plan Unrestricted Reserve A Filed in the Harris County Map Records as Film Code Number 356074, and the northwest corner of the herein described parcel;

THENCE: Easterly along the common line of the above indicated 7.8998 acre parcel to the north and the herein described parcel to the south N 87 deg 44 min 46 sec East 406.61 feet (called 406.40 feet), to a point of the westerly line of a 3.4385 acre parcel of land presently owned by X in concrete bears North 12 deg 36 min East 0.34 feet;

THENCE: Southerly along a common line of the above indicated 3.4385 acre parcel to the east and therein described parcel to the west, South 02 deg 23 min 52 sec East 244.64 to the POINT OF BEGINNING containing 106,557 square feet, 2.4462 acres more or less.

23

Tenant's        Landlord's
Initials        Initials



24

**EXHIBIT C TO LEASE AGREEMENT**

**Parking Privileges**

1.  **Parking Spaces.** At all times during the Lease Term, and conditioned upon the Lease being in full force and effect and there being no uncured default under this Lease as defined in Paragraph 26 of this Lease, Landlord hereby agrees to make parking spaces available to Tenant as follows: 3.5 parking spaces per thousand square feet, 12 of which shall be reserved parking spaces. The location of such spaces shall be selected by Landlord in its sole discretion.

2.  **Parking Rental.** The rent for all parking spaces which are allotted to Tenant pursuant to Paragraph 1 immediately above shall be the rate which is from time to time designated by Landlord as standard for the Building. On the execution date of the Lease, the rate is $0.00 for each "reserved" parking space in the garage and $0.00 for each "unreserved" garage space. All payments of rent for parking spaces shall be made (i) at the same time as each Base Rental is due under the Lease and (ii) to Landlord or to such persons as Landlord may direct from time to time.

3.  **Parking; Allocation Devises.** Landlord reserves the right to change its system for allocating parking spaces, e.g., magnetic parking cards, parking stickers and other devices or forms of identification. If Landlord issues magnetic parking cards, parking stickers or any other device or form of identification, they shall remain the property of Landlord and shall not be transferable. Tenant will be obligated to pay a replacement charge, equal to the amount posted from time to time by Landlord, for loss or other replacement of any magnetic parking card or parking sticker issued by Landlord.

4.  **Damage to or Condemnation.** If Landlord fails or is unable to provide any parking space to Tenant pursuant to Paragraph 1 above because of damage or condemnation, such failure or inability shall never be deemed to be a default by Landlord as to permit Tenant to terminate the Lease, either in whole or in part. Instead, Tenant's obligation to pay rent for any such parking space, which is not provided by Landlord shall be abated for so long as Tenant does not have the use of such parking space, and such abatement shall constitute full settlement of all claims that Tenant might otherwise have against Landlord by reason of such failure or inability to provide Tenant with such parking space.

5.  **Rules and Regulations.** A condition of any parking shall be compliance by the parker with garage or lot rules and regulations, including any sticker or other identification system which may be established by Landlord. The following rules and regulations are in effect until notice is given to Tenant of any change. Landlord reserves the right to modify and/or adopt such other reasonable and generally applicable rules and regulations for the applicable parking areas as it deems necessary for the operation of such areas.

    (a)  Cars must be parked entirely within the painted stall lines.

    (b)  All directional signs and arrows must be observed.

    (c)  The speed limit shall be five (5) miles per hour.

    (d)  Parking is prohibited in areas not striped for parking, aisles, areas where "no parking" signs are posted, in cross hatched areas and in such other areas as may be designated by Landlord or Landlord's agent(s) including, but not limited to, areas designated as "Visitor Parking" or reserved spaces not rented under this Agreement.

    (e)  Every parker is required to park and lock his or her own car. All responsibility for damage to cars or persons or loss of personal possessions is assumed by the parker.

    (f)  Spaces which are designated for small, intermediate or full-sized cars shall be so used. No intermediate or full-size cars shall be parked in parking spaces limited to compact cars.

6.  **Special Provisions Regarding Over-Parking.** Landlord agrees to use its good faith efforts to monitor the parking usage of tenants in the Building and attempt to restrict tenants against permitting their owners, officers, employees, agents and invitees to utilize more parking spaces than they are allotted pursuant to their respective leases. Tenant agrees to cooperate with Landlord's efforts in this regard. In addition, and without limiting the generality of the immediately preceding sentence, Tenant further agrees that if and to the extent requested in writing by Landlord because of Landlord's concern that Tenant's owners, officers, employees, agents and/or invitees are utilizing more

25

000991

parking spaces than Tenant has been allotted under this Exhibit C, then at Landlord's option any one or more of the following shall apply (i.e., the following are cumulative and not mutually exclusive):

(a)     Tenant shall deliver written notices to all employees and other persons who might be utilizing parking spaces, advising them of the parking limits under this Exhibit C.

(b)     Tenant shall furnish to Landlord a complete list of license numbers of all automobiles operated by Tenant and its owners, officers, employees, agents and invitees who might be utilizing parking spaces.

(c)     If any automobile or other vehicle owned by Tenant or any of its employees, agents or other invitees is utilizing a parking space in excess of those allotted to Tenant under this Exhibit C, Tenant shall pay to Landlord as additional rent upon demand an amount equal to the daily rate or charge for such parking as established by Landlord from time to time for each day, or part thereof, that such automobile or other vehicle is so parked.

(d)     If any overparking by Tenant, its employees, agents and other invitees, persists after written notice thereof from Landlord to Tenant, such continued overparking shall constitute a failure of Tenant to comply with this Exhibit C; and such written notice from Landlord shall constitute the "written notice thereof" which is contemplated in item (ii) of Section 26(a) of this Lease, i.e., the overparking shall constitute an event of default under this Lease if not cured within 30 days after such written notice.

26

Tenant's    Landlord's
Initials    Initials

**Leasehold Improvements Agreement**

THIS LEASEHOLD IMPROVEMENTS AGREEMENT (this "Agreement") is hereby incorporated into the attached Lease Agreement (the "Lease"), executed concurrently herewith by and between the "Landlord" and the "Tenant" described in such Lease, and constitutes the entire agreement of Landlord and Tenant with respect to the construction and completion of the Premises described in the Lease. In the event of a conflict between the provisions of this Agreement and other provisions of the Lease, the provisions of this Agreement, as amended, will control. Terms defined in the Lease, when used herein, shall have the same meanings as are ascribed to them in the Lease.

1. Premises Condition. Subject to the provisions of this Agreement, Tenant has agreed to accept the Premises "as is," in their presently existing condition. Tenant acknowledges having inspected the Premises.

2. Space Plan. Landlord shall provide space planning at no cost to Tenant.

3. Working Drawings. If and after Tenant's proposed space plan and any revisions thereto have been approved by Landlord, Tenant shall deliver to Landlord proposed working drawings for the leasehold improvements to be constructed in the Premises based upon the space plan approved by Landlord. The working drawings shall consist of any and all architectural, electrical, mechanical, plumbing, structural, communication/security drawings, and written specifications necessary to permit Landlord to construct the fixed leasehold improvements. The working drawings and any revisions thereto shall be prepared at Tenant's sole cost and expense and shall be subject to the written approval of Landlord, which approval shall not be unreasonably withheld. Landlord's review and/or approval of the working drawings shall not constitute any representation, warranty or agreement of Landlord as to the adequacy, efficiency, performance or desirability of the space plan, working drawings or contemplated leasehold improvements, or the compliance by the working drawings or the leasehold improvements with the space plan or any applicable laws, ordinances, codes, rules or regulations.

4. Landlord's Work: Tenant accepts Leased Premises in an "As-is" condition. Landlord shall provide Tenant with a Tenant Improvement Allowance of $40.00 per Rentable Square Foot to be used for Leasehold Improvements.

5. Certificate of Occupancy; Tenant's Occupancy of the Premises. Landlord and Tenant agree that (a) Tenant will be responsible for obtaining whatever Certificate of Occupancy may be required by applicable law in connection with the Required Improvements, provided that Tenant cooperates in connection therewith and Tenant will occupy the Premises as soon as possible after the date of this Lease.

27

Tenant's          Landlord's
Initials          Initials

## EXHIBIT E TO LEASE AGREEMENT

### Building Rules and Regulations

1. Sidewalks, doorways, vestibules, corridors, stairways and other similar areas shall not be obstructed by Tenant or used by Tenant for any purpose other than ingress and egress to and from the Premises and for going from or to another part of the Building.

2. Plumbing fixtures and appliances shall be used only for the purposes for which designed, and no sweepings, rubbish, rags or other unsuitable materials shall be thrown or placed therein. Damage resulting to any such fixtures or appliances or surrounding areas from misuse by Tenant shall be repaired at the sole cost and expense of Tenant, and Landlord shall not in any case be responsible therefor.

3. No signs, advertisements or notices shall be painted or affixed on or to any windows or doors or other parts of the Building except of such color, size and style and in such places as shall be first approved in writing by Landlord. No nails, hooks or screws shall be driven or inserted in any part of the Building except by the Building maintenance personnel nor shall any part of the Building be defaced by Tenant. No curtains or other window treatments will be placed between the glass and the Building standard window treatments.

4. Landlord will provide and maintain an alphabetical directory of each Tenant's firm name on the first floor (main lobby) of the Building. No other directory shall be permitted unless previously consented to by Landlord in writing.

5. Tenant shall not place any additional lock or locks on any doors in or to the Premises without Landlord's prior written consent. A reasonable number of keys to the locks on the doors which access the Premises from the Common Areas shall be furnished by Landlord to Tenant, and Tenant shall not have any duplicate keys made. Upon termination of the Lease, Tenant shall return all keys to Landlord and shall provide to Landlord a means of opening all safes, cabinets and vaults being left with the Premises.

6. With respect to work being performed by Tenant in the Premises with the approval of Landlord, Tenant will refer all contractors, contractor's representatives and installation technicians rendering any service to them to Landlord for Landlord's supervision, approval and control before the performance of any contractual services. This provision shall apply to work performed in the Building including, but not limited to, installation of telephones, telegraph equipment, electrical devices and attachments, and any and all installation of every nature affecting floors, walls, woodwork, trim, windows, ceilings, equipment and any other physical portion of the Building. Tenant must have Landlord's written approval prior to employing any contractor. Any and all such contractors shall comply with these Rules and Regulations for such services including, but not limited to, insurance requirements. All work in or on the Building shall comply with any and all codes.

7. Movement in or out of the Building of furniture or office equipment, or dispatch or receipt by Tenant of any bulky materials, merchandise or materials which require use of elevators or stairways, or movement through the Building entrances or lobby shall be restricted to such hours as Landlord shall designate. All such movement shall be under the supervision of Landlord and in the manner agreed between Tenant and Landlord by prearrangement before performance. Such prearrangement initiated by Tenant will include determination by Landlord, and subject to its decision and control, as to the time, method and routing of movement and as to limitations for safety or other concerns which may prohibit any article, equipment or any other item from being brought into the Building. Tenant is to assume all risk as to damage to articles moved and injury to person or public engaged or not engaged in such movement, including equipment, property and personnel of Landlord and other tenants if damaged or injured as a result of acts in connection with carrying out this service for Tenant from the time of entering the property to completion of work; and Landlord shall not be liable for acts of any person engaged in, or any damage or loss to any of

28

Tenant's Initials    Landlord's Initials

said property or persons resulting from any act in connection with such service performed for Tenant.

8. Landlord shall have the power to prescribe the weight and position of safes and other heavy equipment, which shall, in all cases, be positioned to distribute the weight and stand on supporting devices approved by Landlord. All damage done to the Building by taking in or putting out any property of Tenant, or done by Tenant's property while in the Building, shall be repaired at the expense of Tenant.

9. Tenant, in its capacity as an employer, shall establish -- and shall use reasonable measures to enforce -- a policy for its employees which prohibits firearms (including, but not limited to, concealed handguns) in the Building and the Premises.

10. Tenant shall cooperate with Landlord's employees in keeping its Premises neat and clean. Tenant shall not employ any person for the purpose of such cleaning other than the Building's cleaning and maintenance personnel. Landlord shall be in no way responsible to Tenant, its agents, employees or invitees for any loss of property from the Premises or public areas or for any damage to any property thereon from any cause whatsoever.

11. To insure orderly operation of the Building, no ice, mineral or other water, towels, newspapers, etc. shall be delivered to the Premises except by persons appointed or approved by Landlord in writing.

12. Corridor doors, when not in use, shall be kept closed.

13. Should Tenant require telegraphic, telephonic, annunciator or other communication service, Landlord will direct the electrician in writing where and how wires are to be introduced and placed and none shall be introduced or placed except as Landlord shall direct. Electric current shall not be used for power in excess of standard office use or heating without Landlord's prior written permission. Landlord shall have the sole discretion as to which communication company or companies are permitted to enter the Building and service tenants in the Building.

14. Tenant shall not make or permit any improper odors or noises in the Building or otherwise interfere in any way with other tenants or persons having business with them.

15. Nothing shall be swept or thrown into the corridors, halls, elevator shafts or stairways. No animals shall be brought into or kept in, on or about the Premises.

16. No machinery other than standard office equipment shall be operated by Tenant in its Premises without the prior written consent of Landlord, nor shall Tenant use or keep in the Building any flammable or explosive fluid or substance.

17. No portion of the Premises shall at any time be used or occupied as sleeping or lodging quarters.

18. Landlord will not be responsible for money, jewelry or other personal property lost or stolen in or from the Premises or public areas regardless of whether such loss or theft occurs when the area is locked against entry or not.

19. Landlord reserves the right to rescind any of these rules and regulations and to make such other and further rules and regulations as in its judgment shall from time to time be advisable for the safety, protection, care and cleanliness of the Building, the use and operation thereof, the preservation of good order therein and the protection and comfort of the tenants and their agents, employees and invitees, which rules and regulations, when made and written notice thereof is given to Tenant, shall be binding upon Tenant in like manner as if originally herein prescribed; provided, however, that no new rules or regulations shall deprive Tenant of any rights expressly granted to Tenant pursuant to this Lease.

29

Tenant's          Landlord's
Initials          Initials

## JANITORIAL SPECIFICATIONS

Landlord's janitorial service shall perform according to the following specifications:

### NIGHTLY FIVE (5) NIGHTS PER WEEK
Dust and Damp Mopping
> All hard surfaced floors, including hallways, office areas, etc.

Vacuuming
> All carpeted areas will be completely vacuumed. This will include moving light furniture other than desks and file cabinets.

Spot Cleaning
> All carpeted areas to remove deposits of grease, oil, beverages, etc.
> All walls, doors, window sills, ledges, elevator doors, etc., to remove smudges, finger prints and splash marks.
> Wall areas around light switches.
> All hard surfaced floor areas to remove spillage and other marks.
> All interior glass areas to include desk tops.

Dusting
> All desks that are clear of paper; items on desk will be dusted, but not moved.
> All telephones
> All file cabinets
> All chair rails
> All tables, counter tops, lounge chairs, etc.
> Furnishings, horizontal and vertical.

Lunchroom/Breakroom
> Table tops, counter tops, sinks and food preparation area will all be cleaned.
> All bright work will be polished.

Stairwell/Storage Rooms
> Will be swept and mopped as necessary.

Elevators
> Vacuum carpets and spot clean.
> Clean elevator threshold tracks.
> Clean interior wall surfaces.
> Clean elevator doors.

Drinking Fountains
> All fountains will be cleaned with germicidal cleaner.

Glass Cleaned
> All glass tables and desk tops will be cleaned to remove smudges.
> All glass doors at reception and waiting rooms.

Lavatories
> Plumbing fixtures, including all basins, bowls, urinals and toilet seats will be cleaned and disinfected.
> Sweep and wet mop floors with germicidal cleaner.
> Dust all ledges, vents and partitions.
> Polish all mirrors and bright-work.

30

| Tenant's | Landlord's |
|----------|------------|
| Initials | Initials   |

Damp wipe all partitions.
Restock all restroom dispensers.
Sanitary napkin receptacles cleaned and sanitized.
All counter surfaces will be cleaned and disinfected.
Clean all soap and paper good dispensers.

### Waste Baskets/Trash & Recycle

Will be emptied and wiped clean; if liners are used, will be emptied only. (Liners replaced as needed.) Outside of wastebaskets will be wiped as necessary.

All trash will be collected and deposited in an area designated by Landlord and in dumpsters provided by Landlord.

Boxes marked "TRASH" will be collected and deposited in an area designated by Landlord.

### Entrance Lobby

Vacuum receptionist area completely.
Polish elevator cabs.
Sweep and/or vacuum walk-off mats.
Broom sweep front and sidewalk to entrance lobby.
The entrance lobby will receive special attention to maintain an eye-pleasing appearance at all times.
Planters will be checked nightly for litter.

## WEEKLY OPERATIONS TO BE PERFORMED

All picture frames and moldings will be dusted.
All interior window sills and ledges will be dusted.
All ledges, sills, and rails will be dusted.
All vertical surfaces on furnishings will be dusted.
Dust and vacuum all lavatory vents and light exterior surfaces.

## MONTHLY OPERATIONS TO BE PERFORMED

Dust all ventilation grills and vacuum surrounding ceiling tile as needed.
Dust or damp wipe all baseboards as needed.
Entry door glass will be squeegee cleaned inside and outside.

## QUARTERLY OPERATIONS TO BE PERFORMED

Interior and exterior window cleaning as needed.

## FLOOR MAINTENANCE

Hall corridors mopped nightly and polished weekly and scrubbed every four (4) months or three (3) times per year.

Office/work areas will be mopped nightly, polished weekly and scrubbed every four (4) months or three (3) times per year.

Lavatory floors will be mopped nightly and scrubbed every four (4) months or three (3) times per year.

*Landlord reserves the right to makes changes and adjustments to the schedule periodically.*

31

Tenant's    Landlord's
Initials    Initials

# FIRST AMENDMENT

## TO

## LEASE AGREEMENT

**THIS FIRST AMENDMENT TO LEASE AGREEMENT** ("Amendment") is dated the 6th day of April 2018 by and between 2425 WL, LLC ("Landlord") and Jetall Companies, Inc. ("Tenant").

WHEREAS, the original Lease Agreement ("Lease") between Landlord and Tenant was made to be effective the 1st day of August 2015;

WHEREAS, the parties hereto desire to amend the original Lease to amend and restate various provisions of the Lease;

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the parties hereto agrees that Landlord shall take possession of Tenant's Premises in order for VRBex Inc. to occupy the Premises for up to 60 months ("VRBex Term"), commencing on June 1, 2018 ("VRBex Commencement Date") and its expiring on June 1, 2023 ("VRBex Expiration").

The provisions of the Lease are added, amended, or deleted as follows:

1.  <u>Section 1(e) Base Rental</u>. All amounts listed in paragraph 1(e) of the Lease are suspended/abated from the VERBex Commencement Date through the end of the VRBex Term and VRBex Expiration.
2.  <u>Section 4 Additional Rent</u>. All rental obligations of Tenant listed in Section 4 of the Lease are suspended as of the VRBex Commencement Date, through the VERBex Term.
3.  <u>Section 5 Payments and Performance</u>. All payment and performance obligations of Tenant listed in the Lease are suspended as of the VRBex Commencement Date, through the VRBx Term.
4.  <u>Section 19 Termination Right</u>. The first sentence of Section 19 remains intact, however the second sentence of Section 19 is deleted in its entirety.
5.  <u>Section 20 Assignment and Subletting</u>. Section 20(a)-(d) is deleted in its entirety, and restated to read as follows:
    a.  "Tenant shall be permitted to assign or mortgage its Lease or sublet all or any part of the Premises upon prior written notice to Landlord of such assignment, mortgage or sublet."
6.  <u>Section 23 Taxes</u>. All duties of Tenant under Section 23 are suspended from the VRBex Commencement Date through the VRBex Term and VRBex Expiration
7.  Section 27. Deleted in its entirety.
8.  Section 32. Deleted in its entirety.
9.  Section 33. Deleted in its entirety.

**(Signature page to follow)**

000998

## SIGNATURE PAGE TO AMENDMENT

**LANDLORD:**

2425 WL, LLC

By: _____
Authorized Representative

Title: _____ A.M.Agent _____

Date: _4/6/2018_____

**TENANT:**

**JETALL COMPANIES, INC.**

By: _____
Authorized Representative

Title: _Presdent_____


Date_ 4-6-2018_____

Email: _____

Phone: _____

Fed Tax ID: _____

# SECOND AMENDMENT

## TO

## LEASE AGREEMENT

**THIS SECOND AMENDMENT TO LEASE AGREEMENT** ("Amendment") is dated the 1st day of February 2019 by and between Galleria 2425 Owner, LLC ("Landlord") and Jetall Companies, Inc. ("Tenant").

WHEREAS, the original Lease Agreement ("Lease") between Landlord and Tenant was made to be effective the 1st day of August 2015;

WHEREAS, the parties hereto desire to amend the original Lease and First Amendment to the Lease to amend and restate various provisions of the Lease and First Amendment;

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the parties hereto agree to the following:

The provisions of the Lease are added, amended, or deleted as follows:

1. <u>Section 1(e) Base Rental</u>. All amounts listed in paragraph 1(e) of the Lease are suspended from the Sonder Commencement Date through the end of the Sonder Term.
2. <u>Section 4 Additional Rent</u>. All payment and performance obligations of Tenant listed in the Lease are suspended as of the Sonder Commencement Date, through the end of Sonder Term.
3. <u>Section 5 Payments and Performance</u>. All payment and performance obligations of Tenant listed in Section 5 of the Lease are suspended as of the Sonder Commencement Date, through the end of the Sonder Term.
4. <u>Signage and Naming Rights</u>. Tenant is granted absolute and exclusive signage rights on all surfaces of the building, parking garage, and the exterior of the property, including exclusive naming rights. These rights are subject and subordinate to the rights of Stage Stores, Inc.'s in their lease agreement. Tenant recognizes that Stage Stores, Inc. possesses building signage rights, and any and all rights of Tenant are subordinate to Stage Stores, Inc.'s signage rights.
5. <u>Section 23 Taxes</u>. All duties of Tenant under Section 23 are suspended from the Sonder Commencement Date through the Sonder Term.

**(Signature page to follow)**

## SIGNATURE PAGE TO AMENDMENT

**LANDLORD:**

**Galleria 2425 Owner, LLC**

By:_____
Authorized Representative

Title: _____Auth Rep____

Date: _____Feb 1 2019_____

**TENANT:**

**JETALL COMPANIES, INC.**

By: _____
Authorized Representative

Title: _____Feb 1 2019_____


Date_____

Email: _____

Phone: _____

Fed Tax ID: _____

# THIRD AMENDMENT

## TO

## LEASE AGREEMENT

**THIS THIRD AMENDMENT TO LEASE AGREEMENT** ("Amendment") is dated the 1st day of August 2022 by and between Galleria 2425 Owner, LLC ("Landlord") and Jetall Companies, Inc. ("Tenant").

WHEREAS, the original Lease Agreement ("Lease") between Landlord and Tenant was made to be effective the 1st day of August 2015;

WHEREAS, the parties hereto desire to amend the original Lease, First Amendment to Lease, and Second Amendment to Lease to amend and restate various provisions of the Lease, First Amendment to Lease and Second Amendment to Lease;

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the parties hereto agree to the following:

1. 1(c) "Premises" shall mean 19,500 square feet located on the 11th floor at 2425 W. Loop South, Houston, TX 77027 (the "Building").
2. 1(e) "Base Rental" shall mean the schedule attached hereto as Exhibit A.
3. 20. Notwithstanding the provisions of section 20, the Tenant may sublet the Premises or any part thereof without Landlord approval.
4. 31. Deleted in its entirety.
5. Exhibit B. Amended to be the 11th Floor of the Premises.
6. Exhibit D. Section 4. Deleted and replaced with:

   "Landlord shall provide Tenant with a Tenant Improvement Allowance of $100.00 per Rentable Square Foot to be used for leasehold Improvements or, at Tenant's sole election, may be used to offset Rent that becomes due and payable."

**(Signature page to follow)**

## SIGNATURE PAGE TO AMENDMENT

**LANDLORD:**

**Galleria 2425 Owner, LLC**

By: _____
      Authorized Representative

Title: _____

Date: _____

**TENANT:**

**JETALL COMPANIES, INC.**

By: _____
      Authorized Representative

Title: _____

Date _____

Email: _____

Phone: _____

Fed Tax ID: _____

EXHIBIT A

| Lease Month From | Lease Month To | # Months | Total/Full Monthly Rent | Total/Full Annual Rent |
|---|---|---|---|---|
| 08/01/2022 | 09/31/2023 | 14 | $0.00 | $0.00 |
| 10/01/2023 | 09/30/2024 | 12 | $35,750.00 | $429,000.00 |
| 10/01/2024 | 09/30/2025 | 12 | $36,822.50 | $441,870.00 |
| 10/01/2025 | 09/30/2026 | 12 | $37,927.18 | $455,126.10 |
| 10/01/2026 | 09/30/2027 | 12 | $39,064.99 | $468,779.88 |
| 10/01/2027 | 09/30/2028 | 12 | $40,236.94 | $482,843.27 |
| 10/01/2028 | 09/30/2029 | 12 | $41,444.05 | $497,328.56 |
| 10/01/2029 | 09/30/2030 | 12 | $42,687.37 | $512,248.41 |
| 10/01/2030 | 09/30/2031 | 12 | $43,967.99 | $527,615.86 |
| 10/01/2031 | 09/30/2032 | 12 | $45,287.03 | $543,444.33 |