## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| | § | |
| **GALLERIA 2425 OWNER, LLC** | § | **Case No. 23-34815 (JPN)** |
| | § | |
| Debtor. | § | **Chapter 11** |

| | | |
|---|---|---|
| **ALI CHOUDHRI** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **Adversary No. 24-03120** |
| | § | |
| **NATIONAL BANK OF KUWAIT,** | § | |
| **S.A.K.P., NEW YORK BRANCH,** | § | |
| | § | |
| Defendant. | § | |

### NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH'S
### WITNESS AND EXHIBIT LIST FOR JULY 24, 2024 HEARING

National Bank of Kuwait, S.A.K.P., New York Branch ("NBK"), a secured creditor and party in interest in the above-captioned bankruptcy case, files this Witness and Exhibit List for the hearings to be held July 24, 2024 at 9:00 a.m. (prevailing Central Time) on the following matters:

- Emergency Motion to Remand of Ali Choudhri (ECF No. 3) (Adversary Proceeding, No. 24-03120).

- Trustee's Objection to Claim No. 7 of 2425 WL LLC (ECF No. 402) (Main Case, No. 23-34815).

- Trustee's Objection to Claim Nos. 21 and 22 of Ali Choudhri (ECF No. 403) (Main Case, No. 23-34815).

- Trustee's Objection to Claim Nos. 23 and 24 of Jetall Capital, LLC (ECF No. 404) (Main Case, No. 23-34815).

- CC2 TX, LLC's Application for Reimbursement of Fees and Expenses Pursuant to 11 U.S.C. § 506(b) and Fed. R. Bankr. P. 2016(a) (ECF No. 575) (Main Case, No. 23-34815)

(collectively, the "Hearing").

<u>**WITNESS LIST**</u>

NBK may call the following witnesses at the Hearing:

1.      Any witness called by any other party.

2.      Any witness(es) necessary to rebut the testimony of any witness(es) called or designated by any other party.

<u>**EXHIBIT LIST**</u>

| Exhibit | Description | Offer | Object | Admit | Disposition |
|---|---|---|---|---|---|
| 1. | Second Amended Complaint, including any attachments and exhibits (Exhibit D, ECF No. 1-4, Adv. Proc. 24-3120) | | | | |
| 2. | Remand Motion, including any attachments and exhibits (ECF No. 3, Adv. Proc. 24-3120) | | | | |
| 3. | Third Amended Complaint, including any attachments and exhibits (ECF No. 8, Adv. Proc. 24-3120) | | | | |
| 4. | Objection to Remand Motion, including any attachments and exhibits (ECF No. 9, Adv. Proc. 24-3120) | | | | |
| 5. | Trustee's Objection to Claim No. 7 of 2425 WL LLC (Main Case, ECF No. 402) | | | | |
| 6. | Trustee's Objection to Claim Nos. 21 and 22 of Ali Choudhri, including any attachments and exhibits (Main Case, ECF No. 403) | | | | |
| 7. | Trustee's Objection to Claim Nos. 23 and 24 of Jetall Capital, LLC (Main Case, ECF No. 404) | | | | |
| 8. | Credit Bid Order, including any attachments and exhibits (Main Case, ECF No. 535) | | | | |
| 9. | Order Confirming Chapter 11 Plan of Liquidation of the | | | | |

2

| Exhibit | Description | Offer | Object | Admit | Disposition |
|---|---|---|---|---|---|
| | Debtor by National Bank of Kuwait, S.A.K.P., New York Branch, including any attachments and exhibits (Main Case, ECF No. 566) | | | | |
| 10. | Order Granting Amended Motion to Alter or Amend Order in Part (ECF No. 586), including any attachments and exhibits (Main Case, ECF No. 588) | | | | |
| 11. | Any exhibit identified or offered by any other party. | | | | |
| 12. | Any exhibit necessary for impeachment and/or rebuttal purposes. | | | | |

### RESERVATION OF RIGHTS

NBK reserves the right to call or to introduce one or more, or none, of the witnesses and exhibits listed above, and further reserves the right to supplement this Witness and Exhibit List before the Hearing.

001503

DATED: July 22, 2024

**PILLSBURY WINTHROP SHAW PITTMAN LLP**

*/s/ Andrew M. Troop*
Charles C. Conrad
Texas State Bar No. 24040721
Ryan Steinbrunner
Texas State Bar No. 24093201
609 Main Street Suite 2000
Houston, TX 77002
Telephone: (713) 276-7600
Facsimile: (713) 276-7634
charles.conrad@pillsburylaw.com
ryan.steinbrunner@pillsburylaw.com

-   *and*   -

Andrew M. Troop
Massachusetts Bar No. MA547179
Patrick E. Fitzmaurice*
Kwame O. Akuffo*
31 West 52nd Street
New York, NY 10019-6131
Telephone: (212) 858-1000
Facsimile: (212) 858-1500
andrew.troop@pillsburylaw.com
patrick.fitzmaurice@pillsburylaw.com
kwame.akuffo@pillsburylaw.com

*Admitted *pro hac vice*

**Counsel for National Bank of Kuwait, S.A.K.P., New York Branch**

001504

# EXHIBIT D

001505

5/15/2024 4:22 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 87787807
By: Gerardo Perez
Filed: 5/15/2024 4:22 PM

## CAUSE NO. 2024-27168

| | | |
|---|---|---|
| **ALI CHOUDHRI** <br> *Plaintiff,* | § <br> § <br> § <br> § | **IN THE DISTRICT COURT OF** |
| **v.** | § <br> § | **HARRIS COUNTY, TEXAS** |
| **NATIONAL BANK OF KUWAIT,** <br> **S.A.K.P., NEW YORK BRANCH, et al** <br> *Defendants.* | § <br> § <br> § | **129TH JUDICIAL DISTRICT** |

### PLAINTIFF'S SECOND AMENDED ORIGINAL PETITION AND JURY DEMAND

Plaintiff Ali Choudhri ("Plaintiff") files this Second Amended Original Petition against Defendant National Bank of Kuwait, S. A. K.P., New York Branch ("NBK" or "Defendant") and hereby states and alleges the following:

### I.
### DISCOVERY PLAN

1. Discovery should be conducted pursuant to Level 3 of Rule 190.4 of the Texas Rules of Civil Procedure.

### II.
### RELIEF SOUGHT

2. Pursuant to Texas Rules of Civil Procedure 47(c), Plaintiff is presently seeking monetary relief over $1,000,000.00 and/or injunctive relief. The damages sought are within the jurisdictional limits of the Court.

### III.
### PARTIES

3. Plaintiff is an individual residing in Harris County, Texas.

001506

4.   Defendant National Bank of Kuwait, S.A.K.P., New York Branch is a banking corporation organized under the laws of Kuwait, acting through its New York Branch.  Defendant has not designated a registered for service of process in the State of Texas.  As such, pursuant to Texas Civil Practice and Remedies Code 17.041-045, the Secretary of State is Defendant's agent for service of process in this proceeding which arises out of business Defendant has done in this state, and Defendant may be served through the Texas Secretary of State. The Secretary of State shall thereafter forward a copy by certified mail return receipt requested, to Corporation Service Company, 299 Park Avenue, New York, New York 10171.  Plaintiff requests that the clerk issue citation at this time.

**IV.**
**JURISDICTION AND VENUE**

5.   The Court has jurisdiction over the parties and claims which are subject of this suit.

6.   Venue is proper in Harris County, Texas pursuant to the Texas Civil Practice & Remedies §15.0115 because Defendant transacted business in and around Harris County, Texas, the real estate which forms the basis of the ownership of tax liens asserted by Plaintiff is located in Harris County, Texas, and the agreement to return the tax liens which forms a portion of the basis of this suit was executed and performable in Harris County, Texas. In addition the contract at issue regarding the sale of the real estate to Plaintiff was accepted in Harris County, Texas and performable in Harris County, Texas with respect to real estate located in Harris County. Mandatory venue exists in Harris County since this is an action to recover an interest in real property located in Harris County.

2

## V.
## FACTUAL BACKGROUND

7.   Plaintiff is an individual, and the sole member and manager of Galleria West Loop Investments II, LLC, which is the sole member and manager of Galleria 2425 JV, LLC, which is the sole member and manager of and principal officer in and of Galleria 2425 Owner, LLC. ("2425 Owner") which owns an office building located at 2425 West Loop South in Houston, Texas ("Real Property").

8.   As a principal related to the various corporate entities and in his individual capacity, Plaintiff participated in negotiations with the Defendant with respect to issues affecting the Real Property.

9.   The Real Property is a unique and iconic Grade A building in the heart of one of Houston's prominent retail and food destinations, the Galleria. The building itself is in close proximity to the Galleria Mall, an upscale mixed-use urban development shopping mall located in the Uptown District of Houston with over 30 million visitors per year, as well as the River Oaks District, an outdoor shopping complex of global luxury brands. The Real Property was designed in the 1980s by world renowned architect, I.M. Pei. To honor his legacy work, The Real Property was recently refurbished and continues to undergo significant upgrades with new health and wellness amenities for the tenants, and a new ground floor tenant conference facility and tenant lounge.

10.   In 2018, 2425 Owner entered into a loan agreement with Defendant.  The indebtedness on that loan was secured by a first lien deed of trust on the Real Property.  Accordingly, Defendant held an interest in the Real Property by virtue of its first-priority deed of trust and 2425 Owner held an interest in the Real Property as the owner.  During September of 2021, a dispute arose concerning certain loan payments.  State court litigation ensued, and in August of 2022 that

3

litigation was dismissed as part of an agreement of the affected parties, designated as a Confidential Settlement Agreement ("CSA"). Pursuant to that agreement, Plaintiff was individually included and named as a "Purchase Option Party," entitled to purchase the deed of trust and loan for $27,000,000.00. The draft of the closing documents exchanged after the agreement was reached did not include the name of the buyer, since it was contemplated that the buyer could be the Plaintiff, the borrower, or the Plaintiff's designee. That contemplated transaction did not occur in 2022, but as will be noted below a new offer concerning the sale of the Real Property was made by Defendant in 2023 and accepted by Plaintiff.

11.     As part of the CSA, Plaintiff was required to cause the transfer of tax liens ("Tax Liens") against the Real Property for the years 2019 and 2020, currently valued at a little less than $4,000,000, to the Defendant.[1]     Specifically, the agreement provided that "Choudhri shall cause the transfer and assignment of the tax liens with respect to the Property for years 2019 and 2020 (the "Tax Liens") to NBK." Plaintiff performed his obligations under the Agreement, and the Tax Liens were transferred to NBK on the temporary basis contemplated by the parties. The agreement further provided that upon consummation of the payment provisions of the agreement, the Tax Liens would be returned to Plaintiff as the rightful owner.    In the operative documents this was stated as follows: "Upon NBK's receipt of either the Settlement Payment or Purchase Option Payment, NBK shall contemporaneously transfer and assign the Tax Liens to Choudhri."  Included in the documents exchanged in connection with the settlement were documents assigning the Tax Liens back to Plaintiff.  The Tax Liens were never returned to their rightful owner, and Defendant

---

[1] On April 9, 2024, Defendant, unperturbed by the fact that it has no legitimate ownership rights, filed proof of claim No. 13 in the bankruptcy case: In re:   Galleria 2425 Owner, LLC, Debtor, Case no. 23-34815 in the amount of $3,864,455.06 which is based on Defendant's asserted ownership of the Tax Liens.

001509

currently asserts that it is the lawful owner of the Tax Liens.  Defendant NBK fraudulently asserts ownership of Plaintiff's assets.

12.    Obviously if Defendant NBK breached the agreement, refused to perform the agreement, or for any reason the agreement was not fully performed, Defendant NBK was obligated under law to return the Tax Liens to Plaintiff.  This was never done, and NBK continues to exercise wrongful dominion and control over the property of Plaintiff, and it appears that Defendant NBK may be attempting to permanently deprive Plaintiff of his lawful interest. At no time was there ever the contemplation under any circumstances that NBK would NOT return the Tax Liens.  If the CSA had been performed, that agreement required the return of the Tax Liens. If the CSA agreement does not exist, Defendant NBK has no right to any of the fruits of that agreement. However the controversy between the various parties is to be resolved the Plaintiff's right to his property, the Tax Liens, remains inviolate.  If the agreement does not exist, the Tax Liens must be returned; if the agreement does exist, by the terms of the agreement the Tax Liens should have been returned long ago.

13.    After the time of the CSA, discussions continued and on June 28, 2023, Defendant, acting through its authorized agent (Charles Conrad of the Pillsbury Winthrop Shaw Pittman, LLP law firm) forwarded a letter to Plaintiff's attorney, Jim Wetwiska (Akin Gump law firm), in which Defendant made a new offer to sell the Deed of Trust and Loan for a fixed price, which was $27,000,000.00 less sums previously paid on the subject loan (Exhibit A). Neither the Defendant attorney nor any of its attorneys, agents or representatives ever rescinded or withdrew the offer it made to the Plaintiff and the offer remained open, therefore, subject to acceptance.

14.    On April 28, 2024, Plaintiff unconditionally accepted the offer to purchase the Deed of Trust and the Loan at the price and on the terms proposed by the Defendant. Plaintiff tendered the

full amount requested by Defendant's attorney in the June 28, 2023 offer (Exhibit B).  Accordingly,
the parties entered into a binding contract for Plaintiff to acquire from Defendant the Deed of Trust
and the Loan on this unique Real Property.  At that time, the amount of the first lien exceeds the
market value of the property, so the holder and owner of the first lien effectively has the ultimate
right to own the Real Property if it, or he, so chooses.

15.    After Plaintiff accepted the offer extended and not withdrawn by Defendant, the
Defendant continues, as it has done with the Tax Liens, to assert that it owns the Note and Deed
of Trust that it agreed to sell to Plaintiff.

16.    The record shows that Defendant made an offer to the Plaintiff and that Plaintiff
accepted it.  Plaintiff tendered performance, but the Defendant has refused to accept the price for
which it agreed to sell the note and the deed of trust that secures it.  Defendant repudiated the
contract and continues to do so.

17.    The parties mutually assented to all terms and there is a binding contract ("2024
Contract"), subject to the remedies of specific performance, consequential damages, and attorneys'
fees.

18.    Defendant made the offer to sell the Note and the Deed of Trust by written
communication from by its duly authorized agent, made to the duly authorized agent of Plaintiff.
The offer was never withdrawn.  Plaintiff unconditionally accepted all material terms and
conditions in Defendant's written offer. Thus, a binding contract has been made.

19.    Plaintiff has previously tendered the funds nominated by Defendant and at all times
since, including the present, continues to be ready, willing and able to perform. Plaintiff is ready,
willing, and able to pay the required money and otherwise perform under the 2024 Contract.

001511

20.    To date, Defendant has failed to provide the purchase and sale documents that of necessity accompany the agreed to transaction.  These include the transfer of ownership of the right to payment under the Note and the Deed of Trust.  In addition, Defendant continues to wrongfully assert ownership, dominion and control of the Note and Deed of Trust. A party repudiates a contract if the party manifests, by words or actions, a definite and unconditional intention not to perform the contract according to its terms.  Defendant has repudiated the contract.

21.    Defendant has materially breached the 2024 Contract by failing effectuate purchase and sale of the Deed of Trust and Loan, by repudiating the contract, by continuing to assert ownership that it does not have, and by refusing to deliver appropriate documents effectuating the transfer of title to the assets it agreed to sell.  Plaintiff has been damaged in many ways, the most serious of which is the inability to control to fate of this unique asset.

22.    Defendant has breached the terms of the CSA by which it obtained the Tax Liens and the by failing to return them to the Plaintiff.  Outside of the actions contemplated by the CSA, Defendant is, and has been, in wrongful possession of the assets of the Plaintiff.

## VI.

23.    Plaintiff seeks specific performance of Defendant's contractual obligation to sell the Deed of Trust and Loan to Plaintiff for the contract amount.

24.    The 2024 Contract is a binding agreement.  There exists no other real property identical to the Real Property now subject to the Defendant's Note and Deed of Trust lien.  The first lien that is the subject of this sale effectively gives ownership rights of a unique asset to the owner of the Note and Deed of Trust. Plaintiff has tendered actual funds and stands ready to deliver actual funds in any reasonable fashion once its right to specific performance is confirmed by this Court.

001512

Plaintiff is entitled to the equitable remedy of specific performance and requests an Order from this Court granting this relief.

25.     Plaintiff will show the Court that money damages will not provide adequate compensation for the harm and financial injury plaintiff will sustain if the Court does not require specific performance of the 2024 Contract.

26.     In addition, this Court should order Defendant NBK to execute the documents necessary to transfer the Tax Liens back to Plaintiff, either due to the enforcement of the CSA, or because the CSA failed and does not exist, and Defendant NBK is wrongfully attempting to steal these Tax Liens, concerning which it has no legitimate rights or interest. The Tax Liens have, buy their very nature, the right to foreclose on the Real Property, so they are an interest in real property, that by definition is unique.

**VII.**

27.     Presently, Defendant is a creditor in a Chapter 11 bankruptcy case pending in the bankruptcy court of this district: Case Number 23-34815 (JPN) styled "*In re GALLERIA 2425 OWNER, LLC*." 2024 Owner is the debtor and the owner of the Real Property. 2024 Owner filed a bankruptcy petition after D instituted foreclosure proceedings.

28.     Defendant, as a creditor in the bankruptcy proceeding, is attempting to use the Deed of Trust and Note[2] that it contractually agreed to sell to Plaintiff, as a means to purchase the Real Property.

29.     Plaintiff is not a debtor or a debtor in possession under Chapter 11 in any pending bankruptcy case in the United States. This suit and request for injunctive relief is based on the

---

[2] As well as the Tax Liens that it refused to return to Plaintiff.

Tax Liens owned by Plaintiff and the 2024 Contract between Plaintiff, individually and Defendant. Thus, this suit is between two non-debtors and involves property – the Deed of Trust and the Loan and the Tax Liens - which are not the property of 2024 Owner or the bankruptcy estate.

30.     Plaintiff will suffer irreparable harm if Defendant is allowed to retain ownership of the Deed of Trust and the Loan in derogation of Plaintiff's rights under the 2024 Contract.[3] The value of the Real Property is much less than the claimed amount of "credit" the Defendant asserts, so the holder of the Note and Deed of Trust effectively owns the Real Property.    On April 9, 2024, Defendant filed proof of claim No. 14 in the bankruptcy court in the amount of $67,157,854.15 which is based on the loan and a deed of trust against the Real Property.  It seems probable that objections to the ownership claims made by Defendant NBK will be some part of the bankruptcy proceedings, but the controversy over ownership remains between two non-debtor parties, and properly in this Court.

31.     The harm is imminent because the bankruptcy court has scheduled an auction to sell the Real Property on June 18, 2024. It is clear that Defendant is asserting the right to make a credit bid using as "credit" the Deed of Trust and Note that it sold to Plaintiff in the 2024 Contract.[4]  The Defendant also apparently intends to use the Tax Liens as part of its "credit".[5]   In essence, the Defendant is using the property of the Plaintiff to deprive the Plaintiff of effective ownership in

---

[3] *See Yarto v. Gilliland*, 287 S.W.3d 83, 97 (Tex. App.-Corpus Christi 2009, no pet.) (holding that the potential loss of rights in real property is probable, imminent, and irreparable injury that qualifies a party for injunctive relief); *Rus-Ann Dev., Inc. v. ECGC, Inc.*, 222 S.W.3d 921, 927 (Tex. App.-Tyler 2007, no pet.) (same).

[4] Plaintiff objects to the Defendant claiming ownership of the Note and Deed of Trust and the Tax Liens and using that disputed "ownership" in the impending bankruptcy proceedings, because it wrongfully deprives Plaintiff of the use of assets he is due.  Proof of Claim 14 is wrongfully made.  If this use is allowed and then the determination is made that Plaintiff prevails on his claims, it inures to the detriment of these parties and all those who may become involved.

[5] Plaintiff also objects to Defendant wrongfully using the Tax Liens that under any version of the "facts" it is clear that the Defendant has no rights, because it too wrongfully deprives Plaintiff of the use of its assets. Proof of claim 13 is wrongfully made.

001514

the unique Real Property that is the subject of this action.  Plaintiff expects the bankruptcy court to delay the actual auction and sale of the Real Property past the current June 18, 2024 date, but Plaintiff reserves his right to seek emergency injunctive relief in the event an auction or sale intends to go forward even though the ownership of the note and deed of trust is in dispute.

32.    Defendant is entitled to specific performance, but if this remedy is not available before the sale of the Real Property, then this Court should put in place injunctive relief restraining the Defendant from exercising ownership rights to the Note and Deed of Trust, and it should maintain that injunction pending the final determination of the issue of ownership, and an order of specific performance upon the final trial of the issue, after which a permanent injunction should not be necessary.[6]

33.    Plaintiff submits that fundamental contract law and the preponderance of evidence supports his assertion that the parties entered into a binding contract that pertains to a unique commercial property. The terms of the offer are specific and identifiable, and fully met by Plaintiff's acceptance of that offer.   There is no question that the offeror could have rescinded or revoked the written offer at any time and chose not to do so, leaving it open for acceptance in this ongoing controversy. There is no apparent issue with the authority of the author of the offer, or with the capacity of the Plaintiff in accepting.  No issue is presented at all concerning the ability of the Plaintiff to perform, as he has already tendered that performance. Consequently, there is a very strong likelihood that plaintiff will prevail in a trial on the merits.

34.    Accordingly, plaintiff requests that the Court schedule a hearing to consider evidence, after which it should issue a preliminary injunction.  Plaintiff requests that this Court restrain

---

[6] Determination of the ownership of real property is often the subject of injunctive relief of the type requested here for the obvious reason that a host of potential problems are avoided if a determination is made before a sale or encumbrance, or multiples of these occur and then have to be unwound.

10

defendant from exercising ownership, dominion or control over the Note and Deed of Trust, including but not limited to the exercise of decision-making over the ue of the Deed of Trust and Loan, pending the Court's final determination on the merits.

**VIII.**
**ATTORNEYS' FEES**

35.     Plaintiff repeats the allegations set forth in all preceding and subsequent paragraphs of this Complaint, as if fully set forth herein.

36.     Plaintiff hereby seeks from Defendant reasonable and necessary attorney's fees for breach of contract, specific performance, injunctive relief, and under any statutory or common law right to recover attorney's fees.

**IX.**
**JURY DEMAND**

37.     Plaintiff demands a jury trial and has tendered the appropriate fee.

**PRAYER**

WHEREFORE, premises considered, Plaintiff prays that Defendant be cited to appear herein as provided by law and that upon hearing:  the Honorable Court to find, adjudge and Order as follows:

1) Plaintiff is entitled to specific performance of 2024 Contract, as identified in the offer letter and accepted by Plaintiff;

2) A preliminary injunction to be in effect until the issue of ownership of the Deed of Trust and Note is determined, followed by an Order directing Defendant to comply with the contract created by the offer letter and the acceptance by Plaintiff.  The injunctive relief should be that Defendant is restrained from exercising dominion, control or assertion of ownership of the Real Property that the true owner may possess under the Deed of Trust and Note;

3) The immediate return of the Tax Liens;

11

4)   An award of Plaintiff's reasonable and necessary attorney's fees, and

5)   any other and further relief to which Plaintiff may be justly entitled at law and
equity.

Respectfully Submitted,

**THE STEIDLEY LAW FIRM**

*By   Jeffrey W. Steidley*
JEFFREY W. STEIDLEY
State Bar No. 19126300
jeff@texlaw.us
3701 Kirby Drive, Suite 1196
Houston, Texas 77098
(713) 523-9595 (telephone)
(713) 523-0578 (facsimile)

**ATTORNEY FOR PLAINTIFF**

12

001517

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Jeffrey Steidley on behalf of Jeffrey Steidley
Bar No. 19126300
jeff@texlaw.us
Envelope ID: 87787807
Filing Code Description: Amended Filing
Filing Description: Plaintiff's Second Amended Petition
Status as of 5/16/2024 8:25 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|---------------------|--------|
| Jeffrey WSteidley | | jeff@texlaw.us | 5/15/2024 4:22:49 PM | SENT |
| Lawrence Rodriguez | | Lawrence@texlaw.us | 5/15/2024 4:22:49 PM | SENT |
| Ali Choudhri | | ali@jetallcapital.com | 5/15/2024 4:22:49 PM | SENT |

001518

**EXHIBIT A**



Pillsbury Winthrop Shaw Pittman LLP
Two Houston Center 909 Fannin, Suite 2000 | Houston, TX 77010-1018 | tel 713.276.7600 | fax 713.276.7673

Charles C. Conrad
tel: +1.713.276.7626
charles.conrad@pillsburylaw.com

June 28, 2023

*Via Email*
Jim Wetwiska
Akin Gump Strauss Hauer & Feld LLP
1111 Louisiana, 44th Floor
Houston, Texas 77002-5200

Re:    Cause No. 2021-63370; *Galleria 2425 Owner LLC v. National Bank of
Kuwait, S.A.K.P.*, In the 281st Judicial District Court of Harris County,
Texas

<p align="center">**Confidential Communication**</p>

Jim,

We received your letter this morning, and we are working to get you drafts of the
documents you reference therein (*i.e.*, the Loan and Sale Agreement, Assignments of
the Lien and Tax Liens, and Allonge) as soon as practicable. In this regard, please
inform us who the buyer/purchaser and assignee is, and when your client intends to
initiate the settlement/purchase option payment so that an orderly closing can be
scheduled on Monday, July 3.

With respect to the specific amount of the Settlement Payment/Purchase Option
Payment, here is what we have (please confirm this is the correct amount on your end):

Settlement Payment Amount: $27 million

Amounts Paid to Date:

- $801,509.42 paid to NBK from registry of the Court

- $80,000 paid to NBK on 4/18 per order of the Court

- $80,000 paid to NBK on 5/10 per order of the Court

Current Outstanding Settlement Balance: $26,038,490.58

Jim Wetwiska
Akin Gump Strauss Hauer & Feld LLP
June 28, 2023
Page 2

For the payee information, please have the funds wired to our firm's trust account and reference "National Bank of Kuwait, S.A.K.P." in the Remittance Information.  We have included wiring instructions with this letter.

Thanks again, and we look forward to hearing from you.

Very truly yours,

Charles C. Conrad

Attachment

Unofficial Copy Office of Marilyn Burgess District Clerk

**EXHIBIT B**

Ali Choudhri
2425 West Loop South, 11th Floor
Houston, TX 77027

April 28, 2024

Charles Conrad
Pillsbury Winthrop Shaw Pittman, LLP
Two Houston Center
909 Fannin, Suite 200
Houston, TX 77010

     RE:    Galleria 2425 Owner, LLC

     SUB:  Tender of Settlement/Purchase Option Payment

Dear Mr. Conrad:

     Pursuant to your letter (attached herewith) and recent discussions, I hereby accept and tender the Settlement/Purchase Option, full payment in the amount of the Current Outstanding Settlement Balance (**$26,038,490.58**),  regarding the Confidential Settlement Agreement dated August 21 2022 as follows:

Settlement Payment Amount: $27 million

Current Outstanding Settlement Balance: **$26,038,490.58**.

     The above payment, as instructed in your letter, shall be wired to an account you designate. If you wish to handle this with a designated title company, please advise.  Please provide the necessary documents to consummate the transaction for example the Assignment of Note and Sale Agreement and Assignment of any liens.

     I expect that the National Bank of Kuwait is prepared to perform its obligations under the Confidential Settlement Agreement in connection with this payment.

     To confirm the Assignee for the Note and Lien will be:

     QB Loop Property LP is a Texas limited partnership. It's general partner is QB Loop Property GP LLC, a Texas limited liability company, and it's manager is Anwar I Qadeer.

I look forward to bringing this to a close.  I appreciate your cooperation.

Sincerely,

Ali Choudhri

Unofficial Copy Office of Marilyn Burgess District Clerk

001521

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **IN RE:** | § | |
| **GALLERIA 2425 OWNER, LLC** | § | **Case No. 23-34815 (JPN)** |
| | § | |
| **Debtor** | § | |
| | § | |
| **ALI CHOUDHRI** | § | |
| *Plaintiff,* | § | |
| | § | |
| **vs.** | § | **ADV. PROC. 24-03120** |
| | § | |
| **NATIONAL BANK OF KUWAIT,** | § | |
| **S.A.K.P., NEW YORK BRANCH,** | § | |
| *Defendants.* | § | |

## EMERGENCY MOTION TO REMAND OF ALI CHOUDHRI

**EMERGENCY RELIEF HAS BEEN REQUESTED. IF THE COURT CONSIDERS THIS MOTION ON AN EMERGENCY BASIS, THEN YOU WILL HAVE LESS THAN 21 DAYS TO ANSWER. IF YOU OBJECT TO THE REQUESTED RELIEF, OR IF YOU BELIEVE THAT EMERGENCY CONSIDERATION IS NOT WARRANTED, YOU SHOULD FILE AN IMMEDIATE RESPONSE.**

**THIS MOTION SEEKS AN ORDER THAT MAY ADVERSELY AFFECT YOU. IF YOU OPPOSE THE MOTION, YOU SHOULD IMMEDIATELY CONTACT THE MOVING PARTY TO RESOLVE THE DISPUTE. IF YOU AND THE MOVING PARTY CANNOT AGREE, YOU MUST FILE A RESPONSE AND SEND A COPY TO THE MOVING PARTY. YOU MUST FILE AND SERVE YOUR RESPONSE WITHIN 21 DAYS OF THE DATE THIS WAS SERVED ON YOU. YOUR RESPONSE MUST STATE WHY THE MOTION SHOULD NOT BE GRANTED. IF YOU DO NOT FILE A TIMELY RESPONSE, THE RELIEF MAY BE GRANTED WITHOUT FURTHER NOTICE TO YOU. IF YOU OPPOSE THE MOTION AND HAVE NOT REACHED AN AGREEMENT, YOU MUST ATTEND THE HEARING. UNLESS THE PARTIES AGREE OTHERWISE, THE COURT MAY CONSIDER EVIDENCE AT THE HEARING AND MAY DECIDE THE MOTION AT THE HEARING.**

**ADUIO COMMUNICATION WILL BE BY USE OF THE COURT'S DIAL IN FACILITY. YOU MAY ACCESS THE FACILITY AT 832-917-1510. YOU WILL BE RESPONSIBLE FOR YOUR OWN LONG DISTANCE CHARGES. ONCE**

CONNECTED, YOU WILL BE ASKED TO ENTER THE CONFERENCE ROOM NUMBER. JUDGE NORMAN'S CONFERENCE ROOM NUMBER IS 174086.

YOU MAY VIEW VIDEO VIA GOTOMEETING.  TO USE GOTOMEETING, THE COURT RECOMMENDS THAT YOU DOWNLOAD THE FREE GOTOMEETING APPLICATION.  TO CONNECT, YOU SHOULD ENTER THE MEETING CODE "JUDGE NORMAN" IN THE GOTOMEETING APP OR CLICK THE LINK ON JUDGE NORMAN'S HOME PAGE IN THE SOUTHERN DISTRICT OF TEXAS WEBSITE.  ONCE CONNECTED, CLICK THE SETTINGS ICON IN THE UPPER RIGHT HAND CORNER AND ENTER YOUR NAME UNDER PERSONAL INFORMATION SETTING.

ALL NON-EVIDENTIARY, UNCONTESTED OR UNOPPOSED EVIDENTIARY HEARINGS WILL BE HELD ON A HYBRID BASIS.  PARTIES MAY APPEAR EITHER REMOTELY OR IN PERSON UNLESS THE COURT ORDERS OTHERWISE.  REMOTE APPEARANCES SHALL BE MADE BOTH BY VIDEO AND TELEPHONE.

ALL EVIDENTIARY, CONTESTED OR OPPOSED TRIALS OR HEARINGS WILL BE HELD IN PERSON UNLESS A HYBRID TRIAL OR HEARING IS CONSENTED TO BY ALL PARTIES.  PARTIES SHALL AT LEAST TWO BUSINESS DAY PRIOR TO ANY SCHEDULED EVIDENTIARY HEARING FILE A STIPULATION WITH AN ORDER SEEKING A HYBRID TRIAL OR HEARING.  THE COURT WILL THEN, IF APPROVED, ENTER THE ORDER FOR A HYBRID TRIAL OR HEARING.  HYBRID TRIALS OR HEARINGS ARE NOT AVAILABLE IF THE COURT HAS PREVIOUSLY ORDERED IN PERSON APPEARANCE.

REMOTE PARTICIPANTS MUST APPEAR BY VIDEO.  NON-VIDEO, TELEPHONE ONLY, APPEARANCES ARE NOT PERMITTED.  A SEPARATE TELEPHONE CONNECTION IS REQUIRED FOR AUDIO.  PARTIES WHO ONLY WISH TO MONITOR HEARINGS SHOULD NOT APPEAR BY VIDEO.  REMOTE PARTICIPANTS SHOULD APPEAR FROM LOCATIONS THAT ARE FIXED, WELL LIGHTED, WITH NO BACKGROUND NOISE.  THE COURT DOES NOT ALLOW TESTIMONY FROM AUTOMOBILES OR NON-FIXED LOCATIONS.  ALL TESTIFYING WITNESSES MUST APPEAR BY VIDEO SEPARATE FROM COUNSEL.  WITNESSES SHALL BE SEGREGATED DURING TESTIMONY AND MAY NOT REFERENCE WRITTEN MATERIALS UNLESS PRESENTED TO THEM DURING HEARING OR TRIAL ELECTRONICALLY.

ELECTRONIC PRESENTATION OF EXHIBITS IS REQUIRED FOR ALL TRIALS AND HEARINGS, PAPER EXHIBITS ARE NOT PERMITTED.  EXHIBITS THAT ARE TO BE ENTERED INTO EVIDENCE MUST BE FILED ON CM/ECF WITH AN EXHIBIT LIST PRIOR TO THE HEARING.  EXHIBITS MUST BE REFERENCED AT TRIAL BY ECF FILING NUMBER.  EXHIBITS SHOULD BE FILED AS ATTACHMENTS TO THE EXHIBIT LIST.  BY EXAMPLE IF AN EXHIBIT LIST IS FILED AT ECF NO. 100, THEN EXHIBITS SHALL BE FILED AT ECF NO. 100-1, 100-

001523

**2, 100-3 ETC.  EXHIBITS NOT FILED ELECTRONICALLY AT LEAST 24 HOURS TO HEARING MAY NOT BE PRESENTED AT TRIAL.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Ali Choudhri ("Choudhri") files this Emergency Motion to Remand seeking to remand and his brief in support thereof.

## I.  PROCEDURAL HISTORY

1.  The above bankruptcy case was filed on December 5, 2023.

2.  On June 7, 2024, the National Bank of Kuwait ("NBK") filed a Notice of Removal of the state court case of *Ali Choudhri vs. National Bank of Kuwait*, Cause 2024-27168, which has been on file since May 15, 2024 (the "Removed Case" or the "State Court Case").

3.  The only asserted jurisdictional basis for removal is the claim that the State Court case is a "core proceeding" which is incorrect as a matter of law.[1] The removal was improper and the Removed Case should be remanded back to state court immediately. This motion should be treated as an emergency because the removal is frivolous, has no support in applicable law, and was made solely for delay which should not be rewarded. The case should be remanded immediately so the Plaintiff can actively pursue his remedies.

4.  The Debtor in this bankruptcy case is the entity 2425 Galleria Owner, LLC, and NBK claims to be a creditor in that bankruptcy.[2] In August of 2022 a potential agreement was reached

---

[1] The disputed matter in State Court Case involves two Tax Liens – which have never been "property of the estate" and the ownership of a Note and Deed of Trust, neither of which have ever been even claimed to be "property of the estate".

[2] NBK's status as creditor depends on its asserted ownership of a Note and Deed of Trust. At least two active claims challenge this status. One involves the claim that the transfer of the Note and Deed of Trust from NBK to another was frustrated by NBK, as a result of an alleged breach of NBK's obligations under the agreement. Another involves an offer made in a communication to Choudhri's lawyer, and late accepted by Choudhri by email. The Debtor has no interest in either of these claims and they remain unresolved.

3

with Choudhri, the Debtor and NBK,[3] whereby the Note and Deed of Trust would be transferred to Choudhri, or an entity of his choosing, once certain conditions were met. The parties to the agreement disagree on which party caused the nonperformance of certain conditions, and neither the payment of funds nor the transfer of the Note and Deed of Trust occurred.

5.    NBK, though its counsel, issued an email describing the particular terms that NBK would accept in consideration for the transfer of the Note and Deed of Trust. Choudhri contends that this email constituted an offer in writing that was never withdrawn by NBK. After the passage of some time, Choudhri forwarded an email accepting the terms of the NBK offer, but NBK has not responded to that communication, apparently taking the position that no offer or acceptance has occurred.

6.    In connection with the Confidential Settlement Agreement, Choudhri agreed to transfer to NBK certain tax liens ("Tax Liens"). The agreement provided that this assignment would be temporary and that NBK would assign these liens back to Choudhri once the other terms of the agreement had been fulfilled. NBK has taken the position that the agreement is null and void for failure of performance but has unlawfully retained the Tax Liens when there is no legal support of them to do so.

7.    Whatever the ultimate determination is made concerning the Tax Lien dispute, it is abundantly clear that the Tax Lien dispute arose prior to bankruptcy between two parties over property that does not belong to the Debtor under any theory.

8.    Similarly, the dispute between Choudhri and NBK over the Note and Deed of trust began long before any bankruptcy filing, and without a doubt the resolution of ownership of these non-debtor assets is of no legal interest to the Debtor at all. At the time of the Chapter 11 filing, these

---

[3] This agreement has been referred to as the Confidential Settlement Agreement, but the Trustee has made a public filing of some of all of the agreement. Some of the operative terms appear in litigation documents as well.

4

matters were solely within the purview of state courts.  To the extent that NBK asserts that orders entered in the bankruptcy court post-filing can "bootstrap" subject matter jurisdiction or alter the character of the Debtor's property at the time of filing, it is roundly incorrect.

## II.   THERE IS NO "CORE MATTER" JURISDICTION OVER THE STATE COURT ACTION

### a.   Bankruptcy Jurisdiction and Removal

9.   Removal of a civil action to bankruptcy court is governed by 28 U.S.C. §1452, which provides that a party may remove any claim to the district court for the district where such claim is pending, if the district court has jurisdiction of such claim under section 1334 of title 28.  *In re EOTL Sys., Inc.*, No. 03-31017-BJH-7, 2004 WL 1943434, at *2 (Bankr. N.D. Tex. January 12, 2004) (Houser, J). Section 1452 further provides that the court to which such claim is removed may remand it on any equitable ground.  *Id*.

10. The removing parties bear the burden of establishing federal jurisdiction.  *Frank v. Bear Stearns & Co.*, 128 F.3d 919, 921–22 (5th Cir. 1997)). Any doubts concerning removal must be resolved in favor of remand. *Acuna v. Brown & Root Inc.*, 200 F.3d 335, 339 (5th Cir. 2000). Any ambiguities regarding whether removal jurisdiction is proper must be resolved against federal jurisdiction and in favor of the party seeking remand. *See, e.g., Manguno v. Prudential Property and Cas. Ins. Co.*, 276 F.3d 720, 723 (5th Cir. 2002).  The initial inquiry is always whether the court has statutory jurisdiction over the claims asserted in the removed action under 28 U.S.C. § 1334.

11. Apart from original bankruptcy jurisdiction, which is not at issue here, section 1334 provides jurisdiction for claims "arising under title 11" and claims "arising in" a case under title 11.

5

12. Section 1334(b) grants this Court jurisdiction over "all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b). "Arising under" jurisdiction requires that the proceeding "invoke a substantive right provided by [the Bankruptcy Code]." *EOP-Colonnade of Dallas Ltd. P'ship v. Faulkner (In re Stonebridge Techs., Inc.)* , 430 F.3d 260, 267 (5th Cir. 2005)." "Arising in" jurisdiction refers to proceedings that are not based on any provision of the Bankruptcy Code, but nonetheless "would have no existence outside of the bankruptcy." *In re Wood* , 825 F.2d at 97." Taken together, proceedings that are "arising under" or "arising in" bankruptcy comprise this Court's core jurisdiction. *Id.*[4]

13. The sole basis for bankruptcy jurisdiction pled by NBK is "Because the State Court Case involves, among other things, Property of the Debtor's bankruptcy estate, the State Court Case is a core proceeding. See 28 U.S.C. § 157(b)(2)."[5]  This statement is demonstrably false. Neither "arising under" or "arising in" jurisdiction is present.

**b. No "arising under" jurisdiction**

14. "Arising under" jurisdiction applies to causes of action created or determined by a statutory provision of title 11.   *See Wood*, 825 F.2d at 96.  This has no application here. NBK makes no reference to a cause of action that is "created or determined" by statute.  Indeed it could not credibly do so. Choudhri has not asserted any causes of action created or determined by a statutory provision of title 11.  He asserts that NBK stole his tax liens and breached or frustrated a contract.

15.  In this case the claims asserted arise under state law; the claims are all based on prepetition controversies; none of the claims involve property of the Debtor; and the claims which

---

[4] Taken from *Lee v. Choudhri (In re Briar Bldg. Hous. LLC*), 649 B.R. 719 (Bankr. S.D. Tex. 2023)(footnotes brought into text).
[5] Notice of Removal, Document 1,

001527

only involve Choudhri and NBK all exist outside of bankruptcy.  *See In re Wood*, 825 F.2d 90, 97 (5th Cir. 1987) (noting that a proceeding does not "arise under" Title 11 if it does not invoke a substantive right created by federal bankruptcy law).

**c. No "Arising in" jurisdiction**

16. "Arising in" jurisdiction, on the other hand, is not based on a right expressly created by title 11, but instead is based on claims that have no existence outside bankruptcy.  *In re Wood*, 825 F.2d at 97; see also In re Repository Tech., Inc., 601 F.3d 710, 719 (7th Cir. 2010)( "arising in" relates to those cases which could not exist outside of the bankruptcy proceeding).   This type of jurisdiction also does not apply as the State Case alleges that NBK is wrongfully in possession of Tax Liens owned by Choudhri, and NBK has breached or frustrated consummation of a state contract action that, had there been no bankruptcy, could have proceeded in state court. S*ee also Eastport Assocs. v. City of Los Angeles (In re Eastport Assocs.*), 935 F.2d 1071, 1076 (9th Cir.1991) (claim did not 'arise in a case under title 11 because it is not a cause of action ... that only arises in title 11 cases').

**d. Tax Liens, Deed of Trust and Note are not "Property of the Estate"**

17.   The Notice of Removal is based solely on a contention that the Note and Deed of Trust are "property of the estate" which is demonstrably untrue.  Property of the estate is defined by Title 11 U.S.C. Section 541 and includes "all legal or equitable interests of the of the debtor in property as of the commencement of the case." Property of the estate includes proceeds of or from property of the estate. Title 11 U.S.C. Section 541(a)(6).  The Debtor has never had any interest in the Tax Liens, for what should be obvious reasons.  Similarly, the Debtor has never had any

7

interest in the Note or Deed of Trust that is the subject of Choudhri's other claims. The State Court Case makes no such claims.

18. NBK asserts that because the Note and Deed of Trust are related to property of the estate, that this somehow transforms property of NBK or Choudhri (depending on the outcome of their dispute) to property of the estate.  Even claims regarding <u>ownership of the Debtor</u> are not "property of the estate" and the Fifth Circuit has held that a bankruptcy court has no jurisdiction to resolve a dispute over ownership of stock in a Debtor.  *TMT Procurement Corp. v. Vantage Drilling Co. (In re TMT Procurement Corp.)*, 764 F.3d 512 (5th Cir. 2014).  Notably there was no bizarre contention that the issue of stock ownership was a core proceeding.  The Court rejected the concept of "related to" jurisdiction, which has not been asserted here.

### III.    CONCLUSION

19. NBK has the obligation to plead and prove jurisdiction to support its removal.  The sole ground plead for removal is that the State Court Action involves property of the estate and is therefore a core proceeding over which this Court has jurisdiction.  The factual predicate for that assertion is demonstrably lacking.  Absent a showing that the State Court Action in fact involves property of the estate as defined by the Code, and absent any other asserted grounds for removal jurisdiction, this matter must be remanded back to the state district court from which it was wrongfully removed.

001529

Respectfully Submitted,

**THE STEIDLEY LAW FIRM**

*By Jeffrey W. Steidley*
JEFFREY W. STEIDLEY
State Bar No. 19126300
Federal Bar No. 5609
jeff@texlaw.us
3701by Drive, Suite 1196
Houston, Texas 77098
(713) 523-9595 (telephone)
(713) 523-0578 (facsimile)

**ATTORNEY FOR PLAINTIFF**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I have served all counsel of record electronically or by other manner authorized by Fed. R. Civ. P. 5(b)(2) on this the 10th day of June, 2024, as indicated below:

Charles C. Conrad                           *VIA ECF: charles.conrad@pillsburylaw.com*
State Bar No. 24040721
Elizabeth Klingensmith                  *Via ECF: liz.klingensmith@pillsburylaw.com*
State Bar No. 24046496
Ryan Steinbrunner                          *Via ECF: ryan.steinbrunner@pillsburylaw.com*
State Bar No. 24093201
PILLSBURY WINTHROP,
SHAW PITTMAN LLP
609 Main Street Suite 2000
Houston, TX 77002
Telephone: (713) 276-7600
Facsimile: (713) 276-7634

**Attorneys for National Bank of Kuwait,
S.A.K.P., New York Branch**

*By Jeffrey W. Steidley*
Jeffrey W. Steidley

001530

UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| **GALLERIA 2425 OWNER, LLC** | § | **Case No. 23-34815 (JPN)** |
| | § | |
| **Debtor** | § | |
| | § | |
| **ALI CHOUDHRI** | § | |
| *Plaintiff,* | § | |
| | § | |
| **vs.** | § | **ADV. PROC. 24-03120** |
| | § | |
| **NATIONAL BANK OF KUWAIT,** | § | **JURY TRIAL DEMANDED** |
| **S.A.K.P., NEW YORK BRANCH,** | § | |
| *Defendants.* | § | |

## PLAINTIFF'S THIRD[1] AMENDED COMPLAINT

Plaintiff, ALI CHOUDHRI, INDIVDIUALLY, makes and files this his Third Amended

Complaint against NATIONAL BANK OF KUWAIT S. A. K.P., New York Branch (hereinafter

"NBK"), and respectfully shows:

## PARTIES

1.  Plaintiff is an individual residing in Harris County, Texas.

2.  Defendant National Bank of Kuwait, S.A.K.P., New York Branch (hereinafter "NBK"), is

a banking corporation organized under the laws of Kuwait, acting through its New York Branch

and has made an appearance herein.

## JURISDICTION and VENUE

3.  This Court does not have bankruptcy jurisdiction over this cause of action as the removal

was improper[2] and the parties agreed by contract that any dispute between them would be resolved

---

[1] This is the third iteration of the Plaintiff's pleading, although it is the first filed originally in this Court.  This action was removed from the 129th Judicial District Court of Harris County, Texas and is subject to a Motion to Remand.  It is being filed under Rule 15 without a request for leave, since no responsive pleading has been filed by the Defendant.
[2] Please see Motion to Remand, Doc.3, and any supplements.

in the state district courts of Harris County[3] and these types of contractual agreements are honored

by the courts.[4] Neither the viability of the tax liens or the amount of them is in dispute.  The only

issue is the identity of the rightful owner of the proceeds of the tax liens, and the determination of

that issue is of no moment to the bankruptcy estate.   Venue is proper in Harris County, Texas for

a number of reasons, most importantly the contractual agreement of the parties.

## FACTUAL BACKGROUND

4.   NBK, Galleria Owner, LLC ("Galleria"), Naissance Galleria, LLC ("Naissance", and Ali

Choudhri, individually ("Choudhri") entered into an agreement titled "Confidential Settlement

Agreement" (hereinafter "CSA") with a defined Effective Date of August 22, 2022.

5.   The CSA was recently presented in proceedings before this Court as an exhibit by NBK,

the Trustee, and perhaps other parties.  Plaintiff requests that the Court take judicial notice of this

contract that is in the Court's file.

6.    Portions of the CSA appear in this Court's memorandum opinion regarding confirmation.

7.   Under the terms of the CSA Galleria agreed "to pay or cause to be paid to NBK the total

sum of $27,000,000."

8.    Under the CSA no party other than Galleria agreed "to pay or cause to be paid to NBK the

total sum of $27,000,000."

9.   Under the terms of the CSA a Down Payment was to be made directly to NBK, described

as "EIGHT HUNDRED AND ONE THOUSAND FIVE HUNDRED AND NINE AND 42/100

US DOLLARS ($801,509.42)."[5]

---

[3] The CSA expressly states that the parties "agree that exclusive jurisdiction for any dispute based on or arising from this agreement will be in the Harris County District Court, Houston, Texas."

[4] *E.g., Grand View PV Solar Two, LLC v. Helix Elec., Inc.*, 847 F.3d 255 (5th Cir. 2017); *City of New Orleans v. Mun. Admin. Servs., Inc.* , 376 F.3d 501, 504 (5th Cir. 2004).

[5] The Down Payment included "such amount [the $801,509.42] including any increases thereto or income thereon".

10. NBK received the Down Payment.

11. The time frame for payment of the Settlement Amount by Galleria under the CSA was identified in the CSA as the "Payment Date" and that date was 210 days from the Effective Date.

12. The CSA also provided for a "Purchase Option" that included a "Purchase Option Payment" that could be made by the "Purchase Option Parties." Under the Purchase Option, the Purchase Option Parties had the right, but not the obligation to "purchase the Loan Documents" (as defined in the CSA).

13. The "Purchase Option Payment" includes the Down Payment referenced in paragraph 3.1(d) of the CSA, and referenced in this pleading in paragraph 9. The remainder of the "Purchase Option Payment" is the balance of funds, which added to the Down Payment equals the total purchase price of $27,000,000.

14. The Purchase Option was never exercised by any party prior to the Payment Date.

15. The CSA expired by its terms on the Payment Date.

16. The CSA also provided that "[t]o the extent that a Settlement Default (as defined below) occurs, then NBK shall be entitled to retain the Down Payment as liquidated damages…".

17. The CSA provided that Texas law would apply.

18. Under Texas law the term "liquidated damages" as used in the CSA refers to an acceptable measure of damages that parties stipulate in advance will be assessed in the event of a contract breach.

19. The CSA provided that in the event of a Settlement Default "then NBK shall be entitled to retain the Down Payment as liquidated damages..."

20. The CSA also provides that "Choudhri shall cause the transfer and assignment of the tax liens with respect to the Property for years 2019 and 2020 (the 'Tax Liens') to NBK.

001533

21.   Choudhri did in fact cause the transfer and assignment of the Tax Liens to NBK.

22.   The CSA further provides that "Upon NBK's receipt of either the Settlement Payment or the Purchase Option Payment, NBK shall contemporaneously transfer and assign the Tax Liens to Choudhri."

23.   The Tax Liens are nowhere defined in the CSA as part of the consideration of the Settlement Payment or the Purchase Option Payment.

24.   The Tax Liens are not part of the Settlement Payment or the Purchase Option Payment.

25.   The Tax Liens are nowhere defined in the CSA as part of the "Down Payment".

26.   The Tax Liens were not part of the "Down Payment".

27.   The Tax liens are nowhere defined in the CSA as "liquidated damages."

28.   The Tax Liens are not liquidated damages.

29.   The Tax Liens are not defined anywhere in the CSA as damages for breach of the CSA by any party.

30.   Texas law provides that claimed liquidated damage provisions that violate the rule of just compensation, either in design or in operation are not enforceable.

31.   The value of the Tax Liens at the time they were temporarily transferred to NBK exceeded $3,000,000.

32.   The Purchase Option is not susceptible to being "breached" since it offers an option but does not create an obligation.

33.   Any exercise of the Purchase Option was required by the CSA to be "in the form and manner provided in Section 12 of the Intercreditor Agreement."

34.   Plaintiff did not exercise the Purchase Option "in the form and manner provided in Section 12 of the Intercreditor Agreement" prior to the Payment Date.

4

35.   On or about April 11, 2023 a civil action was commenced by Galleria Owner 2425, LLC in the 281st District Court of Harris County, Texas, being Cause No. 2021-63370 regarding disputes concerning the CSA.

36.   In the matter pending in the 281st Judicial District Court, Galleria asserted that NBK breached the CSA.[6]

37.   The trial court in the case in the 281st entered an Order finding that it was likely that Galleria would prevail on its claim of breach of contract.

38.   The finding by the 281st District Court in paragraph 37 was never appealed or set aside.

39.   On June 28, 2023 a letter in email form was forwarded by the lawyers for NBK to counsel for Galleria and Choudhri.

40.   The June 28, 2023 letter listed as "Amounts Paid to Date" the Down Payment, an April $80,000 payment per order of the Court, and a May $80,000 payment, also per order of the Court.

41.   The June 28, 2023 letter was sent after the Payment Date.

42.   The June 28, 2023 letter reflected an "Outstanding Settlement Balance" of $26,038,490.58.

43.   At no time prior to April 28, 2024 did NBK or its representatives send a writing to Plaintiff or his representatives that payment of $26,038,490.58 would be unacceptable.

44.   At no time ever did NBK assert that the consideration for the purchase of assets included in the CSA would be greater than $27,000,000.

45.   By correspondence dated April 28, 2024, from Ali Choudhri to Charles Conrad, counsel for NBK, Mr. Choudhri wrote that he accepted and tendered the Settlement/Purchase Option in the amount of $26,038,490.58.

---

[6] The pleadings in this state court case are now in 2023-22748 before this Court, and Plaintiff requests that the Court take judicial notice, not of the factual accuracy of the pleadings, but of the allegations contained therein.

001535

46.   NBK did not respond to Mr. Choudhri's April 28, 2024 communication favorably.

47.   In oral testimony on June 5, 2024 NBK's designated representative indicated that NBK considered the tender of the Settlement/Purchase Option untimely.

48. The offer to pay the $26,038,490.58 contained in Mr. Choudhri's April 28, 2024 letter was rejected by NBK.

49.   NBK considered the CSA in breach when the Settlement Amount was not received by NBK on or before the Payment Date.

50.   Plaintiff had requested return of the Tax Liens or compensation in the amount of the Tax Liens but NBK has declined to either return the Tax Liens or remit their value to Plaintiff.

<div align="center">

**CLAIMS FOR RELIEF**

</div>

51.   <u>Conversion</u> – Pleading in the alternative, NBK's retention of the Tax Liens to which Plaintiff had entitlement to possession constitutes the unlawful and unauthorized assumption and exercise of control over the property to the exclusion of and inconsistent with, the plaintiff's rights as an owner.  Nothing in the CSA or in the common law of the State of Texas allows NBK to keep the Tax Liens under the circumstances present in this case.  To the extent that NBK breached the CSA with respect to the only obligor in the contract, NBK had no right to maintain possession of the Plaintiff's Tax Liens.  To the extent that performance by Galleria was prevented or did not occur, NBK had no legal right to maintain possession of the Tax Liens.  The remedy for breach of contract is a suit for damages against the party who breached, which in this case could not be Plaintiff, since Galleria was the only party with the obligation to "pay or cause to be paid to NBK the total sum of $27,000,000" and no option was ever exercised by Plaintiff or consented to by NBK.  The Tax Liens are not "liquidated damages" because they are not identified as such, and because the CSA does identify liquidated damages in a specific amount in the event of a breach

<div align="center">6</div>

that does not include the Tax Liens, and because the Tax Liens are the property of Plaintiff, who as a matter of law could not have breached the CSA. NBK agreed to an amount as "liquidated damages" and was paid the amount agreed as "liquidated damages." To the extent that NBK now claims that the Tax Liens are liquidated damages, this is contrary to the terms of the CSA, and in any case the terms regarding the Tax Liens would be unenforceable under Texas law as liquidated damages because they are clearly a penalty against a party who could not have breached the contract.[7]

52. <u>Money Had and Received – Unjust Enrichment.</u> Pleading further in the alternative, Plaintiff would show that the Tax Liens have been wrongfully held by NBK and the funds derived from them should be restored to Plaintiff to prevent the unjust enrichment of NBK. Equity and good conscience require restitution of the value of the Tax Liens to Plaintiff. Under the circumstances presented here, NBK holds money which in equity and good conscience belongs to the Plaintiff. The CSA unequivocally identifies the purchase price in the transaction, and it does not include the Tax Liens. At no time from August 22, 2022 through the date of the letter from NBK's counsel in June 2023 did NBK take the position that the Tax Liens were somehow part of the purchase price. As of this time, NBK has never taken such a position. Similarly, the CSA identifies a specific cash penalty, identified directly as liquidated damages, that NBK is to receive in the event of breach of the CSA. The only breach identified is the failure to remit the Settlement Payment, which is an obligation of Galleria, not the Plaintiff. No breach of any kind has been asserted against the Plaintiff. Liquidated damages are defined under Texas law as "a contractual device that parties use to determine their rights and liabilities in the event of a dispute."[8] NBK

---

[7] *Phillips v. Phillips*, 820 S.W.2d 785, 788 (Tex. 1991) (Whether a contractual provision is an enforceable liquidated damages provision or an unenforceable penalty is a question of law for the court to decide.').

[8] *See Atrium Med. Ctr., LP v. Hous. Red C LLC* , 595 S.W.3d 188, 192 (Tex. 2020)

001537

received those liquidated damages. NBK received the liquidated damages that it contracted to receive. The CSA, absent a finding of breach that caused other damages, is concluded.  No justification exists for the continuing exercise of dominion and control over the any funds derived from the Tax Liens by NBK.  Assuming the CSA was breached by Galleria and there is no legal excuse for the failure of Galleria to "pay or cause to be paid" funds, NBK has received its full measure of its agreed damages by its retention of the Down Payment as liquidated damages.  Alternatively, any further grievance it might have would only be against Galleria, the only party obligated under the CSA to make payment.

53.  <u>Breach of Contract by NBK</u> – Pleading further in the alternative, Plaintiff would show that the failure to return the Tax Liens to Plaintiff is a breach of contract.  The operative provision requires the Tax Liens to be conveyed to Plaintiff once the contract between Galleria and NBK is concluded by payment.  NBK asserts that the CSA was breached by Galleria, and the damages for that alleged breach have been received by NBK.  The acceptance of the liquidated damages concludes Galleria's obligations under the CSA and is the agreed upon substitute for performance – i.e. the payment of the Settlement Payment.  To the extent that the condition for the return of the Tax Liens is in any way enforceable, it has effectively been met.  Whether Galleria or NBK breached the CSA, or neither of them did, the rules of contract law required the return of the Tax Liens to Plaintiff, and gives to Plaintiff the right to monetary damages equal to the value of the Tax Liens.

54.  Pleading further in the alternative, Plaintiff pleads for rescission of the contract terms related to the Tax Liens in the event the Court does not find as a matter of law that the funds obtained by NBK should be paid on the face of the CSA and the undisputed conduct of NBK.  Rescission of a contract term is a remedy that operates to extinguish a contract term whether it is

8

001538

valid or not when it must be set aside because of fraud, mistake, or some other reason to avoid unjust enrichment. The contract provisions concerning the Tax Liens should be rescinded because it was never within the contemplation of both parties that the Tax Liens would be held by NBK on anything other than a temporary basis, and the contract nowhere allows the retention of the Tax Liens due to a breach by NBK or Galleria, or the failure of the payments to be made irrespective of legal fault. NBK has no breach of contract case against the Plaintiff, and in these circumstances could not. NBK has no viable legal action against the Plaintiff that would allow it to keep the Tax Liens, and the funds derived from them, under any damage theory at all. The obligor on the CSA was Galleria. This provision should be avoided due to unilateral or mutual mistake or the doctrine of "mistake-plus-knowledge."

55.     Pleading further in the alternative, if in this case if NBK was always had the intention that once it had secured Plaintiff's Tax liens it would retain them even if the contract was breached by NBK or Galleria, or for some unknown and justified reason the contract was not performed it was aware that this was not the intent of the Plaintiff and was aware of the mistake, and intentionally made no mention of this windfall to itself, leaving Plaintiff in the mistaken view that the Tax Lien transfer was temporary only. No other construction of these facts makes any sense. The "mistake" was "remediable" since this provision could have indicated what result followed if Galleria failed to perform, or for any reason the contract was not performed. If this result is not clear from the wording of the CSA itself, then a jury must determine the fact question concerning whether the mistake is such that this provision should be rescinded.

56.     Pleading further and in the alternative Plaintiff would show that Plaintiff received no consideration for a provision that allegedly allows NBK's permanent taking of the Tax Liens. First of all, the provision adds nothing of any substance to the obligation of Galleria to pay or cause to

9

be paiD the $27,000,000.  The Down Payment is the same.  The balance is the same.   The timing of the Settlement Payment is the same. The agreement on the amount of liquidated damages in the event of a default remains the same. The provisions regarding the Tax Liens, if interpreted as being permanently the property of NBK are without consideration of any kind.  They are not part of the Down Payment.  They are not part of the Settlement Payment.  They are not liquidated damages. These provisions should be rescinded and the Tax Liens, or the funds derived therefrom, returned to Plaintiff.[9]

57.   Pleading further and in the alternative, Plaintiff would show that the factual circumstances surrounding the performance of the parties to the CSA are complicated and unresolved.  These claims have not been fully and fairly litigated as is applicable here, with the possible exception of the proceedings in state court reference above. In the event that NBK breached the CSA[10], then the retention of the Tax Liens obviously has no support in law, since NBK would be profiting from its own breach, but this result would follow from NBK's construction of the CSA. This result is even worse than NBK punishing Plaintiff for the alleged breach of the other party to the CSA which is the only party to the CSA with an obligation to "pay or cause to be paid" the Settlement Amount.  This construction is untenable and e above paragraphs concerning causes of action that support the return of the Tax Liens or the funds derived from them, compel the return of the Tax Liens or the payment of the value of the Tax Liens to the Plaintiff.

58.   Pleading further an in the alternative, should the Court find that the language concerning the Tax liens did not compel the return of the Tax Liens to Plaintiff and as a matter of law compel

---

[9] Plaintiff anticipates that the recent auction and sale will be approved by the court and the buyer will have the responsibility for paying the Tax Liens.  Any references to the "return" of the Tax Liens is not operative absent unforeseen circumstances, but would otherwise be an alternative legal remedy.

[10] These allegations have been incorporated by reference and are not the basis for a cause of action in this pleading for contract damages for breach per se.  Their inclusion in this pleading is addressed to the effect of a party other than Plaintiff causing a breach, and the effect that should have in law regarding the return of the Tax Liens or payment of their value to the Plaintiff.

001540

damages to be awarded to Plaintiff of their value, then Plaintiff would show that the language is ambiguous since there is no language in the CSA that expressly deals with the handling of the Tax Liens in the event of a breach of the agreement by NBK or by Galleria. There is no language concerning the treatment of the Tax Liens in the event of justifiable impossibility or other no-fault events that might prevent performance in a timely fashion. It seems abundantly clear that the parties intended the transfer to be only temporary but should there be any doubt about this then the operative clause must be considered ambiguous.  Under Texas law when a contract does not specifically address the treatment of the retention of assets the provision is deemed to be ambiguous, and then the fact question of intent must be resolved by a jury.

59.   State Court Matters -- Docket Control Order –If the matter is remanded, Plaintiff requests a docket control order specific to this particular case.  Pursuant Texas Rule of Civil Procedure 47(c)(4) Plaintiff seeks damages for over a million dollars. All conditions precedent to Plaintiff's claims for relief have occurred or been performed. RULE 193.7 NOTICE Plaintiff hereby gives actual notice to Defendant that any and all documents produced may be used against Defendant at any pre-trial proceeding and/or at trial of this matter without the necessity of authenticating the documents.

## DAMAGES

60.   Plaintiff requests monetary damages in the amount of the value of the Tax Liens, as well as reasonable attorneys' fees, prejudgment and postjudgment interest and costs, to the extent allowed by law.

## JURY DEMAND

61.   Plaintiff demands a jury trial.

001541

## **PRAYER**

62.   Plaintiff prays that upon hearing this matter be remanded back to the state court from which it was removed, the controversy here being between two non-debtor parties over the ownership of the proceeds from payment of the Tax Liens, and that after a jury trial the Plaintiff have judgment against NBK for actual damages in the amount of the value of the Tax Liens, for reasonable attorneys' fees, for costs, for prejudgment and post-judgment interest as set forth in law, and for such other and further relief concerning which the Court deems fair and just.

Respectfully Submitted,

**THE STEIDLEY LAW FIRM**

By: /s/ Jeffrey W. Steidley
JEFFREY W. STEIDLEY
State Bar No. 19126300
Federal Bar No. 5609
jeff@texlaw.us
3701 Kirby Drive, Suite 1196
Houston, Texas 77098
(713) 523-9595 (telephone)
(713) 523-0578 (facsimile)

**ATTORNEY FOR PLAINTIFF**

001542

## CERTIFICATE OF SERVICE

I hereby certify that I have served all counsel of record electronically or by other manner authorized by Fed. R. Civ. P. 5(b)(2) on this the 3rd day of July, 2024, as indicated below:

Charles C. Conrad                    ***VIA ECF***
State Bar No. 24040721
Elizabeth Klingensmith
State Bar No. 24046496
Ryan Steinbrunner
State Bar No. 24093201
PILLSBURY WINTHROP SHAW PITTMAN LLP
609 Main Street Suite 2000
Houston, TX 77002
Telephone: (713) 276-7600
Facsimile: (713) 276-7634
charles.conrad@pillsburylaw.com
liz.klingensmith@pillsburylaw.com
ryan.steinbrunner@pillsburylaw.com

**Attorneys for National Bank of Kuwait,**
**S.A.K.P., New York Branch**

*By: /s/ Jeffrey W. Steidley*
Jeffrey W. Steidley

001543

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **Case No. 23-34815 (JPN)** |
| **GALLERIA 2425 OWNER, LLC** | § | |
| | § | **Chapter 11** |
| Debtor. | § | |

| | | |
|---|---|---|
| **ALI CHOUDHRI** | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **Adversary No. 24-03120** |
| | § | |
| **NATIONAL BANK OF KUWAIT,** | § | |
| **S.A.K.P., NEW YORK BRANCH,** | § | |
| | § | |
| Defendant. | § | |

**DEFENDANT NATIONAL BANK OF KUWAIT, S.A.K.P.,
NEW YORK BRANCH'S OBJECTION TO
EMERGENCY MOTION TO REMAND OF ALI CHOUDHRI**

To the Honorable Jeffrey P. Norman, Bankruptcy Judge:

Defendant National Bank of Kuwait, S.A.K.P., New York Branch ("NBK") objects to the

*Emergency Motion to Remand of Ali Choudhri* [Adv. Pro., ECF No. 3] (the "Motion") stating as

follows:

**INTRODUCTION**

1.       The Court should not remand Mr. Choudhri's lawsuit to state court because it has

"arising in" jurisdiction over the "core" lawsuit.  The lawsuit is premised on Mr. Choudhri's

(implausible) allegations that (i) he owns certain tax liens that he assigned to NBK under a

confidential settlement agreement, and (ii) NBK is obligated to sell him the promissory note for

its loan to the Debtor (the "Loan") and the related Deed of Trust[1] securing the estate's real property (the "Property") based on an alleged June 2023 offer which Mr. Choudhri (or an affiliate) tried to accept ten months later in April 2024.

2.       Because the viability of these claims necessarily involves the interpretation of various orders the Court has entered in this case, including without limitation, the order allowing NBK to credit bid at the auction on the Property and the order and decision confirming NBK's liquidating plan for the Debtor (the "Plan") which (a) allows NBK's tax lien claim and Loan claim against the Debtor and (b) erects a gatekeeping threshold that requires Mr. Choudhri establish that the asserted claims both (i) are not estate claims and (ii) are colorable before the lawsuit can proceed, the requirements for establishing "arising in" jurisdiction have been satisfied.

3.       Even if "arising in" jurisdiction does not exist, the Court has post-confirmation "related-to" jurisdiction over the lawsuit because, while the lawsuit partially involves conduct that predates the bankruptcy case (the alleged prepetition offer by NBK that was allegedly accepted by Mr. Choudhri during this chapter 11 case), the results of the lawsuit could impact the implementation of the Plan if Mr. Choudhri prevails.  Not only does the Plan provide that NBK has allowed claims for the tax liens and the Loan and receives releases of estate claims, it also requires NBK (a) to fund a liquidation trust, to pay a significant amount to fund a partial payment to holders of allowed unsecured trade claims and to pay in full secured and priority claims other than its claims if it is the successful bidder of the Property and (b) to compromise the amount of its filed tax lien claim and subordinate its distribution on its secured claim to fund a liquidation trust, to pay a significant amount to fund a partial payment to holders of allowed unsecured trade claims and to pay in full secured and priority claims if it is not the successful bidder.  These matters

---

[1]  Capitalized terms not defined in this introduction have the meaning ascribed to them in the Objection.

001545

directly pertain to implementation of the Plan and, consistent with Fifth Circuit law, the Court has post-confirmation "related-to" jurisdiction over the lawsuit that could impact them.

4.      Finally, the Court should not exercise discretion to remand the lawsuit to state court. Permitting the lawsuit to proceed in state court is inefficient and would reward Mr. Choudhri's clear effort to avoid this Court for at least the following reasons:

a.   After two days of hearings on 2425 WL LLC's ("2425 WL") motion to prohibit NBK's credit bid and objection to confirmation of the Plan, the Court found that the record did not support Mr. Choudhri's allegations against NBK and entered orders denying 2425 WL's motion and confirming the Plan.  In denying the credit bid motion, the Court determined that NBK has a secured interest in the Property and can "credit bid" for the Property, which is not possible without NBK owning the Loan and the Deed of Trust.  As part of plan confirmation, the Court also determined that NBK has an "allowed" claim for the tax liens.

b.   Moreover, Mr. Choudhri's decision to file the lawsuit in state court while the chapter 11 case was pending, the Plan with its gatekeeping provisions was on file with the Court, and his surrogate 2425 WL was pressing substantially the same claims against NBK before this Court, can only be interpreted as a deliberate attempt by Mr. Choudhri to evade this Court's jurisdiction and the terms of the Plan should it be confirmed.  Indeed, the now-withdrawn competing plan of reorganization filed by Team Choudhri members 2425 WL and the Debtor (and signed by Mr. Choudhri) specifically provided that the "Court [would] determine[ ] [whether] the Confidential Settlement Agreement

3

between NBK, the Debtor and Ali Choudhri remains enforceable," making Mr. Choudhri's gamesmanship all the more apparent. (*See* ECF No. 377 at 14.)[2]

5.     For these reasons, and those detailed below, the Motion should be denied and Mr. Choudhri should be compelled to comply with the Plan's gatekeeping provisions.

<u>BACKGROUND</u>

*A. Filing of the Plan*

6.     NBK filed the Plan and related disclosure statement on April 10, 2024. (*See* ECF Nos. 194 and 195.)  Among other things, the Plan provided for the allowance of NBK's tax and Loan claims and differing treatment for those claims if NBK was or was not the successful bidder for the Property.  The Plan also provided for the release of estate claims against NBK and requires that before claims against NBK relating to the Debtor can proceed, the plaintiff/claimant must first obtain a ruling from the Court that estate claims are not being pursued and the claims otherwise are colorable. (*See* ECF No. 194 at 20 and 21.)  On April 25, 2024, the Court entered an order requiring certain limited changes to the disclosure statement before it would approve it. (*See* ECF No. 239.)

*B. Filing of State Court Tax Lien Lawsuit*

7.     On April 26, 2024, two weeks after the Plan and related disclosure statement were filed, Mr. Choudhri filed a petition against NBK in the Harris County District Court, Cause No. 24-27168 (the "<u>Tax Lien Lawsuit</u>").  The original petition was first amended on May 3, 2024, and the second amended petition was filed on May 15, 2024.  On July 3, 2024 (after the Tax Lien Lawsuit was removed to this Court, the Motion was filed and the Plan was confirmed), Mr.

---

[2] All references to "ECF No." only mean the docket filing number in the main bankruptcy case, Case No. 23-34815.

001547

Choudhri filed a third amended petition (the "Complaint" or "Compl.").[3] Adv. Pro., ECF No. 8.[4] None of the original or amended petitions have ever been served on NBK.

### C. Third Amended Complaint

8.      The Complaint alleges the following facts relevant to the consideration of the Motion and this objection:

a.   In August 2022, the Debtor, NBK, Mr. Ali Choudhri and the Debtor's mezzanine lender entered into a confidential settlement agreement (the "CSA" as defined in the Complaint). (Compl. at ¶ 4.)

b.   Under the CSA, the Debtor agreed to pay off the Loan[5] in the amount of $27,000,000 (the "Settlement Payment") within 210 days from the effective date of the CSA (the "Payment Date"). (*Id.* at ¶¶ 8 and 11.)

c.   Among other things, the CSA required the Debtor to pay NBK a down payment of $801,509.42 and Mr. Choudhri to transfer and assign tax liens against the Property for tax years 2019 and 2020 to NBK (the "Tax Liens"). (*Id.* at ¶¶ 9 and 20.)

---

[3]   Mr. Choudhri amended the Complaint to delete specific references to the Loan and the Deed of Trust securing the Property, but the Complaint still implicates those documents. The reasons to deny the Motion, therefore, are unaffected but this most recent amendment.

[4]   Solely for the purposes of this objection, NBK will treat the Complaint as the operative complaint for considering the Motion, although the second amended petition likely is more appropriately considered the operative complaint. Pursuant to Bankruptcy Rule 7015, which now applies to the Tax Lien Lawsuit, Mr. Choudhri was entitled to amend his complaint as of right only once and subsequent amendments are permitted only with leave of court. *See* Fed. R. Bankr. P. 7015(a)(1) and (2). Mr. Choudhri did not seek leave to file the Complaint, the fourth iteration of his lawsuit.

[5]   The Loan and proceeds thereof are evidenced by the (i) Loan Agreement between NBK and the Debtor dated May 23, 2018, (ii) Promissory Note dated May 23, 2018 executed by the Debtor and payable to NBK (the "Note"), and (iii) Deed of Trust, Assignment of Leases and Rents and Profits, Security Agreement and Fixture Filing dated May 23, 2018, recorded RP 2018-235600 in the Real Property Records of Harris County, Texas (the "Deed of Trust", together with the Loan, Note and Deed of Trust, the "Loan Documents"). *See* Proof of Claim No. 14.

001548

d.  The CSA gave certain parties the option to "'purchase the Loan Documents'" by the Payment Date (the "<u>Purchase Option Payment</u>").[6]  (*Id.* at ¶ 12.)  The Purchase Option Payment consisted of the down payment plus the remaining balance of the Settlement Payment.  The CSA also provided that "NBK shall contemporaneously transfer and assign the Tax Liens to Choudhri" but only if NBK received "either the Settlement Payment or the Purchase Option Payment." (*Id.* at ¶ 22.)

e.  "The Purchase Option was never exercised by any party prior to the Payment Date." (*Id.* at ¶ 14).  In April 2023, as NBK was in the process of foreclosing on the Property, the Debtor filed a state court lawsuit, alleging that NBK breached the CSA. (*Id.* at ¶¶ 35 and 36.)  The state court extended the time for payment of the Settlement Payment or the Purchase Option Payment until the beginning of July 2023, but it also required that the Debtor to make three monthly payments of $80,000 each to NBK on each of April 15, 2023, May 15, 2023, and June 15, 2023.  The Debtor only made two payments in April and May of 2023.  (*Id.* at ¶ 40.)

f.  In a June 28, 2023 response letter to a letter from the Debtor's counsel that same day, NBK wrote to counsel that the outstanding balance under the CSA was $26,038,490.58. (*Id.* at ¶ 42.)

g.  Ten months later, on April 28, 2024, Mr. Choudhri wrote "that he accepted and tendered the Settlement/Purchase Option in the amount of $26,038,490.58" based on NBK's alleged offer to sell the Note and Deed of Trust in its June 28,

---

[6]  The parties are referred to as the "Purchase Option Parties," which the CSA defines as Naisance Galleria LLC, the Debtor, Mr. Choudhri "and an entity wholly owned and controlled by [Mr.] Choudhri."

2023 response letter to counsel (*Id.* at ¶ 42.)   Other than referencing Mr. Choudhri's letter, the Complaint contains no allegations that any payment of the Settlement/Purchase Option in the amount of $26,038,490.58 was made to NBK.

h.   NBK retained the Tax Liens because neither the Debtor nor Mr. Choudhri paid the full amount of the Settlement Payment or the Purchase Option Payment by the Payment Date (as effectively extended by the state court), and the Debtor failed to make the last $80,000 payment even after the state court extended the period to perform under the CSA.   Still, among other claims asserted in the Complaint, Mr. Choudhri claims that NBK failed to return the Tax Liens to him. (*Id.* at ¶ 53.)

9.      As discussed below, the Court found these allegations to be without support after evaluating the evidence presented during the lengthy hearings on June 17 and 19, 2024.

*D.  Proofs of Claim for the Tax Liens and Objection to the Choudhri Tax Lien Claim*

10.      NBK filed Proof of Claim No. 13 in the aggregate amount of $3,864,455.06 based on the Tax Liens assigned to NBK by Mr. Choudhri (the "NBK Tax Lien Claim").   Although 2425 WL has no rights in or to the Tax Liens, it filed an objection to the NBK Tax Lien Claim on behalf of Mr. Choudhri who did not personally object to the claim. (*See* ECF No. 284.)   2425 WL's claim objection asserts that Mr. Choudhri is the rightful owner of the NBK Tax Lien Claim making nearly identical allegations to those contained in the Complaint.   The hearing on the claim objection is September 24, 2024, with dispositive motions due on August 30, 2024.  (*See* ECF No. 543.)   NBK has filed a supplemental response to the claim objection, that, among other things, requests that

the Court overrule and dismiss it as a matter of law based on the undisputed facts of this case. (*See* ECF No. 612.)

11.     Mr. Choudhri filed Proof of Claim No. 21 for the Tax Liens in the aggregate amount of $4,176,657.46 (the "<u>Choudhri Tax Lien Claim</u>").  On June 3, 2024, the Trustee objected to the Choudhri Tax Lien Claim, because Mr. Choudhri assigned the Tax Liens to NBK, the assignment was acknowledged by a notary and filed with the real property records of Harris County, and as a result, Mr. Choudhri has no claim against the estate.  (*See* ECF No. 403 at ¶¶ 9 and 14.)

12.     The Trustee's objection to the Choudhri Tax Lien Claim will be heard on the same day as the Motion.

### E.  *2425 WL's Complaint for Equitable Subordination*

13.      On March 22, 2024, 2425 WL filed an adversary proceeding in this Court against NBK, which was amended on May 30, 2024.  (*See* Adv. Pro. No., 24-03043 (JPN).)  2425 WL's complaint is grounded in the same factual allegations about the CSA, its alleged breach by NBK and ownership disputes as the Complaint.  (*See id.*, ECF No. 20.)

### F.  *Removal of Tax Lien Lawsuit and Motion to Remand*

14.     On June 7, 2024, NBK removed the Tax Lien Lawsuit to this Court pursuant to 28 U.S.C. § 1452(a) because the lawsuit is a core proceeding under 28 U.S.C. § 157(b)(2).  (*See* Adv. Pro., ECF No. 1.)  On June 10, 2024, Mr. Choudhri filed the Motion to remand the Tax Lien Lawsuit to state court because the Court lacks "core" jurisdiction over the lawsuit.

### G.  *Order Denying 2425 WL's Motion to Prohibit NBK's Credit Bid and Auction*

15.     On June 17, 2024, the Court denied 2425 WL's motion to prohibit NBK from credit bidding at the auction (the "<u>Credit Bid Order</u>").  (*See* ECF No. 535.)  After evaluating the evidence and witness testimony, the Court did not "believe [Mr. Choudhri's] allegations" that NBK breached

001551

the CSA and offered to sell the Note and Deed of Trust, or that NBK's actions prevented him from paying the Settlement Payment.  (Credit Bid Order at 4.)  According to the Court, "there was no offer by NBK or valid acceptance by any party," and "[t]he evidence [did] not support such an allegation."  (*Id.* at 3.)  The Court also found that NBK had rights to the Property, and that 2425 WL and Mr. Choudhri failed to establish cause to prohibit NBK's right to credit bid.  (*Id.*)

16.     On June 21, 2024, the Trustee held an auction of the Property.  QB Loop Property LP was declared the successful bidder with a total cash bid of $27,250,000, with NBK as the backup bidder with a $27,000,000 credit bid.  (*See* ECF No. 561.)

17.     On July 1, 2024, 2425 WL filed a motion to alter the Credit Bid Order, requesting the Court to, among other things, correct a factual error in the order.  (*See* ECF No. 586.)  The Court partially granted the motion to correct the factual error and denied the balance of the request to alter.  (*See* ECF No. 588.)  In ruling, the Court reiterated that "there was no valid acceptance by any party" of an offer by NBK to accept the Settlement Payment from the Debtor or its affiliates, and that it "found no cause . . . to disallow credit bidding."  (*Id.* at 2.)

*H.  Confirmation of NBK's Chapter 11 Plan of Liquidation*

18.     On June 22, 2024, the Court entered an order confirming the Plan over 2425 WL's and the Debtor's objections (the "<u>Confirmation Order</u>").[7]  (*See* ECF Nos. 565 and 566.)  The Plan and Confirmation Order contain, among others, provisions regarding the treatment and allowance of claims, plan implementation and gatekeeping.

19.     The confirmed Plan provides, without limitation, for the liquidation of the estate, the sale of the Property conducted by the Trustee at the June 21 auction, distributions to creditors with allowed claims, the release of estate claims against NBK, and an injunction against any party

---

[7]  All references to the Bankruptcy Code relate to Title 11 of the United States Code.

pursuing released estate claims against NBK.  It also contains a gatekeeping provision that requires parties to obtain court approval before proceeding with claims against NBK to ensure that released estate claims, and only colorable claims, are being pursued.  (*See* Plan Art. VI, VII and IX.)

20.     The Confirmation Order also provides in relevant part that "[a]s provided in Article VII of the Plan, no Claim is or shall be deemed Allowed . . . unless otherwise . . . Allowed pursuant to the Plan." (Confirmation Order ¶ G.)  The Plan defines an "Allowed" claim in relevant part as one that is "expressly allowed . . . pursuant to the Plan," and "Allowed Claim" means "a Claim that is Allowed."  Plan Art. I.4(d) and 5.  Under the Plan, NBK receives Allowed claims as follows:

    a.  An Allowed claim for the Tax Liens in the amount of $1,696,384.85 if NBK is not the successful bidder for the Property, and NBK will waive this claim if it is the successful bidder.  (*See* Plan Art. III.B(d).)

    b.  An Allowed secured claim for the Loan and an unsecured deficiency claim for the balance, whether it is the successful bidder for the Property or not.  If NBK is not the successful bidder, then NBK's Allowed secured claim equals the remaining sale proceeds after certain secured and priority claims are paid in full, $238,307.99 in funding is provided for a significant partial payment to holders of allowed unsecured trade claims and a liquidation trust is funded with $150,000.  (*See* Plan Art. III.B(e) and VI.E.)  If NBK is the successful bidder, its Allowed secured claim equals the amount of its winning bid although it also is required to fund certain secured and priority claims in full, $238,307.99 for a significant partial payment to holders of allowed unsecured trade claims and a $150,000 for the liquidation trust.  (*See* Plan Art. III.B(e) and VI.C.)

21.     Under the Confirmation Order, the Court retains exclusive jurisdiction over "all matters arising under, arising out of, or related to," this case "including all matters listed in Article XI of the Plan."  (Confirmation Order at ¶ LL.)  Article X of the Plan gives the Court exclusive jurisdiction to hear and determine matters that "may arise in connection with the interpretation of the Plan" and to enforce "the provisions set forth in the Plan."  (Plan Art. X(e) and (l).)

<u>THE TAX LIEN LAWSUIT SHOULD NOT BE REMANDED</u>

*A.  This Court Has Jurisdiction Over the Adversary Proceeding*

22.     Mr. Choudhri argues that the Tax Lien Lawsuit should be remanded to state court because it does not "arise under" or "arise in" title 11, does not invoke this Court's "core" jurisdiction, and does not involve estate property.  (Motion at ¶¶ 14-18.)

23.     The Tax Lien Lawsuit does not invoke substantive rights that "arise under" the Bankruptcy Code.  However, it does require that the Court interpret the Credit Bid Order and the Plan and Confirmation Order, which confers "arising in" jurisdiction for this Court and otherwise constitutes a "core" matter for this Court to decide.  Even if there is no "arising in" jurisdiction over the Tax Lien Lawsuit, that lawsuit (including Mr. Choudhri's purported post-petition effort to "accept" NBK's (non-existent) offer to sell him the Loan and Deed of Trust) "relates" to this case, conferring jurisdiction in this Court.

24.     To be clear, the Tax Lien Lawsuit does not have to be a core matter "arising under" the Bankruptcy Code or "arising in" a bankruptcy case, for removal to have been proper and for this Court to retain jurisdiction over the removed action if there is "related to" jurisdiction over the action.  *See Matter of Wood*, 825 F.2d 90, 93 (5th Cir. 1987) ("it is not necessary to distinguish between proceedings "arising under", "arising in a case under", or "related to a case under", title 11" because "[t]hese references operate conjunctively to define the scope of jurisdiction.

Therefore, it is necessary only to determine whether a matter is at least "related to" the bankruptcy.").

> i.   The Court Has "Arising In" "Core" Jurisdiction Over the Tax Lien Lawsuit

25.     Bankruptcy courts can hear and determine matters that "arise under," "arise in," or "relate to" title 11.  *See* 28 U.S.C. § 157(a); *see also Exec. Benefits Ins. Agency v. Arkison*, 573 U.S. 25, 34 (2014) ("If a matter is core, the statute empowers the bankruptcy judge to enter final judgment on the claim, subject to appellate review by the district court.").  "Arising under" jurisdiction involves actions created by the Bankruptcy Code, whereas "'[a]rising in' jurisdiction" implicates actions that are "not based on a right expressly created by title 11, but nevertheless, would have no existence outside the bankruptcy."  *Matter of Wood*, 825 F.2d at 97.

26.     Although theoretically Mr. Choudhri might have had claims against NBK for the Tax Liens, the Loan and Deed of Trust outside the bankruptcy, in this case, determining Mr. Choudhri's rights, if any, requires that this Court interpret and apply its own prior orders.  Whatever the limitations on "arising in" jurisdiction, it "plainly covers matters" requiring a bankruptcy court "to interpret and enforce its own prior orders."  *Travelers Indemnity Co. v. Bailey*, 129 S. Ct. 2195, 2205 (2009); *see also In re Aramid Entm't Fund, LLC*, 628 B.R. 584, 595 (Bankr. S.D.N.Y. 2021) ("the term arising in 'plainly covers' matters that require the interpretation or enforcement of orders issued during a bankruptcy case").

27.     In addition, the interpretation and enforcement by the Court of its own orders is unequivocally a "core" matter under 28 U.S.C. § 157(b)(2).  *See In re Davis Offshore, L.P.*, 644 F.3d 259, 262 n.3 (5th Cir.), *cert. denied*, 132 S. Ct. 782 (2011) ("We are persuaded that [the Bankruptcy Court] had core jurisdiction to interpret the Plan and confirmation order pursuant to 28 U.S.C. § 157(b)."); *In re Gen. Growth Props., Inc.*, 460 B.R. 592, 598 (Bankr. S.D.N.Y. 2011)

001555

("A bankruptcy court always has jurisdiction to interpret its own orders. It does not matter that the State Court Action is purportedly between two non-debtors.").  State law claims also "may be considered core if they are 'dependent upon rights created in bankruptcy." *In re Spillman Dev. Grp., Ltd.*, 710 F.3d 299, 305 (5th Cir. 2013) (quoting *In re Stonebridge Techs., Inc.*, 430 F.3d 260, 266-67 (5th Cir. 2005)).

28.    "Arising in" jurisdiction exists here because the Tax Lien Lawsuit requires the Court, at a minimum, to interpret the Credit Bid and Confirmation Orders and its decision confirming the Plan.  Accordingly, the Court's jurisdiction also is "core."

29.    Mr. Choudhri's Complaint is premised on NBK's alleged breach of the CSA and alleged offer to sell the Note and related Deed of Trust to him.  After taking testimony for a full day on June 17, 2024, on 2425 WL's and Mr. Choudhri's motion to prohibit NBK from credit bidding at the auction, the Court found that there was no offer to sell the Note or Deed of Trust, and the record did not support Mr. Choudhri's claims that the Tax Lien Lawsuit "which was removed to this court" raised "substantial disputes relating to NBK's claim(s)."  (*See* Credit Bid Order at 3.)

30.    After evaluating the evidence presented at the June 19th hearing, the Court also determined that the "record does not support" Mr. Choudhri's "implausible claims" against NBK relating to the CSA.  (*See* ECF No. 565 at 17.)  For that reason and others, the Court confirmed the Plan, which (among other things) provides NBK with "allowed" claims for the Tax Liens and the Loan. (*See* Confirmation Order at ¶ G; Plan Art. III.B(d) and(e).)  That determination is binding on Mr. Choudhri personally, especially since he did not object to confirmation of the Plan, only the Debtor and 2425 WL objected.  *See* 11 U.S.C. § 1141(a) (confirmation of a plan provision is binding on creditors even though they did not accept the plan); *Matter of Howard*, 972 F.2d 639,

13

641 (5th Cir. 1992) (confirming the general rule that a confirmed plan was *res judicata* on the validity of a plan provision); *Matter of Howe*, 913 F. 2d 1138, 1143 (5th Cir. 1990) ("a plan is binding upon all parties once it is confirmed and all questions that could have been raised pertaining to such plan are *res judicata*.").

31.     Under these circumstances, the Tax Lien Lawsuit is properly characterized as a collateral attack on the Credit Bid Order, the Confirmation Order and Plan, and resolving the Tax Lien Lawsuit necessarily will involve, at the very least, the Court to interpret its prior orders and ruling on matters that only "arise in" bankruptcy (i.e., rights to credit bid pursuant to section 363(k) and confirmation of a plan pursuant to section 1129) and which are "core." *See Stonebridge Tech.*, 430 F.3d at 267 ("Although the breach of the Lease claims are grounded in state contract law, the controlling questions for this case involve the interpretation of substantive rights provided by title 11, the § 502(b)(6) cap and lease rejection under § 365(a)").

32.     Finally, the Tax Lien Lawsuit is the other side of the coin to the Trustee's objection to the Choudhri Tax Lien Claim.  (*See* ECF No. 403)  Mr. Choudhri's defense to that objection must be that he, not NBK, owns the Tax Liens.  A ruling sustaining the Trustee's claim objection will necessarily resolve the Tax Lien Lawsuit in NBK's favor.  Because the Trustee's claim objection is a core matter under 28 U.S.C. § 157(b)(2)(B), its flip side – the Tax Lien Lawsuit - is as well.  By filing his own proof of claim for the Tax Liens in this case, Mr. Choudhri submitted to core bankruptcy court jurisdiction over the subject matter of that claim, the foundation of which is his alleged ownership of the Tax Liens based on the CSA and its alleged breach by NBK.  *See Lagenkamp v. Culp*, 498 U.S. 42, 44 (1990) ("by filing a claim against a bankruptcy estate the creditor triggers the process of 'allowance and disallowance of claims,' thereby subjecting himself to the bankruptcy court's equitable power.").

14

ii.    *Alternatively, There Is "Related-to" Jurisdiction Over the Tax Lien Lawsuit*

33.    Alternatively, the Court has "related-to" jurisdiction over the Tax Lien Lawsuit because its results could impact the implementation of the Plan and the Trustee's objection to Choudhri's Tax Lien Claim.

34.    A proceeding "relates to" a bankruptcy case if "the outcome of that proceeding could conceivably have any effect" on the estate. *In re Bass*, 171 F.3d 1016, 1022 (5th Cir. 1999). "Related-to" jurisdiction, therefore, includes any litigation that "could alter the debtor's rights, liabilities, options, or freedom of action or could influence the administration of the bankrupt estate." *In re KSRP, Ltd.*, 809 F.3d 263, 266 (5th Cir. 2015).   Following plan confirmation, bankruptcy "related-to" jurisdiction is limited to "matters pertaining to the implementation or execution of the plan." *In re Craig's Stores of Tex.*, 266 F.3d 388, 390 (5th Cir. 2001). *See also In re Houston Regional Sports Network*, 547 B.R. 717, 735 (Bankr. S.D. Tex. 2016) (section 1334 "does not expressly limit bankruptcy jurisdiction upon plan confirmation." (citing *Brass Corp.*, 301 F.3d at 304)).   Post-confirmation "related-to" jurisdiction includes matters that "impact compliance with or completion of the reorganization plan," as well as "any claims that attempt to 'subvert' a confirmed plan." *In re U.S. Brass Corp.*, 301 F.3d 296, 305 (5th Cir. 2002) & *In re Seven Seas Petroleum, Inc.*, 522 F.3d 575, 589 (5th Cir. 2008).

35.    A lawsuit involving non-debtors remains within the Court's post-confirmation "related-to" jurisdiction, especially when the dispute implicates implementing a reorganization or liquidating plan. *See, e.g.*, *In re GenOn Mid-Atlantic Dev., L.L.C.*, 42 F.4th 523, 534 (5th Cir. 2022) (bankruptcy court had "related-to" jurisdiction over contract dispute between non-debtors because the claims "implicated the 'implementation and execution' of the plan"); *Matter of Zale*, 62 F.3d 746, 757-59 (5th Cir. 1995) (bankruptcy court had "related-to" jurisdiction over state law

001558

action between non-debtors after confirming the debtor's plan). Also, a bankruptcy court is not divested of post-confirmation "related-to" jurisdiction because a plan is confirmed after the removal of the state court action to federal court or the estate morphs into a trust. *See In re Enron Corp. Securities*, 535 F.3d 325, 335 (5th Cir. 2008) (finding that the bankruptcy court was not divested of "related-to" jurisdiction after confirming the debtor's plan); *AE Marketing, L.L.C. v. Jenkins-Baldwin Corp.*, No. 3:07-CV-0321-F, 2010 WL 11537889 at *2 (N.D. Tex. Feb. 1, 2010) (finding that bankruptcy court had "related-to" jurisdiction over removed state court action that pre-dated confirmation of the debtor's plan); *see also In re Resorts Int'l, Inc.*, 372 F.3d 154, 164 (3d Cir. 2004) (although litigation trusts continue after a plan is confirmed, "bankruptcy jurisdiction may still obtain if there is a sufficient connection to the bankruptcy.").

36.    In evaluating whether a bankruptcy court has post-confirmation "related-to" jurisdiction, the Fifth Circuit has identified three factors for courts to consider: (i) whether the proceedings arise from preconfirmation or post-confirmation relations between the parties; (ii) whether antagonism between the parties was pending as of the date of confirmation; and (iii) whether facts or law deriving from the reorganization or the plan are necessary to the proceedings. *See Enron Corp.*, 535 F.3d at 335 (citing *Craig's Stores*, 266 F.3d at 391).

37.    All three of these factors weigh heavily in favor of "related-to" jurisdiction. As to the first two factors, the Tax Lien Lawsuit indisputably arises from alleged preconfirmation conduct and the "antagonism between the parties" was not only pending as of the confirmation date, it was manifest as of confirmation in at least three ways: (a) the Tax Lien Lawsuit was pending in state court before confirmation and referred to by Team Choudhri in their own pleadings with the Court, if not yet served, (*see* ECF No. 270, Exhibit 1 (original petition)), (b) the Tax Lien Lawsuit was removed to the Court on June 7, 2024, before the confirmation hearing on June 19,

2024 and (c) the issues raised by the Tax Lien Lawsuit were not only joined at the June 17, 2024, hearing on credit bidding and the June 19, 2024, confirmation, they also were addressed by the Court in its credit bidding and confirmation decisions.  (*See* ECF No. 535 and 565).

38.     Although it is not necessary to consider the third factor, it too weighs heavily in favor of "related to" jurisdiction over the Tax Lien Lawsuit.  *See In re Enron*, 535 F.3d at 336 (the third factor was of no consequence even if the parties argued it "because the first two *Craig's Stores* factors weigh[ed] heavily in favor of federal jurisdiction.").  As demonstrated above, resolution of the Tax Lien Lawsuit necessarily is implicated by the order permitting NBK to credit bid, which was premised on a lack of credibility to the ownership dispute claims asserted by Mr. Choudhri, and the confirmed Plan which allows NBK Tax Lien and Loan claims based on NBK's ownership of those claims.

39.     Moreover, resolution of the Tax Lien Lawsuit may implicate implementation of the Plan.  If NBK is found not to be the owner of the Tax Lien and Loan Claims, its commitments under the Plan to fund certain amounts and waive claims if it is the successful bidder for the Property or to compromise and subordinate recoveries if it is not the successful bidder likely fall away which would have an indisputable impact on the administration of this estate.

*B.  Mr. Choudhri's Conduct Precludes Remand*

40.     The filing of the Tax Lien Lawsuit in state court is a blatant attempt by Mr. Choudhri to avoid orders of the Court, the terms of the confirmed Plan, the allowance of NBK's Tax and Loan Claims and the smooth implementation of the Plan, and otherwise avoid having the dispute over claimed ownership of the Tax Liens and the Loan resolved by this Court.  His request for remand furthers those efforts.

Case 24-03120   Document 9   Filed in TXSB on 07/09/24   Page 18 of 20

41.     But, Mr. Choudhri's own conduct (directly or through his surrogates, 2425 WL and the Debtor) precludes the exercise of any discretion the Court may have to remand notwithstanding having core and arising in or related-to jurisdiction over the Tax Lien Lawsuit.  First, this Court has more than passing knowledge of the documents and allegations raised in the Tax Lien Lawsuit because Mr. Choudhri and his surrogates made them issues in contested matters before this Court. Second, this Court is best suited to determine how its prior orders impact the Tax Lien Lawsuit. Third, Mr. Choudhri's surrogates proposed a plan of reorganization that required the Court to determine these very CSA issues.  (*See* ECF No. 377 at 14.)  Because Team Choudhri engaged these issues with the Court, required the expenditure of judicial and party resources to address these issues in this case, and effectively conceded the issue of jurisdiction over the dispute in their own proposed plan, they cannot legitimately dispute jurisdiction now.  They are estopped from doing so.

### MR. CHOUDHRI MUST COMPLY WITH THE PLAN'S GATEKEEPING REQUIREMENTS

42.     The confirmed Plan requires that before any action against NBK can proceed, the plaintiff/claimant must demonstrate to the Court that the claims being asserted are not estate claims released pursuant to the Plan and are otherwise colorable.  (*See* Plan Art. IX.E.)

43.     Mr. Choudhri has not complied with these provisions.

44.     Accordingly, in addition to denying the remand request, the Court should also compel compliance with the Plan's gatekeeping provisions by setting deadlines for (a) Mr. Choudhri to request permission to proceed with the Tax Lien Lawsuit in a way that explains why the Tax Lien Lawsuit does not assert released estate claim and otherwise states colorable claims for relief and (b) NBK to respond to any such request.  Assuming that both (a) and (b) occur,

18

the Court can then schedule a hearing or status conference or rule on the papers in response the gatekeeping request.

<u>C</u>ONCLUSION

For the foregoing reasons, the Court should (i) enter the proposed order attached as <u>Exhibit A</u> (a) denying the Motion and (b) compelling Mr. Choudhri to comply with the gatekeeping provisions of the Plan and (ii) grant NBK such other relief as is just and proper.

DATED: July 9, 2024

**PILLSBURY WINTHROP SHAW PITTMAN LLP**

*/s/ Andrew M. Troop*
Charles C. Conrad
Texas State Bar No. 24040721
Ryan Steinbrunner
Texas State Bar No. 24093201
609 Main Street Suite 2000
Houston, TX 77002
Telephone: (713) 276-7600
Facsimile: (713) 276-7634
charles.conrad@pillsburylaw.com
ryan.steinbrunner@pillsburylaw.com

-   *and*   -

Andrew M. Troop (Bar No. MA547179)
Patrick E. Fitzmaurice*
Kwame O. Akuffo*
31 West 52nd Street
New York, NY 10019-6131
Telephone: (212) 858-1000
Facsimile: (212) 858-1500
andrew.troop@pillsburylaw.com
patrick.fitzmaurice@pillsburylaw.com
kwame.akuffo@pillsburylaw.com

*Admitted *pro hac vice*

***Counsel for National Bank of Kuwait, S.A.K.P., New York Branch***

001562

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on July 9, 2024, a true and correct copy of this document was served via the Court's CM/ECF system on all parties who are deemed to have consented to ECF electronic service.

*/s/ Andrew M. Troop*
Andrew M. Troop

001563

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GALLERIA 2425 OWNER, LLC, | ) | |
| | ) | Case No. 23-34815 |
| Debtor. | ) | |
| | ) | |

## TRUSTEE'S OBJECTION TO CLAIM NO. 7 OF 2425 WL LLC

**THIS IS AN OBJECTION TO YOUR CLAIM. THIS OBJECTION ASKS THE COURT TO DISALLOW THE CLAIM THAT YOU FILED IN THIS BANKRUPTCY CASE. IF YOU DO NOT FILE A RESPONSE WITHIN 30 DAYS AFTER THE OBJECTION WAS SERVED ON YOU, YOUR CLAIM MAY BE DISALLOWED WITHOUT A HEARING.**

**A HEARING HAS BEEN SET ON THIS MATTER ON <u>JULY 24, 2024, at 11:00 A.M. (CENTRAL TIME)</u> IN COURTROOM 403, 4TH FLOOR, UNITED STATES BANKRUPTCY COURT FOR SOUTHERN DISTRICT OF TEXAS, 515 RUSK AVENUE, HOUSTON, TEXAS 77002.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

Christopher R. Murray, in his capacity as chapter 11 trustee in the above-captioned case (the "<u>Trustee</u>"), hereby files this objection (the "<u>Objection</u>") to Claim No. 7 (the "<u>Claim</u>") filed by 2425 WL LLC ("<u>2425 WL</u>"). In support of this Objection, the Trustee respectfully states as follows:

### <u>JURISDICTION AND VENUE</u>

1.      This Court has jurisdiction to consider this Objection pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The Court has the authority to enter the requested relief under sections 502(b) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

3.      The Trustee consents, pursuant to Bankruptcy Rule 7008, to the entry of a final order by the Court in connection with this Objection.

## BACKGROUND & RELEVANT FACTS

### A.  Chapter 11 Case

4.      On December 5, 2023 (the "Petition Date"), Galleria 2425 Owner, LLC (the "Debtor") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court" or the "Court").

5.      The Court entered an order [Bankr. Dkt. No. 116] approving the Trustee's appointment as chapter 11 trustee in the Bankruptcy Case on February 9, 2024.

### B.  Claim No. 7

6.      On March 31, 2024, 2425 WL filed Claim No. 7 with the Court asserting a claim in the amount of $22,968,231.58 secured by a lien on the Debtor's real property located at 2425 West Loop S, Houston, TX (the "Property"). Ali Choudhri signed Claim No. 7, purporting to act as 2425 WL's manager.

7.      The amount claimed in Claim No. 7 included accrued interest. Pursuant to Bankruptcy Rule 3001(c)(2)(A), an itemization indicating as was attached to Claim No. 7, indicating as follows:

001565

| | |
|---|---|
| Principal | $ 14,780,332.38 |
| Interest Rate | 10% |
| Start Date | 5/23/2018 |
| Petition Date | 12/5/2023 |
| Intrest Accrued | $  8,187,899.20 |
| Total | $ 22,968,231.58 |

8.      Claim No. 7 indicated that the basis of perfection of the lien asserted therein was a deed of trust. An unofficial copy of a deed of trust was attached to Claim No. 7.

**C.  Irregularities Regarding the Deed of Trust**

*i.)      The Deed of Trust Appears to have been executed in 2021.*

9.      A certified copy of the deed of trust referenced in Claim No. 7 is attached hereto as Exhibit A (the "2425 WL Deed of Trust").

10.      The first page of the Deed of Trust indicates that it was issued on May 23, 2018. It also indicates in the document that the note secured by the Deed of Trust was dated May 23, 2018, in the original principal amount of $14,730,332.38.

11.      However, the file stamp of the Deed of Trust indicates that it was filed with the real property records of Harris County on May 11, 2021. The jurat in the deed of trust does not contain a date other than the year, which is indicated to be 2021.

*ii.)      The Debtor purportedly executed the Deed of Trust in 2018 through Ali Choudhri on behalf of Galleria West Loop Investments II LLC.*

12.      The Deed of Trust was signed by Ali Choudhri, purportedly in his role as manager of Galleria West Loop Investments II LLC, the purported managing member of Galleria 2425 JV, LLC, which in turn was the purported managing member of the Debtor.

13.      Neither Galleria West Loop Investments II LLC Ali Choudhri had the authority to act on behalf of Galleria 2425 JV, LLC in 2018.

14.     Prior to 2021, Naissance Capital Real Estate, LLC was the managing member of Galleria 2425 JV, LLC.

15.     In its Application for Registration of a Foreign Limited Liability Company filed with the Texas Secretary of State (the "Foreign Registration Application") on April 5, 2018, Galleria 2425 JV, LLC indicated that its governing person was Naissance Capital Real Estate, LLC. A copy of the Foreign Registration Application is attached hereto as Exhibit B.

16.     Prior to 2021, the Debtor executed all material transactions of public record through Naissance Capital Real Estate, LLC, including:

    a.  All documents in connection with the transaction between the Debtor and the National Bank of Kuwait, including the (i) loan agreement (the "NBK Loan Agreement"), (ii) the note (the "NBK Note"), (iii) the deed of trust (the "NBK DOT"), and (iv) the assignment of leases and rents (the "NBK Assignment of Leases and Rents"). Copies of the NBK Loan Agreement, NBK Note, NBK DOT, and NBK Assignment of Leases and Rents are attached hereto as Exhibits C, D, E, and F respectively.

    b.  The transfers of tax liens to Caz Creek TX II, LLC, including the (i) Sworn Document Authorizing Transfer of Tax Lien filed in the Harris County real property tax records on March 11, 2020, and (b) Tax Lien Contract filed in the Harris County real property records on June 4, 2020. Copies of these documents are attached hereto as Exhibit G and H respectively.

17.     The Amended and Restated Limited Liability Company Agreement of Galleria 2425 JV, LLC (the "Galleria 2425 JV Company Agreement"), indicates that Naissance Capital Real Estate was the "Managing Member" of Galleria 2425 JV, LLC as of May 23, 2018. The

001567

"Managing Member" was defined as the "Naissance Member," which in turn was defined as Naissance Capital Real Estate, LLC. Section 8.1 of the Company Agreement provided:

> Management of the Company. The business and affairs of the Company will be managed by the Managing Member. Subject to the provisions of Section 8.2, the Managing Member will have full and complete discretion to manage and control the business and affairs of the Company, to make all decisions affecting the business and affairs of the Company, and to take all such actions as it deems necessary or appropriate to accomplish the purposes of the Company set froth in Section 2.5; provided that, the Managing Member will manage the Company in accordance with the Budget. The actions of the Managing Member taken in accordance with the provisions of this Agreement will bind the Company. ___No other Member will have any authority or right to act on behalf of or bind the Company, unless otherwise provided herein or unless specifically authorized by the Managing Member pursuant to a resolution expressly authorizing such action which resolution is duly adopted by the Managing Member___.

(emphasis supplied), Section 8.2 covers actions requiring the unanimous written approval of the members, and includes "permit the incurrence of indebtedness by the Company, the Owner SPV, or any other Subsidiary of the Company, except as set forth in any applicable and approved budget. A copy of the Galleria 2425 JV Company Agreement is attached hereto as Exhibit I.

18.     In 2021—three (3) years after the 2425 WL Deed of Trust was purportedly executed—the members of Galleria 2425 JV, LLC executed a unanimous written consent appointing Galleria West Loop Investment II LLC as the managing member of the Company. A copy of the unanimous written consent—filed by the Debtor on the docket—is attached hereto as Exhibit J (the "2021 Unanimous Consent").

19.     The 2021 Unanimous Consent had the effect of giving Choudhri the authority to act on behalf of the Debtor.

**D.  Irregularities with the Promissory Note Referenced in the Deed of Trust**

   *i.)*   *The Debtor purportedly executed the Promissory Note in 2018 through Ali Choudhri as its "Authorized Agent."*

20.     A copy of the Promissory Note that 2425 WL asserts Claim No. 7 is based upon and is secured by the Deed of Trust is attached hereto as <u>Exhibit K</u> (the "<u>Promissory Note</u>").

21.     The Promissory Note indicates that it was executed on May 23, 2018, and was signed by Ali Choudhri as "Authorized Agent" of Galleria 2425 JV, LLC.

22.     As indicated above, Ali Choudhri did not have authority to act on behalf of Galleria 2425 JV, LLC or the Debtor in 2018.

23.     On May 23, 2018, Naissance Capital Real Estate, LLC was the managing member of Galleria 2425 JV, LLC.

24.     Naissance Galleria, LLC, an affiliate of Naissance Capital Real Estate, LLC provided $16,100,000.00 of mezzanine funding to Galleria 2425 JV, LLC to finance in part the Debtor's acquisition of the Property.

   *ii.)*   *The Settlement Statement executed by 2425 WL in connection with the sale of the real property from 2425 WL to the Debtor does not indicate any loan from 2425 WL but rather a $14,730,332.38 seller credit reducing the amount due.*

25.     A copy of the HUD-1 Settlement Statement in connection with the sale of the real property from 2425 WL to the Debtor—provided to the Trustee by 2425 WL—is attached hereto as <u>Exhibit L </u>(the "<u>Settlement Statement</u>").[1]

26.     The Settlement Statement does not indicate any loan from 2425 WL to the Debtor. Instead, the Settlement Statement reflects a $14,730,332.38 seller credit to the Debtor reducing the amount due to 2425 WL as seller.

---

[1] The attached copy of the Settlement Statement was provided by 2425 WL. On Information and belief, the highlighted portion thereof was added by 2425 WL.

001569

27.    The Settlement Statement was signed by 2425 WL LLC and certified by the settlement agent.

28.    Pursuant to the closing of the transaction pursuant to the Settlement Statement funds loaned by National Bank of Kuwait, S.A.K.P., New York Branch ("NBK") and Naissance Galleria, LLC were used to pay off in excess of $50,000,000 of debt owed by 2425 WL.

29.    2425 WL received in excess of $13,000,000.00 of cash as the result of the closing of the transaction reflected by the Settlement Statement.

## OBJECTION

**A.  Claim No. 7 Does not reflect a valid claim against the Debtor.**

30.    The Promissory Note and Deed of Trust are fraudulent. They were either (a) created in 2021 based on a non-existent debt or (b) were executed by Ali Choudhri without authority. In either case, 2425 WL has no enforceable obligation against the Debtor and the asserted claim should be disallowed.

*i.)    The Promissory Note is unenforceable due to lack of consideration.*

31.    The Promissory Note purports to be governed by New York law. It was apparently executed in Texas. A sham note like the Promissory Note is not enforceable under either New York or Texas law.

32.    Under New York law, lack of consideration is a viable defense to the enforcement of a promissory note. *ABR Wholesalers, Inc. v. King*, 172 A.D.3d 1929, 1930 (NY App. Div. 4th Dept. 2019). Consideration consists of either a benefit to the promisor (i.e., the Debtor) or a detriment to the promisee (i.e., 2425 WL). *Id.*

33.    Lack of consideration is also an affirmative defense to the enforcement of a promissory note under Texas law. *McLernon v. Dynegy, Inc.*, 347 S.W.3d 315, 335 (Tex. App.— Houston [14th] 2011). Consideration requires an element of exchange between the parties, that can

7

be either a benefit to the promisor or a detriment to the promisee. *Benson v. Forgie*, 2023 Tex. App. LEXIS 6896, at *9 (Tex. App.—Houston [14th] Aug. 31, 2023).

34.     Whether the Promissory Note was executed in 2021 or 2018, the only benefit was to 2425 WL and the only detriment was to the Debtor. This does not constitute consideration under either New York or Texas law. If—as seems most likely—the Promissory Note was executed in 2021, it does not connect to any obligation and is entirely fictitious. If the Promissory Note was executed in 2018, the only potential consideration was for a seller credit that had *already been given* by 2425 WL, as reflected in the Settlement Statement.[2] The Promissory Note is a legal nullity and created no enforceable obligation against the Debtor.

> ii.)     *If the Promissory Note was created in 2018, it is unenforceable because Choudhri lacked apparent or actual authority to bind the Debtor.*

35.     Further, Choudhri did not have either actual or apparent authority to bind the Debtor in 2018.  2425 WL was aware of this fact or, at the very least, was aware of facts that obligated it to investigate the matter, which it failed to do. Under Delaware, New York, and Texas law this renders the Promissory Note unenforceable.[3] *See, e.g.*, *Halevi Enters. LLC v. Waa Holdings, Inc.*, 2024 Del. Super. LEXIS 205, at *1 (Super. Ct. Mar. 19, 2024) (citing *Finnegan Constr. Co. v. Robino-Ladd Co.*, 354 A.2d 142, 144 (Del. Super. Ct. 1976)); *39 Coll. Point Corp. v. Transpac Capital Corp.*, 12 A.D.3d 664, 664 (NY App. Div. 2nd Dept. 2004); *TVO Cobblestone, LLC v. ASI Capital, LLC*, 2023 Tex. App. LEXIS 8202, at *15-16 (Tex. App.—El Paso Oct. 27, 2023).

36.     That Choudhri did not have actual authority is clear. In the Foreign Registration Application dated April 5, 20`8, Galleria 2425 JV, LLC indicated that its only governing person

---

[2] The only alternative would be that the Promissory Note was contemplated before the Settlement Statement was executed. But that would constitute criminal action. *See* 18 U.S.C. § 1344; Tex. Penal Code § 32.32. 2425 WL should be estopped from raising as a defense to a claim objection that it committed a crime.
[3] Delaware law may be relevant to this issue because the Debtor is a Delaware entity.

001571

was Naissance Capital Real Estate, LLC. A "governing person" is defined by the Texas Business Organizations Code as "a person serving as part of the governing authority of an entity." Choudhri was not part of the governing authority of Galleria 2425 JV, LLC in 2018. This is consistent with the Galleria 2425 JV Company Agreement.

37.     2425 WL cannot claim apparent authority under the circumstances. Choudhri was the beneficial owner of 2425 WL. On information and belief, he directed the actions of 2425 WL and thus 2425 WL was aware of Choudhri's lack of actual authority. Moreover, the circumstances were such that 2425 WL should have been alerted to the issue. The other transactions surrounding the May 2018 sale of the real property from 2425 WL to the Debtor and the related financing, Azeemah Zaheer executed the documents on behalf of Naissance Capital Real Estate, LLC, the managing member of Galleria 2425 JV LLC, which in turn was the sole member of the Debtor. Reliance on any indicia of authority by Choudhri in executing a note purportedly on the same day and in connection with the same transaction is not reasonable.[4] And any indicia of authority by Choudhri was the result of Choudhri's actions, not the actions of the Debtor.[5]

**B. The Court should apply the doctrine of quasi-estoppel to prevent 2425 WL from asserting positions contrary to the Settlement Statement.**

38.     The Fifth Circuit has recognized the doctrine of quasi-estoppel in federal proceedings.[6] *Ave. SWNG TIC 1 LLC v. Better World Props., LLC*, 2024 U.S. Dist. LEXIS 43664, at *5 (S.D. Tex. Feb. 7, 2024) (citing *In re Davidson*, 947 F.2d 1294, 1297 (5th Cir. 1991)). The

---

[4] Reliance must be reasonable under the law of Delaware, New York, and Texas for an entity to be bound by apparent authority. *See B.A.S.S. Grp., LLC v. Coastal Supply Co.*, 2009 Del. Ch. LEXIS 166, at *19 (Del. Ch. June 19, 2009); Elgin Realty, Inc. v. Klein, 109 A.D.3d 785, 786, (NY App. Div. 2nd Dept. 2013); Paragon Indus. Applications, Inc. v. Stan Excavating, LLC, 432 S.W.3d 542, 550 (Tex. App.—Texarkana 2014).

[5] What matters is not whether the purported agent (i.e., Choudhri) claimed authority but whether the actions of the purported principal (i.e., the Debtor) gave that impression. *See, e.g., B.A.S.S. Grp., LLC*, 2009 Del. Ch. LEXIS 166, at *19; *Elgin Realty, Inc.*, 109 A.D.3d at 786; *Paragon Indus. Applications, Inc.*, 432 S.W.3d at 550.

[6] Texas and New York courts and substantive state law also apply a doctrine of quasi-estoppel to various extents. Here, the Trustee seeks the application of quasi-estoppel on a procedural basis under federal law.

001572

doctrine "'forbids a party from accepting the benefits of a transaction or statute and then subsequently taking an inconsistent position to avoid the corresponding obligations or effects[,]'" *id.* (quoting *In re Davidson*, 947 F.2d at 1297), and applies "'when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit[,]'" *id.* (quoting *Galyean v. Guinn*, 2022 U.S. Dist. LEXIS 198600 at *5 (N.D. Tex. Oct. 24, 2022)).

39.    2425 WL received a substantial benefit in connection with the 2018 sale of the Real Property. As reflected in the Settlement Statement, 2425 WL received (a) satisfaction of more than $50 million of debt, (b) payment of $363,777.29 of current-year property taxes, and (c) $13,720,254.15 of cash. It received these benefits from loans advanced by NBK and Naissance Galleria, LLC to the Debtor.

40.    Moreover, it would be unconscionable to allow 2425 WL to assert now in bankruptcy that the transaction was not as reflected in the Settlement Statement. It was on the basis of the Settlement Statement that the funds from NBK and Naissance Galleria, LLC's funds were disbursed. And 2425 WL did not just tacitly accept the Settlement Statement but rather represented that its representative had "carefully reviewed the HUD-1 Settlement Statement and to the best of [his] knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction." For 2425 WL to benefit further from a claim inconsistent with the Settlement Statement to the detriment of the NBK and Naissance Galleria is patent inequity that the doctrine of quasi-estoppel is meant to prevent.

41.    While NBK and Naissance Galleria, LLC were the parties most clearly affected, the Trustee has the ability to make these arguments for the benefit of all creditors. Absent

001573

subordination in a plan of reorganization, all general unsecured creditors of the Debtor would be harmed by 2425 WL's inconsistent statements.

## **RESERVATION OF RIGHTS**

42.     To the extent that the 2425 WL Note and 2425 WL Deed of Trust were executed in 2021, the Trustee asserts that any lien or obligation would also be avoidable under the Texas Uniform Fraudulent Transfer law. While Bankruptcy Rule 3007(b) allows an objection to claim to be brought as an adversary proceeding in connection with such relief, it is not required. The Trustee reserves his right to seek the avoidance of the purported obligation under 2425 WL Note and purported lien under 2425 WL Deed of Trust to the extent that 2425 WL LLC's claim is allowed.


WHEREFORE, the Trustee respectfully requests that the Court enter an order, substantially in the form attached hereto, disallowing the Claim No. 7 in its entirety and granting such other relief as is just and equitable.

Dated: June 3, 2024                                  Respectfully submitted,

                                                     SHANNON & LEE LLP

                                                     */s/R. J. Shannon*
                                                     Kyung S. Lee (TBA No. 12128400)
                                                     R. J. Shannon (TBA No. 24108062)
                                                     2100 Travis Street, STE 1525
                                                     Houston, TX 77002
                                                     Telephone: (713) 714-5770
                                                     Email: klee@shannonleellp.com
                                                             rshannon@shannonleellp.com

                                                     *Counsel to Christopher R. Murray, Chapter 11 Trustee*

001574

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on June 3, 2024, the forgoing document was served (i) through the Court's CM/ECF System on all parties registered to receive such service and (ii) separately by U.S.P.S first class mail, postage prepaid, and email on the following parties:

2425 WL LLC
c/o Ali Choudhri
2425 West Loop S, 11th Floor
Houston, TX 77027
ali@jetallcapital.com

Stephen W. Sather
7329 N. MoPac Expwy., Suite 400
Austin, TX 78731
ssather@bn-lawyers.com

*/s/R. J. Shannon*
R. J. Shannon

001575

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GALLERIA 2425 OWNER, LLC, | ) | |
| | ) | Case No. 23-34815 |
| Debtor. | ) | |
| | ) | |

**ORDER SUSTAINING TRUSTEE'S OBJECTION TO CLAIM NO. 7 OF 2425 WL LLC**

(Relates to Dkt. No. _____)

Upon the objection (the "Objection") of Christopher R. Murphy, chapter 11 trustee in the above-captioned case (the "Trustee") seeking entry of this order (this "Order") sustaining the *Trustee's Objection Claim No. 7 of 2425 WL LLC*; and this court having jurisdiction over this matter pursuant to 28 U.S.C § 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157 (b)(2); and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Objection in this district is permissible pursuant to 28 U.S.C §§ 1408 and 1409; and this Court having found that notice of the Objection and opportunity for a hearing on the Objection were  appropriate under the circumstances and no other notice need be provided; and this Court having reviewed and considered the Objection and any statements in support of the relief requested therein; and this Court having determined that the legal and factual bases set forth in the Objection and at any hearing thereon establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.        The Objection is sustained as set forth herein.

2.      Any response to the Objection not otherwise withdrawn, resolved, or adjourned is hereby overruled on its merits.

3.      Claim No. 7 filed by 2425 WL LLC is hereby disallowed in its entirety.

4.      This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Dated: _____, 2024

_____
**UNITED STATES BANKRUPTCY JUDGE**

Proposed Order Submitted By:

*/s/R. J. Shannon*_____
Kyung S. Lee (TBA No. 12128400)
R. J. Shannon (TBA No. 24108062)
SHANNON & LEE LLP
2100 Travis Street, STE 1525
Houston, TX 77002
Telephone: (713) 714-5770
Facsimile: (833) 714-5770
Email: klee@shannonleellp.com
         rshannon@shannonleellp.com

*Counsel to Christopher R. Murray, Chapter 11 Trustee*

001577

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| IN RE: | ) |
| | )    CHAPTER 11 |
| GALLERIA 2425 OWNER, LLC, | ) |
| | )    Case No. 23-34815 |
| Debtor. | ) |
| | ) |

**DECLARATION OF CHRISTOPHER R. MURRAY IN SUPPORT OF TRUSTEE'S**
**OBJECTION TO CLAIM NO. 7 OF 2425 WL LLC**

I, Christopher R. Murray, hereby declare under penalty of perjury as follows:

1.　　Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my discussions with my counsel retained in this case, my experience as a trustee and bankruptcy attorney, and/or my review of relevant documents and information relevant to the above-captioned case. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

2.　　I am the chapter 11 trustee in the bankruptcy case of Galleria 2425 Owner, LLC, Case No. 23-34815.

3.　　I have been the chapter 11 trustee of the Debtor's case since February 9, 2024. In my role as trustee, I have become familiar with the Debtor's operations, the Debtor's assets and liabilities, and the various pleadings and filings with the U.S. Bankruptcy Court for the Southern District of Texas.

4.　　The Trustee's Objection to Claim No. 7 of 2425 WL LLC (the "Objection")[1] is the result of the investigation that I have conducted and directed my attorneys to conduct in the above-

---

[1] Capitalized terms used, but not defined in this Declaration have the meanings ascribed to such terms in the Objection.

captioned case. I have read the Objection, and to the best of my knowledge, information, and belief, the factual assertions made in the Objection are accurate.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 3, 2024

_____
Christopher R. Murray, Chapter 11 Trustee

2

001579

**EXHIBIT A**

**2425 WL Deed of Trust**

RP-2021-258619
05/11/2021  ER  $66.00

Page 1 of 14   Wednesday, March 20, 2024

County Clerk Harris County, Texas

RP-2021-258619

# Deed of Trust

**Notice of confidentiality rights: If you are a natural person, you may remove or strike any or all of the following information from any instrument that transfers an interest in real property before it is filed for record in the public records: your Social Security number or your driver's license number.**

## Basic Information

**Date**:  May 23, 2018

**Grantor**:     Galleria 2425 Owner, LLC, a Delaware limited liability company

**Grantor's Mailing Address**: 1001 West Loop South Suite 700, Houston, TX 77027

**Trustee**:     Michael O'Connor

**Trustee's Mailing Address**: 11509 S Lou Al Dr., Houston, TX 77024

**Lender**:     2425 WL, LLC, a New York limited liability company

**Lender's Mailing Address**:  11509 S Lou Al Dr., Houston, TX 77024

**Obligation**

> **Note**

>> **Date**:   May 23, 2018

>> **Original principal amount**:  $14,730,332.38

>> **Borrower**:     Galleria 2425 Owner, LLC

>> **Lender**:     2425 WL, LLC

>> **Maturity date**:       June 1, 2021

> **Other Debt**: N/A

**Property** (including any improvements): that certain real property described on <u>Exhibit A</u> attached hereto.

**Other Exceptions to Conveyance and Warranty**: N/A

**A.**     **Granting Clause**

For value received and to secure payment of the Obligation, Grantor conveys the Property to Trustee in trust. Grantor warrants and agrees to defend the title to the Property,

521550.000001 24808189.2

001581



subject to the Other Exceptions to Conveyance and Warranty. On payment of the Obligation and all other amounts secured by this deed of trust, this deed of trust will have no further effect, and Lender will release it at Grantor's expense.

**B.     Grantor's Obligations**

*B.1.*     Grantor agrees to maintain all property and liability insurance coverages with respect to the Property, revenues generated by the Property, and operations on the Property that Lender reasonably requires ("Required Insurance Coverages"), issued by insurers and written on policy forms acceptable to Lender, and as to property loss, that are payable to Lender under policies containing standard mortgagee clauses, and deliver evidence of the Required Insurance Coverages in a form acceptable to Lender before execution of this deed of trust and again at least ten days before the expiration of the Required Insurance Coverages.

*B.2.*     Grantor agrees to—

    a.     keep the Property in good repair and condition;

    b.     pay all taxes and assessments on the Property before delinquency, not authorize a taxing entity to transfer its tax lien on the Property to anyone other than Lender, and not request a deferral of the collection of taxes pursuant to section 33.06 of the Texas Tax Code;

    c.     defend title to the Property subject to the Other Exceptions to Conveyance and Warranty and preserve the lien's priority as it is established in this deed of trust;

    d.     obey all laws, ordinances, and restrictive covenants applicable to the Property;

    e.     keep any buildings occupied as required by the Required Insurance Coverages; and

    f.     notify Lender of any change of address.

**C.     Lender's Rights**

*C.1.*     Lender or Lender's mortgage servicer may appoint in writing one or more substitute trustees, succeeding to all rights and responsibilities of Trustee.

*C.2.*     If the proceeds of the Obligation are used to pay any debt secured by prior liens, Lender is subrogated to all the rights and liens of the holders of any debt so paid.

*C.3.*     Lender may apply any proceeds received under the property insurance policies covering the Property either to reduce the Obligation or to repair or replace damaged or destroyed improvements covered by the policy. If the Property is Grantor's primary residence and Lender reasonably determines that repairs to the improvements are economically feasible, Lender will make the property insurance proceeds available to Grantor for repairs.

521550.000001 24808189.2

RP-2021-258619

001582

*C.4.*    Notwithstanding the terms of the Note to the contrary, and unless applicable law prohibits, all payments received by Lender from Grantor with respect to the Obligation or this deed of trust may, at Lender's discretion, be applied first to amounts payable under this deed of trust and then to amounts due and payable to Lender with respect to the Obligation, to be applied to late charges, principal, or interest in the order Lender in its discretion determines.

*C.5.*    If Grantor fails to perform any of Grantor's obligations, Lender may perform those obligations and be reimbursed by Grantor on demand for any amounts so paid, including attorney's fees, plus interest on those amounts from the dates of payment at the rate stated in the Note for matured, unpaid amounts. The amount to be reimbursed will be secured by this deed of trust.

*C.6.*    **COLLATERAL PROTECTION INSURANCE NOTICE**

**In accordance with the provisions of section 307.052(a) of the Texas Finance Code, the Beneficiary hereby notifies the Grantor as follows:**

**(A)**    **the Grantor is required to:**

**(i)**    **keep the collateral insured against damage in the amount the Lender specifies;**

**(ii)**    **purchase the insurance from an insurer that is authorized to do business in the state of Texas or an eligible surplus lines insurer; and**

**(iii)**    **name the Lender as the person to be paid under the policy in the event of a loss;**

**(B)**    **the Grantor must, if required by the Lender, deliver to the Lender a copy of the policy and proof of the payment of premiums; and**

**(C)**    **if the Grantor fails to meet any requirement listed in Paragraph (A) or (B), the Lender may obtain collateral protection insurance on behalf of the Grantor at the Grantor's expense.**

*C.7.*    If a default exists in payment of the Obligation or performance of Grantor's obligations and the default continues after any required notice of the default and the time allowed to cure, Lender may—

a.    declare the unpaid principal balance and earned interest on the Obligation immediately due;

b.    exercise Lender's rights with respect to rent under the Texas Property Code as then in effect;

c.    direct Trustee to foreclose this lien, in which case Lender or Lender's

521550.000001 24808189.2

RP-2021-258619

001583



agent will cause notice of the foreclosure sale to be given as provided by the Texas Property Code as then in effect; and

    d.    purchase the Property at any foreclosure sale by offering the highest bid and then have the bid credited on the Obligation.

*C.8.*    Lender may remedy any default without waiving it and may waive any default without waiving any prior or subsequent default.

**D.**    **Trustee's Rights and Duties**

If directed by Lender to foreclose this lien, Trustee will—

*D.1.*    either personally or by agent give notice of the foreclosure sale as required by the Texas Property Code as then in effect;

*D.2.*    sell and convey all or part of the Property "AS IS" to the highest bidder for cash with a general warranty binding Grantor, to the Other Exceptions to Conveyance and Warranty and without representation or warranty, express or implied, by Trustee;

*D.3.*    from the proceeds of the sale, pay, in this order—

    a.    expenses of foreclosure, including a reasonable commission to Trustee;

    b.    to Lender, the full amount of principal, interest, attorney's fees, and other charges due and unpaid;

    c.    any amounts required by law to be paid before payment to Grantor; and

    d.    to Grantor, any balance; and

*D.4.*    be indemnified, held harmless, and defended by Lender against all costs, expenses, and liabilities incurred by Trustee for acting in the execution or enforcement of the trust created by this deed of trust, which includes all court and other costs, including attorney's fees, incurred by Trustee in defense of any action or proceeding taken against Trustee in that capacity.

**E.**    **General Provisions**

*E.1.*    If any of the Property is sold under this deed of trust, Grantor must immediately surrender possession to the purchaser. If Grantor does not, Grantor will be a tenant at sufferance of the purchaser, subject to an action for forcible detainer.

*E.2.*    Recitals in any trustee's deed conveying the Property will be presumed to be true.

*E.3.*    Proceeding under this deed of trust, filing suit for foreclosure, or pursuing any other remedy will not constitute an election of remedies.

4



*E.4.*     This lien will remain superior to liens later created even if the time of payment of all or part of the Obligation is extended or part of the Property is released.

*E.5.*     If any portion of the Obligation cannot be lawfully secured by this deed of trust, payments will be applied first to discharge that portion.

*E.6.*     Grantor assigns to Lender all amounts payable to or received by Grantor from condemnation of all or part of the Property, from private sale in lieu of condemnation, and from damages caused by public works or construction on or near the Property. After deducting any expenses incurred, including attorney's fees and court and other costs, Lender will either release any remaining amounts to Grantor or apply such amounts to reduce the Obligation. Lender will not be liable for failure to collect or to exercise diligence in collecting any such amounts. Grantor will immediately give Lender notice of any actual or threatened proceedings for condemnation of all or part of the Property.

*E.7.*     Grantor collaterally assigns to Lender all present and future rent from the Property and its proceeds. Grantor warrants the validity and enforceability of the assignment. Grantor will apply all rent to payment of the Obligation and performance of this deed of trust, but if the rent exceeds the amount due with respect to the Obligation and the deed of trust, Grantor may retain the excess. If a default exists in payment of the Obligation or performance of this deed of trust, Lender may exercise Lender's rights with respect to rent under the Texas Property Code as then in effect. Lender neither has nor assumes any obligations as lessor or landlord with respect to any occupant of the Property. Lender may exercise Lender's rights and remedies under this paragraph without taking possession of the Property. Lender will apply all rent collected under this paragraph as required by the Texas Property Code as then in effect. Lender is not required to act under this paragraph, and acting under this paragraph does not waive any of Lender's other rights or remedies.

*E.8.*     Interest on the debt secured by this deed of trust will not exceed the maximum amount of nonusurious interest that may be contracted for, taken, reserved, charged, or received under law. Any interest in excess of that maximum amount will be credited on the principal of the debt or, if that has been paid, refunded. On any acceleration or required or permitted prepayment, any such excess will be canceled automatically as of the acceleration or prepayment or, if already paid, credited on the principal of the debt or, if the principal of the debt has been paid, refunded. This provision overrides any conflicting provisions in this and all other instruments concerning the debt.

*E.9.*     In no event may this deed of trust secure payment of any debt that may not lawfully be secured by a lien on real estate or create a lien otherwise prohibited by law.

*E.10.*     Grantor may not sell, transfer, or otherwise dispose of any Property, whether voluntarily or by operation of law, without the prior written consent of Lender. If granted, consent may be conditioned upon (a) the grantee's integrity, reputation, character, creditworthiness, and management ability being satisfactory to Lender; and (b) the grantee's executing, before such sale, transfer, or other disposition, a written assumption agreement containing any terms Lender may require, such as a principal pay down on the Obligation, an increase in the rate of interest payable with respect to the Obligation, a transfer fee, or any other

521550.000001 24808189.2

001585

modification of the Note, this deed of trust, or any other instruments evidencing or securing the Obligation.

Grantor may not cause or permit any Property to be encumbered by any liens, security interests, or encumbrances other than the liens securing the Obligation and the liens securing ad valorem taxes not yet due and payable without the prior written consent of Lender. If granted, consent may be conditioned upon Grantor's executing, before granting such lien, a written modification agreement containing any terms Lender may require, such as a principal pay down on the Obligation, an increase in the rate of interest payable with respect to the Obligation, an approval fee, or any other modification of the Note, this deed of trust, or any other instruments evidencing or securing the Obligation.

Grantor may not grant any lien, security interest, or other encumbrance (a "Subordinate Instrument") covering the Property that is subordinate to the liens created by this deed of trust without the prior written consent of Lender. If granted, consent may be conditioned upon the Subordinate Instrument's containing express covenants to the effect that—

a.   the Subordinate Instrument is unconditionally subordinate to this deed of trust;

b.   if any action is instituted to foreclose or otherwise enforce the Subordinate Instrument, no action may be taken that would terminate any occupancy or tenancy without the prior written consent of Lender, and that consent, if granted, may be conditioned in any manner Lender determines;

c.   rents, if collected by or for the holder of the Subordinate Instrument, will be applied first to the payment of the Obligation then due and to expenses incurred in the ownership, operation, and maintenance of the Property in any order Lender may determine, before being applied to any indebtedness secured by the Subordinate Instrument;

d.   written notice of default under the Subordinate Instrument and written notice of the commencement of any action to foreclose or otherwise enforce the Subordinate Instrument must be given to Lender concurrently with or immediately after the occurrence of any such default or commencement; and

e.   in the event of the bankruptcy of Grantor, all amounts due on or with respect to the Obligation and this deed of trust will be payable in full before any payments on the indebtedness secured by the Subordinate Instrument.

Grantor may not cause or permit any of the following events to occur without the prior written consent of Lender: if Grantor is (a) a corporation, the termination of the corporation or the sale, pledge, encumbrance, or assignment of any shares of its stock; (b) a limited liability company, the termination of the company or the sale, pledge, encumbrance, or assignment of any of its membership interests; (c) a general partnership or joint venture, the termination of the

521550.000001 24808189.2

RP-2021-258619

001586



RP-2021-258619

partnership or venture or the sale, pledge, encumbrance, or assignment of any of its partnership or joint venture interests, or the withdrawal from or admission into it of any general partner or joint    enture; or (d) a limited partnership, (i) the termination of the partnership, (ii) the sale, pledge, encumbrance, or assignment of any of its general partnership interests, or the withdrawal from or admission into it of any general partner, (iii) the sale, pledge, encumbrance, or assignment of a controlling portion of its limited partnership interests, or (iv) the withdrawal from or admission into it of any controlling limited partner or partners. If granted, consent may be conditioned upon (a) the integrity, reputation, character, creditworthiness, and management ability of the person succeeding to the ownership interest in Grantor (or security interest in such ownership) being satisfactory to Lender; and (b) the execution, before such event, by the person succeeding to the interest of Grantor in the Property or ownership interest in Grantor (or security interest in such ownership) of a written modification or assumption agreement containing such terms as Lender may require, such as a principal pay down on the Obligation, an increase in the rate of interest payable with respect to the Obligation, a transfer fee, or any other modification of the Note, this deed of trust, or any other instruments evidencing or securing the Obligation.

E.11.    When the context requires, singular nouns and pronouns include the plural.

E.12.    The term *Note* includes all extensions, modifications, and renewals of the Note and all amounts secured by this deed of trust.

E.13.    This deed of trust binds, benefits, and may be enforced by the successors in interest of all parties.

E.14.    If Grantor and Borrower are not the same person, the term *Grantor* includes Borrower.

E.15.    Grantor and each surety, endorser, and guarantor of the Obligation waive, to the extent permitted by law, all (a) demand for payment, (b) presentation for payment, (c) notice of intention to accelerate maturity, (d) notice of acceleration of maturity, € protest, (f) notice of protest, and (g) rights under sections 51.003, 51.004, and 51.005 of the Texas Property Code.

E.16.    Grantor agrees to pay reasonable attorney's fees, trustee's fees, and court and other costs of enforcing Lender's rights under this deed of trust if an attorney is retained for its enforcement.

E.17.    If any provision of this deed of trust is determined to be invalid or unenforceable, the validity or enforceability of any other provision will not be affected.

E.18.    The term *Lender* includes any mortgage servicer for Lender.

E.19.    Grantor hereby grants Lender a right of first refusal with respect to Grantor's power to authorize any third party (other than Lender pursuant to its rights as set forth in this instrument) to pay ad valorem taxes on the Property and authorize a taxing entity to transfer its tax lien on the Property to that third party. Grantor's authorization to any third party (other than Lender) to pay the ad valorem taxes and receive transfer of a taxing entity's lien for ad valorem taxes shall be null and void and of no force and effect unless Lender, within ten days after

521550.000001 24808189.2

receiving written notice from Grantor, fails to pay the ad valorem taxes pursuant to Lender's rights as set forth in this instrument.

E.20.    Grantor represents that this deed of trust and the Note are given for the following purposes: evidence and secure the Obligation.

**GRANTOR**:

**GALLERIA 2425 OWNER, LLC**,
a Delaware limited liability company

By:    Galleria 2425 JV, LLC,
       a Delaware limited liability company,
       its Managing Member

By:    Galleria West Loop Investments II LLC,
       its Managing Member

By: _____
Name: Ali Choudhri
Title: Manager

STATE OF TEXAS          §
                        §
COUNTY OF Harris        §

    This instrument was acknowledged before me on this _____ day of _____, 2021, by Ali Choudhri, the Manager of Galleria West Loop Investments II LLC, the Managing Member of Galleria 2425 JV, LLC, a Delaware limited liability company, the Managing Member of Galleria 2425 Owner, LLC, a Delaware limited liability company, on behalf of said limited liability companies.

[SEAL]                          _____
                                Notary Public in and for the
                                STATE OF Texas



STEPHANIE ALVAREZ
Notary Public, State of Texas
Com. Expires 04-06-2021
Notary ID 131078509

8

521550.000001 24808189.2



RP-2021-258619

RP-2021-258619

EXHIBIT A
PROPERTY DESCRIPTION

**TRACT 1: FEE TRACT**

BEING 2.4462 ACRES (106,557 SQUARE FEET) OF LAND OUT OF THE WILLIAM WHITE SURVEY, ABSTRACT NO. 836, HOUSTON, HARRIS COUNTY, TEXAS, BEING THE SAME PROPERTY CONVEYED TO 2425 WEST LOOP, LP BY SPECIAL WARRANTY DEED RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20070732472, SAID TRACT CONVEYED BY DEED TO ONE WEST LOOP PLAZA, LTD. UNDER HCCF NO. S547896 AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE WESTHEIMER ROAD (ROW VARIES) BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 204.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST, TO A 1/2 INCH IRON ROD FOUND AT THE NORTHEAST CORNER OF THE 2.3468 ACRE PARCEL BEING THE SOUTHEAST CORNER OF THE HEREIN DESCRIBED PARCEL AND THE POINT OF BEGINNING:

THENCE, WESTERLY ALONG THE COMMON LINE OF THE 2.3468 ACRE PARCEL TO THE SOUTH AND THE HEREIN DESCRIBED PARCEL TO THE NORTH, SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 464.50 FEET TO A POINT ON THE EASTERLY RIGHT OF WAY (ROW) LINE OF INTERSTATE 610 WEST LOOP AND THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED PARCEL FROM. WHICH A FOUND RAILROAD SPIKE BEARS SOUTH 21 DEGREES 43 MINUTES EAST 2.42 FEET;

THENCE, NORTHERLY ALONG THE EASTERLY RIGHT OF WAY LINE OF INTERSTATE 610 WEST LOOP (ROW 350 FEET) NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST 251.27 FEET TO AN "X" SET IN CONCRETE BEING THE SOUTHWEST CORNER OF A 7.8998 ACRE PARCEL AS SHOWN ON THE HOUSTON VENTURE PLAT UNRESTRICTED RESERVE "A" FILED IN THE HARRIS COUNTY MAP RECORDS AS FILM CODE NUMBER 356074, AND THE NORTHWEST CORNER OF THE HEREIN DESCRIBED PARCEL;

THENCE, EASTERLY ALONG THE COMMON LINE OF THE ABOVE INDICATED 7.8998 ACRE PARCEL TO THE NORTH AND THE HEREIN DESCRIBED PARCEL TO THE SOUTH NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 406.61 FEET TO AN "X"

521550.000001 24808189.2

FOUND IN THE WESTERLY LINE OF A 3.4385 ACRE PARCEL OF LAND CONVEYED TO RESTPROP, LTD AS RECORDED IN THE HCCF NO. R228886;

THENCE, SOUTHERLY ALONG A COMMON LINE OF THE ABOVE INDICATED 3.4385 ACRE PARCEL TO THE EAST AND THE HEREIN DESCRIBED PARCEL TO THE WEST, SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 244.64 FEET TO THE POINT OF BEGINNING CONTAINING 106,557 SQUARE FEET, 2.4462 ACRES MORE LESS.

**TRACT 2 EASEMENT TRACT**: 20 FOOT NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT OVER AND ACROSS A TRACT OF LAND NORTHERLY OF AND 20 FEET WIDE ALONG THE ENTIRE NORTHERLY BOUNDARY LINE OF TRACT I; SAID EASEMENT CREATED AND GRANTED BY VI IAN L. SMITH, INDIVIDUALLY AND AS INDEPENDENT EXECUTRIX OF THE ESTATE OF R. E. SMITH, DECEASED IN THAT CERTAIN GENERAL WARRANTY DEED DATED JULY 5, 1977 FILED IN HCCF NO. F216562 AND DESCRIBED IN HCCF NO. G743294, BEING THE SAME EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS INC. IN A DEED RECORDED IN HCCF NO. S056346 AND

THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 204.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST TO A 1/2 INCH IRON ROD FOUND FOR THE SOUTHEAST CORNER OF TRACT I;

THENCE CONTINUING NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 244.64 FEET ALONG A COMMON LINE OF A PREVIOUSLY NOTED 3.4385 ACRE PARCEL OF LAND TO THE EAST AND TRACT I TO THE WEST TO AN "X" FOUND FOR THE NORTHEAST CORNER OF TRACT I AND THE POINT OF BEGINNING;

THENCE, WESTERLY SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 406.61 FEET ALONG THE NORTHERLY LINE OF TRACT 1 TO AN "X" SET ON THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP (350 FEET WIDE);

521550.000001 24808189.2

RP-2021-258619

001590



THENCE, NORTHERLY NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST 20.54 FEET ALONG THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP TO A POINT;

THENCE, EASTERLY 20.00 FEET NORTHERLY FROM AND PARALLEL TO THE NORTHERLY LINE OF TRACT 1, NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 401.88 FEET TO A POINT;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST 20.00 FEET TO THE POINT OF BEGINNING AND CONTAINING 0.1856 ACRES OR 8,085 SQUARE FEET OF LAND MORE OR LESS.

**TRACT 3 EASEMENT TRACT**: 20 FOOT NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT;

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT OVER AND ACROSS A TRACT OF LAND SOUTHERLY OF AND 20.00 FEET WIDE ALONG THE ENTIRE SOUTHERN BOUNDARY LINE OF TRACT 1, SAID EASEMENT CREATED AND GRANTED ON FEBRUARY 16, 1979, FROM WEST LOOP HOTEL, LIMITED TO FIN PROPERTIES, LIMITED FILED IN HCCF NO. G041310, BEING THE SAME PROPERTY EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 184.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST TO THE POINT OF BEGINNING, WHENCE THE SOUTHEAST CORNER OF TRACT I BEARS NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 20.02 FEET;

THENCE, WESTERLY 20.00 FEET SOUTHERLY FROM AND PARALLEL TO THE SOUTHERLY LINE OF TRACT 1, SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 469.23 FEET TO A POINT IN THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP;

THENCE, NORTHERLY NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST, 20.54 FEET ALONG THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP TO THE

RP-2021-258619

11

521550.000001 24808189.2

001591



SOUTHWEST CORNER FOR TRACT 1 FROM WHICH A FOUND RAILROAD SPIKE BEARS SOUTH 21 DEGREES 43 MINUTES EAST, 2.42 FEET;

THENCE, EASTERLY NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 464.50 FEET ALONG THE SOUTHERLY LINE OF TRACT 1 TO A 1/2 INCH IRON ROD FOUND AT THE SOUTHEAST CORNER OF TRACT 1;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 20.02 FEET ALONG THE A COMMON LINE BETWEEN A PREVIOUSLY DESCRIBED 2.3468 ACRES PARCEL TO THE WEST AND A 3.4385 ACRE PARCEL TO THE EAST TO THE POINT OF BEGINNING AND CONTAINING 0.2144 ACRES OR 9,337 SQUARE FEET OF LAND, MORE OR LESS.

**TRACT 4 EASEMENT TRACT**: 28 FOOT ROADWAY AND PEDESTRIAN EASEMENT;

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT ACROSS EASTERLY 28 FEET OF A 2.3468 ACRE TRACT ADJACENT TO AND SOUTHERLY OF TRACT I, CREATED AND GRANTED IN THAT CERTAIN ROAD AND PEDESTRIAN EASEMENT DATED FEBRUARY 16, 1979 FROM WEST LOOP HOTEL, LIMITED TO FIN PROPERTIES, LIMITED, FILED IN HCCF NO. G041313, BEING THE SAME PROPERTY EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT A FOUND 5/8 INCH IRON ROD IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, WESTERLY SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST, 28.00 FEET ALONG THE NORTHERLY LINE OF WESTHEIMER ROAD TO A POINT;

THENCE, NORTHERLY 28.00 FEET WESTERLY OF AND PARALLEL TO THE EASTERLY LINE OF SAID 2.3468 ARE TRACT NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 205.08 FEET TO A POINT ON THE SOUTHERLY LINE OF TRACT I;

THENCE, EASTERLY NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 28.00 FEET ALONG THE SOUTHERLY LINE OF TRACT I TO A 1/2 INCH IRON ROD FOUND IN THE WESTERLY LINE OF A 3.4385 ACRE PARCEL OF LAND PRESENTLY OWNED BY RESTPROP, LTD AS RECORDED IN THE HCCF NO. R228886;

RP-2021-258619

521550.000001 24808189.2



001592



THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 204.61 FEET ALONG A COMMON LINE OF THE ABOVE INDICATED 3.4385 ACRE PARCEL TO THE EAST SAID THE PREVIOUSLY DESCRIBED 2.3468 ACRE PARCEL TO THE WEST, TO THE POINT OF BEGINNING, CONTAINING 0.1317 ACRES OR 5,735 SQUARE FEET (CALLED 5,740) OF LAND MORE OR LESS.

**TRACT 5 EASEMENT TRACT**: 5 FOOT STORM SEWER EASEMENT

A 1,025 SQUARE FOOT TRACT OF LAND, BEING THAT SAME TRACT UN PROPERTIES, LIMITED, RECORDED IN HCCF NUMBER G041311, LOCATED IN THE WILLIAM WHITE SURVEY, ABSTRACT NUMBER 836, CITY OF HOUSTON, HARRIS COUNTY, TEXAS, BEING THE SAME EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY (ROW) OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. 5056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR. TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE ALONG THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD, SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST, A DISTANCE OF 16.00 FEET TO THE SOUTHEAST CORNER OF SAID EASEMENT AND THE HEREIN DESCRIBED TRACT;

THENCE CONTINUING ALONG THE NORTHERLY LINE OF WESTHEIMER ROAD, SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST A DISTANCE OF 5.00 FEET, THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE DEPARTING SAID WESTHEIMER ROAD, NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, A DISTANCE OF 204.96 FEET, TO A POINT IN THE SOUTHERLY LINE OF A 2.4462 ACRE TRACT CONVEYED BY DEED TO HE 2425 WEST LOOP, LP RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20070732472;

THENCE ALONG THE SOUTHERLY LINE OF SAID 2.4462 ACRE TRACT, NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST A DISTANCE OF 5.00 FEET TO THE NORTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE DEPARTING THE SOUTHERLY LINE OF SAID 2.4462 ACRE TRACT, SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, A DISTANCE OF 204.88 FEET TO THE POINT OF BEGINNING AND CONTAINING 1,025 SQUARE FEET OF LAND, MORE OR LESS.

521550.000001 24808189.2

RP-2021-258619

001593

County Clerk Harris County, Texas

RP-2021-258619

```
RP-2021-258619
# Pages 14
05/11/2021 12:19 PM
e-Filed & e-Recorded in the
Official Public Records of
HARRIS COUNTY
TENESHIA HUDSPETH
COUNTY CLERK
Fees  $66.00
```

RECORDERS MEMORANDUM
This instrument was received and recorded electronically
and any blackouts, additions or changes were present
at the time the instrument was filed and recorded.

Any provision herein which restricts the sale, rental, or
use of the described real property because of color or
race is invalid and unenforceable under federal law.
THE STATE OF TEXAS
COUNTY OF HARRIS
I hereby certify that this instrument was FILED in
File Number Sequence on the date and at the time stamped
hereon by me; and was duly RECORDED in the Official
Public Records of Real Property of Harris County, Texas.



COUNTY CLERK
HARRIS COUNTY, TEXAS

001594





I, Teneshia Hudspeth, County Clerk of Harris County, Texas certify that these pages are a true and correct copy of the original record filed and recorded in my office, electronically or hard copy, as it appears on this date.

Witness my official hand and seal of office
This March 20, 2024

Teneshia Hudspeth, County Clerk
Harris County, Texas

Any provision herein which restrict the sale, rental or use of the described Real Property because of color or race is invalid and unenforceable under the Federal Law. Confidential information may have been redacted from the document in compliance with the Public Information Act.



**<u>EXHIBIT B</u>**

**Foreign Registration Application**

001596

Corporations Section
P.O.Box 13697
Austin, Texas 78711-3697

Jane Nelson
Secretary of State

# Office of the Secretary of State

The undersigned, as Secretary of State of Texas, does hereby certify that the attached is a true and correct copy of each document on file in this office as described below:

Galleria 2425 JV, LLC
Filing Number: 802982348

Application for Registration

April 05, 2018

In testimony whereof, I have hereunto signed my name officially and caused to be impressed hereon the Seal of State at my office in Austin, Texas on June 03, 2024.



Jane Nelson
Secretary of State

*Come visit us on the internet at https://www.sos.texas.gov/*

Phone: (512) 463-5555          Fax: (512) 463-5709          Dial: 7-1-1 for Relay Services
Prepared by: SOS-WEB          TID: 10266          Document: 1368638960003

| Form **304**<br>(Revised 05/11) | | This space reserved for office use. |
|---|---|---|
| Submit in duplicate to:<br>Secretary of State<br>P.O. Box 13697<br>Austin, TX 78711-3697<br>512 463-5555<br>FAX: 512/463-5709<br>**Filing Fee: $750** | **Application for<br>Registration<br>of a Foreign Limited<br>Liability Company** | **F I L E D**<br>In the Office of the<br>Secretary of State of Texas<br><br>APR 0 5 2018<br><br>**Corporations Section** |

1. The entity is a foreign limited liability company. The name of the entity is:

Galleria 2425 JV, LLC

*Provide the full legal name of the entity as stated in the entity's formation document in its jurisdiction of formation.*

2A. The name of the entity in its jurisdiction of formation does not contain the word "limited liability company" or "limited company" (or an abbreviation thereof). The name of the entity with the word or abbreviation that it elects to add for use in Texas is:

2B. The entity name is not available in Texas. The assumed name under which the entity will qualify and transact business in Texas is:

*The assumed name must include an acceptable organizational identifier or an accepted abbreviation of one of these terms.*

3. Its federal employer identification number is: _____

☑ Federal employer identification number information is not available at this time.

4. It is organized under the laws of: (set forth state or foreign country)   Delaware

and the date of its formation in that jurisdiction is:   04/04/2018

*mm/dd/yyyy*

5. As of the date of filing, the undersigned certifies that the foreign limited liability company currently exists as a valid limited liability company under the laws of the jurisdiction of its formation.

6. The purpose or purposes of the limited liability company that it proposes to pursue in the transaction of business in Texas are set forth below.

Any lawful business or activity under the law of this state.

The entity also certifies that it is authorized to pursue such stated purpose or purposes in the state or country under which it is organized.

7. The date on which the foreign entity intends to transact business in Texas, or the date on which the: foreign entity first transacted business in Texas is: upon filing

*mm/dd/yyyy*          *Late fees may apply (see instructions).*

8. The principal office address of the limited liability company is:

| 6501 Westchester Avenue | Houston | TX | U.S | 77005-3761 |
|---|---|---|---|---|
| *Address* | *City* | *State* | *Country* | *Zip/Postal Code* |

**RECEIVED**

APR 0 5 2018

**Secretary of State**

Form 304                    6

001598

Complete item 9A or 9B, but not both.  Complete item 9C.

☑ 9A.  The registered agent is an organization (cannot be entity named above) by the name of:

Capitol Corporate Services, Inc.

OR

☐ 9B.  The registered agent is an individual resident of the state whose name is:

| | | | |
|---|---|---|---|
| *First Name* | *M.I.* | *Last Name* | *Suffix* |

9C.  The business address of the registered agent and the registered office address is:

| | | | |
|---|---|---|---|
| 206 E. 9th Street, Suite 1300 | Austin | TX | 78701-4411 |
| *Street Address* | *City* | *State* | *Zip Code* |

10.  The entity hereby appoints the Secretary of State of Texas as its agent for service of process under the circumstances set forth in section 5.251 of the Texas Business Organizations Code.

11.  The name and address of each governing person is:

**NAME AND ADDRESS OF GOVERNING PERSON** (Enter the name of either an individual or an organization, but not both.)

IF INDIVIDUAL

| | | | |
|---|---|---|---|
| *First Name* | *M.I.* | *Last Name* | *Suffix* |

OR

IF ORGANIZATION

Naissance Capital Real Estate, LLC

*Organization Name*

| | | | | |
|---|---|---|---|---|
| 6501 Westchester Avenue | Houston | TX | U.S | 77005-3761 |
| *Street or Mailing Address* | *City* | *State* | *Country* | *Zip Code* |

**NAME AND ADDRESS OF GOVERNING PERSON** (Enter the name of either an individual or an organization, but not both.)

IF INDIVIDUAL

| | | | |
|---|---|---|---|
| *First Name* | *M.I.* | *Last Name* | *Suffix* |

OR

IF ORGANIZATION

*Organization Name*

| | | | | |
|---|---|---|---|---|
| *Street or Mailing Address* | *City* | *State* | *Country* | *Zip Code* |

**NAME AND ADDRESS OF GOVERNING PERSON** (Enter the name of either an individual or an organization, but not both.)

IF INDIVIDUAL

| | | | |
|---|---|---|---|
| *First Name* | *M.I.* | *Last Name* | *Suffix* |

OR

IF ORGANIZATION

*Organization Name*

| | | | | |
|---|---|---|---|---|
| *Street or Mailing Address* | *City* | *State* | *Country* | *Zip Code* |

Form 304                                            7

## Supplemental Provisions/Information

Text Area: [The attached addendum, if any, is incorporated herein by reference.]

## Effectiveness of Filing (Select either A, B, or C.)

A. ☑ This document becomes effective when the document is filed by the secretary of state.

B. ☐ This document becomes effective at a later date, which is not more than ninety (90) days from the date of signing. The delayed effective date is: _____

C. ☐ This document takes effect upon the occurrence of a future event or fact, other than the passage of time. The 90th day after the date of signing is: _____

The following event or fact will cause the document to take effect in the manner described below:

## Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

Date: _____ 4/4/2018 _____

_Azeemeh Zaheer_
_____
Signature of authorized person (see instructions)

Azeemeh Zaheer
_____
Printed or typed name of authorized person.

Form 304                                    8

001600

**Form 401-A**
**(Revised 12/09)**



### Acceptance of Appointment
### and
### Consent to Serve as Registered Agent
### §5.201(b) Business Organizations Code

The following form may be used when the person designated as registered agent in a registered agent filing is an individual.

---

<u>Acceptance of Appointment and Consent to Serve as Registered Agent</u>

I acknowledge, accept and consent to my designation or appointment as registered agent in Texas for

*Name of represented entity*

I am a resident of the state and understand that it will be my responsibility to receive any process, notice, or demand that is served on me as the registered agent of the represented entity; to forward such to the represented entity; and to immediately notify the represented entity and submit a statement of resignation to the Secretary of State if I resign.

X:

| *Signature of registered agent* | *Printed name of registered agent* | *Date (mm/dd/yyyy)* |

---

The following form may be used when the person designated as registered agent in a registered agent filing is an organization.

---

<u>Acceptance of Appointment and Consent to Serve as Registered Agent</u>

I am authorized to act on behalf of  Capitol Corporate Services, Inc.
*Name of organization designated as registered agent*

The organization is registered or otherwise authorized to do business in Texas. The organization acknowledges, accepts and consents to its appointment or designation as registered agent in Texas for:

Galleria 2425 JV, LLC

*Name of represented entity*

The organization takes responsibility to receive any process, notice, or demand that is served on the organization as the registered agent of the represented entity; to forward such to the represented entity; and to immediately notify the represented entity and submit a statement of resignation to the Secretary of State if the organization resigns.

X:

Krista Abair, Assistant Secretary on behalf of Capitol Corporate Services, Inc.   04/05/2018

| *Signature of person authorized to act on behalf of organization* | *Printed name of authorized person* | *Date (mm/dd/yyyy)* |

---

Form 401-A

3

001601

**<u>EXHIBIT C</u>**

**NBK Loan Agreement**

001602

LOAN AGREEMENT

Dated as of May 23, 2018

among

GALLERIA 2425 OWNER, LLC,

as Borrower,

NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH,

as Administrative Agent,

and

NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH, and certain other lenders who
may now or later be made party hereto,

collectively, as Lenders

001603

# TABLE OF CONTENTS

ARTICLE I DEFINITIONS; PRINCIPLES OF CONSTRUCTION ....................................................... 1

    Section 1.1. Definitions ...................................................................................................... 1
    Section 1.2. Interpretation................................................................................................. 12

ARTICLE II GENERAL TERMS ................................................................................................ 13

    Section 2.1. Loan Commitment; Extension ..................................................................... 13
    Section 2.2. Interest Rate and Loan Payments ................................................................. 13
    Section 2.3. Usury Savings .............................................................................................. 14

ARTICLE III CONDITIONS PRECEDENT ................................................................................. 14

    Section 3.1. Representations and Warranties; Compliance with Conditions..................... 14
    Section 3.2. Delivery of Loan Documents; Title Policy; Due Diligence Items................. 14
    Section 3.3. Related Documents ...................................................................................... 16
    Section 3.4. Organizational Documents .......................................................................... 16
    Section 3.5. Opinions of Counsel .................................................................................... 16
    Section 3.6. Taxes and Other Charges ............................................................................ 16
    Section 3.7. Completion of Proceedings ......................................................................... 16
    Section 3.8. Payments ..................................................................................................... 16
    Section 3.9. Transaction Costs ........................................................................................ 16
    Section 3.10. No Material Adverse Change...................................................................... 16
    Section 3.11. Leases ........................................................................................................ 17
    Section 3.12. Tenant Estoppel Certificate ....................................................................... 17
    Section 3.13. SNDA ........................................................................................................ 17
    Section 3.14. Tax Lot...................................................................................................... 17
    Section 3.15. Borrower's and Guarantor's Financials ...................................................... 17
    Section 3.16. Acquisition of Property .............................................................................. 17
    Section 3.17. Further Documents ..................................................................................... 17
    Section 3.18. Interest Reserve Deposit............................................................................. 17

ARTICLE IV REPRESENTATIONS AND WARRANTIES........................................................... 17

    Section 4.1. Organization................................................................................................ 17
    Section 4.2. Status of Borrower ....................................................................................... 18
    Section 4.3. Validity of Documents ................................................................................. 18
    Section 4.4. No Conflicts ................................................................................................ 18
    Section 4.5. Litigation..................................................................................................... 18
    Section 4.6. Agreements.................................................................................................. 18
    Section 4.7. Solvency...................................................................................................... 19
    Section 4.8. Full and Accurate Disclosure ...................................................................... 19
    Section 4.9. ERISA Compliance..................................................................................... 19
    Section 4.10. Not a Foreign Person ................................................................................. 20
    Section 4.11. Enforceability............................................................................................ 20
    Section 4.12. Business Purposes...................................................................................... 20
    Section 4.13. Compliance ............................................................................................... 20
    Section 4.14. Financial Information ................................................................................. 20
    Section 4.15. Illegal Activity ........................................................................................... 20
    Section 4.16. Separate Tax and Zoning Lot...................................................................... 20

i

**TABLE OF CONTENTS**
continued

Section 4.17. Federal Reserve Regulation ....................................................................... 20
Section 4.18. Investment Company Act ......................................................................... 21
Section 4.19. No Change in Facts or Circumstances; Disclosure ................................... 21
Section 4.20. Special Purpose Entity ............................................................................. 21
Section 4.21. Intellectual Property ................................................................................. 21
Section 4.22. Embargoed Person .................................................................................... 21
Section 4.23. Patriot Act ................................................................................................ 22
Section 4.24. No Contractual Obligations ...................................................................... 22
Section 4.25. Shareholders of Borrower ........................................................................ 22
Section 4.26. Survival .................................................................................................... 23
Section 4.27. Leases ....................................................................................................... 23
Section 4.28. Landmark Status ....................................................................................... 23
Section 4.29. Broker ....................................................................................................... 23

ARTICLE V COVENANTS ............................................................................................ 23

Section 5.1. Existence; Compliance With Legal Requirements ..................................... 23
Section 5.2. Maintenance and Use of Project ................................................................ 24
Section 5.3. Waste .......................................................................................................... 24
Section 5.4. Taxes and Other Charges ........................................................................... 24
Section 5.5. Litigation .................................................................................................... 26
Section 5.6. Access to the Project .................................................................................. 27
Section 5.7. Notice of Default ........................................................................................ 27
Section 5.8. Cooperate in Legal Proceedings ................................................................ 27
Section 5.9. Performance of Obligations ....................................................................... 27
Section 5.10. Awards; Insurance Proceeds .................................................................... 27
Section 5.11. Financial Reporting .................................................................................. 27
Section 5.12. Estoppel Statement ................................................................................... 28
Section 5.13. Management of Project ............................................................................. 28
Section 5.14. Liens ......................................................................................................... 29
Section 5.15. Debt Cancellation ..................................................................................... 29
Section 5.16. Zoning ....................................................................................................... 29
Section 5.17. ERISA ....................................................................................................... 30
Section 5.18. No Joint Assessment ................................................................................. 30
Section 5.19. Alterations ................................................................................................ 30
Section 5.20. Reciprocal Easement Agreement ............................................................. 30
Section 5.21. Notices ...................................................................................................... 30
Section 5.22. Curing ....................................................................................................... 30
Section 5.23. Limitation on Securities Issuances ........................................................... 31
Section 5.24. Limitations on Distributions ..................................................................... 31
Section 5.25. Contractual Obligations ............................................................................ 31
Section 5.26. Additional Indebtedness ........................................................................... 31
Section 5.27. Restrictions on Leasing ............................................................................ 31
Section 5.28. Debt Service Coverage Ratio ................................................................... 32
Section 5.29. Loan-to-Value Ratio ................................................................................. 33
Section 5.30. UCC Searches ........................................................................................... 33
Section 5.31. Updated/New Appraisal ............................................................................ 33
Section 5.32. Interest Reserve Account .......................................................................... 33
Section 5.33. Mezzanine Loan ....................................................................................... 34

4161624-v7\CHIDMS1

001605

**TABLE OF CONTENTS**
continued

ARTICLE VI ENTITY COVENANTS ......................................................................................... 34

    Section 6.1. Single Purpose Entity/Separateness ................................................................. 34
    Section 6.2. Change of Name, Identity or Structure ........................................................... 35
    Section 6.3. Business and Operations ................................................................................. 36

ARTICLE VII NO SALE OR ENCUMBRANCE ....................................................................... 36

    Section 7.1. Transfer Definitions ........................................................................................ 36
    Section 7.2. No Sale/Encumbrance ..................................................................................... 36
    Section 7.3. Administrative Agent's Rights ........................................................................ 37
    Section 7.4. Assumption ...................................................................................................... 37

ARTICLE VIII INSURANCE; CASUALTY; CONDEMNATION; RESTORATION ........................... 37

    Section 8.1. Insurance .......................................................................................................... 37
    Section 8.2. Insurance Escrow; Payment by Administrative Agent ................................... 41
    Section 8.3. Casualty ........................................................................................................... 42
    Section 8.4. Condemnation .................................................................................................. 44

ARTICLE IX INTENTIONALLY OMITTED ............................................................................ 45

ARTICLE X EVENTS OF DEFAULT; REMEDIES ................................................................. 45

    Section 10.1. Event of Default ............................................................................................ 45
    Section 10.2. Remedies ....................................................................................................... 48

ARTICLE XI REPLACEMENT OF LENDERS ......................................................................... 48

ARTICLE XII SECONDARY MARKET; ASSIGNMENT; PARTICIPATION ................................. 49

    Section 12.1. Assignment; Participation ............................................................................. 49
    Section 12.2. Intralinks ....................................................................................................... 51

ARTICLE XIII AGENT ............................................................................................................... 51

    Section 13.1. Appointment, Powers and Immunities .......................................................... 51
    Section 13.2. Reliance by Administrative Agent ................................................................ 53
    Section 13.3. Purchase of Disapproving Lender's Interest ................................................. 53
    Section 13.4. Rights of Administrative Agent as Lender .................................................... 54
    Section 13.5. Indemnification ............................................................................................. 54
    Section 13.6. Non-Reliance on Administrative Agent and Other Lenders ......................... 55
    Section 13.7. Failure to Act ................................................................................................. 55
    Section 13.8. Action by Administrative Agent ................................................................... 55
    Section 13.9. Successor Administrative Agent .................................................................... 56
    Section 13.10. Sharing ........................................................................................................ 56
    Section 13.11. Pro Rata Treatment and Payments .............................................................. 56
    Section 13.12. Lenders Pro Rata Shares ............................................................................. 57
    Section 13.13. Disbursement of Proceeds by Administrative Agent ................................... 57
    Section 13.14. Amendments Concerning Agency Function ................................................ 58
    Section 13.15. Events of Default ......................................................................................... 58
    Section 13.16. Defaulting Lender ........................................................................................ 59
    Section 13.17. Servicing Fee .............................................................................................. 61

4161624-v7\CHIDMS1

001606

**TABLE OF CONTENTS**
continued

ARTICLE XIV INDEMNIFICATIONS ........................................................................................ 61

    Section 14.1. General Indemnification ...................................................................... 61
    Section 14.2. Intangible Tax Indemnification ............................................................ 61
    Section 14.3. ERISA Indemnification ....................................................................... 61
    Section 14.4. Survival ............................................................................................... 62

ARTICLE XV NOTICES ............................................................................................................. 62

    Section 15.1. Notices ................................................................................................ 62

ARTICLE XVI FURTHER ASSURANCES .................................................................................. 62

    Section 16.1. Replacement and Corrective Documents ............................................. 62
    Section 16.2. Further Acts, Etc .................................................................................. 63
    Section 16.3. Changes in Tax, Debt, Credit and Documentary Stamp Law ................. 63
    Section 16.4. Expenses ............................................................................................. 64

ARTICLE XVII WAIVERS ......................................................................................................... 64

    Section 17.1. Remedies Cumulative; Waivers .......................................................... 64
    Section 17.2. Modification, Waiver in Writing ......................................................... 64
    Section 17.3. Delay Not a Waiver ............................................................................. 65
    Section 17.4. Trial by Jury ........................................................................................ 65
    Section 17.5. Waiver of Notice ................................................................................. 65
    Section 17.6. Remedies of Borrower ......................................................................... 65
    Section 17.7. Waiver of Marshalling of Assets ......................................................... 65
    Section 17.8. Waiver of Statute of Limitations ......................................................... 66
    Section 17.9. Waiver of Counterclaim ...................................................................... 66

ARTICLE XVIII GOVERNING LAW .......................................................................................... 66

    Section 18.1. Choice of Law ..................................................................................... 66
    Section 18.2. Severability ......................................................................................... 67
    Section 18.3. Preferences ......................................................................................... 68

ARTICLE XIX MISCELLANEOUS ............................................................................................ 68

    Section 19.1. Survival ............................................................................................... 68
    Section 19.2. Administrative Agent's Discretion ....................................................... 68
    Section 19.3. Headings ............................................................................................. 68
    Section 19.4. Cost of Enforcement ........................................................................... 68
    Section 19.5. Schedule Incorporated ........................................................................ 68
    Section 19.6. Offsets, Counterclaims and Defenses .................................................. 68
    Section 19.7. No Joint Venture or Partnership; No Third Party Beneficiaries ............. 69
    Section 19.8. Publicity ............................................................................................. 70
    Section 19.9. Conflict; Construction of Documents; Reliance ................................... 70
    Section 19.10. Actions, Approvals and Determinations .............................................. 70
    Section 19.11. Entire Agreement ............................................................................... 71
    Section 19.12. Certain Additional Rights of Lenders ................................................. 71
    Section 19.13. Counterparts ...................................................................................... 71

**TABLE OF CONTENTS**
continued

EXHIBIT A - Borrower's Organizational Structure

EXHIBIT B - Form of Assignment and Assumption Agreement

SCHEDULE 13.12 - Amount of Loan Attributable to Lender

SCHEDULE 15.1 - Lenders' Offices, Addresses for Notices

4161624-v7\CHIDMS1

001608

LOAN AGREEMENT

THIS LOAN AGREEMENT dated as of May 23, 2018 (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "Agreement"), among (1) GALLERIA 2425 OWNER, LLC, a Delaware limited liability company, having an address at 3139 W Holcombe Blvd #845, Houston, Texas 77025 ("Borrower"), (2) the Lenders (as hereinafter defined), and (3) NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH, a banking corporation organized under the laws of Kuwait, acting through its New York branch, having an address at 299 Park Avenue, New York, New York 10171, as administrative and collateral agent for the Lenders (in such capacity, and together with its successors and assigns, "Administrative Agent").

RECITALS:

WHEREAS, Lenders have agreed to make a certain $51,675,000.00 loan to Borrower (the "Loan"); and

WHEREAS, the Loan shall be (i) governed by this Agreement, (ii) evidenced by the Note (as hereinafter defined), and (iii) secured by the Deed of Trust (as hereinafter defined).

NOW THEREFORE, in consideration of the making of the Loan by the Lenders and the covenants, agreements, representations and warranties set forth in this Agreement, the parties hereto hereby covenant, agree, represent and warrant as follows:

ARTICLE I
DEFINITIONS; PRINCIPLES OF CONSTRUCTION

Section 1.1. Definitions. For all purposes of this Agreement, except as otherwise expressly required or unless the context clearly indicates a contrary intent:

"Access Laws" shall mean, collectively, the Americans with Disabilities Act of 1990, the Fair Housing Amendments Act of 1988, all other federal, state and local laws, regulations, rules, statutes, ordinances, orders and decrees related to handicapped access, including, without limitation, the American with Disabilities Act Accessibility Guidelines for Buildings and Facilities.

"Action Notice" shall have the meaning set forth in Section 13.15 hereof.

"Actual Proceeds" shall have the meaning set forth in Section 8.3 hereof.

"Administrative Agent Loan Documents" shall have the meaning set forth in Section 13.1 hereof.

"Affiliate" shall mean, as to any specified Person, (a) any Person that directly or indirectly through one or more intermediaries Controls, is Controlled by or is under common Control with such Person, (b) any Person owning or controlling 10% or more of the outstanding voting securities of or other ownership interests in such Person, (c) any officer, director, partner, employee or member (direct or indirect and no matter how remote) of such Person, (d) if such Person is an individual, any entity for which such Person directly or indirectly acts as an officer, director, partner, owner employee or member, (e) any entity in which such Person (together with the members of his family if the Person in question is an individual) owns, directly or indirectly through one or more intermediaries an interest in any class of stock (or other beneficial interest in such entity) of 10% or more, (f) any immediate family member of such Person, (g) with respect to any Borrower or Guarantor, any other Borrower or Guarantor, or (h) with respect to any Borrower or Guarantor, any direct or indirect owner of an interest in such Borrower or Guarantor.

"Affiliated Manager" shall have the meaning set forth in Section 7.1 hereof.

"Agent Discretion Standard" shall have the meaning set forth in Section 13.15 hereof.

"Annex" shall have the meaning set forth in Section 4.23 hereof.

"Applicable Percentage" shall have the meaning set forth in Section 8.3 hereof.

"Appraised Value" shall have the meaning set forth in Section 5.29 hereof.

"Approving Lenders" shall have the meaning set forth in Section 13.3 hereof.

"Assignee" shall have the meaning set forth in Section 12.1 hereof.

"Assignment of Agreements, Licenses, Permits and Contracts" shall mean the Assignment of Agreements, Licenses, Permits and Contracts dated as of the Closing Date, made by Borrower to Administrative Agent, on behalf of Lenders, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Assignment of Interest Rate Agreement" shall mean, with respect to any Interest Rate Protection Product entered into between Borrower and a third-party, an Assignment of Interest Rate Agreement made by Borrower to Administrative Agent, on behalf of Lenders, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Assignment of Leases and Rents" shall mean the absolute assignment by Borrower to Administrative Agent of the Property Income with respect to the Property and the Project pursuant to that certain Absolute Assignment of Leases and Rents dated as of the Closing Date made by Borrower to Administrative Agent, on behalf of Lenders, encumbering the Project, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Award" shall mean any compensation paid by any Governmental Authority in connection with a Condemnation in respect of all or any part of the Project.

"Balance" shall have the meaning set forth in Section 8.3 hereof.

"Benefit Plan" shall mean any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA, Section 412 of the Internal Revenue Code or Section 302 or 303 of ERISA, that is or, within any of the preceding six (6) plan years was, sponsored, maintained or contributed to by Borrower or any of its Subsidiaries or ERISA Affiliates (or by any Person that was an ERISA Affiliate within the last six (6) years), or with respect to which Borrower or any of its Subsidiaries or ERISA Affiliates has any liability, whether actual or contingent.

"Benefit Plan Investor" shall mean any of the following: (a) an "employee benefit plan" (within the meaning of Section 3(3) of ERISA), whether or not it is subject to ERISA and including governmental and foreign plans, (b) a "plan" as defined in Section 4975 of the Internal Revenue Code of 1986, as amended, or (c) a Person whose underlying assets include "plan assets" of the foregoing by reason of investment by an employee benefit plan or plan in such Person.

"Borrower Materials" shall have the meaning set forth in Section 12.2 hereof.

"Borrower Members" shall have the meaning set forth in Section 4.1 hereof.

001610

"<u>Borrower Operating Agreement</u>" shall mean Borrower's Amended and Restated Limited Liability Company Agreement dated as of May 23, 2018, as the same may hereafter be amended in accordance with the terms and provisions hereof.

"<u>Business Day</u>" shall have the meaning set forth in the Note.

"<u>Casualty</u>" shall have the meaning set forth in <u>Section 8.3</u> hereof.

"<u>Closing Date</u>" shall mean the date hereof.

"<u>Condemnation</u>" shall mean a temporary or permanent taking by any Governmental Authority as the result, in lieu or in anticipation, of the exercise of the right of condemnation or eminent domain, of all or any part of the Project, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Project or any part thereof.

"<u>Consented Assignee</u>" shall have the meaning set forth in <u>Section 12.1</u> hereof.

"<u>Contractual Obligation</u>" shall mean as to any Person, any provision of any security issued by such Person or of any agreement, instrument or undertaking, to which such Person is a party or by which it or any of its property is bound, or any provision of the foregoing.

"<u>Control</u>" shall have the meaning set forth in <u>Section 7.1</u> hereof.

"<u>Control Account Agreement</u>" means that certain Control Account Agreement dated as of May 18, 2018 and effective as of the Closing Date, entered into by and among Borrower, Administrative Agent and Frost Bank, a Texas state bank, with respect to Borrower's deposit account, as more particularly described therein.

"<u>Coverage Advance</u>" shall have the meaning set forth in <u>Section 13.11</u> hereof.

"<u>Creditors' Rights Laws</u>" shall mean with respect to any Person any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization, conservatorship, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to its debts or debtors.

"<u>DSCR</u>" shall have the meaning set forth in <u>Section 5.28</u> hereof.

"<u>DSCR Threshold</u>" shall have the meaning set forth in <u>Section 5.28</u> hereof.

"<u>Debt</u>" shall mean the outstanding principal amount set forth in, and evidenced by, this Agreement and the Note, together with all interest accrued and unpaid thereon and all other sums due to Lenders in respect of the Loan under the Note, this Agreement, the Deed of Trust or any other Loan Document.

"<u>Debt Service</u>" shall mean, with respect to any particular period of time, scheduled interest and principal payments under the Note and/or this Agreement.

"<u>Debt Service Payments</u>" shall have the meaning set forth in <u>Section 13.12</u> hereof.

"<u>Deed of Trust</u>" shall mean that certain Deed of Trust, Assignment of Leases and Rents and Profits, Security Agreement and Fixture Filing dated as of the Closing Date made by Borrower to Salima Umatiya, as trustee, for the benefit of Administrative Agent, on behalf of Lenders, in the principal amount of $51,675,000.00, encumbering the Project, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Default" shall mean the occurrence of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would be an Event of Default.

"Defaulting Lender" shall have the meaning set forth in Section 13.16 hereof.

"Defaulting Lender's Interest" shall have the meaning set forth in Section 13.16 hereof.

"Disapproving Lenders" shall have the meaning set forth in Section 13.3 hereof.

"Dollars" or "$" shall mean lawful money of the United States of America.

"Eligible Assignee" shall have the meaning set forth in Section 12.1 hereof.

"Embargoed Person" shall have the meaning set forth in Section 4.22 hereof.

"Engineering Report" shall mean any written report resulting from the property condition assessments of the Project delivered to Administrative Agent in connection with the Loan.

"Environmental Indemnity Agreement" shall mean that certain Environmental Indemnity Agreement dated as of the Closing Date made by Borrower and Guarantor in favor of Administrative Agent, on behalf of Lenders, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Environmental Report" shall mean any written report resulting from the environmental site assessments of the Project delivered to Administrative Agent in connection with the Loan.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time and any successor statutes thereto and applicable regulations issued pursuant thereto in temporary or final form.

"ERISA Affiliate" shall mean any trade or business (whether or not incorporated) that, together with Borrower, is treated as a single employer under Section 414(b), (c), (m) or (o) of the Internal Revenue Code.

"ERISA Event" shall mean (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Benefit Plan (other than an event for which the 30 day notice period is waived); (b) a failure to satisfy the minimum funding standards of Section 412 of the Internal Revenue Code or Section 302 of ERISA, whether or not waived; (c) the filing pursuant to Section 412(c) of the Internal Revenue Code or Section 302(c) of ERISA of an application for a waiver of the minimum funding standards with respect to any Benefit Plan; (d) a failure to make any required installment under Section 430(j) of the Internal Revenue Code with respect to any Benefit Plan; (e) a failure to make any required contribution to a Multiemployer Plan when due; (f) the incurrence by Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Benefit Plan; (g) the receipt by Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Benefit Plan or Benefit Plans or to appoint a trustee to administer any Benefit Plan; (h) the incurrence by Borrower or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Benefit Plan or Multiemployer Plan; (i) the receipt by Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from Borrower or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability; (j) a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, or in endangered or critical status within the meaning of Section 432 of the Internal Revenue Code or Title IV of ERISA; (k) a determination that any Benefit Plan is in "at risk" status (as defined in Section 430 of the Internal Revenue Code or Section 303 of ERISA); or (l) the imposition of a

Lien under the Internal Revenue Code or ERISA on the assets of Borrower, any Subsidiary or any ERISA Affiliate, or Borrower or any Subsidiary or ERISA Affiliate has been notified in writing that such a Lien will be imposed on the assets of Borrower, Subsidiary or ERISA Affiliate.

"Event of Default" shall have the meaning set forth in Section 10.1 hereof.

"Excess Funds" shall have the meaning set forth in Section 8.3 hereof.

"Existing Leases" means (i) the Key Tenant Lease, (ii) the Jetall Lease, (iii) the Regus Lease, (iv) Official Lease Agreement, dated October 3, 2012, by and between G3 Visas & Passports, Inc., as tenant, and Borrower, as successor-in-interest to Seller, as landlord, as amended by First Amendment to Lease Agreement, (v) Lease Agreement, dated November 1, 2014, by and between PEM Offshore, Inc., a Texas corporation, as tenant, and Borrower, as successor-in-interest to Seller, as landlord, as amended by First Amendment to Lease Agreement, (vi) Lease Agreement, dated November 1, 2014, by and between PrimeLending, a PlainsCapital Company, a Texas Corporation, as tenant, and Borrower, as successor-in-interest to Seller, as landlord, as amended by First Amendment to Lease Agreement, (vii) Lease Agreement, dated December 2016, by and between SIBS International, Inc. a Texas corporation, as tenant, and Borrower, as successor-in-interest to Seller, as landlord, (viii) Lease Agreement, dated November 1, 2014, by and between Uptown Cosmetic and Implant Dentistry/Dr. Robert Velasco, DDS, as tenant, and Borrower, as successor-in-interest to Seller, as landlord, (ix) Lease Agreement, dated December 1, 2015, by and between Vasso's Bar and Grill, as tenant, and Borrower, as successor-in-interest to Seller, as landlord, and (x) Lease Agreement, dated January 1, 2015, by and between Wallis State Bank, as tenant, and Borrower, as successor-in-interest to Seller, as landlord; as each has been and may hereafter be amended, extended, restated and assigned in accordance with the terms and provisions of this Agreement.

"FATCA" shall mean (i) Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to the foregoing and (ii) any similar law adopted by any non-U.S. Governmental Authority pursuant to an intergovernmental agreement between such non-U.S. jurisdiction and the United States.

"Federal Funds Rate" shall mean, for any day, the rate per annum (rounded upwards, if necessary, to the nearest 1/100 of 1%) equal to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers on such day, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate charged to NBK on such day on such transactions as determined by Administrative Agent.

"Fee Letter" shall mean that certain Fee Letter dated as of the Closing Date between Borrower and NBK.

"Financial Statements" shall have the meaning set forth in Section 5.11 hereof.

"Governmental Authority" shall mean any court, board, agency, department, commission, office or other authority of any nature whatsoever for any governmental unit (federal, state, county, municipal, city, town, special district or otherwise) whether now or hereafter in existence.

"Guarantor" shall mean Bradley Parker, an individual.

4161624-v7\CHIDMS1

001613

"Guaranty" shall mean that certain Guaranty, dated as of the Closing Date, made by Guarantor for the benefit of Administrative Agent, on behalf of Lenders, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Indemnified Liabilities" shall have the meaning set forth in Section 14.1 hereof.

"Indemnified Parties" shall mean (a) Lenders, (b) Administrative Agent, (c) any prior owner or holder of the Loan or Participations in the Loan, (d) any servicer or prior servicer of the Loan, (e) any Participant or Assignee or any prior Participant or Assignee of the Loan, (f) any trustees, custodians or other fiduciaries who hold or who have held a full or partial interest in the Loan for the benefit of any Participant or Assignee or other third party, (g) any receiver or other fiduciary appointed in a foreclosure or other Creditors' Rights Laws proceeding, (h) any officers, directors, shareholders, partners, member, employees, agents, servants, representatives, contractors, subcontractors, affiliates or subsidiaries of any and all of the foregoing, and (i) the heirs, legal representatives, successors and assigns of any and all of the foregoing (including, without limitation, any successors by merger, consolidation or acquisition of all or a substantial portion of the Indemnified Parties' assets and business), in all cases whether during the term of the Loan or as part of or following a foreclosure of the Deed of Trust.

"Inspector" shall have the meaning set forth in Section 8.3 hereof.

"Insurance Certificates" shall have the meaning set forth in Section 8.1(b) hereof.

"Insurance Premiums" shall have the meaning set forth in Section 8.1(b) hereof.

"Insurance Proceeds" shall have the meaning set forth in Section 8.3 hereof.

"Intercreditor Agreement" shall mean that certain Intercreditor Agreement, dated as of the Closing Date, by and between Administrative Agent, Lenders and Mezzanine Lender.

"Interest Rate" shall have the meaning set forth in the Note.

"Interest Rate Protection Products" shall mean any interest rate hedging agreement(s) relating to the Loan entered into by Borrower, any Lender or any Affiliate of any Lender, including, without limitation, any Transaction (as defined in any ISDA Master Agreement), and any interest rate swap, basis swap, forward rate transaction, commodity swap, commodity option, equity or index swap or option bond, note or bill option, interest rate option, forward foreign exchange transaction, cap, collar, or floor transaction, currency swap, cross currency swap, swap option, currency option, or any similar transaction, including, without limitation, under any ISDA Master Agreement, entered into by Borrower, any Lender or any affiliate of Lenders.

"Interest Reserve Account" shall have the meaning set forth in Section 3.18 hereof.

"Internal Revenue Code" shall mean the Internal Revenue Code of 1986, as amended, as it may be further amended from time to time, and any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"Involuntary Rate" shall have the meaning set forth in the Note.

"ISDA Master Agreement" shall mean any Master Agreement published by the International SWAP Dealers Association, Inc. or commonly used by swap dealers, as the same may be amended by any Lender or any Affiliate of such Lender.

"Jetall Lease" shall mean that certain Lease Agreement dated April 1, 2016 by and between Jetall Companies, Inc., as tenant, and Borrower, as successor-in-interest to Seller, as landlord.

6

001614

"Judgment Amount" shall have the meaning set forth in Section 13.15 hereof.

"Key Principal" shall mean, collectively, Azeemeh Zaheer, an individual, and NCRE.

"Key Tenant" shall mean Specialty Retailers, Inc., a Texas corporation.

"Key Tenant Lease" shall mean that certain Office Lease Agreement, dated as of May 27, 2015, by and between Key Tenant and Borrower, as successor-in-interest to Seller, as landlord.

"Lease" shall mean the Existing Leases and any lease entered into by Borrower, as landlord, for all or any portion of the Project.

"Legal Requirements" shall mean all statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities affecting Borrower or the Project or any part thereof, or the construction, use, alteration or operation thereof, whether now or hereafter enacted and in force, and all permits, licenses, authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting Borrower or the Project or any part thereof, including, without limitation, any which may (a) require repairs, modifications or alterations in or to the Project or any part thereof, or (b) in any way limit the use and enjoyment thereof.

"Lender Interest Rate" shall have the meaning set forth in Section 13.11 hereof.

"Lender(s)" shall mean, individually and collectively, any financial institution that either (a) is listed on the signature pages hereof as a "Lender" or (b) from time to time becomes a party hereto pursuant to the terms and provisions of this Agreement, in each case together with its successors.

"Lien" shall mean any mortgage, deed of trust, lien, pledge, hypothecation, assignment, security interest, or any other encumbrance, charge or transfer of, on or affecting Borrower, the Project, any portion thereof or any interest therein, including, without limitation, any conditional sale or the title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanics', materialmens' and other similar liens and encumbrances.

"Loan" shall have the meaning set forth in the Recitals.

"Loan Documents" shall mean, collectively, this Agreement, the Note, the Deed of Trust, the Assignment of Leases and Rents, the Guaranty, the Environmental Indemnity Agreement, the Assignment of Agreements, Licenses, Permits and Contracts, the Subordination of Management Agreement, the Fee Letter, the Intercreditor Agreement, the Control Account Agreement, any Assignment of Interest Rate Agreement entered into after the Closing Date and any and all other documents, agreements and certificates executed and/or delivered in connection with the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time. Loan Documents shall also include any Interest Rate Protection Product or ISDA Master Agreement.

"Losses" shall mean any and all claims, suits, liabilities (including, without limitation, strict liabilities), actions, proceedings, obligations, debts, damages, losses, costs, expenses, fines, penalties, charges, fees, judgments, awards, amounts paid in settlement of whatever kind or nature (including, but not limited to, legal fees and other costs of defense).

"LTVR" shall have the meaning set forth in Section 5.29 hereof.

"LTVR Threshold" shall have the meaning set forth in Section 5.29 hereof.

7

001615

"<u>Management Agreement</u>" shall mean, with respect to the Project, that certain Property Management Agreement dated on or about the Closing Date by and between Borrower and Manager, pursuant to which such Manager is to provide management, leasing and other services with respect to the Project, as the same may be amended, restated, replaced, supplemented or otherwise modified in accordance with the terms of this Agreement.

"<u>Manager</u>" shall mean (a) Boxer Property Management Corporation, a Texas corporation, (b) a Qualified Manager, or (c) any other management organization prior to whose employment as manager of the Project, such employment shall have been approved by Administrative Agent, which approval shall not be unreasonably delayed, conditioned or denied.

"<u>Material Lease</u>" shall mean (i) the Key Tenant Lease, (ii) the Regus Lease, (iii) the Jetall Lease, and (iv) any Lease which (A) individually or in the aggregate (with respect to such Tenant and its Affiliates) cover more than 20,000 square feet of the Improvements, (B) provide the Tenant under such Lease with an option or other preferential right to purchase all or any portion of the Project, or (C) the Tenant under such Lease is an Affiliate of the Borrower.

"<u>Maturity Date</u>" shall have the meaning set forth in the Note.

"<u>Maximum Rate</u>" shall have the meaning set forth in the Note.

"<u>Mezzanine Borrower</u>" shall mean the Sole Member.

"<u>Mezzanine Lender</u>" shall mean Naissance Galleria, LLC, a Cayman Islands limited liability company.

"<u>Mezzanine Loan</u>" shall mean the $16,100,000 loan made by Mezzanine Lender to Mezzanine Borrower, secured by the Mezzanine Pledge Agreement.

"<u>Mezzanine Loan Agreement</u>" shall mean that certain Mezzanine Loan Agreement, dated as of the Closing Date, by and between Mezzanine Lender and Mezzanine Borrower.

"<u>Mezzanine Loan Documents</u>" shall have the meaning given to the term "Loan Documents" in the Mezzanine Loan Agreement.

"<u>Mezzanine Pledge Agreement</u>" shall mean that certain Pledge and Security Agreement, dated as of the Closing Date, by and between Mezzanine Borrower and Mezzanine Lender.

"<u>Multiemployer Plan</u>" shall mean a multiemployer plan as defined in Section 3(37) of ERISA as to which Borrower or any ERISA Affiliate contributes or, within the last six (6) years, contributed or had any obligation to contribute or otherwise has any obligation or liability, whether actual or contingent.

"<u>NCRE</u>" shall mean Naissance Capital Real Estate, LLC, a Delaware limited liability company.

"<u>NBK</u>" shall mean National Bank of Kuwait, S.A.K.P., New York Branch.

"<u>Net Operating Income</u>" shall mean the difference between:

(a)     the sum of (i) actual rent collections for the period in question from Tenants and other Persons paying rent to Borrower *plus* (ii) any miscellaneous income actually received by Borrower from the Project. Net Operating Income shall not include any amounts paid by a Tenant under any Lease, including without limitation, the Existing Leases, for reimbursement of operating costs and expenses (including Taxes); <u>and</u>

8

(b)      actual operating expenses for the period in question (not including non-recurring expenses such as leasing commissions, tenant improvement costs, bonuses paid to managers for turning over space at the Project, and other renovation expenses), other than: (i) Debt Service due under the Note and (ii) all operating costs and expenses (including Taxes) payable by a Tenant under any Lease, including, without limitation, the Existing Leases. Any refunds or rebates to operating expenses are to be applied and credited against the applicable operating expenses for the period that such operating expenses were incurred.

"Note" shall mean that certain Promissory Note dated as of the Closing Date in the original principal amount of the Loan made by Borrower to Administrative Agent, on behalf of Lenders, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"OECD" shall mean the Organization for Economic Cooperation and Development.

"OFAC" shall mean the Office of Foreign Assets Control, Department of the Treasury.

"Organizational Documents" shall mean, as to any Person, the certificate of incorporation and by-laws with respect to a corporation; the articles of organization (or the equivalent of such items under applicable state law) and operating agreement with respect to a limited liability company; the certificate of limited partnership and partnership agreement with respect to a limited partnership, or any other organizational or governing documents of such Person.

"Other Charges" shall mean all ground rents, maintenance charges, impositions other than Taxes, and any other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Project, now or hereafter levied or assessed or imposed against the Project or any part thereof.

"Participant" shall have the meaning set forth in Section 12.1 hereof.

"Participations" shall have the meaning set forth in Section 12.1 hereof.

"Patriot Act" shall have the meaning set forth in Section 4.23 hereof.

"Permitted Encumbrances" shall mean, with respect to the Project, collectively, (a) Liens, if any, for Taxes imposed by any Governmental Authority not yet due and payable or delinquent, (b) Liens for Taxes being contested in accordance with Section 5.4(d), (c) Liens, if any, for mechanics, materialmen or laborers which are fully bonded over in accordance with Section 5.4(c), (d) Liens set forth on Schedule B of the Title Policy, and (e) such other encumbrances as Administrative Agent has approved or may approve in writing in Administrative Agent's sole and absolute discretion.

"Permitted Transfers" shall mean the following:

(a)      a Lease entered into in accordance with the terms and conditions of the Loan Documents;

(b)      provided that no Event of Default shall then exist and be continuing, any transfer, Sale or Pledge of an interest in Borrower or any Restricted Party to any Person provided that:

(i)      such transfer shall not (x) cause the transferee (other than Key Principal), together with its Affiliates, to acquire Control of Borrower or Sole Member or to acquire or increase its direct or indirect interest in Borrower or in Sole Member to an amount which equals or exceeds forty-nine percent (49%) of the equity interests in Borrower or Sole Member, or (y) result in Borrower or Sole Member no longer being Controlled by Key Principal;

9

001617

 (ii) after giving effect to such Transfer, Key Principal(s) shall continue to Control the day to day operations of Borrower and continue to own at least 51% of all equity interests (direct or indirect) in Borrower; and

 (iii) Borrower shall continue to be a single purpose entity in accordance with Section 6.1 and Sole Member shall continue to be the sole managing member of Borrower;

(c) provided that no Event of Default shall then exist and be continuing, a transfer for estate planning purposes of any Key Principal's direct or indirect interests in Borrower to the spouse, child, parent, grandparent, grandchild, niece, nephew, aunt or uncle of such Key Principal, or to a trust for the benefit of such Key Principal or for the benefit of the spouse, child, parent, grandparent, grandchild, niece, nephew, aunt or uncle of such Key Principal so long as immediately following such transfer, Key Principals continue to Control the day to day operations of Borrower.

"Person" shall mean any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any other entity, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"Pre-Approved Accounting Firm" shall mean Pannell Kerr Forster of Texas, P.C.

"Plans" shall have the meaning set forth in Section 8.3 hereof.

"Platform" shall have the meaning set forth in Section 12.2 hereof.

"Policies" shall have the meaning set forth in Section 8.1(b) hereof.

"Policy" shall have the meaning set forth in Section 8.1(b) hereof.

"Prepayment Premium" shall have the meaning set forth in the Note.

"Prohibited Transfer" shall have the meaning set forth in Section 7.2(a) hereof.

"Project" shall mean the Property and that certain 281,590 rentable square foot office building located at the Property, and all other buildings and structures thereon, and all easements, rights, privileges and appurtenances (including, without limitation, any air or development rights, if any) thereunto belonging or in any way appurtenant, and all of the estate, right, title, interest, claim or demand whatsoever of Borrower therein, and all estates, rights, titles, interests, privileges, tenements, hereditaments, and appurtenances of any nature whatsoever, in any way belonging, relating or pertaining to the Property, either in law or in equity, in possession or expectancy, now or hereafter acquired.

"Property" shall mean that certain parcel of land located at 2425 West Loop South, City of Houston, County of Harris, State of Texas.

"Property Income" shall mean all rents, income, issues, profits, security deposits and other benefits to which Borrower may now or hereafter be entitled from the Project.

"Provided Information" shall have the meaning set forth in Section 12.1 hereof.

"Pro Rata Share" shall have the meaning set forth in Section 13.12 hereof.

"<u>PSA</u>" shall mean the Contract of Sale dated as of April 16, 2018 by and between Sole Member and Seller, as assigned by Sole Member to Borrower pursuant to that certain Assignment and Assumption of Contract dated as of the Closing Date.

"<u>Purchase Price</u>" shall have the meaning set forth in <u>Section 13.3</u> hereof.

"<u>Qualified Manager</u>" shall mean a property manager which (i) is a reputable and experienced professional management company having at least five (5) years' experience in the management of commercial properties with similar uses as the Project and in the jurisdiction in which the Project is located, (ii) has, for at least three (3) years prior to its proposed engagement as "Manager", managed at least five (5) properties of the same property type, quality and size as the Project, and (iii) is not the subject of a bankruptcy or similar insolvency proceeding. For the avoidance of doubt, an Affiliate of the Manager initially named in this Agreement shall be deemed to be a "Qualified Manager" for purposes of this Agreement.

"<u>Regus Lease</u>" shall mean the Lease Agreement dated February 29, 1995, as amended by Amendment No. 1 to Lease Agreement dated July 28, 1997, Amendment No. 2 to Lease Agreement dated February 26, 2001, Amendment No. 3 to Lease Agreement effective as of January 1, 2005, Amendment No. 4 to Lease Agreement effective as of October 3, 2011, Amendment No. 5 to Lease Agreement effective as of October 3, 2011, Amendment No. 6 to Lease Agreement effective as of September 11, 2012 and Amendment No. 7 to Lease Agreement effective as of November 15, 2012, by and between RGN-Houston XXXIX, as successor-in-interest to Abby Executive Suites, West Loop, Inc. and Abby Office Centers, Uptown, Ltd., as tenant, and Borrower, as successor-in-interest to Seller, as landlord.

"<u>Required Lenders</u>" shall have the meaning set forth in <u>Section 13.2</u> hereof.

"<u>Restoration Account</u>" shall have the meaning set forth in <u>Section 8.3</u> hereof.

"<u>Restoration Work</u>" shall have the meaning set forth in <u>Section 8.3</u> hereof.

"<u>Restricted Party</u>" shall have the meaning set forth in <u>Section 7.1</u> hereof.

"<u>Sale or Pledge</u>" shall have the meaning set forth in <u>Section 7.1</u> hereof.

"<u>Seller</u>" shall mean 2425 West Loop, LP, a Texas limited partnership.

"<u>Servicer</u>" shall have the meaning set forth in <u>Section 12.1</u> hereof.

"<u>Servicing Fee</u>" shall have the meaning set forth in <u>Section 13.17</u> hereof.

"<u>SNDA</u>" shall mean a Subordination, Non-Disturbance and Attornment Agreement.

"<u>Sole Member</u>" shall mean Galleria 2425 JV, LLC, a Delaware limited liability company, the sole member of Borrower.

"<u>State</u>" shall mean, with respect to the Project, the state in which the Project or any part thereof is located, and with respect to Borrower, the state of Borrower's organization.

"<u>Subordination of Management Agreement</u>" shall mean, during such time as a Management Agreement may be in place, that certain Assignment and Subordination of Management Agreement among Administrative Agent, Borrower and Manager, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"Subsidiary" shall mean any corporation, partnership, limited liability company or other entity in which a Person holds an equity interest which is more than twenty percent (20%) of the equity classes issued by such entity.

"Syndication" shall have the meaning set forth in Section 12.1 hereof.

"Taxes" shall mean all real estate and personal property taxes, assessments, water rates or sewer rents, now or hereafter levied, assessed, or imposed against the Project (or any part thereof).

"Telecom Leases" shall mean leases with telecommunications providers or their affiliates or agents for the installation and maintenance of communication equipment, including, without limitation, antennas, at the Property.

"Tenant" shall mean any Person leasing, subleasing or otherwise occupying any portion of the Project under a Lease or other occupancy agreement with Borrower or any predecessor-in-interest to Borrower.

"Term" shall have the meaning set forth in the Note.

"Title Company" shall have the meaning set forth in Section 3.2 hereof.

"Title Policy" shall have the meaning set forth in Section 3.2 hereof.

"UCC" or "Uniform Commercial Code" shall mean the Uniform Commercial Code as in effect in the State.

"West Loop" shall mean Galleria West Loop Investments II, LLC, a Texas limited liability company.

"Withdrawal Liability" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

Section 1.2. Interpretation. Unless the context of this Agreement otherwise clearly requires, the following rules of construction shall apply to this Agreement and each of the Loan Documents:

(a) Number; Inclusion. To the extent the context so requires, references to the plural include the singular, references to the singular include the plural, and references to the part include the whole; "or" has the inclusive meaning represented by the phrase "and/or"; and "including" has the meaning represented by the phrase "including, without limitation,";

(b) Determination. References to "determination" of or by Administrative Agent or Lenders shall be deemed to include good-faith estimates by Administrative Agent or Lenders (in the case of quantitative determinations), and good-faith beliefs by Administrative Agent or Lenders (in the case of qualitative determinations), and such determination shall be conclusive absent manifest error;

(c) Construction. This Agreement and all other Loan Documents shall be construed without regard to any presumption or other rule requiring construction against the party causing this Agreement and all such other Loan Documents to be drafted. If any words or phrases in this Agreement or any other Loan Document shall have been stricken out or otherwise eliminated, whether or not any other words or phrases have been added, this Agreement and all other Loan Documents shall be construed as if the words or phrase so stricken out or otherwise eliminated were never included herein or therein and no implication or inference shall be drawn from the fact that said words or phrases were so stricken out or otherwise eliminated;

12

(d)     Agent's or Lenders Discretion and Consent. Whenever Administrative Agent or Lenders are granted the right herein or in any Loan Document to make any decision or determination, to exercise any right, remedy or power or otherwise to act in its or their sole discretion or to grant or withhold consent, such right shall be exercised in good faith utilizing generally accepted commercial practices for transactions similar to the transaction that is the subject matter of this Agreement or such Loan Document (as the case may be);

(e)     Documents Taken as a Whole. The words "hereof," "herein," "hereunder," "hereto" and similar terms in this Agreement or in any Loan Document refer to this Agreement or such Loan Document as a whole and not to any particular provision of this Agreement or such Loan Document;

(f)     Headings. The section and other headings contained in this Agreement or any Loan Document and the table of contents (if any) preceding this Agreement or any Loan Document are for reference purposes only and shall not control or affect the construction of this Agreement or such Loan Document or the interpretation thereof in any respect;

(g)     Implied References to this Agreement. Article, section, subsection, clause, schedule and exhibit references are to this Agreement unless otherwise specified;

(h)     Persons. Reference to any Person includes such Person's successors and assigns but, if applicable, only if such successors and assigns are permitted by this Agreement or by such Loan Document, as the case may be, and reference to a Person in a particular capacity excludes such Person in any other capacity;

(i)     Modifications to Documents. Reference to any agreement (including this Agreement and any Loan Document, together with the schedules and exhibits hereto or thereto), document or instrument means such agreement, document or instrument as amended, modified, replaced, substituted for, superseded or restated at the relevant time;

(j)     From, To and Through. Relative to the determination of any period of time, "from" means "from and including," "to" means "to but excluding," and "through" means "through and including"; and

(k)     Shall; Will. References to "shall" and "will" are intended to have the same meaning.

ARTICLE II
GENERAL TERMS

Section 2.1. Loan Commitment; Extension.

(a)     Subject to the terms, provisions, covenants and conditions of this Agreement, Lenders shall make the Loan to Borrower in an amount equal to FIFTY ONE MILLION SIX HUNDRED SEVENTY FIVE THOUSAND AND NO/100THS DOLLARS ($51,675,000.00).

(b)     The Loan shall be secured by the Deed of Trust, the Assignment of Leases and Rents, and the other Loan Documents.

(c)     Borrower shall use the proceeds of the Loan to (i) partially finance Borrower's acquisition of the Project, (ii) make a deposit into the Interest Reserve Account, and (iii) pay costs and expenses incurred in connection with the closing of the Loan, as approved by Administrative Agent.

Section 2.2. Interest Rate and Loan Payments.

13

001621

(a)      The Loan shall bear interest at the per annum rates set forth in the Note.

(b)      Borrower hereby agrees to make principal and interest payments as set forth in the Note.

(c)      All payments to be made by Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by Borrower hereunder and under the other Loan Documents shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's office in Dollars and in immediately available funds not later than 2:00 p.m. EST on the date specified herein. All payments received by the Administrative Agent after 2:00 p.m. EST shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue. If any payment to be made by Borrower shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

Section 2.3. <u>Usury Savings</u>. This Agreement and the Note are subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the principal balance of the Loan at a rate which could subject Lenders to either civil or criminal liability as a result of being in excess of the Maximum Rate. If, by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Rate, the Interest Rate or the Involuntary Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Rate and all previous payments in excess of the Maximum Rate shall be deemed to have been payments in reduction of principal, without premium, and not on account of the interest due hereunder. All sums paid or agreed to be paid to Lenders for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Rate of interest from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

<div align="center">

ARTICLE III
CONDITIONS PRECEDENT

</div>

The obligation of Lenders to enter into this Agreement and make the Loan hereunder is subject to the fulfillment by Borrower and Guarantor or waiver by Administrative Agent of the following conditions precedent no later than the Closing Date.

Section 3.1. <u>Representations and Warranties; Compliance with Conditions</u>. The representations and warranties of Borrower and Guarantor contained in this Agreement and the other Loan Documents shall be true and correct in all material respects on and as of the Closing Date with the same effect as if made on and as of such date, and Administrative Agent shall have determined that no Default or an Event of Default shall have occurred and be continuing nor shall any Default or Event of Default occur immediately following the Closing Date and Borrower and Guarantor shall be in compliance in all material respects with all terms and conditions set forth in this Agreement and in each other Loan Document on its part to be observed or performed.

Section 3.2. <u>Delivery of Loan Documents; Title Policy; Due Diligence Items</u>.

(a)      <u>Deed of Trust, Loan Agreement, Note and Guaranty</u>. Administrative Agent shall have received (i) from Borrower fully executed and acknowledged counterparts of the Deed of Trust and Assignment of Leases and Rents, and evidence that the Uniform Commercial Code financing statement has been delivered to the Title Company for recording and/or filing, in the judgment of Administrative

<div align="center">14</div>

Agent, so as to effectively create upon such recording and/or filing valid and enforceable Liens upon the Project, of first priority, in favor of Lenders, and (ii) from Borrower and Guarantor, as applicable, fully executed counterparts of this Agreement, the Note, the Guaranty and all of the other Loan Documents.

(b)     Policy; Title Policy. Administrative Agent shall have received a paid title insurance policy (the "Title Policy"), in the amount of the Deed of Trust, issued by a title company(ies) (the "Title Company") acceptable to Administrative Agent and dated as of the Closing Date. Such Title Policy shall (A) provide coverage for the full amount of the Loan, (B) insure Lenders that the Deed of Trust insured by such Title Policy creates a valid, perfected lien on the Project of first priority and that Borrower is the sole owner of a valid fee estate in and to the Project, free and clear of all exceptions from coverage other than the standard exceptions and exclusions from coverage, (C) provide full coverage against mechanics' liens (filed and inchoate), (D) contain such endorsements and affirmative coverages as Administrative Agent may reasonably request, and (E) name Administrative Agent as the insured. The Title Policy shall be assignable. Administrative Agent also shall have received evidence that all premiums in respect of such Title Policy have been paid.

(c)     Survey. Administrative Agent shall have received a current title survey for the Property, certified to the Title Company and Lenders and their successors and assigns, in form and content satisfactory to Administrative Agent and prepared by a professional and properly licensed land surveyor satisfactory to Administrative Agent. Such survey shall reflect the same legal description contained in the Title Policy referred to in Section 3.2(b) hereof and shall include, among other things, a metes and bounds description of the real property comprising part of the Project satisfactory to Administrative Agent. The surveyor's seal shall be affixed to the survey and the surveyor shall provide a certification for the survey in form and substance acceptable to Administrative Agent.

(d)     Insurance. Administrative Agent shall have received copies of the certificates of insurance for the Policies required hereunder, together with such Acord forms as Administrative Agent shall require, satisfactory to Administrative Agent in Administrative Agent's sole and absolute discretion, and, evidence of the payment of all Insurance Premiums payable for the existing policy period.

(e)     Encumbrances. Borrower shall have taken or caused to be taken such actions in such a manner so that Lenders have a valid and perfected first Lien as of the Closing Date on the Project and Administrative Agent shall have received satisfactory evidence thereof, subject to Permitted Encumbrances.

(f)     Lien Searches. Borrower shall have delivered to Administrative Agent certified search results pertaining to Borrower, Guarantor and such other Persons as reasonably required by Administrative Agent for state and federal tax liens, bankruptcy, judgment, litigation and state and local UCC filings.

(g)     Environmental Report. Administrative Agent shall have received an Environmental Report in respect of the Project, which report shall be satisfactory to Administrative Agent in all respects.

(h)     Engineering Report. Administrative Agent shall have received an Engineering Report in respect of the Project, which report shall be satisfactory to Administrative Agent in all respects (including, without limitation, indicating that there exists no material deferred maintenance at the Project).

(i)     Appraisal. Administrative Agent shall have received an appraisal for the Project, which appraisal shall be prepared by an MAI appraiser and satisfactory in form and substance to Administrative Agent (including, without limitation, providing for a loan-to-value ratio of not greater than

15

fifty-three and seven-tenths percent (53.7%), based on (i) the "as-is" value of the Project and (ii) the original principal balance of the Loan).

        (j)     [Intentionally Omitted]

        Section 3.3. <u>Related Documents</u>. Each additional document not specifically referenced herein, but relating to the transactions contemplated herein, shall have been duly authorized, executed and delivered by all parties thereto and at Administrative Agent's written request, Administrative Agent shall have received and approved certified copies thereof.

        Section 3.4. <u>Organizational Documents</u>. Administrative Agent shall have received (a) certified copies of all Organizational Documents related to Borrower and Guarantor, as applicable, which must be acceptable to Administrative Agent, in Administrative Agent's sole and absolute discretion, and (b) such other evidence of the formation, structure, existence and/or good standing of Borrower and Guarantor and such other Persons as Administrative Agent may request, in Administrative Agent's sole and absolute discretion, including, without limitation, good standing or existence certificates, resolutions authorizing the entering into of the Loan and the granting of the Deed of Trust and incumbency certificates as may be requested by Administrative Agent.

        Section 3.5. <u>Opinions of Counsel</u>. Administrative Agent shall have received opinions of counsel with respect to (i) formation, existence and good standing of Borrower and Guarantor, as applicable, (ii) due execution, authority, enforceability of the Loan Documents, and (iii) such other matters as Administrative Agent may reasonably require. All such opinions shall be in form, scope and substance reasonably satisfactory to Administrative Agent and Lenders' counsel in their sole and absolute discretion.

        Section 3.6. <u>Taxes and Other Charges</u>. Borrower shall have paid all Taxes and Other Charges (including any in arrears) relating to the Project.

        Section 3.7. <u>Completion of Proceedings</u>. All corporate and other proceedings taken or to be taken in connection with the transactions contemplated by this Agreement and other Loan Documents and all documents incidental thereto shall be satisfactory in form and substance to Administrative Agent, and Administrative Agent shall have received all such counterpart original or certified copies of such documents as Administrative Agent may reasonably request.

        Section 3.8. <u>Payments</u>. All payments, deposits or escrows required to be made or established by Borrower under this Agreement, the Note and the other Loan Documents on or before the Closing Date shall have been paid.

        Section 3.9. <u>Transaction Costs</u>. Except as otherwise expressly provided herein, Borrower shall have paid or reimbursed Administrative Agent and Lenders for all reasonable third party out of pocket expenses actually incurred in connection with the underwriting, negotiation, and closing of the Loan, including, without limitation, title insurance premiums and other title company charges; registration, filing and similar fees, taxes and charges; transfer, deed, stamp, mortgage recording or documentary taxes or similar fees or charges; actual costs of third-party reports, including, without limitation, environmental studies, credit reports, appraisals, surveys, underwriting and origination expenses; and all reasonable legal fees and expenses charged by counsel to Lenders and Administrative Agent.

        Section 3.10. <u>No Material Adverse Change</u>. There shall have been no material adverse change in the financial condition or business condition of the Project, Borrower or any other Person contributing to the operating income and operations of the Project since the date of the most recent financial statements and/or other information delivered to Administrative Agent. The income and expenses of the Project, the occupancy and leases thereof, and all other features of the transaction shall be as represented to Lenders

and Administrative Agent without material adverse change. Neither Borrower nor Guarantor shall be the subject of any bankruptcy, reorganization, or insolvency proceeding.

Section 3.11. <u>Leases</u>. Administrative Agent shall have received copies of all Leases affecting the Project, which shall be satisfactory in form and substance to Administrative Agent.

Section 3.12. <u>Tenant Estoppel Certificate</u>. Administrative Agent shall have received, or shall receive within fifteen (15) Business Days of the Closing Date, a tenant estoppel certificate from each Tenant under a Material Lease, addressed to Administrative Agent, in form and substance satisfactory to Administrative Agent in all respects. Failure by Borrower to deliver such tenant estoppel certificates within such time period shall constitute an Event of Default.

Section 3.13. <u>SNDA</u>. Administrative Agent shall have received, or shall receive within fifteen (15) days of the Closing Date, an SNDA executed by Key Tenant with respect to the Key Tenant Lease, in form and substance satisfactory to Administrative Agent in all respects. Failure by Borrower to deliver such SNDA within such time period shall constitute an Event of Default.

Section 3.14. <u>Tax Lot</u>. Administrative Agent shall have received evidence that the Property constitutes one or more separate tax lots, which evidence shall be satisfactory to Administrative Agent in all respects.

Section 3.15. <u>Borrower's and Guarantor's Financials</u>. Administrative Agent shall have received copies of Borrower's and Guarantor's most recent financial statements.

Section 3.16. <u>Acquisition of Property</u>. Administrative Agent shall have received evidence of the purchase price for the Project to be paid by Borrower and evidence that Borrower invested, upon acquisition of the Project, the required equity.

Section 3.17. <u>Further Documents</u>. Administrative Agent or Administrative Agent's counsel shall have received such other and further approvals, opinions, documents and information as Administrative Agent or Administrative Agent's counsel may have requested in form and substance satisfactory to Administrative Agent and Administrative Agent's counsel.

Section 3.18. <u>Interest Reserve Deposit</u>. Borrower shall have established a deposit account in the name of Borrower with Administrative Agent (the "<u>Interest Reserve Account</u>"), into which Borrower shall have deposited an amount equal to $2,500,000.

ARTICLE IV
REPRESENTATIONS AND WARRANTIES

Borrower represents and warrants to Lenders and Administrative Agent as of the Closing Date that:

Section 4.1. <u>Organization</u>. Borrower (a) has been duly organized and is validly existing and in good standing with requisite power and authority to own its properties and to transact the businesses in which it is now engaged, (b) is duly qualified to do business and is in good standing in each jurisdiction where it is required to be so qualified in connection with its properties, businesses and operations, (c) possesses all rights, licenses, permits and authorizations, governmental or otherwise, necessary to entitle it to own its properties and to transact the businesses in which it is now engaged, and the sole business of Borrower is the ownership and management of the Project, and (d) has full power, authority and legal right to mortgage the Project pursuant to the terms of the Loan Documents and has full power, authority and legal right to keep and observe all of the terms of the Loan Documents to which it is a party. Borrower represents and warrants that the chart attached hereto as <u>Exhibit A</u> sets forth an accurate listing

17

of the direct and indirect owners of all of the equity interests in Borrower (the "Borrower Members"). For the avoidance of doubt, "Borrower Members" shall include Sole Member, NCRE and West Loop.

Section 4.2. Status of Borrower. Borrower's exact legal name is correctly set forth on the first page of this Agreement, on the Deed of Trust, and on any UCC-1 Financing Statements filed in connection with the Loan. Borrower is an organization of the type specified on the first page of this Agreement. Borrower is organized under the laws of the State of Delaware and authorized to do business under the laws of the State of Texas. Borrower's principal place of business and chief executive office, and the place where Borrower keeps its books and records, including recorded data of any kind or nature, regardless of the medium of recording, including software, writings, plans, specifications and schematics, has been for the preceding four (4) months (or, if less, the entire period of the existence of Borrower) the address of Borrower set forth on the first page of this Agreement. Borrower may designate a change of principal place of business and chief executive office by written notice to Administrative Agent by certified mail, return receipt requested, postage prepaid, at least thirty (30) days before such change of principal place of business and chief executive office is to become effective.

Section 4.3. Validity of Documents. Borrower has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents. This Agreement and the other Loan Documents have been duly executed and delivered by or on behalf of Borrower and Guarantor, as applicable, and constitute the legal, valid and binding obligations of Borrower and Guarantor, as applicable, enforceable against Borrower and Guarantor, as applicable, in accordance with their respective terms, subject only to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

Section 4.4. No Conflicts. The execution, delivery and performance of this Agreement and the other Loan Documents by Borrower and Guarantor, as applicable, will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any lien, charge or encumbrance (other than pursuant to the Loan Documents) upon any of the property or assets of Borrower and Guarantor, as applicable, pursuant to the terms of any agreement or instrument to which Borrower and Guarantor is a party or by which any of Borrower's or Guarantor's property or assets is subject, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any Governmental Authority having jurisdiction over Borrower or Guarantor or any of Borrower's or Guarantor's properties or assets, and any consent, approval, authorization, order, registration or qualification of or with any Governmental Authority required for the execution, delivery and performance by Borrower and Guarantor, as applicable, of this Agreement or any of the other Loan Documents has been obtained and is in full force and effect.

Section 4.5. Litigation. To the best of Borrower's knowledge, there are no actions, suits or proceedings at law or in equity by or before any Governmental Authority or other agency now pending or, to Borrower's knowledge, threatened against or affecting Borrower, Guarantor or the Project, which actions, suits or proceedings, if determined against Borrower, Guarantor or the Project, could materially adversely affect the condition (financial or otherwise) or business of Borrower or Guarantor or the condition or ownership of the Project.

Section 4.6. Agreements. Neither Borrower nor Guarantor is a party to any agreement or instrument or subject to any restriction which would materially and adversely affect Borrower, such Guarantor or the Project, or Borrower's or such Guarantor's business, properties or assets, operations or condition, financial or otherwise. To Borrower's and Guarantor's actual knowledge, neither Borrower nor Guarantor are in default in any material respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which Borrower or

18

001626

Guarantor is a party or by which Borrower, Guarantor or the Project is bound. Borrower has no material financial obligations under any agreement or instrument to which Borrower is a party or by which Borrower or the Project is otherwise bound, other than (a) obligations incurred in the ordinary course of the ownership, leasing and operation of the Project and (b) obligations under the Loan Documents.

Section 4.7. <u>Solvency</u>. Neither Borrower nor Guarantor has entered into the transaction or executed the Note, this Agreement, the Guaranty or any other Loan Documents with the actual intent to hinder, delay or defraud any creditor, and Borrower and Guarantor have each received reasonably equivalent value in exchange for their respective obligations under such Loan Documents. No petition in bankruptcy has been filed against Borrower or Guarantor in the last ten years, and neither Borrower nor Guarantor in the last ten years has made an assignment for the benefit of creditors or taken advantage of any Creditors' Rights Laws. Neither Borrower nor Guarantor is contemplating either the filing of a petition by it under any Creditors' Rights Laws or the liquidation of all or a major portion of Borrower's or such Guarantor's assets or property, and Borrower has no knowledge of any Person contemplating the filing of any such petition against Borrower or Guarantor.

Section 4.8. <u>Full and Accurate Disclosure</u>. No material statement of fact made by or on behalf of Borrower or Guarantor in this Agreement or in any of the other Loan Documents or in any other document or certificate delivered by or on behalf of Borrower or Guarantor contains any untrue statement of a material fact or omits to state any material fact necessary to make statements contained herein or therein not misleading. There is no material fact presently known to Borrower or Guarantor which has not been disclosed to Administrative Agent and Lenders which adversely affects, nor as far as Borrower or the applicable Guarantor can reasonably foresee, might adversely affect, the Project or the business, operations or condition (financial or otherwise) of Borrower or Guarantor.

Section 4.9. <u>ERISA Compliance</u>.

(a)    Borrower covenants, represents and warrants that (i) Borrower is not and will not be a Benefit Plan Investor, (ii) neither Borrower nor any of its Subsidiaries or ERISA Affiliates maintains or contributes to, or has at any time maintained or contributed to, or has any liability, whether actual or contingent, under, a plan subject to Section 302 or Title IV of ERISA or to Section 412 of the Internal Revenue Code, (iii) neither Borrower nor any of its Subsidiaries or ERISA Affiliates has ever contributed to or had an obligation to contribute to any Multiemployer Plan. None of the Benefit Plans are part of, or have at any time been part of, a multiple employer welfare arrangement, as that term is defined in Section 3(40) of ERISA, (iv) no Benefit Plan is or was at any time a multiple employer plan, as described in Section 413(c) of the Internal Revenue Code or Sections 4063 or 4064 of ERISA, and (v) neither Borrower nor any of its Subsidiaries or ERISA Affiliates has ever contributed to or had an obligation to contribute to any such plan.

(b)    No ERISA Event has occurred or is reasonably expected to occur. No employee welfare benefit plan within the meaning of §3(1) or §3(2)(B) of ERISA of Borrower or any Subsidiary, provides benefit coverage subsequent to termination of employment except as required by Title I, Part 6 of ERISA or applicable state insurance laws. Each Benefit Plan is in material compliance with ERISA, the Internal Revenue Code and any applicable law. Each Benefit Plan that is intended to qualify under Section 401(a) of the Internal Revenue Code has received a favorable determination letter from the Internal Revenue Service for all required amendments regarding its qualification thereunder that considers the law changes incorporated in the plan sponsor's most recently expired remedial amendment cycle determined under the provisions of Rev. Proc. 2007-44, and nothing has occurred subsequent to the issuance of such termination letter which would prevent, or cause the loss of, such qualification.

4161624-v7\CHIDMS1

001627

Section 4.10. <u>Not a Foreign Person</u>. Borrower is not a "foreign person" within the meaning of § 1445(f)(3) of the Internal Revenue Code.

Section 4.11. <u>Enforceability</u>. The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by Borrower or Guarantor including, without limitation, the defense of usury, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable, and neither Borrower nor Guarantor has asserted any right of rescission, set-off, counterclaim or defense with respect thereto. No Default or Event of Default exists under or with respect to any Loan Document.

Section 4.12. <u>Business Purposes</u>. The Loan is solely for the business purpose of Borrower, and is not for personal, family, household, or agricultural purposes.

Section 4.13. <u>Compliance</u>. To the best of Borrower's knowledge, and other than as contained in any searches requested by or on behalf of Administrative Agent in connection with the Loan, Borrower and the Project, and the use and operation of the Project, comply in all material respects with all Legal Requirements, including, without limitation, building ordinances and codes and the Americans with Disabilities Act. To the best of Borrower's knowledge, neither Borrower nor Guarantor is in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority and neither Borrower nor Guarantor has received any written notice of any such default or violation. There has not been committed by Borrower or Guarantor or, to Borrower's knowledge, any other Person in occupancy of or involved with the operation or use of the Project any act or omission affording any Governmental Authority the right of forfeiture as against the Project or any part thereof or any monies paid in performance of Borrower's or Guarantor's obligations under any of the Loan Documents.

Section 4.14. <u>Financial Information</u>. All financial data, including, without limitation, the balance sheets, statements of cash flow, and statements of income and operating expense, that have been delivered to Administrative Agent in respect of Borrower, Guarantor and/or to Borrower's knowledge the Project (a) are true, complete and correct in all material respects as of the date of such information, (b) accurately represent the financial condition of Borrower, Guarantor and/or the Project, as applicable, as of the date of such reports, and (c) to the extent prepared or audited by an independent certified public accounting firm, have been prepared in accordance with a modified accrual accounting method or such other method satisfactory to Administrative Agent throughout the periods covered, except as disclosed therein. Borrower has no contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments that are known to Borrower and reasonably likely to have a material adverse effect on the Project or the current and/or intended operation thereof, except as referred to or reflected in said financial statements. Since the date of such financial statements, there has been no materially adverse change in the financial condition, operations or business of the Borrower, Guarantor or, to Borrower's knowledge, the Project from that set forth in said financial statements.

Section 4.15. <u>Illegal Activity</u>. No portion of the Project has been or shall be purchased by Borrower with proceeds of any illegal activity and no part of the proceeds of the Loan will be used in connection with any illegal activity.

Section 4.16. <u>Separate Tax and Zoning Lot</u>. The Property constitutes a distinct parcel or parcels for purposes of zoning and of taxes, assessments and impositions (public or private) and are not otherwise considered as part of a larger single lot which includes property other than the Property for purposes of zoning or of taxes, assessments or impositions (public or private).

Section 4.17. <u>Federal Reserve Regulation</u>. Borrower shall use the proceeds of the Loan for the purposes set forth in <u>Section 2.1(c)</u> hereof and not for any illegal activity. No part of the proceeds of the

20

001628

Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by Legal Requirements or prohibited by the terms and conditions of this Agreement or the other Loan Documents.

Section 4.18. <u>Investment Company Act</u>. Borrower is not (a) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (b) [Reserved]; or (c) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

Section 4.19. <u>No Change in Facts or Circumstances; Disclosure</u>. All information submitted by Borrower, Guarantor or Borrower's or Guarantor's agents to Administrative Agent and in all financial statements, reports, certificates and other documents submitted in connection with the Loan or in satisfaction of the terms thereof and all statements of fact made by Borrower in this Agreement or in any other Loan Document, are accurate, complete and correct in all material respects as of the date of such item. There has been no material adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise misleading in any material respect or that otherwise materially and adversely affects or might materially and adversely affect the Project or the business operations or the financial condition of Borrower or Guarantor. Borrower and Guarantor have disclosed to Administrative Agent all material facts and have not failed to disclose any material fact that could cause any representation or warranty made herein to be materially misleading. With respect to any representations, warranties, or statements of fact which are specifically qualified in this Agreement as being true and correct to the best of Borrower's knowledge, the representation and warranty set forth in this <u>Section 4.19</u> shall be, to the best of Borrower's knowledge, true and correct as of the Closing Date.

Section 4.20. <u>Special Purpose Entity</u>. Borrower meets all of the requirements of <u>Article VI</u> hereof as of the Closing Date.

Section 4.21. <u>Intellectual Property</u>. All trademarks, trade names and service marks necessary to the business of Borrower as presently conducted or as Borrower contemplates conducting Borrower's business are in good standing and, to the extent of Borrower's actual knowledge, uncontested. To the best of Borrower's knowledge, Borrower has not infringed, is not infringing, and has not received notice of infringement with respect to asserted trademarks, trade names and service marks of others. To Borrower's knowledge, there is no infringement by others of trademarks, trade names and service marks of Borrower.

Section 4.22. <u>Embargoed Person</u>. To the best of Borrower's knowledge, as of the Closing Date and at all times throughout the term of the Loan, including after giving effect to any transfers of interests permitted pursuant to the Loan Documents or the Mezzanine Loan Documents, (a) none of the funds or other assets of Borrower or Guarantor constitute property of, or are beneficially owned, directly or indirectly, by any Person or government subject to trade restrictions under U.S. law, including, but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder with the result that the investment in Borrower (whether directly or indirectly), is prohibited by law or the Loan made by Lenders is in violation of law ("<u>Embargoed Person</u>"); (b) no Embargoed Person has any interest of any nature whatsoever in Borrower with the result that the investment in Borrower (whether directly or indirectly), is prohibited by law or the Loan is in violation of law; and (c) none of the funds of Borrower have been derived from any unlawful activity with the result that the investment in Borrower (whether directly or indirectly) is prohibited by law or the Loan is in violation of law.

Section 4.23. <u>Patriot Act</u>. All capitalized words and phrases and all defined terms used in the USA Patriot Act of 2001, 107 Public Law 56 (October 26, 2001) and in other statutes and all orders, rules and regulations of the United States government and its various executive departments, agencies and offices related to the subject matter of the Patriot Act, including Executive Order 13224 effective September 24, 2001 (collectively referred to in this Section only as the "<u>Patriot Act</u>") are incorporated into this Section. Each of Borrower and Borrower Members hereby represent and warrant that (a) Borrower, Guarantor and Borrower Members and each and every Person affiliated with Borrower, or that to Borrower's or Borrower Members' knowledge has an economic interest in Borrower or Borrower Members, or, to Borrower's or Borrower Members' knowledge, that has or shall have an interest in the transaction contemplated by this Agreement or in the Project or shall participate, in any manner whatsoever, in the Loan, is, to the extent required so that the Loan in not in violation of applicable Legal Requirements, <u>and</u> (b) Borrower, Guarantor and each Person actively involved in the management of Borrower or the Project is: (i) not a "blocked" Person listed in the Annex to Executive Order Nos. 12947, 13099 and 13224 and all modifications thereto or thereof (the "<u>Annex</u>"); (ii) in full compliance with the requirements of the Patriot Act and all other requirements contained in the rules and regulations of the OFAC; (iii) to the extent applicable, operated under policies, procedures and practices, if any, that are in compliance with the Patriot Act and available to Administrative Agent for Administrative Agent's review and inspection during normal business hours and upon reasonable prior notice; (iv) not in receipt of any notice from the Secretary of State or the Attorney General of the United States or any other department, agency, or office of the United States claiming a violation or possible violation of the Patriot Act; (v) not listed as a Specially Designated Terrorist or as a "blocked" Person on any lists maintained by the OFAC pursuant to the Patriot Act or any other list of terrorists or terrorist organizations maintained pursuant to any of the rules and regulations of the OFAC issued pursuant to the Patriot Act or on any other list of terrorists or terrorist organizations maintained pursuant to the Patriot Act; (vi) not a Person who has been determined by competent authority to be in violation of any of the prohibitions contained in the Patriot Act; and (vii) not controlled by or now acting or will in the future act for or on behalf of any Person named in the Annex or any other list promulgated under the Patriot Act or any other Person who has been determined to be in violation of the prohibitions contained in the Patriot Act. Borrower covenants and agrees that in the event Borrower or Guarantor receives any notice that Borrower (or any of Borrower's beneficial owners), Guarantor or any other Person related to or affiliated with Borrower, Guarantor or the Project become listed on the Annex or any other list promulgated under the Patriot Act or is indicted, arraigned, or custodially detained on charges involving money laundering or predicate crimes to money laundering, Borrower shall immediately notify Administrative Agent. It shall be an Event of Default hereunder if Borrower or any other party to any Loan Document becomes listed on any list promulgated under the Patriot Act or is indicted, arraigned or custodially detained on charges involving money laundering or predicate crimes to money laundering.

Section 4.24. <u>No Contractual Obligations</u>. Other than the Loan Documents, the Mezzanine Loan Documents, the Borrower Operating Agreement, the Management Agreement, the Existing Leases, the PSA pursuant to which Borrower is acquiring the Property, and certain Contractual Obligations to operate and manage the Project that are necessary and customary for properties similar to the Project, as of the date of this Agreement, Borrower is not subject to any Contractual Obligations and has not entered into any agreement, instrument or undertaking by which Borrower or Borrower's assets are bound, or has incurred any indebtedness (other than the Loan), and prior to the date of this Agreement, Borrower has not entered into any Contractual Obligation, or any agreement, instrument or undertaking by which it or its assets are bound or incurred any indebtedness (other than the Loan).

Section 4.25. <u>Shareholders of Borrower</u>. One hundred percent (100%) of the membership interests of Borrower are owned by the Sole Member.

Section 4.26. <u>Survival</u>. Borrower acknowledges and agrees that, unless expressly provided otherwise, all of the representations and warranties of Borrower and Guarantor set forth in this Agreement and in the other Loan Documents shall survive for so long as any portion of the Debt remains owing to Lenders. All representations, warranties, covenants and agreements made in this Agreement or in the other Loan Documents by Borrower and Guarantor shall be deemed to have been relied upon by Lenders notwithstanding any investigation heretofore or hereafter made by Lenders or on its behalf.

Section 4.27. <u>Leases</u>. As of the Closing Date, there are no Leases pursuant to which any Person other than Borrower has any right, title or interest in the Project other than under the Existing Leases.

Section 4.28. <u>Landmark Status</u>. No portion of the Project is designated by or registered with any governmental authority as historic or landmark buildings or any other similar designation or registration and Borrower shall not attempt or cooperate to obtain or effect any such designation or registration.

Section 4.29. <u>Broker</u>. Borrower represents and warrants to Administrative Agent and Lenders that Borrower has not dealt with any broker with respect to the transaction contemplated hereby and, by accepting the Loan, Borrower agrees forever to indemnify and hold Administrative Agent and Lenders harmless from and against any and all claims or suits for compensation, commissions, fees or otherwise (and all Losses related thereto) that may be asserted or made by any broker or Person claiming to have dealt with or to have been employed by Borrower or Borrower's representatives in connection with the brokering of the Loan.

<div align="center">

ARTICLE V
COVENANTS

</div>

From the Closing Date and until repayment of the Debt in full and performance in full of all obligations of Borrower and Guarantor under the Loan Documents or the earlier release of the Lien of the Deed of Trust (and all related obligations) in accordance with the terms of this Agreement and the other Loan Documents, Borrower hereby covenants and agrees with Lenders that:

Section 5.1. <u>Existence; Compliance With Legal Requirements</u>.

(a)     Borrower shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, licenses, permits and franchises and comply in all material respects with all Legal Requirements applicable to Borrower and the Project. Borrower hereby covenants and agrees not to commit, permit or suffer to exist any act or omission affording any Governmental Authority the right of forfeiture as against the Project or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents.

(b)     Borrower agrees that the Project shall at all times comply, to the extent applicable, with the Access Laws in all material respects. Notwithstanding any provisions set forth herein or in any other documents regarding Administrative Agent's approval or alterations of the Project, Borrower shall not alter the Project in any manner which would increase Borrower's responsibilities for compliance with the applicable Access Laws in any material respect without the prior written approval of Administrative Agent. The foregoing shall apply to tenant improvements constructed by Borrower or by any of Borrower's Tenants. Administrative Agent may condition any such approval upon receipt of a certificate of Access Law compliance from an architect, engineer or other Person acceptable to Administrative Agent. Borrower agrees to give prompt notice to Administrative Agent of the receipt by Borrower of any complaints related to violations of any Access Laws and of the commencement of any proceedings or investigations which relate to compliance with applicable Access Laws.

<div align="center">23</div>

(c)      Notwithstanding any other provision of this Section, Borrower shall not be deemed to be in default solely by reason of Borrower's failure to comply with any applicable Legal Requirement so long as, in Administrative Agent's judgment, each of the following conditions is satisfied: (i) Borrower is engaged in and diligently pursuing in good faith administrative or judicial proceedings appropriate to contest the validity or amount of such law, rule regulation or order; (ii) Borrower's compliance with such law, rule, regulation or order would necessarily and materially prejudice Borrower's prospects for success in such proceedings; (iii) noncompliance with any such law, rule, regulation or order will not result in the loss or forfeiture of the Project or any other collateral for the Loan or any interest of Administrative Agent therein or result in any fines or other punitive actions or any insurance coverage; and (iv) Borrower deposits with Administrative Agent, as security for any payment or performance which may ultimately be required, a sum equal to the amount of any fine, assessment or charge plus the interest, penalties, and other costs which Administrative Agent reasonably estimates are likely to become payable if Borrower's contest is unsuccessful. If Administrative Agent determines that any one or more of such conditions is not satisfied or is no longer satisfied, Borrower shall comply with the law, rule regulation or order in question, within thirty (30) days after Administrative Agent gives notice of such determination.

Section 5.2. <u>Maintenance and Use of Project</u>. Borrower shall maintain the Project in a good and safe condition and repair. The improvements and the Borrower's personal property required for the use of the Project shall not be removed, demolished or materially altered without the written consent of Administrative Agent; *provided*, *however*, that Administrative Agent's consent shall not be required (a) in connection with any removal, demolition or alteration permitted to be made by a Tenant under an Existing Lease without Borrower's consent under the applicable Existing Lease, or required to be made by Borrower under an Existing Lease, and (b) as otherwise set forth in <u>Section 5.19</u>. If under applicable zoning provisions the use of all or any portion of the Project is or shall become a nonconforming use, Borrower shall not cause or permit the nonconforming use to be discontinued or the nonconforming improvement to be abandoned without the express written consent of Administrative Agent. Borrower shall not establish any condominium or cooperative regime with respect to the Project without the prior written consent of Administrative Agent, nor shall Borrower initiate, join in or consent to any change in any private restrictive covenant, zoning ordinance or other public or private restrictions, limiting or defining the uses which may be made of the Project or any portion thereof.

Section 5.3. <u>Waste</u>. Borrower shall not commit or suffer any intentional material waste of the Project or make any change in the use of the Project which shall in any way invalidate or give cause for cancellation of any Policy, or do or permit to be done thereon anything that may in any way materially impair the value of the Project or the security for the Loan. Borrower shall not, without the prior written consent of Administrative Agent, which consent shall not be unreasonably withheld, permit any drilling or exploration for or extraction, removal, or production of any minerals from the surface or the subsurface of the Project, regardless of the depth thereof or the method of mining or extraction thereof, except as may be required by law or in accordance with the orders of any Governmental Authorities having jurisdiction thereof.

Section 5.4. <u>Taxes and Other Charges</u>.

(a)      Borrower shall pay, or cause to be paid, all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Project or any part thereof as the same become due and payable. Borrower shall furnish to Administrative Agent receipts for the payment of the Taxes and the Other Charges prior to the date the same shall become delinquent. Borrower shall not suffer and shall promptly pay and discharge or bond any Lien or charge whatsoever which may be or become a Lien or charge against the Project, and shall pay for all utility services provided to the Project prior to delinquency.

001632

(b)     Borrower shall not be obligated to make any deposit for Taxes as hereinafter provided until (i) Administrative Agent makes demand therefor following a Default and (A) any Tenant under a Material Leases is not paying such Taxes in accordance with the terms and provisions of its respective Material Lease, or (B) any Tenant under a Material Lease is in default under such Material Lease, or (ii) the continuance of an Event of Default hereunder of under any of the other Loan Documents. Upon the occurrence of the events described in clauses (i) and (ii) of the immediately preceding sentence, Borrower shall pay to Administrative Agent, upon the request of Administrative Agent, at the time of each payment of an installment of interest and/or principal under the Note, an additional amount which, together with all other such monthly payments, is sufficient to discharge the obligations for payment of Taxes and Other Charges one (1) month prior to the date the same shall become due. The determination of the amount so payable and of the fractional part thereof to be deposited with Administrative Agent, so that the aggregate of such deposits shall be sufficient for this purpose, shall be made by Administrative Agent in Administrative Agent's sole but reasonable discretion. Such amounts shall be held by Administrative Agent not as a trust fund and without interest (except as may be required by law) and shall be applied to the payment of the obligations in respect of which such amounts were deposited, in such order or priority as Administrative Agent shall determine, on or before the respective dates on which the same or any of them would become delinquent. During the continuance of an Event of Default, the balance of any such amounts held by Administrative Agent may be used and applied for any purpose authorized pursuant to this Agreement or any other Loan Document, including, without limitation, payment of the Debt in any order Administrative Agent may deem appropriate. If, one (1) month prior to the date any of the aforementioned Taxes or Other Charges may be paid without interest or penalty, the amounts then on deposit shall be insufficient for the payment of such obligation in full, Borrower shall, within ten (10) days after demand, deposit the amount of the deficiency with Administrative Agent. Nothing herein contained shall be deemed to affect any right or remedy of Administrative Agent or Lenders under any provisions of this Agreement or the Deed of Trust or of any statute or rule of law to pay any such amount and to add the amount so paid, together with interest at the Involuntary Rate, to the Debt. So long as Administrative Agent requires Borrower to pay Administrative Agent the deposits provided for in this paragraph and for so long as Borrower complies therewith, the obligation for direct payment of Taxes and Other Charges set forth in Subsection 5.4(a) hereof shall be suspended. Notwithstanding anything to the contrary contained herein, Administrative Agent shall not require Borrower to make such deposits for water and sewer charges if such charges are calculated on a metered basis.

(c)     Borrower shall pay or bond so as to remove as a lien of record, from time to time when the same shall become due, all lawful claims and demands of mechanics, materialmen, laborers, and others which, if unpaid, might result in, or permit the creation of, a lien on the Project or any part thereof, or on the revenues, rents, issues, income and profits arising therefrom and in general will do or cause to be done everything necessary so that the Liens of the Deed of Trust shall be fully preserved, at the sole cost and expense of Borrower and without expense to Administrative Agent or Lenders.

(d)     Notwithstanding any other provision of this Section, Borrower shall not be deemed to be in default solely by reason of Borrower's failure to pay any Taxes so long as, in Administrative Agent's sole judgment, reasonably exercised, each of the following conditions is satisfied:

(i)     Borrower or a Tenant is engaged in and diligently pursuing in good faith administrative or judicial proceedings appropriate to contest the validity or amount of such Tax;

(ii)     [Intentionally Omitted];

(iii)     Nonpayment of such Tax will not result in the loss or forfeiture of any property encumbered by the Deed of Trust or any of the other Loan Documents or any interest of Administrative Agent therein; and

(iv)     Borrower deposits with Administrative Agent, as security for such payment which may ultimately be required, a sum equal to the amount of the disputed Taxes plus the interest, penalties, and other costs which Administrative Agent reasonably estimates are likely to become payable if Borrower's contest is unsuccessful.

If Administrative Agent determines, in Administrative Agent's sole judgment, reasonably exercised, that any one or more of such conditions is not satisfied or is no longer satisfied, Borrower shall pay the Tax in question, together with any interest and penalties thereon, within ten (10) days after Administrative Agent gives notice of such determination.  After Administrative Agent has received evidence of such payment, Administrative Agent shall release any security held for such payment of Taxes pursuant to Section 5.4(d)(iv).

(e)     Borrower shall pay any taxes, except income, gross receipts and other taxes determined by reference to the amount of interest and other sums payable under the Loan Documents, imposed on Administrative Agent or Lenders by reason of Administrative Agent's or Lenders' ownership of this Agreement, the Note or the Deed of Trust as a result of any change in Legal Requirements (or any change in the application, interpretation or enforcement of existing Legal Requirements) effected after the date of this Agreement, provided that the Administrative Agent or applicable Lender shall at the time be assessing such taxes upon all of its similarly situated borrowers; provided further that Borrower shall not be required to pay any U.S. federal withholding taxes imposed under FATCA as a result of the failure by a Lender to comply with the applicable provisions of FATCA.

(f)     Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Accordingly, prior to the date that any Lender becomes a party hereto, such Lender shall deliver to the Borrower such certificates, documents or other evidence, as required by the IRS Code or Treasury Regulations issued pursuant thereto (including Internal Revenue Service Forms W-9, W-8ECI, W-8BEN, W-8BEN-E, W-8EXP and W-8IMY as applicable, or appropriate successor forms), properly completed, currently effective and duly executed by such Lender establishing that payments to it hereunder and under the Note are (i) not subject to United States Federal backup withholding tax and (ii) not subject to United States Federal withholding tax under the Internal Revenue Code.  Each such Lender shall (x) deliver further copies of such forms or other appropriate certifications on or before the date that any such forms expire or become obsolete and after the occurrence of any event requiring a change in the most recent form delivered to the Borrower and (y) obtain such extensions of the time for filing, and renew such forms and certifications thereof, as may be reasonably requested by the Borrower.

Section 5.5.  Litigation. Borrower shall give prompt written notice to Administrative Agent of any litigation or governmental proceedings pending or threatened in writing against Borrower or Guarantor which might materially adversely affect Borrower's condition (financial or otherwise) or business or the Project of which Borrower has knowledge.

26

4161624-v7\CHIDMS1

Section 5.6. <u>Access to the Project</u>. Borrower shall permit agents, representatives and employees of Administrative Agent and Lenders to inspect the Project or any part thereof at reasonable hours upon reasonable advance written notice, except in the event of an emergency, in which case no advance notice is necessary.

Section 5.7. <u>Notice of Default</u>. Borrower shall promptly advise Administrative Agent of (a) any material adverse change in the condition (financial or otherwise) of Borrower or the Project, (b) the occurrence of an Event of Default under any Loan Document or (c) an "Event of Default" under any Mezzanine Loan Document (as defined therein).

Section 5.8. <u>Cooperate in Legal Proceedings</u>. Borrower shall, at Borrower's sole cost and expense, cooperate fully with Administrative Agent and Lenders with respect to any proceedings before any court, board or other Governmental Authority which may in any way affect the rights of Lenders hereunder or any rights obtained by Lenders under any of the other Loan Documents and, in connection therewith, permit Administrative Agent and Lenders, at Administrative Agent's or Lenders' sole election, to participate in any such proceedings.

Section 5.9. <u>Performance of Obligations</u>. Borrower shall in a timely manner observe, perform and fulfill each and every covenant, term and provision to be observed and performed by Borrower under this Agreement and the other Loan Documents and any other agreement or instrument affecting or pertaining to the Project and any amendments, modifications or changes thereto.

Section 5.10. <u>Awards; Insurance Proceeds</u>. Borrower shall cooperate with Lenders in obtaining for Lenders the benefits of any Awards or Insurance Proceeds lawfully or equitably payable in connection with the Project in accordance with the terms and provisions of the Loan Documents, and Administrative Agent and Lenders shall be reimbursed for any reasonable, third party expenses incurred in connection therewith (including attorneys' fees and disbursements) out of such Awards or Insurance Proceeds.

Section 5.11. <u>Financial Reporting</u>.

(a)      Borrower shall keep proper books of record and account with respect to the Project and its leases and subleases, in accordance with a modified accrual accounting method or such other method satisfactory to Administrative Agent and in a manner acceptable to Administrative Agent, in Administrative Agent's sole and reasonable discretion.

(b)      Borrower shall furnish to Administrative Agent the following:

(i)      within ninety (90) days after the close of each fiscal or calendar year of Borrower, as applicable, annual financial statements audited by a "Big Four" accounting firm, the Pre-Approved Accounting Firm, or other independent certified public accountant acceptable to Administrative Agent, which financial statements shall include, without limitation, a balance sheet, a statement of income and expenses, and a projected profit and loss statement for the next fiscal or calendar year, as applicable, disclosing all earnings and expenses with respect to Borrower and the Project (collectively, the "<u>Financial Statements</u>"), together with a certificate from an officer of Borrower certifying that such annual Financial Statements fairly present the financial condition of Borrower and the Project;

(ii)      within forty-five (45) days after the close of each quarter of its fiscal year, a quarterly statement including a balance sheet and statement of profits and losses with respect to the Project;

(iii)      copies of any operating statements or the like when Borrower is required to submit such information to any Governmental Authority;

27

(iv)     promptly following any request therefor, copies of any notices described in Section 101(j) of ERISA that Borrower or any of its Subsidiaries or ERISA Affiliates may provide with respect to any Benefit Plan, copies of any documents described in Section 101(k) of ERISA that Borrower or any of its Subsidiaries or ERISA Affiliates may request with respect to any Multiemployer Plan, copies of any notices described in Section 101(1) of ERISA that Borrower or any of its Subsidiaries or ERISA Affiliates may request with respect to any Multiemployer Plan and any information that Borrower or any of its Subsidiaries or ERISA Affiliates may request with respect to any Multiemployer Plan in connection with Section 4221(e) of ERISA; provided, that if Borrower or any of its Subsidiaries or ERISA Affiliates has not requested such documents or notices from the administrator or sponsor of the applicable Benefit Plan or Multiemployer Plan, Borrower, the Subsidiary or the ERISA Affiliate, as applicable, shall promptly, upon the request of Administrative Agent, make a request for such documents or notices from such administrator or sponsor and shall provide copies of such documents and notices promptly after receipt thereof; and

(v)     such other information respecting the business, properties or the condition or operations, financial or otherwise, of Borrower and/or the Project as Administrative Agent may from time to time reasonably request.

(c)     All Financial Statements and other deliverables of Borrower required under this Section 5.11 shall be (i) prepared in accordance with generally accepted accounting principles or such other method satisfactory to Administrative Agent, (ii) delivered in duplicate, and (iii) certified by Borrower as being true, complete and correct.

Section 5.12. Estoppel Statement. After request by Administrative Agent, Borrower shall within fifteen (15) Business Days furnish Administrative Agent with a statement, duly acknowledged and certified, setting forth (i) the amount of the original principal amount of the Note, (ii) the rate of interest on the Note, (iii) the unpaid principal amount of the Note, (iv) the date installments of interest were last paid, (v) any offsets or defenses to the payment of the Debt, if any, and (vi) that the Note, this Agreement, the Deed of Trust and the other Loan Documents are valid, legal and binding obligations and have not been modified or if modified, giving particulars of such modification. In the event any Governmental Authority requires the same, Lenders shall deliver a similar statement to Borrower.

Section 5.13. Management of Project. In the event a Management Agreement shall be in effect at any time, Borrower hereby covenants and agrees as follows:

(a)     Borrower shall (i) promptly perform and observe all of the covenants required to be performed and observed by Borrower under the Management Agreement and do all things necessary to preserve and to keep unimpaired Borrower's material rights thereunder; (ii) promptly notify Administrative Agent of any material default under the Management Agreement of which Borrower is aware; (iii) promptly deliver to Administrative Agent a copy of any notice of default or other material notice received by Borrower under the Management Agreement; and (iv) promptly enforce the performance and observance of all of the covenants required to be performed and observed by Manager under the Management Agreement.

(b)     If at any time, (i) a Manager shall become insolvent or a debtor in a bankruptcy proceeding, (ii) an Event of Default has occurred and is continuing or (iii) a default has occurred and is continuing under the Management Agreement and Borrower has the right thereunder to terminate the Management Agreement on account thereof, Borrower shall, at the request of Administrative Agent, terminate the applicable Management Agreement upon thirty (30) days prior notice to such Manager and replace such Manager with a Qualified Manager (without the need for the approval of Administrative

28

Agent) or a manager selected by Borrower and approved in writing by Administrative Agent, in Administrative Agent's reasonable discretion.

(c)     Borrower shall not, without the prior written consent of Administrative Agent, which consent shall not be unreasonably withheld, (i) surrender, terminate or cancel the Management Agreement or otherwise replace any Manager or enter into any other management agreement with respect to the Project; (ii) reduce or consent to the reduction of the term of the Management Agreement; (iii) increase or consent to the increase of the amount of any charges under the Management Agreement; or (iv) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under, the Management Agreement in any material respect. In the event that Borrower replaces a Manager at any time during the term of Loan pursuant to this subsection, such Manager shall be approved by Administrative Agent in writing.

(d)     Notwithstanding anything to the contrary contained herein or in any other Loan Document, the Manager initially named in this Agreement may (i) transfer its interest in any Management Agreement for the management of the Project to any Affiliate of such Manager, (ii) transfer shares or equity interests in Manager or Manager's equity owners (including, without limitation, the issuance of treasury stock, or the creation or issuance of a new class of stock or membership interests, in either case in the context of an initial public offering or in the context of a subsequent offering of equity securities), (iii) sell all or substantially all of such Manager's assets, and (iv) merge or consolidate with another entity without, in each case, the approval of Administrative Agent or the same constituting an Event of Default under this Agreement; provided, however, if any of the actions described in clauses (ii), (iii) or (iv) shall cause such Manager to be unable to perform the functions required to be performed and observed by Manager under the Management Agreement, Borrower shall, at the request of Administrative Agent, terminate the applicable Management Agreement upon thirty (30) days prior notice to such Manager and replace such Manager with a Qualified Manager (without the need for the approval of Administrative Agent) or a manager selected by Borrower and approved in writing by Administrative Agent, in Administrative Agent's reasonable discretion.

(e)     Notwithstanding anything to the contrary contained herein or in any other Loan Document, the resignation, removal or replacement of Manager shall not be an Event of Default under this Agreement or require the approval of Administrative Agent so long as Borrower shall appoint or retain a substitute Manager that is a Qualified Manager.

Section 5.14. Liens. Borrower shall not, without the prior written consent of Administrative Agent, create, incur, assume or suffer to exist any Lien on any portion of the Project or permit any such action to be taken, other than the Permitted Encumbrances, the Deed of Trust, the Assignment of Leases and Rents and any other liens created by the Loan Documents. Neither Borrower nor any other Person shall take any action that would impair the Lien created under this Agreement, the Deed of Trust or any other Loan Document.

Section 5.15. Debt Cancellation. Borrower shall not cancel or otherwise forgive or release any claim or debt owed to Borrower by any Person, except for adequate consideration and in the ordinary course of Borrower's business, other than rent abatements or concessions in the ordinary course of business.

Section 5.16. Zoning. Borrower shall not initiate or affirmatively consent to any zoning classification or reclassification of any portion of the Project or seek any variance under any existing or future zoning ordinance or use or permit the use of any portion of the Project in any manner that could result in such use becoming a non-conforming use under any zoning ordinance or any other applicable land use law, rule or regulation, without the prior consent of Administrative Agent.

29

Section 5.17. ERISA. Borrower covenants and agrees to deliver to Administrative Agent such certifications or other evidence from time to time throughout the term of the Loan, as reasonably requested by Administrative Agent that Borrower is not and will not be a Benefit Plan Investor.

Section 5.18. No Joint Assessment. Borrower shall not suffer, permit or initiate the joint assessment of the Property with (a) any other real property constituting a tax lot separate from the Property, or (b) any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the Lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to the Property.

Section 5.19. Alterations. Administrative Agent's prior written approval shall be required in connection with any material alterations to any improvements at or on the Project, except for (a) alterations to Tenant spaces required to be undertaken by Borrower under a Lease, or permitted to be undertaken by such Tenant without Borrower's consent under its Lease, (b) alterations required by Legal Requirements, and (c) ordinary non-structural improvements, alterations and maintenance and structural repairs, the cost of which is $750,000 or less (in the aggregate in any twelve (12) month period). With respect to an Existing Lease, to the extent that Administrative Agent's prior approval is required under this Section 5.19, Administrative Agent shall grant or withhold its consent to any alterations proposed thereunder subject to the standard of consent applicable to the landlord under the applicable Existing Lease.

Section 5.20. Reciprocal Easement Agreement. Borrower shall not enter into any reciprocal easement agreement without Administrative Agent's prior written consent.

Section 5.21. Notices. Borrower shall give notice, or cause notice to be given, to Administrative Agent promptly upon the occurrence, or the receipt of notice, of:

(a)    any Event of Default or, to Borrower's knowledge, any event that would with the giving of notice or passage of time would constitute an Event of Default;

(b)    any default or event of default under any Contractual Obligation of Borrower that, to the knowledge of Borrower, could reasonably be expected to have a material adverse effect on Borrower, the ability of Borrower to perform Borrower's obligations under the Loan Documents or the rights and remedies of Lenders under the Loan Documents;

(c)    any material litigation or proceeding affecting Borrower, Guarantor or the Project but only to the extent such litigation could be reasonably expected to have a material adverse effect on Borrower, Guarantor or the Project, the ability of Borrower or Guarantor to perform their obligations under the Loan Documents or the rights and remedies of Lenders under the Loan Documents;

(d)    a change in the business, operations or financial or other condition or prospects of Borrower or Guarantor which could reasonably be expected to have a material adverse effect on Borrower the ability of Borrower or such Guarantor to perform Borrower's or such Guarantor's obligations under the Loan Documents or the rights and remedies of Administrative Agent and Lenders under the Loan Documents; or

(e)    any ERISA Event.

Section 5.22. Curing. Administrative Agent and Lenders shall have the right, but shall not have the obligation, following ten (10) days' notice to Borrower and an opportunity to cure, to exercise Borrower's rights to satisfy or fully bond over any Liens, claims or judgments against the Project. Borrower shall reimburse Lenders and Administrative Agent on demand for any and all actual costs

4161624-v7\CHIDMS1

001638

incurred by Lenders or Administrative Agent in connection with satisfying any Liens, claims or judgments against the Project.

Section 5.23. <u>Limitation on Securities Issuances</u>. None of Borrower or any of Borrower Members shall issue any additional membership interests or other securities, other than those that have been issued as of the Closing Date to the extent that such issuance would violate the provisions of <u>Section 7.2</u>, without the prior written consent of Administrative Agent, which consent may be withheld by Administrative Agent in Administrative Agent's sole and absolute discretion. For the avoidance of doubt, this <u>Section 5.23</u> shall not apply to the issuance, reissuance or replacement of certificates evidencing membership interests existing as of the Closing Date in accordance with the Mezzanine Loan Documents.

Section 5.24. <u>Limitations on Distributions</u>. Following the occurrence and during the continuance of (i) an Event of Default or (ii) a default by Borrower or the Key Tenant under the Key Tenant Lease, Borrower shall not make any distributions to Sole Member or any Borrower Members or any other Person. Except as aforesaid, there shall be no limitation on the making of any distributions to Borrower Members so long as no Event of Default or default under the Key Tenant Lease shall have occurred and be continuing.

Section 5.25. <u>Contractual Obligations</u>. Other than the Loan Documents, the Mezzanine Loan Documents, the Borrower Operating Agreement (and the membership interests in Borrower issued pursuant thereto) and the other documents described in <u>Section 4.24</u>, neither Borrower nor any of Borrower's assets shall be subject to any Contractual Obligations, and Borrower shall not enter into any agreement, instrument or undertaking by which Borrower or Borrower's assets are bound, other than those Contractual Obligations to operate, manage and Lease the Project that are necessary and customary for properties similar to the Project.

Section 5.26. <u>Additional Indebtedness</u>. Except as provided in <u>Section 6.1(g)</u> hereof, Borrower shall not suffer or incur any additional debt, obligations as lessee under a capitalized lease or contingent liabilities without the prior written consent of Administrative Agent, which consent may be withheld by Administrative Agent in Administrative Agent's sole and absolute discretion.

Section 5.27. <u>Restrictions on Leasing</u>. Borrower shall (i) not execute a Material Lease which shall not have been submitted to and approved by Administrative Agent except for Telecom Leases, (ii) not alter, modify or change the terms of any Material Lease except in the ordinary course of business and provided such alteration, modification or change does not have a material adverse financial effect on Borrower, (iii) not give any consent or exercise any option unless required by the terms of any Lease approved by Administrative Agent, (iv) not cancel or terminate any Material Lease or accept a surrender or tenant buyout thereof except in the event of default by the Tenant thereunder, (v) not consent to any assignment of or subletting under any Material Lease, unless the same shall be in accordance with its terms and such terms have been approved by Administrative Agent, (vi) not collect any of the rents, income and profits arising or accruing under any Leases or from Project for more than one (1) month in advance of the time when the same shall become due, (vii) not execute any other assignment of Borrower's interest in the Leases or any assignment of rents arising or accruing from the Leases or from the Project; (viii) observe and promptly and faithfully perform or cause to be performed all of the covenants, conditions and agreements contained in all Leases in all material respects, (ix) at all times do all things reasonably necessary in the exercise of sound business judgment to compel performance by the lessee under each Lease of all obligations, covenants and agreements by such lessee to be performed thereunder, (x) not do or permit to be done anything to materially impair the security of any Lease, (xi) at Administrative Agent's request, assign and transfer to Administrative Agent any and all subsequent Leases upon all or any part of the Project, and (xii) execute and deliver at the reasonable request of Administrative Agent all such further assurances and assignments in the Project as Administrative Agent

31

shall from time to time require. None of the foregoing restrictions set forth in clauses (i) through (vii) of this Section shall be done or suffered to be done without in each instance obtaining the prior written consent of Administrative Agent, and any of such acts done without the prior written consent of Administrative Agent shall be null and void.  For purposes of clarity, the Existing Leases and the terms therein have been approved by Administrative Agent.

(a)     Tenant Estoppel Certificates.  Borrower shall deliver to Administrative Agent upon the written request of Administrative Agent (made not more often than once in any calendar year), an updated tenant estoppel certificate from any Tenant at the Project addressed to Administrative Agent, in form and substance satisfactory to Administrative Agent in all respects.

(b)     Copies of Leases.  Within ten (10) Business Days of any such request, Borrower shall submit to Administrative Agent or Administrative Agent's counsel true and complete copies of all Leases for the Project including all amendments thereto or extensions thereof, and any guarantees thereof.

(c)     Subordination and Attornment.  Each Lease hereafter entered into shall be subordinate to the lien of the Deed of Trust, to all advances under the Deed of Trust and to any renewals, extensions, modifications or consolidations thereof, and shall provide that, in the event of the enforcement by Lenders of the remedies provided for by law, by this Agreement or by the Deed of Trust, the lessee thereunder shall, upon request of any Person succeeding to the interest of Borrower as a result of such enforcement, automatically become the lessee of and shall attorn to said successor in interest, without change in the terms or other provisions of such Lease; provided, however, that said successor in interest shall not be bound by (i) any payment of rent or additional rent for more than one (1) month in advance, except prepayments in the nature of security for the performance by said lessee of its obligations under said Lease, or (ii) any amendment or modification of the Lease made without the consent of Administrative Agent or such successor in interest, unless such consent is not required pursuant to this Section 5.27. Each Lease shall also provide that, upon request by said successor in interest, such lessee shall execute and deliver an instrument or instruments confirming such attornment.  Administrative Agent, on behalf of Lenders, shall enter into a commercially reasonable SNDA with Tenants under future Leases upon request, from time to time.

Section 5.28. Debt Service Coverage Ratio.

(a)     At all times during the term of the Loan, the Project must maintain a minimum debt service coverage ratio ("DSCR") of 1.20:1.00 ("DSCR Threshold"). The DSCR shall be tested on an annual basis commencing on December 31, 2018 and on each December 31 thereafter during the term of the Loan. The DSCR shall be calculated as the ratio of (i) Net Operating Income for the prior twelve-month period immediately preceding the measurement date, to (ii) actual scheduled principal and interest payments under the Loan for the prior trailing twelve-month period immediately preceding the measurement date. With respect to the calculation of DSCR as aforesaid, until the first (1st) anniversary of the Closing Date, Debt Service and Net Operating Income shall be calculated on the basis of actual Debt Service and Net Operating Income for such partial year period and such amounts shall be annualized by Administrative Agent for purposes of calculating the DSCR.

(b)     The certificate of Administrative Agent as to any DSCR calculation shall, absent manifest error, be final, conclusive and binding on Borrower.

(c)     If, on any annual measurement date, the DSCR is below the DSCR Threshold, Borrower may, at Borrower's option, pay down the Loan (without payment of any Prepayment Premium) by an amount necessary for Borrower to effectively achieve the DSCR Threshold immediately following delivery of such pay down (any amount so paid down may not be reborrowed). Borrower shall deliver the pay down to Administrative Agent within fifteen (15) days following notice from Administrative Agent

32

that such DSCR Threshold has not been met. Borrower's failure to deliver the pay down within such time period such that DSCR Threshold is achieved shall be an Event of Default.

Section 5.29. <u>Loan-to-Value Ratio</u>.

(a)     The Project must maintain a maximum loan-to-value ratio ("<u>LTVR</u>") of 60.0% ("<u>LTVR Threshold</u>") at all times. The LTVR shall be tested by Administrative Agent on an annual basis, commencing on December 31, 2018 and on each December 31 thereafter during the term of the Loan, and shall be calculated as the ratio of (i) the outstanding principal balance under the Loan *to* (ii) the Appraised Value of the Project. For the purpose of this covenant, "<u>Appraised Value</u>" shall mean the market value of the Project according to the latest FIRREA appraisal performed by an appraiser appointed by Borrower and reasonably acceptable to Administrative Agent, which appraisals shall be performed annually by December 31st of each calendar year.

(b)     The certificate of Administrative Agent as to any LTVR calculation shall, absent manifest error, be final, conclusive and binding on Borrower.

(c)     If, on any annual measurement date, the LTVR exceeds the LTVR Threshold, Borrower may, at Borrower's option, pay down the Loan (without payment of any Prepayment Premium) by an amount necessary for Borrower to effectively achieve the LTVR Threshold immediately following delivery of such pay down (any amount so paid down may not be reborrowed). Borrower shall deliver the pay down to Administrative Agent within fifteen (15) days following notice from Administrative Agent that the LTVR Threshold has not been achieved. Borrower's failure to deliver the pay down within such time period such that LTVR Threshold is achieved shall be an Event of Default.

Section 5.30. <u>UCC Searches</u>. Borrower and Guarantor hereby agree that Administrative Agent shall have the right to order UCC, judgment and lien searches against Borrower and Guarantor at any time at Borrower's sole cost and expense. Borrower shall also be responsible for all actual out-of-pocket costs incurred by Administrative Agent to continue the UCC-1 Financing Statements delivered by Borrower in favor of Administrative Agent from time to time.

Section 5.31. <u>Updated/New Appraisal</u>. Borrower hereby acknowledges and agrees that Borrower shall order (or, at Administrative Agent's election, Administrative Agent may order) an updated or new appraisal of the Project (a) annually, in connection with Administrative Agent's test of the LTVR Threshold, at Borrower's sole cost and expense, (b) upon the occurrence of an Event of Default, at Borrower's sole cost and expense, and (c) at any other time, at Administrative Agent's sole cost and expense. Any such appraisal shall be performed by an appraiser appointed by Borrower and reasonably acceptable to Administrative Agent, and Administrative Agent may from time to time require that the appraiser who performs a particular appraisal be different than the appraiser who performed the prior appraisal.

Section 5.32. <u>Interest Reserve Account</u>. Borrower shall maintain the Interest Reserve Account for the term of the Loan, which Interest Reserve Account shall be under the sole dominion and control of Administrative Agent. The Interest Reserve Account shall have a title evidencing the foregoing in a manner reasoning acceptable to Administrative Agent. Borrower hereby grants to Administrative Agent, for the benefit of Lenders, a first-priority security interest in the Interest Reserve Account and all deposits at any time contained therein and the proceeds thereof and will take all actions necessary to maintain in favor of Administrative Agent, for the benefit of Lenders, a perfected first priority security interest in the Interest Reserve Account. All costs and expenses for establishing and maintaining the Interest Reserve Account (or any successor thereto) shall be paid by Borrower. All monies now or hereafter deposited into the Interest Reserve Account shall be deemed additional security for the Debt. Borrower shall not alter or modify the Interest Reserve Account without the prior written consent of Administrative Agent.

33

001641

Borrower shall not draw upon the Interest Reserve Account during the term of the Loan (for the purpose of making interest payments or otherwise).  Upon the occurrence of an Event of Default due to Borrower's failure to timely make any interest payment, Administrative Agent shall apply funds on deposit in the interest reserve against amounts owing to Lenders under this Agreement, and shall notify Borrower whether sufficient funds were available in the Interest Reserve Account to cure such Event of Default. For the avoidance of doubt, Borrower shall be required to make separate interest payments pursuant to the terms of the Note, regardless of whether there are funds in the Interest Reserve Account on deposit with Administrative Agent.

Section 5.33. <u>Mezzanine Loan</u>.  Borrower shall not cause, suffer or permit Mezzanine Borrower to enter into any cancellation, termination, modification, change, supplement, restatement, alteration or amendment of any Mezzanine Loan Document. Without limitation of any other covenant set forth in this Agreement, Borrower shall deliver to Administrative Agent, within two (2) Business Days, any notice of default or other material notice, statement or report given or received by any party under the Mezzanine Loan Documents.

<div align="center">

ARTICLE VI
ENTITY COVENANTS

</div>

Section 6.1. <u>Single Purpose Entity/Separateness</u>. Until the Debt has been paid in full, Borrower represents, warrants and covenants that Borrower has not and shall not:

    (a)    engage in any business or activity other than the ownership of the Project and any activities incidental thereto;

    (b)    acquire or own any assets other than (i) the Project, and (ii) such incidental personal property as may be necessary for the ownership of the Project;

    (c)    merge into or consolidate with any Person, or dissolve, terminate, liquidate in whole or in part, transfer or otherwise dispose of all or substantially all of its assets or change its legal structure;

    (d)    fail to observe all organizational formalities or fail to preserve its existence as an entity duly organized, validly existing and in good standing (if applicable) under the applicable Legal Requirements of the jurisdiction of its organization or formation, or amend, modify, terminate or fail to comply with the provisions of its Organizational Documents;

    (e)    form or own any Subsidiary or make any investment in any Person;

    (f)    commingle its assets with the assets of any other Person;

    (g)    incur any debt, secured or unsecured, direct or contingent (including guaranteeing any obligation) other than (i) the Loan and/or (ii) trade and operational indebtedness incurred in the ordinary course of business with trade creditors, provided such indebtedness is (A) unsecured, (B) not evidenced by a note, (C) on commercially reasonable terms and conditions, and (D) due not more than ninety (90) days past the date incurred and paid on or prior to such date;

    (h)    fail to maintain its records, books of account, bank accounts, financial statements, accounting records and other entity documents separate and apart from those of any other Person;

    (i)    enter into any contract or agreement with any general partner, member, shareholder, principal, guarantor of the obligations of Borrower or any Affiliate of the foregoing, except

<div align="center">34</div>

001642

upon terms and conditions that are intrinsically fair, commercially reasonable and substantially similar to those that would be available on an arm's length basis with unaffiliated third parties;

(j)     maintain its assets in such a manner that it will be costly or difficult to segregate, ascertain or identify its individual assets from those of any other Person;

(k)     assume or guaranty the debts of any other Person, hold itself out to be responsible for the debts of any other Person, or otherwise pledge its assets for the benefit of any other Person or hold out its credit as being available to satisfy the obligations of any other Person, provided however, that this subsection (k) shall not be deemed to prohibit Borrower from pledging assets to secure its own obligations as required or permitted by the Loan Documents;

(l)     make (i) any loans or (ii) any advances (except with respect to distributions to its shareholders, partners or members, as applicable, which are not otherwise prohibited under this Agreement) to any Person;

(m)     fail to file its own tax returns or file a consolidated federal income tax return with any Person (unless prohibited or required, as the case may be, by applicable Legal Requirements);

(n)     fail either to hold itself out to the public as a legal entity separate and distinct from any other Person or to conduct its business solely in its own name or fail to correct any known misunderstanding regarding its separate identity;

(o)     fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations; *provided*, *however*, in no event shall this subsection (o) require any equity owner to make additional capital contributions to Borrower (it being acknowledged, however, that a failure of Borrower to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations shall be a Default hereunder irrespective of such equity owner's lack of an obligation to make additional capital contributions to Borrower);

(p)     (i) file or consent to the filing of any petition, either voluntary or involuntary, to take advantage of any Creditors' Rights Laws (unless filed by Administrative Agent), (ii) seek or consent to the appointment of a receiver, liquidator or any similar official, (iii) take any action that might cause such entity to become insolvent, or (iv) make an assignment for the benefit of creditors;

(q)     fail to allocate shared expenses (including, without limitation, shared office space and services performed by an employee of an Affiliate) among the Persons sharing such expenses and to use separate invoices and checks;

(r)     fail to remain solvent or pay its own liabilities (including, without limitation, salaries of its own employees) only from its own funds; *provided*, *however*, in no event shall this subsection (r) require any equity owner to make additional capital contributions to Borrower (it being acknowledged, however, that a failure of Borrower to remain solvent or pay its own liabilities (including, without limitation, salaries of its own employees) only from its own funds shall be a Default hereunder irrespective of such equity owner's lack of an obligation to make additional capital contributions to Borrower); and

(s)     acquire obligations or securities of its partners, members, shareholders or other affiliates, as applicable.

Section 6.2. Change of Name, Identity or Structure. Borrower shall not change or permit to be changed (a) Borrower's name, (b) Borrower's identity (including Borrower's trade name or names), (c)

35

001643

Borrower's principal place of business set forth on the first page of this Agreement, the Deed of Trust or any UCC-1 Financing Statements, (d) the corporate, partnership, limited liability company or other organizational structure of Borrower, (e) Borrower's state of organization, or (f) Borrower's organizational identification number, without in each case notifying Administrative Agent of such change in writing at least thirty (30) days prior to the effective date of such change and, in the case of a change in Borrower's structure, without first obtaining the prior written consent of Administrative Agent. In addition, Borrower shall not change or permit to be changed any Organizational Documents of such person if such change would adversely impact the covenants set forth in Section 6.1 hereof. Borrower shall execute and deliver to Administrative Agent, prior to or contemporaneously with the effective date of any such change, any financing statement or financing statement amendment reasonably required by Administrative Agent to establish or maintain the validity, perfection and priority of the security interest granted herein. At the request of Administrative Agent, Borrower shall execute a certificate in form satisfactory to Administrative Agent listing the trade names under which Borrower intends to operate under, and representing and warranting that Borrower does business under no other trade name. If Borrower does not now have an organizational identification number and later obtains one, or if the organizational identification number assigned to Borrower subsequently changes, Borrower shall promptly notify Administrative Agent of such organizational identification number or change.

Section 6.3. Business and Operations. Borrower shall remain in good standing under the laws of each State as, and to the extent, the same are required for the ownership, maintenance, management and operation of the Project. Borrower shall not enter into any line of business other than the ownership of the Project and ancillary purposes in connection therewith, or make any material change in the scope or nature of its business objectives, purposes or operations, or undertake or participate in activities other than the continuance of its present business.

ARTICLE VII
NO SALE OR ENCUMBRANCE

Section 7.1. Transfer Definitions. For purposes of this Article VII, an "Affiliated Manager" shall mean any managing agent in which Borrower, Guarantor or any Affiliate of such Persons has directly or indirectly, any legal, beneficial or economic interest; "Control" shall mean, for any Person, the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities or other beneficial interests, by contract or otherwise; "Restricted Party" shall mean Borrower, any Affiliated Manager, or any shareholder, partner, member or non-member manager, or any direct or indirect legal or beneficial owner of Borrower, any Affiliated Manager, or any non-member manager; and a "Sale or Pledge" shall mean a voluntary or involuntary sale, conveyance, mortgage, grant, bargain, encumbrance, lien, pledge, assignment, grant of any options with respect to, or any other transfer or disposition of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) a legal or beneficial interest.

Section 7.2. No Sale/Encumbrance.

(a)      Other than Permitted Transfers, until the Debt is paid in full, Borrower shall not cause or permit a Sale or Pledge of the Project or any part thereof or any legal or beneficial interest therein nor permit a Sale or Pledge of an interest in any Restricted Party (in each case, a "Prohibited Transfer") without the prior written consent of Administrative Agent, which shall not be unreasonably withheld, conditioned or delayed.

(b)      A Prohibited Transfer shall include, but not be limited to, (i) an installment sales agreement wherein Borrower agrees to sell the Project or any part thereof for a price to be paid in installments; (ii) an agreement by Borrower leasing all or a substantial part of the Project for other than

36

001644

actual occupancy by a space tenant thereunder or a sale, assignment or other transfer of, or the grant of a security interest in Borrower's right, title and interest in and to any leases or any rents; (iii) if a Restricted Party is a corporation, any merger, consolidation or Sale or Pledge of such corporation's stock or the creation or issuance of new stock in one or a series of transactions; (iv) if a Restricted Party is a limited or general partnership or joint venture, any merger or consolidation or the change, removal, resignation or addition of a general partner or the Sale or Pledge of the partnership interest of any general or limited partner or any profits or proceeds relating to such partnership interests or the creation or issuance of new partnership interests; (v) if a Restricted Party is a limited liability company, any merger or consolidation or the change, removal, resignation or addition of a managing member or non-member manager (or if no managing member, any member) or the Sale or Pledge of the membership interest of any member or any profits or proceeds relating to such membership interest; (vi) if a Restricted Party is a trust, any merger, consolidation or the Sale or Pledge of the legal or beneficial interest in a Restricted Party or the creation or issuance of new legal or beneficial interests; (vii) the removal or the resignation of a Manager (including, without limitation, an Affiliated Manager) other than in accordance with Section 5.13 hereof.

Section 7.3. <u>Administrative Agent's Rights</u>. Administrative Agent reserves the right to condition the consent to a Prohibited Transfer requested hereunder upon (a) a modification of the terms hereof and an assumption of the Note and the other Loan Documents as so modified by the proposed transferee, (b) receipt of payment of a transfer fee equal to $5,000 and all of Lenders' and Administrative Agent's out-of-pocket expenses actually incurred in connection with such Prohibited Transfer, (c) to the extent applicable to such proposed transferee, the proposed transferee's continued compliance with the covenants set forth in this Agreement (including, without limitation, the covenants in <u>Article VI</u> and the other Loan Documents), (d) a new manager for the Project and a new management agreement satisfactory to Administrative Agent (if applicable), and (e) the satisfaction of such other conditions and/or legal opinions as Administrative Agent shall determine in Administrative Agent's reasonable discretion to be in the interest of Lenders. All reasonable expenses incurred by Lenders and Administrative Agent shall be payable by Borrower whether or not Administrative Agent consents to the Prohibited Transfer. Lenders shall not be required to demonstrate any actual impairment of Lenders' security or any increased risk of default hereunder in order to declare the Debt immediately due and payable upon a Prohibited Transfer made without Administrative Agent's prior written consent. This provision shall apply to each and every Prohibited Transfer, whether or not Administrative Agent has consented to any previous Prohibited Transfer.

Section 7.4. <u>Assumption</u>. Other than as expressly permitted in this Agreement, Borrower hereby acknowledges and agrees that no transfer of all or any portion of the Project to, and the related assumption of the Loan by, any Person shall be permitted under this Agreement.

<div align="center">

ARTICLE VIII
INSURANCE; CASUALTY; CONDEMNATION; RESTORATION

</div>

Section 8.1. <u>Insurance</u>.

(a)     Borrower shall obtain and maintain at all times policies of insurance as follows:

(i)     comprehensive "all risk" or "special causes of loss" insurance, including, without limitation, fire, flood, earthquake, terrorism, vandalism, malicious mischief and such other hazards as may be reasonably specified by Administrative Agent for the mutual benefit of Borrower and Administrative Agent and which is customarily maintained for like properties, including the improvements and the fixtures (other than trade fixtures) at the Project, in each case (A) in an amount equal to one hundred percent (100%) of the "Full Replacement Cost," which for purposes of this Agreement shall mean actual replacement value (exclusive of costs of excavations, foundations,

<div align="center">37</div>

underground utilities and footings) and provided that earthquake and flood may have a sub limit reasonably acceptable to Administrative Agent; (B) containing a replacement cost endorsement and an agreed amount endorsement with respect to such improvements and fixtures (other than trade fixtures) and/or an endorsement waiving all coinsurance provisions; (C) providing for no deductible in excess of $100,000 or such other amount reasonably acceptable to Administrative Agent, for all such insurance coverage; and (D) if any of the improvements or the use of the Project shall at any time constitute legal nonconforming structures or uses, providing coverage for contingent liability from Operation of Building Laws, Demolition Costs and Increased Cost of Construction Endorsements and containing an "Ordinance or Law Coverage" or "Enforcement" endorsement. In addition, Borrower shall obtain, or cause to be obtained: (x) if any portion of the improvements is currently or at any time in the future located in a "special flood hazard area" designated by the Federal Emergency Management Agency, flood hazard insurance in an amount equal to $10,000,000 in excess of the maximum amount of such insurance available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended; and (y) earthquake insurance in amounts and in form and substance reasonably satisfactory to Administrative Agent as determined by a probable maximum loss study or other acceptable assessment of expected maximum loss, not to exceed the amount of indebtedness, in the event the Project is located in an area with a high degree of seismic risk provided that the insurance pursuant to clauses (x) and (y) hereof shall be on terms consistent with the comprehensive all risk insurance policy required under this subsection (i) and further provided that regardless of the flood or seismic zone, Administrative Agent may require reasonable limits of insurance covering such risks;

(ii)        Commercial General Liability insurance against claims for personal injury, bodily injury, death or property damage occurring upon, in or about the Project, with such insurance (A) to be on the so-called "occurrence" form with a general aggregate limit of not less than $2,000,000 per location and a per occurrence limit of not less than $1,000,000; (B) to continue at not less than the aforesaid limit until required to be changed by Administrative Agent in writing by reason of changed economic conditions making such protection inadequate; and (C) to cover at least the following hazards: (1) premises and operations; (2) products and completed operations; (3) independent contractors; and (4) contractual liability;

(iii)        loss of rents insurance or business income insurance, as applicable, (A) covering all risks required to be covered by the insurance provided for in subsection (i) above; (B) which provides that after the physical loss to the improvements and fixtures (other than trade fixtures) occurs, the loss of rents or income, as applicable, will be insured until such completion of Restoration and notwithstanding that the policy may expire prior to the end of such period; and (C) which contains an extended period of indemnity endorsement which provides that after the physical loss to the improvements and personal property has been repaired, the continued loss of income will be insured until such income either returns to the same level it was at prior to the loss, or the expiration of at least six (6) months from the date that the Project is repaired or replaced and operations are resumed, whichever first occurs, and notwithstanding that the policy may expire prior to the end of such period. The amount of such loss of rents or business income insurance, as applicable, shall be determined prior to the date hereof and at least once each year thereafter based on Borrower's reasonable estimate of the gross income from the Project for the succeeding period of coverage required above. All proceeds payable to Lenders pursuant to this subsection shall be held by Lenders and shall be applied to the obligations secured by the Loan Documents with any remaining balance promptly payable to Borrower; *provided*, *however*, that nothing herein contained shall be deemed to relieve Borrower of Borrower's obligations to pay the obligations secured by the Loan Documents on the respective dates of payment provided for in the Note, this Agreement and the other Loan Documents except to the extent such amounts are actually paid out of the proceeds of such loss of rents or business income insurance, as applicable;

001646

(iv)     at all times during which structural construction, demolition, structural repairs or structural alterations are being made with respect to the improvements, and only if the property coverage form does not otherwise apply,

(A)     owner's contingent or protective liability insurance covering claims not covered by or under the terms or provisions of the above mentioned commercial general liability insurance policy;

(B)     the insurance provided for in subsection (i) above written in a so-called Builder's Risk Completed Value form (1) on a non-reporting basis, (2) against "all risks" insured against pursuant to subsection (i) above, (3) including permission to occupy the Project, (4) with an agreed amount endorsement waiving co-insurance provisions, and (5) including coverage for so-called "soft costs" and delayed completion loss of income; and

(C)     Borrower shall ensure, or cause to be insured, that the general contractor maintains (1) commercial general liability coverage, including products and completed operations coverage that shall be continuously renewed for the statutory period during which claims can be made following completion of the project, (2) automobile liability insurance (including owned, hired and non-owned liability) and (3) umbrella/excess liability insurance with no less than $25,000,000, or such other amount reasonably acceptable to Administrative Agent, in limits per occurrence and in the annual aggregate per project, and in addition Borrower shall ensure, or cause to be insured, that all trade contractors provide similar liability insurance coverage with umbrella liability limits that are commensurate with the risks presented by their operations at the site as determined by the general contractor. All parties engaged in work on the improvements or on any restoration shall maintain any workers' compensation and employer's liability insurance required by law in force for all workers on the job. A certificate of insurance shall be issued to Borrower and Administrative Agent, naming each as Additional Insured (except with respect to workers' compensation and employer's liability), and evidencing all insurance required in this subsection. Borrower and Administrative Agent shall be named as Additional Insured with respect to the general contractor's ongoing operations and completed operations by endorsements satisfactory to Administrative Agent. Such insurance shall be primary and any other insurance maintained by the additional insured shall be excess only and not contributing with this insurance;

(v)     workers' compensation, subject to the statutory limits of the State, and employer's liability insurance in respect of any work or operations on or about the Project, or in connection with the Project or its operation (if applicable);

(vi)     comprehensive boiler and machinery insurance, if applicable, in amounts as shall be reasonably required by Administrative Agent on terms consistent with the commercial property insurance policy required under subsection (i) above;

(vii)     excess liability insurance in an amount not less than $25,000,000 per occurrence and in the aggregate per location, or such other amount reasonably acceptable to Administrative Agent, per occurrence and per location, on terms consistent with the commercial general liability insurance required under subsection (ii) above; and

(viii)     upon sixty (60) days' written notice, such other reasonable insurance and in such reasonable amounts as Administrative Agent from time to time may reasonably request against such other insurable hazards which at the time are commonly insured against for property similar to the Project located in or around the region in which the Project is located.

4161624-v7\CHIDMS1

001647

(b)     All insurance provided for in <u>Section 8.1(a)</u> hereof shall be obtained under valid and enforceable policies (collectively, the "<u>Policies</u>" or in the singular, the "<u>Policy</u>"), and shall be in such forms and in such amounts as required above, and shall be subject to the reasonable approval of Administrative Agent as to insurance companies, amounts, deductibles, loss payees and insureds. The Policies shall be issued by financially sound and responsible insurance companies authorized to do business in the State and having a claims paying ability rating of "A" or better by at least two rating agencies (one of which shall be S&P) and/or a general policy rating of "A" or better and a financial class of VIII or better by A.M. Best Company, Inc.; *provided*, *however*, any insurance company with a rating below A:X must have a positive or stable outlook according to A.M. Best Company, Inc. The Policies described in <u>Section 8.1(a)</u> hereof shall designate Administrative Agent and Lenders and their successors and assigns as mortgagee, additional insured and/or loss payee as deemed appropriate by Administrative Agent. Borrower shall deliver to Administrative Agent certificates evidencing renewal of the Policies (such certificates, the "<u>Insurance Certificates</u>") and renewal policies accompanied by evidence satisfactory to Administrative Agent of payment of the premiums due with respect to the policies (the "<u>Insurance Premiums</u>"), within thirty (30) days after the expiration dates of such Policies.

(c)     Any blanket property insurance Policy shall specifically allocate to the Project the amount of coverage from time to time required hereunder and shall otherwise provide the same protection as would a separate Policy insuring only the Project in compliance with the provisions of <u>Section 8.1(a)</u> hereof.

(d)     All Policies provided for or contemplated by <u>Section 8.1(a)</u> hereof shall, in the case of Policies providing for (i) property damage, boiler and machinery, terrorism, flood and earthquake insurance, provide that the loss thereunder shall be payable to Administrative Agent, as mortgagee and loss payee, and (ii) commercial general liability insurance, name Administrative Agent as additional insured.

(e)     All Policies provided for in <u>Section 8.1(a)</u> hereof shall contain clauses or endorsements to the effect that:

(i)     no act or negligence of Borrower or anyone acting for or on behalf of Borrower or of any Tenant or other occupant, or failure to comply with the provisions of any Policy, which might otherwise result in a forfeiture of the insurance or any part thereof, shall in any way affect the validity or enforceability of the insurance with respect to Administrative Agent and Lenders;

(ii)     the property damage insurance Policies, including boiler and machinery, earthquake, flood and terrorism, if separately provided, shall not be materially changed (other than to increase the coverage provided thereby) or canceled without at least thirty (30) days' prior written notice to Administrative Agent and any party named therein as an additional insured;

(iii)     the issuers thereof shall give written notice to Administrative Agent if the Policies have not been renewed ten (10) Business Days prior to their expiration;

(iv)     Administrative Agent and Lenders shall not be liable for any Insurance Premiums thereon or subject to any assessments thereunder, provided that the insurer need not waive the requirement that the premium be paid in order for a claim to be paid and further shall provide that Administrative Agent (for the benefit of Lender) is permitted to make payments to effect the continuation of such policy upon notice of cancellation due to non-payment of premiums;

(v)     the Policies do not contain an exclusion for acts of terrorism; and

001648

(vi)     any claim or defense any property damage insurance company may have against Borrower to deny payment of any claim by Borrower thereunder shall not be effective against Administrative Agent and Lenders (and affirmatively providing that the insurance company will pay the proceeds of such Policy to Administrative Agent notwithstanding any claim or defense of the insurance company against Borrower) and such Policies shall also contain a standard "Waiver of Subrogation" endorsement.

(f)     If at any time Administrative Agent is not in receipt of written evidence that all insurance required hereunder is in full force and effect, Administrative Agent shall have the right, upon not less than five (5) Business Days' notice to Borrower (except in the event of an emergency or an imminent lapse or loss of insurance coverage), to take such action as Administrative Agent deems necessary to protect Lenders' interest in the Project, including, without limitation, obtaining such insurance coverage as Administrative Agent in Administrative Agent's reasonable discretion deems appropriate. All premiums incurred by Administrative Agent or Lenders in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Administrative Agent upon demand and shall bear interest at the Involuntary Rate.

(g)     Borrower shall not take out separate insurance concurrent in form or contributing (in the event of a loss) to the insurance required to be maintained under this Section 8.1. Borrower may, however, carry, or permit Tenants to carry, insurance for the Project in addition to required insurance, but only if such additional insurance: (i) does not violate or entitle the carrier to assert any defense or disclaim any primary coverage under any required insurance; (ii) mutually benefits Borrower or Tenants, as the case may be, and Administrative Agent, as their interests may appear; and (iii) otherwise complies with this Agreement; *provided*, *however*, Administrative Agent reserves the right to approve any insurance provided by any other Tenant.   Notwithstanding the foregoing, Administrative Agent hereby acknowledges that the insurance coverages held by the Tenants as of the Closing Date are acceptable to Administrative Agent.

Section 8.2. Insurance Escrow; Payment by Administrative Agent. Borrower shall not be obligated to make any deposit or payment for insurance premium payment obligations, as hereinafter provided, until Administrative Agent makes demand therefor following an Event of Default and (i) any Tenant under a Material Lease is not paying such premiums in accordance with the terms and provisions of its respective Lease, or (ii) any Tenant under a Material Lease is in default under such Lease. Subject to the foregoing, upon notice from Administrative Agent, Administrative Agent shall have the right to require that Borrower pay to Administrative Agent at the time of each payment of an installment of interest and/or principal under the Note, an additional amount sufficient to discharge the premium payment obligations under this Article VIII when they become due. The determination of the amount so payable and of the fractional part thereof to be deposited with Administrative Agent, so that the aggregate of such deposits shall be sufficient for this purpose, shall be made by Administrative Agent in Administrative Agent's reasonable discretion. Such amounts shall be held by Administrative Agent not as a trust fund and without interest (except as required by applicable law) and shall be applied to the payment of the obligations in respect of which such amounts were deposited, in such order or priority as Administrative Agent shall reasonably determine, on or before the respective dates on which the same or any of them would become due. After acceleration of the Debt, the balance of any such amounts held by Administrative Agent may be used and applied for any purpose authorized pursuant to Article II of the Deed of Trust and Section 10.2 hereof including, without limitation, payment of the Debt in any order Administrative Agent may deem appropriate. If, one (1) month prior to the date any of the aforementioned obligations are due, the amounts then on deposit shall be insufficient for the payment of such obligation in full, Borrower shall, within ten (10) days after written demand, deposit the amount of the deficiency with Administrative Agent. Nothing herein contained shall be deemed to affect any right or

001649

remedy of Administrative Agent or Lenders under any provisions of this Agreement or of any statute or rule of law to pay any such amount and to add the amount so paid, together with interest at the Involuntary Rate, to the Debt.

Section 8.3. <u>Casualty</u>. If the Project shall be damaged or destroyed, in whole or in part, by fire or other casualty (a "<u>Casualty</u>"), Borrower shall give prompt notice of such damage to Administrative Agent and Administrative Agent shall have the right to join Borrower in adjusting any loss. In addition, after the entry of any decree of foreclosure of the Deed of Trust, any purchaser at foreclosure sale or the decree creditor, as the case may be, shall also have the right to join in the adjustment of any such losses. Any moneys received as payment for any loss under any such insurance (the "<u>Insurance Proceeds</u>") shall be paid, subject to the terms of the Existing Leases, over to Administrative Agent to be applied, at Administrative Agent's option, either to (i) prepayment of the Note and other sums due under the Loan Documents or (ii) to the extent reasonably practicable, the reimbursement of Borrower from time to time of expenses incurred by Borrower in connection with the restoration of the Project ("<u>Restoration Work</u>") upon terms otherwise satisfactory to Administrative Agent. Administrative Agent and Lenders shall have the right to participate in the adjustment of all claims for Insurance Proceeds. Borrower shall promptly commence and diligently prosecute the restoration of the Project whether or not the Insurance Proceeds are made available to Borrower. Borrower shall pay all costs of such restoration whether or not such costs are covered by insurance. Provided and on condition that no Event of Default has occurred and is continuing, any prepayment of the Debt by application of Insurance Proceeds shall not be subject to any Prepayment Premium, however, Borrower shall be obligated to pay any breakage costs or other similar losses incurred or suffered by Administrative Agent and Lenders as a result of such prepayment.

Notwithstanding the foregoing, and subject to the terms of subsection (f) hereof, if Administrative Agent agrees to make the Insurance Proceeds, less the reasonable and actual out-of-pocket cost, if any, to Administrative Agent of obtaining and disbursing such Insurance Proceeds (including, without limitation, reasonable attorneys' fees and disbursements and costs allocable to inspecting the Restoration Work and the Plans) for the repair and restoration of the Project ("<u>Actual Proceeds</u>") available to the Borrower (not by way of application against and readvancement of loan funds under the Deed of Trust but solely as a security fund from which to reimburse Borrower for or permit Borrower to pay directly the costs of such repair and restoration), then Administrative Agent shall make the Actual Proceeds available to Borrower and Borrower shall complete the Restoration work in accordance with the following terms, provisions and conditions:

(a)     If the Project should be damaged or destroyed by fire or other casualty, Borrower shall promptly upon insurance settlement, which settlement shall be diligently pursued by Borrower, commence the Restoration Work. Administrative Agent shall, subject to the terms of Subsection (b) below, deposit the proceeds of settlement in an interest-bearing account (the "<u>Restoration Account</u>") in a branch of any federally-insured bank as Administrative Agent may determine, in Administrative Agent's sole and absolute discretion. Borrower shall, as provided below, pay or cause to be paid all expenses in connection with such repair and restoration of the Project so that the Project, at all times, shall be and remain free and clear from any and all Liens.

(b)     If the Insurance Proceeds are less than or equal to $750,000, Administrative Agent shall deliver such Insurance Proceeds to Borrower to perform the Restoration Work. If the Insurance Proceeds are greater than $750,000, Administrative Agent shall make 90% of the Actual Proceeds available to Borrower as provided in subsection (c) below and the final 10% of the Actual Proceeds (the "<u>Balance</u>") available to Borrower as provided in subsection (d) below. Borrower shall utilize such Actual Proceeds only for the purposes of performing the Restoration Work and for no other purpose whatsoever, except as hereinafter set forth. If the estimated costs of the Restoration Work shall exceed the Actual Proceeds, the difference (the "<u>Excess Funds</u>") shall be deposited in the Restoration

42

001650

Account. Such Excess Funds shall be applied toward the Restoration Work prior to the application of the Actual Proceeds, all in accordance with the disbursement procedures hereinafter provided. Any unexpended Actual Proceeds remaining after completion of the Restoration Work shall be paid over to Borrower, provided no Event of Default exists or is continuing.

(c)     Any Actual Proceeds held by Administrative Agent shall be paid by Administrative Agent to Borrower from time to time as the Restoration Work progresses, subject to the following terms, provisions and conditions:

(i)     If the Restoration Work is structural or if the cost of the Restoration Work is reasonably estimated to exceed $750,000, the Restoration Work shall be supervised by a registered architect or engineer and inspected by a consultant engaged by Administrative Agent at the sole cost and expense of Borrower (the "Inspector"). Before Borrower commences any Restoration Work, other than temporary Restoration Work to protect property or prevent interference with business, Administrative Agent shall have been furnished with and shall have approved (which approval shall not be unreasonably withheld or delayed) (i) an estimate of the cost of the Restoration Work accompanied by an architect's certification as to such costs and (ii) appropriate plans and specifications ("Plans") for the Restoration Work, it being nevertheless understood that said Plans shall provide for Restoration Work so that, upon completion thereof, the Project shall be comparable in character and equal in value and general utility to the Project prior to the damage or destruction. Borrower shall furnish Administrative Agent with evidence satisfactory to Administrative Agent that all portions of the Project so restored and/or repaired and their contemplated use fully comply with all Legal Requirements;

(ii)     Each request for payment shall be made upon seven (7) days' prior notice to Administrative Agent and shall be accompanied by certificates to be made by the Inspector or, if none shall be required, by an officer of Borrower, stating (aa) that all of the Restoration Work completed has been done in compliance with the approved Plans, if any be required under subsection (c)(i) above, and all Legal Requirements, (bb) that the sum requested is justly required to reimburse Borrower for payments by Borrower, or is justly due to the contractor, subcontractors, materialmen, laborers, engineers, architects or other Persons rendering services or materials for the Restoration Work (giving a brief description of such services and materials), and that (prior to the final completion of the Restoration Work) the requested payment does not exceed the greater of (x) the amount of the requested payment less the retainage required pursuant to the applicable general contract or subcontract or (y) 90% of the value of the Restoration Work performed which is the subject of the requested payment (hereinafter called the "Applicable Percentage") and that all sums previously paid out by Administrative Agent do not exceed the Applicable Percentage of the aggregate value of the Restoration Work done to the date of such certificate, (cc) that if the sum requested is to cover payment relating to repair and restoration of personal property required or relating to the Project, that title to the personal property items covered by the request for payment is vested in Borrower and (dd) that the amount of Actual Proceeds remaining in the hands of Administrative Agent shall be sufficient upon completion of the Restoration Work to pay for the same in full free and clear of Liens. Additionally, each request for payment shall contain a statement signed by an officer or authorized signatory of Borrower approving both the Restoration Work done to date and the Restoration Work covered by the request for payment in question; and

(iii)     Each request shall be accompanied by (aa) invoices or receipts, (bb) waivers of lien reasonably satisfactory to Administrative Agent covering that part of the Restoration Work for which payment or reimbursement is being requested and (cc) if required by Administrative Agent, a search prepared by the Title Company or other evidence satisfactory to Administrative Agent that there has not been filed with respect to the Project any mechanic's or other lien or instrument for the retention of title in respect of any part of the Restoration Work not discharged of record, or that will not be discharged in connection with the requested payment, by payment, bonding or otherwise. If available,

43

001651

Administrative Agent may, at Administrative Agent's option, require an endorsement to the Title Policy insuring the continued priority of the lien of the Deed of Trust as to all sums advanced hereunder, such endorsement to be paid for by Borrower.

(d)      The Balance shall be paid to Borrower only after the Restoration Work has been fully completed and within seven (7) days following the furnishing by Borrower to Administrative Agent of (i) a copy of any certificate or certificates required by law to render occupancy and full operation of the Project legal and (ii) a certification by the Inspector, if applicable, as to completion in accordance with the approved Plans and Legal Requirements and an architect's certificate of completion in the form of AIA-G703.

(e)      At all times during the conduct of the Restoration Work, Borrower shall, at Borrower's sole cost and expense, obtain and cause to be maintained workmen's compensation and public liability insurance in amounts necessary to protect Borrower, Administrative Agent and Lenders from all liabilities, damages, claims or demands arising out of any accident or occurrence causing injury or death to any Person or property whatsoever. All insurance shall be with responsible insurance companies, licensed and authorized to transact business in the State of Texas and shall be written in forms, amounts and by companies reasonably satisfactory to Administrative Agent. The originals or certified copies of all Policies, together with original certificates or evidence thereof, shall be delivered to Administrative Agent. Renewals of such Policies shall be delivered to Administrative Agent at least ten (10) days before any such Policies shall expire. Nothing contained herein shall relieve Borrower from any requirement of this Agreement regarding the insuring of the Project.

(f)      Notwithstanding the terms and provisions of subsections (b), (c) and (d) hereof, in the event that (i) Borrower fails to commence the Restoration Work or to proceed diligently and continuously to completion of the Restoration Work, subject to force majeure delays, within twelve (12) months from the date the Project was damaged or destroyed, (ii) the damage or destruction occurs during the last six (6) months of the term of the Note, unless, in Administrative Agent's reasonable judgment, the required Restoration Work is capable of being completed by not later than ninety (90) days prior to the Maturity Date, (iii) the required Restoration Work is not capable of being completed within eighteen (18) months from the date the Project was damaged or destroyed, in Administrative Agent's reasonable judgment (provided rent or business interruption insurance is in effect for the entire period of reconstruction), or (iv) an Event of Default is continuing, the terms, provisions and condition of subsections (b), (c) and (d) hereof shall not apply and Administrative Agent's option as to the application of Insurance Proceeds shall continue to apply. During the continuance of an Event of Default, Insurance Proceeds may be applied by Administrative Agent in any manner determined by Administrative Agent in its sole and absolute discretion.

Section 8.4. <u>Condemnation</u>. Borrower shall promptly give Administrative Agent notice of the actual or threatened commencement of any proceeding for the Condemnation of the Project of which Borrower has knowledge and shall deliver to Administrative Agent copies of any and all papers served in connection with such proceedings. Administrative Agent and Lenders may participate in any such proceedings, and Borrower shall from time to time deliver to Administrative Agent all instruments requested by Administrative Agent to permit such participation. Borrower shall, at Borrower's sole cost and expense, diligently prosecute any such proceedings, and shall consult with Administrative Agent, Administrative Agent's attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings. In the event of such condemnation proceedings, the Award payable is hereby assigned to and shall be paid to Administrative Agent. Administrative Agent shall be under no obligation to question the amount of any such Award and may accept the same in the amount in which the same shall be paid. The proceeds of any Award so received shall (except for a temporary taking the Award for which shall be paid over to Borrower), at the option of Administrative Agent, and in the absence of an

44

Event of Default, either be (i) applied to the prepayment of the Note and other sums due under the Loan Documents, or (ii) to the extent reasonably practicable, paid over to Borrower from time to time for expenses incurred by Borrower in the restoration of the Project and upon terms otherwise satisfactory to Administrative Agent, in Administrative Agent's sole and absolute discretion. Notwithstanding any taking by any public or quasi-public authority through Condemnation or otherwise (including, but not limited to, any transfer made in lieu of or in anticipation of the exercise of such taking), Borrower shall continue to pay the Debt at the time and in the manner provided for its payment in the Note and in this Agreement and the Debt shall not be reduced until any Award shall have been actually received and applied by Lenders, after the deduction of expenses of collection, to the reduction or discharge of the Debt. Lenders shall not be limited to the interest paid on the Award by the condemning authority but shall be entitled to receive out of the Award interest at the rate or rates provided herein or in the Note. To the extent the Project can be restored or repaired following any condemnation, and to the extent Borrower shall be entitled or permitted to do the same, if the Project or any portion thereof is taken by a condemning authority, Borrower shall promptly commence and diligently prosecute the restoration of the Project whether or not such Award is made available to Borrower. If the Project is sold, through foreclosure or otherwise, prior to the receipt by Lenders of the Award, Lenders shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award, or a portion thereof sufficient to pay the Debt. Notwithstanding anything to the contrary contained herein, to the extent that the Project can be restored or repaired following any condemnation, as determined by Required Lenders in their sole and absolute good faith discretion, the awards or proceeds from any such condemnation shall be disbursed and paid over to Borrower in the same manner as set forth in Section 8.3 hereof with respect to Insurance Proceeds.

ARTICLE IX
INTENTIONALLY OMITTED

ARTICLE X
EVENTS OF DEFAULT; REMEDIES

Section 10.1. Event of Default. The occurrence of any one or more of the following events shall constitute an "Event of Default":

(a)     if any portion of the Debt is not paid within five (5) days after the date the same is due, or if the entire Debt is not paid on or before the Maturity Date;

(b)     if Borrower shall fail to pay any other sum hereunder or under any of the other Loan Documents when and as the same shall become due and payable and such failure shall not be cured within fifteen (15) days after notice from Administrative Agent;

(c)     if the Policies are not kept in full force and effect, or if the Insurance Certificates or certified copies of the Policies are not delivered to Administrative Agent as provided in Section 8.1 hereof;

(d)     if Borrower breaches any covenant with respect to itself contained in Article VI hereof or if Borrower breaches any covenant contained in Article VII hereof, and same is not cured, if capable of being cured, within thirty (30) days after notice;

(e)     if any representation or warranty of any Person comprising Borrower or Guarantor, or with respect to, Borrower, Guarantor or any member, general partner, principal or beneficial owner of Borrower, made herein, in any other Loan Document, or in any certificate, report, financial statement or other instrument or document furnished to Administrative Agent at the time of the

45

001653

closing of the Loan or during the term of the Loan shall have been false or misleading in any material respect when made;

(f)     if (i) Borrower or Guarantor shall commence any case, proceeding or other action (A) under any Creditors' Rights Laws, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, or (B) seeking appointment of a receiver, trustee, custodian, conservator or other similar official for it or for all or any substantial part of its assets, or Borrower or Guarantor shall make a general assignment for the benefit of its creditors; or (ii) there shall be commenced against Borrower or Guarantor any case, proceeding or other action of a nature referred to in clause (i) above which (A) results in the entry of an order for relief or any such adjudication or appointment or (B) remains undismissed, undischarged or unbonded for a period of sixty (60) days; or (iii) other than an involuntary proceeding commenced by Administrative Agent or any Lender, there shall be commenced against Borrower or Guarantor any case, proceeding or other action seeking issuance of a warrant of attachment, execution, distraint or similar process against all or any substantial part of its assets which results in the entry of any order for any such relief which shall not have been vacated, discharged, or stayed or bonded pending appeal within sixty (60) days from the entry thereof; or (iv) Borrower or Guarantor shall take any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the acts set forth in clause (i), (ii), or (iii) above; or (v) Borrower or Guarantor shall generally not, or shall be unable to, or shall admit in writing its inability to, pay its debts as they become due;

(g)     if there should occur a default which is not cured within the applicable grace or cure period, if any, under any other deed of trust encumbering all or part of the Project regardless of whether any such other deed of trust is prior or subordinate to the Deed of Trust or upon default in the performance of any term, provision, covenant or condition, which is not cured within the applicable grace or cure period, if any, under the notes evidencing such deeds of trust or any other documents executed in connection therewith; it being further agreed by Borrower that an Event of Default hereunder shall constitute an event of default under any such other deed of trust in respect of the Project held by Administrative Agent;

(h)     if Borrower shall be in default beyond applicable notice and grace periods under any other loan or financing arrangement between Borrower and any Lender, whether now or hereafter existing;

(i)     if any federal tax lien is filed against Borrower, Guarantor, Borrower Members or the Project and same is not discharged of record or bonded within thirty (30) days after the same is filed;

(j)     if a judgment is filed against Borrower, Guarantor, Borrower Members or the Project which (x) is in excess of $500,000 or (y) in the reasonable judgment of Administrative Agent would materially interfere with such Person's ability to perform its obligations under the Loan Documents to which it is a party, and which is not stayed, vacated, bonded or discharged within thirty (30) days after the same is filed;

(k)     if any Lien is filed or recorded against the Project or any interest therein *with the consent of Borrower* (but without the consent of Administrative Agent), and such Lien is not released within a period of five (5) days of the filing or recording thereof;

(l)     with the exception of Permitted Encumbrances, if any Lien is filed or recorded against the Project or any interest therein without the consent of Borrower or Administrative Agent and such Lien is not removed, discharged or bonded to the satisfaction of Administrative Agent within thirty (30) days of such filing or recording;

46

001654

(m)     if Borrower, Guarantor or any Borrower Member shall breach any of the terms of:

      (i)     Section 5.14 (Liens);

      (ii)     Section 5.19 (Alterations);

      (iii)     Section 5.21 (Notices);

      (iv)     Section 5.23 (Limitations on Securities Issuances);

      (v)     Section 5.24 (Limitations on Distributions);

      (vi)     Section 5.25 (Contractual Obligations);

      (vii)     Section 5.26 (Additional Indebtedness);

      (viii)     Section 5.27 (Restrictions on Leasing);

      (ix)     Section 5.28 (Debt Service Coverage Ratio);

      (x)     Section 5.29 (Loan-to-Value Ratio);

      (xi)     Section 7.2 (No Sale/Encumbrance);

(n)     [Reserved.];

(o)     if Borrower or Guarantor shall continue to be in default under any other term, covenant or condition of this Agreement or any of the Loan Documents for more than ten (10) days after notice from Administrative Agent in the case of any default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Administrative Agent in the case of any other default, provided that if such default cannot reasonably be cured within such thirty (30)-day period and Borrower or the applicable Guarantor shall have commenced to cure such default within such thirty (30)-day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30)-day period shall be extended for so long as it shall require Borrower or the applicable Guarantor in the exercise of due diligence to cure such default, it being agreed that no such extension shall (i) apply in the event of a default under Section 5.4 or Section 8.1 of this Agreement or (ii) be for a period in excess of one hundred (100) days in the aggregate;

(p)     if a default should occur under any Interest Rate Protection Product entered into by Borrower;

(q)     if there shall occur a default or event of default under the Guaranty which is not cured within any applicable grace or cure period, if any, or the Guaranty shall fail for any reason to be in full force of effect;

(r)     if there shall occur a default or event of default under the Environmental Indemnity Agreement which is not cured within any applicable grace or cure period, if any, or the Environmental Indemnity Agreement shall fail for any reason to be in full force of effect;

(s)     if an ERISA Event shall have occurred that, in the opinion of the Administrative Agent, when taken together with all other ERISA Events that have occurred, results in or could reasonably be expected to result in liability to Borrower in excess of $500,000;

47

001655

(t)       if Borrower shall file a notice limiting the maximum principal amount that may be secured by the Deed of Trust to a sum less than the maximum principal amount set forth in <u>Section 3.12</u> thereof; or

(u)       if there shall be an Event of Default under the Mezzanine Loan Agreement or any other Mezzanine Loan Document by Mezzanine Borrower or any other Person obligated thereunder.

Section 10.2. <u>Remedies</u>.

(a)       Upon the occurrence of an Event of Default (other than an Event of Default described in <u>Section 10.1(f)</u> hereof) and at any time thereafter that such Event of Default is continuing Administrative Agent and/or Lenders may, in addition to any other rights or remedies available to Administrative Agent or Lenders pursuant to this Agreement and the other Loan Documents or at law or in equity, take such action, without notice or demand, that Administrative Agent or Lenders deem advisable to protect and enforce Lenders' rights against Borrower, Guarantor and in the Project, including, without limitation, declaring the Debt to be immediately due and payable, and Administrative Agent and/or Lenders may enforce or avail themselves of any or all rights or remedies provided in the Loan Documents and may exercise all the rights and remedies of a secured party under the UCC, as adopted and enacted by the State where the Project is located, against Borrower, Guarantor and the Project, including, without limitation, all rights or remedies available at law or in equity; and upon any Event of Default described in <u>Section 10.1(f)</u> hereof, the Debt and all other obligations of Borrower and Guarantor hereunder and under the other Loan Documents shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained herein or in any other Loan Document to the contrary notwithstanding.

(b)       Upon the occurrence and during the continuance of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Administrative Agent or Lenders against Borrower or Guarantor under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to, Borrower or Guarantor or at law or in equity may be exercised by Lenders at any time and from time to time, whether or not all or any of the Debt shall be declared due and payable, and whether or not Administrative Agent or Lenders shall have commenced any foreclosure proceeding or other action for the enforcement of Lenders' rights and remedies under any of the Loan Documents with respect to the Project. Any such actions taken by Administrative Agent or Lenders shall be cumulative and concurrent and may be pursued independently, singularly, successively, together or otherwise, at such time and in such order as Administrative Agent or Lenders may determine in Administrative Agent's or Lenders' sole discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Administrative Agent or Lenders permitted by law, equity or contract or as set forth herein or in the other Loan Documents.

ARTICLE XI
REPLACEMENT OF LENDERS

If Borrower is entitled to replace a Lender pursuant to the Note (i.e., pursuant to (i) subsection (e) of the section titled "Increased Costs", or (ii) the section titled "Illegality"), Borrower may, upon notice to such Lender and Administrative Agent, replace such Lender by causing such Lender to assign its rights and obligations under this Agreement and the Note to one or more Eligible Assignees reasonably acceptable to Borrower and Administrative Agent.  Borrower shall or shall cause the replacement lender to pay in full all principal, interest, fees and other amounts owing to such Lender through the date of replacement.  The Lender being replaced and the replacement lender shall execute and deliver an Assignment and Assumption Agreement in the form attached hereto as <u>Exhibit B</u>.  A Lender shall not be required to make any such assignment if, prior thereto, as a result of a waiver by such Lender or otherwise,

the circumstances entitling the Borrower to require such assignment cease to apply.  If a Lender being replaced refuses to execute and deliver such Assignment and Assumption Agreement or otherwise comply with this Article XI, such Lender hereby appoints Administrative Agent as its attorney-in-fact to do so on such Lender's behalf.  Administrative Agent shall distribute an amended Schedule 13.12, which shall thereafter be incorporated into this Agreement, to reflect adjustments to Lenders and their respective amount of the Loan.

ARTICLE XII
SECONDARY MARKET; ASSIGNMENT; PARTICIPATION

Section 12.1. Assignment; Participation.

(a)     Any non-Defaulting Lender (as defined in Section 13.16 hereof) may at any time grant to one or more parties (each a "Participant") participating interests in its Pro Rata Share (as hereinafter defined) of the Loan (the "Participations") and Lenders may syndicate the Loan ("Syndication"). In the event of any such grant by a Lender of a Participation to a Participant, such Lender shall remain responsible for the performance of such Lender's obligations hereunder, and Borrower and Administrative Agent shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations hereunder. Any agreement pursuant to which any Lender may grant a Participation shall provide that such Lender shall retain the sole right and responsibility to enforce the obligations of Borrower, as the case may be, hereunder and under any other Loan Document, including, without limitation, the right to approve any amendment, modification or waiver of any provision of this Agreement or any other Loan Document.

(b)     A Lender may at any time assign (x) to any Eligible Assignee with the consent of Administrative Agent, which consent shall not be unreasonably delayed, conditioned or denied, (y) to any other party with the consent of Administrative Agent, which consent may be withheld by Administrative Agent in Administrative Agent's sole and absolute discretion; provided, however, that as long as no Event of Default has occurred and is continuing, Borrower's consent shall also be required for an assignment pursuant to clauses (x) and (y) (each such assignee set forth in (x) and (y) above, a "Consented Assignee"), or (z) without such consent, to one or more Eligible Assignees which are affiliates, subsidiaries or a parent of a Lender (each Consented Assignee or subsidiary, affiliate or parent bank or institution, an "Assignee") all or a proportionate part of all of such Lender's rights and obligations under this Agreement and the Note, and such Assignee shall assume rights and obligations, pursuant to an Assignment and Assumption Agreement substantially in the form annexed hereto as Exhibit B and made a part hereof executed by such Assignee and the assigning Lender (duplicate executed originals of which shall be delivered to Borrower to the extent available). Upon (i) execution and delivery of such instrument, (ii) payment by such Assignee to the assigning Lender of an amount equal to the purchase price agreed between such Lender and such Assignee and (iii) with respect to a Consented Assignee, payment by such Assignee to Administrative Agent of a fee, for Administrative Agent's own account, in the amount of $5,000, such Assignee shall be a party to this Agreement and shall have all the rights and obligations of a Lender as set forth in such Assignment and Assumption Agreement, and the assigning Lender shall be released from such Lender's obligations hereunder to a corresponding extent, and no further consent or action by any party shall be required. If the Assignee is not incorporated under the laws of the United States or a state thereof, it shall, prior to the first date on which interest or fees are payable hereunder for its account, deliver to Borrower and Administrative Agent certification reasonably acceptable to Borrower as to exemption from deduction or withholding of any United States federal income taxes. Borrower shall not be required to reimburse any Lender for taxes or reimburse any Lender for any withholding due to such Lender's failure to deliver such certification, or due to the validity of such certification. Notwithstanding anything contained herein to the contrary, no Lender shall have the right to assign less than $5,000,000 of such Lender's interest under this Agreement and the other Loan

49

Documents. For the purposes hereof, an "Eligible Assignee" shall mean any of (a) a commercial bank organized under the laws of the United States, or any state thereof or the District of Columbia, and having total assets in excess of $1,000,000,000; (b) a savings and loan association or savings bank organized under the laws of the United States, or any State thereof or the District of Columbia, and having a net worth of at least $100,000,000, calculated in accordance with generally accepted accounting principles; (c) a commercial bank organized under the laws of any other country which is a member of the OECD, or a political subdivision of any such country and having total assets in excess of $1,000,000,000, provided that such bank is acting through a branch or agency located in the country in which it is organized or another country which is also a member of the OECD; (d) the central bank of any country which is a member of the OECD; (e) any other assignee that, in the reasonable judgment of Administrative Agent, is a reputable institutional investor with substantial experience in lending and originating loans similar to the Loan, or in purchasing, investing in or otherwise holding such loans, having a financial net worth of at least $100,000,000 and (f) any non-Defaulting Lender or any affiliate, subsidiary or parent of any non-Defaulting Lender. Neither Borrower, Guarantor nor any Affiliate or Subsidiary of Borrower or Guarantor shall be Eligible Assignee or Participant. Notwithstanding anything to the contrary contained herein, any Lender may at any time pledge or assign a security interest in all or any portion of its rights under the Loan, the Note and the other Loan Documents to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations under the Loan, the Note or any other Loan Document or substitute any such pledgee or assignee for such Lender as a party to the Loan, the Note or any Loan Document.

(c)     Borrower, Guarantor, Administrative Agent and Lenders shall execute such modifications to the Loan Documents as shall, in the reasonable judgment of Administrative Agent, be necessary or desirable in connection with assignments in accordance with the foregoing provisions of this Section 12.1 and which do not adversely affect Borrower or Guarantor or Borrower's or Guarantor's obligations or rights under the Loan Documents (other than to a *de minimis* extent).

(d)     Any Lender may at any time assign all or any portion of such Lender's rights under this Agreement and the Note to a Federal Reserve Bank. No such assignment shall release the transferor Lender from its obligations hereunder.

(e)     Borrower recognizes that in connection with a Lender's selling of Participations or making of assignments, any or all documentation, financial statements, appraisals and other data, or copies thereof, relevant to Borrower, Guarantor or the Loan may be exhibited to and retained by any such Participant or Assignee or prospective Participant or Assignee. Borrower hereby consents to the release of any and all Borrower information to such parties, and holds Administrative Agent and Lenders harmless from any and all liability due to the release of Borrower's financial information by Administrative Agent or any Lender to any such party. Administrative Agent and Lenders shall instruct such Participant or Assignee to keep such information confidential but Administrative Agent and Lenders shall have no liability if such Participant or Assignee fails to do so.

(f)     Borrower and Guarantor agree to cooperate with Lenders in connection with any sale or transfer of the Loan, Syndication or any Participation created pursuant to this Article XII. At the request of the holder of the Note and, to the extent not already required to be provided by Borrower or Guarantor under this Agreement, Borrower and Guarantor shall take such reasonable actions for the benefit of, and use reasonable efforts to provide information not in the possession of, the holder of the Note in order to satisfy the market standards (which may include such holder's delivery of information with respect to Borrower, Guarantor and the Project to any Participant or Assignee or prospective Participant or Assignee) to which the holder of the Note customarily adheres or which may be reasonably required in the marketplace in connection with such sales or transfers, including, without limitation, to:

50

001658

        (i)      provide (x) updated financial, budget and other information with respect to the Project, Borrower, Guarantor and Manager and (y) modifications and/or updates to the appraisals, market studies, Environmental Reports (including Phase I reports and, if appropriate, Phase II reports) of the Project obtained in connection with the making of the Loan (all of the foregoing being referred to as the "<u>Provided Information</u>"), together, if customary, with appropriate verification and/or consents of the Provided Information;

        (ii)      make non-material changes to the Organizational Documents of Borrower, Guarantor or its principals;

        (iii)      upon reasonable prior notice, permit site inspections, appraisals, market studies and other due diligence investigations of the Project, as may be reasonably requested by the holder of the Note or as may be necessary in connection with the Participations or Syndications;

        (iv)      make the representations and warranties with respect to the Project, Borrower, Guarantor, Manager and the Loan Documents as such Persons have made in the Loan Documents and such other representations and warranties with respect to the Project, Borrower, Guarantor and Manager, as may be reasonably requested by the holder of the Note;

        (v)      execute such amendments to the Loan Documents as may be requested by the holder of the Note including, without limitation, bifurcation of the Loan into two or more components and/or separate notes and/or creating a senior/subordinate note structure; *provided*, *however*, that Borrower and Guarantor shall not be required to modify or amend any Loan Document if such modification or amendment would (x) change the interest rate or the stated maturity set forth in the Note, except in connection with a bifurcation of the Loan which may result in varying fixed interest rates and amortization schedules, but which shall have the same initial weighted average coupon of the original Note, (y) in the reasonable judgment of Borrower modify or amend any other economic term of the Loan, or (z) in the reasonable judgment of Borrower or Guarantor increase Borrower's or Guarantor's obligations and liabilities under the Loan Documents, other than to a *de minimis* extent; and

        (vi)      have reasonably appropriate personnel participate in a bank meeting and/or presentation for the potential Participants or Lenders.

        (g)      At the option of Lenders, the Loan may be serviced by a servicer/trustee selected by Lenders ("<u>Servicer</u>") and Lenders may delegate all or any portion of Lenders' responsibilities under this Agreement and the other Loan Documents to such servicer/trustee pursuant to a servicing agreement between Lenders and such servicer/trustee. Lenders shall provide Borrower with notice of same. At no time shall there be more than one (1) Servicer.

        (h)      All third party costs and expenses incurred by Borrower, Guarantor or Lenders in connection with Borrower's or Guarantor's complying with the requests and requirements made under this <u>Article XII</u> shall be paid by Lenders (and not by Borrower).

       Section 12.2. <u>Intralinks</u>. Borrower hereby acknowledges that Administrative Agent will make available to Lenders all information provided by or on behalf of Borrower or Guarantor hereunder or under the other Loan Documents (collectively, "<u>Borrower Materials</u>") by posting the Borrower Materials on IntraLinks® or another similar electronic system (the "<u>Platform</u>").

<div align="center">

ARTICLE XIII
AGENT

</div>

       Section 13.1. <u>Appointment, Powers and Immunities</u>.

<div align="center">51</div>

(a)    Each Lender hereby designates, appoints and authorizes Administrative Agent to act as agent hereunder and under the other Loan Documents to which Administrative Agent is a party in its capacity as Administrative Agent (this Agreement and such other Loan Documents, the "<u>Administrative Agent Loan Documents</u>") with such powers as are specifically delegated to Administrative Agent by the terms of this Agreement and such Loan Documents, together with such other powers as are reasonably incidental thereto. Administrative Agent (a) shall have no duties or responsibilities except those expressly set forth in this Agreement and in the other Administrative Agent Loan Documents, and shall not by reason of this Agreement or any other Administrative Agent Loan Document be a trustee or fiduciary for any of Lenders; (b) shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents), <u>provided</u> that Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose Administrative Agent to liability or that is contrary to any Loan Document or applicable law; (c) shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as Administrative Agent or any of its Affiliates in any capacity; (d) shall not be responsible to Lenders for or have any duty to ascertain or inquire into (i) any recitals, statements, representations or warranties contained in this Agreement, any other Administrative Agent Loan Document, or in any certificate or other document referred to or provided for in, or received by any Lenders under, this Agreement or any other Administrative Agent Loan Document, (ii) the value, validity, effectiveness, genuineness, enforceability or sufficiency of this Agreement or any other Administrative Agent Loan Document or any other document referred to or provided for herein or therein, (iii) any failure by Borrower to perform any of such party's obligations hereunder or thereunder, or (iv) the satisfaction of any condition set forth herein, other than to confirm receipt of items expressly required to be delivered to Administrative Agent; and (e) shall not be responsible to Lenders for any action taken or omitted to be taken by Administrative Agent hereunder or under any other Administrative Agent Loan Document or under any other document or instrument referred to or provided for herein or therein or in connection herewith or therewith, except for Administrative Agent's own gross negligence or willful misconduct or the failure of Administrative Agent to follow the directions of the Required Lenders or all of the Lenders, as the case may be, as provided for herein.

(b)    To the extent that any action is to be taken, any information is to be delivered to or by any Lender, any determination is to be made, or any consent is to be given or withheld by any Lender, any such action, delivery, determination or consent shall be taken, made or given or withheld, as the case may be, by Administrative Agent or any successor agent thereto at the direction of the Required Lenders or all of the Lenders, as the case may be, as provided for herein.

(c)    Administrative Agent may employ agents and attorneys-in-fact and shall not be responsible for the negligence or misconduct of any such agents or attorneys-in-fact selected by Administrative Agent in good faith. Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by Administrative Agent. Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Affiliates. The exculpatory provisions of this <u>Section 13.1</u> shall apply to any such sub-agent and to the Affiliates of Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

4161624-v7\CHIDMS1

     (d)    Administrative Agent may deem and treat the payee of any note as the holder thereof for all purposes hereof unless and until Administrative Agent shall have been notified of the assignment thereof.

     Section 13.2. <u>Reliance by Administrative Agent</u>. Administrative Agent shall be entitled to rely upon, and shall incur no liability under or in respect of any of the Loan Documents by acting upon, any certification, consent, warranty, notice or other paper, instrument or communication (including any thereof by telephone, telecopy, e-mail, telex, telegram or cable) believed by Administrative Agent in good faith to be genuine and authentic and to have been signed or sent by or on behalf of the proper Persons, and upon advice and statements of legal counsel, independent accountants or other experts selected by Administrative Agent in good faith. As to any matters not expressly provided for by this Agreement or any other Administrative Agent Loan Document, Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, hereunder or thereunder in accordance with instructions given by Lenders holding sixty-six and two-thirds percent (66 2/3%) or more of the outstanding principal balance of the Loan (the "<u>Required Lenders</u>"), and such instructions of Administrative Agent and any action taken or not taken pursuant thereto shall be binding on all Lenders. Notwithstanding anything contained herein to the contrary, the consent of all of the Lenders (other than a Defaulting Lender) shall be required before Administrative Agent may take or not take any action with respect to the following:

     (a)    any increase or decrease in the total principal amount of the Loan;

     (b)    reductions in any interest rate (other than default rate interest) applicable to the Loan or any fees (other than late fees) required under this Agreement or any other Loan Document;

     (c)    the extension of the Maturity Date of the Note or the due date of any payment due under the Note (other than default interest or late fees);

     (d)    the release of all or substantially all of the Project (except as provided for herein and in the other Loan Documents);

     (e)    the release of Borrower or Guarantor from Borrower's or such Guarantor's obligations under this Agreement or any other Loan Document; and

     (f)    any amendment or modification of any of the provisions of <u>Article XII</u> or this <u>Article XIII</u>.

     In the event Administrative Agent sends a notice to any Lender recommending any action (or inaction) to be taken under this Agreement or any other Loan Document and such Lender does not respond to Administrative Agent within ten (10) Business Days of the date of Administrative Agent's notice to such Lender, such Lender shall be deemed to have consented to the action (or inaction) being recommended by Administrative Agent.

     Section 13.3. <u>Purchase of Disapproving Lender's Interest</u>.

     (a)    In the event Administrative Agent makes a recommendation to Lenders to take any action requiring unanimous consent pursuant to <u>Section 13.2</u> hereof (which recommendation may be made at any time and for any number of times), and one or more Lenders approve such recommendation (the "<u>Approving Lenders</u>") and one or more Lenders disapprove such recommendation (the "<u>Disapproving Lenders</u>"), one or more of the Approving Lenders shall have the right (but not the obligation), in such Approving Lender's sole and absolute discretion, to purchase the interest of the Disapproving Lender in full within thirty (30) days of such disapproval, upon the payment to Administrative Agent of all principal, accrued interest, default interest (but not the payment of any

applicable prepayment premium) due to such Disapproving Lender hereunder, and all amounts advanced by such Disapproving Lender as protective advances under the Deed of Trust as of the date of sale (collectively, the "Purchase Price"), whereupon such Disapproving Lender shall accept payment. In such event, and concurrently with the payment of the Purchase Price, such Disapproving Lender shall assign all of such Disapproving Lender's right, title and interest in and to the Loan and the Loan Documents to the Approving Lender purchasing such Disapproving Lender's interest, without recourse, representation, warranty or covenant, express or implied, of any kind or nature whatsoever, except that such Disapproving Lender has not assigned or encumbered such Lender's rights in the Loan and the Loan Documents.

(b)     Any sale pursuant to Section 13.3(a) hereof shall be made pursuant to documents reasonably satisfactory to Administrative Agent and the purchasing Approving Lender which shall provide, among other things, that the purchasing Approving Lender shall assume all of the obligations of such Disapproving Lender thereafter accruing under the Loan Documents and indemnify such Disapproving Lender from any claims or causes of actions that may arise after the closing date of such sale in connection with the Loan Documents (other than any claims or causes of action that may arise or be brought by Borrower or any third party as the result of the gross negligence or willful misconduct of such Disapproving Lender). The purchasing Approving Lender's right to purchase such Disapproving Lender's interest may be exercised by notice to Administrative Agent of the purchasing Approving Lender's intention to do so and payment by wire transfer of the Purchase Price.

(c)     If there is more than one Approving Lender that elects to purchase a Disapproving Lender's interest in the Loan, Administrative Agent shall apportion such Disapproving Lender's interest among such Approving Lenders in proportion to their Pro Rata Share.

Section 13.4.  Rights of Administrative Agent as Lender. With respect to its interest in the Loan, Administrative Agent in its capacity as a Lender hereunder shall have the same rights and powers hereunder as any other Lender and may exercise the same as though it were not acting as Administrative Agent, and the terms "Lender" and "Lenders" shall include Administrative Agent in its capacity as a Lender. Administrative Agent and Administrative Agent's affiliates may (without having to account therefor to any Lender) accept deposits from, lend money to (on a secured or unsecured basis), and generally engage in any kind of banking, trust or other business with Borrower (and any of Borrower Affiliates) as if it were not acting as Administrative Agent. Lenders and Lenders' Affiliates may (without having to account therefor to any other Lender or Administrative Agent) accept deposits from, lend money to (on a secured or unsecured basis), and generally engage in any kind of banking, trust or other business with Borrower (and any affiliates of them) as if it were not acting as Lender hereunder.

Section 13.5.  Indemnification.

(a)     Lenders agree to indemnify Administrative Agent (to the extent not reimbursed by Borrower and Guarantor hereunder and without limiting any obligations of Borrower hereunder) ratably, in accordance with their Pro Rata Shares, for any and all reasonable costs, fees, expenses, advances, interest, payments and claims of any kind and nature whatsoever that may be imposed on or incurred by Administrative Agent arising out of or by reason of any investigation in or in any way relating to or arising out of this Agreement or the transactions contemplated hereby (including, without limitation, the actual out-of-pocket costs and expenses that Administrative Agent is obligated to pay hereunder) or the servicing, administration and/or enforcement of the Loan, this Agreement and/or the Loan Documents (collectively, "Costs") provided that no Lender shall be liable for any of the foregoing Costs to the extent such Costs arise from the gross negligence or willful misconduct of Administrative Agent (as determined by a court of competent jurisdiction from which all appeal has been exhausted) or the failure of Administrative Agent to follow the directions of the Required Lenders or all of the Lenders, as the case

54

may be. The foregoing indemnity shall survive the payment of the obligations owing hereunder and the termination or non-renewal of this Agreement.

(b)     Any request by Administrative Agent for reimbursement of Costs shall be in the form of a certificate from Administrative Agent to each Lender as to the nature and amount for which Administrative Agent claims reimbursement from Lenders pursuant to this Section 13.5. Any such request shall include reasonable evidence that such Costs meet the criteria set forth in Subsection 13.5(a) hereof and have been incurred by Administrative Agent.

(c)     Any Costs which are required to be reimbursed by Lenders to Administrative Agent in accordance with this Section 13.5 and which are not reimbursed to Administrative Agent within three (3) Business Days after demand therefor in accordance with Subsection 13.5(b) hereof shall accrue interest at the Federal Funds Rate from and after the fourth (4th) Business Day after the date that such reimbursement request was made through and including the date of reimbursement by such Lender.

(d)     Any Costs which are subsequently recovered from Borrower or any other Person shall be returned to each Lender in proportion to the Pro Rata Share of said Costs previously remitted by each Lender to Administrative Agent.

Section 13.6. Non-Reliance on Administrative Agent and Other Lenders. Each Lender agrees that such Lender has, independently and without reliance on Administrative Agent or any of the other Lenders, and based on such documents and information as such Lender has deemed appropriate, made such Lender's own credit analysis of Borrower and has made such Lender's own decision to enter into this Agreement and the other Loan Documents and that such Lender shall, independently and without reliance upon Administrative Agent or any of the other Lenders, and based on such documents and information as such Lender shall deem appropriate at the time, continue to make such Lender's own analysis and decisions in taking or not taking action under this Agreement and the other Loan Documents. Other than determining whether payments due to Administrative Agent under the Loan Documents have in fact been made, Administrative Agent shall not be required to keep itself informed as to the performance or observance by Borrower of any term or provision of this Agreement or any of the other Loan Documents or any other document referred to as provided for herein or therein or to inspect the properties or books of Borrower. Administrative Agent shall provide each Lender with any information received by Administrative Agent from Borrower which is required to be provided to Lenders hereunder and with a copy of any notice of default received by Administrative Agent from Borrower or any Lender. Except for notices, reports and other documents expressly required to be furnished to Lenders by Administrative Agent hereunder or under any other Administrative Agent Loan Document, Administrative Agent shall not have any duty or responsibility to provide any Lender with any other credit or other information concerning the affairs, financial condition or business of Borrower that may come into the possession of Administrative Agent.

Section 13.7. Failure to Act. Except for action expressly required of Administrative Agent hereunder or under any of the other Administrative Agent Loan Documents, Administrative Agent shall in all cases be fully justified in failing or refusing to act hereunder and thereunder unless Administrative Agent shall receive further assurances to Administrative Agent's complete satisfaction from Lenders of their indemnification obligations under Section 13.5 hereof against any and all liability and expense that may be incurred by Administrative Agent by reason of Administrative Agent taking or continuing to take or failing to take any such action.

Section 13.8. Action by Administrative Agent. Each of the entities comprising Lenders hereby appoints Administrative Agent and each of the other Lenders as agent and bailee for the purpose of perfecting the security interests in and liens upon the Project, in accordance with Article 9 of the Uniform

4161624-v7\CHIDMS1

Commercial Code in effect in the State where the Project is located or the State where Borrower is organized, can be perfected only by possession (or where the security interest of a secured party with possession has priority over the security interest of another secured party). Each Lender hereby appoints Administrative Agent as such Lender's attorney-in-fact for the purpose of executing the Loan Documents (other than this Agreement) on such Lender's behalf.

Section 13.9. <u>Successor Administrative Agent</u>. Administrative Agent may resign as Administrative Agent upon thirty (30) days' written notice to Lenders. If Administrative Agent resigns under this Agreement, Lenders (other than the Lender which is the Administrative Agent resigning) shall appoint from among the other Lenders a successor agent for Lenders. If no successor agent is appointed prior to the effective date of the resignation of Administrative Agent, Administrative Agent may appoint, after consulting with Lenders (other than the Lender which is the Administrative Agent resigning), a successor agent from among such other Lenders. Upon the acceptance by the Lender so selected of such Lender's appointment as successor agent hereunder, such successor agent shall succeed to all of the rights, powers and duties of the retiring Administrative Agent and the term "Administrative Agent" as used herein and in the other Loan Documents shall mean such successor agent and the retiring Administrative Agent's appointment, powers and duties as Administrative Agent shall be terminated. After any retiring Administrative Agent's resignation hereunder as Administrative Agent, the provisions of this <u>Article XIII</u> shall inure to such retiring Administrative Agent's benefit as to any actions taken or omitted by such retiring Administrative Agent while such retiring Administrative Agent was Administrative Agent under this Agreement. If no successor agent has accepted appointment as Administrative Agent by the date which is thirty (30) days after the date of a retiring Administrative Agent's notice of resignation, the retiring Administrative Agent's resignation shall nonetheless thereupon become effective and Lenders shall perform all of the duties of Administrative Agent hereunder until such time, if any, as the Lenders (other than the Lender which has resigned as Administrative Agent) appoint a successor agent as provided for above. The resigning Administrative Agent shall have continuing liability for any act of gross negligence or willful misconduct committed by Administrative Agent during the period such Administrative Agent was the Administrative Agent under this Agreement.

Section 13.10. <u>Sharing</u>. If at any time or times any Lender shall receive (i) by payment, foreclosure, setoff or otherwise, any proceeds of the Project or other collateral or any payments with respect to the obligations of Borrower to such Lender arising under, or relating to, this Agreement or any of the Loan Documents except for any such proceeds or payments received by such Lender from Administrative Agent or otherwise pursuant to the terms of this Agreement, or (ii) payments from Administrative Agent hereunder in excess of such Lender's ratable portion of the relevant distributions by Administrative Agent hereunder, such Lender shall promptly turn the same over to Administrative Agent, in kind, and with such endorsements as may be required to negotiate the same to Administrative Agent, or in same day funds, as applicable, for the account of all of the Lenders and for application to the obligations hereunder in accordance with the applicable provisions of this Agreement.

Section 13.11. <u>Pro Rata Treatment and Payments</u>.

(a)  <u>Funding by Lenders; Presumption by Administrative Agent</u>. With respect to any advance required or deemed necessary by Administrative Agent under this Agreement or any other Loan Document (each, a "<u>Coverage Advance</u>"), Administrative Agent shall give each Lender not less than three (3) Business Days' notice by telephone and facsimile specifying the amount of the Coverage Advance, the date of the Coverage Advance and each Lender's Pro Rata Share of such Coverage Advance. Each Lender shall wire transfer to Administrative Agent immediately available federal funds equal to such Lender's Pro Rata Share of each Coverage Advance by 11:00 a.m. (New York City time) on the day of the Coverage Advance as set forth in the notice. Unless Administrative Agent shall have received notice from a Lender prior to the proposed date of any Coverage Advance that such Lender will not make

56

available to Administrative Agent such Lender's Pro Rata Share of such Coverage Advance, Administrative Agent may assume that such Lender has made such Pro Rata Share available on such date in accordance with this Section and may, in reliance upon such assumption, make available to Borrower a corresponding amount. In such event, if a Lender has not in fact made its Pro Rata Share of the applicable Coverage Advance available to Administrative Agent, then the applicable Lender and Borrower severally agree to pay to Administrative Agent forthwith on demand such corresponding amount with interest thereon, for each day from and including the date such amount is made available to Borrower to but excluding the date of payment to Administrative Agent, at (i) in the case of a payment to be made by such Lender, a rate (the "Lender Interest Rate") equal to the greater of (x) the sum of (1) the Federal Funds Rate in effect from time to time and (2) one percent (1%) per annum and (y) a rate determined by Administrative Agent in accordance with banking industry rules on interbank compensation, and (ii) in the case of a payment to be made by Borrower, the Interest Rate. If Borrower and such Lender shall pay such interest to Administrative Agent for the same or an overlapping period, Administrative Agent shall promptly remit to Borrower the amount of such interest paid by Borrower for such period. If such Lender pays its Pro Rata Share of the applicable Coverage Advance to Administrative Agent, then the amount so paid shall constitute such Lender's Pro Rata Share of the applicable Coverage Advance. Any payment by Borrower shall be without prejudice to any claim Borrower may have against a Lender that shall have failed to make such payment to Administrative Agent.

(b)  Notices. Notices to each Lender shall be delivered in accordance with the terms and provisions of Section 15.1 hereof.

Section 13.12. Lenders Pro Rata Shares. Each Lender shall be entitled to receive, and Administrative Agent shall transfer to each Lender, each Lender's Pro Rata Share of all payments received and collected by Administrative Agent pursuant to the Loan Documents on account of principal and interest (collectively, "Debt Service Payments") and other sums, whether received from Borrower or any third party, excluding, however, any sums payable to Administrative Agent on account of expenses incurred by Administrative Agent for which Borrower is obligated to reimburse Administrative Agent pursuant to the Loan Documents to the extent that any Lender has not made a payment on account thereof pursuant to Section 13.5 hereof. For the purposes hereof, "Pro Rata Share" means, with respect to any Lender, the percentage obtained by dividing (a) the principal amount of the Loan attributable to such Lender as set forth on Schedule 13.12 annexed hereto and made a part hereof, as adjusted for any repayments of principal received by such Lender pursuant to this Agreement, by (b) the then outstanding aggregate principal amount of the Loan.

Section 13.13. Disbursement of Proceeds by Administrative Agent.

(a)  Administrative Agent shall hold each Lender's Pro Rata Share of any proceeds payable under the Loan, however received, as agent of and in trust for each of such Lenders subject to each of such Lenders' rights with respect thereto as herein set forth.

(b)  All sums received and collected by Administrative Agent pursuant to the Loan Documents on account of Debt Service Payments and other sums which are collected by 11:00 a.m. (New York City time) shall be paid to each Lender on the date of collection; all such sums collected by Administrative Agent after 11:00 a.m. (New York City time) shall be paid to each Lender on or before the next succeeding Business Day. Administrative Agent shall allocate and disburse to each Lender all payments received in proportion to each Lender's Pro Rata Share. All payments made by Administrative Agent to Lenders shall be made by deposit of immediately available funds pursuant to the wiring instructions set forth on the signature page hereof or as otherwise set forth in a written notice delivered from any Lender to Administrative Agent.

4161624-v7\CHIDMS1

(c)      Unless Administrative Agent shall have received notice from Borrower prior to the date on which any payment is due to Administrative Agent for the account of the Lenders hereunder that Borrower will not make such payment, Administrative Agent may assume that Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption and pursuant to the foregoing paragraphs, distribute to the Lenders the amount due. In such event, if Borrower has not in fact made such payment or for any reason such payment is required to be returned to Borrower or paid to any other Person pursuant to any bankruptcy or insolvency law, any sharing clause in the Loan Documents or otherwise, then each of the Lenders severally agrees to repay to Administrative Agent forthwith on demand the amount so distributed to such Lender, without interest thereon, unless Administrative Agent is required to return such amount with interest thereon, in which case, with interest thereon at the Lender Interest Rate for each day from and including the date such amount is distributed to such Lender to but excluding the date of payment to Administrative Agent, unless such payment was made as a result of the gross negligence or willful misconduct of Administrative Agent, in which case Lenders shall not pay any interest on such payment.

(d)      The transfer of funds to any Lender by Administrative Agent is made on a nonrecourse basis. Administrative Agent shall have no duty or obligation whatsoever to make any payments to any Lender except from corresponding payments received by Administrative Agent from Borrower or any other Person pursuant to the Loan Documents.

Section 13.14.  Amendments Concerning Agency Function.  Notwithstanding anything to the contrary contained in this Agreement, Administrative Agent shall not be bound by any waiver, amendment, supplement or modification of this Agreement or any other Loan Document which affects Administrative Agent's duties, rights, and/or functions hereunder or thereunder unless Administrative Agent shall have given Administrative Agent's prior written consent thereto.

Section 13.15.  Events of Default.

(a)      Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Event of Default unless and until Administrative Agent has received written notice from a Lender or Borrower specifying such Event of Default.

(b)      In the event of the occurrence of an Event of Default and if Administrative Agent, in Administrative Agent's sole and absolute discretion, determines that any action is to be taken by Administrative Agent on behalf of Lenders in connection therewith, Administrative Agent shall send a notice (the "Action Notice") to each Lender recommending a course of action (which may include a recommendation to refrain from taking any action) and Lenders shall promptly consult in good faith to either confirm Administrative Agent's suggested course of action (or inaction) or to arrive at a course of action which shall be mutually acceptable to all Lenders in their reasonable discretion. Such course of action shall address, amongst other issues, (i) the exercise of remedies and the manner in which a foreclosure or additional remedies shall be conducted, (ii) the interests of all of the Lenders at a foreclosure sale or auction and whether Lenders or their nominees shall succeed to title to the Project or any other collateral and (iii) issues pertaining to the operation, management, maintenance, leasing and/or the sale of the Project or any other collateral. Administrative Agent shall promptly and diligently implement any such agreed upon course of action (or inaction) on behalf of Lenders. Notwithstanding anything to the contrary contained herein, if Lenders are unable to agree on a course of action (or inaction) within ten (10) Business Days of the date of the Action Notice, Administrative Agent shall have the right (but not the obligation), upon notice to Lenders, to take such course of action (or refrain from taking such action) as Administrative Agent deems appropriate and Administrative Agent may continue to proceed on such course of action, or refrain from taking such action, until Administrative Agent receives notice to the contrary from the Required Lenders ("Agent Discretion Standard"). Provided and on condition that

58

Administrative Agent has acted in accordance with this Subsection 13.15(b) and the Agent Discretion Standard, Lenders hereby acknowledge and agree that Administrative Agent shall have no obligation to take any action unless failure to do so would be grossly negligent or rise to the level of willful misconduct.

(c)        Provided that Lenders have agreed to a foreclosure or auction in accordance with Subsection 13.15(b) hereof (or Administrative Agent has exercised the Agent Discretion Standard), upon a foreclosure sale or auction and subject to the terms and provisions of this Agreement, Administrative Agent shall have the right to bid at the foreclosure sale or auction on behalf of Lenders. Any bid entered by Administrative Agent in an amount not in excess of the total indebtedness due under the Note plus expenses and all other amounts which are recoverable from the proceeds of the sale (collectively, the "Judgment Amount") shall be deemed to have been entered on behalf and for the benefit of Lenders, and, if such bid is the successful bid, Administrative Agent shall cause a referee's deed (as to the Project) or the applicable title instrument (as to all other collateral) to be issued to Administrative Agent (or Administrative Agent's nominee) in trust for Lenders, and Administrative Agent (or Administrative Agent's nominee) shall hold title subject to the terms and provisions of Subsection 13.15(d) and Subsection 13.15(e) hereof on behalf of, and as trustee for, Lenders.

(d)        Administrative Agent and Lender hereby acknowledge and agree that if title to (i) the Project or (ii) any other collateral is obtained by Administrative Agent (or Administrative Agent's nominee) for the benefit of Administrative Agent and Lenders, such asset(s) shall not be held as a permanent investment, but shall be marketed and sold as soon as possible, taking into account then current economic and market conditions. Subject to Subsection 13.15(b) hereof, each Lender shall, upon demand therefor from time to time, contribute such Lender's Pro Rata Share of all costs, fees and expenses (including, without limitation, attorney's fees and disbursements) suffered or incurred by Administrative Agent (or Administrative Agent's nominee) in connection with the operation, management, maintenance, leasing and/or sale of all or any part of the Project or any other collateral. Funds received from the ownership, operation or sale of the Project or any other collateral (net of operating expenses or transaction costs in connection with such ownership, operation or sale) shall constitute Debt Service Payments and shall be applied first, to reimburse Administrative Agent for any Costs, and thereafter, in accordance with Section 13.13 hereof. Lenders shall consult with Administrative Agent and attempt to determine a mutually acceptable course of action relating to, but not limited to, the management, operation and leasing of the Project and any other collateral as well as the sale of the Project and any other collateral; *provided*, *however*, if Lenders cannot agree on a mutually acceptable course of action, Administrative Agent shall have the right (but not the obligation) to apply the Agent Discretion Standard upon notice to Lenders.

(e)        Notwithstanding anything to the contrary contained herein, each Lender shall have the right to enter a bid in an amount in excess of the Judgment Amount and, if such bid is the successful bid, such Lender shall acquire the Project or other collateral, as the case may be, for such Lender's own account and, provided and on the condition that the non-bidding party is, by not later than the date of delivery to the bidding party (or such bidding party's nominee) of the referee's deed or other title instrument, paid in full all amounts owed to the non-bidding party under the Loan and this Agreement, the non-bidding party shall have no further interest in the Project or other collateral, as the case may be, and the terms and provisions of Subsection 13.15(b) hereof shall be null and void and of no further force or effect.

Section 13.16. Defaulting Lender.

(a)        In addition to the rights and remedies that may be available to Administrative Agent or Borrower under this Agreement or applicable law, if at any time any Lender has not performed such Lender's obligations under this Agreement or any of the other Loan Documents (a "Defaulting

Lender") and such default continues for twenty (20) days after notice, such Defaulting Lender's right to participate in the administration of the Loan, this Agreement and the other Loan Documents, including, without limitation, any right to vote in respect of, to consent to or to direct any action or inaction of Administrative Agent or to be taken into account in the calculation of the Required Lenders, shall be suspended while such Lender remains a Defaulting Lender. If any Lender is a Defaulting Lender because such Lender has failed to make timely payment to Administrative Agent of any amount required to be paid to Administrative Agent hereunder, in addition to other rights and remedies which Administrative Agent or Borrower may have under the immediately preceding provisions or otherwise, Administrative Agent shall be entitled (i) to collect interest from such Defaulting Lender on such delinquent payment for the period from the date on which the payment was due until the date on which the payment is made at the Lender Interest Rate, (ii) to withhold or setoff and to apply in satisfaction of the defaulted payment and any related interest, any amounts otherwise payable to such Defaulting Lender under this Agreement or any other Loan Document until such defaulted payment and related interest has been paid in full and such default no longer exists and (iii) to bring an action or suit against such Defaulting Lender in a court of competent jurisdiction to recover the defaulted amount and any related interest. Any amounts received by Administrative Agent in respect of a Defaulting Lender shall not be paid to such Defaulting Lender and shall be held uninvested by Administrative Agent and either applied against the purchase price of such Defaulting Lender's interest in the Loan under Subsection 13.16(b) hereof or paid to such Defaulting Lender upon the default of such Defaulting Lender being cured.

(b)     Any Lender that is not a Defaulting Lender shall have the right, but not the obligation, in such Lender's sole and absolute discretion, to acquire all of a Defaulting Lender's interest in the Loan (the "Defaulting Lender's Interest") during the continuance of the applicable default. Upon any such purchase, the Defaulting Lender's Interest and the Defaulting Lender's rights hereunder (but not the Defaulting Lender's liability in respect thereof or under the Loan Documents or this Agreement to the extent the same relate to the period prior to the effective date of the purchase) shall terminate on the date of purchase, and the Defaulting Lender shall promptly execute all documents reasonably requested to surrender and transfer such interest to the purchaser thereof, including an assignment substantially in form and substance as set forth in Exhibit B annexed hereto and made a part hereof. The purchase price for the Defaulting Lender's Interest shall be equal to the amount of the principal balance of the Loan outstanding and owed by Borrower to the Defaulting Lender. The purchaser shall pay to the Defaulting Lender in immediately available funds on the date of such purchase the principal of and accrued and unpaid interest and fees with respect to the Defaulting Lender's Interest (it being understood that such accrued and unpaid interest and fees may be paid pro rata to the purchasing Lender and the Defaulting Lender by the Administrative Agent at a subsequent date upon receipt of payment of such amounts from Borrower). Prior to payment of such purchase price to a Defaulting Lender, Administrative Agent shall apply against such purchase price any amounts retained by Administrative Agent pursuant to the last sentence of Subsection 13.16(a) hereof. The Defaulting Lender shall be entitled to receive amounts owed to such Defaulting Lender by Borrower under the Loan Documents which accrued prior to the date of the default by the Defaulting Lender, to the extent the same are received by Administrative Agent from or on behalf of Borrower. There shall be no recourse against any Lender or Administrative Agent for the payment of such sums except to the extent of the receipt of payments from any other party or in respect of the Loan.

(c)     Nothing contained in this Section 13.16 or elsewhere in this Agreement shall release or in any way limit a Defaulting Lender's obligations as a Lender hereunder and/or under any other of the Loan Documents. Further, a Defaulting Lender shall indemnify and hold harmless Borrower, Administrative Agent and each of the non-Defaulting Lenders from any claim, loss, or costs incurred by Borrower, Administrative Agent and/or the non-Defaulting Lenders as a result of a Defaulting Lender's failure to comply with the requirements of this Agreement, including, without limitation, any and all additional losses, damages, costs and expenses (including, without limitation, attorneys' fees and

4161624-v7\CHIDMS1

disbursements) incurred by Borrower, Administrative Agent and/or any Lender as a result of and/or in connection with (i) any enforcement action brought by Borrower and/or Administrative Agent against a Defaulting Lender and (ii) any action brought against Borrower, Administrative Agent and/or Lenders by a Defaulting Lender. The indemnification provided above shall survive any termination of this Agreement.

Section 13.17. <u>Servicing Fee</u>. Administrative Agent shall be entitled, on a monthly basis, to a servicing fee in an amount to be determined by Administrative Agent based on a percentage of the outstanding principal balance of the Loan (the "<u>Servicing Fee</u>"). Lenders hereby irrevocably authorize Administrative Agent to deduct the Servicing Fee monthly from the Debt Service Payments to be made to Administrative Agent.

<div align="center">

ARTICLE XIV
INDEMNIFICATIONS

</div>

Section 14.1. <u>General Indemnification</u>. Borrower shall indemnify, defend and hold harmless the Indemnified Parties, or Borrower shall cause the Indemnified Parties to be indemnified, defended and held harmless, from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any one or more of the following: (a) any accident, injury to or death of Persons or loss of or damage to property occurring in, on or about the Project or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (b) any use, nonuse or condition in, on or about the Project or any part thereof or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (c) performance of any labor or services or the furnishing of any materials or other property in respect of the Project or any part thereof; (d) any failure of the Project to be in compliance with any applicable Legal Requirements or (e) the payment of any commission, charge or brokerage fee to anyone which may be payable in connection with the funding of the Loan (collectively, the "<u>Indemnified Liabilities</u>"); *provided*, *however*, that Borrower shall not have any obligation to Lenders hereunder to the extent that such Indemnified Liabilities arise from the gross negligence, illegal acts, fraud or willful misconduct of Administrative Agent or Lenders. To the extent that the undertaking to indemnify, defend and hold harmless set forth in the preceding sentence may be unenforceable because it violates any law or public policy, Borrower shall pay the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by Lenders. Administrative Agent agrees that, so long as the Existing Leases shall continue to be in full force and effect, Borrower's indemnification, defense and holding harmless obligations to the Indemnified Parties under this <u>Section 14.1</u> may be satisfied by the applicable Tenants under the corresponding obligations of the Existing Leases; *provided*, *however*, the foregoing shall not act to, or be deemed to, release, relinquish or relieve Borrower from Borrower's obligations to indemnify the Indemnified Parties in accordance with the terms of this <u>Section 14.1</u> to the extent that the Tenant(s) fail, refuse, delay or are otherwise unable or unwilling to do so.

Section 14.2. <u>Intangible Tax Indemnification</u>. Borrower shall, at Borrower's sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses imposed upon or incurred by or asserted against any Indemnified Parties and directly or indirectly arising out of or in any way relating to any stamp or similar intangible tax on the making of the Deed of Trust, the Note or any of the other Loan Documents, excluding, for purposes of clarity, any income, franchise or other similar taxes, or U.S. federal withholding taxes imposed under FATCA as a result of the failure by a Lender to comply with the applicable provisions of FATCA.

Section 14.3. <u>ERISA Indemnification</u>. Borrower shall, at Borrower's sole cost and expense, protect, defend, indemnify, release and hold harmless the Indemnified Parties from and against any and all Losses (including, without limitation, reasonable attorneys' fees and costs incurred in the investigation,

<div align="center">61</div>

defense, and settlement of Losses incurred in correcting any prohibited transaction or in the sale of a prohibited loan, and in obtaining any individual prohibited transaction exemption under ERISA that may be required, in Administrative Agent's sole and absolute discretion) that Administrative Agent or Lenders may incur, directly or indirectly, as a result of a default under <u>Section 4.9</u> or <u>Section 5.17</u> hereof.

Section 14.4. <u>Survival</u>. The obligations and liabilities of Borrower under this <u>Article XIV</u> shall fully survive indefinitely notwithstanding any termination, satisfaction, or assignment of the Deed of Trust.

<div align="center">ARTICLE XV<br>NOTICES</div>

Section 15.1. <u>Notices</u>. All notices, consents, approvals and requests required or permitted hereunder or under any other Loan Document shall be given in writing and shall be effective for all purposes if hand delivered or sent by (a) certified or registered United States mail, postage prepaid, return receipt requested, or (b) expedited prepaid overnight delivery service, either commercial or United States Postal Service, with proof of attempted delivery, addressed as follows (or at such other address and Person as shall be designated from time to time by any party hereto, as the case may be, in a written notice to the other parties hereto in the manner provided for in this Section):

| | |
|---|---|
| If to Lenders: | See address and telephone number specified for such Lender on <u>Schedule 15.1</u> |
| If to Administrative Agent: | National Bank of Kuwait, S.A.K.P., New York Branch<br>299 Park Avenue<br>New York, New York 10171<br>Attention: Corporate Finance |
| With a copy to: | Baker & McKenzie LLP<br>300 E. Randolph St., Suite 5000<br>Chicago, Illinois 60601<br>Attention: Mona Dajani, Esq. |
| If to Borrower: | Galleria 2425 Owner, LLC<br>3139 W Holcombe Blvd #845<br>Houston, Texas  77025<br>Attention: Azeemeh Zaheer |
| With copies to: | Polsinelli<br>2950 Harwood Street, Suite 2100<br>Dallas, Texas 75201<br>Attention: Brian Bullard, Esq. |

A notice shall be deemed to have been given: (i) in the case of hand delivery, at the time of delivery; (ii) in the case of registered or certified mail, when delivered or the first attempted delivery on a Business Day; or (iii) in the case of expedited prepaid delivery, upon the first attempted delivery on a Business Day.

<div align="center">ARTICLE XVI<br>FURTHER ASSURANCES</div>

Section 16.1. <u>Replacement and Corrective Documents</u>. Upon receipt of an affidavit of an officer of Administrative Agent as to the loss, theft, destruction or mutilation of the Note or any other Loan

<div align="center">62</div>

Document which is not of public record, and, in the case of any such mutilation, upon surrender and cancellation of such Note or other Loan Document, Borrower and Guarantor shall issue, in lieu thereof, a replacement Note or other Loan Document, dated the date of such lost, stolen, destroyed or mutilated Note or other Loan Document in the same principal amount thereof and otherwise of like tenor. Borrower and Guarantor hereby consent and agree that in the event that any of the Loan Documents misstate or inaccurately reflect the true and correct terms and provisions of the Loan and said misstatement or inaccuracy is due to the unilateral mistake on the part of Lenders or Administrative Agent, mutual mistake on the part of any of Administrative Agent, Lenders, Borrower and Guarantor or clerical error, then in such event Borrower and Guarantor shall, within thirty (30) days after written request of Administrative Agent and in order to correct such misstatement or inaccuracy, execute such new documents as Administrative Agent may deem necessary to remedy said inaccuracy or mistake.

Section 16.2. <u>Further Acts, Etc</u>. Subject to <u>Article XII</u> hereof, Borrower and Guarantor shall, at the cost and expense of Borrower and Guarantor, and without expense to Lenders or Administrative Agent, do, execute, acknowledge and deliver all and every further acts, deeds, conveyances, assignments, security agreements, control agreements, notices of assignments, transfers and assurances as Administrative Agent shall, from time to time, reasonably require, for the better assuring, conveying, assigning, transferring, and confirming unto Lenders the rights hereby granted, bargained, sold, conveyed, confirmed, pledged, assigned, warranted and transferred or intended now or hereafter so to be, or which Borrower or Guarantor may be or may hereafter become bound to convey or assign to Lenders, or for carrying out the intention or facilitating the performance of the terms of this Agreement or for filing or registering of the Deed of Trust, or for complying with all Legal Requirements. Borrower and Guarantor, on demand, shall deliver, and in the event Borrower or Guarantor shall fail to so deliver, hereby authorizes Administrative Agent to file, in the name of Borrower and Guarantor, one or more financing statements and financing statement amendments to evidence more effectively, perfect and maintain the priority of the security interest of Lenders in the Project. Borrower and Guarantor grant to Lenders and Administrative Agent an irrevocable power of attorney coupled with an interest for the purpose of exercising and perfecting any and all rights and remedies available to Lenders or Administrative Agent at law and in equity, including, without limitation, such rights and remedies available to Lenders or Administrative Agent pursuant to this <u>Section 16.2</u>.

Section 16.3. <u>Changes in Tax, Debt, Credit and Documentary Stamp Law</u>.

(a) If any law is enacted or adopted or amended after the date of this Agreement which deducts the Debt from the value of the Project for the purpose of taxation with the result that taxes are imposed on the Lenders, Borrower shall pay the tax, with interest and penalties thereon, if any, other than U.S. federal withholding taxes imposed under FATCA as a result of the failure by a Lender to comply with the applicable provisions of FATCA. If Lenders are advised by counsel chosen by Lenders that the payment of such tax by Borrower would be unlawful or taxable to Lenders (unless any such tax is reimbursed by Borrower) or unenforceable or provides the basis for a defense of usury then Lenders shall have the option by written notice of not less than one hundred twenty (120) days to declare the Debt immediately due and payable. Borrower shall not claim or demand or be entitled to any credit or credits on account of the Debt for any part of the Taxes or Other Charges assessed against the Project, or any part thereof, and no deduction shall otherwise be made or claimed from the assessed value of the Project, or any part thereof, for real estate or personal property tax purposes by reason of the Deed of Trust or the Debt if such claim, credit or deduction has the effect of imposing a tax on Lenders. If such claim, credit or deduction shall be required by law, Lenders shall have the option, by written notice of not less than one hundred twenty (120) days, to declare the Debt immediately due and payable.

(b) If at any time the United States of America, any State thereof or any subdivision of any such State shall require revenue or other stamps to be affixed to the Note, the Deed of Trust, or any

of the other Loan Documents or impose any other tax or charge on the same, Borrower shall pay for the same, with interest and penalties thereon, if any.

Section 16.4. <u>Expenses</u>. Borrower covenants and agrees to pay or reimburse, as applicable, Lenders and Administrative Agent upon receipt of written notice from Administrative Agent for all actual costs and expenses (including reasonable third party attorneys' fees and disbursements) incurred by Administrative Agent and Lenders in accordance with this Agreement in connection with (a) the preparation, negotiation, execution and delivery of this Agreement, the Deed of Trust and the other Loan Documents and the consummation of the transactions contemplated hereby and thereby and all the costs of furnishing all opinions by counsel for Borrower and Guarantor (including, without limitation, any opinions reasonably requested by Administrative Agent as to any legal matters arising under this Agreement or the other Loan Documents with respect to the Project); (b) Borrower's and Guarantor's ongoing performance of and compliance with Borrower's and Guarantor's agreements and covenants contained in this Agreement, the Deed of Trust and the other Loan Documents on its part to be performed or complied with after the Closing Date, including, without limitation, confirming compliance with environmental and insurance requirements; (c) [Reserved.] (d) subject to <u>Article XII</u> hereof, the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to this Agreement and the other Loan Documents; (e) securing Borrower's and Guarantor's compliance with any requests reasonably made pursuant to the provisions of this Agreement; (f) the filing and recording fees and expenses, title insurance and reasonable fees and expenses of counsel for providing to Administrative Agent all required legal opinions, and other similar expenses reasonably incurred in creating and perfecting the Lien in favor of Lenders pursuant to this Agreement, the Deed of Trust and the other Loan Documents; (g) enforcing or preserving any rights, in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Borrower or Guarantor, this Agreement, the other Loan Documents, the Project, or any security given for the Loan; and (h) enforcing any obligations of or collecting any payments due from Borrower under this Agreement, the other Loan Documents or with respect to the Project or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or of any insolvency or bankruptcy proceedings.

ARTICLE XVII
WAIVERS

Section 17.1. <u>Remedies Cumulative; Waivers</u>. The rights, powers and remedies of Administrative Agent and Lenders under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Administrative Agent or Lenders may have against Borrower or Guarantor pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise. Lenders' rights, powers and remedies may be pursued singularly, concurrently or otherwise, at such time and in such order as Lenders may determine in Lenders' sole discretion. No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient. A waiver of one Default or Event of Default with respect to Borrower or Guarantor shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon.

Section 17.2. <u>Modification, Waiver in Writing</u>. No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, or of the Note, or of any other Loan Document, nor consent to any departure by Borrower or Guarantor therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given. Except as otherwise expressly provided herein, no notice to, or demand on Borrower or

64

Guarantor shall entitle Borrower or such Guarantor to any other or future notice or demand in the same, similar or other circumstances.

Section 17.3. <u>Delay Not a Waiver</u>. Neither any failure nor any delay on the part of Administrative Agent or Lenders in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under the Note or under any other Loan Document, or any other instrument given as security therefor, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege. In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement, the Note or any other Loan Document, Administrative Agent and Lenders shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement, the Note or the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.

Section 17.4. <u>Trial by Jury</u>. BORROWER, ADMINISTRATIVE AGENT AND LENDERS EACH HEREBY AGREES NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH. THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER, ADMINISTRATIVE AGENT AND LENDERS, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE. EACH OF LENDERS, ADMINISTRATIVE AGENT AND BORROWER IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER, ADMINISTRATIVE AGENT AND LENDERS.

Section 17.5. <u>Waiver of Notice</u>. Borrower and Guarantor shall not be entitled to any notices of any nature whatsoever from Administrative Agent or Lenders except with respect to matters for which this Agreement or the other Loan Documents specifically and expressly provide for the giving of notice by Administrative Agent or Lenders to Borrower and Guarantor and except with respect to matters for which Borrower or Guarantor is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice. Borrower hereby expressly waives the right to receive any notice from Administrative Agent or Lenders with respect to any matter for which this Agreement or the other Loan Documents do not specifically and expressly provide for the giving of notice by Administrative Agent or Lenders to Borrower.

Section 17.6. <u>Remedies of Borrower</u>. In the event that a claim or adjudication is made that Administrative Agent or Lenders or Administrative Agent's or Lenders' agents have acted unreasonably or unreasonably delayed acting in any case where by law or under this Agreement or the other Loan Documents, Administrative Agent, Lenders or such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that Administrative Agent, Lenders and Administrative Agent's and Lenders' agents shall not be liable for any monetary damages, and Borrower's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment. The parties hereto agree that any action or proceeding to determine whether Administrative Agent or Lenders have acted reasonably shall be determined by an action seeking declaratory judgment. Administrative Agent and Lenders agrees that, in such event, it shall cooperate in expediting any action seeking injunctive relief or declaratory judgment.

Section 17.7. <u>Waiver of Marshalling of Assets</u>. To the fullest extent permitted by law, Borrower for itself and its successors and assigns, waives all rights to a marshalling of the assets of Borrower and

other Persons with interests in Borrower, and of the Project, and agrees not to assert any right under any laws pertaining to the marshalling of assets, the sale in inverse order of alienation, homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the right of Lenders under the Loan Documents to a foreclosure of the Deed of Trust for the collection of the Debt without any prior or different resort for collection or of the right of Lenders to the payment of the Debt out of the net proceeds of the Project in preference to every other claimant whatsoever.

Section 17.8. <u>Waiver of Statute of Limitations</u>. Borrower hereby expressly waives and releases, to the fullest extent permitted by law, the pleading of any statute of limitations as a defense to payment of the Debt or performance of its other obligations set forth in the Loan Documents.

Section 17.9. <u>Waiver of Counterclaim</u>. Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lenders or Administrative Agent or Lenders' or Administrative Agent's agents.

ARTICLE XVIII
GOVERNING LAW

Section 18.1. <u>Choice of Law</u>.

(i)     THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, THE LOAN WAS MADE BY LENDERS AND ACCEPTED BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE LOAN WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, AND ENFORCEMENT OF THE LIEN AND SECURITY INTEREST CREATED PURSUANT THE DEED OF TRUST, THE ASSIGNMENT OF LEASES AND RENTS AND THE OTHER LOAN DOCUMENTS (OTHER THAN WITH RESPECT TO LIENS AND SECURITY INTERESTS IN PROPERTY WHOSE PERFECTION AND PRIORITY IS COVERED BY ARTICLE 9 OF THE UCC (INCLUDING, WITHOUT LIMITATION, THE ACCOUNTS) WHICH SHALL BE GOVERNED BY THE LAW OF THE JURISDICTION APPLICABLE THERETO IN ACCORDANCE WITH SECTIONS 9-301 THROUGH 9-307 OF THE UCC AS IN EFFECT IN THE STATE OF NEW YORK) SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE PROJECT IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS AND ALL OF THE OBLIGATIONS ARISING HEREUNDER OR THEREUNDER. TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE

66

LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW EXCEPT AS SPECIFICALLY SET FORTH ABOVE.

(ii)     ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST ADMINISTRATIVE AGENT, ANY LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT MAY AT ADMINISTRATIVE AGENT'S OR LENDERS' OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND BORROWER WAIVES ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER HEREBY IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. BORROWER DOES HEREBY DESIGNATE AND APPOINT:

Capitol Services, Inc.
1218 Central Avenue, Suite 100
Albany, NY 12205

AS ITS AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON ITS BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS TOGETHER WITH WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER, IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK. BORROWER (I) SHALL GIVE PROMPT NOTICE TO ADMINISTRATIVE AGENT OF ANY CHANGED ADDRESS OF ITS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF ITS AUTHORIZED AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

(iii)     Borrower, Administrative Agent and Lenders hereby knowingly, voluntarily, intentionally, unconditionally and irrevocably submit to the exclusive jurisdiction of any New York State or Federal court sitting in New York County over any suit, action or proceeding arising out of or relating to this Agreement, and each such party hereby agrees and consents that, in addition to any methods of service of process provided for under applicable law, all service of process in any such suit, action or proceeding in any New York State or Federal court sitting in New York County may be made by certified or registered mail, return receipt requested, directed to such party at the address indicated on the first page of this Agreement or in Section 15.1 hereof, as applicable, and service so made shall be complete three (3) days after the same shall have been so mailed.

Section 18.2. Severability. Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

4161624-v7\CHIDMS1

001675

Section 18.3. <u>Preferences</u>. Lenders shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the obligations of Borrower or Guarantor hereunder in connection with any payment deemed to be fraudulent or an impermissible preference payment under applicable Legal Requirements. To the extent Borrower or Guarantor makes a payment or payments to Lenders, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any Creditors' Rights Laws, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the obligations hereunder or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Lenders.

<div align="center">

ARTICLE XIX
MISCELLANEOUS

</div>

Section 19.1. <u>Survival</u>. This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the entering into by Lenders of this Agreement and the execution and delivery to Lenders of the Note, and shall continue in full force and effect so long as all or any of the Debt is outstanding and unpaid unless a longer period is expressly set forth herein or in the other Loan Documents. Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the successors and assigns of such party. All covenants, promises and agreements in this Agreement, by or on behalf of Borrower shall inure to the benefit of the successors and assigns of Lenders.

Section 19.2. <u>Administrative Agent's Discretion</u>. Whenever pursuant to this Agreement, Administrative Agent exercises any right given to Administrative Agent to approve or disapprove, or any arrangement or term is to be satisfactory to Administrative Agent, the decision of Administrative Agent to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory shall (except as is otherwise specifically herein provided) be in the reasonable discretion of Administrative Agent.

Section 19.3. <u>Headings</u>. The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

Section 19.4. <u>Cost of Enforcement</u>. In the event (a) that the Deed of Trust is foreclosed in whole or in part, (b) of the bankruptcy, insolvency, rehabilitation or other similar proceeding in respect of Borrower or Guarantor or any of Borrower Members, Borrower's constituent Persons or Subsidiaries or an assignment by Borrower or Guarantor or any of Borrower Members, Borrower's constituent Persons or Subsidiaries for the benefit of its creditors, or (c) Lenders exercise any of its other remedies under this Agreement or any of the other Loan Documents, Borrower shall be chargeable with and agrees to pay all costs of collection and defense, including attorneys' fees and costs, incurred by Lenders, Administrative Agent or Borrower in connection therewith and in connection with any appellate proceeding or post-judgment action involved therein, together with all required service or use taxes.

Section 19.5. <u>Schedule Incorporated</u>. The Schedules annexed hereto are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

Section 19.6. <u>Offsets, Counterclaims and Defenses</u>. Any assignee of Lenders' interest in and to this Agreement, the Note and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which Borrower or Guarantor may otherwise have against any assignor of such documents, and no such unrelated counterclaim or defense shall be interposed or asserted by Borrower or such Guarantor in any action or proceeding brought by any

<div align="center">68</div>

001676

such assignee upon such documents and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

Section 19.7.  No Joint Venture or Partnership; No Third Party Beneficiaries.

(a)      Borrower, Administrative Agent and Lenders intend that the relationships created hereunder and under the other Loan Documents be solely that of borrower and lender. Nothing herein or therein is intended to create a joint venture, partnership, tenancy-in-common, or joint tenancy relationship between Borrower, Guarantor, Administrative Agent and Lenders nor to grant Administrative Agent or Lenders any interest in the Project other than that of secured party, Lenders or lender. Borrower hereby knowingly, voluntarily, intentionally, unconditionally and irrevocably waives and relinquishes all claims, demands, counterclaims and/or defenses alleging the existence of any partnership, joint venture or other fiduciary relationship between Administrative Agent or Lenders and Borrower and Borrower shall hold Lenders, Administrative Agent, Lenders' and Administrative Agent's successors and assigns, harmless from and against any and all losses, damages, penalties, fines, forfeitures, legal fees and related costs, judgments and any other fees, costs and expenses that Administrative Agent or Lenders may sustain as a result of any such allegation by any Person whatsoever.

(b)      This Agreement and the other Loan Documents are solely for the benefit of Lenders, Administrative Agent and Borrower and Guarantor and nothing contained in this Agreement or the other Loan Documents shall be deemed to confer upon anyone other than Lenders, Administrative Agent and Borrower and Guarantor any right to insist upon or to enforce the performance or observance of any of the obligations contained herein or therein. All conditions to the obligations of Lenders to enter into this Agreement and make the financial accommodations provided for hereunder are imposed solely and exclusively for the benefit of Lenders and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lenders will refuse to enter into this Agreement or make the financial accommodations provided for hereunder in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Administrative Agent or Lenders if, in Administrative Agent's or Lenders' sole discretion, Administrative Agent or Lenders deem it advisable or desirable to do so.

(c)      The shareholders, general partners, members, principals and (if Borrower is a trust) beneficial owners of Borrower are experienced in the ownership and operation of properties similar to the Project, and Lenders are relying solely upon such expertise and business plan in connection with the ownership and operation of the Project.

(d)      Notwithstanding anything to the contrary contained herein, Lenders are not undertaking the performance of any obligations with respect to any agreements, contracts, certificates, instruments, franchises, permits, trademarks, licenses and other documents of Borrower.

(e)      By accepting or approving anything required to be observed, performed or fulfilled or to be given to Lenders or Administrative Agent pursuant to this Agreement, the Deed of Trust, the Note or the other Loan Documents, including, without limitation, any officer's certificate, balance sheet, statement of profit and loss or other financial statement, survey, appraisal, or insurance policy, Lenders and Administrative Agent shall not be deemed to have warranted, consented to, or affirmed the sufficiency, the legality or effectiveness of same, and such acceptance or approval thereof shall not constitute any warranty or affirmation with respect thereto by Lenders or Administrative Agent.

(f)      Borrower and Guarantor recognize and acknowledge that in accepting this Agreement, the Note, the Deed of Trust and the other Loan Documents, Lenders are expressly and primarily relying on the truth and accuracy of the representations and warranties set forth in Article IV of

69

this Agreement without any obligation to investigate the Project and notwithstanding any investigation of the Project by Administrative Agent; that such reliance existed on the part of Lenders prior to the date hereof, that the warranties and representations are a material inducement to Lenders in entering into this Agreement and making the financial accommodations provided for hereunder; and that Lenders would not be willing to enter into this Agreement and make the financial accommodations provided for hereunder and accept this Agreement, the Note, the Deed of Trust and the other Loan Documents in the absence of the warranties and representations as set forth in Article IV of this Agreement.

Section 19.8. Publicity. All news releases, publicity or advertising by Borrower, Guarantor or Borrower's Affiliates through any media intended to reach the general public which refers to the Loan, Lenders, or any of Lenders' Affiliates shall be subject to the prior written approval of Administrative Agent, not to be unreasonably withheld. Administrative Agent and Lenders shall be permitted to make any news, releases, publicity or advertising by Lenders or Lenders' Affiliates through any media intended to reach the general public which refers to the Loan, the Project, Borrower, Guarantor and Borrower's Affiliates without the approval of Borrower or any such Persons in a "tombstone", advertisement or other written description or loan summary in an industry periodical, journal or newspaper or at industry events or conferences, provided that such references are limited to the following matters: (i) the principal amount of the Loan, (ii) the term of the Loan, (iii) the location of the Project, (iv) whether the interest rate of the Loan is fixed or variable and (v) the identity of Borrower. All other news-releases, publicity or advertising by Lenders shall be subject to Borrower's prior written approval, which approval shall not be unreasonably withheld or delayed. Borrower also agrees that Lenders and Administrative Agent may share any information pertaining to the Loan with third-parties in connection with the sale or transfer of the Loan or any Participations thereof.

Section 19.9. Conflict; Construction of Documents; Reliance. In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control. The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of the Loan Documents and that such Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same. Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Administrative Agent or Lenders or any parent, subsidiary or Affiliate of Administrative Agent or Lenders. Lenders shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to it under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by it or any parent, subsidiary or Affiliate of Lenders of any equity interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Lenders' or Administrative Agent's exercise of any such rights or remedies. Borrower acknowledges that Lenders engage in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse to or competitive with the business of Borrower or its Affiliates.

Section 19.10. Actions, Approvals and Determinations. Wherever in this Agreement it is provided that (a) as a condition precedent to Borrower's undertaking certain action, Borrower shall be required to obtain Administrative Agent's consent or approval or (b) Administrative Agent shall have the right to make a determination (including, without limitation, a determination as to whether a matter is satisfactory to Administrative Agent), or if Borrower shall request that Administrative Agent or Lenders take any action, then, unless expressly provided to the contrary in the applicable provision of this Agreement, the decision whether to grant such consent or approval or to take the requested action, or the determination in question, shall be in the sole and exclusive discretion of Administrative Agent and Lenders and shall be

4161624-v7\CHIDMS1

001678

final and conclusive. Wherever in this Agreement it is stated that any consent or approval shall not be unreasonably withheld or that a determination to be made by Administrative Agent or Lenders shall be subject to a specified standard, then, if a court of competent jurisdiction determines, without right to further appeal, that the consent or approval shall be deemed granted or the standard shall be deemed met, as the case may be, then Administrative Agent or Lenders, at the request of Borrower, shall deliver to Borrower written confirmation thereof. The obtaining of such consent or approval or determination that such standard has been met shall be Borrower's sole and exclusive remedy with respect to the subject matter of this section, and under no circumstance shall Administrative Agent or Lenders, or Administrative Agent's or Lenders' counsel or anyone else acting or purporting to act on Administrative Agent's or Lenders' behalf have any liability (whether in damages or otherwise) with respect thereto. In any instance in which Borrower requests, or any Loan Document provides, that Administrative Agent or Lenders shall consider granting Administrative Agent's or Lenders' consent or approval or making a determination or taking some other action, Borrower shall, upon demand, pay all actual out-of-pocket costs, expenses and reasonable attorneys' fees and disbursements incurred by Administrative Agent and Lenders in connection therewith.

Section 19.11. <u>Entire Agreement</u>. This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written between Borrower, Administrative Agent and Lenders are superseded by the terms of this Agreement and the other Loan Documents.

Section 19.12. <u>Certain Additional Rights of Lenders</u>. Notwithstanding anything which may be contained in this Agreement to the contrary, Lenders shall have:

(a)     the right to designate any party to receive payment of all fees, costs and expenses otherwise payable to Lenders under this Agreement or the other Loan Documents;

(b)     the right to routinely consult with and advise Borrower's, management regarding the significant business activities and business and financial developments of Borrower. Consultation meetings should occur on a regular basis with Administrative Agent or Lenders having the right to call special meetings at any reasonable times;

(c)     the right, without restricting any other right of Administrative Agent or Lenders under this Agreement (including any similar right), to restrict, upon the occurrence and continuance of an Event of Default, Borrower's payments of management consulting director or similar fees to affiliates of Borrower (or their personnel); and

(d)     the right, without restricting any other rights of Administrative Agent or Lenders under this Agreement (including any similar right), to restrict the transfer to voting interests in Borrower held by its shareholders, members or partners (as the case may be), and the right to restrict the transfer of interests in such shareholder, member or partner (as the case may be), except for any transfer that is expressly permitted hereunder.

Section 19.13. <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, and each such counterpart shall for all purposes be deemed to be an original, and all such counterparts together constitute but one and the same agreement. In addition, the parties may execute separate signature pages, and such signature pages (and/or signature pages which have been detached from one or more duplicate original copies of this Agreement) may be combined and attached to one or more copies of this Agreement so that such copies shall contain the signatures of all of the parties hereto.

[balance of page intentionally left blank]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

<u>BORROWER</u>:

**GALLERIA 2425 OWNER, LLC**,
a Delaware limited liability company

By:    Galleria 2425 JV, LLC,
        a Delaware limited liability company,
        its sole member

        By:    Naissance Capital Real Estate, LLC,
                a Delaware limited liability company,
                its Managing Member

                By: _____
                Name: Azeemeh Zaheer
                Title:  Managing Member

[SIGNATURES CONTINUE ON NEXT PAGE]

[Signature Page to Loan Agreement]

001680

<u>ADMINISTRATIVE AGENT AND LENDER</u>:

**NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH**, a banking corporation organized under the laws of Kuwait, acting through its New York branch

By: _____
Name: _____
Title: _____
Arlette Kittaneh
Executive Manager

By: _____
Name: Michael G. McHugh
Title: Executive Manager

[Signature Page to Loan Agreement]

001681

EXHIBIT A

BORROWER'S ORGANIZATIONAL STRUCTURE

[see attached]

Case 23-34815   Document 27-1 Filed in TXSB on 12/22/23   Page 84 of 87

# The Galleria – Houston, Texas (Master Chart)



Galleria West Loop Investments II, LLC [TX]

98%

Naissance Capital Real Estate, LLC [DE]
- managing member -

2%

$14,641,000

Galleria 2425 JV, LLC [DE]
- member managed -

100%

Galleria 2425 Owner, LLC [DE]

Property

Naissance Galleria, LLC [Cayman Islands]

Mezzanine Debt

Portfolio Interest Exemption
$16,100,000

Senior Debt (NBK)

$51,675,000

001683

EXHIBIT B

FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (this "Agreement"), dated as of the ____ day of _____, 20__, made by and between [NAME OF ASSIGNING BANK] ("Assignor") and [NAME OF ASSIGNEE] ("Assignee").

Preliminary Statement

1.      This Agreement relates to that certain Loan Agreement (as the same may be amended from time to time, the "Loan Agreement") dated as of May 23, 2018 made by and among (1) Galleria 2425 Owner, LLC, a Delaware limited liability company ("Borrower"), (2) the lender(s) party thereto (each, a "Lender" and collectively, "Lenders"), and (3) National Bank of Kuwait, S.A.K.P., New York Branch ("Administrative Agent"). All capitalized terms not otherwise defined herein shall have the respective meanings set forth in the Loan Agreement.

2.      Subject to the terms and conditions set forth in the Loan Agreement, Assignor has a pro-rata share of the Loan equal to _____ percent (_____%) in an aggregate principal amount of $_____ ("Assignor's Loan Commitment").

3.      The aggregate outstanding principal amount under Assignor's Loan Commitment at the commencement of business on the date hereof is $_____,

4.      Assignor desires to assign to Assignee all of the rights of Assignor under the Loan Agreement and the other Loan Documents (as defined in the Loan Agreement) in respect of a portion of Assignor's Loan Commitment, such portion being in an amount equal to $_____, which relates to a Pro-Rata Share of the Loan of _____ percent (_____%) (the "Assigned Loan Commitment"); and Assignee desires to accept assignment of such rights and assume the corresponding obligations from Assignor on such terms.

NOW, THEREFORE, in consideration of the foregoing and the mutual agreements contained herein, the parties hereto agree as follows:

SECTION 1.  Assignment. Assignor hereby assigns and sells to Assignee all of the rights of Assignor under the Loan Agreement and the other Loan Documents in and to the Assigned Loan Commitment, and Assignee hereby accepts such assignment from Assignor and assumes all of the obligations of Assignor under the Loan Agreement and the other Loan Documents with respect to the Assigned Loan Commitment. Upon the execution and delivery hereof by Assignor, Assignee, Administrative Agent and the payment of the amount specified in Section 2 hereof required to be paid on the date hereof, (1) Assignee shall, as of the commencement of business on the date hereof, succeed to the rights and obligations of a Lender under the Loan Agreement and the other Loan Documents with a Pro-Rata Share of the Loan equal to the percentage applicable to the Assigned Loan Commitment and (2) the Pro-Rata Share of Assignor shall, as of the commencement of business on the date hereof, be reduced correspondingly and Assignor released from its obligations under the Loan Agreement and the other Loan Documents to the extent such obligations have been assumed by Assignee. Assignor represents and warrants that it (x) owns the Assigned Loan Commitment free and clear of all liens and other encumbrances and (y) is legally authorized to enter into and perform this Agreement. Except as provided in the immediately preceding sentence, the assignment provided for herein shall be without representation or warranty by, or recourse to, Assignor.

Exh. B-1

SECTION 2. <u>Payments</u>. As consideration for the assignment and sale contemplated in Section 1 hereof, Assignee shall pay to Assignor on the date hereof, in immediately available funds, an amount equal to $_____. Each of Assignor and Assignee hereby agrees that if it receives any amount under the Loan Agreement or any of the other Loan Documents which is for the account of the other party hereto, it shall receive the same for the account of such other party to the extent of such other party's interest therein and shall promptly pay the same to such other party.

SECTION 3. <u>Consents; Notices</u>. If required pursuant to <u>Article XII</u> or <u>Article XIII</u> of the Loan Agreement, this Agreement is conditioned upon the consent of Administrative Agent. The execution of this Agreement by Administrative Agent is evidence of this consent. Assignee has designated its address for notices below.

SECTION 4. <u>Non-Reliance on Assignor</u>. Assignor makes no representation or warranty in connection with, and shall have no responsibility with respect to, the solvency, financial condition, or statements of Borrower or any other party to any Loan Document, or the validity and enforceability of the obligations of Borrower or any other party to a Loan Document in respect of the Loan Agreement or any other Loan Document. Assignee acknowledges that it has, independently and without reliance on Assignor, and based on such documents and information as it has deemed appropriate, made its own analysis of the collateral for the Loan, credit analysis of Borrower and decision to enter into this Agreement and will continue to be responsible for making its own independent appraisal of the collateral for the Loan and of the business, affairs and financial condition of Borrower and the other parties to the Loan Documents.

SECTION 5. <u>Governing Law</u>. This Agreement shall be governed by, and construed and enforced in accordance with the Laws of the State of New York without reference to principles of conflicts of law.

SECTION 6. <u>Counterparts</u>. This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.

SECTION 7. <u>Certain Representations and Agreements by Assignee</u>. Assignee represents that it is legally authorized to enter into and perform this Agreement. In addition, Assignee hereby represents that it is entitled to receive any payments to be made to it under the Loan Agreement or hereunder without the withholding of any tax and agrees to furnish the evidence of such exemption as specified therein and otherwise to comply with the provisions of the Loan Agreement and the other Loan Documents.

SECTION 8. <u>Reliance By Borrower</u>. This Agreement shall be binding upon, enforceable by and inure to the benefit of Borrower, its successors and assigns.

[balance of page intentionally left blank]

Exh. B-2

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered by their duly authorized officers as of the date first above written.

ASSIGNOR:


By: _____
    Name:
    Title:


ASSIGNEE:


By: _____
    Name:
    Title:

Assignee's Address for Notices:


[Assignee]
[Address]
Attention: _____
Telephone: (____) _____


ADMINISTRATIVE AGENT:

NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH, a banking corporation organized under the laws of Kuwait, acting through its New York branch


By: _____
    Name:
    Title:

Exh. B-3

SCHEDULE 13.12

Amount of Loan Attributable to Lender

| Lender | Amount of Loan Attributable to Lender |
|--------|---------------------------------------|
| NBK | $51,675,000.00 |

**EXHIBIT D**

**NBK Note**

001688

<u>PROMISSORY NOTE</u>

$51,675,000.00                                                        Date: May 23, 2018

THIS PROMISSORY NOTE (this "<u>Note</u>") made as of May 23, 2018, by GALLERIA 2425 OWNER, LLC, a Delaware limited liability company, having an address at 3139 W Holcombe Blvd #845, Houston, Texas 77025 ("<u>Borrower</u>"), to NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH, a banking corporation organized under the laws of Kuwait, acting through its New York branch, having an office at 299 Park Avenue, New York, New York 10171, as administrative and collateral agent (in such capacity, together with its successors and assigns, "<u>Administrative Agent</u>") for the Lenders (as defined in the Loan Agreement referred to below). *Capitalized terms used but not defined in this Note shall have the meanings assigned to them in the Loan Agreement.*

1.   <u>Covenant to Pay</u>

FOR VALUE RECEIVED, without grace, except as expressly provided for herein and in the Loan Agreement, Borrower does hereby covenant and promise to pay to the order of Administrative Agent, on behalf of Lenders, at Administrative Agent's office at 299 Park Avenue, New York, New York 10171 or at such other place as Administrative Agent may designate to Borrower in writing from time to time, in legal tender of the United States, the principal amount of FIFTY ONE MILLION SIX HUNDRED AND SEVENTY-FIVE THOUSAND AND 00/100 DOLLARS ($51,675,000.00) (the "<u>Principal Balance</u>"), together with interest on the unpaid portion of said Principal Balance at the applicable Interest Rate (as hereinafter defined) calculated in accordance with the terms hereof, from the date the Principal Balance is advanced to Borrower until the Principal Balance and all interest accrued thereon shall be fully paid. The period from the date hereof through and including the Maturity Date is hereinafter referred to as the "<u>Term</u>." "<u>Maturity Date</u>" means May 23, 2023.

2.   <u>Interest Rate</u>

(a)      During the Term, the rate at which interest shall be calculated under this Note (the "<u>Interest Rate</u>") shall be:

i. Commencing on May 24, 2018 and including May 28, 2018, the Interest Rate shall be a rate equal to the sum of (i) 2.75% (the "<u>Interest Rate Markup</u>") <u>plus</u> (ii) the Weekly LIBOR Rate (as hereinafter defined) as of two (2) London Business Days (as hereinafter defined) prior to the date hereof;

ii.   Commencing on May 29, 2018 through and including May 31, 2021, the Interest Rate shall be a fixed rate equal to five and sixty-four hundredths percent (5.64%) per annum (the "<u>Fixed Rate</u>");

iii.   Commencing on June 1, 2021 and continuing on the first (1st) day of each LIBOR Period (as hereinafter defined) thereafter, as applicable (each, a "<u>Rate Adjustment Date</u>"), the Interest Rate shall be recalculated to an adjustable rate equal to the sum of (i) the Interest Rate Markup <u>plus</u> (ii) the LIBOR Rate (as hereinafter defined) for the applicable LIBOR Period (as hereinafter defined) as of two (2) London Business Days (as hereinafter defined) prior to each applicable Rate Adjustment Date.

(b)   Borrower hereby acknowledges and agrees that Borrower shall not have more than three (3) LIBOR contracts outstanding at any one time during the Term.

(c)   During the Term, the LIBOR Period shall be a period of 30 days, except as adjusted pursuant to the definition of "LIBOR Period."

(d)   The certificate of Administrative Agent as to any Interest Rate and the interest amounts payable by Borrower pursuant thereto shall, absent manifest error, be final, conclusive and binding on Borrower.

(e)   As used herein, the following terms shall have the indicated meanings:

<u>Alternate Rate</u> - a per annum rate equal to (i) the Interest Rate Markup *plus* (ii) the Prime Rate (as hereinafter defined) *less* (iii) one percent (1%).

<u>Business Day</u> - a day other than (i) a Saturday, Sunday or (ii) other day on which commercial banks in New York, New York are authorized or required by law to close.

<u>LIBOR Period</u> - the period commencing on June 1, 2021 or any Rate Adjustment Date (as the case may be) and ending on, as applicable, the day immediately prior to the next succeeding payment date or the day immediately prior to the payment date of the calendar month that is one (1) month thereafter; <u>provided</u>, <u>however</u>, that if a payment date would occur on a day that is not a Business Day, the LIBOR Period to which such payment date relates shall be extended to the day immediately prior to the next succeeding Business Day. To the extent that the preceding clause results in the extension of a LIBOR Period, Administrative Agent shall have the right (but not the obligation) to shorten or extend, respectively, the succeeding LIBOR Period so that it shall end on a day that numerically corresponds to the intended payment date indicated in this Note and minimize breakage and/or avoid early termination of

4153909-v7\CHIDMS1

  
any LIBOR contract; provided, however, that no LIBOR Period shall extend beyond the earlier to occur of (i) the Maturity Date or (ii) the date the Loan is otherwise due and payable pursuant to the terms and provisions hereof.  For the avoidance of doubt, the intended payment date is the first calendar day of each calendar month.

LIBOR Rate - the rate per annum (rounded upward, if necessary, to the nearest 1/1000 of 1%) at which United States Dollar deposits are offered in the London interbank market as displayed on the Bloomberg L.P., page "BBAM" or any page that replaces BBAM, two (2) London Business Days prior to the first day of the applicable LIBOR Period, for deposits in immediately available funds, in lawful money of the United States, of amounts substantially comparable to the outstanding Principal Balance for the LIBOR Period, divided by a percentage equal to 100% minus the stated maximum rate of all reserves required to be maintained against "Eurocurrency Liabilities" as specified in Regulation D (or against any other category of liabilities which includes deposits by reference to which the interest rate on LIBOR-based loans is determined) on such date to any member bank of the Federal Reserve System. Notwithstanding any provision above, the practice of rounding to determine the LIBOR Rate may be discontinued at any time in Administrative Agent's sole discretion.  Notwithstanding the foregoing, in no event shall the LIBOR Rate be less than 0%.

London Business Day - any day on which dealings in United States dollar deposits are carried on by banking institutions in the London interbank market.

Prime Rate - a fluctuating interest rate per annum which shall at all times be equal to the rate of interest announced publicly by NBK in New York from time to time, as NBK's prime rate. In the event NBK does not announce its prime rate, the Prime Rate shall be the prime rate as set forth in *The Wall Street Journal* from time to time.

Regulation D - Regulation D of the Board of Governors of the Federal Reserve System as in effect from time to time, including, without limitation, any successor or other regulation or official interpretation of said Board of Governors relating to reserve requirements applicable to member banks of the Federal Reserve System.

Weekly LIBOR Rate - the rate per annum (rounded upward, if necessary, to the nearest 1/1000 of 1%) at which United States Dollar deposits are offered in the London interbank market as displayed on the Bloomberg L.P., page "BBAM" or any page that replaces BBAM, two (2) London Business Days prior to the date hereof, for deposits in immediately available funds, in lawful money of the United States, of amounts substantially comparable to the outstanding Principal Balance for a one week period, divided by a percentage equal to 100% minus the stated maximum rate of all reserves

001691

required to be maintained against "Eurocurrency Liabilities" as specified in Regulation D (or against any other category of liabilities which includes deposits by reference to which the interest rate on LIBOR-based loans is determined) on such date to any member bank of the Federal Reserve System. Notwithstanding any provision above, the practice of rounding to determine the LIBOR Rate may be discontinued at any time in Administrative Agent's sole discretion.  Notwithstanding the foregoing, in no event shall the LIBOR Rate be less than 0%.

3.    Increased Costs

(a)    If, after the date of this Note, any change in applicable law or regulation or in the interpretation or administration thereof by any Governmental Authority charged with the interpretation or administration thereof (whether or not having the force of law), and which change is applicable generally to other financial institutions (each, a "Change in Law"), shall (i) change the basis of taxation of payments to any Lender of the Principal Balance or interest due and owing under this Note or any fees or other amounts payable hereunder (other than changes in respect of taxes imposed on the overall net income of such Lender), (ii) subject any Lender to any tax of any kind whatsoever with respect to this Note or the Loan, or (iii) impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of or credit extended by any Lender or shall impose on any Lender any other condition affecting this Note, and the result of any of the foregoing shall or would be to increase the cost to any Lender of making or maintaining the Loan or to reduce the amount of any sum received or receivable by any Lender hereunder (whether of principal, interest or otherwise), Administrative Agent may, at any time, notify Borrower of the additional amount required to compensate such Lender for such increased cost or reduced amount and Borrower shall pay to Administrative Agent on behalf of such Lender such additional amount or amounts as shall compensate such Lender for such additional costs incurred or reduction suffered.

(b)    If any Lender determines that any Change in Law affecting such Lender or any lending office of such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such capital or on the capital of such Lender's holding company, if any, as a consequence of such Lender's participation in the Loan to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

4

001692

(c)     A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section and delivered to Borrower shall be conclusive absent manifest error. Borrower shall pay such Lender the amount shown as due on any such certificate within ten (10) days after receipt thereof.

(d)     Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation, provided that Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs incurred or reductions suffered more than six (6) months prior to the date that such Lender notifies Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the six-month period referred to above shall be extended to include the period of retroactive effect thereof).

(e)     Any Lender affected by increased costs as set forth above shall use reasonable efforts (subject to overall policy considerations of such Lender) to designate another lending office for any portion of the Loan affected by such event, provided that such designation is made on such terms that such Lender and its lending office suffer no economic, legal or regulatory disadvantage, with the object of avoiding such increased costs.  If the affected Lender is not able to avoid such increased costs by designating another lending office, then Borrower shall have the right to replace the affected Lender with a new Lender in accordance with the terms and provisions of the Loan Documents.

(f)     The Increased Cost provisions of this Note shall be without duplication of the provisions of Section 5.4 or Section 16.3 of the Loan Agreement.

4.     <u>Illegality</u>

If Administrative Agent shall notify Borrower that the introduction of, or any change in, or in the interpretation of, any law or regulation makes it unlawful, or any central bank or other Governmental Authority asserts that it is unlawful, for any Lender to perform such Lender's obligations hereunder, then Borrower shall either (i) prepay in full the entire unpaid Debt within ninety days (such date to be adjusted to minimize or avoid breakage) after notice from Administrative Agent, without Prepayment Premium or yield maintenance of any kind or (ii) replace the affected Lender with a new Lender in accordance with the terms and provisions of the Loan Documents. In addition, if Administrative Agent notifies Borrower that by reason of circumstances affecting the London interbank market for United States dollar deposits there does not exist adequate and reasonable means for ascertaining the LIBOR Rate for any LIBOR Period, then, commencing on the last day of the then existing LIBOR Period therefor, the Interest Rate

5

shall automatically be and remain at the per annum rate at all times equal to the Alternate Rate, which Interest Rate shall be adjusted concurrently with each adjustment in the Alternate Rate until Administrative Agent shall notify Borrower that the circumstances causing the suspension of the use of the LIBOR Rate no longer exist.

5.      Calculation of Interest

Interest shall be computed on the basis of actual days over a three hundred sixty (360) day calendar year (except that interest computed by reference to the Alternate Rate shall be computed on the basis of a three hundred sixty five (365) day calendar year, or a three hundred sixty six (366) day calendar year in a leap year) and shall continue to accrue and be payable on the outstanding Principal Balance to but excluding the date of repayment thereof in full.

6.      Payment of Indebtedness

Borrower shall make payments of interest under this Note as follows and said payments shall be applied upon receipt thereof:

(a)      Interest shall be paid monthly, in arrears, on the first Business Day (i) of each calendar month, if the applicable Interest Rate for such payment is the Fixed Rate in accordance with Section 2(a)(i) above; or (ii) following the applicable one (1)-month LIBOR Period (which payment date, for the avoidance of doubt, is intended to be the first calendar day of each calendar month, subject to adjustment in accordance with the definition of LIBOR Period), for the period of such LIBOR Period, if the applicable Interest Rate for such payment is being calculated with reference to the LIBOR Rate in accordance with Section 2(a)(ii) above; notwithstanding the foregoing, interest for the period commencing on the date hereof and ending on May 31, 2018 shall be paid in advance on the date hereof; and

(b)      On the Maturity Date the entire unpaid Principal Balance, together with all interest accrued thereon and all other Debt, shall be due and payable and repaid in full.

7.      Security

This Note is governed and/or secured by, inter alia, the following documents, each dated as of the date hereof: (i) that certain Loan Agreement made by and among Borrower, Administrative Agent and Lenders (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "Loan Agreement"), (ii) that certain Deed of Trust, Assignment of Leases and Rents and Profits, Security Agreement and Fixture Filing made by Borrower to Salima Umatiya, as trustee, for the

6

001694

benefit of Administrative Agent (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "Deed of Trust"), encumbering the premises known as and located at 2425 West Loop South, City of Houston, State of Texas (the "Property"), (iii) that certain Absolute Assignment of Leases and Rents made by Borrower for the benefit of Administrative Agent encumbering the Property (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "Assignment of Leases"), and (iv) those certain other documents defined as "Loan Documents" in the Loan Agreement, which documents specify various defaults upon the happening of which all sums due and owing under this Note may be declared immediately due and payable.

8.    Prepayment

(a)    Provided no Event of Default exists, Borrower shall have the right to prepay the Principal Balance, in whole, or in part (but if in part, then in minimum increments of $100,000 (or $1,000,000 if an Interest Rate Protection Product in the form of an interest rate swap is then in effect)), upon not less than thirty (30) days' prior written notice (the "Prepayment Notice") to Administrative Agent specifying the date on which prepayment is to be made (the "Prepayment Date") and the amount of any such prepayment (the "Prepayment Amount"). On the Prepayment Date, Borrower shall pay (i) the Prepayment Amount, (ii) interest accrued and unpaid on the Prepayment Amount to and including the last day of the month in which the Prepayment Date occurs, (iii) in the event the Prepayment Amount equals the entire outstanding Principal Balance, all other unpaid Debt, (iv) the cost of unwinding, modifying or terminating any Interest Rate Protection Product then in effect ("Unwinding Costs"), and (v) the then applicable Prepayment Premium (as hereinafter defined). As used herein, "Prepayment Premium" shall mean: (A) if all or any portion of the Debt is prepaid within the first twelve (12) months following the date hereof, an amount equal to 1.50% of the amount so prepaid, and (B) if all or any portion of the Debt is prepaid within the period from and after the date which is twelve (12) months following the date hereof but before the date which is twenty-four (24) months following the date hereof, an amount equal to 1.00% of the amount so prepaid. If all or any portion of the Debt is prepaid after the date which is twenty-four (24) months following the date hereof, no Prepayment Premium shall be due.

(b)    If any Prepayment Notice is given, the entire Prepayment Amount specified therein (together with the applicable Prepayment Premium, Unwinding Costs and all other sums referred to above) shall be due and payable on the Prepayment Date set forth therein.

(c)    Any partial prepayment made hereunder shall be applied against the Principal Balance in inverse order of maturity (i.e., so as to reduce the final payments of principal due and owing hereunder

and not result in any reduction in or deferment of the monthly payments of principal due and owing hereunder).

(d)     Payment of the entire outstanding Principal Balance following an acceleration of the same shall be deemed to be a voluntary prepayment to which the Prepayment Premium and Unwinding Costs shall be applicable.

(e)     Notwithstanding any other provision of this Section, no Prepayment Premium shall be payable with respect to any prepayment occurring as a result of the application of any Insurance Proceeds or Awards under the Loan Agreement.

9.     <u>Waivers</u>

Borrower hereby knowingly, voluntarily, intentionally, unconditionally and irrevocably (i) waives presentment and demand for payment, notice of dishonor, protest and notice of protest of this Note, (ii) agrees to pay all costs of collection when incurred by Administrative Agent and Lenders, including, but not limited to, reasonable attorneys' fees and disbursements (which costs may be added to the amount due under this Note and be receivable therewith) and (iii) agrees to perform and comply with each of the terms, provisions, covenants and conditions contained in this Note, the Loan Agreement, the Deed of Trust and any of the other Loan Documents on the part of Borrower to be observed or performed.

10.     <u>No Release</u>

No (a) release by Administrative Agent of any portion of the Mortgaged Property (as defined in the Deed of Trust) or any other collateral being held as security for the payment by Borrower of the Debt, (b) granting by Administrative Agent of an extension of time for payment of this Note, or any installment thereof, or (c) alteration, amendment or waiver of any term, provision, covenant or condition of this Note or any Loan Document shall release, discharge, modify, change or affect the liability of Borrower under this Note or any of the other Loan Documents. The right to plead any and all statutes of limitations as a defense to any demand on this Note, or any guaranty hereof, or any agreement to pay the same, or any demand secured by the Deed of Trust, or any and all obligations and liabilities arising out of or in connection with this Note, the Loan Agreement or any of the other Loan Documents, is expressly waived by Borrower, and any endorsers and/or guarantors of this Note, to the fullest extent permitted by law.

11.     <u>Writings</u>

8

Case 23-34815 Document 732-2 Filed in TXSB on 07/29/24 Page 97 of 145

This Note may not be waived, changed, modified or discharged orally, but only by an agreement in writing, signed by the party against whom enforcement of any waiver, change, modification or discharge is sought.

12.     Event of Default

It is hereby expressly agreed that the entire Debt shall, then or at any time thereafter, without notice (except as may be provided herein, in the Loan Agreement or in the Deed of Trust), become immediately due and payable at the option of Administrative Agent on the happening of any Event of Default and, in such event, the Deed of Trust may be foreclosed. All of the terms, provisions, covenants and conditions contained in the Loan Agreement, the Deed of Trust, the Assignment of Leases and the other Loan Documents which are to be kept and performed by Borrower are hereby made part of this Note to the same extent and with the same force and effect as if they were fully set forth in this Note. Failure to exercise such option or any other rights Administrative Agent may, in the event of any such Event of Default, be entitled to, shall not constitute a waiver of the right to exercise such option or any other rights in the event of any subsequent Event of Default, whether of the same or different nature.

13.     Late Charge

If any sum payable under this Note (but excluding, however, the final installment of the Principal Balance) is not paid within five (5) days of its due date, Borrower shall pay upon demand a late payment charge ("Late Charge") of two cents ($.02) for each dollar ($1) of such unpaid sum to defray the expenses incurred by Administrative Agent or Lenders in handling and processing such delinquent payment, and such amount shall be secured by the Deed of Trust and the Loan Documents. Nothing contained herein shall be deemed to constitute a waiver or modification of the due date on which such sums are due and payable.

14.     Involuntary Rate

In addition to any Late Charge which may be due under this Note, if the Debt is declared immediately due and payable by Administrative Agent pursuant to the provisions of this Note or any of the Loan Documents, or if any installment of principal or interest is not paid when due, or if the Debt is not paid in full on the Maturity Date, or if any other Event of Default shall have occurred, Borrower shall thereafter pay interest on the Principal Balance from the date of any of such events, as the case may be, until the date the installment of interest or principal is paid, the Debt is paid in full, or until such Event of Default is cured, at a rate (the "Involuntary Rate") equal to the lesser of (i) the Prime Rate plus two percent (2%) per annum or (ii) the Maximum Rate (as hereinafter defined), provided that there shall be no

9

automatic reduction to the Maximum Rate if Borrower is barred by law from availing itself in any action or proceeding of the defense of usury or if Borrower is barred or exempted from the operation of any law limiting the amount of interest that may be paid for the Loan or use of money or in the event this transaction, because of its amount or purpose or for any other reason, is exempt from the operation of any statute limiting the amount of interest that may be paid for the Loan or use of money.

15.    Maximum Rate

        In the event the interest provisions or any exactions provided for herein or in the Loan Agreement, the Deed of Trust or in any of the other Loan Documents shall result, because of the monthly reduction of principal or for any other reason, at any time during the Term in an effective rate of interest which, for any month, transcends the limit of the usury or any other law applicable to the Loan (the "Maximum Rate"), all sums in excess of those lawfully collectible as interest for the period in question shall, without further agreement or notice between or by any party hereto, be applied in reduction of the Principal Balance immediately upon receipt of such moneys by Administrative Agent with the same force and effect as though Borrower had specifically designated such extra sums to be so applied to reduction of the Principal Balance and Administrative Agent had agreed to accept such extra payment(s) as a premium-free prepayment, provided that no Prepayment Premium shall be payable in connection with any such reduction of the Principal Balance. In no event shall any agreed to or actual exaction as consideration for the Loan transcend the limits imposed or provided by the law applicable to this transaction or Borrower in the jurisdiction in which the land is located for the use or detention of money or for forbearance in seeking its collection.

16.    Application of Payments

        If at any time Administrative Agent receives from Borrower a payment or prepayment in an amount that is less than all amounts then due, Administrative Agent may apply that payment or prepayment to amounts then due in any manner and in any order determined by Administrative Agent, in Administrative Agent's sole and absolute discretion. Borrower agrees that neither Administrative Agent's acceptance of a payment or prepayment from Borrower in an amount that is less than all amounts then due, nor Administrative Agent's application of such payment or prepayment in the manner authorized in the immediately preceding sentence, shall be deemed to constitute either a waiver of the unpaid amounts or an accord and satisfaction.

17.    Notices

4153909-v7\CHIDMS1

001698

All notices, demands, requests, consents and other communications which are required or permitted to be given under this Note shall be sufficiently given when given as set forth in the Loan Agreement.

18.  Applicable Law

This Note shall be construed in accordance with and be governed by the laws of the State of New York without reference to principles of conflicts of law. Borrower hereby agrees to submit to personal jurisdiction in all state and federal courts located in the State and County of New York in any action or proceeding relating to this Note, the Loan Agreement, the Deed of Trust or any of the other Loan Documents. In furtherance of such agreement, Borrower hereby knowingly, voluntarily, intentionally, unconditionally and irrevocably appoints Capitol Services, Inc., having an address at 1218 Central Avenue, Suite 100, Albany, NY 12205, as general agent ("Agent") for Borrower for receipt of service of process in any such action or proceeding (and Administrative Agent may make service upon Borrower and/or such Agent). Service of any summons and complaint or other process in any such action or proceeding and any notice of sale or other notices may be made upon Borrower and/or Agent by registered or certified mail, return receipt requested, Borrower and Agent hereby waiving personal service thereof, or as may otherwise be permitted by law.

19.  Waiver of Trial By Jury

Borrower hereby knowingly, voluntarily, intentionally, unconditionally and irrevocably waives all right to trial by jury in any action, proceeding or counterclaim arising out of or relating to this Note, the Loan Agreement, the Deed of Trust or any of the other Loan Documents.

20.  Right to Transfer Note

Administrative Agent and Lenders may transfer this Note and their rights hereunder in accordance with Article XII of the Loan Agreement.

21.  Purchase of Note.

In lieu of prepaying the Note in whole, Borrower shall have the right to purchase this Note, and the liens securing same ("Lender's Liens") upon not less than thirty (30) days' prior written notice to Lender, specifying the date on which such purchase is to occur (the "Note Purchase Date"). The purchase price for the Note shall be an amount equal to the Prepayment Amount that Borrower would be required to pay pursuant to Section [__] if prepaying the Note in whole on the Note Purchase Date. For the avoidance of doubt, the purchase price shall include then-current Principal Balance, accrued but unpaid

interest, any applicable Prepayment Premium, Unwinding Costs, Late Charges or other charges owing on the Note, plus any other Debt or amounts owed to Administrative Agent or Lenders pursuant to the terms of the Loan Documents as of such Note Purchase Date, as reasonably determined by Administrative Agent. Upon receipt of such amounts, Administrative Agent and Lender shall execute and deliver to Borrower a recordable assignment of note and lien instrument ("Note Assignment") with respect to the Note and Lender's Liens being acquired.  The purchase of the Note by Borrower shall be on an as-is basis, other than as expressly set forth in the Note Assignment, which representations and warranties shall be limited to the principal balance of the Note, and that Lender is the owner and holder of the Note and Lender's Liens, subject to no liens or security interests in favor of any third party, and has the full legal right and authority to sell the Note and Lender's Liens.  It is expressly acknowledged and agreed by Borrower that the right granted in this Note is a right to purchase the Note and Loan in full and not in part, and, if the Loan is evidenced by more than one promissory note, Borrower shall not acquire one note without acquiring all notes evidencing the Loan, and Lender shall not sell or assign its interest in one note without selling or assigning its interest in all notes evidencing the Loan.  Prior to assigning, granting a participation in or syndication all or any part of the Note, Lender agrees to provide Borrower thirty (30) Business Days' prior notice thereof.

22.    Joint and Several

If Borrower consists of more than one person or party, the obligations and liabilities of each such person or party hereunder shall be joint and several.

23.    Power

Borrower (and the undersigned representatives of Borrower, if any) represents that Borrower has full power, authority and legal right to execute and deliver this Note and that the payment of the Debt constitutes a valid and binding obligation of Borrower.

24.    Form

Whenever used in this Note, the singular number shall include the plural, the plural the singular, and the words "Lender(s)", "Borrower" and "Administrative Agent" shall include their respective successors and assigns.

25.    Right of Set Off

If an Event of Default shall have occurred and be continuing, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted

by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of Borrower against any and all of the obligations of Borrower now or hereafter existing under this Note, the Loan Agreement or any other Loan Document to such Lender, irrespective of whether or not such Lender shall have made any demand under this Note, the Loan Agreement or any other Loan Document and although such obligations of Borrower are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such indebtedness. The rights of each Lender and its respective Affiliates under this paragraph are in addition to other rights and remedies (including other rights of setoff) that such Lender or its respective Affiliates may have. Each Lender agrees to notify Borrower and Administrative Agent promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

26.     Construction

        This Note shall be construed without regard to any presumption or other rule requiring construction against the party causing this Note to be drafted. To the extent any term herein conflicts with any term of the Loan Agreement, the Loan Agreement shall control.

27.     Administrative Agent

        To the extent that any action is to be taken, any information is to be delivered to or by Lenders, any determination is to be made, or any consent is to be given or withheld by Lenders, any such action, delivery, determination or consent shall be taken, made or given or withheld, as the case may be, by Administrative Agent or any successor agent thereto.

28.     Heirs, Successors and Assigns

        All of the terms, provisions, covenants and conditions of this Note shall apply to, bind and inure to the benefit of, the heirs, executors, administrators, successors and assigns of Borrower, Lenders and Administrative Agent, respectively.

[balance of page intentionally left blank]

4153909-v7\CHIDMS1

001701

IN WITNESS WHEREOF, Borrower has duly executed this Note as of the day and year first above written.

<div style="text-align:center">BORROWER:</div>

**GALLERIA 2425 OWNER, LLC,**
a Delaware limited liability company

By:    Galleria 2425 JV, LLC,
        a Delaware limited liability company,
        its sole member

        By:    Naissance Capital Real Estate, LLC,
                a Delaware limited liability company,
                its Managing Member

        By: _____
        Name: Azeemeh Zaheer
        Title:  Managing Member

<div style="text-align:center">[Signature Page to Promissory Note]</div>

**<u>EXHIBIT E</u>**

**NBK DOT**

001703

RP-2018-235600
05/30/2018  ER  $124.00

RP-2018-235600

THIS INSTRUMENT WAS PREPARED BY
AND UPON RECORDING RETURN TO:

Baker & McKenzie LLP
300 E. Randolph St., Suite 5000
Chicago, IL 60601
Attention: Mona Dajani, Esq.

AFTER RECORDING RETURN TO:

TransAct
TITLE

GF #: 12000490

<u>DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS AND PROFITS, SECURITY
AGREEMENT AND FIXTURE FILING</u>

by

GALLERIA 2425 OWNER LLC, a Delaware limited liability company,
whose address is 3139 W Holcombe Blvd #845, Houston, Texas 77025.
Grantor,

to

Salima Umatiya,
with an address of 245 Commerce Green Blvd., Suite 151, Sugar Land, TX 77478,
Trustee,

for the benefit of

NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH, a banking corporation
organized under the laws of Kuwait, acting through its New York branch, as administrative and
collateral agent,

whose address is having an office at 299 Park Avenue, New York, New York 10171,
Beneficiary

THIS DEED OF TRUST IS ALSO A FIXTURE FILING UNDER SECTION 9.502(b) OF THE
TEXAS BUSINESS AND COMMERCE CODE.

001704



RP-2018-235600

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS: YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

<u>DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS AND PROFITS, SECURITY AGREEMENT AND FIXTURE FILING</u>

THIS DEED OF TRUST, ASSIGNMENT OF LEASES AND RENTS AND PROFITS, SECURITY AGREEMENT AND FIXTURE FILING made as of May 23, 2018 made by GALLERIA 2425 OWNER LLC, a Delaware limited liability company, having an address at 3139 W Holcombe Blvd #845, Houston, Texas 77025 ("Grantor"), in favor of Salima Umatiya, an individual, having an address at 245 Commerce Green Blvd., Suite 151, Sugar Land, TX 77478 (together with its successors and assigns, "Trustee"), as Trustee for the benefit of NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH, a banking corporation organized under the laws of Kuwait, acting through its New York branch, having an office at 299 Park Avenue, New York, New York 10171, as administrative and collateral agent (in such capacity, together with its successors and permitted assigns, "Beneficiary") for the Lenders (as defined in the Loan Agreement referred to below).

<div align="center">WITNESSETH:</div>

A.       Lenders are this day making a term loan to Grantor in the principal amount of $51,675,000.00 (the "Loan"), which loan shall be governed by that certain Loan Agreement dated of even date herewith made by and among Grantor, Beneficiary and Lenders (as the same may be amended, restated or otherwise modified from time to time, the "Loan Agreement");

B.       Beneficiary is the holder of a Promissory Note (as the same may be amended, restated, consolidated, split, severed or otherwise modified from time to time, the "Note"), dated as of even date herewith, given by Grantor, as maker, to Beneficiary, as payee, in the original principal amount of $51,675,000.00; and

C.       Beneficiary has requested, and Grantor has agreed, to secure Grantor's obligations under the Note by giving Beneficiary a first priority lien encumbering the Mortgaged Property (as hereinafter defined).

<div align="center">CERTAIN DEFINITIONS</div>

Unless the context otherwise specifies or requires, the following terms shall have the meanings herein specified, such definitions to be applicable equally to the singular and the plural forms of such terms.

"Chattels" means all fixtures, fittings, appliances, apparatus, equipment, machinery and articles of personal property and additions thereto and replacements thereof (other than those owned by lessees, contractors or licensees), now or at any time hereafter affixed to, attached to, placed upon, or used in any way in connection with the complete and comfortable present or future use, enjoyment, occupancy or operation of the Improvements on the Premises.

"Debt" shall mean the outstanding principal amount set forth in, and evidenced by, the Loan Agreement and the Note, together with all interest accrued and unpaid thereon and all other sums due to Administrative Agent or Lenders in respect of the Loan under the Note, the Loan Agreement, this Deed of Trust or any other Loan Document.

4162651-v5\CHIDMS1



"Deed of Trust" means this Deed of Trust, Assignment of Leases and Rents and Profits, Security Agreement and Fixture Filing, as the same may be amended, restated, consolidated, split, severed or otherwise modified from time to time.

"Deed of Trust Amount" means the maximum principal amount secured by this Deed of Trust as of the date hereof, i.e., $51,675,000.00.

"Events of Default" means the events and circumstances described as such in Section 2.01 hereof.

"Improvements" means all structures or buildings, and replacements thereof, to be erected or now or hereafter located upon the Premises, including all equipment, apparatus, machinery and fixtures of every kind and nature whatsoever forming part of said structures or buildings.

"Loan" means the $51,675,000.00 loan governed by the Loan Agreement, evidenced by the Note and secured by this Deed of Trust.

"Premises" means all that certain plot, piece or parcel of land situated, lying and being in the City of Houston, County of Harris and State of Texas, described on Exhibit A annexed hereto and made a part hereof, including all of the Improvements, easements, rights, privileges and appurtenances (including, without limitation, any air or development rights) thereunto belonging or in anywise appertaining, and all of the estate, right, title, interest, claim or demand whatsoever of Grantor therein and in the rights-of-way, gores of land, streets, ways, alleys, passages, sewer rights, waters, water courses, water rights and powers, and all estates, rights, titles, interests, privileges, tenements, hereditaments, and appurtenances of any nature whatsoever, in any way belonging, relating or pertaining thereto, either in law or in equity, in possession or expectancy, now or hereafter acquired.

All terms of this Deed of Trust which are not defined above shall have the meaning set forth elsewhere in this Deed of Trust or, if not set forth in the Deed of Trust, in the Loan Agreement.

NOW, THEREFORE, Grantor, in consideration of the premises and in order to secure the payment of the Debt and any sums due under any Interest Rate Protection Product and the performance and observance of all of the provisions of this Deed of Trust, the Loan Agreement, the Note and the other Loan Documents, hereby irrevocably GRANTS, TRANSFERS, CONVEYS, CONFIRMS, PLEDGES and ASSIGNS, all of its present and future estate, rights, title, interest and claim, either in law or in equity, of, in and to the following property (collectively, the "Mortgaged Property"), whether now owned or held or hereafter acquired, to Trustee for the benefit of Beneficiary, TO HAVE AND TO HOLD, IN TRUST FOR THE BENEFIT OF BENEFICIARY UPON THE STATUTORY CONDITION AND WITH THE STATUTORY POWER OF SALE:

(i)    the Premises;

(ii)    the Improvements;

(iii)    the Chattels;

(iv)    all proceeds of the conversion, voluntary or involuntary, of any of the foregoing into cash or liquidated claims, including, without limitation, proceeds of insurance and condemnation awards, and all rights of Grantor to refunds of real estate taxes and assessments and the reasonable attorney's fees, costs and disbursements incurred by Beneficiary or Lenders in connection with the collection of such award or payment;

(v)    all Leases now or hereafter entered into and all right, title and interest of Grantor thereunder, including, without limitation, cash or securities deposited thereunder to secure performance

2

4162651-v5\CHIDMS1

Page 4 of 29    Wednesday, March 20, 2024    County Clerk Harris County, Texas

RP-2018-235600

by the Tenants of their obligations thereunder, whether such cash or securities are to be held until the expiration of the terms of such Leases or applied to one or more of the installments of rent coming due immediately prior to the expiration of such terms, including, further, the right during the continuance of an Event of Default, to receive and collect the rents thereunder;

(vi)     all proceeds of (or return of any unearned premiums on) any insurance policies covering all or any part of the Premises, including, without limitation, the right to receive and apply the proceeds of any insurance, judgments or settlements made in lieu thereof, for damage to the Premises;

(vii)     all monies, funds, bank accounts, deposit accounts, accounts receivable, contract rights, other rights and any other intangible assets derived from or related to the rental, operation or ownership of the Premises or any part thereof, and all the agreements, instruments or documents evidencing or relating to any of the same, whether or not identified to or known by Beneficiary or Lenders;

(viii)     all trade names, trademarks, logos, copyrights, good will and books and records relating to or used in connection with the operation of the Mortgaged Property or any part thereof;

(ix)     to the extent assignable, all contracts from time to time executed by Grantor or any manager or agent on Grantor's behalf relating to the ownership, management, leasing, sale, marketing, construction, maintenance, repair, operation, occupancy or financing of the Mortgaged Property or any part thereof and all agreements relating to the purchase or Lease of any portion of same; all consents, licenses, building permits, certificates of occupancy and other governmental approvals relating to construction, completion, occupancy, use or operation of the Mortgaged Property or any part thereof; and all drawings, plans, specifications and similar or related items relating to the Mortgaged Property;

(x)     all so-called "air rights," bulk development rights, floor area, floor area ratio, zoning rooms and other rights and privileges now or hereafter appurtenant to the Premises and Improvements or any part thereof, as defined in, under or with respect to the zoning and building codes or ordinances of all applicable jurisdictions and the regulations and interpretations thereunder or thereof, whether or not transferable, and any or all of the same that may now or hereafter be acquired for use with the Premises or Improvements; and

(xi)     all proceeds and replacements of and substitutions for all or any of the foregoing.

As to any of the Mortgaged Property aforesaid which does not form a part and parcel of the real estate, this Deed of Trust is and is hereby deemed to be, as well, a Security Agreement under the Uniform Commercial Code for the purpose of creating hereby a security interest in such property, which is hereby granted to Beneficiary as "Secured Party" (as said quoted term is defined in the Uniform Commercial Code), securing the Debt and all other obligations set forth herein.

TO HAVE AND TO HOLD unto Beneficiary, its successors and assigns forever and Grantor does hereby bind itself, its successors and assigns to WARRANT AND FOREVER DEFEND the title to the Mortgaged Property unto Trustee.

ARTICLE I.
REPRESENTATIONS, WARRANTIES AND COVENANTS OF GRANTOR

Grantor represents, warrants and covenants as follows:

SECTION 1.01. Title; No Encumbrances. Grantor warrants title to the Mortgaged Property subject to no lien, charge or encumbrance except such encumbrances as are listed as exceptions to title in the Title Policy; that Grantor owns the Chattels free and clear of liens and claims; and that this Deed of Trust is and shall remain a valid first priority lien on the Mortgaged Property subject only to the exceptions

3

4162651-v5\CHIDMS1



Page 5 of 29     Wednesday, March 20, 2024

County Clerk Harris County, Texas

RP-2018-235600

referred to above. Grantor has full power and lawful authority to mortgage the Mortgaged Property in the manner and form herein done or intended hereafter to be done. Grantor shall preserve such title, and shall forever warrant and defend the same to Beneficiary and Grantor shall forever warrant and defend the validity and priority of the lien hereof against the claims of all persons and parties whomsoever.

SECTION 1.02. Related Mortgage Documents; Further Assurances: Grantor shall, at Grantor's sole cost and expense, and without expense to Beneficiary, do, execute, acknowledge and deliver all and every such further agreements, documents, acts, deeds, conveyances, mortgages, estoppel certificates, financing statements, continuation statements, assignments, notices of assignment, subordinations, transfers and assurances as Beneficiary shall from time to time reasonably require, for the better clarifying, assuring, conveying, assigning, transferring and confirming unto Beneficiary the property and rights hereby conveyed or assigned or intended now or hereafter so to be, or which Grantor may be or may hereafter become bound to convey or assign to Beneficiary, or for carrying out the intention or facilitating the performance of the terms, provisions, covenants and conditions of this Deed of Trust, or for filing, registering or recording this Deed of Trust or any of the other Loan Documents and, on demand, shall execute and deliver, and hereby authorizes Beneficiary to execute and file in Grantor's name, to the extent Beneficiary may lawfully do so, one or more financing statements, continuation statements, chattel mortgages or comparable Deed of Trusts, to evidence more effectively the lien of this Deed of Trust upon the Chattels.

SECTION 1.03. Filing and Recording of Mortgage Documents.

(a)      Recording: Grantor forthwith upon the execution and delivery of this Deed of Trust, and thereafter from time to time, shall cause this Deed of Trust and any Deed of Trust creating a lien or evidencing the lien of this Deed of Trust upon the Chattels and each instrument of further assurance to be filed, registered or recorded in such manner and in such places as may be required by any present or future law in order to publish notice of and fully to protect the lien of this Deed of Trust upon, and the interest of Beneficiary in, the Mortgaged Property, provided that no such instrument of further assurance shall materially increase the obligations of Grantor under this Deed of Trust.

(b)      Recording Fees. Grantor shall pay all filing, registration or recording fees, and all expenses incident to the execution and acknowledgment of this Deed of Trust, any mortgage supplemental hereto, any Deed of Trust or financing statement with respect to the Chattels, and any instrument of further assurance or continuation, and all federal, state, county, and municipal stamp taxes and other taxes, duties, imposts, assessments and charges arising out of or in connection with the execution and delivery of the Loan Agreement, the Note, this Deed of Trust, any mortgage supplemental hereto, any Deed of Trust or financing statement with respect to the Chattels or any instrument of further assurance or continuation.

SECTION 1.04. Manner of Payment. Grantor shall punctually pay the principal and interest and all other sums to become due in respect of the Note at the time and place and in the manner specified in the Note, according to the true intent and meaning thereof, all in any coin or currency of the United States of America which at the time of such payment shall be legal tender for the payment of public and private debts.

SECTION 1.05. Compliance With Law.

(a)      Grantor shall comply with all laws, regulations, rules, statutes, ordinances, orders and decrees of any federal, state and local governmental authority or court applicable to the Mortgaged Property or any part thereof (including, without limitation, all applicable zoning, environmental, and energy-related laws and Access Laws (as hereinafter defined)) (collectively, "Legal Requirements").

4

001708



RP-2018-235600

(b)     (i) Grantor agrees that the Premises shall at all times comply to the extent applicable with the requirements of the Americans with Disabilities Act of 1990, the Fair Housing Amendments Act of 1988, all other federal, state and local laws, regulations, rules, statutes, ordinances, orders and decrees related to handicapped access including, without limitation, the American with Disabilities Act Accessibility Guidelines for Buildings and Facilities (collectively, "Access Laws").

(ii)     Notwithstanding any provisions set forth herein or in any other documents regarding Beneficiary's approval or alterations of the Premises, Grantor shall not alter the Premises in any manner which would increase Grantor's responsibilities for compliance with the applicable Access Laws without the prior written approval of Beneficiary. The foregoing shall apply to tenant improvements constructed by Grantor or by any of Grantor's Tenants. Beneficiary may condition any such approval upon receipt of a certificate of Access Law compliance from an architect, engineer, or other person acceptable to Beneficiary.

(iii)     Grantor agrees to give prompt notice to Beneficiary of the receipt by Grantor of any complaints related to violations of any Access Laws and of the commencement of any proceedings or investigations which relate to compliance with applicable Access Laws.

(c)     Notwithstanding any other provision of this Section 1.05, Grantor shall not be deemed to be in default solely by reason of Grantor's failure to comply with any Legal Requirements as aforesaid so long as, in Beneficiary's sole judgment, reasonably exercised, each of the following conditions is satisfied:

(i)     Grantor is engaged in and diligently pursuing in good faith administrative or judicial proceedings appropriate to contest the validity or amount of such Legal Requirements;

(ii)     [Intentionally Omitted];

(iii)     Noncompliance with any such Legal Requirements will not result in the loss or forfeiture of any property encumbered hereby or any interest of Beneficiary therein or result in any fines or other punitive actions or the loss of any insurance coverage; and

(iv)     Grantor deposits with Beneficiary, as security for any payment or performance which may ultimately be required, a sum equal to the amount of any fine, assessment or charge plus the interest, penalties, and other costs which Beneficiary estimates are likely to become payable if Grantor's contest is unsuccessful.

If Beneficiary determines, in Beneficiary's sole judgment, reasonably exercised, that any one or more of such conditions is not satisfied or is no longer satisfied, Grantor shall comply with the Legal Requirements in question, within fifteen (15) days after Beneficiary gives notice of such determination.

SECTION 1.06. Future Acquisitions. All right, title and interest of Grantor in and to all extensions, improvements, betterments, renewals, substitutions and replacements of, and all additions and appurtenances to, the Mortgaged Property, hereafter acquired by or released to Grantor, or constructed, assembled or placed by Grantor on the Mortgaged Property, and all conversions of the security constituted thereby, immediately upon such acquisition, release, construction, assembling, placement or conversion, as the case may be, and in each such case, without any further mortgage, conveyance, assignment or other act by Grantor, shall become subject to the lien of this Deed of Trust as fully and completely, and with the same effect, as though now owned by Grantor and specifically described in the granting clause hereof, but at any and all times Grantor shall execute and deliver to Beneficiary any and all such further assurances, mortgages, conveyances or assignments thereof as Beneficiary may

5



RP-2018-235600

reasonably require for the purpose of expressly and specifically subjecting the same to the lien of this Deed of Trust.

SECTION 1.07. Beneficiary's Right To Cure Defaults. If Grantor shall fail to perform or comply with any of the representations, warranties and covenants contained in Sections 1.01, 1.03 or elsewhere herein, then upon five (5) days' notice to Grantor (which notice shall not be required to be delivered in the event of an emergency), Beneficiary may make advances to perform the same on its behalf, and all sums so advanced, with interest at the Involuntary Rate, shall immediately be due from Grantor to Beneficiary, and shall be added to the Debt and shall be secured by this Deed of Trust. The provisions of this Section 1.07 shall not prevent any default in the observance of any of the representations, warranties and covenants contained in said Sections 1.01, 1.03 or elsewhere herein from constituting an Event of Default.

SECTION 1.08. Legal Proceedings. Whether or not an Event of Default has occurred and exists, Beneficiary shall have the right, but not the duty or obligation, to intervene or otherwise participate in, prosecute or defend at any legal or equitable proceedings (including, without limitation, any eminent domain proceedings) which, in Beneficiary's reasonable discretion, affect the Mortgaged Property, the Leases or any of the rights created hereunder the reasonable out-of-pocket cost of which shall be reimbursed by Grantor to Beneficiary and shall be secured by this Deed of Trust.

SECTION 1.09. Assignment of Leases. Grantor hereby absolutely and unconditionally assigns and transfers to Beneficiary the Leases and the Property Income. Grantor shall not otherwise assign, transfer or encumber in any manner the Leases or the Property Income or any portion thereof. Grantor shall have a license to collect and use the Property Income as the same becomes due and payable and to amend, supplement or modify the Leases in accordance with and as permitted under the Loan Agreement and to exercise Grantor's rights thereunder, so long as no Event of Default is continuing, but may not collect any Property Income more than thirty (30) days in advance of the date the same becomes due. The assignment in this Section 1.09 shall constitute an absolute and present assignment of the Leases and the Property Income, and not an assignment for security, and the existence or exercise of the Grantor's conditional license to collect Property Income shall not operate to subordinate this assignment to any subsequent assignment. The exercise by Beneficiary or Trustee of any of its rights or remedies under this Section 1.09 shall not be deemed or construed to make Beneficiary or Trustee a mortgagee-in-possession.

SECTION 1.10. Insurance. Grantor agrees, at Grantor's sole cost and expense, to keep the Mortgaged Property insured, at all times throughout the term of this Deed of Trust, in accordance with Article VIII of the Loan Agreement.

ARTICLE II.
EVENTS OF DEFAULT AND REMEDIES

SECTION 2.01. Events of Default. If an Event of Default shall occur and is continuing under the Loan Agreement, then, and in every such case Beneficiary, Lenders and/or Trustee may exercise any remedy available at law or in equity, including, but not limited to, those listed below and those listed in the Loan Agreement and the other Loan Documents, in such sequence and in such combination as Beneficiary may determine in Beneficiary's sole and absolute discretion:

(a)    Acceleration. Upon the occurrence of any Event of Default, the entire principal amount of the indebtedness evidenced by the Note and all other Debt together with accrued interest thereon at the Involuntary Rate shall, subject to the terms of the Loan Agreement and the Note, at the option of Beneficiary exercised while such Event of Default is continuing, without demand or notice of any kind to Grantor or any other person, become immediately due and payable. All the provisions of the Loan Agreement are incorporated herein for all purposes as if set forth in full herein.

6

4162651-v5\CHIDMS1



    (b)   <u>Remedies Cumulative</u>. No remedy or right of Beneficiary hereunder or under the Loan Agreement, the Note or any of the other Loan Documents, or otherwise, or available under applicable law or in equity, shall be exclusive of any other right or remedy, but each such remedy or right shall be in addition to every other remedy or right now or hereafter existing under any such document or under applicable law or in equity. No delay in the exercise of, or omission to exercise, any remedy or right accruing on any Event of Default shall impair any such remedy or right or be construed to be a waiver of any such Event of Default or an acquiescence therein, nor shall it affect any subsequent Event of Default of the same or a different nature. Every such remedy or right may be exercised concurrently or independently, and when and as often as may be deemed expedient by Beneficiary. All obligations of Grantor, and all rights, powers and remedies of Beneficiary, expressed herein shall be in addition to, and not in limitation of, those provided by law or in equity or in the Loan Agreement, the Note or any other Loan Documents or any other written agreement or instrument relating to any of the Debt or any security therefor.

    (c)   <u>Foreclosure; Appointment of Receiver</u>.

    (i)   <u>Non-Judicial Foreclosure</u>. If the unpaid principal amount of or interest on the Debt or any part thereof shall have become due and payable (whether at maturity or as an installment of combined principal and/or interest or by reason of any prepayment requirement or by declaration or acceleration or otherwise) and shall not have been paid, Beneficiary or other holder of the Note may proceed with foreclosure by directing Trustee or his successor or substitute in trust to proceed as hereafter authorized to sell, assign, transfer and deliver the whole or, from time to time, any part of the Mortgaged Property, or any interest in any part thereof, by advertisement and sale in accordance with applicable law. Trustee shall execute and deliver to the purchaser at any such sale a trustee's deed conveying the property so sold, but without any covenant or warranty, expressed or implied. The recitals in such trustee's deed of any matters or facts shall be prima facie proof of the truthfulness thereof. Any Person, including Beneficiary, may bid at the sale. Trustee shall apply the proceeds of the sale in the following order:

    <u>First</u>: To the payment of the costs and expenses of such sale (including the charges of advertising, sale and conveyance, including a commission to Trustee then acting, any amounts necessary to pay impositions or prior liens, the cost of evidence of title and the costs and expenses, if any, of taking possession of, retaining custody over, repairing, managing, operating, maintaining and preserving the Mortgaged Property or any part thereof prior to such sale), all reasonable costs and expenses incurred by Trustee, Beneficiary or any other Person in obtaining or collecting any insurance proceeds, condemnation awards or other amounts received by Beneficiary, all reasonable costs and expenses of any receiver of the Mortgaged Property or any part thereof, and any taxes, assessments, impositions or other charges or expenses prior to the security interest or lien of this Deed of Trust, which Trustee or Beneficiary may consider it necessary or desirable to pay;

    <u>Second</u>: To the payment of all amounts of principal and interest (including post-petition interest to the extent such interest is a liability) at the time due and payable on the Debt outstanding at the time (whether due by reason of maturity or by prepayment or by declaration or acceleration or otherwise), including interest at the Involuntary Rate on any overdue principal and (to the extent permitted under applicable law) on any overdue interest;

    <u>Third</u>: The balance, if any, held by Trustee after payment in full of all amount referred to in subdivisions <u>First</u> and <u>Second</u>, above, shall be paid to the Person or Persons entitled to receive such proceeds.

    (ii)   <u>Judicial Foreclosure</u>. If an Event of Default is continuing, Beneficiary at any time may, at its election, proceed at law or in equity or otherwise to enforce the payment of the Debt

4162651-v5\CHIDMS1

RP-2018-235600



Page 9 of 29    Wednesday, March 20, 2024    County Clerk Harris County, Texas

RP-2018-235600

in accordance with the terms hereof and thereof and to foreclose the lien of this Deed of Trust as against all or any part of the Mortgaged Property and to have the same sold under the judgment or decree of a court of competent jurisdiction. Beneficiary shall be entitled to recover in such proceedings all reasonable costs incident thereto, including reasonable trustee's fees and reasonable attorneys' fees and expenses in such amounts as may be fixed by the court.

(iii)    Appointment of Receiver. If an Event of Default is continuing, Beneficiary shall, as a matter of right and without regard to the adequacy of any security for the indebtedness secured hereby or the solvency of Grantor, be entitled to the appointment of a receiver for all or any part of the Mortgaged Property, whether such receivership be incidental to a proposed sale of the Mortgaged Property or otherwise, and Grantor hereby consents to the appointment of such a receiver and will not oppose any such appointment.

(d)    Possession of the Premises; Remedies for Leases and Rents: Grantor hereby waives all right to the possession, income, and rents of the Premises during the continuance of any Event of Default, and Beneficiary is hereby expressly authorized and empowered, at and following any such occurrence, to enter into and upon and take possession of the Premises or any part thereof. If any Event of Default is continuing, then, whether before or after institution of legal proceedings to foreclose the lien of this Deed of Trust or before or after the sale thereunder, Beneficiary shall be entitled, in its sole and absolute discretion, to do all or any of the following: (i) enter and take actual possession of the Premises, the Property Income, the Leases and other Mortgaged Property relating thereto or any part thereof personally, or by its agents or attorneys, and exclude Grantor therefrom; (ii) with or without process of law, enter upon and take and maintain possession of all of the documents, books, records, papers and accounts of Grantor relating thereto; (iii) as attorney-in-fact or agent of Grantor, or in its own name as mortgagee and under the powers herein granted, hold, operate, manage and control the Premises, the Property Income, the Leases and other Mortgaged Property relating thereto and conduct the business, if any, thereof either personally or by its agents, contractors or nominees, with full power to use such measures, legal or equitable, as in its sole and absolute discretion or in the discretion of its successors or assigns may be deemed proper or necessary to enforce the payment of the Property Income, the Leases and other Mortgaged Property relating thereto (including actions for the recovery of rent, actions in forcible detainer and actions in distress of rent); (iv) cancel or terminate any Lease or sublease for any cause or on any ground which would entitle Grantor to cancel the same; (v) elect to disaffirm any Lease or sublease made subsequent hereto or subordinated to the lien hereof; (vi) make all necessary or proper repairs, decorations, renewals, replacements, alterations, additions, betterments and improvements to the Premises that, in its discretion, may seem appropriate; (vii) insure and reinsure the Mortgaged Property for all risks incidental to Beneficiary's possession, operation and management thereof; and (viii) receive all such Property Income and proceeds, and perform such other acts in connection with the management and operation of the Mortgaged Property, as Beneficiary in its discretion may deem proper, Grantor hereby granting Beneficiary full power and authority to exercise each and every one of the rights, privileges and powers contained herein at any and all times while any Event of Default is continuing without notice to Grantor or any other Person. Beneficiary, in the exercise of the rights and powers conferred upon it hereby, shall have full power to use and apply the Property Income to the payment, in such order as Beneficiary may determine, of or on account of any one or more of the following: (a) to the payment of the operating expenses of the Premises, including the actual out-of-pocket cost of management and leasing thereof (which shall include reasonable compensation to Beneficiary and its agents or contractors, if management be delegated to agents or contractors, and it shall also include lease commissions and other compensation and expenses of seeking and procuring tenants and entering into leases), established claims for damages, if any, and premiums on insurance hereinabove authorized; (b) to the payment of taxes, charges and special assessments, the out-of-pocket costs of all repairs, decorating, renewals, replacements, alterations, additions, betterments and improvements of the Mortgaged Property,

8

001712



RP-2018-235600

including the out-of-pocket cost from time to time of installing, replacing or repairing the Mortgaged Property, and of placing the Mortgaged Property in such condition as will, in the judgment of Beneficiary, make it readily rentable; and (c) to the payment of any Debt. The entering upon and taking possession of the Premises, or any part thereof, and the collection of any Property Income and the application thereof as aforesaid shall not cure or waive any Event of Default theretofore or thereafter occurring or affect any notice of Default hereunder or invalidate any act done pursuant to any such Event of Default or notice, and, notwithstanding continuance in possession of the Premises or any part thereof by Beneficiary or a receiver and the collection, receipt and application of the Property Income, Beneficiary shall be entitled to exercise every right provided for in this Deed of Trust or by law or in equity during the continuance of an Event of Default. Any of the actions referred to in this <u>Section 2.01(d)</u> may be taken by Beneficiary irrespective of whether any notice of Default has been given hereunder and without regard to the adequacy of the security for the indebtedness hereby secured.

(e)     <u>Personal Property</u>. If any Event of Default is continuing, Beneficiary may exercise from time to time any rights and remedies available to it under the Loan Documents or applicable law upon default in payment of indebtedness, including, without limitation, those available to a secured party under the Uniform Commercial Code of the state where the goods are located. Grantor shall, promptly upon request by Beneficiary, assemble the Mortgaged Property and make it available to Beneficiary at such place or places, reasonably convenient for both Beneficiary and Grantor, as Beneficiary shall designate. Grantor hereby expressly waives, to the fullest extent permitted by applicable law, any and all notices, advertisements, hearings, or process of law in connection with the exercise by Beneficiary of any of its rights and remedies while an Event of Default is continuing. If any notification of intended disposition of the Mortgaged Property is required by law, such notification, if mailed, shall be deemed reasonably and properly given if mailed by registered or certified mail, return receipt requested, at least ten (10) business days before such disposition, postage prepaid, addressed to Grantor either at the address shown below or at any other address of Grantor appearing on the records of Beneficiary. Without limiting the generality of the foregoing, whenever there exists an Event of Default hereunder, Beneficiary may, with respect to so much of the Mortgaged Property as is personal property under applicable law, to the fullest extent permitted by applicable law, without further notice, advertisement, hearing or process of law of any kind, (i) notify any Person obligated on the Mortgaged Property to perform directly for Beneficiary its obligations thereunder, (ii) enforce collection of any portion of the Mortgaged Property by suit or otherwise, and surrender, release or exchange all or any part thereof or compromise or extend or renew for any period (whether or not longer than the original period) any obligations of any nature of any party with respect thereto, (iii) endorse any checks, drafts or other writings in the name of Grantor to allow collection of the Mortgaged Property, (iv) take control of any proceeds of the Mortgaged Property, (v) enter upon any premises where any of the Mortgaged Property may be located and take possession of and remove such Mortgaged Property and render all or any part of the Mortgaged Property unusable, all without being responsible for loss or damage, (vi) sell any or all of the Mortgaged Property, free of all rights and claims of Grantor therein and thereto, at any lawful public or private sale and on such terms as Beneficiary deems advisable and (vii) bid for and purchase any or all of the Mortgaged Property at any such public or private sale. Any proceeds of any disposition by Beneficiary of any of the Mortgaged Property may be applied by Beneficiary to the payment of expenses in connection with the Mortgaged Property, including attorneys' fees and legal expenses, and any balance of such proceeds shall be applied by Beneficiary toward the payment of such portion of the Debt and in such order of application as Beneficiary may from time to time elect. Without limiting the foregoing, Beneficiary may exercise from time to time any rights and remedies available to it under the Uniform Commercial Code or other applicable law as in effect from time to time or otherwise available to it under applicable law. Grantor hereby expressly waives presentment, demand, notice of dishonor, protest and notice of protest in connection with the Note and, to the fullest extent permitted by applicable law, any and all other notices, demands, advertisements, hearings or process of law in connection with the exercise by Beneficiary of

9

4162651-v5\CHIDMS1

001713



RP-2018-235600

any of its rights and remedies hereunder. Grantor hereby constitutes Beneficiary its attorney-in-fact with full power of substitution to take possession of the Mortgaged Property while any Event of Default is continuing and, as Beneficiary in its sole and absolute discretion deems necessary or proper, to execute and deliver all instruments required by Beneficiary to accomplish the disposition of the Mortgaged Property; this power of attorney is a power coupled with an interest and is irrevocable while any portion of the Debt is outstanding. Grantor shall remain liable for any deficiency resulting from the sale of the Mortgaged Property and shall pay such deficiency forthwith upon demand, and Beneficiary's right to recover such deficiency shall not be impaired by the sale or other disposition of the Mortgaged Property without required notice. Expenses of retaking, holding, preparing for sale, selling or the like will first be paid from the proceeds before the balance will be applied toward any portion of the Debt.

(f)    No Liability on Beneficiary or Lenders. Either Beneficiary or Trustee may cure any breach or default of Grantor, and if it chooses to do so in connection with any such cure, Beneficiary or Trustee may also enter the Premises and/or do any and all other things which it may in its sole and absolute discretion consider necessary and appropriate to protect the security of this Deed of Trust. Such other things may include, without limitation: appearing in and/or defending any action or proceeding which purports to affect the security of, or the rights or powers of Beneficiary or Trustee under, this Deed of Trust; paying, purchasing, contesting or compromising any encumbrance, charge, lien or claim of lien which in Beneficiary's or Trustee's sole judgment is or may be senior in priority to this Deed of Trust, such judgment of Beneficiary or Trustee to be conclusive as among the parties to this Deed of Trust; obtaining insurance and/or paying any premiums or charges for insurance required to be carried under the Loan Agreement; otherwise caring for and protecting any and all of the Premises; and/or employing counsel, accountants, contractors and other appropriate persons to assist Beneficiary or Trustee. Beneficiary and Trustee may take any of the actions permitted hereunder either with or without giving notice to any person. Notwithstanding anything contained herein, Beneficiary shall not be obligated to perform or discharge, and does not hereby undertake to perform or discharge, any obligation, duty or liability of Grantor, whether hereunder, under any third party agreements or otherwise. Neither Beneficiary nor Lenders shall have responsibility for the control, care, management or repair of the Premises (including, but not limited to, use, storage, manufacture, discharge or transportation of hazardous waste or substances including, without limitation, Hazardous Materials (as defined in the Environmental Indemnity Agreement), by Grantor) or be responsible or liable for any negligence in the management, operation, upkeep, repair or control of the Premises resulting in loss, injury or death to any tenant, licensee, employee, stranger or other Person. No liability shall be enforced or asserted against Beneficiary or Lenders in its exercise of the powers granted to it under this Deed of Trust, and Grantor expressly waives and releases any such liability. Should Beneficiary or Lenders incur any such liability, loss or damage under any third party agreements or under or by reason hereof, or in the defense of any claims or demands, Grantor agrees to reimburse Beneficiary or Lenders within five (5) Business Days upon demand for the full amount thereof, including costs, expenses and attorneys' fees. Such sums shall bear interest at the Involuntary Rate from the date of each such amount is due by Beneficiary or Lenders and shall be paid by Grantor to Beneficiary forthwith upon demand by Beneficiary, and shall be secured by this Deed of Trust, and Beneficiary shall have, in addition to any other right or remedy of Beneficiary, the same rights and remedies in the event of non-payment of any such sums by Grantor as in the case of a default by Grantor in the payment of any installment of principal or interest due and payable under the Loan Agreement.

## ARTICLE III.
## MISCELLANEOUS

SECTION 3.01. Severability. In the event any one or more of the provisions contained in this Deed of Trust, the Loan Agreement or the Note shall for any reason be held to be invalid, illegal or

4162651-v5\CHIDMS1

001714



unenforceable in any respect, such invalidity, illegality, or unenforceability shall, at the option of Beneficiary, not affect any other provision of this Deed of Trust, but this Deed of Trust shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein or therein.

SECTION 3.02. Notices. All notices hereunder and under any applicable law pertaining hereto shall be in writing and shall be deemed sufficiently given or served for all purposes when delivered as provided for in the Loan Agreement.

SECTION 3.03. Heirs, Successors and Assigns. All of the grants, covenants, terms, provisions and conditions of this Deed of Trust shall run with the land and shall apply to, bind and inure to the benefit of, the heirs, executors, administrators, successors and assigns of Grantor, the heirs, executors, administrators, successors and assigns of Trustee, and the heirs, executors, administrators, successors and assigns of Beneficiary.

SECTION 3.04. Counterparts. This Deed of Trust may be executed in any number of counterparts and each of such counterparts shall for all purposes be deemed to be an original, and all such counterparts shall together constitute but one and the same deed of trust.

SECTION 3.05. Future Mortgage Taxes. In the event of the passage after the date of this Deed of Trust of any law of the State of Texas deducting from the value of real property for the purpose of taxation any lien or encumbrance thereon or changing in any way the laws for the taxation of mortgages or debts secured by mortgages for state or local purposes or the manner of the collection of any such taxes, and imposing a tax, either directly or indirectly, on this Deed of Trust, the Loan Agreement, the Note or the Debt, Grantor shall, if permitted by law, pay any tax imposed as a result of any such law within the statutory period or within fifteen (15) days after demand by Beneficiary, whichever is less; *provided*, *however*, that if, in the opinion of the attorneys for Beneficiary, Grantor is not permitted by law to pay such taxes, Beneficiary shall have the right, at Beneficiary's option, to declare the Debt due and payable, without prepayment premium, on a date specified in a prior notice to Grantor of not less than thirty (30) days.

SECTION 3.06. Stamp Tax: If at any time the United States of America, any state thereof or any governmental subdivision of any such state, shall require revenue or other stamps to be affixed to the Loan Agreement, the Note or this Deed of Trust, Grantor shall pay for the same, with interest and penalties thereon, if any.

SECTION 3.07. Cover Sheet. The information set forth on the cover of this Deed of Trust is hereby incorporated herein.

SECTION 3.08. Governing Law.

(a)    THIS DEED OF TRUST WAS NEGOTIATED IN THE STATE OF NEW YORK, AND MADE BY GRANTOR TO BENEFICIARY IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE NOTE SECURED HEREBY WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS DEED OF TRUST AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES (I) THE PROVISIONS FOR THE CREATION,

4162651-v5\CHIDMS1

RP-2018-235600

RP-2018-235600

PERFECTION, AND ENFORCEMENT OF THE LIEN AND SECURITY INTEREST CREATED PURSUANT HERETO AND PURSUANT TO THE OTHER LOAN DOCUMENTS (OTHER THAN WITH RESPECT TO LIENS AND SECURITY INTERESTS IN PROPERTY WHOSE PERFECTION AND PRIORITY IS COVERED BY ARTICLE 9 OF THE UCC (INCLUDING, WITHOUT LIMITATION, THE ACCOUNTS) WHICH SHALL BE GOVERNED BY THE LAW OF THE JURISDICTION APPLICABLE THERETO IN ACCORDANCE WITH SECTIONS 9-301 THROUGH 9-307 OF THE UCC AS IN EFFECT IN THE STATE OF NEW YORK) AND (II) THE ENFORCEMENT OF THE RIGHTS CREATED BY THE ABSOLUTE ASSIGNMENT OF LEASES AND RENTS OF EVEN DATE HEREWITH SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE MORTGAGED PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS AND ALL OF THE OBLIGATIONS ARISING HEREUNDER OR THEREUNDER. TO THE FULLEST EXTENT PERMITTED BY LAW AND EXCEPT AS SET FORTH IN THE IMMEDIATELY PRECEDING SENTENCE, GRANTOR HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS DEED OF TRUST AND THE NOTE, AND THIS DEED OF TRUST AND THE NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(b)    ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST GRANTOR OR BENEFICIARY ARISING OUT OF OR RELATING TO THE DEBT OR THIS DEED OF TRUST MAY AT BENEFICIARY'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND GRANTOR WAIVES ANY OBJECTIONS WHICH GRANTOR MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND GRANTOR HEREBY KNOWINGLY, VOLUNTARILY, INTENTIONALLY, UNCONDITIONALLY AND IRREVOCABLY SUBMITS TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. GRANTOR DOES HEREBY DESIGNATE AND APPOINT:

Capitol Services, Inc.
1218 Central Avenue, Suite 100
Albany, NY 12205

AS GRANTOR'S AUTHORIZED AGENT TO ACCEPT AND ACKNOWLEDGE ON GRANTOR'S BEHALF SERVICE OF ANY AND ALL PROCESS WHICH MAY BE SERVED IN ANY SUCH SUIT, ACTION OR PROCEEDING IN ANY FEDERAL OR STATE COURT IN NEW YORK, NEW YORK, AND AGREES THAT SERVICE OF PROCESS UPON SAID AGENT AT SAID ADDRESS AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO GRANTOR IN THE MANNER PROVIDED HEREIN SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON GRANTOR, IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK. GRANTOR (I) SHALL GIVE PROMPT NOTICE TO BENEFICIARY OF ANY CHANGED ADDRESS OF GRANTORS AUTHORIZED AGENT HEREUNDER, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE A SUBSTITUTE AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK (WHICH SUBSTITUTE AGENT AND OFFICE SHALL BE DESIGNATED AS THE PERSON AND ADDRESS FOR SERVICE OF PROCESS), AND (III) SHALL PROMPTLY DESIGNATE SUCH A SUBSTITUTE IF GRANTOR'S AUTHORIZED

12

4162651-v5\CHIDMS1

001716

AGENT CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK OR IS DISSOLVED WITHOUT LEAVING A SUCCESSOR.

SECTION 3.09. Joint and Several Liability. If Grantor consists of more than one person or party, the obligations and liabilities of each such person or party hereunder shall be joint and several.

SECTION 3.10. Variable Rate. The Note contains provisions for a variable rate of interest, and reference to such provisions is made hereby.

SECTION 3.11. Purchase Money Deed of Trust. Grantor hereby agrees and acknowledges that Grantor borrowed the Deed of Trust Amount to finance Grantor's purchase of the Mortgaged Property.

SECTION 3.12. Maximum Secured Amount/Future Advances. This Deed of Trust shall secure the payment of any amounts advanced from time to time under the Loan Documents, or under other documents stating that such advances are secured hereby, whether such advances are obligatory or to be made at the option of the Lenders, or otherwise, to the same extent as if such future advances were made on the date of the execution of this Deed of Trust, although there may be no advance made at the time of execution of this Deed of Trust and although there may be no indebtedness outstanding at the time any advance is made. The lien of this Deed of Trust shall be valid as to any and all future obligations and Debt arising under or in connection with this Deed of Trust from the time of its filing for record in the recorder's or registrar's office of the county in which the Premises is located, which future obligations and Debt shall have the same priority as if all such future obligations and Debt were made on the date of execution hereof. Nothing in this Section or in any other provision of this Deed of Trust shall be deemed an obligation on the part of Beneficiary to make any future advances of any sort. At all times, regardless of whether any loan proceeds have been disbursed, this Deed of Trust shall secure (in addition to any loan proceeds disbursed from time to time) the payment of any and all expenses and advances due to or incurred by Beneficiary in connection with the Debt to be secured hereby and which are to be reimbursed by Grantor under the terms of this Deed of Trust. The total amount of indebtedness may increase or decrease from time to time, as provided in the Loan Agreement. This Deed of Trust is intended to and shall be valid and have priority over all subsequent liens and encumbrances, including statutory liens, excepting solely taxes and assessments levied on the Premises.

SECTION 3.13. Interest Rate Protection Product. Grantor acknowledges and agrees that any amounts now or hereafter due and owing from Grantor to Beneficiary arising from or in connection with any Interest Rate Protection Product, now existing or hereafter entered into between Grantor and Beneficiary, and any out-of-pocket costs incurred by Beneficiary in connection therewith, including, without limitation, any interest, expenses, fees, penalties or other charges associated with any obligations undertaken by Beneficiary to hedge or offset Beneficiary's obligations pursuant to such Interest Rate Protection Product, or the termination of any such obligations, shall be (i) deemed additional interest and/or a related expense (to be determined in the sole discretion of Beneficiary) due in connection with the principal amount of the Debt secured by this Deed of Trust, (ii) included (in the manner described above) as part of the Debt secured by this Deed of Trust, and secured by this Deed of Trust to the full extent thereof, and (iii) included in any judgment in any proceeding instituted by Beneficiary or its agents against Grantor for foreclosure of this Deed of Trust or otherwise.

SECTION 3.14. Administrative Agent. To the extent that any action is to be taken, any information is to be delivered to or by Lenders, any determination is to be made, or any consent is to be given or withheld by Lenders, any such action, delivery, determination or consent shall be taken, made or given or withheld, as the case may be, by Beneficiary, as administrative agent under the Loan Agreement or any successor agent thereto.

13

4162651-v5\CHIDMS1

RP-2018-235600

RP-2018-235600

SECTION 3.15.Acts by Trustee. At any time upon written request of Beneficiary, payment of its fees and (in case of full reconveyance, for cancellation and retention) presentation of this Deed of Trust and the appropriate instruments evidencing the Debt for endorsement and without affecting the liability of any person for the payment of the Debt, Trustee may: (a) consent to the making of any map or plat of the Premises; (b) join in granting any easement or creating any restriction thereon; (c) join in any subordination or other agreement affecting this Deed of Trust or the lien or charge thereof; or (d) reconvey, without warranty, all or any part of the Premises, as provided in Section 3.20 hereof. The recitals in any reconveyance of any matters or facts shall be conclusive proof of the truthfulness thereof. Grantor agrees to pay a reasonable trustee's fee for full or partial reconveyance, together with a recording fee if Trustee, at its option, elects to record said reconveyance. Trustee may resign by instrument in writing filed in the office of county clerk or applicable recorder or registrar of deeds in which this Deed of Trust shall have been recorded or filed.

SECTION 3.16.Successor Trustee. In the event of the resignation, refusal or inability of Trustee to act or at the option of Beneficiary, with or without any reason, Beneficiary is authorized either in its own name or through an attorney or attorney-in-fact appointed for the purpose by written instrument duly recorded and without any formality other than a designation in writing of a successor or substitute trustee, to appoint a successor or substitute trustee who shall thereupon become vested with and succeed to all the rights, title and powers given to Trustee herein named, the same as if the successor or substitute trustee had been named original Trustee herein; and such right to appoint a successor or substitute trustee shall exist as often as and whenever Beneficiary desires.

SECTION 3.17.Covenants of Trustee. Trustee covenants faithfully to perform the trust herein created, being liable, however, only for its own gross negligence or misconduct and that of the employees and agents of Trustee.

SECTION 3.18.Employment of Agents. Trustee, or anyone acting in its stead, shall have, in its discretion, authority to employ all proper agents and attorneys in the execution of this trust and in the conducting of any sale made pursuant to the terms hereof, and to pay for such services rendered out of the proceeds of the sale of the Premises, should any be realized; and if no sale be made or if the proceeds of sale be insufficient to pay the same, then Grantor hereby undertakes and agrees to pay the costs of such services rendered to Trustee. Trustee may rely on any document believed by it in good faith to be genuine. All money received by Trustee shall, until used or applied as herein provided, be held in trust, but need not be segregated (except to the extent required by law), and Trustee shall not be liable for interest thereon.

SECTION 3.19.Indemnification of Trustee or Beneficiary. If Trustee or Beneficiary shall be made a party to or shall intervene in any action or proceeding affecting the Premises or the title thereto, or the interest of Trustee or Beneficiary under this Deed of Trust, except for any action or proceeding arising out of the willful misconduct or, to the extent prohibited by law, the gross negligence of Trustee or Beneficiary, Trustee and Beneficiary shall be reimbursed by Grantor, immediately and without demand, for all reasonable costs, charges and attorneys' fees incurred by them or any of them in any case, and the same shall become so much additional indebtedness secured hereby.

SECTION 3.20.Defeasance. Upon full payment of all indebtedness secured hereby and satisfaction of the entire Debt in accordance with their respective terms and at the time and in the manner provided, and when Beneficiary and Lenders have no further obligation to make any advance, or extend any credit hereunder, under the Note or any of the other Loan Documents, Beneficiary shall request Trustee in writing to reconvey the Premises, and shall surrender this Deed of Trust and all notes and instruments evidencing the Debt to Trustee. When Trustee receives Beneficiary's written request for reconveyance and all fees and other sums owing to Trustee by Grantor, Trustee shall reconvey the

14

4162651-v5\CHIDMS1

001718

RP-2018-235600

Premises, or so much of it as is then held under this Deed of Trust, without warranty to the person or persons legally entitled to it. Such person or persons shall pay any costs of recordation. In the reconveyance, the grantee may be described as "the person or persons legally entitled thereto," and the recitals of any matters or facts shall be conclusive proof of their truthfulness absent manifest error. Neither Beneficiary nor Trustee shall have any duty to determine the rights of persons claiming to be rightful grantees of any reconveyance.

SECTION 3.21. Maximum Interest. It is expressly stipulated and agreed to be the intent of Grantor and Beneficiary at all times to comply strictly with the applicable Texas law governing the maximum rate or amount of interest payable on the Debt (or applicable United States federal law to the extent that it permits Beneficiary to contract for, charge, take, reserve or receive a greater amount of interest than under Texas law). If the applicable law is ever judicially interpreted so as to render usurious any amount (i) contracted for, charged, taken, reserved or received pursuant to the Note, any of the Loan Documents or any other communication or writing by or between Grantor and Beneficiary related to the Debt or to the transaction or transactions that are the subject matter of the Loan Documents, (ii) contracted for, charged, taken, reserved or received by reason of Beneficiary's exercise of the option to accelerate the maturity of the Note and/or any other portion of the Debt, or (iii) Grantor will have paid or Beneficiary will have received by reason of any voluntary prepayment by Grantor of the Note and/or any other portion of the Debt, then it is Grantor's and Beneficiary's express intent that all amounts charged in excess of the maximum amount of interest permissible by applicable law (the "Maximum Lawful Rate") shall be automatically cancelled, ab initio, and all amounts in excess of the Maximum Lawful Rate theretofore collected by Beneficiary shall be credited on the principal balance of the Note and/or any other portion of the Debt (or, if the Note and all other Debt have been or would thereby be paid in full, refunded to Grantor), and the provisions of the Note and the other Loan Documents immediately be deemed reformed and the amounts thereafter collectible hereunder and thereunder reduced, without the necessity of the execution of any new document, so as to comply with the applicable law, but so as to permit the recovery of the fullest amount otherwise called for hereunder and thereunder; provided, however, if the Note has been paid in full before the end of the stated term of the Note, then Grantor and Beneficiary agree that Beneficiary shall, with reasonable promptness after Beneficiary discovers or is advised by Grantor that interest was received in an amount in excess of the Maximum Lawful Rate, either refund such excess interest to Grantor and/or credit such excess interest against any other portion of the Debt then owing by Grantor to Beneficiary. Grantor hereby agrees that as a condition precedent to any claim seeking usury penalties against Beneficiary, Grantor will provide written notice to Beneficiary, advising Beneficiary in reasonable detail of the nature and amount of the violation, and Beneficiary shall have sixty (60) days after receipt of such notice in which to correct such usury violation, if any, by either refunding such excess interest to Grantor or crediting such excess interest against the Note and/or any other portion of the Debt then owing by Grantor to Beneficiary. All sums contracted for, charged, taken, reserved or received by Beneficiary for the use, forbearance or detention of any of the Debt, including any portion of the Debt evidenced by the Note shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the stated term of the Note and/or any other portion of the Debt (including any and all renewal and extension periods) until payment in full so that the rate or amount of interest on account of the Note and/or any other portion of the Debt does not exceed the Maximum Lawful Rate from time to time in effect and applicable to the Note and/or any other portion of the Debt for so long as any portion of the Debt is outstanding. Notwithstanding anything to the contrary contained herein or in any of the other Loan Documents, it is not the intention of Beneficiary to accelerate the maturity of any interest that has not accrued at the time of such acceleration or to collect unearned interest at the time of such acceleration.

SECTION 3.22. STATE SPECIFIC PROVISIONS

15

4162651-v5\CHIDMS1



(a)     <u>Inconsistencies</u>. In the event of any inconsistencies between the terms and conditions of this Article and the other provisions of this instrument, the terms and conditions of this Article shall control and be binding.

(b)     <u>Section 1.09</u> is amended by adding the following:

> Without in any way limiting or restricting any of Beneficiary's rights, benefits or privileges hereunder, Beneficiary and Grantor hereby expressly agree that Beneficiary shall be entitled to all of the rights, benefits and privileges provided for in the Texas Assignment of Rents Act, Chapter 64 of the Texas Property Code, as amended from time to time.

(c)     During the continuance of an Event of Default, it shall thereupon be the duty of the above named Trustee, or its successor or substitute, as hereinafter provided, to enforce this trust at the request of Beneficiary (which request shall be presumed) and to sell the Mortgaged Property with or without first having taken possession of the same and in whole or in part, as the Trustee, or its successor or substitute, may elect (all rights to a marshalling of assets of Grantor being expressly waived hereby) to the highest bidder for cash at public auction at the county courthouse of any County in which the Mortgaged Property is situated, in the area of such courthouse designated for real property foreclosure sales in accordance with applicable law (or in the absence of any such designation, in the area set forth in the notice of sale hereinafter described) on the first Tuesday of any month between the hours of 10:00 A.M. and 4:00 P.M. (commencing at the time stated in the hereinafter described notice of sale or not later than three hours after that time), after giving notice of the time, place and terms of sale and the Mortgaged Property to be sold by (i) the Trustee, or its successor or substitute, or any authorized agent of the foregoing filing a copy of the notice thereof in the office of the County Clerk of each County where the Mortgaged Property is situated and by posting written or printed notice thereof at least twenty-one (21) days preceding the date of said sale at the County Courthouse door of each County where the Mortgaged Property is located, and (ii) the holder of the Debt secured by this Deed of Trust or any authorized agent of such holder, at least twenty-one (21) days preceding the date of said sale, serving written notice of such proposed sale by certified mail on each debtor obligated to pay the Debt secured by this Deed of Trust evidenced by the Notes according to the records of Beneficiary. Service of such notice to each debtor shall be completed upon deposit of the notice enclosed in a postpaid wrapper, properly addressed to each debtor at the most recent address as shown by the records of Beneficiary, in a post office or official depository under the care and custody of the United States Postal Service. The affidavit of any person having knowledge of the facts to the effect that such service was completed shall be prima facie evidence of the fact of service. After such sale, the Trustee, or its successor or substitute, shall make due conveyance with general warranty to the purchaser or purchasers and the Grantor binds itself, its heirs, assigns, executors, administrators, successors and legal representatives to warrant and forever defend the title of such purchaser or purchasers. Any abstract of title to the Mortgaged Property furnished in connection with the Loan shall be delivered and become the property of the purchaser at said sale. In the event a foreclosure hereunder shall be commenced by the Trustee or its substitute or successor, Beneficiary may at any time before the sale of the Mortgaged Property, direct the said Trustee, or its successor or substitute, to abandon the sale, and may then institute suit for the collection of the Notes and the other secured indebtedness, and for the foreclosure of this Deed of Trust. It is agreed that if Lender should institute a suit for the collection of the Note or any other secured indebtedness and for the foreclosure of this Deed of Trust, Beneficiary may at any time before the entry of a final judgment in said suit dismiss the same, and require the Trustee, its substitute or successor to sell the Mortgaged Property in accordance with the provisions of this Deed of Trust.

(d)     With respect to the Personal Property, Beneficiary is hereby irrevocably appointed the true and lawful attorney of the Grantor (coupled with an interest), in its name and stead, to

16

RP-2018-235600

001720



RP-2018-235600

make all necessary conveyances, assignments, transfers and deliveries of the Personal Property, and for that purpose Beneficiary may execute all necessary instruments of conveyance, assignment, transfer and delivery, and may substitute one or more persons with such power, Grantor hereby ratifying and confirming all that its said attorney or such substitute or substitutes shall lawfully do by virtue hereof. Notwithstanding the foregoing, Grantor, if so requested by Beneficiary, shall ratify and confirm any such sale or sales by executing and delivering to Lender or to such purchaser or purchasers all such instruments as may be advisable, in the judgment of Beneficiary, for such purpose, and as may be designated in such request.  To the extent permitted by law, any such sale or sales made under or by virtue of this Section 3.22(d) shall operate to divest all the estate, right, title, interest, claim and demand whatsoever, whether at law, or in equity, of Grantor in and to the properties and rights so sold, and shall be a perpetual bar both at law and in equity against Grantor and against any and all persons claiming or who may claim the same, or any part thereof, from, through or under Grantor.  Upon any sale made under or by virtue of this Section 3.22(d), Trustee, or its successor or substitute, or Beneficiary may, to the extent permitted by law, bid for and acquire the Mortgaged Property or any part thereof and in lieu of paying cash therefor may make settlement for the purchase price by crediting upon the debt secured by this Deed of Trust the net sales price after deducting therefrom the expenses of the sale and the cost of the auction and any other sums which Beneficiary is authorized to deduct by law or under this Deed of Trust.  At any sale pursuant to this Section 3.22(d), whether made under power herein granted, the Texas Property Code, the Texas Business and Commerce Code, or any other legal enactment, or by virtue of any judicial proceeding or any other legal right, remedy or recourse, it shall not be necessary for Beneficiary or Trustee, or its successor or substitute, to be physically present, or to have constructive possession of, the Mortgaged Property, and the title to and right of possession of any such property shall pass to the purchaser thereof as completely as if the same had been actually presented and delivered to the purchaser at such sale.

(e)     During the continuance of an Event of Default, Beneficiary shall have the right and option to proceed with foreclosure in satisfaction of such item or items by directing the Trustee, or its successor or substitute as hereinafter provided, to proceed as if under a full foreclosure, conducting the sale as herein provided, and without declaring the whole debt secured by this Deed of Trust due, and provided that if sale is made because of default as hereinabove mentioned, such sale may be made subject to the unmatured part of the Note and the Debt secured by this Deed of Trust, and it is agreed that such sale, if so made, shall not in any manner affect any other obligations secured by this Deed of Trust, but as to such other obligations this Deed of Trust and the liens created hereby shall remain in full force and effect just as though no sale had been made under the provisions of this Section 3.22(e).  It is further agreed that several sales may be made hereunder without exhausting the right of sale for any other breach of any of the obligations secured hereby, it being the purpose to provide for a foreclosure and sale of the Mortgaged Property for any matured portion of any of the Debt secured hereby or other items provided for herein without exhausting the power to foreclose and to sell the Mortgaged Property for any other part of the debt secured hereby whether matured at the time or subsequently maturing.

(f)     The Trustee, or its successor or substitute, hereunder shall have the right to sell the Mortgaged Property in whole or in part and in such parcels and order as he may determine, and the right of sale hereunder shall not be exhausted by one or more sales, but successive sales may be had until all of the Mortgaged Property has been legally sold.  In the event any sale hereunder is not completed or is defective in the opinion of Beneficiary or the holder of any part of the Debt secured hereby, such sale shall not exhaust the power of sale hereunder, and Beneficiary or such holder shall have the right to cause a subsequent sale or sales to be made by the Trustee or any successor or substitute Trustee.  Likewise, Beneficiary on behalf of Lender may become the purchaser at any such sale if it is the highest bidder, and shall have the right, after paying or accounting for all costs of said sale or sales, to credit the amount of the bid upon the amount of the debt secured hereby, in lieu of cash payment.

17

001721

RP-2018-235600

(g)      It shall not be necessary for the Trustee, or its successor or substitute, to have constructively in its possession any part of the real or personal property covered by this Deed of Trust, and the title and right of possession of said property shall pass to the purchaser or purchasers at any sale hereunder as fully as if the same had been actually present and delivered. Likewise, on foreclosure of this Deed of Trust whether by power of sale herein contained or otherwise, Grantor or any person claiming any part of the Mortgaged Property by, through or under Grantor, shall not be entitled to a marshalling of assets or a sale in inverse order of alienation.

(h)      The recitals and statements of fact contained in any notice or in any conveyance to the purchaser or purchasers at any sale hereunder shall be prima facie evidence of the truth of such facts, and all prerequisites and requirements necessary to the validity of any such sale shall be presumed to have been performed.

(i)      Any sale under the powers granted by this Deed of Trust shall be a perpetual bar against Grantor, its heirs, successors, assigns and legal representatives.

(j)      In the event of a foreclosure under the powers granted by this Deed of Trust, Grantor, and all other persons in possession of any part of the Mortgaged Property shall be deemed tenants at will of the purchaser at such foreclosure sale and shall be liable for a reasonable rental for the use of the Mortgaged Property; and if any such tenants refuse to surrender possession of the Mortgaged Property upon demand, the purchaser shall be entitled to institute and maintain the statutory action of forcible entry and detainer and procure a writ of possession thereunder, and Grantor expressly waives all damages sustained by reason thereof.

(k)      To the extent permitted under applicable law, Grantor shall not, and will not, apply for, avail itself of, insist upon or plead or in any manner claim or take advantage of any appraisement, homestead, valuation, stay, extension or exemption laws, or any so called "*Moratorium Laws*", now existing or hereafter enacted, in order to prevent or hinder the enforcement or foreclosure of this Deed of Trust, but hereby waives the benefit of such laws. Grantor, for itself and all who may claim through or under Grantor, waives any and all right to have the property and estates comprising the Mortgaged Property marshaled upon any foreclosure of the lien hereof and agrees that any court having jurisdiction to foreclose such lien may order the Mortgaged Property sold as an entirety. Grantor hereby expressly waives any and all rights of reinstatement and redemption, if any, from sale pursuant to a foreclosure of this Deed of Trust on behalf of Grantor, and each and every person claiming by, through or under Grantor. The waiver of statutory rights contained set forth above specifically includes a waiver of all provisions of Sections 51.003, 51.004, and 51.005 of the Texas Property Code (as the same may be amended from time to time). In the event an interest in any of the Mortgaged Property is foreclosed upon pursuant to a judicial or nonjudicial foreclosure sale, notwithstanding the provisions of Sections 51.003, 51.004, and 51.005 of the Texas Property Code, and to the extent permitted by law, Beneficiary shall be entitled to seek a deficiency judgment from Grantor, any guarantor of the debt secured by this Deed of Trust and any other party obligated on obligations secured hereby (each an "Obligor") equal to the difference between the amount owing on the obligations secured hereby and the amount for which the Mortgaged Property was sold pursuant to judicial or nonjudicial foreclosure sale. Grantor expressly recognizes that this section constitutes a waiver of the above cited provisions of the Texas Property Code which would otherwise permit Grantor and other persons against whom recovery of deficiencies is sought independently (even absent the initiation of deficiency proceedings against them) to present competent evidence of the fair market value of the Mortgaged Property as of the date of the foreclosure sale and offset against any deficiency the amount by which the foreclosure sale price is determined to be less than such fair market value. Grantor further recognizes and agrees that this waiver creates an irrebuttable presumption that the foreclosure sale price is equal to the fair market value of the Mortgaged Property for

18

4162651-v5\CHIDMS1

RP-2018-235600

purposes of calculating deficiencies owed by Grantor or any other Obligor against whom recovery of a deficiency is sought.

(l)     To the extent, notwithstanding the provisions of Section 3.22(k) above, Section 51.003 of the Texas Property Code, or any amendment thereto or judicial interpretation thereof, requires that the "fair market value" of the Mortgaged Property shall be determined as of the foreclosure date in order to enforce a deficiency against Grantor or any other party liable for the repayment of the obligations secured by this Deed of Trust, the term "fair market value" shall include those matters required by law and shall also include the additional factors as follows:

(i)     The Mortgaged Property is to be valued "AS IS, WHERE IS" and "WITH ALL FAULTS" and there shall be no assumption of restoration of or refurbishment of the Mortgaged Property after the date of foreclosure;

(ii)     There shall be an assumption of a prompt resale of the Mortgaged Property for an all cash sales price by the purchaser at the foreclosure so that no extensive holding period should be factored into the determination of "fair market value" of the Mortgaged Property;

(iii)     An offset to the fair market value of the Mortgaged Property, as determined hereunder, shall be made by deducting from such value the reasonable estimated closing costs relating to the sale of the Mortgaged Property including but not limited to brokerage commissions, title policy expenses, tax prorations, escrow fees, and other common charges which are incurred by a seller of real property similar to the Mortgaged Property; and

(iv)     After consideration of the factors required by law and those required above (including the addition of any income to be generated by the Mortgaged Property), an additional discount factor shall be calculated based upon the estimated time it will take to effectuate a sale of the Mortgaged Property so that the "fair market value" as so determined is discounted to be as of the date of the foreclosure of the Mortgaged Property.

(m)     The Mortgaged Property forms no part of any property owned, used or claimed by Grantor as a residence or business homestead and is not exempt from forced sale under the laws of the State of Texas. Grantor hereby disclaims and renounces each and every claim to the Mortgaged Property as a homestead.

(n)     Pursuant to the Uniform Commercial Code, this Deed of Trust shall be effective as a Financing Statement filed as a fixture filing from the date of its filing for record covering and including any and all fixtures of every kind and type affixed to all or any portion of the Property or forming part of all or any portion of the Improvements. The name and address of Borrower, as debtor, and Lender (where information concerning the security interest granted hereby may be obtained), as secured party, are as set forth on the first page of this Deed of Trust. The above described goods are or are to become fixtures related to the Property and the Improvements of which Borrower is record title owner. This Deed of Trust shall also be effective as a financing statement covering minerals or the like (including oil and gas) and accounts subject to Section 9.103(e) of the Uniform Commercial Code, as amended.

(o)     **EACH OF THE PARTIES HERETO SPECIFICALLY ACKNOWLEDGES AND AGREES (i) THAT IT HAS A DUTY TO READ THIS DEED OF TRUST AND THAT IT IS CHARGED WITH NOTICE AND KNOWLEDGE OF THE TERMS HEREOF, (ii) THAT IT HAS IN FACT READ THIS DEED OF TRUST AND IS FULLY INFORMED AND HAS FULL NOTICE AND KNOWLEDGE OF THE TERMS, CONDITIONS AND EFFECTS OF THIS DEED OF TRUST, (iii) THAT IT HAS BEEN REPRESENTED BY LEGAL COUNSEL OF ITS**

19

CHOICE THROUGHOUT THE NEGOTIATIONS PRECEDING ITS EXECUTION OF THIS DEED OF TRUST AND HAS RECEIVED THE ADVICE OF SUCH COUNSEL IN CONNECTION WITH ENTERING INTO THIS DEED OF TRUST, AND (iv) THAT IT RECOGNIZES THAT CERTAIN OF THE TERMS OF THIS DEED OF TRUST PROVIDE FOR (A) CERTAIN WAIVERS AND FOR (B) THE ASSUMPTION BY ONE PARTY OF, AND/OR RELEASE OF THE OTHER PARTY FROM, CERTAIN LIABILITIES THAT SUCH PARTY MIGHT OTHERWISE BE RESPONSIBLE FOR UNDER THE LAW. EACH PARTY HERETO FURTHER AGREES AND COVENANTS THAT IT WILL NOT CONTEST THE VALIDITY OR ENFORCEABILITY OF ANY SUCH PROVISIONS OF THIS DEED OF TRUST ON THE BASIS THAT THE PARTY HAD NO NOTICE OR KNOWLEDGE OF SUCH PROVISION OR THAT SUCH PROVISIONS ARE NOT "CONSPICUOUS."

NOTICE PURSUANT TO SECTION 26.02(e) OF THE TEXAS BUSINESS AND COMMERCE CODE: THE NOTE, THIS DEED OF TRUST AND THE OTHER SECURITY DOCUMENTS CONSTITUTE A WRITTEN LOAN AGREEMENT (AS DEFINED IN SECTION 26(a)(2) OF THE TEXAS BUSINESS AND COMMERCE CODE, AS AMENDED) AND REPRESENT THE FINAL AGREEMENT AND UNDERSTANDING BETWEEN THE BENEFICIARY, THE LENDERS AND THE OTHER RESPECTIVE PARTIES HERETO AND THERETO AND SUPERSEDE ALL PRIOR AGREEMENTS AND UNDERSTANDINGS BETWEEN SUCH PARTIES RELATING TO THE SUBJECT MATTER HEREOF AND THEREOF AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR CONTEMPORANEOUS OR SUBSEQUENT AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.

### NOTICE OF INDEMNIFICATION

(p)     GRANTOR AND BENEFICIARY EACH HEREBY ACKNOWLEDGE AND AGREE THAT THIS DEED OF TRUST CONTAINS CERTAIN INDEMNIFICATION OBLIGATIONS AND COVENANTS.

[remainder of page intentionally left blank]

4162651-v5\CHIDMS1

RP-2018-235600

001724

IN WITNESS WHEREOF, this Deed of Trust has been duly executed by Grantor as of the day first above written.

GRANTOR:

**GALLERIA 2425 OWNER, LLC,**
a Delaware limited liability company

By:    Galleria 2425 JV, LLC,
       a Delaware limited liability company,
       its sole member

       By:    Naissance Capital Real Estate, LLC,
              a Delaware limited liability company,
              its Managing Member

              By: _____
              Name: Azeemeh Zaheer
              Title:  Managing Member

[Signature Page to Deed of Trust]

RP-2018-235600

Page 22 of 29    Wednesday, March 20, 2024    County Clerk Harris County, Texas

001725

RP-2018-235600

ACKNOWLEDGMENT

STATE OF _Texas_ )
                                     )ss.
COUNTY OF _Harris_ )

On _May. 2ᵗʰ,_ 2018 before me ___Shelina Jamani___ personally appeared _Azeemeh Zaheer_, personally known to me (or proved to me on the basis of satisfactory evidence) to be the person, whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person or the entity upon behalf of which the person acted, executed the instrument.

WITNESS my hand and official seal.

Signature _____     (Seal)



SHELINA JAMANI
Notary Public, State of Texas
Comm. Expires 05-09-2019
Notary ID 128607783

[Signature Page to Deed of Trust]

001726

RP-2018-235600

EXHIBIT A
PROPERTY DESCRIPTION

Real property in the City of Houston, County of Harris and State of Texas, described as follows:

Tract 1: Fee Tract

BEING 2.4462 ACRES (106,557 SQUARE FEET) OF LAND OUT OF THE WILLIAM WHITE SURVEY, ABSTRACT NO. 836, HOUSTON, HARRIS COUNTY, TEXAS, BEING THE SAME PROPERTY CONVEYED TO 2425 WEST LOOP, LP BY SPECIAL WARRANTY DEED RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20070732472, SAID TRACT CONVEYED BY DEED TO ONE WEST LOOP PLAZA, LTD. UNDER HCCF NO. S547896 AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE WESTHEIMER ROAD (ROW VARIES) BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 204.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST, TO A 1/2 INCH IRON ROD FOUND AT THE NORTHEAST CORNER OF THE 2.3468 ACRE PARCEL BEING THE SOUTHEAST CORNER OF THE HEREIN DESCRIBED PARCEL AND THE POINT OF BEGINNING:

THENCE, WESTERLY ALONG THE COMMON LINE OF THE 2.3468 ACRE PARCEL TO THE SOUTH AND THE HEREIN DESCRIBED PARCEL TO THE NORTH, SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 464.50 FEET TO A POINT ON THE EASTERLY RIGHT OF WAY (ROW) LINE OF INTERSTATE 610 WEST LOOP AND THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED PARCEL FROM. WHICH A FOUND RAILROAD SPIKE BEARS SOUTH 21 DEGREES 43 MINUTES EAST 2.42 FEET;

THENCE, NORTHERLY ALONG THE EASTERLY RIGHT OF WAY LINE OF INTERSTATE 610 WEST LOOP (ROW 350 FEET) NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST 251.27 FEET TO AN "X" SET IN CONCRETE BEING THE SOUTHWEST CORNER OF A 7.8998 ACRE PARCEL AS SHOWN ON THE HOUSTON VENTURE PLAT UNRESTRICTED RESERVE "A" FILED IN THE HARRIS COUNTY MAP RECORDS AS FILM CODE NUMBER 356074, AND THE NORTHWEST CORNER OF THE HEREIN DESCRIBED PARCEL;

THENCE, EASTERLY ALONG THE COMMON LINE OF THE ABOVE INDICATED 7.8998 ACRE PARCEL TO THE NORTH AND THE HEREIN DESCRIBED PARCEL TO THE SOUTH NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 406.61 FEET TO AN "X"

[Exhibit A - Property Description]



RP-2018-235600

FOUND IN THE WESTERLY LINE OF A 3.4385 ACRE PARCEL OF LAND CONVEYED TO RESTPROP, LTD AS RECORDED IN THE HCCF NO. R228886;

THENCE, SOUTHERLY ALONG A COMMON LINE OF THE ABOVE INDICATED 3.4385 ACRE PARCEL TO THE EAST AND THE HEREIN DESCRIBED PARCEL TO THE WEST, SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 244.64 FEET TO THE POINT OF BEGINNING CONTAINING 106,557 SQUARE FEET, 2.4462 ACRES MORE LESS.

NOTE: WE ARE PROHIBITED FROM INSURING ANY INACCURACY IN STATEMENT AS TO THE QUANTITY OF LAND CONTAINED WITHIN THE BOUNDARIES OF THE LAND DESCRIBED IN SCHEDULE A.

TRACT 2 EASEMENT TRACT: 20 FOOT NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT OVER AND ACROSS A TRACT OF LAND NORTHERLY OF AND 20 FEET WIDE ALONG THE ENTIRE NORTHERLY BOUNDARY LINE OF TRACT I; SAID EASEMENT CREATED AND GRANTED BY VI IAN L. SMITH, INDIVIDUALLY AND AS INDEPENDENT EXECUTRIX OF THE ESTATE OF R. E. SMITH, DECEASED IN THAT CERTAIN GENERAL WARRANTY DEED DATED JULY 5, 1977 FILED IN HCCF NO. F216562 AND DESCRIBED IN HCCF NO. G743294, BEING THE SAME EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 204.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST TO A 1/2 INCH IRON ROD FOUND FOR THE SOUTHEAST CORNER OF TRACT I;

THENCE CONTINUING NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 244.64 FEET ALONG A COMMON LINE OF A PREVIOUSLY NOTED 3.4385 ACRE PARCEL OF LAND TO THE EAST AND TRACT I TO THE WEST TO AN "X" FOUND FOR THE NORTHEAST CORNER OF TRACT I AND THE POINT OF BEGINNING;

[Exhibit A - Property Description]



RP-2018-235600

THENCE, WESTERLY SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 406.61 FEET ALONG THE NORTHERLY LINE OF TRACT 1 TO AN "X" SET ON THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP (350 FEET WIDE);

THENCE, NORTHERLY NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST 20.54 FEET ALONG THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP TO A POINT;

THENCE, EASTERLY 20.00 FEET NORTHERLY FROM AND PARALLEL TO THE NORTHERLY LINE OF TRACT 1, NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 401.88 FEET TO A POINT;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST 20.00 FEET TO THE POINT OF BEGINNING AND CONTAINING 0.1856 ACRES OR 8,085 SQUARE FEET OF LAND MORE OR LESS.

TRACT 3 EASEMENT TRACT: 20 FOOT NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT;

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT OVER AND ACROSS A TRACT OF LAND SOUTHERLY OF AND 20.00 FEET WIDE ALONG THE ENTIRE SOUTHERN BOUNDARY LINE OF TRACT 1, SAID EASEMENT CREATED AND GRANTED ON FEBRUARY 16, 1979, FROM WEST LOOP HOTEL, LIMITED TO FIN PROPERTIES, LIMITED FILED IN HCCF NO. G041310, BEING THE SAME PROPERTY EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 184.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST TO THE POINT OF BEGINNING, WHENCE THE SOUTHEAST CORNER OF TRACT 1 BEARS NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 20.02 FEET;

THENCE, WESTERLY 20.00 FEET SOUTHERLY FROM AND PARALLEL TO THE SOUTHERLY LINE OF TRACT 1, SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 469.23 FEET TO A POINT IN THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP;

[Exhibit A - Property Description]



RP-2018-235600

THENCE, NORTHERLY NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST, 20.54 FEET ALONG THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP TO THE SOUTHWEST CORNER FOR TRACT 1 FROM WHICH A FOUND RAILROAD SPIKE BEARS SOUTH 21 DEGREES 43 MINUTES EAST, 2.42 FEET;

THENCE, EASTERLY NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 464.50 FEET ALONG THE SOUTHERLY LINE OF TRACT 1 TO A 1/2 INCH IRON ROD FOUND AT THE SOUTHEAST CORNER OF TRACT 1;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 20.02 FEET ALONG THE A COMMON LINE BETWEEN A PREVIOUSLY DESCRIBED 2.3468 ACRES PARCEL TO THE WEST AND A 3.4385 ACRE PARCEL TO THE EAST TO THE POINT OF BEGINNING AND CONTAINING 0.2144 ACRES OR 9,337 SQUARE FEET OF LAND, MORE OR LESS.

TRACT 4 EASEMENT TRACT: 28 FOOT ROADWAY AND PEDESTRIAN EASEMENT;

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT ACROSS EASTERLY 28 FEET OF A 2.3468 ACRE TRACT ADJACENT TO AND SOUTHERLY OF TRACT 1, CREATED AND GRANTED IN THAT CERTAIN ROAD AND PEDESTRIAN EASEMENT DATED FEBRUARY 16, 1979 FROM WEST LOOP HOTEL, LIMITED TO FIN PROPERTIES, LIMITED, FILED IN HCCF NO. G041313, BEING THE SAME PROPERTY EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT A FOUND 5/8 INCH IRON ROD IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, WESTERLY SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST, 28.00 FEET ALONG THE NORTHERLY LINE OF WESTHEIMER ROAD TO A POINT;

THENCE, NORTHERLY 28.00 FEET WESTERLY OF AND PARALLEL TO THE EASTERLY LINE OF SAID 2.3468 ARE TRACT NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 205.08 FEET TO A POINT ON THE SOUTHERLY LINE OF TRACT 1;

THENCE, EASTERLY NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 28.00 FEET ALONG THE SOUTHERLY LINE OF TRACT 1 TO A 1/2 INCH IRON ROD FOUND IN THE WESTERLY LINE OF A 3.4385 ACRE PARCEL OF LAND PRESENTLY OWNED BY RESTPROP, LTD AS RECORDED IN THE HCCF NO. R228886;

[Exhibit A - Property Description]

001730



RP-2018-235600

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 204.61 FEET ALONG A COMMON LINE OF THE ABOVE INDICATED 3.4385 ACRE PARCEL TO THE EAST SAID THE PREVIOUSLY DESCRIBED 2.3468 ACRE PARCEL TO THE WEST, TO THE POINT OF BEGINNING, CONTAINING 0.1317 ACRES OR 5,735 SQUARE FEET (CALLED 5,740) OF LAND MORE OR LESS.

TRACT 5 EASEMENT TRACT: 5 FOOT STORM SEWER EASEMENT

A 1,025 SQUARE FOOT TRACT OF LAND, BEING THAT SAME TRACT UN PROPERTIES, LIMITED, RECORDED IN HCCF NUMBER G041311, LOCATED IN THE WILLIAM WHITE SURVEY, ABSTRACT NUMBER 836, CITY OF HOUSTON, HARRIS COUNTY, TEXAS, BEING THE SAME EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY (ROW) OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. 5056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR. TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE ALONG THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD, SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST, A DISTANCE OF 16.00 FEET TO THE SOUTHEAST CORNER OF SAID EASEMENT AND THE HEREIN DESCRIBED TRACT;

THENCE CONTINUING ALONG THE NORTHERLY LINE OF WESTHEIMER ROAD, SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST A DISTANCE OF 5.00 FEET, THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE DEPARTING SAID WESTHEIMER ROAD, NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, A DISTANCE OF 204.96 FEET, TO A POINT IN THE SOUTHERLY LINE OF A 2.4462 ACRE TRACT CONVEYED BY DEED TO HE 2425 WEST LOOP. LP RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20070732472;

THENCE ALONG THE SOUTHERLY LINE OF SAID 2.4462 ACRE TRACT, NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST A DISTANCE OF 5.00 FEET TO THE NORTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE DEPARTING THE SOUTHERLY LINE OF SAID 2.4462 ACRE TRACT, SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, A DISTANCE OF 204.88 FEET TO THE POINT OF BEGINNING AND CONTAINING 1,025 SQUARE FEET OF LAND, MORE OR LESS

[Exhibit A - Property Description]



RP-2018-235600

```
RP-2018-235600
# Pages 29
05/30/2018 08:41 AM
e-Filed & e-Recorded in the
Official Public Records of
HARRIS COUNTY
STAN STANART
COUNTY CLERK
Fees  $124.00
```

RECORDERS MEMORANDUM
This instrument was received and recorded electronically
and any blackouts, additions or changes were present
at the time the instrument was filed and recorded.

Any provision herein which restricts the sale, rental, or
use of the described real property because of color or
race is invalid and unenforceable under federal law.
THE STATE OF TEXAS
COUNTY OF HARRIS
I hereby certify that this instrument was FILED in
File Number Sequence on the date and at the time stamped
hereon by me; and was duly RECORDED in the Official
Public Records of Real Property of Harris County, Texas.



COUNTY CLERK
HARRIS COUNTY, TEXAS

001732





I, Teneshia Hudspeth, County Clerk of Harris County, Texas certify that these pages are a true and correct copy of the original record filed and recorded in my office, electronically or hard copy, as it appears on this date.

Witness my official hand and seal of office
This March 20, 2024

*Teneshia Hudspeth*

Teneshia Hudspeth, County Clerk
Harris County, Texas

Any provision herein which restrict the sale, rental or use of the described Real Property because of color or race is invalid and unenforceable under the Federal Law. Confidential information may have been redacted from the document in compliance with the Public Information Act.



**<u>EXHIBIT F</u>**

**NBK Assignment of Leases and Rents**

001734

**<u>EXHIBIT G</u>**

**Sworn Document Authorizing Transfer of Tax Lien**

001735

# ANN HARRIS BENNETT

Tax Assessor-Collector

03/11/2020   ER   $20.00

| | |
|---|---|
| **STATE OF TEXAS** | § |
| **COUNTY OF HARRIS** | § |

Date: February 11, 2020

## CERTIFIED STATEMENT OF TRANSFER OF TAX LIEN

Account Number: 045-140-006-0400

Legal Description: TR 31D ABST 836 W WHITE

Street Address (if applicable): 2425 W LOOP S

Taxing Unit(s): City Of Houston, Harris County, Harris County Dept. Of Education, Harris County Flood Control Dist, Harris County Hospital District, Houston Community College System, Houston I.S.D., Port Of Houston Authority

Tax Year(s) Paid: 2019

Amount Paid for Transfer (including taxes, penalties, interest and collection costs): $844,387.97

Property Owner(s)' Name(s): GALLERIA 2425 OWNER LLC
3139 W HOLCOMBE BLVD APT 845

Transferee's Name: CAZ CREEK TX II, LLC

Transferee's Street Address: 14800 LANDMARK BLVD STE 400
DALLAS TX 75254

I, Ann Harris Bennett, Tax Assessor-Collector for Harris County, and for all taxing units for which the Office of the Harris County Tax Assessor-Collector collects ad valorem taxes, certify that the above named transferee or transferee's agent ("Transferee") has made payment of the amount listed above to the above named taxing units on the property described above as consideration for a transfer of the tax lien(s), and that the tax lien(s) held by taxing units on the property for the tax years listed above are hereby transferred to Transferee in accordance with Texas Tax Code §32.06. I have issued a receipt to Transferee in conjunction with this certification reflecting the payment for the transfer in the amount of taxes, penalties, interest, and collection costs.



Ann Harris Bennett
Harris County Tax Assessor-Collector

BY: _____
Deputy

AFTER RECORDING, RETURN TO:
CAZ CREEK TX II, LLC
14800 LANDMARK BLVD STE 400
DALLAS TX 75254

RP-2020-112204

1.25

001736

## SWORN DOCUMENT AUTHORIZING TRANSFER OF TAX LIEN

STATE OF TEXAS                §

COUNTY OF HARRIS            §

After recording, return to:
Caz Creek TX II, LLC
14800 Landmark Blvd, Suite 400
Dallas, TX 75254

Before me, the undersigned notary, on this day personally appeared Musa Hussain, authorized signer for Naissance Capital Real Estate, LLC, as Member of Galleria JV, LLC, as Member of Galleria Owner, LLC, known to me to be the person(s) whose name(s) is/are subscribed below, and being duly sworn, upon oath deposed and stated as follows:

"My name is Musa Hussain, authorized signer for Naissance Capital Real Estate, LLC, as Member of Galleria JV, LLC, as Member of Galleria Owner, LLC. I am over 18 years of age and am capable of making this affidavit. The facts stated in this affidavit are within my personal knowledge and are true and correct. I or the entity I represent owns the real property described as follows:

| | |
|---|---|
| Account No. or Property ID No.: | '0451400060400 |
| Legal Description: | TR 31D ABST 836 W WHITE |
| Street Address, if applicable: | 2425 W LOOP S HOUSTON TX 77027 |
| Amount Paid for Transfer: | $ 844,387.97  (including taxes, penalties, interest, & collection costs) |
| Tax Year(s): | 2019 |
| Transferee's Name: | Caz Creek TX II, LLC |
| OCCC Property Tax License Lender No.: | 1800062523-161548 |
| Transferee's Street Address: | 14800 Landmark Blvd, Suite 400, Dallas, TX 75254 |

"Pursuant to Texas Tax Code §32.06, I hereby authorize the above-named transferee or transferee's agent (the "Transferee"), to pay all taxes, penalties, interest, and collection costs imposed by any and all local taxing units or their agents on the real property, described above, for the tax years listed above. I further authorize and direct the tax assessor-collector(s) for said taxing units to issue a tax receipt with the collector's seal of office or notarized signature to the Transferee and to certify that the taxes and any penalties and interest on the subject property and collection costs have been paid by the transferee on behalf of the owner, and the tax lien on the owner's property has been transferred to the Transferee.

"I have been given notice that if this property is my homestead and I am  disabled, I may be eligible for a tax deferral under Texas Tax Code §33.06."

*Property Owner
OR Authorized
Representative*

Name:   Musa Hussain, authorized signer for Naissance Capital Real Estate,
LLC, as Member of Galleria JV, LLC, as Member of Galleria
Owner, LLC

1/31/2020
Date Signed

STATE OF TEXAS
COUNTY OF HARRIS

Subscribed and sworn to before me on 1/31/2020  by Musa Hussain, authorized signer for Naissance Capital Real Estate, LLC, as Member of Galleria JV, LLC, as Member of Galleria Owner, LLC.

NOTARY PUBLIC, STATE OF TEXAS

STEPHANIE A. GALLEGOS
Notary Public, State of Texas
Comm. Expires 12-29-2023
Notary ID 125186127

Account # 20018213 (County)
Current: 01/31/2020 / Original: //

RP-2020-112204

001737



RP-2020-112204

# Pages 3

03/11/2020 02:45 PM

e-Filed & e-Recorded in the

Official Public Records of

HARRIS COUNTY

DIANE TRAUTMAN

COUNTY CLERK

Fees   $20.00

RP-2020-112204

RECORDERS MEMORANDUM
This instrument was received and recorded electronically
and any blackouts, additions or changes were present
at the time the instrument was filed and recorded.

Any provision herein which restricts the sale, rental, or
use of the described real property because of color or
race is invalid and unenforceable under federal law.
THE STATE OF TEXAS
COUNTY OF HARRIS
I hereby certify that this instrument was FILED in
File Number Sequence on the date and at the time stamped
hereon by me; and was duly RECORDED in the Official
Public Records of Real Property of Harris County, Texas.



COUNTY CLERK
HARRIS COUNTY, TEXAS



001738



I, Teneshia Hudspeth, County Clerk of Harris County, Texas certify that these pages are a true and correct copy of the original record filed and recorded in my office, electronically or hard copy, as it appears on this date.

Witness my official hand and seal of office
This April 30, 2024

*Teneshia Hudspeth*

Teneshia Hudspeth, County Clerk
Harris County, Texas

Any provision herein which restrict the sale, rental or use of the described Real Property because of color or race is invalid and unenforceable under the Federal Law. Confidential information may have been redacted from the document in compliance with the Public Information Act.



**EXHIBIT H**

**Tax Lien Contract**

001740

RP-2020-237529
06/04/2020 ER $42.00

**TAX LIEN CONTRACT ("Contract")**

| | |
|---|---|
| **Date:** | 01/31/2020 |
| **Loan Number:** | 20018213 |
| **Property Owner:**<br>(whether one or more) | Galleria 2425 Owner LLC<br>2425 West Loop South, Suite 350<br>Houston, TX 77027 |
| **Tax Lien Transferee:** | Caz Creek TX II, LLC<br>14800 Landmark Blvd, Suite 400<br>Dallas, TX 75254 |
| **Tax Payment Agreement:** | Date:   01/31/2020 |
| | Tax Obligation:   $845,366.97 (original amount) |

**Property** (including any improvements) located in **Harris County**, Texas and described as follows:

SEE EXHIBIT "A" WHICH IS ATTACHED HERETO.

Located at: 2425 W. Loop S, Houston, TX 77027

1.   Pursuant to § 32.06, Texas Tax Code, Property Owner by execution of a sworn document did authorize Tax Lien Transferee to pay ad valorem taxes, penalties, interest and costs due on the Property to certain taxing units. Such sworn authorization permits the taxing units to transfer the tax liens on the Property to Tax Lien Transferee to secure payment of the Tax Obligation. Property Owner also executed the Tax Payment Agreement, and under its terms Property Owner shall pay to Tax Lien Transferee the Tax Obligation. The terms of the Tax Payment Agreement are incorporated herein.

2.   In compliance with § 32.06 and § 32.065, Texas Tax Code, this Contract further secures the special tax lien against the Property transferred to Tax Lien Transferee for the Tax Obligation and secures the payment of all amounts previously or hereafter advanced, charged, or incurred in connection with transferred lien(s), this Contract, the Tax Payment Agreement, or modifications thereof, as agreed to by Property Owner, including taxes, penalties, interest, costs, fees, post-closing costs and fees, or other charges as permitted by law. Tax Lien Transferee is subrogated to rights, liens, remedies, and equities of the taxing units paid, and the same are renewed and extended by this Contract until all obligations under the Tax Payment Agreement are satisfied and paid in full.

3.   An "Event of Default" is any failure by Property Owner to perform under this Contract or the Tax Payment Agreement. Upon an Event of Default, Tax Lien Transferee may proceed to foreclose its tax lien under any method provided in § 32.06(c), Texas Tax Code. In accordance with section 32.06, Texas Tax Code, Property Owner hereby waives the requirement that Tax Lien Transferee wait one year from the date the tax lien transfer is recorded before instituting foreclosure following a default and acceleration. This Contract shall not restrict Tax Lien Transferee from pursuing any remedy to which it is otherwise entitled by law.

4.   This Contract shall be recorded in each county in which the Property is located. When the context requires, singular nouns and pronouns include the plural.



001741





Musa Hussain, authorized signer for Naissance Capital Real Estate, LLC, as Member of Galleria JV, LLC, as Member of Galleria Owner, LLC

STATE OF TEXAS
COUNTY OF HARRIS

    This instrument was acknowledged before me on May 31, 2020 by Musa Hussain, authorized signer for Naissance Capital Real Estate, LLC, as Member of Galleria JV, LLC, as Member of Galleria Owner, LLC.

> STEPHANIE A. GALLEGOS
> Notary Public, State of Texas
> Comm. Expires 12-29-2023
> Notary ID 125186127

    Notary Public, State of Texas

AFTER RECORDING, RETURN DOCUMENT TO: Caz Creek TX II, LLC, 14800 Landmark Blvd Suite 400, DALLAS, TX 75254

Contract  Page 2

RP-2020-237529

County Clerk Harris County, Texas

RP-2020-237529

GALLERIA 2425 OWNER LLC

PARCEL I.D. #0451400060400

# EXHIBIT "A"

**Tract 1:**

BEING 2.4462 ACRES (106,557 SQUARE FEET) OF LAND OUT OF THE WILLIAM WHITE SURVEY, ABSTRACT NO. 836, HOUSTON, HARRIS COUNTY, TEXAS, BEING THE SAME PROPERTY CONVEYED TO 2425 WEST LOOP, LP BY SPECIAL WARRANTY DEED RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20070732472, SAID TRACT CONVEYED BY DEED TO ONE WEST LOOP PLAZA, LTD. UNDER HCCF NO. S547896 AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE WESTHEIMER ROAD (ROW VARIES) BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 204.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST, TO A 1/2 INCH IRON ROD FOUND AT THE NORTHEAST CORNER OF THE 2.3468 ACRE PARCEL BEING THE SOUTHEAST CORNER OF THE HEREIN DESCRIBED PARCEL AND THE POINT OF BEGINNING:

THENCE, WESTERLY ALONG THE COMMON LINE OF THE 2.3468 ACRE PARCEL TO THE SOUTH AND THE HEREIN DESCRIBED PARCEL TO THE NORTH, SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 464.50 FEET TO A POINT ON THE EASTERLY RIGHT OF WAY (ROW) LINE OF INTERSTATE 610 WEST LOOP AND THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED PARCEL FROM WHICH A FOUND RAILROAD SPIKE BEARS SOUTH 21 DEGREES 43 MINUTES EAST 2.42 FEET;

THENCE, NORTHERLY ALONG THE EASTERLY RIGHT OF WAY LINE OF INTERSTATE 610 WEST LOOP (ROW 350 FEET) NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST 251.27 FEET TO AN "X" SET IN CONCRETE BEING THE SOUTHWEST CORNER OF A 7.8998 ACRE PARCEL AS SHOWN ON THE HOUSTON VENTURE PLAT UNRESTRICTED RESERVE "A" FILED IN THE HARRIS COUNTY MAP RECORDS AS FILM CODE NUMBER 356074, AND THE NORTHWEST CORNER OF THE HEREIN DESCRIBED PARCEL;

THENCE, EASTERLY ALONG THE COMMON LINE OF THE ABOVE INDICATED 7.8998 ACRE PARCEL TO THE NORTH AND THE HEREIN DESCRIBED PARCEL TO THE SOUTH NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 406.61 FEET TO AN "X" FOUND IN THE WESTERLY LINE OF A 3.4385 ACRE PARCEL OF LAND CONVEYED



RP-2020-237529

TO RESTPROP, LTD AS RECORDED IN THE HCCF NO. R228886;
THENCE, SOUTHERLY ALONG A COMMON LINE OF THE ABOVE INDICATED 3.4385
ACRE PARCEL TO THE EAST AND THE HEREIN DESCRIBED PARCEL TO THE WEST,
SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 244.64 FEET TO THE POINT OF
BEGINNING CONTAINING 106,557 SQUARE FEET, 2.4462 ACRES MORE LESS.

**TRACT 2:  20 FOOT NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT**

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT OVER AND ACROSS
A TRACT OF LAND NORTHERLY OF AND 20 FEET WIDE ALONG THE ENTIRE
NORTHERLY BOUNDARY LINE OF TRACT I; SAID EASEMENT CREATED AND
GRANTED BY VIVIAN L. SMITH, INDIVIDUALLY AND AS INDEPENDENT
EXECUTRIX OF THE ESTATE OF R. E. SMITH, DECEASED IN THAT CERTAIN
GENERAL WARRANTY DEED DATED JULY 5, 1977 FILED IN HCCF NO. F216562 AND
DESCRIBED IN HCCF NO. G743294, BEING THE SAME EASEMENT CONVEYED TO
PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH
VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO.
20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND
BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF
WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468
ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY
TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND
THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R.
HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 204.61
FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO
THE WEST AND 3.4385 ACRE PARCEL TO THE EAST TO A 1/2 INCH IRON ROD
FOUND FOR THE SOUTHEAST CORNER OF TRACT I;

THENCE CONTINUING NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS
WEST, 244.64 FEET ALONG A COMMON LINE OF A PREVIOUSLY NOTED 3.4385
ACRE PARCEL OF LAND TO THE EAST AND TRACT I TO THE WEST TO AN "X"
FOUND FOR THE NORTHEAST CORNER OF TRACT I AND THE POINT OF
BEGINNING;

THENCE, WESTERLY SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 406.61
FEET ALONG THE NORTHERLY LINE OF TRACT I TO AN "X" SET ON THE
EASTERLY LINE OF INTERSTATE 610 WEST LOOP (350 FEET WIDE);

THENCE, NORTHERLY NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST 20.54
FEET ALONG THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP TO A POINT;

001744



THENCE, EASTERLY 20.00 FEET NORTHERLY FROM AND PARALLEL TO THE
NORTHERLY LINE OF TRACT I, NORTH 87 DEGREES 44 MINUTES 46 SECONDS
EAST, 401.88 FEET TO A POINT;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST 20.00
FEET TO THE POINT OF BEGINNING AND CONTAINING 0.1856 ACRES OR 8,085
SQUARE FEET OF LAND MORE OR LESS.

**TRACT 3: 20 FOOT NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT**

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT OVER AND ACROSS
A TRACT OF LAND SOUTHERLY OF AND 20.00 FEET WIDE ALONG THE ENTIRE
SOUTHERN BOUNDARY LINE OF TRACT I, SAID EASEMENT CREATED AND
GRANTED ON FEBRUARY 16, 1979, FROM WEST LOOP HOTEL, LIMITED TO HN
PROPERTIES, LIMITED FILED IN HCCF NO. G041310, BEING THE SAME PROPERTY
EASEMENT CONVEYED TO PCCF FULLER 2425 WEST LOOP, LLC BY SPECIAL
WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY
CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY
METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF
WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468
ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY
TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND
THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R.
HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 184.61
FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO
THE WEST AND 3.4385 ACRE PARCEL TO THE EAST TO THE POINT OF BEGINNING,
WHENCE THE SOUTHEAST CORNER OF TRACT I BEARS NORTH 02 DEGREES 23
MINUTES 52 SECONDS WEST, 20.02 FEET;

THENCE, WESTERLY 20.00 FEET SOUTHERLY FROM AND PARALLEL TO THE
SOUTHERLY LINE OF TRACT 1, SOUTH 87 DEGREES 44 MINUTES 46 SECONDS
WEST, 469.23 FEET TO A POINT IN THE EASTERLY LINE OF INTERSTATE 610 WEST
LOOP;

THENCE, NORTHERLY NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST, 20.54
FEET ALONG THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP TO THE
SOUTHWEST CORNER FOR TRACT I FROM WHICH A FOUND RAILROAD SPIKE
BEARS SOUTH 21 DEGREES 43 MINUTES EAST, 2.42 FEET;

THENCE, EASTERLY NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 464.50
FEET ALONG THE SOUTHERLY LINE OF TRACT I TO A 1/2 INCH IRON ROD FOUND

RP-2020-237529

Page 5 of 8    Tuesday, April 30, 2024    County Clerk Harris County, Texas



RP-2020-237529

AT THE SOUTHEAST CORNER OF TRACT I;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 20.02 FEET ALONG A COMMON LINE BETWEEN A PREVIOUSLY DESCRIBED 2.3468 ACRES PARCEL TO THE WEST AND A A 3.4385 ACRE PARCEL TO THE EAST TO THE POINT OF BEGINNING AND CONTAINING 0.2144 ACRES OR 9,337 SQUARE FEET OF LAND, MORE OR LESS.

### TRACT 4: 28 FOOT ROADWAY AND PEDESTRIAN EASEMENT

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT ACROSS EASTERLY 28 FEET OF A 2.3468 ACRE TRACT ADJACENT TO AND SOUTHERLY OF TRACT I, CREATED AND GRANTED IN THAT CERTAIN ROAD AND PEDESTRIAN EASEMENT DATED FEBRUARY 16, 1979 FROM WEST LOOP HOTEL, LIMITED TO HN PROPERTIES, LIMITED, FILED IN HCCF NO. G041313, BEING THE SAME PROPERTY EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT A FOUND 5/8 INCH IRON ROD IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, WESTERLY SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST, 28.00 FEET ALONG THE NORTHERLY LINE OF WESTHEIMER ROAD TO A POINT;

THENCE, NORTHERLY 28.00 FEET WESTERLY OF AND PARALLEL TO THE EASTERLY LINE OF SAID 2.3468 ARE TRACT NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 205.08 FEET TO A POINT ON THE SOUTHERLY LINE OF TRACT I;

THENCE, EASTERLY NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 28.00 FEET ALONG THE SOUTHERLY LINE OF TRACT I TO A 1/2 INCH IRON ROD FOUND IN THE WESTERLY LINE OF A 3.4385 ACRE PARCEL OF LAND PRESENTLY OWNED BY RESTPROP, LTD AS RECORDED IN THE HCCF NO. R228886;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 204.61 FEET ALONG A COMMON LINE OF THE ABOVE INDICATED 3.4385 ACRE PARCEL TO THE EAST SAID THE PREVIOUSLY DESCRIBED 2.3468 ACRE PARCEL TO THE WEST, TO THE POINT OF BEGINNING, CONTAINING 0.1317 ACRES OR 5,735 SQUARE FEET (CALLED 5,740) OF LAND MORE OR LESS.



**TRACT 5: 5 FOOT STORM SEWER EASEMENT**

A 1,025 SQUARE FOOT TRACT OF LAND, BEING THAT SAME TRACT HN PROPERTIES, LIMITED, RECORDED IN HCCF NUMBER G041311, LOCATED IN THE WILLIAM WHITE SURVEY, ABSTRACT NUMBER 836, CITY OF HOUSTON, HARRIS COUNTY, TEXAS, BEING THE SAME EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY (ROW) OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. 5056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR. TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE ALONG THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD, SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST, A DISTANCE OF 16.00 FEET TO THE SOUTHEAST CORNER OF SAID EASEMENT AND THE HEREIN DESCRIBED TRACT;

THENCE CONTINUING ALONG THE NORTHERLY LINE OF WESTHEIMER ROAD, SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST A DISTANCE OF 5.00 FEET, THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE DEPARTING SAID WESTHEIMER ROAD, NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, A DISTANCE OF 204.96 FEET, TO A POINT IN THE SOUTHERLY LINE OF A 2.4462 ACRE TRACT CONVEYED BY DEED TO HE 2425 WEST LOOP, LP RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20070732472;

THENCE ALONG THE SOUTHERLY LINE OF SAID 2.4462 ACRE TRACT, NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST A DISTANCE OF 5.00 FEET TO THE NORTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE DEPARTING THE SOUTHERLY LINE OF SAID 2.4462 ACRE TRACT, SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, A DISTANCE OF 204.88 FEET TO THE POINT OF BEGINNING AND CONTAINING 1,025 SQUARE FEET OF LAND, MORE OR LESS.

RP-2020-237529

001747



RP-2020-237529

# Pages 8

06/04/2020 01:56 PM

e-Filed & e-Recorded in the

Official Public Records of

HARRIS COUNTY

CHRIS HOLLINS

COUNTY CLERK

Fees   $42.00

RP-2020-237529

RECORDERS MEMORANDUM
This instrument was received and recorded electronically
and any blackouts, additions or changes were present
at the time the instrument was filed and recorded.

Any provision herein which restricts the sale, rental, or
use of the described real property because of color or
race is invalid and unenforceable under federal law.
THE STATE OF TEXAS
COUNTY OF HARRIS
I hereby certify that this instrument was FILED in
File Number Sequence on the date and at the time stamped
hereon by me; and was duly RECORDED in the Official
Public Records of Real Property of Harris County, Texas.

COUNTY CLERK
HARRIS COUNTY, TEXAS

001748



I, Teneshia Hudspeth, County Clerk of Harris County, Texas certify that these pages are a true and correct copy of the original record filed and recorded in my office, electronically or hard copy, as it appears on this date.

Witness my official hand and seal of office
This April 30, 2024

*Teneshia Hudspeth*

**Teneshia Hudspeth, County Clerk**
**Harris County, Texas**

Any provision herein which restrict the sale, rental or use of the described Real Property because of color or race is invalid and unenforceable under the Federal Law. Confidential information may have been redacted from the document in compliance with the Public Information Act.



**EXHIBIT I**

**Galleria 2425 JV Company Agreement**

001750

**AMENDED AND RESTATED**
**LIMITED LIABILITY COMPANY AGREEMENT**

**OF**

**GALLERIA 2425 JV, LLC**
*(a Delaware limited liability company)*

May 23, 2018

TABLE OF CONTENTS

**Page**

**ARTICLE I DEFINITIONS** ........................................................................................................... 1
    **Section 1.1.**    Definitions ...................................................................... 1
    **Section 1.2.**    Interpretation .................................................................. 8

**ARTICLE II ORGANIZATION** .................................................................................................... 9
    **Section 2.1.**    Formation. ...................................................................... 9
    **Section 2.2.**    Name. ............................................................................. 9
    **Section 2.3.**    Principal Office. ............................................................. 9
    **Section 2.4.**    Registered Office; Registered Agent. .......................... 10
    **Section 2.5.**    Purpose; Powers. .......................................................... 10
    **Section 2.6.**    Term ............................................................................. 10
    **Section 2.7.**    Entity Covenants .......................................................... 10

**ARTICLE III MEMBERSHIP INTERESTS** .............................................................................. 13
    **Section 3.1.**    Membership Schedule ................................................... 13
    **Section 3.2.**    Certification of Membership Interests .......................... 13

**ARTICLE IV CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS** ................................ 14
    **Section 4.1.**    Initial Capital Contributions ........................................ 14
    **Section 4.2.**    Additional Capital Contributions ................................. 14
    **Section 4.3.**    Maintenance of Capital Accounts ................................ 16
    **Section 4.4.**    Succession Upon Transfer ............................................ 16
    **Section 4.5.**    Negative Capital Accounts ........................................... 17
    **Section 4.6.**    No Withdrawals From Capital Accounts ...................... 17
    **Section 4.7.**    Treatment of Loans From Members ............................. 17
    **Section 4.8.**    Modifications. .............................................................. 17
    **Section 4.9.**    Company Expenses ....................................................... 17

**ARTICLE V MEMBERS** ............................................................................................................ 18
    **Section 5.1.**    Members Schedule ........................................................ 18
    **Section 5.2.**    Admission of New Members ......................................... 18
    **Section 5.3.**    Representations and Warranties of Members ................ 18
    **Section 5.4.**    No Personal Liability .................................................... 19
    **Section 5.5.**    No Withdrawal .............................................................. 20
    **Section 5.6.**    No Interest in Company Property .................................. 20

**ARTICLE VI ALLOCATIONS** ................................................................................................... 20
    **Section 6.1.**    Allocation of Net Income and Net Loss ...................... 20
    **Section 6.2.**    Regulatory and Special Allocations ............................. 20
    **Section 6.3.**    Tax Allocations ............................................................ 21
    **Section 6.4.**    Allocations in Respect of Transferred Membership Interests ...................... 22

**ARTICLE VII DISTRIBUTIONS** ............................................................................................... 22
    **Section 7.1.**    Distributions of Cash Flow and Capital Proceeds. ...... 22
    **Section 7.2.**    Tax Withholding; Withholding Advances. .................... 22
    **Section 7.3.**    Distributions in Kind. ................................................... 24

**ARTICLE VIII MANAGEMENT** ................................................................................................ 24
    **Section 8.1.**    Management of the Company. ....................................... 24
    **Section 8.2.**    Actions Requiring Approval of Members ..................... 24
    **Section 8.3.**    Irrevocable Proxy ......................................................... 26

| | | |
|---|---|---|
| **Section 8.4.** | Officers | 26 |
| **Section 8.5.** | Action Without Meeting | 26 |
| **Section 8.6.** | Informational Rights | 26 |
| **Section 8.7.** | Budget | 26 |
| **Section 8.8.** | Deadlock | 27 |
| **Section 8.9.** | Other Activities; Business Opportunities | 28 |
| **ARTICLE IX COMPANY OPERATIONS** | | **28** |
| **Section 9.1.** | Acquisition of Underlying Investment | 28 |
| **Section 9.2.** | Asset Management Fee | 28 |
| **Section 9.3.** | Debt and Equity Placement Fee | 28 |
| **Section 9.4.** | Sale of the Underlying Investment | 28 |
| **Section 9.5.** | Management of Underlying Investment | 29 |
| **ARTICLE X EXCULPATION AND INDEMNIFICATION** | | **30** |
| **Section 10.1.** | Exculpation of Covered Persons | 30 |
| **Section 10.2.** | Liabilities and Duties of Covered Persons | 30 |
| **Section 10.3.** | Indemnification | 31 |
| **Section 10.4.** | Survival | 33 |
| **ARTICLE XI TRANSFER** | | **33** |
| **Section 11.1.** | Restrictions on Transfer | 33 |
| **Section 11.2.** | Permitted Transfers | 34 |
| **ARTICLE XII ACCOUNTING; TAX MATTERS** | | **34** |
| **Section 12.1.** | Financial Statements | 34 |
| **Section 12.2.** | Inspection Rights | 34 |
| **Section 12.3.** | Income Tax Status | 34 |
| **Section 12.4.** | Partnership Representative | 35 |
| **Section 12.5.** | Tax Returns | 35 |
| **Section 12.6.** | Company Funds | 36 |
| **ARTICLE XIII DISSOLUTION AND LIQUIDATION** | | **36** |
| **Section 13.1.** | Events of Dissolution | 36 |
| **Section 13.2.** | Effectiveness of Dissolution | 36 |
| **Section 13.3.** | Liquidation | 36 |
| **Section 13.4.** | Cancellation of Certificate | 37 |
| **Section 13.5.** | Survival of Rights, Duties, and Obligations | 37 |
| **Section 13.6.** | Recourse for Claims | 37 |
| **ARTICLE XIV MISCELLANEOUS** | | **38** |
| **Section 14.1.** | Expenses | 38 |
| **Section 14.2.** | Further Assurances | 38 |
| **Section 14.3.** | Confidentiality | 38 |
| **Section 14.4.** | Notices | 39 |
| **Section 14.5.** | Headings | 39 |
| **Section 14.6.** | Severability | 39 |
| **Section 14.7.** | Entire Agreement | 40 |
| **Section 14.8.** | Successors and Assigns | 40 |
| **Section 14.9.** | No Third-party Beneficiaries | 40 |
| **Section 14.10.** | Amendment | 40 |
| **Section 14.11.** | Waiver | 40 |
| **Section 14.12.** | Governing Law | 40 |
| **Section 14.13.** | Submission to Jurisdiction | 40 |

**Section 14.14.**      WAIVER OF JURY TRIAL ...................................................................... 41
**Section 14.15.**      Equitable Remedies .............................................................................. 41
**Section 14.16.**      Attorneys' Fees ................................................................................... 41
**Section 14.17.**      Remedies Cumulative .......................................................................... 41
**Section 14.18.**      Counterparts ........................................................................................ 41

Limited Liability Company Agreement ~ Galleria 2425 JV, LLC

## AMENDED AND RESTATED LIMITED LIABILITY COMPANY AGREEMENT

This Amended and Restated Limited Liability Company Agreement of Galleria 2425 JV, LLC, a Delaware limited liability company (the "**Company**"), is entered into as of May 23, 2018 (the "**Effective Date**") by and between Galleria West Loop Investments II LLC, a Texas limited liability company (the "**GWLI II Member**"), and Naissance Capital Real Estate, LLC a Delaware limited liability company (the "**Naissance Member**").

### PRELIMINARY STATEMENTS

A.    The Company was formed under the laws of the State of Delaware by the filing of a Certificate of Formation (the "**Certificate**") with the Secretary of State of the State of Delaware on April 4, 2018.

B.    This Agreement amends and restates, in its entirety, that certain Limited Liability Company Agreement of the Company dated as of April 4, 2018.

C.    The Members desire to enter into this Agreement to reflect, among other things, the terms, and conditions governing the operation and management of the Company.

### AGREEMENT

In consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS

**Section 1.1.    Definitions**.  Capitalized terms used herein and not otherwise defined will have the meanings set forth in this Section 1.1:

"**Additional Capital Contribution**" has the meaning set forth in Section 4.2(a).

"**Adjusted Capital Account Deficit**" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

    (a)    crediting to such Capital Account any amount that such Member is obligated to restore or is deemed to be obligated to restore pursuant to Treasury Regulations Sections 1.704-1(b)(2)(ii)(c), 1.704-2(g)(1), and 1.704-2(i); and

    (b)    debiting to such Capital Account the items described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5), and (6).

"**Affiliate**" means, with respect to any Person, any other Person who, directly or indirectly (including through one or more intermediaries), controls, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control," when used with respect to any specified Person, will mean the power, direct or indirect, to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities or partnership or other ownership

interests, by contract or otherwise; and the terms "controlling" and "controlled" will have correlative meanings.

"**Agreement**" means this Amended and Restated Limited Liability Company Agreement, as executed and as it may be amended, modified, supplemented, or restated from time to time, as provided herein.

"**Applicable Law**" means all applicable provisions of: (a) constitutions, treaties, statutes, laws (including the common law), rules, regulations, decrees, ordinances, codes, proclamations, declarations, or orders of any Governmental Authority; (b) any consents or approvals of any Governmental Authority; and (c) any orders, decisions, advisory or interpretative opinions, injunctions, judgments, awards, decrees of, or agreements with, any Governmental Authority.

"**Article 8 Matter**" means any action, decision, determination or election by Mortgage Borrower or its member(s) that its membership interests or other equity interests, or any of them, be, or cease to be, a "security" as defined in and governed by Article 8 of the Uniform Commercial Code, and all other matters related to any such action, decision, determination or election.

"**Available Cash**" means, for any period of computation, the excess, if any, of (a) the sum of (i) all cash receipts of the Company during that period from whatever source and (ii) any cash reserves of the Company existing at the start of that period less (b) the sum of (i) all cash amounts paid or payable (without duplication) in that period on account of any expenses of any type whatsoever incurred in connection with the Company's business (including capital expenditures, operating expenses, all fees and other amounts payable under the Agreement, taxes, amortization and interest on any indebtedness of the Company or any Subsidiary of the Company, expenses incurred in connection with the satisfaction of any such indebtedness or the incurrence of additional indebtedness or any refinancing of indebtedness, and (ii) any cash reserves as contemplated in the Budget, including revisions to the Budget pursuant to <u>Section 8.7(b)</u>, as determined by the Managing Member in its sole discretion.

"**Bankruptcy**" means, with respect to a Member, the occurrence of any of the following: (a) the filing of an application by such Member for, or a consent to, the appointment of a trustee of such Member's assets; (b) the filing by such Member of a voluntary petition in bankruptcy or the filing of a pleading in any court of record admitting in writing such Member's inability to pay its debts as they come due; (c) the making by such Member of a general assignment for the benefit of such Member's creditors; (d) the filing by such Member of an answer admitting the material allegations of, or such Member's consenting to, or defaulting in answering a bankruptcy petition filed against such Member in any bankruptcy proceeding; or (e) the expiration of sixty (60) days following the entry of an order, judgment or decree by any court of competent jurisdiction adjudicating such Member a bankrupt or appointing a trustee of such Member's assets.

"**BBA**" has the meaning set forth in <u>Section 12.4(a)</u>.

"**BBA Procedures**" has the meaning set forth in <u>Section 12.4(c)</u>.

"**Book Depreciation**" means, with respect to any Company asset for each Fiscal Year, the Company's depreciation, amortization, or other cost recovery deductions determined for federal income tax purposes, except that if the Book Value of an asset differs from its adjusted tax basis at the beginning of such Fiscal Year, Book Depreciation will be an amount which bears the same ratio to such beginning Book Value as the federal income tax depreciation, amortization, or other cost recovery deduction for such Fiscal Year bears to such beginning adjusted tax basis; provided that, if the adjusted basis for federal income tax purposes of an asset at the beginning of such Fiscal Year is zero and the Book Value of the

asset is positive, Book Depreciation will be determined with reference to such beginning Book Value using any permitted method selected by the Managing Member in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g)(3).

"**Book Value**" means, with respect to any Company asset, the adjusted basis of such asset for federal income tax purposes, except as follows:

(a)     the initial Book Value of any Company asset contributed by a Member to the Company will be the gross Fair Market Value of such Company asset as of the date of such contribution;

(b)     immediately prior to the distribution by the Company of any Company asset to a Member, the Book Value of such asset will be adjusted to its gross Fair Market Value as of the date of such distribution;

(c)     the Book Value of all Company assets will be adjusted to equal their respective gross Fair Market Values, as reasonably determined by the Members, as of the following times:

(i)     the acquisition of an additional Membership Interest by a new or existing Member in consideration for more than a *de minimis* Capital Contribution;

(ii)     the distribution by the Company to a Member of more than a *de minimis* amount of property (other than cash) as consideration for all or a part of such Member's Membership Interest; and

(iii)     the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g);

provided that, adjustments pursuant to clauses (i) and (ii) above need not be made if the Managing Member reasonably determines that such adjustment is not necessary or appropriate to reflect the relative economic interests of the Members and that the absence of such adjustment does not adversely and disproportionately affect any Member;

(d)     the Book Value of each Company asset will be increased or decreased, as the case may be, to reflect any adjustments to the adjusted tax basis of such Company asset pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Account balances pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m); provided that, Book Values will not be adjusted pursuant to this paragraph (d) to the extent that an adjustment pursuant to paragraph (c) above is made in conjunction with a transaction that would otherwise result in an adjustment pursuant to this paragraph (d); and

(e)     if the Book Value of a Company asset has been determined pursuant to paragraph (a) or adjusted pursuant to paragraphs (c) or (d) above, such Book Value will thereafter be adjusted to reflect the Book Depreciation taken into account with respect to such Company asset for purposes of computing Net Income and Net Losses.

"**Budget**" has the meaning set forth in Section 8.7(a).

"**Business Day**" means a day other than a Saturday, Sunday or other day on which commercial banks in the City of New York are authorized or required to close.

"**Buy-out Price**" has the meaning set forth in Section 8.8(b).

"**Buy-Sell Election Date**" has the meaning set forth in Section 8.8(b).

"**Buy-Sell Offer Notice**" has the meaning set forth in Section 8.8(b).

"**Capital Account**" has the meaning set forth in Section 4.3.

"**Capital Contribution**" means, for any Member, the total amount of cash and cash equivalents and the Book Value of any property actually contributed to the Company by such Member, including, for purposes of clarity, any Additional Capital Contributions.

"**Capital Transaction**" means (i) the sale, exchange, condemnation, casualty loss, or other disposition (whether voluntary or involuntary) of the Underlying Investment or the SPV, but specifically excluding any dispositions of personal property and equipment in the ordinary course of business, (ii) recovery of damage awards and insurance proceeds (other than business or rental interruption insurance proceeds), and/or (iii) net proceeds (if any) from the placement of mortgage debt or other financing upon the Company's property (including the Underlying Investment), or other indebtedness secured by the Underlying Investment or any ownership interest therein, or any refinancing thereof, in each case as expressly permitted pursuant to the terms and provisions of this Agreement.

"**Certificate**" has the meaning set forth in the Preliminary Statements.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Company**" has the meaning set forth in the preamble of this Agreement.

"**Company Interest Rate**" has the meaning set forth in Section 7.2(c).

"**Company Lender**" means any Person providing credit or cash to the Company where the indebtedness obligation(s) of the Company is secured by assets of, or equity interests in, the Company.

"**Company Minimum Gain**" means "partnership minimum gain" as defined in Treasury Regulations Section 1.704-2(b)(2), substituting the term "Company" for the term "partnership" as the context requires.

"**Confidential Information**" has the meaning set forth in Section 14.3(a).

"**Contributing Member**" has the meaning set forth in Section 4.2(b).

"**Covered Person**" has the meaning set forth in Section 10.1(a).

"**Cram-Down Contribution**" has the meaning set forth in Section 4.2(c).

"**Default Amount**" has the meaning set forth in Section 4.2(b).

"**Default Loan**" has the meaning set forth in Section 4.2(b).

"**Default Rate**" has the meaning set forth in Section 4.2(b).

"**Delaware Act**" means the Delaware Limited Liability Company Act, Title 6, Chapter 18, §§18-101, et seq, and any successor statute, as it may be amended from time to time.

"**Effective Date**" has the meaning set forth in the preamble of this Agreement.

"**Election Notice**" has the meaning set forth in <u>Section 9.4(c)</u>.

"**Electronic Transmission**" means any form of communication not directly involving the physical transmission of paper that creates a record that may be retained, retrieved and reviewed by a recipient thereof and that may be directly reproduced in paper form by such a recipient through an automated process.

"**Equity Interest**" has the meaning set forth in <u>Section 8.3</u>.

"**Evoking Member**" has the meaning set forth in <u>Section 9.4(b)</u>.

"**Fair Market Value**" of any asset as of any date means the purchase price that a willing buyer having all relevant knowledge would pay a willing seller for such asset in an arm's length transaction, as determined jointly by the Members.

"**Fiscal Year**" means the calendar year, unless the Company is required to have a taxable year other than the calendar year, in which case Fiscal Year will be the period that conforms to its taxable year.

"**GAAP**" means United States generally accepted accounting principles in effect from time to time.

"**Governmental Authority**" means any federal, state, local, or foreign government or political subdivision thereof, or any agency or instrumentality of such government or political subdivision, or any self-regulated organization or other non-governmental regulatory authority or quasi-governmental authority (to the extent that the rules, regulations, or orders of such organization or authority have the force of law), or any arbitrator, court, or tribunal of competent jurisdiction.

"**GWLI II Member**" has the meaning set forth in the preamble of this Agreement.

"**Initiating Member**" has the meaning set forth in <u>Section 8.8(b)</u>.

"**Lender**" has the meaning set forth in <u>Section 2.7(a)</u>.

"**Liquidator**" has the meaning set forth in <u>Section 13.3(a)</u>.

"**Loan**" has the meaning set forth in <u>Section 2.7(a)</u>.

"**Loan Agreement**" has the meaning set forth in <u>Section 2.7(a)</u>.

"**Losses**" has the meaning set forth in <u>Section 10.3(a)</u>.

"**Managing Member**" means, initially, the Naissance Member, or such other Member as may be designated or become the Managing Member pursuant to the terms of this Agreement.

"**Member**" means (a) the GWLI II Member and the Naissance Member, and (b) each Person who is hereafter admitted as a member of the Company in accordance with the terms of this Agreement and the Delaware Act.  The Members will constitute the "members" (as that term is defined in the Delaware Act) of the Company.

"**Member Nonrecourse Debt**" means "partner nonrecourse debt" as defined in Treasury Regulations Section 1.704-2(b)(4), substituting the term "Company" for the term "partnership" and the term "Member" for the term "partner" as the context requires.

"**Member Nonrecourse Debt Minimum Gain**" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if the Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulations Section 1.704-2(i)(3).

"**Member Nonrecourse Deduction**" means "partner nonrecourse deduction" as defined in Treasury Regulations Section 1.704-2(i), substituting the term "Member" for the term "partner" as the context requires.

"**Membership Interest**" means an equity interest in the Company owned by a Member, which ownership is evidence of a Member's right to: (a) a distributive share of Net Income, Net Loss, and other items of income, gain, loss, and deduction of the Company; (b) a distributive share of the assets of the Company; (c) vote on, consent to, or otherwise participate in any decision of the Members; and (d) any and all other benefits that a Member may be entitled; each as further provided in this Agreement and the Delaware Act; provided that, the Membership Interest Percentage of a Member (relative to other Members) may not be determinative with respect to the amount of such Member's distributive share of any assets of the Company.

"**Membership Interest Percentage**" means, with respect to any Member, the fractional portion (expressed as a percentage) of the Membership Interest held by such Member relative to all other Members and, unless otherwise set forth in this Agreement, determined by dividing (i) the Capital Contributions of such Member by (ii) the Capital Contributions of all Members.

"**Members Schedule**" has the meaning set forth in Section 5.1.

"**Naissance Member**" has the meaning set forth in the preamble of this Agreement.

"**Net Income**" and "**Net Loss**" mean, for each Fiscal Year or other period specified in this Agreement, an amount equal to the Company's taxable income or taxable loss, or particular items thereof, determined in accordance with Code Section 703(a) (where, for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) will be included in taxable income or taxable loss), but with the following adjustments:

(a) any income realized by the Company that is exempt from federal income taxation, as described in Code Section 705(a)(1)(B), will be added to such taxable income or taxable loss, notwithstanding that such income is not includable in gross income;

(b) any expenditures of the Company described in Code Section 705(a)(2)(B), including any items treated under Treasury Regulations Section 1.704-1(b)(2)(iv)(I) as items described in Code Section 705(a)(2)(B), will be subtracted from such taxable income or taxable loss, notwithstanding that such expenditures are not deductible for federal income tax purposes;

(c) any gain or loss resulting from any disposition of Company property with respect to which gain or loss is recognized for federal income tax purposes will be computed by reference to the Book Value of the property so disposed, notwithstanding that the adjusted tax basis of such property differs from its Book Value;

(d) any items of depreciation, amortization and other cost recovery deductions with respect to Company property having a Book Value that differs from its adjusted tax basis will be computed by reference to the property's Book Value (as adjusted for Book Depreciation) in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g);

(e) if the Book Value of any Company property is adjusted as provided in the definition of Book Value, then the amount of such adjustment will be treated as an item of gain or loss and included in the computation of such taxable income or taxable loss; and

(f) to the extent an adjustment to the adjusted tax basis of any Company property pursuant to Code Sections 732(d), 734(b), or 743(b) is required, pursuant to Treasury Regulations Section 1.704 1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts will be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis).

"**Non-Contributing Member**" has the meaning set forth in Section 4.2(b).

"**Non-Managing Members**" means at any time a Member that is not the Managing Member.

"**Nonrecourse Deductions**" has the meaning set forth in Treasury Regulations Section 1.704-2(b).

"**Nonrecourse Liability**" has the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

"**Officers**" has the meaning set forth in Section 8.4.

"**Owner SPV**" has the meaning set forth in Section 2.5(a)(i).

"**Partnership Representative**" has the meaning set forth in Section 12.4(a).

"**Permitted Transfer**" means a Transfer of Membership Interests carried out pursuant to Section 11.2. "**Permitted Transferee**" means a recipient of a Permitted Transfer.

"**Person**" means an individual, corporation, partnership, joint venture, limited liability company, Governmental Authority, unincorporated organization, trust, association, or other entity.

"**Pledge Agreement**" has the meaning set forth in Section 2.7(a).

"**Property Offer Notice**" has the meaning set forth in Section 9.4(a).

"**Property Sale Election**" has the meaning set forth in Section 9.4(b).

"**Property Sale Notice**" has the meaning set forth in Section 9.4(c).

"**Property Sale Offer**" has the meaning set forth in Section 9.4(b).

"**Purchasing Member**" has the meaning set forth in Section 8.8(d).

"**Regulatory Allocations**" has the meaning set forth in Section 6.2(e).

"**Related Party Agreement**" means any agreement, arrangement, or understanding between the Company and any Member or any Affiliate of a Member or any officer or employee of the Company, as such agreement may be amended, modified, supplemented, or restated in accordance with the terms of this Agreement.

"**Representative**" means, with respect to any Person, any and all directors, officers, employees, consultants, financial advisors, counsel, accountants, and other agents of such Person.

"**Responding Member**" has the meaning set forth in <u>Section 8.8(b)</u>.

"**Response Notice**" has the meaning set forth in <u>Section 8.8(c)</u>.

"**Securities Act**" means the Securities Act of 1933, as amended, or any successor federal statute, and the rules and regulations thereunder, which will be in effect at the time.

"**Sell-out Price**" has the meaning set forth in <u>Section 8.8(b)</u>.

"**Selling Member**" has the meaning set forth in <u>Section 8.8(d)</u>.

"**Subsidiary**" means, with respect to any Person, any other Person of which a majority of the outstanding shares or other equity interests having the power to vote for directors or comparable managers are owned, directly or indirectly, by the first Person.

"**Taxing Authority**" has the meaning set forth in <u>Section 7.2(b)</u>.

"**Transfer**" means to, directly or indirectly, sell, transfer, assign, pledge, encumber, hypothecate, or similarly dispose of, either voluntarily or involuntarily, by operation of law or otherwise, or to enter into any contract, option, or other arrangement or understanding with respect to the sale, transfer, assignment, pledge, encumbrance, hypothecation, or similar disposition. "**Transfer**" when used as a noun will have a correlative meaning. "**Transferor**" and "**Transferee**" mean a Person who makes or receives a Transfer, respectively.

"**Treasury Regulations**" means the final or temporary regulations issued by the United States Department of Treasury pursuant to its authority under the Code, and any successor regulations.

"**Underlying Investment**" has the meaning set forth in <u>Section 2.5(a)(ii)</u>.

"**Withholding Advances**" has the meaning set forth in <u>Section 7.2(b)</u>.

**Section 1.2.    Interpretation**.

(a)    For purposes of this Agreement:

    (i)    the words "include," "includes," and "including" will be deemed to be followed by the words "without limitation";

    (ii)    the word "or" is not exclusive; and

    (iii)    the words "herein," "hereof," "hereby," "hereto," and "hereunder" refer to this Agreement as a whole.

(b)      The definitions given for any defined terms in this Agreement will apply equally to both the singular and plural forms of the terms defined.

(c)      Whenever the context may require, any pronoun will include the corresponding masculine, feminine, and neuter forms.

(d)      Unless the context otherwise requires, references in this Agreement:

      (i)      to articles, sections, and exhibits mean the articles and sections of, and exhibits attached to, this Agreement;

      (ii)      to an agreement, instrument, or other document means such agreement, instrument, or other document as amended, supplemented, and modified from time to time to the extent permitted by the provisions thereof; and

      (iii)      to a statute means such statute as amended from time to time and includes any successor legislation thereto and any regulations promulgated thereunder.

(e)      This Agreement will be construed without regard to any presumption or rule requiring construction or interpretation against the party drafting an instrument or causing any instrument to be drafted.

(f)      The exhibits referred to herein will be construed with, and as an integral part of, this Agreement to the same extent as if they were set forth verbatim herein.

## ARTICLE II
## ORGANIZATION

**Section 2.1.    Formation.**

(a)      The Company was formed pursuant to the provisions of the Delaware Act upon the filing of the Certificate with the Secretary of State of the State of Delaware, and the Members desire to continue such limited liability company pursuant to the Delaware Act and this Agreement.

(b)      This Agreement will constitute the "limited liability company agreement" (as that term is used in the Delaware Act) of the Company.  The rights, powers, duties, obligations, and liabilities of the Members will be determined pursuant to the Delaware Act and this Agreement.  To the extent that the rights, powers, duties, obligations, and liabilities of any Member are different by reason of any provision of this Agreement than they would be under the Delaware Act in the absence of such provision, this Agreement will, to the extent permitted by the Delaware Act, control.

**Section 2.2.    Name**.  The name of the Company is "Galleria 2425 JV, LLC" or such other name or names as may be designated by the Managing Member; provided that, the name will always contain the words "Limited Liability Company" or the abbreviation "L.L.C." or the designation "LLC."  The Managing Member will give prompt notice to the Members of any change to the name of the Company.

**Section 2.3.    Principal Office**.  The principal office of the Company is located at 6501 Westchester Ave., Houston Texas 77005, or such other place as may from time to time be determined by the Managing Member.  The Managing Member will give prompt notice of any such change to each of the Members.

**Section 2.4.      Registered Office; Registered Agent.**

(a)      *Registered Office*.  The registered office of the Company will be the office of the initial registered agent named in the Certificate or such other office (which need not be a place of business of the Company) as the Managing Member may designate from time to time in the manner provided by the Delaware Act and Applicable Law.

(b)      *Registered Agent*.  The registered agent for service of process on the Company in the State of Delaware will be the initial registered agent named in the Certificate or such other Person or Persons as the Managing Member may designate from time to time in the manner provided by the Delaware Act and Applicable Law.

**Section 2.5.      Purpose; Powers.**

(a)      The purposes of the Company are to:

  (i)      own (as the sole member) one hundred percent (100%) of the equity ownership interest in Galleria 2425 Owner, LLC, a Delaware limited liability company (including any successors and assigns, the "**Owner SPV**");

  (ii)      cause the Owner SPV to acquire real property and improvements located at 2425 West Loop South, Houston, Texas, 77027 (such real property and, the "**Underlying Investment**");

  (iii)      directly or indirectly facilitating (A) the renovation, rehabilitation, and installation of improvements to the Underlying Investment, and (B) the operation of the Underlying Investment for the production of a profit;

  (iv)      refinancing, selling, or otherwise disposing of, in whole or in part, the Underlying Investment or the SPV;

  (v)      causing the Company and the SPV to incur indebtedness to enable the activities set forth in Section 2.5(a)(ii)-(iv); and

  (vi)      engage in any and all activities necessary or incidental to the foregoing clauses, as determined by the Managing Member in its sole discretion.

(b)      The Company will have all the powers necessary or convenient to carry out the purposes for which it is formed, including the powers granted by the Delaware Act.

(c)      The Company may execute, deliver, and perform all contracts, agreements and other undertakings and engage in all activities and transactions as may in the opinion of the Managing Member be necessary or advisable to achieve the purposes of the Company.

**Section 2.6.      Term**.  The term of the Company commenced on the date the Certificate was filed with the Secretary of State of the State of Delaware and will continue in existence perpetually until the Company is dissolved in accordance with the provisions of this Agreement.

**Section 2.7.      Entity Covenants**. Capitalized terms used but not defined in this Section shall have the meanings defined in that certain Mezzanine Loan Agreement (the "**Loan Agreement**") between the Company and Naissance Galleria, LLC, a Cayman Islands limited liability company (the "**Lender**"),

pursuant to which the Company will become indebted to the Lender in the amount of approximately $16,100,000 (the "**Loan**"). Borrower hereby represents and warrants to, and covenants with, Lender that since the date of its formation and at all times on and after the date hereof and until such time as the Obligations shall be paid and performed in full:

(a)     *Single Purpose of Borrower.* The sole purpose of Borrower is to (1) acquire, own, hold, and maintain equity interests in Mortgage Borrower (the "**Equity Interests**"); (2) serve as the borrower and perform its obligations under the Loan Documents in connection with the Loan; (3) serve as the sole member of Mortgage Borrower and deal with Mortgage Borrower to the extent permitted under the Loan Documents and the documents evidencing or securing the Mortgage Loan to Mortgage Borrower, and (4) subject to <u>Section 2.7(b)</u>, to engage in any other business or activity that may be incidental, proper, advisable or convenient to accomplish the foregoing purposes (including, without limitation, obtaining financing therefor) and that is not forbidden by the law of any jurisdiction in which Borrower engages in that business.

(b)     *Single Purpose Entity/Separateness.* Until the Loan is paid in full, Borrower shall remain a Single Purpose Entity. A "Single Purpose Entity" means a limited liability company which contains provisions in its organizational documents similar to the provisions set forth in this <u>Section 2.7(b)</u>. At all times since its formation and thereafter, Borrower:

(i)     was, and will be, organized solely for the purpose of owning 100% of the direct or indirect Equity Interests;

(ii)     has not, and will not, engage in any business unrelated to the ownership of 100% of the direct or indirect Equity Interests;

(iii)     has not and will not own any asset or property other than 100% of the direct or indirect Equity Interests;

(iv)     to the fullest extent permitted by law, has not and will not engage in, seek or consent to any dissolution, winding up, liquidation, consolidation or merger, in whole or in part, and, except as otherwise expressly permitted by the Loan Agreement or consented to by Lender in writing, has not and will not engage in, seek or consent to any asset sale, transfer of limited liability company interests, or amendment of its certificate of formation or the Loan Agreement;

(v)     has not failed, and will not fail, to correct any known misunderstanding regarding its separate identity;

(vi)     has maintained, and will maintain, its books, records, financial statements, accounting records, bank accounts and other entity documents in its own name and separate from any other Person;

(vii)     has maintained, and will maintain, its books, records, resolutions and agreements as official records;

(viii)     has not commingled, and will not commingle, its funds or other assets with those of any other Person;

(ix)     has held, and will hold, its assets in its own name, and has maintained, and will maintain, its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its assets from those of any other Person;

(x)      has conducted, and will conduct, its business in its name;

(xi)     has filed, and will file, its own tax returns (to the extent required to file any tax returns) and has not and will not file a consolidated federal income tax return with any other Person;

(xii)    is and intends to remain solvent, and has paid and will pay its own debts and liabilities out of its own funds and assets (to the extent of such funds and assets) as the same shall become due, and will give prompt written notice to Lender of the insolvency or bankruptcy filing of Borrower or the death, insolvency, or bankruptcy filing of Guarantor;

(xiii)   has done or caused to be done, and will do or cause to be done, all things necessary to observe all limited liability company formalities and preserve its existence and good standing, and, has not, and without the prior written consent of Lender, will not, amend, modify or otherwise change any of the single purpose, separateness or bankruptcy remote provisions or requirements of the Loan Agreement or other organizational documents (except as required by law);

(xiv)    has maintained and will maintain an arms-length relationship with its Affiliates,

(xv)     has and will have no indebtedness other than the Loan and unsecured trade payables in the ordinary course of business relating to the ownership of 100% of the direct or indirect interests in Mortgage Borrower which (i) do not exceed, at any time, $25,000.00 and (ii) are paid within sixty (60) days of the date incurred;

(xvi)    has not and will not assume, guarantee, become obligated for or hold out its credit as being available to satisfy the debts or obligations of any other Person, or the decisions or actions respecting the daily business or affairs of any other Person, except Mortgage Borrower;

(xvii)   has not acquired and will not acquire obligations or securities of any other Person, except Mortgage Borrower;

(xviii)  has allocated and will allocate fairly and reasonably shared expenses, including, without limitation, shared office space, and has maintained and utilized and will maintain and utilize separate stationery, invoices and checks bearing its own name;

(xix)    has not and will not pledge its assets for the benefit of any other Person;

(xx)     has held and identified itself and will hold itself out to the public as a legal entity separate and distinct from any other Person and under its own name;

(xxi)    has not made and will not make loans or advances to any Person;

(xxii)   has not and will not identify itself or any of its Affiliates as a division or part of the other;

(xxiii)  has not entered and will not enter into any transaction, contract or agreement with its members or its Affiliates except in the ordinary course of its business and on terms which are intrinsically fair and are no less favorable to it than would be obtained in a comparable arms-length transaction with an unrelated third party and which are fully disclosed to Lender in writing in advance;

(xxiv)  has paid and will pay the salaries of its own employees from its own funds (to the extent of such funds) and has maintained and intends to maintain a sufficient number of employees in light of its contemplated business operations; provided, however, the foregoing shall not require Member to make additional capital contributions to Borrower;

(xxv)  has maintained and intends to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations; provided, however, the foregoing shall not require Member to make additional capital contributions to Borrower;

(xxvi)  other than in connection with the day to day operations of the Property, has not permitted and will not permit any Affiliate independent access to its bank accounts;

(xxvii)  to the fullest extent permitted by law has considered and will consider the interests of Borrower, including its creditors, in connection with all of its limited liability company actions; and

(xxviii)  has caused and will cause its agents and other representatives to act at all times with respect to such entity consistently and in furtherance of the foregoing and in the best interests of such entity.

## ARTICLE III
## MEMBERSHIP INTERESTS

**Section 3.1.    Membership Schedule**.  The aggregate equity ownership interests in the Company will be represented by issued and outstanding Membership Interests, which will initially be in a single type and class.

**Section 3.2.    Certification of Membership Interests**

(a)  The Managing Member may, but will not be required to, issue certificates to the Members representing the Membership Interest and Membership Interest Percentage held by such Member.

(b)  In the event the Managing Member issues certificates representing Membership Interests in accordance with Section 3.2(a), then in addition to any other legend required by Applicable Law, all certificates representing issued and outstanding Membership Interests will bear a legend substantially in the following form:

THE MEMBERSHIP INTEREST REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO A LIMITED LIABILITY COMPANY AGREEMENT AMONG THE COMPANY AND ITS MEMBERS, A COPY OF WHICH IS ON FILE AT THE PRINCIPAL EXECUTIVE OFFICE OF THE COMPANY.  NO TRANSFER, SALE, ASSIGNMENT, PLEDGE, HYPOTHECATION, OR OTHER DISPOSITION OF THE MEMBERSHIP INTEREST REPRESENTED

BY THIS CERTIFICATE MAY BE MADE EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF SUCH LIMITED LIABILITY COMPANY AGREEMENT.

THE MEMBERSHIP INTEREST REPRESENTED BY THIS CERTIFICATE HAS NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY OTHER APPLICABLE SECURITIES LAWS AND MAY NOT BE TRANSFERRED, SOLD, ASSIGNED, PLEDGED, HYPOTHECATED OR OTHERWISE DISPOSED EXCEPT PURSUANT TO (A) A REGISTRATION STATEMENT EFFECTIVE UNDER SUCH ACT AND LAWS, OR (B) AN EXEMPTION FROM REGISTRATION THEREUNDER.

## ARTICLE IV
## CAPITAL CONTRIBUTIONS; CAPITAL ACCOUNTS

**Section 4.1.    Initial Capital Contributions**.    Contemporaneously with the execution of this Agreement, each Member has made an initial contribution of capital to the Company and is deemed to own the Membership Interest Percentage set forth opposite such Member's name on the Members Schedule.  The Managing Member will update the Members Schedule upon the issuance or Transfer of any Membership Interest to any new or existing Member in accordance with this Agreement.  Capital Contributions will be used by the Company (i) to pay expenses of the Company (in accordance with the Budget), (ii) to establish Reserves (as provided herein), and (iii) as otherwise determined by the Managing Member to be related to the object and purpose of the Company (as set forth in Section 2.5(a))

**Section 4.2.    Additional Capital Contributions**

(a)    The Members will make additional in-cash contributions of capital to the Company in proportion to their respective Membership Interest Percentages, as determined by the Managing Member from time to time to be reasonably necessary to pay any operating, capital, or other expenses relating to the business of the Company (such additional contributions of capital, the "**Additional Capital Contributions**"), provided that, such Additional Capital Contributions will not exceed corresponding amounts expressly provided for in the Budget, as it may be amended from time to time.  Upon the Managing Member making such determination for Additional Capital Contributions, the Managing Member will deliver to the Non-Managing Member(s) a written notice of the Company's need for Additional Capital Contributions, which notice will specify in reasonable detail (i) the purpose for such Additional Capital Contributions, (ii) the aggregate amount of such Additional Capital Contributions, (iii) each Member's share of such aggregate amount of Additional Capital Contributions based upon each such Member's Membership Interest Percentage, and (iv) the date (which date will not be less than three (3) Business Days from the date that such notice is given) on which such Additional Capital Contributions will be required to be made by the Members.

(b)    If any Member will fail to timely make, or notifies the other Member(s) that it will not make, all or any portion of any Additional Capital Contribution that such Member is obligated to make under Section 4.2(a), then such Member will be deemed to be a "**Non-Contributing Member**." Any Member who timely makes 100% of the Additional Capital Contribution that such Member is obligated to make under Section 4.2(a) (each, a "**Contributing Member**") will be entitled, but not obligated, to loan to a Non-Contributing Member, by contributing to the Company on its behalf, all or any part of the amount (the "**Default Amount**") that such Non-Contributing Member failed to contribute to the Company (each such loan, a "**Default Loan**").  Such Default

Loan will be treated as an Additional Capital Contribution by the Non-Contributing Member. Each Default Loan will bear interest (compounded monthly on the first day of each calendar month) on the unpaid principal amount thereof from time to time remaining from the date advanced until repaid, at the lesser of (i) 15% per annum, or (ii) the maximum rate permitted at law (the "**Default Rate**"). Each Default Loan will be recourse solely to the Non-Contributing Member's Membership Interest. Default Loans will be repaid out of the distributions that would otherwise be made to the Non-Contributing Member under ARTICLE VII or ARTICLE XIV, as more fully provided for in Section 4.2(d). So long as a Default Loan is outstanding, the Non-Contributing Member will have the right to repay the Default Loan (and interest then due and owing) in whole or in part. Upon the repayment in full of all Default Loans (but not upon their conversion as provided in Section 4.2(c)) made in respect of a Non-Contributing Member (and so long as the Non-Contributing Member is not otherwise a Non-Contributing Member), such Non-Contributing Member will cease to be a Non-Contributing Member.

(c)      At any time after the date six (6) months after a Default Loan is made, at the option of the Contributing Member, (i) such Default Loan will be converted into an Additional Capital Contribution of the Contributing Member in an amount equal to the principal and unpaid interest on such Default Loan pursuant to this Section 4.2(c)), (ii) the Non-Contributing Member will be deemed to have received a distribution, pursuant to ARTICLE VII, of an amount equal to the principal and unpaid interest on such Default Loan, (iii) such distribution will be deemed paid to the Contributing Member in repayment of the Default Loan, (iv) such amount will be deemed contributed by the Contributing Member as an Additional Capital Contribution (a "**Cram-Down Contribution**"), and (v) the Contributing Member's Capital Account will be increased by, and the Non-Contributing Member's Capital Account will be decreased by, an amount equal to the principal and unpaid interest on such Default Loan. A Cram-Down Contribution will be deemed an Additional Capital Contribution by the Contributing Member making (or deemed making) such Cram-Down Contribution as of the date such Cram-Down Contribution is made or the date on which such Default Loan is converted to a Cram-Down Contribution. At the time of a Cram-Down Contribution, the Membership Interest Percentage of the Contributing Member will be increased proportionally by the amount of such contribution, thereby diluting the Membership Interest Percentage of the Non-Contributing Member. Once a Cram-Down Contribution has been made (or deemed made), no subsequent payment or tender in respect of the Cram-Down Contribution will affect the Membership Interest Percentages of the Members, as adjusted in accordance with this Section 4.2(c).

(d)      Notwithstanding any other provisions of this Agreement, any amount that otherwise would be paid or distributed to a Non-Contributing Member pursuant to ARTICLE VII will not be paid to the Non-Contributing Member but will be deemed paid and applied on behalf of such Non-Contributing Member (i) first, to accrued and unpaid interest on all Default Loans (in the order of their original maturity date), (ii) second to the principal amount of such Default Loans (in the order of their original maturity date), and (iii) third, to any Additional Capital Contribution of such Non-Contributing Member that has not been paid and is not deemed to have been paid.

(e)      Notwithstanding the foregoing, if a Non-Contributing Member fails to make its Additional Capital Contribution in accordance with Section 4.2(a), the Contributing Member may:

(i)      institute proceedings against the Non-Contributing Member to obtain payment of its portion of the Additional Capital Contributions, together with interest thereon at the Default Rate from the date that such Additional Capital Contribution was due until the date that such Additional Capital Contribution is made, at the cost and expense of the Non-Contributing Member;

(ii)    purchase the Membership Interest of the Non-Contributing Member at a price equal to 85% of the lesser of (i) the price paid by the Non-Contributing Member for its Membership Interest, and (ii) the Fair Market Value of its Membership Interest; or

(iii)    force a sale of the Company to a third party other than an Affiliate of any of the Members on commercially reasonable market terms as reasonably determined by the Contributing Member; provided that, if the Non-Contributing Member pays the unfunded portion of its required Additional Capital Contribution prior to the Contributing Member's election of a forced sale, the Contributing Member will no longer have the right to force a sale of the Company under this <u>Section 4.2(e)(iii)</u>.

(f)    If a Member is characterized as a Non-Contributing Member, then, so long as the Member remains a Non-Contributing Member, it will forfeit and no longer be entitled to any consent or voting rights granted in this Agreement.

(g)    Except as set forth in this <u>Section 4.2</u>, neither Member will be required to make additional Capital Contributions or make loans to the Company.

**Section 4.3.**    **Maintenance of Capital Accounts**.  The Company will establish and maintain for each Member a separate capital account (a "**Capital Account**") on its books and records in accordance with this <u>Section 4.3</u>.  Each Capital Account will be established and maintained in accordance with the following provisions:

(a)    Each Member's Capital Account will be increased by the amount of:

(i)    such Member's Capital Contributions;

(ii)    any Net Income or other item of income or gain allocated to such Member pursuant to <u>ARTICLE VI</u>; and

(iii)    any liabilities of the Company that are assumed by such Member or secured by any property distributed to such Member.

(b)    Each Member's Capital Account will be decreased by:

(i)    the cash amount or Book Value of any property distributed to such Member pursuant to <u>ARTICLE VII</u> and <u>Section 13.3(c)</u>;

(ii)    the amount of any Net Loss or other item of loss or deduction allocated to such Member pursuant to <u>ARTICLE VI</u>; and

(iii)    the amount of any liabilities of such Member assumed by the Company or that are secured by any property contributed by such Member to the Company.

**Section 4.4.**    **Succession Upon Transfer**.  In the event that a Membership Interest is Transferred in accordance with the terms of this Agreement, the Transferee will succeed to the Capital Account of the Transferor to the extent it relates to the Transferred Membership Interest and, subject to <u>Section 6.4</u>, will receive allocations and distributions pursuant to <u>ARTICLE VI</u>, <u>ARTICLE VII</u>, and <u>ARTICLE XIII</u> in respect of such Membership Interest.

**Section 4.5.**    **Negative Capital Accounts**.  In the event that any Member will have a deficit balance in its Capital Account, such Member will have no obligation, during the term of the Company or upon dissolution or liquidation thereof, to restore such negative balance or make any contributions of capital to the Company by reason thereof, except as may be required by Applicable Law or in respect of any negative balance resulting from a withdrawal of capital or dissolution in contravention of this Agreement.

**Section 4.6.**    **No Withdrawals From Capital Accounts**.  No Member will be entitled to withdraw any part of its Capital Account or to receive any distribution from the Company, except as otherwise provided in this Agreement.  No Member, including the Managing Member, will receive any interest, salary, or drawing with respect to its Capital Contributions or its Capital Account, except as otherwise provided in this Agreement.  The Capital Accounts are maintained for the sole purpose of allocating items of income, gain, loss, and deduction among the Members and will have no effect on the amount of any distributions to any Members, in liquidation or otherwise.

**Section 4.7.**    **Treatment of Loans From Members**.  Loans by any Member to the Company will not be considered Capital Contributions and will not affect the maintenance of such Member's Capital Account, other than to the extent provided in Section 4.2(c) and Section 4.3(a)(iii), if applicable.

**Section 4.8.**    **Modifications**.  The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b) and will be interpreted and applied in a manner consistent with such Treasury Regulations.  If the Managing Member determines that it is prudent to modify the manner in which the Capital Accounts, or any increases or decreases to the Capital Accounts, are computed in order to comply with such Treasury Regulations, the Managing Member may authorize such modifications.

**Section 4.9.**    **Company Expenses**.

(a)    *Expenses Not Borne by the Company*.  The Managing Member will pay, without reimbursement by the Company, all of its own ordinary administrative and overhead expenses in connection with the activities of the Company, including all costs and expenses on account of salaries, wages, bonuses, and other employee benefits.

(b)    *Ongoing Company Expenses*.  On an ongoing basis, except for the expenses provided for in Section 4.9(a), the Company will pay, or reimburse the Managing Member or its Affiliates, as applicable, for the following out-of-pocket expenses:

(i)    any expenses relating to the SPV or the Underlying Investment, including, without limitation, travel expenses, valuation expenses (e.g., costs of independent appraisers), carrying costs and custodial, trustee, record-keeping, and other administrative fees;

(ii)    any and all expenses incurred in connection with the preparation, review, and audit of the Company's reports, tax returns, and related disclosure schedules;

(iii)    any and all fees for attorneys and accountants (including in-house and outside legal and accounting fees and expenses) relating to Company matters;

(iv)    any and all taxes and other governmental charges that may be incurred or payable by the Company;

(v)    any and all reasonable costs and expenses incurred in connection with distributions to Members;

(vi)     any and all reasonable expenses (including in-house and outside legal fees and expenses) of the Company or the Managing Member incurred (A) to comply with any law or regulation related to the activities of the Company, or (B) in connection with any litigation or governmental inquiry, investigation, or proceeding involving the Company, including the amount of any judgments, settlements, or fines paid in connection therewith;

(vii)     any and all costs and expenses incurred in connection with the accounting and reporting requirements of the Company, including back-office overhead (e.g., rent, computer software, and equipment); and

(viii)     any and all reasonable expenses incurred in connection with any amendments, modifications, revisions, or restatements to the constituent documents of the Company.

(c)     *Loan Origination Fees*.  The Company will be permitted to pay an origination fee of up to $160,000 to a Company Lender.

## ARTICLE V
## MEMBERS

**Section 5.1.     Members Schedule**.  The name, address, and Membership Interest Percentage of each member of the Company are set forth on <u>Schedule A</u>, attached hereto (as amended, the "**Members Schedule**").  The Members Schedule will be revised from time to time by the Managing Member to reflect any of the following accomplished in compliance with the terms of this Agreement: (i) the withdrawal or admission of a member of the Company; (ii) any change in the name or address of a Member; and (iii) any change in Membership Interest Percentage of a Member.  A Member can modify their address at any time by providing the Managing Member at least five (5) days advance written notice of the same.

**Section 5.2.     Admission of New Members**

(a)     *Additional Members*.  No Persons will be admitted to the Company as additional members of the Company except as approved by the Managing Member, and the Managing Member may cause the Company to admit any Person as an additional member of the Company upon (i) the issuance of an additional Membership Interest to such Person, or (ii) any Transfer of a Membership Interest made in accordance with <u>ARTICLE XI</u>.

(b)     *Joinder*.  In order for any Person (not already a Member) to be admitted as a member of the Company, whether pursuant to an issuance or Transfer of a Membership Interest, such Person will be required to execute and deliver to the Company a written joinder agreement, the form and substance of which will be determined by the Managing Member in its sole discretion.  Upon the amendment of the Members Schedule by the Managing Member and the satisfaction of any other applicable conditions, including, if a condition, the receipt by the Company of payment for the issuance of the applicable Membership Interest, such Person will simultaneously be (i) admitted as a member of the Company, (ii) deemed listed as such on the books and records of the Company, and (iii) issued his, her, or its Membership Interest.  The Managing Member will adjust the Capital Accounts of the Members, as necessary, upon the admission of any additional Person as a member of the Company.

**Section 5.3.     Representations and Warranties of Members.**  All Members, whether admitted as of the Effective Date or pursuant to <u>Section 5.2</u>, represents and warrants to the Company and the other Members, and acknowledges that:

(a)     the Membership Interests have not been registered under the Securities Act or the securities laws of any other jurisdiction, are issued in reliance upon federal and state exemptions for transactions not involving a public offering, and cannot be disposed of unless (i) they are subsequently registered or exempted from registration under the Securities Act, and (ii) the provisions of this Agreement have been complied with;

(b)     such Member is an "accredited investor" within the meaning of Rule 501 promulgated under the Securities Act, as amended by Section 413(a) of the Dodd-Frank Wall Street Reform and Consumer Protection Act, and agrees that it will not take any action that could have an adverse effect on the availability of the exemption from registration provided by Rule 501 promulgated under the Securities Act with respect to the offer and sale of the Membership Interests;

(c)     such Member's Membership Interest is being acquired for its own account solely for investment purposes and not with a view to resale or distribution thereof;

(d)     such Member has such knowledge and experience in financial and business matters and is capable of evaluating the merits and risks of an investment in the Company and making an informed decision with respect thereto;

(e)     with respect to the tax and other legal aspects of investment in the Company and the acquisition and ownership of a Membership Interest, such Member is relying solely upon the advice of such Member's own tax and legal advisors and not upon any representation by any other Member or representative thereof;

(f)     such Member is able to bear the economic and financial risk of an investment in the Company for an indefinite period of time;

(g)     the execution, delivery, and performance of this Agreement by such Member (i) have been duly authorized and do not require such Member to obtain any consent that has not been obtained, and (ii) will not contravene or result in a default under (A) any provision of any law or regulation applicable to such Member, (B) the Organizational Documents of such Member, or (C) any other agreements or instruments to which such Member is a party or by which such Member is bound;

(h)     this Agreement is valid, binding, and enforceable against such Member in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium, and other similar laws of general applicability relating to or affecting creditors' rights or general equity principles (regardless of whether considered at law or in equity);

(i)     such Member has been duly organized and is validly existing and in good standing under the laws of the state of its organization; and

(j)     there is no suit, action, or proceeding, pending or threatened, against or affecting such Member before or by any court, administrative agency, or other Governmental Authority that (i) brings into question the validity of the transactions contemplated by this Agreement, (ii) would interfere with or impede in any way the ability of such Member to comply with the terms of this Agreement, (iii) could materially and adversely affect such Member or any of its respective properties, assets or Affiliates, or (iv) could materially and adversely affect the legality, validity, or enforceability of this Agreement.

**Section 5.4.     No Personal Liability**.     Except as otherwise provided in the Delaware Act, by Applicable Law, or expressly in this Agreement, no Member will be obligated personally for any debt,

obligation or liability of the Company or other Members, whether arising in contract, tort or otherwise, solely by reason of being a Member.

**Section 5.5.    No Withdrawal**.  So long as a Member continues to hold a Membership Interest, such Member will not have the ability to withdraw or resign as a Member prior to the dissolution and winding up of the Company and any such withdrawal or resignation or attempted withdrawal or resignation by a Member prior to the dissolution or winding up of the Company will be null and void.  As soon as any Person who is a Member ceases to hold a Membership Interest, such Person will no longer be a Member. A Member will not cease to be a Member as a result of the Bankruptcy of such Member or as a result of any other events specified in §18-304 of the Delaware Act.

**Section 5.6.    No Interest in Company Property**.  No real or personal property of the Company will be deemed to be owned by any Member individually, but will be owned by, and title will be vested solely in, the Company.  Without limiting the foregoing, each Member hereby irrevocably waives during the term of the Company any right that such Member may have to maintain any action for partition with respect to the property of the Company.

<div align="center">

**ARTICLE VI**
**ALLOCATIONS**

</div>

**Section 6.1.    Allocation of Net Income and Net Loss**.  For each Fiscal Year (or portion thereof), except as otherwise provided in this Agreement, Net Income and Net Loss (and, to the extent necessary, individual items of income, gain, loss, or deduction) of the Company will be allocated among the Members in a manner such that, after giving effect to the special allocations set forth in Section 6.2, the Capital Account balance of each Member, immediately after making such allocations, is, as nearly as possible, equal to (a) the distributions that would be made to such Member pursuant to Section 13.3(c) if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their Book Value, all Company liabilities were satisfied (limited with respect to each Nonrecourse Liability to the Book Value of the assets securing such liability), and the net assets of the Company were distributed, in accordance with Section 13.3(c), to the Members immediately after making such allocations, minus (b) such Member's share of Company Minimum Gain and Member Nonrecourse Debt Minimum Gain, computed immediately prior to the hypothetical sale of assets.

**Section 6.2.    Regulatory and Special Allocations**.  Notwithstanding the provisions of Section 6.1:

(a)    If there is a net decrease in Company Minimum Gain (determined according to Treasury Regulations Section 1.704-2(d)(1)) during any Fiscal Year, each Member will be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g).  The items to be so allocated will be determined in accordance with Treasury Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2).  This Section 6.2 is intended to comply with the "minimum gain chargeback" requirement in Treasury Regulations Section 1.704-2(f) and will be interpreted consistently therewith.

(b)    Member Nonrecourse Deductions will be allocated in the manner required by Treasury Regulations Section 1.704-2(i).  Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), if there is a net decrease in Member Nonrecourse Debt Minimum Gain during any Fiscal Year, each Member that has a share of such Member Nonrecourse Debt Minimum Gain will be specially allocated Net Income for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to that Member's share of the net decrease in Member Nonrecourse

Debt Minimum Gain.  Items to be allocated pursuant to this paragraph will be determined in accordance with Treasury Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2).  This <u>Section 6.2(b)</u> is intended to comply with the "minimum gain chargeback" requirements in Treasury Regulations Section 1.704-2(i)(4) and will be interpreted consistently therewith.

(c)     Nonrecourse Deductions will be allocated to the Members in accordance with their Membership Interest Percentages.

(d)     In the event any Member unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4), (5) or (6), Net Income will be specially allocated to such Member in an amount and manner sufficient to eliminate the Adjusted Capital Account Deficit created by such adjustments, allocations or distributions as quickly as possible.  This <u>Section 6.2(d)</u> is intended to comply with the qualified income offset requirement in Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and will be interpreted consistently therewith.

(e)     The allocations set forth in paragraphs (a), (b), (c) and (d) above (the "**Regulatory Allocations**") are intended to comply with certain requirements of the Treasury Regulations under Code Section 704.  Notwithstanding any other provisions of this <u>ARTICLE VI</u> (other than the Regulatory Allocations), the Regulatory Allocations will be taken into account in allocating Net Income and Net Losses among Members so that, to the extent possible, the net amount of such allocations of Net Income and Net Losses and other items and the Regulatory Allocations to each Member will be equal to the net amount that would have been allocated to such Member if the Regulatory Allocations had not occurred.

**Section 6.3.     Tax Allocations.**

(a)     Subject to <u>Section 6.3(b)</u>, <u>Section 6.3(c)</u>, and <u>Section 6.3(d)</u>, all income, gains, losses and deductions of the Company will be allocated, for federal, state and local income tax purposes, among the Members in accordance with the allocation of such income, gains, losses and deductions pursuant to <u>Section 6.1</u> and <u>Section 6.2</u>, except that if any such allocation for tax purposes is not permitted by the Code or other Applicable Law, the Company's subsequent income, gains, losses and deductions will be allocated among the Members for tax purposes, to the extent permitted by the Code and other Applicable Law, so as to reflect as nearly as possible the allocation set forth in <u>Section 6.1</u> and <u>Section 6.2</u>.

(b)     Items of Company taxable income, gain, loss and deduction with respect to any property contributed to the capital of the Company will be allocated among the Members in accordance with Code Section 704(c) and the traditional method with curative allocations of Treasury Regulations Section 1.704-3(c), so as to take account of any variation between the adjusted basis of such property to the Company for federal income tax purposes and its Book Value.

(c)     If the Book Value of any Company asset is adjusted pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(f) as provided in <u>clause (c)</u> of the definition of Book Value, subsequent allocations of items of taxable income, gain, loss and deduction with respect to such asset will take account of any variation between the adjusted basis of such asset for federal income tax purposes and its Book Value in the same manner as under Code Section 704(c).

(d)     Allocations of tax credit, tax credit recapture and any items related thereto will be allocated to the Members according to their interests in such items as determined by the Managing Member taking into account the principles of Treasury Regulations Section 1.704-1(b)(4)(ii).

(e)     Allocations pursuant to this <u>Section 6.3</u> are solely for purposes of federal, state and local taxes and will not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Net Income, Net Losses, distributions, or other items pursuant to any provisions of this Agreement.

**Section 6.4.     Allocations in Respect of Transferred Membership Interests**.   In the event of a Transfer of Membership Interests during any Fiscal Year made in compliance with the provisions of <u>ARTICLE XI</u>, Net Income, Net Losses, and other items of income, gain, loss, and deduction of the Company attributable to such Membership Interests for such Fiscal Year will be determined using the interim closing of the books method.

<div align="center">

**ARTICLE VII**
**DISTRIBUTIONS**

</div>

**Section 7.1.     Distributions of Cash Flow and Capital Proceeds.**

(a)     Subject to <u>Section 7.1(b)</u>, any Available Cash of the Company, after allowance for all reasonable costs and expenses incurred by the Company and for such reasonable reserves as contemplated in the Budget, will be distributed to the Members, on at least a quarterly basis, in accordance with their respective Membership Interest Percentages.

(b)     Proceeds from a Capital Transaction will be distributed to the Members in the following order and priority:

    (i)     *first*, to the Members on a *pari passu* basis in proportion to their Membership Interest Percentages until the GWLI II Member receives cumulative distributions in an amount necessary to produce an IRR of seven percent (7%) on its Capital Contributions;

    (ii)     *thereafter*, (i) twenty percent (20%) to the Managing Member, and (ii) eighty percent (80%) to the Members on a *pari passu* basis in proportion to their respective Membership Interest Percentages.

(c)     If a Member has (i) an unpaid Additional Capital Contribution that is overdue, or (ii) an outstanding Default Loan due to another Member, any amount that otherwise would be distributed to such Member pursuant to <u>Section 7.1(a)</u> or <u>ARTICLE XIV</u> (up to the amount of such Additional Capital Contribution or outstanding Default Loan, together with interest accrued thereon) will not be paid to such Member but will be deemed distributed to such Member and applied on behalf of such Member pursuant to <u>Section 4.2(d)</u>.

(d)     Notwithstanding any provision to the contrary contained in this Agreement, the Company will not make any distribution to Members if such distribution would violate §18-607 of the Delaware Act or other Applicable Law.

**Section 7.2.     Tax Withholding; Withholding Advances.**

(a)     *Tax Withholding*.  If requested by the Managing Member, each Member will, if able to do so, deliver to the Managing Member:

    (i)     an affidavit in form satisfactory to the Managing Member that the applicable Member (or its members, as the case may be) is not subject to withholding under the provisions of any federal, state, local, foreign, or other Applicable Law;

       (ii)      any certificate that the Managing Member may reasonably request with respect to any such laws; and

       (iii)     any other form or instrument reasonably requested by the Managing Member relating to any Member's status under such law.

If a Member fails or is unable to deliver to the Managing Member the affidavit described in Section 7.2(a)(i), the Managing Member may withhold amounts from such Member in accordance with Section 7.2(b).

(b)     *Withholding Advances*.  The Company is hereby authorized at all times to make payments ("**Withholding Advances**") with respect to each Member in amounts required to discharge any obligation of the Company (as determined by the Partnership Representative based on the advice of legal or tax counsel to the Company) to withhold or make payments to any federal, state, local, or foreign taxing authority (a "**Taxing Authority**") with respect to any distribution or allocation by the Company of income or gain to such Member and to withhold the same from distributions to such Member. Any funds withheld from a distribution by reason of this Section 7.2(b) will nonetheless be deemed distributed to the Member in question for all purposes under this Agreement.

(c)     *Repayment of Withholding Advances*.  Any Withholding Advance made by the Company to a Taxing Authority on behalf of a Member and not simultaneously withheld from a distribution to that Member will, with interest thereon accruing from the date of payment at a rate equal to the prime rate published in the Wall Street Journal on the date of payment plus two percent (2.0%) per annum (the "**Company Interest Rate**"):

       (i)      be promptly repaid to the Company by the Member on whose behalf the Withholding Advance was made (which repayment by the Member will not constitute a Capital Contribution, but will credit the Member's Capital Account if the Managing Member will have initially charged the amount of the Withholding Advance to the Capital Account); or

       (ii)     with the consent of the Managing Member, be repaid by reducing the amount of the next succeeding distribution or distributions to be made to such Member (which reduction amount will be deemed to have been distributed to the Member, but which will not further reduce the Member's Capital Account if the Managing Member will have initially charged the amount of the Withholding Advance to the Capital Account).

Interest will cease to accrue from the time the Member on whose behalf the Withholding Advance was made repays such Withholding Advance (and all accrued interest) by either method of repayment described above.

(d)     *Indemnification*.  Each Member hereby agrees to indemnify and hold harmless the Company and the other Members from and against any liability with respect to taxes, interest, or penalties that may be asserted by reason of the Company's failure to deduct and withhold tax on amounts distributable or allocable to such Member.  The provisions of this Section 7.2(d) and the obligations of a Member pursuant to Section 7.2(c) will survive the termination, dissolution, liquidation, and winding up of the Company and the withdrawal of such Member from the Company or Transfer of its Membership Interest.  The Company may pursue and enforce all rights and remedies it may have against each Member under this Section 7.2, including bringing a lawsuit to collect repayment with interest of any Withholding Advances.

(e)     *Overwithholding*.  Neither the Company nor the Managing Member will be liable for any excess taxes withheld in respect of any distribution or allocation of income or gain to a Member.  In the event of an overwithholding, a Member's sole recourse will be to apply for a refund from the appropriate Taxing Authority.

**Section 7.3.     Distributions in Kind.**

(a)     The Managing Member is hereby authorized, as it may reasonably determine, to make distributions to the Members in the form of securities or other property held by the Company.  In any non-cash distribution, the securities or property so distributed will be distributed among the Members in the same proportion and priority as cash equal to the Fair Market Value of such securities or property would be distributed among the Members pursuant to Section 7.1.

(b)     Any distribution of securities will be subject to such conditions and restrictions as the Managing Member determines are required or advisable to ensure compliance with Applicable Law.  In furtherance of the foregoing, the Managing Member may require that the Members execute and deliver such documents as the Managing Member may deem necessary or appropriate to ensure compliance with all federal and state securities laws that apply to such distribution and any further Transfer of the distributed securities, and may appropriately legend the certificates that represent such securities to reflect any restriction on Transfer with respect to such laws.

**ARTICLE VIII**
**MANAGEMENT**

**Section 8.1.     Management of the Company**.  The business and affairs of the Company will be managed by the Managing Member.  Subject to the provisions of Section 8.2, the Managing Member will have full and complete discretion to manage and control the business and affairs of the Company, to make all decisions affecting the business and affairs of the Company, and to take all such actions as it deems necessary or appropriate to accomplish the purposes of the Company set forth in Section 2.5; provided that, the Managing Member will manage the Company in accordance with the Budget.  The actions of the Managing Member taken in accordance with the provisions of this Agreement will bind the Company. No other Member will have any authority or right to act on behalf of or bind the Company, unless otherwise provided herein or unless specifically authorized by the Managing Member pursuant to a resolution expressly authorizing such action which resolution is duly adopted by the Managing Member.

**Section 8.2.     Actions Requiring Approval of Members**.  Notwithstanding anything herein to the contrary, without the unanimous written approval of all Members, the Company will not, and will not enter into any commitment to:

(a)     admit any Person as an additional member, partner, or other economic owner of the Company, the Owner SPV, or any other Subsidiary of the forgoing;

(b)     make any material change to the nature of the business conducted by, or the purpose of, the Company, the Owner SPV, or any other subsidiary of the forgoing;

(c)     form any Subsidiary (other than the Owner SPV);

(d)     wind up, dissolve, or liquidate of the Company, the Owner SPV, or any other Subsidiary of the forgoing, except as otherwise permitted by the organizational documents of any such Person;

(e)     sell, lease, or convey of all or substantially all of the assets of the Company, the Owner SPV, or any other Subsidiary of the forgoing, including, without limitation, the Underlying Investment, except as otherwise permitted by the organizational documents of any such Person;

(f)     create or entire into any Related Party Agreement, except as otherwise permitted /contemplated by the organizational documents of the creating Person;

(g)     consummate a transaction that is not in the ordinary course of the business of the Company, the Owner SPV, or any other Subsidiary of the forgoing, or that is not directly related to the indirect acquisition and ownership of the Underlying Investment;

(h)     make any payment (or incurrence of liability) that deviates by more than three percent (3%) from the amount of such payment(s) provided for or contemplated in an applicable annual operating budget of the Company;

(i)     extend, modify, renew, amend, or terminate any material contract or agreement pertaining to the day-to-day management of the Underlying Investment;

(j)     extend, modify, renew, or amend any loan agreement, or any documents executed in connection with any refinancing transaction involving the Company or the Underlying Investment;

(k)     pay, settle, or compromise any legal action (whether actual or threatened in connection with the Underlying Investment, the Company, the Owner SPV, or any other Subsidiary of the Company or the Owner SPV;

(l)     commence any federal, state, or foreign bankruptcy, insolvency, reorganization, arrangement, or liquidation proceeding for, or consent to the appointment of a receiver, liquidator, assignee, trustee, conservator, or sequester (or other similar official) of, the Company, the Owner SPV, or any other Subsidiary of the forgoing, or of all or a substantial part of the assets of the Company, the Owner SPV, or any other Subsidiary of the forgoing;

(m)     permit the incurrence of indebtedness by the Company, the Owner SPV, or any other Subsidiary of the Company, except as set forth in any applicable and approved budget;

(n)     waive or compromise any claim or right the Company, the Owner SPV, or any other Subsidiary of the forgoing may have against an affiliate of a Member;

(o)     commence any action or proceeding to appeal ad valorem taxes or special assessments relating to the Underlying Investment, the Company, the Owner SPV, or any other Subsidiary of the Company, the Owner SPV;

(p)     condemn the Underlying Investment (or any portion thereof or any interest therein), or the conveyance or an agreement to convey the Property (or any portion thereof or any interest therein) in lieu of condemnation;

(q)     make a loan or other extension of credit to any Person;

(r)     spend proceeds or other funds received the Company, the Owner SPV, or any other Subsidiary of the forgoing as a result of insurance or condemnation awards except to the extent required by any loan agreement executed by the Company, the Owner SPV, or any other Subsidiary of the forgoing; or

(s)      issue additional Membership Interests.

**Section 8.3.    Irrevocable Proxy**. Solely with respect to Article 8 Matters (as hereinafter defined), the Company hereby irrevocably grants and appoints the Lender, as the Company's true and lawful proxy, for and in Company's name, place and stead to vote the Equity Interests, whether directly or indirectly, beneficially or of record, now owned or hereafter acquired, with respect to all Article 8 Matters.  The proxy granted and appointed in this <u>Section 8.3</u> shall include the right to sign Company's name (as a member of Mortgage Borrower) to any consent, certificate or other document relating to an Article 8 Matter and the Pledged Securities that applicable law may permit or require, to cause the Pledged Securities to be voted in accordance with the preceding sentence.  Company hereby represents and warrants that there are no other proxies and powers of attorney with respect to an Article 8 Matter that Company may have granted or appointed.  Company will not give a subsequent proxy or power of attorney or enter into any other voting agreement with respect to the Pledged Securities with respect to any Article 8 Matter and any attempt to do so with respect to an Article 8 Matter shall be void and of no effect.  The proxies and powers granted by Company pursuant to this Agreement are coupled with an interest and are given to secure the performance of Company's obligations.

**Section 8.4.    Officers**.  The Managing Member may appoint individuals as officers of the Company (the "**Officers**") as it deems necessary or desirable to carry on the business of the Company and the Managing Member may delegate to such Officers such power and authority as the Managing Member deems advisable.  No Officer is required to also be a Member.  Any individual may hold two or more offices of the Company.  Each Officer will hold office until his successor is designated by the Managing Member or until his earlier death, resignation, or removal.  Any Officer may resign at any time upon written notice to the Managing Member.  Any Officer may be removed by the Managing Member with or without cause at any time.  A vacancy in any office occurring because of death, resignation, removal or otherwise, may, but need not, be filled by the Managing Member.

**Section 8.5.    Action Without Meeting**.  Any matter that is to be voted on, consented to, or approved by Members may be taken without a meeting, without prior notice and without a vote if consented to, in writing or by Electronic Transmission, by a Member or Members having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all members entitled to vote thereon were present and voted.  A record will be maintained by the Managing Member of each such action taken by written consent of a Member or Members.

**Section 8.6.    Informational Rights**.  In addition to the information required to be provided pursuant to <u>ARTICLE XII</u>, the Managing Member will keep the other Members reasonably informed on a timely basis of any material fact, information, litigation, employee relations, or other matter that could reasonably be expected to have a material impact on the operations or financial position of the Company, including, but not limited to, any modification of any loan or other financing to the Company. The Managing Member will provide all material information relating to the Company or the management or operation of the Company as any Member may reasonable request from time to time.

**Section 8.7.    Budget.**

(a)      The initial business plan and annual budgets for the Company through the Fiscal Year ending December 31, 2018 (the "**Budget**"), which have previously been approved by the Members, are attached hereto as <u>Schedule B</u>.  The Budget will include detailed capital and operating expense budgets, cash flow projections (which will include amounts and due dates of all projected calls for Additional Capital Contributions), and profit and loss projections.  The Managing Member will operate the Company in accordance with the Budget.

(b)     At least thirty (30) days before the beginning of each Fiscal Year, the Managing Member will prepare and submit to the Non-Managing Member proposed revisions (including any extensions thereof) to the Budget for such upcoming Fiscal Year.  Not later than seven (7) days following its receipt of the proposed revisions, the Non-Managing Member must, by written notice to the Managing Member, either approve or disapprove the revised Budget.  If the Non-Managing Member will not have responded in writing to the proposed revisions prior to the end of such seven (7)-day period, the Non-Managing Member will be deemed to have approved the revised Budget.  If the Non-Managing Member disapproves of the proposed revisions, then the Members will use good faith efforts to agree on a revised Budget.  The Managing Member will continue to operate the Company in accordance with the existing Budget until a revised Budget is approved by both Members.

**Section 8.8.     Deadlock.**

(a)     If the Members are unable to agree on any of the matters described in <u>Section 8.2</u> and such disagreement continues for sixty (60) days despite good faith deliberations by the Members, then either Member will be entitled to exercise the buy-sell rights set forth in this <u>Section 8.8</u> by delivering a Buy-Sell Offer Notice (as defined herein).

(b)     If a Member wishes to exercise the buy-sell right provided in this <u>Section 8.8</u>, such Member (the "**Initiating Member**") will deliver to the other Member (the "**Responding Member**") written notice (the "**Buy-Sell Offer Notice**") of such election, which notice will include (i) a description of the circumstances that triggered the buy-sell right, and (ii) the purchase price (which will be payable exclusively in cash (unless otherwise agreed)) at which the Initiating Member will (A) purchase all of the Membership Interest owned by the Responding Member (the "**Buy-out Price**") or (B) sell all of its Membership Interest to the Responding Member (the "**Sell-out Price**"), with any difference between the Buy-out Price and the Sell-out Price based solely on each Member's Membership Interest Percentage, without regard to any market discount or premium from differences in such proportionate interests.

(c)     Within thirty (30) days after the Buy-Sell Offer Notice is received (the "**Buy-Sell Election Date**"), the Responding Member will deliver to the Initiating Member a written notice (the "**Response Notice**") stating whether it elects to (i) sell all of its Membership Interest to the Initiating Member for the Buy-out Price, or (ii) buy all of the Membership Interest owned by the Initiating Member for the Sell-out Price.  The failure of the Responding Member to deliver the Response Notice by the Buy-Sell Election Date will be deemed to be an election to sell all of its Membership Interest to the Initiating Member at the Buy-out Price.

(d)     The closing of any purchase and sale of a Membership Interest pursuant to this <u>Section 8.8</u> will take place within thirty (30) days after the Response Notice is delivered or deemed to have been delivered or some other date mutually agreed upon by the parties.  The Buy-out Price or the Sell-out Price, as the case may be, will be paid at closing by wire transfer of immediately available funds to an account designated in writing by the selling Member (the "**Selling Member**").  At the closing, the Selling Member will deliver to the purchasing Member (the "**Purchasing Member**") good and marketable title to its Membership Interest, free and clear of all liens and encumbrances.  Each Member agrees to cooperate and take all actions and execute all documents reasonably necessary or appropriate to reflect the purchase of the Selling Member's Membership Interest by the Purchasing Member.

(e) If the Purchasing Member defaults in any of its material closing obligations, then the Selling Member will have the option to purchase the Purchasing Member's entire Membership Interest at a price that is equal to 85% of the purchase price payable at the initial closing.

**Section 8.9. Other Activities; Business Opportunities**. Nothing contained in this Agreement will prevent any Member, including the Managing Member, or any of its Affiliates from engaging in any other activities or businesses, regardless of whether those activities or businesses are similar to or competitive with the business of the Company. None of the Members nor any of their Affiliates will be obligated to account to the Company or to the other Member for any profits or income earned or derived from other such activities or businesses. None of the Members nor any of their Affiliates will be obligated to inform the Company or the other Member of any business opportunity of any type or description.

## ARTICLE IX
## COMPANY OPERATIONS

**Section 9.1. Acquisition of Underlying Investment.** On the Effective Date, the Company will cause the SPV to acquire the Underlying Investment free and clear of all liens and encumbrances (excluding any encumbrances previously agreed to in writing by the Members.

**Section 9.2. Asset Management Fee.** From and after the Effective Date, the Company will pay the Managing Member an annual asset management fee equal to $175,000, provided the annual asset management fee will be payable to the Managing Member during each Fiscal Year on the first day of each calendar quarter (i.e., January 1st, April 1st, July 1st, and October 1st) and prorated for partial quarters.

**Section 9.3. Debt and Equity Placement Fee.** On the Effective Date, the Managing Member will receive a debt and equity placement fee from the Company in an amount equal to $600,000; provided $200,000 will be immediately recontributed to the Company is equity shares.

**Section 9.4. Sale of the Underlying Investment.**

(a) *Property Offer Notice*. If, during the term of this Agreement, the Company, the SPV, or a Member receives a written offer for the purchase of all or any portion of the Underlying Investment from a non-Affiliate of any Member, it will promptly give the other Members written notice of such offer (the "**Property Offer Notice**"). The Property Offer Notice will identify the prospective purchaser, the proposed purchase price, the proposed closing date, the proposed brokerage commission, and any of the other relevant terms of the transaction. No Member will be authorized to cause the Company or the SPV to accept any such offer to purchase all or any portion of the Underlying Investment unless such offer has been approved by the other Members.

(b) *Property Sale Election*. At any time after thirty-six (36) months after the Effective Date, the Managing Member (the "**Evoking Member**") will have the right to unilaterally elect to cause the Company (on behalf of the SPV) to solicit offers (each, a "**Property Sale Offer**") from prospective third party purchasers to buy the Underlying Investment. Upon determining to solicit Property Sale Offers, the Evoking Member (A) will notify the Members, in writing, of any such election (a "**Property Sale Election**"), and (B) prepare an information package on the Underlying Investment that includes (y) a form sale contract reasonably approved by the Members (to be executed by any such prospective third party purchaser), and (z) the other material terms and conditions on which the Evoking Member is prepared to have the Company (on behalf of the SPV) sell and otherwise dispose of the Underlying Investment.

(c)      *Property Sale Notice*. If the Company obtains a Property Sale Offer within six (6) months after delivery of a Property Sale Election, and an Evoking Member determines, in its sole discretion, that the Company (on behalf of the SPV) should accept such Property Sale Offer, such Evoking Member will provide written notice ("**Property Sale Notice**") to the Members of its desire to accept such Property Sale Offer. The non-Evoking Member(s) will have fifteen (15) Business Days from the delivery of any Property Sale Notice to notify the Evoking Member, in writing, of the election (the "**Election Notice**") of the non-Evoking Member(s) to either:

(i)      approve the Property Sale Offer, in which case the Evoking Member will be authorized to effect a Sale of the Underlying Investment, in the name and on behalf of the SPV, on the terms and subject to the conditions set forth in the applicable Property Sale Offer; or

(ii)      purchase the Underlying Investment on substantially the same terms and conditions as set forth in the applicable Property Sale Offer (net of any commission that would customarily be payable by the Company or the SPV in the event of a sale of the Underlying Investment to a third party), provided (A) the non-Evoking Member(s) must close such purchase within one hundred twenty (120) days following the Evoking Member's delivery of any Property Sale Notice, and (B) with respect to any obligations under agreement with Company Lenders for which the Evoking Member or any of its Affiliates are liable, the non-Evoking Members must secure the complete and unequivocal release of the Evoking Member and its Affiliates from and against any post-transfer claim(s) by each Company Lender;

     provided that (x) failure to deliver an Election Notice on or before fifteen (15) Business Days from the delivery of any Property Sale Notice will be deemed to be an election of <u>Section 9.4(c)(i)</u>, (y) the release set forth in the previous sentence will be a closing condition of any election permitted by this <u>Section 9.4(c)(i)</u>, and (z) in order for a Property Sale Offer to be valid, it must be a bona fide, arm's-length, all-cash offer from a third party for the Underlying Investment, and must be accompanied by a signed contract of sale and a good-faith deposit.

(d)      *Default Sale*. Any failure by non-Evoking Member(s) to effectuate the purchase of the Underlying Investment in accordance with <u>Section 9.4(c)(i)</u> (after such option is elected) will (i) be a material breach of this Agreement, and (ii) result in such Member forever forfeiting its right to act as a managing member of the Company, consent to material actions in accordance with <u>Section 8.2</u>, or initiate any action pursuant to <u>Section 8.8</u>.

**Section 9.5.**      **Management of Underlying Investment.**

(a)      Subject to the terms and conditions of this Agreement, the property manager will be engaged to oversee the management of the Underlying Investment.

(a)      The Managing Member may terminate, extend, or modify the property management agreement with the property manager of the Underlying Investment without the prior written consent of any other Member.

(b)      The Company or the SPV will pay a fixed fee to the manager of the Underlying Investment in accordance with a property management agreement.

## ARTICLE X
## EXCULPATION AND INDEMNIFICATION

**Section 10.1.    Exculpation of Covered Persons.**

(a)    *Covered Persons*.  As used herein, the term "**Covered Person**" will mean (i) each Member, including the Managing Member; (ii) each officer, director, stockholder, partner, member, Affiliate, employee, agent or representative of each Member, and each of their Affiliates; and (iii) each employee, agent, or representative of the Company (including all Officers).

(b)    *Standard of Care*.  No Covered Person will be liable to the Company or any other Covered Person for any loss, damage or claim incurred by reason of any action taken or omitted to be taken by such Covered Person in good faith reliance on the provisions of this Agreement, so long as such action or omission does not constitute fraud, gross negligence, willful misconduct or a material breach of this Agreement by such Covered Person or is not made in knowing violation of the provisions of this Agreement.

(c)    *Good Faith Reliance*.  A Covered Person will be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements (including financial statements and information, opinions, reports or statements as to the value or amount of the assets, liabilities, Net Income or Net Losses of the Company or any facts pertinent to the existence and amount of assets from which distributions might properly be paid) of the following Persons or groups: (i) another Member; (ii) one or more Officers or employees of the Company; (iii) any attorney, independent accountant, appraiser or other expert or professional employed or engaged by or on behalf of the Company; or (iv) any other Person selected in good faith by or on behalf of the Company, in each case as to matters that such relying Person reasonably believes to be within such other Person's professional or expert competence.  The preceding sentence will in no way limit any Person's right to rely on information to the extent provided in §18-406 of the Delaware Act.

**Section 10.2.    Liabilities and Duties of Covered Persons.**

(a)    *Limitation of Liability*.  This Agreement is not intended to, and does not, create, or impose any fiduciary duty on any Covered Person.  Furthermore, each of the Members and the Company hereby waives any and all fiduciary duties that, absent such waiver, may be implied by Applicable Law, and in doing so, acknowledges and agrees that the duties and obligation of each Covered Person to each other and to the Company are only as expressly set forth in this Agreement.  The provisions of this Agreement, to the extent that they restrict the duties and liabilities of a Covered Person otherwise existing at law or in equity, are agreed by the Members to replace such other duties and liabilities of such Covered Person.

(b)    *Duties*.  Whenever in this Agreement a Covered Person is permitted or required to make a decision (including a decision that is in such Covered Person's "discretion" or under a grant of similar authority or latitude), the Covered Person will be entitled to consider only such interests and factors as such Covered Person desires, including its own interests, and will have no duty or obligation to give any consideration to any interest of or factors affecting the Company or any other Person.  Whenever in this Agreement a Covered Person is permitted or required to make a decision in such Covered Person's "good faith," the Covered Person will act under such express standard and will not be subject to any other or different standard imposed by this Agreement or any other Applicable Law.

**Section 10.3.    Indemnification.**

(a)     *Indemnification*.  To the fullest extent permitted by the Delaware Act, as the same now exists or may hereafter be amended, substituted or replaced (but, in the case of any such amendment, substitution or replacement, only to the extent that such amendment, substitution or replacement permits the Company to provide broader indemnification rights than the Delaware Act permitted the Company to provide prior to such amendment, substitution or replacement), the Company will indemnify, hold harmless, defend, pay and reimburse any Covered Person against any and all losses, claims, damages, judgments, fines or liabilities, including reasonable legal fees or other expenses incurred in investigating or defending against such losses, claims, damages, judgments, fines, or liabilities, and any amounts expended in settlement of any claims (collectively, "**Losses**") to which such Covered Person may become subject by reason of:

(i)     any act or omission or alleged act or omission performed or omitted to be performed on behalf of the Company, any Member or any direct or indirect Subsidiary of the foregoing in connection with the business of the Company; or

(ii)     such Covered Person being or acting in connection with the business of the Company as a member, stockholder, Affiliate, manager, director, officer, employee or agent of the Company, any Member, or any of their respective Affiliates, or that such Covered Person is or was serving at the request of the Company as a member, manager, director, officer, employee, or agent of any Person including the Company;

provided that, (x) such Covered Person acted in good faith and in a manner believed by such Covered Person to be in, or not opposed to, the best interests of the Company and, with respect to any criminal proceeding, had no reasonable cause to believe his conduct was unlawful, and (y) such Covered Person's conduct did not constitute fraud, gross negligence, willful misconduct or a material breach of this Agreement by such Covered Person or a knowing violation of the provisions of this Agreement, in either case as determined by a final, nonappealable order of a court of competent jurisdiction. In connection with the foregoing, the termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, will not, of itself, create a presumption that the Covered Person did not act in good faith or, with respect to any criminal proceeding, had reasonable cause to believe that such Covered Person's conduct was unlawful, or that the Covered Person's conduct constituted fraud, gross negligence, willful misconduct or a knowing violation or material breach of this Agreement.

(b)     *Control of Defense*.    Upon a Covered Person's discovery of any claim, lawsuit or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to this Section 10.3, the Covered Person will give prompt written notice to the Company of such claim, lawsuit or proceeding, provided that, the failure of the Covered Person to provide such notice will not relieve the Company of any indemnification obligation under this Section 10.3, unless the Company will have been materially prejudiced thereby. Subject to the approval of the disinterested Members, the Company will be entitled to participate in or assume the defense of any such claim, lawsuit, or proceeding at its own expense.  After notice from the Company to the Covered Person of its election to assume the defense of any such claim, lawsuit or proceeding, the Company will not be liable to the Covered Person under this Agreement or otherwise for any legal or other expenses subsequently incurred by the Covered Person in connection with investigating, preparing to defend or defending any such claim, lawsuit or other proceeding.  If the Company does not elect (or fails to elect) to assume the defense of any such claim, lawsuit or proceeding, the Covered Person will have the right to assume the defense of such claim, lawsuit

or proceeding as it deems appropriate, but it will not settle any such claim, lawsuit or proceeding without the consent of the Company (which consent will not be unreasonably withheld, conditioned or delayed).

(c)    *Reimbursement*.  The Company will promptly reimburse (and/or advance to the extent reasonably required) each Covered Person for reasonable legal or other expenses (as incurred) of such Covered Person in connection with investigating, preparing to defend or defending any claim, lawsuit or other proceeding relating to any Losses for which such Covered Person may be indemnified pursuant to this <u>Section 10.3</u>; provided that, if it is finally judicially determined that such Covered Person is not entitled to the indemnification provided by this <u>Section 10.3</u>, then such Covered Person will promptly reimburse the Company for any reimbursed or advanced expenses.

(d)    *Entitlement to Indemnity*.  The indemnification provided by this <u>Section 10.3</u> will not be deemed exclusive of any other rights to indemnification to which those seeking indemnification may be entitled under any agreement or otherwise.  The provisions of this <u>Section 10.3</u> will continue to afford protection to each Covered Person regardless of whether such Covered Person remains in the position or capacity pursuant to which such Covered Person became entitled to indemnification under this <u>Section 10.3</u> and will inure to the benefit of the executors, administrators, legatees, and distributees of such Covered Person.

(e)    *Insurance*.  To the extent available on commercially reasonable terms, the Company may purchase, at its expense, insurance to cover Losses covered by the foregoing indemnification provisions and to otherwise cover Losses for any breach or alleged breach by any Covered Person of such Covered Person's duties in such amount and with such deductibles as the Managing Member may reasonably determine; provided that, the failure to obtain such insurance will not affect the right to indemnification of any Covered Person under the indemnification provisions contained herein, including the right to be reimbursed or advanced expenses or otherwise indemnified for Losses hereunder. If any Covered Person recovers any amounts in respect of any Losses from any insurance coverage, then such Covered Person will, to the extent that such recovery is duplicative, reimburse the Company for any amounts previously paid to such Covered Person by the Company in respect of such Losses.

(f)    *Funding of Indemnification Obligation*.  Notwithstanding anything contained herein to the contrary, any indemnity by the Company relating to the matters covered in this <u>Section 10.3</u> will be provided out of and to the extent of Company assets only, and no Member (unless such Member otherwise agrees in writing) will have personal liability on account thereof or will be required to make additional contributions of capital to the Company to help satisfy such indemnity by the Company.

(g)    *Savings Clause*.  If this <u>Section 10.3</u> or any portion hereof will be invalidated on any ground by any court of competent jurisdiction, then the Company will nevertheless indemnify and hold harmless each Covered Person pursuant to this <u>Section 10.3</u> to the fullest extent permitted by any applicable portion of this <u>Section 10.3</u> that will not have been invalidated and to the fullest extent permitted by Applicable Law.

(h)    *Amendment*.  The provisions of this <u>Section 10.3</u> will be a contract between the Company, on the one hand, and each Covered Person who served in such capacity at any time while this <u>Section 10.3</u> is in effect, on the other hand, pursuant to which the Company and each such Covered Person intend to be legally bound.  No amendment, modification, or repeal of this <u>Section 10.3</u> that adversely affects the rights of a Covered Person to indemnification for Losses incurred or

relating to a state of facts existing prior to such amendment, modification, or repeal will apply in such a way as to eliminate or reduce such Covered Person's entitlement to indemnification for such Losses without the Covered Person's prior written consent.

**Section 10.4.    Survival**.  The provisions of this ARTICLE X will survive the dissolution, liquidation, winding up, and termination of the Company.

## ARTICLE XI
## TRANSFER

**Section 11.1.    Restrictions on Transfer.**

(a)      Except as otherwise provided in this ARTICLE XI or in Section 8.8, no Member will Transfer all or any portion of its Membership Interest without the written consent of the other Member (which consent may be granted or withheld in the sole discretion of the other Member).  No Transfer of a Membership Interest to a Person not already a Member will be deemed completed until the prospective Transferee is admitted as a member of the Company in accordance with Section 5.2(b).

(b)      Notwithstanding any other provision of this Agreement (including Section 11.2), each Member agrees that it will not Transfer all or any portion of its Membership Interest, and the Company agrees that it will not issue any Membership Interest:

(i)      except as permitted under the Securities Act and other applicable federal or state securities or blue sky laws, and then, with respect to a Transfer of a Membership Interest, only upon delivery to the Company of an opinion of counsel in form and substance satisfactory to the Company to the effect that such Transfer may be effected without registration under the Securities Act;

(ii)      if such Transfer or issuance would cause the Company to be considered a "publicly traded partnership" under Section 7704(b) of the Code within the meaning of Treasury Regulations Section 1.7704-1(h)(1)(ii), including the look-through rule in Treasury Regulations Section 1.7704-1(h)(3);

(iii)      if such Transfer or issuance would affect the Company's existence or qualification as a limited liability company under the Delaware Act;

(iv)      if such Transfer or issuance would cause the Company to lose its status as a partnership for federal income tax purposes;

(v)      if such Transfer or issuance would cause a termination of the Company for federal income tax purposes;

(vi)      if such Transfer or issuance would cause the Company to be required to register as an investment company under the Investment Company Act of 1940, as amended; or

(vii)      if such Transfer or issuance would cause the assets of the Company to be deemed "Plan Assets" as defined under the Employee Retirement Income Security Act of 1974 or its accompanying regulations or result in any "prohibited transaction" thereunder involving the Company.

(c)     Any Transfer or attempted Transfer of a Membership Interest in violation of this Agreement will be null and void, no such Transfer will be recorded on the Company's books and the purported Transferee in any such Transfer will not be treated (and the purported Transferor will continue be treated) as the owner of such Membership Interest for all purposes of this Agreement.

(d)     For the avoidance of doubt, any Transfer of a Membership Interest permitted by this Agreement will be deemed a sale, transfer, assignment, or other disposal of such Membership Interest in its entirety as intended by the parties to such Transfer, and will not be deemed a sale, transfer, assignment, or other disposal of any less than all of the rights and benefits described in the definition of the term "Membership Interest," unless otherwise explicitly agreed to by the parties to such Transfer.

**Section 11.2.    Permitted Transfers**.  The provisions of <u>Section 11.1(a)</u> will not apply to any Transfer by any Member of all or any portion of its Membership Interest to its Affiliate.

<div align="center">

**ARTICLE XII**
**ACCOUNTING; TAX MATTERS**

</div>

**Section 12.1.    Financial Statements**.  The Managing Member will cause the Company will furnish to each Member the following reports:

(a)     *Annual Financial Statements*.  As soon as available, and in any event within one hundred twenty (120) days after the end of each Fiscal Year, consolidated balance sheets of the Company as at the end of each such Fiscal Year and consolidated statements of income, cash flows and Members' equity for such Fiscal Year, in each case setting forth in comparative form the figures for the previous Fiscal Year.

(b)     *Quarterly Financial Statements*.  As soon as available, and in any event within sixty (60) days after the end of each quarterly accounting period in each Fiscal Year (other than the last fiscal quarter of the Fiscal Year), consolidated balance sheets of the Company as at the end of each such fiscal quarter and for the current Fiscal Year to date and unaudited consolidated statements of income, cash flows and Members' equity for such fiscal quarter and for the current Fiscal Year to date, in each case setting forth in comparative form the figures for the corresponding periods of the previous fiscal quarter.

**Section 12.2.    Inspection Rights**.  Upon reasonable notice from a Member, the Company will afford each Member and its Representatives access during normal business hours to: (a) the Company's properties, offices, plants, and other facilities; (b) the corporate, financial, and similar records, reports, and documents of the Company, including, without limitation, all books and records, minutes of proceedings, internal management documents, reports of operations, reports of adverse developments, copies of any management letters, and communications with Members (including the Managing Member), and to permit each Member and its Representatives to examine such documents and make copies thereof; and (c) any officers, senior employees and public accountants of the Company, and to afford each Member and its Representatives the opportunity to discuss and advise on the affairs, finances and accounts of the Company with such officers, senior employees, and public accountants (and the Company hereby authorizes said accountants to discuss with such Member and its Representatives such affairs, finances, and accounts).

**Section 12.3.    Income Tax Status**.  It is the intent of this Company and the Members that this Company will be treated as a partnership for U.S., federal, state, and local income tax purposes.  Neither the

Company nor any Member will make an election for the Company to be classified as other than a partnership pursuant to Treasury Regulations Section 301.7701-3.

**Section 12.4.     Partnership Representative**.

(a)     *Appointment*.     The Members hereby appoint the Managing Member as the "partnership representative" (the "**Partnership Representative**") as provided in Code Section 6223(a) (as amended by the Bipartisan Budget Act of 2015 ("**BBA**")).  The Partnership Representative may resign at any time if there is another Managing Member to act as the Partnership Representative.

(b)     *Tax Examinations and Audits*.     The Partnership Representative is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by Taxing Authorities, including resulting administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith.  Each Member agrees that such Member will not independently act with respect to tax audits or tax litigation of the Company, unless previously authorized to do so in writing by the Partnership Representative, which authorization may be withheld by the Partnership Representative in its sole and absolute discretion.  The Partnership Representative shall have sole discretion to determine whether the Company (either on its own behalf or on behalf of the Members) will contest or continue to contest any tax deficiencies assessed or proposed to be assessed by any Taxing Authority.

(c)     *BBA Elections*.     To the extent permitted by applicable law and regulations, the Company will annually elect out of the partnership audit procedures enacted under Section 1101 of the BBA (the "**BBA Procedures**") for tax years beginning on or after January 1, 2018 pursuant to Code Section 6221(b) (as amended by the BBA).  For any year in which applicable law and regulations do not permit the Company to elect out of the BBA Procedures, then within forty-five (45) days of any notice of final partnership adjustment, the Company will elect the alternative procedure under Code Section 6226, as amended by Section 1101 of the BBA, and furnish to the Internal Revenue Service and each Member during the year or years to which the notice of final partnership adjustment relates a statement of the Member's share of any adjustment set forth in the notice of final partnership adjustment.

(d)     *Tax Returns and Tax Deficiencies*.     Each Member agrees that such Member shall not treat any Company item inconsistently on such Member's federal, state, foreign or other income tax return with the treatment of the item on the Company's return.  Any deficiency for taxes imposed on any Member or former Member (including penalties, additions to tax or interest imposed with respect to such taxes and any taxes imposed pursuant to Code Section 6226 as amended by the BBA) will be paid by such Member or former Member, and if required to be paid (and actually paid) by the Company, will be recoverable from such Member as provided in Section 7.2(d).

(e)     *Income Tax Elections*.     Except as otherwise provided herein, the Partnership Representative shall have sole discretion to make any determination regarding income tax elections it deems advisable on behalf of the Company; provided, that the Partnership Representative will make an election under Code Section 754, if requested in writing by another Member.

**Section 12.5.     Tax Returns**.     At the expense of the Company, the Managing Member (or any Officer that it may designate pursuant to Section 8.4) will endeavor to cause the preparation and timely filing (including extensions) of all tax returns required to be filed by the Company pursuant to the Code as well as all other required tax returns in each jurisdiction in which the Company own property or do business.  The Managing Member will provide the Non-Managing Member, for its review and comment, copies of

all tax returns prior to the filing thereof.  As soon as reasonably possible after the end of each Fiscal Year, the Managing Member or designated Officer will cause to be delivered to each Person who was a Member at any time during such Fiscal Year, IRS Schedule K-1 to Form 1065 and such other information with respect to the Company as may be necessary for the preparation of such Person's federal, state and local income tax returns for such Fiscal Year.

**Section 12.6.    Company Funds**.  All funds of the Company will be deposited in its name, or in such name as may be designated by the Managing Member, in such checking, savings or other accounts, or held in its name in the form of such other investments as will be designated by the Managing Member. The funds of the Company will not be commingled with the funds of any other Person.  All withdrawals of such deposits or liquidations of such investments by the Company will be made exclusively upon the signature or signatures of such Officer or Officers as the Managing Member may designate.

## ARTICLE XIII
## DISSOLUTION AND LIQUIDATION

**Section 13.1.    Events of Dissolution**.  The Company will be dissolved and its affairs wound up only upon the occurrence of any of the following events:

(a)      The determination of the Members to dissolve the Company;

(b)      The Bankruptcy of a Member, unless within ninety (90) days after the occurrence of such Bankruptcy, the other Member agrees in writing to continue the business of the Company;

(c)      At the election of a non-defaulting Member, in its sole discretion, if the other Member breaches any material covenant, duty or obligation under this Agreement (including a Member's obligation to make Additional Capital Contributions pursuant to Section 4.2), which breach remains uncured for ten (10) days after written notice of such breach was received by the defaulting Member;

(d)      The sale, exchange, involuntary conversion, or other disposition or Transfer of all or substantially all the assets of the Company; or

(e)      The entry of a decree of judicial dissolution under §18-802 of the Delaware Act.

**Section 13.2.    Effectiveness of Dissolution**.  Dissolution of the Company will be effective on the day on which the event described in Section 13.1 occurs, but the Company will not terminate until the winding up of the Company has been completed, the assets of the Company have been distributed as provided in Section 13.3 and the Certificate will have been cancelled as provided in Section 13.4.

**Section 13.3.    Liquidation**.  If the Company is dissolved pursuant to Section 13.1, the Company will be liquidated and its business and affairs wound up in accordance with the Delaware Act and the following provisions:

(a)      *Liquidator*.  The Managing Member will act as liquidator to wind up the Company (the "**Liquidator**"), unless the Company is being dissolved pursuant to Section 13.1(b) or Section 13.1(c) based on the Bankruptcy or a breach by the Managing Member, in which case the Liquidator will be the Non-Managing Member.  The Liquidator will have full power and authority to sell, assign, and encumber any or all of the Company's assets and to wind up and liquidate the affairs of the Company in an orderly and business-like manner.

(b)    *Accounting*.  As promptly as possible after dissolution and again after final liquidation, the Liquidator will cause a proper accounting to be made by a recognized firm of certified public accountants of the Company's assets, liabilities and operations through the last day of the calendar month in which the dissolution occurs or the final liquidation is completed, as applicable.

(c)    *Distribution of Proceeds*.  The Liquidator will liquidate the assets of the Company and distribute the proceeds of such liquidation in the following order of priority, unless otherwise required by mandatory provisions of Applicable Law:

(i)    First, to the payment of all of the Company's debts and liabilities to its creditors (including Members, if applicable) and the expenses of liquidation (including sales commissions incident to any sales of assets of the Company);

(ii)    Second, to the establishment of and additions to reserves that are determined by the Managing Member to be reasonably necessary for any contingent unforeseen liabilities or obligations of the Company; and

(iii)    Third, to the Members in accordance with Section 7.1.

(d)    *Discretion of Liquidator*.  Notwithstanding the provisions of Section 13.3(c) that require the liquidation of the assets of the Company, but subject to the order of priorities set forth in Section 13.3(c), if upon dissolution of the Company the Liquidator reasonably determines that an immediate sale of part or all of the Company's assets would be impractical or could cause undue loss to the Members, the Liquidator may defer the liquidation of any assets except those necessary to satisfy Company liabilities and reserves, and may distribute to the Members, in lieu of cash, as tenants in common and in accordance with the provisions of Section 13.3(c), undivided interests in such Company assets as the Liquidator deems not suitable for liquidation. Any such distribution in kind will be subject to such conditions relating to the disposition and management of such properties as the Liquidator deems reasonable and equitable and to any agreements governing the operating of such properties at such time.  For purposes of any such distribution, any property to be distributed will be valued at its Fair Market Value.

**Section 13.4.    Cancellation of Certificate**.  Upon completion of the distribution of the assets of the Company as provided in Section 13.3(c) hereof, the Company will be terminated and the Liquidator will cause the cancellation of the Certificate in the State of Delaware and of all qualifications and registrations of the Company as a foreign limited liability company in jurisdictions other than the State of Delaware and will take such other actions as may be necessary to terminate the Company.

**Section 13.5.    Survival of Rights, Duties, and Obligations**.  Dissolution, liquidation, winding up, or termination of the Company for any reason will not release any party from any Loss that at the time of such dissolution, liquidation, winding up or termination already had accrued to any other party or thereafter may accrue in respect of any act or omission prior to such dissolution, liquidation, winding up or termination.  For the avoidance of doubt, none of the foregoing will replace, diminish, or otherwise adversely affect any Member's right to indemnification pursuant to Section 10.3.

**Section 13.6.    Recourse for Claims**.  Each Member will look solely to the assets of the Company for all distributions with respect to the Company, such Member's Capital Account, and such Member's share of Net Income, Net Loss and other items of income, gain, loss and deduction, and will have no recourse therefor (upon dissolution or otherwise) against the Liquidator or any other Member.

## ARTICLE XIV
## MISCELLANEOUS

**Section 14.1.   Expenses**.   Except as otherwise expressly provided herein, all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with the preparation and execution of this Agreement, or any amendment or waiver hereof, and the transactions contemplated hereby will be paid by the Company.

**Section 14.2.   Further Assurances**.   In connection with this Agreement and the transactions contemplated hereby, the Company and each Member hereby agrees, at the request of the Company or any other Member, to execute and deliver such additional documents, instruments, conveyances and assurances and to take such further actions as may be required to carry out the provisions hereof and give effect to the transactions contemplated hereby.

**Section 14.3.   Confidentiality.**

(a)     Each Member acknowledges that during the term of this Agreement, it will have access to and become acquainted with trade secrets, proprietary information and confidential information belonging to the Company and its Affiliates that are not generally known to the public, including, but not limited to, information concerning business plans, financial statements and other information provided pursuant to this Agreement, operating practices and methods, expansion plans, strategic plans, marketing plans, contracts, customer lists or other business documents that the Company treats as confidential, in any format whatsoever (including oral, written, electronic or any other form or medium) (collectively, "**Confidential Information**"). In addition, each Member acknowledges that: (i) the Company has invested, and continues to invest, substantial time, expense and specialized knowledge in developing its Confidential Information; (ii) the Confidential Information provides the Company with a competitive advantage over others in the marketplace; and (iii) the Company would be irreparably harmed if the Confidential Information were disclosed to competitors or made available to the public.  Without limiting the applicability of any other agreement to which any Member is subject, no Member will, directly or indirectly, disclose or use (other than solely for the purposes of such Member monitoring and analyzing its investment in the Company) at any time, including, without limitation, use for personal, commercial or proprietary advantage or profit, either during its association with the Company or thereafter, any Confidential Information of which such Member is or becomes aware.  Each Member in possession of Confidential Information will take all appropriate steps to safeguard such information and to protect it against disclosure, misuse, espionage, loss, and theft.

(b)     Nothing contained in Section 14.3(a) will prevent any Member from disclosing Confidential Information: (i) upon the order of any court or administrative agency; (ii) upon the request or demand of any regulatory agency or authority having jurisdiction over such Member; (iii) to the extent compelled by legal process or required or requested pursuant to subpoena, interrogatories or other discovery requests; (iv) to the extent necessary in connection with the exercise of any remedy hereunder; (v) to the other Member; (vi) to such Member's Representatives who, in the reasonable judgment of such Member, need to know such Confidential Information and agree to be bound by the provisions of this Section 14.3 as if a Member; or (vii) to any potential Permitted Transferee in connection with a proposed Transfer of Membership Interests from such Member, as long as such Transferee agrees to be bound by the provisions of this Section 14.3 as if a Member; provided that, in the case of clause (i), (ii), or (iii), such Member will notify the Company and other Member of the proposed disclosure as far in advance of such disclosure as practicable (but in no event make any such disclosure before notifying the Company and other

Member) and use reasonable efforts to ensure that any Confidential Information so disclosed is accorded confidential treatment satisfactory to the Company, when and if available.

(c)    The restrictions of <u>Section 14.3(a)</u> will not apply to Confidential Information that: (i) is or becomes generally available to the public other than as a result of a disclosure by a Member in violation of this Agreement; (ii) is or has been independently developed or conceived by such Member without use of Confidential Information; or (iii) becomes available to such Member or any of its Representatives on a non-confidential basis from a source other than the Company, the other Member or any of their respective Representatives, provided that, such source is not known by the receiving Member to be bound by a confidentiality agreement regarding the Company.

(d)    The obligations of each Member under this <u>Section 14.3</u> will survive (i) the termination, dissolution, liquidation and winding up of the Company, (ii) the withdrawal of such Member from the Company, and (iii) such Member's Transfer of its Membership Interests.

**Section 14.4.    Notices**.    All notices, requests, consents, claims, demands, waivers and other communications hereunder will be in writing and will be deemed to have been given: (a) when delivered by hand (with written confirmation of receipt); (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (c) on the date sent by facsimile or e-mail of a PDF document (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next Business Day if sent after normal business hours of the recipient; or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as will be specified in a notice given in accordance with this <u>Section 14.4</u>):

|  |  |
|---|---|
| If to the GWLI II Member : | To the applicable address set forth on the Members Schedule |
| If to the Naissance Member: | To the applicable address set forth on the Members Schedule |
| *with a copy to:* | Polsinelli PC<br>2950 N. Harwood Street, Ste. 2100<br>Dallas, TX 75201<br>Attention: Brian A. Bullard<br>E-mail: bbullard@polsinelli.com |

**Section 14.5.    Headings**.  The headings in this Agreement are inserted for convenience or reference only and are in no way intended to describe, interpret, define, or limit the scope, extent, or intent of this Agreement or any provision of this Agreement.

**Section 14.6.    Severability**.  If any term or provision of this Agreement is held to be invalid, illegal or unenforceable under Applicable Law in any jurisdiction, such invalidity, illegality or unenforceability will not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Except as provided in <u>Section 10.3(g)</u>, upon such determination that any term or other provision is invalid, illegal or unenforceable, the parties hereto will negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

**Section 14.7.    Entire Agreement**.  This Agreement, together with the Certificate and all related Exhibits and Schedules, constitutes the sole and entire agreement of the parties to this Agreement with respect to the subject matter contained herein and therein, and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, with respect to such subject matter.

**Section 14.8.    Successors and Assigns**.  Subject to the restrictions on Transfers set forth herein, this Agreement will be binding upon and will inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns.

**Section 14.9.    No Third-party Beneficiaries**.  Except as provided in <u>ARTICLE X</u>, which will be for the benefit of and enforceable by Covered Persons as described therein, this Agreement is for the sole benefit of the parties hereto (and their respective heirs, executors, administrators, successors, and assigns) and nothing herein, express or implied, is intended to or will confer upon any other Person, including any creditor of the Company, any legal or equitable right, benefit, or remedy of any nature whatsoever under or by reason of this Agreement.

**Section 14.10.    Amendment**.  No provision of this Agreement may be amended or modified except by an instrument in writing executed by both of the Members.  Any such written amendment or modification will be binding upon the Company and each Member.  Notwithstanding the foregoing, amendments to the Members Schedule following any new issuance, redemption, repurchase, or Transfer of Membership Interests in accordance with this Agreement may be made by the Managing Member without the consent of or execution by the Members.

**Section 14.11.    Waiver**.  No waiver by any party of any of the provisions hereof will be effective unless explicitly set forth in writing and signed by the party so waiving.  No waiver by any party will operate or be construed as a waiver in respect of any failure, breach, or default not expressly identified by such written waiver, whether of a similar or different character, and whether occurring before or after that waiver.  No failure to exercise, or delay in exercising, any right, remedy, power, or privilege arising from this Agreement will operate or be construed as a waiver thereof, nor will any single or partial exercise of any right, remedy, power, or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power, or privilege.  For the avoidance of doubt, nothing contained in this <u>Section 14.1</u> will diminish any of the explicit and implicit waivers described in this Agreement, including in <u>Section 14.14</u>.

**Section 14.12.    Governing Law**.  All issues and questions concerning the application, construction, validity, interpretation, and enforcement of this Agreement will be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to any choice or conflict of law provision or rule (whether of the State of Delaware or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Delaware.

**Section 14.13.    Submission to Jurisdiction**.  The parties hereby agree that any suit, action or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby, whether in contract, tort, or otherwise, will be brought in the United States District Court for the District of Delaware or in the Court of Chancery of the State of Delaware (or, if such court lacks subject matter jurisdiction, in the Superior Court of the State of Delaware), so long as one of such courts will have subject-matter jurisdiction over such suit, action, or proceeding, and that any case of action arising out of this Agreement will be deemed to have arisen from a transaction of business in the State of Delaware. Each of the parties hereby irrevocably consents to the jurisdiction of such courts (and of the appropriate appellate courts therefrom) in any such suit, action, or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now

or hereafter have to the laying of the venue of any such suit, action, or proceeding in any such court or that any such suit, action, or proceeding that is brought in any such court has been brought in an inconvenient form. Service of process, summons, notice, or other document by registered mail to the address set forth in <u>Section 14.4</u> will be effective service of process for any suit, action, or other proceeding brought in any such court.

**Section 14.14.  WAIVER OF JURY TRIAL.**   EACH PARTY HERETO HEREBY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY THAT MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES AND, THEREFORE, EACH SUCH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

**Section 14.15.  Equitable Remedies**.   Each party hereto acknowledges that a breach or threatened breach by such party of any of its obligations under this Agreement would give rise to irreparable harm to the other parties, for which monetary damages would not be an adequate remedy, and hereby agrees that in the event of a breach or a threatened breach by such party of any such obligations, each of the other parties hereto will, in addition to any and all other rights and remedies that may be available to them in respect of such breach, be entitled to equitable relief, including a temporary restraining order, an injunction, specific performance and any other relief that may be available from a court of competent jurisdiction (without any requirement to post bond).

**Section 14.16.  Attorneys' Fees**.   In the event that any party hereto institutes any legal suit, action or proceeding, including arbitration, against another party in respect of a matter arising out of or relating to this Agreement, the prevailing party in the suit, action, or proceeding will be entitled to receive, in addition to all other damages to which it may be entitled, the costs incurred by such party in conducting the suit, action, or proceeding, including reasonable attorneys' fees and expenses and court costs.

**Section 14.17.  Remedies Cumulative**.   The rights and remedies under this Agreement are cumulative and are in addition to and not in substitution for any other rights and remedies available at law or in equity or otherwise, except to the extent expressly provided in <u>Section 10.2</u> to the contrary.

**Section 14.18.  Counterparts**.   This Agreement may be executed in counterparts, each of which will be deemed an original, but all of which together will be deemed to be one and the same agreement. A signed copy of this Agreement delivered by facsimile, e-mail or other means of Electronic Transmission will be deemed to have the same legal effect as delivery of an original signed copy of this Agreement.

*[Remainder of page intentionally left blank – signature page follows]*

The parties hereto have caused this Agreement to be executed as of the Effective Date by their respective officers thereunto duly authorized.

**MEMBERS:**

NAISSANCE CAPITAL REAL ESTATE, LLC, a Delaware limited liability company

By: _____

Name: Azeemeh Zaheer

Title:  Managing Member

GALLERIA WEST LOOP INVESTMENTS II LLC, a Texas limited liability company

By:  GALLERIA WEST LOOP INVESTMENTS, LLC, a
     Texas limited liability company, its manager

By: _____

Name:  Bradley S. Parker

Title:  President

**SCHEDULE A**

MEMBERS SCHEDULE

| Member<br>*(Name and Address)* | Initial Capital<br>Contributions | Membership<br>Interest<br>Percentage |
|---|---|---|
| **GWLI II Member :** | | |
| 1614 Sidney Baker Street<br>Kerville, Texas 78028 | $16,000,000 | 98.77% |
| **Naissance Member:** | | |
| 6501 Westchester Ave.<br>Houston Texas 77005 | $200,000 | 1.23% |
| **Totals:** | **$16,200,000** | **100%** |

Limited Liability Company Agreement ~ Galleria 2425 JV, LLC

001797

**SCHEDULE B**

BUDGET

[attached]

## Boxer Property Management
*Property*
*Pro Forma Summary*

|  | Year 1 | |
|  | *May-18* | *Apr-19* |
|  | **Annual Total** | **PSF** |
|---|---|---|
| *Rate* | *$21.73* | *$22.18* |
| *Occupied Square Feet* | *259,016* | *259,016* |
| *Occupied Percentage* | *91.41%* | *91.41%* |
| **Gross Potential Revenue** | **6,241,332** $ | **22.03** |
| Vacancy Loss | (584,177) $ | (2.06) |
| Net Rental Revenue | 5,657,155 $ | 19.96 |
| Expense Reimbursements | 1,992,273 $ | 7.03 |
| Building Services / Other Income | 23,634 $ | 0.08 |
| **Total Revenue** | **7,673,063** $ | **27.08** |
| **Operating Expenses** | | |
| Salaries and Benefits | 264,844 $ | 0.93 |
| General and Administrative | 215,552 $ | 0.76 |
| Repair and Maintenance | 243,569 $ | 0.86 |
| Utilities (Electric) | 368,364 $ | 1.30 |
| Utilities (Non-electric) | 82,174 $ | 0.29 |
| Contract Services | 258,224 $ | 0.91 |
| Controllable Expenses | 1,432,727 $ | 5.06 |
| Mgmt Fee | 141,679 $ | 0.50 |
| Property Taxes | 753,500 $ | 2.66 |
| Insurance | 35,420 $ | 0.13 |
| **Total Operating Expenses** | **2,363,325** $ | **8.34** |
| **Net Operating Income** | **5,309,738** $ | **18.74** |
| **Other Expenses/(Income)** | | |
| In-house Leasing Salaries | 36,993 $ | 0.13 |
| In-house Marketing/Advertising | 87,677 $ | 0.31 |
| In-house Leasing/Design & Construction | 69,009 $ | 0.24 |
| In-house Legal | 24,302 $ | 0.09 |
| 3rd Party Professional Fees | 18,809 $ | 0.07 |
| Texas Margin Tax | 74,812 $ | 0.26 |
| **Total Other Expenses/(Income)** | **311,603** $ | **1.10** |
| **Net Income Before Interest** | **4,998,135** $ | **17.64** |

001799

**Bayou Property Management**
*Property*
*Year 1 Pro Forma*

| | May-18 | Jun-18 | Jul-18 | Aug-18 | Sep-18 | Oct-18 | Nov-18 | Dec-18 | Jan-19 | Feb-19 | Mar-19 | Apr-19 | Annual Total | PSF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | | |
| *Rate* | $21.73 | $21.73 | $21.74 | $21.74 | $21.74 | $21.74 | $21.74 | $21.74 | $21.76 | $22.12 | $22.13 | $22.18 | | |
| *Occupied Square Feet* | 259,016 | 259,016 | 259,016 | 259,016 | 259,016 | 259,016 | 259,016 | 259,016 | 259,016 | 259,016 | 259,016 | 259,016 | | |
| *Occupied Percentage* | 91.41% | 91.41% | 91.41% | 91.41% | 91.41% | 91.41% | 91.41% | 91.41% | 91.41% | 91.41% | 91.41% | 91.41% | | |
| Total Current Rents | 469,129 | 469,129 | 469,248 | 469,248 | 469,248 | 469,248 | 469,248 | 469,248 | 469,641 | 477,524 | 477,575 | 478,669 | 5,657,155 | $ 19.96 |
| Total New Rents | - | - | - | - | - | - | - | - | - | - | - | - | - | $ - |
| Vac Loss | 48,681 | 48,681 | 48,681 | 48,681 | 48,681 | 48,681 | 48,681 | 48,681 | 48,681 | 48,681 | 48,681 | 48,681 | 584,177 | $ 2.06 |
| **Gross Potential Revenue** | 517,810 | 517,810 | 517,929 | 517,929 | 517,929 | 517,929 | 517,929 | 517,929 | 518,322 | 526,205 | 526,256 | 527,351 | 6,241,332 | $ 22.03 |
| Rental Allowances | - | - | - | - | - | - | - | - | - | - | - | - | - | $ - |
| Vacancy Loss | (48,681) | (48,681) | (48,681) | (48,681) | (48,681) | (48,681) | (48,681) | (48,681) | (48,681) | (48,681) | (48,681) | (48,681) | (584,177) | $ (2.06) |
| Bad Debt Expense | | | | | | | | | | | | | | |
| Net Rental Revenue | 469,129 | 469,129 | 469,248 | 469,248 | 469,248 | 469,248 | 469,248 | 469,248 | 469,641 | 477,524 | 477,575 | 478,669 | 5,657,155 | $ 19.96 |
| Expense Reimbursements | 166,023 | 166,023 | 166,023 | 166,023 | 166,023 | 166,023 | 166,023 | 166,023 | 166,023 | 166,023 | 166,023 | 166,023 | 1,992,273 | $ 7.03 |
| Building Services / Other Income | 1,970 | 1,970 | 1,970 | 1,970 | 1,970 | 1,970 | 1,970 | 1,970 | 1,970 | 1,970 | 1,970 | 1,970 | 23,634 | $ 0.08 |
| **Total Revenue** | 637,121 | 637,121 | 637,240 | 637,240 | 637,240 | 637,240 | 637,240 | 637,240 | 637,633 | 645,516 | 645,567 | 646,661 | 7,673,063 | $ 27.08 |
| **Operating Expenses** | | | | | | | | | | | | | | |
| Salaries and Benefits | 20,427 | 20,427 | 20,427 | 30,286 | 20,427 | 20,427 | 20,427 | 20,427 | 20,427 | 20,427 | 30,286 | 20,427 | 264,844 | $ 0.93 |
| General and Administrative | 17,859 | 17,859 | 17,859 | 18,482 | 17,859 | 17,859 | 17,859 | 17,859 | 17,859 | 17,859 | 18,482 | 17,859 | 215,552 | $ 0.76 |
| Repair and Maintenance | 20,297 | 20,297 | 20,297 | 20,297 | 20,297 | 20,297 | 20,297 | 20,297 | 20,297 | 20,297 | 20,297 | 20,297 | 243,569 | $ 0.86 |
| Utilities (Electric) | 30,697 | 30,697 | 30,697 | 30,697 | 30,697 | 30,697 | 30,697 | 30,697 | 30,697 | 30,697 | 30,697 | 30,697 | 368,364 | $ 1.30 |
| Utilities (Non-electric) | 6,848 | 6,848 | 6,848 | 6,848 | 6,848 | 6,848 | 6,848 | 6,848 | 6,848 | 6,848 | 6,848 | 6,848 | 82,174 | $ 0.29 |
| Contract Services | 21,519 | 21,519 | 21,519 | 21,519 | 21,519 | 21,519 | 21,519 | 21,519 | 21,519 | 21,519 | 21,519 | 21,519 | 258,224 | $ 0.91 |
| Mgmt Fee | 11,807 | 11,807 | 11,807 | 11,807 | 11,807 | 11,807 | 11,807 | 11,807 | 11,807 | 11,807 | 11,807 | 11,807 | 141,679 | $ 0.50 |
| Controllable Expenses | 129,453 | 129,453 | 129,453 | 139,936 | 129,453 | 129,453 | 129,453 | 129,453 | 129,453 | 129,453 | 139,936 | 129,453 | 1,574,405 | $ 5.56 |
| Property Taxes | 62,792 | 62,792 | 62,792 | 62,792 | 62,792 | 62,792 | 62,792 | 62,792 | 62,792 | 62,792 | 62,792 | 62,792 | 753,500 | $ 2.66 |
| Insurance | 2,952 | 2,952 | 2,952 | 2,952 | 2,952 | 2,952 | 2,952 | 2,952 | 2,952 | 2,952 | 2,952 | 2,952 | 35,420 | $ 0.13 |
| **Total Operating Expenses** | 195,197 | 195,197 | 195,197 | 205,679 | 195,197 | 195,197 | 195,197 | 195,197 | 195,197 | 195,197 | 205,679 | 195,197 | 2,363,325 | $ 8.34 |
| **Net Operating Income** | 441,925 | 441,925 | 442,044 | 431,561 | 442,044 | 442,044 | 442,044 | 442,044 | 442,437 | 450,320 | 439,888 | 451,465 | 5,309,738 | $ 18.74 |
| **Other Expenses/(Income)** | | | | | | | | | | | | | | |
| In-house Leasing Salaries | 2,846 | 2,846 | 2,846 | 4,268 | 2,846 | 2,846 | 2,846 | 2,846 | 2,846 | 2,846 | 4,268 | 2,846 | 36,993 | $ 0.13 |
| In-house Marketing/Advertising | 6,871 | 6,871 | 6,871 | 9,481 | 6,871 | 6,871 | 6,871 | 6,871 | 6,871 | 6,871 | 9,481 | 6,871 | 87,677 | $ 0.31 |
| In-house Leasing/Design & Construction | 5,308 | 5,308 | 5,308 | 7,963 | 5,308 | 5,308 | 5,308 | 5,308 | 5,308 | 5,308 | 7,963 | 5,308 | 69,009 | $ 0.24 |
| In-house Legal | 1,869 | 1,869 | 1,869 | 2,804 | 1,869 | 1,869 | 1,869 | 1,869 | 1,869 | 1,869 | 2,804 | 1,869 | 24,302 | $ 0.09 |
| 3rd Party Professional Fees | 1,567 | 1,567 | 1,567 | 1,567 | 1,567 | 1,567 | 1,567 | 1,567 | 1,567 | 1,567 | 1,567 | 1,567 | 18,809 | $ 0.07 |
| Texas Margin Tax | 6,234 | 6,234 | 6,234 | 6,234 | 6,234 | 6,234 | 6,234 | 6,234 | 6,234 | 6,234 | 6,234 | 6,234 | 74,812 | $ 0.26 |
| **Total Other Expenses/(Income)** | 24,697 | 24,697 | 24,697 | 32,318 | 24,697 | 24,697 | 24,697 | 24,697 | 24,697 | 24,697 | 32,318 | 24,697 | 311,603 | $ 1.10 |
| **Net Income Before Interest** | 417,228 | 417,228 | 417,347 | 399,244 | 417,347 | 417,347 | 417,347 | 417,347 | 417,740 | 425,623 | 407,570 | 426,768 | 4,998,135 | $ 17.64 |

001800

**<u>EXHIBIT J</u>**

**2021 Unanimous Consent**

001801

## GALLERIA 2425 JV, LLC

### UNANIMOUS WRITTEN CONSENT OF THE MEMBERS
### IN LIEU OF MEETING

Jun 18, 20 21

THE UNDERSIGNED, being all of members (each, a "Member" and collectively, the **"Members"**) of Galleria 2425 JV, LLC, a Delaware limited liability company (**"Company"**), do hereby waive any and all requirements for calling, giving notice of and holding a meeting and, in lieu of such meeting, consents to the adoption of the following resolutions:

RESOLVED, that Galleria West Loop Investment II LLC, a Texas limited liability company is hereby appointed as the Managing Member the Company pursuant to the terms of that certain Amended and Restated Limited Liability Company Agreement of Galleria 2425 JV, LLC.

*[Signature page follows]*

EXECUTED to be effective as of the date first written above.

MEMBERS:

NAISSANCE CAPITAL REAL ESTATE, LLC,
a Delaware limited liability company

By: _____
Name:      Azeemeh Zaheer
Title:      Managing Member

GALLERIA WEST LOOP INVESTMENTS II LLC,
a Delaware limited liability company

By:   Galleria West Loop Investments, LLC,
      a Texas limited liability company,
      its manager

By: _____
Name: _____
Title: _____

521550.000001 24747452.1

Signature Page to Unanimous Written Consent
Galleria 2425 JV, LLC
001803

EXECUTED to be effective as of the date first written above.

**MEMBERS:**

NAISSANCE CAPITAL REAL ESTATE, LLC,
a Delaware limited liability company

By: _____

Name:     Azeemeh Zaheer

Title:      Managing Member


GALLERIA WEST LOOP INVESTMENTS II LLC,
a Delaware limited liability company

By:      Galleria West Loop Investments, LLC,
          a Texas limited liability company,
          its manager

By: _____

Name: _____

Title: _____

521550.000001 24747452.1

Signature Page to Unanimous Written Consent
Galleria 2425 JV, LLC

001804

**EXHIBIT K**

**2425 WL LLC Promissory Note**

**PROMISSORY NOTE**

**$14,730,332.38 (USD)**

**Houston, Texas**
**May 23, 2018**

**FOR VALUE RECEIVED, Galleria 2425 Owner, LLC** ("Borrower"), a Delaware limited liability company with an address at 1001 W. Loop South, Suite 700 Houston Texas 77027, through its managing member **Galleria 2425 JV, LLC**, a Delaware limited liability company, hereby unconditionally promises to pay to the order of **2425 WL, LLC**, a New York limited liability company, having an address at 11509 S Lou Al Dr Houston Texas 77024 ("Lender"), or at such other place as the holder hereof may from time to time designate in writing, the maximum principal sum of **FOURTEEN MILLION SEVEN HUNDRED AN THIRTY THOUSAND THREE HUNDRED AND THIRTY TWO AND 38/100 DOLLARS ($14,730,332.38)** in lawful money of the United States of America with interest thereon to be computed from the date of this Note at the Applicable Interest Rate, and to be paid in accordance with the terms of this Note, and the Deed of Trust (the "Deed of Trust"), dated as of the date hereof, between Borrowers and Lender (the "Loan Agreement"). All capitalized terms not defined herein shall have the meanings set forth in the Deed of Trust. This Note and the Deeds of Trust are sometimes collectively referred to as the "Loan Documents" or singly as "Loan Document."

**ARTICLE 1 - Payment Terms**

Borrowers agree to pay the principal sum of this Note, together with all accrued and unpaid interest thereon, all at the stated regular rate of ten percent (10.00%) per annum (the "Applicable Rate") on or before May 22, 2021 (the "Maturity Date"). Commencing May 23, 2018 and continuing on the 23rd of each subsequent May until the Maturity Date, Borrower agrees to pay to Lender interest-only payments based on the principal sum of this Note and the Applicable Rate.

If Borrowers fail to pay the amount stated in the preceding paragraph, together with all accrued and unpaid interest thereon on or before the Maturity Date, Borrower shall pay to Lender additional interest at the Default Rate of the lesser of eighteen percent (18.00%) per annum (the "Default Rate") or the maximum amount allowed by the laws for the State of New York.

**ARTICLE 2 - Default And Acceleration**

The Debt shall without notice become immediately due and payable at the option of Lender if any payment of principal or interest required in this Note is not paid on or prior to the date when due or if not paid on the Maturity Date or on the happening of any other Event of Default and in addition, Lender shall be entitled to receive interest on the entire unpaid principal sum at the Default Rate pursuant to the terms of the Loan Agreement. This Article 2, however, shall not be construed as an agreement or privilege to extend the date of the payment of the Debt, nor as a waiver of any other right or remedy accruing to Lender by reason of the occurrence of any Event of Default.

001806

### ARTICLE 3 - Loan Documents

This Note is secured by the Deed of Trust. All of the terms, covenants and conditions contained in any other Loan Document are hereby made part of this Note to the same extent and with the same force as if they were fully set forth herein.

### ARTICLE 4 - Savings Clause

This Note and the other Loan Documents are subject to the express condition that at no time shall Borrowers be obligated or required to pay interest on the principal balance of the Loan at a rate which could subject Lender to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate. If, by the terms of this Note or any other Loan Document, Borrowers are at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Legal Rate, the Applicable Interest Rate or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder. All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate of interest from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

### ARTICLE 5 - No Oral Change

This Note may not be modified, amended, waived, extended, changed, discharged or terminated orally or by any act or failure to act on the part of Borrowers or Lender, but only by an agreement in writing signed by the party against whom enforcement of any modification, amendment, waiver, extension, change, discharge or termination is sought.

### ARTICLE 6 - Waivers

Borrowers and all others who may become liable for the payment of all or any part of the Debt do hereby severally waive presentment and demand for payment, notice of dishonor, notice of intent to accelerate, notice of acceleration, protest, notices of protest and/or of non-payment and any and all other notices of any kind except any such notice expressly required by this Note. No release of any security for the Debt or extension of time for payment of this Note or any installment hereof, and no alteration, amendment or waiver of any provision of this Note or any other Loan Documents made by agreement between Lender or any other Person shall release, modify, amend, waive, extend, change, discharge, terminate or affect the liability of Borrowers, and any other Person who may become liable for the payment of all or any part of the Debt, under this Note, the Loan Agreement or the other Loan Documents.

No notice to or demand on Borrowers shall be deemed to be a waiver of the obligation of Borrowers or of the right of Lender to take further action without further notice or demand as provided for in this Note, the Loan Agreement or the other Loan Documents.  In the case of

- 2 -

Grove, the agreements herein contained shall remain in force and be applicable, notwithstanding any changes in the members comprising Grove, and the term "Borrower" as used herein, shall include any alternate or successor limited liability company, but any predecessor limited liability company shall not thereby be released from any liability. (Nothing in the foregoing sentence shall be construed as a consent to, or a waiver of, any prohibition or restriction on transfers of interests in such partnership, corporation or limited liability company which may be set forth in any Loan Document.)

## ARTICLE 7 - Transfer

Upon the transfer of this Note, Borrowers hereby waiving notice of any such transfer, Lender may deliver all the collateral mortgaged, granted, pledged or assigned pursuant to the Loan Documents, or any part thereof, to the transferee who shall thereupon become vested with all the rights herein or under applicable law given to Lender with respect thereto, and Lender shall thereafter forever be relieved and fully discharged from any liability or responsibility in the matter accruing from and after the date of the transfer; but Lender shall retain all rights hereby given to it with respect to any liabilities and the collateral not so transferred.

## ARTICLE 8 - Governing Law

This Note shall be governed in accordance with the laws of the State of New York.

## ARTICLE 9 - Notices

All notices or other written communications hereunder shall be delivered to the respective addresses for each such party shown hereinabove, unless the party to whom notice is directed has given notice that its address has changed and provided the party from whom notice is given its new address.

## ARTICLE 10 -

[Intentionally omitted.]

## ARTICLE 11 - Liability

The obligations and liabilities of each Borrower hereunder shall be joint and several.


## [NO FURTHER TEXT ON THIS PAGE]

001808

IN WITNESS WHEREOF, EFFECTIVE as of the day and year first above written.

**BORROWER:**

**GALLERIA 2425 OWNER, LLC,**
a Delaware limited partnership

By: **GALLERIA 2425 JV, LLC**
Its Managing Member

By:_____
Its Authorized Agent

**<u>EXHIBIT L</u>**

**Settlement Statement**

001810

A. **Settlement Statement**

| B. Type of Loan | | | | | |
|---|---|---|---|---|---|
| 1. ☐ FHA   2. ☐ FmHA   3. ☐ Conv Unins<br>4. ☐ VA   5. ☐ Conv Ins   6. ☐ Seller Finance<br>7. ☐ Cash Sale | | 6. File Number<br>**12000990** | 7. Loan Number | 8. Mortgage Ins Case Number | |

C. **Note:**   This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked
"(p.o.c.)" were paid outside the closing, they are shown here for informational purposes and are not included in the totals.

| D. Name & Address of Borrower | E. Name & Address of Seller | F. Name & Address of Lender |
|---|---|---|
| **Galleria 2425 Owner, LLC, a Delaware limited**<br>**liability company**<br>**60 W 2nd St**<br>**Freeport, NY 11520** | **2425 WL, LLC, a New York Limited Liability**<br>**Company**<br>**2500 West Loop South, Suite 255**<br>**Houston, TX 77027** | **National Bank of Kuwait, S.A.K.P., New York**<br>**Branch, a banking corporation organized under the**<br>**laws of Kuwait, acting through its New York branch**<br>**299 Park Avenue**<br>**New York, NY 10171** |

| G. Property Location | H. Settlement Agent Name |
|---|---|
| **TR 31D ABST 836 W WHITE**<br>**2425 W Loop S**<br>**Houston , TX 77027** | **TransAct Title - Galleria**<br>**6117 Richmond Ave, Suite 250**<br>**Houston, TX 77057   Tax ID: 45-3483105**<br>**Underwritten By: WFG National Title Insurance Company** |

| | Place of Settlement<br>**TransAct Title - Galleria**<br>**6117 Richmond Ave, Suite 250**<br>**Houston, TX 77057** | I. Settlement Date<br>**5/23/2018**<br>Fund: |
|---|---|---|

| J. Summary of Borrower's Transaction | | | K. Summary of Seller's Transaction | | |
|---|---|---|---|---|---|
| **100. Gross Amount Due from Borrower** | | | **400. Gross Amount Due to Seller** | | |
| 101.  Contract Sales Price | | | 401.  Contract Sales Price | | $79,500,000.00 |
| 102.  Personal Property | | | 402.  Personal Property | | |
| 103.  Settlement Charges to borrower | | | 403. | | |
| 104. | | | 404. | | |
| 105. | | | 405. | | |
| **Adjustments for items paid by seller in advance** | | | **Adjustments for items paid by seller in advance** | | |
| 106.  City property taxes | | | 406.  City property taxes | | |
| 107.  County property taxes | | | 407.  County property taxes | | |
| 108.  Assessment Taxes | | | 408.  Assessment Taxes | | |
| 109.  School property taxes | | | 409.  School property taxes | | |
| 110.  MUD taxes | | | 410.  MUD taxes | | |
| 111.  Other taxes | | | 411.  Other taxes | | |
| 112. | | | 412. | | |
| 113. | | | 413. | | |
| 114. | | | 414. | | |
| 115. | | | 415. | | |
| 116. | | | 416. | | |
| **120. Gross Amount Due From Borrower** | | | **420.  Gross Amount Due to Seller** | | $79,500,000.00 |
| **200. Amounts Paid By Or in Behalf Of Borrower** | | | **500. Reductions in Amount Due to Seller** | | |
| 201.  Deposit or earnest money | | | 501.  Excess Deposit | | |
| 202.  Principal amount of new loan(s) | | | 502.  Settlement Charges to Seller (line 1400) | | $206,079.65 |
| 203.  Existing loan(s) taken subject to | | | 503.  Existing Loan(s) Taken Subject to | | |
| 204.  Mezzanine financing | | | 504.  Payoff of first mortgage loan | | $46,174,360.27 |
| 205. | | | 505.  Payoff of second mortgage loan | | $3,039,080.50 |
| 206. | | | 506.  Escrow Reserve (Lee at all) | | $50,000.00 |
| 207.  Earnest Money pd directly | | | 507.  Earnest Money pd directly | | $100.00 |
| 208. | | | 508.  CPate Family Investment Payoff | | $608,007.88 |
| 209.    ' | | | 509.  CC Multifamily G.P. Payoff | | $608,007.88 |
| **Adjustments for items unpaid by seller** | | | **Adjustments for items unpaid by seller** | | |
| 210.  City property taxes | | | 510.  City property taxes | | |
| 211.  County property taxes      01/01/18  05/23/18 | | | 511.  County property taxes      01/01/18  05/23/18 | | $363,777.29 |
| 212.  Assessment Taxes | | | 512.  Assessment Taxes | | |
| 213.  School property taxes | | | 513.  School property taxes | | |
| 214.  MUD taxes | | | 514.  MUD taxes | | |
| 215.  Other taxes | | | 515.  Other taxes | | |
| 216. | | | 516. | | |
| 217. | | | 517. | | |
| 218.  SELLER CREDIT TO BUYER | | | 518.  SELLER CREDIT TO BUYER | | $14,730,332.38 |
| 219. | | | 519. | | |
| **220. Total Paid By/For Borrower** | | | **520. Total Reduction Amount Due Seller** | | $65,779,745.85 |
| **300. Cash At Settlement From/To Borrower** | | | **600. Cash At Settlement To/From Seller** | | |
| 301.  Gross Amount due from borrower (line 120) | | | 601.  Gross Amount due to seller (line 420) | | $79,500,000.00 |
| 302. Less amounts paid by/for borrower (line 220) | | | 602.  Less reductions in amt. due seller (line 520) | | $65,779,745.85 |
| **303. Cash  Borrower** | | | **603. Cash To Seller** | | $13,720,254.15 |

**L. Settlement Charges**

| | | | | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|---|---|
| **700. Total Sales/Broker's Commission based on price** | | @ % = | | | |
| Division of Commission (line 700) as follows: | | | | | |
| 701. | to | | | | |
| 702. | to | | | | |
| 703. | | | | | |
| **800. Items Payable in Connection with Loan** | | | | | |
| 801. Loan Origination Fee    % | to | | | | |
| 802. Loan Discount    % | to | | | | |
| 803. Appraisal Fee | to | | | | |
| 804. Attorney Fees  (Invoice needed) | to | Baker & McKenzie LLP | | | |
| 805. Senior Loan | to | Polsinelli | | | |
| 806. Mezzanine Loan | to | Polsinelli | | | |
| 807. Equity / Joint Venture | to | Polsinelli | | | |
| 808. Commitment fee (Mezzanine lender) | to | Naissance Galleria, LLC | | | |
| 809. Interest 5/24/18 end 5/29/18 | to | National Bank of Kuwait, S.A.K.P., New York Branch, a banking corporation organized under the laws of Kuwait, acting through its New York branch | | | |
| 810. Interest 5/29/18 end 6/1/18 | to | National Bank of Kuwait, S.A.K.P., New York Branch, a banking corporation organized under the laws of Kuwait, acting through its New York branch | | | |
| 811. Interest Reserve Deposit | to | National Bank of Kuwait, S.A.K.P., New York Branch, a banking corporation organized under the laws of Kuwait, acting through its New York branch | | | |
| 812. 50 bps Upfront Fee | to | National Bank of Kuwait, S.A.K.P., New York Branch, a banking corporation organized under the laws of Kuwait, acting through its New York branch | | | |
| **900. Items Required by Lender To Be Paid in Advance** | | | | | |
| 901. Interest from   5/23/2018  to   6/1/2018 @ $0/day | | | | | |
| 902. Mortgage Insurance Premium for  months | to | | | | |
| 903. Hazard Insurance Premium for  years | to | HANDLED OUTSIDE OF | | | |
| **1000. Reserves Deposited With Lender** | | | | | |
| 1001. Hazard insurance | months @ | per month | | | |
| 1002. Mortgage insurance | months @ | per month | | | |
| 1003. City property taxes | months @ | per month | | | |
| 1004. County property taxes | months @ | per month | | | |
| 1005. Assessment Taxes | months @ | per month | | | |
| 1006. School property taxes | months @ | per month | | | |
| 1007. MUD taxes | months @ | per month | | | |
| 1008. Other taxes | months @ | per month | | | |
| 1011. Aggregate Adjustment | | | | | |
| **1100. Title Charges** | | | | | |
| 1101. Settlement or closing fee | to | TransAct Title, LLC-Settlement Fees | | | $2,500.00 |
| 1102. Abstract or title search | to | | | | |
| 1103. Title examination | to | | | | |
| 1104. Title insurance binder | to | TransAct Title, LLC | | | |
| 1105. Document preparation (Curative) | to | Umatiya Law Firm, LLC | | | $1,250.00 |
| 1106. Notary fees | to | | | | |
| 1107. Attorney's fees | to | | | | |
| (includes above items numbers: | | ) | | | |
| 1108. Title insurance | to | TransAct Title, LLC | | | $175,601.00 |
| (includes above items numbers: | | ) | | | |
| 1109. Lender's coverage | $51,675,000.00/$13,533.10 | | | | |
| 1110. Owner's coverage | $79,500,000.00/$237,161.35 | | | | |
| 1111. Escrow fee | to | TransAct Title, LLC | | | |
| 1112. Guaranty Assessment Recoupment Fee | to | Texas Title Insurance Guaranty Association | | | $4.50 |
| 1113. Courier Service | to | TransAct Title-Courier | | | $75.00 |
| 1114. Erecording Fee | to | TransAct Title, LLC-Recording | | | $20.00 |
| 1115. Document Review | to | Umatiya Law Firm, PLLC | | | |
| 1116. Non-Imputation Endorsement | to | TransAct Title, LLC | | | |
| 1117. Adjustable Mortgage Loan | to | TransAct Title, LLC | | | |
| 1118. Survey Amendment (OTP only) | to | TransAct Title, LLC | | | $26,340.15 |
| 1119. Not yet due/payable (MTP & BIN | to | TransAct Title, LLC | | | |
| 1120. T19 Non-Res. Endorsemen | to | TransAct Title, LLC | | | |
| 1121. Access Endorsement | to | TransAct Title, LLC | | | |
| 1122. Contiguity Endorsement | to | TransAct Title, LLC | | | |
| 1123. MSD MTP T-19.2 End | to | TransAct Title, LLC | | | |
| 1124. MSD MTP T-19.3 End | to | TransAct Title, LLC | | | |
| 1125. REM OTP T-19.1 No Amendment | to | TransAct Title, LLC | | | |
| 1126. MSD OTP T-19.2 End | to | TransAct Title, LLC | | | |
| 1127. MSD OTP T-19.3 End | to | TransAct Title, LLC | | | |
| **1200. Government Recording and Transfer Charges** | | | | | |
| 1201. Recording Fees    Deed $44.00 ; Mortgage $184.00 , Rel $200.00    to TransAct Title, LLC-Recording | | | | | $200.00 |
| 1202. City/county tax/stamps    Deed ; Mortgage    to | | | | | |
| 1203. State tax/stamps    Deed ; Mortgage    to | | | | | |
| 1204. Tax certificates | to | Kirby TaxNet, Inc. | | | $89.00 |

| 1205 | | to | | | |
|------|---|-----|----|---|---|
| **1300. Additional Settlement Charges** | | | | | |
| 1301 | Survey | to | South Texas Surveying & Associates, Inc. | | |
| 1302 | Pest Inspection | to | | | |
| 1303 | HOA Transfer Fee | to | | | |
| 1304 | Home Warranty | to | | | |
| 1305 | Third Parties - Appraisal | to | Jack W. Bass II, MAI | | |
| 1306 | Promotion | to | NAZAR (INVOICE NEEDED) | | |
| 1307 | Promotion | to | Eastil Secured LLC | | |
| 1308 | BBG Third Parties -ESA | to | AWA, LLC dba BBG Assessment | | |
| 1309 | BBG Third Parties - PCA | to | AWA, LLC dba BBG Assessment | | |
| 1310 | Third Parties - Valuations | to | Hibco Services, LLC | | |
| 1311 | UCCPlus Policy Premium | to | UCCPlus Insurance | | |
| 1312 | | to | | | |
| 1313 | | to | | | |
| 1314 | | to | | | |
| 1315 | | to | | | |
| **1400. Total Settlement Charges (enter on lines 103, Section J and 502, Section K)** | | | | | **$206,079.65** |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction. I further certify that I have received a completed copy of pages 1, 2 and 3 of this HUD-1 Settlement Statement.

**GALLERIA 2425 OWNER, LLC**
a Delaware limited liability company

By:  Galleria 2425 JV, LLC
    a Delaware limited liability company,
    its sole member

    By:  Naissance Capital Real Estate, LLC
        a Delaware limited liability company
        its Managing Member

        By:_____
          Azeemeh Zaheer, Managing Member

**2425 WL LLC,**
**a New York Limited Liability Company**

By:_____
    **Adam Broder, Sole Member**

SETTLEMENT AGENT CERTIFICATION
The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction. I have caused the funds to be disbursed in accordance with this statement.

_____  5-24-18
Settlement Agent              Date

001814

A. **Settlement Statement**

| B. Type of Loan | | |
|---|---|---|
| 1. ☐ FHA   2. ☐ FmHA   3. ☐ Conv Unins | 6. File Number | 7. Loan Number | 8. Mortgage Ins Case Number |
| 4. ☐ VA   5. ☐ Conv Ins.   6. ☐ Seller Finance | 12000990 | | |
| 7. ☐ Cash Sale | | | |

C. Note:   This form is furnished to give you a statement of actual settlement costs. Amounts paid to and by the settlement agent are shown. Items marked "(p.o.c.)" were paid outside the closing; they are shown here for informational purposes and are not included in the totals.

| D. Name & Address of Borrower | E. Name & Address of Seller | F. Name & Address of Lender |
|---|---|---|
| Galleria 2425 Owner, LLC, a Delaware limited liability company<br>60 W 2nd St<br>Freeport, NY 11520 | 2425 WL, LLC, a New York Limited Liability Company<br>2500 West Loop South, Suite 255<br>Houston, TX 77027 | National Bank of Kuwait, S.A.K.P., New York Branch, a banking corporation organized under the laws of Kuwait, acting through its New York branch<br>299 Park Avenue<br>New York, NY 10171 |

| G. Property Location | H. Settlement Agent Name |
|---|---|
| TR 31D ABST 836 W WHITE<br>2425 W Loop S<br>Houston , TX 77027 | TransAct Title - Galleria<br>6117 Richmond Ave, Suite 250<br>Houston, TX 77057   Tax ID: 45-3483105<br>Underwritten By: WFG National Title Insurance Company |

| Place of Settlement | I. Settlement Date |
|---|---|
| TransAct Title - Galleria<br>6117 Richmond Ave, Suite 250<br>Houston, TX 77057 | 5/23/2018<br>Fund: |

| J. Summary of Borrower's Transaction | | K. Summary of Seller's Transaction | |
|---|---|---|---|
| **100. Gross Amount Due from Borrower** | | **400. Gross Amount Due to Seller** | |
| 101. Contract Sales Price | $79,500,000.00 | 401. Contract Sales Price | |
| 102. Personal Property | | 402. Personal Property | |
| 103. Settlement Charges to borrower | $3,369,209.67 | 403. | |
| 104. | | 404. | |
| 105. | | 405. | |
| Adjustments for items paid by seller in advance | | Adjustments for items paid by seller in advance | |
| 106. City property taxes | | 406. City property taxes | |
| 107. County property taxes | | 407. County property taxes | |
| 108. Assessment Taxes | | 408. Assessment Taxes | |
| 109. School property taxes | | 409. School property taxes | |
| 110. MUD taxes | | 410. MUD taxes | |
| 111. Other taxes | | 411. Other taxes | |
| 112. | | 412. | |
| 113. | | 413. | |
| 114. | | 414. | |
| 115. | | 415. | |
| 116. | | 416. | |
| **120. Gross Amount Due From Borrower** | $82,869,209.67 | **420. Gross Amount Due to Seller** | |
| **200. Amounts Paid By Or in Behalf Of Borrower** | | **500. Reductions in Amount Due to Seller** | |
| 201. Deposit or earnest money | | 501. Excess Deposit | |
| 202. Principal amount of new loan(s) | $51,675,000.00 | 502. Settlement Charges to Seller (line 1400) | |
| 203. Existing loan(s) taken subject to | | 503. Existing Loan(s) Taken Subject to | |
| 204. Mezzanine financing | $16,100,000.00 | 504. Payoff of first mortgage loan | |
| 205. | | 505. Payoff of second mortgage loan | |
| 206. | | 506. | |
| 207. Earnest Money pd directly | $100.00 | 507. Earnest Money pd directly | |
| 208. | | 508. | |
| 209. | | 509. | |
| Adjustments for items unpaid by seller | | Adjustments for items unpaid by seller | |
| 210. City property taxes | | 510. City property taxes | |
| 211. County property taxes   01/01/18 05/23/18 | $363,777.29 | 511. County property taxes   01/01/18 05/23/18 | |
| 212. Assessment Taxes | | 512. Assessment Taxes | |
| 213. School property taxes | | 513. School property taxes | |
| 214. MUD taxes | | 514. MUD taxes | |
| 215. Other taxes | | 515. Other taxes | |
| 216. | | 516. | |
| 217. | | 517. | |
| 218. | | 518. | |
| 219. | | 519. | |
| **220. Total Paid By/For Borrower** | $68,138,877.29 | **520. Total Reduction Amount Due Seller** | |
| **300. Cash At Settlement From/To Borrower** | | **600. Cash At Settlement To/From Seller** | |
| 301. Gross Amount due from borrower (line 120) | $82,869,209.67 | 601. Gross Amount due to seller (line 420) | |
| 302. Less amounts paid by/for borrower (line 220) | $68,138,877.29 | 602. Less reductions in amt. due seller (line 520) | |
| **303. Cash From Borrower** | $14,730,332.38 | **603. Cash To Seller** | |

**L. Settlement Charges**

| 700. Total Sales/Broker's Commission based on price | | @ % = | Paid From Borrower's Funds at Settlement | Paid From Seller's Funds at Settlement |
|---|---|---|---|---|
| Division of Commission (line 700) as follows: | | | | |
| 701. | to | | | |
| 702. | to | | | |
| 703. | | | | |
| **800. Items Payable in Connection with Loan** | | | | |
| 801. Loan Origination Fee     % | to | | | |
| 802. Loan Discount          % | to | | | |
| 803. Appraisal Fee | to | | | |
| 804. Attorney Fees (Invoice needed) | to   Baker & McKenzie LLP | | $150,237.25 | |
| 805. Senior Loan | to   Polsinelli | | $67,200.25 | |
| 806. Mezzanie Loan | to   Polsinelli | | $64,340.00 | |
| 807. Equity / Joint Venture | to   Polsinelli | | $26,417.00 | |
| 808. Commitment fee (Mezzanie lender) | to   Naissance Galleria, LLC | | $161,000.00 | |
| 809. Interest 5/24/18 end 5/29/18 | to   National Bank of Kuwait, S.A.K.P., New York Branch, a banking corporation organized under the laws of Kuwait, acting through its New York branch | | $32,308.29 | |
| 810. Interest 5/29/18 end 6/1/18 | to   National Bank of Kuwait, S.A.K.P., New York Branch, a banking corporation organized under the laws of Kuwait, acting through its New York branch | | $24,287.25 | |
| 811. Interest Reserve Deposit | to   National Bank of Kuwait, S.A.K.P., New York Branch, a banking corporation organized under the laws of Kuwait, acting through its New York branch | | $2,500,000.00 | |
| 812. 50 bps Upfront Fee | to   National Bank of Kuwait, S.A.K.P., New York Branch, a banking corporation organized under the laws of Kuwait, acting through its New York branch | | $258,375.00 | |
| **900. Items Required by Lender To Be Paid in Advance** | | | | |
| 901. Interest from          @ $0/day | | | | |
| 902. Mortgage Insurance Premium for  months | to | | | |
| 903. Hazard Insurance Premium for  years | to   HANDLED OUTSIDE OF SETTLEMENT | | | |
| **1000. Reserves Deposited With Lender** | | | | |
| 1001. Hazard insurance | months @ | per month | | |
| 1002. Mortgage insurance | months @ | per month | | |
| 1003. City property taxes | months @ | per month | | |
| 1004. County property taxes | months @ | per month | | |
| 1005. Assessment Taxes | months @ | per month | | |
| 1006. School property taxes | months @ | per month | | |
| 1007. MUD taxes | months @ | per month | | |
| 1008. Other taxes | months @ | per month | | |
| 1011. Aggregate Adjustment | | | | |
| **1100. Title Charges** | | | | |
| 1101. Settlement or closing fee | to   TransAct Title, LLC-Settlement Fees | | $2,500.00 | |
| 1102. Abstract or title search | to | | | |
| 1103. Title examination | to | | | |
| 1104. Title insurance binder | to   TransAct Title, LLC | | | |
| 1105. Document preparation (Curative) | to   Umatiya Law Firm, LLC | | | |
| 1106. Notary fees | to | | | |
| 1107. Attorney's fees | to | | | |
| (includes above items numbers: | | ) | | |
| 1108. Title insurance | to   TransAct Title, LLC | | $100.00 | |
| (includes above items numbers: | | ) | | |
| 1109. Lender's coverage | $51,675,000.00/$13,533.10 . | | | |
| 1110. Owner's coverage | $79,500,000.00/$237,161.35 | | | |
| 1111. Escrow fee | to   TransAct Title, LLC | | | |
| 1112. Guaranty Assessment Recoupment Fee | to   Texas Title Insurance Guaranty Association | | $4.50 | |
| 1113. Courier Service | to   TransAct Title-Courier | | $150.00 | |
| 1114. Erecording Fee | to   TransAct Title, LLC-Recording | | $20.00 | |
| 1115. Document Review | to   Umatiya Law Firm, PLLC | | | |
| 1116. Non-Imputation Endorsement | to   TransAct Title, LLC | | $8,780.05 | |
| 1117. Adjustable Mortgage Loan | to   TransAct Title, LLC | | $20.00 | |
| 1118. Survey Amendment (OTP only) | to   TransAct Title, LLC | | | |
| 1119. Not yet due/payable (MTP & BIN) | to   TransAct Title, LLC | | $5.00 | |
| 1120. T19 Non-Res. Endorsemen | to   TransAct Title, LLC | | $13,108.10 | |
| 1121. Access Endorsement | to   TransAct Title, LLC | | $100.00 | |
| 1122. Contiguity Endorsement | to   TransAct Title, LLC | | $100.00 | |
| 1123. MSD MTP T-19.2 End | to   TransAct Title, LLC | | $50.00 | |
| 1124. MSD MTP T-19.3 End | to   TransAct Title, LLC | | $50.00 | |
| 1125. REM OTP T-19.1 No Amendment | to   TransAct Title, LLC | | $26,340.15 | |
| 1126. MSD OTP T-19.2 End | to   TransAct Title, LLC | | $50.00 | |
| 1127. MSD OTP T-19.3 End | to   TransAct Title, LLC | | $50.00 | |
| **1200. Government Recording and Transfer Charges** | | | | |
| 1201. Recording Fees    Deed $44.00 ; Mortgage $184.00 ; Rel $200.00    to TransAct Title, LLC-Recording | | | $228.00 | |
| 1202. City/county tax/stamps    Deed ; Mortgage | to | | | |
| 1203. State tax/stamps    Deed ; Mortgage | to | | | |



001816

| | | | | |
|---|---|---|---|---|
| 1204. Tax certificates | to | Kirby TaxNet, Inc. | | |
| 1205. | to | | | |
| **1300.  Additional Settlement Charges** | | | | |
| 1301.  Survey | to | South Texas Surveying & Associates, Inc. | $3,193.38 | |
| 1302.  Pest Inspection | to | | | |
| 1303.  HOA Transfer Fee | to | | | |
| 1304.  Home Warranty | to | | | |
| 1305.  Third Parties - Appraisal | to | Jack W. Bass II, MAI | $2,000.00 | |
| 1306.  Promotion | to | NAZAR (INVOICE NEEDED) | $1,200.00 | |
| 1307.  Promotion | to | Eastil Secured LLC | $5,979.00 | |
| 1308.  BBG Third Parties -ESA | to | AWA, LLC dba BBG Assessment | $2,450.00 | |
| 1309.  BBG Third Parties - PCA | to | AWA, LLC dba BBG Assessment | $2,650.00 | |
| 1310.  Third Parties - Valuations | to | Hibco Services, LLC | $3,731.00 | |
| 1311.  UCCPlus Policy Premium | to | UCCPlus Insurance | $12,185.45 | |
| 1312. | to | | | |
| 1313. | to | | | |
| 1314. | to | | | |
| 1315. | to | | | |
| **1400. Total Settlement Charges (enter on lines 103, Section J and 502, Section K)** | | | $3,369,209.67 | |

I have carefully reviewed the HUD-1 Settlement Statement and to the best of my knowledge and belief, it is a true and accurate statement of all receipts and disbursements made on my account or by me in this transaction.  I further certify that I have received a completed copy of pages 1, 2 and 3 of this HUD-1 Settlement Statement.

**GALLERIA 2425 OWNER, LLC**
a Delaware limited liability company

By:  Galleria 2425 JV, LLC
a Delaware limited liability company,
its sole member

By:  Naissance Capital Real Estate, LLC
a Delaware limited liability company,
its Managing Member

By: _____
Azeemeh Zaheer, Managing Member

**2425 WL LLC,**
**a New York Limited Liability Company**

By: _____
Adam Broder, Sole Member

SETTLEMENT AGENT CERTIFICATION
The HUD-1 Settlement Statement which I have prepared is a true and accurate account of this transaction.  I have caused the funds to be disbursed in accordance with this statement.

_____      _____
Settlement Agent                                        Date
**Warning:** It is a crime to knowingly make false statements to the United States on this or any other similar form.  Penalties upon conviction can include a fine and imprisonment.  For details see: Title 18 U.S. Code Section 1001 and Section 1010.

| | | |
|---|---|---|
| Previous Editions are Obsolete | Page 3 | form **HUD-1** (3/86) |
| | | Handbook 4305.2 |

001817

001818

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GALLERIA 2425 OWNER, LLC, | ) | |
| | ) | Case No. 23-34815 |
| Debtor. | ) | |
| | ) | |

**TRUSTEE'S OMNIBUS OBJECTION TO CLAIM NOS. 21 AND 22 OF ALI CHOUDHRI**

**THIS IS AN OBJECTION TO YOUR CLAIM. THIS OBJECTION ASKS THE COURT TO DISALLOW THE CLAIM THAT YOU FILED IN THIS BANKRUPTCY CASE. IF YOU DO NOT FILE A RESPONSE WITHIN 30 DAYS AFTER THE OBJECTION WAS SERVED ON YOU, YOUR CLAIM MAY BE DISALLOWED WITHOUT A HEARING.**

**A HEARING HAS BEEN SET ON THIS MATTER ON <u>JULY 24, 2024, at 11:00 A.M. (CENTRAL TIME)</u> IN COURTROOM 403, 4TH FLOOR, UNITED STATES BANKRUPTCY COURT FOR SOUTHERN DISTRICT OF TEXAS, 515 RUSK AVENUE, HOUSTON, TEXAS 77002.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

Christopher R. Murray, in his capacity as chapter 11 trustee in the above-captioned case (the "<u>Trustee</u>"), hereby files this objection (the "<u>Objection</u>") to Claim Nos. 21 and 22 (the "<u>Claims</u>") filed by Ali Choudhri ("<u>Choudhri</u>"). In support of this Objection, the Trustee respectfully states as follows:

**JURISDICTION AND VENUE**

1.      This Court has jurisdiction to consider this Objection pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The Court has the authority to enter the requested relief under sections 502(b) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

3.      The Trustee consents, pursuant to Bankruptcy Rule 7008, to the entry of a final order by the Court in connection with this Objection.

## BACKGROUND & RELEVANT FACTS

### A.  Chapter 11 Case

4.      On December 5, 2023 (the "Petition Date"), Galleria 2425 Owner, LLC (the "Debtor") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court" or the "Court").

5.      The Court entered an order [Bankr. Dkt. No. 116] approving the Trustee's appointment as chapter 11 trustee in the Bankruptcy Case on February 9, 2024.

### B.  Claim No. 21

6.      On April 9, 2021, Choudhri filed Claim No. 21 (Claim No. 21) with the Court asserting a secured claim in the amount of $4,176,657.46 against the Debtor.

7.      The apparent basis for Claim No. 21 are tax loans between the Debtor and Caz Creek TX II, LLC (the "Caz Creek Tax Loans").

8.      As reflected in the documentation to Claim No. 21, the Caz Creek Tax Loans were assigned to Ali Choudhri.

9.      However, as reflected in the Assignment of Tax Liens attached hereto as Exhibit A (the "NBK Assignment") the Caz Creek Tax Loans were subsequently assigned from Ali Choudhri to the National Bank of Kuwait, S.A.K.P. ("NBK"). The NBK Assignment was signed by Ali

Choudhri, acknowledged before Scarlet MacGeorge acting as a notary, and filed with the real property records of Harris County, Texas.

**C. Claim No. 22**

10.     On April 9, 2021, Choudhri filed Claim No. 22 ("Claim No. 22") with the Court asserting an unsecured claim in the amount of $1,844,500.45 against the Debtor.

11.     The purported documentation in support of Claim No. 22 consisted of an email from Charles Conrad—one of NBK's attorneys at Pillsbury Winthrop Shaw Pittman LLP—that provides no basis for the amount indicated in Claim No. 22 being an obligation of the Debtor to Choudhri. The amounts do not even match up. Payments of $961,959.08 of payments are indicated in the documentation to Claim No. 22.

12.     While not expressly indicated in Claim No. 22 or the documentation thereto, amounts reflected in the documentation to Claim No. 22 were paid to NBK pursuant to the Confidential Settlement Agreement dated August 22, 2022. The Debtor, under Choudhri's direction, has filed a copy of the Confidential Settlement Agreement on the docket and NBK has agreed to waive confidentiality. A copy of the Confidential Settlement Agreement is attached hereto as Exhibit B.

## OBJECTION

13.     Bankruptcy Code § 502(b)(1) provides that a claim asserted should not be allowed to the extent that the "claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured . . . ."

14.     As demonstrated by the NBK Assignment, Ali Choudhri transferred his interest in the Caz Creek Tax Loans to NBK. The claim asserted in Claim No. 21 does not reflect an enforceable obligation of the Debtor to Ali Choudhri.

3

15.     The documentation attached to Claim No. 22 provides no basis for the asserted claim. Form 410 indicates that the basis for the claim was "bond payment on behalf of the Debtor and legal advances" but that is not supported by the documentation attached to Claim No. 22.

16.     Even if the payments from the Debtor to NBK were made by Ali Choudhri, there is no basis to determine that Choudhri is entitled to a claim against the Debtor on account of such payments. Claim No. 22 provides no documentation showing that these payments were to be considered loans rather than equity contributions from Choudhri. Further, Choudhri received a release from NBK under the Confidential Settlement Agreement and therefore received direct value on account of any payments he made.

WHEREFORE, the Trustee respectfully requests that the Court enter an order, substantially in the form attached hereto, disallowing Claim Nos. 21 and Claim 22 in their entirety and granting such other relief as is just and equitable.

Dated: June 3, 2024

Respectfully submitted,

SHANNON & LEE LLP

/s/R. J. Shannon
Kyung S. Lee (TBA No. 12128400)
R. J. Shannon (TBA No. 24108062)
2100 Travis Street, STE 1525
Houston, TX 77002
Telephone: (713) 714-5770
Email: klee@shannonleellp.com
        rshannon@shannonleellp.com

*Counsel to Christopher R. Murray, Chapter 11 Trustee*

001822

## <u>CERTIFICATE OF SERVICE</u>

   I hereby certify that on June 3, 2024, the forgoing document was served (i) through the Court's CM/ECF System on all parties registered to receive such service and (ii) separately by U.S.P.S first class mail, postage prepaid, and email on the following parties:

Ali Choudhri
2425 West Loop S, 11th Floor
Houston, TX 77027
ali@jetallcapital.com

Ali Choudhri
1001 West Loop South, Suite 700
Houston, TX 77027
ali@jetallcapital.com

          */s/R. J. Shannon*
          R. J. Shannon

001823

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GALLERIA 2425 OWNER, LLC, | ) | |
| | ) | Case No. 23-34815 |
| Debtor. | ) | |
| | ) | |

**ORDER SUSTAINING TRUSTEE'S OMNIBUS OBJECTION TO CLAIM NOS. 21 AND 22 OF ALI CHOUDHRI**

(Relates to Dkt. No. _____)

Upon the objection (the "Objection") of Christopher R. Murphy, chapter 11 trustee in the above-captioned case (the "Trustee") seeking entry of this order (this "Order") sustaining the *Trustee's Omnibus Objection to Claim Nos. 21 and 22 of Ali Choudhri*; and this court having jurisdiction over this matter pursuant to 28 U.S.C § 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157 (b)(2); and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Objection in this district is permissible pursuant to 28 U.S.C §§ 1408 and 1409; and this Court having found that notice of the Objection and opportunity for a hearing on the Objection were  appropriate under the circumstances and no other notice need be provided; and this Court having reviewed and considered the Objection and any statements in support of the relief requested therein; and this Court having determined that the legal and factual bases set forth in the Objection and at any hearing thereon establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Objection is sustained as set forth herein.

2.      Any response to the Objection not otherwise withdrawn, resolved, or adjourned is hereby overruled on its merits.

3.      Claim No. 21 and Claim No. 22 filed by Ali Choudhri are each hereby disallowed in their entirety.

4.      This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.


Dated: _____, 2024

_____
**UNITED STATES BANKRUPTCY JUDGE**


Proposed Order Submitted By:

*/s/R. J. Shannon*_____
Kyung S. Lee (TBA No. 12128400)
R. J. Shannon (TBA No. 24108062)
SHANNON & LEE LLP
2100 Travis Street, STE 1525
Houston, TX 77002
Telephone: (713) 714-5770
Facsimile: (833) 714-5770
Email: klee@shannonleellp.com
        rshannon@shannonleellp.com

*Counsel to Christopher R. Murray, Chapter 11 Trustee*

001825

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|                                      |   |                        |
|--------------------------------------|---|------------------------|
| IN RE:                               | ) |                        |
|                                      | ) | CHAPTER 11             |
| GALLERIA 2425 OWNER, LLC,            | ) |                        |
|                                      | ) | Case No. 23-34815      |
| Debtor.                              | ) |                        |
|                                      | ) |                        |

**DECLARATION OF CHRISTOPHER R. MURRAY IN SUPPORT OF TRUSTEE'S**
**OMNIBUS OBJECTION TO CLAIM NOS. 21 AND 22 OF ALI CHOUDHRI**

I, Christopher R. Murray, hereby declare under penalty of perjury as follows:

1.      Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my discussions with my counsel retained in this case, my experience as a trustee and bankruptcy attorney, and/or my review of relevant documents and information relevant to the above-captioned case. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

2.      I am the chapter 11 trustee in the bankruptcy case of Galleria 2425 Owner, LLC, Case No. 23-34815.

3.      I have been the chapter 11 trustee of the Debtor's case since February 9, 2024. In my role as trustee, I have become familiar with the Debtor's operations, the Debtor's assets and liabilities, and the various pleadings and filings with the U.S. Bankruptcy Court for the Southern District of Texas.

4.      The Trustee's Omnibus Objection to Claim Nos. 21 and 22 of Ali Choudhri (the "Objection")[1] is the result of the investigation that I have conducted and directed my attorneys to

---

[1] Capitalized terms used, but not defined in this Declaration have the meanings ascribed to such terms in the Objection.

conduct in the above-captioned case. I have read the Objection, and to the best of my knowledge, information, and belief, the factual assertions made in the Objection are accurate.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 3, 2024

_____
Christopher R. Murray, Chapter 11 Trustee

2

001827

# **EXHIBIT A**

NBK Assignment

RP-2023-248173
07/03/2023   ER   $42.00

**ASSIGNMENT OF TAX LIENS**
Secured by Section 32.06 Tax Lien Transfer

Date: August 26, 2022

| Holder of Note and Lien ("Transferor"):<br>Ali Choudhri<br>1001 West Loop South, Suite 700<br>Houston, TX 77027 | Transferee ("Transferee"):<br>National Bank of Kuwait, S.A.K.P., New York Branch<br>299 Park Avenue<br>New York, NY 10171 | Note (the "Note"):<br>Tax Payment Agreement dated as of the Loan Date made by Borrower in favor of Caz Creek TX II, LLC (the "Original Transferor") in the amount of the Original Balance |
|---|---|---|
| Borrower:<br>Galleria 2425 Owner, LLC | Original Balance:<br>$1,696,384.85 | Maturity Date:<br>February 1, 2030 |
| | | Tax Account Number(s):<br>0451400060400 |
| Liens (the "Liens"): | | |
| Tax Lien Contract Recorded as Instrument No(s).: RP-2020-237529, Real Property Records of Harris County, TX | Tax Lien Transfer Recorded as Instrument No(s).: RP-2020-112204, Real Property Records of Harris County, TX | First Assignment of Tax Lien Recorded as Instrument No(s): RP-2021-508701, Real Property Records of Harris County, TX |
| Tax Lien Contract Recorded as Instrument No(s).: RP-2021-252144, Real Property Records of Harris County, TX | Tax Lien Transfer Recorded as Instrument No(s).: RP-2021-280403, Real Property Records of Harris County, TX | First Assignment of Tax Lien Recorded as Instrument No(s): RP-2021-508702, Real Property Records of Harris County, TX |
| County: Harris County, TX | | |
| Property Address and Description: 2425 West Loop South, Houston, TX 77027 and more particularly described in Exhibit A attached hereto and incorporated by reference herein (the "Property"). | | |

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Transferor hereby transfers, assigns, grants, and conveys unto Transferee, effective the date first written above and subject to the terms set forth in that certain Confidential Settlement Agreement involving Transferor and Transferee dated August 22, 2022 (the "Settlement Agreement"), the Note, Liens, and any and all other related loan documents, including other agreements, instruments and other collateral which evidence, secure or otherwise relate to Transferor's right, title or interest in the Note and Liens.  Transferor warrants that the Liens are valid against the Property in the priority indicated and the above loan information is true and correct.  Transferee warrants that, pursuant to the Settlement Agreement, it will not take any actions during the "Foreclosure Forbearance Period" (as such term is defined in the Settlement Agreement) to: (a) foreclose upon, extinguish, or otherwise invalidate the Liens, or (b) merge the Note or Liens into the outstanding amount owed pursuant to that certain Loan Agreement between Transferee and Galleria 2425 Owner, LLC dated May 23, 2018.

RP-2023-248173

001829



**Transferor:**

Ali Choudhri

By: _____
Ali Choudhri

STATE OF TEXAS          §
COUNTY OF HARRIS        §

This instrument was acknowledged before me on August 31st, 2022 by Ali Choudhri on behalf of himself individually.



Notary Public State of Texas

**After recording, return to:**
National Bank of Kuwait, S.A.K.P., New York Branch
c/o Charles C. Conrad
Pillsbury Winthrop Shaw Pittman, LP
909 Fannin St., Suite 2000
Houston, TX 77010

SCARLET MACGEORGE
My Notary ID # 124519627
Expires April 9, 2023

RP-2023-248173

Page 2 of 8    Wednesday, April 3, 2024

County Clerk Harris County, Texas

2

001830

EXHIBIT A
PROPERTY DESCRIPTION

Real property in the City of Houston, County of Harris and State of Texas, described as follows:

Tract 1: Fee Tract

BEING 2.4462 ACRES (106,557 SQUARE FEET) OF LAND OUT OF THE WILLIAM WHITE SURVEY, ABSTRACT NO. 836, HOUSTON, HARRIS COUNTY, TEXAS, BEING THE SAME PROPERTY CONVEYED TO 2425 WEST LOOP, LP BY SPECIAL WARRANTY DEED RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20070732472, SAID TRACT CONVEYED BY DEED TO ONE WEST LOOP PLAZA, LTD. UNDER HCCF NO. S547896 AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE WESTHEIMER ROAD (ROW VARIES) BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 204.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST, TO A 1/2 INCH IRON ROD FOUND AT THE NORTHEAST CORNER OF THE 2.3468 ACRE PARCEL BEING THE SOUTHEAST CORNER OF THE HEREIN DESCRIBED PARCEL AND THE POINT OF BEGINNING;

THENCE, WESTERLY ALONG THE COMMON LINE OF THE 2.3468 ACRE PARCEL TO THE SOUTH AND THE HEREIN DESCRIBED PARCEL TO THE NORTH, SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 464.50 FEET TO A POINT ON THE EASTERLY RIGHT OF WAY (ROW) LINE OF INTERSTATE 610 WEST LOOP AND THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED PARCEL FROM. WHICH A FOUND RAILROAD SPIKE BEARS SOUTH 21 DEGREES 43 MINUTES EAST 2.42 FEET;

THENCE, NORTHERLY ALONG THE EASTERLY RIGHT OF WAY LINE OF INTERSTATE 610 WEST LOOP (ROW 350 FEET) NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST 251.27 FEET TO AN "X" SET IN CONCRETE BEING THE SOUTHWEST CORNER OF A 7.8998 ACRE PARCEL AS SHOWN ON THE HOUSTON VENTURE PLAT UNRESTRICTED RESERVE "A" FILED IN THE HARRIS COUNTY MAP RECORDS AS FILM CODE NUMBER 356074, AND THE NORTHWEST CORNER OF THE HEREIN DESCRIBED PARCEL;

THENCE, EASTERLY ALONG THE COMMON LINE OF THE ABOVE INDICATED 7.8998 ACRE PARCEL TO THE NORTH AND THE HEREIN DESCRIBED PARCEL TO THE SOUTH NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 406.61 FEET TO AN "X"

[Exhibit A - Property Description]

RP-2023-248173

Page 3 of 8   Wednesday, April 3, 2024      County Clerk Harris County, Texas

001831



FOUND IN THE WESTERLY LINE OF A 3.4385 ACRE PARCEL OF LAND CONVEYED TO RESTPROP, LTD AS RECORDED IN THE HCCF NO. R228886;

THENCE, SOUTHERLY ALONG A COMMON LINE OF THE ABOVE INDICATED 3.4385 ACRE PARCEL TO THE EAST AND THE HEREIN DESCRIBED PARCEL TO THE WEST, SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 244.64 FEET TO THE POINT OF BEGINNING CONTAINING 106,557 SQUARE FEET, 2.4462 ACRES MORE LESS.

NOTE:  WE ARE PROHIBITED FROM INSURING ANY INACCURACY IN STATEMENT AS TO THE QUANTITY OF LAND CONTAINED WITHIN THE BOUNDARIES OF THE LAND DESCRIBED IN SCHEDULE A.

TRACT 2 EASEMENT TRACT: 20 FOOT NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT OVER AND ACROSS A TRACT OF LAND NORTHERLY OF AND 20 FEET WIDE ALONG THE ENTIRE NORTHERLY BOUNDARY LINE OF TRACT I; SAID EASEMENT CREATED AND GRANTED BY VI IAN L. SMITH, INDIVIDUALLY AND AS INDEPENDENT EXECUTRIX OF THE ESTATE OF R. E. SMITH, DECEASED IN THAT CERTAIN GENERAL WARRANTY DEED DATED JULY 5, 1977 FILED IN HCCF NO. F216562 AND DESCRIBED IN HCCF NO. G743294, BEING THE SAME EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 204.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST TO A 1/2 INCH IRON ROD FOUND FOR THE SOUTHEAST CORNER OF TRACT I;

THENCE CONTINUING NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 244.64 FEET ALONG A COMMON LINE OF A PREVIOUSLY NOTED 3.4385 ACRE PARCEL OF LAND TO THE EAST AND TRACT I TO THE WEST TO AN "X" FOUND FOR THE NORTHEAST CORNER OF TRACT I AND THE POINT OF BEGINNING;

[Exhibit A - Property Description]

RP-2023-248173



RP-2023-248173

THENCE, WESTERLY SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 406.61 FEET ALONG THE NORTHERLY LINE OF TRACT I TO AN "X" SET ON THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP (350 FEET WIDE);

THENCE, NORTHERLY NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST 20.54 FEET ALONG THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP TO A POINT;

THENCE, EASTERLY 20.00 FEET NORTHERLY FROM AND PARALLEL TO THE NORTHERLY LINE OF TRACT I, NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 401.88 FEET TO A POINT;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST 20.00 FEET TO THE POINT OF BEGINNING AND CONTAINING 0.1856 ACRES OR 8,085 SQUARE FEET OF LAND MORE OR LESS.

TRACT 3 EASEMENT TRACT: 20 FOOT NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT;

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT OVER AND ACROSS A TRACT OF LAND SOUTHERLY OF AND 20.00 FEET WIDE ALONG THE ENTIRE SOUTHERN BOUNDARY LINE OF TRACT I, SAID EASEMENT CREATED AND GRANTED ON FEBRUARY 16, 1979, FROM WEST LOOP HOTEL, LIMITED TO FIN PROPERTIES, LIMITED FILED IN HCCF NO. G041310, BEING THE SAME PROPERTY EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, NORTHERLY NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 184.61 FEET ALONG THE COMMON LINE OF THE AFORESAID 2.3468 ACRE PARCEL TO THE WEST AND 3.4385 ACRE PARCEL TO THE EAST TO THE POINT OF BEGINNING, WHENCE THE SOUTHEAST CORNER OF TRACT I BEARS NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 20.02 FEET;

THENCE, WESTERLY 20.00 FEET SOUTHERLY FROM AND PARALLEL TO THE SOUTHERLY LINE OF TRACT I, SOUTH 87 DEGREES 44 MINUTES 46 SECONDS WEST, 469.23 FEET TO A POINT IN THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP;

[Exhibit A - Property Description]

001833



RP-2023-248173

THENCE, NORTHERLY NORTH 10 DEGREES 55 MINUTES 17 SECONDS EAST, 20.54 FEET ALONG THE EASTERLY LINE OF INTERSTATE 610 WEST LOOP TO THE SOUTHWEST CORNER FOR TRACT 1 FROM WHICH A FOUND RAILROAD SPIKE BEARS SOUTH 21 DEGREES 43 MINUTES EAST, 2.42 FEET;

THENCE, EASTERLY NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 464.50 FEET ALONG THE SOUTHERLY LINE OF TRACT 1 TO A 1/2 INCH IRON ROD FOUND AT THE SOUTHEAST CORNER OF TRACT 1;

THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 20.02 FEET ALONG THE A COMMON LINE BETWEEN A PREVIOUSLY DESCRIBED 2.3468 ACRES PARCEL TO THE WEST AND A 3.4385 ACRE PARCEL TO THE EAST TO THE POINT OF BEGINNING AND CONTAINING 0.2144 ACRES OR 9,337 SQUARE FEET OF LAND, MORE OR LESS.

TRACT 4 EASEMENT TRACT: 28 FOOT ROADWAY AND PEDESTRIAN EASEMENT;

A NON-EXCLUSIVE ROADWAY AND PEDESTRIAN EASEMENT ACROSS EASTERLY 28 FEET OF A 2.3468 ACRE TRACT ADJACENT TO AND SOUTHERLY OF TRACT 1, CREATED AND GRANTED IN THAT CERTAIN ROAD AND PEDESTRIAN EASEMENT DATED FEBRUARY 16, 1979 FROM WEST LOOP HOTEL, LIMITED TO FIN PROPERTIES, LIMITED, FILED IN HCCF NO. G041313, BEING THE SAME PROPERTY EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING AT A FOUND 5/8 INCH IRON ROD IN THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. S056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR., TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE, WESTERLY SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST, 28.00 FEET ALONG THE NORTHERLY LINE OF WESTHEIMER ROAD TO A POINT;

THENCE, NORTHERLY 28.00 FEET WESTERLY OF AND PARALLEL TO THE EASTERLY LINE OF SAID 2.3468 ARE TRACT NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, 205.08 FEET TO A POINT ON THE SOUTHERLY LINE OF TRACT 1;

THENCE, EASTERLY NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST, 28.00 FEET ALONG THE SOUTHERLY LINE OF TRACT 1 TO A 1/2 INCH IRON ROD FOUND IN THE WESTERLY LINE OF A 3.4385 ACRE PARCEL OF LAND PRESENTLY OWNED BY RESTPROP, LTD AS RECORDED IN THE HCCF NO. R228886;

[Exhibit A - Property Description]



THENCE, SOUTHERLY SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, 204.61 FEET ALONG A COMMON LINE OF THE ABOVE INDICATED 3.4385 ACRE PARCEL TO THE EAST SAID THE PREVIOUSLY DESCRIBED 2.3468 ACRE PARCEL TO THE WEST, TO THE POINT OF BEGINNING, CONTAINING 0.1317 ACRES OR 5,735 SQUARE FEET (CALLED 5,740) OF LAND MORE OR LESS.

TRACT 5 EASEMENT TRACT: 5 FOOT STORM SEWER EASEMENT

A 1,025 SQUARE FOOT TRACT OF LAND, BEING THAT SAME TRACT UN PROPERTIES, LIMITED, RECORDED IN HCCF NUMBER G041311, LOCATED IN THE WILLIAM WHITE SURVEY, ABSTRACT NUMBER 836, CITY OF HOUSTON, HARRIS COUNTY, TEXAS, BEING THE SAME EASEMENT CONVEYED TO PCCP FULLER 2425 WEST LOOP, LLC BY SPECIAL WARRANTY DEED WITH VENDOR'S LIEN RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20100450007, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING AT A POINT IN THE NORTHERLY RIGHT OF WAY (ROW) OF WESTHEIMER ROAD (ROW VARIES), BEING THE SOUTHEAST CORNER OF A 2.3468 ACRE PARCEL CONVEYED BY LINCOLN NATIONAL LIFE INSURANCE COMPANY TO RED LION HOTELS, INC. IN A DEED RECORDED IN HCCF NO. 5056346 AND THE SOUTHWEST CORNER OF A 3.4385 ACRE PARCEL CONVEYED BY HARVEY R. HOUCK, JR. TO RESTPROP, LTD IN A DEED RECORDED IN HCCF NO. R228886;

THENCE ALONG THE NORTHERLY RIGHT OF WAY LINE OF WESTHEIMER ROAD, SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST, A DISTANCE OF 16.00 FEET TO THE SOUTHEAST CORNER OF SAID EASEMENT AND THE HEREIN DESCRIBED TRACT;

THENCE CONTINUING ALONG THE NORTHERLY LINE OF WESTHEIMER ROAD, SOUTH 86 DEGREES 46 MINUTES 52 SECONDS WEST A DISTANCE OF 5.00 FEET, THE SOUTHWEST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE DEPARTING SAID WESTHEIMER ROAD, NORTH 02 DEGREES 23 MINUTES 52 SECONDS WEST, A DISTANCE OF 204.96 FEET, TO A POINT IN THE SOUTHERLY LINE OF A 2.4462 ACRE TRACT CONVEYED BY DEED TO HE 2425 WEST LOOP, LP RECORDED UNDER HARRIS COUNTY CLERK'S FILE NO. 20070732472;

THENCE ALONG THE SOUTHERLY LINE OF SAID 2.4462 ACRE TRACT, NORTH 87 DEGREES 44 MINUTES 46 SECONDS EAST A DISTANCE OF 5.00 FEET TO THE NORTHEAST CORNER OF THE HEREIN DESCRIBED TRACT;

THENCE DEPARTING THE SOUTHERLY LINE OF SAID 2.4462 ACRE TRACT, SOUTH 02 DEGREES 23 MINUTES 52 SECONDS EAST, A DISTANCE OF 204.88 FEET TO THE POINT OF BEGINNING AND CONTAINING 1,025 SQUARE FEET OF LAND, MORE OR LESS

[Exhibit A - Property Description]



RP-2023-248173

RP-2023-248173
# Pages 8
07/03/2023 01:37 PM
e-Filed & e-Recorded in the
Official Public Records of
HARRIS COUNTY
TENESHIA HUDSPETH
COUNTY CLERK
Fees   $42.00

RECORDERS MEMORANDUM
This instrument was received and recorded electronically
and any blackouts, additions or changes were present
at the time the instrument was filed and recorded.

Any provision herein which restricts the sale, rental, or
use of the described real property because of color or
race is invalid and unenforceable under federal law.
THE STATE OF TEXAS
COUNTY OF HARRIS
I hereby certify that this instrument was FILED in
File Number Sequence on the date and at the time stamped
hereon by me; and was duly RECORDED in the Official
Public Records of Real Property of Harris County, Texas.



COUNTY CLERK
HARRIS COUNTY, TEXAS



001836



I, Teneshia Hudspeth, County Clerk of Harris County, Texas certify that these pages
are a true and correct copy of the original record filed and recorded in my office,
electronically or hard copy, as it appears on this date.

Witness my official hand and seal of office
This April 3, 2024

*Teneshia Hudspeth*

Teneshia Hudspeth, County Clerk
Harris County, Texas

Any provision herein which restrict the sale, rental or use of the described Real Property because of color or race is invalid and
unenforceable under the Federal Law. Confidential information may have been redacted from the document in compliance with the
Public Information Act.



## **EXHIBIT B**

Confidential Settlement Agreement

001838

## CONFIDENTIAL SETTLEMENT AGREEMENT

This Confidential Settlement Agreement is made and entered into by and between the undersigned as of August 22, 2022 (the "Effective Date"), and is a binding contract pursuant to which the below named parties have fully and finally settled all claims and controversies existing between and among them, according to the terms of this Confidential Settlement Agreement. The parties to this agreement are National Bank of Kuwait, S.A.K.P., New York Branch, Galleria 2425 Owner, LLC, Naissance Galleria, LLC, and Ali Choudhri.

## I.    D E F I N I T I O N S

In addition to other definitions provided in this document as needed, the Parties hereto have agreed to the following definitions:

1.1     "Agreement" means this Confidential Settlement Agreement.

1.2     "Claims" means the Lawsuit (as defined below) and all other claims, counter-claims, causes of action, controversies, losses, demands, costs, damages, liabilities (joint or several), expenses of any nature (including attorneys' fees, costs and/or expenses), judgments, fines, and other amounts, both known and unknown, asserted or not asserted, accrued or not accrued, from the beginning of time up until the date of this Agreement, under any theory or any cause of action whatsoever recognized by law or equity between NBK, Galleria, and Ali Choudhri (and Naissance to the extent Naissance exercises the Purchase Option pursuant to Section 3.1(h)), as such terms are defined below.

1.3     "NBK" means National Bank of Kuwait, S.A.K.P., New York Branch, the Defendant and Counter-Plaintiff in the Lawsuit.

1.4     "NBK Released Parties" means NBK and all of its present or past parents, present or past subsidiaries, divisions, partners, successors-in-interest, predecessors, present and future affiliates, shareholders, unit holders, employees, officers, directors, representatives, agents, investigators, attorneys, assigns, executors, administrators, lenders, lien holders, creditors, financing institutions, banks, and insurers, and those in privity therewith.

1.5     "Galleria" means Galleria 2425 Owner, LLC, the Plaintiff and Counter-Defendant in the Lawsuit.

1.6     "Galleria Released Parties" means Galleria and all of its present or past parents, present or past subsidiaries, divisions, partners, successors-in-interest, members, managers, guarantors (including the Guarantor under the Loan Agreement), predecessors, present and future affiliates, shareholders, unit holders, employees, officers, directors, representatives, agents, investigators, attorneys, assigns, executors, administrators, lenders, lien holders, creditors, financing institutions, banks, and insurers, and those in privity therewith.

1.7     "Choudhri" means Ali Choudhri in his sole and individual capacity and as Intervenor in the Lawsuit.

1.8     "Choudhri Released Parties" means Choudhri, both in his individual capacity and including his heirs, assigns, agents, executors, attorneys, lenders, administrators, lien holders, creditors, and those in privity therewith, along with any entity in which Choudhri may have an ownership interest in and/or right to control now or in the future.

1.9     "Naissance" means Naissance Galleria, LLC.

1.10    "Parties" means NBK, Galleria, Naissance, and Choudhri, as defined herein, who are the parties to this Agreement.

1.11    "Lawsuit" means: Cause No. 2021-63370; *Galleria 2425 Owner, LLC v. National Bank of Kuwait, S.A.K.P., A New York Branch, et al.*; in the 281st District Court of Harris County, Texas.

1.12    "Loan Agreement" means that certain Loan Agreement between NBK and Galleria, dated May 23, 2018.  Capitalized terms not defined herein shall have the meaning ascribed in the Loan Agreement.

1.13    "Loan Documents" collectively means the following documents as defined in the Loan Agreement: the Loan Agreement, the Promissory Note, the Deed of Trust, the Assignment of Leases and Rents, the Guaranty, the Environmental Indemnity Agreement, the Assignment of Agreements, Licenses, Permits and Contracts, the Subordination of Management Agreement, the Fee Letter, the Intercreditor Agreement, the Control Account Agreement, any Assignment of Interest Rate Agreement entered into after the Closing Date and any and all other documents, agreements and certificates executed and/or delivered in connection with the Loan, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.  Loan Documents shall also include any Interest Rate Protection Product or ISDA Master Agreement.

1.14    "Property" means that certain real property and improvements located at 2425 West Loop South, Houston, TX 77027.

1.15    "Purchase Option Parties" means Naissance, Galleria, Choudhri and an entity wholly owned and controlled by Choudhri.

## II.     R E C I T A L S

2.1     WHEREAS, the Parties understand and agree that the claims and defenses asserted between them are in dispute, the Parties desire to confidentially compromise and settle the Claims and the Lawsuit, and including all claims, counter-claims, claims in intervention, third-party

2

claims and causes of action that were asserted or which could have been asserted, currently known or unknown, from the beginning of time up until the date of this Agreement, whether or not alleged or set forth in prior correspondence, claims, pleadings, or orally, which arise out of the Claims or the Lawsuit, the related occurrences, or legal proceedings, and which pertain thereto, to prevent any current or future litigation by or between the Parties arising out of or related to the Claims or the Lawsuit.

2.2     WHEREAS, the Parties deny all allegations, claims, counterclaims, claims in intervention and third-party claims arising out of the Claims or the Lawsuit, and by executing this Agreement, the Parties make no admissions, but rather have settled those claims and defenses which were raised or could have been raised by compromise as set forth below in order to avoid further litigation and to buy peace of mind.

## III.   A G R E E M E N T

NOW, THEREFORE, for and in consideration of the mutual promises, covenants and agreements contained herein, for the resolution and settlement of the Claims and the Lawsuit as set forth below, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree and covenant as follows:

### A.     SETTLEMENT TERMS

3.1     (a) **Acknowledgement of the Indebtedness.**     As of the Effective Date, Choudhri, Galleria and Naissance acknowledge and agree that NBK is owed $60,212,816.90 under the Loan Documents, **without defenses, setoffs, claims, counterclaims or deductions of any nature whatsoever, all of which are hereby expressly waived**;

(b) **Acknowledgment of Existing Defaults**. Galleria, Choudhri and Naissance further acknowledges and agrees that: (i) an Event of Default exists under the Loan Documents, (ii) any cure period with respect thereto has expired, (iii) all principal, interest, fees, costs and other charges due under the Loan Documents are fully accelerated and immediately due and owing to NBK **without defenses, setoffs, claims or counterclaims or deductions of any nature whatsoever all of which are hereby expressly waived**, and (iv) that each of Galleria, Choudhri and Naissance waives the right to all notices (including but not limited to notice of default, notice of intent to accelerate, notice of acceleration, and notice of foreclosure) each may otherwise be entitled to under the Loan Documents or otherwise. Galleria, Choudhri and Naissance further acknowledge and agree that all conditions precedent for NBK to post the Property for foreclosure have been fully satisfied;

(c) **Acknowledgment of Right to Foreclose.** Except as otherwise provided in this Agreement, Galleria, Choudhri and Naissance expressly recognize and acknowledge that NBK can exercise all of its rights and remedies under the Loan Documents, which are fully matured and

3

available for exercise by NBK, including, without limitation, the right to foreclose and the right to recover on any part or all of the indebtedness **without defenses, setoffs, claims or counterclaims or deductions of any nature whatsoever all of which are hereby expressly waived**;

(d) **Settlement Payment**. On or before the Payment Date (as defined below), Galleria will pay or cause to be paid to NBK the total sum of $27,000,000 as a settlement for all amounts owed under the Loan Documents, as follows: (i) within five (5) days of the Effective Date, Galleria agrees to request the Court to transfer the amount deposited into the registry of the Court by Choudhri, currently EIGHT HUNDRED AND ONE THOUSAND FIVE HUNDRED AND NINE AND 42/100 US DOLLARS ($801,509.42) (such amount, including any increases thereto or income thereon, the "Down Payment") directly to NBK. To the extent that a Settlement Default (as defined below) occurs, then NBK shall be entitled to retain the Down Payment as liquidated damages and, in addition, shall be entitled to pursue all of its rights and remedies under this Agreement, the Loan Documents or otherwise at law or in equity. If necessary, NBK agrees to join in Galleria's request to the Court where the Lawsuit is pending seeking disbursement of the funds constituting the Down Payment that is currently on file with the registry of the court in the Lawsuit; (ii) within two hundred ten (210) days of the Effective Date (such date, the "Payment Date") Galleria agrees to pay, or cause to be paid to NBK the balance by wire transfer in immediately available funds (the "Settlement Payment")**,** except to the extent that the Purchase Option is exercised pursuant to Section 3.1(h); and (iii) contemporaneously with NBK's receipt of the Settlement Payment set forth in Section 3.1(d)(ii), NBK will file a release of its lien and deliver proof of such release to Galleria's attorneys establishing that no NBK liens exist or have not been otherwise released by NBK;

(e) The Settlement Payment shall be made in good and immediately available funds by wire transfer to an account designated by NBK in writing; provided, however, that to the extent the Settlement Payment is made in connection with a sale or refinancing of the Property, the Settlement Payment may be first transferred to a title company handling the closing of such sale or refinancing for onward remittance to NBK;

(f) Galleria acknowledges and agrees that to the extent the Settlement Payment is remitted to NBK, or to an agreed upon title company as escrow agent or other acceptable escrow agent for further delivery to NBK, by anyone other than Galleria (including, without limitation, any lender to Galleria), then Galleria has no right, title or interest of any kind whatsoever in such Settlement Payment or the proceeds thereof;

(g) **Dismissal of the Lawsuit**. Within five (5) days of the Effective Date, Galleria will execute, enter, and file in conjunction with NBK a joint motion for dismissal with prejudice of all of its claims against NBK in the Lawsuit and a motion to permanently dissolve with prejudice the Court's Temporary Injunction Order issued in the Lawsuit;

4

(h) **Purchase Option**. NBK grants the Purchase Option Parties, as directed by Choudhri, the sole and exclusive right to purchase the Loan Documents as follows: (i) the Purchase Option Parties each acknowledge that a Purchase Option Event (as defined in the Intercreditor Agreement) has occurred, that Naissance has received a Purchase Option Notice (as defined in the Intercreditor Agreement), and that the Monetary Cure Period (as defined in the Intercreditor Agreement) has expired; (ii) the Parties agree that the Loan Purchase Price (within the meaning of Section 12(a) of the Intercreditor Agreement) is $27,000,000 payable as follows: (x) $801,509.42 in the form of the Down Payment payable pursuant to section 3.1(d) hereof; and (y) the balance payable by wire transfer in good and immediately available funds on or before the Payment Date (such payment, the "Purchase Option Payment"); (iii) other than the amount of the Loan Purchase Price set forth in this section 3.1(h), a Purchase Option Party's exercise of the Purchase Option shall be in the form and manner provided in Section 12 of the Intercreditor Agreement; (iv) all Parties consent to the transfer of the Loan Documents to a Purchase Option Party in connection with the exercise of the purchase option; (v) to the extent that a party other than a Purchase Option Party seeks to exercise this purchase option, NBK has the right to consent to such exercise, such consent not to be unreasonably withheld; and (vi) NBK shall transfer and assign the Loan Documents to the party exercising this purchase option upon NBK's receipt of the Purchase Option Payment. Upon written request of a Purchase Option Party, NBK shall provide such Purchase Option Party with a payoff statement for the satisfaction or purchase of its loan and the Loan Documents;

(i) within five (5) days of the Payment Date, NBK will prepare, execute and file a request to the Court in which the Lawsuit is pending for an abatement of NBK's claims in the Lawsuit. To the extent the Court declines to grant such abatement request, then NBK shall file a nonsuit, without prejudice, of its claims and Galleria specifically agrees (i) that such claims may be refiled following a the occurrence of a Settlement Default; (ii) that they will accept service of any such refiled claims by email on their counsel; and (iii) they agree not to assert any statute of limitations, laches or similar defense in response to such refiled claims;

(j) Except upon the occurrence of a Settlement Default, NBK will not take measures to foreclose on the Property or sell or assign the loan, other than as provided for in this Agreement, for two hundred ten (210) days after the Effective Date (such period, the "Foreclosure Forbearance Period"), and during such Foreclosure Forbearance Period, Galleria will maintain the Property itself and maintain all insurance policies covering the Property.  If during the Foreclosure Forbearance Period, Galleria presents a request on behalf of any potential tenant that presents a Material Lease: 1) that does not include subordination and non-disturbance agreement from NBK, Galleria shall be permitted to enter into such lease without obtaining NBK's prior consent; or 2) that does include subordination and non-disturbance agreement from NBK, then NBK shall have the right to accept or reject pursuant to the Loan Documents;

B.     **RELEASES**

5

4.1     Release of NBK Released Parties.

(a) by Galleria. As of the Effective Date, Galleria **RELEASES, ACQUITS AND FOREVER DISCHARGES** the NBK Released Parties from all claims, both known and unknown, accrued or not accrued, from the beginning of time until the date of this Agreement, including, but not limited to, any and all claims relating to the Claims or the Lawsuit.  Upon NBK's receipt of either the Settlement Payment or the Purchase Option Payment, Galleria further **RELEASES, ACQUITS AND FOREVER DISCHARGES** the NBK Released Parties from all known and unknown claims, accrued or not accrued, from the beginning of time until the date of such payment, including, but not limited to, any and all claims relating to the Claims or the Lawsuit;

(b) By Choudhri. As of the Effective Date, Choudhri **RELEASES, ACQUITS AND FOREVER DISCHARGES** the NBK Released Parties from all known and unknown claims, accrued or not accrued, from the beginning of time until the date of this Agreement, including, but not limited to, any and all claims relating to the Claims or the Lawsuit.  Upon NBK's receipt of either the Settlement Payment or the Purchase Option Payment, Choudhri further **RELEASES, ACQUITS AND FOREVER DISCHARGES** the NBK Released Parties from all known and unknown claims, accrued or not accrued, from the beginning of time until the date of such payment, including, but not limited to, any and all claims relating to the Claims or the Lawsuit.

(c) by Naissance. As of the Effective Date, Naissance **RELEASES, ACQUITS AND FOREVER DISCHARGES** the NBK Released Parties from all known and unknown claims, accrued or not accrued, from the beginning of time until the date of this Agreement, including, but not limited to, any and all claims relating to the Claims, the Lawsuit or the Intercreditor Agreement.  Upon NBK's receipt of either the Settlement Payment or the Purchase Option Payment, Choudhri further **RELEASES, ACQUITS AND FOREVER DISCHARGES** the NBK Released Parties from all known and unknown claims, accrued or not accrued, from the beginning of time until the date of such payment, including, but not limited to, any and all claims relating to the Claims, the Lawsuit or the Intercreditor Agreement.

4.2     Release of Choudhri Released Parties.

(a) By NBK. As of the Effective Date, NBK **RELEASES, ACQUITS AND FOREVER DISCHARGES** the Choudhri Released Parties from all known and unknown claims, accrued or not accrued, from the beginning of time until the date of this Agreement, including, but not limited to, any and all claims relating to the Claims or the Lawsuit. Effective upon NBK's receipt of the Settlement Payment or the Purchase Option Payment, NBK **RELEASES, ACQUITS AND FOREVER DISCHARGES** the Choudhri Released Parties from all known and unknown claims, accrued or not accrued, from the beginning of time until the date of such payment, including, but not limited to, any and all claims relating to the Claims or the Lawsuit.

001844

4.3     Release of Galleria Released Parties.

(a) By NBK. Effective upon NBK's receipt of the Settlement Payment or the Purchase Option Payment, NBK **RELEASES, ACQUITS AND FOREVER DISCHARGES** the Galleria Released Parties from all known and unknown claims, accrued or not accrued, from the beginning of time until the date of this Agreement, including, but not limited to, any and all claims relating to the Claims or the Lawsuit. Galleria acknowledges and agrees that such release, NBK's dismissal of its claims in the Lawsuit and the other obligations NBK has or will occur in connection with this Agreement constitute new value given to Galleria by NBK and that such new value is given by NBK and received by Galleria contemporaneously with the releases and any other value given or obligation incurred by Galleria under this Agreement.

## C.     REPRESENTATIONS AND WARRANTIES

5.1 **Capacity to Execute Agreement**. The Parties represent and warrant that they have the sole right and exclusive authority to enter into and execute this Agreement and that they have not sold, assigned, transferred or otherwise disposed of any of the Claims.

5.2 **Due Authority**. Each Party hereto that is not a natural person has duly authorized the person signing this Agreement on such Party's behalf to do so and each such signatory has the requisite power and authority to bind such Party to the terms of this Agreement.

5.3 **Concerning any Foreclosure**. Following any Settlement Default, each of Galleria, Choudhri and Naissance covenant and agree that they shall not seek to restrain or otherwise hinder, delay, frustrate or impair NBK's efforts to (i) foreclose upon any collateral granted under the Loan Documents, or (ii) enforce its rights and remedies pursuant to the Loan Documents. The provisions of this Paragraph shall be specifically enforceable by NBK and Galleria, Choudhri and Naissance acknowledge and agree that any breach thereof will expose NBK to irreparable harm and therefore injunctive relief is necessary without having to prove damages or post a bond or other collateral. Galleria, Choudhri and Naissance will cooperate, assist and execute all necessary documents, upon NBK's request, in furtherance of NBK's rights, powers and remedies under the Loan Documents.

5.4 **Assignment of Tax Liens**. Within five (5) days of the Effective Date, Choudhri shall cause the transfer and assignment of the tax liens with respect to the Property for years 2019 and 2020 (the "Tax Liens") to NBK. NBK represents and warrants that it will not take any measures to foreclose on the Property pursuant to the Tax Liens during the Foreclosure Forbearance Period. Upon NBK's receipt of either the Settlement Payment or Purchase Option Payment, NBK shall contemporaneously transfer and assign the Tax Liens to Choudhri.

## D.     DEFAULT

6.1 **Settlement Default**. Each of the following shall constitute a Settlement Default: (i) failure of any of Galleria, Choudhri or Naissance to comply with its representations, warranties,

7

001845

covenants or other undertakings under this Agreement; (ii) breach of any representation made by Galleria, Choudhri or Naissance in this Agreement; (iii) if NBK does not receive the Settlement Payment or the Purchase Option Payment on or before the Payment Date; (iv) if Galleria (a) admits in writing of its inability to pay its debts generally as they become due, (b) file a petition in bankruptcy or a petition to take advantage of any insolvency act; (c) make an assignment for the benefit of creditors; (d) consent to, or acquiesce in, the appointment of a receiver, liquidator or trustee of itself or of the whole or any substantial part of its properties or assets; (e) file a petition or answer seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the Federal Bankruptcy laws or any other applicable law; (f) have a court of competent jurisdiction enter an order, judgment or decree appointing a receiver, liquidator or trustee of Borrower, or of the whole or any substantial part of the property or assets of Borrower, and such order, judgment or decree shall remain unabated or not set aside or unstated for sixty (60) days; (g) have a petition filed against it seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under the Federal Bankruptcy laws or any other applicable law and such petition shall remain undismissed for sixty (60) days; (h) have, under the provisions of any other law for the relief or aid of debtors, any court of competent jurisdiction assume custody or control of Borrower or of the whole or any substantial part of its property or assets and such custody or control shall remain unterminated or unstayed for sixty (60) days; or (i) have an attachment or execution levied against the Property which is not discharged or dissolved by a bond within sixty (60) days;

6.2 **Remedies**. Upon the occurrence of a Settlement Default, NBK shall have the right to pursue any and all rights and remedies it has under the Loan Documents, applicable law and in equity, including, without limitation, the right to pursue foreclosure of the Property.

## E.    GUARANTY

7.1 Choudhri agrees that to the extent that any portion of the Settlement Payment or the Purchase Option Payment is avoided and recovered as a result of the operation of any bankruptcy or other proceeding, then Choudhri shall be liable for, and absolutely and unconditionally guarantees to NBK, the prompt payment to NBK of such avoided and recovered sums. This guaranty is a guaranty of payment and not of collection and Choudhri waives any right to require NBK to sue Galleria or any other party or to foreclose on the Property or any other collateral.

## F.    <u>DEFENSE, INDEMNITY AND HOLD HARMLESS.</u>

8.1    In consideration of the mutual promises, covenants, and agreements contained herein, for the resolution and settlement of the Claims and the Lawsuit, Galleria agrees to fully defend, indemnify, and hold NBK Released Parties harmless from any and all claims asserted against the NBK Released Parties by any party that are related to the Property, the Loan, the Loan Documents, this Agreement and any payments made under it.

8

### G.    MISCELLANEOUS

9.1    The Parties further agree that this Agreement shall not be interpreted as an admission of liability on the part of any of the Parties hereto.  The consideration described above has been given by way of compromise to avoid expenses and terminate all controversies between the Parties, regardless to the extent of the Claims and the Lawsuit.

9.2    It is further agreed that the considerations stated above are the sole considerations for this Agreement, and that the considerations are contractual and not mere recitals, and that all agreements and understandings of the Parties are expressed herein.

9.3    **CONFIDENTIALITY AGREEMENT.  The Parties hereby further expressly represent, warrant, and agree that in making this Agreement, NBK, Galleria, Naissance, and Choudhri will keep the negotiations, contents and terms of this Agreement completely confidential and will not make known such information to anyone at any time under any circumstances (meaning that such information may not be published, displayed, discussed, disclosed, revealed or characterized, directly or indirectly, in any way to any one) save and except the Parties themselves, and as to their tax advisor or attorney, in which case NBK, Galleria, Naissance, and Choudhri warrant that such individuals shall also comply with this confidentiality provision, except as compelled to do so by law.  The Parties further agree, however, that any action brought on any kind herein released, this Agreement may be pled by the party against whom the claim is filed as a defense and this Agreement may be used by any party in any suit for breach of this Agreement.  Notwithstanding the foregoing and anything herein to the contrary, the Parties further agree that (i) following the Effective Date of this Agreement, Galleria or Choudhri may inform governmental agencies or departments that the Parties have reached a settlement agreement, and NBK will confirm same if contacted by any governmental agencies or departments, and (ii) upon NBK's receipt of either the Settlement Payment or Purchase Option Payment, Galleria or Choudhri may inform governmental agencies or departments that the Parties have reached a settlement agreement to the satisfaction of all Parties, and NBK will confirm same if contacted by any governmental agencies or departments.**

9.4    No person or entity not a party to this Agreement shall be deemed to be a third-party beneficiary of this Agreement.

9.5    This Agreement may be amended only by an instrument in writing executed by the Parties.

9.6    If any term or other provision of this Agreement is found to be invalid, illegal, or incapable of being enforced by any rule of law or public policy, such provision shall be severed or reformed to the maximum extent allowed by law.  In any event, all other terms and provisions of this Agreement shall nevertheless remain in full force and effect.

9

9.7     The Parties hereto agree that this Agreement may be executed in counterpart originals, each of which shall constitute an original, and all of which together shall constitute one and the same agreement.

9.8     The Parties acknowledge that they have had the opportunity to read this Agreement and to consult with legal counsel of their choosing as to the meaning and effect of the Agreement and the rights and liabilities of the Parties. The Parties acknowledge that they understand and appreciate the foregoing words and terms and their effect.

9.9     The Parties acknowledge that they understand the meaning and effect of this Agreement and that they execute it of their own free will and accord for the purposes and considerations set forth.  Further, the Parties solemnly state that this Agreement is not being made because of any persuasive statement or representation or promise by anyone whomsoever or for anything other than what is recited herein.   In entering into this Agreement, each Party acknowledges that it is not relying upon any statement, representation, or promise that is not specified expressly herein.

9.10    The Parties represent one to the other that their respective signatory to this Agreement is empowered and legally competent to execute this Agreement on behalf of the Party for which it signed.  The Parties further represent that they, their respective signatories, and their respective representatives are of sound mind at the time they executed this Agreement.

9.11    The Parties represent and warrant to each other that they are the sole owner of all claims and causes of action they have released in this Agreement, that such claims are free and clear of all claims or liens of any other person or entity, that they have not assigned, pledged, subrogated or in any other manner transferred any of the claims or causes of action released herein, the Loan or any debt related to the Loan, and that there are no other persons or legal entities who could or should have asserted such claims or joined in any settlement or compromise of such claims.

9.12    Notwithstanding any provision contained herein to the contrary, each Party agrees to pay all of his or its own legal fees, costs and expenses that have been incurred in connection with the Claims and the Lawsuit, and the release of claims and related activities, including those associated with the negotiating, drafting and signing of this Agreement.

9.13    Within thirty (30) days after NBK's receipt of the Settlement Payment or the Purchase Option Payment, each party shall return all documents and discovery in their possession or control, including all copies, to the party who furnished it in the Lawsuit, or certify in writing that all such documents have been destroyed.

9.14    The undersigned acknowledges that this Agreement is to be performed in Texas, and that the provisions hereof, and the respective rights and duties of the Parties hereto shall be construed in accordance with and governed by the laws of the State of Texas.  The undersigned agree that exclusive jurisdiction for any dispute based on or arising from this Agreement will be in the Harris County District Court, Houston, Texas; and that the prevailing party in any suit based on or arising from this Agreement will be further entitled to recover from the non-prevailing party the prevailing party's reasonable and necessary attorneys' fees, costs, and expenses.

9.15    THIS AGREEMENT CONSTITUTES THE ENTIRE AGREEMENT BETWEEN THE PARTIES HERETO WITH RESPECT TO THE SUBJECT MATTER HEREOF AND THERE ARE NO OTHER AGREEMENTS, WRITTEN OR ORAL, EXPRESS OR IMPLIED, RELATED TO THE MATTERS SET FORTH HEREIN.  THIS AGREEMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES.

*<remainder of this page left intentionally blank>*

11

001849

## NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH

**Agreed:**  National Bank of Kuwait, S.A.K.P., New York Branch

**By:**  Marwan Isbaih

**Its:**  General Manager

8/22/2020

**Date**

12

001850

**GALLERIA 2425 OWNER, LLC**

Agreed:   Galleria 2425 Owner, LLC

By: _Ali Choudhri_  _w/permission_ MP

Its: _Auth Agent_

Date _8/21/22_

13

## NAISSANCE GALLERIA, LLC

Agreed:   Naissance Galleria, LLC

By: _____

Its: _____

Authorized Agent

Ali Choudhri w/permission MP

Date _____ 8/21/22 _____

14

001852

**ALI CHOUDHRI**

Agreed: Ali Choudhri

_____

_____
**Date**        $\text{1-21-22}$

15

001853

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| GALLERIA 2425 OWNER, LLC, | ) | |
| | ) | Case No. 23-34815 |
| Debtor. | ) | |
| | ) | |

## TRUSTEE'S OMNIBUS OBJECTION TO CLAIM NOS. 23 AND 24 OF JETALL CAPITAL, LLC

**THIS IS AN OBJECTION TO YOUR CLAIM. THIS OBJECTION ASKS THE COURT TO DISALLOW THE CLAIM THAT YOU FILED IN THIS BANKRUPTCY CASE. IF YOU DO NOT FILE A RESPONSE WITHIN 30 DAYS AFTER THE OBJECTION WAS SERVED ON YOU, YOUR CLAIM MAY BE DISALLOWED WITHOUT A HEARING.**

**A HEARING HAS BEEN SET ON THIS MATTER ON <u>JULY 24, 2024, at 11:00 A.M. (CENTRAL TIME)</u> IN COURTROOM 403, 4TH FLOOR, UNITED STATES BANKRUPTCY COURT FOR SOUTHERN DISTRICT OF TEXAS, 515 RUSK AVENUE, HOUSTON, TEXAS 77002.**

**REPRESENTED PARTIES SHOULD ACT THROUGH THEIR ATTORNEY.**

Christopher R. Murray, in his capacity as chapter 11 trustee in the above-captioned case (the "<u>Trustee</u>"), hereby files this objection (the "<u>Objection</u>") to Claim Nos. 23 and 24 (the "<u>Claims</u>") filed by Jetall Capital, LLC ("<u>Jetall Capital</u>"). In support of this Objection, the Trustee respectfully states as follows:

### JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Objection pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The Court has the authority to enter the requested relief under sections 502(b) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

3. The Trustee consents, pursuant to Bankruptcy Rule 7008, to the entry of a final order by the Court in connection with this Objection.

## BACKGROUND & RELEVANT FACTS

### A. Chapter 11 Case

4. On December 5, 2023 (the "Petition Date"), Galleria 2425 Owner, LLC (the "Debtor") filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court" or the "Court").

5. The Court entered an order [Bankr. Dkt. No. 116] approving the Trustee's appointment as chapter 11 trustee in the Bankruptcy Case on February 9, 2024.

### B. Claim Nos. 23 and 24

6. On April 9, 2021, Choudhri filed Claim No. 23 (Claim No. 23) and Claim No. 24 ("Claim No. 24") with the with the Court. The proofs of claim were identical, each indicating an unsecured claim in the amount of $1,699,750.00. Each was signed by Ali Choudhri.

7. No basis for Claim Nos. 23 or 24 was provided. The basis for the claim on Form 410 was left blank on both proofs of claim and no documentation was attached to either.

8. The Debtor's schedules [ECF No. 70] did not indicate any claim owed to Jetall Capital. Although the schedules were signed by Dward Darjean, Ali Choudhri was in control of the Debtor at the time that the schedules were filed with the Court.

001855

## **OBJECTION**

9.      Bankruptcy Code § 502(b)(1) provides that a claim asserted should not be allowed to the extent that the "claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured . . . ."

10.     As set forth in Bankruptcy Rule 3001(f), a properly executed and filed proof of claim constitutes prima facie evidence of the validity and the amount of the claim under section 502(a) of the Bankruptcy Code. *See, e.g.*, *In re Jack Kline Co., Inc.*, 440 B.R. 712, 742 (Bankr. S.D. Tex. 2010). A proof of claim loses the presumption of prima facie validity under Bankruptcy Rule 3001(f) if an objecting party refutes at least one of the allegations that are essential to the claim's legal sufficiency. *See In re Fidelity Holding Co., Ltd.*, 837 F.2d 696, 698 (5th Cir. 1988). An objecting party may rebut the presumption by (a) producing specific and detailed allegations that place the claim into dispute, (b) presenting legal arguments based upon the contents of the claim and its supporting documents, or (c) by the presentation of pretrial pleadings, in which evidence is presented to bring the validity of the claim into question. *In re High Standard Mfg. Co., Inc.*, 2016 WL 5947244, at *7 (Bankr. S.D. Tex. Oct. 13, 2016) (quoting *In re Fid. Holding Co., Ltd.*, 837 F.2d 696, 698 (5th Cir. 1988)); *accord In re Northbelt, LLC*, 630 B.R. 228, 245 (Bankr. S.D. Tex. 2020).

11.     Once such an allegation is refuted, the burden shifts to the claimant to prove the validity of its claim by a preponderance of the evidence. *See In re High Standard Mfg. Co., Inc.*, 2016 WL 5947244, at *7. Despite this shifting burden during the claim objection process, "the ultimate burden of proof always lies with the claimant." *In re Armstrong*, 347 B.R. 581, 583 (Bankr. N.D. Tex. 2006) (citing *Raleigh v. Ill. Dep't of Revenue*, 530 U.S. 15 (2000)).

12.     The evidence or allegations necessary to refute the presumption of validity of a proof of claim depends on the allegations of the proof of claim. The objecting party need only present evidence of equal probative weight. *See In re High Standard Mfg. Co.*, 2016 WL 5947244, at *7. Where there is no supporting evidence or statements as with Claim Nos. 23 and 24—indeed, Jetall Capital did not even indicate a basis for its asserted claims—no evidence is required to rebut the presumption.

13.     To the extent that evidence is required, the Debtor's schedules provide evidence of equal probative value to the non-assertions in Claim No. 23 and 24. The Debtor's schedules do not indicate that Jetall Capital is a creditor of the Debtor. Jetall Capital asserts that it is but does not assert any basis for its claim. The schedules, like the proofs of claim, were filed with the Court and were attested to under penalty of perjury.

WHEREFORE, the Trustee respectfully requests that the Court enter an order, substantially in the form attached hereto, disallowing Claim Nos. 23 and Claim 24 in their entirety and granting such other relief as is just and equitable.

Dated: June 3, 2024                        Respectfully submitted,

                                           SHANNON & LEE LLP

                                           */s/R. J. Shannon*
                                           Kyung S. Lee (TBA No. 12128400)
                                           R. J. Shannon (TBA No. 24108062)
                                           2100 Travis Street, STE 1525
                                           Houston, TX 77002
                                           Telephone: (713) 714-5770
                                           Email: klee@shannonleellp.com
                                                   rshannon@shannonleellp.com

                                           *Counsel to Christopher R. Murray, Chapter 11 Trustee*

001857

## <u>CERTIFICATE OF SERVICE</u>

        I hereby certify that on June 3, 2024, the forgoing document was served (i) through the Court's CM/ECF System on all parties registered to receive such service and (ii) separately by U.S.P.S first class mail, postage prepaid, and email on the following parties:

Jetall Capital, LLC
1001 West Loop South, Suite 700
Houston, TX 77027
ali@jetallcapital.com

                               */s/R. J. Shannon*
                               R. J. Shannon

001858

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| GALLERIA 2425 OWNER, LLC, | ) |  |
|  | ) | Case No. 23-34815 |
| Debtor. | ) |  |
|  | ) |  |

**ORDER SUSTAINING TRUSTEE'S OMNIBUS OBJECTION TO CLAIM NOS. 23 AND 24 OF JETALL CAPITAL, LLC**

(Relates to Dkt. No. _____)

Upon the objection (the "Objection") of Christopher R. Murphy, chapter 11 trustee in the above-captioned case (the "Trustee") seeking entry of this order (this "Order") sustaining the *Trustee's Omnibus Objection to Claims No. 23 and 24 of Jetall Capital, LLC*; and this court having jurisdiction over this matter pursuant to 28 U.S.C § 1334; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157 (b)(2); and this Court having found that it may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Objection in this district is permissible pursuant to 28 U.S.C §§ 1408 and 1409; and this Court having found that notice of the Objection and opportunity for a hearing on the Objection were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed and considered the Objection and any statements in support of the relief requested therein; and this Court having determined that the legal and factual bases set forth in the Objection and at any hearing thereon establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Objection is sustained as set forth herein.

2.      Any response to the Objection not otherwise withdrawn, resolved, or adjourned is hereby overruled on its merits.

3.      Claim No. 23 and Claim No. 24 filed by Jetall Capital, LLC are each hereby disallowed in their entirety.

4.      This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

Dated: _____, 2024

_____
**UNITED STATES BANKRUPTCY JUDGE**

Proposed Order Submitted By:

*/s/R. J. Shannon*_____
Kyung S. Lee (TBA No. 12128400)
R. J. Shannon (TBA No. 24108062)
SHANNON & LEE LLP
2100 Travis Street, STE 1525
Houston, TX 77002
Telephone: (713) 714-5770
Facsimile: (833) 714-5770
Email: klee@shannonleellp.com
        rshannon@shannonleellp.com

*Counsel to Christopher R. Murray, Chapter 11 Trustee*

001860

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | CHAPTER 11 |
| GALLERIA 2425 OWNER, LLC, | ) | |
| | ) | Case No. 23-34815 |
| Debtor. | ) | |
| | ) | |

**DECLARATION OF CHRISTOPHER R. MURRAY IN SUPPORT OF TRUSTEE'S**
**OMNIBUS OBJECTION TO CLAIM NOS. 23 AND 24 OF JETALL CAPITAL, LLC**

I, Christopher R. Murray, hereby declare under penalty of perjury as follows:

1.      Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my discussions with my counsel retained in this case, my experience as a trustee and bankruptcy attorney, and/or my review of relevant documents and information relevant to the above-captioned case. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

2.      I am the chapter 11 trustee in the bankruptcy case of Galleria 2425 Owner, LLC, Case No. 23-34815.

3.      I have been the chapter 11 trustee of the Debtor's case since February 9, 2024. In my role as trustee, I have become familiar with the Debtor's operations, the Debtor's assets and liabilities, and the various pleadings and filings with the U.S. Bankruptcy Court for the Southern District of Texas.

4.      The Trustee's Omnibus Objection to Claim Nos. 23 and 24 of Jetall Capital, LLC (the "Objection")[1] is the result of the investigation that I have conducted and directed my attorneys

---

[1] Capitalized terms used, but not defined in this Declaration have the meanings ascribed to such terms in the Objection.

to conduct in the above-captioned case. I have read the Objection, and to the best of my knowledge, information, and belief, the factual assertions made in the Objection are accurate.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 3, 2024

_____
Christopher R. Murray, Chapter 11 Trustee

2

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

June 17, 2024

Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 23-34815** |
| GALLERIA 2425 OWNER, LLC, | § | |
| | § | |
| Debtor. | § | |
| | § | |
| | § | **CHAPTER 11** |

## ORDER

Before the Court is the Motion for Entry of Order Prohibiting Credit Bidding by National Bank of Kuwait, S.A.K.P. New York Branch Pursuant to 11 U.S.C. § 363(k) (ECF No. 353) filed by 2425 WL, LLC and Ali Choudhri ("Choudhri").  The National Bank of Kuwait, S.A.K.P. New York Branch ("NBK") filed its objection to the motion at ECF No. 455.  Hearing was held on June 17, 2024.

The movants are requesting that the Court prohibit credit bidding[1] in any auction or sale of the debtor's property located at 2425 West Loop South, Houston, Texas (the "Property"), as there are bona fide disputes regarding whether NBK possesses any claim or rights to the Property based on the loan, deed of trust, and tax liens, and disputes exist relating to the validity of NBK's lien on the Property.  Movants further argue that the right to credit bid will chill interest in the auction of the Property.

## BACKGROUND

NBK has filed two secured claims in this case, one in the amount of $3,864,455.06 (Claim No. 13) and one in the amount of $67,157,854.15 (Claim No. 14), totaling $71,018,309.21.  Claim 13 is based on two Tax Lien Contracts and a Loan Modification Agreement, and Claim 14 is based on a Loan Agreement, a Promissory Note and a Deed of Trust on the Property.  In support of their allegations, the movants referenced a Confidential Settlement Agreement dated August 22, 2022,[2] alleging that NBK breached the agreement, which increased NBK's claim against the debtor.  NBK disputed those allegations and presented evidence that it was the debtor that breached the agreement and failed to comply with a state court order requiring it to close on a loan purchase or allow NBK to foreclose.[3]

NBK filed its Plan of Liquidation (ECF No. 194) on April 10, 2024 (the "NBK Plan").  The NBK Plan provides for the sale of the Property and dissolution of the debtor.

---

[1] Credit bidding is a term of art which permits a creditor to bid at a sale under Section 363(b) in an amount up to its entire claim.  *In re Dalton Crane, L.C.* 641 B.R. 850 (Bankr. S.D. Tex. 2022).

[2] ECF No. 499-90 and ECF No. 508-7.

[3] ECF No. 498-1, pages 72 – 76 and ECF No. 90-3, pages 31, 34, 36, 40, 56, 58, 60 and 62 for the rulings by the court.

001863

On April 10, 2024, the Chapter 11 Trustee filed a Notice of Proposed Stalking Horse Agreement at ECF No. 197. That agreement provides that NBK will purchase the Property through a credit bid in the amount of $18.6 million. The Bid Procedures approved by the Court on April 29, 2024, at ECF No. 254 set a bid deadline of June 14, 2024, at 5:00 p.m., set an auction date of June 18, 2024, at 1:00 p.m., if needed, and approved the form of the Stalking Horse Agreement but did not approve the sale of the Property to NBK, even if NBK is the only bidder. Instead, it provides that the Trustee should promptly seek approval of the Stalking Horse Agreement if NBK has the only qualified bid for the Property. The deadline to object to the sale is July 1, 2024, and the hearing, if needed, for the Court to consider a successful bid is scheduled for July 8, 2024, at 9:00 a.m.

In support of its objection, NBK points to the bidding process and the Chapter 11 Trustee's status report,[4] advising of the interest he has received in the sale of the Property and the efforts by potential bidders. Accordingly, there is the possibility that NBK credit bidding has not chilled interest in an auction. The bidding process consisted of two months of marketing and required a bid deposit of 10% of the cash purchase price.

## ANALYSIS

Section 363(k) of the Bankruptcy Code provides as follows: At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court **for cause** orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

11 U.S.C. §363(k) treats credit bids as a method of payment the same as if the secured creditor has paid cash.[5] The Supreme Court has held that debtor may not sell property free and clear of liens without allowing a lienholder to credit bid.[6] That case was similar in that the debtor proposed a plan which provided for a sale of property by auction, with the initial bid to be submitted by a "stalking horse" – a potential purchaser who was willing to make an advance bid of $47.5 million. The sale was to be free and clear of liens, with the secured creditor being paid out of the proceeds of the sale, and not allowed to credit bid. The debtor in that case sought to confirm the plan under the cramdown provisions of Section 1129(b)(2)(A). The secured creditor objected to the plan. Here NBK proposed the plan, is the "stalking horse," and it has sought a credit bid of $18.6 million.

The Fifth Circuit in a concurrence discussing *RadLAX,* advised that prudent bankruptcy courts routinely order transparent, broadly publicized auctions of debtors' assets that test the market for valuations as well as secured creditors' sincerity about credit bidding.[7] That was done in this case.

---

[4] ECF No. 452.

[5] *R&L Inv. Property, LLC v. Green,* No. 12-4171, 2014 WL 1807618, (Bankr.N.D. Tex. May 6, 2014) *citing In re Spillman Development Group, Ltd.*, 401 B.R. 240 (Bankr. W.D. Tex. 2009).

[6] *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 132 S. Ct. 2065 (2012).

[7] *Baker Hughes Oilfield Operations, Inc. v. Morton (In re R.L. Adkins Corp.)*, 784 F.3d 978 (5th Cir. 2015).

Movants' initial objection to the credit bidding is that they contend that NBK does not have an allowed claim, and the extent or validity of its liens is genuinely in dispute. In support of this argument, it cites to *In re CS Mining*,[8] which found that the right of a lienholder whose lien was not in bona fide dispute may bid at a sale. The court used the fact that there was an objection to the claim and an adversary as a starting point in its analysis to determine if there was cause to deny credit bidding. It found that it was only one factor, however, in its overall analysis whether or not to change the existing bidding procedures that were in place in that case. There was no evidence presented at the hearing that demonstrated that the debtor complied with the provisions of the Confidential Settlement Agreement regarding the Settlement Payment, as the amount of $801,509.42 was not paid within 210 days of the Effective Date as set forth in that agreement.[9] In fact, there was evidence submitted that the payment was not made.[10] Additionally, when the payment date was extended to July 3, 2023 by state court action, again the Settlement Payment was not made.

The movants broadly claim that NBK has no interest in the subject property and that they have breached the Confidential Settlement Agreement or that there are other contract breaches. They alleged that "on June 28, 2023, NBK offered to sell the Loan and the Deed of Trust securing the Property to Choudhri for $27 million less credits resulting in a net purchase price of $26,038,490.58." The Court does not believe this to be true, there was no offer by NBK or valid acceptance by any party. The evidence does not support such an allegation. They further alleged that Choudhri's state court litigation [which has been removed to this court] raises substantial disputes relating to the NBK claim(s), including whether NBK has any rights to the Property whatsoever pursuant to the Loan and Deed of Trust. The Court entirely disagrees with this allegation.

The Court notes that there are various claim objections pending, however, the Court finds that these are not a sufficient dispute for the court to find cause to disallow or limit NBK's right to credit bid under 11 U.S.C. § 363(k). The Court finds that the moving parties have failed to meet their burden as to cause. Its second objection is that allowing NBK to credit bid up to $71 million would have the effect of chilling other interested parties from bidding on the Property.

It is clear that Section 363(k) allows a court discretion if cause if found to prohibit or limit credit bidding. One cause could be if permitting the lienholder to bid would chill the bidding process.[11] The Chapter 11 Trustee has filed a report on the marketing process.[12] The Court does believe that credit bidding in this case, just like a secured creditor bidding at a foreclosure sale, may impact the bidding process. However, if this was all that was needed to prohibit or limit credit bidding then Section 363(k) would simply disallow credit bidding, when it does exactly the opposite. The Court holds that there must be some sufficient dispute between the parties that it can find cause for disallowing or limiting credit bidding. Here it does not find any such cause and denies the motion in its entirety.

---

[8] *In re CS Mining, LLC*, 574 B.R. 259 (Bankr. D. Utah 2017) *citing in re RadLAX, supra*.
[9] ECF No. 508-7, page 4.
[10] ECF No. 498-1, page 18 "[t]here's no dispute that the payment wasn't made in full by March 20,"
[11] *In re Fisker Automotive Holdings, Inc.,* 510 B.R. 55 (Bankr. D. De. 2014) *citing* to 3 Collier on Bankruptcy 363.09[1].
[12] ECF No. 452.

The movants and especially Choudhri go to great lengths to pass the blame for their non-payment to NBK of the Settlement Payment, in effect that he or others could not pay due to the actions of NBK.  The Court upon review of the documentary evidence does not believe these allegations.  Additionally, and finally the Court recognizes that NBK is a liquid institution and that any possible claims made against it for money damages, by any party, if awarded will be paid. While the Court doubts the allegations of the movants and does not believe that they will be successful on any of their claims, if they do, to the extent they are entitled to money damages they will be paid.  Still further the Court relies on the Chapter 11 Trustee's business judgment as to the lack of validity of the movants claims having heard no credible evidence to question his testimony.

For the reasons so stated the Motion to Prohibit Credit Bidding (ECF No. 353) is in all things denied.

**SO ORDERED**.

SIGNED 06/17/2024

Jeffrey Norman
United States Bankruptcy Judge

001866

United States Bankruptcy Court
Southern District of Texas
**ENTERED**
June 22, 2024
Nathan Ochsner, Clerk

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO: 23-34815 |
| GALLERIA 2425 OWNER, LLC, | § | |
| | § | |
| Debtor. | § | |
| | § | CHAPTER 11 |

### ORDER CONFIRMING CHAPTER 11 PLAN OF LIQUIDATION OF THE DEBTOR BY NATIONAL BANK OF KUWAIT, S.A.K.P. NEW YORK BRANCH

**BASED ON THE COURT'S MEMORANDUM OPINION, IT IS HEREBY ORDERED THAT:**

**A. Findings of Fact and Conclusions of Law** The findings of fact and conclusions of law set forth in the Court's Memorandum Opinion are hereby incorporated by reference as though fully set forth herein and constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable herein by Bankruptcy Rule 9014.

**B. Eligibility for Relief** The Debtor was and is eligible for relief under section 109 of the Bankruptcy Code.

**C. Confirmation** The Plan is confirmed under section 1129 of the Bankruptcy Code. The Plan Supplement is incorporated by reference into, and is an integral part of, the Plan and this Confirmation Order, and is authorized and approved. NBK is authorized to implement and consummate the Plan, including taking all actions necessary or appropriate to effectuate the Plan, without further authorization except as may be required by the Plan or this Confirmation Order.

**D. Objections** All objections, responses, reservations, statements, and comments to the Plan, other than those resolved, adjourned, or withdrawn with prejudice prior to, or on the record at, the Confirmation Hearing, are overruled on the merits in all respects. All withdrawn objections, if any, are deemed withdrawn with prejudice. All objections to Confirmation not filed and served prior to the deadline for filing objections to the Plan set forth in the Confirmation Hearing Notice, if any, are deemed waived and will not be considered by the Court.

**E. Binding Effect** Effective as of entry of this Confirmation Order and subject to the occurrence of the Effective Date, the Plan, the Plan Supplement, and this Confirmation Order shall bind any Holder of a Claim or Interest and such Holder's respective successors and assigns, whether or not: (a) the Claim or Interest is impaired under the Plan; (b) such Holder has accepted the Plan; (c) such Holder has failed to vote to accept or reject the Plan or voted to reject the Plan; (d) such Holder is entitled to a distribution under the Plan; (e) such Holder will receive or retain any property or interests in property under the Plan; and (f) such Holder has filed a Proof of Claim in this Chapter 11 Case. The Plan, the Plan Supplement, and this Confirmation Order constitute

legal, valid, binding, and authorized obligations of the respective parties and shall be enforceable in accordance with their terms. Pursuant to section 1142(a) of the Bankruptcy Code, the Plan, the Plan Documents, and this Confirmation Order shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

**F. Plan Classification Controlling** The terms of the Plan shall govern the classification of Claims and Interests for purposes of distributions to be made thereunder. The classification set forth on the Ballots tendered to or returned by the Holders of Claims in connection with voting on the Plan: (a) were set forth thereon solely for the purposes of voting to accept or reject the Plan; (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of Claims and Interests under the Plan for distribution purposes; (c) may not be relied upon by any Holder of a Claim or Interest as representing the actual classification of such Claim or Interest under the Plan for distribution purposes; and (d) shall not be binding on NBK or the Chapter 11 Trustee except for voting purposes.

**G. Allowance of Claims** As provided in Article VII of the Plan, no Claim is or shall be deemed Allowed until the later of the Claims Objection Deadline or the expiration of some other applicable period of limitation fixed by the Bankruptcy Code, Bankruptcy Rules, or Bankruptcy Court, unless otherwise ordered by a Final Order of the Bankruptcy Court or Allowed pursuant to the Plan.

**H. Effective Date**  Except as otherwise provided herein, upon the occurrence of the Effective Date, the terms of the Plan, the Plan Supplement, and this Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Estate, the Liquidation Trust, and any and all Holders of Claims against or Interests in the Debtor (irrespective of whether their Claims or Interests are presumed to have accepted or deemed to have rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtor.

**I. Distributions** All distributions pursuant to the Plan shall be made in accordance with Article VII of the Plan, and such methods of distribution are approved. The Distribution Agent shall have no duty or obligation to make distributions to any Holder of an Allowed Claim unless and until such Holder executes and delivers, in a form acceptable to the Distribution Agent, any and all documents applicable to such distributions in accordance with Article VI of the Plan.

**J. Retained Assets**  Pursuant to Article VI of the Plan, except as otherwise provided in the Plan or in any contract, instrument, release, indenture or other agreement entered into in connection with the Plan, in accordance with Bankruptcy Code § 1123(b)(3), any claims, Causes of Action, defenses and counterclaims that the Debtor may hold against any Person, shall vest in the Liquidation Trust, and the Liquidation Trustee shall retain and may exclusively enforce any and all such claims, causes of action, defenses and counterclaims.

**K. Treatment of Executory Contracts and Unexpired Leases** Notwithstanding any provision in the Plan to the contrary, all Executory Contracts and Unexpired Leases are deemed rejected

001868

unless (i) described in the Plan as to be assumed in connection with Confirmation, (ii) identified on the Schedule of Contracts/Leases, (iii) subject to a motion by the Chapter 11 Trustee to assume (or assume and assign) as of the Effective Date, and (iv) entered into in connection with the Plan. Entry of this Confirmation Order shall constitute a Court order approving the rejection of such executory contracts or unexpired leases, as applicable.

**L. Exemption From Transfer Taxes**  To the fullest extent applicable and permitted by section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of a security, or the making of delivery of an instrument of transfer, provided under the Plan, from the Estate to NBK or any other Person pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax or governmental assessment. The appropriate federal, state or local governmental officials or agents are directed to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the instruments or other documents as set forth in the Plan without the payment of any such tax or governmental assessment.

**M. Filing and Recording**  This Confirmation Order is, and shall be, binding upon and shall govern the acts of all persons or entities including all filing agents, filing officers, title agents, title companies, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required, by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any document or instrument.

Each and every foreign, federal, state, and local government agency is hereby directed to accept any and all documents and instruments necessary, useful, advisable, or appropriate (including financing statements under the applicable uniform commercial code) to effectuate, implement, and consummate the transactions under the Plan.

**N. Tax Withholding** In accordance with the provisions of the Plan and subject to Article VII.G of the Plan, to the extent applicable, the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms the Distribution Agent believes is reasonable and appropriate.

**O. Discharge of Claims and Termination of Interests; Compromise and Settlement of Claims, Interests and Controversies**  Pursuant to section 1141(d) of the Bankruptcy Code and except as otherwise specifically provided in the Plan or this Confirmation Order, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations

001869

of, rights against, and Interests in the Debtor or any of its assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (i) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest voted to accept or reject the Plan.

This Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date, and all actions taken to effectuate the Plan, including by any agent, shall be given the same effect as if such actions were performed under the applicable nonbankruptcy laws that govern the documents under which such agent was appointed. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019 and without any further notice to or action, order, or approval of the Court, after the Effective Date, the Liquidation Trustee may compromise and settle Claims against, and Interests in, the Debtor and its Estate and Causes of Action against other Entities.

**P. Releases, Injunction, Exculpation and Related Provisions Under the Plan** Except to the extent modified by this Confirmation Order, the releases, injunctions, exculpations, and related provisions in Article IX of the Plan are incorporated herein in their entirety, are hereby approved and authorized in all respects, are so ordered, and shall be immediately effective on the Effective Date without further order of this Court or any other party.

The injunction provision in Article IX.E of the Plan will be immediately effective on the Effective Date and is (i) within the jurisdiction of this Court; (ii) necessary to preserve and enforce the exculpation provision in Article IX.C of the Plan, the Estate Release in Article IX.D of the Plan, and the compromises and settlements implemented under the Plan; and (iii) are narrowly tailored to achieve these purposes. Notwithstanding any provision in the Plan, including Article IX.C of the Plan and the definition of Exculpated Party contained in Article I.A.39 of the Plan, "Exculpated Parties" shall mean only the Chapter 11 Trustee and any Related Parties of the Chapter 11 Trustee.

**Q. Post-Confirmation Notice** In accordance with Bankruptcy Rules 2002 and 3020(c), no later than seven (7) days after the Effective Date, NBK shall cause a notice of Confirmation and occurrence of the Effective Date, substantially in the form attached as Exhibit B (the "Notice of Confirmation and Effective Date") to be served on all parties served with the Confirmation Hearing Notice by email or U.S. first-class mail, postage prepaid. The Notice of Confirmation and Effective Date will have the effect of an order of the Court, will constitute sufficient notice of entry of this Confirmation Order and occurrence of the Effective Date to filing and recording officers, and will be a recordable instrument notwithstanding any contrary provision of applicable nonbankruptcy law.

**R. Cancellation of Interests** Pursuant to Article III of the Plan, on the Effective Date, all Interests shall be deemed automatically cancelled and extinguished.

**S. Distribution Record Date** The record date for purposes of making distributions under the Plan on account of Allowed Claims shall be the Confirmation Date or such other date as is announced by the Chapter 11 Trustee, the Liqudiation Trustee or another designated party in a Final Order.

**T. Ad Valorem Taxes**  Notwithstanding any provision in the Plan to the contrary, on the Effective Date, any claim held by a governmental unit and Caz Creek TX, LLC for *ad valorem* taxes shall be paid statutory interest accruing from the Petition Date until such taxes are paid in full; *provided*, that any and all *ad valorem* statutory tax liens held by a governmental unit and Caz Creek TX, LLC, whether for prepetition or postpetition tax years, shall be retained until the *ad valorem* taxes are paid in full.

**U. Post-Confirmation Sale of Property** Notwithstanding any provision in the Plan to the contrary, the Bankruptcy Court will consider approval of the sale of the Property post-confirmation and for the sake of a clean record, will enter a separate Final Order with respect to the sale at that time.

**V. Effect of Confirmation Order and Other Orders** Unless expressly provided for herein, nothing in the Plan or this Confirmation Order shall affect any orders entered in this Chapter 11 Case.

**W. Inconsistency** In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in the Plan Supplement or in this Confirmation Order). In the event of any inconsistency between any of the Plan, Plan Supplement, or the Disclosure Statement on the one hand, and this Confirmation Order on the other hand, this Confirmation Order shall control.

**X. Injunctions and Automatic Stay** Unless otherwise provided in the Plan or in this Confirmation Order, all injunctions or stays in effect in this Chapter 11 Case pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Court, and extant on this Confirmation Date (excluding any injunctions or stays contained in the Plan or this Confirmation Order), shall remain in full force and effect through and including the Effective Date. All injunctions or stays contained in the Plan or this Confirmation Order shall remain in full force and effect in accordance with their terms.

**Y. Authorization to Consummate** NBK and to the extent required the Chapter 11 Trustee are authorized to consummate the Plan and finalize and implement the Plan at any time after the entry of this Confirmation Order subject to satisfaction or waiver of the conditions precedent to consummation set forth in Article VIII of the Plan.

001871

**Z. Substantial Consummation** On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101(2) and 1127(b) of the Bankruptcy Code.

**AA. Severability** Except as set forth in Article VIII of the Plan, the provisions of the Plan, including its release, injunction, exculpation and compromise provisions are mutually dependent and nonseverable. This Confirmation Order constitutes a judicial determination and hereby provides that each term and provision of the Plan are: (i) valid and enforceable pursuant to their terms; (ii) integral to the Plan and may not be deleted or modified without NBK's consent; and (iii) nonseverable and mutually dependent.

**BB. Effect of Non-Occurrence of Effective Date** If the Effective Date does not occur, the Plan shall be null and void in all respects, and nothing contained in the Plan, the Disclosure Statement, or this Confirmation Order shall (i) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtor; (ii) prejudice in any manner the rights of NBK, any Holders of Claims or Interests, or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by NBK, any Holders of Claims or Interests, or any other Entity in any respect.

**CC. Chapter 11 Trustee's Actions Post-Confirmation Through the Effective Date** Until the Effective Date, the Chapter 11 Trustee shall continue to manage the estate, subject to the Court's oversight as provided under the Bankruptcy Code, the Bankruptcy Rules, and this Confirmation Order and any order of the Court that is in full force and effect.

**DD. Reports** After the Effective Date, the Chapter 11 Trustee has no obligation to file with this Court or serve on any parties reports that the Estate was obligated to file under the Bankruptcy Code or a prior order of the Court, including monthly operating reports (except for any periods for which a monthly operating report was not filed before the Confirmation Date), ordinary course professional reports, and monthly or quarterly reports for Professionals; *provided*, *however*, that the Chapter 11 Trustee shall continue to comply with the U.S. Trustee's quarterly reporting requirements.

**EE. Conditions to Effective Date** The Plan shall not become effective unless and until the conditions in Article VIII.B of the Plan have been satisfied or waived pursuant to Article VIII.C of the Plan.

**FF. Waiver of Stay** Notwithstanding any Bankruptcy Rule (including Bankruptcy Rules 3020(e) and 6004(h)), this Confirmation Order is effective immediately and not subject to any stay, sufficient cause having been shown.

**GG. Modification of Plan Supplement** Subject to the terms of the Plan and this Confirmation Order, NBK is authorized to modify and amend the Plan Supplement through and including the Effective Date, and to take all actions necessary and appropriate to effectuate the transactions contemplated therein.

**HH. Post-Confirmation Modification of the Plan** Subject to the terms of the Plan and this Confirmation Order, NBK is authorized to amend or modify the Plan at any time prior to the

001872

substantial consummation of the Plan without further order of this Court, but only in accordance with section 1127 of the Bankruptcy Code and Article XI.H of the Plan.

**II. No Waiver/References to and Omissions of Plan Provisions** References to articles, sections, documents and provisions of the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan. The failure to include or to refer to any particular article, section, or provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such article, section, document or provision nor constitute a waiver thereof, an such article, section, document or provision shall have the same validity, binding effect, and enforceability as every other article, section, document, or provision of the Plan, it being the intent of the Court that the Plan be confirmed in its entirety, except as expressly modified herein, and incorporated herein by this reference.

**JJ. Reservation of Rights** The filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by NBK with respect to the Plan shall not be deemed to be an admission or waiver of any rights of NBK, the Chapter 11 Trustee, the Liquidation Trustee, or any other Person with respect to Claims against and Interests in the Debtor.

**KK. Final Order** The provisions of Federal Rule of Civil Procedure 62, as applicable pursuant to Bankruptcy Rule 7062, and Bankruptcy Rule 3020(e) shall not apply to this Confirmation Order. The period in which an appeal with respect to this Confirmation Order must be filed shall commence immediately upon the entry of this Confirmation Order.

**LL. Retention of Jurisdiction** Notwithstanding the entry of this Confirmation Order, from and after the Effective Date, this Court shall retain exclusive jurisdiction over this Chapter 11 Case and all matters arising under, arising out of, or related to, this Chapter 11 Case, including all matters listed in Article XI of the Plan or addressed by this Confirmation Order, as well as for the purposes set forth in section 1142 of the Bankruptcy Code, to the fullest extent legally permissible.

Signed: June 22, 2024

Jeffrey P. Norman
United States Bankruptcy Judge

7 / 7

001873

THE SOLICITATION MATERIALS ACCOMPANYING THE PLAN OF LIQUIDATION HAVE NOT BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF 11 U.S.C. § 1125(a). NBK EXPECTS TO SEEK AN ORDER OF THE BANKRUPTCY COURT, AMONG OTHER THINGS: (1) APPROVING THE SOLICITATION OF VOTES AS HAVING BEEN IN COMPLIANCE WITH 11 U.S.C. § 1126(b); AND (2) CONFIRMING THE PLAN OF LIQUIDATION PURSUANT TO 11 U.S.C. § 1129.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| **GALLERIA 2425 Owner, LLC** | § | **Case No. 23-34815 (JPN)** |
| | § | |
| Debtor. | § | **Chapter 11** |
| | § | |
| | § | |

CHAPTER 11 PLAN OF LIQUIDATION OF THE DEBTOR BY
NATIONAL BANK OF KUWAIT S.A.K.P., NEW YORK BRANCH

**PILLSBURY WINTHROP SHAW PITTMAN LLP**
Charles C. Conrad
Texas State Bar No. 24040721
Ryan Steinbrunner
Texas State Bar No. 24093201
609 Main Street Suite 2000
Houston, TX 77002
Phone: (713) 276-7600
Facsimile: (713) 276-7634
charles.conrad@pillsburylaw.com
ryan.steinbrunner@pillsburylaw.com

*Counsel for National Bank of Kuwait, S.A.K.P., New York Branch*

**PILLSBURY WINTHROP SHAW PITTMAN LLP**
Andrew M. Troop
Federal Bar No. MA547179
Patrick E. Fitzmaurice (admitted *pro hac vice*)
Kwame O. Akuffo (admitted *pro hac vice*)
31 West 52nd Street
New York, NY 10019
Phone: (212) 858-1000
Facsimile: (212) 858-1500
andrew.troop@pillsburylaw.com
patrick.fitzmaurice@pillsburylaw.com
kwame.akuffo@pillsburylaw.com

001874

## INTRODUCTION

National Bank of Kuwait, S.A.K.P., New York Branch, proposes this Chapter 11 Plan of Liquidation pursuant to the provisions of the United States Bankruptcy Code for the resolution of Debtor's outstanding Claims and Interests. All Holders of Claims and Interests are encouraged to read the Plan and any exhibits or supplements attached hereto, or filed by NBK in conjunction with the Plan, in their entirety before voting to accept or reject the Plan.

As set forth more fully below, the Plan proposes that the Debtor's Property be sold through a public auction run by the Chapter 11 Trustee. Pursuant to the Purchase Agreement, NBK has agreed to purchase the Property through a credit bid in the amount of $18,600,000, subject to any higher and better offers that may be received; NBK reserves the right to increase its credit bid.

In general, the Plan provides that if NBK is the Successful Bidder, NBK will make a Cash contribution to the Estate in an amount sufficient to (i) satisfy in full Other Secured Claims and Other Priority Claims; (ii) pay 70% of the Trade General Unsecured Claims in Cash on or after the Effective Date; and (iii) fund the Liquidation Trust. If NBK is not the Successful Bidder, then the Plan provides that the foregoing sums will be paid out of the third-party Purchase Price with the balance being paid to NBK on account of its secured claim against the Debtor.

Capitalized terms not defined in this Introduction shall have the meanings ascribed to them in Article I of the Plan.

PLEASE READ THE PLAN CAREFULLY WITH RESPECT TO HOW YOUR RIGHTS MAY BE AFFECTED.

## ARTICLE I
## DEFINITIONS AND CONSTRUCTION OF TERMS

### A. Defined Terms

1.  *Action* means Causes of Action and Avoidance Actions.

2.  *Administrative Claim* means any Claim constituting a cost or expense of administration of the Chapter 11 Case under Bankruptcy Code section 503(b) and that is entitled to priority under Bankruptcy Code section 507(a), including, inter alia, any actual and necessary expenses of preserving the estate, and all fees and charges assessed against the bankruptcy estate under Chapter 123 of Title 28, United States Code.

3.  *Affiliate* has the meaning set forth in Bankruptcy Code section 101(2).

4.  *Allowed* means any Claim or Interest: (a) that has been listed in the Debtor's Schedules as liquidated in amount and not disputed or contingent and for which no contrary Proof of Claim has been filed or with respect to which no objection has been filed; (b) expressly allowed (i) by a stipulation with the Chapter 11 Trustee executed before the Confirmation Date and approved by the Court regarding the amount and nature of such Claim, (ii) by a stipulation with the Liquidation Trustee executed after the Confirmation Date and, if necessary, approved by the Court regarding the amount and nature of such Claim or (iii) in any contract or other agreement

2

entered into or assumed in connection with the Plan; (c) related to a rejected executory contract or unexpired lease that is (i) not a Disputed Claim or (ii) has been allowed by a Final Order; or (d) expressly allowed by a Final Order or pursuant to the Plan.

5.     ***Allowed Claim*** means a Claim that is Allowed.

6.     ***Auction*** means the sale of the Property that was held in accordance with the Sale and Bid Procedures.

7.     ***Avoidance Actions*** means any and all Causes of Action which a trustee, debtor in possession, the Estate or other appropriate party in interest may assert under Bankruptcy Code sections 502, 510, 541, 542, 543, 544, 545, 547, 548, 549, 550, 551, or 553 (other than those which are released or dismissed as part of and pursuant to the Plan) or under other similar or related state or federal statutes or common law, including fraudulent conveyance laws.

8.     ***Bankruptcy Code*** means Title 11 of the United States Code, as amended from time to time.

9.     ***Bankruptcy Rules*** means the Federal Rules of Bankruptcy Procedure, as amended from time to time and made applicable to the Chapter 11 Case.

10.    ***Broker*** means JLL or other broker engaged by the Chapter 11 Trustee to market the Property.

11.    ***Business Day*** means any day, other than a Saturday, Sunday, or a legal holiday, as defined in Bankruptcy Rule 9006(a).

12.    ***Cash*** means the legal tender of the United States of America or the equivalent thereof, including bank deposits, checks, and cash equivalents, as applicable.

13.    ***Cash Contribution*** means the Cash contribution set forth in Article VI(C).

14.    ***Cause of Action*** means any and all actions, Claims, rights, defenses, third party claims, damages, executions, demands, crossclaims, counterclaims, suits, choses in action, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims whatsoever, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, Disputed, undisputed, secured or unsecured and whether asserted or assertable directly, indirectly or derivatively, at law, in equity or otherwise, including, but not limited to, the Avoidance Actions.

15.    ***Chapter 11 Case*** means the chapter 11 case filed by the Debtor on the Petition Date.

16.    ***Chapter 11 Trustee*** means Christopher R. Murray, solely in his capacity as such.

17.    ***Claim*** has the meaning set forth in Bankruptcy Code section 101(5).

18.    ***Claims Objection Deadline*** means the deadline for objecting to filed Proofs of Claims or scheduled claims, which shall be the sixtieth (60) day following the later of (a) the

001876

Effective Date and (b) the date that a Proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim, as the same may be extended by time to time in accordance with Article VII(D).

19.    ***Claimant*** means the Holder of a Claim.

20.    ***Class*** means a category of Holders of Claims or Interests as classified in the Plan.

21.    ***Confirmation Date*** means the date on which the Court enters the Confirmation Order.

22.    ***Confirmation Hearing*** means the hearing at which the Court will consider confirmation of the Plan, as such hearing may be adjourned or continued from time to time.

23.    ***Confirmation Order*** means the order of the Court confirming the Plan.

24.    ***Court*** means the United States Bankruptcy Court for the Southern District of Texas, Houston Division, or in the event such court ceases to exercise jurisdiction over the Chapter 11 Case, such court as may have jurisdiction with respect to the liquidation of Debtor under Chapter 11 of the Bankruptcy Code.

25.    ***Cure Costs*** means the payment of Cash by the Purchaser necessary to cure a default of an executory contract or unexpired lease pursuant to Bankruptcy Code section 365(b).

26.    ***Debtor*** means Galleria 2425 Owner, LLC.

27.    ***Disallowed*** means, with respect to any Claim or Interest, that such Claim or Interest: (a) has been withdrawn by agreement of the Debtor and the Holder thereof; (b) has been withdrawn by the Holder thereof; (c) has been disallowed by Final Order; or (d) specified in a provision of the Plan not to be Allowed.

28.    ***Disallowed Claim*** means a Claim, or any portion thereof, that is Disallowed.

29.    ***Disclosure Statement*** means the disclosure statement for the Plan, as the Disclosure Statement may be amended, supplemented or otherwise modified from time to time, including all exhibits and schedules thereto and references therein that relate to the Plan, that is prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules and applicable law.

30.    ***Disputed*** means, with respect to any Claim or Interest, any Claim or Interest that is not yet Allowed.

31.    ***Disputed Claim*** means a Claim, or any portion thereof, that is Disputed. Under the Plan, a Claim that has been neither Allowed nor Disallowed shall be considered a Disputed Claim.

32.    ***Distribution*** means a distribution of Cash from the Liquidation Trustee on account of an Allowed Claim.

33.    ***Distribution Account Claims*** has the meaning set forth in Article VI(E).

34.     ***Distribution Agent*** means the Liquidation Trustee who shall make Distributions and transfers in accordance with the Plan.

35.     ***Effective Date*** means the first Business Day following the date on which all conditions to consummation set forth in Article VIII(B) have been satisfied or waived pursuant to Article VIII(C).

36.     ***Entity*** has the meaning set forth in Bankruptcy Code section 101(15).

37.     ***Estate*** means the estate of the Debtor as defined in section 541 of the Bankruptcy Code.

38.     ***Estate Assets*** means all legal or equitable interests as defined in Bankruptcy Code section 541 or the Plan belonging to the Estate.

39.     ***Exculpated Party*** means: (a) the Chapter 11 Trustee; (b) NBK; (c) the Liquidation Trustee; (d) the Distribution Agent; (e) the Purchaser; (f) each current and former Affiliate of each Entity in clause (a) through the following clause (g); and (g) each Related Party of each Entity in clause (a) through this clause (g).

40.     ***Final Decree*** means the decree contemplated under Bankruptcy Rule 3022.

41.     ***Final Order*** means an order or judgment of the Court as entered on the docket in the Chapter 11 Case, or other court of competent jurisdiction, the operation or effect of which has not been stayed, reversed or amended, and as to which order or judgment (or any reversal, modification or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending; *provided*, *however*, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable state court rules of civil procedure, may be filed with respect to such order, shall not cause an order not to be a Final Order.

42.     ***General Unsecured Claim*** means an Unsecured Claim which is not entitled to priority under the Bankruptcy Code, including the NBK Deficiency Claim.

43.     ***Holder*** means a Person or an Entity holding a Claim against or an Interest in the Debtor.

44.     ***Impaired*** means, with respect to a Claim or Interest, or Class of Claims or Interests, "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

45.     ***Insider*** has the meaning set forth in section 101(31) of the Bankruptcy Code.

46.     ***Insider Claims*** means Claims that are held by Insiders. For the avoidance of doubt, the Insider Claims include the following:

001878

| Reference | Claimant | C, D, UL | Est. Claim |
|---|---|---|---|
| POC No. 7 | 2425 WL, LLC | - | $22,968,231.58 |
| POC No. 21 | Ali Choudhri | - | $4,176,657.46 |
| POC No. 22 | Ali Choudhri | - | $1,844,500.45 |
| POC No. 20 | Jetall Companies Inc. | | $3,180,223.30 |
| POC No. 23 | Jetall Capital, LLC | - | $1,699,750.00 |
| | | TOTAL: | $33,869,362.79 |

47.    *Interest* means any equity security (as defined in Bankruptcy Code section 101(16)) of Debtor, including, *inter alia*, any rights arising from the issued and outstanding membership interest or the right to purchase membership interest in Debtor.

48.    *JLL* means Jones Lang LaSalle.

49.    *Lien* has the meaning set forth in Bankruptcy Code section 101(37), and, with respect to any asset, includes, *inter alia*, any mortgage, lien, pledge, charge, security interest or other encumbrance of any kind, or any other type of preferential arrangement that has the practical effect of creating a security interest, in respect of such asset.

50.    *Liquidation Trust* means the trust established under Article VI.

51.    *Liquidation Trust Agreement* means the agreement to be executed among the Liquidation Trustee and the Chapter 11 Trustee establishing the Liquidation Trust.

52.    *Liquidation Trust Assets* means any and all assets of the Liquidation Trust.

53.    *Liquidation Trust Fund* means the Remaining Cash transferred to the Liquidation Trust and any other proceeds of the Liquidation Trust Assets.

54.    *Liquidation Trustee* means the trustee of the Liquidation Trust.

55.    *NBK* means National Bank of Kuwait, S.A.K.P., a banking corporation organized under the laws of Kuwait, acting through its New York branch.

56.    *NBK Deficiency Claim* means the Claim of NBK set forth in Article III(B)(g).

57.    *NBK Tax Claim* means the Claim of NBK in the aggregate amount of $1,696,384.85 for tax liens imposed against the Property for years 2019 and 2020 pursuant to the Texas Property Tax Code, which liens have been assigned to NBK under that certain confidential settlement agreement, dated August 22, 2022.

58.    *Objection Deadline* means the deadline to object to any of: (a) the proposed Cure Costs set forth in the Schedule of Contracts/Leases; (b) the proposed assumption and assignment of any executory contract or unexpired lease; and (c) the proposed sale of the Property pursuant to

001879

the Sale and Bid Procedures. The Objection Deadline shall be set forth in the notice of Auction (as defined in the Sale and Bid Procedures Final Order).

59.     ***Other Priority Claim*** means any Claim against the Debtor entitled to priority in right of payment under section 507(a) of the Bankruptcy Code, excluding Administrative Claims, Professional Fee Claims, Priority Tax Claims or any Claim asserted by an Insider, Affiliate of the Debtor or Related Party to the Debtor.

60.     ***Other Secured Claim*** means any Secured Claim against the Debtor, including a Claim of a governmental unit for the payment of *ad valorem* real property taxes that is secured by property of the Estate. For avoidance of doubt, Other Secured Claim does not include the NBK Secured Claim or any Secured Claim asserted by an Insider.

61.     ***Other General Unsecured Claim*** means any Unsecured Claim against the Debtor that is not a Trade General Unsecured Claim, an Insider Claim, or a Subordinated Claim.

62.     ***Person*** has the meaning set forth in section 101(41) of the Bankruptcy Code.

63.     ***Petition Date*** means December 5, 2023, the date of filing of the Chapter 11 Case.

64.     ***Plan*** means this Chapter 11 Plan of Liquidation with respect to the Debtor, as amended, modified, or supplemented from time to time, together with all addenda, exhibits, schedules, supplements or other attachments.

65.     ***Plan Supplement*** means any supplement to this Plan that is filed with the Court prior to the Confirmation Hearing.

66.     ***Purchaser*** means the buyer of the Property under the Purchase Agreement.

67.     ***Purchase Agreement*** means that certain Asset Purchase Agreement dated as of April 10, 2024, as it may be modified or amended, by and among the Chapter 11 Trustee, as seller, and NBK, as stalking horse bidder or other buyer, which provides for the sale of the Property, and any schedules, exhibits or other documents attached thereto or contemplated thereby, in each case as amended from time to time in accordance with their terms.

68.     ***Purchase Price*** has the meaning given to it in the Purchase Agreement.

69.     ***Priority Claim*** means any Claim entitled to priority in payment pursuant to Bankruptcy Code section 507(a), excluding Administrative Claims or Priority Tax Claims.

70.     ***Priority Tax Claim*** means any Claim entitled to priority in payment pursuant to Bankruptcy Code sections 502(i) and 507(a)(8).

71.     ***Property*** means that certain real property located at 2425 West Loop South, Houston, Texas 77027.

72.     ***Pro-Rata Share*** means the proportion that an Allowed Claim in a particular Class bears to the aggregate amount of Allowed Claims in that Class.

73.    **Professional** means any professional employed in the Chapter 11 Case pursuant to Bankruptcy Code sections 327, 328 or 1103 or any professional or other Entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Case pursuant to Bankruptcy Code section 503(b)(4).

74.    **Professional Fee Claim** means a Claim by a Professional seeking an award by the Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date under Bankruptcy Code sections 330 or 331.

75.    **Proof of Claim** means a proof of Claim filed against the Debtor.

76.    **Quarterly Fees** means fees payable to the U.S. Trustee.

77.    **Related Party** means with respect to a Person, that Person's current and former, direct or indirect, directors, members, managers, officers, control persons, equity holders, partners, participants, managed accounts or funds, fund advisors or managers, investment managers, management companies, affiliates, predecessors, successors, assigns, subsidiaries, principals, employees, agents, trustees, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and advisors, but does not include the Chapter 11 Trustee or Professionals employed by the Chapter 11 Trustee.

78.    **Released Parties** means (a) the Chapter 11 Trustee; (b) NBK; (c) the Liquidation Trustee, and (d) each Related Party of each Entity in clause (a) through this clause (d). For avoidance of doubt, the Debtor, its current and former equity holders and their Affiliates and Related Parties are not Released Parties.

79.    **Releasing Parties** means, collectively, and in each case solely in their capacity as such, each of the Released Parties.

80.    **Remaining Cash** means the Cash transferred to the Liquidation Trust in accordance with Article VI(E).

81.    **Sale** means the sale of the Property under the Sale and Bid Procedures.

82.    **Sale and Bid Procedures** means the Final Order setting forth the requirements of a qualifying bidder and the manner in which bidding will occur at the Auction.

83.    **Schedules** means, collectively, the (a) schedules of assets and liabilities and (b) statements of financial affairs filed pursuant to section 521 of the Bankruptcy Code filed at docket number 70 in the Chapter 11 Case.

84.    **Schedule of Contracts/Leases** means the schedule of executory contracts and unexpired leases assumed by the Debtor and to be assigned to the Purchaser in connection with the Purchase Agreement, which schedule shall be an attachment to the Purchase Agreement.

85.    **Secured Claim** means: (a) any Claim that is secured by a Lien on property in which the Estate has an interest, which Liens are valid, perfected and enforceable under applicable law or by reason of a Final Order, or that is subject to setoff under Bankruptcy Code section 553, to

8

001881

the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to Bankruptcy Code section 506(a); and (b) any Claim which is Allowed under the Plan as a Secured Claim.

86.   ***Subordinated Claims*** means any Claim that is not a Class 1, 2, 3, 4, 5 or 6 Claim/that is the Other Secured Claims, Priority Claims, the NBK Tax Claim, NBK Secured Claim, Trade General Unsecured Claims and Other General Unsecured Claims.

87.   ***Successful Bid*** means the offer accepted for the Property in accordance with the Sale and Bid Procedures.

88.   ***Successful Bidder*** means the Qualifying Bidder who makes the Successful Bid.

89.   ***Trade General Unsecured Claims*** means any Claim against the Debtor for goods and repair, maintenance, and utility services provided to the Debtor prior to the Petition Date by a party other than the Debtor, an Affiliate of the Debtor, or a Related Party to the Debtor.  For the avoidance of doubt, the Trade General Unsecured Claims include the following (subject to being Allowed pursuant to the procedures set forth in this Plan):

| Reference | Claimant | C, D, UL | Est. Claim |
|---|---|---|---|
| Sch. 3.2 | ADT | - | $1,487.00 |
| Sch. 3.4 | Ash Automated Control Systems, LLC | - | $1,548.31 |
| Sch. 3.5 | CFI Mechanical | - | $668.44 |
| POC No. 8 | Cirro Electric | - | $62,405.41 |
| Sch. 3.7 | City of Houston Water | - | $6,126.00 |
| Sch. 3.8 | CNA Insurance Co. | - | $0.00 |
| Sch. 3.9 | Comcast | - | $300.00 |
| Sch. 3.10 | Datawatch Systems | - | $22,900.00 |
| Sch. 3.11 | Environmental Coalition Inc. | D, UL | $800.00 |
| Sch. 3.12 | Ferguson Facilities Supplies | - | $2,001.00 |
| Sch. 3.13 | Firetron | - | $30,000.00 |
| Sch. 3.14 | First Insurance Funding | - | $5,507.36 |
| Sch. 3.17 | HNB Construction | D, UL | $84,853.00 |
| Sch. 3.19 | Kings 111 Emergency Communications | - | $315.00 |
| Sch. 3.21 | Logix Fiber Networks | - | $323.42 |
| Sch. 3.22 | Mueller Water Treatment | - | $950.00 |
| Sch. 3.23 | Nationwide Security | - | $32,549.70 |
| Sch. 3.25 | Smart Office Solutions | - | $1,877.00 |
| Sch. 3.26 | T&R Mechanical | - | $4,216.34 |

001882

| Sch. 3.27 | TKE (TK Elevator Corporation) | - | $76,935.00 |
| Sch. 3.28 | Waste Management | - | $456.00 |
| Sch. 3.29 | Zindler Cleaning Service Co. | - | $4,221.00 |
| | | TOTAL: | $340,439.98 |

90.     ***Transferred Actions*** means all Actions of the Estate other than Causes of Action and Avoidance Actions released, enjoined or exculpated under the Plan. All such Transferred Actions will be transferred to the Liquidation Trust on the Effective Date.

91.     ***Unclaimed Property*** means any distribution of Cash or any other property made to the Holder of an Allowed Claim pursuant to the Plan that is returned to the Debtor, the Distribution Agent, or the Liquidation Trustee as undeliverable and no appropriate forwarding address is received prior to the date on which the Final Decree is entered in the Chapter 11 Case.

92.     ***Unimpaired*** means a Claim that is not Impaired within the meaning of Bankruptcy Code section 1124.

93.     ***Unsecured Claim*** means a Claim that is not a Secured Claim, other than Administrative Claims, Other Secured Claims, Priority Tax Claims, and Professional Fee Claims.

94.     ***U.S. Trustee*** means the United States Trustee for Region 7.

**B.     Exhibits and Schedules.**  All exhibits and schedules to the Plan are incorporated into and are a part of the Plan.

**C.     Rules of Interpretation and Construction.**  For purposes of the Plan, (a) any reference in the Plan to an existing document or exhibit filed or to be filed means that document or exhibit as it may have been or may be amended, modified, or supplemented; (b) unless otherwise specified, all references in the Plan to sections, articles, and exhibits are references to sections, articles, or exhibits to the Plan; (c) the words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan in its entirety and not to any particular portion of the Plan; (d) captions and headings contained in the Plan are inserted for convenience and reference only, and are not intended to be part of or to affect the interpretation of the Plan; (e) wherever appropriate from the context, each term stated in either the singular or the plural shall include the singular and the plural, and pronouns stated in the masculine, feminine, or neutral gender shall include the masculine, feminine, and neutral gender; and (f) the rules of construction outlined in Bankruptcy Code section 102 and in the Bankruptcy Rules shall apply to the Plan. In addition, unless otherwise indicated herein, (i) all references to dollars are to United States dollars and (ii) all amounts set forth in the Plan, including, inter alia, with respect to shares, dollar amounts and percentages, shall be subject to rounding and other immaterial changes.

## ARTICLE II
## ADMINISTRATIVE AND PRIORITY CLAIMS

**A.     Allowed Administrative Claims.** Except to the extent that a Holder of an Allowed Administrative Claim agrees to a different treatment, the Holders of Allowed Administrative

001883

Claims will receive Cash equal to the unpaid portion of such Allowed Administrative Claim on the later of the (a) the Effective Date, (b) the date on which said Entity becomes a holder of such Allowed Administrative Claim, or (c) such date as such Entity may agree to with the Chapter 11 Trustee or Liquidation Trustee; *provided*, *however*, that Administrative Claims representing liabilities incurred in the ordinary course of business by the Estate or liabilities arising under other obligations incurred by the Estate whether or not incurred in the ordinary course of business, shall be paid by the Estate in accordance with the terms and subject to the conditions of any orders or agreements governing, instruments evidencing, or other documents relating to, such transactions.

**B.** **Administrative Claims Bar Date.** Notwithstanding Bankruptcy Code section 503(a), any person seeking payment of an asserted Administrative Claim under Bankruptcy Code section 503, other than a governmental unit seeking payment of an expense under sections 503(b)(1)(B) or (C), that was incurred on or before the Effective Date but which has not been paid as of the Effective Date, shall be required to file an application for the allowance of final payment of said claim on or before forty-five (45) calendar days after the Effective Date, and any such claim not filed by that date shall be forever barred and discharged.  The provisions of this Article II shall apply to any Professional applying for the allowance and payment of a Professional Fee Claim.

**C.** **Allowed Priority Tax Claims.** Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the Holder of an Allowed Priority Tax Claim and the Chapter 11 Trustee or Liquidation Trustee, as applicable, each Holder of an Allowed Priority Tax Claim will, in full and final satisfaction of that portion of its Allowed Priority Tax Claim that is due and payable on the Effective Date, either (i) receive Cash equal to the amount of such Allowed Claim on or after the Effective Date or (ii) otherwise be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code.

### ARTICLE III
### CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

Except for the Claims addressed in Article II, all Claims and Interests are classified in the Classes set forth below in accordance with Bankruptcy Code section 1122. A Claim or an Interest is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

**A.  Summary of Classification**

Below is a summary of the classification of Claims against and Interests in the Debtor:

| Class | Claim | Status | Voting Rights |
|-------|-------|--------|---------------|
| 1 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 2 | Other Priority Claims | Unimpaired | Deemed to Accept |
| 3 | NBK Tax Claim | Impaired | Deemed to Reject |
| 4 | NBK Secured Claim | Impaired | Entitled to Vote |
| 5(a) | Trade General Unsecured Claims | Impaired | Entitled to Vote |
| 5(b) | Other General Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Insider Claims | Impaired | Deemed to Reject |
| 7 | Subordinated Claims | Impaired | Deemed to Reject |
| 8 | Interests | Impaired | Deemed to Reject |

11

### B. Treatment of Classes of Claims and Interests

a. **Unclassified Claims.** Administrative Claims and Priority Tax Claims are treated in accordance with Article II and Bankruptcy Code sections 1129(a)(9)(A) and 1129(a)(9)(C), respectively. Such Claims are Unimpaired under the Plan and, in accordance with section 1123(a)(1) of the Bankruptcy Code, are not designated as Classes of Claims for purposes of this Plan or sections 1123, 1124, 1126 and 1129 of the Bankruptcy Code.

b. **Class 1: Other Secured Claims.** On or after the Effective Date, each Holder of an Allowed Other Secured Claim shall receive Cash in an amount equal to the Allowed amount of such Claim or, at the discretion of the Liquidation Trustee, shall be given the property securing its claim in full satisfaction of that claim.

c. **Class 2: Other Priority Claims.** On or after the Effective Date, each Holder of an Allowed Other Priority Claim shall receive Cash in an amount equal to the Allowed amount of such Claim.

d. **Class 3: NBK Tax Claim.** The NBK Tax Claim shall be Allowed in an amount equal to $1,696,384.85. If NBK is not the Purchaser of the Property, on or after the Effective Date, NBK shall receive Cash in an amount equal to the Allowed amount of the NBK Tax Claim. NBK shall not receive a distribution on account of the NBK Tax Claim if it is the Purchaser of the Property.

e. **Class 4: NBK Secured Claim.** The NBK Secured Claim shall be Allowed in an amount equal to: (a) $18,600,000 (which is the appraised value of the Property according to the most recent appraisal obtained by NBK); or (b) any other amount established at the Auction as determined by the Successful Bid. If NBK is not the Purchaser of the Property, on or after the Effective Date, NBK shall receive in full and final satisfaction of the NBK Secured Claim: (x) the Remaining Cash and (y) any excess proceeds after payment of the Distribution Account Claims. NBK shall not receive a distribution on account of the NBK Secured Claim if it is the Purchaser of the Property

f. **Class 5(a): Trade General Unsecured Claims.** Each Holder of a Trade General Unsecured Claim shall receive in full and final satisfaction of such Claim (x) Cash equal to 70% of the Allowed amount of such Claim, and (y) a *Pro-Rata* Share of the Liquidation Trust Assets.

g. **Class 5(b): Other General Unsecured Claims.** Each Holder of an Other General Unsecured Claim shall receive in full and final satisfaction of such Claim, a *Pro-Rata* Share of the Liquidation Trust Assets; *provided*, *however*, NBK shall be deemed to have an Other General Unsecured Claim equal to 90% of the Allowed amount of the NBK Deficiency Claim as determined by the Successful Bid and in accordance with section 506 of the Bankruptcy Code. The NBK Deficiency Claim shall not be subject to objection, disallowance, offset, reduction or subordination.

h. **Class 6: Insider Claims.** On the Effective Date, all Insider Claims shall be canceled and extinguished. Holders of Class 6 Insider Claims shall not receive or retain any property under the Plan on account of such Claims.

001885

**i.      Class 7: Subordinated Claims.** On the Effective Date, all Subordinated Claims shall be canceled and extinguished, and Holders of such Claims shall not receive or retain any property under the Plan on account of such Subordinated Claims against the Debtor.

**j.      Class 8: Interests.** On the Effective Date, all Interests in the Debtor shall be canceled and extinguished, and holders of such Interests shall not receive or retain any property under the Plan on account of such Interests in the Debtor.

## ARTICLE IV
## ACCEPTANCE OR REJECTION OF THE PLAN

**A.      Presumed Acceptance by Unimpaired Classes.** Holders of Claims in Classes 1 and 2 are Unimpaired under the Plan, and therefore are conclusively presumed to accept the Plan under section 1126(f) of the Bankruptcy Code.

**B.      Impaired Classes of Claims Entitled to Vote.** Holders of Claims in Classes 4, 5(a) and 5(b) are Impaired and are entitled to vote to accept or reject the Plan.

**C.      Classes Deemed to Reject the Plan.** Holders of Claims in Classes 3, 6 and 7 and Holders of Interests in Class 8 are not entitled to receive or retain any property under the Plan. Under Bankruptcy Code section 1126(g), Holders of Claims in Classes 6 and 7, and Holders of Interests in Class 8 are deemed to reject the Plan, and therefore their votes will not be solicited.

**D.      Acceptance of Impaired Class.** Pursuant to Bankruptcy Code section 1126(c), an Impaired Class of Claims shall have accepted the Plan if it is accepted by Holders of at least two-thirds (2/3) in dollar amount and one-half (1/2) in number of the Allowed Claims of such Class that have timely and properly voted to accept or reject this Plan.

**E.      Cramdown.** If all applicable requirements for confirmation of this Plan are met as set forth in Bankruptcy Code section 1129(a)(1) through (16) except subsection (a)(8) thereof, NBK intends to request confirmation of this Plan in accordance with Bankruptcy Code section 1129(b), notwithstanding the failure to satisfy the requirements of section 1129(a)(8).

## ARTICLE V
## EXECUTORY CONTRACTS AND LEASES

**A.      Executory Contracts and Unexpired Leases.** Except as otherwise provided herein, on the Effective Date, each executory contract and unexpired lease not previously rejected, assumed, or assumed and assigned shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such executory contract or unexpired lease: (i) is specifically described in the Plan as to be assumed in connection with confirmation of the Plan, (ii) is identified on the Schedule of Contracts/Leases; (iii) is subject to a motion filed by the Chapter 11 Trustee to assume (or assume and assign) such unexpired lease or executory contract as of the Effective Date; or (iv) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; *provided*, *however*, that NBK as plan proponent in cooperation with the Purchaser shall have the right to amend the Schedule of Contracts/Leases up to thirty days (30) after the Effective Date or by any other means approved by the Court or to

001886

delete any executory contract or unexpired lease listed therein, thus providing for its rejection pursuant to this Article V or to add any executory contract or unexpired lease, thus providing for its assumption and assignment pursuant to this Article V and the terms of the Purchase Agreement. Such rejection or assumption and assignment shall be effective upon the filing and serving of a final version of the Schedule of Contracts/Leases, which final Contract/Lease Schedule shall be filed and served no later than thirty days (30) after the Effective Date.

**B.** **Assumption of Executory Contracts and Unexpired Leases.** Entry of the Confirmation Order shall constitute the approval, pursuant to Bankruptcy Code section 365(a), of the assumption of the executory contracts and unexpired leases assumed as of the Effective Date.

**C.** **Rejection Claims.** If the rejection of an executory contract or unexpired lease pursuant to the Plan results in damages to the other party or parties to such contract or lease, a Claim for such damages, if not evidenced by a filed proof of claim, shall be forever barred and shall not be enforceable against the Debtor or any property to be distributed under the Plan, unless a proof of claim is filed with the Court and served upon the Trustee or the Liquidation Trustee, as applicable, on or before the date that is thirty (30) calendar days after the Effective Date.

**D.** **Cure of Defaults for Assumed Contracts and Leases.** The cure of all defaults under executory contracts and unexpired leases to be assumed and assigned under the Purchase Agreement, including the resolution of all objections to the adequacy of assurance of future performance under such contracts and leases and as to the adequacy of amounts proposed to cure defaults under such contracts and leases filed by the Objection Deadline, if any, shall be governed by the terms and conditions of the Sale and Bid Procedures Final Order and other orders of the Court. All such Cure Costs shall be satisfied by the Purchaser.

## ARTICLE VI
## MEANS OF IMPLEMENTATION OF THE PLAN

**A.** **Sale of Property.** The Confirmation Order shall authorize the consummation of the Sale pursuant to Bankruptcy Code sections 363, 365, 1123(a)(5), 1123(b)(4), 1129(b)(2)(A), 1141(c) and 1146(a) under the terms and conditions of the Purchase Agreement free and clear of any Claims, Liens, Interests, encumbrances, executory contracts or unexpired leases of real or personal property other than Assumed Liabilities or Contracts as defined in the Purchase Agreement. Any Sale conducted via the Auction shall be conducted in accordance with applicable orders of the Court, including, without limitation, the Sale and Bid Procedures (prior to entry of the Confirmation Order). Upon Confirmation, the Chapter 11 Trustee shall be authorized and directed to take any action necessary to consummate the Sale.

**B.** **Management of Property.** Upon entry of the Confirmation Order, JLL shall continue to manage the Property and pay any expenses associated with the Property until such time as the Sale is consummated pursuant to the Purchase Agreement.

**C.** **Cash Contribution.** If NBK is the Successful Bidder, on or after the Effective Date, NBK shall contribute Cash to the Estate in the amounts necessary for the following (the "**Cash Contribution**"): (i) payment of the Distribution Account Claims in full; (ii) initial funding

14

of the Liquidation Trust in the amount of $150,000.00; and (iii) payment of $238,307.99 to Trade General Unsecured Claims, as provided for in Article III(B)(f).

**D.      Dissolution of Debtor.** The Debtor shall be dissolved effective upon filing a certificate of dissolution (or its equivalent) with the secretary of state or similar official jurisdiction of organization of the Debtor after the Effective Date. Any such certificates shall be executed for Debtor by the Liquidation Trustee. On the Effective Date, each of the managers and any other officers or directors of the Debtor shall be deemed to have resigned from all of their respective positions. No separate vote or authorization shall be required to cause or show the authority for the Debtor to be dissolved.

**E.      Distribution Account.** A Distribution Account shall be established to receive any proceeds of the Sale and/or Cash Contribution.  If NBK is not the Purchaser of the Property, on or after the Effective Date, the Distribution Agent shall receive the proceeds of the Sale and: (a) make distributions from the Distribution Account to Holders of Allowed Administrative Claims (including any commission for the Broker), Allowed Priority Tax Claims, Allowed Other Secured Claims, Allowed Other Priority Claims, the NBK Tax Claim, and the NBK Secured Claim in accordance with the Plan (collectively, the "**Distribution Account Claims**"); and (b) transfer the Remaining Cash to the Liquidation Trust; *provided*, *however*, if NBK is the Purchaser of the Property, the Distribution Agent shall receive the Cash Contribution and make distributions to all other Holders of the Distribution Account Claims, except the Holder of the NBK Tax Claim. The Liquidation Trustee shall be authorized to hold and control a Distribution Account for the purpose of administering and resolving Disputed Administrative Claims and distributing Cash to Holders of Administrative Claims if and when they become Allowed after the Administrative Claims bar date approved by the Court.

**F.      Liquidation Trust.** Except as otherwise provided for herein, the Liquidation Trust shall be established on the Effective Date and shall on or after the Effective Date receive: (a) the Liquidation Trust Fund; (b) the Transferred Actions; and (c) any other assets conveyed to the Liquidation Trust under the Plan, all of which assets shall vest in the Liquidation Trust on the Effective Date free and clear of all Claims, encumbrances and Interests in accordance with section 1141 of the Bankruptcy Code. The Liquidation Trust shall be the representative of the Estate pursuant to section 1123(b)(3) of the Bankruptcy Code.

**G.      Liquidation Trustee Powers and Duties.** The Liquidation Trustee shall administer the Liquidation Trust and its assets in accordance with this Plan and the Liquidation Trust Agreement, and shall be responsible for, among other things, as Distribution Agent, making distributions required under this Plan.  From and after the Effective Date and continuing through the date of entry of a Final Decree, the Liquidation Trustee shall: (a) have and be entitled to exercise all rights and powers of the Debtor and the Estate, including but not limited to those provided for in the Bankruptcy Code, including section 1107 thereof; (b) possess all rights and powers granted in the Liquidation Trust Agreement, including the authority to direct the affairs of, and dissolve, the Debtor (and all bylaws, articles or certificates of incorporation, and related corporate documents are deemed amended by this Plan to permit and authorize such appointment); (c) possess the rights of a party in interest pursuant to section 1109(b) of the Bankruptcy Code for all matters arising in, arising under, or related to the Chapter 11 Cases and, in connection therewith, shall (i) have the right to appear and be heard on matters brought before the Court or other courts,

15

(ii) be entitled to notice and opportunity for hearing on all such issues, (iii) participate in all matters brought before the Court, and (iv) receive notice of all applications, motions, and other papers and pleadings filed in the Court; (d) have the authority to act as and for the Debtor in all adversary proceedings and contested matters pending in the Court and in all actions and proceedings pending elsewhere; (e) have the power to prosecute, compromise and settle the Transferred Actions; (f) have the right to object to Claims; (g) have the authority to retain such personnel or professionals (including, without limitation, legal counsel, financial advisors or other agents) as it deems appropriate and compensate such personnel and professionals as it deems appropriate, all without prior notice to or approval of the Court; and (h) borrow money for such purposes as financing the costs of prosecuting the Transferred Actions, on terms and conditions it deems appropriate, upon Court approval after notice and hearing. Professionals and personnel retained or employed by the Liquidation Trust or the Liquidation Trustee need not be disinterested as that term is defined in the Bankruptcy Code.

       **H.**    **Dissolution of Liquidation Trust.**  The Liquidation Trust shall be discharged or dissolved as set forth in the Liquidation Trust Agreement.

       **I.**    **Application of Sale Proceeds and Powers of Purchaser.**  In accordance with the Plan and the Purchase Agreement, the Purchaser or the Chapter 11 Trustee, as applicable, shall, among other things: (a) deliver the proceeds of the Sale to the Distribution Agent to (i) satisfy Allowed Distribution Account Claims and (ii) fund the Liquidation Trust; (b) satisfy all costs to cure and provide adequate assurance of performance with respect to all executory contracts and unexpired leases assumed and assigned to Purchaser; and (c) direct the distribution of the Remaining Cash, if necessary.

       **J.**    **Transfer of Excluded Assets.** On the Effective Date, the Debtor or Chapter 11 Trustee, as applicable, shall transfer to the Liquidation Trust for Holders of Claims in Classes 4, 5(a) and 5(b), the Transferred Actions and those Excluded Assets (as defined in the Purchase Agreement) not otherwise provided in the Plan.

       **K.**    **Causes of Action and Avoidance Actions.** Other than Causes of Action and Avoidance Actions released, enjoined or exculpated under Article IX, all Causes of Action and Avoidance Actions shall automatically be transferred to and become property of the Liquidation Trust. Pursuant to section 1123(b)(3) of the Bankruptcy Code, the Liquidation Trust (as a representative of the Estate) will have the right to retain, enforce and prosecute such Transferred Actions against any Person, Entity, Affiliate or Insider of the Debtor, that arose before the Effective Date. The Debtor shall provide to the Liquidation Trustee copies of all its books and records as may be necessary, in the Liquidation Trustee's reasonable discretion, to identify, analyze and prosecute such Transferred Actions.

### ARTICLE VII
### CLAIMS AND DISTRIBUTIONS

       **A.**    **Distribution Agent.** On the Effective Date, the Liquidation Trustee shall serve as Distribution Agent for all Distributions required under the Plan.

001889

**B.** **Time and Manner of Distributions.** Except as set forth herein or ordered by the Court, on the Effective Date, the Liquidation Trustee shall establish deposit and reserve accounts for the Holders of Allowed Claims to make payments to such Holders in accordance with this Plan. All Distributions to be made or otherwise reserved pursuant to this Plan shall be held by the Liquidation Trust in trust in such accounts for Holders of Allowed Claims entitled to receive Distributions.

**C.** **Delivery of Distributions.** Distributions to be made to Holders of Allowed Claims shall be made at (a) the address of each Holder as set forth in the Schedules filed with the Court unless superseded by the address set forth on proof(s) of Claim filed by such Holder, or (b) the last known address of such Holder if no proof of Claim is filed and if the Chapter 11 Trustee or the Liquidation Trustee has been notified in writing of a change of address. If any Distribution is returned as undeliverable, the Liquidation Trust may, in its discretion, make such efforts to determine the current address of the Holder of the Claim or Interest with respect to which the Distribution was made as the Liquidation Trust deems appropriate, but no Distribution to any Holder shall be made unless and until the Liquidation Trust has determined the then-current address of the Holder, at which time the Distribution to such Holder shall be made to the Holder without interest. Amounts in respect of any undeliverable Distributions made through or by the Liquidation Trust shall be returned and held in trust by, the Liquidation Trust until such Distributions are claimed or are deemed to be Unclaimed Property under section 347(b) of the Bankruptcy Code or otherwise distributed as set forth herein.

**D.** **Claims Objection.** The Liquidation Trustee shall file, prosecute, litigate, settle or withdraw objections to any Claim.  Objections to claims shall be filed by the Claims Objection Deadline unless extended by the Court or agreement with the holder of a Claim.  No party in interest, including the Debtor, shall have the authority to file, prosecute, litigate, settle or withdraw objections to any Claim.

**E.** **Claims Estimation.** The Liquidation Trustee may request estimation or liquidation of any Disputed Claim that is contingent or unliquidated pursuant to Bankruptcy Code section 502(c); *provided*, *however*, that the Court shall determine (a) whether such Disputed Claim is subject to estimation pursuant to Bankruptcy Code section 502(c) and (b) the timing and procedures for such estimation proceedings, if any.

**F.** **Disputed Claims Reserves.** On and after the Effective Date, the Liquidation Trustee may establish and maintain reserves for all Disputed Claims. For purposes of establishing a reserve, Cash will be set aside in the applicable deposit account equal to the amount that would have been distributed to the Holders of Disputed Claims in such Class had their Disputed Claims been deemed Allowed Claims on the Effective Date, or such other amount as may be approved by the Court upon motion of the Liquidation Trustee. If any such Disputed Claim becomes an Allowed Claim by Final Order, the relevant portion of the Cash held in reserve therefor shall be distributed by the Liquidation Trustee to the Claimant. The balance of such Cash, if any, remaining after all Disputed Claims have been resolved, shall be distributed by the Liquidation Trustee to Holders of Allowed Claims in Classes 4, 5(a) and 5(b) on account of their *Pro-Rata* Share of such amount. No Distributions shall be made with respect to a Claim that is a Disputed Claim pending resolution of the dispute by Final Order.

001890

G.     **Withholding Taxes.** Any federal, state, or local withholding taxes or other amounts required to be withheld under applicable law shall be deducted from Distributions hereunder. All Persons holding Claims shall have an affirmative duty and be required to provide any information necessary to effect the withholding of such taxes, including its federal tax identification number or social security number.

H.     **Setoffs.** Except as otherwise provided for herein, the Liquidation Trustee may, but shall not be required to, set off against any Claim and the Distributions to be made pursuant to this Plan in respect of such Claim, claims of any nature whatsoever that the Debtor or its Estate may have against the Holder of such Claim, but neither the failure to do so nor the allowance of a Claim hereunder shall constitute a waiver or release by the Debtor, the Liquidation Trustee or the Estate of any Claim they may have against such Creditor; *provided* that such right of setoff shall be subject to this Article VII and in no event shall the Debtor or the Liquidation Trustee set off, or be permitted to set off, against any Claims Allowed under this Plan.

I.     **Unclaimed Distributions.** All property distributed on account of Claims must be claimed prior to the date on which the Court enters the Final Decree. All Unclaimed Property will be retained by and will vest in the Liquidation Trust for distribution to Holders of Allowed Claims in Classes 4, 5(a) and 5(b).  Pursuant to section 1143 of the Bankruptcy Code, all Claims in respect of Unclaimed Property shall be deemed Disallowed and the Holder of any Claim Disallowed in accordance with this Article VII(I) will be forever barred, expunged, estopped and enjoined from asserting such Claim in any manner against the Debtor, the Distribution Agent, the Liquidation Trustee, NBK, or the Purchaser, or their respective assets.

J.     **De Minimis Distribution.** No Cash payment of less than twenty-five ($25.00) dollars shall be made to any Holder of an Allowed Claim on account of such Allowed Claim.

K.     **Satisfaction of Claims**.  Except as otherwise provided in the Plan, any distributions and deliveries to be made on account of Allowed Claims under the Plan shall be in complete and final satisfaction, settlement, and discharge of and exchange for such Allowed Claims.

L.     **No Fractional Distributions.**  Cash distributions of fractions of dollars will not be made; rather, whenever any payment of a fraction of a dollar would be called for, the actual payment made shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down. To the extent that Cash remains undistributed as a result of the rounding of such fraction to the nearest whole cent, such Cash shall be treated as Unclaimed Property pursuant to Article VII(I).

## ARTICLE VIII
## CONDITIONS TO CONSUMMATION OF THE PLAN

A.     **Confirmation Order.**  The Confirmation Order shall not be entered until the Court enters an order approving the Sale of the Property in accordance with the Sale and Bid Procedures, and the Plan Supplement and all of the schedules, documents, and exhibits contained therein, and all other schedules, documents, supplements and exhibits to the Plan, if any, shall have been filed.

001891

**B.**   **Conditions to the Effective Date.**   The Plan shall not be consummated, and the Effective Date shall not occur, until the following conditions have occurred or been waived (if waivable):

    **a.**   the Confirmation Order shall have been entered and shall not be stayed, vacated, or otherwise rendered ineffective by order of a court of competent jurisdiction;

    **b.**   all conditions precedent under the Purchase Agreement shall have been satisfied;

    **c.**   the transactions contemplated in the Purchase Agreement shall have been consummated;

    **d.**   the Liquidation Trustee shall have been appointed, the Liquidation Trust Agreement shall have been executed, and the Liquidation Trust shall have received the Liquidation Trust Fund; and

    **e.**   no order of a court shall have been entered and shall remain in effect restraining NBK from consummating the Plan, or if it is the Successful Bidder, taking title to the Property directly or through a designee.

**C.**   **Waiver of Conditions.** Each of the conditions set forth in Article VIII(B) may be waived at any time by the Successful Bidder, without notice, leave or order of the Court or any further action other than proceeding to confirm or consummate the Plan. The Successful Bidder's failure to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any time.

**D.**   **Effect of Failure of Conditions; Order Denying Confirmation.** If one or more of the conditions specified in Article VIII(B) have not been satisfied (or waived) or if the Allowed NBK Secured Claim has not been paid in full where NBK is not the Successful Bidder, upon notification submitted by the Chapter 11 Trustee to the Court: (a) the Confirmation Order shall be vacated, (b) no Distributions under the Plan shall be made, (c) Estate Assets shall revest in the Estate, and (d) all Holders of Claims and Interests shall be restored to the status quo ante as of the day immediately preceding the Confirmation Date as though the Confirmation Date never occurred; (e) the Purchase Agreement shall become null and void; and (f) the Estate's obligations with respect to the Claims and Interests shall be as if the Confirmation Order had not been entered.

## ARTICLE IX
## EFFECT OF CONFIRMATION

**A.**   **Discharge.**   Pursuant to section 1141(d)(3) of the Bankruptcy Code, confirmation of the Plan will not discharge Claims against the Debtor.

**B.**   **Compromise and Settlement of Claims and Interests**.   Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided pursuant to this Plan, the provisions of this Plan, including the settlement of all Claims, Interests, or controversies among the Debtor, the Estate and NBK, shall constitute an integrated and global good faith compromise of all Claims, Interests and controversies relating to the contractual, legal and subordination rights that a Holder of a Claim or Interest may have

001892

with respect to any Allowed Claim or Allowed Interest, or any distribution to be made on account of such Allowed Claim or Allowed Interest or any distribution to be made on account of such Allowed Claim or Allowed Interest. The entry of the Confirmation Order shall constitute the Court's integrated and global approval of the compromise or settlement of all such Claims, Interests and controversies, as well as a finding by the Court that such compromise or settlement is in the best interest of the Debtor, its Estate and Holders of Claims and Interests and is fair, equitable and is within the range of reasonableness. Subject to the provisions of this Plan governing distributions, all distributions made to holders of Allowed Claims and Allowed Interests in any Class are intended to be and shall be final.

**C.     Exculpation. Except as otherwise provided in the Plan, to the maximum extent permitted by the Bankruptcy Code and applicable law, no Exculpated Party shall have or incur any liability to any Person, including, any Holder of a Claim or Interest or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys or affiliates or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, filing, negotiating, prosecuting, administering, formulating, implementing, soliciting support or acceptance of, confirming or consummating this Plan, the Purchase Agreement, or the property to be distributed under this Plan, including all activities leading to the promulgation and Confirmation of the Plan, the Disclosure Statement (including any information provided or statement made in the Disclosure Statement or omitted therefrom), or any contract, instrument, release or other agreement or document created in connection with or related to the Plan or the administration of the Debtor or this Chapter 11 Case; *provided, however*, that the foregoing exculpation shall not apply to any act of gross negligence or willful misconduct.**

**D.     Estate Releases. Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date, and for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtor and this Estate will be deemed to have forever released, waived and discharged the Released Parties from any and all Actions, Claims, obligations, suits, judgments, damages, demands, debts, rights, and liabilities, whether for tort, contract, violations of federal or state securities laws, or otherwise, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity or otherwise that are based in whole or part on any act, omission, transaction, event or other occurrence, including actions in connection with indebtedness for money borrowed by the Debtor, taking place on or prior to the Effective Date in any way relating to the Debtor, the Chapter 11 Case, or the Plan. This release does not release any Action, Claim, obligation, suit, judgment, damages, demands, debts, rights, and liabilities of a Released Party arising under or pursuant to the Plan or Purchase Agreement, and the contracts, instruments, releases and other agreements delivered in connection with the Plan or Purchase Agreement, which may be enforced only by the Chapter 11 Trustee, NBK, the Purchaser, the Distribution Agent or the Liquidation Agent, as applicable.**

**E.     Injunction. Except as otherwise provided herein, on the Effective Date, the Confirmation Order shall constitute an injunction permanently enjoining any Person (excluding the Liquidation Trustee) that has held, currently holds or may hold a Claim,**

001893

Action or liability that is released pursuant to Article IX(D) from enforcing or attempting to enforce any such Claim, Action or liability against any Released Party or any of their respective Property; *provided*, *further*, that no Person who has held, holds, or may hold Claims, Interests, or Action may commence or pursue a Claim or Action, as applicable, of any kind in any way related to the Debtor against any Released Party that arose before the Petition Date or arose or arises from or is related to the Chapter 11 Case, the negotiation of the Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the Debtor's business, the administration of the Liquidation Trust, or the transactions in furtherance of the foregoing without the Court (i) first determining, after notice and a hearing, that such claim or cause of action represents a colorable claim of any kind, including, negligence, bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Released Party that such person has standing and is otherwise entitled to assert such claim or cause of action and (ii) specifically authorizing such Releasing Party to bring such claim or cause of action against any such Released Party.

      **F.**    <u>**Duration of Injunctions and Stays**</u>.  **Unless otherwise provided in this Plan, in the Confirmation Order, or in a Final Order of the Court, all injunctions and stays entered during the Chapter 11 Case and in existence on the Confirmation Date shall remain in full force and effect in accordance with their terms; and (ii) the automatic stay arising under Bankruptcy Code section 362 shall remain in full force and effect subject to Bankruptcy Code Section 362(c).**

<div align="center">

**ARTICLE X**
<u>**RETENTION OF JURISDICTION**</u>

</div>

      The Court shall retain jurisdiction of all matters arising under, or related to, these proceedings, including, but not limited to:

    **a.**   ensuring that the Plan is carried out;

    **b.**   considering any modification of the Plan under Bankruptcy Code section 1127;

    **c.**   hearing and determining all controversies, suits, and disputes that may arise in connection with the interpretation of the Plan;

    **d.**   hearing and determining all objections to claims, controversies, suits, and disputes that may be pending as of or initiated after the Effective Date;

    **e.**   hearing and determining all claims, controversies, suits, and disputes against the Debtor or that may arise in connection with the interpretation of the Plan;

    **f.**   hearing and determining all requests for compensation and/or reimbursement of expenses that may be made for fees/expenses incurred before the Effective Date;

    **g.**   enforcing any Final Order, the Confirmation Order, the Final Decree, and all injunctions contained in those orders;

    **h.**   entering an order concluding and terminating this Chapter 11 Case;

<div align="center">21</div>

**i.** correcting any defect, cure any omission, or reconcile any inconsistency in the Plan or the Confirmation Order;

**j.** determining all questions and disputes regarding title to the Property and any other assets of Debtor;

**k.** enter a Final Decree in the Chapter 11 Case according to Bankruptcy Rule 3022;

**l.** enforcing the provisions set forth in the Plan, the Confirmation Order, any Final Decree, and any Final Order that provides for the adjudication of any issue by the Court; and

**m.** entering and implementing such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated.

## ARTICLE XI
## MISCELLANEOUS PROVISIONS

**A.** **Additional Documents/Execution of Documents Generally.** On or before substantial consummation of the Plan, the Chapter 11 Trustee or NBK shall issue, execute, deliver, and file with the Court or record any agreements and other documents consistent with, and take any action as may be necessary or appropriate to effectuate, consummate and further evidence the terms and conditions of the Plan. The Chapter 11 Trustee has the authority, and the Confirmation Order shall constitute conclusive authority, of the Chapter 11 Trustee to act for, and in the name of the Debtor, and any document executed by the Chapter 11 Trustee in connection with the Plan or Sale shall be accepted by any recording office and shall be recorded and published on receipt.

**B.** **Binding Effect.** This Plan shall be binding upon and inure to the benefit of the Debtor, NBK, the Estate, the Liquidation Trustee, the Liquidation Trust, the Distribution Agent, the Purchaser, any Holder of any Claim or Interest treated herein or any Person named or referred to in the Plan, and each of their respective heirs, executors, administrators, representatives, predecessors, successors, assigns, agents, officers and directors, and, to the fullest extent permitted under the Bankruptcy Code and other applicable law, each other Person affected by the Plan.

**C.** **Entire Agreement.** The Plan (and all exhibits thereto and the Plan Supplement) sets forth the entire agreement and undertakings relating to the subject matter hereof and supersedes all prior discussions and documents. The Debtor shall not be bound by any terms, conditions, definitions, warranties, understandings, or representations with respect to the subject matter hereof, other than as expressly provided for herein or as may hereafter be agreed to by the parties in writing.

**D.** **Final Order.** Except as otherwise provided in the Plan, any requirement in the Plan for a Final Order may be waived: (a) by the Purchaser, in its sole discretion, provided, however, that in the event the Debtor determines in good faith that any such waiver would constitute a breach of the Chapter 11 Trustee's fiduciary duties, NBK may seek to prevent any such waiver by seeking an order of the Court on an expedited basis; or (b) after the Effective Date, by the Liquidation

001895

Trustee upon written notice to the Court. No such waiver shall prejudice the right of any party in interest to seek a stay pending appeal of any order that is not a Final Order.

      **E.**    <u>**Governing Law**</u>.  Except to the extent that the Bankruptcy Code is applicable, the rights and obligations arising under this Plan shall be governed and construed and enforced in accordance with the laws of the State of New York.

      **F.**    <u>**No Admissions or Waivers**</u>. Notwithstanding anything herein to the contrary, nothing contained in the Plan shall be deemed an admission or waiver by the Debtor with respect to any matter set forth herein, including, without limitation, liability on any Claim or Interest or the propriety of any classification of any Claim or Interest.

      **G.**    <u>**Notices**</u>. Any notice required or permitted to be provided under this Plan to the Debtor, or any request for information with respect to the Plan, shall be in writing and served by either (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery or (c) reputable overnight delivery service, freight prepaid, to be addressed as follows:

| Chapter 11 Trustee | Counsel to Chapter 11 Trustee |
|---|---|
| Christopher R. Murray<br>**Jones Murray LLP**<br>602 Sawyer Street, Suite 400<br>Houston, TX 77007 | R. J. Shannon<br>Kyung S. Lee<br>**Shannon & Lee LLP**<br>2100 Travis Street, Suite 1525<br>Houston, TX 77002 |
| **NBK** | **Counsel to NBK** |
| Marwan Isbaih<br>Michael C. Carter<br>**National Bank of Kuwait,**<br>**S.A.K.P., New York Branch**<br>299 Park Avenue<br>New York, NY 10171 | **Pillsbury Winthrop Shaw Pittman LLP**<br>Charles C. Conrad<br>Ryan Steinbrunner<br>609 Main Street Suite 2000<br>Houston, TX 77002<br>----------------------<br>Andrew M. Troop<br>Patrick E. Fitzmaurice<br>Kwame O. Akuffo<br>31 West 52nd Street<br>New York, NY 10019 |

      **H.**    <u>**Plan Modification**</u>. NBK may amend or modify the Plan in accordance with Bankruptcy Code section 1127 or as permitted at any time prior to the Confirmation Date.

      **I.**    <u>**Post-Confirmation Operating Reports**</u>. The Liquidation Trustee shall file quarterly operating reports as required by the U.S. Trustee until such time as a Final Decree or other order is entered under section 350(a) of the Bankruptcy Code closing the Chapter 11 Case.

      **J.**    <u>**Quarterly Fees**</u>. Quarterly Fees due shall be paid on or after the Effective Date.

      **K.**    <u>**Severability**</u>. Should the Court determine, prior to the Confirmation Date, that any provision of the Plan is either illegal on its face or illegal as applied to any Claim or Interest, such

001896

provision shall be unenforceable as to all Holders of Claims or Interests or to the specific Holder of such Claim or Interest, as the case may be, as to which such provision is illegal. Unless otherwise determined by the Court, such a determination of unenforceability shall in no way limit or affect the enforceability and operative effect of any other provision of the Plan.

**L.** **Section 1146 Exemption.** To the fullest extent permitted under Bankruptcy Code section 1146(a), the execution, delivery or recording of an instrument of transfer under the Plan, or the revesting, transfer or sale of any real or other property of or to the Debtor shall not be taxed under any state or local law imposing a stamp tax, transfer tax or similar tax or fee. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument, without requiring the payment of any documentary stamp tax, deed stamps, stamp tax, transfer tax, mortgage recording tax, intangible tax or similar tax.

**M.** **Solicitation.** NBK (and each of its respective Affiliates, officers, directors, employees, consultants, agents, advisors, members, attorneys, accountants, financial advisors, other representatives and Professionals) has, and upon Confirmation of the Plan, shall be deemed to have, solicited acceptances of the Plan in good faith and in compliance with the applicable provisions of the Bankruptcy Code.

**N.** **Withdrawal of the Plan.** NBK shall reserve the right, at any time prior to Confirmation of the Plan, to withdraw the Plan. If the Plan is withdrawn, the Plan shall be null and void and have no force and effect. In such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtor or any other Person or to prejudice the rights of the Debtor or any Person in any further proceedings involving the Debtor.

NBK requests Confirmation of the Plan under section 1129(a) or section 1129(b) of the Bankruptcy Code.

Dated: April 10, 2024

NATIONAL BANK OF KUWAIT, S.A.K.P., NEW YORK BRANCH

By: _____
Name:  Michael C. Carter
Title:   Vice President

24

001897

**<u>Exhibit B</u>**

Notice of Confirmation and Effective Date

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | § |
| | §   **Case No. 23-34815 (JPN)** |
| **GALLERIA 2425 Owner, LLC** | § |
| | §   **Chapter 11** |
| **Debtor.** | § |
| | § |

NOTICE OF CONFIRMATION AND EFFECTIVE DATE OF
CHAPTER 11 PLAN OF LIQUIDATION OF THE DEBTOR BY
NATIONAL BANK OF KUWAIT S.A.K.P., NEW YORK BRANCH

**PLEASE TAKE NOTICE OF THE FOLLOWING**:

1.　　**Entry of Confirmation Order**.  On June [●], 2024, the United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "Bankruptcy Court") entered an order [ECF No. [●]] (the "Confirmation Order") confirming the National Bank of Kuwait S.A.K.P., New York Branch's ("NBK") *Chapter 11 Plan of Liqudiation of the Debtor by National Bank of Kuwait, S.AK.P., New York Branch* [ECF No. [●]] attached as Exhibit A to the Confirmation Order (together with all exhibits thereto, and as may be amended, modified or supplemented, the "Plan") in the chapter 11 case of the above-captioned debtor (the "Debtor").

2.　　**Effective Date of the Plan**.  The Effective Date of the Plan was [●] **[●], 2024**.

3.　　**Substantial Consummation of Plan**.  NBK gives notice that the Plan has been substantially consummated.

4.　　**Release, Exculpation, and Injunction**.  Pursuant to the Confirmation Order, the release, injunction, and exculpation provisions in the Article IX of the Plan are now in full force and effect.

5.　　**Administrative Claim Bar Date**.  As provided for in Article II.B of the Plan and in the Confirmation Order, all requests for payment of an Administrative Claim must be filed with the Bankruptcy Court and served on NBK, the Chapter 11 Trustee, the Liquidation Trustee and the U.S. Trustee no later than [●] [●], 2024 (the date that is 45 days after the Effective Date).

6.　　**Deadline to File Professional Fee Claims**.  As provided for in the Article II.B of the Plan and in the Confirmation Order, all final applications for payment of Professional Fee Claims must be filed with the Bankruptcy Court and served on NBK, the Liquidation Trustee, and the U.S. Trustee no later than 4:00 p.m. (prevailing Central Time) on [●] [●], 2024 (the date that is 45 days after the Effective Date),  unless otherwise ordered by the Bankruptcy Court or such later date is agreed to by the Liquidation Trustee.

7. **Deadline to File Rejection Damages Claims**. Except as set forth in Article V of the Plan, [all Executory Contracts and Unexpired Leases that are not listed in the Schedule of Contracts and Leases attached to [●] [ECF No. [●]] have been rejected as of the Effective Date. As provided for in Article [●] of the Plan and in the Confirmation Order, unless otherwise provided by a Bankruptcy Court order, any proofs of claim asserting rejection damages claims pursuant to the Plan must be filed within [●].

8. **Inquiries by Interested Parties**. Copies of all pleadings (including the Confirmation Order, to which the Plan is attached as Exhibit A) may be examined for a fee via PACER by visiting http://ecf.txsb.uscourts.gov, or for free at during regular business hours at the office of the Clerk of the Bankruptcy Court, United States Bankruptcy Court for the Southern District of Texas, Bob Casey United States Courthouse, 515 Rusk, Houston, TX 77002.

DATED: [●] [●], 2024

**PILLSBURY WINTHROP SHAW PITTMAN LLP**

*/s/ Draft*
Charles C. Conrad
Texas State Bar No. 24040721
Ryan Steinbrunner
Texas State Bar No. 24093201
609 Main Street Suite 2000
Houston, TX 77002
Telephone: (713) 276-7600
Facsimile: (713) 276-7634
charles.conrad@pillsburylaw.com
ryan.steinbrunner@pillsburylaw.com

-   *and*   -

Andrew M. Troop (Bar No. MA547179)
Patrick E. Fitzmaurice*
Kwame O. Akuffo*
31 West 52nd Street
New York, NY 10019-6131
Telephone: (212) 858-1000
Facsimile: (212) 858-1500
andrew.troop@pillsburylaw.com
patrick.fitzmaurice@pillsburylaw.com
kwame.akuffo@pillsburylaw.com

*Admitted *pro hac vice*

***Counsel for National Bank of Kuwait, S.A.K.P., New York Branch***

2

001900

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 23-34815** |
| **GALLERIA 2425 OWNER, LLC,** | § | |
| | § | |
| **Debtor.** | § | |
| | § | **CHAPTER 11** |

**ORDER CONFIRMING CHAPTER 11 PLAN OF LIQUIDATION OF THE DEBTOR
BY NATIONAL BANK OF KUWAIT, S.A.K.P. NEW YORK BRANCH**

**BASED ON THE COURT'S MEMORANDUM OPINION, IT IS HEREBY ORDERED
THAT:**

**A. Findings of Fact and Conclusions of Law** The findings of fact and conclusions of law set
forth in the Court's Memorandum Opinion are hereby incorporated by reference as though fully
set forth herein and constitute this Court's findings of fact and conclusions of law pursuant to
Bankruptcy Rule 7052, made applicable herein by Bankruptcy Rule 9014.

**B. Eligibility for Relief** The Debtor was and is eligible for relief under section 109 of the
Bankruptcy Code.

**C. Confirmation** The Plan is confirmed under section 1129 of the Bankruptcy Code. The Plan
Supplement is incorporated by reference into, and is an integral part of, the Plan and this
Confirmation Order, and is authorized and approved. NBK is authorized to implement and
consummate the Plan, including taking all actions necessary or appropriate to effectuate the Plan,
without further authorization except as may be required by the Plan or this Confirmation Order.

**D. Objections** All objections, responses, reservations, statements, and comments to the Plan, other
than those resolved, adjourned, or withdrawn with prejudice prior to, or on the record at, the
Confirmation Hearing, are overruled on the merits in all respects. All withdrawn objections, if any,
are deemed withdrawn with prejudice. All objections to Confirmation not filed and served prior to
the deadline for filing objections to the Plan set forth in the Confirmation Hearing Notice, if any,
are deemed waived and will not be considered by the Court.

**E. Binding Effect** Effective as of entry of this Confirmation Order and subject to the occurrence
of the Effective Date, the Plan, the Plan Supplement, and this Confirmation Order shall bind any
Holder of a Claim or Interest and such Holder's respective successors and assigns, whether or not:
(a) the Claim or Interest is impaired under the Plan; (b) such Holder has accepted the Plan; (c) such
Holder has failed to vote to accept or reject the Plan or voted to reject the Plan; (d) such Holder is
entitled to a distribution under the Plan; (e) such Holder will receive or retain any property or
interests in property under the Plan; and (f) such Holder has filed a Proof of Claim in this Chapter
11 Case. The Plan, the Plan Supplement, and this Confirmation Order constitute legal, valid,

001901

binding, and authorized obligations of the respective parties and shall be enforceable in accordance with their terms. Pursuant to section 1142(a) of the Bankruptcy Code, the Plan, the Plan Documents, and this Confirmation Order shall apply and be enforceable notwithstanding any otherwise applicable nonbankruptcy law.

**F. Plan Classification Controlling** The terms of the Plan shall govern the classification of Claims and Interests for purposes of distributions to be made thereunder. The classification set forth on the Ballots tendered to or returned by the Holders of Claims in connection with voting on the Plan: (a) were set forth thereon solely for the purposes of voting to accept or reject the Plan; (b) do not necessarily represent, and in no event shall be deemed to modify or otherwise affect, the actual classification of Claims and Interests under the Plan for distribution purposes; (c) may not be relied upon by any Holder of a Claim or Interest as representing the actual classification of such Claim or Interest under the Plan for distribution purposes; and (d) shall not be binding on NBK or the Chapter 11 Trustee except for voting purposes.

**G. Allowance of Claims** As provided in Article VII of the Plan, no Claim is or shall be deemed Allowed until the later of the Claims Objection Deadline or the expiration of some other applicable period of limitation fixed by the Bankruptcy Code, Bankruptcy Rules, or Bankruptcy Court, unless otherwise ordered by a Final Order of the Bankruptcy Court or Allowed pursuant to the Plan.

**H. Effective Date**  Except as otherwise provided herein, upon the occurrence of the Effective Date, the terms of the Plan, the Plan Supplement, and this Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Estate, the Liquidation Trust, and any and all Holders of Claims against or Interests in the Debtor (irrespective of whether their Claims or Interests are presumed to have accepted or deemed to have rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtor.

**I. Distributions** All distributions pursuant to the Plan shall be made in accordance with Article VII of the Plan, and such methods of distribution are approved. The Distribution Agent shall have no duty or obligation to make distributions to any Holder of an Allowed Claim unless and until such Holder executes and delivers, in a form acceptable to the Distribution Agent, any and all documents applicable to such distributions in accordance with Article VI of the Plan.

**J. Retained Assets**  Pursuant to Article VI of the Plan, except as otherwise provided in the Plan or in any contract, instrument, release, indenture or other agreement entered into in connection with the Plan, in accordance with Bankruptcy Code § 1123(b)(3), any claims, Causes of Action, defenses and counterclaims that the Debtor may hold against any Person, shall vest in the Liquidation Trust, and the Liquidation Trustee shall retain and may exclusively enforce any and all such claims, causes of action, defenses and counterclaims.

**K. Treatment of Executory Contracts and Unexpired Leases** Notwithstanding any provision in the Plan to the contrary, all Executory Contracts and Unexpired Leases are deemed rejected unless (i) described in the Plan as to be assumed in connection with Confirmation, (ii) identified on the Schedule of Contracts/Leases, (iii) subject to a motion by the Chapter 11 Trustee to assume

2 / 7

(or assume and assign) as of the Effective Date, and (iv) entered into in connection with the Plan. Entry of this Confirmation Order shall constitute a Court order approving the rejection of such executory contracts or unexpired leases, as applicable.

**L. Exemption From Transfer Taxes**  To the fullest extent applicable and permitted by section 1146(a) of the Bankruptcy Code, the issuance, transfer, or exchange of a security, or the making of delivery of an instrument of transfer, provided under the Plan, from the Estate to NBK or any other Person pursuant to the Plan shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax or governmental assessment. The appropriate federal, state or local governmental officials or agents are directed to forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the instruments or other documents as set forth in the Plan without the payment of any such tax or governmental assessment.

**M. Filing and Recording**  This Confirmation Order is, and shall be, binding upon and shall govern the acts of all persons or entities including all filing agents, filing officers, title agents, title companies, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required, by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any document or instrument.

Each and every foreign, federal, state, and local government agency is hereby directed to accept any and all documents and instruments necessary, useful, advisable, or appropriate (including financing statements under the applicable uniform commercial code) to effectuate, implement, and consummate the transactions under the Plan.

**N. Tax Withholding**  In accordance with the provisions of the Plan and subject to Article VII.G of the Plan, to the extent applicable, the Distribution Agent shall comply with all tax withholding and reporting requirements imposed on it by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, the Distribution Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions pending receipt of information necessary to facilitate such distributions, or establishing any other mechanisms the Distribution Agent believes is reasonable and appropriate.

**O. Discharge of Claims and Termination of Interests; Compromise and Settlement of Claims, Interests and Controversies**  Pursuant to section 1141(d) of the Bankruptcy Code and except as otherwise specifically provided in the Plan or this Confirmation Order, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and Interests in the Debtor or any of its assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests,

including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (i) a Proof of Claim based upon such debt or right is filed or deemed filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest voted to accept or reject the Plan.

This Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the occurrence of the Effective Date, and all actions taken to effectuate the Plan, including by any agent, shall be given the same effect as if such actions were performed under the applicable nonbankruptcy laws that govern the documents under which such agent was appointed. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019 and without any further notice to or action, order, or approval of the Court, after the Effective Date, the Liquidation Trustee may compromise and settle Claims against, and Interests in, the Debtor and its Estate and Causes of Action against other Entities.

**P. Releases, Injunction, Exculpation and Related Provisions Under the Plan** Except to the extent modified by this Confirmation Order, the releases, injunctions, exculpations, and related provisions in Article IX of the Plan are incorporated herein in their entirety, are hereby approved and authorized in all respects, are so ordered, and shall be immediately effective on the Effective Date without further order of this Court or any other party.

The injunction provision in Article IX.E of the Plan will be immediately effective on the Effective Date and is (i) within the jurisdiction of this Court; (ii) necessary to preserve and enforce the exculpation provision in Article IX.C of the Plan, the Estate Release in Article IX.D of the Plan, and the compromises and settlements implemented under the Plan; and (iii) are narrowly tailored to achieve these purposes. Notwithstanding any provision in the Plan, including Article IX.C of the Plan and the definition of Exculpated Party contained in Article I.A.39 of the Plan, "Exculpated Parties" shall mean only the Chapter 11 Trustee and any Related Parties of the Chapter 11 Trustee.

**Q. Post-Confirmation Notice** In accordance with Bankruptcy Rules 2002 and 3020(c), no later than seven (7) days after the Effective Date, NBK shall cause a notice of Confirmation and occurrence of the Effective Date, substantially in the form attached as Exhibit B (the "Notice of Confirmation and Effective Date") to be served on all parties served with the Confirmation Hearing Notice by email or U.S. first-class mail, postage prepaid. The Notice of Confirmation and Effective Date will have the effect of an order of the Court, will constitute sufficient notice of entry of this Confirmation Order and occurrence of the Effective Date to filing and recording officers, and will be a recordable instrument notwithstanding any contrary provision of applicable nonbankruptcy law.

**R. Cancellation of Interests** Pursuant to Article III of the Plan, on the Effective Date, all Interests shall be deemed automatically cancelled and extinguished.

**S. Distribution Record Date** The record date for purposes of making distributions under the Plan on account of Allowed Claims shall be the Confirmation Date or such other date as is announced by the Chapter 11 Trustee, the Liquidation Trustee or another designated party in a Final Order.

**T. Ad Valorem Taxes** Notwithstanding any provision in the Plan to the contrary, on the Effective Date, any claim held by a governmental unit and Caz Creek TX, LLC for *ad valorem* taxes shall be paid statutory interest accruing from the Petition Date until such taxes are paid in full; *provided*, that any and all *ad valorem* statutory tax liens held by a governmental unit and Caz Creek TX, LLC, whether for prepetition or postpetition tax years, shall be retained until the *ad valorem* taxes are paid in full.

**U. Post-Confirmation Sale of Property** Notwithstanding any provision in the Plan to the contrary, the Bankruptcy Court will consider approval of the sale of the Property post-confirmation and for the sake of a clean record, will enter a separate Final Order with respect to the sale at that time.

**V. Effect of Confirmation Order and Other Orders** Unless expressly provided for herein, nothing in the Plan or this Confirmation Order shall affect any orders entered in this Chapter 11 Case.

**W. Inconsistency** In the event of an inconsistency between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in the Plan Supplement or in this Confirmation Order). In the event of any inconsistency between any of the Plan, Plan Supplement, or the Disclosure Statement on the one hand, and this Confirmation Order on the other hand, this Confirmation Order shall control.

**X. Injunctions and Automatic Stay** Unless otherwise provided in the Plan or in this Confirmation Order, all injunctions or stays in effect in this Chapter 11 Case pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Court, and extant on this Confirmation Date (excluding any injunctions or stays contained in the Plan or this Confirmation Order), shall remain in full force and effect through and including the Effective Date. All injunctions or stays contained in the Plan or this Confirmation Order shall remain in full force and effect in accordance with their terms.

**Y. Authorization to Consummate** NBK and to the extent required the Chapter 11 Trustee are authorized to consummate the Plan and finalize and implement the Plan at any time after the entry of this Confirmation Order subject to satisfaction or waiver of the conditions precedent to consummation set forth in Article VIII of the Plan.

**Z. Substantial Consummation** On the Effective Date, the Plan shall be deemed to be substantially consummated under sections 1101(2) and 1127(b) of the Bankruptcy Code.

**AA. Severability** Except as set forth in Article VIII of the Plan, the provisions of the Plan, including its release, injunction, exculpation and compromise provisions are mutually dependent and nonseverable. This Confirmation Order constitutes a judicial determination and hereby provides that each term and provision of the Plan are: (i) valid and enforceable pursuant to their

terms; (ii) integral to the Plan and may not be deleted or modified without NBK's consent; and (iii) nonseverable and mutually dependent.

**BB. Effect of Non-Occurrence of Effective Date**  If the Effective Date does not occur, the Plan shall be null and void in all respects, and nothing contained in the Plan, the Disclosure Statement, or this Confirmation Order shall (i) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtor; (ii) prejudice in any manner the rights of NBK, any Holders of Claims or Interests, or any other Entity; or (iii) constitute an admission, acknowledgment, offer, or undertaking by NBK, any Holders of Claims or Interests, or any other Entity in any respect.

**CC. Chapter 11 Trustee's Actions Post-Confirmation Through the Effective Date** Until the Effective Date, the Chapter 11 Trustee shall continue to manage the estate, subject to the Court's oversight as provided under the Bankruptcy Code, the Bankruptcy Rules, and this Confirmation Order and any order of the Court that is in full force and effect.

**DD. Reports**  After the Effective Date, the Chapter 11 Trustee has no obligation to file with this Court or serve on any parties reports that the Estate was obligated to file under the Bankruptcy Code or a prior order of the Court, including monthly operating reports (except for any periods for which a monthly operating report was not filed before the Confirmation Date), ordinary course professional reports, and monthly or quarterly reports for Professionals; *provided*, *however*, that the Chapter 11 Trustee shall continue to comply with the U.S. Trustee's quarterly reporting requirements.

**EE. Conditions to Effective Date** The Plan shall not become effective unless and until the conditions in Article VIII.B of the Plan have been satisfied or waived pursuant to Article VIII.C of the Plan.

**FF. Waiver of Stay** Notwithstanding any Bankruptcy Rule (including Bankruptcy Rules 3020(e) and 6004(h)), this Confirmation Order is effective immediately and not subject to any stay, sufficient cause having been shown.

**GG. Modification of Plan Supplement** Subject to the terms of the Plan and this Confirmation Order, NBK is authorized to modify and amend the Plan Supplement through and including the Effective Date, and to take all actions necessary and appropriate to effectuate the transactions contemplated therein.

**HH. Post-Confirmation Modification of the Plan** Subject to the terms of the Plan and this Confirmation Order, NBK is authorized to amend or modify the Plan at any time prior to the substantial consummation of the Plan without further order of this Court, but only in accordance with section 1127 of the Bankruptcy Code and Article XI.H of the Plan.

**II. No Waiver/References to and Omissions of Plan Provisions** References to articles, sections, documents and provisions of the Plan are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Plan. The failure to include or to refer to any particular article, section, or provision of the Plan in this Confirmation Order shall not diminish or impair the effectiveness of such article, section, document or provision nor constitute

6 / 7

a waiver thereof, an such article, section, document or provision shall have the same validity, binding effect, and enforceability as every other article, section, document, or provision of the Plan, it being the intent of the Court that the Plan be confirmed in its entirety, except as expressly modified herein, and incorporated herein by this reference.

**JJ. Reservation of Rights** The filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by NBK with respect to the Plan shall not be deemed to be an admission or waiver of any rights of NBK, the Chapter 11 Trustee, the Liquidation Trustee, or any other Person with respect to Claims against and Interests in the Debtor.

**KK. Final Order** The provisions of Federal Rule of Civil Procedure 62, as applicable pursuant to Bankruptcy Rule 7062, and Bankruptcy Rule 3020(e) shall not apply to this Confirmation Order. The period in which an appeal with respect to this Confirmation Order must be filed shall commence immediately upon the entry of this Confirmation Order.

**LL. Retention of Jurisdiction**  Notwithstanding the entry of this Confirmation Order, from and after the Effective Date, this Court shall retain exclusive jurisdiction over this Chapter 11 Case and all matters arising under, arising out of, or related to, this Chapter 11 Case, including all matters listed in Article XI of the Plan or addressed by this Confirmation Order, as well as for the purposes set forth in section 1142 of the Bankruptcy Code, to the fullest extent legally permissible.

**MM. Sonder USA, Inc. claim** The estate's claims against Sonder USA, Inc. was sold to 2425 WL LLC or another entity designated by Ali Choudhri by order entered on May 15, 2024 (ECF No. 337), and those claims are no longer property of the estate.

001907

United States Bankruptcy Court
Southern District of Texas

**ENTERED**

July 03, 2024

Nathan Ochsner, Clerk

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO: 23-34815** |
| **GALLERIA 2425 OWNER, LLC,** | § | |
| | § | |
| Debtor. | § | |
| | § | **CHAPTER 11** |

**ORDER GRANTING AMENDED MOTION TO ALTER
OR AMEND ORDER IN PART (ECF NO. 586)**

This matter is before the Court on the Amended[1] Motion to Alter or Amend Order Denying Motion for Order Prohibiting Credit Bidding (ECF No. 586) filed by 2425 WL, LLC.  The movant failed to self-calendar this matter for hearing as required by this Court's procedures.[2]  In addition, as noted by movant, Federal Rule of Bankruptcy Procedure 9023 and Federal Rule of Civil Procedure 59(a)(2) requires that a motion for reconsideration must be filed within 14 days of the date the order was entered. The order at issue[3] was entered on June 17, 2024, and the motion to alter or amend order was not filed until July 2, 2024.  Although the Court does not believe that Federal Rule of Civil Procedure 15 allows this pleading to relate back to the erroneously filed document, it will address the motion's allegations as it agrees with one contention in the motion.

The Court is in agreement that a factual error occurred in its order that should be corrected. On page 3, the Court stated that "$801,509.42 was not paid within 210 days after the Effective Date as set forth in that agreement." That statement is incorrect.  The parties agree that the payment of $801,509.42 was made.  However, the parties also agreed that the Settlement Payment was not made in full by March 20, 2023, as required by the Settlement Agreement.

The Court does not agree with the remaining allegations in the motions.  First, the allegation regarding the letter dated June 28, 2023[4] does reference "an orderly closing" of July 3, 2023.  It also references drafts of various documents that have not yet been presented including

---

[1] Styled as an Amended Motion the Court cannot find a Motion that the movant can amend.  On July 1, 2024, the movant docketed a Motion to Amend (ECF No. 585), but the so-called motion is a proposed form of order.
[2] The Court Procedures can be found at the following website: http://www.txs.uscourts.gov/page/united-states-bankruptcy-judge-jeffrey-p-norman.
[3] ECF No. 535.
[4] ECF No. 499-36.

1 / 3

001908

loan and sale agreements, it requests confirmation on several points; including who the buyer/purchaser will be, when the payment will be made and whether there is agreement that the amount of $26,038,490.58 is correct.  Again, the Court reiterates that there was no valid acceptance by any party at that time.

The movant objects to the Court's opinion that documentary evidence contradicts the testimony of various attorneys in page 4 of the order.  Actually, the order does not address the attorneys' testimony on page 4.  Instead, the Court stated that it was the "movants and especially Choudhri go to great lengths to pass the blame for their non-payment to NBK of the Settlement Payment, in effect that he or others could not pay due to the actions of NBK." It was on that basis that the Court found that "upon review of the documentary evidence" it did not believe those allegations.

Lastly, the Court does not believe that it has to clarify why it ruled the way it did. Movant has presented no authority requiring such clarification.  The Court emphasized in its order that Section 363(k) of the Bankruptcy Code provides for credit bidding, unless the Court **for cause** orders otherwise.  The Court found no cause in this case to disallow credit bidding.

**THEREFORE, IT IS ORDERED** that the Motion to Alter or Amend Order Denying Motion for Order Prohibiting Credit Bidding is granted in part and the Order at ECF 535 is amended on page 3 as follows:

> Movants' initial objection to the credit bidding is that they contend that NBK does not have an allowed claim, and the extent or validity of its liens is genuinely in dispute. In support of this argument, it cites to *In re CS Mining*, which found that the right of a lienholder whose lien was not in bona fide dispute may bid at a sale. The court used the fact that there was an objection to the claim and an adversary as a starting point in its analysis to determine if there was cause to deny credit bidding. It found that it was only one factor, however, in its overall analysis whether or not to change the existing bidding procedures that were in place in that case. There was no evidence presented at the hearing that demonstrated that the debtor complied with the provisions of the Confidential Settlement Agreement regarding the Settlement Payment,[5] as the amount of $~~801,509.42~~ 27,000,000.00 was not paid within 210 days of the Effective Date as set forth in that agreement. In fact, there

---

[5] ECF No. 508-7, page 4

2 / 3

001909

was evidence submitted that the payment was not made.[6] Additionally, when the payment date was extended to July 3, 2023, by state court action, again the Settlement Payment was not made.

**SO ORDERED.**

 SIGNED 07/03/2024

_____
Jeffrey Norman
United States Bankruptcy Judge

---

[6] ECF No. 498-1, page 18 "[t]here's no dispute that the payment wasn't made in full by March 20,"